**MCDERMOTT WILL & EMERY LLP**
Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
Grayson Williams (TX 24124561)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone:    (214) 295-8000
Facsimile:    (972) 232-3098
Email:        mhelt@mwe.com
              jhaake@mwe.com
              gwilliams@mwe.com

**MCDERMOTT WILL & EMERY LLP**
Daniel M. Simon (*pro hac vice* pending)
Emily C. Keil (*pro hac vice* pending)
William A. Guerrieri (*pro hac vice* pending)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone:    (312) 372-2000
Facsimile:    (312) 984-7700
Email:        dsimon@mwe.com
              ekeil@mwe.com
              wguerrieri@mwe.com

*Proposed Counsel for the Debtors and
Debtors-in-Possession*

### IN THE UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTHCARE, INC., *et al.*, | ) | Case No. 25-80185 (SGJ) |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |
| | ) | |

## DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING <u>A FINAL HEARING, AND (V) GRANTING RELATED RELIEF</u>

---

[1]   The last four digits of Genesis Healthcare, Inc's federal tax identification number are 4755. There are 299 Debtors in these chapter 11 cases, for which the Debtors have requested joint administration. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

**EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 9:30 A.M. (CT) ON JULY 11, 2025.**

**IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

**A VIRTUAL HEARING WILL BE CONDUCTED ON THIS MATTER ON JULY 11, 2025 AT 9:30 A.M. (CT) AT THE EARLE CABELL FEDERAL BUILDING, 1100 COMMERCE STREET, 14TH FLOOR, COURTROOM 1, DALLAS, TEXAS, 75242.**

**YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**

**AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 1-650-479-3207. VIDEO COMMUNICATION WILL BE BY THE USE OF THE CISCO WEBEX PLATFORM. CONNECT VIA THE CISCO WEBEX APPLICATION OR CLICK THE LINK ON JUDGE JERNIGAN'S HOME PAGE. THE MEETING CODE IS 2304 154 2638. CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

**HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF ELECTRONIC HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE JERNIGAN'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**

Genesis Healthcare, Inc. ("Genesis") and certain of its affiliates and subsidiaries, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby move (the "Motion") for entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B** (the "Interim Order" and the "Final Order," respectively), granting the relief described below. In support thereof, the Debtors rely upon the *Declaration of Louis E. Robichaux IV in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"),[2] filed contemporaneously herewith. In further support of the Motion, the Debtors respectfully represent as follows:

---

[2] Capitalized terms used but not otherwise defined in this Motion shall have the meanings ascribed to them in the DIP Term Sheet (as defined below) or the First Day Declaration, as applicable.

## **RELIEF REQUESTED**

1.  By the Motion, the Debtors respectfully request entry of the Interim Order and the

Final Order (collectively, the "DIP Orders"):

- *DIP Facility*: authorizing the Debtors to obtain postpetition financing on a secured junior basis, consisting of a new money term loan facility (the "DIP Facility," and the loans issued thereunder, the "DIP Loans") in an aggregate principal amount of up to $30,000,000 pursuant to the terms and conditions set forth in the Interim Order and that certain term sheet attached to the Interim Order as Exhibit 1 (as may be amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Term Sheet"), executed by Genesis and FC-GEN Operations Investment, LLC, as borrower (the "DIP Borrowers"), and those certain Debtors identified as guarantors in the DIP Term Sheet (the "DIP Guarantors" and, together with the DIP Borrowers, the "DIP Loan Parties"), Markglen, Inc., as lender under the DIP Facility (in such capacity, the "Welltower DIP Lender"), OHI Mezz Lender LLC, as lender under the DIP Facility (in such capacity, the "Omega DIP Lender"), and CPE 88988 LLC, as lender under the DIP Facility (in such capacity, the "WAX DIP Lender" and, together with Welltower DIP Lender and Omega DIP Lender, the "DIP Lenders"), and Welltower OP LLC, upon execution of the DIP Credit Agreement, administrative and collateral agent (in such capacity, the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties");

- *DIP Loan Documents*:  authorizing the Debtors to enter into the DIP Term Sheet and, subject to a final order, that certain loan agreement by and among the DIP Borrowers, the DIP Guarantors, the DIP Lenders, and the DIP Agent (the "DIP Credit Agreement") and that certain promissory note evidencing the obligations due and owing under the DIP Credit Agreement (the "DIP Note") and any other agreements, instruments, pledge agreements, guarantees, indemnities, security agreements, intellectual property security agreements, control agreements, escrow agreements, instruments, notes, and documents executed in accordance and connection therewith (each as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, and collectively with the DIP Term Sheet, the DIP Credit Agreement, and the DIP Note, the "DIP Loan Documents");

- *DIP Facility Obligations*:  authorizing the DIP Borrowers to incur, and for the DIP Guarantors to guarantee on an unconditional joint and several basis, obligations for principal, interest, fees, costs, expenses, obligations (whether contingent or otherwise), and all other amounts, as and when due and payable under and in accordance with the Interim Order, the DIP Term Sheet, and the other DIP Loan Documents (collectively, the "DIP Facility Obligations");

- *Authorization*: authorizing the DIP Loan Parties to perform such other and further acts as may be necessary or desirable in connection with this Interim Order, the

3

DIP Term Sheet, the DIP Loan Documents, and the transactions contemplated hereby and thereby;

- ***DIP Liens***:  granting each of the DIP Lenders, jointly and severally, and authorizing the DIP Loan Parties to incur, the DIP Liens, as applicable, in all DIP Collateral having the priority described in the Interim Order;

- ***DIP Superpriority Claims***:  granting each of the DIP Lenders, jointly and severally, and authorizing the DIP Loan Parties to incur, allowed superpriority administrative expense claims against each of the DIP Loan Parties in respect of all DIP Facility Obligations, in each case, in accordance with the terms of the Interim Order;

- ***Cash Collateral***: authorizing the DIP Loan Parties' use of Prepetition Collateral, including Cash Collateral, as well as the proceeds of the DIP Facility, subject to the terms and conditions set forth in the Interim Order and the DIP Loan Documents;

- ***Adequate Protection***:  providing adequate protection to the Prepetition Secured Parties on account of any Diminution in Value (as defined in the Interim Order) of the Prepetition Secured Parties' interest in the Prepetition Collateral;

- ***Automatic Stay; Immediate Effectiveness***: modifying the automatic stay imposed by Bankruptcy Code section 362 solely to the extent necessary to implement and effectuate, including the right to exercise remedies following an Event of Default and expiration of any applicable notice period, the terms and provisions of the Interim Order and the DIP Loan Documents, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order, and providing for the immediate effectiveness of the Interim Order;

- ***506(c) and Equities of the Case Waivers***: upon entry of a Final Order providing for such relief and as set forth in paragraphs 25 and 27 of the Interim Order, authorizing the Debtors to waive as to the DIP Lenders and Prepetition Secured Parties (a) any rights to surcharge the DIP Collateral or any Prepetition Collateral pursuant to Bankruptcy Code section 506(c), and (b) any "equities of the case" exception under Bankruptcy Code section 552(b);

- ***Marshalling Waiver***:  upon entry of a Final Order providing for such relief, waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to (a) the DIP Collateral, for the benefit of any party other than the DIP Secured Parties, and (b) the Prepetition Collateral, for the benefit of any party other than the Prepetition Secured Parties, subject to the Carve Out; and

- ***Final Hearing***: scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, and approving the form of notice with respect to the Final Hearing.

4

2.     The Debtors also request that the DIP Orders authorize the Debtors' banks and other financial institutions to receive, process, honor, and pay any and all checks and other forms of payment drawn on the Debtors' bank accounts, including fund transfers and electronic payment requests, to the extent they relate to any of the foregoing and to rely on the Debtors' direction to pay amounts authorized under the Motion, provided that sufficient funds are available in the applicable accounts to make such payments.

## JURISDICTION AND VENUE

3.     The Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern District of Texas.  This matter is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

4.     The legal predicates for the relief requested herein are sections 105, 361, 362, 363 364(c), 364(d)(1), 364(e), 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rule(s) 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2002-1, 4001-1. 5005-1, and 9013-1 of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas* (the "Local Rules"), and Sections C and D of the *Procedures for Complex Cases in the Northern District of Texas*, effective February 6, 2023 (the "Complex Case Procedures").

## BACKGROUND

### I.     The Chapter 11 Cases

5.     On July 9, 2025 (the "Petition Date"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases")

in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court"). Contemporaneously herewith, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

6.     To date, the Office of the United States Trustee for Region 6 (the "U.S. Trustee") has not appointed an official committee in these Chapter 11 Cases, nor has any trustee or examiner been appointed.

7.     Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in the First Day Declaration.

## II.     Proposed Postpetition Financing

8.     As discussed in the First Day Declaration, the Company's liquidity challenges are not new. As part of the Company's continuing growth — both organically and through acquisitions — the Company transformed into a multi-billion-dollar operation with over 500 facilities in 34 states at its peak. With those acquisitions, however, came a complex web of legacy liabilities and operational challenges that built up over time. In addition, the COVID-19 pandemic and its resulting after-effects irrevocably changed the Company and the industry in ways that are still prevalent today.

9.     In the months prior to the Petition Date, the Company engaged constructively and collaboratively with the lenders under the Prepetition Term Loans to explore potential restructuring scenarios. As part of this process, the Debtors sought post-petition financing, which ultimately was memorialized in the DIP Term Sheet, proposed to be entered into by the DIP Loan

6

Parties and the DIP Secured Parties, which will supply the Debtors with critical and necessary postpetition debtor-in-possession financing.  The DIP Facility and the Debtors' ability to use Cash Collateral are essential to the Debtors' ability to maintain their business relationships with their employees, landlords, administrative personnel, vendors, and suppliers, and to meet their ongoing obligations to their residents.  In short, access to the proceeds of the DIP Facility and the use of Cash Collateral are crucial to the Debtors' continued viability during the Chapter 11 Cases.  Any disruption in operations would likely have a grave and immediate impact on the Debtors' businesses and negatively impact their chapter 11 effort.

10.     The DIP Facility consists of a postpetition junior secured debtor-in-possession credit facility in the form of a new money term loan facility in an aggregate principal amount of up to $30 million, with a maximum principal amount of $12 million available upon entry of the Interim Order, available upon satisfaction of certain conditions set forth in the DIP Term Sheet. The DIP Facility will be secured by (a) valid, binding, continuing, enforceable, fully-perfected first priority senior security interests in and liens on all property of the DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date are not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by Bankruptcy Code section 546(b)), and (b) valid, binding, continuing, enforceable, fully-perfected security interests in and liens on all property of the DIP Loan Parties (other than the property described in clause (a) above, as to which the liens and security interests in favor of the DIP Lenders will be as described in such clause), whether existing on the Petition Date or thereafter acquired, which DIP Liens shall be (A) subject only to the Carve Out, the ABL Obligations, Prepetition ABL Liens, ABL Adequate Protection, Prepetition Term Loan Obligations, Prepetition Term Loan Liens, Prepetition Term Loan Adequate Protection,

7

WELL/OHI Master Lease Obligations, WELL/OHI Master Lease Liens, WELL/OHI Master Lease Adequate Protection Liens, Prepetition Rochester Manor HUD Liens, Prepetition HUD Lender Liens, and Other Landlord Liens, and (B) senior to any and all other liens and security interests in the DIP Collateral.

11.     If approved, the proposed DIP Facility will provide the Debtors with access to much needed liquidity that will enable the Debtors to, among other things, honor employee wages and benefits, procure goods and services, fund general and corporate operating needs and the administration of these Chapter 11 Cases, and, most importantly, continue to provide quality care at the Debtors' Facilities, in each case in accordance with the Approved DIP Budget agreed upon by the Debtors and the DIP Lenders and attached as Exhibit 2 to the Interim Order.

12.     In addition, by this Motion, the Debtors seek the Court's authorization to use Cash Collateral.  The nature of the Debtors' business requires the Debtors to have immediate use of Cash Collateral.  Without it, the Debtors would be unable to operate their business and administer their estates, which would immediately and irreparably harm their stakeholders.  With access to Cash Collateral, the Debtors will be able to continue their operations and preserve value for the benefit of their estates and stakeholders.

13.     It is particularly important that the Debtors be granted authority to use Cash Collateral subject to the Prepetition ABL Liens.  Pursuant to the Prepetition ABL Documents, the Prepetition ABL Agent, for the benefit of itself and the Prepetition ABL Lenders, holds a priority lien on the Debtors' cash.  Because of the Debtors' existing borrowing base and reserve requirements imposed by the Prepetition ABL Documents, it was unclear to the Debtors whether the Prepetition ABL Lenders would provide the Debtors with any additional liquidity.  Accordingly, by this Motion, the Debtors are seeking the authority to use the Cash Collateral

subject to the Prepetition ABL Liens, with the Prepetition ABL Lenders being provided adequate
protection on account of their liens.

14. Overall, the DIP Facility is the culmination of extensive prepetition negotiations
between the Debtors and the DIP Secured Parties and is the only actionable proposal that the
Debtors' received. Access to the proposed DIP Facility will send a clear signal to the Debtors'
stakeholders that the Debtors' business is on the path to solid footing, encouraging them to work
cooperatively with the Debtors through the restructuring. As set forth in the First Day Declaration,
the Debtors and their estates would suffer immediate and irreparable harm if the Debtors were
denied the financing needed to sustain ongoing business operations during the critical first weeks
of these Chapter 11 Cases. First Day Decl. ¶¶ 108–110. The DIP Facility ensures that the Debtors
(a) have sufficient funding to consummate a value-maximizing restructuring transaction and
(b) can continue to operate uninterrupted in these Chapter 11 Cases. Further, as set forth in the
DIP Declaration, the terms of the DIP Facility are reasonable under the circumstances, and were
the product of good faith, arm's-length negotiations.

15. Accordingly, the relief requested by this Motion is necessary, both to preserve the
Debtors' operations and provide a bridge to consummation of a comprehensive restructuring
transaction. For the reasons set forth in this Motion, the First Day Declaration, and the
DIP Declaration, the Debtors firmly believe that the DIP Facility and continued use of Cash
Collateral, on the terms set forth in the Interim Order, are necessary to avoid immediate and
irreparable harm and are in the best interests of the Debtors, their estates, and all stakeholders. The
Debtors respectfully request that the Court enter the Interim Order.

III.    **Concise Summary of Terms of DIP Facility**

A.      **Summary of Material Terms**

16.    Under the disclosure requirements of Bankruptcy Rule 4001(b), (c) and (d) and Section D.13 of the Complex Case Procedures, the following table concisely summarizes the significant terms of the DIP Facility and the Interim Order:[3]

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| **Borrower**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Genesis, a Delaware limited liability company, and FC-GEN Operations Investment, LLC, a Delaware limited liability company, each in its capacity as a debtor and debtor-in-possession.<br><br>**(DIP Term Sheet, Borrower)** |
| **Guarantors**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Each of the Borrower's direct and indirect affiliates and subsidiaries that commence Chapter 11 Cases on or after the Petition Date, including without limitation such affiliates and subsidiaries as set forth on <u>Exhibit B</u> of the DIP Term Sheet.<br><br>**(DIP Term Sheet, Guarantors)** |
| **DIP Secured Parties**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | DIP Lenders:    Markglen, Inc., OHI Mezz Lender LLC, and CPE 88988 LLC<br><br>DIP Agent:        Welltower OP LLC, as the administrative and collateral agent<br><br>**(DIP Term Sheet, DIP Secured Parties)** |
| **Amount and Type of Facilities**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | A junior secured debtor-in-possession credit facility comprised of a term loan credit facility available in two draws in an aggregate principal amount equal to $30,000,000, which shall be available as term loans upon entry of the Interim Order and satisfaction of the other conditions set forth therein in an initial amount not to exceed the amount reflected in the Budget and the remainder available upon entry of the Final Order.<br><br>**(DIP Term Sheet, Type and Amount of the DIP Facility)** |
| **Interest Rates, Fees, and Expenses**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Interest Rate**.  15%, with such interest payable monthly in arrears in kind (i.e., by adding such outstanding interest to the aggregate principal amount of the DIP Loans) on the monthly anniversary of the Petition Date, computed based on a 365/366-day year; *provided* that any and all accrued and unpaid (in cash) interest shall be due and payable in cash upon the DIP Termination Date. |

---

[3]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced including, without limitation, the DIP Term Sheet and the Interim Order. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.

| | |
|---|---|
| **MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING** | |

| | |
|---|---|
| | **(DIP Term Sheet, Interest)** |
| | **Default Rate**. An additional 2% per annum above the applicable interest rate if an Event of Default under the DIP Loan Documents has occurred and is continuing. |
| | **(DIP Term Sheet, Default Interest)** |
| | **Upfront Fee**: Each DIP Lender shall receive an upfront fee, payable-in-kind (i.e., by adding such fee to the aggregate principal amount of the DIP Loans) equal to 2% of such DIP Lender's DIP Commitment under the DIP Facility, which shall be fully earned, non-refundable, and due and payable upon the Closing Date. |
| | **Exit Fee**: Each DIP Lender shall receive a payable-in-cash exit fee (the "Exit Fee") equal to 4% of such DIP Lender's initial DIP Commitment, which shall be fully earned and non-refundable on the Closing Date, and payable on the DIP Termination Date; *provided, however*, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Loan Documents, then the Exit Fee shall not be payable until the DIP Facility Obligations have been accelerated by the DIP Lenders. |
| | **(DIP Term Sheet, Fees)** |
| | **Expenses**: All fees, including reasonable and documented out-of-pocket legal and other professional fees (limited to the reasonable and documented fees of the advisors) related to negotiating, documenting, approving, administering, monitoring or enforcing any rights under the DIP Facility of each DIP Lender shall be paid by the Debtors promptly upon written demand and without the requirement of Court approval. |
| | **(DIP Term Sheet, Expenses)** |
| **Maturity**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | All DIP Obligations will be due and payable in full in cash unless otherwise agreed to in writing (email being sufficient) by each of the DIP Lenders on the earliest of (i) the date that is 210 calendar days after the Petition Date (or such later date as agreed to by each of the DIP Lenders), (ii) if the Final DIP Order has not been entered, 35 calendar days after the Petition Date (or such later date as agreed to by each of the DIP Lenders), (iii) the acceleration of the DIP Loans and the termination of the DIP Commitments upon the occurrence of an event referred to in the DIP Term Sheet under "Termination", (iv) the effective date of any chapter 11 plan of reorganization or liquidation of the Borrower or any other Loan Parties (the "Plan"), (v) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (vi) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (vii) the closing of any sale of assets under section 363 of the U.S. Bankruptcy Code, which when taken together with all other sales of assets since the Closing Date, constitutes a sale of all or substantially all of the assets of the Loan Parties, (viii) the date an order is entered in any Bankruptcy Case appointing a chapter 11 trustee or examiner with enlarged powers, |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | (ix) the date on which the Debtors consent to the standing of any party, including a Committee to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, any Challenge, and (x) the date on which a Challenge Proceeding is commenced by any party, including the Debtors or a Committee (each, a "<u>DIP Termination Event</u>" and the earliest of any such date, the "<u>DIP Termination Date</u>"). Principal of, and accrued interest on, the DIP Loans and all other amounts owing to the DIP Lenders under the DIP Facility shall be due and payable in cash on the DIP Termination Date.<br><br>The occurrence of the DIP Termination Date shall terminate the ability of the Borrower to borrow the Initial Draw or the Final Draw and shall terminate the DIP Commitments and any further obligation each DIP Lender has to make any DIP Loans under the DIP Loan Documents.<br><br>**(DIP Term Sheet, Maturity)** |
| <u>**Mandatory Prepayments**</u><br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Subject to the senior rights of the ABL Lenders in Prepetition ABL Collateral, the Prepetition Term Loan Lenders in Prepetition Term Loan Collateral, the WELL/OHI Master Lease Secured Parties in WELL/OHI Master Lease Collateral, and the Other Landlords in Other Landlord Collateral, the following amounts shall be indefeasibly paid in cash in satisfaction of the DIP Obligations within two (2) business days of receipt, except as such amounts are set forth in the Budget and are necessary to satisfy the expenditures set forth in the Budget:<br><br>   i.      100% of the net proceeds of asset sales.<br>   ii.     100% of the net proceeds of insurance and condemnation awards.<br>   iii.    100% of the net proceeds of any debt issuance or equity issuance.<br>   iv.    100% of proceeds of claims and causes of action.<br><br>**(DIP Term Sheet, Mandatory Prepayments)** |
| <u>**Security and Priority**</u><br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(i)* | As security for all obligations of the Borrower and the Guarantors to the DIP Lenders under the DIP Facility, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees and expenses or any other amounts due (collectively, the "<u>DIP Obligations</u>"), effective and automatically perfected upon the date of the Interim DIP Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by any DIP Lender of, or over, any DIP Collateral, the following security interests and liens will be granted by the Debtors to the DIP Lenders, subject only to the ABL Obligations, Prepetition ABL Liens, ABL Adequate Protection, Prepetition Term Loan Obligations, Prepetition Term Loan Liens, Prepetition Term Loan Adequate Protection, WELL/OHI Master Lease Obligations, WELL/OHI Master Lease Liens, WELL/OHI Master Lease Adequate Protection Liens, Prepetition Rochester Manor HUD Liens, Prepetition HUD Lender Liens, Other Landlord Liens, payment of the Carve Out to the extent provided for herein and the Permitted Liens (if any) (all such liens and security interests granted to the DIP Lenders under the Interim DIP |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
| --- |

Order and the DIP Loan Documents, the "<u>DIP Liens</u>," and the property subject to the DIP Liens, collectively, the "<u>DIP Collateral</u>"):

i.   <u>First Lien on Unencumbered Property</u>:  Under section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien on all property of the Loan Parties, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), including, but not limited to, all of the Loan Parties' respective rights, title, or interest in and to the following assets to the extent unencumbered: cash and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds and proceeds therefrom, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, all of the issued and outstanding capital stock of each Loan Party, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, beneficial interests in any trust, money, investment property, causes of action (including, for the avoidance of doubt, but subject to entry of the Final DIP Order, all proceeds of the Loan Parties' respective claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law (the "<u>Avoidance Actions</u>")), and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits, and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located;

ii.   <u>Priming Liens and Liens Junior to Certain Other Liens</u>:  Under sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien on all property of the Loan Parties (other than the property described in clause (i) above, as to which the liens and security interests in favor of the DIP Lenders will be as described in such clause), whether existing on the Petition Date or thereafter acquired including, but not limited to, all of the Loan Parties' respective rights, title, or interest in and to the following assets: cash and any investment of such cash, accounts, inventory, goods,

| | |
|---|---|
| **MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING** | |
| | contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds and proceeds therefrom, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, all of the issued and outstanding capital stock of each Loan Party, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, beneficial interests in any trust, money, investment property, causes of action (including, for the avoidance of doubt, but subject to entry of the Final DIP Order, all proceeds of Avoidance Actions), and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits, and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, which DIP Liens shall be (A) subject only to the Carve Out, the ABL Obligations, Prepetition ABL Liens, ABL Adequate Protection, Prepetition Term Loan Obligations, Prepetition Term Loan Liens, Prepetition Term Loan Adequate Protection, WELL/OHI Master Lease Obligations, WELL/OHI Master Lease Liens, WELL/OHI Master Lease Adequate Protection Liens, Prepetition Rochester Manor HUD Liens, Prepetition HUD Lender Liens, and Other Landlord Liens (in each case, to the extent such liens and security interests are valid, perfected and nonavoidable as of the Petition Date, the "<u>Permitted Liens</u>"), and (B) senior to any and all other liens and security interests in the DIP Collateral.<br><br>Except to the extent expressly permitted hereunder (including, for the avoidance of doubt, the Prepetition ABL Liens, Prepetition Term Loan Liens, WELL/OHI Master Lease Liens, Other Landlord Liens, HUD Liens, and adequate protection with respect to the foregoing, as applicable), subject to the Carve Out, the DIP Liens and the DIP Superpriority Claims shall not be made subject to or *pari passu* with (a) any lien, security interest, or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any subsequently converted Chapter 11 Case of the Debtor to a case under chapter 7 of the Bankruptcy Code and any lien or security interest granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board, or court for any liability of the Debtors, (b) any lien or security interest that is avoided or preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (c) any intercompany or affiliate claim, lien, or security interest of the Debtors or their affiliates, or |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | (d) any other lien, security interest, or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof.<br><br>**(DIP Term Sheet, Priority and Security under DIP Facility; Interim Order, ¶ 5)** |
| **DIP Budget and Reporting**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Subject to the satisfaction of the conditions precedent set forth below, use of cash shall be subject to a 13-week cash flow forecast commencing on the Petition Date, which forecast shall include an itemized list of expenses to be incurred during each week along with information sufficient to denote the purpose of such expenses and shall be in form and substance acceptable to each of the DIP Lenders in their sole discretion (the "<u>Budget</u>," a copy of the initial Budget is attached as <u>Exhibit A</u> to the DIP Term Sheet) and shall, at a minimum, contain the categories set forth in the Budget attached as <u>Exhibit A</u> to the DIP Term Sheet (each, a "<u>Reporting Category</u>").<br><br>By no later than 5:00 pm ET on the fourth business day of each week, commencing with the fourth full week after the Petition Date (each, a "<u>Reporting Date</u>"), Borrower shall deliver to the DIP Lenders a variance report (each, a "<u>Variance Report</u>") showing comparisons of actual results for each line item against such line item in the Budget.  Each Variance Report shall indicate whether there are any adverse variances that exceed the allowed variances, which means, in each case measured on a cumulative basis for the prior four-week period and for the period from the Petition Date, (x) up to 15% in the aggregate for all "Total Operating Disbursements," excluding, for the avoidance of doubt, "Non-Operating Disbursements" and "Restructuring Disbursements" and (y) up to 15% in the aggregate for all "Total Receipts" (all as defined in the Budget) (each, a "<u>Permitted Variance</u>")<br><br>If necessary, the Debtors may provide to the DIP Lenders an updated 13-week cash flow forecast, containing line items of sufficient detail to reflect the Debtors' projected cash receipts and disbursements for such 13-week period on a weekly basis (the "<u>Updated 13-Week Forecast</u>").  Such Updated 13-Week Forecast shall be acceptable to each of the DIP Lenders in their sole discretion, and upon acceptance by each of the DIP Lenders, such Updated 13-Week Forecast shall become the new Budget commencing on such week, and promptly after ethe DIP Lenders approve the new Budget, the Debtors shall deliver the new Budget, together with any amendments or modifications thereto approved by each of the DIP Lenders.  In the event that the DIP Lenders and the Debtors do not agree to an updated Budget, the Budget shall be the then-existing Budget or such Budget as may be approved by the Bankruptcy Court after a hearing.<br><br>**(DIP Term Sheet, Financial Reporting Requirements)** |
| **Lending Conditions**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Lenders' obligations to fund the Initial Draw will be subject to each of the following conditions precedent satisfied to each of the DIP Lenders' sole discretion:<br><br>    i.    All "first day" motions, including those related to the DIP Facility, filed by the Debtors and related interim and final orders, as applicable, |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
|---|

|  |  |  |
|---|---|---|
|  |  | entered within 3 business days of the Petition Date by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to each of the DIP Lenders. |
|  | ii. | The DIP Lenders shall have received a Budget in form and substance satisfactory to each of the DIP Lenders. Entry by the Bankruptcy Court of the Interim DIP Order authorizing the secured financing under the DIP Facility on the terms and conditions contemplated by this DIP Term Sheet, authorizing the Debtors' use of DIP Collateral subject to the terms provided herein, and otherwise on terms reasonably acceptable to each of the DIP Lenders no later than 3 business days after the Petition Date, and such Interim DIP Order shall be in full force and effect and not have been vacated, reversed, stayed, modified or amended (except in the case of a modification or amendment as consented to by each of the DIP Lenders, in their sole discretion) and shall not be subject to a stay pending appeal or motion for leave to appeal or other proceeding to set aside any such order or the challenge to the relief provided for in it, except as consented to by each of the DIP Lenders. |
|  | iii. | Entry by the Bankruptcy Court of an order authorizing, on an interim basis, the use of Cash Collateral and providing for adequate protection in favor of the Prepetition Secured Parties on terms satisfactory to the Prepetition Secured Parties. |
|  | iv. | The DIP Lenders shall have a valid and perfected lien on and security interest in the DIP Collateral of the Debtors on the basis and with the priority set forth herein. |
|  | v. | All out-of-pocket costs, fees and expenses required to be paid to the DIP Lenders under this DIP Term Sheet, the DIP Loan Documents or the Interim DIP Order shall have been paid. |
|  | vi. | No default or Event of Default shall have occurred, and shall be continuing, under the DIP Term Sheet immediately prior to the funding of the DIP Loans or would result from such borrowing of the DIP Loans. |
|  | vii. | The Borrower shall have delivered to the DIP Lenders a customary borrowing notice. |
|  | viii. | Other than the Chapter 11 Cases, as stayed upon the commencement of the Chapter 11 Cases, or as disclosed in writing to the DIP Lenders prior to the Petition Date, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in writing in any court or before any arbitrator or governmental authority that (a) would reasonably be expected to result in a material adverse effect, or (b) restrains, prevents or purports to affect materially |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | adversely the legality, validity or enforceability of the DIP Facility or the consummation of the transactions contemplated thereby.<br><br>ix.   The making of the Initial Draw shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently.<br><br>**(DIP Term Sheet, Conditions Precedent to Initial Draw)** |
| **Entities with an Interest in Cash Collateral**<br>*Fed. R. Bankr. P. 4001(b)(1)(B)(i)* | As of the Petition Date, the following secured parties have an interest in Cash Collateral:<br><br>• Prepetition ABL Secured Parties<br><br>• Prepetition Term Loan Secured Parties<br><br>• Rochester Manor HUD Lender (as defined below)<br><br>• Internal Revenue Service<br><br>• HUD (as defined below)<br><br>**(Interim Order, ¶ E)** |
| **Use of Proceeds**<br>*Fed. R. Bankr. P. 4001(b)(1)(B)(ii), 4001(c)(1)(B)* | Proceeds of the DIP Loans and Cash Collateral shall be used, in each case subject to the Budget (including Permitted Variances) and the terms and conditions of the DIP Term Sheet, the Interim DIP Order, the Final DIP Order, and the DIP Loan Documents, to (i) provide working capital and for other general corporate purposes of the Debtors, (ii) fund the costs of the administration of the Chapter 11 Cases (including professional fees and expenses), and (iii) fund fees and other payments contemplated in respect of the DIP Facility.<br><br>Without in any way limiting the foregoing, no DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve Out, or any other cash or funds may be used, directly or indirectly, by any of the Debtors, any official committee appointed in the Chapter 11 Cases (the "Committee"), or any trustee or other estate representative appointed in the Chapter 11 Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):  (a) to object to, contest, prevent, hinder, delay, or interfere with, in any way, the DIP Secured Parties' or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral, Prepetition Collateral, or Cash Collateral, following the occurrence and continuation of a DIP Termination Event ; or (b) to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, against any of the Prepetition Secured Parties, DIP Agent, and DIP Lenders, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
|---|

advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (in each case, in their respective capacities as such) with respect to any transaction, occurrence, omission, action, or other matter arising under, in connection with, or related to the Interim DIP Order, the DIP Facility, the DIP Loan Documents, the DIP Facility Obligations, the Prepetition Liens, the Prepetition Secured Obligations, or the Prepetition Secured Documents or the transactions contemplated therein or thereby, or any other matters relating to the Debtors, including, without limitation, (A) any Avoidance Actions, (B) any so-called "lender liability" claims and causes of action, (C) any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superpriority Claims, the DIP Liens, the DIP Loan Documents, the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition ABL Obligations, the Prepetition ABL Documents, the Prepetition ABL Liens, the Prepetition Term Loan Documents, Prepetition Term Loan Liens, the Welltower Master Lease Agreement, the Welltower Master Lease Documents, the Welltower Master Lease Liens, the Omega Master Lease Agreement, the Omega Master Lease Documents, or the Omega Master Lease Liens, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, subordinate, or recharacterize in whole or in part, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the Prepetition ABL Obligations, the Prepetition Collateral, the Adequate Protection Liens, and the Adequate Protection Claims, or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any of the DIP Secured Parties hereunder or under any of the DIP Loan Documents or the Prepetition Secured Parties hereunder or under any of the Prepetition Secured Documents, as applicable (in each case, including, without limitation, claims, proceedings, or actions that might prevent, hinder, or delay any of the DIP Secured Parties, or the Prepetition Secured Parties' assertions, enforcements, realizations, or remedies on or against the DIP Collateral or Prepetition Collateral in accordance with the applicable DIP Loan Documents or Prepetition Secured Documents and the Interim DIP Order and/or the Final DIP Order (as applicable)); *provided*, that (i) no more than $25,000 in the aggregate of the DIP Collateral, the Carve Out or Cash Collateral, proceeds from the borrowings under the DIP Facility or any other amounts, may be used for allowed fees and expenses incurred solely by any Committee (if appointed) in investigating, but not objecting to, challenging, litigating, opposing, prosecuting, or seeking to subordinate or recharacterize the validity, enforceability, perfection, and priority of the Prepetition Liens, the Prepetition Secured Documents, the Adequate Protection Liens, or the Adequate Protection Claims prior to the Challenge Deadline, (ii) no more than an additional $25,000 in the aggregate of the DIP Collateral, the Carve Out or Cash Collateral, proceeds from the borrowings under the DIP Facility or any other amounts, may be used for allowed fees and expenses incurred solely by any Committee (if appointed) in investigating the claims and/or liens of the WAX/MAO Term Lenders and each of their respective officers, directors,

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing (collectively, the "WAX/MAO Investigation Parties"), and (iii) no DIP Collateral (including Cash Collateral) or any proceeds thereof shall be used to investigate, object to, challenge, litigate, oppose, or prosecute any cause of action against the DIP Secured Parties (in their capacity as such), including seeking to subordinate or recharacterize the validity, enforceability, perfection, and priority of the DIP Liens, the DIP Superpriority Claims, the DIP Loans, or the DIP Loan Documents.  Except to the extent expressly permitted by the terms of the DIP Loan Documents and this Interim Order or any further order of this Court, none of the Debtors, any Committee (if appointed), or any trustee or other estate representative appointed in the Chapter 11 Cases or any other person or entity may use or seek to use Cash Collateral or, to sell, or otherwise dispose of DIP Collateral or Prepetition Collateral, in each case, without the consent of each of the DIP Lenders.<br><br>**(DIP Term Sheet, Use of Proceeds; Interim Order, ¶ 23)** |
| **Stipulations as to Prepetition Liens and Claims**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii)* | After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties in interest, the Debtors, on their behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree to certain stipulations regarding the validity and extent of the Prepetition Secured Parties' claims and liens, but subject to paragraph 24 of the Interim Order.<br><br>**(Interim Order, ¶¶ E, 24)** |
| **Effect of Stipulations**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii)* | The Debtors' Stipulations shall be binding on the Debtors in all circumstances upon entry of the Interim Order.  The Debtors' Stipulations shall be binding on each other party in interest upon the occurrence of the Challenge Deadline, including, without limitation, any official committee, unless, and solely to the extent that a Challenge Proceeding is commenced prior to the Challenge Deadline.<br><br>**(Interim Order, ¶ 24)** |
| **Adequate Protection**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ii)* | *ABL Adequate Protection*.  As adequate protection for the interests of the Prepetition ABL Secured Parties in the Prepetition ABL Collateral (including Cash Collateral), under sections 361, 362, and 363(e) of the Bankruptcy Code, and as a condition for the use of their Prepetition Collateral, including any Cash Collateral, the Prepetition ABL Secured Parties will be granted the following (collectively, the "ABL Adequate Protection"):<br><br>i.    ABL Adequate Protection Liens: Solely to the extent of any Diminution in Value of any Prepetition ABL Secured Party's interests in Prepetition ABL Collateral and in each case subject and subordinate to the Carve Out and any other prepetition Permitted Lien expressly permitted to be senior in priority to the ABL Liens on the Petition Date, the Prepetition ABL Secured Parties are granted the following security interests and liens (collectively, the "ABL Adequate Protection Liens") under sections 361, 362, 363 of |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
|---|

the Bankruptcy Code: valid, binding, enforceable, and perfected replacement liens on and security interests in assets of the type and nature that would be deemed Prepetition ABL Collateral but for the filing of these cases, and the proceeds thereof. For the avoidance of doubt, the DIP Liens, Prepetition Term Loan Adequate Protection Liens, and the WELL/OHI Master Lease Adequate Protection Liens shall be subject, subordinate and junior to all ABL Adequate Protection Liens on assets of the type and nature that would be deemed Prepetition ABL Collateral but for the filing of these cases, and the proceeds thereof.

ii. <u>ABL Adequate Protection Superpriority Claims</u>: Solely to the extent of any Diminution in Value of any Prepetition ABL Secured Party's interests in Prepetition Collateral and in each case subject and subordinate to the Carve Out, the Prepetition ABL Secured Parties will be granted an allowed superpriority administrative expense claim under sections 503(b) and 507(b) of the Bankruptcy Code against the applicable Debtors (collectively, the "<u>ABL Adequate Protection Superpriority Claims</u>"). All ABL Adequate Protection Superpriority Claims shall have priority over any and all administrative expenses and other claims against the applicable Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under the Bankruptcy Code.

iii. <u>ABL Adequate Protection Payments</u>: No later than the fifth Business Day following entry of the Interim DIP Order and on the fifth Business Day of each month hereafter, Debtors shall pay the Prepetition ABL Agent adequate protection in the form of interest, that has accrued at the non-default rate on the Prepetition ABL Obligations as of the Petition Date to be applied by the Prepetition ABL Agent in accordance with the Prepetition ABL Documents.

iv. As further adequate protection, the Debtors will reimburse each Prepetition ABL Secured Party for all reasonable and documented out-of-pocket fees, costs and expenses of such Prepetition ABL Secured Party (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses, including one (1) local counsel and one (1) prepetition credit counsel). All such fees, including reasonable and documented out-of-pocket legal and other professional fees shall be paid by the Debtors promptly upon written demand and without the requirement of Bankruptcy Court approval.

For the avoidance of doubt and except for the ABL Adequate Protection Liens and the ABL Adequate Protection Superpriority Claims, (a) the respective rights, interests obligations, priority, and positions as between the Prepetition

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
|---|

|  | ABL Secured Parties and the Prepetition Term Loan Secured Parties shall continue to be governed by the ABL/Term Loan Intercreditor Agreement; and (b) the respective rights, interests obligations, priority, and positions as between the Prepetition ABL Secured Parties and the WELL/OHI Master Lease Landlords shall continue to be governed by the ABL/Landlord Intercreditor Agreements.<br><br>_Prepetition Term Loan Adequate Protection_:  As adequate protection for the interests of the Prepetition Term Loan Secured Parties in the Prepetition Collateral (including Cash Collateral), under sections 361, 362 and 363(e) of the Bankruptcy Code, and as a condition for the use of the Prepetition Collateral, including any Cash Collateral, the Prepetition Term Loan Secured Parties will be granted the following (collectively, the "Prepetition Term Loan Adequate Protection"): |

     i.     Prepetition Term Loan Adequate Protection Liens.  Solely to the extent of, and in an aggregate amount equal to, any Diminution in Value of any Prepetition Term Loan Secured Party's interests in such Prepetition Term Loan Secured Party's Prepetition Collateral, from and after the Petition Date, the Prepetition Term Loan Lenders are granted the following security interests and liens (collectively, the "Prepetition Term Loan Adequate Protection Liens" and the collateral subject thereto, the "Prepetition Term Loan Adequate Protection Collateral") under sections 361, 362, and 363 of the Bankruptcy Code: valid, binding, enforceable, and perfected replacement liens on and security interests in the Prepetition Collateral, including now-owned and hereafter-acquired real and personal property, assets, and rights of any kind or nature, wherever located, which liens and security interests shall be junior to (a) the Carve Out and (b) the Prepetition ABL Agent's prepetition liens and the ABL Adequate Protection Liens (subject to such liens solely with respect to assets of the type and nature that would be deemed Prepetition ABL Collateral but for the filing of these cases).

     ii.    Prepetition Term Loan Adequate Protection Superpriority Claims.  Solely to the extent of, and in an aggregate amount equal to, any Diminution in Value of its respective Prepetition Collateral, and in each case, subject and subordinate to the Carve Out and the ABL Adequate Protection Superpriority Claims, each Prepetition Term Loan Secured Party is hereby granted an allowed superpriority administrative expense claim under sections 503(b) and 507(b) of the Bankruptcy Code against the applicable Debtors (collectively, the "Prepetition Term Loan Adequate Protection Superpriority Claims"). All Prepetition Term Loan Adequate Protection Superpriority Claims shall be junior to (a) the Carve Out and (b) the ABL Adequate Protection Superpriority Claims, and otherwise have priority over any and all other administrative expenses and other claims against the applicable Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses

21

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
|---|

of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under the Bankruptcy Code.

iii.   <u>Prepetition Term Loan Adequate Protection Payments</u>:  No later than the fifth Business Day following entry of the Interim DIP Order and on the fifth Business Day of each month hereafter, Debtors shall pay the Prepetition Term Loan Agent adequate protection on partial account of interest that has accrued on the Prepetition Term Loan Obligations in the amounts set forth in the Budget, to be applied by the Prepetition Term Loan Agent in accordance with the Prepetition Term Loan Documents.

iv.   As further adequate protection, the Debtors will reimburse each Prepetition Term Loan Secured Party for all reasonable and documented out-of-pocket fees, costs and expenses of (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses, including one (1) local counsel). All such fees, including reasonable and documented out-of-pocket legal and other professional fees shall be paid by the Debtors promptly upon written demand and without the requirement of Bankruptcy Court approval; *provided, however*, that in the event such fees and expenses exceed the amounts set forth in the DIP Budget, any excess amounts shall be added to the principal balance of the DIP Loans.

*Master Lease Adequate Protection*:  As adequate protection for the interests of the WELL/OHI Master Lease Secured Parties in the Prepetition Collateral (including Cash Collateral), under sections 361, 362 and 363(e) of the Bankruptcy Code, and as a condition for the use of the Prepetition Collateral, including any Cash Collateral, the WELL/OHI Master Lease Secured Parties are hereby granted the following (collectively, the "<u>WELL/OHI Master Lease Adequate Protection</u>"):

i.   <u>Master Lease Adequate Protection Liens</u>:  Solely to the extent of, and in an aggregate amount equal to, any Diminution in Value of any WELL/OHI Master Lease Secured Party's interests in such WELL/OHI Master Lease Collateral, from and after the Petition Date, the WELL/OHI Master Lease Secured Parties are granted the following security interests and liens (collectively, the "<u>WELL/OHI Master Lease Adequate Protection Liens</u>" and the collateral subject thereto, the "<u>WELL/OHI Master Lease Adequate Protection Collateral</u>") under sections 361, 362, and 363 of the Bankruptcy Code:  valid, binding, enforceable, and perfected replacement liens on and security interests in the Prepetition Collateral, including now-owned and hereafter-acquired real and personal property, assets, and rights of any kind or nature, wherever located, which liens and security interests shall be junior to (a) the Carve-Out, (b) the Prepetition ABL Agent's prepetition liens, (c) the ABL Adequate

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | Protection Liens, (d) the Prepetition Term Loan Liens, and (e) the Prepetition Term Loan Adequate Protection Liens. |
| | ii.  <u>Master Lease Adequate Protection Superpriority Claims</u>. Solely to the extent of, and in an aggregate amount equal to, any Diminution in Value of its respective Prepetition Collateral, and in each case, subject and subordinate to the Carve Out, the ABL Adequate Protection Superpriority Claims, and the Prepetition Term Loan Adequate Protection Superpriority Claims, each WELL/OHI Master Lease Secured Party is hereby granted an allowed superpriority administrative expense claim under sections 503(b) and 507(b) of the Bankruptcy Code against the applicable Debtors (collectively, the "<u>WELL/OHI Master Lease Adequate Protection Superpriority Claims</u>"). All WELL/OHI Master Lease Adequate Protection Superpriority Claims shall be junior to (a) the Carve Out, (b) the ABL Adequate Protection Superpriority Claims, and (c) the Prepetition Term Loan Adequate Protection Superpriority Claims. |
| | iii.  As further adequate protection, the Debtors will reimburse each WELL/OHI Master Lease Secured Party for all reasonable and documented out-of-pocket fees, costs and expenses of (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses, including one (1) local counsel). All such fees, including reasonable and documented out-of-pocket legal and other professional fees shall be paid by the Debtors promptly upon written demand and without the requirement of Bankruptcy Court approval; *provided, however*, that in the event such fees and expenses exceed the amounts set forth in the DIP Budget, any excess amounts shall be added to the principal balance of the DIP Loans. |
| | **(DIP Term Sheet, Adequate Protection; Interim Order ¶ 9)]** |
| **Covenants**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | **Affirmative Covenants**: Customary for transactions of this type (and to include reporting covenants (including with respect to the Budgets and Permitted Variances) and consistent with the Prepetition Term Loan Agreement, the delivery of all material pleadings, motions and other material documents filed with the Bankruptcy Court on behalf of the Debtors in the Chapter 11 Cases to the DIP Lenders and their counsel, to the extent practical under the circumstances, update meetings and/or calls with the DIP Lenders as reasonably requested).<br><br>**Negative Covenants**: Customary for transactions of this type (and to include limitations on indebtedness, liens, investments, acquisitions, restricted payments and dispositions of assets) and consistent with the Prepetition Term Loan Agreement.<br><br>**(DIP Term Sheet, Affirmative Covenants, Negative Covenants)** |

| **MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING** |  |
|---|---|
| **Events of Default and DIP Termination**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | "Events of Default" shall include the following and any other defaults specified as such in the DIP Orders, each of which may only be waived in writing by each of the DIP Lenders:<br><br>i.   failure to make payments including adequate protection payments when due;<br><br>ii.  noncompliance with covenants (subject to customary cure periods as may be agreed with respect to certain covenants);<br><br>iii. breaches of representations and warranties in any material respect, in either case, under the DIP Loan Documents;<br><br>iv. invalidity of any material provision of the DIP Loan Documents;<br><br>v.  change in ownership or control;<br><br>vi. filing of a Plan by the Debtors that does not propose to indefeasibly repay the DIP Obligations, to the extent outstanding, in full in cash on the Plan effective date, unless otherwise consented to in writing by each of the DIP Lenders prior to its filing;<br><br>vii. any of the Debtors shall file a pleading seeking to vacate or modify the Interim DIP Order or the Final DIP Order over the objection of the DIP Lenders;<br><br>viii. entry of an order without the prior written consent of each of the DIP Lenders amending, supplementing or otherwise modifying the Interim DIP Order or the Final DIP Order;<br><br>ix. entry of an order without the express written consent of each of the DIP Lenders obtaining additional financing from a party other than the DIP Lenders under section 364(d) of the Bankruptcy Code except if such financing contemplates payment in full of the DIP Obligations;<br><br>x.  reversal, vacatur or stay of the effectiveness of the Interim DIP Order or the Final DIP Order except to the extent reversed within ten (10) business days;<br><br>xi. any violation of any material term of the Interim DIP Order or the Final DIP Order by the Debtors;<br><br>xii. termination of the Debtors' right to use Cash Collateral as permitted hereunder;<br><br>xiii. failure to comply with the Budget, including Permitted Variances; |

24

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
| --- |

|  | xiv. | entry of an order in favor of the objector, movant or plaintiff any timely filed Challenge Proceeding; |
|  | xv. | dismissal of the Chapter 11 Case of a Debtor with material assets or conversion of the Chapter 11 Case of a Debtor with material assets to a case under chapter 7 of the Bankruptcy Code, or any Debtor shall file a motion or other pleading seeking such dismissal or conversion of any Bankruptcy Case; |
|  | xvi. | appointment of a chapter 11 trustee or examiner with enlarged powers, or any Debtor shall file a motion or other pleading seeking such appointment; |
|  | xvii. | failure to meet a Milestone, unless extended or waived by the prior written consent (email being sufficient) of each of the DIP Lenders; |
|  | xviii. | the Debtors' filing of a motion to reject the WELL/OHI Master Lease Documents or modify the claim(s) of the WELL/OHI Master Lease Landlords or the failure of the Debtors to make any payment when due (without taking into account any stays or other relief provided by commencement of the Chapter 11 Cases) of postpetition Rents (as defined in the WELL/OHI Master Lease Documents) accruing on account of the WELL/OHI Master Lease Obligations, unless otherwise waived by the prior written consent (email being sufficient) of the applicable WELL/OHI Master Lease Landlord, or the failure of the Debtors to make any payment when due (without taking into account any stays or other relief provided by commencement of the Chapter 11 Cases) of other postpetition rents, unless otherwise waived by the prior written consent (email being sufficient) of the applicable WELL/OHI Master Lease Landlord, or the occurrence and continuation of any other "Event of Default" under the WELL/OHI Master Lease Documents (other than a default of the type described in section 365(b)(2) of the Bankruptcy Code) unless otherwise waived by the prior written consent (email being sufficient) of the applicable WELL/OHI Master Lese Landlord; |
|  | xix. | the Debtors' filing of a motion to reject the VSR Master Leases or modify the claim(s) of the Landlords thereunder or the failure of the Debtors to make any payment when due (without taking into account any stays or other relief provided by commencement of the Chapter 11 Cases) of postpetition Rents (as defined in the VSR Master Leases) accruing on account of the obligations thereunder, unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the VSR Master Leases, or the failure of the Debtors to make any payment when due (without taking into account any stays or other relief provided by commencement of the Chapter 11 Cases) of other postpetition rents, unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the VSR Master Leases, or the occurrence and |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING |
|---|

continuation of any other "Event of Default" under the VSR Master Leases (other than a default of the type described in section 365(b)(2) of the Bankruptcy Code) unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the VSR Master Leases;

xx.    the Debtors' filing of a motion to reject the PA 22 Sub-Subleases or PA 22 MOTAs or modify the claim(s) of the Landlords or counterparties thereunder or the failure of the Debtors to make any payment when due (without taking into account any stays or other relief provided by commencement of the Chapter 11 Cases) of postpetition Rents (as defined in the PA 22 Sub-Subleases) accruing on account of the obligations thereunder, unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the PA 22 Sub-Subleases, or the failure of the Debtors to make any payment when due (without taking into account any stays or other relief provided by commencement of the Chapter 11 Cases) of other postpetition rents, unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the PA 22 Sub-Subleases, or the occurrence and continuation of any other "Event of Default" under the PA 22 Sub-Subleases or PA 22 MOTAs (other than a default of the type described in section 365(b)(2) of the Bankruptcy Code) unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord or counterparty under the PA 22 Sub-Subleases or PA 22 MOTAs;

xxi.    the Debtors' filing of a motion to reject the JV Leases or modify the claim(s) of the Landlords thereunder or the failure of the Debtors to make any payment when due (without taking into account any stays or other relief provided by commencement of the Chapter 11 Cases) of postpetition Rents (as defined in the JV Leases) accruing on account of the obligations thereunder, unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the JV Leases, or the failure of the Debtors to make any payment when due (without taking into account any stays or other relief provided by commencement of the Chapter 11 Cases) of other postpetition rents, unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the JV Leases, or the occurrence and continuation of any other "Event of Default" under the JV Leases (other than a default of the type described in section 365(b)(2) of the Bankruptcy Code) unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the JV Leases;

xxii.   the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Bankruptcy Court, granting any superpriority claim or lien (except as

26

| **MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING** | | |
|---|---|---|
| | | contemplated herein) which is senior to or *pari passu* with the DIP Claims; |
| | xxiii. | the Debtors seeking, or supporting any other person's motion seeking (in any such case, verbally in any court of competent jurisdiction or by way of any motion or pleading filed with the Bankruptcy Court, or any other writing to another party in interest by the Debtors), to challenge the validity or enforceability of any of the obligations of the parties under the Prepetition Secured Documents; |
| | xxiv. | the Debtors filing a motion for the Bankruptcy Court to approve a sale of the DIP Collateral under section 363 of the Bankruptcy Code, unless such proposed sale is approved by each of the DIP Lenders, in their sole discretion; |
| | xxv. | any Debtor shall fail to execute and deliver to the DIP Lenders any agreement, financing statement, trademark filing, copyright filing, notices of lien or similar instruments or other documents that the DIP Lenders may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Lenders; |
| | xxvi. | the Debtors shall assert in any pleading filed in any court that the guarantee contained in the DIP Loan Documents is not valid and binding, for any reason, to be in full force and effect, other than under the terms hereof or thereof; |
| | xxvii. | payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein or as otherwise consented to by each of the DIP Lenders; |
| | xxviii. | expiration or termination of the period provided by section 1121 of the Bankruptcy Code for the exclusive right to file a plan with respect to a Debtor with material assets unless such expiration or termination was sought by any of the Prepetition Secured Parties or the DIP Lenders; |
| | xxix. | cessation of the DIP Liens or the DIP Claims to be valid, perfected and enforceable in all respects; |
| | xxx. | any Debtor asserting any right of subrogation or contribution against any other Debtor until all borrowings under the DIP Facility are paid in full and the commitments are terminated; |
| | xxxi. | subject to entry of the Final DIP Order, the allowance of any claim or claims under section 506(c) of the Bankruptcy Code or otherwise against any Prepetition TL/ML Secured Party; |

| **MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING** | |
|---|---|
| | xxxii.  the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against a material portion of the Debtors' assets;<br><br>xxiii.  the entry of an order in any Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Obligations owing under the DIP Loan Documents; and<br><br>xxxiv.  the entry of an order by the Bankruptcy Court providing relief adverse to the interests of any DIP Lender or any Prepetition Secured Party with respect to any motion, objection, application or adversary proceeding challenging the validity, enforceability, perfection or priority of, or seeking avoidance, subordination or characterization of, any portion of the Prepetition Secured Obligations and/or the liens and security interests securing the Prepetition Secured Obligations or asserting any other claim or cause of action against and/or with respect to the Prepetition Secured Obligations or the liens and security interests securing the Prepetition Secured Obligations, but excluding preliminary or final relief granting standing to any other party to prosecute such claims, causes of action or proceeding.<br><br>**(DIP Term Sheet, Events of Default, Termination; Interim Order, ¶ 17)** |
| **Remedies**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Lenders shall have customary remedies upon the occurrence and during the continuance of an Event of Default, including, without limitation, the following:<br><br>Without further order from the Bankruptcy Court, and subject to the terms of the Interim DIP Order and the Final DIP Order (including in respect of any required notices), the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of Default under the DIP Loan Documents, all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable): (a) immediately terminate the Debtors' use of any cash collateral; (b) cease making any DIP Loans under the DIP Facility to the Debtors; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts (and, with respect to the DIP Loan Documents and the DIP Facility, sweep all funds contained in any account subject to a control agreement); (e) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Lenders against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of the DIP Lenders, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under the Interim DIP Order and the Final DIP Order, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations; *provided, however*, that the DIP Lenders must provide |

| **MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING** | |
|---|---|
| | the Debtors with five (5) business days' written notice (which may be by email and a copy of which shall be sent to the Prepetition ABL Agent) before exercising any enforcement rights or remedies with respect to the DIP Collateral or the Prepetition Collateral other than funds contained in any account subject to a control agreement; *provided, further*, that neither the Debtors, the Committee nor any other party-in-interest shall have the right to contest the enforcement of the remedies set forth in the Interim DIP Order and the Final DIP Order and the DIP Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable DIP Loan Documents. <br><br> **(DIP Term Sheet, Remedies; Interim Order, ¶ 18)** |
| **Carve Out** <br><br> *Fed. R. Bankr. P. 4001(c)(1)(B)* | "Carve Out" means an amount equal to the sum of the following:  (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest under 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000 (without regard to the notice set forth in clause (iii) below); (iii) to the extent permitted by the Budget (subject to an allowed variance of 15% of the amount budgeted for each respective Estate Professional) and allowed by the Bankruptcy Court at any time, whether by Interim DIP Order, procedural order, final order or otherwise, all accrued and unpaid fees, disbursements, costs and expenses incurred by persons or firms retained by the Debtors under section 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and all accrued unpaid fees, disbursements, costs and expenses incurred by the Committee (if any) under section 328 and 1103 of the Bankruptcy Code (the "Committee Professionals," together with the Debtor Professionals, the "Estate Professionals," and such Estate Professional fees, the "Allowed Professional Fees"), at any time before or on the first business day following delivery by the DIP Lenders of a Carve Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $750,000 incurred after the first business day following delivery by the DIP Lenders of a Carve Out Trigger Notice, to the extent consistent with the Budget and allowed at any time, whether by Interim DIP Order, procedural order, final order, or otherwise (the amounts set forth in this clause (iv), the "Post-Carve Out Trigger Notice Cap"); *provided, however*, nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation sought by any such professionals or any other person or entity.  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice (which may be delivered by e-mail (or other electronic means)) by the DIP Lenders to the Debtors and their counsel, the United States Trustee, and lead counsel to any Committee appointed in the Chapter 11 Cases, which notice may be delivered following the occurrence of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked. |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve Out shall be senior to all liens and claims securing the DIP Facility, and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations.<br><br>**(DIP Term Sheet, Carve Out; Interim Order, ¶ 21)** |
| **Milestones**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(v), (vi)* | The obligations of the DIP Lenders to advance the DIP Loans shall be subject to the Debtors satisfying, or causing the satisfaction of, the milestones listed below (collectively, the "Milestones") by the specified or by such later date as each of the DIP Lenders may agree in writing (email being sufficient):<br><br>i. No later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order.<br><br>ii. No later than ten (10) days after the Petition Date, the Debtors shall have filed a motion for approval of procedures for the marketing and sale of some or all the Debtors' assets under Bankruptcy Code section 363 (the "Transaction"), which motion shall be in form and substance acceptable to each of the DIP Lenders.<br><br>iii. No later than twenty-one (21) days after entry of the Interim DIP Order, all documentation relating to the DIP Facility, including the DIP Credit Agreement, shall be in form and substance satisfactory to each of the DIP Lenders and shall have been duly executed and delivered by all parties thereto.<br><br>iv. No later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered an order granting the Debtors' motion for approval of procedures for the marketing and Transaction (the "Bidding Procedures Order"), which order shall be in form and substance acceptable to each of the DIP Lenders.<br><br>v. No later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order.<br><br>vi. No later than forty (40) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Debtors rejection of the certain leases mutually agreed between the Debtors and the DIP Lenders, which order shall be in form and substance acceptable to each of the DIP Lenders.<br><br>vii. Any auction to select a winning bidder under the Bidding Procedures Order shall be conducted no later than ninety-five (95) days following the Petition Date.<br><br>viii. No later than one hundred (100) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Transaction by approving the sale of substantially all the Debtors' |

| MATERIAL TERMS OF THE PROPOSED POSTPETITION FINANCING | |
|---|---|
| | assets under section 363 of the Bankruptcy Code, which order shall be in form and substance acceptable to each of the DIP Lenders.<br><br>ix. No later than 210 days after the Petition Date, the Transaction shall have been consummated.<br><br>**(DIP Term Sheet, Chapter 11 Cases Milestones)** |
| **Automatic Stay**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(iii)* | The Interim Order provides for modifying the automatic stay to allow the DIP Lenders and Prepetition Secured Parties to exercise all rights and remedies provided for in the DIP Loan Documents and the Interim Order.<br><br>**(Interim Order ¶ 11)** |
| **Marshalling and Waiver of 506(c) and 552(b) Claims**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(x)* | Effective upon entry of the Final Order, the DIP Lenders and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral, the DIP Facility Obligations, the Prepetition Collateral, or the Prepetition Secured Obligations as applicable, and all proceeds shall be received and applied in accordance with the Interim Order, the DIP Term Sheet and the Prepetition Secured Documents, as applicable.<br><br>Effective upon entry of the Final Order, the Debtors (on behalf of themselves and their estates) shall waive, and shall not assert in the Chapter 11 Cases or any successor cases, (i) any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lenders and the Prepetition Secured Parties, upon the DIP Collateral or the Prepetition Collateral, and (ii) the DIP Lenders and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties or Prepetition Collateral.<br><br>**(Interim Order, ¶¶ 25–27)** |
| **Liens on Avoidance Actions**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(xi)* | The DIP Liens shall attach to the proceeds of claims and causes of action under chapter 5 of the Bankruptcy Code.<br><br>**(Interim Order, ¶ 5)** |
| **Indemnification**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)(ix)* | The Debtors shall indemnify, pay and hold harmless the DIP Lenders (and their directors, officers, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence, bad faith, fraud, or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction).<br><br>**(DIP Term Sheet, Indemnification; Interim Order, ¶ 19)** |

### B.      Provisions to Be Highlighted

17.      The Debtors hereby disclose the below key terms pursuant to Complex Case

Procedures Section D.10:[4]

- *Case Milestones*:  Pursuant to paragraph 16 of the Interim Order and the "Chapter 11 Cases Milestones" section of the DIP Term Sheet, the Debtors have agreed to comply with certain case milestones.  *See* Complex Case Procedures, § 10(a).

- *Cross-Collateralization Provisions*:  No such provision is contained in the Interim Order or DIP Term Sheet.  *See* Complex Case Procedures, § 10(b).

- *Provisions Authorizing "Roll Up" or Repayment of Prepetition Debt*:  No such provision is contained in the Interim Order or DIP Term Sheet.  *See* Complex Case Procedures, § 10(c).

- *Default and Termination Provisions*:  Paragraph 18 of the Interim Order and the "Events of Default" section of the DIP Term sheet sets forth default and termination provisions, including: (a) the occurrence and continuance of any "Event of Default" under and as defined in the DIP Term Sheet; (b)  failure to make payments including adequate protection payments when due; (b) occurrence of any event within the definition of "DIP Termination Date" in the DIP Term Sheet; (c) consent of the Debtors to the standing of any party, including an Official Committee, to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, any Challenge;  or (d) commencement of a Challenge Proceeding.  *See* Complex Case Procedures, § 10(d).

- *Stipulations*:  Pursuant to paragraph E of the Interim Order, the Debtors have provided the Debtors' Stipulations concerning the Prepetition Loan Documents, the Prepetition Secured Obligations, and the Prepetition Liens, and a release and indemnification of the Prepetition Secured Parties and certain of the DIP Secured Parties, among other things.  The stipulations are subject to challenge by parties in interest (other than the Debtors), subject to the limitations set forth in paragraph 24(d) of the Interim Order, and will not be binding upon any such parties in interest until occurrence of the Challenge Deadline.  The Challenge Deadline is the earliest of (a) if no committee has been appointed, 75 days after the Petition Date or (b) if a committee has been appointed, 60 days after the date of formation of such committee.  *See* Complex Case Procedures, § 10(e).

- *Releases*:  Section E.xi of the Interim Order includes certain proposed releases by the Debtors, the Debtors' estates, and certain related parties of the Released Parties (as defined in the Interim Order).  *See* Complex Case Procedures, § 10(f).

---

[4]   As of the date of this Motion, the DIP Borrowers, the DIP Guarantors, the DIP Lenders, and the DIP Agent have not yet entered into or finalized a form of DIP Credit Agreement.  As such, the Debtors have identified the location of the terms below in the Interim Order and DIP Term Sheet.

- ***Priming of Prepetition Liens***:  Pursuant to paragraph 6(a)(2) of the Interim Order, the DIP Facility provides for "priming" liens.  *See* Complex Case Procedures, § 10(g).

## IV.   Prepetition Capital Structure – Secured Debt Obligations

18.    As described and defined more fully below, as of the Petition Date, all of the Debtors' assets are pledged to secure debts held by multiple parties, including: (a) affiliates of White Oak Healthcare Finance, LLC ("White Oak") under the White Oak Prepetition ABL Facilities (as defined below); (b) affiliates of Welltower and Omega Healthcare Investors, Inc. (both publicly traded real estate investment trusts) as well as other co-lenders under the Prepetition Term Loan Credit Facility (as defined below); (c) certain HUD lenders under HUD Operator Security Agreements  to secure certain Facilities encumbered by HUD loans; (d) the Rochester Manor HUD Lender (as defined below) under the Rochester Manor HUD Mortgage (as defined below); and (e) the Internal Revenue Service, who filed numerous tax liens against Company entities for outstanding deferred payroll tax claims.  A summary of the Debtors' prepetition secured debt is as follows:

| Prepetition Secured Debt Obligations | | | |
|---|---|---|---|
| Secured Debt | Interest | Maturity Date | Estimated Amount Outstanding ($ in millions) |
| **White Oak Prepetition ABL Revolving Credit Facilities** | | | |
| *White Oak Prepetition Non-HUD ABL Credit Facility* | | | |
| White Oak Non-HUD Revolver | SOFR + 4.85% | 3/9/27 | $223.6 |
| *White Oak Prepetition HUD ABL Credit Facility* | | | |
| White Oak HUD Revolver | SOFR + 6.00% | 3/9/27 | $55.7 |
| **Prepetition Term Loan Credit Facility** | | | |
| *2016 Term Loan Credit Facility* | | | |
| Welltower Term Loan ($120M) | 14.0% | 6/30/26 | $72.6 |
| Omega Term Loan ($120M) | 14.0% | 6/30/26 | $97.7 |
| WAX Term Loan ($120M) | 14.0% | 6/30/26 | $69.8 |
| MAO Term Loan ($120M) | 14.0% | 6/30/26 | $13.7 |
| *2018 Term Loan Credit Facility* | | | |
| Welltower Term Loan ($40M) | 10.0% | 6/30/26 | $39.9 |
| Omega Term Loan ($40M) | 10.0% | 6/30/26 | $23.1 |
| MAO Term Loan ($40M) | 10.0% | 6/30/26 | $1.0 |
| **Other Secured Debt** | | | |

| Prepetition Secured Debt Obligations | | | |
|---|---|---|---|
| Secured Debt | Interest | Maturity Date | Estimated Amount Outstanding (*$ in millions*) |
| HUD Operator Agreements | Various | Various | $0.0 |
| Rochester Manor – HUD Loan | 2.99% | 1/1/52 | $8.3 |
| Internal Revenue Service | Statutory Rate | N/A | $103.1 |
| *Total Secured Liabilities* | | | **$708.5** |

19.     The lien priorities among the various secured lenders are largely governed by intercreditor and subordination agreements.  In addition, within the Prepetition Term Loan Credit Facility, collateral is allocated pursuant to agreement among the various lenders.  A simplified summary of the lien priorities is as follows:[5]

- The Company's ABL facilities hold a first lien ("1L") in the Company's cash, accounts receivable ("AR"), and accounts receivable-related intangible assets and a second lien ("2L") on the Company's IP, equipment, leased real estate ("RE") and general intangible assets.
- The Term Loan facilities (with certain exceptions related to HUD-related OpCos) hold a 1L position in substantially all other assets and a 2L in the ABL collateral.
- The IRS holds a settlement claim with a junior lien on substantially all assets of the Company's non-ancillary-service OpCo entities and certain ancillary services entities.

| | | Collateral Overview | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Non-HUD OpCos | | HUD OpCos | | Ancillary Services | | HoldCo Entities | |
| Asset Description | | • Cash, A/R, and Intangibles associated with A/R | • IP, equipment, leased RE, and general intangibles, among others | • Cash, A/R, and Intangibles associated with A/R | • IP, equipment, leased RE, and general intangibles, among others | • Cash, A/R, and Intangibles associated with A/R | • IP, equipment, leased RE, general intangibles, and subsidiary equity interests, among others | • Cash, A/R, and Intangibles associated with A/R | • IP, equipment, leased RE, general intangibles, and subsidiary equity interests, among others |
| Lien Priority | First | Non-HUD ABL | Term Loan | HUD-ABL | HUD | Non-HUD ABL | Term Loan | ABL | Term Loan |
| | Second | Term Loan | Non-HUD ABL | HUD | HUD-ABL | Term Loan | Non-HUD ABL | Term Loan | ABL |
| | Third | IRS | IRS | IRS | IRS | IRS | IRS | | |

## A.     White Oak Prepetition Non-HUD ABL Credit Facility

20.     The Debtors have outstanding obligations under that certain Fifth Amended and Restated Credit Agreement, dated as of March 9, 2022 (as otherwise amended, supplemented, or otherwise modified from time to time, the "Prepetition Non-HUD ABL Credit Agreement," and together with any other documents executed and delivered in connection therewith, the

---

[5]     The following depiction is provided for summary purposes only, but any lien priorities shall be governed solely by the rights and privileges afforded under relevant security agreements, intercreditor arrangements, the Bankruptcy Code, and other applicable law.

"<u>Prepetition Non-HUD ABL Documents</u>"), by and among, Genesis Healthcare, Inc. ("<u>Ultimate Parent</u>"), Ultimate Parent's affiliates and subsidiaries party thereto as "Borrowers" (as defined therein) (collectively with Ultimate Parent, the "Prepetition <u>Non-HUD ABL Borrowers</u>"), the "Lenders" (as defined therein) from time-to-time party to the Prepetition Non-HUD ABL Credit Agreement (the "<u>Prepetition Non-HUD ABL Lenders</u>"), and White Oak, as "Administrative Agent" (as defined therein) for the Prepetition Non-HUD ABL Lenders (in such capacity, the "<u>Prepetition Non-HUD ABL Agent</u>," and together with the Prepetition Non-HUD ABL Lenders, the "<u>Prepetition Non-HUD ABL Secured Parties</u>") pursuant to which the Prepetition Non-HUD ABL Lenders provided a first lien asset-based lending credit facility to the Prepetition Non-HUD ABL Borrowers (the "<u>White Oak Prepetition Non-HUD ABL Credit Facility</u>," and the loans provided thereunder, the "<u>White Oak Prepetition Non-HUD ABL Loans</u>").

21.     Under the Prepetition Non-HUD ABL Documents, the Prepetition Non-HUD ABL Borrowers granted to the Prepetition Non-HUD ABL Agent, for the benefit of itself and the Prepetition Non-HUD ABL Lenders, valid and properly perfected continuing liens on and security interests in (the "<u>Prepetition Non-HUD ABL Liens</u>") all "Collateral" (as defined in the Prepetition Non-HUD ABL Credit Agreement) (the "<u>Prepetition Non-HUD ABL Collateral</u>"), which includes a first priority security interest in, and continuing lien on, the Prepetition Non-HUD ABL Borrowers' cash and accounts receivable (the "<u>Prepetition Non-HUD ABL Priority Collateral</u>").

22.     As of the Petition Date, the Debtors were indebted and liable to the Prepetition Non-HUD ABL Secured Parties, in the aggregate amount of approximately $215.0 million on account of the White Oak Prepetition Non-HUD ABL Loans outstanding under the Prepetition Non-HUD ABL Documents, plus all fees, charges and interests as provided in the Prepetition Non-HUD ABL Documents, (collectively, the "<u>White Oak Prepetition Non-HUD ABL Obligations</u>").

### B.      White Oak Prepetition HUD ABL Credit Facility

23.      The Debtors have outstanding obligations under that certain Third Amended and Restated Revolving Credit Agreement, dated as of March 6, 2020 (as otherwise amended, supplemented, or otherwise modified from time to time, the "White Oak Prepetition HUD ABL Credit Agreement," and together with any other documents executed and delivered in connection therewith, the "White Oak Prepetition HUD ABL Loan Documents"),[6] by and among, certain affiliates and subsidiaries of Ultimate Parent party thereto as "Borrowers" (collectively, the "Prepetition HUD ABL Borrowers"), the Prepetition HUD ABL Borrowers' affiliates and subsidiaries party thereto as guarantors (the "HUD ABL Guarantors," together with the Prepetition HUD ABL Borrowers, the "HUD ABL Loan Parties" and, together with the Prepetition Non-HUD ABL Borrowers, the "ABL Loan Parties"; the Prepetition HUD ABL Borrowers and the Prepetition Non-HUD ABL Borrowers are collectively referred to herein as the "Prepetition ABL Borrowers"), the "Lenders" (as defined therein) from time-to-time party to the Prepetition HUD ABL Credit Agreement (the "Prepetition HUD ABL Lenders" and, together with the Prepetition Non-HUD ABL Lenders, the "Prepetition ABL Lenders"), and White Oak as "Administrative Agent" (as defined therein) (successor-by-assignment to MidCap Funding IV Trust, a Delaware statutory trust) for the Prepetition HUD ABL Lenders (in such capacity, the "Prepetition HUD ABL Agent," and together with the Prepetition HUD ABL Lenders, the "Prepetition HUD ABL Secured Parties")[7] pursuant to which the Prepetition HUD ABL Lenders provided a first lien asset-

---

[6]   The White Oak Prepetition HUD ABL Credit Agreement and Prepetition Non-HUD ABL Credit Agreement are collectively referred to herein as the "Prepetition ABL Credit Agreements", and the White Oak Prepetition HUD ABL Loan Documents and the Prepetition Non-HUD ABL Documents are collectively referred to herein as the "White Oak Prepetition ABL Loan Documents".

[7]   The Prepetition HUD ABL Agent and Prepetition Non-HUD ABL Agent are collectively referred to herein as the "Prepetition ABL Agents", and the Prepetition HUD ABL Secured Parties and the Prepetition Non-HUD ABL Secured Parties are collectively referred to herein as the "Prepetition ABL Secured Parties".

based lending credit facility to the Prepetition HUD ABL Borrowers (the "White Oak Prepetition HUD ABL Credit Facility," and the loans provided thereunder, the "White Oak Prepetition HUD ABL Loans").[8]

24.    Under the White Oak Prepetition HUD ABL Loan Documents, the Prepetition HUD ABL Borrowers and the other HUD ABL Loan Parties granted to the Prepetition HUD ABL Agent, for the benefit of itself and the Prepetition HUD ABL Lenders, valid and properly perfected continuing liens on and security interests in (the "Prepetition HUD ABL Liens" and, together with the Prepetition Non-HUD ABL Liens, the "Prepetition ABL Liens") all "Collateral" (as defined in the Prepetition HUD ABL Credit Agreement) (the "Prepetition HUD ABL Collateral" and, together with the Prepetition Non-HUD ABL Collateral, the "Prepetition ABL Collateral"), which includes a first priority security interest in, and continuing lien on, the Prepetition HUD ABL Borrowers' cash and accounts receivable (the "Prepetition HUD ABL Priority Collateral" and, together with the Prepetition Non-HUD ABL Priority Collateral, the "Prepetition ABL Priority Collateral").

25.    As of the Petition Date, the Debtors were indebted and liable to the Prepetition HUD ABL Secured Parties, in the aggregate amount of approximately $57.7 million on account of the White Oak Prepetition HUD ABL Loans outstanding under the White Oak Prepetition HUD ABL Loan Documents, plus all fees, charges and interests as provided in the White Oak Prepetition HUD ABL Loan Documents, (collectively, the "Prepetition HUD ABL Obligations").

---

[8]    The White Oak Prepetition HUD ABL Credit Facility and White Oak Prepetition Non-HUD ABL Credit Facility are collectively referred to herein as the "White Oak Prepetition ABL Credit Facilities", and the White Oak Prepetition HUD ABL Loans and the White Oak Prepetition Non-HUD ABL Loans are collectively referred to herein as the "White Oak Prepetition ABL Loans".

### C.     Prepetition Term Loan Credit Facility

26.     The Debtors have obligations under that certain Term Loan Agreement, dated as of July 29, 2016 (as otherwise amended, supplemented, or otherwise modified from time to time, the "Prepetition Term Loan Credit Agreement," and together with any other documents executed and delivered in connection therewith, the "Prepetition Term Loan Documents"), by and among Ultimate Parent, certain affiliates and subsidiaries of Ultimate Parent party thereto as "Borrowers" (collectively, the "Prepetition Term Loan Borrowers"), certain affiliates and subsidiaries of Ultimate Parent party thereto as guarantors (together with Ultimate Parent, the "Prepetition Term Loan Guarantors," together with the Prepetition Term Loan Borrowers, the "Prepetition Term Loan Obligors"), the "Lenders" (as defined therein) from time-to-time party to the Prepetition Term Loan Credit Agreement (collectively, the "Prepetition Term Loan Lenders"),[9] and Welltower OP LLC (formerly known as Welltower Inc.) as "Administrative Agent" (as defined therein) for the Prepetition Term Loan Lenders (in such capacity, the "Prepetition Term Loan Agent," and together with the Prepetition Term Loan Lenders, the "Prepetition Term Loan Secured Parties")[10] pursuant to which the Prepetition Term Loan Lenders provided a term loan credit

---

[9]     The original Prepetition Term Loan Lenders include MarkGlen, LLC, an affiliate of Welltower (the "Welltower Prepetition Term Loan Lender") and OHI Mezz Lender LLC, an affiliate of Omega Healthcare, Inc. ("Omega"). As discussed herein, a portion of the Prepetition Term Loan Credit Facility held by the Welltower Prepetition Term Loan Lender was assumed and assigned to MAO and WAX (each as defined herein) on September 30, 2024.

[10]    The Prepetition Term Loan Agent and Prepetition ABL Agents are collectively referred to herein as the "Prepetition Agents", the Prepetition Term Loan Lenders and Prepetition ABL Lenders are collectively referred to herein as the "Prepetition Lenders" and the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties are collectively referred to herein as the "Prepetition Non-HUD Secured Parties".

facility to the Prepetition Term Loan Borrowers (the "Prepetition Term Loan Credit Facility," and the loans provided thereunder, the "Prepetition Term Loans").[11]

27.    Under the Prepetition Term Loan Documents, the Prepetition Term Loan Borrowers and the other Prepetition Term Loan Obligors granted to the Prepetition Term Loan Agent, valid and properly perfected continuing liens on and security interests in (the "Prepetition Term Loan Liens") all "Collateral" (as defined in the Prepetition Term Loan Credit Agreement) (the "Prepetition Term Loan Collateral"), which includes second priority valid and properly perfected continuing liens on and security interests in all Prepetition Non-HUD ABL Priority Collateral, and a first priority security interest in, and continuing lien on, all assets other than the Non-HUD ABL Priority Collateral (the "Prepetition Term Loan Priority Collateral").

28.    On September 30, 2024, the Welltower Prepetition Term Loan Lender executed two *Assignment and Assumption* agreements with MAO 22322 LLC ("MAO") and WAX Dynasty Partners LLC ("WAX"),[12] pursuant to which a portion of the Prepetition Term Loan Credit Facility held by the Welltower Prepetition Term Loan Lender was assumed and assigned.  In total, $55,504,328.00 was assigned to WAX and $13,275,000.00 was assigned to MAO and each received promissory notes from FC-GEN in corresponding amounts.  The interests of WAX and MAO are subordinated to the interests of Welltower and Omega under the Prepetition Term Loans.

29.    As of the Petition Date, the Debtors were indebted to the Prepetition Term Loan Secured Parties in the aggregate amount of approximately $317.8 million on account of the Prepetition Term Loans outstanding under the Prepetition Term Loan Documents, plus all fees,

---

[11]   The Prepetition Term Loan Credit Facility and White Oak Prepetition ABL Credit Facilities are collectively referred to herein as the "Prepetition Credit Facilities", and the Prepetition Term Loans and the White Oak Prepetition ABL Loans are collectively referred to herein as the "Prepetition Non-HUD Loans".

[12]   WAX is an entity that shares common beneficial ownership with ReGen Healthcare, LLC ("ReGen"), which holds convertible subordinated notes with the Company.

charges and interests as provided in the Prepetition Term Loan Documents (collectively, the "Prepetition Term Loan Obligations"). Of that balance, approximately $112.5 million is owed to the Welltower Prepetition Term Loan Lender, $120.8 million is owed to Omega, $14.7 million is owed to MAO, and $69.8 million is owed to WAX

### D.    Prepetition HUD Lender Obligations

30.    Certain Debtors operate Facilities (collectively, the "HUD Facilities") which are encumbered by loans (the "HUD Property Loans") provided by certain financial institutions (the "Prepetition HUD Lenders") and insured by the U.S. Department of Housing and Urban Development, acting by and through its Secretary and his or her successors, assigns or designates ("HUD"). In connection with the HUD Property Loans, such Debtors entered into certain Operator Security Agreement (each, a "HUD Operator Security Agreement") with the applicable HUD Lender granting to such HUD Lender valid and properly perfected continuing liens on and security interests in (the "Prepetition HUD Lender Liens") all "Collateral" (as defined in each HUD Operator Security Agreement) (the "Prepetition HUD Lender Collateral") to secure, among other things, obligations owed to the HUD Lenders, including the HUD Property Loans (the "Prepetition HUD Lender Obligations").

31.    As of the Petition Date, the Debtors do not believe any amounts were due and owing to the Prepetition HUD Lenders.

### E.    Rochester Manor HUD Mortgage

32.    Debtor 40 Whitehall Road Property LLC (the "Rochester Manor Borrower") has outstanding obligations owed to Berkadia Commercial Mortgage LLC (the "Rochester Manor HUD Lender") and, together with HUD, the "Rochester Manor HUD Secured Parties") under that certain Healthcare Facility Note, dated as of December 1, 2016 (as otherwise amended,

supplemented, or otherwise modified from time to time, the "Rochester Manor HUD Note," and together with any other documents executed and delivered in connection therewith, the "Rochester Manor HUD Documents"), which is insured by HUD.

33.     Under the Rochester Manor HUD Documents, the Rochester Manor Borrower granted to the Rochester Manor HUD Secured Parties valid and properly perfected continuing liens on and security interests in (the "Prepetition Rochester Manor HUD Liens") substantially all of its asserts, including the Rochester Manor skilled nursing facility located in Strafford County, New Hampshire (the "Prepetition Rochester Manor HUD Collateral").

34.     As of the Petition Date, the Rochester Manor Borrower was indebted and liable to the Rochester Manor HUD Secured Parties in the aggregate amount of approximately $8.3 million on account of the Rochester Manor HUD Note, plus all fees, charges, and interest as provided in the Rochester Manor HUD Documents (collectively, the "Prepetition Rochester Manor HUD Obligations").

    **6.     IRS Secured Liens**

35.     Sections 2302(a)(1)-(2) the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") allowed employers to defer, without penalty, the deposit and payment of the employer portion of Social Security taxes for the period beginning on March 27, 2020 until December 31, 2020.[13]  Section 2302(d)(3) of the CARES Act required employers to pay 50% of the eligible deferred amount by December 31, 2021 and the remaining amount of the eligible deferred amount by December 31, 2022.[14]

---

[13]    *See* Pub. L. 116-136, 134 Stat. 281 §§ 2302(a)(1)-(2), (d)(2) (Mar. 27, 2020).

[14]    *See id.*, § 2302(d)(3); *see Deferral of employment tax deposits and payments through December 31, 2020*, IRS FAQs #18, available at https://www.irs.gov/newsroom/deferral-of-employment-tax-deposits-and-payments-through-december-31-2020#what-are-applicable-dates-by-which-deferred-deposits-employers-share-social-security-tax-must-be-deposited (last accessed July 8, 2025).

36.     As permitted by the CARES Act, the Company deferred its employer portion of payroll taxes for the period beginning March 27, 2020 until December 31, 2020 for approximately 312 of its subsidiaries.  Such deferred amounts were due in part on December 31, 2021 and in full on December 31, 2022.  Given the Company's liquidity constraints in advance of the payment dates, the Company engaged with the IRS on a payment plan to pay the outstanding deferrals to the IRS, with penalties and interest.

37.     Pursuant to certain Installment Agreements (Form 433-D) (the "Prepetition IRS Installment Agreements") executed by certain Debtors in July 2024 in favor of the Department of Treasury – Internal Revenue Service (the "IRS"), certain Debtors (the "Prepetition IRS Obligors") agreed to pay to the IRS certain amounts otherwise due and payable relating to such Prepetition IRS Obligors' portion of employer payroll taxes (the "Prepetition Deferred Payroll Taxes").  The Prepetition Deferred Payroll Taxes are secured by liens on substantially all assets of the Prepetition IRS Obligors, as exhibited by notices of federal tax lien filed prior to the Petition Date against such Prepetition IRS Obligors.

38.     As of the Petition Date, the Debtors were indebted to the IRS, in the aggregate amount of approximately $103.1 million on account of the Prepetition Deferred Payroll Taxes outstanding under the Prepetition IRS Installment Agreements, plus all fees, charges and interests as provided under applicable law (collectively, the "Prepetition IRS Tax Obligations").

## V.     Proposed Postpetition Financing

### A.     The Debtors' Need for the DIP Facility and Development of the DIP Budget

39.     As described in the DIP Declaration and in the First Day Declaration, the Debtors require immediate access to the DIP Facility in addition to continued use of Cash Collateral to fund, among other things, working capital, payroll obligations, overhead costs, and make any other

payments that are essential for the continued management and preservation of the Debtors' business and continuity of care for the residents of the Debtors' Facilities. As of the Petition Date, the Debtors' cash on hand is insufficient to operate their enterprise and continue paying their obligations as they come due. The Debtors' business is cash-intensive, and without sufficient liquidity to satisfy obligations to the Debtors' contract counterparties, landlords, vendors, workforce, and other stakeholders, the Debtors will be unable to maintain their critical role as a healthcare provider in the communities in which the Debtors operate.

40. The Debtors, in consultation with Ankura, reviewed and analyzed the Debtors' projected cash receipts and disbursements and prepared a budget outlining the Debtors' postpetition cash needs in the initial 13 weeks of the Chapter 11 Cases, a copy of which is attached as Exhibit 2 to the Interim Order. The Debtors relied on these forecasts to determine the amount of postpetition financing required to fund operations and administer these Chapter 11 Cases. More specifically, the Debtors determined that they require immediate access to DIP financing to fund the costs of these Chapter 11 Cases and ongoing business operations.

41. Importantly, the Debtors' business requires immediate liquidity to satisfy their obligations owed to employees, vendors, and suppliers, all of whom are critical to ensuring that the Debtors can continue providing safe, high-quality healthcare in the communities in which they operate. Furthermore, obtaining access to the DIP Facility will allow the Debtors to send a clear message to the Debtors' stakeholders—including, most critically, vendors on whose continued partnership the Debtors rely to provide high quality care to residents—that the Debtors will continue to be a reliable partner in spite of the difficulties facing the Debtors' business. The proposed DIP Facility will provide much needed stabilization to the Debtors' business operations. The DIP Facility will also provide the funding means to accomplish a comprehensive restructuring

43

and ensure the Debtors' ability to operate as a going concern, preserving value of the Debtors' estates for the benefit of all of their stakeholders.

### A.       The Debtors' Efforts to Obtain Postpetition Financing

42.       As described herein and in the DIP Declaration and the First Day Declaration, the Debtors and their advisors have engaged in extensive discussions and diligence with key stakeholders to reach a framework for the Chapter 11 Cases.  The current framework contemplates that postpetition financing will be necessary to reorganize or transition the Debtors' facilities to new operators and subsequently liquidate the Debtors' remaining assets.

43.       Prior to commencing these Chapter 11 Cases, the Debtors, with the assistance of Jefferies, sought to solicit and secure the best available DIP financing.  *See* DIP Decl. ¶ 9.  In connection therewith, Jefferies commenced an outreach to potential third party financing sources. *Id.*  At the same time, the Debtors, with the assistance of Jefferies and their other advisors, also engaged in discussions with the Prepetition Secured Parties regarding potential DIP financing.  *Id.*

44.       Specifically, on May 28, 2025, Jefferies launched a formal outreach to potential third party lenders.  *Id.* at ¶ 10.  In total, Jefferies contacted and provided twelve (12) potential third party financing sources, including banks and credit funds, with an overview of the financing opportunity.  *Id.*  These parties were selected based on, among other things, their experience with financing transactions and their experience with Debtors' industry.  *Id.* Nine (9) of these parties entered into non-disclosure agreements with the Debtors and were thereafter given confidential marketing materials and access to a virtual data room in connection with their evaluation of a potential financing transaction with the Debtors.  *Id.*

45.       Notwithstanding the foregoing outreach, only one party provided indicative terms with respect to financing on a senior secured priming basis.  *Id.*at ¶ 11.  Thus, to obtain third-party

44

DIP financing, the Debtors would have had to engage in a "priming" fight with Prepetition Lenders, and the prospect of such fight would challenge any efforts to obtain postpetition financing. Further, to date, none of the remaining parties contacted have expressed a willingness to provide financing on an unsecured or junior secured basis.

46.     Certain of the Prepetition Secured Parties, however, had informed the Debtors that they would not consent to any third party priming liens. *Id.* at ¶ 12. Accordingly, the Debtors and their advisors focused their efforts on DIP financing from the Prepetition Secured Lenders and ultimately agreed to the terms of the DIP Term Sheet with the DIP Lenders, avoiding potentially extensive and costly litigation associated with a third party priming debtor-in-possession facility. *Id.*

47.     The DIP Facility is critical to the Debtors' ability to pay the administrative costs of the Chapter 11 Cases and should provide the Debtors with sufficient liquidity to operate their business without creating a "priming" or valuation dispute at the outset of the Chapter 11 Cases. *See* First Day Decl. ¶ 110. The DIP Facility, therefore, should provide a path to emergence that the Debtors believe is important to reassure residents, protect operations, and maximize value for all stakeholders. *Id.*

## **BASIS FOR RELIEF REQUESTED**

**I.      The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Loan Documents**

**A.      Entry into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment**

48.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and continue using the Cash Collateral. Bankruptcy Code section 364 authorizes a debtor to obtain secured or

superpriority financing under certain circumstances discussed in detail below. Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party in interest").

49.    The Fifth Circuit has described the business judgment standard as a flexible one, which will be satisfied if a debtor articulates a business justification, and the decision furthers the interests of the debtors and other parties in interest. *See ASARCO, Inc. v. Elliott Mgmt. (In re ASARCO, L.L.C.)*, 650 F.3d 593, 601 (5th Cir. 2011) (in the context of section 363 of the Bankruptcy Code.  To determine whether the business judgment standard is met, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second

guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of the debtor's authority under the [Bankruptcy] Code").

50.      In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (while many of the terms favored the DIP lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); *see also In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

51.      The Debtors' determination to move forward with the DIP Facility is a sound exercise of their business judgment following an arm's-length process and careful evaluation of available alternatives.  The Debtors require significant postpetition financing to support their working capital needs and to operate smoothly in chapter 11.  As discussed herein, the Debtors and their advisors determined that the DIP Facility is the only reasonable financing option available to the Debtors, and no alternative financing is available on more favorable economic terms.  The Debtors and their advisors also determined that the DIP Facility provides certainty with respect to the capital necessary for the administration of these Chapter 11 Cases through emergence.  The fees, rates, and other economics provided for in the DIP Facility, taken as a whole, are in the Debtors' best interests and the DIP Facility is the best and only reasonable financing option currently available to the Debtors under the circumstances.  *Id.* ¶¶ 16–18.  The Debtors simply do not have any actionable alternatives.

47

52.     The Debtors negotiated the DIP Loan Documents in good faith, at arm's-length, and with the assistance of their advisors, and they have obtained the best financing available under the circumstances.  After extensive negotiations with the DIP Lenders and careful consideration of the alternatives, the Debtors determined that the proposed DIP Facility was the only viable alternative as it provided immediate liquidity and avoided a costly priming fight.  Accordingly, the Court should authorize the Debtors' entry into the DIP Loan Documents as a reasonable exercise of the Debtors' business judgment.

**B.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims to the DIP Secured Parties**

53.     The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Loan Documents pursuant to Bankruptcy Code section 364(c).  Specifically, the Debtors propose to provide to the DIP Secured Parties postpetition security interest in and liens on the DIP Collateral and Prepetition Collateral that are valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute, or subordination immediately upon entry of the Interim Order.

54.     The statutory requirement for obtaining postpetition credit under Bankruptcy Code section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]." 11 U.S.C. § 364(c); *see In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under Bankruptcy Code section 364(c) is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under Bankruptcy Code section 364(c).  Specifically, courts look to whether:

- the debtor is unable to obtain unsecured credit under Bankruptcy Code section 364(b), i.e., by allowing a lender only an administrative claim;

- the credit transaction is necessary to preserve the assets of the estate; and

- the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See Ames Dep't Stores*, 115 B.R. at 37–40; *see also In re St. Mary Hosp.*, 86 B.R. 393, 401–02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

55.    The Debtors meet each part of this test.  As described above, no lenders were willing to provide sufficient postpetition financing on a junior lien or an unsecured or administrative priority basis.  *See* DIP Decl. ¶¶ 11, 16.  Given the Debtors' dire cash position, the lack of an alternative lender willing to provide financing on more favorable terms, the DIP Facility is reasonable under the circumstances and necessary to obtain critical financing and, by extension, maintain ordinary course operations for the benefit of all parties in interest including, especially, the Debtors' residents.

56.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under Bankruptcy Code section 503(b)(1), Bankruptcy Code section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (a) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (b) secured by a lien on property of the estate that is not otherwise subject to a lien; or (c) secured by a junior lien on property of the estate that is subject to a lien."  As described above, the Debtors are unable to obtain unsecured credit.  Therefore, approving (a) superpriority claims in favor of the DIP Lenders, (b) liens in favor of the DIP Lenders on unencumbered property of the estate, and (c) junior liens in favor of the DIP Lenders on Prepetition Collateral is reasonable and appropriate.

**B.      No Comparable Alternative to the DIP Facility Is Reasonably Available on More Favorable Overall Terms**

57.      A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Bankruptcy Code section 364(c).  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  In circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] conduct such an exhaustive search for financing."  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

58.      As noted above, the Debtors do not believe that any more favorable alternative DIP financing is reasonably available given the realities imposed by the Debtors' existing capital structure and the Debtors' solicitation of alternative financing proposals.  Furthermore, as set forth in the DIP Declaration, the Debtors engaged with certain stakeholders and third parties regarding potential financing for a chapter 11 process, but ultimately they did not receive any offer or combination of offers superior to the DIP Facility.  DIP Decl. ¶ 11.  Simply put, the DIP Facility provides the Debtors with the liquidity they need at the lowest cost available while simultaneously placing the Debtors on an optimal path for a successful restructuring.  Therefore, the requirement

of Bankruptcy Code section 364 that alternative credit on more favorable terms be unavailable to

the Debtors is satisfied.

## II.    The Debtors Should Be Authorized to Use Cash Collateral

59.    Bankruptcy Code section 363 generally governs the use of estate property.

Bankruptcy Code section 363(c)(2)(A) permits a debtor in possession to use Cash Collateral with

the consent of the secured party or if the court, after notice and a hearing, authorizes such use in

accordance with the provisions of this section of the Bankruptcy Code.

60.    The Debtors seek to use the Cash Collateral of White Oak to allow the Debtors to

continue their operations, pay their employees, care for their residents, and administer these

Chapter 11 Cases for the benefit of all creditors, including White Oak.[15]  Failure to obtain use of

Cash Collateral would result in an immediate and unplanned closure of the Debtors' Facilities,

which would put the very lives that the Debtors are charged with protecting in danger.  Thus, the

continuing use of Cash Collateral is necessary to stabilize and maintain operations, and ultimately

bridge to a sale transaction through a competitive auction process.  The far-reaching economic

impact of the Debtors' inability to use Cash Collateral would result in significant value destruction

for the Debtors' estates and each of their creditors.

## III.    Adequate Protection Provided to the Prepetition Secured Parties Is Appropriate

61.    Bankruptcy Code section 363(e) provides for adequate protection of interests in

property when a debtor uses cash collateral.  Further, Bankruptcy Code section 362(d)(1) provides

for adequate protection of interests in property due to the imposition of the automatic stay.  *See In*

---

[15]    The Debtors intend to negotiate with White Oak following the filing of the Chapter 11 Cases to determine whether
use of Cash Collateral can be obtained on a consensual basis.  However, given that access to Cash Collateral is
critical for the Debtors to continue to operate their facilities and provide continuous critical health care services
to their residents, to the extent they are unable to reach agreement with White Oak, the Debtors intend to seek
authority to obtain use of Cash Collateral on a non-consensual basis.

*re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (*en banc*).  While Bankruptcy Code section

361 provides examples of forms of adequate protection, such as granting replacement liens and

administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-

case basis.  *See, e.g.*, *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (explaining

that the "determination of whether there is adequate protection is made on a case by case basis");

*In re Satcon Tech. Corp.*, 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012) (same); *In re*

*N.J. Affordable Homes Corp.*, 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("the

circumstances of the case will dictate the necessary relief to be given"); *In re Columbia Gas Sys.,*

*Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) ("[W]hat interest

is entitled to adequate protection and what constitutes adequate protection must be decided on a

case-by-case basis."); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing

2 Collier on Bankruptcy ¶ 361.01 [1] at 361–66 (15th ed. 1993) (explaining that adequate

protection can take many forms and "must be determined based upon equitable considerations

arising from the particular facts of each proceeding")).

62.      As described more fully herein, and as set forth in the Interim Order, the Debtors

propose to provide the Prepetition Secured Parties with a variety of adequate protection to protect

against the postpetition Diminution in Value of the Cash Collateral resulting from the use, sale, or

lease of the Cash Collateral by the Debtors and the imposition of the automatic stay.  The adequate

protection being provided includes: (a) the ABL Adequate Protection Liens, Prepetition Term

Loan Adequate Protection Liens, and WELL/OHI Master Lease Adequate Protection Liens; (b)

the ABL Adequate Protection Superpriority Claims, Prepetition Term Loan Adequate Protection

Superpriority Claims, and WELL/OHI Master Lease Adequate Protection Superpriority Claims,

(c) the ABL Adequate Protection Payments and Prepetition Term Loan Adequate Protection

Payment, and (d) reimbursement of each Prepetition HUD ABL Secured Party, Prepetition Non-HUD ABL Secured Party, Prepetition Term Loan Secured Party, and Welltower Landlord and Omega Landlord for all reasonable and documented out-of-pocket fees, costs and expenses (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses, including one (1) local counsel) (collectively, the "Adequate Protection Package").  In light of the foregoing, the proposed Adequate Protection Package to be provided for the benefit of the Prepetition Secured Parties is appropriate.  The Debtors' provision of the liens provided for under the Adequate Protection Package is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these Chapter 11 Cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

## IV.     The Scope of the Carve Out Is Appropriate

63.     The proposed adequate protection is subject to the Carve Out contained in the DIP Orders.  Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these Chapter 11 Cases would be restricted.  *See Ames Dep't Stores*, 115 B.R. at 40 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced").  The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve Out protects against administrative insolvency during the course of the Chapter 11 Cases by ensuring that assets remain for the payment of the Clerk of

the Court, U.S. Trustee fees, and professional fees of the Debtors and any statutory committee

appointed under Bankruptcy Code section 1102 in these Chapter 11 Cases.

**V.     The Debtors Should Be Authorized to Pay the Fees Required by the DIP Lenders under the DIP Loan Documents**

64.     In connection with negotiating the DIP Facility, the Debtors have agreed, subject

to Court approval, to incur certain fees and premiums to the DIP Lenders.  In particular, as noted

above, the Debtors have agreed to incur the fees consisting of the following:

- Upfront Fee:  Each DIP Lender shall receive an upfront fee, payable-in-kind (i.e., by adding such fee to the aggregate principal amount of the DIP Loans) equal to 2% of such DIP Lender's DIP Commitment under the DIP Facility, which shall be fully earned, non-refundable, and due and payable upon the Closing Date.

- Exit Fee:  Each DIP Lender shall receive a payable-in-cash exit fee (the "Exit Fee") equal to 4% of such DIP Lender's initial DIP Commitment, which shall be fully earned and non-refundable on the Closing Date, and payable on the DIP Termination Date; *provided, however*, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Loan Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lenders.

65.     As set forth in the DIP Declaration, the interest and fees to be incurred under the

DIP Facility are consistent with the market and appropriate, particularly in light of the

circumstances of these Chapter 11 Cases and the marketing process undertaken, and represent the

only viable option presently available to the Debtors.  *See* DIP Decl. ¶¶ 16–17.  The fees and rates

to be paid under the proposed DIP Facility were the subject of arm's-length negotiation between

the Debtors and the DIP Lenders.  *Id.* ¶ 17.  The Debtors considered the fees described above when

determining in their sound business judgment that the DIP Facility is reasonable and constitutes

the best terms on which the Debtors can obtain the postpetition financing necessary to continue

their operations, prosecute their cases, and benefit the Debtors' estates.  Accordingly, the Court

should authorize the Debtors to pay the interest and fees provided under the DIP Loan Documents

in connection with the DIP Facility.

## VI.    The DIP Secured Parties Should Be Afforded Good-Faith Protection under Bankruptcy Code Section 364(e)

66.    Bankruptcy Code section 364(e) protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Bankruptcy Code section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

67.    As explained herein, the DIP Loan Documents are the result of: (a) the Debtors' reasonable and informed determination that the DIP Secured Parties provided the best postpetition financing alternative available under the circumstances and (b) extended arm's-length, good-faith negotiations between the Debtors and the DIP Secured Parties.  The terms and conditions of the DIP Loan Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, the Debtors market tested the terms of the DIP Facility before determining that the DIP Facility provided the best terms available.  Accordingly, the Court should find that the DIP Secured Parties are "good faith" lenders within the meaning of Bankruptcy Code section 364(e) and are entitled to all of the protections afforded by that section.

## VII.    The Automatic Stay Should Be Modified on a Limited Basis

68.    The proposed Interim Order provides that the automatic stay provisions of Bankruptcy Code section 362 will be modified to allow the DIP Agents to file any financing statements, security agreements, notices of liens, and other similar instruments and documents to

validate and perfect the liens and security interests granted to them under the Interim Order.  The

proposed Interim Order further provides that the automatic stay is modified as necessary to permit

the Debtors to grant liens to the DIP Secured Parties and the Prepetition Secured Parties and to

incur all liabilities and obligations set forth in the Interim Order.  The automatic stay should be

modified to allow the Debtors and the DIP Secured Parties to effectuate the terms of the Interim

Order.

## VIII.   Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm

69.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to

obtain credit pursuant to Bankruptcy Code section 364 may not be commenced earlier than 14

days after the service of such motion.  Upon request, however, the Court may conduct a

preliminary, expedited hearing on the motion and authorize the obtaining of credit to the extent

necessary to avoid immediate and irreparable harm to a debtor's estate.

70.     The Debtors request that the Court hold and conduct a hearing to consider entry of

the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final

Hearing, to withdraw and borrow funds under the DIP Facility to the extent permitted in the Interim

Order.  The Debtors require access to the DIP Facility prior to the Final Hearing and entry of the

Final Order to continue operating in the ordinary course by paying their administrative expenses

and implementing the relief requested in the Debtors' other "first day" motions.  This and such

other relief is necessary for the Debtors to avoid immediate and irreparable harm to the Debtors'

estates and to preserve and maximize value for the benefit of all parties in interest.

## IX.    Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Fund Transfers.

71.     The Debtors also request that all applicable banks and other financial institutions

be authorized to receive, process, honor, and pay all checks presented for payment, and to honor

all electronic payment requests made by the Debtors, related to the obligations described herein, whether such checks were presented or electronic requests were submitted prior to or after the Petition Date.  The Debtors further request that all such banks and financial institutions be authorized to rely on the Debtors' designation of any particular check or electronic payment request as approved pursuant to the Motion.  The Debtors represent that they have sufficient availability of funds to pay any amounts described herein.

## EMERGENCY CONSIDERATION

72.     The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003.  Here, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm.  Furthermore, the failure to receive the requested relief during the first 21 days of these Chapter 11 Cases would severely disrupt the Debtors' operations at this critical juncture.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the Court approve the relief requested in this Motion on an emergency basis.

## WAIVER OF ANY APPLICABLE STAY

73.     The Debtors seek a waiver of any stay of the effectiveness of the order granting this Motion.  Pursuant to Bankruptcy Rule 6004(h), any "order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." The Debtors submit that the relief requested in this Motion is

necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable.

## RESERVATION OF RIGHTS

74.     Nothing in the Motion should be construed as (a) authority to assume or reject any executory contract or unexpired lease of real property, or as a request for the same; (b) an admission as to the validity, priority, or character of any claim or other asserted right or obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or applicable non-bankruptcy law; (c) a promise or requirement to pay any claim or other obligation; or (d) granting third-party-beneficiary status, bestowing any additional rights on any third party, or being otherwise enforceable by any third party.

## NOTICE

75.     The Debtors will provide notice of the Motion to: (a) the U.S. Trustee; (b) the Internal Revenue Service; (c) the United States Attorney for the Northern District of Texas; (d) the Attorney General for the State of Texas; (e) State Comptroller of Public Accounts; (f) the Centers for Medicare and Medicaid Services; (g) the Attorneys General for the states in which the Debtors conduct business; (h) the parties included on the Debtors' list of their 30 largest unsecured creditors; (i) counsel to the Prepetition ABL Agents; (j) counsel to the Prepetition Term Loan Agent, (k) counsel to the Omega Landlords; (l) counsel to the Welltower Landlords; (m) the United States Department of Housing and Urban Development; and (n) all parties entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or further notice is required.

## **NO PRIOR REQUEST**

76.     No previous request for the relief sought herein has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Interim and Final

Orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, respectively,

granting the relief requested herein and such other and further relief as may be just and proper.

Dated: July 10, 2025                          **MCDERMOTT WILL & EMERY LLP**
      Dallas, Texas

                                     */s/ Marcus A. Helt*
                                     Marcus A. Helt (TX 24052187)
                                     Jack G. Haake (TX 24127704)
                                     Grayson Williams (TX 24124561)
                                     2801 N. Harwood Street, Suite 2600
                                     Dallas, Texas 75201-1574
                                     Telephone:    (214) 295-8000
                                     Facsimile:    (972) 232-3098
                                     Email:         mhelt@mwe.com
                                                jhaake@mwe.com
                                                gwilliams@mwe.com

                                     - and -

                                     Daniel M. Simon (*pro hac vice* pending)
                                     Emily C. Keil (*pro hac vice* pending)
                                     William A. Guerrieri (*pro hac vice* pending)
                                     444 West Lake Street, Suite 4000
                                     Chicago, Illinois 60606
                                     Telephone:    (312) 372-2000
                                     Facsimile:    (312) 984-7700
                                     Email:         dsimon@mwe.com
                                                ekeil@mwe.com
                                                wguerrieri@mwe.com

                                     *Proposed Counsel for the Debtors and*
                                     *Debtors-in-Possession*

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true and correct copy of the foregoing Motion was served by the Court's CM/ECF system on all counsel of record registered in these Chapter 11 Cases through CM/ECF.  Subject to the Court's approval of their retention and access to filing privileges, the Debtors' proposed claims and noticing agent will be filing a supplemental certificate of service on the docket to reflect any additional service of the foregoing Motion.

Dated: July 10, 2025
      Dallas, Texas

**MCDERMOTT WILL & EMERY LLP**

*/s/ Marcus A. Helt*
Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
Grayson Williams (TX 24124561)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone:    (214) 295-8000
Facsimile:    (972) 232-3098
Email:       mhelt@mwe.com
           jhaake@mwe.com
           gwilliams@mwe.com

- and -

Daniel M. Simon (*pro hac vice* pending)
Emily C. Keil (*pro hac vice* pending)
William A. Guerrieri (*pro hac vice* pending)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone:    (312) 372-2000
Facsimile:    (312) 984-7700
Email:       dsimon@mwe.com
           ekeil@mwe.com
           wguerrieri@mwe.com

*Proposed Counsel for the Debtors and Debtors-in-Possession*

**EXHIBIT A**

**<u>Proposed Interim Order</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | ) | Case No. 25-80185 (SGJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Related to Docket No. ___** |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) MODIFYING THE AUTOMATIC STAY, (IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

---

[1]  The last four digits of Genesis Healthcare, Inc's federal tax identification number are 4755.  There are 299 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only.  A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Genesis.  The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

Upon the motion (the "DIP Motion")[2] of Genesis Healthcare, Inc. ("Genesis") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") for entry of an interim order (this "Interim Order") and a final order ("Final Order"), under sections 105, 361, 362, 363, 364, 503, 506, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1, 5005-1, and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules"), and Section D of the Procedures for Complex Cases in the Northern District of Texas (the "Complex Case Procedures") seeking, *inter alia*:

(i)       authorizing the Debtors to obtain postpetition financing on a secured junior basis, consisting of a new money term loan facility (the "DIP Facility," and the loans issued thereunder, the "DIP Loans") in an aggregate principal amount of up to $30,000,000 pursuant to the terms and conditions set forth in this Interim Order and that certain term sheet annexed hereto as **Exhibit 1** (as may be amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Term Sheet"), executed by Genesis  and FC-GEN Operations Investment, LLC, as borrowers (the "DIP Borrowers"), and those certain Debtors identified as guarantors in the DIP Term Sheet (the "DIP Guarantors" and, together with the DIP Borrowers, the "DIP Loan Parties"), Markglen, Inc., as lender under the DIP Facility (in such capacity, the "Welltower DIP Lender"), OHI Mezz Lender LLC, as lender under the DIP Facility (in such capacity, the "Omega DIP Lender"), and CPE 88988 LLC, as lender under the DIP Facility (in such capacity, the "WAX DIP Lender" and, together with Welltower DIP Lender and Omega DIP Lender, the "DIP Lenders"), and Welltower OP LLC, upon execution

---

[2]   Capitalized terms used herein and not herein defined have the meaning ascribed to such terms in the DIP Motion or the DIP Term Sheet (as defined herein).

2

of the DIP Credit Agreement, administrative and collateral agent (in such capacity, the "DIP Agent" and, together with the DIP Lenders, the "DIP Secured Parties");

(ii)     authorizing the Debtors to enter into the DIP Term Sheet and that certain loan agreement by and among the DIP Borrowers, the DIP Guarantors, the DIP Lenders, and the DIP Agent (the "DIP Credit Agreement") and that certain promissory note evidencing the obligations due and owing under the DIP Credit Agreement (the "DIP Note") and any other agreements, instruments, pledge agreements, guarantees, indemnities, security agreements, intellectual property security agreements, control agreements, escrow agreements, instruments, notes, and documents executed in accordance and connection therewith (each as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms hereof and thereof, and collectively with the DIP Term Sheet, the DIP Credit Agreement, and the DIP Note, the "DIP Loan Documents");

(iii)    authorizing the DIP Borrowers to incur, and for the DIP Guarantors to guarantee on an unconditional joint and several basis, obligations for principal, interest, fees, costs, expenses, obligations (whether contingent or otherwise), and all other amounts, as and when due and payable under and in accordance with this Interim Order, the DIP Term Sheet, and the DIP Loan Documents (collectively, the "DIP Facility Obligations");

(iv)    authorizing the DIP Loan Parties to perform such other and further acts as may be necessary or desirable in connection with this Interim Order, the DIP Term Sheet, the DIP Loan Documents, and the transactions contemplated hereby and thereby;

(v)     granting each of the DIP Lenders, jointly and severally, and authorizing the DIP Loan Parties to incur, the DIP Liens (as defined below), as applicable, in all DIP Collateral (as defined below) having the priority described in this Interim Order;

3

(vi)    granting each of the DIP Lenders, jointly and severally, and authorizing the DIP Loan Parties to incur, allowed superpriority administrative expense claims against each of the DIP Loan Parties in respect of all DIP Facility Obligations, in each case, in accordance with the terms of this Interim Order;

(vii)    authorizing the DIP Loan Parties' use of Prepetition Collateral (as defined below), including Cash Collateral (as defined below), as well as the proceeds of the DIP Facility, subject to the terms and conditions set forth in this Interim Order and the DIP Loan Documents;

(viii)    providing adequate protection to the Prepetition Secured Parties (as defined below) on account of any Diminution in Value (as defined below) of the Prepetition Secured Parties' interest in the Prepetition Collateral;

(ix)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate, including the right to exercise remedies following an Event of Default (as defined below) and expiration of any applicable notice period, the terms and provisions of this Interim Order and the DIP Loan Documents, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order, and providing for the immediate effectiveness of this Interim Order;

(x)    upon entry of a Final Order providing for such relief and as set forth in paragraphs 25 and 27 herein, authorizing the Debtors to waive as to the DIP Lenders and Prepetition Secured Parties (a) any rights to surcharge the DIP Collateral or any Prepetition Collateral (as defined herein) pursuant to section 506(c) of the Bankruptcy Code, and (b) any "equities of the case" exception under section 552(b) of the Bankruptcy Code;

(xi)    upon entry of a Final Order providing for such relief, waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to (a) the DIP Collateral, for the benefit of any party other than the DIP Secured Parties, and (b) the Prepetition Collateral, for the benefit of any party other than the Prepetition Secured Parties (as defined herein), subject to the Carve Out (as defined below); and

(xii)   scheduling a final hearing (the "Final Hearing") to consider entry of the Final Order, and approving the form of notice with respect to the Final Hearing.

This Court having considered the DIP Motion, the DIP Term Sheet, the proposed Interim Order, the *Declaration of Jaspinder Kanwal in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. [●]] (the "DIP Declaration") *and the Declaration of Louis E. Robichaux IV in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. [●]] (the "First Day Declaration"), the pleadings filed with this Court, the evidence submitted and arguments proffered or adduced at the hearing held before this Court on July 11, 2025 (the "Interim Hearing"), and upon the record of these Chapter 11 Cases; and adequate notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001 and 9014, and all applicable Local Rules; and it appearing that no other or further notice need be provided; and any objections, responses and reservations of rights with respect to the entry of the Interim Order or the relief requested in the DIP Motion having been withdrawn, resolved, or overruled by this Court; and it appearing to this Court that granting the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, and otherwise is

fair and reasonable and in the best interests of the Debtors, their estates, and their creditors, represents a sound exercise of the Debtors' business judgment, and is necessary for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.     **Petition Date**.  On July 9, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas (this "Court") commencing these Chapter 11 Cases.  On July [●], 2025, this Court entered an order approving the joint administration of the Chapter 11 Cases for procedural purposes only.

B.     **Debtors-in-Possession**.  The Debtors continue in possession of and to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of these Chapter 11 Cases.

C.     **Committee Formation**.  As of the date hereof, the United States Trustee for Region 6 (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases (the "Official Committee").

D.     **Jurisdiction and Venue**.  This Court has jurisdiction over the Debtors, property of the Debtors' estates, the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

---

[3]   The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Venue for these Chapter 11 Cases and the proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief set forth herein are sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, Local Rules 2002-1, 4001-1, 5005-1, and 9013-1, and the Complex Cases Procedures.

E.     **Debtors' Stipulations**.  Subject to the limitations thereon contained in paragraph 24 hereof, the Debtors, on behalf of their estates, admit, stipulate, acknowledge, and agree, having considered and reviewed the facts and circumstances and record, that the following statements are true and correct:

(i)     Prepetition ABL Credit Agreement.

(a)     Genesis Healthcare, Inc., and certain of its affiliates designated therein as borrowers (such borrowers, collectively, the "Prepetition Non-HUD ABL Borrowers" or the "Prepetition Non-HUD ABL Obligors"), White Oak Healthcare Finance, LLC and the other financial institutions party thereto from time to time as lenders (the "Prepetition Non-HUD ABL Lenders"), White Oak Healthcare Finance, LLC, as agent for the Prepetition Non-HUD ABL Lenders (in such capacity, the "Prepetition Non-HUD ABL Agent," and together with the Prepetition Non-HUD ABL Lenders, the "Prepetition Non-HUD ABL Secured Parties"), entered into that certain Fifth Amended and Restated Credit Agreement, dated as of March 9, 2022 (as otherwise amended, supplemented, or otherwise modified from time to time, the "Prepetition Non-HUD ABL Credit Agreement," and together with any other documents executed and delivered in connection therewith, the "Prepetition Non-HUD ABL Documents").

(b)     As of the Petition Date, the Prepetition Non-HUD ABL Obligors were justly and lawfully indebted and liable to the Prepetition Non-HUD ABL Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less

7

than $[223.6] million, *plus* accrued and unpaid interest (including default interest) thereon and reimbursement obligations, fees, costs, and expenses (including, without limitation, any attorneys', accountants', appraisers' financial advisors' fees, and related costs and expenses, in each case, solely to the extent that they are chargeable or reimbursable under the Prepetition Non-HUD ABL Documents), charges, disbursements, indemnification obligations, and any other amounts, contingent or otherwise, whenever arising or accruing, that may be due, owing, or chargeable in respect thereof, and all other Obligations (as defined in the Prepetition Non-HUD ABL Agreement) incurred or accrued in connection therewith (whether arising before, on, or after the Petition Date), owing, in each case under or in connection with the Prepetition Non-HUD ABL Documents without defense, counterclaim, or offset of any kind (collectively, the "Prepetition Non-HUD ABL Obligations").

(c)    The Prepetition Non-HUD ABL Obligations are secured by valid, binding, perfected, and enforceable first priority security interests in and liens on all "Collateral" (as defined in the Prepetition Non-HUD ABL Documents) (such collateral, the "Non-HUD ABL Senior Collateral" and such security interests in and liens on the Non-HUD ABL Senior Collateral, the "Prepetition Non-HUD ABL Liens").

(d)    Genesis Healthcare, Inc., and certain of its affiliates designated therein as borrowers (such borrowers, collectively, the "Prepetition HUD ABL Borrowers" or the "Prepetition HUD ABL Obligors" and, together with the Prepetition Non-HUD ABL Borrowers or the Prepetition Non-HUD ABL Obligors, the "Prepetition ABL Borrowers" or the "Prepetition ABL Obligors"), White Oak Healthcare Finance, LLC and the other financial institutions party thereto from time to time as lenders (the "Prepetition HUD ABL Lenders" and, together with the Prepetition Non-HUD ABL Lenders, the "Prepetition ABL Lenders"), White Oak Healthcare

Finance, LLC, as agent for the Prepetition HUD ABL Lenders (in such capacity, the "Prepetition HUD ABL Agent," and together with the Prepetition HUD ABL Lenders, the "Prepetition HUD ABL Secured Parties"; the Prepetition HUD ABL Agent and the Prepetition Non-HUD ABL Agent shall be referred to collectively as the "Prepetition ABL Agents" and the Prepetition HUD ABL Secured Parties and the Prepetition Non-HUD ABL Secured Parties shall be collectively referred to as the "Prepetition ABL Secured Parties"), entered into that certain Third Amended and Restated Credit Agreement, dated as of March 6, 2020 (as otherwise amended, supplemented, or otherwise modified from time to time, the "Prepetition HUD ABL Credit Agreement," and together with any other documents executed and delivered in connection therewith, the "Prepetition HUD ABL Documents"; the Prepetition HUD ABL Credit Agreement and the Prepetition Non-HUD ABL Credit Agreement shall be referred to collectively as the "Prepetition ABL Credit Agreements" and the Prepetition HUD ABL Documents and the Prepetition Non-HUD ABL Documents shall be collectively referred to as the "Prepetition ABL Documents").

(e)      As of the Petition Date, the Prepetition HUD ABL Obligors were justly and lawfully indebted and liable to the Prepetition HUD ABL Secured Parties, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $[55.7] million, *plus* accrued and unpaid interest (including default interest) thereon and reimbursement obligations, fees, costs, and expenses (including, without limitation, any attorneys', accountants', appraisers' financial advisors' fees, and related costs and expenses, in each case, solely to the extent that they are chargeable or reimbursable under the Prepetition HUD ABL Documents), charges, disbursements, indemnification obligations, and any other amounts, contingent or otherwise, whenever arising or accruing, that may be due, owing, or chargeable in respect thereof, and all other Obligations (as defined in the Prepetition HUD ABL Agreement)

incurred or accrued in connection therewith (whether arising before, on, or after the Petition Date), owing, in each case under or in connection with the Prepetition HUD ABL Documents without defense, counterclaim, or offset of any kind (collectively, the "<u>Prepetition HUD ABL Obligations</u>" and, together with the Prepetition Non-HUD ABL Obligations, the "<u>Prepetition ABL Obligations</u>").

(f)     The Prepetition HUD ABL Obligations are secured by valid, binding, perfected, and enforceable first priority security interests in and liens on all "Collateral" (as defined in the Prepetition HUD ABL Documents) (such collateral, the "<u>HUD ABL Senior Collateral</u>" and such security interests in and liens on the HUD ABL Senior Collateral, the "<u>Prepetition HUD ABL Liens</u>"; the HUD ABL Senior Collateral and the Non-HUD ABL Senior Collateral shall be referred to collectively as the "<u>ABL Senior Collateral</u>" and the Prepetition HUD ABL Liens and the Prepetition Non-HUD ABL Liens shall be collectively referred to as the "<u>Prepetition ABL Liens</u>").

(ii)     <u>Prepetition Term Loan Credit Agreement</u>.

(a)     Genesis Healthcare, Inc., and certain of its affiliates designated therein, as borrowers (such borrowers, collectively, the "<u>Prepetition Term Loan Borrowers</u>"), certain other parties designated as guarantors thereto (such guarantors collectively, the "<u>Prepetition Term Loan Guarantors</u>" and, together with the Prepetition Term Loan Borrowers, the "<u>Prepetition Term Loan Obligors</u>"), Markglen, Inc. (in such capacity, the "<u>Prepetition Welltower Term Loan Lender</u>"), OHI Mezz Lender, LLC (in such capacity, the "<u>Prepetition Omega Term Loan Lender</u>" and, together with the Prepetition Welltower Term Loan Lender, the "<u>Prepetition WELL/OHI Term Loan Lenders</u>"), WAX Dynasty Partners LLC (in such capacity, the "<u>Prepetition WAX Term Loan Lender</u>"), MAO 22322 LLC (in such capacity, the "<u>Prepetition MAO Term Loan Lender</u>"

10

and, together with the Prepetition WAX Term Loan Lender, the "Prepetition WAX/MAO Term Loan Lenders") and the other financial institutions party thereto from time to time as lenders and the other financial institutions party thereto from time to time as lenders (collectively, the "Prepetition Term Loan Lenders"), and Welltower OP LLC (formerly known as Welltower Inc.), as administrative and collateral agent for the Prepetition Term Loan Lenders (in such capacity, the "Prepetition Term Loan Agent," and together with the Prepetition Term Loan Lenders, the "Prepetition Term Loan Secured Parties") entered into that certain Term Loan Agreement, dated as of July 29, 2016 (as otherwise amended, supplemented, or otherwise modified from time to time, the "Prepetition Term Loan Credit Agreement," and together with any other documents executed and delivered in connection therewith, the "Prepetition Term Loan Documents").

(b)     As of the Petition Date, the Prepetition Term Loan Obligors were justly and lawfully indebted and liable to the Prepetition Term Loan Secured Parties, without defense, counterclaim or offset of any kind in the aggregate principal amount of at least $[317.8] million, *plus* accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Prepetition Term Loan Documents), charges, indemnities and all other Obligations (as defined in the Prepetition Term Loan Credit Agreement) incurred or accrued in connection therewith (whether arising before, on, or after the Petition Date), owing in each case under or in connection with the Prepetition Term Loan Documents without defense, counterclaim, or offset of any kind (collectively, the "Prepetition Term Loan Obligations"), which Prepetition Term Loan Obligations have been guaranteed on a joint and several basis by the Prepetition Term Loan Guarantors.

(c)     The Prepetition Term Loan Obligations are secured by second priority security interests in and liens on property of the Prepetition Term Loan Obligors constituting ABL Senior Collateral and first priority security interests in and liens on any other property of the Prepetition Term Loan Obligors as set forth in the Prepetition Term Loan Documents (such collateral, the "Prepetition Term Loan Collateral" and such security interests in and liens on the Prepetition Term Loan Collateral, the "Prepetition Term Loan Liens").

(iii)    Prepetition Welltower Non-HUD Master Lease Agreement.

(a)     Genesis Dynasty Operations, LLC (the "Welltower Non-HUD Master Tenant") entered into that certain Master Lease Agreement, dated as of December 23, 2016 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Welltower Non-HUD Master Lease Agreement" and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the "Landlord" (the "Welltower Non-HUD Master Lease Landlord") including, without limitation, all security agreements, notes, guarantees, including the Welltower Non-HUD Master Lease Guaranty (as defined below), mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Welltower Non-HUD Master Lease Documents") by and among the Welltower Non-HUD Master Tenant and the Welltower Non-HUD Master Lease Landlord.  The Welltower Non-HUD Master Tenant has subleased the facilities leased to the Welltower Non-HUD Master Tenant under the Welltower Non-HUD Master Lease Agreement to certain operators set forth therein (the "Existing Welltower Non-HUD Operators").

(b)     Certain of the Debtors, including the Existing Welltower Non-HUD Operators, and other parties (each a "Welltower Non-HUD Master Lease Guarantor" and,

collectively with the Welltower Non-HUD Master Tenant, the "Welltower Non-HUD Master Lease Obligors") have entered into that certain Unconditional and Continuing Guaranty and Indemnification Agreement, dated as of December 23, 2016 with the Welltower Non-HUD Master Lease Landlord (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, in respect of the Welltower Non-HUD Master Lease Agreement, the "Welltower Non-HUD Master Lease Guaranty").

(c)      As of the Petition Date, the Welltower Non-HUD Master Lease Obligors were justly and lawfully indebted and liable to the Welltower Non-HUD Master Lease Landlord, without defense, counterclaim or offset of any kind for certain amounts, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Welltower Non-HUD Master Lease Documents), charges, indemnities and all other Lease Obligations (as defined in the Welltower Non-HUD Master Lease) incurred or accrued in connection therewith (whether arising before, on, or after the Petition Date) owing, in each case under or in connection with the Welltower Non-HUD Master Lease Documents without defense, counterclaim, or offset of any kind (collectively, the "Welltower Non-HUD Master Lease Obligations"), which Welltower Non-HUD Master Lease Obligations have been guaranteed on a joint and several basis by the Welltower Non-HUD Master Lease Guarantors.

(d)      The Welltower Non-HUD Master Lease Obligations are secured by second priority security interests in and liens on property of the Welltower Non-HUD Master Lease Obligors constituting ABL Senior Collateral and first priority security interests in and liens on any other property of the Welltower Non-HUD Master Lease Obligors as set forth in the Welltower Non-HUD Master Lease Documents (the "Welltower Non-HUD Landlord Collateral").

(iv)     Prepetition Welltower HUD Master Lease Agreement.

(a)     Genesis Tang Operations LLC (the "Welltower HUD Master Tenant") entered into that certain Master Lease Agreement, dated as of October 1, 2017 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Welltower HUD Master Lease Agreement" and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of "Landlord" (the "Welltower HUD Master Lease Landlord" and together with the Welltower Non-HUD Master Lease Landlord, the "Welltower Landlords") including, without limitation, all security agreements, notes, guarantees, including the Welltower HUD Master Lease Guaranty (as defined below), mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Welltower HUD Master Lease Documents" and together with the Welltower Non-HUD Master Lease Documents, the "Welltower Master Lease Documents") by and among the Welltower HUD Master Tenant and the Welltower HUD Master Lease Landlord (together with the Welltower Non-HUD Master Lease Landlord, the "Welltower Master Lease Secured Parties").  The Welltower HUD Master Tenant has subleased the facilities leased to the Welltower HUD Master Tenant under the Welltower HUD Master Lease Agreement to certain operators set forth therein (the "Existing Welltower HUD Operators").

(b)     Certain of the Debtors, including the Existing Welltower HUD Operators, and other parties (each a "Welltower HUD Master Lease Guarantor" and, collectively with the Welltower HUD Master Tenant, the "Welltower HUD Master Lease Obligors," and, together with the Welltower Non-HUD Master Lease Obligors, the "Welltower Master Lease Obligors") have entered into that certain Unconditional and Continuing Guaranty and

14

Indemnification Agreement, dated as of October 26, 2017 with the Welltower HUD Master Lease Landlord (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, in respect of the Welltower HUD Master Lease Agreement, the "<u>Welltower HUD Master Lease Guaranty</u>").

        (c)       As of the Petition Date, the Welltower HUD Master Lease Obligors were justly and lawfully indebted and liable to the Welltower HUD Master Lease Landlord, without defense, counterclaim or offset of any kind for certain amounts, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Welltower HUD Master Lease Documents), charges, indemnities and all other Lease Obligations (as defined in the Welltower HUD Master Lease) incurred or accrued in connection therewith (whether arising before, on, or after the Petition Date) owing, in each case under or in connection with the Welltower HUD Master Lease Documents without defense, counterclaim, or offset of any kind (collectively, the "<u>Welltower HUD Master Lease Obligations</u>" and, together with the Welltower Non-HUD Master Lease Obligations, the "<u>Welltower Master Lease Obligations</u>"), which Welltower HUD Master Lease Obligations have been guaranteed on a joint and several basis by the Welltower HUD Master Lease Guarantors.

        (d)       The Welltower HUD Master Lease Obligations are secured by second priority security interests in and liens on property of the Welltower HUD Master Lease Obligors constituting ABL Senior Collateral and first priority security interests in and liens on any other property of the Welltower HUD Master Lease Obligors as set forth in the Welltower HUD Master Lease Documents (the "<u>Welltower HUD Landlord Collateral</u>," and together with the Welltower Non-HUD Landlord Collateral, the "<u>Welltower Landlord Collateral</u>").

15

(v)     <u>Prepetition Omega Master Lease Agreement</u>.

(a)     Sunbridge Care Enterprises, LLC, a Delaware limited liability company, Sunbridge Beckley Health Care, LLC, a West Virginia limited liability company, Sunbridge Putnam Health Care, LLC, a West Virginia limited liability company, Sunbridge Dunbar Health Care, LLC, a West Virginia limited liability company, Sunbridge Salem Health Care, LLC, a West Virginia limited liability company, Sunbridge Regency-North Carolina, LLC, a North Carolina limited liability company, Sunbridge Healthcare, LLC, a New Mexico limited liability company, Sunbridge Regency-Tennessee, LLC, a Tennessee limited liability company, Falmouth Healthcare, LLC, a Delaware limited liability company, Mashpee Healthcare, LLC, a Delaware limited liability company, Peak Medical Of Idaho, LLC, a Delaware limited liability company, Peak Medical Of Boise, LLC, a Delaware limited liability company, Genesis OMG Operations LLC, a Delaware limited liability company, 803 Hacienda Lane Operations LLC, a New Mexico limited liability company, 419 Harding Street Operations LLC, a New Mexico limited liability company, 1650 Galisteo Street Operations LLC, a New Mexico limited liability company, 3720 Church Rock Street Operations LLC, a New Mexico limited liability company, 3514 Fowler Avenue Operations LLC, a New Mexico limited liability company, 400 Mckinley Avenue Operations LLC, a West Virginia limited liability company, Sunbridge Retirement Care Associates, LLC, a Colorado limited liability company, and Albuquerque Heights Healthcare And Rehabilitation Center, LLC, a Delaware limited liability company (collectively, the "<u>Omega Master Tenant</u>") entered into that certain Second Consolidated Amended and Restated Master Lease Agreement, dated as of January 30, 2015 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Omega Master Lease Agreement</u>" and, together with all other agreements, documents, and instruments executed and/or delivered

16

with, to or in favor of the Omega Landlords (as defined therein) including, without limitation, all security agreements, notes, guarantees, including the Omega Master Lease Guaranty (as defined below), mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Omega Master Lease Documents" and together with the Welltower Master Lease Documents, the Prepetition Term Loan Documents, and the Prepetition ABL Documents, the "Prepetition Secured Documents") by and among the Omega Master Tenant and the Omega Landlords (the "Omega Master Lease Secured Parties" and, together with the Welltower Master Lease Secured Parties, the WELL/OHI Master Lease Secured Parties and, the WELL/OHI Master Lease Secured Parties together with the Prepetition Term Loan Secured Parties, the "Prepetition TL/ML Secured Parties" and, the Prepetition TL/ML Secured Parties together with the Prepetition ABL Secured Parties, the "Prepetition Secured Parties").  The Omega Master Tenant has subleased the facilities leased to the Omega Master Tenant under the Omega Master Lease Agreement to certain operators set forth therein (the "Existing Omega Operators").

(b)      Certain of the Debtors, including the Existing Omega Operators, and other parties (each an "Omega Master Lease Guarantor" and, collectively with the Omega Master Tenant, the "Omega Master Lease Obligors," and, together with the Welltower Master Lease Obligors and the Prepetition Term Loan Obligors, the "Prepetition TL/ML Obligors" and, the Prepetition TL/ML Obligors together with the Prepetition ABL Obligors, the "Prepetition Obligors") have entered into that certain Lease Guaranty, dated as of January 30, 2015 with the "Omega Landlords" (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, in respect of the Omega Master Lease Agreement, the "Omega Master Lease Guaranty").

17

(c)     As of the Petition Date, the Omega Master Lease Obligors were justly and lawfully indebted and liable to the Omega Landlords, without defense, counterclaim or offset of any kind for certain amounts, plus accrued and unpaid interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees, in each case, solely to the extent that they are chargeable or reimbursable under the Omega Master Lease Documents), charges, indemnities and all other Obligations (as defined in the Omega Master Lease) incurred or accrued in connection therewith (whether arising before, on, or after the Petition Date) owing, in each case under or in connection with the Omega Master Lease Documents without defense, counterclaim, or offset of any kind (collectively, the "Omega Master Lease Obligations" and, together with the Welltower Master Lease Obligations, the "WELL/OHI Master Lease Obligations" and the WELL/OHI Master Lease Obligations together with the Prepetition Term Loan Obligations, the "Prepetition TL/ML Secured Obligations" and, the Prepetition TL/ML Secured Obligations together with the Prepetition ABL Obligations, the "Prepetition Secured Obligations"), which Omega Master Lease Obligations have been guaranteed on a joint and several basis by the Omega Master Lease Guarantors.

(d)     The Omega Master Lease Obligations are secured by second priority security interests in and liens on property of the Omega Master Lease Obligors constituting ABL Senior Collateral and first priority security interests in and liens on any other property of the Omega Master Lease Obligors as set forth in the Omega Master Lease Documents (the "Omega Landlord Collateral" and, together with the Welltower Landlord Collateral, the "WELL/OHI Landlord Collateral" and, the WELL/OHI Landlord Collateral, together with the Prepetition Term Loan Collateral, the "Prepetition TL/ML Collateral" and, the Prepetition TL/ML Collateral together with the ABL Senior Collateral, the "Prepetition Collateral"); and such liens on and

security interests in the Welltower Landlord Collateral and the Omega Landlord Collateral, the "<u>WELL/OHI Master Lease Liens</u>," and together with the Prepetition Term Loan Liens, the "<u>Prepetition TL/ML Liens</u>" and, the Prepetition TL/ML Liens together with the Prepetition ABL Liens, the "<u>Prepetition Liens</u>").

       (vi)    ***Intercreditor Agreements***.  As of the Petition Date the Prepetition Non-HUD ABL Agent was party to (A) that certain Intercreditor Agreement dated as of March 9, 2022, by and among the Prepetition Non-HUD ABL Agent, in its capacity as revolving agent for itself and the Prepetition Non-HUD ABL Lenders, and the Prepetition Term Loan Agent, in its capacity as administrative agent for itself and the Prepetition Term Loan Lenders (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition ABL/TL Intercreditor Agreement</u>"), which governs, among other things, the rights, interests obligations, priority, and positions of the Prepetition Non-HUD ABL Secured Parties and the Prepetition Term Loan Secured Parties with respect to collateral on which both the Prepetition ABL Non-HUD Secured Parties and the Prepetition Term Loan Secured Parties hold liens; (B)(i) that certain Intercreditor Agreement dated as of December 23, 2016, by and among the Prepetition Non-HUD ABL Agent (as successor to MidCap Funding IV Trust) in its capacity as revolving agent for itself and the Prepetition Non-HUD ABL Lenders, the Prepetition Term Loan Agent, and certain Welltower Landlords (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time); and (ii) that certain Intercreditor Agreement dated as of October 31, 2019, by and among the Prepetition Non-HUD ABL Agent (as successor to MidCap Funding IV Trust) in its capacity as revolving agent for itself and the Prepetition Non-HUD ABL Lenders, the Prepetition Term Loan Agent, and certain Welltower Landlords (as amended, restated, amended and restated, supplemented, or otherwise modified from

time to time, together, the "<u>Prepetition ABL/WELL ML Intercreditor Agreements</u>"), which govern, among other things, the rights, interests obligations, priority, and positions of the Prepetition Non-HUD ABL Secured Parties and the Welltower Landlords with respect to collateral on which both the Prepetition Non-HUD ABL Secured Parties and the Welltower Landlords hold liens; and (C) that certain Intercreditor Agreement dated as of July 29, 2016, by and among the Prepetition Non-HUD ABL Agent (as successor to MidCap Funding IV Trust) in its capacity as revolving agent for itself and the Prepetition Non-HUD ABL Lenders, the Prepetition Term Loan Agent, and certain Omega Landlords (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition ABL/OHI ML Intercreditor Agreement</u>"), which governs, among other things, the rights, interests obligations, priority, and positions of the Prepetition Non-HUD ABL Secured Parties and the Omega Landlords with respect to collateral on which both the Prepetition Non-HUD ABL Secured Parties and the Omega Landlords hold liens.

(vii)   ***Prepetition Secured Obligations***.  As of the Petition Date, the Prepetition Secured Obligations owing to the Prepetition Secured Parties constitute legal, valid, and binding obligations of the Debtors and their applicable affiliates, enforceable against them in accordance with their respective terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and no portion of the Prepetition Secured Obligations owing to, or any transfers made to any or all of the Prepetition Secured Parties is subject to avoidance, recharacterization, reduction, set-off, offset, counterclaim, cross-claim, recoupment, defenses, disallowance, impairment, recovery, subordination (whether equitable or otherwise), or any other legal or equitable challenges pursuant to the Bankruptcy Code or applicable non-bankruptcy law or regulation by any person or entity.

(viii)    ***Prepetition Liens***.  The Prepetition Liens granted to the Prepetition Secured Parties respectively constitute legal, valid, binding, enforceable (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), non-avoidable, and properly perfected liens on and security interests in the Prepetition Collateral and were granted to, or for the benefit of, the applicable Prepetition Secured Parties for fair consideration and reasonably equivalent value, and are not subject to defense, counterclaim, recharacterization, subordination (equitable or otherwise), avoidance, or recovery pursuant to the Bankruptcy Code or applicable non-bankruptcy law or equity or regulation by any person or entity.

(ix)    ***No Challenges/Claims***.    No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, no facts or occurrence supporting or giving rise to any offset, challenge, objection, defense, claim or counterclaim of any kind or nature to any of the Prepetition Liens or Prepetition Secured Obligations exist, and no portion of the Prepetition Liens or Prepetition Secured Obligations are subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law or equity.  The Debtors and their estates have no valid Claims (as such term is defined in section 101(5) of the Bankruptcy Code), objections, challenges, causes of action, and/or choses in action, including "lender liability" causes of action, derivative claims, or basis for any equitable relief against any of the Prepetition Secured Parties or DIP Lenders or any of their respective predecessors, affiliates, agents, attorneys, advisors, professionals, officers, directors, and employees with respect to the Prepetition ABL Documents, the Prepetition Term Loan Documents, the Welltower Master Lease Documents, the Omega Master Lease Documents, the Prepetition Secured Obligations, the

21

Prepetition Liens, the DIP Loan Documents, the DIP Liens, or otherwise, whether arising at law or at equity, including, without limitation, any challenge, recharacterization, subordination, avoidance, recovery, disallowance, reduction, or other Claims arising under or pursuant to sections 105, 502, 510, 541, 542 through 553, inclusive, or 558 of the Bankruptcy Code or applicable non-bankruptcy law equivalents.  The Prepetition Secured Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code.  The Debtors waive, discharge, and release any right to challenge any of the Prepetition Secured Obligations, including the amount, allowance, character and priority of the Debtors' Obligations thereunder and the validity, binding, legal, enforceability, allowance, amount, characterization, extent and priority as to the Prepetition Secured Liens.

(x)      *Indemnity*.  The DIP Agent, the DIP Lenders, and the Prepetition Secured Parties have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by them in connection with or related in any way to negotiating, implementing, documenting, or obtaining the requisite approvals of the DIP Facility and the use of Cash Collateral, including in respect of the granting of the DIP Liens and the Adequate Protection Liens (as defined below), the DIP Superpriority Claims (as defined below), and the Adequate Protection Superpriority Claims (as defined below), and all documents related to any and all transactions contemplated by the foregoing.  Accordingly, the Prepetition Secured Parties, the DIP Agent, and the DIP Lenders shall be and hereby are indemnified and held harmless by the Debtors, joint and severally, in respect of any Claim or liability incurred in respect thereof or in any way related thereto, provided that no such party will be indemnified for any loss, cost, expense, or liability to the extent determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted primarily from any such party's gross negligence or willful

misconduct.  No exception or defense exists in contract, law, or equity as to any obligation set

forth in this paragraph, in the Prepetition ABL Documents, the Prepetition Term Loan Documents,

the Welltower Master Lease Documents, the Omega Master Lease Documents, or in the DIP Loan

Documents, to the Debtors' obligation to indemnify and/or hold harmless the Prepetition Secured

Parties, the DIP Agent, or the DIP Lenders, as the case may be.

   (xi) ***Releases***.  Effective as of the date of entry of this Interim Order, as to the

Debtors only, subject solely to the rights and limitations set forth in paragraphs 24 herein, each of

the Debtors and the Debtors' estates, on its and their own behalf, on behalf of its and their

respective past, present and future predecessors, heirs, successors, subsidiaries, and assigns, hereby

absolutely, unconditionally and irrevocably releases and forever discharges and acquits (i) the DIP

Agent, the Welltower DIP Lender, the Omega DIP Lender, the Welltower Master Lease Secured

Parties, the Omega Master Lease Secured Parties, the Prepetition Term Loan Agent, the Prepetition

WELL/OHI Term Loan Lenders, the Prepetition ABL Secured Parties, and each of their respective

officers, directors, controlling persons, employees, agents, attorneys, affiliates, or successors of

each of the foregoing (all in their capacities as such) and (ii) the WAX DIP Lender and the

WAX/MAO Investigation Parties (as defined in the DIP Term Sheet), solely as it relates to the

DIP Facility, the DIP Obligations, and the DIP Loan Documents ((i) and (ii) collectively, the

"Released Parties"), from any and all (a) obligations and liabilities to the Debtors (and their

successors and assigns), and (b) claims, counterclaims, demands, defenses, offsets, debts,

accounts, contracts, liabilities, actions and causes of action arising prior to the date of this Interim

Order of any kind, nature or description, whether matured or unmatured, known or unknown,

asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected,

liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or

under any state or federal law or otherwise, in each case arising out of or related to (as applicable) the Prepetition Term Loan Documents, the Prepetition ABL Documents, the Welltower Master Lease Documents, the Omega Master Lease Documents, the DIP Loan Documents, and the obligations owing and financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Interim Order.  For the avoidance of doubt, nothing in this release shall relieve the DIP Loan Parties or the Debtors of the Prepetition Secured Obligations or their obligations under the DIP Loan Documents from and after the date of this Interim Order.

(xii)   ***Sale and Credit Bidding***.  The Debtors and the Prepetition Obligors admit, stipulate, acknowledge, and agree that any one or more of the DIP Lenders, the DIP Agent, or the Prepetition Secured Parties, shall have the right to credit bid the entirety of (or any portion of) the Prepetition Secured Obligations and/or the DIP Facility Obligations, as applicable, secured by their respective Prepetition Liens.

(xiii)   ***Cash Collateral***.  Any and all of the DIP Loan Parties' cash and other amounts on deposit or maintained in any account or accounts by the Debtors, whether existing as of the Petition Date or thereafter, wherever located, including any amounts generated by the collection of accounts receivable or other disposition of the Prepetition Collateral existing as of the Petition Date, constitutes or will constitute "cash collateral" within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

(xiv)    ***Bank Accounts***.  The Debtors acknowledge and agree that as of the Petition

Date, none of the Debtors has either opened or maintains any bank accounts other than the accounts

listed in the exhibit attached to any order authorizing the Debtors to continue to use the Debtors'

existing cash management system.

F.    **Findings Regarding Corporate Authority**.  Subject to entry of this Interim Order,

each DIP Loan Party has all requisite power and authority to execute and deliver the DIP Loan

Documents to which it is a party and to perform its obligations thereunder.

G.    **Findings Regarding Postpetition Financing and Use of Cash Collateral**.

(i)    ***Good Cause***.  Good and sufficient cause has been shown for the entry of

this Interim Order and for authorization of the Debtors to obtain financing pursuant to the DIP

Facility and the DIP Loan Documents, and to use Cash Collateral as set forth herein and consistent

with the Approved DIP Budget (as defined below), subject to Permitted Variances (as defined in

the DIP Term Sheet).

(ii)    ***Immediate Need for Postpetition Financing and Use of Cash Collateral***.

The Debtors' need to use the Prepetition Collateral (including Cash Collateral) and to obtain credit

pursuant to the DIP Facility as provided for herein is immediate and critical to avoid serious and

irreparable harm to the Debtors, their estates, their creditors, and other parties in interest.  The

Debtors have an immediate need to obtain the DIP Loans and other financial accommodations and

to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other

things:  (a) permit the orderly continuation of the operation of their businesses; (b) maintain the

health, safety, and well-being of their residents; (c) maintain, amend, renew, or modify insurance

policies in the ordinary course of business; (d) maintain business relationships with customers,

vendors, and suppliers, including purchasing necessary materials and services to maintain

compliance with all applicable regulatory and safety requirements; (e) make payroll; (f) satisfy other working capital, capital improvement, and operational needs;  (g) make postpetition payments to the Debtors' landlords when due, including under the terms of the Welltower Master Lease Documents, the Omega Master Lease Documents, the VSR Master Leases, the PA 22 Sub-Subleases, and the JV Leases; (h) pay professional fees, expenses, and obligations; (i) pay costs, fees, and expenses associated with or payable under the DIP Facility, subject to the terms of this Interim Order and the DIP Loan Documents; and (j) make adequate protection payments as set forth herein.  The Debtors' use of Cash Collateral alone would be insufficient to meet the Debtors' cash disbursement needs during the period of effectiveness of this Interim Order.  The access by the Debtors to sufficient working capital and liquidity through the use of Cash Collateral and other Prepetition Collateral, incurrence of new indebtedness under the DIP Loan Documents, and other financial accommodations provided under the DIP Loan Documents are necessary and vital to preserve and maintain the value of the Debtors' assets.  The terms of the proposed DIP Facility pursuant to the DIP Loan Documents, and this Interim Order are fair and reasonable, reflect each Debtor's exercise of its prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

(iii)     ***No Credit Available on More Favorable Terms***.  The Debtors have been unable to obtain financing and other financial accommodations from sources other than the DIP Lenders on terms more favorable than those provided under the DIP Facility and the DIP Loan Documents.  The Debtors have been unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  The Debtors also have been unable to obtain adequate credit for money borrowed (a) having priority over administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the Bankruptcy Code, or

26

(b) secured only by a lien on property of the Debtors and their estates that is not otherwise subject to a lien.  Postpetition financing is not otherwise available without (i) as with respect to the DIP Lenders:  (1) granting to each of the DIP Lenders, jointly and severally, the DIP Liens on all DIP Collateral, as set forth herein, (2) the DIP Superpriority Claims, and (3) the other protections set forth in this Interim Order; (ii) as with respect the Prepetition ABL Agents for the benefit of the Prepetition ABL Lenders:  (1) the ABL Adequate Protection Liens on all ABL Adequate Protection Collateral (each as defined below), as set forth herein, (2) the ABL Adequate Protection Superpriority Claims (as defined below), and (3) the other protections set forth in this Interim Order; and (iii) as with respect to the Prepetition TL/ML Secured Parties:  (1) the Prepetition Term Loan Adequate Protection Liens and the WELL/OHI Master Lease Adequate Protection Liens (each as defined below), as set forth herein, (2) the Prepetition Term Loan Adequate Protection Superpriority Claims and the WELL/OHI Master Lease Adequate Protection Superpriority Claims (each as defined below), and (3) the other protections set forth in this Interim Order.  After considering all alternatives, the Debtors have properly concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time, and are in the best interests of all of their stakeholders.

(iv)    *Use of Proceeds of the DIP Facility and Cash Collateral*.  As a condition to entry into the DIP Facility, the extension of credit and other financial accommodations made under the DIP Facility and the consent to use Cash Collateral (including, without limitation, the proceeds of the DIP Facility), each of the Prepetition ABL Secured Parties, the Prepetition TL/ML Secured Parties, and the DIP Secured Parties requires, and the Debtors have agreed, that Cash Collateral, the proceeds of the DIP Facility, and all other cash or funds of the Debtors, shall be used solely in accordance with the terms and conditions of this Interim Order and the DIP Loan

Documents, and only for the expenditures set forth in and consistent with the Approved DIP Budget (as defined below) (subject to Permitted Variances), and for no other purpose.

(v)    ***Adequate Protection***.  The Debtors have agreed, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code, to provide the Prepetition Secured Parties adequate protection, as and to the extent set forth in this Interim Order, against the risk of any diminution in the value of their respective interests in the Prepetition Collateral which is as a result of, or arises from, or is attributable to, the imposition of the automatic stay, or the use, sale or lease of such Prepetition Collateral, or the grant of a lien under section 364 of the Bankruptcy Code and applicable case law interpreting the same (any such diminution, "<u>Diminution in Value</u>").  Based on the DIP Motion, the DIP Declaration, the First Day Declaration, or other evidence filed in support of the DIP Motion, and the record presented to this Court in connection with the Interim Hearing, the terms of the adequate protection arrangements and of the use of Prepetition Collateral (including Cash Collateral) are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the use of Prepetition Collateral (including Cash Collateral).

(vi)    [***Consent***.  The Prepetition Secured Parties have consented to the Debtors' use of Prepetition Collateral (including Cash Collateral) and the DIP Loan Parties' entry into the DIP Facility and the DIP Loan Documents, in each case, solely in accordance with and subject to the terms and conditions of this Interim Order and the DIP Loan Documents.]

(vii)    ***Limitation on Charging Expenses Against Collateral***.  Upon entry of a Final Order providing for such relief and as set forth in paragraph 25 herein, no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be

charged against or recovered from the DIP Collateral or any Prepetition Collateral (in each case, including Cash Collateral) as to the Prepetition Secured Parties pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Secured Parties with respect to DIP Collateral or the Prepetition Secured Parties with respect to the Prepetition Collateral, and no consent shall be implied from any other action, inaction or acquiescence by the DIP Secured Parties or the Prepetition Secured Parties, respectively, and nothing contained in this Interim Order or the DIP Loan Documents shall be deemed to be a consent by the DIP Secured Parties or the Prepetition Secured Parties to any charge, lien, assessment, or claims against the DIP Collateral or the Prepetition Collateral, respectively, under section 506(c) of the Bankruptcy Code or otherwise.

(viii)    ***No Marshaling***.  Upon entry of a Final Order providing for such relief, in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Facility Obligations, the Prepetition Collateral, or the Prepetition Secured Obligations.  Further, upon entry of a Final Order providing for such relief, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to the Prepetition Secured Parties or the Prepetition Collateral.

(ix)    ***Business Judgment and Good Faith Pursuant to Section 364(e)***.  Based on the DIP Motion, the DIP Declaration, the First Day Declaration, and the record presented to this Court at the Interim Hearing, (a) the extension of credit and other financial accommodations made under the DIP Facility; (b) the terms of the DIP Loan Documents; (c) the fees and other amounts paid and to be paid thereunder; (d) the terms of adequate protection granted to the Prepetition Secured Parties; (e) the terms on which the Debtors may continue to use Prepetition

29

Collateral (including Cash Collateral); and (f) the Cash Collateral arrangements described therein

and herein, in each case, pursuant to this Interim Order and the DIP Loan Documents, (1) are fair,

reasonable, and the best available to the Debtors under the circumstances; (2) reflect the Debtors'

exercise of prudent business judgment consistent with their fiduciary duties; (3) are supported by

reasonably equivalent value and fair consideration; and (4) represent the best financing available.

The DIP Facility and the use of Prepetition Collateral (including Cash Collateral) were negotiated

in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition

Secured Parties.  The use of Prepetition Collateral (including Cash Collateral) and the credit to be

extended under the DIP Facility shall be deemed to have been so allowed, advanced, made, used,

and/or extended in good faith, and for valid business purposes and uses, within the meaning of

section 364(e) of the Bankruptcy Code, and the DIP Secured Parties are therefore entitled to the

protection and benefits of section 364(e) of the Bankruptcy Code and this Interim Order.

     (x)    ***Good Faith of DIP Secured Parties***.  The DIP Facility, the adequate

protection granted to the Prepetition Secured Parties, and the use of Prepetition Collateral

(including Cash Collateral) hereunder have been negotiated in good faith and at arm's length

among the Debtors, the DIP Secured Parties, and their respective advisors, and all of the Debtors'

obligations and indebtedness arising under, in respect of, or in connection with, the DIP Facility

and the DIP Loan Documents, including, without limitation, all loans and other financial

accommodations made to and guarantees issued by the Debtors pursuant to the DIP Loan

Documents and any DIP Facility Obligations shall be deemed to have been extended by the DIP

Secured Parties and their respective affiliates in good faith, as that term is used in section 364(e)

of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of

the Bankruptcy Code, and the claims, security interests and liens, and other rights, benefits, and

protections granted to the DIP Secured Parties (and the successors and assigns thereof) pursuant to this Interim Order and the DIP Loan Documents shall each be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is reversed or modified on appeal.

(xi) ***Good Faith of Prepetition Secured Parties***. The Prepetition Secured Parties have acted in good faith regarding the DIP Facility and the Debtors' continued use of Prepetition Collateral (including Cash Collateral) to fund the administration of the Debtors' estates and continued operation of their businesses (including the incurrence and payment of any adequate protection obligations and the granting of adequate protection liens), in accordance with the terms hereof.

(xii) ***Initial DIP Budget***. The Debtors have prepared and delivered to the DIP Secured Parties the initial itemized cash flow forecast set forth on **Exhibit 2** attached hereto (the "Initial DIP Budget"), which is acceptable to each of the DIP Lenders [and the Prepetition ABL Agents], setting forth all line-item and cumulative cash receipts and operating disbursements on a weekly basis for the period beginning as of the week including the Closing Date (as defined in the DIP Term Sheet) through and including the end of the thirteenth calendar week following such week. The DIP Secured Parties are relying upon the Debtors' agreement to comply with the Initial DIP Budget (as may be updated by the Debtors and approved by each of the DIP Lenders from time to time pursuant to and in accordance with the terms hereof and of the DIP Term Sheet, the "Approved DIP Budget"), in determining to enter into the postpetition financing arrangements provided for in this Interim Order and to allow the Debtors to use DIP Collateral (including Cash Collateral) subject to the terms of this Interim Order, respectively.

(xiii)    ***Notice***.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties in interest, including:  (a) the U.S. Trustee for Region 6; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the Prepetition ABL Agents; (d) counsel to the Prepetition Term Loan Agent, (e) counsel to the Omega Landlords; (f) counsel to the Welltower Landlords; (g) the United States Department of Housing and Urban Development, (h) the United States Attorney's Office for the Northern District of Texas; (i) the Internal Revenue Service; (j) the state attorneys general for states in which the Debtors conduct business; (k) the Attorney General for the State of Texas; (l) the Texas Comptroller of Public Accounts, and (m) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties").   Under the circumstances, such notice of the Interim Hearing and the relief requested in the DIP Motion constitutes due, sufficient, and appropriate notice and complies with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b) and (c), and the Complex Case Procedures.

(xiv)    ***Relief Essential; Necessity of Immediate Entry***.    The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent entry of this Interim Order, the Debtors' businesses, properties, and estates will be immediately and irreparably harmed.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors' estates, and is necessary, essential, and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their assets and properties.

32

**NOW THEREFORE**, based upon the foregoing findings and conclusions, the DIP Motion, the DIP Declaration, the First Day Declaration, and the record before this Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      **DIP Motion Approved**.  The DIP Motion is granted on an interim basis, and the Interim Financing (as defined below) is authorized and approved, in each case, in accordance with and subject to the terms and conditions of this Interim Order and the DIP Term Sheet.  Any objections or other statements to any of the relief set forth in this Interim Order that have not been withdrawn, waived, or settled, and all reservation of rights inconsistent with this Interim Order, are hereby overruled; *provided* that, the rights of all parties in interest to object to the entry of a Final Order on the DIP Motion are fully reserved.

2.      Authorization of DIP Facility.

(a)      Subject to the terms and conditions of this Interim Order, each of the DIP Loan Parties is hereby authorized to execute, enter into, guarantee (as applicable), and perform all obligations under the DIP Loan Documents, and such additional documents, instruments, certificates and agreements as may be reasonably required or requested by the DIP Secured Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Loan Documents.  To the extent not entered into as of the date hereof, the Debtors and the DIP Secured Parties shall negotiate the DIP Loan Documents in good faith, and in all respects such DIP Loan Documents shall be, subject to the terms of this Interim Order and the Final Order, consistent with the terms of the DIP Loan Documents and otherwise acceptable to the DIP Secured Parties.  Upon entry of this Interim Order, the Interim Order, the DIP Term Sheet, and other DIP Loan Documents shall govern and control the DIP Facility.

(b)     Upon entry of this Interim Order through the entry of the Final Order, the DIP Borrowers are authorized to incur, and the DIP Guarantors are hereby authorized to unconditionally guarantee, on a joint and several basis, all of the DIP Loan Parties' DIP Facility Obligations on account of such incurrence under the DIP Facility, up to aggregate principal amount of $30 million in new money DIP Loans on an interim basis, together with applicable interest, protective advances, fees, and other charges payable in connection with the DIP Facility; *provided*, that prior to entry of the Final Order, such amount shall be reduced to $12 million until the Final Order is entered (the "Interim Financing"), as applicable, in each case, subject to the terms and conditions set forth in this Interim Order and the DIP Term Sheet.

(c)     Without limiting the foregoing, and without the need for further approval of this Court, each DIP Loan Party is authorized to perform all acts to make, execute, and deliver all instruments and documents and to pay all fees or expenses that are authorized by the DIP Loan Documents and this Interim Order.

(d)     No DIP Secured Party shall have any obligation or responsibility to monitor any Debtor's use of the DIP Facility, and each DIP Secured Party may rely upon each DIP Loan Party's representations that the amount of the DIP Facility requested at any time and the use thereof are in accordance with the requirements of this Interim Order, the DIP Term Sheet, and Bankruptcy Rule 4001(c)(2).

3.      **DIP Facility Obligations**.  Upon entry of this Interim Order and execution and delivery of the DIP Term Sheet, the DIP Term Sheet shall constitute valid, binding, enforceable, and non-avoidable obligations of each of the DIP Loan Parties, and shall be fully enforceable against each of the DIP Loan Parties, their estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases, or any

case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing and/or upon the dismissal of any of the Chapter 11 Cases, and their creditors and other parties in interest, in each case, in accordance with the terms thereof and this Interim Order.  Upon execution and delivery of the DIP Loan Documents, the Debtors shall file the same with the Court within three (3) business days of their execution, and the DIP Facility Obligations will include all postpetition loans and any other indebtedness or obligations, contingent or absolute, now existing or hereafter arising, which may from time to time be or become owing by any of the DIP Loan Parties to the DIP Agent or DIP Lenders, in each case, under, or secured by, and in accordance with, the DIP Loan Documents or this Interim Order, including all principal, interest, costs, fees, expenses, and other amounts under the DIP Loan Documents (including this Interim Order).  The DIP Loan Parties shall be jointly and severally liable for the DIP Facility Obligations.  Subject to paragraph 18 of this Interim Order and after the expiration of the DIP Remedies Notice Period (as defined below), the DIP Facility Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease during the continuation of a DIP Termination Event (as defined below) or the occurrence and continuance of any event or condition set forth in paragraph 18 of this Interim Order.  No obligation, payment, transfer, or grant of security under the DIP Term Sheet or this Interim Order to the DIP Secured Parties shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 362, 502(d), 544, 548, or 549 of the Bankruptcy Code, any applicable Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or other similar state statute or common law), or subject to any defense, reduction, recoupment, recharacterization, subordination, disallowance, impairment, cross-claim, claim,

counterclaim, offset, or any other challenge under the Bankruptcy Code or any applicable law unless in accordance with paragraph 18 of this Interim Order.

4.      **No Obligation to Extend Credit**.   The DIP Secured Parties shall have no obligation to make any loan or advance under the  DIP Term Sheet unless all of the conditions precedent to the making of such extension of credit by the DIP Secured Parties under the DIP Term Sheet and this Interim Order have been satisfied in full or waived in accordance with the terms of the DIP Term Sheet.

5.      *Procedure for Payment of DIP Fees and Expenses*.   All fees and expenses permitted to be paid pursuant to Paragraph 2 above (such fees, the "DIP Fees and Expenses") shall be paid in accordance with the following procedures, and the invoices for such fees and expenses shall not be required to comply with any particular format, may be in summary form only, and may include redactions.

(a)      The applicable professional shall serve copies of the invoices supporting the DIP Fees and Expenses on counsel to the Debtors, counsel to the Prepetition ABL Agents, counsel to the Prepetition Term Loan Agent, counsel to the Official Committee, if any, and the U.S. Trustee (collectively, the "Fee Notice Parties").

(b)      Any DIP Fees and Expenses shall be subject to prior ten-day review by the Fee Notice Parties.

(c)      If no objection is filed within such ten-day review period, such invoice shall be paid without further order of the Court within five days after the expiration of the foregoing review period and shall not be subject to any further review, challenge, or disgorgement.

(d)      If any Fee Notice Party shall file with this Court an objection to any such legal invoice, the undisputed amounts shall be paid immediately and the portion subject to such objection shall not be paid until resolution of such objection by this Court.

(e)      For the avoidance doubt, the provision of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine.

6.      **DIP Liens**.

(a)      As security for the DIP Facility Obligations, effective and perfected upon the date of this Interim Order, and without the necessity of the execution, recordation of filings by the Debtors or any other party of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by the DIP Agent or DIP Lenders of or over any DIP Collateral, the following security interests and liens are hereby jointly and severally granted by the Debtors to the DIP Lenders, subject to (i) the Prepetition ABL Obligations, Prepetition ABL Liens, and ABL Adequate Protection, (ii) the Prepetition Term Loan Obligations, Prepetition Term Loan Liens, and Prepetition Term Loan Adequate Protection, (iii) the WELL/OHI Master Lease Obligations, WELL/OHI Master Lease Liens, and WELL/OHI Master Lease Adequate Protection, (iv) the Permitted Liens (as defined below), and (v) the Carve Out (all such liens and security interests granted to each of the DIP Lenders, jointly and severally, pursuant to this Interim Order and the DIP Loan Documents, the "DIP Liens"):

(1)      *First Priority Lien on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon the all property of the DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, that, on or as of

37

the Petition Date that is not subject to (i) valid, perfected and non-avoidable liens, or (ii) valid and non-avoidable liens perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code, including, but not limited to, all of the DIP Loan Parties' respective rights, title, or interest in and to the following assets to the extent unencumbered:  cash and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds and proceeds therefrom, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, all of the issued and outstanding capital stock of each DIP Loan Party, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, beneficial interests in any trust, money, investment property, causes of action (including, for the avoidance of doubt, but subject to entry of the Final Order, all proceeds of the DIP Loan Parties' respective claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law (the "Avoidance Actions")), and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits, and supporting obligations of any of the collateral described above, whether existing on the Petition Date or thereafter acquired, and wherever located, and the proceeds, products, rents, and profits of the foregoing whether arising under section 552(b) of the Bankruptcy Code or otherwise (all of the foregoing collectively,

the "DIP Priority Collateral"); for the avoidance of doubt, the DIP Priority Collateral excludes assets that qualify as ABL Senior Collateral (as defined herein).

(2) ***Priming Liens and Liens Junior to Certain Other Liens***.  Pursuant to sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien on all property of the DIP Loan Parties (other than the property described in clause (1) above, as to which the liens and security interests in favor of the DIP Lenders will be as described in such clause), whether existing on the Petition Date or thereafter acquired, including, but not limited to, all of the DIP Loan Parties' respective rights, title, or interest in and to the following assets:  cash and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds and proceeds therefrom, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, all of the issued and outstanding capital stock of each DIP Loan Party, other equity or ownership interests, including equity interests in subsidiaries and non-wholly- owned subsidiaries, beneficial interests in any trust, money, investment property, causes of action (including, for the avoidance of doubt, but subject to entry of the Final Order, all proceeds of Avoidance Actions), and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits, and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter

39

created, acquired, or arising and wherever located, which DIP Liens shall be (A) subject only to the Carve Out, the ABL Obligations, Prepetition ABL Liens, ABL Adequate Protection, Prepetition Term Loan Obligations, Prepetition Term Loan Liens, Prepetition Term Loan Adequate Protection, WELL/OHI Master Lease Obligations, WELL/OHI Master Lease Liens, WELL/OHI Master Lease Adequate Protection Liens, Prepetition Rochester Manor HUD Liens, Prepetition HUD Lender Liens, and liens of other landlords of the Debtors (the "Other Landlord Liens") (in each case, to the extent such liens and security interests are valid, perfected and nonavoidable as of the Petition Date, the "Permitted Liens"), and (B) senior to any and all other liens and security interests in the DIP Collateral (collectively, the "DIP Priming Collateral" and, the DIP Priming Collateral, together with the DIP Priority Collateral and the Prepetition Collateral, the "DIP Collateral")).

(b)      For the avoidance of doubt, the term "DIP Collateral" shall include all assets and properties of each of the Debtors of any kind or nature whatsoever, whether tangible or intangible, real, personal or mixed, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, any of the Debtors, whether prior to or after the Petition Date, whether owned or consigned by or to, or leased from or to, the Debtors, and wherever located, including, without limitation, each of the Debtors' rights, title and interests in (i) all Prepetition Collateral, and (ii) all proceeds, products, offspring, and profits of each of the foregoing and all accessions to, substitutions, and replacements for, each of the foregoing, including any and all proceeds of any insurance, indemnity, warranty, or guaranty payable to any Debtor from time to time with respect to any of the foregoing.

(c)     Except as expressly provided in this Interim Order, the DIP Liens (i) shall

not be made subject or subordinate to or *pari passu* with (A) any lien, security interest, or claim

heretofore or hereinafter granted in any of the Chapter 11 Cases, including any subsequently

converted Chapter 11 Case of the Debtor to a case under chapter 7 of the Bankruptcy Code and

any lien or security interest granted in favor of any federal, state, municipal, or other governmental

unit (including any regulatory body), commission, board, or court for any liability of the Debtors,

(B) any lien or security interest that is avoided or preserved for the benefit of the Debtors and their

estates under section 551 of the Bankruptcy Code or otherwise, (C) any intercompany or affiliate

claim, lien, or security interest of the Debtors or their affiliates, or (D) any other lien, security

interest, or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the

date hereof, and (ii) shall not be subject to sections 506(c) (to the extent a Final Order is entered

providing for such relief), 510, 549, 550, or 551 of the Bankruptcy Code.

(d)     To the extent a Final Order is entered providing for such relief, any

provision of any lease, loan document, easement, use agreement, proffer, covenant, license,

contract, organizational document, or other instrument or agreement that requires the consent, or

the payment of any fees or obligations to, any governmental entity or non-governmental entity in

order for the DIP Loan Parties to pledge, grant, mortgage, sell, assign, or otherwise transfer any

fee or leasehold interest in any property or the proceeds thereof, is and shall hereby be deemed to

be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with

respect to the DIP Liens or Adequate Protection Liens on such leasehold interests or other

applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any DIP Loan

Parties, in favor of the DIP Secured Parties or the Prepetition Secured Parties in accordance with

the terms of the DIP Loan Documents and this Interim Order.

7.      **<u>DIP Superpriority Claims</u>**.  Effective immediately upon entry of this Interim Order, the DIP Lenders are hereby jointly and severally granted, pursuant to section 364(c)(1) and 503(b) of the Bankruptcy Code, an allowed superpriority administrative expense claim in each of the DIP Loan Parties' Chapter 11 Cases on account of the DIP Facility Obligations, with priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to sections 105, 328, 330, 331, 364(c)(1), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113, 1114, or any other provisions of the Bankruptcy Code and any other claims against the DIP Loan Parties, subject only to (a) the Carve Out, (b) the Prepetition ABL Obligations, (c) the ABL Adequate Protection, (d) the Prepetition Term Loan Obligations, (e) the Prepetition Term Loan Adequate Protection, (f) the WELL/OHI Master Lease Obligations, and (g) the WELL/OHI Master Lease Adequate Protection (the "<u>DIP Superpriority Claims</u>").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  The DIP Superpriority Claims shall have recourse against each of the DIP Loan Parties, on a joint and several basis.  Notwithstanding anything contained herein or in any of the DIP Term Sheet to the contrary, the DIP Superpriority Claims shall, at all times be (x) in respect of any DIP Priming Collateral or proceeds or products thereof, (i) junior in right of payment only to Permitted Liens, and (ii) subject only to the Carve Out, senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases; and (y) in respect of any DIP Priority Collateral or proceeds or products thereof, subject only to the Carve Out, senior to any and all other administrative expense claims or other claims against the DIP Loan Parties or their estates, in the Chapter 11 Cases.

8.        **Use of Proceeds of the DIP Facility and Cash Collateral**.  The use of Prepetition Collateral (in each case, including Cash Collateral) is authorized and approved, in each case, in accordance with and subject to the terms and conditions of this Interim Order and the DIP Term Sheet.  From and after the date of entry of this Interim Order, so long as no DIP Termination Event has occurred and is continuing the DIP Loan Parties shall be (a) authorized to use Prepetition Collateral (including Cash Collateral), and (b) permitted to draw upon the Interim Financing and the proceeds thereof, subject, in each case, to the terms and conditions of this Interim Order and the DIP Term Sheet, and in accordance with the Approved DIP Budget (subject to Permitted Variances), including, without limitation:  (i) payment of any amounts due to DIP Secured Parties under the DIP Term Sheet; (ii) payment of any adequate protection payments expressly approved by the Court; (iii) to fund the Carve Out; (iv) to provide working capital and for other general corporate purposes of the DIP Loan Parties; and (v) to pay administration costs of the Chapter 11 Cases and claims or amounts approved by this Court, including in the "first day" or "second day" orders or as required under the Bankruptcy Code.  For the avoidance of doubt, none of the DIP Loan Parties will use any DIP Loans, the proceeds of the DIP Facility or DIP Collateral (including Cash Collateral) in a manner or for a purpose other than those consistent with the Approved DIP Budget, the DIP Loan Documents, and this Interim Order unless otherwise ordered by this Court. Except as expressly permitted in this Interim Order, the DIP Term Sheet, or the Approved DIP Budget, nothing in this Interim Order shall otherwise authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business, or any of the Debtors' use of any DIP Collateral (including Cash Collateral) or other proceeds resulting therefrom.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances,

insurance recoveries, condemnations, or otherwise, will be deposited and applied as required by this Interim Order and the DIP Loan Documents.

9.      **Disposition of DIP Collateral**.   The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or Prepetition Collateral (in each case, including Cash Collateral) (and, in each case, the Debtors shall not enter into any binding agreement to do so) other than in accordance with the DIP Loan Documents, in the ordinary course of business, or as otherwise ordered by this Court without the prior written consent of each of the DIP Lenders and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lenders; *provided*, *however*, that entry of an order of the Court authorizing any sale, transfer, lease, encumbrance, or other disposition of all or any portion of the DIP Collateral or Prepetition Collateral shall not modify the Debtors' obligations to comply with restrictions on sales, transfers, leases, encumbrances, or other dispositions in the DIP Loan Documents.

10.      **Adequate Protection**.   The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363(e), and 507 of the Bankruptcy Code, to adequate protection of their interests in all Prepetition Collateral (in each case, including Cash Collateral), to the extent of any Diminution in Value of such Prepetition Secured Parties' interests in the Prepetition Collateral (including Cash Collateral) from and after the Petition Date, (such claims the "Adequate Protection Claims").   In consideration of the foregoing, the Prepetition Secured Parties, as applicable, are hereby granted the following adequate protection:

(a)      ***Adequate Protection to the Prepetition HUD ABL Secured Parties***.   The Prepetition HUD ABL Secured Parties will be granted the following (collectively, the "HUD ABL Adequate Protection").

44

(1)      *HUD ABL Adequate Protection Liens*.    Solely to the extent of any

Diminution in Value of any Prepetition HUD ABL Secured Party's interests in HUD ABL

Senior Collateral, in each case subject and subordinate to the Carve Out, the Prepetition

HUD ABL Secured Parties are granted the following security interests and liens

(collectively, the "HUD ABL Adequate Protection Liens") under sections 361, 362, 363 of

the Bankruptcy Code:  valid, binding, enforceable, and perfected replacement liens on and

security interests in assets of the type and nature that would be deemed HUD ABL Senior

Collateral but for the filing of these cases, and the proceeds thereof (collectively, the "HUD

ABL Adequate Protection Collateral").  The HUD ABL Adequate Protection Liens shall

be subordinate only to the Carve Out and any other prepetition Permitted Lien expressly

permitted to be senior in priority to the Prepetition HUD ABL Liens on the Petition Date.

For the avoidance of doubt, the DIP Liens, the Prepetition Term Loan Adequate Protection

Liens (as defined below), and the WELL/OHI Master Lease Adequate Protection Liens (as

defined below) shall be subject, subordinate, and junior to the Prepetition HUD ABL Liens

and all HUD ABL Adequate Protection Liens on assets of the type and nature that would

be deemed HUD ABL Senior Collateral but for the filing of these Chapter 11 Cases.

(2)      *HUD ABL Adequate Protection Superpriority Claims*.  Solely to the extent

of any Diminution in Value of any Prepetition HUD ABL Secured Party's interest in

Prepetition Collateral, and in each case, subject and subordinate to the Carve Out, the

Prepetition HUD ABL Secured Parties will be granted an allowed superpriority

administrative expense claim under sections 503(b) and 507(b) of the Bankruptcy Code

against the applicable Debtors (collectively, the "HUD ABL Adequate Protection

Superpriority Claims").  With respect to HUD ABL Senior Collateral, all HUD ABL

Adequate Protection Superpriority Claims shall have priority over any and all administrative expenses and other claims against the applicable DIP Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under the Bankruptcy Code.

(3)    ***HUD ABL Adequate Protection Payments***: No later than the fifth Business Day following entry of the Interim Order and on the fifth (5th) Business Day of each month hereafter, Debtors shall pay the Prepetition HUD ABL Agent adequate protection (the "HUD ABL Adequate Protection Payment") in the form of interest, that has accrued at the non-default rate on the Prepetition HUD ABL Obligations as of the Petition Date to be applied by the Prepetition HUD ABL Agent in accordance with the Prepetition HUD ABL Documents.

(4)    As further adequate protection, the Debtors will reimburse each Prepetition HUD ABL Secured Party for all reasonable and documented out-of-pocket fees, costs and expenses of such Prepetition HUD ABL Secured Party (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses, including one (1) local counsel).  All such fees, including reasonable and documented out-of-pocket legal and other professional fees shall be paid by the Debtors promptly upon written demand and without the requirement of Court approval.

(b)    ***Adequate Protection to the Prepetition Non-HUD ABL Secured Parties***. The Prepetition Non-HUD ABL Secured Parties will be granted the following (collectively, the

"Non-HUD ABL Adequate Protection" and, together with the HUD ABL Adequate Protection, the "ABL Adequate Protection").

       (1)    ***Non-HUD ABL Adequate Protection Liens***.  Solely to the extent of any Diminution in Value of any Prepetition Non-HUD ABL Secured Party's interests in Non-HUD ABL Senior Collateral, in each case subject and subordinate to the Carve Out, the Prepetition Non-HUD ABL Secured Parties are granted the following security interests and liens (collectively, the "Non-HUD ABL Adequate Protection Liens" and, together with the HUD ABL Adequate Protection Liens, the "ABL Adequate Protection Liens") under sections 361, 362, 363 of the Bankruptcy Code:  valid, binding, enforceable, and perfected replacement liens on and security interests in assets of the type and nature that would be deemed Non-HUD ABL Senior Collateral but for the filing of these cases, and the proceeds thereof (collectively, the "Non-HUD ABL Adequate Protection Collateral" and, together with the HUD ABL Adequate Protection Collateral, the "ABL Adequate Protection Collateral").  The Non-HUD ABL Adequate Protection Liens shall be subordinate only to the Carve Out and any other prepetition Permitted Lien expressly permitted to be senior in priority to the Prepetition Non-HUD ABL Liens on the Petition Date.  For the avoidance of doubt, the DIP Liens, the Prepetition Term Loan Adequate Protection Liens (as defined below), and the WELL/OHI Master Lease Adequate Protection Liens (as defined below) shall be subject, subordinate, and junior to the Prepetition Non-HUD ABL Liens and all Non-HUD ABL Adequate Protection Liens on assets of the type and nature that would be deemed Non-HUD ABL Senior Collateral but for the filing of these Chapter 11 Cases.

       (2)    ***Non-HUD ABL Adequate Protection Superpriority Claims***.  Solely to the extent of any Diminution in Value of any Prepetition Non-HUD ABL Secured Party's

interest in Prepetition Collateral, and in each case, subject and subordinate to the Carve Out, the Prepetition Non-HUD ABL Secured Parties will be granted an allowed superpriority administrative expense claim under sections 503(b) and 507(b) of the Bankruptcy Code against the applicable Debtors (collectively, the "Non-HUD ABL Adequate Protection Superpriority Claims" and, together with the HUD ABL Adequate Protection Superpriority Claims, the "ABL Adequate Protection Superpriority Claims"). With respect to Non-HUD ABL Senior Collateral, all Non-HUD ABL Adequate Protection Superpriority Claims shall have priority over any and all administrative expenses and other claims against the applicable DIP Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under the Bankruptcy Code.

(3)    ***Non-HUD ABL Adequate Protection Payments***: No later than the fifth Business Day following entry of the Interim Order and on the fifth (5th) Business Day of each month hereafter, Debtors shall pay the Prepetition Non-HUD ABL Agent adequate protection (the "Non-HUD ABL Adequate Protection Payment" and, together with the HUD ABL Adequate Protection Payment, the "ABL Adequate Protection Payment") in the form of interest, that has accrued at the non-default rate on the Prepetition Non-HUD ABL Obligations as of the Petition Date to be applied by the Prepetition Non-HUD ABL Agent in accordance with the Prepetition Non-HUD ABL Documents.

(4)    As further adequate protection, the Debtors will reimburse each Prepetition Non-HUD ABL Secured Party for all reasonable and documented out-of-pocket fees, costs and expenses of such Prepetition Non-HUD ABL Secured Party (limited, in the case of

48

counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses, including one (1) local counsel).  All such fees, including reasonable and documented out-of-pocket legal and other professional fees shall be paid by the Debtors promptly upon written demand and without the requirement of Court approval.

(c)    ***Adequate Protection to the Prepetition Term Loan Secured Parties***.  The Prepetition Term Loan Secured Parties will be granted the following (collectively, the "<u>Prepetition Term Loan Adequate Protection</u>").

(1)    ***Prepetition Term Loan Adequate Protection Liens***.  Solely to the extent of, and in an aggregate amount equal to, any Diminution in Value of any Prepetition Term Loan Secured Party's interests in such Prepetition Term Loan Collateral, from and after the Petition Date, the Prepetition Term Loan Secured Parties are granted the following security interests and liens (collectively, the "<u>Prepetition Term Loan Adequate Protection Liens</u>") under sections 361, 362, and 363 of the Bankruptcy Code:  valid, binding, enforceable, and perfected replacement liens on and security interests in the Prepetition Collateral, including now-owned and hereafter-acquired real and personal property, assets, and rights of any kind or nature, wherever located, which liens and security interests shall be junior to (a) the Carve Out, (b) the Prepetition ABL Liens and the ABL Adequate Protection Liens (subject to such liens solely with respect to assets of the type and nature that would be deemed ABL Senior Collateral but for the filing of these Chapter 11 Cases).

(2)    ***Prepetition Term Loan Adequate Protection Superpriority Claims***.  Solely to the extent of, and in an aggregate amount equal to, any Diminution in Value of its respective Prepetition Collateral, and in each case, subject and subordinate to the Carve Out and the ABL Adequate Protection Superpriority Claims (solely with respect to ABL

49

Senior Collateral), each Prepetition Term Loan Secured Party is hereby granted an allowed superpriority administrative expense claim under sections 503(b) and 507(b) of the Bankruptcy Code against the applicable Debtors (collectively, the "Prepetition Term Loan Adequate Protection Superpriority Claims"). All Prepetition Term Loan Adequate Protection Superpriority Claims shall be junior to (a) the Carve Out and (b) the ABL Adequate Protection Superpriority Claims (solely with respect to ABL Senior Collateral), and otherwise have priority over any and all other administrative expenses and other claims against the applicable Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under the Bankruptcy Code.

(3)     ***Prepetition Term Loan Adequate Protection Payments***:  No later than the fifth Business Day following entry of the Interim DIP Order and on the fifth Business Day of each month hereafter, Debtors shall pay the Prepetition Term Loan Agent adequate protection (the "Prepetition Term Loan Adequate Protection Payment") on partial account of interest that has accrued on the Prepetition Term Loan Obligations in the amounts set forth in the Budget, to be applied by the Prepetition Term Loan Agent in accordance with the Prepetition Term Loan Documents.

(4)     As further adequate protection, the Debtors will reimburse each Prepetition Term Loan Secured Party for all reasonable and documented out-of-pocket fees, costs and expenses of (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses, including one (1) local counsel).  All such fees, including reasonable and documented out-of-pocket legal and other professional fees shall

50

be paid by the Debtors promptly upon written demand and without the requirement of Court approval; *provided*, *however*, that in the event such fees and expenses exceed the amounts set forth in the Approved DIP Budget, any excess amounts shall be added to the principal balance of the DIP Loans.

(d)      ***Adequate Protection to the WELL/OHI Master Lease Secured Parties***. The WELL/OHI Master Lease Secured Parties will be granted the following (collectively, the "WELL/OHI Master Lease Adequate Protection").

(1)      ***WELL/OHI Master Lease Adequate Protection Liens***.  Solely to the extent of, and in an aggregate amount equal to, any Diminution in Value of any WELL/OHI Master Lease Secured Party's interests in such WELL/OHI Landlord Collateral, from and after the Petition Date, the WELL/OHI Master Lease Secured Parties are granted the following security interests and liens (collectively, the "WELL/OHI Master Lease Adequate Protection Liens" and, together with the ABL Adequate Protection Liens and the Prepetition Term Loan Adequate Protection Liens, the "Adequate Protection Liens") under sections 361, 362, and 363 of the Bankruptcy Code:  valid, binding, enforceable, and perfected replacement liens on and security interests in the Prepetition Collateral, including now-owned and hereafter-acquired real and personal property, assets, and rights of any kind or nature, wherever located, which liens and security interests shall be junior to (a) the Carve Out, (b) the Prepetition ABL Liens and the ABL Adequate Protection Liens, (c) the Prepetition Term Loan Liens, and (d) the Prepetition Term Loan Adequate Protection Liens.

(2)      ***WELL/OHI Master Lease Adequate Protection Superpriority Claims***. Solely to the extent of, and in an aggregate amount equal to, any Diminution in Value of

its respective Prepetition Collateral, and in each case, subject and subordinate to the Carve Out, the ABL Adequate Protection Superpriority Claims (solely with respect to ABL Senior Collateral), and the Prepetition Term Loan Adequate Protection Superpriority Claims, each WELL/OHI Master Lease Secured Party is hereby granted an allowed superpriority administrative expense claim under sections 503(b) and 507(b) of the Bankruptcy Code against the applicable Debtors (collectively, the "WELL/OHI Master Lease Adequate Protection Superpriority Claims," and together with the Prepetition Term Loan Adequate Protection Superpriority Claims and the ABL Adequate Protection Superpriority Claims, the "Adequate Protection Superpriority Claims").  All WELL/OHI Master Lease Adequate Protection Superpriority Claims shall be junior to (a) the Carve Out, (b) the ABL Adequate Protection Superpriority Claims (solely with respect to ABL Senior Collateral), and (c) the Prepetition Term Loan Adequate Protection Superpriority Claims, and otherwise have priority over any and all other administrative expenses and other claims against the applicable Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under the Bankruptcy Code.

(3)     As further adequate protection, the Debtors will reimburse each Welltower Landlord and Omega Landlord for all reasonable and documented out-of-pocket fees, costs and expenses of (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses, including one (1) local counsel).  All such fees, including reasonable and documented out-of-pocket legal and other professional fees shall be paid by the Debtors promptly upon written demand and without the requirement

of Court approval; *provided*, *however*, that in the event such fees and expenses exceed the amounts set forth in the Approved DIP Budget, any excess amounts shall be added to the principal balance of the DIP Loans.

(e)  ***Procedure for Payment of Adequate Protection Fees and Expenses***.  All fees permitted to be paid pursuant to paragraphs (a) through (d) above (such fees, the "<u>Adequate Protection Fees and Expenses</u>") shall be paid in accordance with the following procedures, and the invoices for such fees and expenses shall not be required to comply with any particular format, may be in summary form only, and may include redactions.

(1)  The applicable professional shall serve copies of the invoices supporting the Adequate Protection Fees and Expenses on the Fee Notice Parties.

(2)  Any Adequate Protection Fees and Expenses shall be subject to prior ten-day review by the Fee Notice Parties.

(3)  If no objection is filed within such ten-day review period, such invoice shall be paid without further order of the Court within five days after the expiration of the foregoing review period and shall not be subject to any further review, challenge, or disgorgement.

(4)  If any Fee Notice Party shall file with this Court an objection to any such legal invoice, the undisputed amounts shall be paid immediately and the portion subject to such objection shall not be paid until resolution of such objection by this Court.

(5)  For the avoidance doubt, the provision of such invoices shall not constitute a waiver of attorney-client privilege or any benefits of the attorney work product doctrine.

(f)  ***Reservation of Rights***.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b)

thereof, this Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties.

11. **Budget and Access to Records**.

(a) All borrowings under the DIP Facility, and the use of Cash Collateral shall at all times comply with the Approved DIP Budget (subject to Permitted Variances) and the DIP Term Sheet. On the first Thursday of each weekly period after the Reporting Date (as defined below), the Debtors shall deliver updates to the Initial DIP Budget (or the previously supplemented Approved DIP Budget, as the case may be), covering the 13-week period that commences with the beginning of the week immediately following the week in which the supplemental budget is required to be delivered, consistent with the form and level of detail set forth in the Initial DIP Budget (each such supplemental budget, an "Updated DIP Budget") and the Updated DIP Budget will be filed with this Court and will replace the Initial DIP Budget (or the previously supplemented Approved DIP Budget, as the case may be), unless the DIP Lenders or Prepetition ABL Agents otherwise object within two (2) Business Days of the receipt thereof to the substance of such Updated DIP Budget on the basis of such Updated DIP Budget not being based on reasonable assumptions, as being inconsistent with the terms, conditions and covenants under the DIP Loan Documents, or being based on information that is incorrect in any material respect, in which case the Updated DIP Budget will be as agreed reasonably and in good faith by the DIP Lenders, the Prepetition ABL Agents, and the Debtors; provided that, in the event of an objection to the Updated DIP Budget in accordance with this paragraph, the then-current Approved DIP Budget shall remain in effect, effective as of the beginning of the week immediately following the week in which it was delivered. Each Approved DIP Budget shall be filed with this Court.

(b)      By no later than 5:00 pm ET on the fourth business day of each week, commencing with the fourth full week after the Petition Date (each, a "Reporting Date"), Borrower shall deliver to the DIP Lenders a variance report (each, a "Variance Report") showing comparisons of actual results for each line item against such line item in the Budget.  Each Variance Report shall indicate whether there are any adverse variances that exceed the allowed variances, which means, in each case measured on a cumulative basis for the prior four-week period and for the period from the Petition Date, (x) up to 15% in the aggregate for all "Total Operating Disbursements" (as defined in the Approved DIP Budget), excluding, for the avoidance of doubt, "Non-Operating Disbursements" and "Restructuring Disbursements" (each as defined in the Approved DIP Budget) and (y) up to 15% in the aggregate for all "Total Receipts" (as defined in the Approved DIP Budget) (each, a "Permitted Variance").

(c)      ***Access to Records***.  The Debtors shall provide the advisors to the DIP Secured Parties with all reporting and other information required to be provided to the DIP Agent or DIP Lenders under the DIP Loan Documents.  In addition to, and without limiting, whatever rights to access the DIP Secured Parties have under the DIP Loan Documents, upon reasonable notice to Debtors' counsel (email being sufficient), the Debtors shall permit representatives, agents, and employees of the DIP Secured Parties to have reasonable access to (i) inspect the Debtors' assets, and (ii) all information (including historical information and the Debtors' books and records) and personnel, including regularly scheduled meetings as mutually agreed with senior management of the Debtors and other company advisors (during normal business hours), and the DIP Secured Parties shall be provided with access to all information they shall reasonably request, excluding any information for which confidentiality is owed to third parties, information subject

to attorney client or similar privilege, or where such disclosure would not be permitted by any applicable requirements of law.

12.    **Modification of Automatic Stay**.  Subject to paragraph 19 hereof, the automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified as necessary to permit: (a) the DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Secured Parties may reasonably request, to assure the perfection and priority of the DIP Liens and the DIP Superpriority Claims; (b) the DIP Loan Parties to incur all liabilities and obligations, including all the DIP Facility Obligations, to the DIP Secured Parties as contemplated under this Interim Order and the DIP Loan Documents, and to perform under the DIP Loan Documents any and all other instruments, certificates, agreements, and documents that may be reasonably required, necessary, or prudent for the performance by the applicable DIP Loan Parties under the DIP Loan Documents and any transactions contemplated therein or in this Interim Order in each case in accordance therewith or herewith; (c) the DIP Loan Parties to take all appropriate actions to grant the DIP Liens, and to take all appropriate actions (including such actions as the Prepetition Secured Parties may reasonably request) to ensure that the ABL Adequate Protection Liens, Prepetition Term Loan Adequate Protection Liens, and WELL/OHI Master Lease Adequate Protection Liens granted hereunder are perfected and maintain the priority set forth herein; (d) the DIP Loan Parties to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents and this Interim Order; (e) the DIP Secured Parties and the applicable Prepetition Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents and this Interim Order; (f) subject to paragraph 19 hereof, the DIP Secured Parties to exercise, upon the occurrence and during the continuance of any DIP Termination Event (as defined below), all rights and remedies provided for in the DIP

56

Loan Documents and take any or all actions provided therein in accordance therewith; and (g) subject to paragraph 18 hereof, the implementation and exercise of all of the terms, rights, benefits, privileges, remedies, and provisions of this Interim Order and the DIP Loan Documents, in each case, in accordance herewith and therewith, without further notice, motion or application to, or order of this Court.

13.    **Perfection of DIP Liens and Adequate Protection Liens**.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of all liens granted herein, including, without limitation, the DIP Liens and the Adequate Protection Liens, without the necessity of execution, filing, or recording any financing statement, mortgage, notice, or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable law) such liens, or to entitle the DIP Secured Parties and the Prepetition Secured Parties to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent, the DIP Lenders, the Prepetition ABL Agents, the Prepetition Term Loan Agent, the Welltower Landlords, and the Omega Landlords, without any further consent of any party, are authorized to execute, file, or record, as the case may be (and the DIP Agent, the DIP Lenders, the Prepetition ABL Agents, the Prepetition Term Loan Agent, the Welltower Landlords, and the Omega Landlords may reasonably request the execution, filing, or recording), as each, in its reasonable discretion deems necessary, such financing statements, notices of lien, and other similar documents to enable the DIP Agent, the DIP Lenders, the Prepetition ABL Agents, the Prepetition Term Loan Agent, the Welltower Landlords, and the Omega Landlords to further validate, perfect, preserve, and enforce the applicable DIP Liens or other liens and security interests granted hereunder, perfect in accordance

with applicable law or to otherwise evidence the applicable DIP Liens and/or the applicable

Adequate Protection Liens, as applicable, and all such financing statements, notices, and other

documents shall be deemed to have been filed or recorded as of the date of entry of the Interim

Order; *provided* that, no such filing or recordation shall be necessary or required in order to create,

perfect, preserve, or enforce the DIP Liens and/or the Adequate Protection Liens.  The Debtors are

authorized to execute and deliver promptly upon reasonable request and in accordance with the

DIP Term Sheet to the DIP Agent, the DIP Lenders, the Prepetition ABL Agents, the Prepetition

Term Loan Agent, the Welltower Landlords, and the Omega Landlords all such financing

statements, notices, and other security documents as the DIP Agent, the DIP Lenders, the

Prepetition ABL Agents, the Prepetition Term Loan Agent, the Welltower Landlords, and the

Omega Landlords may reasonably request.  The DIP Agent, the DIP Lenders, the Prepetition ABL

Agents, the Prepetition Term Loan Agent, the Welltower Landlords, and the Omega Landlords,

each in its discretion, may file a photocopy of this Interim Order as a financing statement with any

filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of

such financing statements, notices of lien, or similar instruments.  To the extent that the Prepetition

ABL Agents, the Prepetition Term Loan Agent, the Welltower Landlords, and/or the Omega

Landlords is a secured party under any account control agreement, listed as an additional insured,

loss payee under any of the Debtors' insurance policies, or is the secured party under any loan

document, financing statement, deed of trust, mortgage, or other instrument or document which

may otherwise be required under the law of any jurisdiction to validate, attach, perfect, or prioritize

liens (any such instrument or document, a "Security Document"), each of the DIP Lenders shall

also be deemed to be the secured party under each such Security Document, and shall have all the

rights and powers attendant to that position (including, without limitation, rights of enforcement),

and shall act in that capacity and distribute any proceeds recovered or received in accordance with the terms of this Interim Order and/or the Final Order, as applicable, and the other DIP Loan Documents.

14. **Proceeds of Subsequent Financing**. Without limiting the provisions of the immediately preceding paragraph, if at any time prior to the indefeasible payment in full in cash of all of the DIP Facility Obligations, Prepetition ABL Obligations, the Prepetition Term Loan Obligations, and the WELL/OHI Master Lease Obligations, in each case, other than contingent indemnification obligations as to which no claim has been asserted, the termination of the DIP Secured Parties' obligations to extend credit under the DIP Facility and this Interim Order (including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' estates), and the satisfaction of the DIP Superpriority Claims and the Adequate Protection Claims, either the DIP Loan Parties, the DIP Loan Parties' estates, any trustee, any examiner with enlarged powers, or any responsible officer subsequently appointed in any of the DIP Loan Parties' Chapter 11 Cases, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code then, unless otherwise agreed in advance in writing by the DIP Lenders in their sole discretion, all of the cash proceeds derived from such credit or debt and all DIP Collateral shall immediately be turned over to the DIP Agent for further distribution to the applicable DIP Secured Parties on account of their applicable DIP Facility Obligations pursuant to the applicable DIP Loan Documents.

15. **Covenants**. The DIP Loan Parties shall comply with the covenants set forth in the DIP Loan Documents in accordance with the terms thereof.

16. **Milestones**. It is a condition to the DIP Facility and the use of Cash Collateral that the Debtors shall comply with those certain case milestones set forth in the DIP Term Sheet (the

"Milestones").  The failure to comply with any Milestone shall constitute an "Event of Default" in accordance with the terms of the DIP Term Sheet.

17.    **Maintenance of DIP Collateral**.    Until all DIP Facility Obligations are indefeasibly paid in full (other than contingent indemnification obligations as to which no claim has been asserted) and the DIP Secured Parties' obligation to extend credit under the DIP Facility has terminated, the Debtors shall continue to maintain all property, operational, and other insurance as required in the DIP Loan Documents.  Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy maintained by the DIP Loan Parties that in any way relates to the DIP Collateral, and the DIP Agent shall distribute any proceeds recovered or received in respect of any such insurance policies, to the payment in full of the DIP Facility Obligations (other than contingent indemnification obligations as to which no claim has been asserted).

18.    **Termination Events**.    The (i) occurrence and continuance of any "Event of Default" under and as defined in the DIP Term Sheet; (ii) occurrence of any event within the definition of "DIP Termination Date" in the DIP Term Sheet; (iii) consent of the Debtors to the standing of any party, including an Official Committee to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, any Challenge (as defined below); or (iv) commencement of a Challenge Proceeding (as defined below) by any party, including the Debtors or an Official Committee, shall each constitute a "DIP Termination Event" under this Interim Order (each a "DIP Termination Event," and the date upon which such DIP Termination Event occurs, the "DIP Termination Date"), unless waived in writing by the DIP

Lenders in their sole discretion.  A notice of the occurrence of the DIP Termination Date shall be filed with this Court within 3 days after the DIP Termination Date.

19.   **Exercise of Remedies**.

(a)   Remedies of the DIP Agent.  Immediately upon the occurrence and during the continuation of a DIP Termination Event, any stay, whether arising under section 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim Order, including clause (d) of this paragraph, is hereby modified, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the DIP Agent to, upon the delivery of written notice (which may include electronic mail) to the DIP Remedies Notice Parties (as defined below):  (i) declare all DIP Facility Obligations owing under the DIP Facility to be immediately due and payable; (ii) terminate, reduce, or restrict any commitment to extend credit to the DIP Loan Parties under the DIP Facility (to the extent any such commitment remains); (iii) terminate the DIP Facility and the DIP Loan Documents as to any future liability or obligation thereunder, but without affecting the DIP Liens or the DIP Facility Obligations; (iv) charge interest at the default rate under the DIP Facility; (v) terminate and/or revoke the Debtors' right, if any, under this Interim Order and the DIP Loan Documents to use any Cash Collateral of the DIP Secured Parties; (vi) otherwise enforce any and all rights against the DIP Collateral in the possession of the DIP Lenders; and (vii) take any other actions or exercise any other rights or remedies permitted under this Interim Order, the DIP Loan Documents, or applicable law; *provided* that prior to the exercise of any right in clauses (v) through (vii) of this paragraph, the DIP Lenders shall be required to provide five (5) Business Days' written notice (by electronic mail or other electronic means) to counsel to the Debtors, counsel to the Prepetition ABL Agents, counsel to the Prepetition Term Loan Agent, counsel to the Official Committee, if any, and the U.S. Trustee (the "DIP Remedies Notice Parties") of the

DIP Lenders' intent to exercise their rights and remedies (the "DIP Remedies Notice Period");
*provided*, *further*, that the DIP Lenders shall not be obligated to make any loans or advances under
the DIP Facility during any DIP Remedies Notice Period; *provided further* that, for the avoidance
of doubt, the Debtors may continue to use any Cash Collateral prior to the expiration of the DIP
Remedies Notice Period so long as such Cash Collateral is used in accordance with the Approved
DIP Budget (subject to Permitted Variances).

   (b)  <u>Remedies of the Prepetition ABL Agents</u>. Immediately upon the
occurrence and during the continuation of a DIP Termination Event (or any event that would have
been a DIP Termination Event but for any extension, waiver, modification, or similar change to
the DIP Credit Documents by the DIP Agent or DIP Lenders), any stay, whether arising under
section 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim Order,
including clause (d) of this paragraph 19, is hereby modified, without further notice to, hearing of,
or order from this Court, to the extent necessary to permit the Prepetition ABL Agents to, upon
the delivery of written notice (which may include electronic mail) to the ABL Remedies Notice
Parties (as defined below):  (i) terminate and/or revoke the Debtors' right, if any, under this Interim
Order to use any Cash Collateral of the DIP Secured Parties; (ii) otherwise enforce any and all
rights against the DIP Collateral; and (iii) take any other actions or exercise any other rights or
remedies permitted under this Interim Order or applicable law; *provided* that prior to the exercise
of any right in clauses (i) through (iii) of this paragraph, the Prepetition ABL Agents shall be
required to provide five (5) Business Days' written notice (by electronic mail or other electronic
means) to counsel to the Debtors, counsel to the DIP Lenders, counsel to the Prepetition Term
Loan Agent, counsel to the Official Committee, if any, and the U.S. Trustee (the "ABL Remedies
Notice Parties") of the Prepetition ABL Agents' intent to exercise its rights and remedies (the

"ABL Remedies Notice Period," together with DIP Remedies Notice Period, as applicable, a "Remedies Notice Period"); *provided*, *further*, that, for the avoidance of doubt, the Debtors may continue to use any Cash Collateral prior to the expiration of the ABL Remedies Notice Period so long as such Cash Collateral is used in accordance with the Approved DIP Budget (subject to Permitted Variances); *provided*, *further*, that nothing in this paragraph 19(b) shall prevent the Debtors from seeking the Court's authorization to use Cash Collateral over the objection of either of the Prepetition ABL Agents in accordance with a new Approved DIP Budget but otherwise on the same terms and conditions contained in this Interim Order.

(c)     *Remedies of the Prepetition Term Loan Agent*.  Immediately upon the occurrence and during the continuation of a DIP Termination Event (or any event that would have been a DIP Termination Event but for any extension, waiver, modification, or similar change to the DIP Credit Documents by the DIP Agent or DIP Lenders), any stay, whether arising under section 362 of the Bankruptcy Code or otherwise, but subject to the terms of this Interim Order, including clause (d) of this paragraph 19, is hereby modified, without further notice to, hearing of, or order from this Court, to the extent necessary to permit the Prepetition Term Loan Agent to, upon the delivery of written notice (which may include electronic mail) to the Prepetition Term Loan Remedies Notice Parties (as defined below):  (i) terminate and/or revoke the Debtors' right, if any, under this Interim Order to use any Cash Collateral of the DIP Secured Parties; (ii) otherwise enforce any and all rights against the DIP Collateral; and (iii) take any other actions or exercise any other rights or remedies permitted under this Interim Order or applicable law; *provided* that prior to the exercise of any right in clauses (i) through (iii) of this paragraph, the Prepetition Term Loan Agent shall be required to provide five (5) Business Days' written notice (by electronic mail or other electronic means) to counsel to the Debtors, counsel to the DIP

Lenders, counsel to the Prepetition ABL Agents, counsel to the Official Committee, if any, and the U.S. Trustee (the "Prepetition Term Loan Remedies Notice Parties") of the Prepetition Term Loan Agent's intent to exercise its rights and remedies (the "Prepetition Term Loan Remedies Notice Period," together with DIP Remedies Notice Period and the ABL Remedies Notice Period, as applicable, a "Remedies Notice Period"); *provided*, *further*, that, for the avoidance of doubt, the Debtors may continue to use any Cash Collateral prior to the expiration of the Prepetition Term Loan Remedies Notice Period so long as such Cash Collateral is used in accordance with the Approved DIP Budget (subject to Permitted Variances); *provided*, *further*, that nothing in this paragraph 19(c) shall prevent the Debtors from seeking the Court's authorization to use Cash Collateral over the objection of the Prepetition Term Loan Agent in accordance with a new Approved DIP Budget but otherwise on the same terms and conditions contained in this Interim Order.

(d)        During the applicable Remedies Notice Period, the Debtors, the Official Committee or any other party in interest may seek an emergency hearing before this Court.  Unless during such Remedies Notice Period this Court enters an order to the contrary, the DIP Agent, Prepetition ABL Agents, or Prepetition Term Loan Agent, as applicable, shall be deemed to have received relief from the automatic stay to exercise all rights and remedies available against the DIP Collateral (subject to the rights of the applicable Prepetition Secured Parties), permitted by applicable law or equity, without further notice to, hearing of, or order from this Court, and without restriction or restraint by any stay under sections 105 or 362 of the Bankruptcy Code or otherwise. To the extent a Final Order is entered providing for such relief and in furtherance of the foregoing, upon the occurrence and during the continuation of a DIP Termination Event, and the expiration of the applicable Remedies Notice Period without entry of a Court order to the contrary, the DIP

Agent and any liquidator or other professional acting at the DIP Agent's direction (or Prepetition

ABL Agents or Prepetition Term Loan Agent and any liquidator or other professional acting at

their respective direction) shall (A) have the right to use, license or sub-license (without payment

of royalty or other compensation) any or all intellectual property of the Debtors, computer

hardware and software, trade secrets, brochures, customer lists, promotional and advertising

materials, labels, packaging materials and other property, in advertising for sale, marketing,

selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with

respect to, any DIP Collateral or Prepetition Collateral, as applicable, and (B) have the right to

access, and a rent free right to use, any and all owned or leased locations (including, without

limitation, manufacturing facilities, warehouse locations, distribution centers and offices) for the

purpose of arranging for and effecting the sale or disposition of DIP Collateral or Prepetition

Collateral, as applicable, including the production, completion, packaging and other preparation

of such DIP Collateral or Prepetition Collateral, as applicable, for sale or disposition (it being

understood and agreed that the DIP Agent and its representatives (and persons employed on its

behalf) or Prepetition ABL Agents and their representatives (and persons employed on their

behalf) or Prepetition Term Loan Agent and its representatives (and persons employed on its

behalf), as applicable, may continue to operate, service, maintain, process and sell the DIP

Collateral (subject to the rights of the Prepetition Secured Parties in the Prepetition Collateral) or

Prepetition Collateral, as applicable, as well as to engage in bulk sales of such DIP Collateral or

Prepetition Collateral, as applicable.

(e)     The Debtors (i) shall reasonably cooperate with the DIP Agent, Prepetition

ABL Agents, or Prepetition Term Loan Agent, as applicable, in its exercise of rights and remedies,

whether against DIP Collateral (subject to the rights of the Prepetition Secured Parties in the

Prepetition Collateral) or Prepetition Collateral, as applicable, or otherwise; (ii) waive any right to

seek relief under section 105 of the Bankruptcy Code; and (iii) unless this Court orders otherwise,

may not contest or challenge the exercise of any such rights or remedies other than to dispute

whether a DIP Termination Event has in fact occurred.

20.    **Indemnification**.  The DIP Loan Parties shall jointly and severally indemnify and

hold harmless each DIP Secured Party and each of their respective directors, officers, employees,

agents, attorneys, accountants, advisors, controlling persons, equity holders, partners, members,

and other representatives and each of their respective successors and permitted assigns (each, an

"Indemnified Party") against, and to hold each Indemnified Party harmless from, any and all

losses, claims, damages, liabilities, and reasonable, documented and invoiced out-of- pocket fees

and expenses (including, without limitation, fees and disbursements of counsel but limited, in the

case of counsel, to the extent set forth in the DIP Term Sheet) that may be incurred by or asserted

or awarded against any Indemnified Party, in each case, arising out of, or in any way in connection

with, or as a result of:  (i) the execution or delivery of the DIP Term Sheet, the DIP Credit

Agreement, the DIP Note, any other DIP Loan Document, the performance by the parties thereto

of their respective obligations thereunder and the other transactions contemplated thereby; (ii) the

use of the proceeds of the DIP Loans; (iii) the enforcement or protection of its rights in connection

with the DIP Term Sheet, the DIP Credit Agreement, the DIP Note, and any other DIP Loan

Document; (iv) the negotiation of and consent to this Interim Order; or (v) any claim, litigation,

investigation or proceeding relating to any of the foregoing, whether or not any Indemnified Party

is a party thereto and regardless of whether such matter is initiated by a third party or the Debtors

or any of their subsidiaries or affiliates or creditors; *provided* that, the foregoing indemnity shall

not apply to any claims arising (i) prior to the Petition Date or (ii) out of, or in any way in

connection with, or as a result of provisions of the Prepetition Secured Documents (for the avoidance of doubt, nothing in this Interim Order alters, amends, expands or minimizes any indemnification under the Prepetition Secured Documents, subject to applicable law); *provided further* that, no Indemnified Party will be indemnified for any loss, claim, damage, liability, cost, or other expense to the extent such loss, claim, damage, liability, cost, or expense that (i) is determined by a final, non-appealable judgment of a court of competent jurisdiction to have resulted from (A) the gross negligence, bad faith, or willful misconduct of such Indemnified Party or (B) a material breach of the obligations of such Indemnified Party under the DIP Loan Documents; or (ii) relates to any proceeding between or among Indemnified Parties other than claims arising out of any act or omission on the part of the DIP Loan Parties in accordance with this paragraph 20.

21.    **Proofs of Claim**.  The DIP Agent, the DIP Secured Parties, and the Prepetition Secured Parties shall not be required to file proofs of claim in any of the Chapter 11 Cases for any claim allowed herein or therein in respect of the Prepetition Secured Obligations.  Any order entered by this Court establishing a bar date in any of the Chapter 11 Cases shall not apply to the DIP Secured Parties or the Prepetition Secured Parties; *provided* that, notwithstanding any order entered by this Court establishing a bar date in any of the Chapter 11 Cases to the contrary, the DIP Agent, on behalf of the DIP Secured Parties, and the Prepetition ABL Agents, the Prepetition Term Loan Agent, the Welltower Landlords, and/or the Omega Landlords, on behalf of the Prepetition Secured ABL Parties, the Prepetition Term Loan Secured Parties, the Welltower Landlords, and/or the Omega Landlords, as applicable, may (but are not required) in their discretion file (and amend and/or supplement) in the Debtors' lead chapter 11 case *In re Genesis Healthcare, Inc., et al.*, Case No. 25-80185 (SGJ), a single, master proof of claim, on behalf of the

Prepetition Secured ABL Parties, the Prepetition Term Loan Secured Parties, the Welltower Landlords, and/or the Omega Landlords, as applicable, for any claim allowed herein or their allowed claims arising under the applicable Prepetition Secured Documents, and any such proof of claim may (but is not required to) be filed as one consolidated proof of claim against all of the Debtors (each, a "Master Proof of Claim"), rather than as separate proofs of claim against each Debtor.  Any proof of claim filed by the DIP Secured Parties or any of the Prepetition Secured Parties shall be deemed to be in addition to (and not in lieu of) any other proof of claim that may be filed by any such persons.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest.  The Master Proofs of Claim shall not be required to attach any instruments, agreements or other documents evidencing the obligations owing by each of the Debtors to the Prepetition Secured Parties, which instruments, agreements or other documents will be provided upon written request to counsel to each Prepetition Secured Party.

22.   **Carve Out**.

(a)    Subject to the terms, conditions and limitations contained in this paragraph 22, but only to the extent and subject to the express exclusions set forth herein, the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Adequate Protection Liens and the Adequate Protection Superpriority Claims, and any other liens or claims granted under this Interim Order, are all subordinate (except as otherwise provided herein) to the following (collectively, the "Carve Out"):

(1)    allowed administrative expenses pursuant to 28 U.S.C. § 1930(a)(6) for statutory fees payable to the U.S. Trustee, together with the statutory rate of interest, and 28 U S.C. § 156(c) for fees required to be paid to the Clerk of this Court (collectively, the "Statutory Fees"), which shall not be subject to any budget;

(2)     all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code;

(3)     to the extent consistent with the Approved DIP Budget (subject to an allowed variance of 15% of the amount budgeted for each respective Professional Person) and allowed at any time, whether by interim order, procedural order, or otherwise, all accrued and unpaid fees (other than any "success," "restructuring," "transaction" or similar fees), disbursements, costs, and expenses ("Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals"), the Official Committee pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals"), or, if a patient care ombudsman (the "PCO") is appointed by order of this Court, by the PCO pursuant to section 327, 328, or 333 of the Bankruptcy Code (together with the PCO, the "PCO Professionals" and, together with the Debtor Professionals and the Committee Professionals, the "Professional Persons"), at any time on or before the first (1st) Business Day following delivery of the Carve Out Trigger Notice by the DIP Lenders (as defined below) whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and

(4)     Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $750,000 incurred after the first (1st) Business Day following delivery DIP Lenders of a Carve Out Trigger Notice, to the extent consistent with the Approved DIP Budget and allowed at any time, whether by Interim Order, procedural order, final order, or otherwise (the amounts set forth in this clause (4), the "Post-Carve Out Trigger Notice Cap").

(b)     For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Lenders to the Debtors and their counsel, with a copy to the DIP Agent and its counsel, the U.S. Trustee, and counsel to the Official Committee, if any, which notice may be delivered following the occurrence and during the continuation of a DIP Termination Event stating that the Carve Out Trigger Notice Cap has been invoked.  The term "Carve-Out Trigger Notice Date" shall mean the day on which a Carve-Out Trigger Notice is received by the Debtors.  On the Carve-Out Trigger Notice Date, the Carve-Out Trigger Notice shall constitute a demand to the Debtors to transfer cash in an amount equal to the Post-Carve-Out Trigger Notice Cap plus an amount equal to the total budgeted Professional

69

Person fees for the prior two (2) unfunded weeks less any amount then held in the Carve-Out Account (as defined below).

(c) Within three (3) business days of the initial funding of the DIP Loans, the Debtors shall fund into a segregated account (the "Carve-Out Account") not subject to the control of the DIP Agent, or any of the DIP Lenders or Prepetition Secured Parties an amount equal to the total budgeted Professional Person fees for the first two (2) postpetition weeks set forth in the Approved DIP Budget and, thereafter the Debtors may transfer into the Carve-Out Account cash on a weekly basis in an amount equal to the estimated Professional Person fees for the next unfunded week set forth in the Approved DIP Budget.  Thereafter, the Debtors shall use such funds held in the Carve-Out Account to pay Allowed Professional Fees as they become allowed and payable pursuant to interim or final orders from the Court, consistent with the Approved DIP Budget (subject to an allowed variance of 15% of the amount budgeted for each respective Professional Person); *provided*, that the Debtors' obligations to pay the allowed fees and expenses of the Debtor Professional Persons shall not be limited or deemed limited to funds held in the Carve-Out Account.  For the avoidance of doubt, the amount budgeted for each Professional Person and deposited in the Carve-Out Account in accordance with this paragraph shall be available to pay in full any fees and expenses incurred by such Professional Person until all such fees and expenses are paid in full before any fees and expenses of another Professional Person is paid out of such earmarked funds.

(d) The Carve-Out Trigger Notice shall constitute a demand to the Debtors, and the Debtors shall be immediately required prior to the payment of any DIP Facility Obligations, to utilize all cash on hand as of such date, and any available cash thereafter held by any Debtor, to fund the Carve-Out Account in an amount equal to the difference between the Post-Carve-Out

Trigger Notice Cap plus an amount equal to the total budgeted Professional Person fees for the

prior two (2) unfunded weeks and the balance held in the Carve-Out Account as of the Carve-Out

Trigger Notice Date.   Notwithstanding anything to the contrary herein, in the DIP Loan

Documents, or the Prepetition Secured Documents, following delivery of a Carve-Out Trigger

Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of

the sale or other disposition of any assets) of the Debtors until the Carve-Out Account has been

fully funded as permitted above (it being understood that this does not prohibit any sweep or

foreclosure on cash in excess of the amounts necessary to fully fund the Carve-Out Account).

(e)     The amounts in the Carve-Out Account shall be available only to satisfy

Allowed Professional Fees and other amounts included in the Carve-Out until such amounts are

paid in full.   Notwithstanding anything to the contrary herein, (i) the failure of the Carve-Out

Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the

Carve-Out and (ii) in no way shall the Carve-Out, the Carve-Out Account, or any Approved DIP

Budget be construed as a cap or limitation on the amount of the Allowed Professional Fees due

and payable by the Debtors or that may be allowed by the Court at any time (whether by interim

order, final order, or otherwise).   All funds in the Carve-Out Account shall be used first to pay all

obligations benefitting from the Pre Carve-Out Trigger Notice Cap, until paid in full, and then the

obligations benefitting from the Post Carve-Out Trigger Notice Cap.

(f)     Notwithstanding anything to the contrary herein or elsewhere, the Carve

Out shall be senior to all claims and liens, including liens securing the DIP Facility, as well as any

adequate protection liens and claims described herein, and the DIP Collateral shall exclude the

Carve Out Account; *provided* that, if after paying all amounts set forth in the definition of Carve

Out, the Carve Out Account has not been reduced to zero, all remaining funds shall be distributed

to the DIP Agent for application towards the DIP Facility Obligations, unless the DIP Facility Obligations have been indefeasibly paid in full in cash and the DIP Facility Obligations have been terminated.

(g)      Nothing herein, including the inclusion of line items in the Approved DIP Budget for Professional Persons, shall be construed as consent to the allowance of any particular professional fees or expense of the Debtors, of the Official Committee, or of any other person or shall affect the right of the DIP Agent, the Prepetition ABL Agents, the Prepetition Term Loan Agent, the Welltower Landlords, the Omega Landlords, the U.S. Trustee, or any other party in interest to object to the allowance and payment of such fees and expenses.  The Prepetition Secured Parties shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Professional Persons incurred in connection with the Chapter 11 Cases. Nothing in this Interim Order or otherwise shall be construed to obligate the Prepetition Secured Parties in any way to pay compensation to or to reimburse expenses of any Professional Persons, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

23.      **Limitations on the DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, the Carve Out, and Other Funds**.  Notwithstanding anything contained in the DIP Loan Documents, this Interim Order, or any other order of this Court to the contrary, no DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve Out, or any other cash or funds may be used, directly or indirectly, by any of the Debtors, any Official Committee (if appointed), or any trustee or other estate representative appointed in the Chapter 11 Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to object to, contest, prevent, hinder, delay, or interfere with, in any way, the DIP Secured Parties' or the

Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral, Prepetition

Collateral, or Cash Collateral, following the occurrence and continuation of a DIP Termination

Event; or (b) to investigate (including by way of examinations or discovery proceedings, whether

formal or informal), prepare, assert, join, commence, support, or prosecute any action for any

claim, counter-claim, action, proceeding, application, motion, objection, defense, or other

contested matter seeking any order, judgment, determination, or similar relief against, or adverse

to the interests of, in any capacity, against any of the Prepetition Secured Parties, DIP Agent, and

DIP Lenders, and each of their respective successors, assigns, affiliates, parents, subsidiaries,

partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors,

consultants, professionals, officers, directors, members, managers, shareholders, and employees,

past, present and future, and their respective heirs, predecessors, successors and assigns (in each

case, in their respective capacities as such) (collectively, the "Subject Parties") with respect to any

transaction, occurrence, omission, action, or other matter arising under, in connection with, or

related to this Interim Order, the DIP Facility, the DIP Loan Documents, the DIP Facility

Obligations, the Prepetition Liens, the Prepetition Secured Obligations, or the Prepetition Secured

Documents or the transactions contemplated therein or thereby, or any other matter relating to the

Debtors, including, without limitation, (A) any Avoidance Actions, (B) any so-called "lender

liability" claims and causes of action, (C) any claim or cause of action with respect to the validity,

enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP

Facility Obligations, the DIP Superpriority Claims, the DIP Liens, the DIP Loan Documents, the

Adequate Protection Liens, the Adequate Protection Claims, the Prepetition ABL Obligations, the

Prepetition ABL Documents, the Prepetition ABL Liens, the Prepetition Term Loan Documents,

Prepetition Term Loan Liens, the Welltower Master Lease Agreement, the Welltower Master

Lease Documents, the Welltower Master Lease Liens, the Omega Master Lease Agreement, the

Omega Master Lease Documents, or the Omega Master Lease Liens, (D) any claim or cause of

action seeking to challenge, invalidate, modify, set aside, avoid, marshal, subordinate, or

recharacterize in whole or in part, the DIP Facility Obligations, the DIP Liens, the DIP

Superpriority Claims, the DIP Collateral, the Prepetition ABL Obligations, the Prepetition

Collateral, the Adequate Protection Liens, and the Adequate Protection Claims, or (E) any action

seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits

granted to any of the DIP Secured Parties hereunder or under any of the DIP Loan Documents or

the Prepetition Secured Parties hereunder or under any of the Prepetition Secured Documents, as

applicable (in each case, including, without limitation, claims, proceedings, or actions that might

prevent, hinder, or delay any of the DIP Secured Parties, or the Prepetition Secured Parties'

assertions, enforcements, realizations, or remedies on or against the DIP Collateral or Prepetition

Collateral in accordance with the applicable DIP Loan Documents or Prepetition Secured

Documents and this Interim Order and/or the Final Order (as applicable)); *provided*, that (i) no

more than $25,000 in the aggregate of the DIP Collateral, the Carve Out or Cash Collateral,

proceeds from the borrowings under the DIP Facility or any other amounts, may be used for

allowed fees and expenses incurred solely by any Official Committee (if appointed) in

investigating, but not objecting to, challenging, litigating, opposing, prosecuting, or seeking to

subordinate or recharacterize the validity, enforceability, perfection, and priority of the Prepetition

Liens, the Prepetition Secured Documents, the Adequate Protection Liens, or the Adequate

Protection Claims prior to the Challenge Deadline (as defined below), (ii) no more than an

additional $25,000 in the aggregate of the DIP Collateral, the Carve Out or Cash Collateral,

proceeds from the borrowings under the DIP Facility or any other amounts, may be used for

allowed fees and expenses incurred solely by any Official Committee (if appointed) in investigating the claims and/or liens of the Prepetition WAX/MAO Term Loan Lenders and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing, and (iii) no DIP Collateral (including Cash Collateral) or any proceeds thereof shall be used to investigate, object to, challenge, litigate, oppose, or prosecute any cause of action against the DIP Secured Parties (in their capacity as such), including seeking to subordinate or recharacterize the validity, enforceability, perfection, and priority of the DIP Liens, the DIP Superpriority Claims, the DIP Loans, or the DIP Loan Documents.  Notwithstanding anything else contained in this Interim Order or the DIP Loan Documents, the Investigation Period will not limit the ability of any party to challenge the liens or secured claims held by, or to assert claims against, the Prepetition WAX/MAO Term Loan Lenders .  Except to the extent expressly permitted by the terms of the DIP Loan Documents and this Interim Order or any further order of this Court, none of the Debtors, any Official Committee (if appointed), or any trustee or other estate representative appointed in the Chapter 11 Cases or any other person or entity may use or seek to use Cash Collateral or, to sell, or otherwise dispose of DIP Collateral or Prepetition Collateral, in each case, without the consent of each of the DIP Lenders.

24. **Reservation of Certain Third-Party Rights and Bar of Challenges and Claims**.

(a)     Subject to the challenge rights described in this paragraph 24, each of the stipulations, admissions, and agreements contained in this Interim Order, including, without limitation, in clauses (i) through (xiv) of paragraph E of this Interim Order (collectively, the "Stipulations"), shall be binding upon the DIP Loan Parties and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the DIP Loan

Parties in the Chapter 11 Cases) in all circumstances and for all purposes.  The Stipulations shall

be binding upon all parties in interest (including without limitation, (x) the DIP Loan Parties and

any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed

or elected for any of the DIP Loan Parties in the Chapter 11 Cases), and (y) any Official

Committee, if appointed) and any other person or entity acting or seeking to act on behalf of the

DIP Loan Parties' estates, in all circumstances and for all purposes, unless an Official Committee,

if any, or a party in interest (in each case, to the extent requisite standing is obtained pursuant to

an order of this Court entered prior to the Challenge Deadline (as defined below)) with respect to

the Stipulations and a challenge has been filed with this Court (each, a "Challenge Proceeding")

by the Challenge Deadline, objecting to or challenging the amount, validity, perfection,

enforceability, priority, or extent of any of the Prepetition Secured Obligations, the Prepetition

Liens, or the Prepetition Secured Documents, or otherwise asserting or prosecuting any Avoidance

Action or any other claim, counterclaim, cause of action, objection, contest, defense or other

challenge (a "Challenge") against any of the Subject Parties arising under, in connection with or

related to the Debtors, the Prepetition Secured Obligations, the Prepetition Liens, the Prepetition

Secured Documents, or the DIP Loan Documents, and there is entered a final non- appealable

order in favor of the objector, movant or plaintiff in any such timely filed Challenge Proceeding;

*provided* that (i) as to the Debtors (but not their estates), any and all such challenges are hereby

irrevocably waived and relinquished as of the Petition Date, (ii) any pleadings filed in any

Challenge Proceeding shall set forth with the requisite specificity the basis for such Challenge (and

any Challenges not so specified prior to the Challenge Deadline shall be deemed forever, waived,

released and barred), and (iii) such Challenge Proceeding may be pursued by the Official

Committee or any other party in interest that timely commenced a Challenge Proceeding pursuant to the terms of this Interim Order.

(b)     If no such Challenge Proceeding is timely filed with this Court prior to the Challenge Deadline, then, without further notice to any person or entity or order of this Court, the Stipulations shall be binding on all parties in interest, including, without limitation, any Official Committee, if appointed, the DIP Loan Parties and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the DIP Loan Parties in the Chapter 11 Cases) and the Debtors.

(c)     If any such Challenge Proceeding is timely filed prior to the Challenge Deadline, the Stipulations shall nonetheless remain binding and preclusive (as provided in paragraph 24(b) hereof) on any Official Committee (if appointed) and on any other person or entity, the DIP Loan Parties and any successor thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the DIP Loan Parties in the Chapter 11 Cases), and the Debtors, except to the extent that such Stipulations were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.

(d)     The "Challenge Deadline" shall mean the date that is (A) the later of (i) 75 calendar days after entry of this Interim Order if no Official Committee has been formed by such date, or (ii) if an Official Committee is appointed within 75 calendar days after entry of this Interim Order, 60 days after formation of such Official Committee, (B) with respect to any Subject Party, such later date that such Subject Party has agreed to in writing, prior to the expiration of the deadline to commence a Challenge, or (C) any such later date as has been ordered by this Court for cause upon a motion filed and served prior to the expiration of the deadline to commence a

Challenge; *provided*, that the filing of a motion pursuant to subsection (C), *supra*, shall toll the Challenge Period only as to the party that timely filed such standing motion until such motion is resolved or adjudicated by this Court; *provided further*, if a chapter 7 trustee or a chapter 11 trustee is appointed or elected during the Challenge Period, then the Challenge Period Termination Date with respect to such trustee only, shall be the later of (i) the last day of the Challenge Period and (ii) the date that is twenty (20) calendar days after the date on which such trustee is appointed or elected.  Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including any Official Committee or any other committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Secured Documents, the Prepetition Secured Obligations or the Prepetition Liens, and all rights to object to such standing are expressly reserved.

25.    **Limitations on Charging Expenses**.   To the extent a Final Order is entered providing for such relief, and except to the extent of the Carve Out and paragraph 23, and except as otherwise provided under an Approved DIP Budget, no costs or expenses of administration of the Chapter 11 Cases at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Secured Parties or the Prepetition Secured Parties (as the case may be) upon the DIP Collateral or Prepetition Collateral (as the case may be), shall be charged against or recovered from (a) the DIP Secured Parties or the DIP Collateral (including in respect of the Adequate Protection Liens), or any of the DIP Facility Obligations, or (b) the Prepetition Secured Parties or the Prepetition Collateral, in each case, pursuant to sections 105 or 506(c) of the Bankruptcy Code or any other legal or equitable doctrine (including unjust enrichment) or any similar principle of law, without

78

the prior express written consent of each of the DIP Lenders, the Prepetition ABL Agents, the

Prepetition Term Loan Agent, the Welltower Landlords, and the Omega Landlords, as applicable,

each in their sole discretion, and no such consent shall be implied, directly or indirectly, from any

other action, inaction, or acquiescence by any such agents or creditors (including, without

limitation, consent to the Carve Out or the approval of any budget hereunder).

26.    **No Marshaling**.  To the extent a Final Order is entered providing for such relief,

in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the

equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the

DIP Facility Obligations, the Prepetition Collateral, or the Prepetition Secured Obligations as

applicable, and all proceeds shall be received and applied in accordance with this Interim Order,

the DIP Term Sheet and the Prepetition Secured Documents, as applicable.

27.    **Equities of the Case**.  Further, to the extent a Final Order is entered providing for

such relief, in no event shall the "equities of the case" exception in section 552(b) of the

Bankruptcy Code apply to any of the Prepetition Secured Parties or Prepetition Collateral.

28.    **Joint and Several Liability**.  Nothing in this Interim Order shall be construed to

constitute or authorize a substantive consolidation of any of the Debtors' estates, it being

understood, however, that the DIP Loan Parties shall be jointly and severally liable for the

obligations hereunder and in accordance with the terms of this Interim Order.

29.    **Right to Credit Bid**.

(a)    The DIP Agent or its designee (at the written direction of the DIP Lenders),

on behalf of the DIP Secured Parties, unless this Court for cause orders otherwise, shall have the

right to credit bid on the DIP Collateral, in accordance with the DIP Loan Documents, up to the

full amount of the DIP Facility Obligations, subject to the Prepetition Secured Parties' respective

interests in the DIP Collateral, in connection with any sale or other disposition of all or any portion of the DIP Collateral, as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same, including, without limitation, any sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, and shall automatically be deemed a "qualified bidder" with respect to any disposition of DIP Collateral under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.

(b)     The Prepetition ABL Agents or their designee (at the written direction of the Prepetition ABL Lenders), on behalf of the Prepetition ABL Secured Parties, unless this Court for cause orders otherwise, shall have the right to credit bid on the ABL Senior Collateral, in accordance with the Prepetition ABL Documents, up to the full amount of the Prepetition ABL Obligations, in connection with any sale or other disposition of all or any portion of the DIP Collateral, as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same, including, without limitation, any sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, and shall each automatically be deemed a "qualified bidder" with respect to any disposition of ABL Senior Collateral under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.

(c)      The Prepetition Term Loan Agent or its designee (at the written direction of the Prepetition Term Loan Lenders), on behalf of the Prepetition Term Loan Secured Parties, unless this Court for cause orders otherwise, shall have the right to credit bid on the Prepetition Term Loan Collateral, in accordance with the Prepetition Term Loan Documents, up to the full amount of the Prepetition Term Loan Obligations, in connection with any sale or other disposition of all or any portion of the DIP Collateral, as provided for in section 363(k) of the Bankruptcy Code, without the need for further Court order authorizing the same, including, without limitation, any sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, and shall automatically be deemed a "qualified bidder" with respect to any disposition of Prepetition Term Loan Collateral under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code.

30.      **Rights Preserved**.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (a) the rights of the DIP Secured Parties or the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors; (b) the rights of the DIP Secured Parties or the Prepetition Secured Parties under the DIP Loan Documents or the Prepetition Secured Documents, the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any or all of the Chapter 11 Cases to a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a

Chapter 11 plan or plans; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties or the Prepetition Secured Parties.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', the DIP Loan Parties', or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence, except as expressly set forth in this Interim Order.

31.      **No Waiver by Failure to Seek Relief**.  The failure or delay on the part of any of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Loan Documents or the Prepetition Secured Documents, or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights hereunder, thereunder or otherwise.  No delay on the part of any party in the exercise of any right or remedy under this Interim Order shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy.  None of the rights or remedies of any party under this Interim Order shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the party against whom such amendment, modification, suspension, or waiver is sought.  No consents required hereunder by any of the DIP Secured Parties or the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties.

32.      **No Deemed Control**.  In determining to make, and in providing, any DIP Loans under the DIP Note, or in exercising any rights or remedies as and when permitted pursuant to this Interim Order, any Final Order or the DIP Loan Documents, no DIP Secured Party and no Prepetition Secured Party shall be deemed to be in control of any Debtor or its operations or to be

acting as a "responsible person," "managing agent" or "owner or operator" (as such terms are defined in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, et seq., as amended, or any similar state or federal statute) with respect to the operation or management of such Debtor.

33.    **Binding Effect of this Interim Order**.  Immediately upon entry of this Interim Order by this Court, this Interim Order shall inure to the benefit of the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties, and the provisions of this Interim Order (including all findings and conclusions of law herein) shall be valid and binding upon the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties, any and all other creditors of the Debtors, any Official Committee (if appointed) or other committee appointed in the Chapter 11 Cases, any and all other parties in interest, and the respective successors and assigns of each of the foregoing, including any trustee or other fiduciary hereafter appointed as legal representative of any of the Debtors in any of the Chapter 11 Cases, or upon dismissal or conversion of any of the Chapter 11 Cases; *provided* that (a) nothing in this paragraph shall confer final status on this Interim Order; and (b) the DIP Secured Parties and the Prepetition Secured Parties shall have no obligation to permit the use of DIP Collateral or Prepetition Collateral (including Cash Collateral) by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee, or similar responsible person appointed for the estates of the Debtors.

34.    **Survival**.  The terms and provisions of this Interim Order, including, without limitation, (a) the Carve Out and (b) all of the rights, privileges, benefits, and protections afforded herein and in the DIP Loan Documents (including the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and the Adequate Protection Claims, and any other claims, liens, security interests, and other protections (as applicable)) granted to the DIP Secured Parties and the

Prepetition Secured Parties pursuant to this Interim Order and the DIP Loan Documents (collectively, the "DIP Protections"), and any actions taken pursuant hereto or thereto, shall survive, shall continue in full force and effect, shall remain binding on all parties in interest, and shall maintain their priorities, and shall not be modified, impaired, or discharged by (except to the extent consented to in writing by the applicable secured parties), entry of any order that may be entered (i) confirming any plan of reorganization in any of the Chapter 11 Cases; (ii) converting any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (iii) dismissing any or all of the Chapter 11 Cases; or (iv) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases, in each case, until, in respect of the DIP Facility, all of the DIP Facility Obligations, pursuant to the DIP Term Sheet and this Interim Order, have been indefeasibly paid in full in cash (other than contingent indemnification obligations as to which no claim has been asserted) and all commitments to extend credit under the DIP Facility are terminated. This Court shall retain jurisdiction, notwithstanding any such confirmation, conversion, or dismissal, for the purposes of enforcing such DIP Protections and the Prepetition Secured Parties' adequate protection.

35. **Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order**. The DIP Secured Parties have acted in good faith in connection with the DIP Facility, the DIP Loan Documents, the Interim Financing, and with this Interim Order, and their reliance on this Interim Order is in good faith. Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, the DIP Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Loan Documents to the extent provided therein. If any or all of the provisions of this Interim Order are hereafter reversed

or modified on appeal, such reversal or modification shall not affect the validity, priority, or enforceability of the DIP Facility Obligations or the DIP Liens; *provided, however*, that the DIP Secured Parties shall not be entitled to protection under section 364(e) of the Bankruptcy Code with respect to any funds advanced by the DIP Secured Parties or made available by the Prepetition Secured Parties, as applicable, under the DIP Loan Documents after entry of an order staying this Interim Order or any provision of this Interim Order authorizing the Debtors to borrow funds under the DIP Loan Documents.  Notwithstanding any such reversal or modification of this Interim Order or certain provisions thereof on appeal, any DIP Facility Obligations, DIP Liens, or Adequate Protection Liens incurred by the DIP Loan Parties to the DIP Secured Parties or the Prepetition Secured Parties, as the case may be, prior to the actual receipt of written notice by the DIP Agent and the Prepetition Agent of the effective date of such reversal, modification, or stay shall be governed in all respects by the original provisions of this Interim Order.

36. **Amendment of the DIP Loan Documents**.  The DIP Loan Documents may, from time to time, be amended, amended and restated, modified, or supplemented by the parties thereto without notice or a hearing if the amendment, amendment and restatement, modification, or supplement is not material, and is:  (i) in accordance with the DIP Loan Documents; and (ii) not adverse or prejudicial in any material respect to the rights of the Debtors, the estates, or third parties; *provided, however*, all amendments, modifications and waivers of the DIP Loan Documents shall require the consent of each of the DIP Lenders.  Any material amendment, restatement, modification or supplement to the DIP Loan Documents may only be made pursuant to an order of this Court, upon notice and a hearing; *provided further however*, that any (i) extension of maturity, (ii) waiver or modification or compromise with respect to any Event of Default, or (iii) amendment to the Approved DIP Budget, including with respect to Permitted

Variances, shall require the written consent of the DIP Lenders and shall not require entry of an

order of this Court; for the avoidance of doubt, the Prepetition ABL Agents and Prepetition Term

Loan Agent each retain theirs rights to seek termination of the Debtors' ability to continue to use

Cash Collateral upon any such consent granted by the DIP Lenders and pursuant to the terms set

forth in paragraph 19 of this Interim Order.  The Debtors shall file all amendments, restatements,

modification and supplements of the DIP Loan Documents with this Court and serve the same on

the U.S. Trustee and the Official Committee, if any.

37.  **Adequate Assurance Deposits**.  Notwithstanding anything to the contrary in this

Interim Order, the interests of the DIP Secured Parties and the Prepetition Secured Parties in any

adequate assurance deposit ordered by this Court for the benefit of the Debtors' utilities shall be

subordinate to the interests of the Debtors' utilities in such adequate assurance deposit until such

time as the adequate assurance deposit is returned to the Debtors.

38.  **Limitation of Liability**.  Nothing in this Interim Order, the DIP Loan Documents,

or any other documents related to these transactions shall in any way be construed or interpreted

to impose or allow the imposition upon the DIP Secured Parties (in each case, in their capacities

as such) of (a) any liability for any claims arising from the prepetition or postpetition activities of

the Debtors in the operation of their business, or in connection with their restructuring efforts, or

(b) any fiduciary duties to the Debtors, their respective creditors, shareholders, or estates.  So long

as the DIP Secured Parties comply with their obligations under the DIP Loan Documents and their

obligations, if any, under applicable law (including the Bankruptcy Code), (x) the DIP Secured

Parties shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP

Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any

cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer,

bailee, custodian, forwarding agency, or other person; and (y) all risk of loss, damage, or destruction of the DIP Collateral shall be borne by the DIP Loan Parties.

39.  **Interim Order Controls**.  In the event of any conflict or inconsistency between or among the terms or provisions of this Interim Order, any of the DIP Loan Documents, unless such term or provision in this Interim Order is phrased in terms of "defined in" or "as set forth in" the DIP Loan Documents, the terms and provisions of this Interim Order shall govern and control.

40.  **Payments Held in Trust**.  Except as expressly permitted in this Interim Order or the DIP Loan Documents, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to indefeasible payment in full in cash of all DIP Facility Obligations under the DIP Loan Documents, and termination of the DIP Commitments in accordance with the DIP Term Sheet, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Agent and the DIP Lenders and shall immediately turn over such proceeds to the DIP Agent or applicable DIP Lender, for application in accordance with the DIP Term Sheet and this Interim Order.

41.  **Interim Order Effective as of the Petition Date**.  This Interim Order shall take effect and shall be enforceable as of the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), and 7062 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

42.  **Bankruptcy Rules**.  The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

43.     **Necessary Action**.  The Debtors are authorized and directed to take any and all such necessary actions as are reasonable and appropriate to implement the terms of this Interim Order.

44.     **Headings**.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

45.     **Final Hearing**.  **The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility is scheduled for [August 5], 2025 at [9:30 a].m. (prevailing Central Time), before the Honorable United States Bankruptcy Judge Stacey G. Jernigan, at the United States Bankruptcy Court for the Northen District of Texas.**  The Debtors shall promptly transmit copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties given notice of the Interim Hearing, to any party that has filed a request for notices with this Court, and to any official committee, after the same has been appointed, or any counsel thereto.

46.     **Objections**.  Any objections or responses to the entry of the proposed Final Order shall be filed with the Court and served on the following no later 4:00 p.m. (prevailing Central Time) on [July 29], 2025:  (a) Genesis Healthcare, Inc., c/o Ankura Consulting Group, LLC, 2021 McKinney Ave. Suite 340, Dallas, TX 75201 (Attn: Louis E. Robichaux IV (louis.robichaux@ankura.com)); (b) proposed counsel to the Debtors, McDermott Will & Emery LLP, 2501 North Harwood Street, Suite 1900, Dallas, TX 75201 (Attn:  Marcus A. Helt (mhelt@mwe.com) and Jack G. Haake (jhaake@mwe.com)), and 1180 Peachtree St. NE, Suite 3350, Atlanta, GA 30309 (Attn:  Daniel M. Simon (dsimon@mwe.com)), and 444 West Lake Street, Suite 4000, Chicago, IL 60606 (Attn:  William A. Guerrieri (wguerrieri@mwe.com) and Emily C. Keil (ekeil@mwe.com)); (c) counsel to Welltower, Gibson, Dunn & Crutcher LLP, 2001

Ross Avenue, Suite 2100, Dallas, TX 75201 (Attn: John T. Cox III (tcox@gibsondunn.com)) and 333 South Grand Avenue, Los Angeles, CA 90071 (Attn: Jeffrey C. Krause (jkrause@gibsondunn.com) and Michael G. Farag (mfarag@gibsondunn.com)); (d) counsel to Omega, Goodwin Proctor LLP, The New York Times Building, 620 Eighth Avenue, New York, NY 10018 (Attn: Robert J. Lemons (rlemons@goodwinlaw.com)), and Ferguson Braswell Fraser Kubasta PC, 2500 Dallas Parkway, Suite 600, Plano, TX 75093 (Attn: Leighton Aiken (laiken@fbfk.law)); (e) counsel to the Debtors' Prepetition ABL Secured Parties, Blank Rome LLP, 444 West Lake Street, Suite 1650, Chicago, IL 60606 (Attn: Kenneth J. Ottaviano (ken.ottaviano@blankrome.com)); (f) counsel to the Debtors' proposed DIP Lenders, DLA Piper LLP, 1900 N. Pearl St., Suite 2200, Dallas, TX 75201 (Attn: James Muenker (james.muenker@us.dlapiper.com)); (g) the United States Trustee for the Northern District of Texas, 1100 Commerce Street, Room 976, Dallas, TX 75242 (Attn: Meredyth A. Kippes); (h) counsel to the official committee of unsecured creditors (if any) appointed in these Chapter 11 Cases; and (i) any party that has requested notice pursuant to Bankruptcy Rule 2002. Any objections by creditors or any other party in interest to the DIP Motion or any of the provisions of this Interim Order shall be deemed waived unless filed and received in accordance with the foregoing on or before such date.

47.    **Retention of Jurisdiction**.  This Court shall retain jurisdiction to hear, determine and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP Facility and/or this Interim Order.

# # # END OF ORDER # # #

Prepared and presented by:

/s/ *Marcus A. Helt*

Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
Grayson Williams (TX 24124561)
**MCDERMOTT WILL & EMERY LLP**
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone:      (214) 295-8000
Facsimile:      (972) 232-3098
Email:          mhelt@mwe.com
                jhaake@mwe.com
                gwilliams@mwe.com

- and -

Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
**MCDERMOTT WILL & EMERY LLP**
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone:      (312) 372-2000
Facsimile:      (312) 984-7700
Email:          dsimon@mwe.com
                ekeil@mwe.com
                wguerrieri@mwe.com

*Proposed Counsel for the Debtors and*
*Debtors-in-Possession*

## **EXHIBIT 1**

**DIP Term Sheet**

**GENESIS HEALTHCARE, INC., et al.**

**JUNIOR SECURED
DEBTOR-IN-POSSESSION CREDIT FACILITY TERM SHEET**

**Summary of Proposed Terms and Conditions**

July 9, 2025

This binding term sheet (including all schedules, annexes and exhibits hereto, this "DIP Term Sheet" and together with the Interim DIP Order, the Final DIP Order, the Budget (each as defined below), and the definitive loan agreement (as modified in accordance with its terms, the "DIP Credit Agreement"), security agreement or other definitive documentation of the terms and conditions set forth herein, collectively, the "DIP Loan Documents") sets forth a summary of the terms and conditions with respect to the junior secured debtor-in-possession term loan credit facility (to be provided by the DIP Lenders (as defined below)) to Genesis Healthcare, Inc. and certain of its affiliates in connection with cases (the "Chapter 11 Cases") filed by the Debtors (as defined below) in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court") under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").

**This DIP Term Sheet is proffered in the nature of a settlement proposal in furtherance of settlement discussions. Accordingly, this DIP Term Sheet is protected by Rule 408 of the Federal Rules of Evidence and any other applicable statutes or doctrines protecting the use or disclosure of confidential settlement discussions. Nothing contained in this DIP Term Sheet shall be an admission of fact or liability.**

**This DIP Term Sheet shall be a binding agreement from and after, and subject to, the entry of the Interim DIP Order with respect to the DIP Loans (as defined below). This DIP Term Sheet does not purport to summarize all of the terms, conditions, representations and other provisions with respect to the DIP Facility (as defined below), which will be set forth in the DIP Loan Documents. The obligation of the DIP Lenders (as defined below) to provide financing pursuant to this DIP Term Sheet shall be subject to the conditions precedent and other terms and conditions set forth herein. In the event of any conflict between this DIP Term Sheet and the terms of the Interim DIP Order or the Final DIP Order (each as defined below), the terms of the Interim DIP Order or the Final DIP Order (as applicable) shall govern.**

| | |
|---|---|
| **Borrowers:** | Genesis Healthcare, Inc., a Delaware limited liability company, and FC-GEN Operations Investment, LLC, a Delaware limited liability company, each in its capacity as a debtor and debtor-in-possession (collectively, the "Borrowers") in the Chapter 11 Cases to be filed (such date, the "Petition Date") under chapter 11 of Title 11 of the Bankruptcy Code in the Bankruptcy Court.<br><br>This DIP Term Sheet assumes that the Borrowers and the Guarantors (as defined below) will file voluntary petitions simultaneously under the Bankruptcy Code in the Bankruptcy Court and will request joint administration of the Chapter 11 Cases; provided that all of Borrowers' and Guarantors' existing and future, direct or indirect domestic or foreign affiliates and subsidiaries that become debtors and debtors-in-possession |

| | |
|---|---|
| | in the Chapter 11 Cases at any time and from time to time, shall be Guarantors, as described below under "Guarantors". |
| **Guarantors:** | Each of the Borrowers' direct and indirect affiliates and subsidiaries that commence Chapter 11 Cases on or after the Petition Date, including without limitation such affiliates and subsidiaries as set forth on **Exhibit B** hereto, in their capacities as debtors and debtors-in- possession, on a joint and several basis (each, a "<u>Guarantor</u>" and collectively, the "<u>Guarantors</u>", together with the Borrowers, each individually a "<u>Loan Party</u>" and a "<u>Debtor</u>", and collectively, the "<u>Loan Parties</u>" and the "<u>Debtors</u>") absolutely and unconditionally guarantees, as a guaranty of performance and payment and not as a guaranty of collection, prompt payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and at all times thereafter, the payment and performance of any and all obligations of Borrowers under and with respect to the DIP Facility (as defined below), including, without limitation any and all DIP Loans and DIP Claims (each as defined below) (collectively, the "<u>Guaranteed Obligations</u>"), subject to, and in accordance with, the terms of the DIP Orders.  This guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the Guaranteed Obligations or any instrument or agreement evidencing any Guaranteed Obligations, or by the existence, validity, enforceability, perfection, non-perfection or extent of any collateral therefor, or by any fact or circumstance relating to the Guaranteed Obligations which might otherwise constitute a defense to the obligations of any Guarantor under this Guaranty other than the irrevocable payment in full in cash and performance of all obligations hereunder, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing (other than the defense of payment in full). |
| **Prepetition Secured Obligations; Prepetition Collateral:** | See **Annex A** attached hereto.[1] |
| **DIP Secured Parties:** | Markglen, Inc., as lender under the DIP Facility (in such capacity, the "<u>Welltower DIP Lender</u>"), OHI Mezz Lender LLC, as lender under the DIP Facility (in such capacity, the "<u>Omega DIP Lender</u>"), and CPE 88988 LLC, as lender under the DIP Facility (in such capacity, the "<u>WAX DIP Lender</u>" and, together with Welltower DIP Lender and Omega DIP Lender, the "<u>DIP Lenders</u>"), and Welltower OP LLC, upon execution of the DIP Credit Agreement, administrative and collateral agent (in such capacity, the "<u>DIP Agent</u>" and, together with the DIP Lenders, the "<u>DIP Secured Parties</u>"). |

---

[1] Capitalized terms used but not defined herein have the meaning given to them in **Annex A** attached hereto.

|  | "WELL/OHI DIP Lenders" shall mean, collectively, the Welltower DIP Lender and the Omega DIP Lender (the DIP Loans held by the WELL/OHI DIP Lenders, the "WELL/OHI DIP Loans").<br><br>The DIP Loans held by the WAX DIP Lender are referred to as the "WAX DIP Loans."<br><br>The obligations of each DIP Lender with respect to the DIP Facility (as defined below), under the DIP Loan Documents, and for all other purposes, shall be several and not joint. |
|---|---|
| **Type and Amount of the DIP Facility:** | A junior secured debtor-in-possession credit facility comprised of a new money term loan credit facility available in two draws as set forth herein in an aggregate principal amount equal to $30,000,000 (the "DIP Facility"; each DIP Lender's commitment under the DIP Facility, its "DIP Commitment" and the aggregate commitments of the DIP Lenders, the "DIP Commitments") (the loans under the DIP Facility, the "DIP Loans"; each DIP Lender's claim under the DIP Facility, a "DIP Claim" and the aggregate claims of the DIP Lenders, collectively, the "DIP Claims"; and proceeds received by the Borrowers from the DIP Loans, the "DIP Proceeds").<br><br>Each DIP Lender's respective DIP Commitment and obligations is several and not joint with the DIP Commitment and obligations of any other DIP Lender, and in no event shall any DIP Lender be required to fund or otherwise make available DIP Loans in excess of its DIP Commitment.<br><br>Following the Closing Date (as defined below), the DIP Loans may be incurred during the Availability Period (as defined below) (x) upon entry of an interim order of the Bankruptcy Court in form and substance satisfactory to each of the DIP Lenders, in their sole discretion, authorizing and approving the DIP Facility and the use of Cash Collateral (within the meaning of section 363(a) of the Bankruptcy Code) (the "Interim DIP Order"), in an aggregate principal amount not to exceed the amount reflected in the Budget (as defined below) (the "Initial Draw") and (y) the remaining principal amount in a single draw (the "Final Draw") upon entry of a final order of the Bankruptcy Court in form and substance satisfactory to each of the DIP Lenders, in their sole discretion, *inter alia*, authorizing and approving the DIP Facility (including the DIP Loans and the DIP Loan Documents and all lender fees related thereto) (the "Final DIP Order," and, together with the Interim DIP Order, the "DIP Orders") and satisfaction of any other conditions to draw as set forth in the DIP Loan Documents, in an aggregate amount not to exceed the aggregate DIP Commitments, in each case subject to the terms and conditions provided herein and in the DIP Loan Documents.<br><br>Once repaid, the DIP Loans incurred under the DIP Facility cannot be reborrowed.  For the avoidance of doubt, the DIP Commitments will be permanently reduced by the amount of DIP Loans made on the date of the Initial Draw and of the Final Draw, as applicable. |

3

| | |
|---|---|
| | The DIP Facility shall be available from the Closing Date (as defined below) to the DIP Termination Date (as defined below) (the "Availability Period"). |
| **Closing Date:** | The date of the satisfaction or waiver by the DIP Secured Parties of the relevant "Conditions Precedent to the Initial Draw" set forth below and in the DIP Credit Agreement (the "Closing Date"). |
| **Maturity:** | All DIP Obligations (as defined below) will be due and payable in full in cash unless otherwise agreed to in writing (email being sufficient) by each of the DIP Lenders on the earliest of (i) the date that is 210 calendar days after the Petition Date (or such later date as agreed to by each of the DIP Lenders), (ii) if the Final DIP Order has not been entered, 35 calendar days after the Petition Date (or such later date as agreed to by each of the DIP Lenders), (iii) the acceleration of the DIP Loans and the termination of the DIP Commitments upon the occurrence of an event referred to below under "Termination", (iv) the effective date of any chapter 11 plan of reorganization or liquidation of the Borrowers or any other Loan Parties (the "Plan"), (v) the date the Bankruptcy Court converts any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, (vi) the date the Bankruptcy Court dismisses any of the Chapter 11 Cases, (vii) the closing of any sale of assets under section 363 of the U.S. Bankruptcy Code, which when taken together with all other sales of assets since the Closing Date, constitutes a sale of all or substantially all of the assets of the Loan Parties, (viii) the date an order is entered in any Bankruptcy Case appointing a chapter 11 trustee or examiner with enlarged powers, (ix) the date on which the Debtors consent to the standing of any party, including a Committee (as defined below) to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, any Challenge (as defined below), and (x) the date on which a Challenge Proceeding (as defined below) is commenced by any party, including the Debtors or a Committee (each, a "DIP Termination Event" and the earliest of any such date, the "DIP Termination Date").  Principal of, and accrued interest on, the DIP Loans and all other amounts owing to the DIP Lenders under the DIP Facility shall be due and payable in cash on the DIP Termination Date.<br><br>The occurrence of the DIP Termination Date shall terminate the ability of the Borrowers to borrow the Initial Draw or the Final Draw and shall terminate the DIP Commitments and any further obligation each DIP Lender has to make any DIP Loans under the DIP Loan Documents. |
| **Budget:** | The Budget shall consist of a 13-week operating budget setting forth all forecasted receipts and disbursements on a weekly basis for such 13-week period beginning as of the week of the Petition Date, broken down by week, including the anticipated weekly uses of the DIP Proceeds and Cash Collateral for such period, which shall include, among other things, available cash, cash flow, trade payables and ordinary course expenses, total expenses, fees and expenses relating to the DIP Facility, Adequate Protection payments, fees and expenses related to the Chapter 11 Cases (including professional fees), and working capital and other general |

|  | corporate needs, which forecast shall be in form and substance satisfactory to each of the DIP Lenders in their sole discretion (such Budget shall meet the requirements described under, and be supplemented in the manner required under, the "Financial Reporting Requirements" section below). |
|---|---|
| **Use of Proceeds:** | Proceeds of the DIP Loans and Cash Collateral shall be used, in each case subject to the Budget (including Permitted Variances (as defined below)) and the terms and conditions of the DIP Term Sheet, the Interim DIP Order, the Final DIP Order, and the DIP Loan Documents, to (i) provide working capital and for other general corporate purposes of the Debtors, (ii) fund the costs of the administration of the Chapter 11 Cases (including professional fees and expenses), and (iii) fund fees and other payments contemplated in respect of the DIP Facility.<br><br>Without in any way limiting the foregoing, no DIP Collateral (as defined below), Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, any portion of the Carve Out, or any other cash or funds may be used, directly or indirectly, by any of the Debtors, any official committee appointed in the Chapter 11 Cases (the "Committee"), or any trustee or other estate representative appointed in the Chapter 11 Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith):  (a) to object to, contest, prevent, hinder, delay, or interfere with, in any way, the DIP Secured Parties' or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral, Prepetition Collateral, or Cash Collateral, following the occurrence and continuation of a DIP Termination Event ; or (b) to investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, assert, join, commence, support, or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination, or similar relief against, or adverse to the interests of, in any capacity, against any of the Prepetition Secured Parties, DIP Agent, and DIP Lenders, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (in each case, in their respective capacities as such) with respect to any transaction, occurrence, omission, action, or other matter arising under, in connection with, or related to the Interim DIP Order, the DIP Facility, the DIP Loan Documents, the DIP Facility Obligations, the Prepetition Liens, the Prepetition Secured Obligations, or the Prepetition Secured Documents or the transactions contemplated therein or thereby, or any other matters relating to the Debtors, including, without limitation, (A) any Avoidance Actions (as defined below), (B) any so-called "lender liability" claims and causes of action, (C) any claim or cause of action with respect to the validity, enforceability, priority and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the DIP Superiority Claims, the DIP Liens, the DIP Loan Documents, the Adequate Protection Liens, the Adequate Protection Claims, the Prepetition ABL Obligations, |

5

the Prepetition ABL Documents, the Prepetition ABL Liens, the Prepetition Term Loan Documents, Prepetition Term Loan Liens, the Welltower Master Lease Agreement, the Welltower Master Lease Documents, the Welltower Master Lease Liens, the Omega Master Lease Agreement, the Omega Master Lease Documents, or the Omega Master Lease Liens, (D) any claim or cause of action seeking to challenge, invalidate, modify, set aside, avoid, marshal, subordinate, or recharacterize in whole or in part, the DIP Obligations, the DIP Liens, the DIP Superpriority Claims, the DIP Collateral, the Prepetition ABL Obligations, the Prepetition Collateral, the Adequate Protection Liens, and the Adequate Protection Claims, or (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to any of the DIP Secured Parties hereunder or under any of the DIP Loan Documents or the Prepetition Secured Parties hereunder or under any of the Prepetition Secured Documents, as applicable (in each case, including, without limitation, claims, proceedings, or actions that might prevent, hinder, or delay any of the DIP Secured Parties, or the Prepetition Secured Parties' assertions, enforcements, realizations, or remedies on or against the DIP Collateral or Prepetition Collateral in accordance with the applicable DIP Loan Documents or Prepetition Secured Documents and the Interim DIP Order and/or the Final DIP Order (as applicable)); *provided*, that (i) no more than $25,000 in the aggregate of the DIP Collateral, the Carve Out or Cash Collateral, proceeds from the borrowings under the DIP Facility or any other amounts, may be used for allowed fees and expenses incurred solely by any Committee (if appointed) in investigating, but not objecting to, challenging, litigating, opposing, prosecuting, or seeking to subordinate or recharacterize the validity, enforceability, perfection, and priority of the Prepetition Liens, the Prepetition Secured Documents, the Adequate Protection Liens, or the Adequate Protection Claims prior to the Challenge Deadline (as defined below), (ii) no more than an additional $25,000 in the aggregate of the DIP Collateral, the Carve Out or Cash Collateral, proceeds from the borrowings under the DIP Facility or any other amounts, may be used for allowed fees and expenses incurred solely by any Committee (if appointed) in investigating the claims and/or liens of the WAX/MAO Term Lenders and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, assigns, or successors of each of the foregoing (collectively, the "WAX/MAO Investigation Parties"), and (iii) no DIP Collateral (including Cash Collateral) or any proceeds thereof shall be used to investigate, object to, challenge, litigate, oppose, or prosecute any cause of action against the DIP Secured Parties (in their capacity as such), including seeking to subordinate or recharacterize the validity, enforceability, perfection, and priority of the DIP Liens, the DIP Superpriority Claims, the DIP Loans, or the DIP Loan Documents. Except to the extent expressly permitted by the terms of the DIP Loan Documents and this Interim Order or any further order of this Court, none of the Debtors, any Committee (if appointed), or any trustee or other estate representative appointed in the Chapter 11 Cases or any other person or entity may use or seek to use Cash Collateral or, to sell, or otherwise

| | |
|---|---|
| | dispose of DIP Collateral or Prepetition Collateral, in each case, without the consent of each of the DIP Lenders. |
| **Interest:** | A per annum rate equal to 15%, with such interest payable monthly in arrears in kind (i.e., by adding such outstanding interest to the aggregate principal amount of the DIP Loans) on the monthly anniversary of the Petition Date, calculated on the basis of the actual number of days elapsed in a 365/366-day year; *provided* that any and all accrued and unpaid (in cash) interest shall be due and payable in cash upon the DIP Termination Date. |
| **Default Interest:** | If an Event of Default under the DIP Loan Documents has occurred and is continuing, the DIP Loans and all DIP Obligations will automatically bear interest at an additional 2% per annum. |
| **Fees:** | Upfront Fee:  Each DIP Lender shall receive an upfront fee, payable-in-kind (i.e., by adding such fee to the aggregate principal amount of the DIP Loans) equal to 2% of such DIP Lender's DIP Commitment under the DIP Facility, which shall be fully earned, non-refundable, and due and payable upon the Closing Date. <br><br> Exit Fee:  Each DIP Lender shall receive a payable-in-cash exit fee (the "Exit Fee") equal to 4% of such DIP Lender's initial DIP Commitment, which shall be fully earned and non-refundable on the Closing Date, and payable on the DIP Termination Date; *provided*, *however*, if the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Loan Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the DIP Lenders. |
| **Voluntary Prepayments:** | Voluntary prepayments of the DIP Loans shall be permitted at any time, without premium or penalty. |
| **Mandatory Prepayments:** | Subject to the senior rights of the ABL Lenders in Prepetition ABL Collateral, the Prepetition Term Loan Lenders in Prepetition Term Loan Collateral, the WELL/OHI Master Lease Secured Parties in WELL/OHI Master Lease Collateral, and the Other Landlords in Other Landlord Collateral, the following amounts shall be indefeasibly paid in cash in satisfaction of the DIP Obligations within two (2) business days of receipt, except as such amounts are set forth in the Budget and are necessary to satisfy the expenditures set forth in the Budget: <br><br> i.    100% of the net proceeds of asset sales. <br><br> ii.   100% of the net proceeds of insurance and condemnation awards. <br><br> iii.  100% of the net proceeds of any debt issuance or equity issuance. <br><br> iv.   100% of proceeds of claims and causes of action. |

| Priority and Security under DIP Facility: | As security for all obligations of the Borrowers and the Guarantors to the DIP Lenders under the DIP Facility, including, without limitation, all principal and accrued interest, premiums (if any), costs, fees and expenses or any other amounts due (collectively, the "DIP Obligations"), effective and automatically perfected upon the date of the Interim DIP Order, and without the necessity of the execution, recordation of filings by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements, or other similar documents, or the possession or control by any DIP Lender of, or over, any DIP Collateral, the following security interests and liens will be granted by the Debtors to the DIP Lenders, subject only to the ABL Obligations, Prepetition ABL Liens, ABL Adequate Protection, Prepetition Term Loan Obligations, Prepetition Term Loan Liens, Prepetition Term Loan Adequate Protection, WELL/OHI Master Lease Obligations, WELL/OHI Master Lease Liens, WELL/OHI Master Lease Adequate Protection, Other Landlord Liens, the Rochester Manor HUD Liens, HUD Lender Liens, payment of the Carve Out to the extent provided for herein and the Permitted Liens (if any) (all such liens and security interests granted to the DIP Lenders under the Interim DIP Order and the DIP Loan Documents, the "DIP Liens," and the property subject to the DIP Liens, collectively, the "DIP Collateral"): |
|---|---|

i.  <u>First Lien on Unencumbered Property</u>: Under section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien on all property of the Loan Parties, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), including, but not limited to, all of the Loan Parties' respective rights, title, or interest in and to the following assets to the extent unencumbered:  cash and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds and proceeds therefrom, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, all of the issued and outstanding capital stock of each Loan Party, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, beneficial interests in any trust, money, investment property, causes of action (including, for the avoidance of doubt, but subject to entry of the Final DIP Order, all proceeds of the Loan Parties' respective claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law (the "Avoidance Actions")), and all cash and non-

cash proceeds, rents, products, substitutions, accessions, profits, and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located;

ii.  <u>Priming Liens and Liens Junior to Certain Other Liens</u>:  Under sections 364(c)(3) and 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien on all property of the Loan Parties (other than the property described in clause (i) above, as to which the liens and security interests in favor of the DIP Lenders will be as described in such clause), whether existing on the Petition Date or thereafter acquired including, but not limited to, all of the Loan Parties' respective rights, title, or interest in and to the following assets: cash and any investment of such cash, accounts, inventory, goods, contract rights, mineral rights, instruments, documents, chattel paper, patents, trademarks, copyrights and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, intercompany claims, contracts, owned real estate, real property leaseholds and proceeds therefrom, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment property, letter-of-credit rights, supporting obligations, vehicles, machinery and equipment, real property, all of the issued and outstanding capital stock of each Loan Party, other equity or ownership interests, including equity interests in subsidiaries and non-wholly-owned subsidiaries, beneficial interests in any trust, money, investment property, causes of action (including, for the avoidance of doubt, but subject to entry of the Final DIP Order, all proceeds of Avoidance Actions), and all cash and non-cash proceeds, rents, products, substitutions, accessions, profits, and supporting obligations of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located, which DIP Liens shall be (A) subject only to the Carve Out, the ABL Obligations, Prepetition ABL Liens, ABL Adequate Protection, Prepetition Term Loan Obligations, Prepetition Term Loan Liens, Prepetition Term Loan Adequate Protection, WELL/OHI Master Lease Obligations, WELL/OHI Master Lease Liens, WELL/OHI Master Lease Adequate Protection, Other Landlord Liens, the Rochester Manor HUD Liens and HUD Lender Liens (in each case, to the extent such liens and security interests are valid, perfected and nonavoidable as of the Petition Date, the "<u>Permitted Liens</u>"), and (B) senior to any and all other liens and security interests in the DIP Collateral.

Except to the extent expressly permitted hereunder (including, for the avoidance of doubt, the Prepetition ABL Liens, Prepetition Term Loan Liens, WELL/OHI Master Lease Liens, Other Landlord Liens, the Rochester Manor HUD Liens, HUD Lender Liens, and adequate protection with respect to the foregoing, as applicable), subject to the Carve Out, the

| | |
|---|---|
| | DIP Liens and the DIP Superpriority Claims (as defined below) shall not be made subject to or *pari passu* with (a) any lien, security interest, or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, including any subsequently converted Chapter 11 Case of the Debtor to a case under chapter 7 of the Bankruptcy Code and any lien or security interest granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board, or court for any liability of the Debtors, (b) any lien or security interest that is avoided or preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, (c) any intercompany or affiliate claim, lien, or security interest of the Debtors or their affiliates, or (d) any other lien, security interest, or claim arising under section 363 or 364 of the Bankruptcy Code granted on or after the date hereof. |
| **Superpriority DIP Claims:** | All DIP Claims shall be entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having superpriority over any and all administrative expenses of the kind that are specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provisions of the Bankruptcy Code, senior in priority to all other claims or administrative expenses, subject only to (a) the Carve Out, (b) the Prepetition ABL Obligations, (c) the ABL Adequate Protection, (d) the Prepetition Term Loan Obligations, (e) the Prepetition Term Loan Adequate Protection, (f) the WELL/OHI Master Lease Obligations, and (g) the WELL/OHI Master Lease Adequate Protection. |
| **Carve Out:** | "Carve Out" means an amount equal to the sum of the following:  (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest under 31 U.S.C. § 3717 (without regard to the notice set forth in clause (iii) below); (ii) all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000 (without regard to the notice set forth in clause (iii) below); (iii) to the extent permitted by the Budget (subject to an allowed variance of 15% of the amount budgeted for each respective Estate Professional) and allowed by the Bankruptcy Court at any time, whether by Interim DIP Order, procedural order, final order or otherwise, all accrued and unpaid fees, disbursements, costs and expenses incurred by persons or firms retained by the Debtors under section 327, 328 or 363 of the Bankruptcy Code (the "Debtor Professionals") and all accrued unpaid fees, disbursements, costs and expenses incurred by the Committee (if any) under section 328 and 1103 of the Bankruptcy Code (the "Committee Professionals," together with the Debtor Professionals, the "Estate Professionals," and such Estate Professional fees, the "Allowed Professional Fees"), at any time before or on the first business day following delivery by the DIP Lenders of a Carve Out Trigger Notice (as defined below), whether allowed by the Bankruptcy Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Estate Professionals in an aggregate amount not to exceed $750,000 incurred after the first business day following delivery by the DIP Lenders of a Carve Out Trigger Notice, to the extent consistent with |

| | |
|---|---|
| | the Budget and allowed at any time, whether by Interim DIP Order, procedural order, final order, or otherwise (the amounts set forth in this clause (iv), the "Post-Carve Out Trigger Notice Cap"); provided, however, nothing herein shall be construed to impair the ability of any party to object to any fees, expenses, reimbursement or compensation sought by any such professionals or any other person or entity.  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice (which may be delivered by e-mail (or other electronic means)) by the DIP Lenders to the Debtors and their counsel, the United States Trustee, and lead counsel to any Committee appointed in the Chapter 11 Cases, which notice may be delivered following the occurrence of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has been invoked. <br><br> For the avoidance of doubt and notwithstanding anything to the contrary herein, the Carve Out shall be senior to all liens and claims securing the DIP Facility, and all other forms of adequate protection, liens, or claims securing the DIP Obligations or the Prepetition Secured Obligations. |
| **Investigation Rights:** | The Committee (to the extent appointed) and any other party in interest with proper standing granted by the Bankruptcy Court, shall have the lesser of (x) with respect to the Committee, sixty (60) calendar days from the date of its appointment or (y) to the extent a Committee is not appointed, any party in interest (other than the Debtors) shall have a maximum of seventy-five (75) calendar days from the entry of the Interim DIP Order for any other party in interest with requisite standing (the "Investigation Period") to investigate and commence an adversary proceeding or contested matter, as required by the applicable Federal Rules of Bankruptcy Procedure, and challenge (each, a "Challenge") the findings, the Debtors' stipulations, or any other stipulations contained in the Interim DIP Order and the Final DIP Order relating to the Prepetition Loan Documents and WELL/OHI Master Lease Documents, including, without limitation, any challenge to the validity, priority or enforceability of the liens securing the Prepetition Secured Obligations of the WELL/OHI Term Lenders and WELL/OHI Master Lease Secured Parties or their affiliates, or to assert any claim or cause of action against the WELL/OHI Term Lenders and WELL/OHI Master Lease Secured Parties or their affiliates arising under or in connection with their respective Prepetition Loan Documents, WELL/OHI Master Lease Documents, or their respective Prepetition Secured Obligations, as the case may be, whether in the nature of a setoff, counterclaim or defense of Prepetition Secured Obligations, or otherwise. Notwithstanding anything else contained in the DIP Loan Documents (including this DIP Term Sheet), the Investigation Period will not limit the ability of any party to challenge the liens or secured claims held by, or to assert claims against, the WAX/MAO Term Lenders.  The Investigation Period may only be extended with the prior written consent of the applicable Prepetition Secured Party or under an order of the Bankruptcy Court.   Except to the extent asserted in an adversary proceeding or contested matter filed during the Investigation Period, upon the expiration of such applicable Investigation Period (to the extent not otherwise waived or barred), (i) any and all Challenges or potential challenges shall be deemed to be forever waived and barred; (ii) all of the agreements, |

| | |
|---|---|
| | waivers, releases, affirmations, acknowledgements and stipulations contained in the Interim DIP Order and Final DIP Order shall be irrevocably and forever binding on the Debtors, the Committee and all parties-in-interest and any and all successors-in- interest as to any of the foregoing, including any chapter 7 trustee, without further action by any party or the Bankruptcy Court; (iii) the Prepetition Secured Obligations owing to the WELL/OHI Term Lenders and WELL/OHI Master Lease Secured Parties or their affiliates shall be deemed to be finally allowed and the Prepetition Liens securing such claims shall be deemed to constitute valid, binding and enforceable encumbrances, and not subject to avoidance under the Bankruptcy Code or applicable non-bankruptcy law; and (iv) the Debtors shall be deemed to have released, waived, and discharged the Released Parties from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Secured Obligations.  Notwithstanding anything to the contrary herein:  (x) if any Challenge is timely commenced with the Bankruptcy Court (such commencement, a "<u>Challenge Proceeding</u>"), the stipulations contained in the Interim DIP Order and the Final DIP Order shall nonetheless remain binding on all other parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (y) the Released Parties reserve all of their rights to contest on any grounds any Challenge.  For the avoidance of doubt, the Interim DIP Order and the Final DIP Order shall include language that the investigation rights afforded to the Committee will not constitute the Debtors', the Prepetition Secured Parties' or DIP Lenders' recognition, consent, or agreement not to object to, the Committee's standing to assert any claim or cause of action. |
| **Conditions Precedent to Initial Draw:** | The DIP Lenders' obligations to fund the Initial Draw will be subject to each of the following conditions precedent satisfied to each of the DIP Lenders' sole discretion:<br><br>i.    All "first day" motions, including those related to the DIP Facility, filed by the Debtors and related interim and final orders, as applicable, entered within 3 business days of the Petition Date by the Bankruptcy Court in the Chapter 11 Cases shall be in form and substance reasonably satisfactory to each of the DIP Lenders.<br><br>ii.    The DIP Lenders shall have received a Budget in form and substance satisfactory to each of the DIP Lenders.  Entry by the Bankruptcy Court of the Interim DIP Order authorizing the secured financing under the DIP Facility on the terms and conditions contemplated by this DIP Term Sheet, authorizing the Debtors' use of DIP Collateral subject to the terms provided herein, and otherwise on terms reasonably acceptable to each of the DIP Lenders no later than 3 business days after the Petition Date, and such Interim DIP Order shall be in full force and effect and not have been vacated, reversed, stayed, modified or amended (except in the case of a modification or amendment as consented to by each of the DIP Lenders, in their sole discretion) and shall not be subject to a stay pending appeal or motion for leave to |

| | |
|---|---|
| | appeal or other proceeding to set aside any such order or the challenge to the relief provided for in it, except as consented to by each of the DIP Lenders. |
| | iii.   Entry by the Bankruptcy Court of an order authorizing, on an interim basis, the use of Cash Collateral and providing for adequate protection in favor of the Prepetition Secured Parties on terms satisfactory to the Prepetition Secured Parties. |
| | iv.   The DIP Lenders shall have a valid and perfected lien on and security interest in the DIP Collateral of the Debtors on the basis and with the priority set forth herein. |
| | v.   All out-of-pocket costs, fees and expenses required to be paid to the DIP Lenders under this DIP Term Sheet, the DIP Loan Documents or the Interim DIP Order shall have been paid. |
| | vi.   No default or Event of Default shall have occurred, and shall be continuing, under the DIP Term Sheet immediately prior to the funding of the DIP Loans or would result from such borrowing of the DIP Loans. |
| | vii.   The Borrowers shall have delivered to the DIP Lenders a customary borrowing notice. |
| | viii.   Other than the Chapter 11 Cases, as stayed upon the commencement of the Chapter 11 Cases, or as disclosed in writing to the DIP Lenders prior to the Petition Date, there shall exist no action, suit, investigation, litigation or proceeding pending or threatened in writing in any court or before any arbitrator or governmental authority that (a) would reasonably be expected to result in a material adverse effect, or (b) restrains, prevents or purports to affect materially adversely the legality, validity or enforceability of the DIP Facility or the consummation of the transactions contemplated thereby. |
| | ix.   The making of the Initial Draw shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently. |
| **Conditions Precedent to Final Draw:** | The DIP Lenders' obligation to fund the Final Draw will be subject to each of the following conditions precedent: |
| | i.   All documentation relating to the DIP Facility, including the DIP Credit Agreement, shall be in form and substance satisfactory to each of the DIP Lenders and shall have been duly executed and delivered by all parties thereto. |
| | ii.   The Interim DIP Order, as entered by the Bankruptcy Court, shall not have been reversed, modified, amended, stayed or vacated, |

13

without the consent of each of the DIP Lenders, and the Borrowers shall be in compliance in all respects with the Interim DIP Order.

iii. The Bankruptcy Court shall have entered the Final DIP Order within thirty-five (35) calendar days following the Petition Date, in form and substance consistent with the terms and conditions set forth herein, authorizing the Debtors' use of DIP Collateral subject to the terms provided herein, and otherwise satisfactory to each of the DIP Lenders, which Final DIP Order shall include, an updated Budget (as necessary) as an exhibit thereto, entered on notice to such parties as may be satisfactory to each of the DIP Lenders and otherwise as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules of the Bankruptcy Court, authorizing and approving, on a final basis, (a) the DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the superpriority status, security interests and priming liens, and the payment of all fees, referred to herein; (b) the use of cash collateral and providing for adequate protection in favor of the Prepetition Secured Parties as and to the extent provided herein; and (c) reflecting such other terms and conditions that are mutually satisfactory to each of the DIP Lenders and the Debtors, in their respective discretion, in each case, on the terms and conditions set forth herein; which Final DIP Order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of each of the DIP Lenders.

iv. The DIP Lenders shall have received a borrowing notice from the Borrowers at least two (2) business days prior to the anticipated date of the Final Draw.

v. The representations and warranties of the Loan Parties under the DIP Loan Documents shall be true and correct in all material respects (or in the case of representations and warranties with a "materiality" qualifier, true and correct in all respects).

vi. No default or "Event of Default" shall have occurred, and shall be continuing, under the DIP Loan Documents immediately prior to the funding of the DIP Loans or would result from such borrowing of the DIP Loans.

vii. The Debtors shall have made all payments when due (without taking into account any stay or other relief provided by commencement of the Chapter 11 Cases) of postpetition Rents (as defined in the WELL/OHI Master Lease Documents) on account of the WELL/OHI Master Lease Obligations, unless otherwise waived by the prior written consent (email being sufficient) of the applicable WELL/OHI Master Lease Landlord, and shall have made payment when due (without taking into account any stay or other relief provided by commencement of the Chapter 11 Cases)

14

of all other postpetition rents, unless otherwise waived by the prior written consent (email being sufficient) of the applicable WELL/OHI Master Lease Landlord; and there shall not have occurred and remain ongoing any other "Event of Default" under the WELL/OHI Master Lease Documents (other than a default of the type described in section 365(b)(2) of the Bankruptcy Code) unless otherwise waived by the prior written consent (email being sufficient) of the applicable WELL/OHI Master Lease Landlord.

viii.   The Debtors shall have made all payments when due (without taking into account any stay or other relief provided by commencement of the Chapter 11 Cases) of postpetition Rents (as defined therein) on account of the obligations under the VSR Master Leases[2], unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the VSR Master Leases, and shall have made payment when due (without taking into account any stay or other relief provided by commencement of the Chapter 11 Cases) of all other postpetition rents, unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the VSR Master Leases; and there shall not have occurred and remain ongoing any other "Event of Default" under the VSR Master Leases (other than a default of the type described in section 365(b)(2) of the Bankruptcy Code) unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the VSR Master Leases.

ix.   The Debtors shall have made all payments when due (without taking into account any stay or other relief provided by commencement of the Chapter 11 Cases) of postpetition Rents (as defined therein) on account of the obligations under the PA 22 Sub-Subleases,[3] unless otherwise waived by the prior written

---

[2] "VSR Master Leases" shall mean, collectively, together with any documents related thereto, (i) that certain Amended and Restated Master Lease Agreement No. 5 dated as of February 2, 2015 (as otherwise amended, supplemented, or otherwise modified from time to time), and (ii) that certain HUD Facilities Master Lease dated as of March 29, 2012 (as otherwise amended, supplemented, or otherwise modified from time to time), by and among those entities identified as "Landlord" thereunder and the Debtor entities identified as "Tenant" thereunder.

[3] "PA 22 Sub-Subleases" shall mean, collectively, together with any documents related thereto, (i) that certain Assignment and Assumption of Lease, dated as of January 1, 2025 (as otherwise amended, supplemented, or otherwise modified from time to time), by and among Integra WIP Tenant LLC, a Delaware limited liability company, as assignor, and 1700 Market Street Opco LLC, 940 Walnut Bottom Road Opco LLC, 1070 Stouffer Avenue Opco LLC, 100 West Queen Street Opco LLC, 2600 Northampton Street Opco LLC, 3430 Huntingdon Pike Opco LLC, 1008 Thompson Street Opco LLC, 600 West Valley Forge Road Opco LLC, 100 Abbeyville Road Opco LLC, 2125 Elizabeth Avenue Opco LLC, 900 Tuck Street Opco LLC, 640 Bethlehem Pike Opco LLC, 724 North Charlotte St Opco LLC, 3000 Windmill Road Opco LLC, 901 Court Street Opco LLC, 115 South Providence Road Opco LLC, 425 Buttonwood Street Opco LLC, 200 Pauline Drive Opco LLC, 2400 Kingston Court Opco LLC, 1770 Barley Road Opco LLC, 2021 Westgate Drive Opco LLC, 2029 Westgate Drive Opco LLC, as assignees, and Genesis PM PA Operations LLC, as sublessee, (ii) that certain Amended and Restated Sub-Sublease Agreement, dated as of January 1, 2025 but effective as of December 22, 2022 (as otherwise amended, supplemented, or otherwise modified from time to time), by and between Genesis PM PA Operations LLC, a
*(Cont'd on next page)*

|  | | consent (email being sufficient) of the applicable Landlord under the PA 22 Sub-Subleases, and shall have made payment when due (without taking into account any stay or other relief provided by commencement of the Chapter 11 Cases) of all other postpetition rents, unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the PA 22 Sub-Subleases; and there shall not have occurred and remain ongoing any other "Event of Default" under the PA 22 Sub-Subleases (other than a default of the type described in section 365(b)(2) of the Bankruptcy Code) unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the PA 22 Sub-Subleases. |
|  | x. | There shall not have occurred and remain ongoing any event of default under the PA 22 MOTAs[4] (other than a default of the type described in section 365(b)(2) of the Bankruptcy Code) unless otherwise waived by the prior written consent (email being |

---

Delaware limited liability company, as sub-sublessor, and 2021 Westgate Drive Operations, LLC, 2029 Westgate Drive Operations LLC, 1700 Market Street Operations LLC, 940 Walnut Bottom Road Operations LLC, 1070 Stouffer Avenue Operations LLC, 2600 Northampton Street Operations LLC, 3430 Huntington Pike Operations LLC, 1008 Thompson Street Operations LLC, 600 W. Valley Forge Road Operations LLC, 100 Abbeyville Road Operations LLC, 2125 Elizabeth Avenue Operations LLC, 900 Tuck Street Operations LLC, 640 Bethlehem Pike Operations LLC, 724 N. Charlotte Street Operations LLC, 3000 Windmill Road Operations LLC, 800 Court Street Circle Operations LLC, 115 S. Providence Road Operations LLC, 425 Buttonwood Street Operations LLC, 200 Pauline Drive Operations LLC, 2400 Kingston Court Operations LLC, and 1770 Barley Road Operations LLC, as sub-sublesses, and (iii) that certain Sublease Agreement dated as of December 22, 2022, by and between Integra WIP Tenant LLC, a Delaware limited liability company, as sublessor, and Genesis PM PA Operations LLC, a Delaware limited liability company, as sublessee, as amended by that certain First Amendment to Sublease Agreement dated as of November 1, 2024, as further amended by that certain Lease Division and Second Amendment to Sublease Agreement dated as of January 1, 2025 (as otherwise amended, supplemented, or otherwise modified from time to time).

[4] "PA 22 MOTAs" shall mean, collectively, together with any documents related thereto, that certain Operations Transfer Agreement, dated as of January 1, 2025, by and among 2021 Westgate Drive Operations, LLC, 2029 Westgate Drive Operations LLC, 1700 Market Street Operations LLC, 940 Walnut Bottom Road Operations LLC, 1070 Stouffer Avenue Operations LLC, 2600 Northampton Street Operations LLC, 3430 Huntington Pike Operations LLC, 100 W Queen Street Operations LLC, 1008 Thompson Street Operations LLC, 600 W. Valley Forge Road Operations LLC, 100 Abbeyville Road Operations LLC, 2125 Elizabeth Avenue Operations LLC, 900 Tuck Street Operations LLC, 640 Bethlehem Pike Operations LLC, 724 N. Charlotte Street Operations LLC, 3000 Windmill Road Operations LLC, 800 Court Street Circle Operations LLC, 115 S. Providence Road Operations LLC, 425 Buttonwood Street Operations LLC, 200 Pauline Drive Operations LLC, 2400 Kingston Court Operations LLC, and 1770 Barley Road Operations LLC, as existing operators, and 1700 Market Street Opco LLC, 940 Walnut Bottom Road Opco LLC, 1070 Stouffer Avenue Opco LLC, 100 West Queen Street Opco LLC, 2600 Northampton Street Opco LLC, 3430 Huntingdon Pike Opco LLC, 1008 Thompson Street Opco LLC, 600 West Valley Forge Road Opco LLC, 100 Abbeyville Road Opco LLC, 2125 Elizabeth Avenue Opco LLC, 900 Tuck Street Opco LLC, 640 Bethlehem Pike Opco LLC, 724 North Charlotte St Opco LLC, 3000 Windmill Road Opco LLC, 901 Court Street Opco LLC, 115 South Providence Road Opco LLC, 425 Buttonwood Street Opco LLC, 200 Pauline Drive Opco LLC, 2400 Kingston Court Opco LLC, 1770 Barley Road Opco LLC, 2021 Westgate Drive Opco LLC, 2029 Westgate Drive Opco LLC, as new operators, and, for limited purposes, Genesis Healthcare, Inc. and Altira Health Group LLC.

sufficient) of the applicable counterparties under the PA 22 MOTAs.

xi.   The Debtors shall have made all payments when due (without taking into account any stay or other relief provided by commencement of the Chapter 11 Cases) of postpetition Rents (as defined therein) on account of the obligations under the JV Leases, unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the JV Leases, and shall have made payment when due (without taking into account any stay or other relief provided by commencement of the Chapter 11 Cases) of all other postpetition rents, unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the JV Leases; and there shall not have occurred and remain ongoing any other "Event of Default" under the JV Leases (other than a default of the type described in section 365(b)(2) of the Bankruptcy Code) unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the JV Leases.

xii.  The Debtors have delivered to the DIP Lenders the most recent Budget and such other information as requested by the DIP Lenders, in form and substance satisfactory to each of the DIP Lenders.

xiii. The Debtors are in compliance with the Milestones as of that date.

xiv.  Since the Petition Date, other than the Chapter 11 Cases, there shall not have occurred or there shall not exist any event, condition, circumstance or contingency that, individually, or in the aggregate, (a) has had or could reasonably be expected to have a material adverse effect on the business, operations, properties, assets, performance or financial condition of the Loan Parties taken as a whole; (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the DIP Lenders; or (c) has had or could reasonably be expected to have, a material adverse effect on the ability of the Loan Parties to perform their obligations under any DIP Document.

xv.   All reasonable and documented costs, fees, expenses (including, without limitation, legal fees and expenses) incurred in connection negotiating, documenting, approving, administering, monitoring or enforcing any rights under the DIP Facility set forth in the DIP Loan Documents or otherwise to be paid to the DIP Lenders shall have been paid when due.

xvi.  The amounts requested by the Borrowers shall be used for an authorized purpose as defined under "Use of Proceeds" above and

| | |
|---|---|
| | in accordance with the Budget, subject to a Permitted Variance (as defined below).<br><br>xvii.    The Loan Parties are in compliance with (a) the Interim DIP Order; (b) the Final DIP Order; and (c) the Budget (subject to Permitted Variances). |
| **Credit Bidding:** | Subject to entry of the Final DIP Order, the DIP Agent shall have the unqualified right to credit bid any or all of the obligations under the DIP Facility in connection with any disposition of DIP Collateral, including the Transaction. |
| **Admissions/Stipulations:** | The Borrowers shall make customary admissions and stipulations with respect to the amount of the Prepetition Secured Obligations, the validity, perfection, enforceability, non-avoidability, and priority of the Prepetition Liens, and the value of the Prepetition Collateral. |
| **Representations and Warranties:** | Customary and appropriate for financings of this type. |
| **Affirmative Covenants:** | Customary for transactions of this type (and to include reporting covenants (including with respect to the Budgets and Permitted Variances) and consistent with the Prepetition Term Loan Agreement, the delivery of all material pleadings, motions and other material documents filed with the Bankruptcy Court on behalf of the Debtors in the Chapter 11 Cases to the DIP Lenders and their counsel, to the extent practical under the circumstances, update meetings and/or calls with the DIP Lenders as reasonably requested). |
| **Negative Covenants:** | Customary for transactions of this type (and to include limitations on indebtedness, liens, investments, acquisitions, restricted payments and dispositions of assets) and consistent with the Prepetition Term Loan Agreement. |
| **Financial Reporting Requirements:** | Subject to the satisfaction of the conditions precedent set forth below, use of cash shall be subject to a 13-week cash flow forecast commencing on the Petition Date, which forecast shall include an itemized list of expenses to be incurred during each week along with information sufficient to denote the purpose of such expenses and shall be in form and substance acceptable to each of the DIP Lenders in their sole discretion (the "<u>Budget</u>," a copy of the initial Budget is attached as **<u>Exhibit A</u>** to this DIP Term Sheet) and shall, at a minimum, contain the categories set forth in the Budget attached as **<u>Exhibit A</u>** (each, a "<u>Reporting Category</u>").<br><br>By no later than 5:00 pm ET on the fourth business day of each week, commencing with the fourth full week after the Petition Date (each, a "<u>Reporting Date</u>"), Borrowers shall deliver to the DIP Lenders a variance report (each, a "<u>Variance Report</u>") showing comparisons of actual results for each line item against such line item in the Budget.  Each Variance Report shall indicate whether there are any adverse variances that exceed the allowed variances, which means, in each case measured on a |

<table>
<tr><td></td><td>cumulative basis for the prior four-week period and for the period from the Petition Date, (x) up to 15% in the aggregate for all "Total Operating Disbursements," excluding, for the avoidance of doubt, "Non-Operating Disbursements" and "Restructuring Disbursements" and (y) up to 15% in the aggregate for all "Total Receipts" (all as defined in the Budget) (each, a "<u>Permitted Variance</u>").

If necessary, the Debtors may provide to the DIP Lenders an updated 13-week cash flow forecast, containing line items of sufficient detail to reflect the Debtors' projected cash receipts and disbursements for such 13-week period on a weekly basis (the "<u>Updated 13-Week Forecast</u>").   Such Updated 13-Week Forecast shall be acceptable to each of the DIP Lenders in their sole discretion, and upon acceptance by each of the DIP Lenders, such Updated 13-Week Forecast shall become the new Budget commencing on such week, and promptly after ethe DIP Lenders approve the new Budget, the Debtors shall deliver the new Budget, together with any amendments or modifications thereto approved by each of the DIP Lenders.  In the event that the DIP Lenders and the Debtors do not agree to an updated Budget, the Budget shall be the then-existing Budget or such Budget as may be approved by the Bankruptcy Court after a hearing.</td></tr>
</table>

| **Chapter 11 Cases Milestones:** | The obligations of the DIP Lenders to advance the DIP Loans shall be subject to the Debtors satisfying, or causing the satisfaction of, the milestones listed below (collectively, the "<u>Milestones</u>") by the specified or by such later date as each of the DIP Lenders may agree in writing (email being sufficient): |
|---|---|

   i.    No later than three (3) days after the Petition Date, the Bankruptcy Court shall have entered the Interim DIP Order.

   ii.   No later than ten (10) days after the Petition Date, the Debtors shall have filed a motion for approval of procedures for the marketing and sale of some or all the Debtors' assets under Bankruptcy Code section 363 (the "<u>Transaction</u>"), which motion shall be in form and substance acceptable to each of the DIP Lenders.

   iii.  No later than twenty-one (21) days after entry of the Interim DIP Order, all documentation relating to the DIP Facility, including the DIP Credit Agreement, shall be in form and substance satisfactory to each of the DIP Lenders and shall have been duly executed and delivered by all parties thereto.

   iv.   No later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered an order granting the Debtors' motion for approval of procedures for the marketing and Transaction (the "<u>Bidding Procedures Order</u>"), which order shall be in form and substance acceptable to each of the DIP Lenders.

   v.    No later than thirty-five (35) days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order.

| | |
|---|---|
| | vi.  No later than forty (40) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Debtors rejection of certain leases mutually agreed between the Debtors and the DIP Lenders, which order shall be in form and substance acceptable to each of the DIP Lenders.<br><br>vii.  Any auction to select a winning bidder under the Bidding Procedures Order shall be conducted no later than ninety-five (95) days following the Petition Date.<br><br>viii.  No later than one hundred (100) days after the Petition Date, the Bankruptcy Court shall have entered an order approving the Transaction by approving the sale of substantially all the Debtors' assets under section 363 of the Bankruptcy Code, which order shall be in form and substance acceptable to each of the DIP Lenders.<br><br>ix.  No later than 210 days after the Petition Date, the Transaction shall have been consummated. |
| **Events of Default:** | "<u>Events of Default</u>" shall include the following and any other defaults specified as such in the DIP Orders, each of which may only be waived in writing by each of the DIP Lenders:<br><br>i.  failure to make payments including adequate protection payments when due;<br><br>ii.  noncompliance with covenants (subject to customary cure periods as may be agreed with respect to certain covenants);<br><br>iii.  breaches of representations and warranties in any material respect, in either case, under the DIP Loan Documents;<br><br>iv.  invalidity of any material provision of the DIP Loan Documents;<br><br>v.  change in ownership or control;<br><br>vi.  filing of a Plan by the Debtors that does not propose to indefeasibly repay the DIP Obligations, to the extent outstanding, in full in cash on the Plan effective date, unless otherwise consented to in writing by each of the DIP Lenders prior to its filing;<br><br>vii.  any of the Debtors shall file a pleading seeking to vacate or modify the Interim DIP Order or the Final DIP Order over the objection of the DIP Lenders;<br><br>viii.  entry of an order without the prior written consent of each of the DIP Lenders amending, supplementing or otherwise modifying the Interim DIP Order or the Final DIP Order;<br><br>ix.  entry of an order without the express written consent of each of the DIP Lenders obtaining additional financing from a party other than |

the DIP Lenders under section 364(d) of the Bankruptcy Code except if such financing contemplates payment in full of the DIP Obligations;

x.   reversal, vacatur or stay of the effectiveness of the Interim DIP Order or the Final DIP Order except to the extent reversed within ten (10) business days;

xi.   any violation of any material term of the Interim DIP Order or the Final DIP Order by the Debtors;

xii.   termination of the Debtors' right to use Cash Collateral as permitted hereunder;

xiii.   failure to comply with the Budget, including Permitted Variances;

xiv.   entry of an order in favor of the objector, movant or plaintiff any timely filed Challenge Proceeding;

xv.   dismissal of the Chapter 11 Case of a Debtor with material assets or conversion of the Chapter 11 Case of a Debtor with material assets to a case under chapter 7 of the Bankruptcy Code, or any Debtor shall file a motion or other pleading seeking such dismissal or conversion of any Bankruptcy Case;

xvi.   appointment of a chapter 11 trustee or examiner with enlarged powers, or any Debtor shall file a motion or other pleading seeking such appointment;

xvii.   failure to meet a Milestone, unless extended or waived by the prior written consent (email being sufficient) of each of the DIP Lenders;

xviii.   the Debtors' filing of a motion to reject the WELL/OHI Master Lease Documents or modify the claim(s) of the WELL/OHI Master Lease Landlords or the failure of the Debtors to make any payment when due (without taking into account any stays or other relief provided by commencement of the Chapter 11 Cases) of postpetition Rents (as defined in the WELL/OHI Master Lease Documents) accruing on account of the WELL/OHI Master Lease Obligations, unless otherwise waived by the prior written consent (email being sufficient) of the applicable WELL/OHI Master Lease Landlord, or the failure of the Debtors to make any payment when due (without taking into account any stays or other relief provided by commencement of the Chapter 11 Cases) of other postpetition rents, unless otherwise waived by the prior written consent (email being sufficient) of the applicable WELL/OHI Master Lease Landlord, or the occurrence and continuation of any other "Event of Default" under the WELL/OHI Master Lease Documents (other than a default of the type described in section 365(b)(2) of the Bankruptcy Code) unless otherwise waived by the

21

prior written consent (email being sufficient) of the applicable WELL/OHI Master Lese Landlord;

xix.  the Debtors' filing of a motion to reject the VSR Master Leases or modify the claim(s) of the Landlords thereunder or the failure of the Debtors to make any payment when due (without taking into account any stays or other relief provided by commencement of the Chapter 11 Cases) of postpetition Rents (as defined in the VSR Master Leases) accruing on account of the obligations thereunder, unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the VSR Master Leases, or the failure of the Debtors to make any payment when due (without taking into account any stays or other relief provided by commencement of the Chapter 11 Cases) of other postpetition rents, unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the VSR Master Leases, or the occurrence and continuation of any other "Event of Default" under the VSR Master Leases (other than a default of the type described in section 365(b)(2) of the Bankruptcy Code) unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the VSR Master Leases;

xx.  the Debtors' filing of a motion to reject the PA 22 Sub-Subleases or PA 22 MOTAs or modify the claim(s) of the Landlords or counterparties thereunder or the failure of the Debtors to make any payment when due (without taking into account any stays or other relief provided by commencement of the Chapter 11 Cases) of postpetition Rents (as defined in the PA 22 Sub-Subleases) accruing on account of the obligations thereunder, unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the PA 22 Sub-Subleases, or the failure of the Debtors to make any payment when due (without taking into account any stays or other relief provided by commencement of the Chapter 11 Cases) of other postpetition rents, unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the PA 22 Sub-Subleases, or the occurrence and continuation of any other "Event of Default" under the PA 22 Sub-Subleases or PA 22 MOTAs (other than a default of the type described in section 365(b)(2) of the Bankruptcy Code) unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord or counterparty under the PA 22 Sub-Subleases or PA 22 MOTAs;

xxi.  the Debtors' filing of a motion to reject the JV Leases or modify the claim(s) of the Landlords thereunder or the failure of the Debtors to make any payment when due (without taking into account any stays or other relief provided by commencement of the Chapter 11 Cases) of postpetition Rents (as defined in the JV Leases) accruing on account of the obligations thereunder, unless otherwise waived by the prior written consent (email being

sufficient) of the applicable Landlord under the JV Leases, or the failure of the Debtors to make any payment when due (without taking into account any stays or other relief provided by commencement of the Chapter 11 Cases) of other postpetition rents, unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the JV Leases, or the occurrence and continuation of any other "Event of Default" under the JV Leases (other than a default of the type described in section 365(b)(2) of the Bankruptcy Code) unless otherwise waived by the prior written consent (email being sufficient) of the applicable Landlord under the JV Leases;

xxii.   the Debtors' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order by the Bankruptcy Court, granting any superpriority claim or lien (except as contemplated herein) which is senior to or *pari passu* with the DIP Claims;

xxiii.  the Debtors seeking, or supporting any other person's motion seeking (in any such case, verbally in any court of competent jurisdiction or by way of any motion or pleading filed with the Bankruptcy Court, or any other writing to another party in interest by the Debtors), to challenge the validity or enforceability of any of the obligations of the parties under the Prepetition Secured Documents;

xxiv.   the Debtors filing a motion for the Bankruptcy Court to approve a sale of the DIP Collateral under section 363 of the Bankruptcy Code, unless such proposed sale is approved by each of the DIP Lenders, in their sole discretion;

xxv.    any Debtor shall fail to execute and deliver to the DIP Lenders any agreement, financing statement, trademark filing, copyright filing, notices of lien or similar instruments or other documents that the DIP Lenders may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the DIP Liens created in favor of the DIP Lenders;

xxvi.   the Debtors shall assert in any pleading filed in any court that the guarantee contained in the DIP Loan Documents is not valid and binding, for any reason, to be in full force and effect, other than under the terms hereof or thereof;

xxvii.  payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein or as otherwise consented to by each of the DIP Lenders;

xviii.  expiration or termination of the period provided by section 1121 of the Bankruptcy Code for the exclusive right to file a plan with respect to a Debtor with material assets unless such expiration or

23

| | | |
|---|---|---|
| | | termination was sought by any of the Prepetition Secured Parties or the DIP Lenders; |
| | xxix. | cessation of the DIP Liens or the DIP Claims to be valid, perfected and enforceable in all respects; |
| | xxx. | any Debtor asserting any right of subrogation or contribution against any other Debtor until all borrowings under the DIP Facility are paid in full and the commitments are terminated; |
| | xxxi. | subject to entry of the Final DIP Order, the allowance of any claim or claims under section 506(c) of the Bankruptcy Code or otherwise against any Prepetition TL/ML Secured Party; |
| | xxxii. | the entry of an order in any of the Chapter 11 Cases granting relief from any stay or proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure against a material portion of the Debtors' assets; |
| | xxiii. | the entry of an order in any Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the DIP Obligations owing under the DIP Loan Documents; and |
| | xxiv. | the entry of an order by the Bankruptcy Court providing relief adverse to the interests of any DIP Lender or any Prepetition Secured Party with respect to any motion, objection, application or adversary proceeding challenging the validity, enforceability, perfection or priority of, or seeking avoidance, subordination or characterization of, any portion of the Prepetition Secured Obligations and/or the liens and security interests securing the Prepetition Secured Obligations or asserting any other claim or cause of action against and/or with respect to the Prepetition Secured Obligations or the liens and security interests securing the Prepetition Secured Obligations, but excluding preliminary or final relief granting standing to any other party to prosecute such claims, causes of action or proceeding. |
| **Termination:** | | Upon the occurrence and during the continuance of an Event of Default, the DIP Lenders may by written notice to the Borrowers, their counsel, the U.S. Trustee and counsel for any statutory committee, terminate the DIP Facility, declare the obligations in respect thereof to be immediately due and payable and, subject to the conditions in the "Remedies" row of this DIP Term Sheet, exercise all rights and remedies under the DIP Loan Documents, the Interim DIP Order, and the Final DIP Order. |
| **Remedies:** | | The DIP Lenders shall have customary remedies upon the occurrence and during the continuance of an Event of Default, including, without limitation, the following:<br><br>Without further order from the Bankruptcy Court, and subject to the terms of the Interim DIP Order and the Final DIP Order (including in respect of |

| | any required notices), the automatic stay provisions of section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lenders to exercise, upon the occurrence and during the continuance of any Event of Default under the DIP Loan Documents, all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to the Bankruptcy Court (as applicable):  (a) immediately terminate the Debtors' use of any cash collateral; (b) cease making any DIP Loans under the DIP Facility to the Debtors; (c) declare all DIP Obligations to be immediately due and payable; (d) freeze monies or balances in the Debtors' accounts (and, with respect to the DIP Loan Documents and the DIP Facility, sweep all funds contained in any account subject to a control agreement); (e) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Lenders against the DIP Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of the DIP Lenders, including, without limitation, disposition of the DIP Collateral solely for application towards the DIP Obligations; and (f) take any other actions or exercise any other rights or remedies permitted under the Interim DIP Order and the Final DIP Order, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations; _provided_, _however_, that the DIP Lenders must provide the Debtors with five (5) business days' written notice (which may be by email and a copy of which shall be sent to the Prepetition ABL Agent) before exercising any enforcement rights or remedies with respect to the DIP Collateral or the Prepetition Collateral other than funds contained in any account subject to a control agreement; _provided_, _further_, that neither the Debtors, the Committee nor any other party-in-interest shall have the right to contest the enforcement of the remedies set forth in the Interim DIP Order and the Final DIP Order and the DIP Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable DIP Loan Documents. |
|---|---|
| **Adequate Protection:** | _ABL Adequate Protection_.  As adequate protection for the interests of the Prepetition ABL Secured Parties in the Prepetition ABL Collateral (including Cash Collateral), under sections 361, 362, and 363(e) of the Bankruptcy Code, and as a condition for the use of their Prepetition Collateral, including any Cash Collateral, the Prepetition ABL Secured Parties will be granted the following (collectively, the "ABL Adequate Protection"): |
| | i.   ABL Adequate Protection Liens:  Solely to the extent of any Diminution in Value of any Prepetition ABL Secured Party's interests in Prepetition ABL Collateral and in each case subject and subordinate to the Carve Out, the Prepetition ABL Secured Parties are granted the following security interests and liens (collectively, the "ABL Adequate Protection Liens") under sections 361, 362, 363 of the Bankruptcy Code:  valid, binding, enforceable, and perfected replacement liens on and security interests in assets of the type and nature that would be deemed Prepetition ABL Collateral but for the filing of these cases, and the |

proceeds thereof. For the avoidance of doubt, the DIP Liens, Prepetition Term Loan Adequate Protection Liens, and the WELL/OHI Master Lease Adequate Protection Liens shall be subject, subordinate and junior to all ABL Adequate Protection Liens on assets of the type and nature that would be deemed Prepetition ABL Collateral but for the filing of these cases, and the proceeds thereof.

ii.   <u>ABL Adequate Protection Superpriority Claims</u>: Solely to the extent of any Diminution in Value of any Prepetition ABL Secured Party's interests in Prepetition Collateral and in each case subject and subordinate to the Carve Out, the Prepetition ABL Secured Parties will be granted an allowed superpriority administrative expense claim under sections 503(b) and 507(b) of the Bankruptcy Code against the applicable Debtors (collectively, the "<u>ABL Adequate Protection Superpriority Claims</u>"). All ABL Adequate Protection Superpriority Claims shall have priority over any and all administrative expenses and other claims against the applicable Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under the Bankruptcy Code.

iii.  <u>ABL Adequate Protection Payments</u>: No later than the fifth Business Day following entry of the Interim DIP Order and on the fifth Business Day of each month hereafter, Debtors shall pay the Prepetition ABL Agent adequate protection in the form of interest, that has accrued at the non-default rate on the Prepetition ABL Obligations as of the Petition Date to be applied by the Prepetition ABL Agent in accordance with the Prepetition ABL Documents.

iv.   As further adequate protection, the Debtors will reimburse each Prepetition ABL Secured Party for all reasonable and documented out-of-pocket fees, costs and expenses of such Prepetition ABL Secured Party (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses, including one (1) local counsel and one (1) prepetition credit counsel). All such fees, including reasonable and documented out-of-pocket legal and other professional fees shall be paid by the Debtors promptly upon written demand and without the requirement of Bankruptcy Court approval.

For the avoidance of doubt and except for the ABL Adequate Protection Liens and the ABL Adequate Protection Superpriority Claims, (a) the respective rights, interests obligations, priority, and positions as between the Prepetition ABL Secured Parties and the Prepetition Term Loan Secured Parties shall continue to be governed by the ABL/Term Loan Intercreditor Agreement; and (b) the respective rights, interests obligations, priority, and positions as between the Prepetition ABL

Secured Parties and the WELL/OHI Master Lease Landlords shall continue to be governed by the ABL/Landlord Intercreditor Agreements.

*Prepetition Term Loan Adequate Protection*:  As adequate protection for the interests of the Prepetition Term Loan Secured Parties in the Prepetition Collateral (including Cash Collateral), under sections 361, 362 and 363(e) of the Bankruptcy Code, and as a condition for the use of the Prepetition Collateral, including any Cash Collateral, the Prepetition Term Loan Secured Parties will be granted the following (collectively, the "Prepetition Term Loan Adequate Protection"):

i.  Prepetition Term Loan Adequate Protection Liens.  Solely to the extent of, and in an aggregate amount equal to, any Diminution in Value of any Prepetition Term Loan Secured Party's interests in such Prepetition Term Loan Secured Party's Prepetition Collateral, from and after the Petition Date, the Prepetition Term Loan Lenders are granted the following security interests and liens (collectively, the "Prepetition Term Loan Adequate Protection Liens" and the collateral subject thereto, the "Prepetition Term Loan Adequate Protection Collateral") under sections 361, 362, and 363 of the Bankruptcy Code:  valid, binding, enforceable, and perfected replacement liens on and security interests in the Prepetition Collateral, including now- owned and hereafter-acquired real and personal property, assets, and rights of any kind or nature, wherever located, which liens and security interests shall be junior to (a) the Carve Out and (b) the Prepetition ABL Agent's prepetition liens and the ABL Adequate Protection Liens (subject to such liens solely with respect to assets of the type and nature that would be deemed Prepetition ABL Collateral but for the filing of these cases).

ii.  Prepetition Term Loan Adequate Protection Superpriority Claims. Solely to the extent of, and in an aggregate amount equal to, any Diminution in Value of its respective Prepetition Collateral, and in each case, subject and subordinate to the Carve Out and the ABL Adequate Protection Superpriority Claims, each Prepetition Term Loan Secured Party is hereby granted an allowed superpriority administrative expense claim under sections 503(b) and 507(b) of the Bankruptcy Code against the applicable Debtors (collectively, the "Prepetition Term Loan Adequate Protection Superpriority Claims").   All Prepetition Term Loan Adequate Protection Superpriority Claims shall be junior to (a) the Carve Out and (b) the ABL Adequate Protection Superpriority Claims, and otherwise have priority over any and all other administrative expenses and other claims against the applicable Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under the Bankruptcy Code.

iii.  <u>Prepetition Term Loan Adequate Protection Payments</u>:  No later than the fifth Business Day following entry of the Interim DIP Order and on the fifth Business Day of each month hereafter, Debtors shall pay the Prepetition Term Loan Agent adequate protection on partial account of interest that has accrued on the Prepetition Term Loan Obligations in the amounts set forth in the Budget, to be applied by the Prepetition Term Loan Agent in accordance with the Prepetition Term Loan Documents.

iv.  As further adequate protection, the Debtors will reimburse each Prepetition Term Loan Secured Party for all reasonable and documented out-of-pocket fees, costs and expenses of (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses, including one (1) local counsel).  All such fees, including reasonable and documented out-of-pocket legal and other professional fees shall be paid by the Debtors promptly upon written demand and without the requirement of Bankruptcy Court approval; <u>provided</u>, <u>however</u>, that in the event such fees and expenses exceed the amounts set forth in the DIP Budget, any excess amounts shall be added to the principal balance of the DIP Loans.

*<u>Master Lease Adequate Protection</u>*:  As adequate protection for the interests of the WELL/OHI Master Lease Secured Parties in the Prepetition Collateral (including Cash Collateral), under sections 361, 362 and 363(e) of the Bankruptcy Code, and as a condition for the use of the Prepetition Collateral, including any Cash Collateral, the WELL/OHI Master Lease Secured Parties are hereby granted the following (collectively, the "<u>WELL/OHI Master Lease Adequate Protection</u>"):

i.  <u>Master Lease Adequate Protection Liens</u>:  Solely to the extent of, and in an aggregate amount equal to, any Diminution in Value of any WELL/OHI Master Lease Secured Party's interests in such WELL/OHI Master Lease Collateral, from and after the Petition Date, the WELL/OHI Master Lease Secured Parties are granted the following security interests and liens (collectively, the "<u>WELL/OHI Master Lease Adequate Protection Liens</u>" and the collateral subject thereto, the "<u>WELL/OHI Master Lease Adequate Protection Collateral</u>") under sections 361, 362, and 363 of the Bankruptcy Code:  valid, binding, enforceable, and perfected replacement liens on and security interests in the Prepetition Collateral, including now-owned and hereafter-acquired real and personal property, assets, and rights of any kind or nature, wherever located, which liens and security interests shall be junior to (a) the Carve-Out, (b) the Prepetition ABL Agent's prepetition liens, (c) the ABL Adequate Protection Liens, (d) the Prepetition Term Loan Liens, and (e) the Prepetition Term Loan Adequate Protection Liens.

ii.  <u>Master Lease Adequate Protection Superpriority Claims</u>.  Solely to the extent of, and in an aggregate amount equal to, any

28

Diminution in Value of its respective Prepetition Collateral, and in each case, subject and subordinate to the Carve Out, the ABL Adequate Protection Superpriority Claims, and the Prepetition Term Loan Adequate Protection Superpriority Claims, each WELL/OHI Master Lease Secured Party is hereby granted an allowed superpriority administrative expense claim under sections 503(b) and 507(b) of the Bankruptcy Code against the applicable Debtors (collectively, the "<u>WELL/OHI Master Lease Adequate Protection Superpriority Claims</u>"). All WELL/OHI Master Lease Adequate Protection Superpriority Claims shall be junior to (a) the Carve Out, (b) the ABL Adequate Protection Superpriority Claims, and (c) the Prepetition Term Loan Adequate Protection Superpriority Claims.

iii.     As further adequate protection, the Debtors will reimburse each WELL/OHI Master Lease Secured Party for all reasonable and documented out-of-pocket fees, costs and expenses of (limited, in the case of counsel, to all reasonable and documented out-of-pocket fees, costs, disbursements and expenses, including one (1) local counsel). All such fees, including reasonable and documented out-of-pocket legal and other professional fees shall be paid by the Debtors promptly upon written demand and without the requirement of Bankruptcy Court approval; <u>provided</u>, <u>however</u>, that in the event such fees and expenses exceed the amounts set forth in the DIP Budget, any excess amounts shall be added to the principal balance of the DIP Loans.

| | |
|---|---|
| **Marshalling and Waiver of 506(c) and 552(b) Claims:** | Effective upon entry of the Final DIP Order, the DIP Lenders and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied under the Final DIP Order and the DIP Loan Documents notwithstanding any other agreement or provision to the contrary.

Effective upon entry of the Final DIP Order, the Debtors (on behalf of themselves and their estates) shall waive, and shall not assert in the Chapter 11 Cases or any successor cases, (i) any surcharge claim under sections 105(a) and/or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lenders and the Prepetition Secured Parties, upon the DIP Collateral or the Prepetition Collateral, and (ii) the DIP Lenders and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lenders and the Prepetition Secured Parties with respect to proceeds, product, offspring or profits of any of the Prepetition Collateral or DIP Collateral. |
| **Release:** | Effective as of the date of entry of the Interim DIP Order, as to the Debtors only, subject solely to the Challenge rights and limitations set forth in herein, each of the Debtors and the Debtors' estates, on its and their own |

| | behalf, on behalf of its and their respective past, present and future predecessors, heirs, successors, subsidiaries, and assigns, shall absolutely, unconditionally and irrevocably release and forever discharge and acquit (i) the DIP Agent, the Welltower DIP Lender, the Omega DIP Lender, the Welltower Master Lease Secured Parties, the Omega Master Lease Secured Parties, the Prepetition Term Loan Agent, the Prepetition WELL/OHI Term Loan Lenders, the Prepetition ABL Secured Parties, and each of their respective officers, directors, controlling persons, employees, agents, attorneys, affiliates, or successors of each of the foregoing (all in their capacities as such) and (ii) the WAX DIP Lender and the WAX/MAO Investigation Parties, solely as it relates to the DIP Facility, the DIP Obligations, and the DIP Loan Documents ((i) and (ii) collectively, the "Released Parties"), from any and all (a) obligations and liabilities to the Debtors (and their successors and assigns), and (b) claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action arising prior to the date of the Interim DIP Order of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case arising out of or related to (as applicable) the Prepetition Term Loan Documents, the Prepetition ABL Documents, the Welltower Master Lease Documents, the Omega Master Lease Documents, the DIP Loan Documents, and the obligations owing and financial obligations made thereunder, the negotiation thereof and of the transactions and agreements reflected thereby, and the obligations and financial obligations made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of the Interim DIP Order.  For the avoidance of doubt, nothing in the release shall relieve the Debtors of the Prepetition Secured Obligations or their obligations under the DIP Loan Documents. |
|---|---|
| **Indemnification:** | The Debtors shall indemnify, pay and hold harmless the DIP Lenders (and their directors, officers, employees and agents) against any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent resulting from the gross negligence, bad faith, fraud, or willful misconduct of the indemnified party, as determined by a final, non-appealable judgment of a court of competent jurisdiction). |
| **Expenses:** | All fees, including reasonable and documented out-of-pocket legal and other professional fees (limited to the reasonable and documented fees of the advisors) related to negotiating, documenting, approving, administering, monitoring or enforcing any rights under the DIP Facility of each DIP Lender shall be paid by the Debtors promptly upon written demand and without the requirement of Bankruptcy Court approval. |

30

| Governing Law: | Except as governed by the Bankruptcy Code, the law of the State of New York. |
|---|---|

[Remainder of Page Intentionally Blank; Signature Pages to Follow]

     **IN WITNESS HEREOF**, each of the undersigned has executed this Term Sheet or has caused the same to be executed by its duly authorized representatives as of the date first written above.

**Genesis Healthcare, Inc., FC-GEN Operations Investment, LLC, and such other entities listed on <u>Exhibit B</u>**

By: _____

Name:  Louis E. Robichaux
Title:   Co-Chief Restructuring Officer of
       Genesis Healthcare, Inc., et al.

[_____]

By: _____

Name:
Title:

*[Signature Page to Junior Secured Debtor-in-Possession Credit Facility Term Sheet]*

<u>**ANNEX A**</u>

**Prepetition Secured Obligations; Prepetition Collateral**

*Prepetition ABL Credit Facilities*

That certain Fifth Amended and Restated Credit Agreement, dated as of March 9, 2022 (as supplemented, amended, amended and restated, or otherwise modified from time to time, the "<u>Prepetition ABL Credit Agreement</u>," and together with any other documents executed and delivered in connection therewith, the "<u>Prepetition Non-HUD ABL Documents</u>"), by and among Genesis Healthcare, Inc., a Delaware corporation, FC-GEN Operations Investment, LLC, a Delaware limited liability company, Skilled Healthcare, LLC, a Delaware limited liability company, Genesis Holdings, LLC, a Delaware limited liability company, Genesis Healthcare LLC, a Delaware limited liability company, and certain affiliates and subsidiaries party thereto as "Borrowers" (collectively, the "<u>Non-HUD ABL Borrowers</u>"), White Oak Healthcare Finance, LLC ("<u>WOHCF</u>") and the other financial institutions party thereto from time to time as lenders (the "<u>Prepetition Non-HUD ABL Lenders</u>"), WOHCF, as Agent for the lenders (in such capacity, the "<u>Prepetition Non-HUD ABL Agent</u>," and together with the Prepetition Non-HUD ABL Lenders, the "<u>Prepetition Non-HUD ABL Secured Parties</u>"), pursuant to which the Prepetition Non-HUD ABL Lenders provided an asset-based lending credit facility to the Non-HUD ABL Borrowers (the "<u>Prepetition Non-HUD ABL Credit Facility</u>").  The Non-HUD ABL Borrowers and the other guarantors granted to the Prepetition Non-HUD ABL Agent, for itself and on behalf of the Prepetition Non-HUD ABL Lenders, valid and properly perfected continuing liens on and security interests in (the "<u>Prepetition Non-HUD ABL Liens</u>") all "Collateral" as defined in the Prepetition Non-HUD ABL Documents (collectively, the "<u>Prepetition Non-HUD ABL Collateral</u>") (it being understood that the term "Prepetition Non-HUD ABL Collateral" does not include any property or assets that have been expressly excluded from such definition in the Prepetition Non-HUD ABL Documents).

That certain Third Amended and Restated Revolving Credit Agreement, dated as of March 6, 2020 (as otherwise amended, supplemented, or otherwise modified from time to time, the "<u>Prepetition HUD ABL Credit Agreement</u>," and together with any other documents executed and delivered in connection therewith, the "<u>Prepetition HUD ABL Loan Documents</u>"), by and among, certain affiliates and subsidiaries of Genesis Healthcare, Inc. party thereto as "Borrowers" (collectively, the "<u>HUD ABL Borrowers</u>"), WOHCF and the other financial institutions party thereto from time to time as lenders (the "<u>Prepetition Non-HUD ABL Lenders</u>"), White Oak Healthcare Finance, LLC ("<u>WOHCF</u>"), as Agent for the lenders (in such capacity, the "<u>Prepetition Non-HUD ABL Agent</u>," and together with the Prepetition Non-HUD ABL Lenders, the "<u>Prepetition Non-HUD ABL Secured Parties</u>"), pursuant to which the Prepetition Non-HUD ABL Lenders provided an asset-based lending credit facility to the Non-HUD ABL Borrowers (the "<u>Prepetition Non-HUD ABL Credit Facility</u>").  The HUD ABL Borrowers and the other guarantors granted to the Prepetition HUD ABL Agent, for itself and on behalf of the Prepetition HUD ABL Lenders, valid and properly perfected continuing liens on and security interests in (the "<u>Prepetition HUD ABL Liens</u>") all "Collateral" as defined in the Prepetition HUD ABL Documents (collectively, the "<u>Prepetition HUD ABL Collateral</u>") (it being understood that the term "Prepetition HUD ABL Collateral" does not include any property or assets that have been expressly excluded from such definition in the Prepetition HUD ABL Documents).

*WELL/OHI Master Lease Agreements*

<u>Welltower Master Lease Agreements</u>

- That certain Master Lease Agreement, dated as of December 23, 2016 (as otherwise amended, supplemented, or otherwise modified from time to time, the "<u>Welltower Non-HUD Master Lease Agreement</u>," and together with any other documents executed and delivered in connection

therewith, the "<u>Welltower Non-HUD Master Lease Documents</u>"), by and among the entities party thereto from time to time collectively as a "Landlord" (the "<u>Welltower Non-HUD Master Lease Landlord</u>") and Genesis Dynasty Operations, LLC as tenant, (the "<u>Welltower Non-HUD Master Lease Tenant</u>") pursuant to which the Welltower Non-HUD Master Lease Landlord leased certain properties (the "<u>Non-HUD Welltower Leased Properties</u>") to the Welltower Non-HUD Master Lease Tenant on the terms set forth in the Welltower Non-HUD Master Lease Documents.  As more fully set forth in the Welltower Non-HUD Master Lease Documents, the Welltower Non-HUD Master Lease Obligations (as defined below) are unconditionally and irrevocably guaranteed by the certain of those entities who provided a Guaranty (as defined therein) in connection therewith, (collectively, the "<u>Welltower Non-HUD Master Lease Guarantors</u>," and together with the Welltower Non-HUD Master Lease Tenant, the "<u>Welltower Non-HUD Master Lease Obligors</u>").

- That certain Master Lease Agreement, dated as of October 1, 2017 (as otherwise amended, supplemented, or otherwise modified from time to time, the "<u>Welltower HUD Master Lease Agreement,</u>" and together with any other documents executed and delivered in connection therewith, the "<u>Welltower HUD Master Lease Documents</u>" and together with the Welltower Non-HUD Master Lease Documents, the "<u>Welltower Master Lease Documents</u>"), by and among the entities party thereto from time to time collectively as a "Landlord" (the "<u>Welltower HUD Master Lease Landlord</u>" and, together with the Welltower Non-HUD Master Lease Landlord, the "<u>Welltower Master Lease Landlords</u>") and Genesis Tang Operations LLC as tenant, (the "<u>Welltower HUD Master Lease Tenant</u>") pursuant to which the Welltower HUD Master Lease Landlord leased certain properties (the "<u>HUD Welltower Leased Properties</u>") to the Welltower HUD Master Lease Tenant on the terms set forth in the Welltower HUD Master Lease Documents. As more fully set forth in the Welltower HUD Master Lease Documents, the Welltower HUD Master Lease Obligations (as defined below) are unconditionally and irrevocably guaranteed by the certain of those entities who provided a Guaranty (as defined therein) in connection therewith, (collectively, the "<u>Welltower HUD Master Lease Guarantors</u>," and together with the Welltower HUD Master Lease Tenant, the "<u>Welltower HUD Master Lease Obligors</u>" and the Welltower HUD Master Lease Obligors and Welltower Non-Hud Master Lease Obligors, collectively, the "<u>Welltower Master Lease Obligors</u>").

- The Welltower Non-HUD Master Lease Obligors granted to the Welltower Non-HUD Master Lease Landlord (collectively, the "<u>Welltower Non-HUD Master Lease Secured Parties</u>") valid and properly perfected continuing liens on and security interests in (the "<u>Welltower Non-HUD Master Lease Liens</u>") all "Collateral" as defined in the Welltower Non-HUD Master Lease Documents (collectively, the "<u>Welltower Non-HUD Master Lease Collateral</u>") (it being understood that the term "Welltower Non-HUD Master Lease Collateral" does not include any property or assets that have been expressly excluded from such definition in the Welltower Non-HUD Master Lease Documents).

- The Welltower HUD Master Lease Obligors granted to the Welltower Non-HUD Master Lease Landlord (collectively, the "<u>Welltower HUD Master Lease Secured Parties</u>" and, together with the Welltower Non-HUD Master Lease Secured Parties, the "<u>Welltower Master Lease Secured Parties</u>") valid and properly perfected continuing liens on and security interests in (the "<u>Welltower HUD Master Lease Liens</u>" and, together with the Welltower Non-HUD Master Lease Liens, the "<u>Welltower Master Lease Liens</u>") all "Collateral" as defined in the Welltower HUD Master Lease Documents (collectively, the "<u>Welltower HUD Master Lease Collateral</u>" and, together with the Welltower Non-HUD Master Lease Collateral, the "<u>Welltower Master Lease Collateral</u>") (it being understood that the term "Welltower HUD Master Lease Collateral" does not include any property

or assets that have been expressly excluded from such definition in the Welltower HUD Master Lease Documents).

- The obligations of the Welltower Master Lease Obligors under the Welltower Master Lease Documents are referred to, collectively, as the "Welltower Master Lease Obligations".

Omega Master Lease Agreement

- That certain Second Consolidated Amended and Restated Master Lease Agreement, dated as of January 30, 2015 (as otherwise amended, supplemented, or otherwise modified from time to time, the "Omega Master Lease Agreement," and together with any other documents executed and delivered in connection therewith, the "Omega Master Lease Documents"), by and among the entities party thereto from time to time collectively as a "Landlord" (the "Omega Master Lease Landlord") and Sunbridge Care Enterprises, LLC, a Delaware limited liability company, Sunbridge Beckley Health Care, LLC, a West Virginia limited liability company, Sunbridge Putnam Health Care, LLC, a West Virginia limited liability company, Sunbridge Dunbar Health Care, LLC, a West Virginia limited liability company, Sunbridge Salem Health Care, LLC, a West Virginia limited liability company, Sunbridge Regency-North Carolina, LLC, a North Carolina limited liability company, Sunbridge Healthcare, LLC, a New Mexico limited liability company, Sunbridge Regency-Tennessee, LLC, a Tennessee limited liability company, Falmouth Healthcare, LLC, a Delaware limited liability company, Mashpee Healthcare, LLC, a Delaware limited liability company, Peak Medical Of Idaho, LLC, a Delaware limited liability company, Peak Medical Of Boise, LLC, a Delaware limited liability company, Genesis OMG Operations LLC, a Delaware limited liability company, 803 Hacienda Lane Operations LLC, a New Mexico limited liability company, 419 Harding Street Operations LLC, a New Mexico limited liability company, 1650 Galisteo Street Operations LLC, a New Mexico limited liability company, 3720 Church Rock Street Operations LLC, a New Mexico limited liability company, 3514 Fowler Avenue Operations LLC, a New Mexico limited liability company, 400 Mckinley Avenue Operations LLC, a West Virginia limited liability company, Sunbridge Retirement Care Associates, LLC, a Colorado limited liability company, and Albuquerque Heights Healthcare And Rehabilitation Center, LLC, a Delaware limited liability company, as tenant (collectively, the "Omega Master Lease Tenant"), pursuant to which the Omega Master Lease Landlord leased certain properties (the "Omega Leased Properties") to the Omega Master Lease Tenant on the terms set forth in the Omega Master Lease Documents.  As more fully set forth in the Omega Master Lease Documents, the Omega Master Lease Obligations (as defined below) are unconditionally and irrevocably guaranteed by the certain of those entities who provided a Guaranty (as defined therein) in connection therewith, (collectively, the "Omega Master Lease Guarantors," and together with the Omega Master Lease Tenant, the "Omega Master Lease Obligors"), and the obligations of the Omega Master Lease Obligors under the Omega Master Lease Documents, collectively, the "Omega Master Lease Obligations").

- The Omega Master Lease Obligors granted to the Omega Master Lease Landlord (collectively, the "Omega Master Lease Secured Parties") valid and properly perfected continuing liens on and security interests in (the "Omega Master Lease Liens") all "Collateral" as defined in the Omega Master Lease Documents (collectively, the "Omega Master Lease Collateral") (it being understood that the term "Omega Master Lease Collateral" does not include any property or assets that have been expressly excluded from such definition in the Omega Master Lease Documents).

The Welltower Master Lease Documents and the Omega Master Lease Documents are referred to, collectively, as the "WELL/OHI Master Lease Documents"; the Welltower Master Lease Landlords and the Omega Master Lease Landlord are referred to, collectively, as the "WELL/OHI Master Lease

Landlords"; the Welltower Master Lease Obligations and the Omega Master Lease Obligations are referred to, collectively, as the "WELL/OHI Master Lease Obligations"; the Welltower Master Lease Secured Parties and the Omega Master Lease Secured Parties are referred to, collectively, as the "WELL/OHI Master Lease Secured Parties"; the Welltower Master Lease Liens and Omega Master Lease Liens are referred to, collectively, as the "WELL/OHI Master Lease Liens"; and the Welltower Master Lease Collateral and the Omega Master Lease Collateral is referred to, collectively, as the "WELL/OHI Master Lease Collateral".

### Other Lease Agreements

Certain of the Debtors are parties to various lease agreements and related documents (collectively, the "Other Landlord Leases") with certain other landlords (the "Other Landlords"). The Debtors' obligations under the Other Landlord Leases are referred to, collectively, as the "Other Landlord Lease Obligations"; the liens granted to the Other Landlords under the Other Landlord Leases are referred to, collectively, as the "Other Landlord Liens"; and the collateral under the Other Landlord Leases is referred to, collectively, as the "Other Landlord Collateral".

### Prepetition Term Loan Facility

That certain Term Loan Agreement, dated as of July 29, 2016 (as amended and restated pursuant to that certain Amendment No. 13 to Loan Agreement and Amendment No. 2 to Guarantee and Collateral Agreement, dated as of April 10, 2024, and as otherwise supplemented, amended, amended and restated, or otherwise modified from time to time, the "Prepetition Term Loan Credit Agreement," and together with any other documents executed and delivered in connection therewith, the "Prepetition Term Loan Documents"; the Prepetition Term Loan Documents, together with the WELL/OHI Master Lease Documents, the "Prepetition TL/ML Loan Documents"; and the Prepetition TL/ML Loan Documents, together with the Prepetition ABL Documents, the "Prepetition Loan Documents"), by and among Genesis Healthcare, Inc., a Delaware corporation, FC-GEN Operations Investment, LLC, a Delaware limited liability company, GEN Operations I, LLC, a Delaware limited liability company, GEN Operations II, LLC, a Delaware limited liability company, and certain affiliates and subsidiaries party thereto as "Borrowers" (collectively, the "Prepetition Term Loan Obligors"), Welltower OP LLC (formerly known as Welltower Inc.) and the other financial institutions party thereto from time to time as lenders (the "Prepetition Term Loan Lenders"),[5] and Welltower OP LLC (formerly known as Welltower Inc.), as agent for the Prepetition Term Loan Lenders (in such capacity, the "Prepetition Term Loan Agent," and together with the Prepetition Term Loan Lenders, the "Prepetition Term Loan Secured Parties"; the Prepetition Term Loan Secured Parties, together with the WELL/OHI Master Lease Secured Parties, the "Prepetition TL/ML Secured Parties"; and Prepetition TL/ML Secured Parties, together with the Prepetition ABL Secured Parties, the "Prepetition Secured Parties").

The Prepetition Term Loan Obligors, granted to the Prepetition Term Loan Agent, for the benefit of itself and the Prepetition Term Loan Lenders, valid and properly perfected continuing liens on and security interests in (the "Prepetition Term Loan Liens"; the Prepetition Term Loan Liens, together with the WELL/OHI Master Lease Liens and the Prepetition ABL Liens, the "Prepetition Liens") all "Collateral" as defined in the Prepetition Term Loan Documents (collectively, the "Prepetition Term Loan Collateral"; the

---

[5] WAX Dynasty Partners LLC and MAO 22322 LLC are referred to, collectively, as the "WAX/MAO Term Lenders," and the Prepetition Term Loan Obligations with respect to the WAX/MAO Term Lenders are referred to as the "WAX/MAO Term Loan Obligations." Markglen, Inc. and OHI Mezz Lender, LLC are referred to, collectively, as the "WELL/OHI Term Lenders," and the Prepetition Term Loan Obligations with respect to the WELL/OHI Term Lenders are referred to as the "WELL/OHI Term Loan Obligations."

Prepetition Term Loan Collateral, together with the WELL/OHI Master Lease Collateral and the Prepetition ABL Collateral, the "Prepetition Collateral").

***Priority of Prepetition Liens; Intercreditor Agreements.***

*ABL/Term Loan Intercreditor Agreement*.  The Prepetition ABL Agent and the Prepetition Term Loan Agent entered into that certain Fifth Amended and Restated Intercreditor Agreement, dated as of March 9, 2022 (as otherwise amended, supplemented, or otherwise modified from time to time, the "ABL/Term Loan Intercreditor Agreement"), to govern the respective rights, interests, obligations, priority and positions of the Prepetition ABL Obligations and the Prepetition Term Loan Obligations with respect to certain of the Prepetition ABL Collateral and the Prepetition Term Loan Collateral.  Certain of the Debtors under the Prepetition Loan Documents acknowledged and agreed to the ABL/Term Loan Intercreditor Agreement.

*ABL/Welltower Landlord Intercreditor Agreement*.  The Prepetition ABL Agent, as successor to MidCap Funding IV Trust, the Prepetition Term Loan Agent, the Welltower Master Lease Landlords, and certain of the Debtors party to the Welltower Master Lease Documents (or, in each case, their predecessors in interest) entered into (i) that certain Intercreditor Agreement, dated as of December 23, 2016 and (ii) that certain Intercreditor Agreement, dated as of October 31, 2019 (together, as supplemented, amended, amended and restated, or otherwise modified from time to time, the "ABL/Welltower Landlord Intercreditor Agreements," and together with the ABL/Term Loan Intercreditor Agreement, the "Intercreditor Agreements"), to govern the respective rights, interests, obligations, priority and positions of the Prepetition ABL Obligations and the Welltower Master Lease Obligations with respect to certain of the Prepetition ABL Collateral and the Welltower Landlord Collateral.

*ABL/Omega Landlord Intercreditor Agreement*.  The Prepetition ABL Agent, as successor to MidCap Funding IV Trust, the Prepetition Term Loan Agent, the Omega Master Lease Landlord, the Prepetition Term Loan Agent, and certain of the Debtors party to the Omega Master Lease Documents entered into that certain Amended and Restated Intercreditor Agreement, dated as of July 29, 2016 (as supplemented, amended, amended and restated, or otherwise modified from time to time, the "ABL/Omega Landlord Intercreditor Agreement," and together with the ABL/Welltower Landlord Intercreditor Agreements, the ABL/Landlord Intercreditor Agreements (together with the ABL/Term Loan Intercreditor Agreement, the "Intercreditor Agreements")), to govern the respective rights, interests, obligations, priority and positions of the Prepetition ABL Obligations and the Omega Master Lease Obligations with respect to certain of the Prepetition ABL Collateral and the Omega Landlord Collateral.

***Prepetition HUD Lender Liens.***

Certain Debtors operate Facilities (collectively, the "HUD Facilities") which are encumbered by loans (the "HUD Property Loans") provided by certain financial institutions (the "HUD Lenders") and insured by the U.S. Department of Housing and Urban Development, acting by and through its Secretary and his or her successors, assigns or designates ("HUD").  In connection with the HUD Property Loans, such Debtors entered into certain Operator Security Agreement (each, a "HUD Operator Security Agreement") with the applicable HUD Lender granting to such HUD Lender valid and properly perfected continuing liens on and security interests in (the "HUD Lender Liens") all "Collateral" (as defined in each HUD Operator Security Agreement) (the "HUD Lender Collateral") to secure, among other things, obligations owed to the HUD Lenders, including the HUD Property Loans.

***Rochester Manor HUD Mortgage.***

Debtor 40 Whitehall Road Property LLC (the "Rochester Manor Borrower") has outstanding obligations owed to Berkadia Commercial Mortgage LLC (the "Rochester Manor HUD Lender") and, together with

HUD, the "Rochester Manor HUD Secured Parties") under that certain Healthcare Facility Note, dated as of December 1, 2016 (as otherwise amended, supplemented, or otherwise modified from time to time, the "Rochester Manor HUD Note," and together with any other documents executed and delivered in connection therewith, the "Rochester Manor HUD Documents"), which is insured by HUD.

Under the Rochester Manor HUD Documents, the Rochester Manor Borrower granted to the Rochester Manor HUD Secured Parties valid and properly perfected continuing liens on and security interests in (the "Rochester Manor HUD Liens") substantially all of its asserts, including the Rochester Manor skilled nursing facility located in Strafford County, New Hampshire (the "Rochester Manor HUD Collateral").

## EXHIBIT A

**Budget**

**Genesis HealthCare**
**DIP Budget**

| ($ in millions) | wk 1 Fcst. Post 7/11/25 | wk 2 Fcst. Post 7/18/25 | wk 3 Fcst. Post 7/25/25 | wk 4 Fcst. Post 8/1/25 | wk 5 Fcst. Post 8/8/25 | wk 6 Fcst. Post 8/15/25 | wk 7 Fcst. Post 8/22/25 | wk 8 Fcst. Post 8/29/25 | 8-Wk Fcst. Post Total |
|---|---|---|---|---|---|---|---|---|---|
| 1  **Operating Receipts** | **24.3** | **43.5** | **68.3** | **43.6** | **53.7** | **55.9** | **50.0** | **72.3** | **411.7** |
| 2  Payroll & Benefits | (4.0) | (33.5) | (27.4) | (34.2) | (26.5) | (34.0) | (26.3) | (34.1) | (220.0) |
| 3  Insurance | - | - | (2.6) | (0.6) | - | - | - | - | (3.3) |
| 4  Provider Assessments | - | (6.9) | (6.2) | (2.9) | (4.7) | (1.6) | (1.3) | (0.4) | (24.1) |
| 5  Trade Payables | (8.0) | (14.0) | (19.3) | (11.3) | (11.2) | (11.2) | (11.2) | (11.2) | (97.3) |
| 6  Utilities | - | 0.0 | (0.6) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (5.7) |
| 7  Rent & Related | - | (2.6) | (2.1) | - | (22.0) | - | (3.6) | (2.1) | (32.5) |
| 8  **Subtotal - Operating Disbursements** | **($12.0)** | **($57.0)** | **($58.2)** | **($50.0)** | **($65.4)** | **($47.8)** | **($43.5)** | **($48.8)** | **($382.9)** |
| 9  **Net Operating Cash Flows** | **$12.3** | **($13.5)** | **$10.1** | **($6.4)** | **($11.7)** | **$8.1** | **$6.5** | **$23.5** | **$28.8** |
| 10  Interest Payments & Fees | - | - | (3.2) | - | - | - | - | (3.3) | (6.5) |
| 11  Professional Fees | (1.5) | (1.4) | (1.4) | (1.4) | (2.1) | (1.8) | (1.8) | (1.8) | (13.2) |
| 12  US Trustee Fees | - | - | - | - | - | - | - | - | - |
| 13  Other Restructuring Disbursements | (0.1) | (4.1) | (0.1) | (0.1) | (0.1) | (1.6) | (0.1) | (0.1) | (6.3) |
| 14  **Subtotal - Restructuring Disbursements** | **($1.6)** | **($5.5)** | **($4.6)** | **($1.5)** | **($2.2)** | **($3.4)** | **($1.9)** | **($5.3)** | **($26.0)** |
| 15  **Net Cash Flow** | **$10.7** | **($18.9)** | **$5.5** | **($7.8)** | **($13.9)** | **$4.6** | **$4.6** | **$18.2** | **$2.9** |
| 16  Beginning Op. Book Cash Balance | 2.5 | 25.2 | 6.2 | 11.7 | 3.9 | 7.9 | 12.5 | 17.1 | 2.5 |
| 17  (+/-): Net Cash Flow | 10.7 | (18.9) | 5.5 | (7.8) | (13.9) | 4.6 | 4.6 | 18.2 | 2.9 |
| 18  (+): DIP Draw | 12.0 | - | - | - | 18.0 | - | - | - | 30.0 |
| 19  **Ending Op. Book Cash Balance** | **$25.2** | **$6.2** | **$11.7** | **$3.9** | **$7.9** | **$12.5** | **$17.1** | **$35.4** | **$35.4** |

<u>**EXHIBIT B**</u>

**Guarantor Entities**

| Debtor Name | EIN Number |
|---|---|
| 1 Glen Hill Road Operations LLC | 83-3800183 |
| 1 Sutphin Drive Operations LLC | 26-0798393 |
| 10 Woodland Drive Operations LLC | 26-3157524 |
| 100 Abbeyville Road Operations LLC | 88-4293103 |
| 100 Chambers Street Operations LLC | 26-0796788 |
| 100 W. Queen Street Operations LLC | 92-1075272 |
| 105 Chester Road Operations LLC | 37-1787889 |
| 1000 Lincoln Drive Operations LLC | 26-0798815 |
| 1008 Thompson Street Operations LLC | 92-1055669 |
| 101 13th Street Operations LLC | 26-0798876 |
| 101 Development Group, LLC | 26-3764579 |
| 1020 South Main Street Operations LLC | 26-0831465 |
| 106 Tyree Street Operations LLC | 26-0798930 |
| 1070 Stouffer Avenue Operations LLC | 92-1055714 |
| 11 Dairy Lane Operations LLC | 26-0797280 |
| 1100 Norman Eskridge Highway Operations LLC | 26-0789197 |
| 1104 Welsh Road Operations LLC | 26-0831607 |
| 1105 Perry Highway Operations LLC | 92-1060178 |
| 113 W. McMurray Road Operations LLC | 92-1040208 |
| 115 S. Providence Road Operations LLC | 92-1149731 |
| 12-15 Saddle River Road Operations LLC | 26-0858429 |
| 1245 Church Road Operations LLC | 26-0832125 |
| 1248 Hospital Drive Operations LLC | 36-4813989 |
| 125 Holly Road Operations LLC | 26-0833210 |
| 128 East State Street Associates, LLC | 20-5229040 |
| 136 Donahoe Manor Road Operations LLC | 92-1085905 |
| 1361 Route 72 West Operations LLC | 26-0858998 |
| 1539 Country Club Road Operations LLC | 26-1446436 |
| 1543 Country Club Road Manor Operations LLC | 26-1446339 |
| 161 Bakers Ridge Road Operations LLC | 26-0798986 |
| 1631 Ritter Drive Operations LLC | 26-0799048 |
| 1650 Galisteo Street Operations LLC | 38-4089170 |
| 1680 Spring Creek Road Operations LLC | 26-0834593 |
| 1700 Market Street Operations LLC | 88-4312980 |
| 1700 Pine Street Operations LLC | 26-0837632 |
| 175 Blueberry Lane Operations LLC | 26-0902592 |
| 1770 Barley Road Operations LLC | 92-1100285 |
| 1848 Greentree Road Operations LLC | 92-1100372 |
| 191 Hackett Hill Road Operations LLC | 61-1745358 |
| 2 Blackberry Lane Operations LLC | 37-1787899 |
| 20 Maitland Street Operations LLC | 26-0902639 |
| 200 Pauline Drive Operations LLC | 92-1085955 |
| 200 Reynolds Avenue Operations LLC | 26-0865155 |
| 200 South Ritchie Avenue Operations LLC | 26-0802292 |

| Debtor Name | EIN Number |
|---|---|
| 201 Wood Street Operations LLC | 26-0802570 |
| 2021 Westgate Drive Operations LLC | 92-1071278 |
| 2029 Westgate Drive Operations LLC | 92-1071366 |
| 2101 Fairland Road Operations LLC | 27-3286015 |
| 211-213 Ana Drive Operations LLC | 32-0445595 |
| 2125 Elizabeth Avenue Operations LLC | 88-4303273 |
| 22 Tuck Road Operations LLC | 26-3157262 |
| 225 Evergreen Road Operations LLC | 26-0837946 |
| 227 Evergreen Road Operations LLC | 26-0838035 |
| 23 Fair Street Operations LLC | 38-3974821 |
| 23 Fair Street Property, LLC | 37-1790621 |
| 24 Old Etna Road Operations LLC | 26-0902883 |
| 2400 Kingston Court Operations LLC | 88-4314431 |
| 25 East Lindsley Road Operations LLC | 26-0865287 |
| 25 Ridgewood Road Operations LLC | 26-0902937 |
| 2507 Chestnut Street Operations LLC | 26-0838130 |
| 2600 Northampton Street Operations LLC | 92-1075101 |
| 262 Toll Gate Road Operations LLC | 26-0838226 |
| 2720 Charles Town Road Operations LLC | 26-0802645 |
| 279 Cabot Street Operations LLC | 32-0473527 |
| 279 Cabot Street Property LLC | 38-3975205 |
| 2800 Palo Parkway Operations LLC | 88-4420565 |
| 290 Hanover Street Operations LLC | 26-3156358 |
| 292 Applegarth Road Operations LLC | 26-0865549 |
| 3 Industrial Way East Operations LLC | 26-0865899 |
| 30 West Avenue Operations LLC | 26-2602152 |
| 300 Pearl Street Operations LLC | 38-3975338 |
| 3000 Windmill Road Operations LLC | 88-4314481 |
| 302 Cedar Ridge Road Operations LLC | 26-0802735 |
| 330 Franklin Turnpike Operations LLC | 26-0865965 |
| 333 Green End Avenue Operations LLC | 26-0796847 |
| 3430 Huntingdon Pike Operations LLC | 88-4304543 |
| 3485 Davisville Road Operations II LLC | 92-1105056 |
| 3514 Fowler Avenue Operations LLC | 30-1116161 |
| 3590 Washington Pike Operations LLC | 37-1800646 |
| 3720 Church Rock Street Operations LLC | 36-4906274 |
| 390 Red School Lane Operations LLC | 26-0866040 |
| 40 Crosby Street Operations LLC | 32-0573730 |
| 40 Whitehall Road Operations LLC | 30-0878413 |
| 40 Whitehall Road Property LLC | 36-4814745 |
| 400 McKinley Avenue Operations LLC | 93-3663691 |
| 4140 Old Washington Highway Operations LLC | 26-0814286 |
| 419 Harding Street Operations LLC | 37-1905331 |
| 422 23rd Street Operations LLC | 26-0806381 |
| 425 Buttonwood Street Operations LLC | 92-1040323 |
| 450 East Philadelphia Avenue Operations LLC | 26-0838908 |
| 462 Main Street Operations LLC | 26-0796131 |
| 50 Mulberry Tree Street Operations LLC | 26-0804456 |

| Debtor Name | EIN Number |
|---|---|
| 50 Pheasant Road Operations LLC | 61-1896882 |
| 500 East Philadelphia Avenue Operations LLC | 26-0840575 |
| 501 Thomas Jones Way Operations LLC | 92-1086015 |
| 505 Weyman Road Operations LLC | 92-1086060 |
| 530 Macoby Street Operations LLC | 26-0840740 |
| 54 Sharp Street Operations LLC | 26-0866164 |
| 5485 Perkiomen Avenue Operations LLC | 26-0840797 |
| 550 South Negley Avenue Operations LLC | 92-1089430 |
| 5609 Fifth Avenue Operations LLC | 92-1116989 |
| 590 North Poplar Fork Road Operations LLC | 26-0802814 |
| 60 Highland Road Operations LLC | 88-4292979 |
| 600 Paoli Pointe Drive Operations LLC | 26-0842139 |
| 600 W. Valley Forge Road Operations LLC | 88-4293566 |
| 613 Hammonds Lane Operations LLC | 26-0816065 |
| 624 N. Converse Street Property, LLC | 32-0467257 |
| 640 Bethlehem Pike Operations LLC | 92-1044499 |
| 642 Metacom Avenue Operations LLC | 26-3157291 |
| 660 Commonwealth Avenue Operations LLC | 26-0796908 |
| 677 Court Street Operations LLC | 26-0903080 |
| 7 Baldwin Street Operations LLC | 26-0903110 |
| 700 Marvel Road Operations LLC | 26-0789419 |
| 700 Town Bank Road Operations LLC | 26-0866369 |
| 715 East King Street Operations LLC | 37-1690544 |
| 723 Summers Street Operations LLC | 26-0804524 |
| 724 N. Charlotte Street Operations LLC | 92-1045090 |
| 735 Putnam Pike Operations LLC | 26-3156030 |
| 75 Hickle Street Operations LLC | 26-0842502 |
| 777 Lafayette Road Operations LLC | 26-3157593 |
| 8 Rose Street Operations LLC | 26-0804585 |
| 8 Snow Road Operations LLC | 36-4904863 |
| 80 Maddex Drive Operations LLC | 26-0804643 |
| 800 Court Street Circle Operations LLC | 92-1089501 |
| 803 Hacienda Lane Operations LLC | 36-4905637 |
| 8100 Washington Lane Operations LLC | 26-0842681 |
| 825 Summit Street Operations LLC | 26-0804702 |
| 84 Cold Hill Road Operations LLC | 26-0866432 |
| 840 Lee Road Operations LLC | 26-0805378 |
| 850 12th Avenue Property, LLC | 61-1762114 |
| 867 York Road Operations LLC | 26-0842583 |
| 885 MacBeth Drive Operations LLC | 92-1055531 |
| 900 Tuck Street Operations LLC | 92-1055607 |
| 91 Country Village Road Operations LLC | 26-0903160 |
| 940 Walnut Bottom Road Operations LLC | 92-1089574 |
| 98 Hospitality Drive Operations LLC | 36-4814147 |
| Albuquerque Heights Healthcare and Rehabilitation Center, LLC | 26-0675040 |
| Albuquerque Heights Property, LLC | 36-4739932 |
| Belen Meadows Healthcare and Rehabilitation Center, LLC | 26-0675094 |
| Belfast Operations, LLC | 20-5541877 |

3

| Debtor Name | EIN Number |
|---|---|
| Brier Oak on Sunset, LLC | 95-4212165 |
| Camden Operations, LLC | 20-5542380 |
| Canyon Albuquerque Property, LLC | 61-1715791 |
| Canyon Transitional Rehabilitation Center, LLC | 26-0675157 |
| Clovis Healthcare and Rehabilitation Center, LLC | 26-0675210 |
| Courtyard JV LLC | 27-3653462 |
| Encore GC Acquisition LLC | 36-4746246 |
| Encore Pediatrics, LLC | 92-0850640 |
| Encore Preakness, LLC | 25-1805051 |
| Encore Rehabilitation Services, LLC | 20-8215706 |
| Falmouth Operations, LLC | 20-5542263 |
| Farmington Operations, LLC | 20-5542206 |
| Five Ninety Six Sheldon Road Operations LLC | 26-3157551 |
| Forty Six Nichols Street Operations LLC | 26-3157432 |
| Fountain Holdco, LLC | 61-1690655 |
| Franklin Woods JV LLC | 27-3653701 |
| GEN BQ JV Holdings, LLC | 83-4680177 |
| GEN CCG JV Holdings LLC | 84-4231317 |
| GEN Operations I, LLC | 27-3237090 |
| GEN Operations II, LLC | 27-3237225 |
| GEN SF JV Holdings, LLC | 84-2030307 |
| GEN-CCG WO Master Tenant LLC | 84-4852373 |
| GEN-Next Holdco I LLC | 83-3196600 |
| Genesis Administrative Services LLC | 30-0847166 |
| Genesis CT Holdings LLC | 26-0787896 |
| Genesis CT XCL Operations LLC | 83-4097388 |
| Genesis DE Holdings LLC | 26-0788062 |
| Genesis Dynasty Operations LLC | 35-2579085 |
| Genesis Eldercare Network Services, LLC | 23-2107987 |
| Genesis ElderCare Physician Services, LLC | 06-1156428 |
| Genesis HealthCare LLC | 27-3237296 |
| Genesis HealthCare of Maine, LLC | 36-4725000 |
| Genesis Holdings LLC | 30-0843337 |
| Genesis MA Holdings LLC | 26-0788158 |
| Genesis MD Holdings LLC | 26-0788216 |
| Genesis Midwest II Operations LLC | 61-1866165 |
| Genesis NH Holdings LLC | 26-0902542 |
| Genesis NHG Operations LLC | 37-1904639 |
| Genesis NHG-GEN Operations LLC | 83-4098117 |
| Genesis NJ Holdings LLC | 26-0856500 |
| Genesis OMG Operations LLC | 45-2036948 |
| Genesis Operations III LLC | 27-3956918 |
| Genesis Operations IV LLC | 45-2014515 |
| Genesis Operations LLC | 26-0787826 |
| Genesis Operations V LLC | 45-2015148 |
| Genesis Operations VI LLC | 45-2015863 |
| Genesis Orion Operations LLC | 46-3646227 |
| Genesis PA Holdings LLC | 26-0788305 |

| Debtor Name | EIN Number |
|---|---|
| Genesis Partnership LLC | 61-1747445 |
| Genesis Physician Services MSO, LLC | 37-1896412 |
| Genesis PM CO Operations LLC | 92-1398777 |
| Genesis PM NJ Operations LLC | 92-1881394 |
| Genesis PM PA Operations LLC | 92-1071670 |
| Genesis RI Holdings LLC | 26-0788381 |
| Genesis SNI Operations LLC | 84-2628539 |
| Genesis Tang Operations LLC | 38-4021426 |
| Genesis VA Holdings LLC | 26-0874971 |
| Genesis VT Holdings LLC | 26-0822458 |
| Genesis WV Holdings LLC | 26-0788494 |
| GHC Holdings LLC | 26-0740682 |
| GHC JV Holdings LLC | 27-3451063 |
| GHC Payroll LLC | 26-1091992 |
| GHC TX Operations LLC | 61-1750087 |
| Granite Ledges JV LLC | 27-3653829 |
| Harborside Danbury Limited Partnership | 06-1528119 |
| Harborside Health I LLC | 51-0304578 |
| Harborside Healthcare Advisors Limited Partnership | 04-2985690 |
| Harborside Healthcare Limited Partnership | 04-2985687 |
| Harborside Healthcare, LLC | 04-3307188 |
| Harborside New Hampshire Limited Partnership | 04-3284611 |
| Harborside Rhode Island Limited Partnership | 05-0495209 |
| Harborside Toledo Business LLC | 04-3274482 |
| HBR Kentucky, LLC | 20-2512086 |
| HBR Trumbull, LLC | 20-4599841 |
| HC 63 Operations LLC | 26-0805549 |
| Kansas City Transitional Care Center, LLC | 38-3879014 |
| Kennebunk Operations, LLC | 20-5542183 |
| Kennett Center, L.P. | 34-1975968 |
| KHI LLC | 51-0304577 |
| Leasehold Resource Group, LLC | 20-0083961 |
| Lewiston Operations, LLC | 20-5541920 |
| LTC ACO, LLC | 37-1787111 |
| Maryland Harborside, LLC | 04-3168713 |
| Magnolia JV LLC | 27-3653937 |
| Metro Therapy, Inc. | 11-3068922 |
| Nine Haywood Avenue Operations LLC | 26-0797562 |
| Odd Lot LLC | 27-5191122 |
| Orono Operations, LLC | 20-5542044 |
| PAI Participant 1, LLC | 83-4164482 |
| PAI Participant 2, LLC | 83-4164572 |
| PAI Participant 3, LLC | 83-4164685 |
| PAI Participant 4, LLC | 83-4164813 |
| PBR Intermediate Holdings, LLC | 88-3920334 |
| PDDTSE, LLC | 46-2458197 |
| Peak Medical Assisted Living, LLC | 52-2088942 |
| Peak Medical Las Cruces No. 2, LLC | 20-0068615 |

| Debtor Name | EIN Number |
|---|---|
| Peak Medical Las Cruces, LLC | 71-0950059 |
| Peak Medical New Mexico No. 3, LLC | 85-0484183 |
| Peak Medical Roswell, LLC | 20-0068604 |
| Peak Medical, LLC | 52-2088940 |
| Pine Tree Villa LLC | 20-2513222 |
| Post-Acute Innovations, LLC | 37-1932430 |
| Powerback Pediatrics of Arkansas, LLC | 88-4247749 |
| Powerback Pediatrics of Georgia, LLC | 99-0921365 |
| Powerback Pediatrics of Missouri, LLC | 92-0863507 |
| Powerback Pediatrics of Nebraska, LLC | 92-0886808 |
| Powerback Pediatrics of South Carolina, LLC | 99-0921075 |
| Powerback Pediatrics of Vermont, LLC | 99-0921658 |
| Powerback Rehabilitation, LLC | 23-2446104 |
| PRMC/GEC at Salisbury Center, LLC | 23-3010869 |
| Property Resource Holdings, LLC | 37-1712484 |
| Regency Health Services, LLC | 33-0210226 |
| Respiratory Health Services LLC | 52-2054967 |
| Romney Health Care Center Limited Partnership | 55-0689584 |
| Route 92 Operations LLC | 26-0805623 |
| Saddle Shop Road Operations LLC | 26-0805711 |
| Salisbury JV LLC | 27-3654054 |
| Scarborough Operations, LLC | 20-5542088 |
| SHG Partnership, LLC | 36-4802236 |
| SHG Resources, LLC | 20-0084078 |
| Skies Healthcare and Rehabilitation Center, LLC | 26-0675263 |
| Skiles Avenue and Sterling Drive Urban Renewal Operations LLC | 61-1717930 |
| Skilled Healthcare, LLC | 20-0084014 |
| Skowhegan SNF Operations, LLC | 20-5541352 |
| St. Anthony Healthcare and Rehabilitation Center, LLC | 26-0675327 |
| St. Catherine Healthcare and Rehabilitation Center, LLC | 20-8386337 |
| St. John Healthcare and Rehabilitation Center, LLC | 20-8386810 |
| St. Theresa Healthcare and Rehabilitation Center, LLC | 26-0675370 |
| State Street Associates, L.P. | 23-2799332 |
| State Street Kennett Square, LLC | 23-2446105 |
| Stillwell Road Operations LLC | 26-0805824 |
| Summit Care Parent, LLC | 38-3901040 |
| Summit Care, LLC | 95-3656297 |
| Sun Healthcare Group, Inc. | 13-4230695 |
| SunBridge Beckley Health Care LLC | 31-1042548 |
| SunBridge Care Enterprises, LLC | 95-3311961 |
| SunBridge Clipper Home of North Conway, LLC | 02-0417606 |
| SunBridge Clipper Home of Wolfeboro, LLC | 02-0382521 |
| SunBridge Dunbar Health Care LLC | 55-0593873 |
| SunBridge Gardendale Health Care Center, LLC | 58-2238801 |
| SunBridge Goodwin Nursing Home, LLC | 02-0303002 |
| SunBridge Healthcare, LLC | 85-0370802 |
| SunBridge Nursing Home, LLC | 91-1572371 |
| SunBridge Putnam Health Care LLC | 31-0996773 |

| Debtor Name | EIN Number |
|---|---|
| SunBridge Regency-North Carolina, LLC | 56-1954175 |
| SunBridge Regency-Tennessee, LLC | 33-0690226 |
| SunBridge Retirement Care Associates, LLC | 43-1441789 |
| SunBridge Salem Health Care LLC | 31-0996769 |
| SunDance Rehabilitation Agency, LLC | 30-0141695 |
| SunDance Rehabilitation Holdco, Inc. | 38-3954180 |
| SunDance Rehabilitation, LLC | 06-1310410 |
| The Rehabilitation Center of Albuquerque, LLC | 26-0675426 |
| Thirty Five Bel-Aire Drive SNF Operations LLC | 26-0797624 |
| Three Mile Curve Operations LLC | 26-0806097 |
| Waterville SNF Operations LLC | 20-5541966 |
| Westbrook Operations, LLC | 20-5542347 |
| Westwood Medical Park Operations LLC | 26-0797458 |

## **EXHIBIT 2**

**Initial DIP Budget**

**Genesis HealthCare**
**DIP Budget**

| ($ in millions) | wk 1 Fcst. Post 7/11/25 | wk 2 Fcst. Post 7/18/25 | wk 3 Fcst. Post 7/25/25 | wk 4 Fcst. Post 8/1/25 | wk 5 Fcst. Post 8/8/25 | wk 6 Fcst. Post 8/15/25 | wk 7 Fcst. Post 8/22/25 | wk 8 Fcst. Post 8/29/25 | 8-Wk Fcst. Post Total |
|---|---|---|---|---|---|---|---|---|---|
| **1  Operating Receipts** | **24.3** | **43.5** | **68.3** | **43.6** | **53.7** | **55.9** | **50.0** | **72.3** | **411.7** |
| 2  Payroll & Benefits | (4.0) | (33.5) | (27.4) | (34.2) | (26.5) | (34.0) | (26.3) | (34.1) | (220.0) |
| 3  Insurance | - | - | (2.6) | (0.6) | - | - | - | - | (3.3) |
| 4  Provider Assessments | - | (6.9) | (6.2) | (2.9) | (4.7) | (1.6) | (1.3) | (0.4) | (24.1) |
| 5  Trade Payables | (8.0) | (14.0) | (19.3) | (11.3) | (11.2) | (11.2) | (11.2) | (11.2) | (97.3) |
| 6  Utilities | - | 0.0 | (0.6) | (1.0) | (1.0) | (1.0) | (1.0) | (1.0) | (5.7) |
| 7  Rent & Related | - | (2.6) | (2.1) | - | (22.0) | - | (3.6) | (2.1) | (32.5) |
| **8  Subtotal - Operating Disbursements** | **($12.0)** | **($57.0)** | **($58.2)** | **($50.0)** | **($65.4)** | **($47.8)** | **($43.5)** | **($48.8)** | **($382.9)** |
| **9  Net Operating Cash Flows** | **$12.3** | **($13.5)** | **$10.1** | **($6.4)** | **($11.7)** | **$8.1** | **$6.5** | **$23.5** | **$28.8** |
| 10  Interest Payments & Fees | - | - | (3.2) | - | - | - | - | (3.3) | (6.5) |
| 11  Professional Fees | (1.5) | (1.4) | (1.4) | (1.4) | (2.1) | (1.8) | (1.8) | (1.8) | (13.2) |
| 12  US Trustee Fees | - | - | - | - | - | - | - | - | - |
| 13  Other Restructuring Disbursements | (0.1) | (4.1) | (0.1) | (0.1) | (0.1) | (1.6) | (0.1) | (0.1) | (6.3) |
| **14  Subtotal - Restructuring Disbursements** | **($1.6)** | **($5.5)** | **($4.6)** | **($1.5)** | **($2.2)** | **($3.4)** | **($1.9)** | **($5.3)** | **($26.0)** |
| **15  Net Cash Flow** | **$10.7** | **($18.9)** | **$5.5** | **($7.8)** | **($13.9)** | **$4.6** | **$4.6** | **$18.2** | **$2.9** |
| 16  Beginning Op. Book Cash Balance | 2.5 | 25.2 | 6.2 | 11.7 | 3.9 | 7.9 | 12.5 | 17.1 | 2.5 |
| 17  (+/-): Net Cash Flow | 10.7 | (18.9) | 5.5 | (7.8) | (13.9) | 4.6 | 4.6 | 18.2 | 2.9 |
| 18  (+): DIP Draw | 12.0 | - | - | - | 18.0 | - | - | - | 30.0 |
| **19  Ending Op. Book Cash Balance** | **$25.2** | **$6.2** | **$11.7** | **$3.9** | **$7.9** | **$12.5** | **$17.1** | **$35.4** | **$35.4** |

**EXHIBIT B**

**<u>Proposed Final Order</u>**

[To come]