**MCDERMOTT WILL & EMERY LLP**
Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
Grayson Williams (TX 24124561)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone:      (214) 295-8000
Facsimile:      (972) 232-3098
Email:           mhelt@mwe.com
                 jhaake@mwe.com
                 gwilliams@mwe.com

*Proposed Counsel for the Debtors and
Debtors-in-Possession*

**MCDERMOTT WILL & EMERY LLP**
Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone:      (312) 372-2000
Facsimile:      (312) 984-7700
Email:           dsimon@mwe.com
                 ekeil@mwe.com
                 wguerrieri@mwe.com

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | ) | Case No. 25-80185 (SGJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING BIDDING PROCEDURES AND EXPENSE REIMBURSEMENT, (II) APPROVING THE DEBTORS' ENTRY INTO THE STALKING HORSE APA, (III) SCHEDULING CERTAIN DATES AND DEADLINES, (IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (V) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, (VI) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS, AND (VII) AUTHORIZING THE SALE OF ASSETS

---

[1] The last four digits of Genesis Healthcare, Inc.'s federal tax identification number are 4755. There are 291 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

IF YOU OBJECT TO THE RELIEF REQUESTED, YOU MUST RESPOND IN WRITING. UNLESS OTHERWISE DIRECTED BY THE COURT, YOU MUST FILE YOUR RESPONSE ELECTRONICALLY AT HTTPS://ECF.TXNB.USCOURTS.GOV/ AT LEAST TWO (2) BUSINESS DAYS BEFORE THE START OF THE HEARING. IF YOU DO NOT HAVE ELECTRONIC FILING PRIVILEGES, YOU MUST FILE A WRITTEN OBJECTION THAT IS ACTUALLY RECEIVED BY THE CLERK AND FILED ON THE DOCKET AT LEAST TWO (2) BUSINESS DAYS BEFORE THE START OF THE HEARING. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.

A VIRTUAL HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 5, 2025 AT 9:30 A.M. (CT) AT THE EARLE CABELL FEDERAL BUILDING, 1100 COMMERCE STREET, 14TH FLOOR, COURTROOM 1, DALLAS, TEXAS, 75242.[2]

YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.

AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 1-650-479-3207. VIDEO COMMUNICATION WILL BE BY THE USE OF THE CISCO WEBEX PLATFORM. CONNECT VIA THE CISCO WEBEX APPLICATION OR CLICK THE LINK ON JUDGE JERNIGAN'S HOME PAGE. THE MEETING CODE IS 2304 154 2638. CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.

HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF ELECTRONIC HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE JERNIGAN'S HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.

Genesis Healthcare, Inc. ("Genesis") and certain of its affiliates and subsidiaries, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby file this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), granting the relief described below. In support thereof, the Debtors respectfully represent as follows:[3]

---

[2]   For the avoidance of doubt, relief with respect to the Debtors' proposed sale shall not be heard at this hearing and will be scheduled for a subsequent hearing to be separately noticed at a later date. The Debtors will seek approval of the Debtors' proposed bid procedures and related relief at this hearing.

[3]   Capitalized terms used but not immediately defined are defined later in this Motion, the Bidding Procedures (as defined below) or the Stalking Horse Term Sheet (as defined below), as applicable.

## RELIEF REQUESTED

1.    By the Motion, the Debtors seek entry of the Bidding Procedures Order (a) approving the Bidding Procedures, by which the Debtors will solicit and select the highest or otherwise best offer(s) for the sale or sales of all, substantially all, or any portion of the Assets pursuant to section 363 of the Bankruptcy Code; (b) authorizing the Debtors to select CPE 88988 LLC as the Stalking Horse Bidder pursuant to the Stalking Horse APA; (c) authorizing and approving, if and to the extent payable pursuant to the terms of the Bidding Procedures and Stalking Horse APA, an Expense Reimbursement in an amount up to $750,000; (d) scheduling certain dates and deadlines; (e) approving the manner of notice of the Auction and Sale Hearing; (f) approving procedures for the assumption and assignment of certain Executory Contracts and Unexpired Leases in connection with the Transaction(s), if any; and (g) authorizing the assumption and assignment of Assumed Contracts.

2.    Additionally, the Debtors will seek entry of one or more orders (each, a "Sale Order") at a proposed hearing on October 16, 2025, or as soon thereafter as the Debtors may be heard (subject to court availability) (the "Sale Hearing"), (a) authorizing and approving the Transaction(s) with the Successful Bidder(s) on the terms substantially set forth in the Successful Bid(s); (b) authorizing and approving the sale of the Debtors' Assets free and clear of liens, claims, encumbrances, and other interests to the extent set forth in an asset purchase agreement with the Successful Bidder(s); (c) authorizing the settlements and release provisions contained in the Stalking Horse APA; and (d) authorizing the assumption and assignment of Executory Contracts and Unexpired Leases as set forth in an asset purchase agreement with the Successful Bidder(s).

## JURISDICTION AND VENUE

3.    The Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated

August 3, 1984, entered by the United States District Court for the Northern District of Texas. This matter is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and the Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

4. The legal predicates for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 6004, and 6006(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and 2002-1 and 9013-1 of the *Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas* (the "Local Rules"), and Section E of the *Procedures for Complex Cases in the Northern District of Texas*, effective February 6, 2023 (the "Complex Case Procedures").

## BACKGROUND

5. On July 9, 2025 (the "Petition Date"), each Debtor commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases") in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

6. To date, the Office of the United States Trustee for Region 6 (the "U.S. Trustee") has not appointed an official committee in these Chapter 11 Cases, nor has any trustee or examiner been appointed.

7. Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in the *Declaration of Louis E. Robichaux IV in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 18] (the "First Day Declaration").

4

## **INTRODUCTION**

8.  As described in the First Day Declaration, the Debtors commenced these Chapter 11 Cases with the purpose of implementing a comprehensive restructuring solution that would permit the Debtors to continue delivering high quality care to their residents and appropriately invest in their facilities and equipment.  The Debtors came to the decision, with the advice of their restructuring professionals, that the best path for accomplishing their objectives in the Chapter 11 Cases involved the pursuit of a competitive marketing, auction, and sale process for all or substantially all of their assets under Bankruptcy Code section 363.  To support the Debtors in this process, the Debtors have obtained access to the continued use of cash collateral ("Cash Collateral") and $30 million in new money debtor-in-possession financing (the "DIP Facility"),[4] which will be used to fund operations and administrative expenses during these Chapter 11 Cases. Furthermore, the Debtors have formulated the Bidding Procedures to provide, among other things, that CPE 88988 LLC, an entity under common control with WAX Dynasty Partners LLC ("WAX"), or a controlled affiliate thereof, will serve as stalking horse bidder in connection with the sale process (the "Stalking Horse Bidder" and, the Stalking Horse Bidder's bid, the "Stalking Horse Bid") on the terms set forth in the term sheet attached hereto as **Exhibit B** (the "Stalking Horse Term Sheet") and the stalking horse asset purchase agreement (as amended, supplemented, or otherwise modified by the parties thereto "Stalking Horse APA").[5]  Collectively, the consensual use of Cash Collateral, the DIP Facility, the Bidding Procedures, and the Stalking Horse Term Sheet represent an integrated set of agreements pursuant to which the Debtors' secured lenders

---

[4]  *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 57] (the "Interim DIP Order").

[5]  The Stalking Horse APA, reflecting the terms set forth in the Stalking Horse Term Sheet, will be finalized and filed with the Court in advance of the hearing on this Motion.

have agreed to address the Debtors' liquidity needs and provide for a value-maximizing path forward that will benefit all of the Debtors' stakeholders.

9.      The Stalking Horse Term Sheet, agreed to by the Debtors and the Stalking Horse Bidder, and supported by the DIP Lenders, provides for the Stalking Horse Bidder's purchase of all of the Debtors' Assets (other than certain excluded assets), as described in more detail below. The aggregate consideration for the Assets purchased by the Stalking Horse Bidder includes, without limitation, the following:

a.      a credit bid pursuant to section 363(k) of the Bankruptcy Code of $14 million of the principal amount of the DIP Loans, plus all accrued and unpaid principal, fees, penalties and other obligations with respect to such portion of the DIP Loans; *plus*

b.      the assumption of liabilities with respect to, or cash in an amount equal to, the sum of (a) $16 million of the principal balance, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the DIP Loans (it being understood that such amount, plus the Credit Bid Amounts shall be equal to 100% of all amounts (inclusive of interest, fees, and other charges and expenses) owing under the DIP Loans), *plus* (b) the principal amount, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under that certain Term Loan,[6] in the approximate aggregate principal amount of $317.7 million, which cash shall be paid to the DIP Agent and shall be used to satisfy the DIP Loans and the Term Loan in full at Closing; *plus*

c.      cash in the amount of $15 million, which, in addition to the Excluded Cash and subject to the terms and conditions hereof, is anticipated to be used by the Debtors to confirm a chapter 11 plan of liquidation and fund recoveries to general unsecured creditors; *plus*

d.      cash sufficient to fund the transactions contemplated by the exercise of the Purchase Options; *plus*

e.      assumption of the Assumed Liabilities (which shall include Cure Costs, subject to the agreed-upon cap).

10.     The Stalking Horse Bid benefits the Debtors by serving as a floor for a postpetition marketing and overbid process to ensure that the Debtors receive the highest or otherwise best

---

[6]     As used herein, the "Term Loan" refers to that certain Term Loan Agreement, dated as of July 29, 2016 (as otherwise amended, supplemented, or otherwise modified from time to time), by and among Genesis, certain affiliates and subsidiaries of Genesis party thereto as "Borrowers", certain affiliates and subsidiaries of Genesis party thereto as guarantors, the "Lenders" (as defined therein) from time-to-time party thereto, and Welltower OP LLC (formerly known as Welltower Inc.) ("Welltower") as "Administrative Agent" (as defined therein).

offer for the Assets.  Recognizing the affiliated nature of the Stalking Horse Bidder,[7] the Stalking

Horse Bid was heavily negotiated in good faith and at arm's-length by the Debtors and independent

director members of the Special Investigation Committee (as defined in the First Day Declaration

and further discussed below).    Members of the Special Investigation Committee led a

comprehensive pre-petition investigation—advised by independent special counsel from Katten

Muchin Rosenman LLP ("Katten")—into, among other things, potential claims and causes of

action proposed to be purchased or released under the Stalking Horse Bid.  These efforts ensure

that higher or otherwise better bids will be solicited to test and compete with the Stalking Horse

Bid.  There is no break-up fee proposed in connection with the Stalking Horse Bid.  The Stalking

Horse Bidder, however, is entitled to the Expense Reimbursement of up to $750,000 for expenses

incurred in connection with the Sale, which is an integral part of the Stalking Horse Bidder's offer,

on the terms set forth in the Stalking Horse APA.

11.    The exploration of higher or otherwise better restructuring and sale options will be

pursued with the assistance of the Debtors' proposed investment banker Jefferies, LLC

("Jefferies"), who is leading a comprehensive third-party marketing process (the "Marketing

Process") to solicit proposals for one or more potential sales of all, substantially all, or any portion

of the Debtors' assets (the "Assets," and such sale(s), the "Transaction(s)").  The Debtors, with

Jefferies' assistance, have prepared a confidential information memorandum with extensive

information on the Assets and are populating a virtual data room containing significant diligence

documentation.  The Debtors believe that this marketing process will ensure a value-maximizing

path forward.  The DIP Facility and contemplated Bidding Procedures provide for a timeline that

---

[7]    The Stalking Horse Bidder is affiliated with WAX, which is a term loan lender and an entity that shares common
beneficial ownership with ReGen Healthcare, LLC ("ReGen").  As noted in the First Day Declaration, ReGen
holds convertible subordinated notes with the Debtors and has the right to appoint three members of the Debtors'
Board.

allows the Debtors to appropriately market their assets while still administering these Chapter 11

Cases efficiently, recognizing that operating skilled nursing and assisted living facilities inside of

chapter 11 for an extended period comes with its own inherent difficulties.  As set forth in the

Interim DIP Order, the Debtors must satisfy certain milestones (the "DIP Milestones") for the sale

of their Assets or some other value-maximizing transaction, including:

| Sale Milestones | |
| --- | --- |
| Entry of Final DIP Order | 35 Days After Petition Date or August 13, 2025 |
| Entry of Bidding Procedures Order | 35 Days After Petition Date or August 13, 2025 |
| Auction Date | 95 Days After Petition Date or October 12, 2025 |
| Entry of Sale Order | 100 Days After Petition Date or October 17, 2025, in Form and substance acceptable to DIP Lenders |
| Consummation of Sale | 210 Days After Petition Date or February 4, 2026 |

12.     To preserve the value of the Debtors' estates—and to provide an opportunity to

increase the ultimate value provided by the monetization and disposition of their Assets—the

Debtors seek approval of the bidding procedures attached as Exhibit 1 to the Bidding Procedures

Order (collectively, the "Bidding Procedures").  The Bidding Procedures provide substantial

flexibility with respect to the structure of the Transaction(s).  The Debtors will consider any and

all options in accordance with the Bidding Procedures before determining if selling Assets will, in

their reasonable business judgment, maximize value for their estates.

13.     The Debtors believe that the proposed Bidding Procedures, entry into the Stalking

Horse APA, and the related relief requested in the Motion will allow the Debtors to efficiently

pursue a value-maximizing sale process and best position them to achieve their goals in these

Chapter 11 Cases.  The Debtors submit that the sale process has been structured to maximize bidder

interest in the Assets.  The Debtors respectfully request that the Court grant the relief requested herein.

## PROPOSED SALE PROCESS AND SELECTION OF STALKING HORSE BIDDER

### I.    The Bidding Procedures.

14.    The Debtors seek approval of the Bidding Procedures to establish an open process for the solicitation, receipt, and evaluation of bids in a fair, accessible, and expeditious manner. The Bidding Procedures will facilitate the Marketing Process to solicit interest in a sale of the Assets.

15.    The timeline set forth in the Bidding Procedures is calculated to balance the need to provide adequate notice to parties in interest and any person or entity interested in purchasing the Assets (a "Potential Bidder") with the need to run an expeditious and efficient sale process. The Bidding Procedures are designed to generate the highest or otherwise best available recoveries to the Debtors' stakeholders by encouraging prospective bidders to submit competitive, value-maximizing bids.  The Debtors believe that the Bidding Procedures and the timeline set forth therein are in the best interests of the Debtors' estates, will establish the extent of the market for the Debtors' Assets, and will provide interested parties with sufficient opportunity to participate.

16.    Because the Bidding Procedures are attached as Exhibit 1 to the Bidding Procedures Order, they are not restated in their entirety herein.  Generally speaking, however, the Bidding Procedures establish the following, among other things:[8]

      a.    **Public Announcement of Auction**.  Within two (2) business days after entry of the Bidding Procedures Order, the Debtors shall serve on the parties that receive notice of this Motion (a) a notice in the form attached to the Bidding Procedures as Schedule 1 (the "Auction Notice") setting forth the date, time, and place of the auction for the Transaction(s) (the "Auction")

---

[8]    This summary is provided in accordance with Section E.19 of the Complex Case Procedures, for the convenience of the Court, and for parties in interest.  To the extent there is any conflict between this summary and the Bidding Procedures, the Bidding Procedures govern in all respects.

and the Sale Hearing and the deadlines and procedures for objecting to the proposed Transaction(s), and (b) the Bidding Procedures Order and the Bidding Procedures. Within three (3) business days after entry of the Bidding Procedures Order, the Debtors shall (a) publish the Auction Notice, with any modifications necessary for ease of publication, on one occasion in the *New York Times* (National Edition), the *Wall Street Journal* or *USA Today* to provide notice to any other potential interested parties, and (b) post the Auction Notice on their case website, https://dm.epiq11.com/Genesis.

b.  **Potential Bidder Qualifications**.  Each Potential Bidder must deliver to the Debtors the following preliminary documentation:

1.  an executed confidentiality agreement in form and substance acceptable to the Debtors;

2.  a statement describing which portion of the Assets the Potential Bidder intends to acquire;

3.  information sufficient to establish that the Potential Bidder has or can reasonably obtain the financial capacity to close a purchase of any portion, all, or substantially all of the Debtors' Assets, the adequacy of which must be acceptable to the Debtors, in consultation with the Consultation Parties;[9] and

4.  a statement detailing whether the Potential Bidder is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint Bid to the extent reasonably practicable.

c.  **Qualified Bid Requirements**.  To participate in the Auction, Potential Bidders that have submitted necessary and acceptable documentation (each, an "Acceptable Bidder") must submit to the Debtors and their advisors an irrevocable offer for the purchase of some or all of the Assets (each, a "Bid")

---

[9]  "Consultation Parties" means the Debtors' prepetition secured lenders (White Oak, Welltower, Omega, WAX, and MAO) and DIP Lenders and any statutory committee appointed in these cases; *provided, however*, that to the extent any of the Consultation Parties submit a credit bid (a "Credit Bid"), for any Assets, or otherwise intends to submit a Bid, or otherwise is intended to receive a release solely in connection with any Bid, such Consultation Party shall not be (x) a Consultation Party with respect to the evaluation and qualification of competing Bids for such Assets included in the Consultation Party's Bid, including a Credit Bid, or with respect to seeking and/or obtaining information about other Bids, but shall remain a Consultation Party for other purposes set forth in the Bidding Procedures and Bidding Procedures Order or (y) entitled to the consent rights set forth in the Bidding Procedures for the DIP Lenders.  For the avoidance of doubt, any of the Consultation Parties that (i) do not submit a Credit Bid and (ii) do not have a financial interest in any Potential Bidder that submits a Credit Bid shall remain Consultation Parties and/or be entitled to the consent rights set forth in the Bidding Procedures.

meeting the criteria set forth in the Bidding Procedures prior to the Bid Deadline (each, a "Qualified Bid"),[10] including:

1. **Purchased Assets and Assumed Liabilities**:  Each Bid must clearly state the following:  (a) the particular Assets, or the portion thereof, identified with reasonable specificity to be purchased and/or liquidated or otherwise disposed of (including, without limitation, estate claims and causes of action); (b) the liabilities and obligations to be assumed, including any debt and Cure Costs (as defined below) to be assumed; and (c) any executory contracts (the "Executory Contracts") and any unexpired leases (the "Unexpired Leases") to be received by assignment. For the avoidance of doubt, a Bid need not provide for the purchase of any estate claims and causes of action to constitute a Qualified Bid;

2. **Good Faith Deposit**:  The Bid must be accompanied by a cash deposit in the amount equal to ten percent (10%) of the aggregate Purchase Price (as defined below) of the Bid to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit").  To the extent that a Bid is modified at or prior to the Auction, the applicable Acceptable Bidder must adjust its Good Faith Deposit so that it equals ten percent (10%) of the increased aggregate Purchase Price promptly and in no event later than one business day following the conclusion of the Auction;

3. **Purchase Price**:  Each Bid must (a) clearly set forth the purchase price to be paid, assuming a purchase of the applicable Assets and any assumption of liabilities (the "Purchase Price") and (b) identify separately the cash and non-cash components of the Purchase Price. Any Bid for substantially all of the Assets must also include a statement as to whether the Bid is conditioned on purchasing all Assets or whether the Qualified Bid should be viewed as a separate Bid for one or more sets of Assets.  The Debtors reserve the right, in consultation with the Consultation Parties, to ask any Acceptable Bidder to allocate the value ascribed to a Bid for any particular Asset and to inquire about any significant assumptions on which such valuations are based;

4. **Sources of Financing**:  To the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Transaction(s) set forth in its Bid with cash on

---

[10]   Each DIP Lender is deemed to be a Qualified Bidder; *provided* that, any DIP Lender that (i) does not submit a Credit Bid and (ii) does not have a financial interest in any Potential Bidder that submits a Credit Bid shall remain a Consultation Party and/or be entitled to the consent rights set forth in the Bidding Procedures.  For the avoidance of doubt, the Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse APA is a Qualified Bid.

hand, the Bid must include committed financing, documented to the Debtors' satisfaction (in consultation with the Consultation Parties), that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Transaction(s) and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors;

5.   **Same or Better Terms; Bid Documents**: Each Bid must include duly executed and non-contingent, where applicable, transaction documents necessary to effectuate the transactions contemplated in the Bid (the "Bid Documents"). The Bid Documents shall include: (a) a purchase agreement, based on the Stalking Horse APA, duly executed by such bidder, containing only changes to the Stalking Horse APA that are reasonably necessary to effectuate the Bid, (b) a schedule of contracts and leases to be assumed or rejected to the extent applicable to the Bid, (c) with respect to the form of purchase agreement, a redline of such agreement marked to reflect the amendments and modifications made to the Stalking Horse APA, (d) any other material documents integral to such Bid, and (e) a statement from the Acceptable Bidder that (i) it is prepared to enter into and consummate the transactions contemplated in the purchase agreement based on the Stalking Horse APA as soon as reasonably practicable after the conclusion of the Auction, subject to any necessary regulatory approvals, as specified by the Acceptable Bidder (or, if no Auction is held, the deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline")) and (ii) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the highest or otherwise best bid to purchase the applicable Assets (each, a "Successful Bid") or next highest or otherwise best bid (the "Back-Up Bid") until the consummation of the Transaction(s));

6.   **No Qualified Bidder Bid Protections**: A Qualified Bid must include a statement that the bid does not entitle such bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under Bankruptcy Code section 503(b) related to bidding for the applicable Assets;

7.   **Employee Obligations**: Each Bid must indicate whether the Acceptable Bidder intends to hire all employees of the Debtors or otherwise indicate its intentions with respect to the employees of the Debtors;

8. **Authorization**: Each Bid must contain evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid;

9. **Contingencies; No Financing or Diligence Outs**: The Bid must not contain any contingencies as to the validity, effectiveness, or binding nature of the Bid, including, without limitation, contingencies for due diligence and inspection or financing of any kind (including any conditions pertaining to financial performance, conditions, or prospects) and all diligence must be completed before the Bid Deadline;

10. **Identity**: Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, or ultimate controlling entities that will be bidding for or purchasing the applicable Assets or otherwise participating in connection with such Bid, including each equity holder or other financial backer of the bidder (including if such bidder is an entity formed for the purpose of consummating the transactions contemplated by such Bid), and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered to complete the transactions on the terms contemplated by the parties. Each Bid must also include contact information for the specific person(s) whom Jefferies and McDermott Will & Emery LLP should contact regarding such Bid;

11. **As-Is, Where-Is**: Each Bid must include a written acknowledgement and representation that the Acceptable Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Transaction(s) prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its Bid; (iii) did not rely on or receive from any person or entity (including any of the Debtors or their advisors or other representatives) any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith or the Auction (if any), except as expressly stated in the Acceptable Bidder's purchase agreement; and (iv) did not engage in collusive conduct and acted in good faith in submitting its Bid;

12. **Joint Bids and Merger Proposals**: The Debtors will be authorized to approve joint bids in their reasonable business judgment and in

13

consultation with the Consultation Parties, including, but not limited to, any bids that contemplate acquiring equity or assets through a merger or similar transaction, including if a proposed bid contemplates additional financing from one or several participating parties, on a case by case basis, so long as such bid meets the Qualified Bid requirements and the applicable bidders otherwise comply with the Bidding Procedures;

13. **Qualifications to Operate Skilled Nursing Facilities**:  Each Bid must provide background on the Acceptable Bidder and its qualifications to operate skilled nursing facilities ("SNFs"), including:

    (i)     Operating history of the Acceptable Bidder;

    (ii)     The number of SNFs that the Acceptable Bidder currently operates;

    (iii)     The Acceptable Bidder's ownership structure and corporate organization chart;

    (iv)     The principal biographies of senior management of the Acceptable Bidder; and

    (v)     A summary of material survey issues, any investigations, or corporate integrity agreements related to the Acceptable Bidder's existing operations, if any.

14. **Adequate Assurance of Future Performance**:  Each Bid must (i) identify the Executory Contracts and Unexpired Leases to be assumed or assumed and assigned in connection with the proposed Transaction(s), (ii) provide for the payment of all cure amounts (the "Cure Amounts") related to such Executory Contracts and Unexpired Leases by the Acceptable Bidder, (iii) demonstrate, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, that the Acceptable Bidder can provide adequate assurance of future performance under all such Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of Bankruptcy Code sections 365(b)(3) and 365(f)(2)(B); and (iv) provide the following documentation:  (a) the proposed assignee (the "Proposed Assignee") and any guarantors, as applicable; (b) financial statements for the calendar or fiscal years ended 2023 and 2024 for the Proposed Assignee and any guarantors, as applicable, and other financial information about the Proposed Assignee to demonstrate its ability to provide adequate assurance of

future performance; and (c) a summary of the Proposed Assignee's proposed use of the premises;

15. **Acknowledgement of Compliance with Bidding Procedures, Bidding Procedures Order, Bankruptcy Code, and Non-Bankruptcy Law**: Each Bid must acknowledge that the Acceptable Bidder has complied, and will continue to comply, in all respects with these Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Code, and any applicable non-bankruptcy law;

16. **No Collusion**: The Acceptable Bidder must (a) acknowledge in writing that it has not engaged in any collusion with respect to any Bids or the Transaction(s), specifying that it did not agree with any Acceptable Bidders or Potential Bidders to control price or otherwise with respect to any of the Assets or the Transaction(s) and processes contemplated by the Bidding Procedures; and (b) agree not to engage in any collusion with respect to any Bids, the Auction, or the Transaction(s); *provided, however*, that nothing shall limit or impair the ability of the DIP Lenders to submit a joint Bid or otherwise engage in discussions or negotiations regarding a Bid. The Acceptable Bidder must further indicate if it has or intends to coordinate its bid, or otherwise bid with, any current or former member of the Debtors' or their affiliates' executive management or board of directors. For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent (email shall suffice);

17. **Good Faith Offer**: Each Bid must constitute a good faith, *bona fide* offer to consummate the Transaction(s);

18. **Irrevocable**: Each Bid must state that in the event a Bid is chosen as the Back-Up Bid, it shall remain irrevocable until the Debtors and the any Qualified Bidder that submits a Successful Bid (a "Successful Bidder") consummate the applicable Transaction(s);

19. **Back-Up Bidder**: Each Bid shall provide that the Acceptable Bidder will serve as a back-up bidder (the "Back-Up Bidder") if the Acceptable Bidder's Bid is the Back-Up Bid with respect to the applicable Assets;

20. **Regulatory and Third-Party Approvals and Covenants**: A Bid must set forth each regulatory and third-party approval, if any, required for the Acceptable Bidder to consummate the applicable Transaction(s), the time period within which the Acceptable Bidder expects to receive such regulatory and third-party approvals, and

those actions the Acceptable Bidder will take to ensure receipt of such approvals as promptly as possible;

21. **Expected Closing Date and Time Frame for Closing**:  Each Bid must state the Acceptable Bidder's expected date of closing of the Transaction(s) (the "Closing") and must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors in consultation with the Consultation Parties and in compliance with the DIP Milestones (unless otherwise consented to by the DIP Lenders).

22. **No Fees**:  Each Acceptable Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction, and by submitting its Bid(s) is agreeing to disclaim any right to receive any payments or amounts analogous to a break-up fee, expense reimbursement, termination fee, or other similar form of compensation;

For the avoidance of doubt, each Acceptable Bidder by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under Bankruptcy Code section 503(b); *provided* that the Debtors are authorized to provide the Expense Reimbursement to the Stalking Horse Bidder in connection with the Stalking Horse APA.

23. **Adherence to Bidding Procedures**:  By submitting its Bid, each Acceptable Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after the conclusion of the Auction;

24. **Consent to Jurisdiction**:  The Acceptable Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, to the Auction, the Transaction(s) and the construction and enforcement of these Bidding Procedures, preliminary bid documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Transaction(s), the Closing, and any other related matter; and

25. **Conditions to Closing**:  Each Bid must identify with particularity each and every condition to closing, including the Executory Contract and Unexpired Leases for which assumption and assignment is required.

17.    In accordance with Section E.19 of the Complex Case Procedures, below is a

summary highlighting the inclusion of certain key terms in the proposed Bidding Procedures or

other documents:

| Relevant Complex Procedures Provision | Summary[11] | Location in Bidding Procedures or Bidding Procedures Order |
|---|---|---|
| **Complex Procedures, Part E Section 19(a)(ii)**<br><br>*Break-Up/Topping Fees and Expense Reimbursement* | The Stalking Horse Bidder is entitled to the Expense Reimbursement on the terms set forth in the Stalking Horse APA, in an amount up to $750,000. The Stalking Horse Bidder is not entitled to a break-up fee. | Bidding Procedures §X; Bidding Procedures Order ¶ 12 |
| **Complex Procedures, Part E Section 19(a)(iii)**<br><br>*Bidding Increments* | The Auction will begin at the Starting Bid. Subsequent bids (each, an "Overbid") may only be made at the Auction and shall be at least (i) a two percent (2%) increase in cash, cash equivalents, or other such consideration that the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, deem equivalent (including the right of any secured creditor to Credit Bid any remaining amounts of its secured claim in accordance with the Bidding Procedures) over the previous bid *plus* (ii) solely with respect to the first Overbid, the amount of the Expense Reimbursement under the Stalking Horse APA (a "Minimum Overbid"), and each successive Overbid shall exceed the then-existing Overbid by an incremental amount that is not less than the Minimum Overbid. The Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties announce increases or reductions to the Minimum Overbid at any time during any Auction. For the avoidance of doubt, each successive Bid that a Qualified Bidder may submit at any Auction must contain a Purchase Price in cash, cash equivalents, or such other consideration that the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, deem equivalent (including the right of any secured creditor to Credit Bid any remaining amounts of its secured claim in accordance with the Bidding Procedures) that exceeds the then-existing highest Bid by at least the amount of the Minimum Overbid. | Bidding Procedures §§ IX and XII; Bidding Procedures Order ¶ 6 |

---

[11]   The summaries in this chart are qualified in their entirety by the provision of the documents referenced including, without limitation, the Stalking Horse Term Sheet and the Stalking Horse APA. To the extent anything in this summary is inconsistent with such documents, the terms of the applicable documents shall control.

| Relevant Complex Procedures Provision | Summary[11] | Location in Bidding Procedures or Bidding Procedures Order |
|---|---|---|
| **Complex Procedures, Part E Section 19(a)(iv)**<br><br>*Treatment of Break-Up and Topping Fees and Expense Reimbursement at Auction* | The first Overbid shall include the amount of the Expense Reimbursement under the Stalking Horse APA. | Bidding Procedures § XII; Bidding Procedures Order ¶ 12 |
| **Complex Procedures, Part E Section 19(b)**<br><br>*Provisions Governing Qualification of Bidders* | A Qualified Bidder is one who submits a Qualified Bid, as defined in § X of the Bidding Procedures and summarized directly below. | Bidding Procedures § X |
| **Complex Procedures, Part E Section 19(c)**<br><br>*Provisions Governing Qualified Bids* | The requirements of a Qualified Bid can be found in § X of the Bidding Procedures. By way of summary, the Bidding Procedures require that a Bid, to be considered a Qualified Bid, must: (i) clearly state the Assets to be purchased and liabilities to be assumed; (ii) be accompanied by the Good Faith Deposit; (iii) clearly set forth the Purchase Price, identifying the cash and non-cash components; (iv) include financial and other information sufficient for the Debtors to make a reasonable determination as to the bidder's ability to consummate the proposed Transaction(s); (v) include duly executed and non-contingent, where applicable, the Bid Documents; (vi) include a statement that the bid does not entitle such bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim; (vii) indicate whether the Acceptable Bidder intends to hire all employees of the Debtors or otherwise indicate its intentions with respect to the employees of the Debtors; (viii) include evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals; (ix) fully disclose the identity of each entity and each entity's shareholders, partners, investors, or ultimate controlling entities that will be bidding; (x) include a written As-Is, Where-Is acknowledgement; (xi) provide background on the Acceptable Bidder and its qualifications to operate skilled nursing facilities; (xii) identify the Executory Contracts and Unexpired Leases to be assumed or assumed and assigned in connection with the proposed Transaction(s), provide for the payment of all Cure Amounts by the | Bidding Procedures § X |

18

| Relevant Complex Procedures Provision | Summary[11] | Location in Bidding Procedures or Bidding Procedures Order |
|---|---|---|
| | Acceptable Bidder, and demonstrate that the Acceptable Bidder can provide adequate assurance of future performance under all such Executory Contracts and Unexpired Leases; (xiii) acknowledge in writing that it has not engaged in any collusion; (xiv) state that in the event such Bid is chosen as the Back-Up Bid, it shall remain irrevocable until the Debtors and the Successful Bidder consummate the applicable Transaction(s); (xv) set forth regulatory and third-party approvals required to consummate the Transaction(s); (xvi) include the forms necessary for submission of regulatory approval; (xvii) state the Acceptable Bidder's expected Closing date; and (xviii) identify with particularity each and every condition to closing. | |
| **Complex Procedures, Part E Section 19(d)** *Modification of Bidding and Auction Procedures* | At the commencement of the Auction, the Debtors may announce modified or additional procedures for conducting the Auction and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive bid(s), or otherwise modify the Bidding Procedures, in each case in consultation with the Consultation Parties; *provided* that material modifications to the Auction Procedures may only be made with the consent of the DIP Lenders (not to be unreasonably withheld, delayed, or conditioned)<br><br>The Debtors, with the consent of the DIP Lenders (not to be unreasonably withheld, delayed or conditioned) and in consultation with the Consultation Parties, may modify the Bidding Procedures as necessary or appropriate to maximize value for their estates. | Bidding Procedures §§ XII, XVII; Bidding Procedures Order ¶ 14 |
| **Complex Procedures, Part E Section 19(e)** *Closing with Alternative Backup Bidders* | The Back-Up Bid to purchase any applicable Assets will be determined by the Debtors, with the consent of the DIP Lenders (not to be unreasonably withheld, delayed or conditioned) and in consultation with the Consultation Parties at the conclusion of the Auction and will be announced at that time to all the Qualified Bidders participating in the Auction. The Debtors' selection of a Back-Up Bid shall be deemed final, and the Debtors shall not accept any further bids or offers to submit a bid after such selection; *provided* that, notwithstanding anything to the contrary in the Bidding Procedures, nothing in the Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any Debtor to take or refrain from taking any action that the Debtors determined in good faith, in consultation | Bidding Procedures § XIV |

| Relevant Complex Procedures Provision | Summary[11] | Location in Bidding Procedures or Bidding Procedures Order |
|---|---|---|
| | with counsel, would be inconsistent with applicable law or its fiduciary obligations under applicable law. The Debtors will be authorized, but not required, to consummate the Transaction(s) with the Back-Up Bidder without further order of the Court, so long as such Back-Up Bid shall have been approved in connection with the Court's approval of the Successful Bid, or subject to Court approval if not.<br><br>If for any reason a Successful Bidder fails to consummate the purchase of such assets within the time permitted, then the Back-Up Bidder will automatically be deemed to have submitted the Successful Bid for such assets, and the Back-Up Bidder shall be deemed a Successful Bidder for such assets and shall be required to consummate any Transaction(s) with the Debtors as soon as is reasonably practicable without further order of the Court, upon twenty-four (24) hours' advance notice filed with the Court. To the extent any objections are raised and remain unresolved, the Court may schedule a hearing on an expedited basis to adjudicate such objection.<br><br>The Back-Up Bid shall remain open and irrevocable until the earliest to occur of (i) ninety (90) days following the hearing to consider the Sale Order, (ii) consummation of a Transaction(s) with one or more Successful Bidders at an Auction, and (iii) the release of such Back-Up Bid by the Debtors in writing (the "Back-Up Termination Date"); *provided* that the Back-Up Termination Date shall be subject to the terms and conditions set forth in the Stalking Horse APA. The Debtors shall return the Back-Up Bidder's deposit owed within five (5) business days of the Back-Up Termination Date. | |
| **Complex Procedures, Part E Section 19(f)**<br><br>*Provisions Governing the Auction* | The Auction, if necessary, shall commence on October 9, 2025, at 10:00 a.m., prevailing Central Time, or such other time or other place as the Debtors determine in consultation with the Consultation Parties. The procedures governing the auction are set forth in § XII of the Bidding Procedures. | Bidding Procedures § XII; Bidding Procedures Order ¶¶ 6, 14-20 |

## II. The Stalking Horse Bidder

18. Prior to the date hereof, the Debtors (including the independent director members of the Special Investigation Committee represented by independent special counsel) and the

Stalking Horse Bidder negotiated the terms of the Stalking Horse Term Sheet, which will be reflected in the Stalking Horse APA, through which the Stalking Horse Bidder will acquire substantially all of the Assets of the Debtors and to assume certain liabilities of the Debtors, subject to Court approval and subject to the Marketing Process.

