IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | |
|---|---|
| In re: <br><br> AFH AIR PROS, LLC, *et al.*,[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 25-10356 (PMB) <br><br> (Jointly Administered) |

DECLARATION OF JEFFREY FINGER IN
SUPPORT OF THE DEBTORS' BIDDING PROCEDURES MOTION

Pursuant to 28 U.S.C. § 1746, Jeffrey Finger, declares as follows under the penalty of perjury:

1. I am a Managing Director and U.S. Co-Head of the Debt Advisory & Restructuring Group at Jefferies LLC ("Jefferies"), a global investment banking and financial advisory firm with its principal offices at 520 Madison Avenue, New York, New York 10022. I am over the age of 18 years and duly authorized to execute this Declaration on behalf of Jefferies. I am not being specifically compensated for this testimony. Jefferies, as a professional proposed to be retained by the Debtors, will receive payments in its capacity as investment banker to the Debtors. The Debtors have authorized me to submit this Declaration.

2. Unless otherwise stated, the facts set forth in this Declaration are based on my personal knowledge, information provided to me by other employees of Jefferies and records kept

---

[1] The last four digits of AFH Air Pros, LLC's tax identification number are 1228. Due to the large number of debtor entities in these chapter 11 cases, for which joint administration has been requested, a complete list of the debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the claims and noticing agent at https://www.veritaglobal.net/airpros. The mailing address for the debtor entities for purposes of these chapter 11 cases is: 150 S. Pine Island Road, Suite 200, Plantation, Florida 33324.

1

in the ordinary course of business by Jefferies, information provided to me by or on behalf of the Debtors, including directors, officers, and other advisors to the Debtors, and records kept in the ordinary course of business by the Debtors and provided by Debtors or their representatives to Jefferies, or my views and beliefs, including as based upon my experience and knowledge of the Debtors' business and financial condition. If I were called to testify, I would testify competently to the facts discussed herein on that basis.

3. This Declaration is being submitted in connection with the *Motion of the Debtors for Entry Of Orders (I)(A) Establishing Bidding Procedures Relating to the Sale of the Debtors' Assets, (B) Approving the Debtors' Entry into the Stalking Horse Purchase Agreements, (C) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (D) Approving Form and Manner of Notices Relating Thereto, (E) Scheduling a Hearing to Consider the Proposed Sale, and (F) Granting Related Relief; and (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Related Relief* (the "Bid Procedures Motion").[2]

## Background and Qualifications

4. Jefferies is a full-service investment banking firm, with thousands of employees around the world. Jefferies and its senior professionals have extensive expertise providing investment banking services to financially distressed companies, creditors, committees, equity holders, asset purchasers and other constituencies in reorganization proceedings and complex

---

[2] Capitalized terms used but not defined otherwise herein shall have the meanings ascribed to them in the Bid Procedures Motion.

ACTIVE 706950891

financial restructurings, both in and out of court. Jefferies and its professionals are providing or have provided investment banking, financial advisory and other services in connection with the following recent cases, among others: *In re Steward Health Care System LLC*, Case No. 24-90213 (CML) (Bankr. S.D. Tex. July 12, 2024); *In re WOM, S.A.*, Case No. 24-10628 (KBO) (Bankr. D. Del. June 20, 2024); *In re Number Holdings, Inc.*, Case No. 24-10719 (JKS) (Bankr. D. Del. Apr. 7, 2024); *In re Ebix*, Case No. 24-80004 (SWE) (Bankr. N.D. Tex. Feb. 6, 2024); *In re GOL Linhas Aéreas Inteligentes S.A.*, Case No. 24-10118 (MG) (Bankr. S.D.N.Y. Jan. 25, 2024); *In re Barretts Minerals Inc.*, Case No. 23-90794 (MI) (Bankr. S.D. Tex. Nov. 21, 2023); *In re Unconditional Love Inc.*, Case No. 23-11759 (MFW) (Bankr. D. Del. Oct. 23, 2023); *In re Aerotech Miami Inc. d/b/a iAero Tech*, Case No. 23-17503 (RAM) (Bankr. S.D. Fla. Oct. 16, 2023); *In re AppHarvest Products, LLC*, Case No. 23-90745 (DRJ) (Bankr. S.D. Tex. Sept. 12, 2023); *In re Qualtek Services, Inc.*, Case No. 23-90584 (CML) (Bankr. S.D. Tex. Aug. 4, 2023); *In re Benefytt Technologies, Inc.*, Case No. 23-90566 (CML) (Bankr. S.D. Tex. July 24, 2023); *In re Pipeline Health System, LLC*, Case No. 22-90291 (MI) (Bankr. S.D. Tex. Oct. 2, 2022); *In re Mining Project Wind Down Holdings, Inc. (f/k/a Compute North Holdings, Inc.)*, Case No. 22-90273 (MI) (Bankr. S.D. Tex. Sept. 22, 2022); *In re SAS AB*, Case No. 22-10925 (MEW) (Bankr. S.D.N.Y. Sept. 19, 2022).

