M. Jermaine Watson (SBN 24063055)
**CANTEY HANGER LLP**
600 West 6th Street, Suite 300
Fort Worth, Texas 76102
Phone: 817-877-2800
Fax: 817-877-2807
Email: jwatson@canteyhanger.com

David G. Sommer [admitted *pro hac vice*]
Md. Fed. Bar No. 27581
Jared S. Dvornicky [admitted *pro hac vice*]
Md. Fed. Bar No. 19157
**GALLAGHER LLP**
218 North Charles Street, Suite 400
Baltimore, Maryland 21201
Phone: 410-727-7702
Fax: 410-468-2786
Email: dsommer@gallagherllp.com
Email: jdvornicky@gallagherllp.com

*COUNSEL FOR MADISON MANOR, INC.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | ) | |
| | ) | Case No. 25-80185 (SGJ) |
| Debtor. | ) | |
| | ) | (Jointly Administered) |
| | ) | |

**MADISON MANOR, INC.'S OBJECTION TO DEBTORS'
PROPOSED SECTION 363 SALE OF THEIR ASSETS IN
ACCORDANCE WITH THE BIDDING PROCEDURES**

Madison Manor, Inc. ("Madison"), by its undersigned attorneys, submits this objection

("Objection") to Debtors' proposed sale of their assets under Section 363 and in accordance with

the Bidding Procedures (the "Transactions"). In support of this Objection, Madison respectfully

states the following[2]:

---

[1] There are 299 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/case/genesis/info. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

[2] Capitalized terms not defined in this Limited Objection retain their definitions from the August 25, 2025 Bidding Procedures Order (Dkt No. 685).

956317

## BACKGROUND

I.     **Madison selected two Debtors to serve as Madison's partners in the licensed operation and management of the Larkin Chase nursing home.**

1.     Madison is an affiliate of the University of Maryland Medical System ("UMMS").

2.     Madison is the co-general partner and a co-limited partner in Bowie Center Limited Partnership ("Bowie Center").

3.     Bowie Center owns and operates a 120-bed licensed nursing home located in Bowie, Maryland, known as "Larkin Chase."

4.     Madison selected Debtor Maryland Harborside, LLC ("MH") (Case No. 25-80359) to serve as Madison's co-general partner in Bowie Center.

5.     Madison selected Debtor Harborside Healthcare Limited Partnership ("Harborside" and together with MH, "Genesis") (Case No. 25-80248), to serve as Madison's co-limited partner in Bowie Center and the manager of Larkin Chase under a management agreement ("Management Agreement") between Harborside and Bowie Center. A true and accurate copy of the Management Agreement is attached as **Exhibit 1**.

6.     In selecting Harborside as manager of Larkin Chase, Madison placed significant trust and confidence in Harborside to run Larkin Chase effectively and in conformance with the Management Agreement and the federal and state laws governing nursing homes.

7.     Under the Management Agreement, Harborside is responsible for all day-to-day operations of Larkin Chase, including without limitation: bookkeeping, accounting, and data processing services; billing and collection and management of financial accounts; maintenance and repairs; purchasing and leasing; quality control; public relations; budgeting and expense management; and regulatory compliance. *See* Management Agreement (Ex. 1), §§ 1.01–1.15.

956317                                                                2

8.      In 2015, Madison, MH, and Harborside executed a Second Amended and Restated Agreement of Limited Partnership ("Partnership Agreement"). A true and accurate copy of the Partnership Agreement is attached as **Exhibit 2**.

9.      Maryland law governs the Partnership Agreement. *See* Partnership Agreement (Ex. 2), § 8.3.

10.     The Partnership Agreement divides the partnership interests in Bowie Center as follows:

- Madison has a .25% general partner interest;
- MH has a .75% general partner interest;
- Madison has a 24.75% limited partner interest; and
- Harborside has a 74.25% limited partner interest. *See* Partnership Agreement (Ex. 2), § 4.1.

