## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | Case No. 25-80185 (SGJ) |
| Debtors. | (Jointly Administered) |
| | Related Docket Nos. 117, 920 |

## UNITED STATES' OBJECTION TO DEBTORS' MOTION TO SELL VARIOUS ASSETS FREE AND CLEAR

The United States of America (the "United States"), on behalf of the U.S.

Department of Health and Human Services ("HHS") and its agency, the Centers for

Medicare & Medicaid Services ("CMS"), the Department of Housing and Urban

Development ("HUD"), the U.S. Department of Veteran Affairs ("VA") and the U.S.

Department of Treasury ("Treasury"), objects to the *Debtors' Motion for Entry of an Order*

*(I) Approving Bidding Procedures and Expense Reimbursement, (II) Approving the*

*Debtors' Entry into the Stalking Horse APA, (III) Scheduling Certain Dates and Deadlines,*

*(IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and*

*Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing*

*the Assumption and Assignment of Assumed Contracts and (VII) Authorizing the Sale of*

---

[1] The last four digits of Genesis Healthcare, Inc.'s federal tax identification number are 4755. There are 299 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at *https://dm.epiq11.com/Genesis*. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

*Assets* (the "Sale Motion") [Docket No. 117].[2] In support of this objection, the United

States avers as follows:

## INTRODUCTION

Through the Sale Motion, Debtors seek to "sell" under section 363 of the

Bankruptcy Code, among others, their Medicare Provider Agreements (defined below),

free and clear of the obligations associated with the agreements, including those

obligations that a buyer must accept to participate in the Medicare program. Debtors

cannot. Medicare Provider Agreements may only be transferred through the CMS-

prescribed Change in Ownership ("CHOW") process. Through the CHOW process, a

purchaser takes a previous provider's Medicare Provider Agreement subject to any

outstanding obligation, including any overpayments or underpayments, and subject to the

provider history.

Similarly, to the extent Debtors seek to sell or assign their existing Regulatory

Agreements, they may not do so. Any entity wishing to operate or lease a skilled nursing

facility encumbered with a HUD-insured mortgage must successfully complete HUD's

regulatorily prescribed Change in Operator/Tenant process.

Furthermore, to the extent the sale price for the HUD Collateral (defined below),

including the Rochester Manor Facility (the "Facility"), does not exceed the amounts

outstanding or the Buyer does not assume the obligations owed to HUD, this Court cannot

approve a Sale of the HUD Collateral free and clear of HUD's interests under section 363.

First, HUD has yet to consent to a free and clear sale. Second, no applicable non-

---

[2] Unless otherwise defined herein, capitalized terms have the meaning ascribed to them in
the Sale Motion.

bankruptcy law permits the sale of the HUD Collateral free and clear of the HUD-insured mortgage or regulatory agreement. Third, the interests created by the HUD-insured mortgages and the regulatory agreements are not in bona fide dispute. Finally, no mechanism exists to compel HUD to accept a money satisfaction of its interests in the HUD Collateral to allow a free and clear sale.

Finally, the United States objects to the waiver of the automatic 14-day stay of sale orders under Fed. R. Bankr. P. 6004(h). The Debtors have failed to make any evidentiary showing that such a waiver is necessary, and waiving the stay could unfairly prejudice the United States' ability to secure its rights to appeal any adverse rulings.

## BACKGROUND

1.     On July 9, 2025 (the "Petition Date"), the above-captioned debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2.     As of the Petition Date, Debtors operated approximately 175 skilled nursing facilities and assisted/independent living facilities across 18 states. *See Declaration of Louis E. Robichaux IV in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 18] at ¶ 1, 33.

## CMS's Interest

3.     Since before the Petition Date, certain Debtors have held Medicare Provider Agreements with the Secretary of HHS to provide skilled nursing services for Medicare beneficiaries.[3] As Medicare providers, these Debtors must maintain the Medicare Provider

---

[3] The statutory and regulatory provisions governing the Medicare system are located at 42 U.S.C. § 1395, *et seq*. and 42 C.F.R. Chapter IV (collectively, the "Medicare Law").

Agreements to remain eligible for reimbursement services provided to Medicare

beneficiaries. 42 U.S.C. § 1395cc; 42 C.F.R. § 400.202 (defining "provider"). All

prospective Medicare Part A providers must be certified and deemed eligible as providers

to enter into provider agreements. *See* 42 U.S.C. § 1395cc(j); 42 C.F.R. §§ 488.1, 488.3,

489.1, 489.2 and 489.10.

