# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | § | Case No. 25-80185 (SGJ) |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

| | | |
|---|---|---|
| Statutory Unsecured Claimholders' Committee of Genesis Healthcare, Inc., | ) | |
| | ) | |
| Plaintiffs. | ) | |
| v. | ) | |
| | ) | |
| ReGen Healthcare, LLC, Joel Landau, Welltower, Inc., Welltower OP, LLC, Markglen, LLC, WAX Dynasty Partners LLC, MAO 22322 LLC, OHI Mezz Lender LLC, Integra Healthcare LLC, Integra WIP Tenant LLC, Cindat Best Years Welltower JV LLC, John Randazzo, David Harrington, David Gefner, Jonathan Kirschner, Pinta Capital Partners | ) | Adversary Proceeding No. _____ |
| | ) | |
| Defendants. | ) | |

---

[1] The last four digits of Genesis Healthcare, Inc's federal tax identification number are 4755. There are 299 Debtors in these chapter 11 cases, for which the Debtors have requested joint administration. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

## COMPLAINT

1.      Plaintiffs, the Statutory Unsecured Claimholders' Committee (the "**Committee**") of Genesis Healthcare, Inc. ("**Genesis**") and Genesis's affiliated debtors in possession, (collectively, the "**Debtors**"), by and through its undersigned counsel, state as their Complaint against the Defendants (defined below) the following:

## PRELIMINARY STATEMENT

2.      This Complaint outlines estate claims to be brought on behalf of the Debtors against Welltower (as defined below), its affiliates, and any additional parties named herein (collectively, the "**DIP Order Releasees**"),[2] as well as Joel Landau, the principal for Debtors and the Stalking Horse, along with Mr. Landau's employees, business partners, family members, and other co-conspirators.  The Committee brings this action to preserve valuable causes of action for the benefit of the Estates rather than enable Welltower , Landau, and company to obtain releases without sufficient consideration.

3.       As the Debtors' own investigation acknowledges, Landau and his business partners looted Genesis of hundreds of millions of dollars as the company plunged further into insolvency and patient care declined precipitously. Notably, the Debtors' investigation did not include claims against Welltower, nor document productions from Welltower, Landau, or Landau's various entities. The Committee obtained these documents through hard-fought

---

[2] The Debtors have already agreed to release any and all estate claims pursuant to the *Final Order (I) Authorizing The Debtors To (A) Obtain Postpetition Financing And (B) Utilize Cash Collateral, (II) Granting Adequate Protection To Prepetition Secured Parties, (III) Modifying The Automatic Stay, And (IV) Granting Related Relief* [ECF No. 677] (the "**Final DIP Order**"). Certain claims included herein may not be subject to the DIP Order Releases. The Committee has included such claims out of an abundance of caution, including to the extent an argument is made by certain defendants, including Debtors' insiders and affiliates, that they are entitled to a DIP Order Release.  The inclusion of a defendant or claim in this Complaint is not an admission that such claim is subject to a release under the Final DIP Order.

2

discovery, and discovered that the estate not only has hundreds of millions of dollars in claims against Landau, it also has similar claims against Welltower because Landau and Welltower worked together to line their own pockets in planning, facilitating, and implementing transactions that overwhelmingly benefitted Welltower and Landau at Debtors' expense.[3]  As outlined herein, Welltower secretly funded Landau's wholesale takeover of Genesis and helped him to maintain the control he used to defraud the company of millions, telling him it would do anything it could do to accommodate his financial goals.  At the same time, Landau acted as a loyal soldier to his benefactor and business partner, committing Genesis to multiple transactions that brought hundreds of millions to Welltower and Landau with Genesis (and its patients) paying the steep price.

4.      Genesis's story is a tale of strange bedfellows. On one hand: Joel Landau, a nursing-home impresario with a checkered past and a history of preying on struggling operators. On the other: Welltower, a publicly-traded real estate investment trust (REIT) focused on seniors and wellness housing communities with a market cap exceeding $120 billion. Yet this odd couple planned, coordinated, negotiated, and implemented a series of deals over the last five years to delay Genesis's bankruptcy, put it in Landau's control, and transfer hundreds of millions from Genesis to Welltower and Landau at the expense of all other stakeholders.  Now, they stand hand-in-hand before the Court asking it to ignore a competitive bid and approve Landau's continued control of the Debtors, pointing to manufactured, hastily-construed "soft" reasons

---

[3] Due to the limited time period the Committee was given to investigate and challenge the DIP Order Releasees and the impact of the deadline, the Complaint is focused on the causes of action against Welltower and its co-conspirators as outlined herein.  The Committee reserves its rights to pursue claims against Landau and his partners and affiliates at a later date, including its right to bring claims against them or any party outside of the DIP Order Releasees based on the events described herein or any other asserted facts.

rather than the true purpose: obtaining the releases for Landau and his partners (including Welltower) that were a central priority of this case since long before it was even filed.

5.       Landau's pattern is well-established.  Through a web of partners and affiliates, Landau takes over companies and extracts millions of dollars through insider transactions and backroom deals.  Once Landau has thoroughly drained his target, he enlists the bankruptcy process (often relying on the same loyal professionals over and over again) to help him avoid any consequences by "repurchasing" the company and all of its claims against him and his friends, emerging from the process to rinse and repeat the same predatory cycle.  The end result is the same: unsecured creditors get next to nothing while Landau retains the business free and clear.

6.       Landau's brazenness and the well-publicized trail of devastation left in his wake make him an unlikely business partner for a blue-chip public company. But alliances with the Landaus of the world are worth the risk to Welltower because its largest tenants (and thus, the largest risk exposure in its portfolio) operate in the skilled nursing space.  When these tenants struggle to pay rent, generate revenue, or maintain solvency, Welltower's stock reacts accordingly.  The more control Welltower can exert—the more insight, access, and influence Welltower has with tenants like Genesis—the better Welltower can protect its financial interests and ensure that the rent keeps getting paid.  But the degree to which Welltower can obtain and exert that control (at least directly) without losing its all-important REIT status is limited by laws which impose restrictions on the relationships between REITs and their tenants.  If Welltower fails to follow these regulations to the letter, their REIT status, which is essential to their business model, is threatened.

7.    When Genesis profits cratered and the company approached insolvency, Welltower needed to control and influence Genesis to protect Welltower interests—to make sure rent was paid, prioritized, and modified when needed, and that Genesis financial struggles didn't impact Welltower as its largest landlord and lender.  Most importantly, Welltower desperately wanted Genesis to forego a bankruptcy filing, which would directly threaten Welltower.  How could Welltower do this without violating REIT rules about equity ownership and control?  Enter Joel Landau.

8.    Landau and Welltower harmed Genesis by inducing the company to forego a Chapter 11 filing in 2021 because it would have been to Welltower's detriment.  Instead, they conspired to implement a scheme that cemented Welltower's control over Genesis through Landau. Landau seemed to offer Genesis a $50 million lifeline, a path forward that would allow it to stave off bankruptcy. In reality, it was Welltower providing those funds to Landau, a fact both parties actively worked to hide from the Genesis board.

9.    Welltower got the control it wanted without threatening tax benefits central to its business. After this collusive relationship put Landau in power, he and his lieutenants abused that position and flouted their fiduciary duties, funneling millions to insiders and affiliates even as staffing levels became dire and patient care declined precipitously. His self-dealing included multimillion-dollar "consulting fees" to the investment vehicle he co-founded and controlled, along with contracts between Genesis and companies owned by his wife and son. None of this could have happened without Welltower's knowledge, influence, and support.

10.    Then, after giving Landau the keys to the store and looking the other way while he looted it with self-dealing, Welltower collected its *quid pro quo*. From 2021 forward, anytime

5

Welltower was in trouble with Genesis or another skilled nursing facility tenant, Landau used Genesis to help bail them out, even when it meant plunging the company further into insolvency. Welltower and Landau worked hand-in-hand to protect Welltower's stock price, silencing and dismissing anyone attempting to prioritize patient care and Genesis success rather than blindly doing their bidding. Together, Landau and Welltower leveraged their control over Genesis to protect Welltower's bottom line and shift funds to Landau, even when that meant Genesis losing hundreds of millions of dollars it didn't have and patient care standards falling off a cliff.

11.     These efforts continue to this day: in a carefully plotted bankruptcy that ensures their leases continue to be paid, Welltower has been the most vocal advocate for a DIP Loan and proposed Stalking Horse Bid that allows Landau to shed liabilities and keep control of the company. If all goes according to their plan, Genesis will emerge from bankruptcy and continue to operate its facilities with Landau at the helm, paying hundreds of millions in rent to Welltower, its primary landlord and largest secured lender, while all of its remaining creditors are left to fight for their share of a fund that would contain at most $15 million and by Debtors' own admission, may provide *zero* recovery. Landau, his business partners, affiliates, and Welltower will be long gone when this fight occurs, because they are all set to receive full releases of any estate claims in the process.

12.     The primary estate claims in this case run on parallel tracks: direct claims against Landau and his affiliates for self-dealing and fiduciary misconduct and claims against Welltower for aiding and abetting those breaches and for fraudulent transfers and other wrongful conduct that extracted value from Genesis to secure and grow Welltower's rent-driven returns. The Committee files this Complaint to hold Welltower and its affiliates or related parties

responsible for these damages rather than releasing them without consideration as contemplated by the Final DIP Order.

13. In addition to judgment on these causes of action, the Committee seeks an order (a) equitably subordinating the claims of Welltower, Debtors' insiders and Landau affiliates as to purported debt these parties assert in the bankruptcy cases that they acquired via fraud or tortious action and/or know to be without value; (b) recharacterizing purported debt owed to a Landau investment vehicle as the equity interest it was intended to be and always has been; and (c) determining the validity and extent of liens on and security interests in the Debtors' assets asserted by Welltower on behalf of the Debtors' prepetition term loan lenders.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Each count in this action is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

15. On December 4, 2025, the Committee filed a *Motion for Leave, Standing, and Authority to Prosecute Certain Claims on Behalf of the Debtors' Estates and for Related Relief.* [ECF No. __] (the "**Standing Motion**"). [On [DATE], 2025, the Court entered an order granting the Standing Motion and authorized the Committee to prosecute this action [ECF No. __] (the "**Standing Order**").]

## RELEVANT PARTIES

16. The Plaintiff is Genesis Healthcare, Inc., a Debtor in these chapter 11 cases, brought derivatively through the Statutory Unsecured Claimholders' Committee, appointed in these Chapter 11 Cases.

7

17. The Debtors currently operate more than one hundred seventy-five Skilled Nursing Facilities (SNF) and Assisted Living Facilities (ALF) in multiple states.

18. Welltower, Inc. ("**Welltower**") is a Delaware corporation located with a place of business at 4500 Dorr Street, Toledo, Ohio 43615. Welltower's registered agent is Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

19. Welltower OP, LLC ("**Welltower OP**") is a Delaware limited liability company. Welltower OP's registered agent is Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

20. Joel Landau ("**Landau**"), David Harrington ("**Harrington**"), David Gefner ("**Gefner**"), John Randazzo ("Randazzo"), and Jonathan Kirschner ("**Kirschner**") each are a natural person**.**

21. Pinta Capital Partners ("**Pinta**") is a Delaware limited liability company with its principal offices located at 885 Third Avenue in New York City, New York. Pinta's registered agent is Northwest Registered Agent Service, Inc., 8 The Green, Ste. B, Dover, Delaware 19901.

22. ReGen Healthcare, LLC ("**ReGen**") is a Delaware limited liability company with principal offices located at 885 Third Avenue in New York City, New York. ReGen's registered agent is Platinum Filings LLC, 555 E. Loockerman Street, Suite 320, Dover, Delaware 19901.

23. Markglen, LLC ("**Markglen**") is a West Virginia limited liability company located, upon information and belief, in Toledo Ohio. Markglen's registered agent is Corporation Service Company, 808 Greenbrier Street, Charleston, West Virginia 25311.

24. WAX Dynasty Partners LLC ("**WAX**") and MAO 22322 LLC ("**MAO**") are Delaware limited liability companies. WAX's registered agent is Platinum Filings LLC, 555 E.

8

Loockerman Street, Suite 320, Dover, Delaware 19901 and MAO's registered agent is Northwest

Registered Agent Service, Inc., 8 The Green, Ste. B, Dover, Delaware 19901.

25.     OHI Mezz Lender LLC ("**Omega**") is a Delaware limited liability company.

Omega's registered agent is Corporation Service Company, 251 Little Falls Drive, Wilmington,

Delaware 19808.

26.     Integra WIP Tenant LLC ("**Integra WIP Tenant**") is a Delaware limited liability

company, located, upon information and belief, in Suffern, New York. Integra WIP Tenant's

registered agent is Platinum Filings LLC, 555 E. Loockerman St, Ste. 120, Dover, DE 19901.

27.     Integra Healthcare LLC ("**Integra**") is a Delaware limited liability company.

Integra's registered agent is American Incorporators Ltd., 1013 Centre Road, Suite 403-A,

Wilmington, DE 19805.

28.     Cindat Best Years Welltower JV LLC ("**Cindat JV**") is a Delaware limited

liability company that was a joint venture between Cindat (as defined below) and Welltower.

Cindat JV's registered agent is Corporation Service Company, 251 Little Falls Drive,

Wilmington, DE 19808.

29.     Altira Health Group, LLC ("**Altira**") is a Delaware limited liability company.

Altira's registered agent is Platinum Filings, LLC, 555 E Loockerman Street, Suite 230, Dover,

DE 19901.

**STATEMENT OF FACTS**

A.     **1985–2011: Genesis's Origins**

30.     The company now known as Genesis was formed as Genesis Health Ventures in

1985 with nine healthcare centers.  It expanded over time, reorganized in 2001, and over the

following decade continued its expansion.  By 2011, Genesis was one of the largest post-acute healthcare providers in the United States.

### B.    2011–2020: Welltower Steps into the Picture

31.    In 2011, Welltower (then known as Health Care REIT, Inc.) commenced its business dealings with Genesis by purchasing substantially all Genesis-owned real estate for $2.4 billion in a sale-leaseback transaction.[4]  Genesis-operated facilities have represented a significant portion of Welltower's tenant and revenue base ever since.  After the sale, Genesis continued to operate the facilities pursuant to a long-term triple-net master lease with Welltower.

32.    During the 2010s, Welltower expanded its relationship with Genesis, taking actions that improved its leverage over the company. Welltower funded Genesis's expansion through conversion of unpaid obligations into a secured term loan and bridge financing for Genesis real estate acquisitions. ███████████████████████████████████ ███████████████████████████████████████ █████████████████████████████████████

33.    ████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████ Using Welltower's bridge financing and rent amortization, Genesis became the largest skilled nursing operator in the United States by 2016.

---

[4] *See* United States Securities and Exchange Commission, *Health Care REIT, Inc. Form 10-K* (Fiscal year ended December 31, 2011), https://www.sec.gov/Archives/edgar/data/766704/000095012312002707/201110-K.htm (at the time, Welltower was known as Health Care REIT, Inc.).

34.     During the latter half of the 2010s, Welltower began to sell some Genesis-operated skilled nursing facilities ("**SNFs**") it owned to third-party joint ventures, including 28 Genesis-operated SNFs to Cindat JV, a joint venture involving Welltower and Cindat. Genesis continued to operate each of the subject facilities and paid rent to the new JVs.[5] Starting in 2017, Genesis also began to divest itself of multiple facilities, a move that generated about $140 million, which it, in turn, used to pay Welltower.  Those divestitures triggered termination fees owed to Welltower, and to pay those fees, Genesis issued two unsecured take-back notes in the aggregate principal amount of approximately $62.9 million (the "**WT Unsecured Take-Back Notes**").[6]  Welltower also refinanced the WT RE Loans into bridge loans in an aggregate principal amount of $317.0 million, (the "**WT Bridge Loans**").[7]

C.     **2020–2021: Genesis Feels the Brunt of COVID-19, Threatening Welltower's Loans and Revenue Steam**

35.     By 2020, Genesis had reduced its footprint to 400 facilities.  Genesis would not, however, reap the benefit of its downsizing efforts, because the COVID-19 pandemic started and wreaked havoc on the skilled nursing industry.  By the end of 2020, Genesis had been harmed so significantly that substantial doubt arose as to its ability to continue as a going concern.

36.     These Genesis financial struggles reverberated to Welltower.  In July 2020, with Genesis approaching insolvency, Welltower revised its accounting approach and wrote off existing straight-line rent receivable balances of $91,025,000 for rent it no longer deemed

---

[5] Genesis Healthcare, Inc., Press Release, *Genesis Healthcare Announces New Leases for 92 Facilities Historically Leased From Welltower Inc.*, (Nov. 2, 2016), https://www.genesishcc.com/about-us/press/press-releases/genesis-healthcare-announces-new-leases-92-facilities-historically.

[6] United States Securities and Exchange Commission, *Genesis Healthcare, Inc. Form 10-K* (Fiscal year ended December 31, 2016), at F-30, https://www.sec.gov/Archives/edgar/data/1351051/000155837017001363/gen-20161231x10k.htm.

[7] *Id.* at F-28-29.

collectible from Genesis.[8]  Welltower also recognized loan impairments of approximately \$107

million between the WT Bridge Loans and WT Term Loan, amounts that were no longer deemed

collectible and were reduced "as a result of the current collateral estimates for loans with

deteriorated credit."[9]  In total, Welltower marked down the entirety of its then-\$500 million-plus

loan portfolio to only \$136,162,000.[10]

37.     By late 2020, Genesis's operational deterioration was a critical threat to

Welltower.  Welltower had massive exposure to both Genesis and another SNF operator known

as ProMedica, which was also in dire straits.  The situation was sufficiently fraught for

Welltower to announce that those two operators accounted "for a significant portion of our

revenues and any failure, inability or unwillingness by them to satisfy obligations under their

agreements with us could adversely affect [Welltower]."[11]  Analysts also identified Genesis as a

risk to Welltower's go-forward performance, noting that "Genesis accounts for nearly half of

[Welltower's] long-term and post-acute portfolio . . . which creates some tenant concentration

risk, particularly given Genesis's current financial difficulties."[12]

38.     This "concentration risk" was genuine and significant.  ███████████████

████████████████████████████████████████████████████████

---

[8] United States Securities and Exchange Commission, *Welltower, Inc. Form 10-K* (Fiscal year ended December 31, 2020), at 3, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000766704/000076670421000018/well-20201231.htm.

[9] *Id.* at 88.

[10] *Id.* at 3.

[11] *Id.* at 31.

[12] Exhibit 1, Baird Equity Research, *Welltower Inc. (WELL) – Initiating Coverage at Outperform: Multi-Year Growth Runway in Focus* (Jan. 5, 2021) at 2.

[REDACTED] [13] [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

**D.     2021—The First Challenged Transaction:  Landau and Welltower Solve the Genesis Problem by Taking Over the Company and Pilfering Its Assets.**

*i.     Welltower and Landau Hatch Their Plan to Divert Genesis from Chapter 11.*

Welltower turned to Landau, who had become a valuable business partner in the SNF space and had direct lines of communication with Welltower's CEO and top executives. Together, they hatched a plan for Welltower to "substantially exit" its Genesis relationships. Genesis would abandon 51 facilities, which would be "purchased" from Welltower and taken over by a new joint venture owned in equal shares by Landau (through his company Aurora), Peace Capital (the controlling owner of an operator called Complete Care), and Welltower itself. These "new" owners would then replace Genesis as tenant with Complete Care and other operators who were not experiencing financial distress.

39.     The deal was great for Welltower, divorcing it from the Genesis operators, avoiding bankruptcy of a key tenant, and making Welltower millions in the process. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

---

[13] WELLGEN00011934 ( [REDACTED] [REDACTED] ). A true and correct copy of the [REDACTED] is attached hereto as Exhibit 2.