19.     The chart below summarizes certain of the Stalking Horse Term Sheet's material terms.[12]

| Material Terms of the Stalking Horse Bid | |
|---|---|
| **Parties**<br><br>(Stalking Horse Term Sheet, Sellers) | The Debtors, as "Sellers", and CPE 88988 LLC, an entity under common control with WAX, or a controlled affiliate thereof, as "Purchaser" |
| **Purchase Price**<br><br>(Stalking Horse Term Sheet, Purchase Price) | The aggregate consideration for the Purchased Assets (the "Purchase Price") shall consist of:<br><br>(i)    a credit bid pursuant to section 363(k) of the Bankruptcy Code of $14 million of the principal amount of the DIP Loans, plus all accrued and unpaid principal, fees, penalties and other obligations with respect to such portion of the DIP Loans (the "Credit Bid Amount"); plus<br><br>(ii)   the assumption of liabilities with respect to, or cash in an amount equal to, the sum of (a) $16 million of the principal balance, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the DIP Loans (it being understood that such amount, plus the Credit Bid Amounts shall be equal to 100% of all amounts (inclusive of interest, fees, and other charges and expenses) owing under the DIP Loans), plus (b) the principal amount, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the Term Loan by and among Genesis, certain affiliates and subsidiaries of Genesis party thereto as "Borrowers", certain affiliates and subsidiaries of Genesis party thereto as guarantors, the "Lenders" (as defined therein) from time-to-time party thereto, and Welltower, as "Administrative Agent" (as defined therein), in the approximate aggregate principal amount of $317.7 million, which cash shall be paid to the DIP Agent and shall be used to satisfy the DIP Loans and the Term Loan in full at Closing; plus<br><br>(iii)  cash in the amount of $15 million, which, in addition to the Excluded Cash and subject to the terms and conditions hereof, is anticipated to be used by the Debtors to confirm a chapter 11 plan of liquidation and fund recoveries to general unsecured creditors; plus |

---

[12]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced including, without limitation, the Stalking Horse Term Sheet and the Bidding Procedures Order. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control

|  | (iv) | cash sufficient to fund the transactions contemplated by the exercise of the Purchase Options; plus |
|  | (v) | assumption of the Assumed Liabilities (which shall include Cure Costs, subject to the agreed-upon cap). |
| **Purchased Assets**<br><br>(Stalking Horse Term Sheet, Purchased Assets) | | The "Purchased Assets" shall include all of the assets of the Sellers, free and clear of all liens, claims, interests and encumbrances (other than permitted liens agreed to by Purchaser and expressly set forth in the APA (as defined below)) to the fullest extent permitted by section 363 of the Bankruptcy Code and/or other applicable law, other than the Excluded Assets (as defined below), as shall be more fully set forth in the APA, including, without limitation, all of Sellers' right, title and interest to, as of the Closing (as defined below), each of the following: |
|  | (i) | other than Excluded Cash, all cash, cash equivalents, prepayments (including, without limitation, all prepayments made to third party vendors), deferred assets, refunds, credits or overpayments; |
|  | (ii) | all accounts receivable of the Sellers (including, without limitation, credit card receivables, funds in transit, deposits and other receivables from customers and other payments/fees, allowances due from landlords with respect to the Assigned Leases, etc.); |
|  | (iii) | all real property owned by the Sellers, including, but not limited to all real property acquired pursuant to any "Assigned Purchase Agreements" (as defined below) that have been consummated prior to the Closing; |
|  | (iv) | all inventory of the Sellers; |
|  | (v) | all shares of capital stock or other equity interests in specified non-Debtor subsidiaries of Sellers including, without limitation, all of the Sellers' equity interests in their non-Debtor joint ventures (the "JV Equity Interests"); |
|  | (vi) | all rights and obligations under or arising out of all insurance policies of the Sellers to the extent such policies relate to the operation of the Sellers' business or to any Assumed Liabilities (including returns and refunds of any premiums paid, or amounts due back to any Seller, with respect to cancelled insurance policies) other than any Excluded Insurance Policy, and all benefits of any nature of any Seller with respect thereto (including any claims of any Seller arising under such policies and all credits, premium refunds, proceeds, causes of action or rights thereunder) other than any Excluded Insurance Policy (as defined below), provided, that to the extent any insurance policies of the Sellers cover any Excluded Liabilities of the Sellers, including, without limitation, tort liabilities, operational liabilities, and environmental liabilities, such policies must be made available to satisfy bona fide claims of any third party that are covered by such insurance policies; |
|  | (vii) | those unexpired leases specifically designated by Purchaser at least one (1) business day prior to the Closing (the "Designation Deadline"), which shall include, but are not necessarily limited to, those leases set forth on **Exhibit C** to the Stalking Horse Term Sheet (the "Assigned Leases") and all other interests of the Sellers in the Assigned Leases; |

(viii)  all of Sellers' interest in those executory contracts specifically designated by the Purchaser on or prior to the Designation Deadline, which shall include the PA 22 MOTAs (the "Assigned Contracts");

(ix)  all rights to any tax credits or rebates of any Seller or that any Seller may qualify for with respect to the Purchased Assets.

(x)  unless otherwise determined by Purchaser in its sole discretion, all of the Sellers' rights in any Medicare and Medicaid provider numbers, related national provider identifiers, reimbursement agreements, and Medicare and Medicaid cost or tax settlements, in each case that relate to the operations of the Sellers' business;

(xi)  all deposits (including security deposits, rent, electricity, telephone or otherwise, credits, prepaid expenses, deferred charges, advance payments, refunds, rights of set-off, rights of recovery, security deposits, prepaid items, duties, letters of credit, guarantees, surety bonds, performance bonds, and other financial assurance obligations issued or entered into by or on behalf of any Seller related to the Purchased Assets (including the Assigned Leases and Assigned Contracts);

(xii)  all furniture, fixtures, equipment, marketing materials and other personal property used in the operations of the Sellers, including, without limitation, all rights to any software;

(xiii)  all merchandise and other personal property used in the operations of the Sellers;

(xiv)  to the extent transferable pursuant to applicable law, all permits required for Sellers to conduct business or for the ownership, operation, use, maintenance or repair of any of the Purchased Assets;

(xv)  all books and records of the Sellers (other than the Excluded Books and Records (as defined below)) and Acquired Medical Records, provided that Purchaser will provide the Sellers and any court-appointed trustee or other fiduciary charged with winding up the affairs of the Sellers with reasonable access to books and records for the purposes of conducting any wind-down activities (which wind-down activities shall include any liquidation, "Wind-Down Activities") post-closing;

(xvi)  all intellectual property owned by the Sellers or licensed to the Sellers; provided that Purchaser will provide Sellers and any court-appointed trustee or other fiduciary charged with winding up the affairs of the Sellers a license (without charge) to use any such intellectual property for purposes of conducting specified Wind-Down Activities;

(xvii)  all general intangibles associated with the Sellers' business and any other Purchased Assets;

(xviii)  all guarantees, representations, warranties and indemnities given by any third party associated with the operation of the business to the extent related to any Purchased Assets or any Assumed Liabilities and arising before or after the Closing Date;

| | |
|---|---|
| | (xix) all rights in or under employee plans of the Sellers which are specifically set forth on a schedule to the APA to be provided by the Purchaser prior to the Auction and thereby designated as "Assumed Employee Plan" under the APA, if any; |
| | (xx) to the extent not otherwise released, all Claims and Causes of Action against the Released Parties, certain critical vendors, counterparties to Assumed Contracts and Assumed Leases and any other Claims and Causes of Action other than the Excluded Causes of Action; |
| | (xxi) all paper and/or electronic medical records relating to patients of the Seller's Facilities that are requested by Purchaser, to the extent such records are in Seller's possession (collectively, "Acquired Medical Records"), provided that Purchaser will provide Sellers and any court-appointed trustee or other fiduciary charged with winding up the affairs of the Sellers access to such medical records for purposes of compliance with Law and conducting specified Wind-Down Activities; |
| | (xxii) all credentialing and medical staff records; |
| | (xxiii) all resident trust funds, patient deposits, or any residents' property held by Sellers on the Closing Date or held thereafter for residents at any of the Facilities; |
| | (xxiv) all rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees and agents of any Seller or with third parties; |
| | (xxv) all of Sellers' rights and interests in respect of the Purchase Options, the purchase agreements arising from the exercise of such Purchase Options ("Assigned Purchase Agreements"), which shall be assumed executory contracts, and the assets subject thereto; and |
| | (xxvi) all of the Sellers' other properties, assets, goodwill and rights of every kind, nature and description (whether tangible or intangible, wherever located and whether or not reflected on the books and records of the Sellers) that are now or hereafter owned, derived from or used or held for use in connection with the Sellers' business. |
| **Assumed Liabilities**<br><br>(Stalking Horse Term Sheet, Assumed Liabilities) | "Assumed Liabilities" shall include the following:<br><br>(i) all liabilities of the Sellers relating to, or arising in respect of, the Purchased Assets or the Facilities arising out of or relating to (a) events, occurrences, acts or omissions occurring on or after the Closing Date or (b) the operation of the Sellers' business or the Purchased Assets by Purchaser on or after the Closing Date;<br><br>(ii) all liabilities of the Sellers under any Assigned Leases and Assigned Contracts (collectively, the "Purchased Contracts") to be paid or performed after the Closing Date, including, without limitation, amounts necessary to cure any defaults in connection with the assumption of any Purchased Contracts (collectively, the "Cure Costs"), subject to a cap to be agreed upon between Purchaser and Sellers in the APA (the "Cap"); |

(iii)    all liabilities incurred after the Closing Date relating to the employment or performance of services, termination of employment or services of any Transferred Employee or any liabilities arising under each Assumed Employee Plan after the Closing Date;

(iv)    all liabilities in connection with the White Oak Facility; provided, however, the parties shall mutually determine that Purchaser shall assume the White Oak Facility pursuant to this clause (iv) or that all liabilities associated with the White Oak Facility shall be satisfied in full at the Closing (which mutual determination shall also be acceptable to Welltower and Omega); provided further, however, that if the parties do not mutually agree to the treatment of the White Oak Facility on or before the day that is 10 days prior to the Auction, Purchaser shall thereafter have the right to terminate the APA, but Purchaser shall not be entitled to the Expense Reimbursement in connection with such termination;

(v)    liabilities associated with funding the payment of allowed priority tax claims of the Sellers in connection with a plan of liquidation, so as to provide the holders of such allowed claims with treatment consistent with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code (to be paid out over a five year period), in an amount not to exceed $31,342,677.60, plus any accrued interest or penalties that would otherwise be entitled to priority under section 507(a)(8) of the Bankruptcy Code;

(vi)    unless otherwise forgiven or discharged as part of the Chapter 11 Cases, all liabilities of the Sellers to ReGen under the approximately $99,500,000 million in outstanding principal amount due under the various convertible promissory notes and all other loan documents in connection therewith;

(vii)    in connection with the Transaction, and on or prior to the Closing Date, (A) the Purchaser shall either assume all of the Sellers' obligations under the A-2 Note and the Split Note (Consolidated A-2) or MAO 22322 LLC shall release, acquit and forever discharge the Genesis Obligors from any and all obligations under the A-2 Note and the Split Note (Consolidated A-2), and (B) the Purchaser shall either assume all of the Sellers' obligations under the Split Note (Consolidated A-1) or WAX Lender shall release, acquit and forever discharge the Genesis Obligors from any and all obligations under the Split Note (Consolidated A-1).

(viii)    in connection with the Transaction, and on or prior to the Closing Date, the Purchaser shall either assume all of the Sellers' obligations to the Released Parties or the Released Parties shall release, acquit, and forever discharge the Sellers from all obligations to the Released Parties, including but not limited to the following claims: (A) any claims held by Integra WIP Tenant or its affiliates against the Sellers for unpaid termination payments arising under the Amendment to Sublease Termination Agreement (Colorado), dated as of December 27, 2023; (B) WAX Lender's claim for back-rent against the Sellers, which claim WAX Lender acquired from the Welltower/Cindat joint venture landlord in September 2024; (C) any claims held by Pinta Capital Partners against the Sellers under the Consulting Agreement, dated as of January 1, 2022; and (D) deficiency claims, if any, held by the Released Parties against the Sellers with respect to the Term Loan.

|  | (ix) all liabilities relating to the secured portion of the IRS claims as determined under section 506(a)(1) of the Bankruptcy Code, in an amount mutually agreed by the parties, the secured amount of which and any repayment terms with respect thereto shall be resolved in a manner satisfactory to Purchaser, in its sole discretion; |
| --- | --- |
|  | (x) all tax liabilities (including bed taxes) that relate to the Purchased Assets for which any Seller is obligated attributable to a taxable period (or portion thereof) after the Closing Date but not payable until due after the Closing Date; |
|  | (xi) all tax liabilities for bed taxes that relate to the Purchased Assets for which any Seller is obligated attributable to a taxable period (or portion thereof) after the Petition Date but not payable until due after the Closing Date, except to the extent such amounts are Budgeted Expenses, in an amount not to exceed an amount mutually agreed by the parties; |
|  | (xii) any and all costs and expenses necessary in connection with providing "adequate assurance of future performance" with respect to the Purchased Contracts (as contemplated by section 365 of the Bankruptcy Code), subject to the Cap; |
|  | (xiii) liabilities for all ordinary course accounts payable and operating expenses, in each case, arising or incurred after the Closing Date; |
|  | (xiv) the Funded Liabilities (solely to the extent assumed by Purchaser as set forth under "Funded Liabilities" in the Stalking Horse Term Sheet); |
|  | (xv) with respect to any pay period that is pending as of the Closing Date, liabilities for self-insured medical claims and ordinary course payroll obligations unpaid as of the Closing Date but not payable until due after the Closing Date, solely with respect to the Transferred Employees (subject in each case to the applicable terms and conditions of the applicable Assumed Employee Plans) and excluding personal injury or general liability claims, in an amount not to exceed an amount mutually agreed by the parties; and |
|  | (xvi) any other liabilities that Purchaser agrees, in its absolute discretion, to assume which shall be set forth on a schedule to the APA. |
| **Sale to Insider**<br><br>(Stalking Horse Term Sheet, Purchaser)<br><br>*Complex Procedures, Part E Section 17(a)* | The sale is not to an insider. Rather, the sale is to CPE 88988 LLC, an entity under common control with WAX, or a controlled affiliate thereof. As noted herein, WAX is a prepetition secured lender and an entity that shares common beneficial ownership with ReGen Healthcare, LLC, which holds convertible subordinated notes with the Debtors and has the right to appoint three members of the Debtors' Board. |
| **Agreements with Management**<br><br>(Stalking Horse Term Sheet, Employee Matters) | No later than two days prior to the Auction, the Purchaser shall deliver a list of all of the Sellers' active employees to whom the Purchaser intends to offer employment effective as of the Closing Date in its sole and absolute discretion and on such terms and conditions as the Purchaser may determine in its sole and absolute discretion, which such employees shall become employees of the Purchaser or its affiliate on the Closing Date to the extent such employees accept the Purchaser's employment |

| | |
|---|---|
| *Complex Procedures, Part E Section 17(b)* | offer (the "Transferred Employees"). The Purchaser shall have no liability for any pay, benefits, severance, or similar claims and all claims and obligations arising under any collective bargaining agreement, employee benefit plan that is not an Assumed Employee Plan (including, any withdrawal liability) or any local, state or federal law, rule or regulation (including, the WARN Act) of any Transferred Employees earned or accrued or arising on or prior to the Closing Date.<br><br>From and after the Closing Date, the Sellers shall retain and be solely responsible for all obligations and liabilities with respect to the employment and services of all employees and independent contractors of the Sellers on or prior to the Closing Date. |
| **Releases, Exculpations and Indemnifications**<br><br>(Stalking Horse Term Sheet, Releases)<br><br>*Complex Procedures, Part E Section 17(c)* | In connection with the Transaction, the Sellers and their estates shall release the Released Parties from any and all Claims and Causes of Action to the fullest extent permitted by applicable law. |
| **Private Sale/No Competitive Bidding**<br><br>(Stalking Horse Term Sheet, Exhibit A, definition of "Auction")<br><br>*Complex Procedures, Part E Section 17(d)* | An auction is contemplated, and there are no provisions limiting the solicitation of competing offers for the Debtors' Assets or otherwise limiting the marketing of the Debtors' Assets in any material way. |
| **Closing and Other Deadlines**<br><br>(Stalking Horse Term Sheet, Closing Conditions)<br><br>*Complex Procedures, Part E Section 17(e)* | As highlighted above, the DIP Milestones require the Sellers and Purchaser to consummate the Sale no later than 210 Days after the Petition Date.<br><br>The respective obligations of the Sellers and Purchaser to consummate the Sale (the "Closing", and the date of the Closing, the "Closing Date") shall be subject to the satisfaction at or prior to the Closing Date of customary conditions, including, without limitation, the following conditions:<br><br>(i)    the Purchaser shall have obtained all required third-party, government and/or regulatory approvals to consummate the Transaction, including, without limitation, the approval of any applicable government department or agency having jurisdiction over the licensing of the Facilities as a healthcare facility;<br><br>(ii)    no temporary restraining order, preliminary or permanent injunction or other order issued by a governmental authority preventing consummation of the Transaction shall be in effect;<br><br>(iii)    no law shall be in effect which prohibits the Transaction;<br><br>(iv)    the Bankruptcy Court shall have entered the final order approving the DIP Facility; |

| | |
|---|---|
| | (v) no breach of Sellers' or Purchaser's covenants under the APA and accuracy of Sellers' and Purchaser's representations and warranties as of the Closing Date that would not reasonably be expected to have a material adverse change (as customarily defined, which definition shall expressly exclude effects related to the Chapter 11 Cases and Sellers' financial distress); |
| | (vi) no material adverse change (as customarily defined) shall have occurred; |
| | (vii) the APA shall continue to remain in full force and effect; |
| | (viii) the Sellers and Purchaser shall have executed and delivered all closing documents required pursuant to the terms of the APA; |
| | (ix) the Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order, in form and substance reasonably acceptable to the Purchaser and the Sellers; |
| | (x) to the extent necessary to facilitate the transactions contemplated hereby and the wind-down of the Sellers, including, without limitation, the purchase and sale of all Purchased Assets, the Sellers and Purchaser shall enter into a transition services agreement, or other similar agreement in form and substance acceptable to Sellers and the Purchaser; and |
| | (xi) Sellers shall have exercised and not revoked the Purchase Options, and the Purchase Options shall remain in effect through Closing. |
| **Good Faith Deposit** <br><br> (Bidding Procedures, Section VI, Right to Credit Bid) <br><br> *Complex Procedures, Part E Section 17(f)* | The Stalking Horse Bidder, as a Secured Creditor, has not submitted and will not be required to submit a good faith deposit; however, they are a DIP Lender and have provided necessary post-petition financing to the Debtors to support the Sale process. |
| **Interim Arrangements with Proposed Buyer** <br><br> (Stalking Horse Term Sheet) <br><br> *Complex Procedures, Part E Section 17(g)* | The Debtors are not entering into any interim agreements or arrangements with the proposed Purchaser. |
| **Use of Proceeds** <br><br> (Stalking Horse Term Sheet) <br><br> *Complex Procedures, Part E Section 17(h)* | The Stalking Horse Term Sheet does not include any provision proposing to release sale proceeds on or after the Closing without further Court order or providing for a definitive allocation of sale proceeds between or among various sellers or collateral other than with respect to cash in the amount equal to the sum of (a) $16 million of the principal balance, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under the DIP Loans plus (b) to the extent the Term Loan is not an assumed liability, the principal amount, plus all accrued and |

|  | unpaid interest, fees, and other charges and expenses arising and payable under that certain Term Loan, which cash shall be paid to the DIP Agent and shall be used to satisfy the DIP Loans and, if applicable, the Term Loan in full at Closing). |
|---|---|
| **Record Retention**<br><br>(Stalking Horse Term Sheet, Purchased Assets, (xv))<br><br>*Complex Procedures, Part E Section 17(i)* | Purchaser will provide the Sellers and any court-appointed trustee or other fiduciary charged with winding up the affairs of the Sellers with reasonable access to books and records for the purposes of conducting any Wind-Down Activities post-closing. |
| **Sale of Avoidance Actions**<br><br>(Stalking Horse Term Sheet, Purchased Assets, (xx))<br><br>*Complex Procedures, Part E Section 17(j)* | The Purchased Assets include, to the extent not otherwise released, all Claims and Causes of Action against the Released Parties, certain critical vendors, counterparties to Assumed Contracts and Assumed Leases and any other Claims and Causes of Action (which includes avoidance claims under Chapter 5 of the Bankruptcy Code) other than the Excluded Causes of Action. The Stalking Horse Bid also requires certain releases against the Released Parties by the Debtors and their estates, which shall be approved in the Sale Order. |
| **Requested Findings as to Successor Liability**<br><br>(Stalking Horse Term Sheet, Purchased Assets)<br><br>*Complex Procedures, Part E Section 17(k)* | The Stalking Horse Term Sheet provides that the Purchased Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (other than permitted liens agreed to by Purchaser and expressly set forth in the APA) to the fullest extent permitted by section 363 of the Bankruptcy Code and/or other applicable law. |
| **Sale Free and Clear of Unexpired Leases**<br><br>(Stalking Horse Term Sheet, Purchased Assets)<br><br>*Complex Procedures, Part E Section 17(l)* | The Stalking Horse Term Sheet provides that the Purchased Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (other than permitted liens agreed to by Purchaser and expressly set forth in the APA) to the fullest extent permitted by section 363 of the Bankruptcy Code and/or other applicable law. |
| **Credit Bid**<br><br>(Stalking Horse Term Sheet; Bidding Procedures Section, Section VI, Right to Credit Bid)<br><br>*Complex Procedures, Part E Section 17(m)* | The Stalking Horse Term Sheet contemplates that the Purchase Price shall include a credit bid pursuant to section 363(k) of the Bankruptcy Code of $14 million of the principal amount of the DIP Loans, plus all accrued and unpaid principal, fees, penalties and other obligations with respect to such portion of the DIP Loans.<br><br>The Stalking Horse Term Sheet does not include any provision by which the Debtors seeks to allow, disallow or affect in any manner, credit bidding pursuant to section 363(k) of the Bankruptcy Code, but the Bidding Procedures expressly preserve the right of Secured Creditors to credit bid. |
| **Relief from Bankruptcy Rule 6004(h)** | As set forth below, the Debtors request that the Court waive the fourteen-day stay period under Bankruptcy Rule 6004(h). |

| (Bidding Procedures Order, Paragraph 36)<br><br>*Complex Procedures, Part E Section 17(n)* | |

20.     The Transactions provided for in the Stalking Horse APA are expressly subject to the Debtors' ability to solicit and receive higher and/or better bids in accordance with the timeline and pursuant to the procedures set forth in the Stalking Horse APA and the Bidding Procedures.

21.     The Stalking Horse APA contains a provision for reimbursement from the Debtors of reasonable, documented out of pocket fees, costs, and expenses of the Stalking Horse Bidder (the "Expense Reimbursement"), not to exceed $750,000, following termination of the Stalking Horse APA under certain circumstances.  Based on the arms'-length negotiations between the Debtors and the Stalking Horse Bidder, the Debtors have determined that Expense Reimbursement is necessary to retain the Stalking Horse Bidder's commitment to the consummation of the Transaction(s).

### III.    The Proposed Schedule.

20.     The Debtors are seeking approval of the Bidding Procedures and the following proposed timeline for the Transaction(s) (the dates set forth below, the "Sale Schedule") to establish a clear and open process for the solicitation, receipt, and evaluation of third-party bids on a timeline that allows the Debtors to consummate a Transaction(s) that is, above all else, value maximizing.  Moreover, the Debtors, in their sound business judgment, reserve the right to alter the timing of the Sale Schedule as necessary under the circumstances, or to conduct multiple Transaction(s) across one or more Auctions in order to maximize the value of the estates, in each case in accordance with the Bidding Procedures; *provided*, *however*, that that any such changes to the timing of the Sale Schedule shall comply with the DIP Milestones (unless otherwise consented

30

to by the DIP Lenders). The Debtors respectfully request that the Court approve the following

Sale Schedule:

| Action | Description | Deadline |
|--------|-------------|----------|
| Notice of Contract Assumption | Deadline for the Debtors to file a notice of contracts that may be assumed and assigned to any Successful Bidder | September 15, 2025 |
| Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures. | October 6, 2025, at 12:00 p.m., prevailing Central Time. |
| Sale Objection Deadline | The deadline by which objections to the Transactions must be made. | October 6, 2025, at 4:00 p.m., prevailing Central Time. |
| Cure Objection Deadline | The deadline by which objections to the proposed assumption and assignment of any Executory Contract or Unexpired Lease or the Cure Costs proposed with respect thereto must be made. | October 6, 2025, at 4:00 p.m., prevailing Central Time. |
| Auction (if any) | The date and time of the Auction, which will be held at the offices of McDermott Will & Emery LLP, 2801 N. Harwood Street, Suite 2600, Dallas, Texas 75201-1574. | October 9, 2025, at 10:00 a.m., prevailing Central Time, if any. |
| Notice of Successful Bidder | The deadline by which the Debtors will file on the docket, but not serve, a notice identifying the Successful Bidder (the "Notice of Successful Bidder"), identifying the applicable Successful Bidder, Assets, and key terms of the agreement. | Within two (2) business days upon the conclusion of the Auction (if any). |
| Post-Auction Objection Deadline | The deadline by which objections to the Successful Bidder and Transactions, if any, or to dispute the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Executory Contract or Unexpired Lease must be made. | October 14, 2025, at 4:00 p.m., prevailing Central Time. |
| Sale Hearing | The Hearing, if any, before the Court to consider approval of the Successful Bid or Successful Bids, pursuant to which the Debtors and the Successful Bidder or Successful Bidders will consummate the Transaction(s). | October 16, 2025 at 9:30 a.m., prevailing Central Time, or as soon thereafter the Debtors may be heard. |

21. The timelines contemplated in the foregoing Sale Schedule are essential to

maximizing value for the Debtors' estates. The Debtors believe that the relief sought by this

Motion appropriately balances the need to provide all parties-in-interest with notice and due

process, affords the Debtors sufficient time to generate interest in any or all of the Assets, and

provides the Debtors with an expeditious process commensurate with the Debtors' liquidity

constraints, the Debtors' businesses and the interests of their patients and residents, and the terms

and conditions of the Interim DIP Order.  Accordingly, the Debtors believe the relief requested

herein is in the best interest of the Debtors' estates, will provide interested parties with sufficient

opportunity to participate in the process, and, therefore, should be approved.

**IV.    Form and Manner of Auction Notice.**

22.    The Debtors propose holding the Auction on October 9, 2025, at 10:00 a.m.,

prevailing Central Time (or such other date as selected by the Debtors), at the offices of the

proposed counsel to the Debtors:  McDermott Will & Emery LLP, 2801 N. Harwood Street, Suite

2600, Dallas, Texas 75201-1574, or such other location as may be communicated to the relevant

participants.

23.    Within two (2) business days after entry of the Bidding Procedures Order, the

Debtors will cause the Auction Notice to be served on the parties that receive notice of this Motion.

In addition, within three (3) business days after entry of the Bidding Procedures Order, the Debtors

will post the Auction Notice on their restructuring website, https://dm.epiq11.com/Genesis, and

publish the Auction Notice, with any modifications necessary for ease of publication, on one

occasion in *The New York Times* (National Edition), the *Wall Street Journal*, or *USA Today*, to

provide notice to any other potential interested parties.  The Debtors submit that, in light of the

nature of the relief requested, no other or further notice need be given.

24.    The Auction Notice is reasonably calculated to provide all interested parties with

timely and proper notice of the proposed Transaction(s), including the date, time, and place of the

Auction (if any), the Bidding Procedures, and the dates and deadlines related thereto.  Accordingly,

the Debtors request that the form and manner of the Auction Notice be approved and no other or

further notice of the Auction be required.

## BASIS FOR RELIEF

**I.    The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved.**

25.    Bankruptcy Code section 363 and Bankruptcy Rule 6004(f)(1) authorize a debtor

to sell property outside the ordinary course of business by private sale or by auction.  Bankruptcy

Code section 363(b) provides that "[t]he [debtor in possession], after notice and a hearing, may

use, sell or lease, other than in the ordinary course of business, property of the estate . . . ."  11

U.S.C. § 363(b)(1).  Bankruptcy Code section 105(a) empowers bankruptcy courts to "issue any

order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

11 U.S.C. § 105(a).

26.    Courts have made clear that a debtor's business judgment is entitled to substantial

deference with respect to the procedures to be used in selling an estate's assets.  *See, e.g.*, *In re

Cont'l Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee

to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some

articulated business justification for using, selling, or leasing the property outside of the ordinary

course of business."); *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to

authorize use, sale or lease of property of the estate under Section 363, courts require the [debtor]

to show that a sound business purpose justifies such actions.'  If the [debtor's] decision evidences

a sound business purpose, then the Bankruptcy Court should approve the sale.") (quoting *In re

Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999)); *In re Integrated Res., Inc.*,

147 B.R. 650, 656 (S.D.N.Y. 1992) (applying business judgment rule to bidding procedures and

incentives and noting that "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence").

27.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See, e.g.*, *In re Bigler, LP*, 443 B.R. 101, 115 (Bankr. S.D. Tex. 2010).  Courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See, e.g.*, *In re ASARCO, LLC*, 650 F.3d 593, 603 (5th Cir. 2011) (affirming the bankruptcy court's approval of bid procedures designed to maximize the value of the debtor's estate); *In re Bigler*, 443 B.R at 115 (providing that the two goals for a sale of the debtors' assets are "maximizing value for the estate and preserving the integrity of the judicial process"); *In re Integrated Res., Inc.*, 147 B.R. at 659 (noting that bid procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets").

28.    Here, the proposed Bidding Procedures will promote active bidding from seriously interested parties and will maximize the value of their Assets for the benefit of the Debtors' estates. The proposed Bidding Procedures will allow the Debtors to market their assets in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who can demonstrate the ability to close a Transaction(s).  In particular, the Bidding Procedures contemplate an open and public marketing process with minimum barriers to entry and provide Potential Bidders with sufficient time to perform due diligence and acquire the information necessary to submit a timely and well-informed bid.  The timelines for the Bidding Procedures are also consistent with the DIP Milestones.

29.     In addition, approval of the Bidding Procedures and entry of the proposed Bidding Procedures Order will facilitate the time-sensitive Transaction(s) process, and any delay will significantly erode estate value available to the Debtors' stakeholders.  The timelines set forth in the Bidding Procedures provide a sufficient period between the Petition Date and the Bid Deadlines and are comparable to other timelines recently approved in this Circuit.  *See, e.g.*, *In re Steward Health Care Sys. LLC*, Case No. 24-90213 (CML) (Bankr. S.D. Tex. June 3, 2024) [Docket No. 626] (approving a sale timeline that provided an approximate six-week period between the filing of the motion and the bid deadline); *In re Eiger Pharms., Inc.*, Case No. 24-80040 (SGJ) (Bankr. N.D. Tex. Apr. 5, 2024) [Docket No. 94] (approving a sale timeline that provided an approximate two-week period between the filing of the motion and the bid deadline); *In re Impel Pharms. Inc.*, Case No. 23-80016 (SGJ) (Bankr. N.D. Tex. Jan. 11, 2024) [Docket No. 137] (approving a sale timeline that provided a five-week period between the filing of the motion and the bid deadline); *In re AppHarvest Prods., LLC*, Case No. 23-90745 (DRJ) (Bankr. S.D. Tex. Aug. 25, 2023) [Docket No. 88] (approving a sale timeline that provided a four-week period between the filing of the motion and the bid deadline).

30.     Accordingly, the Debtors request that the Court approve the Bidding Procedures as a valid exercise of the Debtors' business judgment.

## II.     The Expense Reimbursement Has a Sound Business Purpose and Should Be Approved.

31.     The Debtors seek authority, to offer customary bid protections to the Stalking Horse Bidder consisting of an Expense Reimbursement in an amount up to $750,000.  The use of a stalking horse in a public auction process for the sale of a debtor's assets is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a framework for competitive bidding and

35

facilitat[ing] a realization of that value." *Off. Comm. of Unsecured Creditors v. Interforum Holding LLC*, No. 11-CV-219, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011).

32.     The Court should approve the Expense Reimbursement set forth in the Stalking Horse APA.  Courts have acknowledged that the approval of bid protections in connection with substantial sales in bankruptcy is warranted to compensate an unsuccessful acquirer whose initial offer served as the basis and catalyst for higher or better offers. *See, e.g.*, *In re ASARCO*, 650 F.3d at 602 n.9 (explaining that bid protections "provide an incentive for an initial bidder to serve as a so-called 'stalking horse,' whose initial research, due diligence, and subsequent bid may encourage later bidders") (quoting *In re 310 Assocs.*, 346 F.3d 31, 34 (2d Cir. 2003)).  The Fifth Circuit requires that breakup fees and expenses be supported by a sound business justification. *Id.* at 602–03 (favoring the business judgment standard governing use of assets outside of the ordinary course of business in assessing the propriety of bid protections).

33.     Here, the Expense Reimbursement is supported by a sound business justification. The Stalking Horse Bidder's submission of a competitive offer will offer a strong baseline for the bidding process and ensure that the Debtors maximize the value they are able to realize from the sale.  Moreover, the Expense Reimbursement is an integral part of the Stalking Horse Bidder's offer.  As such, the Expense Reimbursement was an important incentive to ensure the Stalking Horse Bidder's participation in the bidding process as a stalking horse.

34.     Further, the Expense Reimbursement is reasonable in dollar amount and in terms of the percentage of transaction value as compared to those otherwise approved in this district and others. *See In re Prospect Medical Holdings, Inc.*, Case No. 25-80002 (SGJ) (Bankr. N.D. Tex. Mar. 19, 2025) [Docket No. 1264] (approving bid protections, including an expense reimbursement and a breakup fee, not to exceed of up to 3% of the transaction value in the

aggregate); *In re KidKraft Inc.*, Case No. 24-80045 (MVL) (Bankr. N.D. Tex. June 24, 2024)
[Docket No. 238] (approving an expense reimbursement of up to $1 million); *In re Impel Pharms.
Inc.*, Case No. 23-80016 (SGJ) (Bankr. N.D. Tex. Jan. 11, 2024) [Docket No. 137] (approving an
expense reimbursement of up to $300,000 for a transaction with a $17.5 million purchase price).
The Expense Reimbursement is reasonable, necessary, and consistent with terms generally
negotiated for in transactions of similar size and magnitude.