5. I have over twenty-five (25) years of experience advising companies, boards of directors, financial sponsors and creditors across a range of industries in restructuring, recapitalization, liability management, financing and M&A transactions. Prior to joining Jefferies in 2016, I was a partner in the Debt Advisory and Restructuring Group at Centerview Partners and, earlier in my career, I was a Managing Director at Miller Buckfire & Co., a former member of the financial restructuring group of its predecessor, Dresdner Kleinwort Wasserstein, and worked in

3

the investment banking division of Wasserstein Perella. I hold an MBA from the University of Chicago Booth School of Business and a BA in economics from the University of Michigan.

## Debtors' Retention of Jefferies and the Prepetition Marketing Process

6. Jefferies has been advising the Debtors for over eighteen (18) months. In July 2023, the Debtors retained Jefferies as their investment banker to conduct an extensive and comprehensive marketing process for a corporate sale of the Debtors as a going concern (the "2023 Marketing Process"). In January 2024, the Debtors expanded Jefferies' mandate to raise capital to refinance the Debtors' prepetition debt, which ultimately did not result in receipt of any financing proposals. Subsequent to the 2023 Marketing Process and the changes in corporate management as described in the First Day Declaration, with the support of the Debtors' prepetition secured lenders, Jefferies' role was further expanded to explore sales of any or a portion of the Debtors' Assets, including individual business units, rather than solely on a consolidated basis (the "2024 Marketing Process"). In advising the Debtors in connection with these marketing processes, I was assisted by teams from Jefferies mergers and acquisition and industrials groups, which included two other Jefferies' Managing Directors, who collectively have over 30 years of experience.

7. The Debtors, together with Jefferies, launched the 2023 Marketing Process in August 2023 and contacted ninety-two (92) potential buyers, which included a broad range of potential strategic and financial buyers. Seventy-four (74) prospective buyers executed confidentiality agreements and received significant financial and business diligence information. In addition, potential buyers were offered the opportunity to participate in meetings with the Debtors' management team as well as to request additional due diligence items. The Debtors received six (6) non-binding initial indications of interest ("IOIs") and, after inviting the prospective buyers to a second round of the process, the Debtors received one (1) letter of intent. However, due to a variety of factors, including continued financial underperformance of the

4

business throughout the 2023 Marketing Process, the Debtors were unable to secure a binding sale offer.

8. The Debtors, together with Jefferies and their legal and financial advisors, launched the 2024 Marketing Process in October 2024 and contacted sixty (60) prospective strategic and financial buyers since such time. Fifty (50) prospective buyers executed confidentiality agreements and received access to a virtual data room with significant financial and business diligence information. In addition, prospective buyers were offered the opportunity to participate in meetings with the Debtors' management team as well as to request additional due diligence items. The Debtors received eighteen (18) IOIs and, after inviting prospective buyers to a second round of the process, ultimately executed six (6) stalking horse purchase agreements for different business units of the Debtors.

## Appointment of Stalking Horse Bidders

9. Based on my personal experience and overall knowledge of and familiarity with chapter 11 sale processes, I believe that appointment of a stalking horse bidder—here, six (6) stalking horse bidders for the various business units—would enhance the competitiveness of the Debtors' sale process. As a general matter, stalking horse bidders play an important role by demonstrating that a given lot of assets has a threshold value.

10. It is both typical and, in most instances, necessary for an interested party to be granted bid protections in exchange for its agreement to serve this pivotal role—a role that requires valuation of the assets being sold and development of a committed bid on an accelerated timeline in order to set a floor price for a debtor's assets and encourage higher or otherwise better bids. To that end, the Debtors and the Stalking Horse Bidders negotiated Bid Protections at arms' length in the form of a break-up fee of three percent (3%) of the cash purchase price reflected in the applicable Stalking Horse Purchase Agreement and an expense reimbursement totaling no more

5

than one percent (1%) of the cash purchase price. I believe that the Bid Protections, as a whole, are comparable to the bid protections often provided to similar bidders in other bankruptcy cases. I believe that these Bid Protections are reasonable, beneficial to the sale process, and necessary to induce the bidders to execute the Stalking Horse Purchase Agreements.