11.     In selecting MH as the majority co-general partner, Madison placed significant trust and confidence in MH to oversee and guide the management and operation of Bowie Center. As co-general partner in Bowie Center, MH, along with Madison, has significant control over Bowie Center, including "sole and complete control of the management and operation of the affairs and business of [Bowie Center]." Partnership Agreement (Ex. 2), § 2.1.1. MH appoints two of the four members of the Operating Committee, which exercises the general partners' "overall management, control and supervision of the affairs and business of [Bowie Center], including the establishment of all policies of [Bowie Center]." *Id.* The Operating Committee must unanimously approve all major decisions of Bowie Center, including without limitation the following: adopting business plans and budgets; obtaining partnership financing; selling, leasing, transferring, or disposing of all or substantially all of the partnership's assets or merging or consolidating the partnership with any other entity; changing the licensed bed capacity of, level of patient care provided at, or scope of services provided at, Larkin Chase if such change requires the approval of any governmental agency

or authority; admitting new partners; settling legal proceedings; making capital calls; establishing levels of authority of the general partners and the manager of Larkin Chase; and selecting a certified public accounting firm to audit the partnership accounts. *Id.* § 2.1.2.

**II.   Madison has a right of first refusal and purchase option regarding Debtors' partnership interests in Bowie Center.**

12.     Madison protected its ability to select its partners by negotiating two critical contract rights regarding Genesis's partnership interests in Bowie Center (the "Genesis Bowie Partnership Interests"): (1) a right of first refusal ("ROFR"); and (2) a purchase option (the "Purchase Option"). *See* Partnership Agreement (Ex. 2), § 5.2 (ROFR), § 6.7 (Purchase Option).

13.     Pursuant to the ROFR, if Genesis wishes to sell the Genesis Bowie Partnership Interests to a third-party other than an MH affiliate and receives from such third party a bona fide written offer to purchase the Genesis Bowie Partnership Interests, Genesis must "first tender to Madison . . . an offer to sell such interest in [Bowie Center] at the same price and on the same terms and conditions as offered by the third party." Partnership Agreement (Ex. 2), § 5.2.

14.     In pertinent part, the Purchase Option states the following:

> Madison shall have the option to purchase the entire [Genesis Bowie Partnership Interests], together but not separately (including any partnership interest held by others after a permissible sale thereof by [Genesis]), in accordance with the Buy-Out Procedures set forth in Section 6.6 of this Agreement, which option may be exercised by Madison during the sixty (60) day period prior to (i) the seventh (7th) anniversary of the date of admission of the first patient into [Larkin Chase], and (ii) each anniversary of such date thereafter (i.e., after the seventh (7th) anniversary). Partnership Agreement (Ex. 2), § 6.7.

15.     More than seven years have passed since the admission of the first patient into Larkin Chase.

**III.    Pursuant to Section 363(f), Debtors seek to sell the Genesis Bowie Partnership Interests "free and clear of any interest" in the Genesis Bowie Partnership Interests.**

16.    On July 15, 2025, Debtors filed their *Motion for Entry of an Order (I) Approving Bidding Procedures and Expenses Reimbursement, (II) Approving the Debtors' Entry into the Stalking Horse APA, (III) Scheduling Certain Dates and Deadlines, (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts* (Dkt. No. 117) (the "Bidding Procedures Motion").

17.    In the Bidding Procedures Motion, Debtors request Court approval to sell their assets "free and clear of all encumbrances" under Section 363(f). *See* Bidding Procedures Motion (Dkt No. 117), ¶ 60.

18.    Madison objected to the Bidding Procedures Motion. To resolve that objection, prior to the hearing on the motion, Madison and Debtors agreed to propose provisions in the bidding procedures order explicitly (i) clarifying that the relief Debtors request in the Bidding Procedures Motion is not intended to affect any of Madison's rights under the Partnership Agreement, and (ii) identifying the deadlines by when Debtors must provide Madison adequate assurance information.

19.    On August 28, 2025, the Court entered an *Order (I) Approving Bidding Procedures and Expense Reimbursement, (II) Approving the Debtors' Entry into the Stalking Horse APA with the Stalking Horse Bidder and Subject to Higher or other Better Offers at the Auction in accordance with the Bidding Procedures, (III) Scheduling Certain Dates and Deadlines, (IV) Approving the Form and Manner of Notice Thereof, and (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases* (Dkt. No. 685) (the "Bidding Procedures Order").