4.      The Stalking Horse Term Sheet (the "Term Sheet") lists the Debtors'

Medicare Provider Agreements among the assets it seeks to sell free and clear. The Term

Sheet defines "Purchased Assets" as, among others, "all of the Sellers' rights in any

Medicare and Medicaid provider numbers, related national provider identifiers,

reimbursement agreements, and Medicare and Medicaid cost or tax settlements, in each

case that relate to the operations of the Sellers' business." Term Sheet at 2, 4 [Docket No.

117-2].

### HUD's Interest

5.      Before the Petition Date, Berkadia Commercial Mortgage LLC (the "HUD

Lender") extended a loan (the "Loan") to Debtor 40 Whitehall Road Property (the "HUD

Debtor"). The associated mortgage note (the "Mortgage Note") evidences the HUD

Debtor's obligations under the Loan. To secure the HUD Debtor's obligations under the

Mortgage Note, the HUD Debtor granted the HUD Lender a mortgage lien and security

interest (the "Mortgage") in the Facility. Through a Security Agreement, the HUD Debtor

granted security interests in substantially all of its personal property to the HUD Lender

and to HUD to secure its obligations under the Mortgage Note and the Rochester Manor

Regulatory Agreement (defined below).

6.      HUD, on behalf of the Federal Housing Administration ("FHA"), insured the Loan and Mortgage under Section 232 of the National Housing Act. *See* 12 U.S.C. § 1715w. Under Section 232 of the National Housing Act, HUD insures first mortgages on nursing homes and other healthcare facilities. *See* 12 U.S.C. § 1715w(b)(4) (defining "mortgage" as the "first mortgage on real estate in fee simple"). As a condition of the FHA insurance, the HUD Debtor and HUD entered into the Rochester Manor Regulatory Agreement. The Rochester Manor Regulatory Agreement was recorded in the land records for the Facility. Among others, the Rochester Manor Regulatory Agreement requires the HUD Debtor to obtain HUD's approval before transferring any mortgaged property. The Rochester Manor Regulatory Agreement also requires the HUD Debtor to perform under the Mortgage and Mortgage Note. *See* Ex. A at 6.

7.      Various other Debtors operate or lease the Facility or facilities on non-Debtor real property encumbered by HUD-insured mortgages (the "Leased HUD Facilities"). As a condition of operating or leasing a Leased HUD Facility, the operator or lessee ("HUD Lessees") must enter into a regulatory agreement with HUD ("Leased HUD Facilities Regulatory Agreements") and must grant security interests in all of their personal property to HUD and the respective HUD-insured lender to secure their obligations under the Leased HUD Facilities Regulatory Agreements and the HUD-insured Loan. The Facility and the personal property of the HUD Lessees constitute the "HUD Collateral".

8.      Through the Sale Motion, the Debtors seek authority to sell all of their interests in real and personal property free of liens, claims, interests, and encumbrances. Sale Motion at 22-24. This includes sale of the HUD Collateral. *Id.*

5

## **ARGUMENT**

9.      This Court must deny the Sale Motion for five reasons. First, Debtors cannot transfer their Medicare Provider Agreements without undergoing CMS's Change in Ownership process. Second, the Debtors cannot sell their Medicare Provider Agreements free and clear of statutory and regulatory requirements and recoupment rights. Third, the Debtors cannot sell or otherwise transfer the Leased HUD Facilities Regulatory Agreements. Rather, the Stalking Horse Bidder or other Buyer must enter into new regulatory agreements in compliance with HUD's Change of Operator/Tenant transfer process. Fourth, Debtors cannot sell the HUD Collateral free and clear of HUD's interests. Fifth, under the Anti-Assignment Act, Debtors cannot assign any government contracts without the consent of the relevant government agency. Finally, to the extent the Court does approve the sale, the Debtors have failed to justify waiver of Bankruptcy Rule 6004(h)'s automatic stay, so the Court should deny that request.