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████

40.     With Welltower's support and encouragement, Landau presented himself as the

savior of Genesis. ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████

41.     ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████[14] ████████████████████████████████████

████████████[15] ████████████████████████████████████████████████████████

███████████████████

---

[14] WELL is the stock symbol for Welltower.

[15] Exhibit 3, WELLGEN00143578 (██████████████████████████████████████████
██████████████████████████████████████████).

This document, along with the other WELLGEN documents cited herein, were produced to the Committee by Welltower only after the Court granted the Committee's Motion to Compel Discovery. The Court entered its Order granting the Committee's Motion following a hearing in which Welltower counsel stated that it had "already" produced the "relevant documents" that "could exist on those three transactions," which are the same transactions outlined herein, and that the outstanding discovery sought represented the Committee's attempts to "pry into Welltower's confidential proprietary business transactions that have nothing to do with the Debtor or even the claims or challenges they claim to want to make here in these proceedings. . . Nothing." *See* Transcript of October 3, 2025 Hearing ("**Oct. 3 Tr.**") at 19:21-22; 18:3-7.

14



42.

43.

[16] A true and correct copy of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ are attached hereto as Exhibit 4 (WELLGEN00143626; WELLGEN00143585).

[17] Exhibit 5, WELLGEN00176879 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮).

██████████████[18]  ██████████████████████████████████████████████

██[19]

    44.    ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████[20] █████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████[21]

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] WELLGEN00176889.



45. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



*ii.* ████████████████████████████████████████, *the Genesis Board Approves the Transaction, but* ███████████████████ ██████

46.   █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████[22] █████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████[23] █████████████████████████████

████████████[24]

47.   █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████[25] ████████████████

---

[22] Exhibit 6, WELLGEN00146276 (███████████████████████████████ ██████████).

[23] Exhibit 7, WELLGEN00176938 (████████████████████████████████).

[24] *Id.*

[25] Exhibit 8, WELLGEN00176939 (█████████████████████████████).

██████████████████████████████████████████████████████

████████████████████.[26]



48.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████[27]  ██████████████████████████████████████████

██████████████████████████████████████████████████████

---

[26] *Id.*

[27] *Id.*

███████████████████████████████████████████████[28]████████████████████████

████████████████████████████████████████████████████████████████████

████[29] This was the first domino that led to Landau and Welltower's coordinated plundering for the next four years, culminating with their efforts to leave creditors with pennies in this case as they continue to operate with impunity.

     *iii.*     ███████████████████████████████████████████ *Genesis Pays the Price.*

49.     Welltower and the now-Landau-led Genesis framed the final transaction as having the following three steps:

50.     **Step 1: Welltower Facility Transition**.  Welltower announced to significant fanfare that it was "substantially exit[ing] its operating relationship"[30] with Genesis by terminating its master lease on the final 51 properties it owned where Genesis was the operator. Welltower would accomplish this, with Genesis's consent and cooperation, by transitioning 42 of properties to the Landau/Welltower/Peace Capital joint venture, who would install new operators at the properties, and nine to a joint venture with Welltower tenant ProMedica.[31]  In exchange for the "termination" of its relationship with Genesis, Welltower agreed to pay Genesis $86 million as a "lease termination fee."  But Genesis did not get to keep this money.  Welltower "paid" the termination fee but it was immediately roundtripped back to Welltower to be applied to

---

[28] Exhibit 9, WELLGEN00176940 (███████████████████████████████████).

[29] ████████████████████████████████████████████████████████████████

[30] Despite supposedly "exit[ing]" its relationship with Genesis, Welltower remains one of the company's largest creditors to this day.

[31] Welltower Inc., Press Release, *Welltower Announces Substantial Exit of Genesis HealthCare Operating Relationship*, (Mar. 2, 2021), https://welltower.com/investors/press-release-details/?id=174.

unsecured loans Welltower had already written down as unrecoverable.[32] ████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████[33] ████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████

51.      **Step 2:  ReGen Investment**.  On the same day as Step 1 described above, Genesis entered into an investment agreement with ReGen, a Pinta affiliate and Landau investment vehicle, whereby ReGen invested an initial $50 million (unknowingly sourced from Welltower), with optional additional investments up to an aggregate $100 million, in exchange for convertible promissory notes (the "**ReGen Notes**") and control of the Genesis board. And of course, ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████████████████[34]

52.      ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████



---

[32] Contrary to this framing, which was made in the companies' public-facing documents, ██████████ ████████████████████████████████████████████████████████████████████████

[33] As will be described in further detail below, █████████████████████████████████████ ████████████████████████████

[34] CTRL0000001374 (███████████████████████████████████████████████████████████████). A true and correct copy of the ████████████████ is attached hereto as Exhibit 10.

███████████████████████████████████████████████████████████[5] ███████████

████████████████████  ReGen immediately appointed 2 members to Genesis's board of directors, including the Chairman of the Board.   ReGen appointed David Harrington—co-founder of Pinta alongside Landau—as Genesis's Board Chair and John Randazzo as a director.

53.   **Step 3: Genesis Delists From NYSE**.   As part of the restructuring, Genesis voluntarily delisted its Class A common stock from NYSE and deregistered under the Securities Exchange Act, eliminating reporting requirements and other regulatory protections which operate to protect against insider transactions and public misrepresentations.

iv.   *Welltower Takes a Victory Lap for "Exiting" the Genesis Relationship*

54.   In investor presentations and earnings calls, Welltower highlighted the ReGen transaction as a glowing example of its success in attempting to "de-risk" its skilled nursing portfolio.  Welltower valued the benefit from the 42 facilities going to the Welltower/Landau JV as approximately \$680 million of value and the ProMedica JV facility transfer at approximately \$290 million.[36]  Welltower also increased its stake in Genesis to up to approximately 15%[37] directly and further control of Genesis indirectly by having its loyal business partner Landau at the helm, an advantageous relationship that continues to pay off to this day. The market was impressed with the apparent magic trick Welltower pulled off: exiting a risky relationship and

---

[35] ████████████████████████████████████████████████████
███████████████████████████████████████████████.

[36] PR News Wire, News Releases, *Welltower Announces Substantial Exit of Genesis HealthCare Operating Relationship*, (Mar. 2, 2021) https://www.prnewswire.com/news-releases/welltower-announces-substantial-exit-of-genesis-healthcare-operating-relationship-301239097.html.

[37] Genesis Healthcare, Inc., Press Release, *Genesis Healthcare Announces Strategic Restructuring Steps to Strengthen Balance Sheet and Chart Path for Recovery*, (Mar. 3, 2021), https://www.genesishcc.com/static/d1281aa459ea1942fc95eb81fca56b53/Genesis_Press_Release%2520-%252003_03_21%2520FINAL.pdf.

gaining a billion dollars in value while giving up nothing more than self-payment of uncollectible debt and agreement to forgive other uncollectible debt.  Welltower's stock shot up following the announcement:



**Welltower Stock Price**

Welltower Inc. (NYSE:WELL) Share Pricing

3/2/21
Welltower Exits
Genesis facilities

1)  02/29/21 - Welltower announces earnings and dividend
2)  02/22/21 - Ex-dividend date
3)  02/26/21 - Dividends paid
4)  **03/02/21 - Welltower exits Genesis facilities**
5)  03/02/21 to 03/15/21 - Market reacts positively to Welltower's exit. Welltower's stock price rose ~9% in the days following the announcement of the transaction.

55.      This initial transaction, like others that would follow among Genesis, Welltower, and Landau-affiliated entities, was a "win-win" for Welltower and Landau—and a loser for Genesis, its employees, patients, and vendors. ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ Welltower won by (i) successfully transforming a problematic tenant relationship into a transaction that Welltower publicized as

adding $880 million in value to Welltower's bottom line[38] and (ii) installing ██████████ ███████████ Landau at the helm of Genesis. Just as Welltower intended, Genesis and its creditors lost handsomely. Rather than restructure Genesis when its problems were manageable and recoveries more available, ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████ This was only the beginning of the win-win-lose transactions between Landau, Welltower and Genesis.

### E.       2021–2022: Landau Begins Abusing his Control of the Company.

56.      Having assumed operational control of Genesis and installed his lieutenants as Chairman of the Board and key company officers, Landau set out to extract value from Genesis and siphon funds to ancillary businesses under his control.

57.      ReGen, now in control of the company, worked to retrade the March 2021 deal to get even more. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████[39] ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████[40]

---

[38] Welltower Mar. 2021 Press Release, *supra* n. 31.

[39] Exhibit 11, Genesis_SpecialCommittee_0000000009, at 2 (██████████████████████████████ ████████████████████████████████████████████████████████████████████).

[40] *Id.*

24

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████[41] Landau then proceeded to install his business partner and Pinta co-founder David Harrington as CEO in addition to his Chairman role.

58.     ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████[42]  Landau and team were counting the days.  Shortly after that independent committee was disbanded, Landau's self-dealing expanded exponentially.

███████████████████████████████████████████████

██████████████████████████████████[43]  ███████████

███████████████████████████████████████████████

███████████████████████████████[44]  ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[41] *Id.* at 3.

[42] Ex. 11, Investment Agreement, § 5.05.

[43] Exhibit 12, GENESIS_UCC00011417 –11430 (████████████████████
███████████████████████████); Exhibit 13, GENESIS_UCC00011408
(██████████████████████████████████).

[44] Exhibit 14, GENESIS_UCC00004539 (███████████████████████████).



Staffing decreased by 25% and, unsurprisingly, patient care deteriorated dramatically.  Genesis's facilities are graded by Centers for Medicare & Medicaid Services ("**CMS**") pursuant to its rating system, in which "[s]killed nursing facilities receive an overall star rating from one to five stars based on three components: health inspection rating (survey results), quality measure calculations and staffing

---

[45] Exhibit 15, GENESIS_UCC00072426 (█████████████████████████████████████████████████████████████████████████████████████████████████.

[46] *Id.*

data."[47] Under Landau's short tenure—in the space of only *four* years—Genesis's overall quality of care ratings immediately cratered, declining by 21.4% in the aggregate, with the number of one-star Genesis facilities multiplying:

| Summary Statistics | Average SNF CMS Five-Star Quality Ratings | | | | | % Change |
|---|---|---|---|---|---|---|
| | 2021 | 2022 | 2023 | 2024 | 2025 | 2021-2025 |
| Genesis Facilities | | | | | | |
| Overall Rating | 2.96 | 2.48 | 2.40 | 2.38 | 2.33 | (21.4)% |
| Staffing Rating | 3.26 | 2.37 | 2.42 | 2.41 | 2.40 | (26.2)% |

This data is consistent with the anecdotal experience of personal injury and wrongful death claimants that comprise the Committee's constituency, some of whom have already brought their stories before this Court.[48]

F.     **The Second Challenged Transaction: November 7, 2022: Landau Uses Genesis to Bail Out Welltower Again**

i.     *Welltower's ProMedica Problem: Failing Tenant, Tumbling Stock Price.*

61.     As noted above, Welltower had massive exposure not just to Genesis, but also ProMedica, another SNF operator. Landau and Welltower's illicit 2021 collaboration solved Welltower's Genesis problem, but by 2022 ProMedica's troubles were bubbling to the surface and threatening Welltower's bottom line. ProMedica operated 205 facilities at Welltower-owned properties, with funds from those properties accounting for 12% of Welltower's annual net operating income.[49] Moody's had downgraded ProMedica's debt to junk status, citing "material

---

[47] United States Securities and Exchange Commission, *Genesis Healthcare, Inc. Form 10-K* (Fiscal year ended December 31, 2020), at 20, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001351051/000155837021003091/gen-20201231x10k.htm.

[48] *See, e.g.*, *Brian Rigsby's Motion for Relief From the Automatic Stay* [Case No. 25-80185, ECF No. 209], a motion brought by a claimant relating to mediation on punitive damages above the approximately $1.3 million awarded for wrongful death, based on "clear and convincing evidence that [the facility operators] acted with malice . . . . in the commission of Elder Abuse," causing Ms. Rigsby's death on May 26, 2022.

[49] United States Securities and Exchange Commission, *Welltower, Inc. Form 10-K* (Fiscal year ended December 31, 2021), at 92, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000766704/000076670422000013/well-

cashflow loss and decline in liquidity."[50] ProMedica's facilities were loss making, with negative cash flow and ever-deteriorating EBITDA. Welltower made clear to the markets that ProMedica's imminent failure was a significant risk to its bottom line.[51]

62.     So Welltower returned to a familiar solution: Joel Landau. ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████

63.     The reason Landau and Welltower needed Genesis for the ProMedica deal lay in the requirement to transition the facilities to new operators.  No one was lining up to take over many of the facilities – after all, ProMedica, the operator who had been running each of these

_____

20211231.htm ("We depend on ProMedica Health System for a significant portion of our revenues and any failure, inability or unwillingness by them to satisfy obligations under their agreements with us could adversely affect us.").

[50] Yahoo Finance, Moody's, *ProMedica Health System, OH -- Moody's places ProMedica Health System's (OH) Baa3 rating on review for downgrade*, (Aug. 22, 2022) https://finance.yahoo.com/news/promedica-health-system-oh-moodys-230706888.html?guccounter=1&guce_referrer=aHR0cHM6Ly93d3cuYmluZy5jb20v&guce_referrer_sig=AQAAAHm0UV2UeJdn-TTfzlSxIJQjWoR9R4721FMYjOgCYfzp7HW2Zb8ezXV4slmE1XFW-dpKAIqMqgEAfiIGPT8DvOx20FrowX1NQOhprHhDylevTpXRLxnzXBSh8NE0kJIeRqMsHN2O29TEanSweGporXnjgZOrbRr38AzSHhLUs5pI.

[51] *Welltower, Inc. Form 10-K* (Fiscal year ended December 31, 2021), at 32 ("We depend on ProMedica Health System for a significant portion of our revenues and any failure, inability or unwillingness by them to satisfy obligations under their agreements with us could adversely affect us.").

28

facilities, was failing. While a subset of the properties was attractive to operators, there were others in the portfolio that SNF operators wouldn't have wanted to touch with a ten-foot pole – facilities paying rent many times their revenue, losing hundreds of thousands of dollars a month. And the deal couldn't work without established operators because CMS would not approve transitions unless an already-qualified operator was taking over.

64.     Those facts created the problem Welltower needed Landau to solve:  for 36 of the worst facilities in the ProMedica portfolio, they needed a new operator who could submit a valid CHOW (a change in ownership form required to maintain the CMS flow of funds) so that the facility could keep operating and receiving CMS funds and ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ But any operator agreeing to take over would know it was doomed to fail because the operating revenue at these properties was dwarfed by the rent obligations the operator would be agreeing to pay Landau and Welltower.

65.     ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉[52] ProMedica knew how unsuccessful some of the properties in the portfolio were and as a result knew no company could justify taking them on from a business perspective. ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

---

[52] Exhibit 16, WELLGEN00174751 ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉).

███████████████████████████████████████████████████████████

███

66.    The architects of the Landau-Welltower-ProMedica transaction include familiar

faces, still hard at work for Landau nearly three years later.    ████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████

       *ii.    Landau and Welltower Team Up to Take Over ProMedica Properties Touting
Landau's "Proven Track Record" of Welltower and SNF Deals*

67.    █████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███ new partnership between Welltower and "Integra Health." In its press release announcing

the deal, Welltower included a quote from "David Gefner, Integra Health's CEO" ████████████

█████████████████████████████.[53]

---

[53] Welltower, Inc., News Releases, *Welltower Announces the Formation of Joint Venture with Integra Health and Plan to Transition Skilled Nursing Assets Currently Operated by ProMedica*, (Nov. 7, 2022),

68.     Gefner is a former Pinta employee and longtime Landau business partner, but the documents Welltower produced by order of this Court[54] show that Gefner's involvement was minimal at best. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████ [55] ███

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████ [56]

69.     The misleading representations continue to this day.  Earlier this month, in a hearing before this Court, Welltower's counsel described the transaction as "a deal in which [Genesis] just happened to be tenants," stated that Welltower "had nothing to do with the decision to sub-lease properties to Genesis" as a tenant, and that Welltower "d[id]n't care

---

https://welltower.investorroom.com/2022-11-07-Welltower-Announces-the-Formation-of-Joint-Venture-with-Integra-Health-and-Plan-to-Transition-Skilled-Nursing-Assets-Currently-Operated-by-ProMedica.

[54] *See Order Compelling Welltower OP LLC to Produce Response Documents* [Case No. 25-80185, ECF No. 1142].

[55] Exhibit 17, WELLGEN00172656 (███████████████████████████████████████████████).

[56] *Id.*

because that's not our tenant."[57]   But back in December 2022, when Welltower announced it had closed the Integra deal and issued a public-facing presentation,[58] it noted the role of "Integra and its affiliates," which Welltower of course knew included Genesis, ███████████████████ ████████, and included the Genesis logo. The presentation highlighted that "Integra's business plan entails entering into sub-leases with approximately 15 regional operators with strong performance track records in their respective markets" alongside a listing of Genesis and those other "select regional operators."



70.     The presentation took great pains to avoid mentioning Landau's name, but highlighted his experience and prior dealings with Welltower in outlining the "proven track

---

[57] Oct. 3 Tr., 17:15-22; 36:3-9.

[58] Welltower, Inc., News Releases, *Welltower Announces Initial Closing of Real Estate Joint Venture with Integra Health*, (Dec. 23, 2022), https://welltower.investorroom.com/2022-12-23-Welltower-Announces-Initial-Closing-of-Real-Estate-Joint-Venture-with-Integra-Health.

record" of "Integra's principals" and describing dealings with Landau.[59] Welltower had to do this dance because it had emphasized the transaction was designed to "ensure continuity of care for residents and stability for employees,"[60] and it obviously couldn't do this using Integra, a company Landau created for the deal with no employees and a strawman CEO.  Welltower used subterfuge in their public statements by combining Integra's name with Landau's experience and ensuring the market that established operators like Genesis would be taking over the facilities.

71.

---

[59] Welltower, Inc., News Releases, *Transaction Update* (Dec. 23, 2022), https://welltower.com/wp-content/uploads/2022/12/Transaction-Update-December-2022_vF.pdf.

[60] PR Newswire, News Releases, *Welltower Announces the Formation of Joint Venture With Integra Health and Plan to Transition Skilled Nursing Assets Currently Operated by ProMedica* (Nov. 7, 2022) https://www.prnewswire.com/news-releases/welltower-announces-the-formation-of-joint-venture-with-integra-health-and-plan-to-transition-skilled-nursing-assets-currently-operated-by-promedica-301670713.html.

[61] Exhibit 18, GENESIS_UCC00074431 (



72.

*iii.    2022 Transaction Impact: Welltower Makes Billions and Welltower and Landau Charge Genesis Hundreds of Millions in Rent for Facilities the Company Never Wanted*

73.

Not only did Welltower successfully transition operation of the facilities away from a financially-troubled counterparty, but Welltower got a 4% cash rent *increase* over ProMedica's prior rent. As analysts on that quarter's investor call noted, this was an unprecedented outcome: one analyst noted he had never "seen a rent restructuring where the rents went up" before.[62] The surprise was genuine—it was challenging to conceive of an arms' length transaction resulting in

---

[62]    Hindenburg Research, *Welltower: Exposing the Shell Game* (Dec. 7, 2022) https://hindenburgresearch.com/welltower/.

34

someone agreeing to pay even *more* to a landlord as part of assuming facilities that were

hemorrhaging money. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████[63]███████████████████████████████

74.  ███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████  As the presentation and publicity helped show, the deal

was almost too good to be true for Welltower, and its stock price reacted accordingly, jumping

14% over the 3 days following the announcement.[64]  That 14% increase represented approximate

$4.1 *billion* in additional market cap for the company.

75.  ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████



---

[63] Exhibit 19, GENESIS_UCC00069999 (████████████████████████████████████████
████████████████████████████████████████).