35.     Accordingly, for the reasons set forth above, the Debtors respectfully submit that
the Court grant the Debtors the authority to incur and pay the Expense Reimbursement to the extent
it becomes due under the Stalking Horse APA.

**III.     The Form and Manner of Notice Should Be Approved.**

36.     Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide creditors
with twenty-one (21) days' notice of the Auction.  Pursuant to Bankruptcy Rule 2002(c), such
notice must include the time and place of the Auction and the deadline for filing any objections to
such a sale. *See* Fed. R. Bankr. P. 2002(c).

37.     Within two (2) business days following entry of the Bidding Procedures Order, the
Debtors will cause the Auction Notice to be served upon: (a) the U.S. Trustee; (b) the Internal
Revenue Service; (c) the United States Attorney for the Northern District of Texas; (d) the
Attorney General for the State of Texas; (e) State Comptroller of Public Accounts; (f) the Centers
for Medicare and Medicaid Services; (g) the Attorneys General for the states in which the Debtors
conduct business; (h) counsel for any statutory committees appointed in these cases or the Debtors'
30 largest unsecured creditors (on a consolidated basis) if such a committee has not been
appointed; (i) counsel to the Debtors' prepetition lenders; (j) counsel to the DIP Lenders; (k) all
known holders of liens, encumbrances, and other claims secured by the Assets; and (l) all parties
entitled to notice pursuant to Bankruptcy Rule 2002.

38.     The Debtors submit that the Auction Notice constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  Accordingly, no further notice is necessary and the Debtors request that this Court approve the form and manner of the notice of the Auction Notice.

## IV.     The Assumption and Assignment Procedures Are Appropriate and Should Be Approved.

39.     As set forth above, the Transaction(s) contemplates the assumption and assignment of Executory Contracts and Unexpired Leases to the Successful Bidder.  In connection with this process, the Debtors believe it is necessary to establish assumption and assignment procedures by which:  (a) the Debtors and counterparties to the Executory Contracts or Unexpired Leases (the "Contract Counterparties") can reconcile cure obligations, if any, in accordance with Bankruptcy Code section 365; and (b) such Contract Counterparties can object to the assumption and assignment of the Contracts and/or related Cure Costs (the "Assumption and Assignment Procedures").  As set forth in the Bidding Procedures Order, the Debtors also request that any Contract Counterparty that fails to object to the proposed assumption and assignment of any Executory Contract or Unexpired Lease be deemed to consent to the assumption and assignment of the applicable Executory Contract or Unexpired Lease pursuant to Bankruptcy Code section 365 on the terms set forth in the Sale Order, along with the Cure Costs identified in the Contract Assumption Notice (as defined in the Bidding Procedures Order).  *See, e.g.*, *In re Boy Scouts of Am.*, 642 BR 504, 569 (Bankr. D. Del. 2022) ("The lack of objection of a [creditor] is also consensual for purposes of § 363 and, again, permissible under § 363(f)(2)."); *In re Christ Hosp.*, No. CIV.A. 14-472 ES, 2014 WL 4613316, at *14 (D.N.J. Sept. 12, 2014) (same); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, at * 1 (Bankr. D.N.J. May 11, 2007) (same); *Hargrave*

38

*v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (same);

*Pelican Homestead v. Wooten (In re Gabel)*, 61 B.R. 661, 667 (Bankr. W.D. La. 1985) (same).

40.     The Debtors believe that the Assumption and Assignment Procedures are fair and

reasonable, provide sufficient notice to parties to the Executory Contracts and Unexpired Leases,

and provide certainty to all parties in interest regarding their obligations and rights in respect

thereof.  Accordingly, the Debtors request the Court approve the Assumption and Assignment

Procedures set forth in the Bidding Procedures Order.

## V.     The Transaction(s) Should be Approved as an Exercise of Sound Business Judgment.

41.     Bankruptcy Code section 363(b) permits a debtor, subject to court approval, to enter

into a transaction outside the ordinary course of its business so long as there is a "sound business

purpose" that justifies such action.  *See* 11 U.S.C. § 363(b)(1); *see also In re ASARCO*, 650 F.3d

at 601 ("Section 363 of the Bankruptcy Code addresses the debtor's use of property of the estate

and incorporates a business judgment standard."); *Stanziale v. Nachtomi (In re Tower Air, Inc.)*,

416 F.3d 229, 238 (3d Cir. 2005) (stating that "[o]vercoming the presumptions of the business

judgment rule on the merits is a near-Herculean task").

42.     The business judgment rule shields a debtor's decisions from judicial second-

guessing.  Once a debtor articulates a valid business justification, the business judgment rule "is a

presumption that in making a business decision the directors of a corporation acted on an informed

basis, in good faith, and in the honest belief that the action taken was in the best interests of the

company." *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill. 1995) (citations omitted); *see*

*also In re Filene's Basement, LLC*, No. 11-13511 (KJC), 2014 WL 1713416, at *12 (Bankr. D.

Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that

the agreement at issue was negotiated in good faith and is in the best interests of the estate.")

(citations omitted); *see also In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y.

1986) ("[A] presumption of reasonableness attaches to a debtor's management decisions."). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under Bankruptcy Code section 363(b)(1).

43. Generally, courts have applied four factors in determining whether a sale of a debtor's assets should be approved:  (a) whether a sound business purpose exists for the sale; (b) whether the proposed sale price is fair; (c) whether the debtor has provided adequate and reasonable notice; and (d) whether the buyer acted in good faith.  *See, e.g.*, *In re Delaware & Hudson Ry.*, 124 B.R. 169, 176 (D. Del. 1991) ("Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith."); *see also In re Eiger Biopharmaceuticals, Inc.*, Case No. 24-80040 (SGJ) (Bankr. N.D. Tex. Aug. 21, 2024) [Docket No. 558]; *In re Sunland Medical Found.*, Case No. 23-80000 (MVL) (Bankr. N.D. Tex. Dec. 1, 2023) [Docket No. 320]; *In re Christian Care Centers, Inc.*, Case No. 22-80000 (SGJ) (Bankr. N.D. Tex. July 21, 2022 [Docket No. 264].

A.      A Sound Business Purpose Exists for the Transaction(s).

44. Here, a sound business purpose exists for the Transaction(s) because the Debtors believe that the Transaction(s) will maximize the value of their Assets, exposing them to the market as part of a competitive, arms' length process.  It is well-settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market.  *See Bank of Am. Nat'I Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999); *see also In re Trans World Airlines, Inc.*, No. 01-00056, 2001 WL 1820326, *4 (Bankr. D. Del. 2001) ("[I]t is worth noting that a [section] 363(b) sale transaction does not require an auction procedure.  The auction

procedure has developed over the years as an effective means for producing an arm's length fair value transaction."). Consequently, the ultimately successful bid(s), after being subject to a "market check" in the form of the Marketing Process and Auction, will constitute, in the Debtors' business judgment, the highest or otherwise best offer for the Assets and will provide a greater recovery for their estates than any known or practicably available alternative. Also, because any sale of the Debtors' Assets will likely contemplate the assumption of certain of the Debtors' Executory Contracts and Unexpired Leases, it will result in payment in full for a number of the Debtors' creditors.

45. As noted above, prior to the Bid Deadline, Jefferies will market the Assets and solicit other offers consistent with the Bidding Procedures, including, for example, by contacting parties, providing Acceptable Bidders with data room access and requested information, considering a variety of alternative transaction structures, and otherwise assisting the Debtors with all efforts to increase transaction value. In this way, the number of bidders that are eligible to participate in a competitive Auction process will be maximized, or, if no Auction is held because no Auction is necessary, the purchase price will, conclusively, be deemed fair value.

46. Thus, the Debtors submit that the Successful Bid will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative. As such, the Debtors' determination to sell the Assets through an Auction process and subsequently to enter into a purchase agreement with the Successful Bidder will be a valid and sound exercise of the Debtors' business judgment. The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request that the Court make a finding that the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

**B.      Adequate and Reasonable Notice of the Auction and Transaction(s) Will be Provided.**

47.      The Auction Notice:  (a) will be served in a manner that provides parties in interest notice of the date, time, and location of the Sale Hearing; (b) informs parties in interest of the deadlines for objecting to the Transaction(s) or the assumption and assignment of the Executory Contracts and Unexpired Leases; and (c) otherwise includes all information relevant to parties interested in or affected by the Transaction(s).  Significantly, the form and manner of the Auction Notice will have been approved by this Court pursuant to the Bidding Procedures Order after notice and a hearing before it is served on parties in interest.

**C.      The Transaction(s) Has Been Proposed in Good Faith Without Collusion, and the Successful Bidder Is a "Good-Faith Successful Bidder."**

48.      The Debtors request that the Court find the Successful Bidder is entitled to the benefits and protections provided by Bankruptcy Code section 363(m) in connection with the sale of Assets.  Bankruptcy Code section 363(m) provides in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease or property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

49.      Bankruptcy Code section 363(m) thus protects the purchaser of assets sold pursuant to Bankruptcy Code section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser leased or purchased the assets in "good faith."  *See id*.  While the Bankruptcy Code does not define "good faith," courts have held that a good-faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *In re O'Dwyer*, 611 Fed. App'x 195, 200 (5th Cir. 2015); *In re*

*Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7, 9 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764

F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2

(Bankr. D.N.J. May 11, 2007).  In other words, a party would have to show fraud or collusion

between the successful bidder and the debtor-in-possession or trustee or other bidders to

demonstrate a lack of good faith.  An appropriate characterization of good faith in a bankruptcy

sale is a lack of "fraud, collusion between the purchaser and other bidders or the trustee, or an

attempt to take grossly unfair advantage of other bidders."  *In re Bleaufontaine, Inc.*, 634 F.2d

1383, 1388 n.7 (5th Cir. 1981) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th

Cir. 1978)).

50.     The Debtors submit that the Successful Bidder(s), will be "good faith purchasers"

within the meaning of Bankruptcy Code section 363(m), and the Stalking Horse APA and any

marked versions thereof, would be good-faith, arm's-length agreements entitled to the protections

of Bankruptcy Code section 363(m).[13]

51.     *First*, as set forth in more detail above, the consideration to be received by the

Debtors from a Successful Bidder will be substantial, fair, and reasonable.  *Second*, any sale

agreement with a Successful Bidder will presumably be the culmination of a competitive Auction

process in which all parties will be represented by counsel and all negotiations will be conducted

on an arm's-length, good-faith basis.  *Third*, there is no indication of any "fraud, collusion between

the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of

other bidders" or similar conduct that would cause or permit the Transaction(s) to be avoided under

---

[13]    The Debtors believe that a finding of good faith within the meaning of Bankruptcy Code section 363(m) will be
appropriate for any Successful Bidder.  Pursuant to the Bidding Procedures, any Successful Bidder will have had
to present a proposal in accordance with the Bidding Procedures.  In addition, the Debtors will not choose as the
Successful Bidder or Back-Up Bidder any entity whose good faith under Bankruptcy Code section 363(m) can
reasonably be doubted and will be prepared to present the Court with sufficient evidence to allow the Court to
find that the "good faith" standard of Bankruptcy Code section 363(m) has been satisfied.

Bankruptcy Code section 363(n).  With respect to Potential Bidders, the Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process.  *Finally*, any bids that the Debtors ultimately determine to be Successful Bids will have been evaluated and approved by the Debtors in consultation with their advisors and the Consultation Parties. Accordingly, the Debtors believe that the Successful Bidder, if any, and any purchase agreement associated with a Successful Bid should be entitled to the full protections of Bankruptcy Code section 363(m).

## VI.   If Part of a Successful Bid, the Sale and Release of Claims and Causes of Action Contemplated by the Stalking Horse Bid Should be Approved.

52.    The Stalking Horse Bid contemplates that in connection with the Transaction (as defined in the Stalking Horse Bid), the Stalking Horse Bidder shall purchase certain claims and causes of action, and the Debtors and their estates shall release the Released Parties[14] from any and all claims and causes of action to the fullest extent permitted by applicable law (the "Stalking Horse Release").  Recognizing the affiliated nature of the proposed purchaser, the Stalking Horse Bid was heavily negotiated in good faith and at arm's-length by the Debtors and independent director members of the Special Investigation Committee (as defined and further described below). Members of the Special Investigation Committee led a comprehensive pre-petition investigation—

---

[14]   "Released Parties" means ReGen Healthcare, LLC, WAX Dynasty Partners LLC, MAO 22322 LLC, Pinta Capital Partners, Perigrove, Integra WIP Tenant LLC, Purchaser, each of their respective present and former parents, subsidiaries and affiliates, and each of their respective officers, directors, partners, equity holders, managers, members, predecessors, successors, assigns, attorneys, agents, employees, managers, and representatives, each solely in such capacity, including, without limitation, Joel Landau and David Gefner.  For the avoidance of doubt, the Debtors' current and former directors and officers, shall not be Released Parties, and any such Claims or Causes of Action shall be Excluded Assets, subject to the D&O Limitations.

advised by Katten—into, among other things, potential claims and causes of action proposed to be purchased or released under the Stalking Horse Bid.

53.     As set forth in the First Day Declaration, the Debtors initiated a proactive independent investigation of potential claims and causes of action that might be asserted by the Debtors against certain related parties arising from various prepetition transactions, including, among other things, potential avoidance actions under the Bankruptcy Code (the "Investigation"). Upon his retention by the Debtors on March 25, 2025, Mr. Jonathan Foster—who has more than 30 years of relevant experience and has served on more than 50 boards—with the assistance of independent special counsel (Katten), immediately initiated the Investigation.  On May 16, 2025, Ms. Elizabeth LaPuma—an experienced fiduciary with more than 20 years of experience as a restructuring professional—was retained by the Debtors and immediately joined the Investigation, with Katten serving as counsel to the Debtors at the sole direction of Mr. Foster and Ms. LaPuma. The scope and extent of the prepetition Investigation was comprehensive.[15]

54.     Mr. Foster and Ms. LaPuma, with the assistance of Katten, engaged in robust, arm's-length negotiations with the Stalking Horse Bidder to reach the agreements subsumed within the Stalking Horse Term Sheet, which includes the purchase or release of claims and causes of action held by the Debtors against the Purchaser's related parties.  Among other things, the arm's-length, independent negotiations ensured that the Debtors would obtain a smooth entrance into these Chapter 11 Cases, with committed DIP financing, and a pathway to maximize recoveries to

---

[15]   While the Investigation remains open to address any issues during these Chapter 11 Cases, the Debtors underscore the extensive pre-petition efforts over more than three months by Mr. Foster and Ms. LaPuma, with the assistance of Katten, to thoroughly review and investigate the potential causes of action, which ultimately informed the negotiations of the DIP Financing and the Stalking Horse Term Sheet that underpin the Debtors' overall restructuring.

creditors, subject to a competitive marketing and sale process to solicit higher or otherwise better bids.

55.     Further, on July 9, 2025, in order to further strengthen their corporate governance, the Debtors appointed three experienced independent fiduciaries to the Board, which included Mr. Foster and Ms. LaPuma.  In addition, the Debtors also appointed as independent director Mr. William K. Snyder, who has more than 40 years of experience in the restructuring field.  In addition, the Debtors reviewed their existing corporate governance infrastructure and determined that it was in the best interests of the Debtors and its stakeholders to establish two separate special committees of the Board among these three independent directors.  First, the Board delegated to the Special Investigation Committee—comprised of Mr. Foster and Ms. LaPuma—certain rights, authority, and powers in connection with, among other things, valuing the proposed causes of action proposed to be sold to the Stalking Horse Bidder and evaluating the forms of consideration provided by the Stalking Horse Bidder in exchange for such causes of action.  Second, the Board delegated to the Special Restructuring Committee—comprised of Mr. Foster, Ms. LaPuma, and Mr. Snyder—along with the Debtors' Co-Chief Restructuring Officers (Mr. Louis E. Robichaux IV and Mr. Russell Perry) as non-voting advisory members, certain rights, authority, and powers in connection with, among other things, any matter relating to the sale process or the restructuring process involving the Debtors and any of their related parties.  Any determination regarding whether a bid is a "Qualified Bid," and which bid is ultimately determined by the Debtors to be the highest or otherwise best bid, and deemed to be the Successful Bid, will be made exclusively

by the Special Restructuring Committee, as informed by any findings or other recommendation made by the Special Investigation Committee.

56.     Through a value-maximizing sale process, a debtor may sell any and all assets that are "property of the estate" under section 541 of the Bankruptcy Code.  Section 541 broadly defines "property of the estate" to include, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  "[T]he term 'all legal and equitable interests of the debtor in property' is all-encompassing and includes rights of action as bestowed by either federal or state law."  *See S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc.* (*In re S.I. Acquisition, Inc.*), 817 F.2d 1142, 1149 (5th Cir.1987).  The Fifth Circuit has held that assets that a debtor may sell through section 363 of the Bankruptcy Code include claims and causes of action held by a debtor's estate, including (but not limited to) avoidance actions.  *See Matter of South Coast Supply Co.*, 91 F.4th 376 (5th Cir. 2024).  In addition, the Fifth Circuit has held that a settlement of a cause of action is essentially equivalent to a sale of that claim, and may be approved under Bankruptcy Code section 363.  *See In re Moore*, 608 F.3d 253 (5th Cir. 2010)

57.     Based on the extensive work of the Special Investigation Committee to date and the recommendation of the Special Restructuring Committee, the Debtors believe that, subject to the marketing and sale process to determine whether any alternative bid exceeds the value provided under the Stalking Horse Bid, the sale and release of the claims and causes of action under the Stalking Horse Bid are appropriate.  For these and other reasons that will be set forth by the Debtors in advance of the Sale Hearing (which will be submitted into evidence at the Sale Hearing), the Debtors submit that the Stalking Horse Release should be approved by the Court if the Stalking

Horse Release ultimately is part of any Successful Bid(s) following the conclusion of the Debtors'

ongoing marketing and auction process.

## VII. The Transaction(s) Should be Approved "Free and Clear" Under Section 363(f).

58.     Bankruptcy Code section 363(f) permits a debtor to sell property free and clear of

another party's interest in the property if:  (a) applicable nonbankruptcy law permits such a free

and clear sale; (b) the holder of the interest consents; (c) the interest is a lien and the sale price of

the property exceeds the value of all liens on the property; (d) the interest is the subject of a *bona*

*fide* dispute; or (e) the holder of the interest could be compelled in a legal or equitable proceeding

to accept a monetary satisfaction of its interest.  *See* 11 U.S.C. § 363(f).

59.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the

requirements enumerated therein will suffice to warrant the Debtors' sale of the Assets free and

clear of all liens, claims, encumbrances, and other interests, except with respect to any interests

that may be assumed liabilities under the applicable purchase agreement.  *See In re Nature Leisure*

*Times, LLC*, No. 06-41357, 2007 WL 4554276, at *3 (Bankr. E.D. Tex. Dec. 19, 2007) ("The

language of § 363(f) is in the disjunctive such that a sale free and clear of an interest can be

approved if any one of the aforementioned conditions contained in § 363(f) are satisfied."); *see*

*also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five

conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."];

*Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 354 (E.D. Pa. 1988) (holding

that a sale "free and clear" may be approved provided the requirements of at least one subsection

are met).

60.     The Debtors submit that, to the extent that any interest in the Assets will not be an

assumed liability, any such interest in the Assets satisfies or will satisfy at least one of the five

conditions of Bankruptcy Code section 363(f), and that any such interest in the Assets will be adequately protected by either being paid in full at the Closing, or by having it attach to the net proceeds of the Transaction(s), subject to any claims and defenses the Debtors may possess with respect thereto. Accordingly, the Debtors request authority to convey the Assets to the Successful Bidder, if any, free and clear of all encumbrances, with any such encumbrances to attach to the proceeds of the Transaction(s).

**VIII.   The Assumption and Assignment of the Contracts Should be Approved.**

**A.   The Assumption and Assignment of the Executory Contracts and Unexpired Leases Reflects the Debtors' Business Judgment.**

61.   Bankruptcy Code section 365(a) authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, *provided* that the defaults under such contracts and leases are cured and adequate assurance of future performance is provided. The Debtors' decision to assume or reject any executory contract or unexpired lease must only satisfy the "business judgment rule" and will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. *See, e.g.*, *Grp. Of Inst'l Invrs. v. Chicago, Milwaukee, St. Paul & Pacific Ry. Co.*, 318 U.S. 523 (1943) (applying Bankruptcy Act section 77(b), predecessor to Bankruptcy Code section 365, and rejecting test of whether executory contract was burdensome in favor if whether rejection is within the debtor's business judgment); *Mirant Corp. v. Potomac Electric Power Co. (In re Mirant Corp.)*, 378 F.3d 511, 524–25 & n.5 (5th Cir. 2004) (noting that the "usual" standard governing approval of a debtor's decision to assume or reject an executory contract is whether the debtor's business judgment supports assumption or rejection). Under the business judgment test, a court should approve a debtor's proposed assumption if such assumption will benefit the estate. *In re Food City, Inc.*, 94 B.R. 91, 93–94 (Bankr. W.D. Tex. 1988).

49

62.　The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987); *see also In re J. C. Penney Direct Mktg. Servs., LLC*, 50 F.4th 532, 533–35 (5th Cir. 2022) (noting business judgment standard applies to assumption of lease contracts).　Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten a court's ability to control a case impartially.　*See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).

63.　Here, the Court should approve the decision to assume and assign certain designated Executory Contracts and Unexpired Leases (the "Assumed Contracts") in connection with the Transaction(s) as a sound exercise of the Debtors' business judgment.　*First*, certain of the Executory Contracts and Unexpired Leases are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets.　*Second*, it is unlikely that any purchaser would want to acquire the Assets unless a significant number of the Executory Contracts and Unexpired Leases needed to manage the Debtors' day-to-day operations were included in the transaction.　*Third*, the Stalking Horse APA and any marked copy of the Stalking Horse APA submitted by a Potential Bidder will provide that the assumption and assignment of the Assumed Contracts is integral to, and inextricably integrated in, a proposed Transaction(s).　*Finally*, the Assumed Contracts will be assumed and assigned though the process approved by the Court pursuant to the Bidding Procedures Order and, thus, will be reviewed by key constituents in these Chapter 11 Cases.

64.     Accordingly, the Debtors submit that the assumption and assignment of the Assumed Contracts by way of the Assumption and Assignment Procedures should be approved as an exercise of their business judgment.

**B.     Defaults Under the Assumed Contracts Will Be Cured Through the Transaction(s).**

65.     Upon finding that a debtor has exercised its business judgment in determining that assuming an executory contract or unexpired lease is in the best interest of its estate, courts must then evaluate whether the assumption meets the requirements of Bankruptcy Code section 365(b), specifically that a debtor "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1)(A).

66.     The Debtors submit that the statutory requirements of Bankruptcy Code section 365(b)(1)(A) will be promptly satisfied because the Stalking Horse APA and any marked copy thereof submitted by a Potential Bidder will require that the Debtors cure all defaults associated with, or that are required to properly assume, any Assumed Contracts.  Because the Assumption and Assignment Procedures (once approved) provide a clear process by which to resolve disputes over Cure Costs or other defaults, the Debtors are confident that if defaults exist that must be cured, such cure will be achieved fairly, efficiently, and properly, consistent with the Bankruptcy Code and with due respect to the rights of Contract Counterparties.

**C.     Contract Counterparties Will Be Adequately Assured of Future Performance.**

67.     Similarly, the Debtors submit that the third requirement of Bankruptcy Code section 365(b)—adequate assurance of future performance—is also satisfied given the facts and circumstances present here.  "The phrase 'adequate assurance of future performance,' adopted from section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic

51

construction based upon the facts and circumstances of each case.  Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."  *In re Carlisle Homes*, 103 B.R. 524, 538 (D.N.J. 1988) (internal citations omitted).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Filene's Basement*, 2014 WL 1713416, at *12 (holding that a contract could be assigned because the assignee had the financial ability to perform the contract obligations going forward and would not fail to perform the contract's obligations at risk of losing a significant investment); *In re Bygaph, Inc.*, 56 B.R. 596, 605−06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is present where a prospective assignee has the financial resources and has expressed a willingness to devote sufficient funding to a business to give it a strong likelihood of succeeding).

68.      The Debtors believe that they can and will demonstrate that the requirements for assumption and assignment of the Assumed Contracts to the Successful Bidder will be satisfied.  As required by the Bidding Procedures, the Debtors will evaluate the financial wherewithal of potential bidders before designating such party a Qualified Bidder (*e.g.*, financial credibility, willingness, and ability of the interested party to perform under any contracts or leases to be assumed) and will demonstrate such financial wherewithal, willingness, and ability to perform under any contracts or leases to be assumed and assigned to a Successful Bidder.  Further, the Assumption and Assignment Procedures provide the Court and other interested parties ample opportunity to evaluate and, if necessary, challenge the ability of the Successful Bidder to provide adequate assurance of future performance and object to the assumption of the Contracts or proposed Cure Costs.  The Court therefore should have a sufficient basis to authorize the Debtors

to reject or assume and assign any Executory Contract or Unexpired Lease to be assumed and assigned to any Successful Bidder.

## **WAIVER OF ANY APPLICABLE STAY**

69.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of fourteen days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).  The Debtors request that the Sale Order be effective immediately upon its entry by providing that the fourteen-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

70.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *In re Filene's Basement*, 2014 WL 1713416, at *14; *see also* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen-day stay period, the leading treatise on bankruptcy suggests that the fourteen-day stay should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure."  10 *Collier on Bankruptcy* ¶ 6004.11, ¶ 6004.04 (16th rev. ed. 2023). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*; *see In re Filene's Basement*, 2014 WL 1713416, at *14 (reducing the stay to seven days from the date of entry of the sale order).

71.     To maximize the value received for the Assets, the Debtors may seek to close the
Transaction(s) as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request
that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## RESERVATION OF RIGHTS

72.     Nothing in the Motion should be construed as (a) an admission as to the validity,
priority, or character of any claim or other asserted right or obligation, or a waiver or other
limitation on the Debtors' ability to contest the same on any ground permitted by bankruptcy or
applicable non-bankruptcy law; (b) a promise or requirement to pay any claim or other obligation;
or (c) granting third-party-beneficiary status, bestowing any additional rights on any third party,
or being otherwise enforceable by any third party.

## NOTICE

73.     The Debtors will provide notice of the Motion to: (a) the U.S. Trustee; (b) the
Internal Revenue Service; (c) the United States Attorney for the Northern District of Texas; (d) the
Attorney General for the State of Texas; (e) State Comptroller of Public Accounts; (f) the Centers
for Medicare and Medicaid Services; (g) the Attorneys General for the states in which the Debtors
conduct business; (h) counsel for any statutory committees appointed in these cases or the Debtors'
30 largest unsecured creditors (on a consolidated basis) if such a committee has not been
appointed; (i) counsel to the Debtors' prepetition lenders; (j) counsel to the DIP Lenders; (k) all
known holders of liens, encumbrances, and other claims secured by the Assets; and (l) all parties
entitled to notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that no other or further
notice is required.

## **NO PRIOR REQUEST**

74.     No previous request for the relief sought herein has been made to this or any other

court.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, the Debtors respectfully request entry of the Bidding Procedures Order,

substantially in the form attached hereto as **Exhibit A**, and granting the relief requested herein.

Dated: July 15, 2025  
       Dallas, Texas

**MCDERMOTT WILL & EMERY LLP**

*/s/ Marcus A. Helt*                
Marcus A. Helt (TX 24052187)  
Jack G. Haake (TX 24127704)  
Grayson Williams (TX 24124561)  
2801 N. Harwood Street, Suite 2600  
Dallas, Texas 75201-1574  
Telephone:    (214) 295-8000  
Facsimile:     (972) 232-3098  
Email:         mhelt@mwe.com  
               jhaake@mwe.com  
               gwilliams@mwe.com

- and -

Daniel M. Simon (admitted *pro hac vice*)  
Emily C. Keil (admitted *pro hac vice*)  
William A. Guerrieri (admitted *pro hac vice*)  
444 West Lake Street, Suite 4000  
Chicago, Illinois 60606  
Telephone:    (312) 372-2000  
Facsimile:     (312) 984-7700  
Email:         dsimon@mwe.com  
               ekeil@mwe.com  
               wguerrieri@mwe.com

*Proposed Counsel for the Debtors and*  
*Debtors-in-Possession*

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true and correct copy of the foregoing Motion was served by the Court's CM/ECF system on all counsel of record registered in these Chapter 11 Cases through CM/ECF. The Debtors' claims and noticing agent will be filing a supplemental certificate of service on the docket to reflect any additional service of the foregoing Motion.

Dated: July 15, 2025           **MCDERMOTT WILL & EMERY LLP**
       Dallas, Texas

*/s/ Marcus A. Helt*
Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
Grayson Williams (TX 24124561)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone:     (214) 295-8000
Facsimile:      (972) 232-3098
Email:          mhelt@mwe.com
               jhaake@mwe.com
               gwilliams@mwe.com

- and -

Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone:     (312) 372-2000
Facsimile:      (312) 984-7700
Email:          dsimon@mwe.com
               ekeil@mwe.com
               wguerrieri@mwe.com

*Proposed Counsel for the Debtors and*
*Debtors-in-Possession*

**EXHIBIT A**

**Proposed Order**

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | Case No. 25-80185 (SGJ) |
| Debtors. | (Jointly Administered) |
|  | **Related to Docket No. ___** |

## ORDER (I) APPROVING BIDDING PROCEDURES AND EXPENSE REIMBURSEMENT, (II) APPROVING THE DEBTORS' ENTRY INTO THE STALKING HORSE APA, (III) SCHEDULING CERTAIN DATES AND DEADLINES, (IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (V) ESTABLISHING NOTICE AND PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, (VI) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS, AND (VII) AUTHORIZING THE SALE OF ASSETS

Upon the motion (the "<u>Motion</u>") of the Debtors for entry of an order (this "<u>Order</u>")

(a) authorizing and approving the proposed bidding procedures attached hereto as <u>**Exhibit 1**</u> (the

---

[1]   The last four digits of Genesis Healthcare, Inc.'s federal tax identification number are 4755.  There are 291 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only.  A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Genesis.  The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

"Bidding Procedures")[2] by which the Debtors will solicit and select the highest or otherwise best offer(s) for the sale or sales (the "Transaction(s)") of all, substantially all, or any portion of the Debtors' assets (the "Assets"); (b) authorizing the Debtors to select CPE 88988 LLC as the stalking horse bidder for substantially all of the Debtors' Assets (the "Stalking Horse Bidder" and, the Stalking Horse Bidder's bid, the "Stalking Horse Bid") pursuant to the Stalking Horse Term Sheet and that certain Asset Purchase Agreement, dated [_____] (as amended, supplemented, or otherwise modified by the parties thereto, the "Stalking Horse APA"); (c) approving the expense reimbursement relating to the Stalking Horse Bidder (together, the "Expense Reimbursement"); (d) scheduling certain dates and deadlines in connection with the approval of the Bidding Procedures; (e) approving the manner of notice of an auction or auctions, if any, for the Transaction(s) (the "Auction") and the hearing to consider approval of each Transaction(s) (the "Sale Hearing"); and (f) approving procedures for the assumption and assignment of certain executory contracts (the "Executory Contracts") and unexpired leases (the "Unexpired Leases") in connection with the Transaction(s), all as more fully set forth in the Motion; and upon consideration of the First Day Declaration; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc* dated August 3, 1984, entered by the United States District Court for the Northern District of Texas; and the matter being a core proceeding within the meaning of 28 U.S.C. § 157(b)(2); and venue of this proceeding and the Motion in this District being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court being able to issue a final order consistent with Article III of the United States Constitution; and due and sufficient notice of the Motion

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

having been given under the particular circumstances; and the Court having reviewed the Motion

and having heard the statements in support of the relief requested therein at a hearing before this

Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth

in the Motion and at the Hearing establish just cause for the relief granted herein; and it appearing

that no other or further notice is necessary; and it appearing that the relief requested in the Motion

is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and

after due deliberation thereon; and good and sufficient cause appearing therefor; it is hereby

**ORDERED, ADJUDGED, AND DECREED that:**

21.     The Motion is granted as set forth herein.

22.     The Debtors have articulated good and sufficient reasons for authorizing and

approving the Bidding Procedures, which are fair, reasonable, and appropriate under the

circumstances and designed to maximize the recovery on, and realizable value of the Debtors'

enterprise, including with respect to the payment of the Expense Reimbursement in accordance

with the Stalking Horse APA.

23.     The Debtors' proposed notice of the Motion and the Hearing was (a) appropriate

and reasonably calculated to provide all interested parties with timely and proper notice, (b) in

compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and

the Local Rules, and (c) adequate and sufficient under the circumstances of these Chapter 11 Cases,

and no other or further notice is required.  A reasonable opportunity to object or be heard regarding

the relief granted by this Order has been afforded to all interested persons and entities.

24.     All objections to the relief requested in the Motion that have not been withdrawn,

waived, or settled prior to or at the Hearing are overruled.

## II.    Important Dates and Deadlines.

25.    The key dates for the sale process are as follows:

| Action | Description | Deadline |
|---|---|---|
| Notice of Contract Assumption | Deadline for the Debtors to file a notice of contracts that may be assumed and assigned to any Successful Bidder | September 15, 2025 |
| Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures. | October 6, 2025, at 12:00 p.m., prevailing Central Time. |
| Sale Objection Deadline | The deadline by which objections to the Transactions must be made. | October 6, 2025, at 4:00 p.m., prevailing Central Time. |
| Cure Objection Deadline | The deadline by which objections to the proposed assumption and assignment of any Executory Contract or Unexpired Lease or the Cure Costs proposed with respect thereto must be made. | October 6, 2025, at 4:00 p.m., prevailing Central Time. |
| Auction (if any) | The date and time of the Auction, which will be held at the offices of McDermott Will & Emery LLP, 2801 N. Harwood Street, Suite 2600, Dallas, Texas 75201-1574. | October 9, 2025, at 10:00 a.m., prevailing Central Time, if any. |
| Notice of Successful Bidder | The deadline by which the Debtors will file on the docket, but not serve, a notice identifying the Successful Bidder (the "Notice of Successful Bidder"), identifying the applicable Successful Bidder, Assets, and key terms of the agreement. | Within two (2) business days upon the conclusion of the Auction (if any). |
| Post-Auction Objection Deadline | The deadline by which objections to the Successful Bidder and Transactions, if any, or to dispute the ability of the Successful Bidder to provide adequate assurance of future performance with respect to any Executory Contract or Unexpired Lease must be made. | October 14, 2025, at 4:00 p.m., prevailing Central Time. |
| Sale Hearing | The Hearing, if any, before the Court to consider approval of the Successful Bid or Successful Bids, pursuant to which the Debtors and the Successful Bidder or Successful Bidders will consummate the Transaction(s). | October 16, 2025 at 9:30 a.m., prevailing Central Time, or as soon thereafter the Debtors may be heard. |

26.    **Bid Deadline**.  October 6, 2025, at 12:00 p.m., prevailing Central Time, is the deadline by which all Qualified Bids must be **actually received** by the parties specified in the Bidding Procedures.