### The Bidding Procedures and Proposed Sale Timeline

11.     The Bidding Procedures generally set forth: (a) the requirements for participation in the bidding process, including the criteria for a bid to be designated as a Qualified Bid; (b) the process for the submission and evaluation of bids in connection with a Sale; (c) the requirements for participation in, and rules governing the conduct of, the Auction (if any) of some or all of the Assets; (d) the process for designation of Successful Bidders and Backup Bidders; and (e) all related dates and deadlines. The Bidding Procedures also make clear that bids may be of any of the Assets regardless of whether the Assets are included in a particular Stalking Horse Agreement. I believe the Bidding Procedures should increase the likelihood that the Debtors will obtain the highest or otherwise best value for the Assets to the benefit of the Debtors' estates and all parties in interest.

12.     Through the Bidding Procedures, the Debtors seek to establish an orderly and value-maximizing process for pursuing a sale in chapter 11 consistent with successful postpetition marketing processes in other similar chapter 11 cases. Based on my experience, I believe each of (a) the required deposit of ten percent (10%) of the purchase price and (b) an initial overbid requirement of one percent (1%) of the purchase price is reasonable. In addition, the requirements contemplated under the Bidding Procedures for Qualified Bids, including for committed financing with no financing or diligence outs, disclosure of necessary regulatory approvals, and the auction overbid process, are similar to those of other sale processes for which Jefferies has been retained

6

as an advisor.

13. The timeline proposed in the Bidding Procedures was designed in accordance with the approximate three-month milestone set forth in the proposed DIP Facility (as defined in the First Day Declaration) to close on the Sale. This timeline is, in my experience, sufficient time to run a value-maximizing sale process in a chapter 11 case, particularly where, as here, there were extensive prepetition marketing efforts undertaken by the Debtors, with Jefferies' assistance.

14. At the same time, I believe that the proposed sale timeline provides the Debtors and potential bidders sufficient time and opportunity to engage in necessary diligence, negotiate and review a Qualified Bid (in addition to the Stalking Horse Purchase Agreements), and formulate and submit timely competing bids to consummate a Sale. Further, because the Debtors, working in concert with Jefferies, have engaged in extensive prepetition marketing efforts, the Debtors have already made significant progress in their sale process, and have been able to largely concentrate their postpetition marketing efforts on expeditiously responding to diligence queries and supporting interested parties' efforts to evaluate the Assets.

## Conclusion

15. Based on my experience, I believe that the proposed Bidding Procedures and the dates proposed therein are designed to facilitate a competitive bidding process in which potential bidders are encouraged to participate and submit competing bids within the specified timeframe, so that the Debtors are able to consummate a value-maximizing Sales prior to the maturation of the proposed DIP Facility and in accordance with the milestones to which the Debtors agreed in exchange for the DIP Facility. I believe that the proposed dates and deadlines in the Bidding Procedures are appropriate and reasonable in light of the current status of the marketing process and the deadlines required under the proposed DIP Facility, and will provide the Debtors with

sufficient time to canvass the market while maintaining competitive tension.

16. The Bidding Procedures provide for an orderly, definitive, uniform, and appropriately competitive and transparent process through which interested parties may submit offers to purchase substantially all or some of the Assets. Additionally, the Bidding Procedures will allow the Debtors to conduct the Auction, if necessary, in a fair and open manner that will encourage participation by financially capable bidders with demonstrated ability to timely consummate a Sale. At the Auction, the Debtors, after consultation with the Consultation Parties, will have an opportunity to consider all competing offers and select the offer(s) that they deem to be the highest or otherwise best offer(s) for the Assets or which will otherwise maximize that value of the Assets. Alternatively, the Bidding Procedures also make clear that no Auction will be required as to a particular Stalking Horse Purchase Agreement if no Qualifying Bid is received for Assets other than that Stalking Horse Purchase Agreement.

17. Accordingly, it is my view, based on my experience, that the proposed transaction process set forth in the Bidding Procedures, including, without limitation, the timeline set forth therein and the Bid Protections, is reasonable, appropriate, and designed to maximize value under the circumstances.

*[Remainder of page left intentionally blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 18, 2025               /s/ *Jeffrey Finger*
                                                  Jeffrey Finger, Managing Director,
                                                  Jefferies, LLC