956317                                            5

20.     The Bidding Procedures Order adopted the parties' agreed language and, with respect to Madison, states:

> **University of Maryland Medical System Matters**. Notwithstanding anything to the contrary herein, nothing in this Order shall affect the rights and interests of Madison Manor, Inc., the University of Maryland Medical System ("UMMS"), Dimensions Health Corporation, or any of UMMS's affiliates (collectively, the "UMMS Parties") under the Bowie Center Limited Partnership Agreement (as amended) or any other agreement to which any Debtor is a party relating to the ownership, operation, and/or management of Larkin Chase Care and Rehabilitation Center in Bowie, Maryland. The UMMS Parties reserve all rights in connection with any proposed sale of the Debtors' Assets. The Debtors will forward the adequate assurance information they have received from Qualified Bidders by e-mail to counsel to the UMMS Parties no later than 24 hours after the date of any Notice of Contract Assumption with respect to contracts with UMMS Parties (with respect to the Stalking Horse Bidder) and no later than 24 hours after the Bid Deadline with respect to any additional Qualified Bidders. In addition, the UMMS Parties shall be permitted to use adequate assurance information provided by Qualified Bidders as part of any objection, with the understanding that non-public information will be filed under seal. Bidding Procedures Order (Dkt No. 685), ¶ 42.

21.     The Bidding Procedures Order sets a Sale Objection Deadline of October 17, 2025.If any party fails to timely file with the Court and serve an objection by the Sale Objection Deadline, "such party shall be barred from asserting, at the Sale Hearing or otherwise, any objection to the relief requested in the [Bidding Procedures] Motion or to the consummation and performance of the Transaction(s), including the transfer of the Assets to the Successful Bidder, free and clear of all liens, claims, interests, and encumbrances pursuant to Bankruptcy Code section 363(f)." Bidding Procedures Order (Dkt No. 685), ¶ 13.

22.     The Bidding Procedures and Stalking Horse APA further provide that Debtors intend to sell their assets free and clear of all liens, claims, interests, or other encumbrances. *See* Bidding Procedures (Dkt. No. 685, Ex. 1), § I; Asset Purchase Agreement (Dkt. No. 685, Ex. 2),

956317                                                   6

§ 2.01 ("Upon and subject to the terms and conditions of this Agreement on the Closing Date and subject to entry of the Sale Order, Sellers will assume, sell, transfer, assign, convey and deliver to Buyer, and Buyer will purchase, acquire, assume and accept from Sellers all of Sellers' respective right, title and interest in, to and under the Purchased Assets, free and clear of all Liens, Claims and Liabilities to the extent permissible under Section 363(f) of the Bankruptcy Code[.]").

IV. **The Stalking Horse Bid does not allocate any portion of the Purchase Price to the JV Equity Interests and the Bidding Procedures do not include any process for obtaining new operating licenses.**

23. Article III of the Stalking Horse APA includes the Purchase Price for the Purchased Assets. The Purchase Price includes a credit bid, assumption of liabilities, and cash payments for all, or substantially all, of Debtors' assets. Article III of the Stalking Horse APA does not specify which of the many JV Equity Interests the Stalking Horse Bidder proposes to acquire, including the Genesis Partnership Interests. No other portion of the Stalking Horse APA specifies this, either.

24. In communications between Debtors' counsel and Madison's counsel, Debtors' counsel has confirmed that the Stalking Horse Bidder has not allocated, and will not allocate, any portion of the Purchase Price to any of the JV Equity Interests the Stalking Horse Bidder proposes to acquire.

25. Many states, including Maryland, heavily regulate nursing homes and require operating licenses to ensure patients are protected. *See* Code of Maryland Regulations ("COMAR") 10.24.02.03–.04 (establishing Maryland nursing home licensure requirements and the licensing process); COMAR 10.24.01.03 (additional requirements for approval by Maryland Health Care Commission for sale of Maryland nursing home). The Bidding Procedures do not include any process for obtaining new operating licenses if and when the Stalking Horse or other Successful Bidder acquires the JV Equity Interests and the other Purchased Assets.