I.      **The Debtors Cannot Transfer their Medicare Provider Agreements and HUD Regulatory Agreements.**

    a.  **The Only Lawful Way to Transfer a Medicare Provider Agreement is Through the Change in Ownership Process.**

10.     The Debtors cannot sell the Medicare Provider Agreements because Medicare Law bars their sale. Non-bankruptcy law defines the extent of a debtor's rights in property, and the Bankruptcy Code cannot expand such rights. *See, e.g., In re Airadigm Commc'ns, Inc.,* 519 F.3d 640, 651 (7th Cir. 2008) ("[Where] the property itself—the license—is a creature of federal law[,]. . . federal law also defines the . . . interest in that license."); *United States v. Consumer Health Servs. of Am., Inc.*, 108 F.3d 390, 394-95 (D.C. Cir. 1997) (finding that the Bankruptcy Code could not modify an explicit statutory

6

scheme defining liability for services under Medicare); *In re FCX, Inc.*, 853 F.2d 1149,

1153 (4th Cir. 1988) ("[Section] 363(b)(1) permits the trustee to 'use, sell, or lease'

property of the estate but evinces no intent to enlarge the trustee's rights to take such

actions beyond the debtor's pre-bankruptcy rights."); *In re Schauer*, 835 F.2d 1222, 1225

(8th Cir. 1987) (finding that section 363 is an "enabling statute . . . that give[s] the trustee

the authority to sell or dispose of property if the debtor would have had the same right

under state law."). Thus, if the law that creates the property interest also restricts the

transfer of that interest, a debtor cannot disregard non-bankruptcy law and transfer the

interest in violation of such restrictions. *See, e.g., In re Schauer*, 835 F.2d at 1225 (refusing

to permit sale of patronage margin certificates absent statutorily required consent); *In re

Farmers Markets, Inc.*, 792 F.2d 1400, 1402 (9th Cir. 1986) (holding that the debtor's right

to transfer a liquor license is subject to California's right receive state tax payments under

applicable state law); *In re Cosner*, 3 B.R. 445, 448 (Bankr. D. Or. 1980) (concluding that,

under the Bankruptcy Act of 1898, as amended, the capital reserve account of a debtor-

patron of a farm cooperative was subject to transfer restrictions).

      11.    Here, Medicare Law, the applicable non-bankruptcy law, creates and

defines any "interest" the Debtors have in their Medicare Provider Agreements. Medicare

Law explicitly prohibits sale of Medicare Provider Agreements, *see* 42 C.F.R. § 424.550(a)

("[A] provider or supplier is prohibited from selling its Medicare billing number or

privileges to any individual or entity, or allowing another individual or entity to use its

Medicare billing number"), and permits their transfer only through the CHOW regulatory

process. The highly reticulated CHOW process alleviates the need for the new owners to

complete the intricate procedures to qualify as a new provider, but nevertheless requires the

7

proposed transferee to undergo an application process and agree, among other things, to accept the outstanding obligations in the agreement, including provisions for over and under adjustment of payments, and the previous provider's compliance history. 42 C.F.R. § 489.18(d); *see United States v. Vernon Home Health, Inc*., 21 F.3d 693, 696 (5th Cir. 1994) (holding Medicare Law "unambiguously" requires the assignee of the provider agreement to take liability for the Medicare overpayments that were made to the assignor); *Deerbrook Pavilion, LLC v. Shalala*, 235 F.3d 1100 (8th Cir. 2000) (holding that assignee of Medicare provider agreement is liable for money penalty imposed under that provider agreement prior to the assignment); *Off. Comm. of Unsecured Creditors v. Chase Manhattan Bank (In re Charter Behav. Health Sys., LLC)*, 45 F. App'x 150, at n.1 (3rd Cir. 2002) ("If the new owner [of a provider] elects to take assignment of the existing Medicare Provider Agreement, it receives an uninterrupted stream of Medicare payments but assumes successor liability for overpayments" and other liabilities); *Eagle Healthcare, Inc. v. Sebelius*, 969 F. Supp. 2d 38, 40 (D.D.C. 2013) (citations omitted) (in taking assignment of a Medicare provider agreement, the new owner of a provider "merely steps into the shoes of the prior owner"); *see also Delta Health Grp., Inc. v. U.S. Dep't of Health & Human Servs.*, 459 F. Supp. 2d 1207, 1210 (N.D. Fla. 2006) (though the provider may be sold to a new corporate owner, "the actual *provider* itself remains the same") (emphasis in original); *Delco, Inc. v. Corp. Mgmt., Inc.*, 2012 WL 3154969, at *4 (S.D. Miss. Aug. 2, 2012) (quoting *In re Raintree Healthcare Corp.*, 431 F.3d 685, 688 (9th Cir. 2005)).[4]

---

[4] Notably, Medicare Law includes no right to transfer a Medicare Provider Agreement at all but requires an entity wishing to become a Medicare Part A provider to satisfy the application and qualification process in 42 U.S.C. § 1395cc. CMS instituted the CHOW process fourteen years after passage of the Medicare statute to provide a narrow means to