[64]  Yahoo  Finance,  Welltower  Inc.,  2022  Historical  Stock  Information,
https://finance.yahoo.com/quote/WELL/history/?period1=1667520000&period2=1668124800&interval=1d&filter=
history&frequency=1d&includeAdjustedClose=true&guce_referrer=aHR0cHM6Ly9oaW5kZW5idXJncmVzZWFy
Y2guY29tLw&guce_referrer_sig=AQAAACN72tTNWdvZopb6BG_M6ufGzAGNkaZEVon1yJTdFQofDcKRQSL
qwhLxnvpA_WOnJXTeXf8jMyqqftWiz6Z1UOrmRbImhvXPcbed2_phzfXWgh3WThYNWc2akpCfEuyGe1C8Wk
1yPwSbj5L87cViq01JBRRG9HlRx_Qop3XTXp3P (accessed on Oct. 9, 2025).

76.

77.

---

78. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

███████████████████████████████████████████

79. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



*iv.* *As Patient Care Declines,* ███████████████████████

81. ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████ Requiring Genesis to operate facilities ███████

███████████████████████ didn't just cost the company financially; it had a real-

life impact on the patients it was being asked to serve. Upon Genesis's takeover at the end of

2022, the Integra Facilities averaged 2.9 stars on the CMS Five Star Quality Rating System.  By

the Petition Date, that average rating had dropped nearly a full point, to 2.0, a dramatic decrease

in quality, with nearly a third of the portfolio garnering a 1, the lowest possible rating.

---

[68] Exhibit 21, GENESIS_UCC00086916 (██████████████████████████████████████
█████████████████████) (emphasis added).

82. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

83. ████████████████████████████████████████████████

████████ Genesis, its employees, and the thousands of patients it was supposed to serve were the losers. Welltower got a massive stock price bump as the market and investors marveled at Welltower's ability to transition away from a troubled operator and somehow increase its revenue, and Landau ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

39

**G. Challenged Transaction Number 3:** ███████████████████████████
████████████████████████████████████████████████████████████████

84. Landau and Welltower's collaboration was a great success for both parties.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ But by

mid-2024, the partnership encountered a new obstacle – a JV partner who fought back against

their coordination and greed.

*i. Landau and Welltower gain leverage on Cindat by refusing to pay rent*

85. Cindat was a JV partner of Welltower that served as landlord for 28 Genesis-

operated facilities in Pennsylvania. ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

86. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████[69] ████████████

---

[69] Exhibit 22, Genesis_UCC00023709, ¶ 11 (█████████████████████████████████
████████████████████████████████████████████████████████████).

█████████████████████████████████████████████████████

█████████████

87.    █████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████[70]    ████████████████████████████████████

██████████████████████████████[71]

88.    At the same time as these Landau-driven negotiations were occurring, Genesis's

debt owed to Welltower had become an insurmountable obstacle that it could not service.  █

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████

89.    █████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

---

[70] *Id.* at ¶ 78.

[71] *Id.* at ¶ 86.

██████████████████████████████[72]████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

    *ii.    Welltower Negotiates a Settlement, Getting the Control Welltower Wants and*

        ██████████████████████████████

90.    On September 30, 2024, Cindat, Landau, and Welltower reached a holistic settlement of all of their respective disputes. ███████████████████████████

████████████████████████████████████████████████████████████████████

████████    It was a fantastic deal, of course – for Welltower and Landau.  Welltower got what it had been angling for all along, control of the joint venture. ███████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████

91.    Tax and other machinations made the Cindat portion of the deal overly complicated, █████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

---

[72] Exhibit 23, WELLGEN00176919 (██████████████████████████████████████
█████████████████████████████████████████).



92. ████████████████████████████████████

93. ████████████████████████████████████

███████[75]  A glimpse into the parties' negotiations provides the explanation.  ██████

---

[73] ████████████████████████████████████████████████████████████████████████████

[74] Exhibit 24, GENESIS_UCC00023101 (████████████████████████████████████████).

[75] Exhibit 25, GENESIS_UCC00095866 (████████████████████████████████████████████).

[76] Exhibit 26, WELLGEN00116731 (██████████████████████████████████████████████).

[77] *Id.*

43



94.

95.

_iii._

---

[78] *Id.*

[79] Exhibit 27, WELLGEN00034689 (████████████████████).

96.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████

97.    The supposed emphasis on patient care the Court has heard about since this case

was filed was nowhere to be found as ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████[80]

---

[80] Exhibit 28, GENESIS_UCC00135636 (████████████████████████████████████).



98.

*iv.*

99.

100.

46

101. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

102. ████████████████████████████████████████████████

████████████

**H.    The Term Loans Are Deeply Undersecured, and Unsecured Creditors are Entitled to Postpetition Unencumbered Value That Is Not Proceeds of Prepetition Collateral**

103. The foregoing outlines the facts giving rise to causes of action against Welltower, equitable subordination of the Welltower debt (both secured and unsecured) gifted to WAX and MAO, and recharacterization of the ReGen Notes as equity. Each of those claims and causes of action are outlined below. In addition to those deficiencies, the underlying term loans themselves suffer from deficiencies which shift rights and value to unsecured creditors.

104. Genesis Healthcare, Inc. and certain of its debtor-subsidiaries (collectively, the "**Term Loan Obligors**") are purportedly indebted to Welltower, Omega, WAX, and MAO pursuant to the WT Term Loan, dated as of July 29, 2016. Welltower OP serves as collateral and administrative agent for the Term Loan Lenders under the WT Term Loan.

105. The Term Loan Obligors do not include any of the debtor entities that are borrowers under the "Prepetition HUD ABL Credit Agreement" (as defined in the Final DIP Order). The Term Loan Obligors have stipulated that, as of the Petition Date, they were indebted to the Term Loan Lenders under the Prepetition Term Loan Agreement in the amount of at least $317.8 million, plus accrued and unpaid interest, fees, expenses, charges, indemnities, and all

47

other obligations arising under the Prepetition Term Loan Agreement.[81] The Debtors have indicated the amount of the WT Term Loan owed to Welltower and Omega was approximately $233.3 million.[82]

106.    The Term Loan Obligors have further stipulated their obligations under the WT Term Loan are secured by (a) second priority security interests in and liens on property of the Term Loan Obligors consisting of cash, accounts receivable, general intangibles associated with accounts receivable, and proceeds thereof (the "**Term Loan Second Priority Collateral**"), and (b) first priority security interests in and liens on any other property of the Term Loan Obligors and proceeds thereof as set forth in the Prepetition Term Loan Agreement and its related security and other documents (the "**Term Loan First Priority Collateral**," and collectively with the Term Loan Second Priority Collateral, the "**Prepetition Term Loan Collateral**").

107.    Pursuant to the Final DIP Order, the Term Loan Lenders were granted replacement liens on and security interests in the Prepetition Term Loan Collateral, including then-owned and thereafter acquired real and personal property, *solely* to secure an amount equal to any post-petition diminution in value of their interests in the Prepetition Term Loan Collateral resulting or arising from the imposition of the automatic stay, the post-petition use, sale, or lease of any Prepetition Term Loan Collateral, or the grant of liens in favor of the DIP Lender.[83]

108.    As of the Petition Date, the Term Loan Agent's security interest in the Prepetition Term Loan Collateral owned by the following Debtors (collectively, the "**Unperfected Collateral**"), was unperfected as a result of the Term Loan Agent's failure to file or maintain

---

[81] Final DIP Order, ¶ E(ii)(b).

[82] Robichaux Declaration, Dkt. No. 18, at 28.

[83] *Id.* at ¶ 10(c).

UCC-1 financing statements in the respective jurisdictions of "location" of the Debtors: 279 Cabot Street Operations LLC; 279 Cabot Street Property LLC; 3720 Church Rock Street Operations LLC; 419 Harding Street Operations LLC; 462 Main Street Operations LLC; Gen-Next Holdco I, LLC; Sunbridge Putnam Health Care LLC; Sunbridge Dunbar Health Care LLC; Sunbridge Beckley Health Care LLC; Harborside Danbury Limited Partnership; Route 92 Operations LLC; 1650 Galisteo Street Operations LLC; and 803 Hacienda Lane Operations LLC.

109. Upon information and belief, the sum of the value of the interest of the Term Loan Agent and Term Loan Lenders in (a) the Term Loan First Priority Collateral, excluding (i) Unperfected Collateral, and (ii) the value of the Term Loan First Priority Collateral required to satisfy unpaid secured rent obligations as of the Petition Date; plus (b) the Term Loan Second Priority Collateral, excluding (i) Unperfected Collateral and (ii) the value of Term Loan Second Priority Collateral required to satisfy the allowed secured indebtedness of White Oak, as of the Petition Date, was substantially lower than both the aggregate amount of the WT Term Loan asserted as of the Petition Date and the amount of the WT Term Loan purportedly owed to Welltower and Omega as of the Petition date, in an amount to be demonstrated at trial.

110. As such, the Term Loan Obligors' obligations to the Term Loan Lenders in the aggregate, and to Welltower and Omega alone, were materially undersecured as of the Petition Date (before accounting for equitable subordination of the shares of the WT Term Loan held by MAO and WAX as pled herein).

111. Pursuant to the Final DIP Order, the replacement liens granted to the Term Loan Lenders under the Final DIP Order only secure any amount by which the value of the interest of

49

the Term Loan Lenders and Term Loan Agent in the Term Loan Collateral (excluding Unperfected Collateral) on the Petition Date is diminished from and after the Petition Date as a result of the imposition of the automatic stay, the use, sale, or lease of Term Loan Collateral (excluding Unperfected Collateral), or the granting of liens to secure the DIP Loan.

112.    In the absence of any such diminution in value, the Term Loan Lenders' replacement liens will not attach to any property of the Term Loan Obligors or any other Debtor. Moreover, the Term Loan Agent's prepetition security interests in the Prepetition Term Loan Collateral will not attach to any property of the Debtors acquired after the Petition Date, other than proceeds of Prepetition Term Loan Collateral in which the Term Loan Obligors held an interest of the Petition Date, pursuant to section 552(a) of the Bankruptcy Code.

## <u>COUNT I</u>

### <u>Aiding and Abetting Breaches of Fiduciary Duty (Against Welltower, Landau, Gefner)</u>

113.    The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

114.    Under applicable Delaware law, directors owe fiduciary duties of care and loyalty to the corporation and its stockholders, requiring them to act in good faith, with informed, disinterested, and independent decision-making for the long-term benefit of the company. These duties include oversight of corporate operations, acting prudently, avoiding conflicts of interest, and maximizing corporate value for stockholders.

115.    In approving and/or ratifying at least the 2022 Transaction and 2024 Transaction, Genesis directors and officers placed their own financial interests and the interests of Joel Landau, his business partners and his affiliates, and Welltower above the interests of Genesis.  In

so doing, these directors and officers breached their unqualified obligation to act in Genesis's best interests.

116.    The directors' and officers' misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, their business decisions were not entirely fair and intended to unduly benefit Joel Landau, his business partners and his affiliates, and Welltower at the expense of Genesis and its creditors.

117.    Welltower was aware of the breaches of fiduciary duty committed by Genesis's Board of Directors and joined in and substantially participated in those breaches of fiduciary duty by orchestrating and assisting in the structuring of the transactions, and by its failure to reject those transactions.

118.    As a direct and proximate result of the misconduct, Genesis was unable to resolve its liquidity issues, was forced to take on additional debt, and Genesis and its creditors were disadvantaged to hundreds of millions of dollars.

119.    As a direct and proximate result of these actions, Genesis and its creditors have been damaged in an amount to be determined at trial.

## COUNT II

### Fraudulent Conveyance Under Bankruptcy Code § 544 as to 2021 Transaction (Against Welltower, Landau, ReGen)

120.    The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

121.    Bankruptcy Code § 544(b)(1) provides the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable state law by a creditor holding an unsecured claim.

122. ████████████████████████████████████████████████████

████████████████████████████████████████ Debtors, however, did not receive

reasonably equivalent value. ████████████████████████████████████████

████████████████████████████████████████████████████

123. Landau and ReGen realized significant financial gain in the form of control over Genesis. Debtors did not receive reasonably equivalent value.

124. The Debtors were either insolvent at the time of the 2021 Transaction, rendered insolvent by that transaction, operating with unreasonably small capital or believed that they were incurring debts beyond their ability to pay them.

125. For the foregoing reasons, the Debtors are entitled to a judgment against Welltower, ReGen, and Landau (i) avoiding the transfers made under the 2021 Transaction in an amount to be determined at trial under Bankruptcy Code § 544(b), (ii) recovering the transfers for the benefit of the estates under Bankruptcy Code § 550, and (iii) preserving the transfers for the benefit of the estates under Bankruptcy Code § 551.

## COUNT III

### Fraudulent Inducement to Contract as to 2021 Transaction (Against Welltower, ReGen, and Landau)

126. The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

127. Under applicable Delaware law, defendants may be liable for damages resulting from fraudulently inducing another party to enter into a contract.

128. In 2011, Genesis was deeply insolvent and on the brink of filing for chapter 11 bankruptcy, an act which would have severely harmed Welltower's stock price and financial

interests.  Genesis directors and officers were concerned about Welltower exercising any greater control over Genesis's operations, and did not believe it would be in Genesis's best interests to increase Welltower's influence.

129.   Welltower knew that it could not directly invest further under applicable regulatory and tax laws governing its status as a REIT.  Welltower knew that the identity of the investor was material to Genesis's determination as to whether to enter into the Investment Agreement or to take other action, including, but not limited to, potentially filing for chapter 11 protection.

130.  Upon information and belief, , and knew or should have known that statement to have been false and a material representation of fact.

131.  As a result, Genesis did in fact enter into

132.    Genesis reasonably relied upon Welltower and Landau's misrepresentation as to the ████████████████████████████████████████████████████████████

████████

133.    As a result of entering into the fraudulently induced contract, Genesis ████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████

134.    As a direct and proximate result of the misconduct, Genesis was unable to receive ███████████████████████ resolve its liquidity issues, was forced to take on additional debt, and Genesis and its creditors were disadvantaged to hundreds of millions of dollars.

135.    As a direct and proximate result of these actions, Genesis and its creditors have been damaged in an amount to be determined at trial.

## COUNT IV

### Fraudulent Conveyance Under Bankruptcy Code § 548 as to Integra Transaction (Against Welltower, Integra, Landau)

136.    The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

137.    Bankruptcy Code § 548(a)(1)(B) provides the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that was made or incurred within 2 years before the petition date if the debtor received less than reasonably equivalent value for such transfer or obligation and was either insolvent at the time, rendered insolvent by the transfer or obligation, operating with unreasonably small capital, incurred debts

54

the debtor believed would be beyond the debtor's ability to pay as they came due.  11 U.S.C. § 548(a)(1)(B).

138.    Welltower, Integra, and Landau realized significant monetary gains from the Integra Transaction, and the Debtors did not receive reasonably equivalent value for the transfers and obligations generated by the Integra Transactions.

139.    The Debtors were either insolvent at the time of the Integra Transaction, rendered insolvent by that transaction, operating with unreasonably small capital or believed that they were incurring debts beyond their ability to pay them.

140.    Welltower, Landau, and Integra intended for, or believed that Debtor would, incur debts beyond its ability to pay as the debts matured as a result of this transaction. These debts also were made for the benefit of an insider: Landau and Gefner.

141.    For the foregoing reasons, the Debtors are entitled to a judgment against Welltower, Landau and Integra (i) avoiding the transfers made under the Integra Transaction in an amount to be determined at trial under Bankruptcy Code § 548(a), (ii) recovering the transfers for the benefit of the estates under Bankruptcy Code § 550(a), and (iii) preserving the transfers for the benefit of the estates under Bankruptcy Code § 551.

## COUNT V

### Fraudulent Conveyance Under Bankruptcy Code § 544 as to Integra Transaction (Against Welltower, Integra, and Landau)

142.    The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

143.     Bankruptcy Code § 548(b)(1) provides the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable state law by a creditor holding an unsecured claim.

144.     Welltower realized significant financial gain from the Integra Transaction and the Debtors did not receive reasonably equivalent value for the transfers and obligations generated by the Integra Transaction.

145.     Welltower, Integra, and Landau realized significant monetary gains from the Integra Transaction, and the Debtors did not receive reasonably equivalent value for the transfers and obligations generated by the Integra Transactions.

146.     The Debtors were either insolvent at the time of the Integra Transaction, rendered insolvent by that transaction, operating with unreasonably small capital or believed that they were incurring debts beyond their ability to pay them.

147.     For the foregoing reasons, the Debtors are entitled to a judgment against Welltower, Integra, and Landau (i) avoiding the transfers made under the Integra Transaction in an amount to be determined at trial under Bankruptcy Code § 544(b), (ii) recovering the transfers for the benefit of the estates under Bankruptcy Code § 550, and (iii) preserving the transfers for the benefit of the estates under Bankruptcy Code § 551.

## COUNT VI

### Fraudulent Conveyance Under Bankruptcy Code § 548 as to 2024 Transaction (Against Welltower, Landau, Gefner, WAX, MAO, Cindat JV)

148.     The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

56

149. Bankruptcy Code § 548(a)(1)(B) provides the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that was made or incurred within 2 years before the petition date if the debtor received less than reasonably equivalent value for such transfer or obligation and was either insolvent at the time, rendered insolvent by the transfer or obligation, operating with unreasonably small capital, incurred debts the debtor believed would be beyond the debtor's ability to pay as they came due.  11 U.S.C. § 548(a)(1)(B).

150. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ These benefits were to be provided to Genesis in return ████████████████████████████████████████████████

151. The Debtors did not receive reasonably equivalent value for the transfers and obligations generated by the September 2024 Transaction.

152. The Debtors were either insolvent at the time of the September 2024 Transaction, rendered insolvent by that transaction, operating with unreasonably small capital or believed that they were incurring debts beyond their ability to pay them.

153. Welltower, Landau, WAX, Gefner, Cindat JV, and MAO intended for, or believed that Debtor would, incur debts beyond its ability to pay as the debts matured as a result of this transaction. These debts also were made ████████████████████████

154. For the foregoing reasons, the Debtors are entitled to a judgment against Welltower, Landau, WAX, Gefner, MAO, and Cindat JV (i) avoiding the transfers made under the September 2024 Transaction in an amount to be determined at trial under Bankruptcy Code § 548(a), (ii) recovering the transfers for the benefit of the estates under Bankruptcy Code § 550(a), and (iii) preserving the transfers for the benefit of the estates under Bankruptcy Code § 551.

## COUNT VII

## Fraudulent Conveyance Under Bankruptcy Code § 544 as to Administrative Agent Fee
## (Against Welltower)

155. The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

156. Bankruptcy Code § 548(a)(1)(B) provides the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that was made or incurred within 2 years before the petition date if the debtor received less than reasonably equivalent value for such transfer or obligation and was either insolvent at the time, rendered insolvent by the transfer or obligation, operating with unreasonably small capital, incurred debts the debtor believed would be beyond the debtor's ability to pay as they came due. 11 U.S.C. § 548(a)(1)(B).

158. The Debtors did not receive reasonably equivalent value for the "administrative agent fee."

58

159. The Debtors were either insolvent at the time of the June 2024 transaction, rendered insolvent by that transaction, operating with unreasonably small capital or believed that they were incurring debts beyond their ability to pay them.

160. Welltower intended for, or believed that Debtor would, incur debts beyond its ability to pay as the debts matured as a result of this transaction.

161. For the foregoing reasons, the Debtors are entitled to a judgment against Welltower, (i) avoiding transfers made pursuant to the June 2024 Transaction in an amount to be determined at trial under Bankruptcy Code § 548(a), (ii) recovering the transfers for the benefit of the estates under Bankruptcy Code § 550(a), and (iii) preserving the transfers for the benefit of the estates under Bankruptcy Code § 551.