4

27.    **Sale Objection Deadline**.  Objections to the Transaction(s) (the "Sale Objection Deadline"), with the exception of objections solely related to the identity of the Successful Bidder other than the Stalking Horse Bidder and adequate assurance of future performance by the Successful Bidder, which must be filed by the Post-Auction Objection Deadline (as defined below), must be made on or before October 6, 2025, at 4:00 p.m., prevailing Central Time.

28.    **Cure Objection Deadline**.    The deadline to object to any Cure Cost or to assumption and assignment on any basis, with the exception of objections solely related to adequate assurance of future performance by a Successful Bidder other than the Stalking Horse Bidder, which must be filed by the Post-Auction Objection Deadline, shall be made on or before October 6, 2025, at 4:00 p.m., prevailing Central Time.

29.    **Auction**.  The date and time of the Auction is October 9, 2025, at 10:00 a.m., prevailing Central Time, which time may be extended by the Debtors, in consultation with the Consultation Parties, upon written notice to the Court.  The Auction will be held at the offices of the proposed counsel to the Debtors:  McDermott Will & Emery LLP, 2801 N. Harwood Street, Suite 2600, Dallas, Texas 75201-1574, or such other location as may be communicated to the relevant participants.   Only the Debtors, Qualified Bidders, the Consultation Parties, the U.S. Trustee, and such parties' representatives and advisors, shall be entitled to participate in the Auction (*provided* that Qualified Bidders may appear through a duly authorized representative (other than their counsel) bearing a valid and enforceable power of attorney or other written proof evidencing their ability to bind the applicable Qualified Bidder, which document(s) shall be delivered to the Debtors prior to the commencement of the Auction), and only Qualified Bidders will be entitled to participate in or make Overbids (as defined in the Bidding Procedures) at the

Auction.  For the avoidance of doubt, the Debtors may also conduct more than one Auction with respect to non-overlapping material portions of the Debtors' Assets.

30.     **Notice of Successful Bidder**.  Within two (2) business days upon conclusion of the Auction, the Debtors shall file a Notice of Successful Bidder.

31.     **Post-Auction Objection Deadline**.  Objections to the Notice of Successful Bidder related solely to the identity of the Successful Bidder (other than the Stalking Horse Bidder) or adequate assurance of future performance provided by the Successful Bidder ("Post-Auction Objection Deadline"), if any, must be made on or before October 14, 2025, at 4:00 p.m., prevailing Central Time.

32.     **Failure to Object**.  If any party fails to timely file with the Court and serve an objection by the Sale Objection Deadline or Post-Auction Objection Deadline, as applicable, or otherwise abide by the procedures set forth in the Bidding Procedures regarding an objection to the Transaction(s), such party shall be barred from asserting, at the Sale Hearing or otherwise, any objection to the relief requested in the Motion or to the consummation and performance of the Transaction(s), including the transfer of the Assets to the Successful Bidder, free and clear of all liens, claims, interests, and encumbrances pursuant to Bankruptcy Code section 363(f), and shall be deemed to "consent" for the purposes of Bankruptcy Code section 363(f).

33.     **Sale Hearing**.  October 16, 2025, at 9:30 a.m., prevailing Central Time, or as soon thereafter as the Debtors may be heard, is the date and time for the hearing for the Court to consider the Successful Bid or Successful Bids, if needed (the "Sale Hearing").  The Sale Hearing may be adjourned by announcement in open Court or on the Court's calendar without any further notice required.

III.    **Stalking Horse Bid and Expense Reimbursement.**

34.    The Stalking Horse APA, attached hereto as **Exhibit 2**, is the result of extensive, good-faith, arm's-length negotiations.  The approval of the Stalking Horse Bidder as a "stalking-horse" bidder and the Stalking Horse APA as a "stalking-horse" sale agreement is in the best interests of the Debtors, their estates, their creditors, and other stakeholders, and the Debtors have demonstrated compelling and sound justifications for such relief.  The Stalking Horse APA will enable the Debtors to secure a strong baseline for the bidding process and ensure that the Debtors maximize the value they are able to realize from the sale.

35.    The Expense Reimbursement, in an amount up to $750,000, is approved and is justified to retain the Stalking Horse Bidder's commitment to the consummation of the Sale Transaction to enable the Debtors to maximize the ultimate purchase price of the Assets. Any amounts that become due and payable pursuant to the Expense Reimbursement in accordance with the Stalking Horse APA and this Order shall constitute a superpriority administrative expense of the Debtors' estates pursuant to Bankruptcy Code section 503(b), with priority over any and all administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code.  For the avoidance of doubt, the Stalking Horse Bidder shall not be required to include an amount in cash necessary to satisfy the Expense Reimbursement as part of any Overbid.

36.    No person or entity, other than the Stalking Horse Bidder, shall be entitled to any expense reimbursement, breakup fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of Bankruptcy Code section 503(b) or otherwise

IV.     **Auction, Bidding Procedures, Auction Notice, and Related Relief.**

37.     The Bidding Procedures, substantially in the form attached hereto as **<u>Exhibit 1</u>**, including the Auction Notice attached to the Bidding Procedures as <u>Schedule 1</u>, are incorporated herein and are hereby approved in their entirety, and the Bidding Procedures shall govern the submission, receipt, and analysis of all Bids relating to any proposed Transaction(s).  Any party desiring to submit a Bid shall comply with the Bidding Procedures and this Order.  The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.  Subject to the terms of the Bidding Procedures, the Debtors, with the consent of the DIP Lenders (not to be unreasonably withheld, delayed or conditioned) and in consultation with the Consultation Parties, may modify the Bidding Procedures as necessary or appropriate to maximize value for their estates.

38.     Pursuant to the Bidding Procedures, the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, may (a) determine which Qualified Bid is the highest or otherwise best offer, (b) reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Transaction(s), or (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders, and (c) impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these Chapter 11 Cases.

39.     If the Debtors, with the consent of the DIP Lenders (not to be unreasonably withheld, delayed or conditioned) and in consultation with the Consultation Parties, determine not

8

to conduct an Auction, then the Debtors shall file a notice with the Court of such determination within one business day of the making of such determination by the Debtors.

40.     Any deposit (including any Good Faith Deposit) provided by a Qualified Bidder shall be held in escrow by the Debtors or their agent and shall not become property of the Debtors' bankruptcy estates unless and until released from escrow to the Debtors pursuant to the terms of the applicable escrow agreement, the Bidding Procedures, or an order of this Court, as applicable.

41.     Within two (2) business days following the entry of this Order, the Debtors will cause the Auction Notice to be served upon: (a) the office of the United States Trustee for Region 6; (b) the Internal Revenue Service; (c) the United States Attorney for the Northern District of Texas; (d) the Attorney General for the State of Texas; (e) State Comptroller of Public Accounts; (f) the Centers for Medicare and Medicaid Services; (g) the Attorneys General for the states in which the Debtors conduct business; (h) counsel for any statutory committees appointed in these cases or the Debtors' 30 largest unsecured creditors (on a consolidated basis) if such a committee has not been appointed; (i) counsel to the Debtors' prepetition lenders; (j) counsel to the DIP Lenders; (k) all known holders of liens, encumbrances, and other claims secured by the Assets; and (l) all parties entitled to notice pursuant to Bankruptcy Rule 2002.

42.     Within three (3) business days after entry of this Order, the Debtors shall place a publication version of the Auction Notice in *The New York Times* (National Edition), the *Wall Street Journal*, or *USA Today*, and post it on to the Debtors' restructuring website at https://dm.epiq11.com/Genesis.  Such notice shall be deemed sufficient and proper notice of the Transaction(s) with respect to known interested parties.

43.     Pursuant to the Bidding Procedures:  (a) each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or

the Transaction(s), as set forth in the Bidding Procedures; and (b) the Auction shall be transcribed

or videotaped.

## V.    Assumption and Assignment Procedures.

44.    The procedures set forth below regarding the assumption and assignment of any

Executory Contracts and Unexpired Leases proposed to be assumed by the Debtors pursuant to

Bankruptcy Code section 365(b) and assigned to the Successful Bidder, if any, pursuant to

Bankruptcy Code section 365(f) in connection with the Transaction(s) (the "Assumption and

Assignment Procedures") are hereby approved to the extent set forth herein.

45.    The Assumption and Assignment Procedures shall govern the assumption and

assignment of all of the Debtors' Executory Contracts and Unexpired Leases to be assumed and

assigned in connection with the Transaction(s) under the Stalking Horse APA, and any marked

versions thereof, subject to the payment of any amount necessary to satisfy all defaults and actual

pecuniary loss to the counterparty resulting from such defaults including, but not limited to, all

claims, demands, charges, rights to refunds, and monetary and non-monetary obligations that the

relevant counterparty can assert under an Executory Contract or Unexpired Lease, whether legal

or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated

or unliquidated, senior or subordinate, relating to money now owing or owing in the future, arising

under or out of, in connection with, or in any way relating to a Contract (the foregoing amounts as

stated in the Contract Assumption Notice, the "Cure Costs"):

       (a)    **Notice of Contract Assumption**.  On or before September 15, 2025, the
Debtors shall file on the docket and serve a notice of contracts that may be
assumed and assigned to any Successful Bidder (the "Contract Assumption
Notice"), in substantially the form attached hereto as **Exhibit 3**, via first
class mail on the counterparties to the Executory Contracts or Unexpired
Leases to be assumed and assigned in connection with the Transaction(s)
(the "Contract Counterparties").  The Contract Assumption Notice, shall
inform each recipient of the timing and procedures relating to such

10

assumption and assignment, and, to the extent applicable, (i) the title of the Executory Contract or Unexpired Lease, (ii) the name of the counterparty to the Executory Contract or Unexpired Lease, (iii) Debtors' good faith estimates of the Cure Costs, if any, required in connection with the Executory Contract or Unexpired Lease, and (iv) the Cure Objection Deadline; *provided, however*, that service of a Contract Assumption Notice does not constitute an admission that any Executory Contracts and Unexpired Leases listed thereon is an executory contract or that such stated Cure Cost constitutes a claim against the Debtors or a right against any Successful Bidder, all rights with respect thereto being expressly reserved. Further, the inclusion of a contract on the Contract Assumption Notice is not a guarantee that such contract ultimately will be assumed and assigned.

(b)     **Cure Costs**.  The payment of the applicable Cure Costs by the Debtors and/or the Successful Bidder, as applicable shall (i) effect a cure of all defaults existing thereunder, (ii) compensate for any actual pecuniary loss to such counterparty resulting from such default, and (iii) together with the assumption of the ultimately assumed Executory Contract or Unexpired Lease by the Debtors and the assignment of such Executory Contract or Unexpired Lease to the Successful Bidder, constitute adequate assurance of future performance thereof.

(c)     **Supplemental Contract Assumption Notice**.  To the extent the Debtors, at any time after the Auction (i) identify additional Executory Contracts or Unexpired Leases that may be assumed by and assigned to the Successful Bidder, (ii) remove any Executory Contracts or Unexpired Leases from the list attached to the Contract Assumption Notice, (iii) and/or modify the previously stated Cure Cost associated with any Executory Contract or Unexpired Lease, the Debtors will promptly file with this Court and serve by first-class mail a supplemental notice of contract assumption (a "Supplemental Assumption Notice") on each of the Contract Counterparties affected by the Supplemental Assumption Notice.  Each Supplemental Assumption Notice will include the same information with respect to listed Executory Contracts or Unexpired Leases as was included in the Contract Assumption Notice.  Except as otherwise provided in any purchase agreement, a Successful Bidder may designate additional Executory Contracts and Unexpired Leases to be assumed and assigned up to two (2) business days prior to the Closing and may remove Executory Contracts or Unexpired Leases from the list of Executory Contracts and Unexpired Leases up to two (2) business days prior to the Closing.

(d)     **Objections**.  Objections, if any, to the proposed assumption and assignment or the Cure Cost proposed with respect thereto, must (i) be in writing, (ii) comply with the applicable provisions of the Bankruptcy Rules, and the Local Rules, (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Cost, state the correct Cure Cost

alleged by the objecting counterparty, together with any applicable and appropriate documentation in support thereof, and (iv) be filed with the Court and served upon (a) proposed counsel to the Debtors, (b) counsel to the Stalking Horse Bidder, if any, (c) the Bid Notice Parties (as defined in the Bidding Procedures), (d) counsel to the DIP Lenders, and (e) any other party that has filed a notice of appearance in these Chapter 11 Cases, so as to be **actually received no later than October 6, 2025, at 4:00 p.m., prevailing Central Time, (the "Cure Objection Deadline"), or the deadline set forth in a Supplemental Assumption Notice, as applicable**. The Debtors may modify the Cure Objection Deadline and the deadline set forth in a Supplemental Assumption Notice by filing a notice of such modification on the Court's docket.

(e)     **Deemed Consent of Counterparties**.  If no objection to the proposed assumption and assignment or the Cure Cost proposed with respect thereto is timely filed with respect to an Executory Contract or Unexpired Lease: (i) the counterparty to such Executory Contract or Unexpired Lease shall be deemed to have consented to the assumption by the Debtors and assignment to the Successful Bidder of the Executory Contract or Unexpired Lease, and be forever barred from asserting any objection with regard to such assumption and assignment (including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder); (ii) any and all defaults under the Executory Contract or Unexpired Lease and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and (B) upon payment of the Cure Amount set forth in the applicable Contract Assumption Notice or Supplemental Assumption Notice for such Executory Contract or Unexpired Lease; and (iii) the counterparty shall be forever barred from asserting any other claims related to such Executory Contract or Unexpired Lease against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the contract objections and the applicable Sale Order.

(f)     **Dispute Resolution**.  To the extent that the parties are unable to consensually resolve any objection to a Cure Cost or other objection prior to the commencement of the Sale Hearing, including, without limitation, any dispute with respect to the Cure Amount required to be paid to the applicable counterparty under the Bankruptcy Code sections 365(b)(a)(1)(A) and (B) (any such dispute, a "Cure Dispute"), the Debtors may (i) assume the applicable Executory Contract or Unexpired Lease prior to the resolution of the Cure Dispute; *provided* that the Debtors shall (A) pay to the applicable counterparty the undisputed portion of the Cure Amount within five (5) business days after entry of the applicable Sale Order and (B) reserve cash in an amount sufficient to pay the disputed portion of the Cure Amount reasonably asserted by the applicable counterparty (or such lesser amount as may be fixed or estimated by the

12

Court or otherwise agreed to by the counterparty and the Debtors), or (ii) adjourn their request to assume the Executory Contract or Unexpired Lease pending resolution of the Cure Dispute (an "<u>Adjourned Cure Dispute</u>"); *provided further* that, to the extent the Adjourned Cure Dispute is resolved or determined unfavorably to the Debtors, the Debtors may withdraw the proposed assumption of the applicable Executory Contract or Unexpired Lease after such determination by filing a notice of withdrawal, which, in the case of a lease, shall be prior to the expiration of the applicable deadline to assume or reject unexpired leases under Bankruptcy Code section 365(d)(4). The Debtors shall file notice of their intention to reserve for a Cure Amount or to adjourn their request for assumption. An Adjourned Cure Dispute may be resolved after the closing date of the applicable Transaction in the Debtors' discretion.

(g) **Contract Assumption**. No Executory Contract or Unexpired Lease shall be deemed assumed and assigned pursuant to Bankruptcy Code section 365 until the later of (i) the date the Court has entered an order assuming and assigning such Executory Contract or Unexpired Lease or (ii) the date the Transaction(s) has closed.

46. Any party failing to timely file an objection to the Cure Costs, the proposed assumption and assignment of an Executory Contract or Unexpired Lease listed on the Contract Assumption Notice or a Supplemental Assumption Notice, or the adequate assurance of future performance provided by the Successful Bidder is deemed to have consented to (a) such Cure Cost, (b) the assumption and assignment of such Executory Contract or Unexpired Lease, (c) the related relief requested in the Motion, and (d) the Transaction(s). Such party shall be forever barred and estopped from objecting to the Cure Costs, the assumption and assignment of the Executory Contract or Unexpired Lease, adequate assurance of future performance, and the relief requested in the Motion, whether or not applicable law excuses such counterparty from accepting performance by, or rendering performance to, the Successful Bidder for purposes of Bankruptcy Code section 365(c)(1) and from asserting any additional cure or other amounts against the Debtors and the Successful Bidder with respect to such party's Executory Contract or Unexpired Lease.

47.     The Debtors shall provide reasonable evidence to each Executory Contract or Unexpired Lease counterparty that the Proposed Assignee has the ability to comply with the requirements of adequate assurance of future performance; *provided* that any such evidence that constitutes nonpublic information shall be provided on a confidential basis.  All bidders are deemed to consent to the transmission of such evidence of adequate assurances of future performance on a confidential basis to counsel for the applicable Executory Contract or Unexpired Lease counterparties via email, with such information to be used only for purpose of assessing the applicable Bidder.

48.     The inclusion of an Executory Contract or Unexpired Lease in the Contract Assumption Notice or a Supplemental Assumption Notice will not obligate any Debtor to assume any Executory Contract or Unexpired Lease listed thereon or a Successful Bidder to take assignment of such assumed Contract.  Only those Executory Contracts and Unexpired Leases that are included on a schedule of assumed and assigned contracts attached to the executed definitive asset purchase agreement with a Successful Bidder (including amendments or modifications to such schedules in accordance with such asset purchase agreement) will be assumed and assigned to the applicable Successful Bidder.  No Executory Contract or Unexpired Lease in the Contract Assumption Notice or a Supplemental Assumption Notice shall be assumed other than in connection with (and concurrently with the effectiveness of) the assignment of such Executory Contract or Unexpired Lease to the applicable Successful Bidder.

**VI.     Miscellaneous.**

49.     Nothing in this Order or the Bidding Procedures shall be deemed a waiver of any rights, remedies or defenses that any party (including the sureties, the Debtors, the Debtors' lenders, and the agents under their respective credit agreements, the Stalking Horse Bidder or any

14

other prospective purchaser) has or may have under applicable bankruptcy and non-bankruptcy law, under any indemnity agreements, surety bonds or related agreements or any letters of credit relating thereto, or any rights, remedies, or defenses of the Debtors with respect thereto, including seeking Court relief with regard to the Auction, the Bidding Procedures, the Transaction(s), and any related items (including, if necessary, to seek an extension of the Bid Deadline).

50.     The Debtors are authorized, in consultation with the Consultation Parties, to revise the Sale Schedule; *provided*, *however*, that that any such changes to the timing of the Sale Schedule shall comply with the DIP Milestones (unless otherwise consented to by the DIP Lenders).  The Debtors are further authorized to conduct multiple Transaction(s) and/or Auctions (as necessary) in substantial conformity with the Sale Schedule and Bidding Procedures established through this Order.

51.     The Debtors, in connection with offering a product or a service, have not disclosed any policies prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the Debtors.  Subject to this finding, nothing contained in this Order prejudices parties in interest from seeking the appointment of a consumer privacy ombudsman at a later date in connection with any proposed sales pursuant to the Bankruptcy Code. In addition, nothing contained in this Order constitutes a determination as to whether the Debtors are healthcare businesses and does not prejudice the Court from appointing a patient care ombudsman pursuant to the Bankruptcy Code at a later date.

52.     The failure to include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness or enforceability of such a provision in the Bidding Procedures.

53.     The Court, at the request of the Debtors, in consultation with the Consultation

Parties, and subject to its availability, may modify the dates of and adjourn any hearing set by this

Order without further Order of this Court, provided that the Debtors will serve notice to all

requisite parties informing them of such modification and provided that all dates must comply with

the DIP Milestones (unless otherwise consented to by the DIP Lenders).

54.     The Debtors, in consultation with the Consultation Parties, may modify any of the

deadlines set forth herein or provide for additional deadlines within a Sale Schedule without further

order of the Court, provided that the Debtors will disclose all applicable deadlines in a notice filed

with the Court, including, as applicable, the Auction Notice, and provided that all dates must

comply with the DIP Milestones (unless otherwise consented to by the DIP Lenders).

55.     The Debtors may, in consultation with the Consultation Parties, modify any Good

Faith Deposit as necessary or appropriate, based on the Assets being sold.

56.     In the event of any inconsistencies between this Order and the Motion and/or the

Bidding Procedures, this Order shall govern in all respects.

57.     Nothing in the Motion or this Bidding Procedures Order or the relief granted

(including any actions taken or payments made by the Debtors pursuant thereto) shall be construed

as (a) an admission as to the validity, priority, or character of any claim or other asserted right or

obligation, or a waiver or other limitation on the Debtors' ability to contest the same on any ground

permitted by bankruptcy or applicable non-bankruptcy law; (b) a promise or requirement to pay

any claim or other obligation; or (c) granting third-party-beneficiary status, bestowing any

additional rights on any third party, or being otherwise enforceable by any third party.

16

58.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a), the Local Rules, and the Complex Case Procedures are satisfied by such notice.

59.     Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry hereof.

60.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

61.     The Debtors are authorized to take all actions necessary to implement the relief granted in this Order.

62.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

# # # END OF ORDER # # #

Prepared and presented by:

/s/ *Marcus A. Helt*
Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
Grayson Williams (TX 24124561)
**MCDERMOTT WILL & EMERY LLP**
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone:     (214) 295-8000
Facsimile:     (972) 232-3098
Email:         mhelt@mwe.com
               jhaake@mwe.com
               gwilliams@mwe.com

- and -

Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
**MCDERMOTT WILL & EMERY LLP**
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone:     (312) 372-2000
Facsimile:     (312) 984-7700
Email:         dsimon@mwe.com
               ekeil@mwe.com
               wguerrieri@mwe.com

*Proposed Counsel for the Debtors and*
*Debtors-in-Possession*

18

**Exhibit 1**

**Bidding Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | ) | Case No. 25-80185 (SGJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### BIDDING PROCEDURES FOR THE
### SUBMISSION, RECEIPT, AND ANALYSIS OF BIDS
### IN CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS

On July 9, 2025, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Northern District of Texas (the "Court").

The Court has entered the *Interim Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 57] (the "Interim DIP Order") providing, among other things, financing for these Chapter 11 Cases.  Pursuant to the Interim DIP Order, the Debtors must satisfy certain milestones (the "DIP Milestones") for the sale of their Assets or some other value-maximizing transaction.

On [_____], the Court entered the *Order (I) Approving Bidding Procedures and Expense Reimbursement, (II) Approving the Debtors' Entry Into the Stalking Horse APA, (III) Scheduling Certain Dates and Deadlines,, (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, and (VII) Authorizing the Sale of Assets* [Docket No. [ ]] (the "Bidding Procedures Order"),[2] by which the Court approved the following procedures (the "Bidding Procedures") setting forth the process by which the Debtors are authorized to solicit bids for and conduct an auction (the "Auction"), if any,

---

[1]    The last four digits of Genesis Healthcare, Inc.'s federal tax identification number are 4755.  There are 291 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only.  A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Genesis.   The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

[2]    All capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Bidding Procedures Order.

and ultimately select a purchaser for the sale of all or substantially all of the Debtors' assets or any portion thereof (such sale(s), the "Transaction(s)").

The Bidding Procedures Order also authorized, among other things, the Debtors' entry into that certain Asset Purchase Agreement, dated [_____] (as amended, supplemented, or otherwise modified by the parties thereto, the "Stalking Horse APA")[3] between the Debtors and CPE 88988 LLC (the "Stalking Horse Bidder" and, the Stalking Horse Bidder's bid, the "Stalking Horse Bid"), pursuant to which the Stalking Horse Bidder has agreed to acquire substantially all of the Assets of the Debtors and to assume certain liabilities of the Debtors, each as specifically enumerated in the Stalking Horse APA and subject to the terms and conditions set forth therein. The Stalking Horse Bid is subject to higher and better bids in accordance with the terms and conditions of these Bidding Procedures.

Any Transaction will be implemented pursuant to Bankruptcy Code section 363.

> Copies of the Bidding Procedures Order or any other documents in the Debtors' Chapter 11 Cases are available upon request to Epiq Corporate Restructuring, LLC by calling 888-861-3979 (U.S./Canada) or +1 971-306-9937 (international) or visiting the Debtors' restructuring website at https://dm.epiq11.com/Genesis.

## II.   Assets to be Auctioned.

The Debtors are seeking to sell all of their assets, or any portion thereof, to the person or entity making the most value maximizing bid through the process outlined in these Bidding Procedures. These assets include, but are not limited to, the Debtors' going-concern business, unexpired leases, executory contracts, equipment, inventory, supplies, intellectual property, insurance proceeds, prepaid expenses and deposits, and books and records, in each case, free and clear of all liens, claims, interests, or other encumbrances (collectively, the "Assets").

## III.   Public Announcement of Auction.

Within two (2) business days after entry of the Bidding Procedures Order, the Debtors shall serve on the parties that received notice of the Motion (i) the Bidding Procedures Order and the Bidding Procedures and (ii) a notice setting forth (A) the date, time, and place of the Auction and the hearing to consider the approval of the Transaction(s) and (B) the deadlines and procedures for objecting to the proposed Transaction(s) in the form attached hereto as **Schedule 1** (the "Auction Notice"). Within three (3) business days after entry of the Bidding Procedures Order, the Debtors shall publish the Auction Notice, with any modifications necessary for ease of publication, on one occasion in *The New York Times* (National Edition), the *Wall Street Journal*, or *USA Today* to provide notice to any other potential interested parties, and (iii) post the Auction Notice on their case website, https://dm.epiq11.com/Genesis.

---

[3]   A copy of the Stalking Horse APA is attached to the Bidding Procedures Order as Exhibit 2.

IV.    **Potential Bidder Requirements.**

To participate in the bidding process or otherwise be considered for any purpose hereunder, including to receive access to due diligence materials, a person or entity interested in purchasing the Assets or part of the Assets (a "Potential Bidder") must deliver or have previously delivered to the Debtors the following preliminary documentation (collectively, the "Preliminary Bid Documents"):

a.    an executed confidentiality agreement (a "Confidentiality Agreement") in form and substance acceptable to the Debtors;

b.    a statement describing which portion of the Assets the Potential Bidder intends to acquire;

c.    information sufficient to establish that the Potential Bidder has or can reasonably obtain the financial capacity to close a purchase of any portion, all, or substantially all of the Debtors' Assets, the adequacy of which must be acceptable to the Debtors, in consultation with the Consultation Parties;[4] and

d.    a statement detailing whether the Potential Bidder is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, the identity of any such party or parties, and a concise description of the nature of such partnership or joint bid to the extent reasonably practicable.

The Debtors, in consultation with their advisors and the Consultation Parties, will determine and notify each Potential Bidder whether such Potential Bidder has submitted adequate documents so that such Potential Bidder may proceed to conduct due diligence and submit a bid (such Potential Bidder, an "Acceptable Bidder").

V.    **Qualified Bid Requirements.**

To participate in the Auction, an Acceptable Bidder must deliver to the Debtors and their advisors an irrevocable offer for the purchase of some or all of the Assets (each, a "Bid"), and shall meet the following criteria, in each case, on or prior to the Bid Deadline (as defined below):

a.    **Purchased Assets and Assumed Liabilities**:  Each Bid must clearly state the following:  (a) the particular Assets, or the portion thereof, identified with

---

[4]    "Consultation Parties" means the Debtors' prepetition secured lenders (White Oak, Welltower, Omega, WAX, and MAO) and DIP Lenders and any statutory committee appointed in these cases; *provided, however*, that to the extent any of the Consultation Parties submit a Bid, including a credit bid (a "Credit Bid"), for any Assets, or otherwise intends to submit a Bid, or otherwise is intended to receive a release solely in connection with any Bid, such Consultation Party shall not be (x) a Consultation Party with respect to the evaluation and qualification of competing Bids for such Assets included in the Consultation Party's Bid, including a Credit Bid, or  with respect to seeking and/or obtaining information about other Bids, but shall remain a Consultation Party for other purposes set forth in the Bidding Procedures and Bidding Procedures Order or (y) entitled to the consent rights set forth in the Bidding Procedures for the DIP Lenders.  For the avoidance of doubt, any of the Consultation Parties that (i) do not submit a Credit Bid and (ii) do not have a financial interest in any Potential Bidder that submits a Credit Bid shall remain Consultation Parties and/or be entitled to the consent rights set forth in the Bidding Procedures.

reasonable specificity to be purchased and/or liquidated or otherwise disposed of (including, without limitation, estate claims and causes of action); (b) the liabilities and obligations to be assumed, including any debt and Cure Costs (as defined below) to be assumed; and (c) any executory contracts (the "<u>Executory Contracts</u>") and any unexpired leases (the "<u>Unexpired Leases</u>") to be received by assignment. For the avoidance of doubt, a Bid need not provide for the purchase of any estate claims and causes of action to constitute a Qualified Bid;

b.    **Good Faith Deposit**: The Bid must be accompanied by a cash deposit in the amount equal to ten percent (10%) of the aggregate Purchase Price (as defined below) of the Bid (or in the event of a Credit Bid, ten percent (10%) of the cash component of the Bid) to be held in an interest-bearing escrow account to be identified and established by the Debtors (the "<u>Good Faith Deposit</u>"). To the extent that a Bid is modified at or prior to the Auction, the applicable Acceptable Bidder must adjust its Good Faith Deposit so that it equals ten percent (10%) of the increased aggregate Purchase Price promptly and in no event later than one business day following the conclusion of the Auction;

c.    **Purchase Price**: Each Bid must (a) clearly set forth the purchase price to be paid, assuming a purchase of the applicable Assets and any assumption of liabilities (the "<u>Purchase Price</u>") and (b) identify separately the cash and non-cash components of the Purchase Price. Any Bid for substantially all of the Assets must also include a statement as to whether the Bid is conditioned on purchasing all Assets or whether the Qualified Bid should be viewed as a separate Bid for one or more sets of Assets. The Debtors reserve the right, in consultation with the Consultation Parties, to ask any Acceptable Bidder to allocate the value ascribed to a Bid for any particular Asset and to inquire about any significant assumptions on which such valuations are based;

d.    **Sources of Financing**: To the extent that the Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Transaction(s) set forth in its Bid with cash on hand, the Bid must include committed financing, documented to the Debtors' satisfaction (in consultation with the Consultation Parties), that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's obligations under the proposed Transaction(s) and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors;

e.    **Same or Better Terms; Bid Documents**: Each Bid must include duly executed and non-contingent, where applicable, transaction documents necessary to effectuate the transactions contemplated in the Bid (the "<u>Bid Documents</u>"). The Bid Documents shall include: (a) a purchase agreement, based on the Stalking Horse APA, duly executed by such bidder, containing only changes to the Stalking Horse APA that are reasonably necessary to effectuate the Bid, (b) a schedule of contracts and leases to be assumed or rejected to the extent applicable to the Bid,

4

(c) with respect to the form of purchase agreement, a redline of such agreement marked to reflect the amendments and modifications made to the Stalking Horse APA, (d) any other material documents integral to such Bid, and (e) a statement from the Acceptable Bidder that (i) it is prepared to enter into and consummate the transactions contemplated in the purchase agreement based on the Stalking Horse APA as soon as reasonably practicable after the conclusion of the Auction, subject to any necessary regulatory approvals, as specified by the Acceptable Bidder (or, if no Auction is held, the deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures (the "Bid Deadline")) and (ii) the Qualified Bid will be irrevocable (whether or not such Qualified Bid is selected as the highest or otherwise best bid to purchase the applicable Assets (each, a "Successful Bid") or next highest or otherwise best bid (the "Back-Up Bid") until the consummation of the Transaction(s));

f. **No Qualified Bidder Bid Protections**: A Qualified Bid must include a statement that the bid does not entitle such bidder to any break-up fee, termination fee, expense reimbursement, or similar type of payment or reimbursement and a waiver of any substantial contribution administrative expense claim under Bankruptcy Code section 503(b) related to bidding for the applicable Assets;

g. **Employee Obligations**: Each Bid must indicate whether the Acceptable Bidder intends to hire all employees of the Debtors or otherwise indicate its intentions with respect to the employees of the Debtors;

h. **Authorization**: Each Bid must contain evidence that the Acceptable Bidder has obtained all necessary authorizations or approvals from its shareholders and/or its board of managers or directors, or any other internal and other approvals, as applicable, with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid;

i. **Contingencies; No Financing or Diligence Outs**: The Bid must not contain any contingencies as to the validity, effectiveness, or binding nature of the Bid, including, without limitation, contingencies for due diligence and inspection or financing of any kind (including any conditions pertaining to financial performance, conditions, or prospects) and all diligence must be completed before the Bid Deadline;

j. **Identity**: Each Bid must fully disclose the identity of each entity and each entity's shareholders, partners, investors, or ultimate controlling entities that will be bidding for or purchasing the applicable Assets or otherwise participating in connection with such Bid, including each equity holder or other financial backer of the bidder (including if such bidder is an entity formed for the purpose of consummating the transactions contemplated by such Bid), and the complete terms of any such participation, along with sufficient evidence that the Acceptable Bidder is legally empowered to complete the transactions on the terms contemplated by the parties. Each Bid must also include contact information for the specific person(s) whom

5

Jefferies, LLC ("<u>Jefferies</u>") and McDermott Will & Emery LLP should contact regarding such Bid;

k.    **As-Is, Where-Is**:  Each Bid must include a written acknowledgement and representation that the Acceptable Bidder:  (i) has had an opportunity to conduct any and all due diligence regarding the Transaction(s) prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the assets in making its Bid; (iii) did not rely on or receive from any person or entity (including any of the Debtors or their advisors or other representatives) any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the completeness of any information provided in connection therewith or the Auction (if any), except as expressly stated in the Acceptable Bidder's asset purchase agreement; and (iv) did not engage in collusive conduct and acted in good faith in submitting its Bid;

l.    **Joint Bids and Merger Proposals**:  The Debtors will be authorized to approve joint bids in their reasonable business judgment and in consultation with the Consultation Parties, including, but not limited to, any bids that contemplate acquiring equity or assets through a merger or similar transaction, including if a proposed bid contemplates additional financing from one or several participating parties, on a case by case basis, so long as such bid meets the Qualified Bid requirements and the applicable bidders otherwise comply with these Bidding Procedures;

m.    **Qualifications to Operate Skilled Nursing Facilities**:  Each Bid must provide background on the Acceptable Bidder and its qualifications to operate skilled nursing facilities ("<u>SNFs</u>"), including:

(i)    Operating history of Acceptable Bidder;

(ii)    The number of SNFs that the Acceptable Bidder currently operates;

(iii)    The Acceptable Bidder's ownership structure and corporate organization chart;

(iv)    The principal biographies of senior management of the Acceptable Bidder; and

(v)    A summary of material survey issues, any investigations, or corporate integrity agreements related to the Acceptable Bidder's existing operations, if any.

n.    **Adequate Assurance of Future Performance**:  Each Bid must (i) identify the Executory Contracts and Unexpired Leases to be assumed or assumed and assigned in connection with the proposed Transaction(s), (ii) provide for the payment of all cure amounts (the "<u>Cure Amounts</u>") related to such Executory Contracts and Unexpired Leases by the Acceptable Bidder, (iii) demonstrate, in the Debtors'

6

reasonable business judgment and in consultation with the Consultation Parties, that the Acceptable Bidder can provide adequate assurance of future performance under all such Executory Contracts and Unexpired Leases sufficient to satisfy the requirements of Bankruptcy Code sections 365(b)(3) and 365(f)(2)(B), and (iv) provide the following documentation:

(i)     The proposed assignee (the "Proposed Assignee") and any guarantors, as applicable;

(ii)    Financial statements for the calendar or fiscal years ended 2023 and 2024 for the Proposed Assignee and any guarantors, as applicable, and other financial information about the Proposed Assignee to demonstrate its ability to provide adequate assurance of future performance; and

(iii)   Summary of the Proposed Assignee's proposed use of the premises.

o.      **Stalking Horse Bidder is a Qualified Bidder**.  For the avoidance of doubt, the Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse APA is a Qualified Bid.

p.      **DIP Lenders are Qualified Bidders**:  Each DIP Lender is deemed to be a Qualified Bidder; *provided* that, any DIP Lender that does not submit a Credit Bid and does not have a financial interest in the Potential Bidder that submits a Credit Bid shall remain a Consultation Party.

q.      **Acknowledgement of Compliance with Bidding Procedures, Bidding Order, Bankruptcy Code, and Non-Bankruptcy Law**:  Each Bid must acknowledge that the Acceptable Bidder has complied, and will continue to comply, in all respects with these Bidding Procedures, the Bidding Procedures Order, the Bankruptcy Code, and any applicable non-bankruptcy law;

r.      **No Collusion**:  The Acceptable Bidder must (a) acknowledge in writing that it has not engaged in any collusion with respect to any Bids or the Transaction(s), specifying that it did not agree with any Acceptable Bidders or Potential Bidders to control price or otherwise with respect to any of the Assets or the Transaction(s) and processes contemplated by the Bidding Procedures; and (b) agree not to engage in any collusion with respect to any Bids, the Auction, or the Transaction(s); *provided, however*, that nothing shall limit or impair the ability of the DIP Lenders to submit a joint Bid or otherwise engage in discussions or negotiations regarding a Bid.  The Acceptable Bidder must further indicate if it has or intends to coordinate its bid, or otherwise bid with, any current or former member of the Debtors' or their affiliates' executive management or board of directors.  For the avoidance of doubt, this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent (email shall suffice);

s.      **Good Faith Offer**:  The Bid must constitute a good faith, *bona fide* offer to consummate the Transaction(s);

7

t.      **Irrevocable**:  Each Bid must state that in the event such Bid is chosen as the Back-Up Bid (as defined below), it shall remain irrevocable until the Debtors and the Successful Bidder consummate the applicable Transaction(s);

u.      **Back-Up Bid**:  Each Bid shall provide that the Acceptable Bidder will serve as a Back-Up Bidder (as defined below) if the Acceptable Bidder's Bid is the next highest or otherwise best bid with respect to the applicable Assets;

v.      **Regulatory and Third-Party Approvals and Covenants**:  A Bid must set forth each regulatory and third-party approval, if any, required for the Acceptable Bidder to consummate the applicable Transaction(s), the time period within which the Acceptable Bidder expects to receive such regulatory and third-party approvals, and those actions the Acceptable Bidder will take to ensure receipt of such approvals as promptly as possible;

w.      **Expected Closing Date and Time Frame for Closing**:  Each Bid must state the Acceptable Bidder's expected date of closing of the Transaction(s) (the "Closing") and must be reasonably likely (based on antitrust or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, within a time frame acceptable to the Debtors in consultation with the Consultation Parties and in compliance with the DIP Milestones (unless otherwise consented to by the DIP Lenders).

x.      **No Fees**:  Each Acceptable Bidder presenting a Bid or Bids will bear its own costs and expenses (including legal fees) in connection with the proposed transaction, and by submitting its Bid(s) is agreeing to disclaim any right to receive any payments or amounts analogous to a break-up fee, expense reimbursement, termination fee, or other similar form of compensation;

For the avoidance of doubt, each Acceptable Bidder by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under Bankruptcy Code section 503(b); *provided* that the Debtors are authorized to provide the Expense Reimbursement to the Stalking Horse Bidder in connection with the Stalking Horse APA;

y.      **Adherence to Bidding Procedures**:  By submitting its Bid, each Acceptable Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction;

z.      **Consent to Jurisdiction**:  The Acceptable Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, the Auction, the Transaction(s), and the construction and enforcement of these Bidding Procedures, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Transaction(s), the Closing, and any other related matter; and

aa.     **Conditions to Closing**:  Each Bid must identify with particularity each and every condition to closing, including the Executory Contract and Unexpired Leases for which assumption and assignment is required.