956317                                                        7

## LIMITED OBJECTION

**I.   Any sale must preserve all of Madison's contract rights under the Partnership Agreement, including the ROFR and Purchase Option, and require Debtors to honor those rights in selling the Genesis Bowie Partnership Interests.**

**A.   Madison's rights under the Partnership Agreement are not "interests" under Section 363(f) and none of the Section 363(f) factors are satisfied in any event.**

26.    Section 363(b) authorizes a chapter 11 debtor-in-possession, after notice and a hearing, to sell estate property other than in the ordinary course of business.

27.    Section 363(f) provides that a debtor-in-possession may sell property "free and clear of any interest in such property of an entity other than the estate," only if one of the following five conditions is satisfied:

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

28.    "In the context of § 363(f)(4), many courts have defined 'bona fide dispute' as when there is an objective basis for a factual or legal dispute as to the validity of the asserted interest." *In re Patriot Place, Ltd.*, 486 B.R. 773, 815 (Bankr. W.D. Tex. 2013).

29.    The U.S. Bankruptcy Court for the Southern District of New York recently addressed the scope of Section 363(f)(5). In *In re Urb. Commons 2 W. LLC*, 668 B.R. 42, 48 (Bankr. S.D.N.Y. 2025), the court adopted a "realistic possibility" standard for determining the "legal or equitable proceeding(s)" that Section 363(f)(5) encompasses. Under that standard,

956317                                  8

Section 363(f)(5) encompasses "not any conceivable hypothetical proceeding that might compel interest holders to accept a money satisfaction, but only proceedings that might realistically be brought in the case before the court if the automatic stay were lifted or did not apply." *Id.* Typically, "this would include either foreclosure proceedings or UCC sales." *Id.* The court reasoned that "[g]iven the Bankruptcy Code's general reliance on state law to establish parties' baseline rights . . . it makes sense that Congress would have looked to such state law mechanisms to determine which property interests would be extinguished by a bankruptcy sale—that is, that Congress would have intended section 363 sales to strip off any interests that state law 'legal or equitable proceeding[s]' such as foreclosure sales and UCC sales would extinguish." *Id.* at 49–50. The court also concluded that Section 363(f)(5) is not satisfied when the interests at issue are contract rights like the right of a tenant with a non-disturbance agreement to remain on a property after it is sold. *Id.* at 49.

30.    The U.S. Bankruptcy Court for the Western District of Texas (El Paso Division) has held that Section 363(f)(5) is not satisfied when the interests at issue are contract rights and the underlying contract does not include a "buy-out provision" for those rights. *See In re Patriot Place, Ltd.*, 486 B.R. at 817.

31.    Based on the plain language of Section 363(f), the Court may consider whether any of the five conditions in Section 363(f) is satisfied only if the Court first concludes that the interest in question is an "interest" in estate property.

32.    The Bankruptcy Code does not define the term "interest." *Folger Adam Sec., Inc. v. DeMatteis/MacGregor JV*, 209 F.3d 252, 257 (3d Cir. 2000). "Courts faced with the task of defining the scope of the term 'any interest' have been unable to provide a precise definition." *Id.* at 258. "Thus, the issue continues to be addressed on a case-by-case basis, with a review of relevant

956317                                                      9

case law revealing a divergence of opinion." *In re PBBPC, Inc.*, 484 B.R. 860, 867 (B.A.P. 1st Cir. 2013).

33.     Some courts have narrowly interpreted "interest" to mean only *in rem* interests, like liens, and to exclude general unsecured claims in property being sold under Section 363. *See, e.g.*, *Schwinn Cycling and Fitness, Inc. v. Benonis* (*In re Schwinn Bicycle Co.*), 210 B.R. 747, 761 (Bankr.N.D.Ill.1997) (holding that Section 363(f) "in no way protects the buyer from current or future product liability; it only protects the purchased assets from lien claims against those assets"); *In re Wolverine Radio Co.*, 930 F.2d 1132, 1147 (6th Cir. 1991) ("[W]e do not perceive the experience history of [debtor] as an 'interest' that attaches to property ownership so as to cloud its title."); *In re White Motor Credit Corp.*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (explaining that Section 363 "authorizes sales free and clear of specific interests in the property being sold; liens, for example"); *id.* ("General unsecured claimants including tort claimants, have no specific interest in a debtor's property. Therefore, section 363 is inapplicable for sales free and clear of such claims."); *In re New Eng. Fish Co.*, 19 B.R. 323, 326 (Bankr. W.D. Wash. 1982) (concluding that general unsecured claimants did not have an interest in the property being sold under Section 363).