12.    Debtors cannot avoid these statutory restrictions on the sale of the Medicare Provider Agreements through a sale under section 363. To allow otherwise grants the Debtors greater rights under the Medicare Provider Agreements than that exist outside of bankruptcy. *See, e.g., City Wide Cmty. Dev. Corp. v. City of Dallas (In re City Wide Cmty. Dev. Corp.)*, 656 B.R. 186, 200 (Bankr. N.D. Tex. 2023) ("The Supreme Court has emphasized that bankruptcy law is not itself a source of property rights.") (citing *Butner v. United States*, 440 U.S. 48, 54-55 (1979)); *In re Welker*, 163 B.R. 488. 489 (Bankr. N.D. Tex. 1994) (emphasizing a debtor may not employ section 363 to sell property free and clear of HUD's regulatory interests); *Ganter v. Montano (In re Heritage Pac. Fin., LLC)*, Adv. No. 15-4086, 2016 Bankr. LEXIS 2496, *8 (Bankr. E.D. Tex. July 6, 2016) (citing *Butner* and finding that bankruptcy does not create or enlarge property interests). Simply put, the Debtors cannot sell their Medicare Provider Agreements "free and clear" of Medicare obligations because Medicare Law, which creates and defines the Debtors' "interest" in their Medicare Provider Agreements, prohibits their sale.

**b.    Even If the Medicare Provider Agreements Could Be Transferred Outside the Applicable Regulatorily-Required Process, the Medicare Provider Agreements May Not Be Sold 'Free and Clear' of Statutory and Regulatory Requirements or Recoupment Rights.**

13.    Even if the Debtors could lawfully sell or assign the Medicare Provider Agreements, they could not sell or assign them "free and clear" of associated regulatory compliance obligations or the United States' recoupment rights. The obligation to comply with Medicare Law is not an "interest" capable of being stripped from the provider

---

avoid the delay associated with the new provider's qualification under section 1395cc. *See* Notice of Final Rule, 44 Fed Reg. 6958, 6959.

agreements through a "free and clear" sale under 11 U.S.C. § 363(f). The term "interest in property" generally refers to liens and security interests that attach to property of the estate. *See, e.g., In re N. Am. Techs. Grp., Inc.*, 2010 WL 6982456, at *5 (Bankr. E.D. Tex. Mar. 18, 2010); *In re Nature Leisure Times, LLC*, 2007 WL 4554276, at *2 (Bankr. E.D. Tex. Dec. 19, 2007). The United States' regulatory interest in administering the Medicare program for the benefit of Medicare patients and taxpayers does not constitute an "interest in property" that can be extinguished under 11 U.S.C. § 363(f). *See, e.g., Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V.*, 209 F.3d 252, 260 (3d Cir. 2000); *In re Braniff Airways, Inc.*, 700 F.2d 935, 942 (5th Cir. 1983) ("[A]ny transfer of a state or federal regulatory license or certificate [via section 363] is subject to the continuing jurisdiction and approval of the applicable agency."); *In re Wolverine Radio*, 930 F.2d 1132, 1146 (6th Cir. 1991) (finding that state assigned credit rating used to determine a chapter 11 debtor's payments to the state unemployment fund was not an interest in property that could be extinguished under 11 U.S.C. § 363(f)); *In re Eveleth Mines, LLC*, 312 B.R. 634, 655 (Bankr. D. Minn. 2004) (concluding state taxing authority's use of debtor's pre-sale iron ore production to compute production tax for which purchaser was partially liable held not to be an "interest in property" subject to §363(f)). Accordingly, the Debtors and the Buyer cannot strip their statutory and regulatory obligations to HHS.

14.    Likewise, the United States' rights to recover overpayments or other obligations through recoupment from future Medicare payments is not an "interest" which can be extinguished under section 363(f). Recoupment is not a claim, but a defense to a claim. *See* 42 U.S.C. § 1395g(a); *see also Kosadnar v. Metro. Life Ins. Co. (In re Kosadnar)*, 157 F.3d 1011, 1013-14 (5th Cir. 1998); *Chicago Title Ins. Co. v. Seko Inv.,*