## COUNT VIII

### Fraudulent Conveyance Under Bankruptcy Code § 548 as to PA22 (Against Landau, Altira)

162. The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

163. Bankruptcy Code § 548(a)(1)(B) provides the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that was made or incurred within 2 years before the petition date if the debtor received less than reasonably equivalent value for such transfer or obligation and was either insolvent at the time, rendered insolvent by the transfer or obligation, operating with unreasonably small capital, incurred debts the debtor believed would be beyond the debtor's ability to pay as they came due. 11 U.S.C. § 548(a)(1)(B).

████████████████████████████████████████████████████████

████████████████████████████████████

165. The Debtors did not receive reasonably equivalent value for the transfers and obligations generated by the PA22 transaction.

166. The Debtors were insolvent at the time of this transaction.

167. Altira and Landau intended for, or believed that Debtor would, incur debts beyond its ability to pay as the debts matured as a result of this transaction. ████████████████

██████████████████████

168. For the foregoing reasons, the Debtors are entitled to a judgment against Altira and Landau (i) avoiding the transfers made under the PA22 Transaction in an amount to be determined at trial under Bankruptcy Code § 548(a), (ii) recovering the transfers for the benefit of the estates under Bankruptcy Code § 550(a), and (iii) preserving the transfers for the benefit of the estates under Bankruptcy Code § 551.

## COUNT IX

### Fraudulent Conveyance Under Bankruptcy Code § 544 as to 2024 Transaction (Against Welltower, Landau, WAX, MAO, Markglen, Gefner, and Cindat JV)

169. The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

170. Bankruptcy Code § 548(b)(1) provides the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable state law by a creditor holding an unsecured claim.

171. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████

172. The Debtors did not receive reasonably equivalent value for the transfers and obligations generated by the September 2024 Transaction.

173. The Debtors were either insolvent at the time of the September 2024 Transaction, rendered insolvent by that transaction, operating with unreasonably small capital or believed that they were incurring debts beyond their ability to pay them.

174. Welltower, Landau, WAX, MAO, Markglen, Gefner, and Cindat JV intended for, or believed that Debtor would, incur debts beyond its ability to pay as the debts matured as a result of this transaction. These debts also were made for the benefit of an insider: Landau.

175. For the foregoing reasons, the Debtors are entitled to a judgment against Welltower, Landau, WAX, MAO, Markglen, Gefner, and Cindat JV (i) avoiding the transfers made under the September 2024 Transaction in an amount to be determined at trial under Bankruptcy Code § 544(b), (ii) recovering the transfers for the benefit of the estates under Bankruptcy Code § 550, and (iii) preserving the transfers for the benefit of the estates under Bankruptcy Code § 551.

## COUNT X

### Breach of Fiduciary Duty – Usurpation of Corporate Opportunity (Landau)

176. The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

61

177. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

178. At the time of the 2024 Transaction, ████████████████████████████

████

179. Upon information and belief, ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████

180. Upon information and belief, ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████

181. Upon information and belief, WAX and MAO were created for the purpose of entering into the 2024 Transaction.

182. Landau exercised significant control over Debtors' board and the business affairs of Debtors from 2021 to Present, including during the 2024 Transaction. For example, upon information and belief, the 2024 Transaction was structured specifically ████████████████

████████████████████

62

183. The 2024 Transaction was not approved by a special committee of independent directors.

184. The Debtors did not receive reasonably equivalent value for the transfers and obligations generated by the September 2024 Transaction.

185. The Debtors were either insolvent at the time of the September 2024 Transaction, rendered insolvent by that transaction, operating with unreasonably small capital or believed that they were incurring debts beyond their ability to pay them.

186. By facilitating the 2024 Transaction, Landau usurped Debtors' corporate opportunity to reduce its debt to Welltower and the Cindat JV.

187. For the foregoing reasons, the Debtors are entitled to a judgment against Landau for an amount to be awarded at trial, including the profits lost and diverted and any compensation paid to Mr. Landau (through Pinta or ReGen) during this time.

### COUNT XI

### Recharacterization of Convertible Notes (Against ReGen)

188. The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

189. Pursuant to Bankruptcy Code § 502, the Court is empowered to recharacterize an asserted claim if, under applicable state law, that claim does not represent a debt but instead an equity interest.

190. The ReGen Notes, although facially identified as unsecured convertible debt obligations, were not to function as a genuine loan, but rather a disguised equity investment in the Debtors.

63

191. The ReGen Notes display a series of features that mean they are properly considered equity, not debt, under Delaware law.

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████

194. Third, at the time of the issuance of the ReGen Notes, the Debtors were inadequately capitalized.

195. ███████████████████████████████████████████████████

████████████████████ That is less than half the rate on U.S. Treasury bonds at the time.

196. ███████████████████████████████████████████████████

██████████████████████████████████████

197. ███████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████

199. For the foregoing reasons, the ReGen Notes should be recharacterized under Bankruptcy Code § 502 as equity.

## COUNT XII

### Equitable Subordination of Unsecured Debt (ReGen)

200.    The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

201.    Bankruptcy Code § 510(c) provides that "[n]otwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may— (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."

202.    ReGen has engaged in inequitable conduct that has enriched itself, Landau, and related Landau-controlled entities to the expense of the Debtors and their creditors.

203.    ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████[84]
████████████████████████████████████████████████████████████
█████████████████████████████████

204.    The Debtors were harmed by ReGen's machinations and inequitable conduct.

205.    The Debtors' creditors were harmed by ReGen's machinations and inequitable conduct.

206.    ReGen is controlled by Landau.

---

[84] *See* Ex. 12 (Genesis_SpecialCommittee_0000000009).

207.    ReGen is an insider of the Debtors.

208.    Equitable subordination of ReGen's claims is not inconsistent with the provisions of the Bankruptcy Code.

209.    For the foregoing reasons, ReGen's claims should be equitably subordinated pursuant to Bankruptcy Code § 510(c).

## COUNT XIII

### Equitable Subordination of Unsecured Debt (MAO)

210.    The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

211.    Bankruptcy Code § 510(c) provides that "[n]otwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may— (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."

212.    MAO has engaged in inequitable conduct that has enriched itself, Landau, and related Landau-controlled entities to the expense of the Debtors and their creditors.

213.    Specifically, prior to 2024,

66

214. ████████████████████████████████████████████████████

████████████████████████████████

215. The Debtors received nothing in exchange ████████████████████████

███████

216. As a DIP Lender, MAO also facilitated favorable timelines and requirements to this proceeding including a release under the proposed stalking horse agreement.

217. The Debtors were harmed by MAO's machinations and inequitable conduct.

218. The Debtors' creditors were harmed by MAO's machinations and inequitable conduct.

219. MAO is controlled by Landau and Gefner.

220. MAO is an insider of the Debtors.

221. Equitable subordination of MAO's secured claims[85] is not inconsistent with the provisions of the Bankruptcy Code.

222. For the foregoing reasons, MAO's secured claims should be equitable subordinated pursuant to Bankruptcy Code § 510(c).

## COUNT XIV

### Equitable Subordination of Debt (MAO)

223. The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

224. Bankruptcy Code § 510(c) provides that "[n]otwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may— (1) under principles of equitable

---

[85] MAO 2016 Term Loan ($120M) and MAO 2018 Term Loan ($40M).

67

subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."

225.   MAO has engaged in inequitable conduct that has enriched itself, Landau, and related Landau-controlled entities to the expense of the Debtors and their creditors.

226.   Specifically, prior to 2024, ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████

227.   ███████████████████████████████████████████████████████████

█████████████████████████████████

228.   The Debtors received nothing in exchange for the loss of its debt forgiveness from Welltower.

229.   As a DIP Lender, MAO also facilitated favorable timelines and requirements to this proceeding including a release under the proposed stalking horse agreement.

230.   The Debtors were harmed by MAO's machinations and inequitable conduct.

231.   The Debtors' creditors were harmed by MAO's machinations and inequitable conduct.

232.   MAO is controlled by Landau and Gefner.

233.   MAO is an insider of the Debtors.

234.    Equitable subordination of MAO's unsecured claims[86] is not inconsistent with the provisions of the Bankruptcy Code.

235.    For the foregoing reasons, MAO's unsecured claims should be equitable subordinated pursuant to Bankruptcy Code § 510(c).

## COUNT XV

### Equitable Subordination of Secured Claims (WAX)

236.    The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

237.    Bankruptcy Code § 510(c) provides that "[n]otwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may— (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."

238.    WAX has engaged in inequitable conduct that has enriched itself, Landau, and related Landau-controlled entities to the expense of the Debtors and their creditors.

239.    Specifically, prior to 2024, ███████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████

---

[86] MAO/WAX Split Note (Consolidated A-1), MAO/WAX Split Note (Consolidated A-2), and MAO/WAX A-2 Note.

240. ███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

241. The Debtors received nothing in exchange for the loss of its debt forgiveness from Welltower.

242. As a DIP Lender, WAX also facilitated favorable timelines and requirements to this proceeding.

243. The Debtors were harmed by WAX's machinations and inequitable conduct.

244. The Debtors' creditors were harmed by WAX's machinations and inequitable conduct.

245. WAX is controlled by Landau.

246. WAX is an insider of the Debtors.

247. Equitable subordination of WAX's secured claims[87] is not inconsistent with the provisions of the Bankruptcy Code.

248. For the foregoing reasons, WAX's secured claims should be equitable subordinated pursuant to Bankruptcy Code § 510(c).

## COUNT XVI

### Equitable Subordination of Unsecured Claims (WAX)

249. The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

---

[87] WAX 2016 Term Loan ($120M) and WAX DIP Term Loan.

250. Bankruptcy Code § 510(c) provides that "[n]otwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may— (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."

251. WAX has engaged in inequitable conduct that has enriched itself, Landau, and related Landau-controlled entities to the expense of the Debtors and their creditors.

252. Specifically, prior to 2024, ███████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████

253. ████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████

254. The Debtors received nothing in exchange for the loss of its debt forgiveness from Welltower.

255. As a DIP Lender, WAX also facilitated favorable timelines and requirements to this proceeding.

256. The Debtors were harmed by WAX's machinations and inequitable conduct.

257. The Debtors' creditors were harmed by WAX's machinations and inequitable conduct.

258.    WAX is controlled by Landau.

259.    WAX is an insider of the Debtors.

260.    Equitable subordination of WAX's unsecured claims[88] is not inconsistent with the provisions of the Bankruptcy Code.

261.    For the foregoing reasons, WAX's unsecured claims should be equitable subordinated pursuant to Bankruptcy Code § 510(c).

## COUNT XVII

### Preferential Transfer (Against Welltower)

262.    The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

263.    Bankruptcy Code § 547(b) provides that the trustee may avoid any transfer of an interest of the debtor in property to a creditor, made on account of an antecedent debt, made while the debtor was insolvent, made within 90 days before the petition, that enables the creditor to receive more than such creditor would receive in a chapter 7 liquidation.  11 U.S.C. § 547(b).

264.    Upon information and belief, in the 90 days preceding the filing of the Debtors' petitions, ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

265.    The Welltower leases are antecedent debts.

266.    The payments allowed Welltower to receive more than it would receive in a Chapter 7 liquidation.

---

[88] MAO/WAX Split Note (Consolidated A-1), MAO/WAX Split Note (Consolidated A-2), and MAO/WAX A-2 Note.

267. For the foregoing reasons, the Debtors are entitled to a judgment against Welltower (i) avoiding the preferential transfers made to Welltower in an amount to be determined at trial under Bankruptcy Code § 547(b), (ii) recovering the transfers for the benefit of the estates under Bankruptcy Code § 550(a), and (iii) preserving the transfers for the benefit of the estates under Bankruptcy Code § 551.

## COUNT XVIII

### Preferential Transfer (Against Omega)

268. The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

269. Bankruptcy Code § 547(b) provides that the trustee may avoid any transfer of an interest of the debtor in property to a creditor, made on account of an antecedent debt, made while the debtor was insolvent, made within 90 days before the petition, that enables the creditor to receive more than such creditor would receive in a Chapter 7 liquidation. 11 U.S.C. § 547(b).

270. Upon information and belief, in the 90 days preceding the filing of the Debtors' petitions, ███████████████████████████████████████████████

███████████████████

271. The Omega leases are antecedent debts.

272. The payments allowed Omega to receive more than it would receive in a Chapter 7 liquidation.

273. For the foregoing reasons, the Debtors are entitled to a judgment against Omega (i) avoiding the preferential transfers made to Omega in an amount to be determined at trial under Bankruptcy Code § 547(b), (ii) recovering the transfers for the benefit of the estates under

Bankruptcy Code § 550(a), and (iii) preserving the transfers for the benefit of the estates under

Bankruptcy Code § 551.

## COUNT XIX

### Declaratory Judgment Regarding Limitation of Security Interest Pursuant to 11 U.S.C. §§ 506(a) and 552(a) (Against Welltower OP, as Term Loan Collateral Agent)

274.    The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

275.    Bankruptcy Code § 552(a) provides that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."   11 U.S.C. § 552(a).

276.    As a result of the operation of § 552(a), any and all property acquired by the Debtors' estates after the Petition Date is unencumbered by any prepetition security interests and available for distribution to unsecured creditors.

277.    M Much of the Debtors' property is property acquired after the Petition Date, including all new contracts with patients entered into or renewed since the Petition Date and new accounts receivable generated by the Debtors since the Petition Date.

278.    The sole collateral for the WT Term Loan consists of the Term Loan First Priority Collateral and the Term Loan Second Priority Collateral, in each case excluding any Unperfected Collateral and any other assets of the Debtors that are subject to a security interest subject to avoidance as set forth in this Complaint.

279.    The purported outstanding balance of the WT Term Loan as of the Petition Date was $317.8 million.  In the event the shares of the WT Term Loan held by WAX and MAO are

74

equitably subordinated, the remaining outstanding balance of the WT Term Loan would be $233.3 million.  In either case, the value of assets subject to the unavoidable security interests of Welltower OP, as Term Loan Collateral Agent, was less than the valid outstanding balance of the WT Term Loan as of the Petition Date.

280.    Pursuant to section 506(a) of the Bankruptcy Code, any allowed balance of the WT Term Loan in excess of the value of the Term Loan Agent's and Term Loan Lenders' interest in property of the Debtors subject to a valid, perfected security interest is an unsecured deficiency claim.

281.    The claim secured by the replacement liens in postpetition assets of the Debtors granted to Welltower OP as Term Loan Collateral Agent pursuant to the Final DIP Order is limited to the amount of any diminution in value of Welltower's unavoidable interest in the Term Loan First Priority Collateral and the Term Loan Second Priority Collateral as a result of the imposition of the automatic stay, the post-petition use, sale, or lease of any Prepetition Term Loan Collateral, or the grant of liens in favor of the DIP Lender.

282.    The value of any assets acquired by the Debtors after the Petition Date in excess of the amount of any such diminution in value is unencumbered pursuant to section 552(a) of the Bankruptcy Code.

283.    For the foregoing reasons, the Debtors are entitled to a declaratory judgment that (a) the allowable secured claim of the WT Term Lenders no more than the value of the Term Loan Agent's and Term Loan Lenders' interest in property of the Debtors subject to a valid, perfected security interest, in an amount to be determined at trial, and (b) the value of any assets acquired by the Debtors after the Petition Date in excess of the amount of any diminution in

75

value of Welltower OP's unavoidable interest in the Term Loan First Priority Collateral and the Term Loan Second Priority Collateral as a result of the imposition of the automatic stay, the post-petition use, sale, or lease of any Prepetition Term Loan Collateral, or the grant of liens in favor of the DIP Lender is unencumbered by any liens or security interests of Welltower OP or any other party.

COUNT XX

**Preferential Transfer (Against Welltower OP as Term Loan Collateral Agent)**

284.    The Committee reasserts and realleges the allegations contained in all the paragraphs above, as if set forth fully herein.

285.    Bankruptcy Code § 547(b) provides that the trustee may avoid any transfer of an interest of the debtor in property to a creditor, made on account of an antecedent debt, made while the debtor was insolvent, made within 90 days before the petition, that enables the creditor to receive more than such creditor would receive in a chapter 7 liquidation.  11 U.S.C. § 547(b).

286.    Upon information and belief, in the 90 days preceding the filing of the Debtors' petitions, Welltower payments from the Debtors on account of the WT Term Loan in an amount to be determined at trial.

287.    The WT Term Loan was antecedent debt of the Debtors at the time of each such payment.

288.    The payments allowed Welltower OP to receive more than it would receive in a Chapter 7 liquidation.

289.    For the foregoing reasons, the Debtors are entitled to a judgment against Welltower OP (i) avoiding the preferential transfers made to Welltower OP on account of the

76

WT Term Loan in an amount to be determined at trial under Bankruptcy Code § 547(b), (ii)

recovering the transfers for the benefit of the estates under Bankruptcy Code § 550(a), and (iii)

preserving the transfers for the benefit of the estates under Bankruptcy Code § 551.

## COUNT XXI

**Judgment Partially Disallowing Secured WT Term Loan Claim Asserting Claim Secured By Security Interests In Unperfected Collateral and Avoiding and Preserving for the Benefit of Debtors' Estates Any Such Security Interests Pursuant to Bankruptcy Code Sections 544 and 551 (11 U.S.C. §§ 502, 544(a), 550, 551) (Against Welltower OP as Term Loan Collateral Agent)**

290.    The Committee reasserts and realleges the allegations contained in all the paragraphs above, as if set forth fully herein.

291.    Pursuant to the Final DIP Order, the Debtors stipulated that the WT Term Loan is secured by second priority security interests in and liens on the Term Loan Second Priority Collateral and first priority security interests in and liens on the Term Loan First Priority Collateral.

292.    Welltower OP has not met the requirements under Article 9 of the Uniform Commercial Code in effect in each relevant jurisdiction for perfecting a security interest in the Unperfected Collateral.

293.    For the foregoing reasons, the Debtors are entitled to a judgment: (a) disallowing, pursuant to section 502(a) of the Bankruptcy Code, the WT Term Loan claim to the extent it asserts a secured claim secured by a security interest in the Unperfected Collateral; (b) (i) avoiding any and all such security interests in the Unperfected Collateral because such security interests are invalid and unenforceable against the applicable Debtors pursuant to section 544(a) of the Bankruptcy Code, (ii) recovering such interests for the applicable Debtors' estates

pursuant to section 550 of the Bankruptcy Code, and/or (iii) automatically preserving such interests for the benefit of the applicable Debtors' estates pursuant to section 551 of the Bankruptcy Code.

## COUNT XXII

### Violation of the Racketeering Influenced and Corrupt Organizations Act (Against Enterprise Consisting of Landau, Gefner, Pinta, and Welltower)

294.    The Committee reasserts and realleges the allegations contained in all the paragraphs above, as if set forth fully herein.

295.    Defendants Landau and Welltower, as well as at least Gefner and Pinta, were members of a group of individuals and corporations that constituted an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) (the "**Enterprise**"), that is a group of individuals or entities associated in fact, although not a legal entity, which engaged in, and the activities of which affected interstate commerce. The Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the enterprise.

296.    The Enterprise has existed at least since 2021 and continues to exist and operate today.

297.    The Enterprise is a business association among its members that aims to maximize the profits Welltower, Landau and other members of the Enterprise at the expense of other entities, including Genesis and other Debtors.

298.    Landau participates in the Enterprise and its primary decision maker regarding measures taken by Pinta, Integra, WAX, MAO, and other affiliates.

78

299.    Welltower participates in the operations of the Enterprise, including by owning real estate assets used in furtherance of the goals of the Enterprise and has entered into agreements with Genesis and other Debtors in furtherance of those goals.