Only Bids fulfilling all of the preceding requirements contained in this section as determined or otherwise waived in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, may be deemed to be qualified bids (the "Qualified Bids"), and only those parties submitting Qualified Bids, in the Debtors' reasonable business judgment and in consultation with the Consultation Parties, may be deemed to be qualified bidders (the "Qualified Bidders").  The Bids received by the Debtors shall be shared with the Consultation Parties that are not Potential Bidders within a reasonable time after receipt by the Debtors, but in no event no later than twenty-four (24) hours after receipt.

Neither the Debtors nor any of their advisors are making or have at any time made, and no bidder, Potential Bidder, or Acceptable Bidder, including any Qualified Bidder, has relied, is relying, or shall rely on any warranties or representations of any kind or character, express or implied, with respect to the Assets, including, but not limited to, any warranties or representations as to operating history or projections, valuation, governmental approvals, the compliance of the Assets with governmental laws, the truth, accuracy, or completeness of any documents related to the Assets, or any other information provided by or on behalf of the Debtors to a bidder, or any other matter or thing regarding the Assets, except as expressly stated in the Acceptable Bidder's purchase agreement.  All bidders must acknowledge and agree that upon closing the Debtors shall sell and transfer to the Successful Bidder and the Successful Bidder shall accept the applicable Assets to the extent expressly provided in the Court's order approving the Transaction(s).  Neither the Debtors nor any of their advisors will be liable for or bound by any express or implied warranties, guaranties, statements, representations, or information pertaining to the Assets or relating thereto that the Debtors, any advisor, or agent representing or purporting to represent the Debtors to whomever might have made or furnished, directly or indirectly, orally or in writing, unless (with respect to the Debtors only) specifically set forth in the Court's order approving the Transaction(s).

There shall be no communications between or among Potential Bidders and/or Acceptable Bidders, including Qualified Bidders, unless the Debtors' advisors (in consultation with the Consultation Parties) have authorized such communication in writing.  The Debtors reserve the right, in their reasonable business judgment, to disqualify any Potential Bidders or Acceptable Bidders that have communications between or amongst themselves without the prior authorization of the Debtors' advisors.  For the avoidance of doubt, the joining of Bids between Potential Bidders or Acceptable Bidders may be permitted by the Debtors in their reasonable business judgement, in consultation with the Consultation Parties.

As soon as practicable after the Bid Deadline and in any event prior to the Auction, the Debtors shall determine, in consultation with the Consultation Parties, which Acceptable Bidders are Qualified Bidders and will notify the Acceptable Bidders whether Bids submitted constitute Qualified Bids, which will enable such Qualified Bidders to participate in the Auction.  Any Bid that is not deemed a Qualified Bid shall not be considered by the Debtors; *provided* that if the Debtors receive a Bid prior to the Bid Deadline that does not satisfy the requirements of a Qualified

9

Bid, the Debtors may provide the Acceptable Bidder with the opportunity and work with the Acceptable Bidder to remedy any deficiencies prior to the Auction.

## VI.    **Right to Credit Bid**

Any party that has a valid and perfected lien on any of the Assets (a "Secured Creditor") shall have the right to submit Credit Bids consisting of all or a portion of the value of such Secured Creditor's claims within the meaning of Bankruptcy Code section 363(k); *provided* that a Secured Creditor shall have the right to Credit Bid its claim only with respect to the collateral by which such Secured Creditor's claim is secured.

Any Credit Bid made by a Secured Creditor will be deemed to be a cash Bid solely for purposes of the Debtors' evaluation of Bids (including the Debtors' evaluation of Qualified Bids and Subsequent Bids); *provided, however*, that any Credit Bid must include a cash component and wind-down budget as part of such Credit Bid.  Any Secured Creditor shall be deemed to be an Acceptable Bidder, shall be deemed to have submitted a Qualified Bid, and may participate in any Auction with respect to any assets constituting collateral of such Secured Creditor without the requirement to submit a Good Faith Deposit or any Bid Documents other than a marked form of the Stalking Horse APA; *provided* that no other party other than the Prepetition Secured Parties (as defined in the Interim DIP Order) may Credit Bid on the Collateral (as defined in the Interim DIP Order) unless the entire amount of the Prepetition Secured Obligations (as defined in the Interim DIP Order) will be paid in full in cash on the closing of such Credit Bid transaction.  No Secured Creditor submitting a Credit Bid shall be required to submit a Good Faith Deposit or any Bid Documents.

## VII.    **Obtaining Due Diligence Access.**

Only Acceptable Bidders shall be eligible to receive due diligence information, access to the Debtors' electronic data room, and additional non-public information regarding the Debtors. *No Acceptable Bidder will be permitted to conduct any due diligence without entry into a Confidentiality Agreement*.  Beginning on the date the Debtors determine that a party is an Acceptable Bidder, or as soon as reasonably practicable thereafter, the Debtors will provide such Acceptable Bidder with access to an electronic data room and reasonable due diligence information, as requested by such Acceptable Bidder, as soon as reasonably practicable after such request.  The Debtors shall post substantially all written due diligence provided to any Acceptable Bidder to the Debtors' electronic data room for the benefit of all Acceptable Bidders, subject to the further provisions below.

Acceptable Bidders will not, directly, or indirectly, contact or initiate or engage in discussions in respect of matters relating to the Debtors or a potential transaction with any customer, supplier, or other contractual counterparty of the Debtors without the prior written consent of the Debtors.  The due diligence period will end on the Bid Deadline, and subsequent to the Bid Deadline the Debtors shall have no obligation to furnish any due diligence information.

In connection with the provision of due diligence information to Acceptable Bidders, the Debtors shall not furnish any confidential information relating to the Debtors or a potential

transaction to any person except an Acceptable Bidder or such Acceptable Bidder's duly authorized representatives to the extent provided in an applicable Confidentiality Agreement.

The Debtors and their advisors shall coordinate all reasonable requests for additional information and due diligence access from Acceptable Bidders; *provided* that the Debtors may decline to provide such information to Acceptable Bidders who, in the Debtors' reasonable business judgment have not established, or who have raised doubt, that such Acceptable Bidders intend in good faith to, or have the capacity to, consummate a Transaction(s). For any bidder who is a competitor or customer of the Debtors or is affiliated with any competitors or customers of the Debtors, or otherwise presents a *bona fide* competitive or strategic concern, the Debtors reserve the right, in consultation with the Consultation Parties, to withhold or modify any diligence materials that the Debtors determine are business-sensitive or otherwise inappropriate for disclosure to such bidder.

The Debtors shall keep the Consultation Parties reasonably informed of all interested parties that become Acceptable Bidders and the status of their due diligence.

### A.   Communications with Acceptable Bidders (including Qualified Bidders).

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive direct communications, including any diligence requests, with Acceptable Bidders (including any Qualified Bidders) shall be through Jefferies.

### B.   Due Diligence from Acceptable Bidders (including Qualified Bidders).

Each Acceptable Bidder (including any Qualified Bidder) shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors and their respective advisors, regarding the ability of such Acceptable Bidder (including any Qualified Bidder) to consummate its contemplated transaction. Failure by an Acceptable Bidder (including any Qualified Bidder, other than the Stalking Horse Bidder, if any) to comply with such reasonable requests for additional information and due diligence access may be a basis for the Debtors to determine that such bidder is no longer an Acceptable Bidder (including any Qualified Bidder, other than the Stalking Horse Bidder, if any) or that a bid made by such bidder is not a Qualified Bid.

> **Jeffrey Finger, Jaspinder Kanwal, and James Burgoyne at Jefferies, LLC shall coordinate all requests for additional information and due diligence access on behalf of the Debtors. They can be reached at (project.genie.core@jefferies.com).**

## VIII.   <u>Bid Deadline.</u>

Binding Bids must be submitted in writing to the following parties (the "<u>Bid Notice Parties</u>") so as to be **actually received** no later than 12:00 p.m., prevailing Central Time, on October 6, 2025 (the "<u>Bid Deadline</u>").

(i)   proposed counsel to the Debtors, McDermott Will & Emery LLP, 2501 North Harwood Street, Suite 1900, Dallas, TX 75201 (Attn: Marcus A. Helt

(mhelt@mwe.com) and Jack G. Haake (jhaake@mwe.com)), and 1180 Peachtree St. NE, Suite 3350, Atlanta, GA 30309 (Attn: Daniel M. Simon (dsimon@mwe.com)), and 444 West Lake Street, Suite 4000, Chicago, IL 60606 (Attn: William A. Guerrieri (wguerrieri@mwe.com) and Emily C. Keil (ekeil@mwe.com)); and

(ii)     the Debtors' proposed investment banker, Jefferies, LLC, 520 Madison Avenue, 6th Floor, New York, NY 10022 (Attn: Jeffrey Finger, Jaspinder Kanwal, and James Burgoyne (project.genie.core@jefferies.com)).

The Debtors may extend the Bid Deadline for any reason whatsoever, in their reasonable business judgment, in consultation with the Consultation Parties, for all or certain Acceptable Bidders; *provided*, *however*, that that any changes to the dates and deadlines set forth herein shall comply with the DIP Milestones (unless otherwise consented to by the DIP Lenders).

## IX.     Evaluation of Qualified Bids.

The Debtors shall evaluate Qualified Bids and identify the Qualified Bid that is, in the Debtors' reasonable business judgment, in consultation with the Consultation Parties, the highest or otherwise best Qualified Bid or combination of Qualified Bids for any Assets (the "Starting Bid"). The Debtors shall promptly (and in no event later than twenty-four (24) hours after receipt by the Debtors) provide to the Office of the United States Trustee for Region 6 (the "U.S. Trustee") and the Consultation Parties copies of all Bids received by the Debtors, including the Starting Bid; *provided* that the U.S. Trustee and the Consultation Parties must treat such Bids and any related information as confidential and shall not publicly disclose such information without the written consent of the Debtors and the applicable bidder.

## X.     Expense Reimbursement.

Pursuant to the Bidding Procedures Order, the Stalking Horse Bidder is entitled to the Expense Reimbursement on the terms set forth in the Stalking Horse APA, in an amount up to $750,000.

Except as otherwise set forth herein, no person or entity, shall be entitled to any expense reimbursement, breakup fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature, whether by virtue of Bankruptcy Code section 503(b) or otherwise.

## XI.     No Qualified Bids.

If no Qualified Bids other than the Stalking Horse Bid are received for the Assets included in the Stalking Horse Bid by the applicable Bid Deadline, then the Debtors may cancel the Auction with respect to such Assets in consultation with the Consultation Parties. If the Stalking Horse Bid is the only Qualified Bid received by the applicable Bid Deadline, the Debtors may decide, in their reasonable business judgment, and in consultation with the Consultation Parties, to designate the Stalking Horse Bid as the Successful Bid as to the applicable Assets and pursue entry of an order approving a Transaction(s) with respect to such Assets to the Stalking Horse Bidder pursuant

to the Stalking Horse APA.  The Debtors shall promptly file notice of any cancellation of the Auction and/or designation of the Stalking Horse Bid, where applicable, as the Successful Bid with the Court.

## XII.    **Auction.**

Other than as expressly set forth herein, if the Debtors receive more than one Qualified Bid for any particular Asset or portion of Assets by the Bid Deadline, the Debtors shall conduct an Auction to determine the Successful Bidder (or Back-Up Bidder, as applicable) in their reasonable business judgment, in consultation with the Consultation Parties, with respect to such Assets or portion of Assets in accordance with the Auction Procedures (defined below).  If the Debtors do not receive a Qualified Bid other than the Stalking Horse Bid for any particular Asset by the applicable Bid Deadline, the Debtors will not conduct an Auction with respect to such Asset.

If the Debtors determine, in consultation with the Consultation Parties, that they have received no Qualified Bids other than the Stalking Horse Bid, then the Auction will not occur, and the Stalking Horse Bid or the Qualified Bid will be deemed to be the Successful Bid for the Assets to which the Stalking Horse Bid relates.  The Debtors shall file a notice with the Court within one business day of making such a determination.

The Auction, if necessary, shall commence on October 9, 2025, at 10:00 a.m., prevailing Central Time, or such other time or other place as the Debtors determine in consultation with the Consultation Parties.

The Auction will be conducted in accordance with the following procedures (the "Auction Procedures"):

a.    only Qualified Bidders may participate in or make subsequent Bids at the Auction;

b.    only the Debtors, Qualified Bidders, the Consultation Parties, the U.S. Trustee, and such parties' representatives and advisors may attend the Auction; *provided* that Qualified Bidders may appear through a duly authorized representative (other than their counsel) bearing a valid and enforceable power of attorney or other written proof evidencing their ability to bind the applicable Qualified Bidder, which document(s) shall be delivered to the Debtors prior to the commencement of the Auction;

c.    the Debtors, with the assistance of their advisors, shall direct and preside over any Auction;

d.    at the commencement of the Auction, the Debtors may announce modified or additional procedures for conducting the Auction and related rules governing the Auction, including time periods available to all Qualified Bidders to submit successive bid(s), or otherwise modify the Bidding Procedures, in each case in consultation with the Consultation Parties *provided* that material modifications to the Auction Procedures may only be made with the consent of the DIP Lenders (not to be unreasonably withheld, delayed, or conditioned);

13

e.      bidding shall begin with the Starting Bid;

f.      subsequent bids (each, an "Overbid") may only be made at the Auction and shall be at least (i) a two percent (2%) increase in cash, cash equivalents, or other such consideration that the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, deem equivalent (including the right of any Secured Creditor to Credit Bid any remaining amounts of its secured claim in accordance with these Bidding Procedures) over the previous bid *plus* (ii) solely with respect to the first Overbid, the amount of the Expense Reimbursement under the Stalking Horse APA (a "Minimum Overbid"), and each successive Overbid shall exceed the then-existing Overbid by an incremental amount that is not less than the Minimum Overbid. The Debtors may, in their reasonable business judgment and in consultation with the Consultation Parties announce increases or reductions to the Minimum Overbid at any time during any Auction. For the avoidance of doubt, each successive Bid that a Qualified Bidder may submit at any Auction must contain a Purchase Price in cash, cash equivalents, or such other consideration that the Debtors, in their reasonable business judgment, in consultation with the Consultation Parties, deem equivalent (including the right of any Secured Creditor to Credit Bid any remaining amounts of its secured claim in accordance with these Bidding Procedures) that exceeds the then-existing highest Bid by at least the amount of the Minimum Overbid;

g.      each Qualified Bidder will be permitted a reasonable time to respond to previous bids at the Auction, as determined by the Debtors;

h.      during the course of the Auction, the Debtors shall, after submission of each Overbid, promptly inform each Qualified Bidder of the terms of such Overbid and inform each Qualified Bidder whether such Overbid reflects, in the Debtors' view, in consultation with the Consultation Parties, the then highest or otherwise best bid(s) for the applicable Assets;

i.      to remain eligible to participate in the Auction, in each round of bidding, each Qualified Bidder must submit an Overbid with respect to such round of bidding and to the extent a Qualified Bidder fails to submit an Overbid with respect to such round of bidding, such Qualified Bidder shall be disqualified from continuing to participate in the Auction; *provided* that the Debtors may waive such requirement in their reasonable business judgment in consultation with the Consultation Parties;

j.      the Auction will be transcribed to ensure an accurate recording of the bidding at the Auction;

k.      each Qualified Bidder will be required to confirm on the record that it has not engaged, and will not engage, in any collusion with respect to the bidding or any Transaction(s). For the avoidance of doubt, this requirement does not restrict Qualified Bidder(s) from working with other Qualified Bidder(s) with the Debtors' prior written consent, and the Debtors provide their consent for the DIP Lenders to work together in submitting a Bid;

14

l.      each Qualified Bidder will be required to confirm on the record that its bid is a good faith, *bona fide* offer and it intends to consummate the Transaction(s) if selected as the Successful Bid in accordance with these Bidding Procedures (as may be modified in accordance herewith at the Auction);

m.      subject to each Debtor's fiduciary obligations, including as set forth herein, the Debtors will not consider bids made after the Auction has been closed;

n.      the Debtors, in their reasonable business judgment in consultation with the Consultation Parties, may (a) determine which Qualified Bid is the highest or otherwise best offer, (b) reject, at any time before entry of an order of the Court approving a Successful Bid, any Bid that the Debtors determine is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Transaction(s), or (iii) contrary to the best interests of the Debtors, their estates, their creditors, and other stakeholders, and (c) impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these Chapter 11 Cases;

o.      the Debtors have the right to request any additional information that will allow the Debtors to make a reasonable determination as to a Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by their proposal and any further information that the Debtors believe is reasonably necessary to clarify and evaluate any Bid made by a Qualified Bidder during the Auction;

p.      the Debtors reserve the right, in their reasonable business judgment in consultation with the Consultation Parties, to adjourn the Auction one or more times to, among other things, (a) facilitate discussions between the Debtors and Qualified Bidders, (b) allow Qualified Bidders the opportunity to consider how they wish to proceed, and (c) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing amount;

q.      notwithstanding anything herein to the contrary, the Debtors, in consultation with the Consultation Parties, may at any time choose to adjourn the Auction by announcement at the Auction.  The Debtors shall promptly file notice of such adjournment with the Court; and

r.      the Debtors, in consultation with the Consultation Parties, reserve the right to further amend, waive, or otherwise modify the Auction Procedures at any time.

For the avoidance of doubt, nothing in the Auction Procedures will prevent the Debtors from exercising their respective fiduciary duties under applicable law (as reasonably determined in good faith by the Debtors, in consultation with counsel).

# XIII.    Acceptance of the Successful Bid.

The Auction shall continue until (i) there is only one Qualified Bid or a combination of Qualified Bids that the Debtors determine, in their reasonable business judgment, with the consent of the DIP Lenders (not to be unreasonably withheld, delayed or conditioned) and in consultation with the Consultation Parties, and in a manner consistent with the exercise of their fiduciary duties and outlined below in further detail, is the Successful Bid, and (ii) the Debtors determine, in their reasonable business judgment in consultation with the Consultation Parties, that further bidding is unlikely to result in a different Successful Bid or Successful Bids that would be reasonably acceptable to the Debtors, at which point, the Auction will be closed.

When determining the highest or otherwise best Qualified Bid, as compared to other Qualified Bids, the Debtors, in consultation with the Consultation Parties, may consider the following factors in addition to any other factors the Debtors deem appropriate: (a) the amount and nature of the total consideration, which includes but is not limited to, assumed liabilities (administrative liabilities, Cure Costs), and the amount of Executory Contracts and Unexpired Leases that will be assumed; (b) the likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof; (c) the net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents; (d) the Debtors' regulatory requirements; (e) the tax consequences of such Qualified Bid; (f) the certainty of a Qualified Bid leading to a confirmed chapter 11 plan; (g) operating history, including financial performance and any material survey issues, any investigations, or corporate integrity agreements related to the Qualified Bidder's operations; and (h) any other consideration that may impact the Debtors' stakeholders.

Any Qualified Bidder that submits a Successful Bid will be deemed a successful bidder (the "Successful Bidder") with respect to the Assets contemplated for the purchase pursuant to such Successful Bid.  The Debtors shall file notice of the Successful Bid and the Successful Bidder with the Court within two (2) business days after conclusion of the Auction.  Following conclusion of the Auction (if any) and selection of a Successful Bidder, the Debtors shall present the results of the Auction (if any) at the Sale Hearing and shall seek Court approval to enter into a binding purchase agreement with the Successful Bidder on the terms of the Successful Bid (the order approving such entry, the "Definitive Purchase Agreement Order").  For the avoidance of doubt, the Definitive Purchase Agreement Order shall deem the Debtors' selection of the Successful Bid final and, subject to the designation of the Back-Up Bid, the Debtors shall not solicit and /or accept any further bids or offers to submit a bid after such selection; *provided* that, notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any Debtor to take or refrain from taking any action that the Debtors determined in good faith, in consultation with counsel, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Within one business day of the selection of the Successful Bidder, such Successful Bidder (including both the Stalking Horse Bidder, if any, and Back-Up Bidder, if applicable) shall make a cash deposit, in addition to its Good Faith Deposit, in an amount calculated on the basis of the increased aggregate purchase price, submitted by wire transfer of immediately available funds to an escrow account to be identified and established by the Debtors pursuant to a customary and

reasonable escrow agreement.  Each Successful Bidder and the Debtors shall, as soon as reasonably practicable, complete and sign all agreements, contracts, instruments, or other documents evidencing and containing the terms upon which each such Successful Bid was made.

## XIV.   Designation of Back-Up Bidder.

The Back-Up Bid to purchase any applicable Assets (the "Back-Up Bidder") will be determined by the Debtors, with the consent of the DIP Lenders (not to be unreasonably withheld, delayed or conditioned) and in consultation with the Consultation Parties, at the conclusion of the Auction and will be announced at that time to all the Qualified Bidders participating in the Auction. The Debtors' selection of a Back-Up Bid shall be deemed final, and the Debtors shall not accept any further bids or offers to submit a bid after such selection; *provided* that, notwithstanding anything to the contrary in these Bidding Procedures, nothing in these Bidding Procedures shall require the board of directors, board of managers, or such similar governing body of any Debtor to take or refrain from taking any action that the Debtors determined in good faith, in consultation with counsel, would be inconsistent with applicable law or its fiduciary obligations under applicable law.   The Debtors will be authorized, but not required, to consummate the Transaction(s) with the Back-Up Bidder without further order of the Court, so long as such Back-Up Bid shall have been approved in connection with the Court's approval of the Successful Bid, or subject to Court approval if not.

If for any reason a Successful Bidder fails to consummate the purchase of such assets within the time permitted, then the Back-Up Bidder will automatically be deemed to have submitted the Successful Bid for such assets, and the Back-Up Bidder shall be deemed a Successful Bidder for such assets and shall be required to consummate any Transaction(s) with the Debtors as soon as is reasonably practicable without further order of the Court, upon twenty-four (24) hours' advance notice filed with the Court.  To the extent any objections are raised and remain unresolved, the Court may schedule a hearing on an expedited basis to adjudicate such objection.

The Back-Up Bid shall remain open and irrevocable until the earliest to occur of (i) ninety (90) days following the hearing to consider the applicable order approving the Transaction(s) (the "Sale Order"), (ii) consummation of a Transaction(s) with one or more Successful Bidders at an Auction, and (iii) the release of such Back-Up Bid by the Debtors in writing (the "Back-Up Termination Date"); *provided* that the Back-Up Termination Date shall be subject to the terms and conditions set forth in the Stalking Horse APA.  The Debtors shall return the Back-Up Bidder's deposit owed within five (5) business days of the Back-Up Termination Date.

## XV.   Approval of the Transaction(s).

A hearing to consider approval of each Transaction(s) (the "Sale Hearing"), is currently scheduled to take place on [October 16, 2025, at 9:30 a.m.], prevailing Central Time, before the Honorable Stacey G. Jernigan, at the United States Bankruptcy Court for the Northern District of Texas, Earle Cabell Federal Building, 1100 Commerce Street, 14th Floor, Courtroom 1, Dallas, Texas 75242, or conducted consistent with the procedures established pursuant to the Court's standing orders.

At the Sale Hearing, certain findings will be sought from the Court regarding the Auction, including, among other things, that: (i) the Auction was conducted, and the Successful Bidder was selected, in accordance with the Bidding Procedures; (ii) the Auction was fair in substance and procedure; (iii) the Successful Bid was a Qualified Bid as defined in the Bidding Procedures; and (iv) consummation of any Transaction(s) as contemplated by the Successful Bid in the Auction will provide the highest or otherwise best offer for the applicable Assets and is in the best interests of the Debtors and their estates. **The Sale Hearing may be continued to a later date by the Debtors, in consultation with the Consultation Parties, by sending notice to creditors or other parties in interest prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party (including the Stalking Horse Bidder, if any).**

**Objections to the Transaction(s) and the Sale Order must: (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and all orders of the Court; and (iii) be filed with the Court and served so as to be <u>actually received</u> by the Debtors, the Bid Notice Parties, counsel to the DIP Lenders, and the foregoing parties' respective counsel by October 6, 2025, at 4:00 p.m., prevailing Central Time.**

## XVI.   <u>Return of Good Faith Deposit.</u>

The Good Faith Deposit(s) of the Successful Bidder or Successful Bidders, if any, will, upon consummation of the Successful Bid or Successful Bids, become property of the Debtors' estates and be credited to the portion of such Successful Bidder's or Successful Bidders' applicable Purchase Price.

If the Successful Bidder or Successful Bidders (or Back-Up Bidder or Back-Up Bidders, if applicable), if any, fails to consummate the Successful Bid or Successful Bids (or Back-Up Bid or Back-Up Bids, if applicable), then the Good Faith Deposit(s) of such Successful Bidder or Successful Bidders (or Back-Up Bidder or Back-Up Bidders, if applicable) will be irrevocably forfeited to the Debtors and may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors.

The Good Faith Deposits of any unsuccessful Qualified Bidders (except for any Back-Up Bidder or Back-Up Bidders and the Stalking Horse Bidder) will be returned within five (5) business days after entry of the Sale Order of the applicable Transaction(s) or upon the permanent withdrawal of the applicable proposed Transaction(s).

The Good Faith Deposit(s) of any Back-Up Bidder or Back-Up Bidders, if any, will be returned to such Back-Up Bidder or Back-Up Bidders no later than five (5) business days of the Back-Up Termination Date.

The return of any Good Faith Deposits of the Stalking Horse Bidder will be subject to the terms of the applicable Stalking Horse APA. All such Good Faith Deposits shall be held in escrow and at no time shall be deemed property of the Debtors' estates absent further order of the Court.

## XVII.   Reservation of Rights.

The Debtors shall be entitled to modify these Bidding Procedures in their reasonable business judgment and in a manner consistent with the exercise of their fiduciary duties, with the consent of the DIP Lenders (not to be unreasonably withheld, delayed or conditioned) and in consultation with the Consultation Parties, in any manner that will best promote the goals of the bidding process or the Bidding Procedures, or impose, at or before the Auction (if held), additional customary terms and conditions on the sale of the applicable Assets, including, without limitation: (i) extending the deadlines set forth in the Bidding Procedures; (ii) adjourning the Auction; (iii) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction (if held); (iv) canceling the Auction; (v) rejecting any or all Bids or Qualified Bids; and (vi) adjusting the applicable minimum Overbid increment.

All parties expressly reserve all of their rights (and do not waive any such rights) to seek Court relief with regard to the Auction, the Bidding Procedures, the Transaction(s), and any related items (including, if necessary, to seek an extension of the Bid Deadline).

## XVIII.  Consent to Jurisdiction.

All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Court and waived any right to a jury trial in connection with any disputes relating to the Auction, the Sale, the Transaction(s) and the construction and enforcement of these Bidding Procedures, any written indications of interest, Preliminary Bid Documents, the Bids, the Bid Documents, and any and all other agreements entered into in connection with any proposed Transaction(s), as applicable, and consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to the Sale any Transaction(s) if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

Any parties raising a dispute relating to these Bidding Procedures must request that such dispute be heard by the Court on an expedited basis.

## XIX.   Fiduciary Out.

Notwithstanding anything to the contrary in these Bidding Procedures or any document filed with the Court, nothing in these Bidding Procedures or the Bidding Procedures Order shall require a Debtor or its board of directors, board of managers, or similar governing body of a Debtor, or special committee of any board of any Debtor, to take any action or to refrain from taking any action related to any Transaction(s) or with respect to these Bidding Procedures, to the extent such Debtor, board of directors, board of managers, or such similar governing body determines in good faith, in consultation with counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Further, notwithstanding anything to the contrary in these Bidding Procedures, the Bidding Procedures Order, or any document filed with the Court, through the date of the Auction (if held),

19

nothing in these Bidding Procedures or the Bidding Procedures Order shall diminish the right of the Debtors and their respective directors, officers, managers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives to: (a) consider, respond to, and facilitate alternate proposals for sales or other transactions involving any or all of the Assets (each an "Alternate Proposal"); (b) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity with respect to Alternative Proposals; (c) maintain or continue discussions or negotiations with respect to Alternate Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals; and (e) enter into or continue discussions or negotiations with any person or entity regarding any Alternate Proposal.

## **Schedule 1**

**Auction Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | ) | Case No. 25-80185 (SGJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

## NOTICE OF SALE BY AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE** that on [_____], the United States Bankruptcy Court for the Northern District of Texas (the "Court") entered the *Order (I) Approving Bidding Procedures and Expense Reimbursement, (II) Approving the Debtors' Entry Into the Stalking Horse APA, (III) Scheduling Certain Dates and Deadlines, (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, and (VII) Authorizing the Sale of Assets* [Docket No. [__]] (the "Bidding Procedures Order")[2] in the Chapter 11 Cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

**PLEASE TAKE FURTHER NOTICE** that the Debtors are soliciting offers for the purchase of substantially all or a portion of the Assets consistent with the bidding procedures (the "Bidding Procedures") approved by the Court pursuant to the Bidding Procedures Order. **All interested bidders should carefully read the Bidding Procedures and Bidding Procedures Order**. To the extent that there are any inconsistencies between this notice and the Bidding Procedures or Bidding Procedures Order, the Bidding Procedures or Bidding Procedures Order, as applicable, shall govern in all respects.

**PLEASE TAKE FURTHER NOTICE** that, if the Debtors receive qualified competing bids within the requirements and time frame specified by the Bidding Procedures, the Debtors will conduct an auction, if any (the "Auction"), of the Assets **on October 9, at 10:00 a.m., prevailing Central Time**, at the offices of the proposed counsel to the Debtors: McDermott Will & Emery, LLP, 2801 N. Harwood Street, Suite 2600, Dallas, Texas 75201-1574.

---

[1]   The last four digits of Genesis Healthcare, Inc.'s federal tax identification number are 4755. There are 291 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

[2]   Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that only the Debtors, Qualified Bidders, the U.S. Trustee, the Consultation Parties, and any other parties as the Debtors may determine to include in their reasonable discretion, in each case, along with their representatives and advisors, shall be entitled to attend the Auction, and only Qualified Bidders will be entitled to make Overbids at the Auction. **All interested or potentially affected parties should carefully read the Bidding Procedures and the Bidding Procedures Order**.

**PLEASE TAKE FURTHER NOTICE** that the Debtors will seek approval of the Transaction(s) at a hearing scheduled to commence on or before **[October 16, 2025 at 9:30 a.m.], prevailing Central Time**, (the "Sale Hearing") before the Honorable Stacey G. Jernigan, at the United States Bankruptcy Court for the Northern District of Texas, Earle Cabell Federal Building, 1100 Commerce Street, 14th Floor, Courtroom 1, Dallas, Texas 75242, or conducted consistent with the procedures established pursuant to the Court's standing orders.

**PLEASE TAKE FURTHER NOTICE** that the deadline to object to consummation or approval of the Transaction(s) or the proposed Cure Costs or the assumption and assignment of Executory Contracts or Unexpired Leases is **October 6, 2025, at 4:00 p.m., prevailing Central Time** (the "Sale Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that the deadline to object to the identity of the Successful Bidder (other than the Stalking Horse Bidder) or adequate assurance of future performance by the Successful Bidder is **October 14, 2025, at 4:00 p.m., prevailing Central Time** (the "Post-Auction Objection Deadline").