34.     Other courts have adopted a broader interpretation of the term "interest" in Section 363(f). *See, e.g.*, *In re PBBPC, Inc.*, 484 B.R. 860, 869 (B.A.P. 1st Cir. 2013) ("We conclude that the more expansive reading of the term 'any interest' advanced by the Seventh, Fourth, Third, and Second Circuits . . . is more consistent with the language of the Bankruptcy Code and the policy expressed in § 363. We therefore conclude that the term 'any interest' as used in § 363(f) is sufficiently elastic to include the Debtor's experience rate [under state unemployment assistance law]."); *In re Chrysler LLC*, 576 F.3d 108, 126 (2d Cir. 2009) (holding that product liability claims were Section 363(f) interests), *judgment vacated sub nom on other grounds*, *In re Chrysler, LLC*,

592 F.3d 370 (2d Cir. 2010); *In re Trans World Airlines, Inc.*, 322 F.3d 283, 289 (3rd Cir. 2003) (finding employment discrimination claims were Section 363(f) interests because those claims "arise from the property being sold"); *Precision Industries, Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 545 (7th Cir. 2003) (concluding lessee's possessory interest in property was Section 363(f) interest); *In re Leckie Smokeless Coal Co.,* 99 F.3d 573, 582 (4th Cir. 1996) (holding that successor liability claims under Coal Industry Retiree Health Benefit Act were Section 363(f) interests); *P.K.R. Convalescent Centers., Inc. v. Virginia*, 189 B.R. 90, 94 (Bankr.E.D.Va.1995) (finding statutory right to recapture depreciation on sale of health facility was Section 363(f) interest).

35.     While there is a divergence of opinions over the breadth of "interests" under Section 363(f), at least one consensus has emerged: to qualify as an "interest" under Section 363(f), the interest must "arise from the property being sold." *See In re Chrysler*, 576 F.3d at 126 ("We agree with *TWA* and *Leckie* that the term 'any interest in property' encompasses those claims that 'arise from the property being sold.'"); *see also In re Williamsburg Boutique LLC*, 663 B.R. 217, 225 (Bankr. S.D.N.Y. 2024) ("Although the text of the statute refers only to interests in the property itself, it is now generally agreed – including in this Circuit – that this provision may more broadly extinguish claims that 'arise from the property being sold.'"); *In re Christ Hosp.*, 502 B.R. 158, 185 (Bankr. D.N.J. 2013) (applying "arising from" test in *In re Chrysler*), *aff'd*, No. 14-472 ES, 2014 WL 4613316 (D.N.J. Sept. 12, 2014).

36.     Additionally, courts have held that rights of first refusal are not "interests" under Section 363(f), but rather contract rights. *See, e.g.*, *In re Corbett*, 550 B.R. 170, 183 (Bankr. D. Mass. 2016) ("In this regard, the Court also concludes that the right of first refusal contained in Goodwill's lease is not an 'interest' in either the Membership Interest or the Beneficial Interest sold

by the Trustee to Kavanagh as it is not a claim flowing from the Property sold by the Trustee."); *In re Fleishman*, 138 B.R. 641, 647 (Bankr. D. Mass. 1992) ("The Right of First Refusal is thus not an interest in property but a contract right[.]"); *In re Alisa P'ship*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) (concluding that the legislative history of Section 363 "reflects that Congress intended to provide a means for obtaining the maximum benefit possible for the debtor's estate while also providing protection for co-owners by way of right of first refusal").