10

*Inc. (In re Seko Inv., Inc.)*, 156 F.3d 1005, 1008-9 (9th Cir. 1997); *Conoco, Inc. v. Styler
(In re Peterson Distrib., Inc.)*, 82 F.3d 956, 959 (10th Cir. 1996); *Lee v. Schwieker*, 739
F.2d 870, 875 (3d Cir. 1984). Because recoupment is not a claim, it "does not even fall
under the broadest interpretation of an 'interest' in property" for purposes of section 363(f).
*In re Lawrence United Corp.*, 221 B.R. 661, 669 (Bankr. N.D. N.Y. 1998); *Folger Adam
Sec,* 209 F.3d at 254-64 (finding that recoupment does not "constitute an 'interest' for
purposes of section 363(f)" and, therefore, may not be extinguished by a bankruptcy sale).[5]
The rights of setoff and recoupment do not constitute liens or charges disjoined from
associated Medicare claims. *See, e.g., Newberry Corp. v. Fireman's Fund Ins. Co.*, 95 F.3d
1392 (9th Cir. 1996). To the contrary, in the context of Medicare reimbursements, such
rights are simply "necessary adjustments" to payments which otherwise would be
due to the Medicare provider. *See* 42 U.S.C. § 1395g(a); *Consumer Health Servs. of
America*, 108 F.3d at 394.

15.    Thus, "necessary adjustments" are not (and cannot be) "interests" that attach
to the independently existing property (*i.e.*, Medicare Provider Agreements), but rather are

---

[5] Even if the United States' rights could be characterized as interests, the Debtors have not
(and could not) established a right to sell free and clear of such interests under *any* of the
subparts of section 363(f). Applicable non-bankruptcy law (Medicare Law) does not permit
the sale of Medicare Provider Agreements free and clear of such interest under section
363(f)(1). The United States does not consent to the sale as required by section 363(f)(2).
The United States' interests are not liens that can be extinguished under section 363(f)(3).
No *bona fide* dispute exists as to those rights under section 363(f)(4). Finally, under 11
U.S.C. § 363(f)(5), the United States cannot be compelled to accept a monetary settlement
disregarding or abrogating the rights guaranteed under the Medicare program by
Congress. *See Maryland Dep't of Human Resources v. U.S. Dep't of Agric.*, 976 F. 2d
1462, 1480 (4th Cir. 1992) ("An injunction may not strip a federal agency of its power to
exercise lawful authority conferred by Congress through statute.").

part of the fundamental process by which the amount owed to the provider is actually
determined, and may not be stripped under section 363.

    **c.  The Buyers of the HUD Lessee's Property Must Complete the HUD
Change in Operation Process**

    16.    The only way to operate or lease a skilled nursing facility on a property
encumbered by a HUD-insured mortgage is to successfully complete the Change in
Operator/Tenant approval process, which requires HUD's consent.  Through this process
HUD requires the prospective operator or tenant to submit an application with various
documents to establish that the prospective operator or tenant meets program requirements.
*See, e.g., Section 232 Handbook 4232.1 REV-1, Section III, Asset Management, Chapter 8,
Procedure for Change of Operators and/or Management Agent*, https://www.hud.gov/
hudclips/ handbooks/housing-4232-1#close; *see id.*, *Chapter 9, New or Modification of
Master Lease Structure*; *see also* 12 U.S.C. § 1715b; 12 U.S.C. § 1715w(c).

    17.    The HUD-requested due diligence ensures that the new operator or tenant
qualifies as an eligible operator or tenant under HUD's regulations.  Specifically, an
operator "must be a single asset entity acceptable to the Commissioner." 24 C.F.R. §
232.1003. HUD also imposes a variety of requirements on the content of its Master Leases,
as well as the corporate structure of master tenants. *See, e.g., Section 232 Handbook 4232.1
REV-1, Section II, Production, Chapter 13, Master Lease,* https://www.hud.gov/hudclips
/handbooks/housing-4232-1#close. To the extent that the Stalking Horse Bidder, or any
prospective buyer, desires to operate skilled nursing facilities on the property encumbered
by a HUD-insured mortgage, they must complete HUD's established Change in
Operator/Tenant process. They cannot circumnavigate that process by purchasing Debtors'

Regulatory Agreements. HUD currently lacks sufficient information about the corporate structure or operational personnel of the Stalking Horse Bidder and cannot meaningfully determine whether it is eligible to operate or lease a HUD-insured facility.

18.     The parties must strictly adhere to the procedures outlined above as those procedures ensure that new operators and tenants are appropriately vetted to perform the duties and responsibilities that come with their role.