300.    Pinta participates in the operations of the Enterprise, including by being the vehicle through which Landau owns assets used in furtherance of the goals of the Enterprise, including ownership of interests in Genesis and other Debtors.

301.    Gefner participates in the operations of the Enterprise, including by being a director of Integra and MAO and causing those entities to act to the detriment of Genesis and in furtherance of the interests of the Enterprise.

302.    The purposes of the Enterprise include (1) obtaining and maintaining control over Genesis and other Debtors to ensure that Welltower real estate interests and rents as well as Welltower joint venture interests for joint ventures with other members of the Enterprise are protected from the risk of financial loss and that other Enterprise members have the opportunity to use Genesis and other Debtors to enrich themselves, and (2) exerting control over Genesis and other Debtors to serve the purposes of Welltower, Landau, and the other Enterprise members to the detriment of Genesis, other Debtors, and their creditors.

303.    The means and methods by which Landau, Welltower and other members and associates of the Enterprise have conducted and participated in the affairs of the Enterprise include a pattern of racketeering activity, including multiple acts of wire fraud, in violation of 18 U.S.C. § 1962(c), and conspiracy with one another to violate the provisions of 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

304.    Beginning no later than February 18, 2021, Landau, Welltower and other members of the Enterprise knowingly and willfully devised and intended to devise a scheme and artifice to defraud, and for the purpose of obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, transmitted and cause to be transmitted by means of wire communications in interstate commerce, certain writings, signs, signals, pictures, and sounds in violation of 18 U.S.C. § 1343.

305.    In furtherance of this scheme, Landau acted to obtain control of Genesis and █

██████████████████████████████████████████████████████████████

306.    In furtherance of this scheme, ████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████

307.    In furtherance of this scheme, Landau, Welltower, and other members of the Enterprise caused ████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████

308.    In furtherance of the scheme, Landau, Welltower and other members of the Enterprise █████████████████████████████████████████████████

████████ while causing Genesis and other Debtors to suffer financial losses.

309.    The scheme was executed by means of interstate wire communications that were used to wire funds necessary to effect these transactions and through electronic communications that furthered the scheme.

80

310. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████

311. Thereafter, in furtherance of the scheme, Landau and other members of the

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████

312. The 2022-2023 ProMedica/Integra Transaction was carried out in furtherance of

the Enterprise's scheme. Through this transaction, Welltower exited an unprofitable relationship

with ProMedica and entered into a more advantageous relationship with Genesis and other

Debtors, achieving immediate gains in its stock price and rent increases. ██████████████

███████████████████████████████████████████████████████████

███████████████████████████    But Genesis and other Debtors (a) ██████████████

81

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████

313. In orchestrating and approving these transactions, ████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████

314. The scheme continued in the 2024 transactions. On or about September 30, 2024,

in a transaction orchestrated by Landau, ██████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ These

transactions, and all related transfers set forth herein, were executed by wire in interstate

commerce. ████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████

315. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ The payment, which was performed through electronic communications, was sham consideration, and the agreement to refrain from collecting was knowingly false when made.

316.    ████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████ This payment, which was performed through electronic communications, was sham consideration.

317.    Less than ten days after the September 2024 Transaction closed, ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

318.    Genesis and the other Debtors have suffered a loss of at least $ ████████ as a result of this phase of the fraudulent scheme, and untold ██████ due to previous phases of the scheme.

319.    Landau and Welltower are continuing to run the Enterprise and their racketeering activity is ongoing and likely to continue injuring Genesis and the other Debtors and their creditors.

83

## COUNT XXIII

### Disallowance of Claims, 11 U.S.C. §§ 502(d) (Against Welltower, Landau, WAX, MAO, Markglen, Integra, Altira, ReGen, and Cindat JV)

320.    The Committee reasserts and realleges the allegations contained in all the paragraphs above, as if set forth fully herein.

321.    Welltower, Landau, WAX, MAO, Markglen, Integra, Altira, ReGen, and Cindat JV are transferees of transfers avoidable under 11 U.S.C. §§ 544, 547 and 548, which property is recoverable under 11 U.S.C. § 550(a).

322.    Welltower, Landau, WAX, MAO, Markglen, Integra, Altira, ReGen, and Cindat JV have not paid the amount of the transfers or turned over such property for which they are liable under 11 U.S.C. § 550(a).

323.    Pursuant to 11 U.S.C. § 502(d), any and all claims of Welltower, Landau, WAX, MAO, Markglen, Integra, Altira, ReGen, and Cindat JV against Debtors must be disallowed until such time as they pay the amount equal to the aggregate amount of all of the transfers, plus interest thereon and costs.

## COUNT XXIV

### Breach of Fiduciary Duty (Against Landau, Harrington, and Kirschner)

324.    The Committee reasserts and realleges the allegations contained in all paragraphs above, as if fully set forth herein.

325.    Under applicable Delaware law, directors owe fiduciary duties of care and loyalty to the corporation and its stockholders, requiring them to act in good faith, with informed, disinterested, and independent decision-making for the long-term benefit of the company.  These

duties include oversight of corporate operations, acting prudently, avoiding conflicts of interest, and maximizing corporate value for directors, officers, and controlling shareholders.

326.    In approving and/or ratifying at least the 2022 Transaction and 2024 Transaction, Genesis directors and officers placed their own financial interests and the interests of Joel Landau, his business partners and his affiliates, and Welltower above the interests of Genesis.  In so doing, these directors and officers breached their unqualified obligation to act in Genesis's best interests.

327.    The directors' and officers' misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, their business decisions were not entirely fair and intended to unduly benefit Joel Landau, his business partners and his affiliates, and Welltower at the expense of Genesis and its creditors.

328.    As a direct and proximate result of the misconduct, Genesis was unable to resolve its liquidity issues, was forced to take on additional debt, and Genesis and its creditors were disadvantaged to hundreds of millions of dollars.

329.    At the time of the 2022 and 2024 Transactions,

330.    Upon information and belief,



331.    Upon information and belief,



332. Upon information and belief, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

333. Upon information and belief, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

334. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

335. The 2022 and 2024 Transactions were not approved by a special committee of independent directors.

336. As a direct and proximate result of these actions, Genesis and its creditors have been damaged in an amount to be determined at trial.

## CONCLUSION

**WHEREFORE**, for the reasons set forth above, and as the evidence adduced at trial will demonstrate sufficient basis for, the Committee respectfully requests the Court enter an order providing for the following relief, and such other and further relief as the Court may deem just and proper:

**A.** Recharacterization and/or equitable subordination to unsecured creditors of all of the Landau Entities' interests in the Debtors;

86

**B.** Damages in the amount to be determined by the Court, but no less than $150 million, against Welltower for its fraudulent inducement, fraudulent transfers, and aiding and abetting such breaches of fiduciary duty in connection with the challenged transactions;

**C.** Equitable relief including subordination or disallowance of any claims held by Defendants or their affiliates;

**D.** Avoiding and/or granting recovery of all amounts paid and/or obligations incurred in connection with the transferred assets, returning the assets transferred to the Debtor or subjecting those assets to a constructive trust in favor of the Debtor; and

**E.** Such other and further relief as the Court deems just and proper.

[*Remainder of Page Intentionally Left Blank*]

**STINSON LLP**

*/s/ Zachary Hemenway*
Nicholas Zluticky (admitted *pro hac vice*)
Zachary Hemenway (NDTX Bar No. 59670MO)
Miranda Swift (admitted *pro hac vice*)
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone: (816) 842-8600
nicholas.zluticky@stinson.com
zachary.hemenway@stinson.com
miranda.swift@stinson.com

- and -

**PROSKAUER ROSE LLP**

Brian S. Rosen (*pro hac vice*)
Timothy Q. Karcher (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Daniel Desatnik (*pro hac vice*)
Eleven Times Square
New York, New York 10036-8299
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: brosen@proskauer.com
         tkarcher@proskauer.com
         ebarak@proskauer.com
         ddesatnik@proskauer.com

- and -

Paul V. Possinger (*pro hac vice*)
Jordan E. Sazant (*pro hac vice*)
PROSKAUER ROSE LLP
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL 60602-4342
Telephone: (312) 962-3570
Email: ppossinger@proskauer.com
         jsazant@proskauer.com

*Counsel to the Statutory Unsecured Claimholders'
Committee to Genesis Healthcare, Inc., et al.*

88

CORE/3534790.0002/235030548.2

# EXHIBIT 1

# Welltower Inc. (WELL)

## Initiating Coverage at Outperform: Multi-Year Growth Runway in Focus



**Initiating at Outperform.** We expect investors will continue to look through near-term fundamental challenges to the start of a multi-year earnings growth upcycle that we expect to begin in mid-to-late 2021 driven by favorable demographic trends, an improving supply picture, and capital allocation upside as WELL deploys its >$5 billion war chest toward opportunistic acquisitions. We believe WELL's current 13% NAV premium is justified (and we expect it to increase) as a senior housing upcycle starts and given our expectation for Welltower to generate outsized NAV growth through capital allocation.

- **Doubling down on senior housing; multi-year earnings growth runway expected.** The next 6-12 months are likely to remain difficult for the senior housing sector given the COVID-19 resurgence and our belief that customer perception toward the sector may remain negative in the near-to-intermediate term. However, despite the challenging near-term outlook, we believe we are approaching a bottom in EBITDAR, which is supported by rapidly falling supply starts and favorable demographics. Overall, we expect WELL will experience continued occupancy declines through 1H21 with year-over-year FFO/share growth resuming in mid-to-late 2021. Positively, we don't need to assume occupancy returns to pre-COVID levels for an attractive growth inflection to occur (low-double-digit FFO/share growth expected in 2022). While peers are reducing exposure to senior housing, we expect WELL's continued commitment to the sector (along with its well-aligned management agreements) to drive outsized intermediate-term growth.

- **Contrarian capital allocation strategy expected to provide longer-term NAV upside.** Welltower's capital allocation strategy focuses on long-term results rather than short-term accretion/dilution, which can result in short-term stock volatility as WELL invests in less popular healthcare sectors; however, WELL's capital allocation strategy has helped it offset negative fundamental trends in the past and outperform peers. Today, WELL is following a similar contrarian strategy with management building up >$5 billion of liquidity through recent opportunistic sales of better-performing MOB and senior housing assets at an estimated blended mid-5% cap rate. Unlike peers, WELL plans to use its investment capacity to capitalize on attractive investment opportunities in the senior housing sector that have been created through property-level distress and/or limited financing availability; WELL is actively underwriting SHOP acquisitions, some of which we believe can be acquired at >60% discounts to replacement cost.
    - We expect initial purchases could occur in the mid-3% cap rate range (mix of stabilized and unstabilized assets) with yields eventually growing to the mid- to high-single-digit range.

- **Valuation premium appears justified.** WELL is currently trading at a 13% premium to NAV, which is below its ~20% average historical premium to consensus NAV. We believe this premium is justified (and has room to increase) given that we expect above-average NAV premiums at the start of a new senior housing upcycle and our expectation for WELL to generate outsized NAV growth through its contrarian capital allocation strategy.

## INITIATING COVERAGE

**1-Year Price Chart**



### Stock Data

| | |
|---|---|
| Rating: | Outperform |
| Suitability: | Average Risk |
| Price Target: | $68 |
| NAV: | $54.45 |
| Price (1/4/21): | $61.97 |
| Market Cap (mil): | $26,139 |
| Shares Out (mil): | 421.8 |
| Average Daily Vol (mil): | 2.66 |
| Dividend Yield: | 3.9% |

### Estimates

| FY Dec | 2020E | 2021E | 2022E |
|---|---|---|---|
| Q1 | 1.02 A | 0.78 E | 0.86 E |
| Q2 | 0.86 A | 0.80 E | 0.89 E |
| Q3 | 0.84 A | 0.83 E | 0.92 E |
| Q4 | 0.79 E | 0.85 E | 0.94 E |
| **Fiscal FFO** | **3.51 E** | **3.26 E** | **3.61 E** |
| Fiscal P/FFO | 17.7x | 19.0x | 17.2x |
| **AFFO** | **3.15 E** | **2.89 E** | **3.25 E** |

Chart/Table Sources: FactSet and Baird Data. Price chart reflects most recent closing price.

[ **Please refer to Appendix - Important Disclosures and Analyst Certification** ]

**Welltower's portfolio consists of a well-diversified mix of healthcare assets within the senior housing, outpatient medical, health system, and post-acute property sectors**

**Amanda Sweitzer, CFA**
Sr. Research Analyst
asweitzer@rwbaird.com
414.298.1706

**January 5, 2021 | Welltower, Inc.**

# Details

## Background

### History and Description

Welltower (NYSE: WELL) is an S&P 500 Healthcare REIT that owns interests in senior housing, outpatient medical, and post-acute properties located in the United States, the United Kingdom and Canada. The company is headquartered in Toledo, Ohio and originally incorporated as Health Care REIT in 1985. By 2005, the company's total assets reached $3 billion, up from just $182 million in 1987, and in 2006, Health Care REIT acquired Windrose Medical Properties Trust for nearly $1 billion. Following the financial crisis, Health Care REIT focused on its strategic portfolio transformation process and recycled capital into higher-quality assets; through this process, the company increased its private pay exposure, addressed near-term triple-net lease maturities, realigned operator relationships, and reduced exposure to highly levered and/or underperforming operators (including Genesis and Brookdale) and lower-quality locations. As part of this transformation, the company changed its name to Welltower in 2015. Welltower currently has over $30 billion in total assets.

### Current Portfolio

Welltower's portfolio currently consists of a well-diversified mix of healthcare assets within the senior housing, outpatient medical, health system, and post-acute property sectors. The company targets diversification by property type, operator relationship, and geographic location (see charts below). WELL also holds ~$0.9 billion of real estate, non-real estate, and joint venture real estate loans; however, management has reduced the loan book over time, and the company is currently focused on providing real estate-backed loans vs. working capital or OpCo loans.

In terms of capital allocation, WELL has built out its data analytics capabilities over time in order to be more of a sharpshooter in terms of the locations and properties in which it invests. Management seeks to invest along the healthcare continuum and capitalize on value opportunities that may emerge at various points in time based on the different cycles of each subsector. Welltower also looks to create value through its focus on developing relationships with strong operators and health systems; one recent example of the company's ability to create value through partnerships includes the 2018 purchase of Quality Care Properties in partnership with ProMedica. Through this deal, WELL was able to acquire a skilled nursing portfolio well below replacement cost while mitigating the risk by bringing in ProMedica as a partner with a long-term lease backed by a corporate guarantee from ProMedica, which is an A-rated health system (see the "Capital Allocation Case Studies" section for additional details).

For its senior housing portfolio, WELL has historically focused on a barbell approach where it owns higher-end senior housing (with the portfolio partially assembled through development) where there is a greater ability to push rate (and pass expense increases to the consumer) as well as venturing into lower-service models like senior apartments where properties can charge a lower rental rate but the margins are higher given lower labor costs.



**WELL: Portfolio Breakdown as a Percentage of NOI**

Property Type: SHOP, 37%; MOB, 23%; NNN, 22%; Long-Term/Post-Acute, 10%; Health System, 8%

Geography: US, 84%; UK, 9%; Canada, 7%

Partner: Other, 61%; Sunrise - NA, 9%; ProMedica, 8%; Genesis, 5%; Revera, 4%; Avery, 4%; Sunrise - UK, 3%; Sagora, 3%; Brookdale, 3%

*Note: Exposures are based on 3Q20 In-Place NOI*
Sources: Baird Research, Company Documents

## Investment Thesis

### Well-incentivized operators should help drive outsized performance in SHO portfolio

Welltower generates approximately 37% of its in-place NOI through its senior housing operating portfolio, and through this segment of the business Welltower fully participates in the operational upside/downside of its senior living properties; the structure was first authorized through the REIT Investment Diversification and Empowerment Act of 2007 ("RIDEA"). We expect Welltower's exposure to this portion of the business to grow over the near-to-intermediate term as the company takes advantage of attractive pricing for senior housing operating assets and as fundamental performance within the existing portfolio improves. Within the SHO portfolio, the company's choice of operator is a much greater determinant of results than for many of the company's other ownership structures. Therefore, while WELL is focused on the location and quality of build for its SHO portfolio (as it is with all of its assets), management is also focused on employing the best regional operators for each of its SHO assets. The company currently utilizes 25 different operators, and management sees value from using smaller operators where WELL can take an ownership stake or participate in the operator's governance in order to enhance alignment, which should enable WELL to retain more of the longer-term financial upside in its SHO assets.

As part of this alignment process, over the past several years Welltower has worked to move its senior housing operating properties over to its "RIDEA 3.0" contracts, which are incentive-based performance management agreements that create better alignment between the financial performance of Welltower and its operators. The new contracts transitioned operators from earning a standard 5% management fee to a 3% base fee plus a potential performance-based incentive fee. The structure rewards operators who outperform while also enabling Welltower to change operators (as a last resort) if performance is inadequate given shorter-term contract lengths and performance-based termination rights.  While the incentive fees associated with the new operating contracts can result in higher expenses during periods of outperformance, the contracts also serve as downside hedges given that overall management fees decline in conjunction with fundamental underperformance as no incentive fee is earned.

Overall, WELL has transitioned approximately 80% of its SHO portfolio to the RIDEA 3.0 structure, which along with WELL's partial ownership and/or board participation at many of its operators, creates significant alignment. While approximately 20% of the portfolio is not currently operating under the updated contracts, we believe WELL is slightly more likely to sell high-quality portfolios if the operator is unwilling to convert to the RIDEA 3.0 structure, which should result in attractive disposition cap rates.



*Source: Company Documents*

**Balance sheet well positioned through opportunistic dispositions**

Welltower boasts an investment-grade credit rating with over 80% of consolidated debt consisting of unsecured notes. Additionally, despite the recent material fundamental underperformance of the senior housing sector, the capital markets remain wide open to the company as evidenced by WELL's June 2020 unsecured debt offering of 2031 notes at a 2.75% interest rate. Overall, the company's leverage at the end of 3Q20 of ~6.0x is in line with management's longer-term target, and we believe the company has sufficient access to capital through both the debt capital markets and potential joint venture partnerships (as evidenced by the recently announced Wafra MOB joint venture). Additionally, earnings-based leverage metrics should materially improve as senior housing recovers.

Since the end of 1Q20, WELL has completed ~$2.75 billion of opportunistic dispositions (including an estimated $421 million of dispositions in 4Q20), which have helped buttress the company's liquidity and will provide capacity for future acquisitions. Following these sales, WELL has over $5 billion in net liquidity, including $3 billion of capacity under the company's revolving credit facility. Therefore, we believe WELL has sufficient liquidity to navigate the recent COVID-19 resurgence and any further deterioration in fundamentals. Additionally, in conjunction with 1Q20 results, WELL announced a 30% reduction in its quarterly dividend to $0.61/share given the reduction in cash flow following the onset of the pandemic. We expect this reduction will allow WELL to retain nearly $400 million of additional cash flow annually and enable the company to pursue additional opportunistic acquisitions. Additional near-term capital commitments are manageable with minimal debt maturities through YE2021 and ~$481 million of remaining unfunded development commitments (likely to be funded over the next several years through 2022). Overall, we believe WELL's current liquidity position provides the company flexibility to be opportunistic should any distressed opportunities materialize.

**Opportunistic capital allocation strategy should create long-term value for shareholders**

Welltower's capital allocation strategy focuses on long-term results, and management has historically been willing to withstand short-term dilution or lower going-in cap rates if they believe the longer-term IRR will exceed other investment alternatives. Management gains confidence in its capital allocation decisions through its increasing use of data analytics, which allows the company to make granular site selections. While WELL's contrarian strategy can result in some near-term stock volatility as WELL invests in less popular healthcare sectors, we believe the company's capital allocation strategy has helped the company offset the negative fundamental trends experienced by the industry over the past several years and is one factor in the company experiencing lower pre-COVID AFFO/share declines relative to its peers PEAK and VTR.