**PLEASE TAKE FURTHER NOTICE** that all objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; and (c) state with particularity the legal and factual bases for the objection and the specific grounds therefor; and (d) be filed with the Court and served so as to be ***actually received* on or before the applicable deadlines listed above** by the following parties:  (i) Genesis Healthcare, Inc., c/o Ankura Consulting Group, LLC, 2021 McKinney Ave. Suite 340, Dallas, TX 75201 (Attn: Louis E. Robichaux IV (louis.robichaux@ankura.com)); (ii) proposed counsel to the Debtors, McDermott Will & Emery LLP, 2501 North Harwood Street, Suite 1900, Dallas, TX 75201 (Attn: Marcus A. Helt (mhelt@mwe.com) and Jack G. Haake (jhaake@mwe.com)), and 1180 Peachtree St. NE, Suite 3350, Atlanta, GA 30309 (Attn: Daniel M. Simon (dsimon@mwe.com)), and 444 West Lake Street, Suite 4000, Chicago, IL 60606 (Attn: William A. Guerrieri (wguerrieri@mwe.com) and Emily C. Keil (ekeil@mwe.com)); (iii) the Office of the United States Trustee for Region 6, Office of The United States Trustee Earle Cabell Federal Building 1100 Commerce Street, Room 976, Dallas, TX 75242, (Attn: Meredyth A. Kippes (Meredyth.Kippes@usdoj.gov)); (iv) counsel to any official committee of unsecured creditors appointed in these Chapter 11 Cases; (v) counsel to Marklgen, LLC, Gibson, Dunn & Crutcher LLP, 2001 Ross Avenue, Suite 2100, Dallas, TX 75201 (Attn:  John T. Cox III (tcox@gibsondunn.com)) and 333 South Grand Avenue, Los Angeles, CA 90071 (Attn:  Jeffrey C. Krause (jkrause@gibsondunn.com) and Michael G. Farag (mfarag@gibsondunn.com)); (vi) counsel to OHI Mezz Lender LLC, Goodwin Proctor LLP, The New York Times Building, 620 Eighth Avenue, New York, NY 10018 (Attn: Robert J. Lemons (rlemons@goodwinlaw.com)), and Ferguson Braswell Fraser Kubasta PC, 2500 Dallas Parkway, Suite 600, Plano, TX 75093 (Attn:  Leighton Aiken (laiken@fbfk.law)); (vii) counsel to White Oak Healthcare Finance, LLC, Blank Rome LLP, 444 West Lake Street, Suite 1650, Chicago, IL

60606 (Attn: Kenneth J. Ottaviano (ken.ottaviano@blankrome.com) and Paige Tinkham (paige.tinkham@blankrome.com)); and (viii) counsel to WAX Dynasty Partners LLC and the Stalking Horse Bidder, DLA Piper LLP, 1900 N. Pearl St., Suite 2200, Dallas, TX 75201 (Attn: James Muenker (james.muenker@us.dlapiper.com)).

## CONSEQUENCES OF FAILING TO TIMELY MAKE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY MAKE AN OBJECTION TO THE SALE OR TRANSACTION, AS APPLICABLE, ON OR BEFORE THE SALE OBJECTION DEADLINE OR THE POST-AUCTION DEADLINE, AS APPLICABLE, IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE APPLICABLE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS MAY BE SET FORTH IN THE APPLICABLE PURCHASE AGREEMENT.**

Dated: [_____], 2025
      Dallas, Texas

**MCDERMOTT WILL & EMERY LLP**

_____

Marcus A. Helt (TX 24052187)
Jack G. Haake (TX 24127704)
Grayson Williams (TX 24124561)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone:    (214) 295-8000
Facsimile:    (972) 232-3098
Email:      mhelt@mwe.com
          jhaake@mwe.com
          gwilliams@mwe.com

- and -

Daniel M. Simon (admitted _pro hac vice_)
Emily C. Keil (admitted _pro hac vice_)
William A. Guerrieri (admitted _pro hac vice_)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone:    (312) 372-2000
Facsimile:    (312) 984-7700
Email:      dsimon@mwe.com
          ekeil@mwe.com
          wguerrieri@mwe.com

_Proposed Counsel for the Debtors and Debtors-in-Possession_

## Exhibit 2

**Stalking Horse APA**

**Exhibit 3**

**Contract Assumption Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | ) | Case No. 25-80185 (SGJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE TO CONTRACT PARTIES TO POTENTIALLY
## ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES

> YOU ARE RECEIVING THIS NOTICE BECAUSE YOU
> OR ONE OF YOUR AFFILIATES ARE A COUNTERPARTY TO AN
> EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE
> OF THE DEBTORS AS SET FORTH ON **SCHEDULE 1** ATTACHED HERETO.

**PLEASE TAKE NOTICE** that on [_____], the United States Bankruptcy Court for the Northern District of Texas (the "Court") entered the *Order (I) Approving Bidding Procedures and Expense Reimbursement, (II) Approving the Debtors' Entry Into the Stalking Horse APA, (III) Scheduling Certain Dates and Deadlines, (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, and (VII) Authorizing the Sale of Assets* [Docket No. [__]] (the "Bidding Procedures Order")[2] in the Chapter 11 Cases of the above-captioned debtors and debtors in possession (collectively, the "Debtors").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures and the terms of any Successful Bid, the Debtors **may** assume and assign to the Successful Bidder the Executory Contracts and Unexpired Leases listed on **Schedule 1** to which you are a counterparty, upon approval of the Transaction(s). The Debtors have conducted a review of their books and records and have determined that the Cure Costs for unpaid monetary obligations under such Executory Contract or Unexpired Lease is as set forth on **Schedule 1**.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Costs, your objection must: (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy

---

[1]   The last four digits of Genesis Healthcare, Inc.'s federal tax identification number are 4755. There are 291 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

[2]   Capitalized terms used but not defined in this notice have the meanings given to them in the Bidding Procedures Order.

Rules, the Local Rules, and any order governing the administration of these Chapter 11 Cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs; (iv) state the correct Cure Costs alleged to be owed to the objecting contract counterparty, together with any applicable and appropriate documentation in support thereof; and (v) be filed with the Court and served and **actually received no later than October 6, 2025, at 4:00 p.m. (prevailing Central Time) (the "Cure Objection Deadline")** by the Court and the following parties: (i) Genesis Healthcare, Inc., c/o Ankura Consulting Group, LLC, 2021 McKinney Ave. Suite 340, Dallas, TX 75201 (Attn: Louis E. Robichaux IV (louis.robichaux@ankura.com)); (ii) proposed counsel to the Debtors, McDermott Will & Emery LLP, 2501 North Harwood Street, Suite 1900, Dallas, TX 75201 (Attn: Marcus A. Helt (mhelt@mwe.com) and Jack G. Haake (jhaake@mwe.com)), and 1180 Peachtree St. NE, Suite 3350, Atlanta, GA 30309 (Attn: Daniel M. Simon (dsimon@mwe.com)), and 444 West Lake Street, Suite 4000, Chicago, IL 60606 (Attn: William A. Guerrieri (wguerrieri@mwe.com) and Emily C. Keil (ekeil@mwe.com)); (iii) the Office of the United States Trustee for Region 6, Office of The United States Trustee Earle Cabell Federal Building 1100 Commerce Street, Room 976, Dallas, TX 75242, (Attn: Meredyth A. Kippes (Meredyth.Kippes@usdoj.gov)); (iv) counsel to any official committee of unsecured creditors appointed in these Chapter 11 Cases; (v) counsel to Markglen, LLC, Gibson, Dunn & Crutcher LLP, 2001 Ross Avenue, Suite 2100, Dallas, TX 75201 (Attn: John T. Cox III (tcox@gibsondunn.com)) and 333 South Grand Avenue, Los Angeles, CA 90071 (Attn: Jeffrey C. Krause (jkrause@gibsondunn.com) and Michael G. Farag (mfarag@gibsondunn.com)); (vi) counsel to OHI Mezz Lender LLC, Goodwin Proctor LLP, The New York Times Building, 620 Eighth Avenue, New York, NY 10018 (Attn: Robert J. Lemons (rlemons@goodwinlaw.com)), and Ferguson Braswell Fraser Kubasta PC, 2500 Dallas Parkway, Suite 600, Plano, TX 75093 (Attn: Leighton Aiken (laiken@fbfk.law)); (vii) counsel to White Oak Healthcare Finance, LLC, Blank Rome LLP, 444 West Lake Street, Suite 1650, Chicago, IL 60606 (Attn: Kenneth J. Ottaviano (ken.ottaviano@blankrome.com) and Paige Tinkham (paige.tinkham@blankrome.com)); and (viii) counsel to WAX Dynasty Partners LLC and the Stalking Horse Bidder, DLA Piper LLP, 1900 N. Pearl St., Suite 2200, Dallas, TX 75201 (Attn: James Muenker (james.muenker@us.dlapiper.com)); *provided* that the Debtors may modify the Cure Objection Deadline by filing a notice of such modification on the Court's docket.

  **PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Costs or (b) the proposed assignment and assumption of any Executory Contract or Unexpired Lease is filed by the Cure Objection Deadline, then (i) you will be deemed to have stipulated that the Cure Costs as determined by the Debtors are correct and (ii) you will be forever barred, estopped, and enjoined from asserting any additional Cure Costs are due under the Executory Contract or Unexpired Lease.

  **PLEASE TAKE FURTHER NOTICE** that any objection to the proposed assumption and assignment of an Executory Contract or Unexpired Lease or related Cure Costs in connection with the Successful Bid that otherwise complies with these procedures yet remains unresolved as of the commencement of the Sale Hearing, shall be heard at a later date as may be fixed by the Court.

  **PLEASE THAT FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Executory Contract or Unexpired Lease on the Contract Assumption Notice or any Supplemental Assumption Notice does not require or guarantee that such Executory Contract or

Unexpired Lease will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such Executory Contracts and/or Unexpired Leases are reserved. Moreover, the Debtors explicitly reserve the right, in their reasonable discretion, to seek to reject or assume each Executory Contract or Unexpired Lease pursuant to Bankruptcy Code section 365(a) and in accordance with the procedures allowing the Debtors and/or the Successful Bidder, as applicable, to designate any Executory Contract or Unexpired Lease as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that, nothing herein (i) alters in any way the prepetition nature of the Executory Contracts or Unexpired Leases or the validity, priority, or amount of any claims of a counterparty to any Contract against the Debtors that may arise under such Executory Contract or Unexpired Lease, (ii) creates a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Executory Contract or Unexpired Lease against the Debtors that may arise under such Executory Contract or Unexpired Lease.

*[Signatures on following page]*

3

Dated: [_____], 2025                    **MCDERMOTT WILL & EMERY LLP**
        Dallas, Texas

                                           _____

                                           Marcus A. Helt (TX 24052187)
                                           Jack G. Haake (TX 24127704)
                                           Grayson Williams (TX 24124561)
                                           2801 N. Harwood Street, Suite 2600
                                           Dallas, Texas 75201-1574
                                           Telephone:    (214) 295-8000
                                           Facsimile:    (972) 232-3098
                                           Email:        mhelt@mwe.com
                                                         jhaake@mwe.com
                                                         gwilliams@mwe.com

                                           - and -

                                           Daniel M. Simon (admitted *pro hac vice*)
                                           Emily C. Keil (admitted *pro hac vice*)
                                           William A. Guerrieri (admitted *pro hac vice*)
                                           444 West Lake Street, Suite 4000
                                           Chicago, Illinois 60606
                                           Telephone:    (312) 372-2000
                                           Facsimile:    (312) 984-7700
                                           Email:        dsimon@mwe.com
                                                         ekeil@mwe.com
                                                         wguerrieri@mwe.com

                                           *Proposed Counsel for the Debtors and*
                                           *Debtors-in-Possession*

## Schedule 1

**Schedule of Assumed and Assigned Executory Contracts and Unexpired Leases**

# EXHIBIT B

## Stalking Horse Term Sheet

## GENESIS HEALTHCARE, INC.

## STALKING HORSE TERM SHEET

## JULY 9, 2025

THIS BINDING TERM SHEET (TOGETHER WITH ANY ANNEXES, EXHIBITS, AND SCHEDULES ATTACHED HERETO, THE "**TERM SHEET**") SETS FORTH CERTAIN MATERIAL TERMS OF A PROPOSED SALE TRANSACTION (THE "**TRANSACTION**") BETWEEN THE PARTIES DESCRIBED HEREIN. CAPITALIZED TERMS USED HEREIN AND NOT OTHERWISE DEFINED SHALL HAVE THE MEANINGS SET FORTH ON **EXHIBIT A.**

THIS TERM SHEET IS PROFFERED IN THE NATURE OF A SETTLEMENT PROPOSAL IN FURTHERANCE OF SETTLEMENT DISCUSSIONS. ACCORDINGLY, THIS TERM SHEET IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS. NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY.

THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH THE PROPOSED TRANSACTION OR THAT WILL BE SET FORTH IN DEFINITIVE DOCUMENTATION. THE REGULATORY, CORPORATE, TAX, ACCOUNTING, AND OTHER LEGAL AND FINANCIAL MATTERS RELATED TO THE TRANSACTION HAVE NOT BEEN FULLY EVALUATED, AND ANY SUCH EVALUATION MAY AFFECT THE TERMS AND STRUCTURE OF ANY TRANSACTION. THE TRANSACTION CONTEMPLATED BY THIS TERM SHEET IS SUBJECT TO NEGOTIATION AND EXECUTION OF DEFINITIVE DOCUMENTATION IN ACCORDANCE WITH AND CONSISTENT WITH THIS TERM SHEET, ANY OTHER APPLICABLE DOCUMENTS, AND APPLICABLE BANKRUPTCY LAW.

| Overview of the Transaction | |
|---|---|
| **Sellers** | Genesis Healthcare, Inc. ("<u>Genesis</u>") and certain of its affiliates and subsidiaries listed on **Exhibit B** attached hereto (collectively, the "<u>Debtors</u>" or the "<u>Sellers</u>"). |
| **Purchaser** | CPE 88988 LLC (the "<u>Purchaser</u>"), a newly formed entity, organized and controlled by WAX Dynasty Partners LLC or a controlled affiliate thereof ("<u>WAX Lender</u>"). |
| **Purchase Price** | The aggregate consideration for the Purchased Assets (as defined below) (the "<u>Purchase Price</u>") shall consist of: |
| | (i)     a credit bid pursuant to section 363(k) of the Bankruptcy Code of $14 million of the principal amount of the DIP Loans, plus all accrued and unpaid principal, fees, penalties and other obligations with respect to such portion of the DIP Loans (the "<u>Credit Bid Amount</u>"); <u>plus</u> |
| | (ii)     the assumption of liabilities with respect to, or cash in an amount equal to, the <u>sum</u> of (a) $16 million of the principal balance, plus all accrued and unpaid interest, fees, and other charges and expenses arising and |

<table>
<tr><td></td><td colspan="2">payable under the DIP Loans (it being understood that such amount, plus the Credit Bid Amounts shall be equal to 100% of all amounts (inclusive of interest, fees, and other charges and expenses) owing under the DIP Loans), <u>plus</u> (b) the principal amount, plus all accrued and unpaid interest, fees, and other charges and expenses arising and payable under that certain Term Loan Agreement, dated as of July 29, 2016 (as otherwise amended, supplemented, or otherwise modified from time to time, the "<u>Term Loan</u>") by and among Genesis, certain affiliates and subsidiaries of Genesis party thereto as "Borrowers", certain affiliates and subsidiaries of Genesis party thereto as guarantors, the "Lenders" (as defined therein) from time-to-time party thereto, and Welltower OP LLC (formerly known as Welltower Inc.) ("<u>Welltower</u>") as "Administrative Agent" (as defined therein), in the approximate aggregate principal amount of $317.7 million, which cash shall be paid to the DIP Agent and shall be used to satisfy the DIP Loans and the Term Loan in full at Closing; <u>plus</u></td></tr>
<tr><td></td><td>(iii)</td><td>cash in the amount of $15 million, which, in addition to the Excluded Cash and subject to the terms and conditions hereof, is anticipated to be used by the Debtors to confirm a chapter 11 plan of liquidation and fund recoveries to general unsecured creditors; <u>plus</u></td></tr>
<tr><td></td><td>(iv)</td><td>cash sufficient to fund the transactions contemplated by the exercise of the Purchase Options; <u>plus</u></td></tr>
<tr><td></td><td>(v)</td><td>assumption of the Assumed Liabilities (which shall include Cure Costs, subject to the agreed-upon cap).</td></tr>
<tr><td><strong>Purchased Assets</strong></td><td colspan="2">The "<u>Purchased Assets</u>" shall include all of the assets of the Sellers, free and clear of all liens, claims, interests and encumbrances (other than permitted liens agreed to by Purchaser and expressly set forth in the APA (as defined below)) to the fullest extent permitted by section 363 of the Bankruptcy Code and/or other applicable law, other than the Excluded Assets (as defined below), as shall be more fully set forth in the APA, including, without limitation, all of Sellers' right, title and interest to, as of the Closing (as defined below), each of the following:</td></tr>
<tr><td></td><td>(i)</td><td>other than Excluded Cash, all cash, cash equivalents, prepayments (including, without limitation, all prepayments made to third party vendors), deferred assets, refunds, credits or overpayments;</td></tr>
<tr><td></td><td>(ii)</td><td>all accounts receivable of the Sellers (including, without limitation, credit card receivables, funds in transit, deposits and other receivables from customers and other payments/fees, allowances due from landlords with respect to the Assigned Leases, etc.);</td></tr>
<tr><td></td><td>(iii)</td><td>all real property owned by the Sellers, including, but not limited to all real property acquired pursuant to any "Assigned Purchase Agreements" (as defined below) that have been consummated prior to the Closing;</td></tr>
<tr><td></td><td>(iv)</td><td>all inventory of the Sellers;</td></tr>
<tr><td></td><td>(v)</td><td>all shares of capital stock or other equity interests in specified non-Debtor subsidiaries of Sellers including, without limitation, all of the</td></tr>
</table>

Sellers' equity interests in their non-Debtor joint ventures (the "<u>JV Equity Interests</u>");

(vi)    all rights and obligations under or arising out of all insurance policies of the Sellers to the extent such policies relate to the operation of the Sellers' business or to any Assumed Liabilities (including returns and refunds of any premiums paid, or amounts due back to any Seller, with respect to cancelled insurance policies) other than any Excluded Insurance Policy, and all benefits of any nature of any Seller with respect thereto (including any claims of any Seller arising under such policies and all credits, premium refunds, proceeds, causes of action or rights thereunder) other than any Excluded Insurance Policy (as defined below), <u>provided</u>, that to the extent any insurance policies of the Sellers cover any Excluded Liabilities of the Sellers, including, without limitation, tort liabilities, operational liabilities, and environmental liabilities, such policies must be made available to satisfy bona fide claims of any third party that are covered by such insurance policies;

(vii)   those unexpired leases specifically designated by Purchaser at least one (1) business day prior to the Closing (the "<u>Designation Deadline</u>"), which shall include, but are not necessarily limited to, those leases set forth on **Exhibit C** hereto (the "<u>Assigned Leases</u>") and all other interests of the Sellers in the Assigned Leases;

(viii)  all of Sellers' interest in those executory contracts specifically designated by the Purchaser on or prior to the Designation Deadline, which shall include the PA 22 MOTAs (the "<u>Assigned Contracts</u>");

(ix)    all rights to any tax credits or rebates of any Seller or that any Seller may qualify for with respect to the Purchased Assets.

(x)     unless otherwise determined by Purchaser in its sole discretion, all of the Sellers' rights in any Medicare and Medicaid provider numbers, related national provider identifiers, reimbursement agreements, and Medicare and Medicaid cost or tax settlements, in each case that relate to the operations of the Sellers' business;

(xi)    all deposits (including security deposits, rent, electricity, telephone or otherwise, credits, prepaid expenses, deferred charges, advance payments, refunds, rights of set-off, rights of recovery, security deposits, prepaid items, duties, letters of credit, guarantees, surety bonds, performance bonds, and other financial assurance obligations issued or entered into by or on behalf of any Seller related to the Purchased Assets (including the Assigned Leases and Assigned Contracts);

(xii)   all furniture, fixtures, equipment, marketing materials and other personal property used in the operations of the Sellers, including, without limitation, all rights to any software;

(xiii)  all merchandise and other personal property used in the operations of the Sellers;

(xiv)  to the extent transferable pursuant to applicable law, all permits required for Sellers to conduct business or for the ownership, operation, use, maintenance or repair of any of the Purchased Assets;

3

(xv)   all books and records of the Sellers (other than the Excluded Books and Records (as defined below)) and Acquired Medical Records, <u>provided</u> that Purchaser will provide the Sellers and any court-appointed trustee or other fiduciary charged with winding up the affairs of the Sellers with reasonable access to books and records for the purposes of conducting any wind-down activities (which wind-down activities shall include any liquidation, "<u>Wind-Down Activities</u>") post-closing;

(xvi)  all intellectual property owned by the Sellers or licensed to the Sellers; <u>provided</u> that Purchaser will provide Sellers and any court-appointed trustee or other fiduciary charged with winding up the affairs of the Sellers a license (without charge) to use any such intellectual property for purposes of conducting specified Wind-Down Activities;

(xvii) all general intangibles associated with the Sellers' business and any other Purchased Assets;

(xviii) all guarantees, representations, warranties and indemnities given by any third party associated with the operation of the business to the extent related to any Purchased Assets or any Assumed Liabilities and arising before or after the Closing Date;

(xix)  all rights in or under employee plans of the Sellers which are specifically set forth on a schedule to the APA to be provided by the Purchaser prior to the Auction and thereby designated as "Assumed Employee Plan" under the APA, if any;

(xx)   to the extent not otherwise released, all Claims and Causes of Action against the Released Parties, certain critical vendors, counterparties to Assumed Contracts and Assumed Leases and any other Claims and Causes of Action other than the Excluded Causes of Action;

(xxi)  all paper and/or electronic medical records relating to patients of the Seller's Facilities that are requested by Purchaser, to the extent such records are in Seller's possession (collectively, "<u>Acquired Medical Records</u>"), <u>provided</u> that Purchaser will provide Sellers and any court-appointed trustee or other fiduciary charged with winding up the affairs of the Sellers access to such medical records for purposes of compliance with Law and conducting specified Wind-Down Activities;

(xxii) all credentialing and medical staff records;

(xxiii) all resident trust funds, patient deposits, or any residents' property held by Sellers on the Closing Date or held thereafter for residents at any of the Facilities;

(xxiv) all rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees and agents of any Seller or with third parties;

(xxv) all of Sellers' rights and interests in respect of the Purchase Options, the purchase agreements arising from the exercise of such Purchase Options ("<u>Assigned Purchase Agreements</u>"), which shall be assumed executory contracts, and the assets subject thereto; and

| | (xxvi) all of the Sellers' other properties, assets, goodwill and rights of every kind, nature and description (whether tangible or intangible, wherever located and whether or not reflected on the books and records of the Sellers) that are now or hereafter owned, derived from or used or held for use in connection with the Sellers' business. |
|---|---|
| **Excluded Assets** | The Purchased Assets shall not include the following assets (collectively, the "Excluded Assets"):<br><br>(i)   any funds in any escrow account established under a DIP Order (the "Professional Fee Reserve"), for the sole benefit of estate professionals following final application thereof and retainers held by attorneys, accountants, financial advisors and other professional advisors retained by any Seller or by any creditors' committee in the Chapter 11 Cases (collectively, the "Estate Professionals"); provided, however, that any excess funds after payment of all allowed claims of Estate Professionals shall be Purchased Assets and shall be turned over the Purchaser;<br><br>(ii)   all books and records relating solely to any of the Excluded Assets or Excluded Liabilities (as defined below) (including information stored on the computer systems, data networks or servers of any Seller), the organizational documentation, corporate records, stock and minute books or other records related to the corporate organization of, and any tax returns of or with respect to (including, without limitation, working papers) the Sellers, except in connection with such records of any entity whose interests are the JV Equity Interests, and any books and records or other documents that any Seller is prohibited by applicable law or contract from delivering to Purchaser (the "Excluded Books and Records") and any paper and/or electronic medical records that are not Acquired Medical Records;<br><br>(iii)   any records that are required by applicable law or by order of the Bankruptcy Court which the Sellers are required to retain in their possession; provided, however, Sellers shall provide Purchaser with reasonable access to any such records;<br><br>(iv)   executory contracts and unexpired leases of the Sellers that are not Assigned Leases or Assigned Contracts;<br><br>(v)   any confidential personnel or other records to the extent pertaining to any current or former employee who is not a Transferred Employee (as defined below);<br><br>(vi)   all equipment and other assets and items that are (A) owned by third parties, or (B) leased to any Seller or an affiliate thereof, or are not freely assignable, saleable and transferable to the Purchaser, in each case, pursuant to a contract or agreement that is not an Assigned Lease or Assigned Contract;<br><br>(vii)   the Purchase Price and all rights that accrue or will accrue to the Sellers under (A) any of the documents with respect to the Transaction and (B) any documents prepared or received by Sellers |

in connection with the Transaction (including, without limitation, any privileged materials);

(viii) an amount of cash on hand and budgeted to satisfy Sellers' liabilities for all accrued and unpaid expenses set forth in the Budget (the "Budgeted Expenses") not otherwise provided for in a separate reserve in the Budget (together with funds in the Professional Fee Reserve, the "Excluded Cash"); provided, that, for the avoidance of doubt, any cash on hand in excess of the Budgeted Expenses shall be acquired by Purchaser as Purchased Assets and, to the extent that any excess funds remain from the Excluded Cash after paying all allowed expenses, such excess funds shall be Purchased Assets and paid over to Purchaser;

(ix) one or more bank accounts designated by Sellers that the Sellers shall retain in connection with the Excluded Cash;

(x) all director and officer insurance policies (including any tail or runoff policy) and any other insurance policy (A) related solely to any Excluded Asset, (B) required to cover claims or expenses in the Chapter 11 Cases or (C) required to be retained by Sellers in connection with the wind-down of the Sellers' bankruptcy estates following the Closing (the "Excluded Insurance Policies") and, in each case, all rights and benefits of any nature of Sellers with respect thereto;

(xi) any employee benefit plan that is not an Assumed Employee Plan and all assets of any such employee benefits plan, including records relating thereto, or any trust or other funding vehicles with respect to any such employee benefit plan;

(xii) all guarantees, representations, warranties and indemnities to the extent pertaining to any Excluded Asset or rights and defenses to the extent pertaining to any Excluded Liability;

(xiii) all equity interests of the Sellers (other than the JV Equity Interests which are Purchased Assets);

(xiv) all rights to any software used in any computer equipment included in the Purchased Assets, to the extent not freely transferable to Purchaser;

(xv) the portions of inventory, prepaid expenses and other Purchased Assets disposed of, or expended, as the case may be, by the Sellers after the date of the APA and prior to the Closing Date in the ordinary course of business;

(xvi) any permits used or held for use in the operations of the Sellers' business or the Purchased Assets, but that are not assignable pursuant to applicable laws or by order of the Bankruptcy Court, and accreditations used or held for use in the operations of the Sellers' business or the Purchased Assets, but that are not assignable to pursuant to the requirements of applicable accreditation organizations;

|  | (xvii) | any contracts that primarily relate to the Excluded Liabilities or the Excluded Assets, do not relate to the operations of the Sellers' business, the Purchased Assets or the Facilities, contracts in which one or more of the Sellers' other facilities participate that is not a Facility and are not severable, are system-wide or regional contracts of the Sellers which are accessible to the business by virtue of the business being owned by the Sellers and are not otherwise assignable to Purchaser, or those contracts set forth as Excluded Assets on a schedule to the APA; |
|  | (xviii) | all unclaimed property of any third party as of the Closing Date, including, without limitation, property which is subject to applicable escheat laws; |
|  | (xix) | any claims or causes of action of the Sellers against non-Released Parties and third parties solely to the extent that such claims or causes of action relate to the Excluded Assets or the Excluded Liabilities or are claims or causes of action against current and former directors and officers of the Sellers, subject to the D&O Limitations (the "<u>Excluded Causes of Action</u>"); |
|  | (xx) | all documents protected by any applicable privilege, including attorney-client or attorney work product privilege; and |
|  | (xxi) | any other assets designated by Purchaser, in its sole and absolute discretion, and specifically identified on a schedule to the APA (which schedule may be amended by Purchaser to add additional Excluded Assets at any time prior to the Closing). |
| **Assumed Liabilities** | "<u>Assumed Liabilities</u>" shall include the following: | |
|  | (i) | all liabilities of the Sellers relating to, or arising in respect of, the Purchased Assets or the Facilities arising out of or relating to (a) events, occurrences, acts or omissions occurring on or after the Closing Date or (b) the operation of the Sellers' business or the Purchased Assets by Purchaser on or after the Closing Date; |
|  | (ii) | all liabilities of the Sellers under any Assigned Leases and Assigned Contracts (collectively, the "<u>Purchased Contracts</u>") to be paid or performed after the Closing Date, including, without limitation, amounts necessary to cure any defaults in connection with the assumption of any Purchased Contracts (collectively, the "<u>Cure Costs</u>"), subject to a cap to be agreed upon between Purchaser and Sellers in the APA (the "<u>Cap</u>"); |
|  | (iii) | all liabilities incurred after the Closing Date relating to the employment or performance of services, termination of employment or services of any Transferred Employee or any liabilities arising under each Assumed Employee Plan after the Closing Date; |
|  | (iv) | all liabilities in connection with the White Oak Facility; <u>provided, however</u>, the parties shall mutually determine that Purchaser shall assume the White Oak Facility pursuant to this clause (iv) or that all liabilities associated with the White Oak Facility shall be satisfied in full at the Closing (which mutual determination shall also be acceptable to Welltower and Omega); <u>provided further, however,</u> |

that if the parties do not mutually agree to the treatment of the White Oak Facility on or before the day that is 10 days prior to the Auction, Purchaser shall thereafter have the right to terminate the APA, but Purchaser shall not be entitled to the Expense Reimbursement in connection with such termination;

(v) liabilities associated with funding the payment of allowed priority tax claims of the Sellers in connection with a plan of liquidation, so as to provide the holders of such allowed claims with treatment consistent with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code (to be paid out over a five year period), in an amount not to exceed $31,342,677.60, plus any accrued interest or penalties that would otherwise be entitled to priority under section 507(a)(8) of the Bankruptcy Code;

(vi) unless otherwise forgiven or discharged as part of the Chapter 11 Cases, all liabilities of the Sellers to ReGen Healthcare, LLC ("Regen") under the approximately $99,500,000 million in outstanding principal amount due under the various convertible promissory notes and all other loan documents in connection therewith;

(vii) in connection with the Transaction, and on or prior to the Closing Date, (A) the Purchaser shall either assume all of the Sellers' obligations under the A-2 Note and the Split Note (Consolidated A-2) or MAO 22322 LLC shall release, acquit and forever discharge the Genesis Obligors from any and all obligations under the A-2 Note and the Split Note (Consolidated A-2), and (B) the Purchaser shall either assume all of the Sellers' obligations under the Split Note (Consolidated A-1) or Wax Lender shall release, acquit and forever discharge the Genesis Obligors from any and all obligations under the Split Note (Consolidated A-1).

(viii) in connection with the Transaction, and on or prior to the Closing Date, the Purchaser shall either assume all of the Sellers' obligations to the Released Parties or the Released Parties shall release, acquit, and forever discharge the Sellers from all obligations to the Released Parties, including but not limited to the following claims: (A) any claims held by Integra WIP Tenant or its affiliates against the Sellers for unpaid termination payments arising under the Amendment to Sublease Termination Agreement (Colorado), dated as of December 27, 2023; (B) WAX Lender's claim for back-rent against the Sellers, which claim WAX Lender acquired from the Welltower/Cindat joint venture landlord in September 2024; (C) any claims held by Pinta Capital Partners against the Sellers under the Consulting Agreement, dated as of January 1, 2022; and (D) deficiency claims, if any, held by the Released Parties against the Sellers with respect to the Term Loan.