37.     Madison's ROFR and Purchase Option do not arise from the Genesis Bowie Partnership Interests that Debtors seek to sell—they arise from the Partnership Agreement. Accordingly, Madison's ROFR and Purchase Option are not "interests" under Section 363(f), and Debtors cannot sell the Genesis Partnership Interests free and clear of those contract rights.

38.     Even if Madison's contract rights under the Partnership Agreement are "interests" under Section 363(f) (they are not), none of the Section 363(f) conditions are satisfied:

(1)  State law does not permit sale of the Genesis Bowie Partnership Interests free and clear of Madison's contract rights;

(2)  Madison does not consent to the sale of the Genesis Bowie Partnership Interests free and clear of Madison's contract rights;

(3)  Madison's contract rights are not a lien;

(4)  The Partnership Agreement is a valid and enforceable agreement and Madison's contract rights are not in bona fide dispute; and

(5)  Madison could be not be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its contract rights under the Partnership Agreement. Those contract rights are not subject to sale through a foreclosure or UCC sale. *See In re Urb. Commons 2 W. LLC*, 668 B.R. at 49–50. Further, the Partnership Agreement does not include any "buy-out provision" for those rights. *See In re Patriot Place, Ltd.*, 486 B.R. at 817. The Partnership Agreement includes buy-out provisions for partnership interests (*see, e.g.*, Partnership Agreement (Ex. 2), § 6.7) but not for contract rights like Madison's ROFR and Purchase Option.

956317

12

*See In re Plascencia*, 354 B.R. 774, 781 (Bankr. E.D. Va. 2006) (concluding that trustee could not sell property free and clear of repurchase option because none of the Section 363(f) factors were satisfied).

**B. Debtors cannot assume and assign the Partnership and Management Agreements without Madison's consent because Maryland law prohibits adding new partners without the consent of the other partners and the Partnership and Management Agreements are personal services contracts.**

39.     Subject to court approval, Section 365(a) permits a trustee or debtor-in-possession to assume or reject any executory contract or unexpired lease of the debtor.

40.     Under Section 365(f)(1), a trustee or debtor-in-possession may assign an executory contract or unexpired lease of the debtor "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease."

41.     Section 365(c)(1), however, prohibits a trustee or debtor-in-possession from assuming or assigning any executory contract or unexpired lease of the debtor if "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession" and "such party does not consent to such assumption or assignment."

42.     "[T]he focus for determining whether [an] agreement is not subject to assumption under § 365(c)(1) is . . . 'applicable law.'" *In re O'Connor*, 258 F.3d 392, 402 (5th Cir. 2001).

43.     This Court has explained the interplay between Sections 365(c)(1) and (f)(1) as follows: Section 365(f)(1) "states the general rule that a trustee or debtor in possession may assign an executory contract notwithstanding 'applicable law' that prohibits assignment, while [Section] 365(c)(1)(A) represents an exception to that rule where applicable law protects the right of the non-debtor contracting party to refuse to accept from or render performance to an assignee, and does not

apply to general prohibitions on assignments." *In re Lil' Things, Inc.*, 220 B.R. 583, 591 (Bankr. N.D. Tex. 1998).

44.     Another bankruptcy court in the Fifth Circuit has added the following gloss to the relationship between Sections 365(c)(1) and (f)(1):

> "[G]enerally applicable laws which restrict or prohibit transfer of rights or duties under contracts (thereby excusing performance for the non-transferring party) **independent** of any restriction contained within the contract itself, are covered by the provisions of § 365(c)(1) . . . . However, laws for which operation of that law is **dependent** upon contractual provisions prohibiting, restricting, or conditioning transfer are not excepted from § 365(f)(1) by § 365(c)(1), and are not enforceable against a trustee seeking to assume and assign a contract of the debtor." *In re Supernatural Foods, LLC*, 268 B.R. 759, 792 (Bankr. M.D. La. 2001) (emphasis added).