## II.     Debtors Cannot Sell the HUD Collateral Free of HUD's Interests

19.     Section 363(f) permits a debtor to sell its property free and clear of other interests in only five carefully delineated circumstances. The debtor may sell free and clear only if, "1) applicable nonbankruptcy law permits sale of such property free and clear of such interest; 2) such entity consents; 3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; 4) such interest is in bona fide dispute; or 5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f).

20.     Debtors can satisfy none of these requirements as to the HUD Collateral. First, the Debtors have identified no applicable non-bankruptcy law that allows them to sell the HUD Collateral free of HUD's interest. Second, HUD has not consented to the sale of the HUD Collateral free of HUD's interest. Third, the Debtors have not challenged HUD's interest in the HUD Collateral to create a *bona fide* dispute.

### a.  Debtors have yet to demonstrate that the purchase price exceeds the amounts outstanding.

21.     To the extent that the purchase price allocated to the HUD Collateral, including the Facility specifically, does not exceed the amount owed under the respective

13

mortgage notes, neither the Facility nor the HUD Collateral can be sold free and clear of

HUD's interests under section 363(f)(3) of the Bankruptcy Code. Although courts differ on

whether "value of all liens" means the economic value of such liens, *i.e.*, the amount of the

entity's secured claim under section 506(a) of the Bankruptcy Code, or the face amount of

the claims secured by the liens, many have concluded that "value" in the context of section

363(f)(3) can only mean "face value" rather than fair market value. *See In re WDH Howell,

LLC*, 298 B.R. 527 (D.N.J. 2003) (noting the split of authority and concluding that "value"

within the meaning of section 363(f)(3) means the face value of the creditor's claim); *In re

Lutz*, 2017 WL 3316046 (Bankr. D. N.J. 2017) ("The Court agrees with the persuasive

authority of *Howell* and concludes that the term 'value' means the face value of the lien.")

(citing *In re WDH Howell, LLC*, 295 B.R. 527); *see e.g., In re Perroncello*, 170 B.R. 189,

191 (Bankr. D. Mass. 1994); *In re Riverside Inv. P'ship*, 674 F.2d 634, 640 (7th Cir. 1982);

*In re PW, LLC*, 391 B.R. 25, 41 (B.A.P. 9th Cir. 2008); *In re Healthco Int'l, Inc*., 174 B.R.

174, 176 (Bankr. D. Mass. 1994); *In re Conogigo*, 276 B.R. 257, 263 (Bankr. N.D. Cal.

2002). *But see In re Terrace Gardens Park P'ship*, 96 B.R. 707, 712-13 (Bankr. W.D. Tex.

1989) (holding the sale price must exceed the value of the property).

     22.    Section 363(f)(3)'s plain language supports the conclusion that the "value of

all liens" means the full face amount of the claims secured by the liens. Section 363(f)(3)

permits the sale of property free of liens only when the sale price is "*greater than* the

aggregate value of all liens" on that property. 11 U.S.C. § 363(f)(3) (emphasis added).

When a secured creditor is undersecured, the creditor only has a lien with a value equal to

the sale price. *See* 11 U.S.C. § 506(a) (providing that a creditor has a secured claim to the

extent of the value of such interest in the collateral). A price equal to the value of the lien is

not a price *greater than* the value of the lien. A sale price is greater than the aggregate value of the liens only when the price exceeds the face value of all claims secured by the property because each dollar added to the sale price increases the creditor's secured claim by a dollar until that creditor is oversecured.

23.     Here, the Debtors have yet to show that they can satisfy the rigors of section 363(f)(3). The outstanding balance under the Facility's Mortgage Note is roughly $8.3 million. First Day Declaration ¶ 59. And while the Stalking Horse Bid includes cash in the amount of $15 million, the Stalking Horse Bidder has made no representation regarding how much of the cash it will allocate to the Facility.

24.     Until and unless the Debtors can demonstrate that the proposed allocation of the purchase price for the Facility is greater than the aggregate face value of all liens on the Facility, this Court cannot approve that facility's sale free and clear of HUD's and HUD Lenders' interests under section 363(f)(3) of the Bankruptcy Code. *See* 11 U.S.C. § 363(f)(3); *see e.g., In re WDH Howell, LLC*, 298 B.R. 527 (D.N.J. 2003) (under section 363(f)(3), "the bankruptcy court should not order property sold free and clear of liens unless the court is satisfied that the sale proceeds will fully compensate secured lienholders and produce some equity for the benefit of the bankrupt's estate.") (quoting *In re Riverside Inv. P'ship*, 674 F.2d 634, 638–41 (7th Cir.1982)); *In re Terrace Chalet Apartments, Ltd.*, 159 B.R. 821, 826 (N.D. Ill. 1993) ("[T]he trustee cannot sell the property free and clear of the liens unless the sale proceeds will exceed the amount of the secured debt on the property. Under this interpretation, the sale . . . may not extinguish the [creditor's] security interest unless it produces enough proceeds to fully compensate the [the creditor].").