Following the onset of COVID-19, management appears to be following the same contrarian investment playbook and has worked to position its balance sheet to capitalize on any opportunistic acquisitions that may arise. Inclusive of the recently announced Wafra JV, we estimate Welltower has or will sell over $3.5 billion of assets in 2020 and early 2021; we estimate the properties were sold at a weighted-average cap rate of ~5.4%. We view the volume and pricing for these dispositions as impressive given the recent COVID-related demand destruction, and we believe the sales reflect WELL's willingness to sell high-quality assets into strong private capital bids. Most of the company's year-to-date dispositions have been concentrated in the better performing Outpatient Medical and independent living sectors or have consisted of SHO portfolios that had not transitioned over to the RIDEA 3.0 contract structure. We believe many of these sales, particularly within Outpatient Medical, occurred at only modest discounts to pre-COVID-19 levels.

Additionally, private capital remains interested in the healthcare sector, as evidenced by Welltower's recently announced joint venture with Wafra for 24 of the company's MOB assets. This transaction and future potential JVs benefit Welltower in several ways, including allowing the company to benefit from the significant amount of institutional capital looking to enter the sector as well as allowing WELL to retain an ownership stake in the portfolio and benefit from management fees.

Going forward, we expect WELL to be a net buyer of assets as the company targets distressed opportunities and other accretive acquisitions using its significant balance sheet capacity; we

expect the majority of WELL's near-to-intermediate term acquisition activity will be focused in the senior housing space, particularly given the current dearth of financing for unstabilized senior housing assets. Management currently expects ~$500 million of acquisitions to close prior to YE2020 consisting of both stabilized and non-stabilized properties, which we estimate will be acquired at a blended mid-3% initial cap rate with the cap rate expected to increase to the high-single-digit range over time.

Overall, we believe the current earnings pressure in senior housing is creating interesting acquisition opportunities for buyers with longer investment time horizons (like WELL), and we expect senior housing valuations will recover over time in conjunction with a recovery in occupancy, particularly as debt capital should become more widely available once occupancy levels stabilize.

## Capital Allocation Case Study

As Welltower takes advantage of market distress in senior housing, we believe it is instructive to examine the success of another of the company's contrarian bets through a case study of the company's 2018 joint venture with ProMedica to acquire the HCR ManorCare skilled nursing assets.

**ProMedica Joint Venture indicative of contrarian investment mindset**

*Transaction overview:* In April 2018, ProMedica Health System announced the acquisition of HCR ManorCare, which at the time was the second-largest provider of post-acute and long-term care. The acquisition helped propel ProMedica from a regional healthcare provider to a national platform with a full spectrum of care spanning from acute care to skilled nursing to home care. As part of the acquisition, ProMedica formed a joint venture with Welltower to acquire the HCR ManorCare assets from publicly traded Quality Care Properties (WELL also acquired 100% of the non-ManorCare assets, which were less than 10% of the overall transaction value). The joint venture was an extension of Welltower's strategy of aligning its senior housing and post-acute care assets more closely with health systems; this strategy arose from management's belief that health systems would look to expand their continuum of care, particularly as HHS and private insurers continue to focus on driving care to the lowest-cost setting.

*Sector backdrop:* At the time of the transaction, skilled nursing was significantly out of favor in the public markets given underperformance by operators due to reimbursement changes and highly levered capital structures. However, immediately prior to the transaction, there were early signs of shifts occurring in the post-acute sector, including the recapitalization of Genesis and the acquisition of Kindred, and more sophisticated institutional players beginning to deploy capital into the space. Additionally, healthcare delivery appeared to be changing with one of the largest health systems in the United States, Deaconess, announcing that it would begin admitting seniors with hip replacements directly into skilled nursing facilities.

*Structure of the transaction:* At the time of the transaction, QCP was in a similar difficult position as the industry, and the company's real estate was capital starved. Therefore, ProMedica committed to investing $400 million into the HCR ManorCare assets over five years, and right-sizing the capital structure was a key component of the investment working where prior skilled nursing investments had underperformed. ProMedica and WELL structured the lease for the assets as a 15-year absolute triple-net master lease with three five-year renewal options. Crucially, the lease is fully backed by ProMedica's corporate guarantee and includes an annual escalator of 2.75% after a year-one escalator of 1.375%.

*Conclusion - Attractive returns for WELL with protected downside:* Given the negative perception of the asset class at the time, Welltower was able to structure its $2.2 billion investment in the ProMedica JV with an initial 8% cash yield and an above-market EBITDAR coverage of 1.8x; management expected to generate a double-digit IRR under its base-case scenario. WELL had raised $1 billion in equity leading up to the transaction at attractive prices in order to position the balance sheet to capitalize on opportunistic acquisitions with the remaining purchase price funded through a combination of asset sales and debt.

Overall, while there were initial questions surrounding the risk of ProMedica expanding from a regional to national player and the fundamental challenges in the SNF sector, WELL partially mitigated these risks through (1) keeping the existing HCR ManorCare team in place to ensure operational continuity; and (2) ProMedica's corporate guarantee and subordination of its 20% interest provided downside protection for WELL. Additionally, given the strong going-in yield, management believed that the investment could still generate a high single-digit IRR in the worst-case scenario where the underlying real estate was worth salvage value.  In the end, reimbursement changes in October 2019 helped boost performance (prior to the pandemic) and we expect vertical integration within the ProMedica system to continue to increase demand as coordination between inpatient and post-acute care increases. WELL has been able to sell select assets out of the JV at meaningful premiums to the company's cost basis.

## Key Risks

**Timing and extent of senior housing recovery remain unknown**

The next 6-12 months are likely to remain difficult for the senior housing sector given the recent resurgence in COVID-19, the continued negative impact of new supply deliveries, and our belief that customer perception toward senior housing may remain negative in the near-to-intermediate term. Therefore, we believe the penetration rate for the senior housing industry will take time to recover following the pandemic, and the rate of the recovery in the penetration rate (and customer perceptions of the industry) will be a key driver of the timing and eventual magnitude of any recovery in the senior housing industry given the outsized impact small changes in the penetration rate can have on overall demand.

Given this view, we do not model WELL returning to pre-COVID occupancy levels within its SHO portfolio until after 2022; as a result, WELL's NOI margins will remain well below historical averages until occupancy fully rebounds given the high operating cost nature of the senior housing business. We expect WELL's earnings volatility (both to the upside and downside) will remain elevated in the future, particularly relative to peers with less RIDEA exposure.

However, despite the near-term outlook for senior housing remaining challenging, we believe we are approaching a bottom in EBITDAR for the sector, and demographics will continue to favor the sector even if the recovery in the penetration rate remains slow. Over the next five years, the 80-84 and 85+ age cohorts are expected to grow at above-average rates as the Baby Boomers age. While the sector likely won't experience the fastest growth rates from this wave of aging Baby Boomers for several years (we estimate the median senior housing resident age is 85+), we expect performance can and will recover ahead of this wave.



Senior Housing: Population Projections by Age Cohort

~80% of senior housing residents are 80+ years old

Note: Percentages show five-year growth CAGR for each age cohort
Sources: Baird Research, U.S. Census Bureau

**Senior housing supply deliveries will continue to impact near-term fundamentals; limited restrictions on construction could drive future supply resurgence**

WELL's SHO Portfolio's same-store NOI growth has historically been volatile and while there is not a direct correlation between supply and quarterly same-store NOI growth, higher supply clearly has a negative impact on fundamental performance as well as investor perception of the sector. Additionally, we expect periods of oversupply could reoccur over the next several years as there is relatively limited municipal pushback on senior housing developments; additionally, operators are incentivized to develop given low margins in operations.

These forces, along with increased investment ahead of strong demographic trends, has resulted in a significant rise in new development activity since 2014. However, construction starts were already beginning to slow pre-pandemic, and starts have declined further since the onset of the pandemic. While the industry will continue to be impacted by deliveries of properties that were already under construction at the onset of the pandemic, we expect supply to meaningfully slow in the intermediate term and for starts to remain depressed until operations improve and construction financing becomes more widely available.



**Post-acute and SNF business dependent on government reimbursement rates**

Welltower generates ~10% of NOI (3Q20 annualized) from long-term and post-acute care properties and ~8% of NOI from Health System investments. These properties are generally more dependent on government reimbursement rates and could be negatively impacted should the reimbursement criteria change; however, the company's Health System investments are less at risk from these changes given the strength of ProMedica's corporate guarantee. Additionally, Genesis accounts for nearly half of the company's long-term and post-acute care portfolio (~5% of overall NOI), which creates some tenant concentration risk, particularly given Genesis's current financial difficulties.

## Valuation

### Introducing $68 price target

WELL is currently trading at a 13% premium to NAV, which is below its average historical premium to consensus NAV of ~20%. Additionally, WELL is currently trading at a 21.7x NTM AFFO multiple, which is above its historical average multiple of 17.3x and VTR's current multiple of ~19x, but in line with PEAK's multiple. In the near-to-intermediate term, we expect WELL's multiple premium to VTR to persist given our expectation for WELL to generate faster FFO/share growth over the next several years through its capital allocation (WELL has greater current balance sheet capacity) and through greater occupancy upside within WELL's senior housing portfolio (less Canadian exposure).

**Healthcare REITs: Valuation Comparison**

| | Multiple-Based Valuation | | | | | | | NAV-Based Valuation | |
|---|---|---|---|---|---|---|---|---|---|
| Ticker | 2020E P/FFO | 2021E P/FFO | 2020E P/AFFO | 2021E P/AFFO | Est. 2021 AFFO/share Growth | Historical NTM AFFO Range | | Ticker | Premium/ Discount to NAV | Implied Nominal Cap Rate |
| *Big Three Comparison:* | | | | | | | | *Big Three Comparison:* | | |
| PEAK | 17.5x | 17.9x | 20.1x | 20.7x | -3% | 9x - 24x | | PEAK | 1.1% | 5.3% |
| VTR | 14.6x | 15.6x | 16.9x | 18.8x | -10% | 5x - 22x | | VTR | 5.0% | 5.8% |
| WELL | 17.6x | 18.9x | 19.5x | 21.3x | -8% | 9x - 24x | | WELL | 13.1% | 5.0% |
| Median | 17.5x | 17.9x | 19.5x | 20.7x | -8% | 9x - 24x | | Median | 1.1% | 5.3% |
| | | | | | | | | | | |
| *Other Healthcare Peers:* | | | | | | | | *Other Healthcare Peers:* | | |
| ARE** | 23.4x | 22.2x | 29.8x | 27.5x | 9% | 14x - 29x | | ARE** | 10.8% | 3.8% |
| CHCT | 22.6x | 20.3x | 22.0x | 19.5x | 13% | 9x - 24x | | CHCT | 47.7% | 5.1% |
| DOC | 16.0x | 15.2x | 16.9x | 16.4x | 3% | 11x - 20x | | DOC | -8.6% | 5.5% |
| GMRE | 14.6x | 13.0x | 14.3x | 12.7x | 13% | 7x - 17x | | GMRE | 5.1% | 6.2% |
| HR* | 17.5x | 16.7x | 21.9x | 21.0x | 4% | 14x - 28x | | HR* | -10.0% | N/A |
| HTA* | 15.5x | 15.2x | 18.9x | 18.5x | 2% | 14x - 23x | | HTA* | -10.8% | N/A |
| Median | 16.7x | 16.0x | 20.4x | 19.0x | 6% | 11x - 23x | | Median | 9.8% | |

*Valuation metrics based on consensus estimates*
**ARE is covered by Baird Analyst David Rodgers and NAV values reflect his estimates; ARE multiples are based on consensus*
*Source: Company Documents, FactSet, Baird Research*

Our $68 price target is derived through the application of a 50% weighting to WELL's NAV estimate of $54.45 (5.4% applied nominal cap rate) adjusted for a 30% premium given our expectation for WELL's NOI growth to exceed historical averages as senior housing starts to recover in late 1H21 or early 2H21, and a 50% weighting to WELL's NTM AFFO multiple-based price target of ~$65, which assumes a 37.5% premium to its peer median multiple of 16.6x (10x-21x range). The applied 22.8x multiple represents ~1x of multiple expansion relative to current levels.



**WELL: Historical Consensus NAV Premium/Discount**

*Sources: Baird Research, FactSet*

# Investment Thesis

**Long-term senior housing outlook is supported by favorable demographics and declining supply growth.** Longer-term senior housing fundamentals remain extremely favorable given strong demographic trends. The pandemic is also helping to meaningfully curtail new supply given a dearth of construction financing. While the senior housing industry still needs to absorb supply deliveries from the past 18-24 months, we see the pieces falling into place for a stronger occupancy recovery, which will be key to driving bottom-line growth given the high operating leverage in the SHOP model.

**Well-incentivized operators should help drive outsized performance in SHO portfolio.** We expect Welltower's exposure to senior housing operating properties to grow over the near-to-intermediate term as the company takes advantage of attractive pricing for senior housing operating assets and as fundamental performance within the existing portfolio improves. Within the SHO portfolio, the company's choice of operator is a much greater determinant of results than for many of the company's other ownership structures. Therefore, while WELL is focused on the location and quality of build for its SHO portfolio (as it is with all of its assets), management is also focused on employing the best regional operators for each of its SHO assets. Over the past several years Welltower has worked to move its senior housing operating properties over to its "RIDEA 3.0" contracts, which are incentive-based performance management agreements that create better alignment between the financial performance of Welltower and its operators.

**Balance sheet well-positioned through opportunistic dispositions.** Welltower boasts an investment-grade credit rating, and we believe the company has sufficient access to capital through both the debt capital markets and potential joint venture partnerships. WELL has over $5 billion in net liquidity, including $3 billion of capacity under the company's revolving credit facility. Overall, we believe WELL's current liquidity position provides the company flexibility to be opportunistic should any distressed opportunities materialize.

**Opportunistic capital allocation strategy should create long-term value for shareholders.** Welltower's capital allocation strategy focuses on long-term results, and management has historically been willing to withstand short-term dilution or lower going-in cap rates if it believes the longer-term IRR will exceed other investment alternatives. Management gains confidence in its capital allocation decisions through its increasing use of data analytics, which allows the company to make granular site selections. While WELL's contrarian strategy can result in some near-term stock volatility as WELL invests in less popular healthcare sectors, we believe the company's capital allocation strategy has helped the company offset the negative fundamental trends experienced by the industry over the past several years.

# Risks & Caveats

**Timing and extent of senior housing recovery remain unknown**. The next 6-12 months may remain difficult for the senior housing sector given the recent resurgence in COVID-19, the continued negative impact of new supply deliveries, and our belief that customer perception toward senior housing may remain negative in the near-to-intermediate term. Therefore, we believe occupancy levels and the penetration rate for the senior housing industry will take time to recover following the pandemic.

**Senior housing supply deliveries will continue to impact near-term fundamentals; limited restrictions on construction could drive future supply increases**. WELL's SHO portfolio's same-store NOI growth has historically been volatile and while there is not a direct correlation between supply and quarterly same-store NOI growth, higher supply clearly has a negative impact on fundamental performance as well as investor perception of the sector. Additionally, we expect periods of oversupply could reoccur over the next several years as there is relatively limited municipal pushback on senior housing developments; additionally, operators are incentivized to develop given low margins in operations.

**Post-acute and SNF business dependent on government reimbursement rates**. Welltower generates ~10% of NOI from long-term and post-acute care properties and ~8% of NOI from Health System investments. These properties are generally more dependent on government reimbursement rates and could be negatively impacted should the reimbursement criteria change; however, the company's Health System investments are less at risk from these changes given the strength of ProMedica's corporate guarantee. Additionally, Genesis accounts for nearly half of the company's long-term and post-acute care portfolio (~5% of overall NOI), which creates some tenant concentration risk, particularly given Genesis's current financial difficulties.

# Company Description

Welltower's portfolio consists of a well-diversified mix of healthcare assets within the senior housing, outpatient medical, health system, and post-acute property sectors. The company targets diversification by property type, operator relationship, and geographic location. In terms of capital allocation, management seeks to invest along the healthcare continuum and capitalize on value opportunities that may emerge at various points in time based on the different cycles of each subsector. Welltower also looks to create value through its focus on developing relationships with strong operators and health systems.

**Welltower, Inc.**
**NAV Analysis**
**(dollars in thousands, except per share data)**
**1/5/2021**

Amanda Sweitzer, CFA / Phone (414) 298-1706 / Senior Research Analyst / asweitzer@rwbaird.com    **BAIRD**

**Welltower, Inc.**
**4Q20E - 3Q21E**
**NAV Analysis**

| Blended Cap Rate Assumption | 6.19% | 5.93% | 5.67% | 5.43% | 5.14% | 4.88% | 4.61% |
|---|---|---|---|---|---|---|---|
| GAAP NOI from SHOP properties | $629,195 | $629,195 | $629,195 | $629,195 | $629,195 | $629,195 | $629,195 |
| Cash adjustments | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SHOP cash NOI | $629,195 | $629,195 | $629,195 | $629,195 | $629,195 | $629,195 | $629,195 |
| Applied cap rate | 5.0% | 4.7% | 4.5% | 4.2% | 4.0% | 3.7% | 3.5% |
| Gross asset value - SHOP | $12,711,012 | $13,387,130 | $14,139,216 | $14,980,836 | $15,928,990 | $17,005,273 | $18,237,539 |
| | | | | | | | |
| GAAP NOI from NNN Senior Housing | $445,477 | $445,477 | $445,477 | $445,477 | $445,477 | $445,477 | $445,477 |
| Cash adjustments | (13,000) | ($13,000) | ($13,000) | ($13,000) | ($13,000) | ($13,000) | ($13,000) |
| NNN Senior Housing cash NOI | $432,477 | $432,477 | $432,477 | $432,477 | $432,477 | $432,477 | $432,477 |
| Applied cap rate | 7.8% | 7.5% | 7.3% | 7.0% | 6.8% | 6.5% | 6.3% |
| Gross asset value - SHOP | $5,580,342 | $5,766,354 | $5,965,193 | $6,178,236 | $6,407,059 | $6,653,485 | $6,919,624 |
| | | | | | | | |
| GAAP NOI from Outpatient Medical | $451,909 | $451,909 | $451,909 | $451,909 | $451,909 | $451,909 | $451,909 |
| Cash adjustments | (14,668) | ($14,668) | ($14,668) | ($14,668) | ($14,668) | ($14,668) | ($14,668) |
| Outpatient Medical cash NOI | $437,241 | $437,241 | $437,241 | $437,241 | $437,241 | $437,241 | $437,241 |
| Applied cap rate | 6.0% | 5.8% | 5.5% | 5.3% | 5.0% | 4.8% | 4.5% |
| Gross asset value - Outpatient Medical | $7,287,347 | $7,604,188 | $7,949,833 | $8,328,396 | $8,744,816 | $9,205,070 | $9,716,463 |
| | | | | | | | |
| GAAP NOI from Health Systems | $169,700 | $169,700 | $169,700 | $169,700 | $169,700 | $169,700 | $169,700 |
| Cash adjustments | (22,873) | ($22,873) | ($22,873) | ($22,873) | ($22,873) | ($22,873) | ($22,873) |
| Cash NOI from Health Systems | $146,827 | $146,827 | $146,827 | $146,827 | $146,827 | $146,827 | $146,827 |
| Applied cap rate | 7.8% | 7.5% | 7.3% | 7.0% | 6.8% | 6.5% | 6.3% |
| Gross asset value - Health Systems | $1,894,536 | $1,957,687 | $2,025,194 | $2,097,522 | $2,175,208 | $2,258,870 | $2,349,225 |
| | | | | | | | |
| GAAP NOI from LTACH/Post-Acute | $237,929 | $237,929 | $237,929 | $237,929 | $237,929 | $237,929 | $237,929 |
| Cash adjustments | ($14,000) | ($14,000) | ($14,000) | ($14,000) | ($14,000) | ($14,000) | ($14,000) |
| Cash NOI from LTACH/Post-Acute | $223,929 | $223,929 | $223,929 | $223,929 | $223,929 | $223,929 | $223,929 |
| Applied cap rate | 8.3% | 8.0% | 7.8% | 7.5% | 7.3% | 7.0% | 6.8% |
| Gross asset value - LTACH/Post-Acute | $2,714,292 | $2,799,114 | $2,889,408 | $2,985,721 | $3,088,677 | $3,198,987 | $3,317,468 |
| | | | | | | | |
| Cash and Equivalents | $1,306,366 | $1,306,366 | $1,306,366 | $1,306,366 | $1,306,366 | $1,306,366 | $1,306,366 |
| Loans receivable | $687,516 | $687,516 | $687,516 | $687,516 | $687,516 | $687,516 | $687,516 |
| JV Loans Receivable | $227,902 | $227,902 | $227,902 | $227,902 | $227,902 | $227,902 | $227,902 |
| Value of development pipeline | $1,185,524 | $1,185,524 | $1,185,524 | $1,185,524 | $1,185,524 | $1,185,524 | $1,185,524 |
| Value of undeveloped land | $202,558 | $202,558 | $202,558 | $202,558 | $202,558 | $202,558 | $202,558 |
| Other non-property Assets, net | ($228,321) | ($228,321) | ($228,321) | ($228,321) | ($228,321) | ($228,321) | ($228,321) |
| Total Gross Assets | $33,569,075 | $34,896,018 | $36,350,389 | $37,952,257 | $39,726,296 | $41,703,230 | $43,921,864 |
| | | | | | | | |
| Leverage | ($14,028,339) | ($14,028,339) | ($14,028,339) | ($14,028,339) | ($14,028,339) | ($14,028,339) | ($14,028,339) |
| Financing lease liabilities | ($107,798) | ($107,798) | ($107,798) | ($107,798) | ($107,798) | ($107,798) | ($107,798) |
| Noncontrolling interest | ($853,228) | ($853,228) | ($853,228) | ($853,228) | ($853,228) | ($853,228) | ($853,228) |
| Perpetual Preferred Stock | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Net Value of Current Property Operations | $18,579,710 | $19,906,653 | $21,361,024 | $22,962,892 | $24,736,931 | $26,713,865 | $28,932,499 |
| | | | | | | | |
| Net Asset Value (NAV) | $18,579,710 | $19,906,653 | $21,361,024 | $22,962,892 | $24,736,931 | $26,713,865 | $28,932,499 |
| Avg. Diluted Shares/Units O/S | 421,759 | 421,759 | 421,759 | 421,759 | 421,759 | 421,759 | 421,759 |
| NAV per share | $44.05 | $47.20 | $50.65 | $54.45 | $58.65 | $63.34 | $68.60 |