(ix) all liabilities relating to the secured portion of the IRS claims as determined under section 506(a)(1) of the Bankruptcy Code, in an amount mutually agreed by the parties, the secured amount of which and any repayment terms with respect thereto shall be resolved in a manner satisfactory to Purchaser, in its sole discretion;

|  | (x) | all tax liabilities (including bed taxes) that relate to the Purchased Assets for which any Seller is obligated attributable to a taxable period (or portion thereof) after the Closing Date but not payable until due after the Closing Date; |
|---|---|---|
|  | (xi) | all tax liabilities for bed taxes that relate to the Purchased Assets for which any Seller is obligated attributable to a taxable period (or portion thereof) after the Petition Date but not payable until due after the Closing Date, except to the extent such amounts are Budgeted Expenses, in an amount not to exceed an amount mutually agreed by the parties; |
|  | (xii) | any and all costs and expenses necessary in connection with providing "adequate assurance of future performance" with respect to the Purchased Contracts (as contemplated by section 365 of the Bankruptcy Code), subject to the Cap; |
|  | (xiii) | liabilities for all ordinary course accounts payable and operating expenses, in each case, arising or incurred after the Closing Date; |
|  | (xiv) | the Funded Liabilities (solely to the extent assumed by Purchaser as set forth under "Funded Liabilities" below); |
|  | (xv) | with respect to any pay period that is pending as of the Closing Date, liabilities for self-insured medical claims and ordinary course payroll obligations unpaid as of the Closing Date but not payable until due after the Closing Date, solely with respect to the Transferred Employees (subject in each case to the applicable terms and conditions of the applicable Assumed Employee Plans) and excluding personal injury or general liability claims, in an amount not to exceed an amount mutually agreed by the parties; and |
|  | (xvi) | any other liabilities that Purchaser agrees, in its absolute discretion, to assume which shall be set forth on a schedule to the APA. |
| **Excluded Liabilities** | All prepetition and post-petition liabilities of the Sellers, other than the Assumed Liabilities, including, without limitation, any liability arising out of a contract or lease that is not a Purchased Contract, shall be "Excluded Liabilities," including, without limitation: | |
|  | (i) | any liability of any Seller arising out of or relating to any Purchased Asset or the operation of the business on or prior to the Closing Date, other than Assumed Liabilities; |
|  | (ii) | any liability of any Seller to the extent arising from any Excluded Asset; |
|  | (iii) | all liabilities or indebtedness for borrowed money of the Sellers (including, without limitation, any indebtedness or accounts payable owing from any Seller to any affiliate of the Sellers) other than as contemplated by parts (iv), (vi), and (vii) of the of Assumed Liabilities section herein; |

(iv)    except for the Assumed Liabilities, (a) all tax liabilities of the Sellers and (b) all tax liabilities relating to the Purchased Assets or Assumed Liabilities attributable to a taxable period (or portion thereof) ending on or before the Closing Date, in each case to the extent any such tax liabilities are not specifically allocated to Purchaser in the APA;

(v)    all employment-related liabilities of Sellers or of any of their predecessors, including, without limitation, all accrued and unpaid payroll (including service credit and accrued paid time off, whether earned pre- or post- Closing Date), payroll Taxes, severance, accrued vacation, workers' compensation and other employee-related claims, and any claim under the WARN Act, with respect to COBRA liabilities, or with respect to any applicable state or local corollary thereto, and any other liabilities for any action resulting from Sellers' employees' separation of employment, other than those included as Assumed Liabilities;

(vi)    all liabilities of Sellers with respect to any terminated employees (or other individual who is a COBRA qualified beneficiary on account of the individual's relation to an employee) with respect to COBRA, including any individual who becomes an "M&A qualified beneficiary" (within the meaning of Sections 601, et. seq., of ERISA and Section 4980B of the IRC);

(vii)    all liabilities of Sellers or of any of their predecessors with respect to the termination of employment of the Sellers' "insiders" (as such term is defined under the Bankruptcy Code); all liabilities arising under or relating to "employee benefit plans," as defined in section 3(3) of ERISA and to the extent such plans are not among the Assumed Employee Plans, including any multiemployer plans as defined in section 3(37) of ERISA, and all other material employee benefit plans or arrangements (including all assets, trusts, insurance policies and administration service contracts related thereto);

(viii)    all liabilities for fees, costs and expenses that have been incurred or that are incurred or owed by Sellers or of any of their predecessors in connection with the APA or the administration of the Chapter 11 Cases (except as set forth in the Assumed Liabilities section herein), including all fees and expenses of professionals engaged by Sellers and all costs and expenses incurred in connection with (i) the negotiation execution and consummation of the transactions contemplated under the APA and each of the other documents delivered in connection herewith, (ii) the negotiation, execution and consummation of any cash collateral or debtor in possession financing arrangement, and (iii) the consummation of the transactions contemplated by the APA, including any retention bonuses, "success" fees, change of control payments and any other payment obligations of Sellers or of any of their predecessors payable as a result of the consummation of the transactions contemplated by the APA and the documents delivered in connection herewith;

|  | (ix) | any outstanding and unpaid bonus, commission or incentive obligations in respect of any current or former employee, officer, director or other individual service provider of Seller; |
|  | (x) | all liabilities relating to claims arising from or related to the rejection of a contract or lease pursuant to section 365 of the Bankruptcy Code; |
|  | (xi) | all liabilities relating to claims, actions, suits, arbitrations, litigation matters, proceedings or investigations (in each case whether involving private parties, governmental authorities, or otherwise) involving, against, or affecting any Purchased Assets or Purchased Liabilities, the business, Sellers, any of their Affiliates or predecessors, or any assets or properties of Sellers or of any of their predecessors, in each case relating to, resulting from, caused by or arising out of the ownership, operation or control of the Sellers' business to the extent accruing, arising out of or relating to events, occurrences, acts or omissions occurring or existing prior to the Closing Date (except to the extent (and only to such extent that) such actions relate to an Assumed Liability); |
|  | (xii) | all environmental liabilities relating to, resulting from, caused by or arising out of the ownership, operation or control of the Sellers' business, to the extent accruing, arising out of or relating to events, occurrences, acts or omissions occurring or existing prior to the Closing Date; |
|  | (xiii) | any liability (whether arising before, on or after the Closing Date) with respect to any employee or former employee of the Sellers who is not a Transferred Employee; |
|  | (xiv) | except as set forth herein, all liabilities relating to claims for indemnification of any present or former officer, manager, employee, partner or member of any Seller whether arising under bylaws, certificates of formation or other formation documents, or contract in each case arising out of or relating to (a) events, occurrences, acts or omissions occurring or existing prior to the Closing Date or (b) the operation of the Sellers' business or the Purchased Assets by Purchaser prior to the Closing Date; and |
|  | (xv) | all prepetition accounts payable of any Seller (except to the extent expressly assumed by Purchaser). |
| **Funded Liabilities** | As used herein, the term "Funded Liabilities" means collectively: (i) any claims entitled to priority status under section 507(b) of the Bankruptcy Code asserted as of the applicable bar date for such claim, and (ii) any administrative expense claims arising under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, each to the extent asserted as of the applicable bar date for such claim. The amount of Funded Liabilities shall be estimated five business days prior to the Closing Date and shall be mutually satisfactory to the Sellers and the Purchaser. ||
|  | At the option of the Purchaser, in its sole and absolute discretion, each of the Funded Liabilities shall either (1) be assumed by the Purchaser and thereby become Assumed Liabilities, or (2) not be assumed by the Purchaser, in ||

<table>
<tr><td></td><td>which case the Excluded Cash shall be adjusted on a dollar-for-dollar basis to account for the amount of the Funded Liabilities; provided, however, that such amounts (whether assumed by the Purchaser or reserved as Excluded Cash) shall not exceed any excess amounts remaining under the DIP Financing at the Closing Date.  For the avoidance of doubt, and notwithstanding anything contained herein to the contrary, the Purchaser shall not be required to further increase the Purchase Price or further assume any liabilities to pay for Funded Liabilities.</td></tr>
<tr><td><strong>Employee Matters</strong></td><td>No later than two days prior to the Auction, the Purchaser shall deliver a list of all of the Sellers' active employees to whom the Purchaser intends to offer employment effective as of the Closing Date in its sole and absolute discretion and on such terms and conditions as the Purchaser may determine in its sole and absolute discretion, which such employees shall become employees of the Purchaser or its affiliate on the Closing Date to the extent such employees accept the Purchaser's employment offer (the "<u>Transferred Employees</u>"). The Purchaser shall have no liability for any pay, benefits, severance, or similar claims and all claims and obligations arising under any collective bargaining agreement, employee benefit plan that is not an Assumed Employee Plan (including, any withdrawal liability) or any local, state or federal law, rule or regulation (including, the WARN Act) of any Transferred Employees earned or accrued or arising on or prior to the Closing Date.<br><br>From and after the Closing Date, the Sellers shall retain and be solely responsible for all obligations and liabilities with respect to the employment and services of all employees and independent contractors of the Sellers on or prior to the Closing Date.</td></tr>
<tr><td><strong>Milestones/Bidding Procedures</strong></td><td>The Sellers shall run a sale process under section 363 of the Bankruptcy Code in accordance with the Milestones and Bidding Procedures.</td></tr>
<tr><td><strong>Expense Reimbursement</strong></td><td>In the event that the Bankruptcy Court enters an order approving a transaction that represents an alternative to the Transaction contemplated in the APA in accordance with the Bidding Procedures and Sellers consummate such transaction, the APA shall provide for reimbursement of Purchaser's costs and expenses, including internal and external professional fees, in an amount up to $750,000 (the "<u>Expense Reimbursement</u>").</td></tr>
<tr><td><strong>Closing Conditions</strong></td><td>The respective obligations of the Sellers and Purchaser to consummate the Sale (the "<u>Closing</u>", and the date of the Closing, the "<u>Closing Date</u>") shall be subject to the satisfaction at or prior to the Closing Date of customary conditions, including, without limitation, the following conditions:<br><br>(i)  the Purchaser shall have obtained all required third-party, government and/or regulatory approvals to consummate the Transaction, including, without limitation, the approval of any applicable government department or agency having jurisdiction over the licensing of the Facilities as a healthcare facility;<br><br>(ii)  no temporary restraining order, preliminary or permanent injunction or other order issued by a governmental authority preventing consummation of the Transaction shall be in effect;<br><br>(iii)  no law shall be in effect which prohibits the Transaction;</td></tr>
</table>

12

|  | (iv) | the Bankruptcy Court shall have entered the final order approving the DIP Facility; |
|--|------|-----|
|  | (v) | no breach of Sellers' or Purchaser's covenants under the APA and accuracy of Sellers' and Purchaser's representations and warranties as of the Closing Date that would not reasonably be expected to have a material adverse change (as customarily defined, which definition shall expressly exclude effects related to the Chapter 11 Cases and Sellers' financial distress); |
|  | (vi) | no material adverse change (as customarily defined) shall have occurred; |
|  | (vii) | the APA shall continue to remain in full force and effect; |
|  | (viii) | the Sellers and Purchaser shall have executed and delivered all closing documents required pursuant to the terms of the APA; |
|  | (ix) | the Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order, in form and substance reasonably acceptable to the Purchaser and the Sellers; |
|  | (x) | to the extent necessary to facilitate the transactions contemplated hereby and the wind-down of the Sellers, including, without limitation, the purchase and sale of all Purchased Assets, the Sellers and Purchaser shall enter into a transition services agreement, or other similar agreement in form and substance acceptable to Sellers and the Purchaser; and |
|  | (xi) | Sellers shall have exercised and not revoked the Purchase Options, and the Purchase Options shall remain in effect through Closing. |
| **Unexpired Leases and Executory Contracts** | | The Sellers' executory contracts and leases shall, to the extent designated by the Purchaser, be assumed by the applicable Seller and assigned to Purchaser pursuant to section 365 of the Bankruptcy Code.  Prior to the Closing, Sellers shall not reject any contract or lease without the prior written consent of the Purchaser.   The Purchaser may revise the APA to add or remove any Assigned Lease (other than the Assigned Leases listed in Exhibit C hereto) or Assigned Contract (other than the PA 22 MOTAs) any time prior to the Designation Deadline.  In the event that Purchaser seeks to add an Assigned Lease or Assigned Contract, the Sellers shall provide notice of the Assigned Lease or Assigned Contract within two (2) business days of receiving notice from the Purchaser and shall provide the third party with five (5) business days' notice to object to such assignment; provided that Purchaser shall provide to Sellers an initial list of Assigned Leases and Assigned Contracts at least three (3) days prior to the Auction. In addition, Purchaser shall provide adequate assurance under the Bankruptcy Code of performance by Purchaser of the obligations assumed by Purchaser under the Assigned Contracts and Assigned Leases.

Following the Closing and up to and including the last day by which the Sellers may assume and assign an executory contract or lease under applicable law, the Purchaser may, at its sole option, designate any additional |

13

| | |
|---|---|
| | Assigned Lease or Assigned Contract; <u>provided</u> that Purchaser shall pay all Cure Costs on or before the Closing Date. |
| **Stalking Horse APA** | The Sellers and Purchaser shall mutually agree upon an asset purchase agreement ("<u>APA</u>") and such other definitive documents for the acquisition of the Purchased Assets and assumption of the Assumed Liabilities (collectively, the "<u>Definitive Documents</u>") that shall memorialize this Term Sheet and contain such representations, warranties, covenants and releases as set forth herein or as otherwise may be acceptable to the Sellers and the Purchaser. The signing of the Definitive Documents will be subject to, among other things, the negotiation by the Sellers and the Purchaser of acceptable terms and conditions for the Definitive Documents as well as additional legal, accounting, financial, tax, business and regulatory due diligence and the approval of the lenders under the DIP Loan and Term Loan. In the event of any inconsistency between this Term Sheet and any Definitive Documents, the Definitive Documents shall govern.<br><br>The Sellers and Purchaser shall have executed the APA no later than 20 calendar days from the Petition Date. |
| **Pre-Closing Covenants** | The Sellers will make customary negative and operating covenants in the context of section 363 sale transactions, including, without limitation, covenants concerning: (i) conduct of the Sellers' business prior to Closing; (ii) provision of financial and operating data, and access to the personnel, facilities, books, contracts and records of the Sellers and their respective subsidiaries prior to Closing; (iii) commercially reasonable efforts to obtain approval of the Bidding Procedures and the Sale Motion and other case management undertakings; and (iv) such other covenants as Purchaser may reasonably request. The Sellers and the Purchaser shall also use commercially reasonable efforts to obtain the necessary consents and authorizations from any third-party to consummate the Transaction.<br><br>At the election of the Purchaser, in the event that the Transaction is unable to be consummated as a Section 363 sale transaction, the Sellers and Purchaser shall use commercially reasonable efforts to convert the Transaction contemplated herein into a chapter 11 plan . |
| **Representations and Warranties** | The Sellers and the Purchaser will make the following representations and warranties in the APA:<br><br>(i) The Sellers and the Purchaser shall make customary representations and warranties in the context of a section 363 sale transaction (including, but not limited to, representations and warranties regarding the projections of the Sellers provided to the Purchaser);<br><br>(ii) The Sellers shall make customary representations and warranties associated with a transfer and sale of senior living facilities and other assets that comprise the Purchased Assets; and<br><br>(iii) The Sellers shall make a representation and warranty that the Purchased Assets constitute all of the properties, assets, claims and interests of every nature and kind whatsoever used in or held for use in the conduct of the business or otherwise necessary for |

| | Purchaser to conduct and operate the business immediately after the Closing in substantially the same manner as conducted by the Sellers and their subsidiaries before the Closing (other than the Excluded Assets); it being understood that such representations and warranties, to the extent not explicitly stated otherwise in the APA, shall not survive the Closing Date. |
|---|---|
| **Other Terms of the Transaction** | |
| **Retention of Jurisdiction** | The APA will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |
| **Retained Causes of Action** | The Sellers, as applicable, shall retain all rights to commence and pursue any Claims and Causes of Action, other than any Claims and Causes of Action that the Sellers have released or sold pursuant to the Stalking Horse Bid. |
| **Tax Matters** | The Sellers and Purchaser shall negotiate in good faith to determine a structure to implement the Transaction in a tax-efficient manner, including through the distribution by Sellers to an affiliate of Purchaser of certain Purchased Assets, instead of the sale of such Purchased Assets to Purchaser, and/or the cancellation of certain debt held by the Purchaser and/or related parties instead of the assumption or payment of such debt. The Transaction is contingent upon and remains subject to the Sellers and Purchaser working together in good faith to resolve any and all tax issues that are currently outstanding or may arise as a result of the Chapter 11 Cases, and Purchaser's satisfaction thereof in its sole discretion. |
| **Releases** | In connection with the Transaction, the Sellers and their estates shall release the Released Parties from any and all Claims and Causes of Action to the fullest extent permitted by applicable law. |
| **Regulatory Approvals** | Sellers and Purchaser will agree to cooperate regarding all consents and other authorizations required to be obtained from, or any filings required to be made with, any governmental authority that are necessary to consummate the transactions contemplated herein. |
| **Other Customary Provisions** | The APA will provide for other standard and customary provisions typical for transactions of this kind. |
| **Miscellaneous** | |
| | |
| **Expenses** | Each party hereto agrees to bear its own costs and expenses in connection with this Term Sheet, including without limitation, of their respective attorneys, accountants and any other advisors and its efforts to reach definitive agreements and close the Transaction. |
| **Amendments** | No modification or amendment may be made to this Term Sheet unless such modification or amendment is made in writing and executed by all parties to this Term Sheet. |

| | |
|---|---|
| **Governing Law; Counterparts** | Except as governed by the Bankruptcy Code, the provisions of this Term Sheet shall be governed by and construed in accordance with the laws of the State of New York, without regard to any contrary principles of choice of law or conflicts of laws. This Term Sheet may be executed in one or more counterparts (including counterparts transmitted by facsimile, email or other electronic transmission or electronic signature), each of which shall constitute an original for purposes of this Term Sheet, and all of which taken together will constitute one and the same agreement. The parties agree that this Term Sheet constitutes a statement of mutual intention only and does not contain all matters upon which agreement must be reached in order for the Transaction to be consummated. The proposal reflected in this Term Shet is not an offer susceptible to legally binding acceptance and, except as otherwise provided in this paragraph, when executed shall not be binding upon any person or entity. A binding commitment with respect to the Transaction will result only from execution by all parties thereto of a mutually satisfactory APA and any other necessary documentation relating to the Transaction, when and if so executed and delivered, subject to the terms and conditions expressed therein. |

**IN WITNESS HEREOF**, each of the undersigned has executed this Term Sheet or has caused the same to be executed by its duly authorized representatives as of the date first written above.

**SELLERS:**                                    **Genesis Healthcare, Inc. and such other entities listed on Exhibit B**

By: _____

Name:   Louis E. Robichaux IV
Title:    Co-Chief Restructuring Officer of
            Genesis Healthcare, Inc., et al.

**PURCHASER:**                                  **CPE 88988 LLC**

By: _____

Name:
Title:

*[Signature Page to Stalking Horse Term Sheet]*

**IN WITNESS HEREOF**, each of the undersigned has executed this Term Sheet or has caused the same to be executed by its duly authorized representatives as of the date first written above.

**SELLERS:**                              **Genesis Healthcare, Inc. and such other entities listed on Exhibit B**


By: _____


Name:   Louis E. Robichaux IV
Title:    Co-Chief Restructuring Officer of
          Genesis Healthcare, Inc., et al.


**PURCHASER:**                            **CPE 88988 LLC**


By: _____

DocuSigned by:
0492FE21301A40E...

Name:   Mark Andrews
Title:   Authorized Representative

## EXHIBIT A

Definitions

1. ***"A-2 Loan Agreement"*** means that certain Amended and Restated Loan Agreement between Welltower and SHG Resources, LLC, Hospitality Lubbock Property, LLC, Monument La Grange Property, LLC, Town and Country Boerne Property, LLC, pursuant to which Welltower agreed to provide a loan to the borrowers thereunder in the amount set forth therein.

2. ***"A-2 Note"*** means that certain Second Amended and Restated Note issued or guaranteed by the Genesis Obligators in favor of Welltower in connection with the A-2 Loan Agreement, which was subsequently assigned by Welltower to MAO 22322 LLC.

3. "***Auction***" shall have the meaning ascribed to such term in the Bidding Procedures Order.

4. "***Bankruptcy Code***" means Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq., as amended.

5. "***Bankruptcy Court***" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

6. "***Bidding Procedures***" means Debtors' motion for approval of procedures for the marketing and Transaction as approved in the Bidding Procedures Order.

7. "***Bidding Procedures Order***" shall have the meaning ascribed to such term in the DIP Term Sheet.

8. "***Budget***" shall have the meaning ascribed to such term in the DIP Term Sheet.

9. "***Causes of Action***" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code.

10. "***Chapter 11 Cases***" means the voluntary chapter 11 cases commenced by the Sellers.

11. "***Claim***" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

12. "***DIP Agent***" shall have the meaning ascribed to such term in the DIP Term Sheet.

13. "***DIP Facility***" shall have the meaning ascribed to such term in the DIP Term Sheet.

14. "***DIP Loans***" means shall have the meaning ascribed to such term in the DIP Term Sheet.

15. **"DIP Term Sheet"** means that certain Junior Secured Debtor-in-Possession Credit Facility Term Sheet, dated as of July 9, 2025, by and among Genesis, the Debtors named therein, and the DIP Lenders named therein.

16. **"D&O Limitations"** means that the Debtors, or their successors or assigns, shall retain claims to commence litigation against the Debtors' current and former directors and officers in accordance with the following conditions: (i) the Debtors shall use best efforts to file the complaint under seal and to keep confidential all material documents in the case; (ii) the total recovery by way of settlement or judgment in all such litigation may not exceed the aggregate total amounts that may be available under any current insurance policies of the Debtors, and any award of damages (inclusive of expenses) may be pursued only against any applicable insurers; (iii) the litigation against the Debtors' current and former directors and officers shall be limited to claims and allegations against them solely in their capacity as current or former board members, directors, employees, and/or officers of the Debtors; (iv) none of the Debtors' current or former officers and directors shall be required to expend any non-reimbursable funds out-of-pocket with respect to such litigation; (v) the Debtors shall be solely responsible for promptly making payments to the insurers, or to counsel to the defendants in any such litigation, as may be required by the insurers to satisfy any demands therefrom for deductibles, and should the Debtors fail to honor a demand for payment as directed by the insurers that is not subject to bona fide dispute, the Debtors shall immediately abandon any and all claims and causes of action against such party; and (vi) such other limitations as may be mutually agreed and set forth in the definitive documents.

17. **"Facilities"** means the healthcare facilities operated by the Sellers and set forth on Schedule A-1 hereto.

18. **"Genesis Obligors"** means, collectively, FC-Gen Operations Investment, LLC, SHG Resources, LLC, Hospitality Lubbock Property, LLC, Monument La Grange Property, LLC, Town and Country Boerne Property, LLC, Genesis Healthcare, Inc., Gen Operations I, LLC, Gen Operations II, LLC and each of the other parties that are borrowers or guarantors of the Split Note (Consolidated A-1) and the Split Note (Consolidated A-2).

19. **"JV Leases"** shall have the meaning ascribed to such term in the DIP Term Sheet.

20. **"Milestones"** shall have the meaning ascribed to such term in the DIP Term Sheet.

21. **"PA 22 MOTAs"** shall have the meaning ascribed to such term in the DIP Term Sheet.

22. **"PA 22 Sub-Leases"** shall have the meaning ascribed to such term in the DIP Term Sheet.

23. **"Petition Date"** means the date upon which Sellers commenced the Chapter 11 Cases in the Bankruptcy Court.

24. **"Purchase Options"** means, collectively, (i) Sellers' (or an affiliate thereof) exclusive right and title under that certain Purchase Option Agreement, dated as of January 9, 2019, by and among 101 Development Group, LLC and the Sellers set forth on Schedule 1 thereto (the "NextGen Option Agreement") to purchase the Facilities (as defined in the NextGen Option Agreement) and (ii) Sellers' (or an affiliate thereof) exclusive right and title under that certain Purchase Option Agreement, dated as of July 2, 2020, by and among GEN-CCG WO Master Tenant LLC and the Sellers set forth on Schedule 1 thereto (the "CCGen Option Agreement") to purchase the Facilities (as defined in the CCGen Option Agreement).

25. **"*Released Parties*"** means ReGen Healthcare, LLC, WAX Dynasty Partners LLC, MAO 22322 LLC, Pinta Capital Partners, Perigrove, Integra WIP Tenant LLC, Purchaser, each of their respective present and former parents, subsidiaries and affiliates, and each of their respective officers, directors, partners, equity holders, managers, members, predecessors, successors, assigns, attorneys, agents, employees, managers, and representatives, each solely in such capacity, including, without limitation, Joel Landau and David Gefner.  For the avoidance of doubt, the Debtors' current and former directors and officers, shall not be Released Parties, and any such Claims or Causes of Action shall be Excluded Assets, subject to the D&O Limitations.

26. "**Sale Motion**" means the Debtors' motion seeking approval by the Bankruptcy Court of the Transaction.

27. **"*Sale Order*"** means an Order of the Bankruptcy Court in form and substance consistent with the terms of APA and approved by Purchaser and the Sellers (or their designee) in their absolute discretion, pursuant to, inter alia, Sections 105, 363 and 365 of the Bankruptcy Code (i) authorizing and approving, inter alia, the sale of the Purchased Assets to Purchaser on the terms and conditions set forth in the APA, free and clear of all liens and liabilities (other than permitted liens and Assumed Liabilities) to the extent permissible under Section 363(f) of the Bankruptcy Code, (ii) finding that notice of the hearing concerning approval of APA and of the Transaction was given in accordance with the Bankruptcy Code and that such notice is appropriate under the particular circumstances, (iii) authorizing and approving the assumption and assignment of the Assigned Contracts to Purchaser, (iv) containing a finding that Purchaser has acted in "good faith" within the meaning of, and is entitled to the protections of, Section 363(m) of the Bankruptcy Code, (v) containing a finding that the APA was negotiated, proposed and entered into by the parties without collusion, in good faith and from arm's length bargaining positions, (vi) containing a finding that Sellers and Purchaser have not engaged in any conduct that would cause or permit the APA to be avoidable under Section 363(n) of the Bankruptcy Code, (vii) providing that the APA and the Transaction may, subject to the terms set forth herein, be specifically enforced against and binding upon, and not subject to rejection or avoidance by Sellers or their estate or any Chapter 7 or Chapter 11 Bankruptcy Code trustee of Sellers or other representative of their estate, (viii) providing that the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to the APA or the breach thereof, (ix) providing that neither Purchaser nor any of its affiliates shall be deemed a successor in interest to Sellers, and (x) providing that, upon Purchaser's payment of the consideration provided hereunder, Sellers shall have received fair and reasonably equivalent value for the Purchased Assets.

28. **"*Split Note (Consolidated A-1)*"** means that certain promissory note evidencing SHG Resources, LLC's obligation to pay the stated principal amount of Twenty-Four Million, Two Hundred Forty-Five Thousand, Six Hundred and Seventy-Two and No/100 Dollars ($24,245,672.00).

29. **"*Split Note (Consolidated A-2)*"** means that certain promissory note evidencing SHG Resources, LLC's obligation to pay the stated principal amount of One Hundred and Thirty-One Million, Nine Hundred Thirty Thousand, Seven Hundred and Sixty-Four and No/100 Dollars ($131,930,764.00).

30. "**White Oak Facility**" means the Prepetition Non-HUD ABL Credit Facility and the Prepetition HUD ABL Credit Facility, each as defined in in the DIP Term Sheet.

## EXHIBIT B

Seller Entities

| Debtor Name | EIN Number |
| --- | --- |
| Genesis Healthcare, Inc. | 20-3934755 |
| 1 Glen Hill Road Operations LLC | 83-3800183 |
| 1 Sutphin Drive Operations LLC | 26-0798393 |
| 10 Woodland Drive Operations LLC | 26-3157524 |
| 100 Abbeyville Road Operations LLC | 88-4293103 |
| 100 Chambers Street Operations LLC | 26-0796788 |
| 100 W. Queen Street Operations LLC | 92-1075272 |
| 105 Chester Road Operations LLC | 37-1787889 |
| 1000 Lincoln Drive Operations LLC | 26-0798815 |
| 1008 Thompson Street Operations LLC | 92-1055669 |
| 101 13th Street Operations LLC | 26-0798876 |
| 101 Development Group, LLC | 26-3764579 |
| 1020 South Main Street Operations LLC | 26-0831465 |
| 106 Tyree Street Operations LLC | 26-0798930 |
| 1070 Stouffer Avenue Operations LLC | 92-1055714 |
| 11 Dairy Lane Operations LLC | 26-0797280 |
| 1100 Norman Eskridge Highway Operations LLC | 26-0789197 |
| 1104 Welsh Road Operations LLC | 26-0831607 |
| 1105 Perry Highway Operations LLC | 92-1060178 |
| 113 W. McMurray Road Operations LLC | 92-1040208 |
| 115 S. Providence Road Operations LLC | 92-1149731 |
| 12-15 Saddle River Road Operations LLC | 26-0858429 |
| 1245 Church Road Operations LLC | 26-0832125 |
| 1248 Hospital Drive Operations LLC | 36-4813989 |
| 125 Holly Road Operations LLC | 26-0833210 |
| 128 East State Street Associates, LLC | 20-5229040 |
| 136 Donahoe Manor Road Operations LLC | 92-1085905 |
| 1361 Route 72 West Operations LLC | 26-0858998 |
| 1539 Country Club Road Operations LLC | 26-1446436 |
| 1543 Country Club Road Manor Operations LLC | 26-1446339 |
| 161 Bakers Ridge Road Operations LLC | 26-0798986 |
| 1631 Ritter Drive Operations LLC | 26-0799048 |
| 1650 Galisteo Street Operations LLC | 38-4089170 |
| 1680 Spring Creek Road Operations LLC | 26-0834593 |
| 1700 Market Street Operations LLC | 88-4312980 |
| 1700 Pine Street Operations LLC | 26-0837632 |
| 175 Blueberry Lane Operations LLC | 26-0902592 |
| 1770 Barley Road Operations LLC | 92-1100285 |
| 1848 Greentree Road Operations LLC | 92-1100372 |
| 191 Hackett Hill Road Operations LLC | 61-1745358 |
| 2 Blackberry Lane Operations LLC | 37-1787899 |
| 20 Maitland Street Operations LLC | 26-0902639 |
| 200 Pauline Drive Operations LLC | 92-1085955 |
| 200 Reynolds Avenue Operations LLC | 26-0865155 |

| Debtor Name | EIN Number |
|---|---|
| 200 South Ritchie Avenue Operations LLC | 26-0802292 |
| 201 Wood Street Operations LLC | 26-0802570 |
| 2021 Westgate Drive Operations LLC | 92-1071278 |
| 2029 Westgate Drive Operations LLC | 92-1071366 |
| 2101 Fairland Road Operations LLC | 27-3286015 |
| 211-213 Ana Drive Operations LLC | 32-0445595 |
| 2125 Elizabeth Avenue Operations LLC | 88-4303273 |
| 22 Tuck Road Operations LLC | 26-3157262 |
| 225 Evergreen Road Operations LLC | 26-0837946 |
| 227 Evergreen Road Operations LLC | 26-0838035 |
| 23 Fair Street Operations LLC | 38-3974821 |
| 23 Fair Street Property, LLC | 37-1790621 |
| 24 Old Etna Road Operations LLC | 26-0902883 |
| 2400 Kingston Court Operations LLC | 88-4314431 |
| 25 East Lindsley Road Operations LLC | 26-0865287 |
| 25 Ridgewood Road Operations LLC | 26-0902937 |
| 2507 Chestnut Street Operations LLC | 26-0838130 |
| 2600 Northampton Street Operations LLC | 92-1075101 |
| 262 Toll Gate Road Operations LLC | 26-0838226 |
| 2720 Charles Town Road Operations LLC | 26-0802645 |
| 279 Cabot Street Operations LLC | 32-0473527 |
| 279 Cabot Street Property LLC | 38-3975205 |
| 2800 Palo Parkway Operations LLC | 88-4420565 |
| 290 Hanover Street Operations LLC | 26-3156358 |
| 292 Applegarth Road Operations LLC | 26-0865549 |
| 3 Industrial Way East Operations LLC | 26-0865899 |
| 30 West Avenue Operations LLC | 26-2602152 |
| 300 Pearl Street Operations LLC | 38-3975338 |
| 3000 Windmill Road Operations LLC | 88-4314481 |
| 302 Cedar Ridge Road Operations LLC | 26-0802735 |
| 330 Franklin Turnpike Operations LLC | 26-0865965 |
| 333 Green End Avenue Operations LLC | 26-0796847 |
| 3430 Huntingdon Pike Operations LLC | 88-4304543 |
| 3485 Davisville Road Operations II LLC | 92-1105056 |
| 3514 Fowler Avenue Operations LLC | 30-1116161 |
| 3590 Washington Pike Operations LLC | 37-1800646 |
| 3720 Church Rock Street Operations LLC | 36-4906274 |
| 390 Red School Lane Operations LLC | 26-0866040 |
| 40 Crosby Street Operations LLC | 32-0573730 |
| 40 Whitehall Road Operations LLC | 30-0878413 |
| 40 Whitehall Road Property LLC | 36-4814745 |
| 400 McKinley Avenue Operations LLC | 93-3663691 |
| 4140 Old Washington Highway Operations LLC | 26-0814286 |
| 419 Harding Street Operations LLC | 37-1905331 |
| 422 23rd Street Operations LLC | 26-0806381 |
| 425 Buttonwood Street Operations LLC | 92-1040323 |
| 450 East Philadelphia Avenue Operations LLC | 26-0838908 |
| 462 Main Street Operations LLC | 26-0796131 |

| Debtor Name | EIN Number |
|---|---|
| 50 Mulberry Tree Street Operations LLC | 26-0804456 |
| 50 Pheasant Road Operations LLC | 61-1896882 |
| 500 East Philadelphia Avenue Operations LLC | 26-0840575 |
| 501 Thomas Jones Way Operations LLC | 92-1086015 |
| 505 Weyman Road Operations LLC | 92-1086060 |
| 530 Macoby Street Operations LLC | 26-0840740 |
| 54 Sharp Street Operations LLC | 26-0866164 |
| 5485 Perkiomen Avenue Operations LLC | 26-0840797 |
| 550 South Negley Avenue Operations LLC | 92-1089430 |
| 5609 Fifth Avenue Operations LLC | 92-1116989 |
| 590 North Poplar Fork Road Operations LLC | 26-0802814 |
| 60 Highland Road Operations LLC | 88-4292979 |
| 600 Paoli Pointe Drive Operations LLC | 26-0842139 |
| 600 W. Valley Forge Road Operations LLC | 88-4293566 |
| 613 Hammonds Lane Operations LLC | 26-0816065 |
| 624 N. Converse Street Property, LLC | 32-0467257 |
| 640 Bethlehem Pike Operations LLC | 92-1044499 |
| 642 Metacom Avenue Operations LLC | 26-3157291 |
| 660 Commonwealth Avenue Operations LLC | 26-0796908 |
| 677 Court Street Operations LLC | 26-0903080 |
| 7 Baldwin Street Operations LLC | 26-0903110 |
| 700 Marvel Road Operations LLC | 26-0789419 |
| 700 Town Bank Road Operations LLC | 26-0866369 |
| 715 East King Street Operations LLC | 37-1690544 |
| 723 Summers Street Operations LLC | 26-0804524 |
| 724 N. Charlotte Street Operations LLC | 92-1045090 |
| 735 Putnam Pike Operations LLC | 26-3156030 |
| 75 Hickle Street Operations LLC | 26-0842502 |
| 777 Lafayette Road Operations LLC | 26-3157593 |
| 8 Rose Street Operations LLC | 26-0804585 |
| 8 Snow Road Operations LLC | 36-4904863 |
| 80 Maddex Drive Operations LLC | 26-0804643 |
| 800 Court Street Circle Operations LLC | 92-1089501 |
| 803 Hacienda Lane Operations LLC | 36-4905637 |
| 8100 Washington Lane Operations LLC | 26-0842681 |
| 825 Summit Street Operations LLC | 26-0804702 |
| 84 Cold Hill Road Operations LLC | 26-0866432 |
| 840 Lee Road Operations LLC | 26-0805378 |
| 850 12th Avenue Property, LLC | 61-1762114 |
| 867 York Road Operations LLC | 26-0842583 |
| 885 MacBeth Drive Operations LLC | 92-1055531 |
| 900 Tuck Street Operations LLC | 92-1055607 |
| 91 Country Village Road Operations LLC | 26-0903160 |
| 940 Walnut Bottom Road Operations LLC | 92-1089574 |
| 98 Hospitality Drive Operations LLC | 36-4814147 |
| Albuquerque Heights Healthcare and Rehabilitation Center, LLC | 26-0675040 |
| Albuquerque Heights Property, LLC | 36-4739932 |
| Belen Meadows Healthcare and Rehabilitation Center, LLC | 26-0675094 |

| Debtor Name | EIN Number |
|---|---|
| Belfast Operations, LLC | 20-5541877 |
| Brier Oak on Sunset, LLC | 95-4212165 |
| Camden Operations, LLC | 20-5542380 |
| Canyon Albuquerque Property, LLC | 61-1715791 |
| Canyon Transitional Rehabilitation Center, LLC | 26-0675157 |
| Clovis Healthcare and Rehabilitation Center, LLC | 26-0675210 |
| Courtyard JV LLC | 27-3653462 |
| Encore GC Acquisition LLC | 36-4746246 |
| Encore Pediatrics, LLC | 92-0850640 |
| Encore Preakness, LLC | 25-1805051 |
| Encore Rehabilitation Services, LLC | 20-8215706 |
| Falmouth Operations, LLC | 20-5542263 |
| Farmington Operations, LLC | 20-5542206 |
| FC-GEN Operations Investment, LLC | 27-3237005 |
| Five Ninety Six Sheldon Road Operations LLC | 26-3157551 |
| Forty Six Nichols Street Operations LLC | 26-3157432 |
| Fountain Holdco, LLC | 61-1690655 |
| Franklin Woods JV LLC | 27-3653701 |
| GEN BQ JV Holdings, LLC | 83-4680177 |
| GEN CCG JV Holdings LLC | 84-4231317 |
| GEN Operations I, LLC | 27-3237090 |
| GEN Operations II, LLC | 27-3237225 |
| GEN SF JV Holdings, LLC | 84-2030307 |
| GEN-CCG WO Master Tenant LLC | 84-4852373 |
| GEN-Next Holdco I LLC | 83-3196600 |
| Genesis Administrative Services LLC | 30-0847166 |
| Genesis CT Holdings LLC | 26-0787896 |
| Genesis CT XCL Operations LLC | 83-4097388 |
| Genesis DE Holdings LLC | 26-0788062 |
| Genesis Dynasty Operations LLC | 35-2579085 |
| Genesis Eldercare Network Services, LLC | 23-2107987 |
| Genesis ElderCare Physician Services, LLC | 06-1156428 |
| Genesis HealthCare LLC | 27-3237296 |
| Genesis HealthCare of Maine, LLC | 36-4725000 |
| Genesis Holdings LLC | 30-0843337 |
| Genesis MA Holdings LLC | 26-0788158 |
| Genesis MD Holdings LLC | 26-0788216 |
| Genesis Midwest II Operations LLC | 61-1866165 |
| Genesis NH Holdings LLC | 26-0902542 |
| Genesis NHG Operations LLC | 37-1904639 |
| Genesis NHG-GEN Operations LLC | 83-4098117 |
| Genesis NJ Holdings LLC | 26-0856500 |
| Genesis OMG Operations LLC | 45-2036948 |
| Genesis Operations III LLC | 27-3956918 |
| Genesis Operations IV LLC | 45-2014515 |
| Genesis Operations LLC | 26-0787826 |
| Genesis Operations V LLC | 45-2015148 |
| Genesis Operations VI LLC | 45-2015863 |