45.     As recognized by this Court, and others, "[o]ne type of executory contract which cannot be assigned or assumed by a debtor under [Section 365(c)(1)] is a personal services contract, which requires the performance of the party to the contract and not of a substitute." *In re Catron*, 158 B.R. 624, 627 (Bankr. E.D. Va. 1992) (citing Restatement (Second) of Contracts §§ 318(2), 319(2) (1981)), *aff'd*, 158 B.R. 629 (E.D. Va. 1993), *aff'd*, 25 F.3d 1038 (4th Cir. 1994); *see In re Lil' Things, Inc.*, 220 B.R. at 587–88 ("[P]ersonal services contracts are merely one type of contract which f[a]ll under the 365(c)(1)(A) exception, and not the only type.").

46.     For purposes of Section 365(c), a partnership agreement is a personal services contract because "[f]undamentally a partnership is based upon the personal trust and confidence of the partners." *In re Catron*, 158 B.R. at 627 (citing Uniform Limited Partnership Act § 404 (1992)); *see id.* ("[B]ecause of the partners' personal relationship and trust, the agreement or contract governing the partnership is essentially a contract for personal services, which renders it also nondelegable and nonassumable."); *In re Schick*, 235 B.R. 318, 325 (Bankr. S.D.N.Y. 1999) ("The identity of any partner is material to the other partners, and the right to choose one's partners is a

956317                                    14

fundamental tenet of partnership law. Thus, the trustees cannot force the Objectants to accept substitute 'performance' from or render performance to a stranger."); *See also Matter of Daugherty Const., Inc.*, 188 B.R. 607, 614 (Bankr. D. Neb. 1995) (concluding that "a partnership agreement or LLC agreement constitutes an intensely personal contract"); *In re Sunset Devs.*, 69 B.R. 710, 713 (Bankr. D. Idaho 1987) ("The partnership agreement creates a fiduciary relationship among the partners. It is a contract based on personal trust and confidence. The partners fiduciary character imposes upon the parties the duty of good faith and fair dealing and requires that none of the partners take unfair advantage. A partnership agreement is a contract based on personal trust and confidence, which cannot be assigned or assumed without consent of the parties.").

47.     In *In re O'Connor*, 258 F.3d at 402, the Fifth Circuit concluded that "the district court correctly held the [partnership] agreement was not assumable under § 365(c)(1)" because the non-debtor counterpart to the partnership agreement did not consent to assumption and Louisiana corporate law, La. Civ. Code art. 2812, conditions transfer of partnership interest on consent from the other partners regardless of any such condition in the underlying partnership agreement.

48.     Here, assuming without conceding that the Partnership and Management Agreements are executory contracts, for at least two reasons, Section 365(c)(1) prohibits Debtors from assuming and assigning the Partnership and Management Agreements without Madison's consent.

49.     First, just like the Louisiana statute at issue in *In re O'Connor*, the Maryland Revised Uniform Limited Partnership Act prohibits adding new limited or general partners without the consent of the other partners and does not depend on contractual provisions restricting the transfer of partnership interests. *See* Md. Code, Corps. & Ass'ns §§ 10-301, 10-401 (West 2025).

50.     Second, the Partnership and Management Agreements are "intensely personal

contract[s]." *Matter of Daugherty Const., Inc.*, 188 B.R. at 614. Those contracts afford Genesis significant control over Bowie Center and Larkin Chase, and Madison placed significant trust and confidence in Genesis by selecting Genesis as co-general partner, co-limited partner, and manager. Madison selected Genesis as its co-general partner, co-limited partner, and manager of Larkin Chase due to Genesis's extensive experience and reputation in the nursing home industry, and Madison relies heavily on Genesis to oversee and operate Bowie Center and Larkin Chase in accordance with license requirements and to ensure appropriate care for the vulnerable adults Larkin Chase serves.

51.     At this time, the identity of Madison's partners and the Larkin Chase manager is especially critical because Bowie Center is still working to restore operations and revenues to their levels before a recent casualty event at Larkin Chase.

52.     Madison does not consent to Debtors assuming and assigning the Partnership or Management Agreements unless Debtors honor all of Madison's rights under both contracts.

**II.   Any sale must comply with the ROFR procedure in the Partnership Agreement, including specifying the Stalking Horse bid for the Genesis Bowie Partnership Interests.**

53.     The Stalking Horse APA does not allocate a portion of the Purchase Price to any of the JV Equity Interests the Stalking Horse Bidder proposes to acquire, and Debtors' counsel has confirmed that the Stalking Horse Bidder has not performed, and will not perform, this allocation.