15

**b.  HUD could not be compelled in a legal or equitable proceeding to accept money satisfaction of its interests.**

25.     The Debtors also cannot satisfy section 365(f)(5). Section 363(f)(5) permits the Debtors to sell the HUD Collateral free of HUD's interests only if HUD "could be compelled, in a legal or equitable proceeding, to accept money satisfaction of such interest." 11 U.S.C. § 363(f)(5).

26.     Money satisfaction means that a debtor can compel the secured creditor to accept payment less than the outstanding balance in exchange for its interest. 3 Collier on Bankruptcy ¶ 363.06[6] (2020). Even if HUD can be compelled to accept a money satisfaction, the Debtors must point to a "legal or equitable proceeding" permitting such treatment. *See* 11 U.S.C. § 363(f)(5); *see also In re Ferris Props., Inc.*, 2015 WL 4600248, at *2 (Bankr. D. Del. July 30, 2015) ("[T]he sale proponents must prove the existence of a legal or equitable proceeding that could compel it to accept a money satisfaction of its interest in the properties to be sold."); *In re Healthco Int'l, Inc.*, 174 B.R. 174, 177 (Bankr. D. Mass. 1994); *In re PW, LLC*, 391 B.R. 25, 42 (B.A.P. 9th Cir. 2008); *In re Gulf States Steel, Inc. of Ala.*, 285 B.R. 497, 508 (Bankr. N.D. Ala. 2002); *In re James*, 203 B.R. 449, 453 (Bankr. W.D. Mo. 1997); *In re Grand Slam U.S.A., Inc.*, 178 B.R. 460, 462 (E.D. Mich. 1995). Here, the Sale Motion identifies no legal or equitable proceeding that could compel HUD to accept money satisfaction.

27.     Further, a bankruptcy court in this district has recognized that section 363(f) cannot strip away HUD's regulatory interests in property. *See In re Welker*, 163 B.R. 488 (Bankr. N.D. Tex. 1994) (holding that assets could not be sold free of HUD's regulatory interests created by the National Housing Act and other housing-related statutes). As in

16

*Welker*, the Regulatory Agreements between HUD and the Debtors require HUD's

approval to transfer, dispose of, or encumber HUD Collateral. HUD also has the right to

approve the Debtors' management of the Facility. Section 363(f) does not permit the sale

free of clear of these and other interests outlined in the Regulatory Agreements.

### c.  HUD Requests Adequate Protection of its Interests in the Facility

28.     Finally, HUD requests adequate protection of its interests should the Sale

occur without assumption of the Mortgage Note.  Section 363(e) of the Bankruptcy Code

allows the court to condition the sale of property subject to a secured creditor's lien upon

the creditor being provided adequate protection. Undisputably, the HUD Lender and HUD

have lien and security interests in the Facility. As adequate protection, HUD's liens and

security interests must attach to the sale proceeds of the Facility with the same validity,

force, and effect that they now have against the Facility.

### III.     The Debtors Must Obtain Consent of the United States and Comply with Applicable Non-Bankruptcy Law Before They Can Assume and Assign Contracts with the United States

29.     Lastly, the Court cannot approve the Sale Motion to the extent that it seeks

to permit the assumption and assignment of any government contracts, including various

contracts between Debtors and VA and Treasury, without the United States' consent and

compliance with applicable non-bankruptcy law, including the Anti-Assignment Act and

the FAR. *See* Notice to Contract Parties to Potentially Assumed Executory Contracts and

Unexpired Leases at 49, 107, 117, 163, 166 (listing potential assumption of VA and

Treasury contracts) [Docket No. 920]. The Debtors "may not assume or assign any

executory contract or unexpired lease of the debtor . . . if applicable law excuses a party,

other than the debtor, to such contract or lease from accepting performance from or

17

rendering performance to an entity other than the debtor or the debtor in possession." 11 U.S.C. § 365(c)(1). Both the Anti-Assignment Act and the FAR excuse the VA, Treasury, and other government entities from accepting performance from the Stalking Horse Bidder or any other buyer.