| | |
|---|---|
| Current Price: | $61.60 |
| Implicit Nominal Cap Rate: | 4.99% |
| Implicit Economic Cap Rate: | 4.66% |
| Implicit 'All-in' Cap Rate: | 4.32% |
| | |
| NAV | $54.45 |
| Assumed Nominal Cap Rate: | 5.43% |
| Assumed Economic Cap Rate: | 5.07% |
| Assumed 'All-in' Cap Rate: | 4.70% |
| | |
| NAV Premium/Discount | 13.1% |

**WELL Valuation Metrics and Price Target Derivation**

**Price Target Derivation:**

| (1) Peer Valuation Approach: | P/NTM AFFO | (2) Blended Approach: | |
|---|---|---|---|
| Healthcare Realty Trust | 21.3x | PT Based on Relative Valuation | $64.62 |
| Healthcare Trust of America | 18.5x | | |
| Physicians Realty Trust | 16.6x | Distributable NAV | $54.45 |
| Healthpeak Properties | 20.7x | Warranted Premium/(Discount) to NAV: | 30.0% |
| Ventas, Inc. | 17.8x | Price Target Based on Distributable NAV | $70.78 |
| LTC Properties, Inc. | 13.1x | | |
| Medical Properties Trust | 16.0x | Applied Weight to Peer Valuation | 50% |
| Omega Healthcare Investors, Inc. | 11.1x | Applied Weight to Distributable NAV | 50% |
| Sabra Health Care REIT, Inc. | 9.7x | | |
| Median Peer Valuation (P/AFFO) | 16.6x | WELL Price Target | $68 |
| Applied Multiple Premium/(Discount) for WELL | 37.5% | | |
| Applied Multiple to WELL (P/AFFO) | 22.8x | | |
| RWB WELL NTM AFFO Estimate | $2.83 | | |
| WELL Price Target Based on Relative Peer Valuation | $65 | | |

| | | | | | |
|---|---|---|---|---|---|
| Total Return Upside Potential at Current Price Target: | | | | | 14.4% |
| Implied 2019A AFFO Multiple at PT | 18.5x | | At $67: | | 12.7% |
| Implied 2020E AFFO Multiple at PT | 21.6x | | At $66: | | 11.1% |
| Implied 2021E AFFO Multiple at PT | 23.5x | | At $65: | | 9.5% |
| | | | At $64: | | 7.9% |
| Current 2019A AFFO Multiple | 16.8x | | At $63: | | 6.2% |
| Current 2020E AFFO Multiple | 19.5x | | At $62: | | 4.6% |
| Current 2021E AFFO Multiple | 21.3x | | | | |

Source: Company Reports, CoStar, FactSet, SNL Financial and Baird Research
Research disclosures can be accessed at http://www.rwbaird.com/research-insights/research/coverage/research-disclosure.aspx

**3Q20**

| | 2019A | 1Q20A | 2Q20A | 3Q20A | 4Q20E | 2020E | 1Q21E | 2Q21E | 3Q21E | 4Q21E | 2021E | 1Q22E | 2Q22E | 3Q22E | 4Q22E | 2022E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Net Debt and Preferred/In-Place EBITDA | 6.4x | 5.9x | 6.4x | 6.0x | 6.5x | 6.5x | 6.6x | 6.6x | 6.4x | 6.4x | 6.4x | 6.3x | 6.2x | 6.0x | 6.0x | 6.0x |
| End of Period Cash Balance | 284,917 | 303,423 | 1,678,770 | 1,603,740 | 1,133,262 | 1,133,262 | 968,385 | 540,266 | 377,179 | 187,063 | 187,063 | 155,737 | 14,691 | 35,681 | 28,739 | 28,739 |
| End of Period Revolver Balance | 1,588,600 | 845,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 150,000 | 300,000 | 300,000 |
| Core FFO Guidance | $4.16 | | | | | | | | | | | | | | | |
| Core FFO Current Model | $4.16 | $1.02 | $0.86 | $0.84 | $0.79 | $3.51 | $0.78 | $0.80 | $0.83 | $0.85 | $3.26 | $0.86 | $0.89 | $0.92 | $0.94 | $3.61 |
| Core FFO Consensus | $4.16 | $1.02 | $0.86 | $0.84 | $0.80 | $3.51 | $0.78 | $0.81 | $0.83 | $0.84 | $3.26 | $0.86 | $0.89 | $0.92 | $0.92 | $3.59 |
| Core FFO Growth y/y % (RWB Estimates) | 3.3% | | | | | -15.6% | | | | | -7.0% | | | | | 10.8% |

## Income Statement

**Welltower, Inc.**

WELL
1/5/2021

BAIRD

Amanda Sweitzer, CFA / Phone (414) 298-1706 / Senior Research Analyst / asweitzer@rwbaird.com

| | 2019A | 1Q20A | 2Q20A | 3Q20A | 4Q20E | 2020E | 1Q21E | 2Q21E | 3Q21E | 4Q21E | 2021E | 1Q22E | 2Q22E | 3Q22E | 4Q22E | 2022E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Property operating revenues** | | | | | | | | | | | | | | | | |
| Rental income | 1,588,400 | 389,960 | 396,305 | 275,046 | 381,575 | 1,442,886 | 380,525 | 382,488 | 384,462 | 386,447 | 1,533,923 | 388,259 | 390,080 | 391,911 | 393,753 | 1,564,003 |
| Resident fees and services | 3,448,175 | 849,972 | 769,560 | 740,956 | 702,070 | 3,062,558 | 692,880 | 705,139 | 722,725 | 729,418 | 2,850,162 | 729,418 | 749,779 | 762,994 | 764,736 | 3,006,927 |
| **Total property operating revenues** | 5,036,575 | 1,239,932 | 1,165,865 | 1,016,002 | 1,083,644 | 4,505,443 | 1,073,406 | 1,087,627 | 1,107,187 | 1,115,866 | 4,384,085 | 1,117,677 | 1,139,859 | 1,154,906 | 1,158,489 | 4,570,930 |
| **Property operating expenses** | | | | | | | | | | | | | | | | |
| Total | 2,690,042 | 681,781 | 660,764 | 634,717 | 617,601 | 2,594,863 | 610,778 | 618,679 | 625,617 | 631,166 | 2,486,240 | 631,474 | 641,939 | 646,671 | 646,778 | 2,566,861 |
| **Total property operating expenses** | 2,690,042 | 681,781 | 660,764 | 634,717 | 617,601 | 2,594,863 | 610,778 | 618,679 | 625,617 | 631,166 | 2,486,240 | 631,474 | 641,939 | 646,671 | 646,778 | 2,566,861 |
| **Core property NOI** | 2,346,533 | 558,151 | 505,101 | 381,285 | 466,043 | 1,910,580 | 462,628 | 468,947 | 481,570 | 484,700 | 1,897,845 | 486,203 | 497,920 | 508,235 | 511,711 | 2,004,069 |
| NOI from SHOP acquisitions | | | | | 2,844 | 2,844 | 4,112 | 6,637 | 7,929 | 7,978 | 26,656 | 8,028 | 8,078 | 8,129 | 8,180 | 32,415 |
| NOI from SHOP dispositions | | | | | (650) | (650) | (654) | (658) | (662) | (666) | (2,641) | (671) | (675) | (679) | (683) | (2,708) |
| NOI from NNN acquisitions | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NOI from NNN dispositions | | | | | (670) | (670) | (674) | (678) | (683) | (687) | (2,722) | (691) | (696) | (700) | (704) | (2,791) |
| NOI from Outpatient acquisitions | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NOI from Outpatient dispositions | | | | | (5,479) | (5,479) | (9,363) | (9,422) | (9,481) | (9,540) | (37,805) | (9,599) | (9,659) | (9,720) | (9,781) | (38,759) |
| NOI from Other acquisitions | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NOI from Other dispositions | | | | | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| NOI from Development and Redevelopment | | | | | (655) | (655) | 1,252 | 4,181 | 7,081 | 10,932 | 23,446 | 12,792 | 15,205 | 18,423 | 20,807 | 67,227 |
| **Total property NOI** | 2,346,533 | 558,151 | 505,101 | 381,285 | 461,433 | 1,905,970 | 457,300 | 469,007 | 485,755 | 492,717 | 1,904,778 | 496,062 | 510,174 | 523,688 | 529,529 | 2,059,453 |
| Interest income | 63,830 | 15,241 | 16,069 | 16,750 | 16,860 | 64,920 | 16,550 | 16,550 | 16,550 | 16,550 | 66,200 | 16,550 | 16,550 | 16,550 | 16,550 | 66,200 |
| General, administrative and professional fees | (126,549) | (35,481) | (34,062) | (31,003) | (29,993) | (130,539) | (30,868) | (31,658) | (32,788) | (33,258) | (128,573) | (32,244) | (33,161) | (34,040) | (34,419) | (133,864) |
| Other Income | 20,901 | 3,429 | 6,541 | 4,122 | 3,666 | 17,758 | 3,666 | 3,666 | 3,666 | 3,666 | 14,664 | 3,666 | 3,666 | 3,666 | 3,666 | 14,664 |
| Other expenses | (52,612) | (6,292) | (19,411) | (11,544) | 0 | (37,247) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Transaction costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Consolidated EBITDA** | 2,252,103 | 535,048 | 474,238 | 359,610 | 451,966 | 1,820,862 | 446,648 | 457,565 | 473,182 | 479,674 | 1,857,070 | 484,034 | 497,228 | 509,865 | 515,326 | 2,006,453 |
| **Core EBITDA** | 3,035,781 | 580,430 | 502,383 | 490,117 | 462,878 | 2,035,808 | 457,318 | 469,233 | 486,271 | 493,378 | 1,906,199 | 498,040 | 512,537 | 526,306 | 532,292 | 2,069,174 |
| Real estate depreciation and amortization | (1,027,073) | (274,801) | (265,371) | (255,532) | (255,532) | (1,051,236) | (255,532) | (255,532) | (255,532) | (255,532) | (1,022,128) | (255,532) | (255,532) | (255,532) | (255,532) | (1,022,128) |
| Interest expense | (555,559) | (142,007) | (126,357) | (124,851) | (127,452) | (520,667) | (127,828) | (127,290) | (126,602) | (125,993) | (507,712) | (123,471) | (121,396) | (120,977) | (120,316) | (486,161) |
| Loss on debt extinguishment | (84,155) | 0 | (249) | (33,004) | 0 | (33,253) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Income (loss) from unconsolidated entities | 42,434 | (3,692) | 1,332 | (5,981) | 0 | (8,341) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Income tax benefit | (2,957) | (5,442) | (2,233) | (2,003) | (2,260) | (11,938) | (2,233) | (2,288) | (2,366) | (2,398) | (9,285) | (2,420) | (2,486) | (2,549) | (2,577) | (10,032) |
| Loss on derivatives and financial instruments, net | 4,399 | (7,651) | (1,434) | (1,395) | 0 | (10,480) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Impairment of Assets | (28,133) | (27,827) | (75,151) | (23,313) | 0 | (126,291) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Provision for Loan Losses | (18,690) | (7,072) | (1,422) | (2,857) | 0 | (11,351) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TBD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TBD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Net income from continuing operatlons** | 582,369 | 66,556 | 3,353 | (89,326) | 66,722 | 47,305 | 61,055 | 72,455 | 88,683 | 95,751 | 317,944 | 102,611 | 117,814 | 130,806 | 136,901 | 488,132 |
| Gain on real estate dispositions | 748,041 | 262,824 | 155,863 | 484,304 | 0 | 902,991 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TBD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TBD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TBD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Net income** | 1,330,410 | 329,380 | 159,216 | 394,978 | 66,722 | 950,296 | 61,055 | 72,455 | 88,683 | 95,751 | 317,944 | 102,611 | 117,814 | 130,806 | 136,901 | 488,132 |
| Noncontrolling interests' share in earnings | (97,978) | (19,096) | 20,030 | (69,393) | (4,914) | (73,373) | (4,496) | (5,336) | (6,531) | (7,052) | (23,415) | (7,557) | (8,676) | (9,633) | (10,082) | (35,948) |
| TBD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Net income attributable to stockholders** | 1,232,432 | 310,284 | 179,246 | 325,585 | 61,808 | 876,923 | 56,559 | 67,119 | 82,151 | 88,699 | 294,529 | 95,054 | 109,138 | 121,173 | 126,819 | 452,183 |
| Preferred Dividends | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Preferred stock redemption charge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Net income attributable to common stockholders** | 1,232,432 | 310,284 | 179,246 | 325,585 | 61,808 | 876,923 | 56,559 | 67,119 | 82,151 | 88,699 | 294,529 | 95,054 | 109,138 | 121,173 | 126,819 | 452,183 |
| **Funds from operations** | | | | | | | | | | | | | | | | |
| Net income attributable to WELL shareholders | 1,232,432 | 310,284 | 179,246 | 325,585 | 61,808 | 876,923 | 56,559 | 67,119 | 82,151 | 88,699 | 294,529 | 95,054 | 109,138 | 121,173 | 126,819 | 452,183 |
| Depreciation and amortization on real estate assets | 1,027,073 | 274,801 | 265,371 | 255,532 | 255,532 | 1,051,236 | 255,532 | 255,532 | 255,532 | 255,532 | 1,022,128 | 255,532 | 255,532 | 255,532 | 255,532 | 1,022,128 |
| Related to noncontrolling interest | (20,197) | (9,409) | (42,539) | 48,559 | (1,013) | (4,402) | (927) | (1,100) | (1,346) | (1,454) | (4,827) | (1,558) | (1,789) | (1,986) | (2,078) | (7,410) |
| Related to unconsolidated entities | 57,680 | 15,445 | 14,231 | 16,329 | 16,329 | 62,334 | 16,329 | 16,329 | 16,329 | 16,329 | 65,316 | 16,329 | 16,329 | 16,329 | 16,329 | 65,316 |
| Loss on re-measurement of equity interest upon acquisition, net | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Impairment and Gain on real estate dispositions | (719,908) | (234,997) | (80,712) | (460,991) | 0 | (776,700) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loss (gain) on real estate dispositions related to unconsolidated entities | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Discontinued operations: (gain) loss on real estate dispositions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Discontinued operations: depreciation and amortization on real estate as | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Gain on real estate dispositions related to noncontrolling interests | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TBD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TBD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TBD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Funds from operations (FFO)** | 1,577,080 | 356,124 | 335,597 | 185,014 | 332,656 | 1,209,391 | 327,493 | 337,880 | 352,666 | 359,107 | 1,377,146 | 365,357 | 379,210 | 391,048 | 396,602 | 1,532,217 |
| Change in fair value of financial instruments | (4,399) | 7,651 | 1,434 | 1,395 | 0 | 10,480 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Non-recurring income tax benefits | (8,681) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loss (gain) on extinguishment of debt, net | 84,155 | 0 | 249 | 33,004 | 0 | 33,253 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Transaction Costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Incremental Interest Expense | 0 | 5,871 | 0 | 0 | 0 | 5,871 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other impairment | 0 | 32,268 | 1,842 | 112,398 | 0 | 146,508 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TBD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TBD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Normalizing items related to unconsolidated entities | (40,741) | 4,041 | 1,000 | 6,399 | 0 | 11,440 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Preferred stock redemption charge | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Provision for Loan losses | 18,690 | 7,072 | 1,422 | 2,857 | 0 | 11,351 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Expenses | 52,612 | 6,292 | 19,411 | 11,544 | 0 | 37,247 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Additional other income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Non-cash impact of chages to equity plan | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Core funds from operations (FFO; diluted)** | 1,678,716 | 419,319 | 360,955 | 352,611 | 332,656 | 1,465,541 | 327,493 | 337,880 | 352,666 | 359,107 | 1,377,146 | 365,357 | 379,210 | 391,048 | 396,602 | 1,532,217 |
| Non-cash expenses | 11,026 | 2,823 | 2,275 | 4,339 | 4,339 | 13,776 | 4,339 | 4,339 | 4,339 | 4,339 | 17,356 | 4,339 | 4,339 | 4,339 | 4,339 | 17,356 |
| Stock-based compensation | 23,487 | 6,822 | 6,892 | 6,565 | 5,999 | 26,278 | 6,174 | 6,332 | 6,558 | 6,652 | 25,715 | 6,449 | 6,632 | 6,808 | 6,884 | 26,773 |
| Straight-lining of rental income, net | (97,183) | (24,930) | (25,627) | (18,729) | (18,729) | (88,015) | (18,729) | (18,729) | (18,729) | (18,729) | (74,916) | (18,729) | (18,729) | (18,729) | (18,729) | (74,916) |
| Capital expenditures | (131,295) | (22,616) | (17,579) | (19,443) | (40,969) | (100,607) | (27,538) | (27,538) | (27,538) | (40,969) | (123,583) | (27,538) | (27,538) | (27,538) | (40,969) | (123,583) |
| TBD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TBD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TBD | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Funds available for distribution (FAD)** | 1,484,751 | 381,418 | 326,916 | 325,343 | 283,296 | 1,316,973 | 291,738 | 302,284 | 317,296 | 310,400 | 1,221,718 | 329,878 | 343,914 | 355,928 | 348,127 | 1,377,847 |
| | | | | | | | | | | | | | | | | |
| Weighted average common shares and units EPS (basic) | 401,845 | 410,306 | 417,084 | 417,027 | 418,701 | 415,780 | 419,551 | 420,401 | 420,401 | 420,401 | 420,189 | 421,251 | 422,101 | 422,101 | 422,101 | 421,889 |
| Weighted average common shares and units EPS (diluted) | 403,808 | 412,420 | 419,121 | 418,987 | 420,681 | 417,802 | 421,551 | 422,401 | 422,401 | 422,401 | 422,189 | 423,251 | 424,101 | 424,101 | 424,101 | 423,889 |
| Weighted average common shares and units FFO (basic) | 401,845 | 410,306 | 417,084 | 417,027 | 418,701 | 415,780 | 419,551 | 420,401 | 420,401 | 420,401 | 420,189 | 421,251 | 422,101 | 422,101 | 422,101 | 421,889 |
| Weighted average common shares and units FFO (diluted) | 403,808 | 412,420 | 419,121 | 418,987 | 420,681 | 417,802 | 421,551 | 422,401 | 422,401 | 422,401 | 422,189 | 423,251 | 424,101 | 424,101 | 424,101 | 423,889 |
| | | | | | | | | | | | | | | | | |
| Earnings per share (basic) | $3.07 | $0.76 | $0.43 | $0.78 | $0.15 | $2.11 | $0.13 | $0.16 | $0.20 | $0.21 | $0.70 | $0.23 | $0.26 | $0.29 | $0.30 | $1.07 |
| Earnings per share (diluted) | $3.05 | $0.75 | $0.43 | $0.78 | $0.15 | $2.10 | $0.13 | $0.16 | $0.19 | $0.21 | $0.70 | $0.22 | $0.26 | $0.29 | $0.30 | $1.07 |
| | | | | | | | | | | | | | | | | |
| FFO per share (basic) | $3.92 | $0.87 | $0.80 | $0.44 | $0.79 | $2.91 | $0.78 | $0.80 | $0.84 | $0.85 | $3.28 | $0.87 | $0.90 | $0.93 | $0.94 | $3.63 |
| FFO per share (diluted) | $3.91 | $0.86 | $0.80 | $0.44 | $0.79 | $2.89 | $0.78 | $0.80 | $0.83 | $0.85 | $3.26 | $0.86 | $0.89 | $0.92 | $0.94 | $3.61 |
| | | | | | | | | | | | | | | | | |
| Core FFO per share (diluted) | $4.16 | $1.02 | $0.86 | $0.84 | $0.79 | $3.51 | $0.78 | $0.80 | $0.83 | $0.85 | $3.26 | $0.86 | $0.89 | $0.92 | $0.94 | $3.61 |
| | | | | | | | | | | | | | | | | |
| FAD per share (diluted) | $3.68 | $0.92 | $0.78 | $0.78 | $0.67 | $3.15 | $0.69 | $0.72 | $0.75 | $0.73 | $2.89 | $0.78 | $0.81 | $0.84 | $0.82 | $3.25 |
| | | | | | | | | | | | | | | | | |
| Dividends declared per share | $3.48 | $0.87 | $0.61 | $0.61 | $0.61 | $2.70 | $0.61 | $0.61 | $0.61 | $0.61 | $2.44 | $0.61 | $0.61 | $0.61 | $0.61 | $2.44 |
| Annualized dividend | $3.48 | $2.44 | $2.44 | $2.44 | | | $2.44 | $2.44 | $2.44 | $2.44 | | $2.44 | $2.44 | $2.44 | $2.44 | |
| | | | | | | | | | | | | | | | | |
| Net income attributable to common stockholders | 1,330,410 | 329,380 | 159,216 | 394,978 | 66,722 | 950,296 | 61,055 | 72,455 | 88,683 | 95,751 | 317,944 | 102,611 | 117,814 | 130,806 | 136,901 | 488,132 |
| Interest expense | 555,559 | 142,007 | 126,357 | 124,851 | 127,452 | 520,667 | 127,828 | 127,290 | 126,602 | 125,993 | 507,712 | 123,471 | 121,396 | 120,977 | 120,316 | 486,161 |
| Depreciation and amortization | 1,027,073 | 274,801 | 265,371 | 255,532 | 255,532 | 1,051,236 | 255,532 | 255,532 | 255,532 | 255,532 | 1,022,128 | 255,532 | 255,532 | 255,532 | 255,532 | 1,022,128 |
| Stock-based compensation | 24,746 | 7,083 | 7,290 | 6,565 | 5,999 | 26,937 | 6,174 | 6,332 | 6,558 | 6,652 | 25,715 | 6,449 | 6,632 | 6,808 | 6,884 | 26,773 |
| Gain on real estate dispositions | 0 | (262,824) | (155,863) | (484,304) | 0 | (902,991) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loss (gain) on extinguishment of debt, net | 0 | 0 | 249 | 33,004 | 0 | 33,253 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loss from unconsolidated entities | 0 | 3,692 | (1,332) | 5,981 | 4,914 | 13,255 | 4,496 | 5,336 | 6,531 | 7,052 | 23,415 | 7,557 | 8,676 | 9,633 | 10,082 | 35,948 |
| Income tax benefit | 2,957 | 5,442 | 2,233 | 2,003 | 2,260 | 11,938 | 2,233 | 2,288 | 2,366 | 2,398 | 9,285 | 2,420 | 2,486 | 2,549 | 2,577 | 10,032 |
| Transaction Costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Loss/(gain) on derivatives | (4,399) | 7,651 | 1,434 | 1,395 | 0 | 10,480 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Provision for Loan Losses | 18,690 | 7,072 | 1,422 | 2,857 | 0 | 11,351 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Impairments of Assets | 28,133 | 60,095 | 76,993 | 135,711 | 0 | 272,799 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Expenses | 52,612 | 6,031 | 19,013 | 11,544 | 0 | 36,588 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Timing adjustments and sales/held for sale | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Additional Other income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Adjusted EBITDA** | 3,035,781 | 580,430 | 502,383 | 490,117 | 462,878 | 2,035,808 | 457,318 | 469,233 | 486,271 | 493,378 | 1,906,199 | 498,040 | 512,537 | 526,306 | 532,292 | 2,069,174 |
| **Annualized EBITDA** | 2,313,368 | 2,321,720 | 2,009,532 | 1,960,468 | 1,851,514 | 1,851,514 | 1,829,271 | 1,876,930 | 1,945,084 | 1,973,511 | 1,973,511 | 1,992,159 | 2,050,148 | 2,105,223 | 2,129,168 | 2,129,168 |