| Debtor Name | EIN Number |
|---|---|
| Genesis Orion Operations LLC | 46-3646227 |
| Genesis PA Holdings LLC | 26-0788305 |
| Genesis Partnership LLC | 61-1747445 |
| Genesis Physician Services MSO, LLC | 37-1896412 |
| Genesis PM CO Operations LLC | 92-1398777 |
| Genesis PM NJ Operations LLC | 92-1881394 |
| Genesis PM PA Operations LLC | 92-1071670 |
| Genesis RI Holdings LLC | 26-0788381 |
| Genesis SNI Operations LLC | 84-2628539 |
| Genesis Tang Operations LLC | 38-4021426 |
| Genesis VA Holdings LLC | 26-0874971 |
| Genesis VT Holdings LLC | 26-0822458 |
| Genesis WV Holdings LLC | 26-0788494 |
| GHC Holdings LLC | 26-0740682 |
| GHC JV Holdings LLC | 27-3451063 |
| GHC Payroll LLC | 26-1091992 |
| GHC TX Operations LLC | 61-1750087 |
| Granite Ledges JV LLC | 27-3653829 |
| Harborside Danbury Limited Partnership | 06-1528119 |
| Harborside Health I LLC | 51-0304578 |
| Harborside Healthcare Advisors Limited Partnership | 04-2985690 |
| Harborside Healthcare Limited Partnership | 04-2985687 |
| Harborside Healthcare, LLC | 04-3307188 |
| Harborside New Hampshire Limited Partnership | 04-3284611 |
| Harborside Rhode Island Limited Partnership | 05-0495209 |
| Harborside Toledo Business LLC | 04-3274482 |
| HBR Kentucky, LLC | 20-2512086 |
| HBR Trumbull, LLC | 20-4599841 |
| HC 63 Operations LLC | 26-0805549 |
| Kansas City Transitional Care Center, LLC | 38-3879014 |
| Kennebunk Operations, LLC | 20-5542183 |
| Kennett Center, L.P. | 34-1975968 |
| KHI LLC | 51-0304577 |
| Leasehold Resource Group, LLC | 20-0083961 |
| Lewiston Operations, LLC | 20-5541920 |
| LTC ACO, LLC | 37-1787111 |
| Maryland Harborside, LLC | 04-3168713 |
| Magnolia JV LLC | 27-3653937 |
| Metro Therapy, Inc. | 11-3068922 |
| Nine Haywood Avenue Operations LLC | 26-0797562 |
| Odd Lot LLC | 27-5191122 |
| Orono Operations, LLC | 20-5542044 |
| PAI Participant 1, LLC | 83-4164482 |
| PAI Participant 2, LLC | 83-4164572 |
| PAI Participant 3, LLC | 83-4164685 |
| PAI Participant 4, LLC | 83-4164813 |
| PBR Intermediate Holdings, LLC | 88-3920334 |
| PDDTSE, LLC | 46-2458197 |

| Debtor Name | EIN Number |
|---|---|
| Peak Medical Assisted Living, LLC | 52-2088942 |
| Peak Medical Las Cruces No. 2, LLC | 20-0068615 |
| Peak Medical Las Cruces, LLC | 71-0950059 |
| Peak Medical New Mexico No. 3, LLC | 85-0484183 |
| Peak Medical Roswell, LLC | 20-0068604 |
| Peak Medical, LLC | 52-2088940 |
| Pine Tree Villa LLC | 20-2513222 |
| Post-Acute Innovations, LLC | 37-1932430 |
| Powerback Pediatrics of Arkansas, LLC | 88-4247749 |
| Powerback Pediatrics of Georgia, LLC | 99-0921365 |
| Powerback Pediatrics of Missouri, LLC | 92-0863507 |
| Powerback Pediatrics of Nebraska, LLC | 92-0886808 |
| Powerback Pediatrics of South Carolina, LLC | 99-0921075 |
| Powerback Pediatrics of Vermont, LLC | 99-0921658 |
| Powerback Rehabilitation, LLC | 23-2446104 |
| PRMC/GEC at Salisbury Center, LLC | 23-3010869 |
| Property Resource Holdings, LLC | 37-1712484 |
| Regency Health Services, LLC | 33-0210226 |
| Respiratory Health Services LLC | 52-2054967 |
| Romney Health Care Center Limited Partnership | 55-0689584 |
| Route 92 Operations LLC | 26-0805623 |
| Saddle Shop Road Operations LLC | 26-0805711 |
| Salisbury JV LLC | 27-3654054 |
| Scarborough Operations, LLC | 20-5542088 |
| SHG Partnership, LLC | 36-4802236 |
| SHG Resources, LLC | 20-0084078 |
| Skies Healthcare and Rehabilitation Center, LLC | 26-0675263 |
| Skiles Avenue and Sterling Drive Urban Renewal Operations LLC | 61-1717930 |
| Skilled Healthcare, LLC | 20-0084014 |
| Skowhegan SNF Operations, LLC | 20-5541352 |
| St. Anthony Healthcare and Rehabilitation Center, LLC | 26-0675327 |
| St. Catherine Healthcare and Rehabilitation Center, LLC | 20-8386337 |
| St. John Healthcare and Rehabilitation Center, LLC | 20-8386810 |
| St. Theresa Healthcare and Rehabilitation Center, LLC | 26-0675370 |
| State Street Associates, L.P. | 23-2799332 |
| State Street Kennett Square, LLC | 23-2446105 |
| Stillwell Road Operations LLC | 26-0805824 |
| Summit Care Parent, LLC | 38-3901040 |
| Summit Care, LLC | 95-3656297 |
| Sun Healthcare Group, Inc. | 13-4230695 |
| SunBridge Beckley Health Care LLC | 31-1042548 |
| SunBridge Care Enterprises, LLC | 95-3311961 |
| SunBridge Clipper Home of North Conway, LLC | 02-0417606 |
| SunBridge Clipper Home of Wolfeboro, LLC | 02-0382521 |
| SunBridge Dunbar Health Care LLC | 55-0593873 |
| SunBridge Gardendale Health Care Center, LLC | 58-2238801 |
| SunBridge Goodwin Nursing Home, LLC | 02-0303002 |
| SunBridge Healthcare, LLC | 85-0370802 |

| Debtor Name | EIN Number |
|---|---|
| SunBridge Nursing Home, LLC | 91-1572371 |
| SunBridge Putnam Health Care LLC | 31-0996773 |
| SunBridge Regency-North Carolina, LLC | 56-1954175 |
| SunBridge Regency-Tennessee, LLC | 33-0690226 |
| SunBridge Retirement Care Associates, LLC | 43-1441789 |
| SunBridge Salem Health Care LLC | 31-0996769 |
| SunDance Rehabilitation Agency, LLC | 30-0141695 |
| SunDance Rehabilitation Holdco, Inc. | 38-3954180 |
| SunDance Rehabilitation, LLC | 06-1310410 |
| The Rehabilitation Center of Albuquerque, LLC | 26-0675426 |
| Thirty Five Bel-Aire Drive SNF Operations LLC | 26-0797624 |
| Three Mile Curve Operations LLC | 26-0806097 |
| Waterville SNF Operations LLC | 20-5541966 |
| Westbrook Operations, LLC | 20-5542347 |
| Westwood Medical Park Operations LLC | 26-0797458 |

## EXHIBIT C

### Assigned Leases

1. That certain Master Lease Agreement, dated as of December 23, 2016 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Welltower Non-HUD Master Lease Agreement</u>" and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of the "Landlord" thereunder (the "<u>Welltower Non-HUD Master Lease Landlords</u>") including, without limitation, all security agreements, notes, guarantees, including the Welltower Non-HUD Master Lease Guaranty (as defined below), mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "<u>Welltower Non-HUD Master Lease Documents</u>"), by and among Genesis Dynasty Operations, LLC (the "<u>Welltower Non-HUD Master Tenant</u>") and the Welltower Non-HUD Master Lease Landlords. The Welltower Non-HUD Master Tenant has subleased the facilities leased to the Welltower Non-HUD Master Tenant under the Welltower Non-HUD Master Lease Agreement to certain operators set forth therein (the "<u>Existing Welltower Non-HUD Operators</u>").

   a. That certain Unconditional and Continuing Guaranty and Indemnification Agreement, dated as of December 23, 2016, by and among certain of the Debtors, the Existing Welltower Non-HUD Operators and other parties (each a "<u>Welltower Non-HUD Master Lease Guarantor</u>" and, collectively with the Welltower Non-HUD Master Tenant, the "<u>Welltower Non-HUD Master Lease Obligors</u>") and the Welltower Non-HUD Master Lease Landlords (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, in respect of the Welltower Non-HUD Master Lease Agreement, the "<u>Welltower Non-HUD Master Lease Guaranty</u>").

2. That certain Master Lease Agreement, dated as of October 1, 2017, effective as October 26, 2017 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "<u>Welltower HUD Master Lease Agreement</u>" and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of "Landlord" thereunder (the "<u>Welltower HUD Master Lease Landlords</u>") including, without limitation, all security agreements, notes, guarantees, including the Welltower HUD Master Lease Guaranty (as defined below), mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "<u>Welltower HUD Master Lease Documents</u>"), by and among Genesis Tang Operations LLC (the "<u>Welltower HUD Master Tenant</u>") and the Welltower HUD Master Lease Landlords. The Welltower HUD Master Tenant has subleased the facilities leased to the Welltower HUD Master Tenant under the Welltower HUD Master Lease Agreement to certain operators set forth therein (the "<u>Existing Welltower HUD Operators</u>").

   a. That certain Unconditional and Continuing Guaranty and Indemnification Agreement, dated as of October 1, 217 and effective as of October 26, 2017, by and among certain of the Debtors, the Existing Welltower HUD Operators and other parties (each a "<u>Welltower HUD Master Lease Guarantor</u>" and, collectively with the Welltower HUD Master Tenant, the "<u>Welltower HUD Master Lease Obligors</u>") and the Welltower HUD Master Lease Landlords (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, in respect of the Welltower HUD Master Lease Agreement, the "<u>Welltower HUD Master Lease Guaranty</u>").

3.  That certain Amended and Restated Master Lease Agreement No. 5 dated as of February 2, 2015 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Ventas Master Lease" and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of those entities identified as "Landlord" thereunder (the "Ventas Master Lease Landlords") including, without limitation, all security agreements, notes, guarantees, including the Ventas Master Lease Guaranties (as defined below), mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Ventas Master Lease Documents"), by and among the Ventas Master Lease Landlords and the Debtor entities identified as "Tenant" thereunder.

   a.  That certain Third Amended and Restated Master Lease Guaranty and Suretyship Agreement dated as of February 2, 2015 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "GHL Joint Guaranty"), by GENESIS HEALTHCARE LLC, a Delaware limited liability company, FCGEN OPERATIONS INVESTMENT, LLC, a Delaware limited liability company, and GENESIS HEALTHCARE, INC. (f/k/a SKILLED HEALTHCARE GROUP, INC.), a Delaware corporation (collectively, the "GHL Joint Guarantors").

   b.  That certain Fourth Amended and Restated Master Lease Guaranty and Suretyship Agreement dated as of December 1, 2012 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "GHC Ventas Guaranty" and, together with the GHL Joint Guaranty, the "Ventas Master Lease Guaranties"), by GENESIS HEALTHCARE CORPORATION, a Pennsylvania corporation ("GHC").

4.  That certain HUD Facilities Master Lease dated as of March 29, 2012 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Sandy River Master Lease" and, together with all other agreements, documents, and instruments executed and/or delivered with, to or in favor of those entities identified as "Landlord" thereunder (the "Sandy River Master Lease Landlords"), including, without limitation, all security agreements, notes, guarantees, including the Ventas Master Lease Guaranties (as defined below), mortgages, Uniform Commercial Code financing statements, documents, and instruments, including any fee letters, executed and/or delivered in connection therewith or related thereto, the "Sandy River Master Lease Documents"), by and among the Sandy River Master Lease Landlords and the Debtor entities identified as "Tenant" thereunder.

   a.  That certain Fourth Amended and Restated Unconditional and Continuing Guaranty and Indemnification Agreement dated as of March 29, 2012 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Sandy River Joint Guaranty"), by those entities identified as "Subtenant" thereunder (collectively, the "Sandy River Joint Guarantors").

   b.  That certain Guaranty of Master Lease dated as of March 29, 2012 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "GHC Sandy River Guaranty" and, together with the Sandy River Joint Guaranty, the "Sandy River Master Lease Guaranties"), by GHC.

5.  The PA 22 Sub-Subleases.

6.  The JV Leases.

**SCHEDULE A-1**

**List of Facilities**

| BU # | Facility Name | State | Landlord | Address |
|------|--------------|-------|----------|---------|
| 57045 | Cypress Cove | AL | Omega | 200 Alabama Ave., Muscle Shoals, AL 35661-3102 |
| 55286 | Glenwood | AL | Glenwood Realty | 211 Ana Drive, Florence, AL 35630 |
| 55287 | Hilltop at Glenwood | AL | Glenwood Realty | 213 Ana Drive, Florence, AL 35630 |
| 57046 | Keller Landing | AL | Omega | 813 Keller Lane, Tuscumbia, AL 35674-1110 |
| 57047 | Magnolia Ridge | AL | LTC | 420 Dean Drive, Gardendale, AL 35071-2763 |
| 57257 | Magnolia Village | AL | LTC | 420 Dean Drive, Gardendale, AL 35071-2763 |
| 57048 | Merry Wood Lodge | AL | Omega | 280 Mount Hebron Road, Elmore, AL 36025-1526 |
| 57049 | River City | AL | Omega | 1350 14th Avenue SE, Decatur, AL 35601-4364 |
| 57050 | Cottage of the Shoals | AL | Omega | 500 John Aldridge Dr., Tuscumbia, AL 35674-3000 |
| 57305 | Brier Oak on Sunset | CA | BFW, LLC | 5154 Sunset Blvd., Los Angeles, CA 90027 |
| 57007 | St Joseph's | CT | GMF | 6448 Main Street, Trumbull, CT 06611-2075 |
| 55273 | Lofland Park | DE | Seafire NEMA - JV | 715 East King Street, Seaford, DE 19973 |
| 55026 | Milford | DE | Cindat/HUD | 700 Marvel Road, Milford, DE 19963 |
| 55031 | Seaford | DE | Cindat/HUD | 1100 Norman Eskridge Highway, Seaford, DE 19973 |
| 55226 | Cedar Ridge | ME | Sandy River | 23 Cedar Ridge Drive, Skowhegan, ME 4976 |
| 55227 | Harbor Hill | ME | Sandy River | 2 Footbridge Road, Belfast, ME 4915 |
| 55228 | Marshwood | ME | Sandy River | 33 Roger Street, Lewiston, ME 4240 |
| 55229 | Oak Grove | ME | Sandy River | 27 Cool Street, Waterville, ME 4901 |
| 55230 | Orono Commons | ME | Sandy River | 117 Bennoch Road, Orono, ME 4473 |
| 55231 | Pine Point | ME | Sandy River | 67 Pine Point Road, Scarborough, ME 4074 |
| 55232 | RiverRidge | ME | Sandy River | 3 Brazier Lane, Kennebunk, ME 4043 |
| 55233 | Sandy River | ME | Sandy River | 119 Livermore Falls Road, Farmington, ME 4938 |
| 55234 | Sedgewood Commons | ME | Sandy River | 22 Northbrook Drive, Falmouth, ME 4105 |
| 55235 | Springbrook | ME | Sandy River | 300 Spring Street, Westbrook, ME 4092 |
| 55236 | Windward Gardens | ME | Sandy River | 105 Mechanic Street, Camden, ME 4843 |
| 55247 | Fairland | MD | Seafire NEMA - JV | 2101 Fairland Road, Silver Spring, MD 20904 |
| 13013 | Franklin Woods | MD | Managed JV | 9200 Franklin Square Drive, Baltimore, MD 21237 |
| 55013 | Hammonds Lane | MD | Seafire NEMA - JV | 613 Hammonds Lane, Brooklyn Park, MD 21225 |
| 57110 | Larkin Chase | MD | Managed JV | 15005 Health Center Drive, Bowie, MD 20716-1017 |

| BU # | Facility Name | State | Landlord | Address |
|------|--------------|-------|----------|---------|
| 13034 | Doctors Community Rehab Center (Magnolia Gardens) | MD | Managed JV | 6710 Mallery Drive, Lanham, MD 20706 |
| 55169 | Waldorf | MD | Seafire NEMA - JV | 4140 Old Washington Highway, Waldorf, MD 20602 |
| 57014 | Hadley | MA | Chakalos | 20 North Maple St, PO Box 720, Hadley, MA 01035-9715 |
| 55057 | Heritage Woods Asst Living | MA | Ventas | 462 Main Street, Agawam, MA 1001 |
| 13998 | Lasell | MA | Managed JV | 120 Seminary Ave, Auburndale, MA 2466 |
| 57512 | Renaissance Manor on Cabot | MA | Owned | 279 Cabot Street, Holyoke, MA 01040 |
| 57280 | Applewood | NH | Aurora | 8 Snow Road, Winchester, NH 03470-2806 |
| 55062 | Country Village | NH | Cindat | 91 Country Village Road, Box 441, Lancaster, NH 3584 |
| 57281 | Crestwood | NH | Aurora | 40 Crosby Street, Milford, NH 03055-4707 |
| 55266 | Elm Wood at Claremont | NH | Omega | 290 Hanover Street, Claremont, NH 3743 |
| 57034 | Exeter | NH | Aurora | 8 Hampton Rd, Exeter, NH 03833-4806 |
| 13118 | Granite Ledges of Concord | NH | Managed JV | 151 Langley Parkway, Concord, NH 3301 |
| 55288 | Hackett Hill | NH | Seafire NEMA - JV | 191 Hackett Hill Drive, Manchester, NH 3102 |
| 55059 | Harris Hill | NH | Cindat/HUD | 20 Maitland Street, Concord, NH 03301-2696 |
| 55070 | Keene | NH | Cindat/HUD | 677 Court Street, Keene, NH 3431 |
| 55060 | Laconia | NH | Cindat/HUD | 175 Blueberry Lane, Laconia, NH 3246 |
| 55065 | Lebanon | NH | Cindat/HUD | 24 Old Etna Road, Lebanon, NH 3766 |
| 55071 | Mountain Ridge | NH | Cindat/HUD | 7 Baldwin Street, Franklin, NH 03235-1879 |
| 55267 | Oceanside | NH | Omega | 22 Tuck Road, Hampton, NH 3842 |
| 55268 | Partridge House | NH | Omega | 777 Lafayette Road, Hampton, NH 3842 |
| 57282 | Pheasant Wood | NH | Aurora | 50 Pheasant Road, Peterborough, NH 03458-2110 |
| 55066 | Ridgewood | NH | Cindat/HUD | 25 Ridgewood Road, Bedford, NH 03110-6511 |
| 57514 | Rochester Manor | NH | Owned | 40 Whitehall Road, Rochester, NH 03867 |
| 56033 | Arbor Glen | NJ | Cindat/HUD | 25 East Lindsley Road, Cedar Grove, NJ 7009 |
| 56035 | Cranbury | NJ | Next HC - JV | 292 Applegarth Road, Monroe Twp, NJ 8831 |
| 56039 | Holly Manor | NJ | Next HC - JV | 84 Cold Hill Road, Mendham, NJ 7945 |
| 56043 | Jersey Shore | NJ | Cindat/HUD | 3 Industrial Way East, Eatontown, NJ 7724 |
| 55104 | Lopatcong | NJ | Ventas | 390 Red School Lane, Phillipsburg, NJ 8865 |
| 56045 | Maple Glen | NJ | Cindat/HUD | 12-15 Saddle River Road, Fair Lawn, NJ 7410 |
| 55051 | Millville | NJ | Next HC - JV | 54 Sharp Street, Millville, NJ 8332 |
| 55116 | North Cape | NJ | Next HC - JV | 700 Townbank Road, North Cape May, NJ 8204 |
| 56050 | Ridgewood | NJ | Cindat/HUD | 330 Franklin Turnpike, Ridgewood, NJ 7450 |
| 56051 | Southern Ocean | NJ | Cindat/HUD | 1361 Route 72 West, Manahawkin, NJ 8050 |

| BU # | Facility Name | State | Landlord | Address |
|---|---|---|---|---|
| 56053 | Troy Hills | NJ | Melohn | 200 Reynolds Avenue, Parsippany, NJ 7054 |
| 57345 | Albuquerque Heights Healthcare and Rehabilitation Center | NM | Omega/Preferred | 103 Hospital Loop NE, Albuquerque, NM 87109 |
| 57349 | Bear Canyon Rehabilitation Center | NM | LTC | 5123 Juan-Tabo Blvd. NE, Albuquerque, NM 87111 |
| 57352 | Belen Meadows Healthcare and Rehabilitation Center | NM | Belen Health Care | 1831 Camino del Llano, Belen, NM 87002 |
| 55309 | Bloomfield Nursing and Rehab | NM | Omega/Preferred | 803 Hacienda Lane, Bloomfield, NM 87413 |
| 57348 | Canyon Transitional Rehabilitation Center | NM | Omega/Preferred | 10101 Lagrima de Oro NE, Albuquerque, NM 87111 |
| 57167 | Casa De Oro | NM | Grey Handy | 1005 Lujan Hill Road, Las Cruces, NM 88007-6304 |
| 57168 | Casa Del Sol Care | NM | ALE Partners | 2905 East Missouri, Las Cruces, NM 88011-4813 |
| 55310 | Casa Real | NM | Omega/Preferred | 1650 Galisteo Street, Santa Fe, NM 87505 |
| 55311 | Clayton Nursing and Rehab | NM | Omega/Preferred | 419 Harding Street, Clayton, NM 88415 |
| 57354 | Clovis Healthcare and Rehabilitation Center | NM | LTC | 1201 N. Norris St., Clovis, NM 88101 |
| 57169 | Ladera | NM | Ralph Hazelbaker | 5901 Ouray Road NW, Albuquerque, NM 87120-1381 |
| 57170 | Las Palomas | NM | Ralph Hazelbaker | 8100 Palomas NE, Albuquerque, NM 87109-5264 |
| 57172 | Mission Arch | NM | Roswell Health Care | 3200 Mission Arch Drive, Roswell, NM 88201-8307 |
| 55312 | Red Rocks Care Center | NM | Omega/Preferred | 3720 Church Rock Street, Gallup, NM 87301 |
| 57174 | Rio Rancho | NM | Ralph Hazelbaker | 4210 Sabana Grande SE, Rio Rancho, NM 87124-1152 |
| 57350 | Sandia Ridge Center | NM | LTC | 2216 Lester Drive NE, Albuquerque, NM 87112 |
| 55313 | Silver City Care Center | NM | Omega/Preferred | 3514 Fowler Avenue, Silver City, NM 88061 |
| 57347 | Skies Healthcare and Rehabiltation Center | NM | Albuquerque Health Care | 9150 McMahon NW, Albuquerque, NM 87114 |
| 57353 | St. Anthony Healthcare and Rehabilitation Center | NM | LTC | 1400 West 21st Street, Clovis, NM 88101 |
| 57346 | The Rehabilitation Center of Albuquerque | NM | Presbyterian Healthcare | 5900 Forest Hills Dr. NE, Albuquerque, NM 87109 |
| 57173 | The Village at Northrise, Morningside | NM | GMF | 2880 N. Roadrunner Parkway, Las Cruces, NM 88011-0853 |
| 57351 | Uptown Rehabilitation Center | NM | LTC | 7900 Constitution Ave. NE, Albuquerque, NM 87110 |
| 57111 | Abbotts Creek | NC | Omega | 877 Hill Everhart Rd, Lexington, NC 27295-9140 |
| 57117 | Meridian (NC) | NC | Omega | 707 North Elm St, High Point, NC 27262-3917 |
| 57113 | Mount Olive | NC | Omega | 228 Smith Chapel Rd, Mount Olive, NC 28365-1917 |
| 57114 | Pembroke | NC | Omega | 310 East Wardell Dr, Pembroke, NC 28372-7997 |
| 57116 | Siler City | NC | Omega | 900 West Dolphin St, Siler City, NC 27344-3711 |

| BU # | Facility Name | State | Landlord | Address |
|------|---------------|-------|----------|---------|
| 55339 | Abbeyville Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 100 Abbeyville Rd, Lancaster, PA 17603 |
| 55176 | Belvedere | PA | Ventas | 2507 Chestnut Street, Chester, PA 19013 |
| 56116 | Berkshire Commons | PA | Ventas | 5485 Perkiomen Avenue, Reading, PA 19606 |
| 55353 | Bethlehem North Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 2029 Westgate Dr, Bethlehem, PA 18017 |
| 55328 | Bethlehem South Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 2021 Westgate Dr, Bethlehem, PA 18017 |
| 55301 | Bridgeville Center | PA | CC-GEN JV | 3590 Washington Pike, Bridgeville, PA 15017 |
| 55329 | Camp Hill Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 1700 Market St, Camp Hill, PA 17011 |
| 55330 | Carlisle Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 940 Walnut Bottom Rd., Carlisle, PA 17015 |
| 55331 | Chambersburg Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 1070 Stouffer Ave., Chambersburg, PA 17201 |
| 55179 | Chapel Manor | PA | Ventas | 1104 Welsh Road, Philadelphia, PA 19115 |
| 55109 | Crestview | PA | Next HC - JV | 262 Toll Gate Road, Langhorne, PA 19047 |
| 55333 | Easton Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 2600 Northampton St, Easton, PA 18045 |
| 55239 | Gettysburg | PA | Next HC - JV | 867 York Road, Gettysburg, PA 17325-7501 |
| 55184 | Highgate at Paoli Pointe | PA | Ventas | 600 Paoli Pointe Drive, Paoli, PA 19301 |
| 55110 | Hillcrest | PA | Next HC - JV | 1245 Church Road, Wyncote, PA 19095 |
| 56071 | Hopkins | PA | Cindat/HUD | 8100 Washington Lane, Wyncote, PA 19095 |
| 55335 | Huntingdon Valley Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 3430 Huntingdon Pike, Huntingdon Valley, PA 19006 |
| 55332 | Inners Creek Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 100 W Queen St, Dallastown, PA 17313 |
| 55336 | Jersey Shore Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 1008 Thompson St, Jersey Shore, PA 17740 |
| 55337 | King of Prussia Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 600 W. Valley Forge Rd, King of Prussia, PA 19406 |
| 55338 | Kingston Court Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 2400 Kingston Ct, York, PA 17402 |
| 56072 | Laurel | PA | Next HC - JV | 125 Holly Road, Hamburg, PA 19526 |
| 56073 | Laurel Ridge | PA | CC-GEN JV | 75 Hickle Street, Uniontown, PA 15401 |
| 55354 | Laureldale Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 2125 Elizabeth Ave., Laureldale, PA 19605 |

| BU # | Facility Name | State | Landlord | Address |
|------|--------------|-------|----------|---------|
| 55340 | Lebanon Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 900 Tuck St, Lebanon, PA 17042 |
| 56120 | Lehigh Commons | PA | Ventas | 1680 Spring Creek Road, Macungie, PA 18062 |
| 55025 | Mifflin | PA | Seafire - JV | 500 E Philadelphia Ave, Shillington, PA 19607 |
| 55092 | Mifflin Court | PA | Ventas | 450 E Philadelphia Ave, Shillington, PA 19607 |
| 55342 | Montgomeryville Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 640 Bethlehem Pike, Montgomeryville, PA 18936 |
| 55126 | Norriton Center | PA | Seafire NEMA - JV | 1700 Pine Street, Norristown, PA 19401 |
| 55177 | Pennsburg Manor | PA | Ventas | 530 Macoby Street, Pennsburg, PA 18073 |
| 55346 | Pottstown Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 724 N. Charlotte St, Pottstown, PA 19464 |
| 56077 | Quakertown | PA | Seafire NEMA - JV | 1020 South Main Street, Quakertown, PA 18951 |
| 56079 | Sanatoga | PA | Next HC - JV | 225 Evergreen Road, Pottstown, PA 19464 |
| 56119 | Sanatoga Court | PA | Ventas | 227 Evergreen Road, Pottstown, PA 19464 |
| 55355 | Sinking Spring Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 3000 Windmill Rd, Sinking Spring, PA 19608 |
| 55348 | Sunbury Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 901 Court Street, Sunbury, PA 17801 |
| 55349 | Wallingford Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 115 S. Providence Road, Wallingford, PA 19086 |
| 55241 | Wayne | PA | Ventas | 30 West Avenue, Wayne, PA 19087 |
| 55356 | West Reading Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 425 Buttonwood St, West Reading, PA 19611 |
| 55351 | York North Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 1770 Barley Rd, York, PA 17408 |
| 55352 | York South Skilled Nursing and Rehabilitation Center | PA | Integra Healthcare | 200 Pauline Dr, York, PA 17402 |
| 56083 | Grand Islander | RI | Cindat/HUD | 333 Green End Avenue, Middletown, RI 2842 |
| 56084 | Grandview | RI | Cindat | 100 Chambers Street, Cumberland, RI 2864 |
| 57044 | Greenwood | RI | GMF | 1139 Main Avenue, Warwick, RI 02886-1940 |
| 56085 | Kent Regency | RI | Cindat/HUD | 660 Commonwealth Avenue, Warwick, RI 2886 |
| 57120 | Cumberland Village | TN | Omega | 136 Davis Lane, La Follette, TN 37766-3118 |
| 57124 | Willow Ridge | TN | Omega | 215 Richardson Way, Maynardville, TN 37807-3803 |
| 56087 | Westwood | VA | Cindat/HUD | 20 Westwood Medical Park, Bluefield, VA 24605 |
| 55090 | Woodmont | VA | Cindat/HUD | 11 Dairy Lane, Fredericksburg, VA 22405 |
| 56157 | Bel-Aire | VT | Cindat/HUD | 35 Bel-Aire Drive, Newport, VT 5855 |

| BU # | Facility Name | State | Landlord | Address |
|------|---------------|-------|----------|---------|
| 55242 | Mountain View | VT | Cindat/HUD | 9 Haywood Avenue, P.O. Box 6623, Rutland, VT 5701 |
| 55274 | Saint Albans | VT | Omega | 596 Sheldon Road, Saint Albans, VT 5478 |
| 57185 | Columbia Crest | WA | Ventas | 1100 E. Nelson Rd., Moses Lake, WA 98837-2360 |
| 57186 | Everett | WA | Ventas | 1919 - 112th St., Southwest, Everett, WA 98204-3784 |
| 57187 | Lake Ridge | WA | Ventas | 817 East Plum, Moses Lake, WA 98837-1870 |
| 55055 | Ansted | WV | Cindat/HUD | 106 Tyree Street, P.O. Drawer 400, Ansted, WV 25812-9800 |
| 56096 | Brightwood | WV | CC-GEN JV | 840 Lee Road, Follansbee, WV 26037 |
| 56097 | Canterbury | WV | Cindat/HUD | 80 Maddex Drive, Shepherdstown, WV 25443 |
| 56099 | Carehaven | WV | Cindat/HUD | 2720 Charles Town Road, Martinsburg, WV 25401 |
| 56100 | Cedar Ridge | WV | Cindat/HUD | 302 Cedar Ridge Road, Sissonville, WV 25320 |
| 57126 | Dunbar | WV | Omega | 501 Caldwell Lane, Dunbar, WV 25064-2026 |
| 55272 | Hampshire Health Care | WV | Hampshire County, WV | 260 Sunrise Blvd, Romney, WV 26757 |
| 56106 | Heritage | WV | CC-GEN JV | 101 13th Street, Huntington, WV 25701 |
| 55224 | Hidden Valley Health Care | WV | Seafire NEMA - JV | 422 23rd Street, Oak Hill, WV 25901 |
| 55036 | Hilltop | WV | Seafire NEMA - JV | 152 Saddle Shop Road P.O.Box 125, Hilltop, WV 25855 |
| 56102 | Logan | WV | Ventas | P.O.Box 540, 55 LMMH Center Road, Logan, WV 25601 |
| 56112 | Madison | WV | CC-GEN JV | 161 Bakers Ridge Road, Morgantown, WV 26508 |
| 55222 | Marmet Health Care | WV | Cindat/HUD | 1 Sutphin Drive, Marmet, WV 25315 |
| 56103 | Miletree | WV | Seafire NEMA - JV | 825 Summit Street, Spencer, WV 25276 |
| 57129 | Parkersburg Care | WV | Omega | 1716 Gihon Road, Parkersburg, WV 26101-9655 |
| 55271 | Pierpont at Fairmont Campus | WV | Omega | 1543 Country Club Road, Fairmont, WV 26554 |
| 57130 | Pine Lodge | WV | Omega | 405 Stanaford Rd., Beckley, WV 25801-3143 |
| 55365 | Pine View Center | WV | Omega | 400 McKinley Avenue, Harrisville, WV 26362 |
| 56104 | Pocahontas | WV | CC-GEN JV | 5 Everett Tibbs Road, Marlinton, WV 24954-6500 |
| 57131 | Putnam Care | WV | Omega | 300 Seville Rd, Hurricane, WV 25526-9206 |
| 56107 | Raleigh | WV | Seafire NEMA - JV | 1631 Ritter Drive, P.O. Box 741, Daniels, WV 25832 |
| 56108 | Ravenswood | WV | Ventas | 200 South Ritchie Avenue, Ravenswood, WV 26164 |
| 56109 | Rosewood | WV | CC-GEN JV | 8 Rose Street, Grafton, WV 26354 |
| 57132 | Salem | WV | Omega | 255 Sunbridge Drive, Salem, WV 26426-1154 |
| 56118 | Shenandoah | WV | Next HC - JV | 50 Mulberry Tree Street, Charlestown, WV 25414 |
| 56110 | Sisterville | WV | CC-GEN JV | 201 Wood Street, Sisterville, WV 26175 |
| 56111 | Teays Valley | WV | CC-GEN JV | 1390 N. Poplar Fork Road, Hurricane, WV 25526 |
| 55270 | Tygart at Fairmont Campus | WV | Omega | 1539 Country Club Road, Fairmont, WV 26554 |

| BU # | Facility Name | State | Landlord | Address |
|------|--------------|-------|----------|---------|
| 56113 | Valley | WV | Ventas | 1000 Lincoln Drive, Charleston, WV 25309 |
| 56114 | White Sulphur Springs | WV | Ventas | 345 Pocahontas Trail, P.O.Box 249, White Sulphur Springs, WV 24986 |
| 56115 | Willows | WV | Cindat/HUD | 723 Summers Street, Parkersburg, WV 26101 |