54.     This failure to specify the amount bid for the Genesis Bowie Partnership Interests violates the Partnership Agreement and prevents Madison from exercising its ROFR.

55.     Debtors must comply with every aspect of the ROFR procedure in the Partnership Agreement. Specifically, but without limitation, in accordance with Partnership Agreement § 5.2, Debtors must tender to Madison an offer to sell the Genesis Bowie Partnership Interests on the same terms and conditions as offered by the Stalking Horse Bidder, or other Successful Bidder, and further

956317                                                         16

afford Madison thirty (30) days to consider whether to accept or decline the sale offer. It is impossible to comply with or exercise the ROFR where, as here, it is impossible to determine the terms upon which Debtors propose to sell the Genesis Bowie Partnership Interests.

**III.   Any sale must comply with a process under Maryland law for nursing home licensure.**

56.      Maryland law requires all comprehensive or extended care facilities ("nursing homes") like Larkin Chase to obtain a license from the Secretary of the Maryland Department of Health ("Department"). *See* COMAR 10.07.02.03A.

57.      A license application must be "filed with the Department at least 60 days before the anticipated issuance of the license." COMAR 10.07.02.04A(2).

58.      The license application is onerous and takes significant time to complete and be evaluated by the applicable Maryland licensing bodies, including the Department, Office of Health Care Quality, and the Maryland Health Care Commission. *Id.*; COMAR 10.24.01.03A–B.

59.      Per COMAR 10.07.02.04B(4)(a), "[i]f the sale, transfer, assignment, or lease of a nursing home causes a change in the person or persons who control or operate the nursing home, the nursing home shall be considered a 'new nursing home' and the licensee shall conform to all regulations applicable at the time of transfer of operations."

60.      Notably, "[t]he transfer of any stock which results in a change of the person or persons who control the nursing home, or a 25 percent or greater change in any form of ownership interest, constitutes a sale." COMAR 10.07.02.04B(4)(b).

61.      Because the Genesis Bowie Partnership Interests compose 75% of the total Bowie Center partnership interests, Bowie Center will have to apply for and obtain a new license from the Department.

62.      A sale that disregards Maryland's licensing requirements could cause regulators

956317                                                    17

to suspend operations at the facility or sanction Bowie Center, causing prejudice to the center itself, Madison, as a co-general partner and limited partner, and the facility's residents who depend on licensed healthcare.

### RESERVATION OF RIGHTS

63.    Madison reserves any and all rights to supplement and/or amend this Limited Objection and expressly reserves the right to assert any further objections with respect to the Transactions as they deem necessary or appropriate.

### CONCLUSION

**WHEREFORE**, Madison respectfully requests that the Court enter an order (i) modifying any sale order as requested herein, and (ii) granting such other and further relief as this Court deems just and proper.

Dated: October 17, 2025
       Fort Worth, Texas

Respectfully submitted by,

*/s/ M. Jermaine Watson*
M. Jermaine Watson
State Bar No. 24063055
**CANTEY HANGER LLP**
600 West 6th Street, Suite 300
Fort Worth, Texas 76102
Phone: 817-877-2800
Fax: 817-877-2807
Email: jwatson@canteyhanger.com

David G. Sommer [admitted pro hac vice]
Md. Fed. Bar No. 27581
Jared S. Dvornicky [admitted pro hac vice]
Md. Fed. Bar No. 19157
**GALLAGHER EVELIUS & JONES LLP**
218 North Charles Street, Suite 400
Baltimore, Maryland 21201
Phone: 410-727-7702
Fax: 410-468-2786

956317

18

Email: dsommer@gejlaw.com
Email: jdvornicky@gejlaw.com

***Counsel to Madison Manor, Inc.***

956317

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 17, 2025, a true and correct copy of the foregoing *Objection*, along with exhibits, was served electronically by the Court's PACER system on all parties who have entered their appearance in this chapter 11 proceeding.

*/s/ M. Jermaine Watson*
M. Jermaine Watson