30.     The Anti-Assignment Act prohibits the "party to whom the Federal Government gives a contract" from "transfer[ing] the contract or order, or any interest in the contract or order, to another party" without annulling the contract or order. 41 U.S.C. § 6305(a). As such, any government contracts, including the VA and Treasury contracts, can only be assumed and assigned under the Bankruptcy Code if the VA or Treasury consents to the assumption and assignment of their respective contracts, as required by the Anti-Assignment Act.

31.     Any assumption and assignment of the VA and Treasury contracts and other government contracts may also have to comply with the FAR, codified at Title 48, Chapter 1 of the United States Code of Federal Regulations, *see* 48 C.F.R. § 1.105-2, which governs the process by which the United States awards contracts and acquires goods and services. For example, prior to the assignment of any government contracts, the Debtors and Stalking Horse Bidder or other buyer must novate each contract. 48 C.F.R. § 42.1204. This requires the submission of necessary documentation to the United States—including but not limited to "[e]vidence of the transferee's ability to perform" and "[e]vidence that any security clearance requirements have been met"—and the subsequent approval of the novation by the appropriate United States agency. 48 C.F.R. § 42.1204(e)-(f). The United States objects to any order that authorizes the assumption or assignment of the VA and

18

Treasury contracts or any federal contracts without the consent of the United States and compliance with applicable non-bankruptcy law.

### IV. The Debtors' Request to Waive Bankruptcy Rule 6004(h) 14-Day Stay Should Be Denied.

32. The Court should also deny Debtors' request to waive the 14-day stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure. Debtors have not demonstrated any cause as to why the Court should waive this statutory requirement.

33. Unless otherwise ordered by the Court, an automatic fourteen-day stay is imposed from the date of entry of a sale order. Fed. R. Bankr. P. 6004(h). In considering whether to grant a waiver of this stay, courts require debtors to make an evidentiary showing to the Court's satisfaction demonstrating a "business exigency" as to why the transaction needs to be closed within the fourteen-day window. *In re PSINet Inc.*, 268 B.R. 358, 379 (Bankr. S.D.N.Y. 2001) (finding that a "generalized assertion that the Debtors required 'an expedited closing'" does not sufficiently support the Court's granting a waiver). Here, the Debtors have yet to make such evidentiary showing demonstrating the necessity for the Court to dispense with the automatic 14-day stay of any sale order. Therefore, the Court must deny Debtors' waiver request. Furthermore, the Sale Motion indicates that the Closing Date must occur no later than February 4, 2026. Sale Motion at 135. But, the Sale Hearing is scheduled for November 18, 2025. *Id.* at 5. This timeline provides Debtors and any future buyer with more than enough time to meet the February 4 deadline accounting for the stay.

### V. Reservation of Rights

19

34.     As the Debtor has yet to identify the ultimate purchaser of its assets and has yet to identify the definitive asset purchase agreement with the ultimate purchaser, the United States reserves all rights to supplement this Objection and to raise any other objections to any proposed sale at or prior to the Sale Hearing.

## CONCLUSION

35.     For the foregoing reasons, the Court should (i) deny approval of the sale to the extent it seeks to transfer the Medicare Provider Agreements outside of CMS' Change in Ownership process; (ii) deny approval of the sale to the extent the Debtors request to transfer their Medicare Provider Agreements "free and clear" of associated obligations under the Medicare Law; (iii) deny approval of the sale to the extent it seeks to transfer any regulatory agreements to allow the leasing or operation of a skilled nursing facility without HUD's approval (iv) deny approval of the sale to the extent it seeks to sell the HUD Collateral free and clear of HUD's interests; (v) deny approval of the sale to the extent it seeks to assign contracts in contravention of the Anti-Assignment Act; and (vi) deny the Debtors' request to waive the automatic 14-day stay of any order authorizing the sale of property.

Dated: October 17, 2025

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General
Civil Division

*/s/ Zachary Semple*
KIRK T. MANHARDT
RODNEY A. MORRIS
ZACHARY C. SEMPLE
United States Department of Justice
Civil Division
1100 L Street, NW
Washington, D.C. 20005
Tel: (202) 353-5555
Fax: (202) 514-9163
E-mail: Zachary.C.Semple@usdoj.gov

*Attorneys for the United States*

## CERTIFICATE OF SERVICE

I certify that on October 17, 2025, a true and correct copy of the foregoing was served via electronic means through transmission facilities from the Court upon those parties authorized to participate and access the Electronic Filing System in the above-captioned case.

Dated: October 17, 2025                    */s/ Zachary Semple*_____
                                           ZACHARY SEMPLE