*Source: Company Reports, CoStar, FactSet, SNL Financial and Baird Research*
Research disclosures can be accessed at http://www.rwbaird.com/research-insights/research/coverage/research-disclosure.aspx

# Appendix - Important Disclosures and Analyst Certification

Approved on 05 January 2021 16:01EST/ Published on 05 January 2021 16:06EST.

**Covered Companies Mentioned**

All stock prices below are the 1/4/2021 closing price.

Healthpeak Properties, Inc. (PEAK - $28.89 - Outperform)
Ventas, Inc. (VTR - $46.88 - Not Rated)
(See recent research reports for more information)







1 Robert W. Baird & Co. Incorporated makes a market in the securities of WELL, PEAK and VTR.

**Appendix – Important Disclosures and Analyst Certification**

Robert W. Baird & Co. Incorporated ("Baird") and/or its affiliates expect to receive or intend to seek investment-banking related compensation from the company or companies mentioned in this report within the next three months. Baird may not be licensed to execute transactions in all foreign listed securities directly. Transactions in foreign listed securities may be prohibited for residents of the United States. Please contact a Baird representative for more information.

**Investment Ratings: Outperform (O)** - Expected to outperform on a total return, risk-adjusted basis the broader U.S. equity market over the next 12 months. **Neutral (N)** - Expected to perform in line with the broader U.S. equity market over the next 12 months. **Underperform (U)** - Expected to underperform on a total return, risk-adjusted basis the broader U.S. equity market over the next 12 months.

**Risk Ratings: L - Lower Risk** – Higher-quality companies for investors seeking capital appreciation or income with an emphasis on safety. Company characteristics may include: stable earnings, conservative balance sheets, and an established history of revenue and earnings. **A - Average Risk** – Growth situations for investors seeking capital appreciation with an emphasis on safety. Company characteristics may include: moderate volatility, modest balance-sheet leverage, and stable patterns of revenue and earnings. **H - Higher Risk** – Higher-growth situations appropriate for investors seeking capital appreciation with the acceptance of risk. Company characteristics may include: higher balance-sheet leverage, dynamic business environments, and higher levels of earnings and price volatility. **S - Speculative Risk** – High growth situations appropriate only for investors willing to accept a high degree of volatility and risk. Company characteristics may include: unpredictable earnings, small capitalization, aggressive growth strategies, rapidly changing market dynamics, high leverage, extreme price volatility and unknown competitive challenges.

**Valuation, Ratings and Risks.** The recommendation and price target contained within this report are based on a time horizon of 12 months but there is no guarantee the objective will be achieved within the specified time horizon. Price targets are determined by a subjective review of fundamental and/or quantitative factors of the issuer, its industry, and the security type. A variety of methods may be used to determine the value of a security including, but not limited to, discounted cash flow, earnings multiples, peer group comparisons, and sum of the parts. Overall market risk, interest rate risk, and general economic risks impact all securities. Specific information regarding the price target and recommendation is provided in the text of our most recent research report.

**Distribution of Investment Ratings.** As of December 31, 2020, Baird U.S. Equity Research covered 728 companies, with 64% rated Outperform/Buy, 35% rated Neutral/Hold and 1% rated Underperform/Sell. Within these rating categories, 14% of Outperform/Buy-rated and 4% of Neutral/Hold-rated companies have compensated Baird for investment banking services in the past 12 months and/or Baird managed or co-managed a public offering of securities for these companies in the past 12 months.

**Analyst Compensation.** Research analyst compensation is based on: (1) the correlation between the research analyst's recommendations and stock price performance; (2) ratings and direct feedback from our investing clients, our institutional and retail sales force (as applicable) and from independent rating services; (3) the research analyst's productivity, including the quality of such analyst's research and such analyst's contribution to the growth and development of our overall research effort; and (4) compliance with all of Baird's internal policies and procedures. This compensation criteria and actual compensation is reviewed and approved on an annual basis by Baird's Research Oversight Committee. Research analyst compensation is derived from all revenue sources of the firm, including revenues from investment banking. Baird does not compensate research analysts based on specific investment banking transactions.

A complete listing of all companies covered by Baird U.S. Equity Research and applicable research disclosures can be accessed at http://www.rwbaird.com/research-insights/research/coverage/third-party-research-disclosures.aspx. You can also call 800-792-2473 or write: Robert W. Baird & Co., Equity Research, 777 E. Wisconsin Avenue, Milwaukee, WI 53202.

**Analyst Certification**

The senior research analyst(s) certifies that the views expressed in this research report and/or financial model accurately reflect such senior analyst's personal views about the subject securities or issuers and that no part of his or her compensation was, is, or will be directly or indirectly related to the specific recommendations or views contained in the research report.

**Disclaimers**

**Baird prohibits analysts from owning stock in companies they cover.**

This is not a complete analysis of every material fact regarding any company, industry or security. The opinions expressed here reflect our judgment at this date and are subject to change. The information has been obtained from sources we consider to be reliable, but we cannot guarantee the accuracy.

**ADDITIONAL INFORMATION ON COMPANIES MENTIONED HEREIN IS AVAILABLE UPON REQUEST**

The Dow Jones Industrial Average, S&P 500, S&P 400 and Russell 2000 are unmanaged common stock indices used to measure and report performance of various sectors of the stock market; direct investment in indices is not available. Baird is exempt from the requirement to hold an Australian financial services license. Baird is regulated by the United States Securities and Exchange Commission, FINRA, and various other self-regulatory organizations and those laws and regulations may differ from Australian laws. This report has been prepared in accordance with the laws and regulations governing United States broker-dealers and not Australian laws.

**Other Disclosures**

The information and rating included in this report represent the research analyst's views based on a time horizon of 12 months, as described above, unless otherwise stated. In our standard company-specific research reports, the subject company may be designated as a "Fresh Pick", representing that the research analyst believes the company to be a high-conviction investment idea based on a subjective review of one or more fundamental or quantitative factors until an expiration date specified by the analyst but not to exceed nine months. The Fresh Pick designation and specified expiration date will be displayed in standard company-specific research reports on the company until

the occurrence of the expiration date or such time as the analyst removes the Fresh Pick designation from the company in a subsequent, standard company-specific research report. The research analyst(s) named in this report may, at times and at the request of clients or their Baird representatives, provide particular investment perspectives or trading strategies based primarily on the analyst's understanding of the individual client's objectives. These perspectives or trading strategies generally are responsive to client inquiries and based on criteria the research analyst considers relevant to the client. As such, these perspectives and strategies may differ from the research analyst's views contained in this report.

Baird and/or its affiliates may provide to certain clients additional or research supplemental products or services, such as outlooks, commentaries and other detailed analyses, which focus on covered stocks, companies, industries or sectors. Not all clients who receive our standard company-specific research reports are eligible to receive these additional or supplemental products or services. Baird determines in its sole discretion the clients who will receive additional or supplemental products or services, in light of various factors including the size and scope of the client relationships. These additional or supplemental products or services may feature different analytical or research techniques and information than are contained in Baird's standard research reports. Any ratings and recommendations contained in such additional or research supplemental products are consistent with the research analyst's ratings and recommendations contained in more broadly disseminated standard research reports. Baird disseminates its research reports to all clients simultaneously by posting such reports to Baird's password-protected client portal, https://bol.rwbaird.com/Login("BairdOnline"). All clients may access BairdOnline and at any time. All clients are advised to check BairdOnline for Baird's most recent research reports. After research reports are posted to BairdOnline, such reports may be emailed to clients, based on, among other things, client interest, coverage, stock ownership and indicated email preferences, and electronically distributed to certain third-party research aggregators, who may make such reports available to entitled clients on password-protected, third-party websites. Not all research reports posted to BairdOnline will be emailed to clients or electronically distributed to such research aggregators. To request access to Baird Online, please visit https://bol.rwbaird.com/Login/RequestInstLogin or contact your Baird representative.

**Dividend Yield.** As used in this report, the term "dividend yield" refers, on a percentage basis, to the historical distributions made by the issuer relative to its current market price. Such distributions are not guaranteed, may be modified at the issuer's discretion, may exceed operating cash flow, subsidized by borrowed funds or include a return of investment principal.

**United Kingdom ("UK") disclosure requirements for the purpose of distributing this research into the UK and other countries for which Robert W. Baird Limited holds a MiFID passport.**

The contents of this report may contain an "investment recommendation", as defined by the Market Abuse Regulation EU No 596/2014 ("MAR"). This report does not contain a "personal recommendation" or "investment advice", as defined by the Market in Financial Instruments Directive 2014/65/EU ("MiFID"). Please therefore be aware of the important disclosures outlined below. Unless otherwise stated, this report was completed and first disseminated at the date and time provided on the timestamp of the report. If you would like further information on dissemination times, please contact us. The views contained in this report: (i) do not necessarily correspond to, and may differ from, the views of Robert W. Baird Limited or any other entity within the Baird Group, in particular Robert W. Baird & Co. Incorporated; and (ii) may differ from the views of another individual of Robert W. Baird Limited.

This material is distributed in the UK and the European Economic Area ("EEA") by Robert W. Baird Limited, which has an office at Finsbury Circus House, 15 Finsbury Circus, London EC2M 7EB and is authorized and regulated by the Financial Conduct Authority ("FCA") in the UK. For the purposes of the FCA requirements, this investment research report is classified as investment research and is objective. This material is only directed at and is only made available to persons in the EEA who would satisfy the criteria of being "Professional" investors under MiFID and to persons in the UK falling within Articles 19, 38, 47, and 49 of the Financial Services and Markets Act of 2000 (Financial Promotion) Order 2005 (all such persons being referred to as "relevant persons"). Accordingly, this document is intended only for persons regarded as investment professionals (or equivalent) and is not to be distributed to or passed onto any other person (such as persons who would be classified as Retail clients under MiFID).

All substantially material sources of the information contained in this report are disclosed. All sources of information in this report are reliable, but where there is any doubt as to reliability of a particular source, this is clearly indicated. There is no intention to update this report in future. Where, for any reason, an update is made, this will be made clear in writing on the research report. Such instances will be occasional only.

Please note that this report may provide views which differ from previous recommendations made by the same individual in respect of the same financial instrument or issuer in the last 12 months. Information and details regarding previous recommendations in relation to the financial instruments or issuer referred to in this report are available at https://baird.bluematrix.com/sellside/MAR.action.

Robert W. Baird Limited or one of its affiliates may at any time have a long or short position in the company or companies mentioned in this report. Where Robert W. Baird Limited or one of its affiliates holds a long or short position exceeding 0.5% of the total issued share capital of the issuer, this will be disclosed separately by your Robert W. Baird Limited representative upon request.

Investment involves risk. The price of securities may fluctuate and past performance is not indicative of future results. Any recommendation contained in the research report does not have regard to the specific investment objectives, financial situation and the particular needs of any individuals. You are advised to exercise caution in relation to the research report. If you are in any doubt about any of the contents of this document, you should obtain independent professional advice.

Robert W. Baird Limited and Robert W. Baird & Co. Incorporated have in place organisational and administrative arrangements for the prevention, avoidance, and disclosure of conflicts of interest with respect to research recommendations. Robert W. Baird Limited's Conflicts of Interest Policy, available here, outlines the approach Robert W. Baird Limited takes in relation to conflicts of interest and includes detail as to its procedures in place to identify, manage and control conflicts of interest. Robert W. Baird Limited and or one of its affiliates may

be party to an agreement with the issuer that is the subject of this report relating to the provision of services of investment firms. Robert W. Baird & Co. Incorporated's policies and procedures are designed to identify and effectively manage conflicts of interest related to the preparation and content of research reports and to promote objective and reliable research that reflects the truly held opinions of research analysts. Robert W. Baird & Co. Incorporated's research analysts certify on a quarterly basis that such research reports accurately reflect their personal views.

This material is strictly confidential to the recipient and not intended for persons in jurisdictions where the distribution or publication of this research report is not permitted under the applicable laws or regulations of such jurisdiction.

Robert W. Baird Limited is exempt from the requirement to hold an Australian financial services license and is regulated by the FCA under UK laws, which may differ from Australian laws. As such, this document has not been prepared in accordance with Australian laws.

**Copyright 2021 Robert W. Baird & Co. Incorporated**

This information is prepared for the use of Baird clients and may not be redistributed, retransmitted or disclosed, in whole or in part, or in any form or manner, without the express written consent of Baird. Any unauthorized use or disclosure is prohibited. Receipt and review of this information constitutes your agreement not to redistribute, retransmit, or disclose to others the contents, opinions, conclusion, or information contained in this information (including any investment ratings, estimates or price targets) without first obtaining expressed permission from an authorized officer of Baird.

Ask the analyst a question                                    Click here to unsubscribe

# EXHIBIT 2

# FILED UNDER SEAL

# EXHIBIT 3

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 4

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 5

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 6

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 7

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 8

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 9

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 10

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 11

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 12

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 13

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 14

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 15

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 16

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 17

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 18

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 19

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 20

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 21

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 22

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 23

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 24

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 25

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 26

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 27

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1

# EXHIBIT 28

# FILED UNDER SEAL

CORE/9990000.8169/234957108.1