IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

| | | |
|---|---|---|
| IN RE: | . | Case No. : 25-80185-SGJ-11 |
| | . | |
| GENESIS HEALTHCARE, INC., | . | (Jointly Administered) |
| ET AL., | . | |
| | . | |
| Debtors. | . | Thursday, December 11, 2025 |
| . . . . . . . . . . . . . . . . | | 9:37 A.M. |

TRANSCRIPT OF CONTINUED HEARING ON DEBTORS' MOTION FOR ENTRY OF
AN ORDER (I) APPROVING BIDDING PROCEDURES AND EXPENSE
REIMBURSEMENT, (II) APPROVING THE DEBTORS' ENTRY INTO THE
STALKING HORSE  APA, (3) SCHEDULING CERTAIN DATES AND
DEADLINES, (IV) APPROVING THE FORM AND MANNER OF NOTICE
THEREOF, (V) ESTABLISHING NOTICE AND PROCEDURES FOR THE
ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, (VI)
AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS,
AND (VII) AUTHORIZING THE SALE OF ASSETS FILED BY DEBTOR
GENESIS HEALTHCARE, INC. (117)

**BEFORE THE HONORABLE STACEY G. JERNIGAN**
**UNITED STATES BANKRUPTCY COURT CHIEF JUDGE**

APPEARANCES:

For the Debtors:

McDermott Will & Schulte LLP
BY: DANIEL SIMON, ESQUIRE
1180 Peachtree Street, NE, Suite 3350
Atlanta, Georgia 30309
(404) 260-8554
dsimon@mwe.com

Audio Recorder:          Michael F. Edmond
Earle Cabell Federal Building
1100 Commerce Street, Room 1254
Dallas, Texas 75242

Transcription Service:   Liberty Transcripts
9107 Topridge Drive
Austin, Texas 78750
(847) 848-4907
DBPATEL1180@GMAIL.COM

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES:

For the Debtors:

                         McDermott Will & Schulte LLP
                         BY: JERRY L. HALL, ESQUIRE
                         2801 North Harwood Street, Suite 2600
                         Dallas, Texas 75201
                         (212) 547-5543
                         jhall@mwe.com


For the Statutory Unsecured Claimholders' Committee:

                         Stinson Leonard Street LLP
                         BY: NICHOLAS J. ZLUTICKY, ESQUIRE
                         1201 Walnut Street, Suite 2900
                         Kansas City, Missouri 64106
                         (816) 691-3278
                         nicholas.zluticky@stinson.com

                         Stinson Leonard Street LLP
                         BY: ZACHARY HEMENWAY, ESQUIRE
                         1201 Walnut Street, Suite 2900
                         Kansas City, Missouri 64106
                         (816) 691-2647
                         zachary.hemenway@stinson.com


For the Statutory Unsecured Claimholders' Committee:

                         Proskauer Rose LLP
                         BY: DANIEL DESATNIK, ESQUIRE
                         Eleven Times Square
                         New York, New York 10036
                         (212) 969-3191
                         ddesatnik@proskauer.com

                         Proskauer Rose LLP
                         BY: RICHARD WESTLING, ESQUIRE
                         1001 Pennsylvania Avenue, N.W.
                         Suite 600 South
                         Washington, DC 20004
                         (202) 416-5876
                         rwestling@proskauer.com

APPEARANCES (CONTINUED):

For Various Tort Claimants/Creditors:

                    Anthony & Partners, LLC
                    BY: JOHN ANTHONY, ESQUIRE
                    100 South Ashley Drive, Suite 1600
                    Tampa, Florida 33602
                    (813) 273-5616
                    janthony@anthonyandpartners.com


For Markglen, LLC and Welltower, OP, LLC

                    Gibson Dunn & Crutcher, LLP
                    BY: JEFFREY KRAUSE, ESQUIRE
                    333 South Grand Avenue
                    Los Angeles, California 90071
                    (213) 229-7995
                    jkrause@gibsondunn.com


For White Oak Healthcare Finance:

                    Blank Rome, LLP
                    BY: PAIGE TINKHAM, ESQUIRE
                    444 West Lake Street, Suite 1650
                    Chicago, Illinois 60606
                    (312) 776-2514
                    paige.tinkham@blankrome.com

For the United States Trustee:

                    Office of the United States Trustee
                    BY: MEREDYTH KIPPES, ESQUIRE
                    1100 Commerce Street, Room 976
                    Dallas, Texas 75242
                    (214) 767-8967
                    Meredyth.kippes@usdoj.gov

For Omega Entities:

                    Ferguson Braswell Fraser Kubasta, PC
                    BY: LEIGHTON AIKEN, ESQUIRE
                    2500 Dallas Parkway, Suite 600
                    Plano, Texas 75093
                    (972) 378-9111
                    laiken@fbfk.law

APPEARANCES (CONTINUED):

For Genie 3 Partners, LLC:

                         Baker & Hostetler LLP
                         BY: ELIZABETH A. GREEN, ESQUIRE
                         200 South Orange Avenue
                         SunTrust Center, Suite 2300
                         Orlando, Florida 32801
                         (407) 649-4000
                         egreen@bakerlaw.com

                         Baker & Hostetler LLP
                         BY: ANDREW E. LAYDEN, ESQUIRE
                         200 South Orange Avenue
                         SunTrust Center, Suite 2300
                         Orlando, Florida 32801
                         (407) 649-4000
                         alyden@bakerlaw.com


For Olumie Capital, LLC:

                         Spector & Cox PLLC
                         BY: HOWARD MARC SPECTOR, ESQUIRE
                         12770 Coit Road
                         Banner Place, Suite 850
                         Dallas, Texas 75251
                         (214) 365-5377
                         hspector@spectorcox.com


For CPE 88988 LLC:

                         DLA Piper LLP
                         BY: JAMES MUENKER, ESQUIRE
                         1900 North Pearl Street, Suite 2200
                         Dallas, Texas 75201
                         (214) 743-4559
                         james.muenker@us.dlapiper.com

                         DLA Piper LLP
                         BY: BRETT INGERMAN, ESQUIRE
                         Harbor East
                         650 South Exeter Street, Suite 1100
                         Baltimore, Maryland 21202
                         (410) 580-4177
                         brett.ingerman@us.dlapiper.com

APPEARANCES (CONTINUED):

For Jonathan Foster and Elizabeth LaPuma in their capacity as
Independent Directors of Genesis Healthcare, Inc.

                         Katten Muchin Rosenman LLP
                         BY: DANIEL BARNOWSKI, ESQUIRE
                         1919 Pennsylvania Avenue, NW
                         Suite 800
                         Washington, D.C. 20006
                         (202) 625-3661
                         dan.barnowski@katten.com


For Monticelloam, LLC:

                         Cooley LLP
                         BY: ERIC E. WALKER, ESQUIRE
                         1100 North Wacker Drive, Suite 4200
                         Chicago, Illinois 60606
                         (312) 881-6375
                         ewalker@cooley.com

6

INDEX

PAGE

MATTERS HEARD:

Debtors' Motion for Entry of an Order (I) Approving
Bidding Procedures and Expense Reimbursement,
(II) Approving the Debtors' Entry Into the Stalking
Horse APA, (3) Scheduling Certain Dates and Deadlines,
(IV) Approving the Form and Manner of Notice Thereof,
(V) Establishing Notice and Procedures for the Assumption
and Assignment of Contracts and Leases, (VI) Authorizing
the Assumption and Assignment of Assumed Contracts,
and (VII) Authorizing the Sale of Assets Filed by Debtor
Genesis Healthcare, Inc. (117)

**Court's Ruling - Continued to 12/17/2025**              **311**

INDEX

PAGE

WITNESSES FOR THE MOVANTS:

MARK ANDREWS
  Cross-Examination by Mr. Zluticky                 10
  Redirect Examination by Mr. Simon                 29
  Redirect Examination by Mr. Ingerman              35
  Recross-Examination by Mr. Zluticky               38

BILL MORRISON
  Direct Examination by Mr. Hall                    41
  Cross-Examination by Mr. Westling                 46
  Redirect Examination by  Mr. Hall                 53

WITNESSES FOR THE OPPONENTS:

DENNIS SAPIEN-PANGINDIAN
  Direct Examination by Mr. Westling                56

ANDREW TURNBULL
  Direct Examination by Mr. Zluticky                60
  Cross-Examination by Mr. Hall                    115
  Cross-Examination by Mr. Krause                  146
  Cross-Examination by Mr. Ingerman                152
  Examination by the Court                         167

BRIAN TAYLOR
  Cross-Examination by Mr. Barnowski               171
  Redirect Examination by Mr. Aiken                202
  Recross-Examination by Mr. Desatnik              206

ROWAN FARBER
  Direct Examination by Mr. Layden                 227
  Cross-Examination by Mr. Simon                   234
  Redirect Examination by Mr. Mr. Layden           289

JOSEPH BORENSTEIN
  Direct Examination by Mr. Walker                 291

JACOB SOD
  Direct Examination by Ms. Green                  297

CLINTON PHILLIPS
  Direct Examination by Mr. Spector                303

INDEX

| EXHIBITS: | Marked | Admitted |
|---|---|---|
| EXHIBITS FOR THE DEBTORS: | | |
| (None) | | |
| EXHIBITS FOR THE COMMITTEE: | | |
| (None) | | |
| EXHIBITS FOR OMEGA: | | |
| 1 | 114 | 114 |
| EXHIBITS FOR GENIE 3: | | |
| 1 through 26 | 227 | 227 |
| EXHIBITS FOR OLUMIE CAPITAL: | | |
| 1 through 6 | 302 | 302 |

(Proceedings commenced at 9:37 a.m.)

THE CLERK:  All rise.  The United States Bankruptcy Court for the Northern District of Texas, Dallas Division, is now in session; the Honorable Stacey Jernigan presiding.

THE COURT:  Good morning.  Please be seated.

All right.  We're ready to resume with the Genesis Healthcare sale hearing, Day 2, Case Number 25-80185.  A reminder to sign the attorney appearance sign-in sheet.  My law clerk tattled that some of you did not yesterday, so make sure we have a record of your appearance, please.

All right.  So we heard four witnesses yesterday, and I'll start with Mr. Simon once again and ask are you ready to call your next witness.

MR. SIMON:  We are, Your Honor.  The next witness will be Mark Andrews.  He's from CPE.

THE COURT:  All right.

MR. SIMON:  And we're going to tender Mark for cross.

THE COURT:  All right.  Mr. Andrews, welcome.

MR. ANDREWS:  Good morning, Your Honor.

THE COURT:  I know you are an officer of the Court. But given the significance of this, I think it's important to swear you in.  Please raise your right hand.

MARK ANDREWS, DEBTORS' WITNESS, SWORN

THE COURT:  All right, please be seated.

And I do have Mr. Andrews' declaration which was

actually filed at Docket 1802 as our direct testimony.  Does the Committee want to cross?

MR. ZLUTICKY:  Yes.  Thank you, Your Honor.

THE COURT:  Okay.

CROSS-EXAMINATION

BY MR. ZLUTICKY:

Q    Good morning, Mr. Andrews.  It's good to see you again. I'm Nick Zluticky from the Committee.  We spoke at length on Saturday during your deposition.  I appreciate you again for making the time for that.

A    Thank you.  Good morning.

Q    Good morning.  So we have your declaration on file, and I believe that it is Debtors' Exhibit 5.  And so I think probably to start, it might be good to just sort of have that open in front of you because we may be referring to portions of that throughout the testimony.

A    You may have to help me, because I'm not sure which --

Q    Oh, so the white binders are Debtors' exhibits.

A    Okay.  So it would be 5.  All right.  I think I've got it here.  I have it.

Q    Okay.  Thank you, Mr. Andrews.  So this is a declaration that was filed on December the 8th of this year, correct?

A    Yes.

Q    Okay.  And we took your deposition, I believe, on December the 6th, Saturday?

A    Saturday the 6th.  That's right.

Q    I'd like for you to turn to Paragraph 32 of your

declaration.  It's on Page 11 of your declaration, if that's

helpful.

A    I see that.

Q    Okay.  Paragraph 32 says, "To the best of CPE's knowledge,

there is no common identity of incorporators, directors, or

controlling stockholders between the Debtors and CPE."

     Do you see that in Paragraph 32?

A    I do.

Q    CPE is owned by two trusts.  Is that right?

A    Yes, that's right.

Q    CPE does not know who the beneficiaries of those trusts

are, does it?

A    No.

Q    CPE does not know who the settlers of those trusts are,

does it?

A    No, it does not.

Q    CPE has not seen the trust agreements, has it?

A    No.

Q    CPE knows Zalman Schapiro is a Trustee of the trusts, but

does not know whether there are any other Trustees, does it?

A    That's correct.

Q    You don't know what Joel Landau's affiliation or interest

in CPE is, do you?

A    I'm sorry, could you say that again?  I didn't quite hear you.

Q    Sure.  I'll speak up.

A    Yeah.

Q    You don't know what Joel Landau's affiliation or interest in CPE is, do you?

A    No.

Q    You think Joel Landau has some reason to be involved, though?

A    Correct.

Q    You just don't know what that reason is?

A    Correct.

Q    And you don't know what David Gefner's affiliation with CPE is either, correct?

A    No, only that there's an interest, and that's it.

Q    Paragraph 32, we're going to go back to that Paragraph. It says, "CPE is an affiliate of ReGen Healthcare LLC, ReGen, and WAX."  Do you see that in Paragraph 32?

A    I do.

Q    It also says, "CPE understands and believes that ReGen had the right to convert certain subordinated notes to equity in the Debtors, but never did so."

     Do you see that in your paragraph?

A    Yes.

Q    And finally, "CPE understands and believes that ReGen had

a right to appoint only a minority in the number of directors

to the Debtors' board of directors."

Do you see that in Paragraph 32?

A    I do.

Q    CPE doesn't know who owns ReGen, correct?

A    Sitting here today, I couldn't tell you who owns ReGen.

Q    CPE doesn't know anything about ReGen, does it?

A    I'm thinking about that, and the answer I think is no.
But I'll think about that some more and if I have a better
answer, I'll tell you.

Q    I want to make sure I understand the answer.  Does CPE
know anything about ReGen?

A    Well, it knows about the debt structure.  It knows a
little bit about the notes.  If you're talking about the
corporate formalities and ReGen's actual ownership structure,
no, I don't think so.

Q    Including ReGen governance rights?

A    Correct.

Q    Yeah.  So let's go back to the first sentence in Paragraph
32, where it says CPE is an affiliate of ReGen Healthcare and
WAX.  Do you see that in Paragraph 32?

A    Yes.

Q    Okay.  CPE does not know what CPE's relationship is to
WAX, does it?

A    It does not know its -- no, it does not know what the

direct relationship is.  It knows there is a relationship.

Correct.

Q    Okay.

A    Yeah.

Q    Let's move to Paragraph 28.

A    Okay.

Q    Paragraph 28 says, and I'm paraphrasing you, please tell me if I get this incorrectly, that CPE plans to hire the Debtors' regional and facility level employees.

     Do you see that in Paragraph 28?

A    Yes.

Q    But CPE hasn't identified an operator for any of those facilities, has it?

A    I'm going to say that I don't understand what your question is there --

Q    Okay.

A    -- when you say that.  Can you repeat it?

Q    As of today, has CPE identified any operator for any of those facilities?

A    I guess I would disagree with the premise of your question.  Has it identified an operator?  CPE has said in its Asset Purchase Agreement and in response to questions that were put to it that you have the answers to, and the supplemental request that came from the Debtors' Restructuring Committee, that it plans to hire substantially all of the employees of the

Debtor.

And so to that extent, the answer is we plan to continue and be as seamless as possible.

Q    Are C-suite employees regional level directors?

A    I don't know.  But let me ask --

Q    Are our facility level employees C-suite officers?

A    No.

Q    Are regional directors and facilities level employees overall management of the broader company?

A    I don't know whether the nomenclature that you're using is consistent with what I just said or not.  But I will say -- I'll say it again this way.  CPE's intention is to hire substantially all of the people who currently work for the Debtor.  It has not made final decisions with respect to any individual employee, but CPE's intention is to retain the people who are currently working for the Debtor.

Q    But you understand what the term operator means generally, correct?

A    Yes.

Q    Okay.  So let's go ahead and turn to your deposition transcript.  So that's Committee's Exhibit 42.  It's the black binder.

MR. ZLUTICKY:  Your Honor, may I approach the witness?  I should have asked that first.

THE COURT:  You may.

MR. ZLUTICKY:  I apologize.

I'm hoping it's this one, but --

THE WITNESS:  Yeah, is it 42?

MR. ZLUTICKY:  Yes, sir.

THE WITNESS:  Okay.  Thanks.

BY MR. ZLUTICKY:

Q    Okay.  So if you could please turn to Page 251 of your transcript.

A    I've got it.

Q    Okay.  So the line of questioning starts at Page 251, Line 11.

"Q   And the person who's going to be in charge of operating these facilities is Chris Bryson."

Your counsel objected to the form of the question, scope.

"A   I couldn't tell you the answer to that because I don't know that that decision has been made.

"Q   Has CPE 88988 LLC had discussions with any other operators about taking over operations of the Genesis Healthcare skilled nursing facilities?

"A   Not that I'm aware of, no."

Then it goes on.

"Q   In the last paragraph on Page 3, it says, 'Mr. Bryson is also working with key members of Synergy Healthcare to provide a variety of startup and support services in support of CPE's bid.'  And then it goes on and ends with, 'Such services

include but are not limited to' and lists a range of services.

Do you see that last paragraph I'm referring to?

"A   I do.

"Q   And I agree, the paragraph speaks for itself.  I'm just pointing to it.  To your knowledge, does Synergy Healthcare have a written agreement with CPE?"

Counsel objected.

"A   I don't know.

"Q   Who would know?

"A   I'm not sure."

And then Question 22, "Des CPE 88988 LLC think that it's important to know who's going to operate all of these skilled nursing facilities at closing?"

Can you go ahead and read your answer at the top of Page 253?

A   Sure.  "It's important, and it's a decision that's not lightly made.  Bear in mind, closing is no earlier than probably the end of March.  There are a number of discussions with people who are already employed, as well as Mr. Bryson and his team, that need to take place.  So it's an issue that will be front and center, provided the Court designates this bid as the winning bid."

Q   So it has to be provided the Court designates this bid as the winner, right?

A   Well, it would be irrelevant if the Court didn't designate

this bid as the winner.

Q    But then the next line,

"Q    So that's a decision CPE will make later?

"A    It will be making those decisions between now and the closing.

"Q    But sitting here today has not made a decision?"

Can you read your answer?

A    "To be specific, it hasn't made a specific decision on who specifically is fulfilling which roles, as opposed to that Synergy is going to be involved in some way.  Yeah.  Are the existing employees going to be involved?  Yes.  How all of that fits together, I think, is something that has to be designed as we approach closing."

Q    Okay.  So as of today, none of that's been decided and therefore not disclosed, correct?

A    No, I disagree.  What's been disclosed is that we are going to retain substantially all of the employees of the Debtor entities and that we're working towards the specific people who have specific roles at the higher levels.  That's my answer.

Q    Okay.  Board of Directors has been decided?

A    Not to my knowledge.

Q    CEO?

A    Not to my knowledge.

Q    CFO?

A     Not to my knowledge.

Q     CFO?

A     Nope.

Q     Person in charge of patient care?

A     None of those things have been decided as of today, but again, my statement stands that we're intending to employ all of the people who are currently employed by the Debtor, and we'll decide whether each and any of those roles need to be filled by other people or supplemented or augmented.  But --

Q     All right.  Thank you, Mr. Andrews.  So let's go to Paragraph 10 of your declaration.

A     Okay, I'm there.

Q     It says, "As of November 17, 2025, Welltower and Omega had also agreed to the treatment of their portion of the DIP loans and the term loan."

      Do you see that in Paragraph 10?

            MR. SIMON:  I don't --

            MR. ZLUTICKY:  Are we looking at the wrong paragraph?  Did I identify the wrong one?

            THE COURT:  You said Paragraph 10.

            MR. ZLUTICKY:  I did.

            THE WITNESS:  I think -- I'm at Paragraph 10.

BY MR. ZLUTICKY:

Q     Q     Yeah, so I'm looking at the last sentence of Paragraph 10.  So at the very beginning of Paragraph 10, it

says, "On November 17, it's submitted the revised portion of the APA."  Do you see that?

A    Yes.

Q    And then the very last sentence, "Welltower and Omega had also agreed to the treatment of their portion of the DIP loans and the term loan."  Do you see that?

A    Yes.

Q    Okay.  But you hadn't executed the term sheet with Welltower and Omega as of December 6th, correct?

A    Welltower and Omega sent their terms to us.  Now, what date that was, recall in the deposition, I testified that there were things in my inbox.  I don't know whether I got it that day, the next day, but sometime before this hearing, I received the term sheet from the Welltower/Omega group.

Q    And as of December 6th, you had not signed the term sheet, though, with Welltower and Omega on the term line?

A    They didn't require my signature.

Q    Okay.

A    Yeah.

Q    You may have had a version in your inbox, you just didn't know?

A    I didn't know at that time.  And I'll add that the discussions with them had been ongoing and an understanding that they had supported our bid predates -- predates the December 6th, 7th, and 8th time frame.

Q    So let's turn to Paragraph 28 of your declaration.

A    I have it.

Q    Paragraph 28 says, "The consideration to be paid by CPE under the amended APA was negotiated at arm's length, in good faith, and without collusion."

UNIDENTIFIED SPEAKER:  29.

MR. SIMON:  29.

BY MR. ZLUTICKY:  I apologize.

Q    Apparently I'm having trouble with my paragraph numbers today.  Paragraph 29 of your declaration says, "The consideration to be paid by CPE under the amended APA was negotiated at arm's length, in good faith, and without collusion, and I believe it constitutes reasonably equivalent value and fair and adequate consideration for the purchased assets."  Is that right?

A    Correct.

Q    Those purchased assets include the causes of action against the released parties.  Is that right?

A    They do.

Q    And if you turn to UCC Exhibit 16, so it would be the black binder, Exhibit 16.

A    Okay.  I have it.

Q    And if I've done this correctly, which I'm a little hesitant to say, that should be the APA.

A    It is the APA.

Case 25-80185-sgj11 Doc 1925 Filed 12/15/25 Entered 12/15/25 14:38:50 Desc
Main Document Page 22 of 320

22

Andrews - Cross/Zluticky

Q Okay. And if you turn to Pages 20 and 21, it should have a definition for released parties.

MR. SIMON: 20 at the bottom.

MR. ZLUTICKY: Yes. It begins at the bottom of Page 20 and continues on to 21.

THE COURT: 21 and continues to 22.

THE WITNESS: In my book, it's 21. It's 21 going to 22.

BY MR. ZLUTICKY:

Q So the released parties are listed as ReGen Healthcare LLC, WAX Dynasty Partners LLC, MAO 22322 LLC, Pinta Capital Partners, Perigrove, Integra WIP Tenant Buyer, and then it goes on to say each of their respective, and then it lists things like present and former parents, subsidiaries, affiliates, officers, directors, parents, equity.

Do you see all of those things in that definition?

A I do.

Q Okay. And at the end, it says including without limitation Joel Landau and David Gefner. Do you see that?

A I do.

Q Okay. But CPE has no idea what relationship ReGen has to CPE other than as lender, correct?

A Yeah, I think that's correct.

Q Okay. And CPE has no idea what relationship WAX has to CPE except as lender, correct?

**www.libertytranscripts.com**

A    I think in the supplemental response that we gave to the

Restructuring Committee, we identified that WAX was affiliated

with CPE.

Q    Okay.

A    I don't know this precise affiliation.  If that's what

you're asking, yeah, I don't know.

Q    Okay.  So you don't know the precise affiliation?

A    Correct.

Q    And CPE, before our deposition on the 6th, you'd never

heard of Pinta Capital Partners.  Is that right?

A    Yeah.  I hadn't heard of them.  Didn't remember who that

was.

Q    CPE has no idea why Pinta Capital Partners is a released

party, do they?

A    I don't know.

Q    And CPE has no idea why Perigrove is a released party, do

they?

A    No.

Q    CPE has no idea why Joel Landau is being released, do

they?

A    Well, again, Mr. Landau and Mr. Gefner both have some

interest in this through CPE that was disclosed to the

Restructuring Committee.  What the precise nature of the

relationship is, again, I agree, I don't know.  But that's part

of the general releases that were sought.

Q    Okay.  But you don't know what their interest is.  You just know they have some reason to be involved?

A    Correct.

Q    You just don't know what that reason is?

A    Correct.

Q    Yeah.  CPE cannot identify any of the partners, subsidiaries, affiliates, officers, directors, partners, equity holders, managers, members, predecessors, successors, and assigns of any of these above entities, can it?

A    No.

Q    So let's talk about that letter that was sent to the Special Restructuring Committee for the materials that they had requested.  It was sent on November 26th.

        UNIDENTIFIED SPEAKER:  Debtors' Exhibit 13.

BY MR. ZLUTICKY:

Q    So let's go ahead and turn to the white notebook.  It's Debtors' Exhibit 13, Mr. Andrews.

A    Okay.

Q    If you need help, I'm happy to come over and grab another binder.  I know you've got a lot in front of you.

        MR. ZLUTICKY:  Your Honor, may I approach?

        THE COURT:  You may.

        THE WITNESS:  I think I've got it.

BY MR. ZLUTICKY:

Q    Okay.  You have Tab 13?

A    I've got it.

Q    Perfect.

A    Thank you.

Q    So in Tab 13, in the answer to 1, there's a question about funding.  Do you see that?

A    I do.

Q    And it references a bank statement?

A    Yes.

Q    Okay.  And the bank statement attaches an exhibit to those materials.  Is that right?

A    I think that's right.

Q    Okay.  And do you have that in front of you?

A    Yes.  The Metropolitan Commercial Bank account information with a balance as of that date of $50,100,000.

Q    Okay.  But you don't know who opened that account, do you?

A    Well, I understand that there was a letter provided to the Debtor Restructuring Committee that presumably went to the consulting parties as well that simply says that it was opened by CPE.

Q    Okay.  But you don't know who at CPE opened that account, do you?

A    The only person in connection with that account has been Mr. Schapiro.  Yeah, as far as I know, it's Mr. Schapiro.  But I do not know sitting here today if for sure it was Mr. Schapiro.

Q    You didn't open it, did you?

A    I did not open that account.

Q    Okay.  You're the only officer for CPE.  Is that correct?

A    Right.

Q    And you don't have access to that bank account, do you?

A    No.

Q    Okay.  And you don't have signing authority for that bank account?

A    I do not.

Q    Okay.  Do you know who has access to that bank account?

A    Mr. Schapiro.

Q    How do you know that?

A    Because Mr. Schapiro and I have had conversations about this bank account.

Q    After December 6th when I took your deposition --

A    Yes.

Q    -- three days ago?

A    Yes, because you raised the issue so I asked him the question.

Q    Fair.  All right.

A    Yeah.

Q    So did Mr. Schapiro also tell you who else has signing authority for that?

A    He's the only one that I think has signing authority for that, but I could be mistaken.

Q    Did you ask him?

A    We talked about the account, and Mr. Schapiro confirmed to me as recently as this morning that there's $40 million in that account.  10 million has gone out for the good-faith deposit, and that was a sum and substance of it.

Q    And that's information you directly have access to because you have access to the account, or you're relying on Mr. Schapiro to tell you that?

A    Talking to Mr. Schapiro.

Q    Okay.

A    Yeah.

Q    And you don't know who deposited the funds into the CPE bank account, do you?

A    Well, it came from equity.

Q    But --

A    It's --

Q    -- you've already told us you don't know who the equity is.

A    Well, it's two trusts.

Q    So it came from the two trusts. You know that?

A    Well, I don't have -- I don't have direct knowledge of that.

Q    Okay.

A    Correct.

Q    Yeah.  Were you in the courtroom yesterday when Mr. Snyder

was testifying?

A    Not the whole time.

Q    Okay.

A    I had left before he completed his testimony.

Q    Okay.  Did you hear his testimony about the ability of Mr. Landau to close deals?

A    I don't think I did.

Q    Okay.

A    Yeah.

Q    This isn't the first time you've represented a stalking horse as an authorized representative, as a purchaser for a transaction, is it?

A    No.

Q    Okay.  In fact, you held a very similar role to the one you hold here for the stalking horse purchaser in LaVie.  Is that correct?

A    That's correct.

Q    And that's the LaVie deal that closed earlier this year?

A    Correct.

Q    Okay.  And do you know what Joel Landau's affiliation was with the stalking horse in that deal?

A    No.

Q    And is it still your testimony that despite being involved in that case and this one, you've only spoken with Joel Landau on the phone one time?

A    No.  I think it's maybe twice is my testimony.

Q    Oh.  When did the second one occur?

A    No.  Both of them were in connection with this case.

Q    With this case, but not LaVie?

A    Oh, yeah.  Correct.

Q    Okay.

A    I don't recall ever speaking to him during LaVie.

Q    Okay.  And you've never met Joel Landau?

A    No.

        MR. ZLUTICKY:  Okay.  No further questions, Your

Honor.  I'll pass the witness.  Thank you.

        THE COURT:  Any other cross?

    (No audible response)

        THE COURT:  All right.  Any redirect?

        MR. SIMON:  I'll be brief, Your Honor, and then

Mr. Ingerman may have more.

                    REDIRECT EXAMINATION

BY MR. SIMON:

Q    Good morning, Mr. Andrews.  You're aware, I think you

testified, that Mr. Landau and Mr. Gefner have an interest in

CPE, correct?

A    Yes.

Q    And it's not directly, but it's through trusts.  Is that

correct?

A    That's --

MR. ZLUTICKY:  Objection, Your Honor.  Misstates the witness' testimony.

THE COURT:  Sustained.  That's not what I heard either.

BY MR. SIMON:

Q    What is your understanding of their interest in CPE?

A    Their interest in CPE is derivative some way of those trusts.  How direct or indirect it is, I couldn't tell you, but they certainly have an interest through the trust.

Q    And from your knowledge, do they have an interest in -- does one or both of them have an interest in ReGen, as well?

A    My understanding is that a number of the lenders, including ReGen, WAX, and MAO, all have relationships, are all interrelated.  To describe the precise nature of the relationships, I couldn't do it, but they are related.

Q    But the entities that are identified under the released parties that Mr. Zluticky was talking about, are you aware of whether those were entities that Katten or the Special Investigation Committee looked at?

A    I was told that the Special Investigation Committee came up with a list of targets.

MR. ZLUTICKY:  Your Honor, I'm going to object.  This calls for hearsay.

THE COURT:  Your response?

MR. SIMON:  He was sitting in the courtroom yesterday

when there was testimony about the scope of the Special

Investigation Committee.  And so I'm asking for his

understanding of what the Special Investigation Committee

looked at and whether they looked at the released parties as

targets.

MR. ZLUTICKY:  Your Honor, that's hearsay.  He's just

simply -- unless he's just simply asking the witness for a

memory test of what the Special Investigation Committee folks

testified to, that's hearsay.

THE COURT:  Is that what you're doing?  Asking for

his memory of yesterday's testimony?

MR. SIMON:  Yeah, I think so.  Yes.

THE COURT:  Okay.  I overrule.  I did hear it myself.

THE WITNESS:  So my answer is twofold.  Yesterday,

what I understood is that there are a series of parties that

have been sued or will be sued if standing is provided to the

Committee to file a lawsuit.  It's a long series of parties,

and it seemed like many of them are the same as the parties

that are in the release.

BY MR. SIMON:

Q   Mr. Zluticky was asking you about Mr. Bryson.  Is

Mr. Bryson a representative of the stalking horse bidder?

A   Yes, in the sense of he's the -- let me back up.  CPE has

basically four people who do a lot of heavy lifting work.

Chris Bryson is key on operations, on finance, and on dealing

with the lenders.  Zalman Schapiro is key in connection with some of the oversight.  Mr. Muenker is key as outside counsel. And my role is to do some things that have more to do with the bankruptcy and insolvency aspects of the acquisition.

So those are the four people who are doing most of the heavy lifting work during the leadup to both the financing early in August and then to the auction in November.

Q    And Mr. Bryson, I think you said, is more on the operations side.  Is that correct?

A    That's correct.

Q    And what is his experience on the operations side?

A    He's operated a number of nursing homes, skilled nursing facilities.  He's also involved in an entity called LaVie that was acquired out of a bankruptcy in Atlanta for I think it's roughly 40 nursing homes.  So he is very good at planning and assisting with emergent entities coming out of bankruptcy.

Q    Mr. Zluticky asked you a little bit about whether certain decisions have been made around governance, around operations. Do you recall that?

A    Yes.

Q    Would you find it unusual to make those decisions three or four months in advance of closing?

A    Yes, and potentially just wasteful because things change between now and three months from now.  You don't know that everybody who's there now decides to stick around on the

management team.

Frequently, there's a little bit of upset in connection with an acquisition.  So your plans have to fit the facts as you see them at the moment.  You can't design it too far in advance.

Q    Mr. Zluticky asked you questions around commitments from Welltower and Omega and asked you about the signed term sheet on -- whether you had a signed term sheet on December 6th.

Do you recall?

A    Yes.

Q    Is there a signed term sheet today?

A    No.  There is not a signed term sheet in connection with Welltower/Omega from me, if that was his question.  There is a signed term sheet from them that I received, I think, the 7th.  Some of that may have been in my inbox by the 6th when I was testifying earlier to him.  When I was being deposed, I told him that my inbox was stacked with documents from people in the case, and I was still going through it.

Q    And I realize my nomenclature was not wrong.  Is it a term sheet or is it a commitment?

A    So let me break them down into pieces.

Q    Yes.

A    So first of all, White Oak was the first one that we received, and that one I countersigned, and that was done on November the 17th, either the day of or the day before the

auction began.  The other documents that I have are Welltower

and Omega, and that is not signed by me, but I have received

that document and received a third document.

All of those are attached to the notice of filing of the

APA.  They're behind the notice of filing of the APA in the

exhibit that we were looking at earlier, which I'm sorry, I

don't remember what exhibit number that is, but all the

commitments are in that exhibit.

Q    So there's an executed commitment letter from White Oak

that has been filed.  Is that correct?

A    Yes.

Q    And there is an executed commitment letter from Welltower

and Omega that has been filed.  Is that correct?

A    Correct.

Q    And did you attend the auction?

A    Yes.

Q    And when the auction, the second day of the auction

adjourned at 6 p.m. with the sealed final bids, were you able

to speak with Welltower and Omega to finalize the commitment

between then and December 1st?

A    No, because the Debtors in connection with the consulting

parties instituted a rule that there couldn't be any

communication with the consulting parties or between the

Debtors and the Committee and any of the bidders.  So there was

a ban on communications from that point until the decision by

the Restructuring Committee was announced.

Q    And CPE didn't violate that ban, did they?

A    They did not.

Q    And so after that ban was lifted, is that when CPE finalized that commitment with Welltower and Omega?

A    That's right.  But to be clear, Welltower and Omega, it's indicated they would support the bid from much earlier.  It was only the finalizing of the commitment that occurred later, not the actual undertaking by them to support our bid.

Q    So there was an agreement in principle even leading up to that point?

A    Correct.

        MR. SIMON:  I'll pass the witness.

        THE COURT:  All right.

        MR. INGERMAN:  Very briefly, Your Honor.

        Brett Ingerman, DLA Piper, on behalf of CPE.

        THE COURT:  Okay.

                    REDIRECT EXAMINATION

BY MR. INGERMAN:

Q    Good morning, Mr. Andrews.

A    Good morning.

Q    A couple of quick questions.  Ownership of CPE, two trusts?

A    Yes.

Q    Okay.  And who is the trustee of each trust?

A     Mr. Schapiro.

Q     Okay.  So Mr. Schapiro is the trustee of both trusts, yes?

A     Yes.

Q     One of the trusts affiliated with Joel Landau?

A     Yes.

        MR. ZLUTICKY:  Objection, Your Honor.  That mischaracterized the witness's testimony.  He already testified that he didn't know who the trusts were owned by or who they --

        THE COURT:  He said he didn't know the precise affiliation.

        MR. INGERMAN:  Exactly.

        THE COURT:  So overruled.

        MR. INGERMAN:  Thank you, Your Honor.

BY MR. INGERMAN:

Q     Let me ask it again.  Trust number one, some affiliation with Joel Landau, yes?

A     Yes.

Q     Trust number two, some affiliation with David Gefner, yes?

A     Yes.

Q     Okay.

        MR. ZLUTICKY:  Your Honor, that one I am going to object.  He said they had some connection to the trust, but he didn't know.  He didn't know if one was affiliated with trust one and one was affiliated with trust two.  He just said they had both affiliations, but he didn't know what they were.

THE COURT:  Okay.  You can recross, but I overruled this objection.

MR. INGERMAN:  All right.  Thank you, Your Honor.

BY MR. INGERMAN:

Q    So one trust, some affiliation with Landau, other trust, some affiliation with Gefner.  What's the ownership interest of each trust in CPE?

A    Fifty percent.

Q    Fifty-fifty?

A    Fifty-fifty.  It's a split.  Yeah.

Q    Okay.  Who is the manager of CPE?

A    Mr. Schapiro.

Q    Okay.  In connection with CPE's bid for the assets, is patient care important to CPE?

A    Yes.

Q    And what does CPE have planned in order to maintain and improve patient care at these facilities, if it is chosen as a successful bidder?

MR. ZLUTICKY:  Your Honor, I'm going to object.  This goes beyond the scope of cross.

THE COURT:  Overruled.

THE WITNESS:  So the plan is to do an assessment in the event that we're chosen as the successful bidder.  And the assessment will involve not only assessing employment situations and the need for, you know, buttressing any of the

staff or any of the C-suite or making changes in connection

with that.  It will also involve reaching out to the patient

care ombudsman and to take steps in order to shore up anywhere

we think that there are deficiencies in care.

Q    And what about engaging Mr. Bryson and his firm Synergy?

Does that have any impact on CPE's plans to maintain and

improve patient care?

A    Yes.

Q    How?

A    The idea is to bring in Mr. Bryson and his team, which

have experience in connection with operating skilled nursing

facilities and nursing homes, and have them review, you know,

everything from staffing and process issues, patient care

issues, et cetera.

          MR. INGERMAN:  Thank you, Your Honor.  No further

questions.

          THE COURT:  All right.  Any re-cross?

          MR. ZLUTICKY:  Very briefly, Your Honor.

                    RECROSS-EXAMINATION

BY MR. ZLUTICKY:

Q    You were asked on redirect about Mr. Bryson.  Do you

recall that, Mr. Andrews?

A    Yes.

Q    Okay.  Do you still have the exhibit in front of you, 16,

that has the letter from Mr. Muenker?

A    Is it Committee 16 or is it --

Q    I'm sorry, it is the Debtors.  It Debtors' exhibit.

A    Debtors' 16.

Q    Yeah, I believe it should be the document currently in front of you.

          MR. SIMON:  Debtors' Exhibit 13?

          THE COURT:  Was it 13?

          MR. ZLUTICKY:  13, I apologize.

          UNIDENTIFIED SPEAKER:  It's white binder.

BY MR. ZLUTICKY:

Q    Yep, white binder.

A    White binder?  Okay.

Q    I believe it's the document currently in front of you.

A    Oh, okay.  Yep, then I do have it.  Yes.

Q    There's a bio listed for Mr. Bryson in the back of that letter.  Do you see that?

A    Yes, I have it here.

Q    In that document, it speaks to Mr. Bryson's ability as COO and then as CEO of Consulate Health.  Do you see that?

A    I do.

Q    Okay.  And do you know Consulate Health as a company that filed bankruptcy in 2021 and became re-known as LaVie?

A    I don't -- I don't know that for a fact.

Q    Okay.  And then Mr. Bryson resigned as CEO at the time?

A    I'm sorry, I just don't know.

Q    Okay.  But he has some involvement with LaVie Part 3 now?

A    Well, he is, as I understand it, has a role in the emergent LaVie post its bankruptcy this past year.

Q    Its second bankruptcy in Georgia?

A    I don't know whether it's second, strictly speaking, because I don't know the connection directly between Consulate and LaVie.

Q    Okay.  But he's involved in LaVie now that was purchased by the stalking horse that you acted as authorized representative for?

A    That's correct.

Q    Okay.

A    Yeah.

Q    But you don't know what role Mr. Bryson's going to have at Genesis post sale, do you?

A    Again, I don't know his precise role.  He'll have involvement, yes.

Q    Are you going to make that decision?

A    No.

Q    Okay.  Who will make that decision?

A    I'm sure that it will be made by Mr. Schapiro, among others.

        MR. ZLUTICKY:  Okay.  No further questions, Your Honor.  Pass the witness.

        THE COURT:  All right.  Any other recross?

(No audible response)

THE COURT:  All right.  Thank you, Mr. Andrews.
You're excused.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  Next witness.

MR. HALL:  Yes, Your Honor.  We call Bill Morrison.

THE COURT:  Okay.  Bill Morrison, you've been called
to the stand?  Maybe?

MR. HALL:  Your Honor, he can be in the hallway.  May
I?

THE COURT:  You certainly may.

(Pause)

THE COURT:  All right.  Is this Bill Morrison?

UNIDENTIFIED SPEAKER:  Yes.

THE COURT:  Okay.  If you could approach the witness
box, I will swear you in.  This is witness number six.  We have
a declaration at Docket 1836 as Mr. Morrison's direct
testimony.  Please raise your right hand.

BILL MORRISON, DEBTORS' WITNESS, SWORN

THE COURT:  Please be seated.

DIRECT EXAMINATION

BY MR. HALL:

Q    Good morning.

A    Good morning.

Q    State your name for the record.

A    Bill Morrison.

Q    What do you do professionally?

A    I'm an attorney at Haynes & Boone.  I lead our national healthcare practice.

Q    As a result of your practice, are you familiar with OIG-HHS exclusion rules?

A    I am.

Q    Very familiar?

A    Yes.

Q    And you're here today to testify as an expert?

A    I am.

Q    Only a few questions, Mr. Morrison.  Can you briefly describe the background of what you understand to be the exclusion issue in this case?

A    I understand from the settlement agreement that there's an excluded party who was involved in some litigation or investigation in the Northern District of New York.  As a result of that, the party entered into a settlement agreement where he agreed to pay fines, restitution, and also agreed to be voluntarily excluded for a period of 10 years.

My understanding from some of the materials that I've read is that that excluded party has had some connection to this matter, either in the form of a consultancy, perhaps a landlord, or in some cases I've seen a minority owner, and

perhaps others. I'm not aware of, at this point, any other connection.

Q Have you been advised whether or not the bidder that has this excluded party affiliation disclosed that to the Debtors?

A As far as I am aware from the record, it was not disclosed.

Q If you had been counsel to Genie 3, would you have counseled them to disclose?

A I would have, yes.

Q Why would you have counseled them to disclose?

A When someone enters into either voluntarily an exclusion order or is excluded under the OIG's mandatory exclusion for criminal conduct, it's a really big deal. The purpose is to remove that individual from directly or indirectly working with healthcare providers that submit payments to federal programs.

So my opinion, or what I would have counseled the party with whom the excluded party was dealing, would be to disclose it because I think it's a very material issue that could impact repayment by the federal government or could lead to civil monetary penalties and perhaps exclusion.

Q And I believe the Court already knows this, but have you been advised approximately what percentage of revenues of the Debtors comes from participating in CMS programs?

A The numbers I've seen are at least 80 percent, perhaps up to 90 percent of revenue is payable by federal or state

programs.

Q    I think you mentioned earlier that you heard or have, through the materials you've reviewed, discovered that he has potentially been involved as a consultant.  I want to focus on that for a second.

Would you have counseled disclosure if his role was limited to being a consultant to one of the principals of the bidder?

A    I would have, yes.

Q    Do you advise clients in your private practice on similar issues?

A    I do, regularly.

Q    So if a client was going to be engaging a consultant, would you advise the client to get a disclosure from the consultant to verify whether they're on the exclusion list?

A    Yeah.  If I was counseling a provider who was engaging a consultant, I would, in addition to other protections related to HIPAA and to other things that you regularly do, want them to verify to you that they were not an excluded party because of these issues.  Because one of the OIG, the guidance in the statute, you can't contract with an excluded party.

Q    And just to be clear, that is your typical practice, not just something you're hypothesizing you would do.

A    That's correct.

Q    You've seen two other declarations in this case related to

exclusion issues, two other experts, correct?

A    Correct.

Q    And you're aware that it is possible that the OIG would take no action if a person who was an excluded person was unaffiliated or severed a relationship with, in this case, the bidder, Genie 3.  You're familiar with --

A    I'm familiar with --

Q    -- the regs in that area?

A    Yes.

Q    You gave a deposition in this matter, right?

A    I did, yes.

Q    And at that deposition, did you testify about when that possibility that the OIG would take no action might be upset by the known prior participation of an excluded person?

A    Yes.

Q    What was that testimony about?

A    Well, two parts of that.  First, I do agree that if an individual had no involvement with an entity that ultimately bills healthcare providers, that there would be no issue here, no exclusion.

What I testified to in the deposition was that providers have a regular and ongoing duty to diligently review those that they're involved with to -- there's a list of excluded parties. You screen against that list.  It's part of regular activities, and it creates this ongoing obligation to continue to review

the involvement of parties.

And to the extent that there is an excluded party, you have to immediately deal with that.  I think this situation is a little different because this is a known party, someone that is known to the people, for sure the people in this room, as to be an excluded party.  So it's not something that you would find in the ordinary course of diligence where you are unknowingly associated or affiliated with an excluded party.

MR. HALL:  Pass the witness, Your Honor.

THE COURT:  All right.  Cross?

MR. WESTLING:  Rich Westling on behalf of the Committee.

CROSS-EXAMINATION

BY MR. WESTLIN:

Q    Good morning, Mr. Morrison.

A    Good morning.

Q    So I want to follow up on some of the testimony you've just given and begin by just getting a sense of your role here. So you're appearing as an expert, correct?

A    That's correct.

Q    All right.  And you are not the regulatory counsel to the Special Restructuring Committee, correct?

A    I was not.  And to be very clear about that, I have not -- I don't have an attorney relationship with anybody in this room other than serving as an expert witness.

Q    And so as a practical matter, you also were not retained until after the Special Restructuring Committee had made its decision to select CPE as the winning bidder, correct?

A    That's correct.

Q    All right.  And so nothing about what you're saying in the courtroom is anything the Committee relied on.  Is that right?

A    That's correct.

Q    Okay.  So I want to talk a little bit about your experience.  You testified you're an experienced healthcare lawyer, correct?

A    Correct.

Q    And that's been in private practice, right?

A    Private practice at Haynes & Boone, and then I spent four years at a healthcare provider, Tenet Healthcare.

Q    In an in-house role, correct?

A    In an in-house role, yes.

Q    And it dealt generally with regulatory matters?

A    Correct.

Q    Okay.  But as a practical matter, you've never worked for the government, correct?

A    That's correct.

Q    You've never worked at OIG, right?

A    That's correct.

Q    CMS, correct?

A    Correct.

Q    Or the Justice Department.  Is that right?

A    That's correct.

Q    And so that means you've never had to make a decision about whether to exclude someone from a federal program.  Is that right?

A    That's correct.

Q    Everything that you've learned about this has been based on your experience in practice, correct?

A    Correct.

Q    And then basically reading the guidance that's publicly available, right?

A    That's correct.

Q    All right.  And so I want to take a little bit of time to address some of the things you said regarding exclusion.  One of the things you testified to just a moment ago was that mandatory exclusion is a serious matter.  I think that's something like what you said.  Do I have that generally right?

A    Generally, mandatory exclusion is very serious, yes.

Q    Right.  But you know that in this case, Mr. Schwartz was not the subject of mandatory exclusion, correct?

A    Correct.

Q    All right.  And so we're really not talking about mandatory exclusion at all, right?

A    Well, we could be.  If -- if the excluded party is somehow in violation of his exclusion order, then the next step of OIG

or DOJ could very well be mandatory exclusion for that knowing violation.

Q    But that wouldn't relate to the entity he's working for, correct?

A    I don't know, and I don't think anybody knows how DOJ or OIG would react to a knowing violation of an exclusion order.

Q    But the reality is that the mandatory exclusion you talked about has specific requirements that are in statute, and it's not a discretionary matter at all, so it doesn't have to do with reactions, does it?

A    That's correct, but it depends on the conduct and how the conduct is charged or investigated.  If OIG or DOJ did bring an action based on one of those mandatory requirements, in this case, it could lead to mandatory or permanent exclusion.

Q    And are you aware of anything that an entity, even if they employed Mr. Schwartz, would do that could trigger mandatory exclusion based on the statute?

A    Not in this case, no.

Q    Okay.  All right.  Now let's talk about permissive exclusion, which I think is what Mr. Schwartz was the subject of here.

A    Correct.

Q    Okay.  And so that's a situation where the agency, OIG, makes a determination of whether or not, in its discretion, to exclude someone, correct?

A    That's correct.

Q    And they have a variety of factors which you're familiar with from the guidance, correct?

A    Correct.

Q    And it's clear from that guidance that being even an owner of a healthcare entity, in and of itself, is not a grounds for exclusion, correct?

A    That's correct.

Q    All right.  But there are lots of limitations.  You can't be involved in management, right?

A    Correct.

Q    Control, right?

A    Certainly.

Q    You can't have a majority ownership, right?

A    More than that.  I mean, you -- well, correct.

Q    And then you also can't, obviously, receive any of the benefit of health program dollars, correct?

A    Correct.  Directly or indirectly.

Q    Right.  And so, just so we're clear, in this case, at this point, you understand that Genie is not a healthcare provider, correct?

A    I do.

Q    All right.  And so they're not subject to any of the rules around Medicare and Medicaid at this point, correct?

A    At this point, that's my understanding.

Q    All right.  And so, to the extent that Genie 3 is a
bidding entity and not going to be the entity that operates any
of these entities here, would there be any concern that you see
of Mr. Schwartz's involvement as a consultant in a deal that
led to being selected for a bid?

A    I do.  I think that there's risk associated with it.
Whether that risk plays out and there's some action taken by
DOJ or the OIG, I don't know, but I'd certainly think that
there's risk.

Q    But they can't exclude him for participating in something
that's not a healthcare provider, correct?

A    At this point, based on my understanding, that would be
correct.

Q    Okay.  So nothing he's done to date could be the basis of
exclusion right now, correct?

A    From what I know, that's correct.

Q    All right.  And so to the extent that what we contemplate
here is a transaction where there will be a healthcare provider
in the future, if Mr. Schwartz plays no role in that company in
any way, there would not be a risk of exclusion either,
correct?

A    I believe that's part of my declaration, that if he really
has no involvement whatsoever, then there is no analysis to be
done.

Q    Okay.  And you're aware, are you not, that there were

representations made by Genie in connection with diligence

requests by the Special Restructuring Committee that

Mr. Schwartz would have no going forward role in this case,

correct?

A    I believe I've seen that, yes.

Q    Okay.  And so based on that, we only have that to act on

at this point, there would be no reason to be concerned about

this from a regulatory position going forward, right?

A    Right, from a regulatory perspective.  But if the question

is about is there reason to be concerned, I would say so

because of the involvement of the excluded party and the

ongoing risk that that excluded party may be involved in some

capacity, some consulting arrangement, something in the future.

As a healthcare attorney, that would give me concern.

Q    Understood.  But I guess what I'm saying is that that all

requires us to look at what could happen, not what's been

represented as going to happen, correct?

A    Correct.

Q    And not what's happened to date, right?

A    I'm not aware of -- I don't know if I can answer that in

terms of his involvement to date.

Q    But I think what we had established a moment ago -- and if

I'm getting it wrong, please correct me -- is that because

there's no healthcare entity involved at this point, nothing

that he's done now could trigger a future risk unless he has

future involvement, correct?

A    Based on those facts, correct.

MR. WESTLING:  All right.  Could I have one moment, Your Honor?

THE COURT:  Yes.

MR. WESTLING:  Thank you.  I have no further questions.

THE COURT:  All right.  Any other opposition cross?

(No audible response)

THE COURT:  All right.  Any redirect?

MR. HALL:  Quickly, Your Honor.

THE COURT: Uh-huh.

MR. HALL:  Well, I guess it could be slow.  It's our shot clock.

REDIRECT EXAMINATION

BY MR. HALL:

Q    On cross, you were asked a question.  You acknowledged that Genie 3, the bidder, represents that Mr. Schwartz would have no further role, correct?

A    Correct.

Q    And you were asked sort of as a quick follow-up, we only have that to go on.  Do you recall?

A    I do.

Q    That's not accurate, is it?  Have you reviewed any documents that are inconsistent with that representation, that

Mr. Schwartz will have no role?

A    Well, I guess it depends on the timing.  I've reviewed documents that indicate that he has been involved, and then I think the declarations came later.  So I'm not sure which one to rely upon, but I've definitely seen information that suggests that he is involved, has been involved, and then subsequently declarations that say that he's not.

So to me, again, in my declaration, I'm not taking any position as to what his involvement is, simply as an expert saying that to the extent that he is or could be involved, I think there is a risk, an ongoing risk, because he's an excluded individual.

Q    Do you believe that the Special Restructuring Committee acted reasonably in taking the matter seriously?

A    I think the way I would answer that is that I would, as a healthcare lawyer, be concerned about the involvement, peripherally, directly, indirectly, of an excluded party in a healthcare deal.

MR. HALL:  Thank you, Your Honor.

THE COURT:  All right.  Any recross on that redirect?

MR. WESTLING:  No, Your Honor.

THE COURT:  All right.  Thank you.  We appreciate your testimony.

THE WITNESS:  Thank you.  May I be excused?

THE COURT:  You may.  Thank you.

(Witness excused)

THE COURT:  All right.  Next witness.

MR. HALL:  Your Honor, I just want to make sure that Mr. Morrison's declaration is admitted, Your Honor?

THE COURT:  Yes.  I thought I broadly admitted all of those yesterday.

MR. HALL:  Fair enough.  Then, Your Honor, the Debtors rest.

THE COURT:  Debtors rest.

All right.  Well, then we will shift to the opposition.  Your first witness.

(Pause)

MR. WESTLING:  Yes.  All right.  Thank you.

Your Honor, the Committee calls Dennis Sapien-Pangindian to testify as our first witness.

MR. INGERMAN:  Your Honor, I apologize.  One issue that I just discussed with Committee counsel, CPE had some exhibits on their list.  I'm not sure we were part of the whole exhibit discussion.  So --

THE COURT:  You were not.

MR. INGERMAN:  Okay.  So just the Debtors have rested.  I would request subject to discussion with Committee counsel about CPE exhibits coming in, if that's okay.

THE COURT:  All right.  So you're going to discuss it and tell me later?

MR. INGERMAN:  Yes, ma'am.

THE COURT:  Okay.  That's fine.

MR. INGERMAN:  Thank you.

THE COURT:  All right.  I'll swear in the witness.

DENNIS SAPIEN-PANGINDIAN, COMMITTEE'S WITNESS, SWORN

THE COURT:  All right.  Please be seated.

MR. WESTLING:  Again, Richard Westling for the Committee.

DIRECT EXAMINATION

BY MR. WESTLING:

Q    And Mr. Sapien-Pangindian, I'm going to call you Mr. Sapien.  It's easier for me and you've indicated it's okay.

A    Yes.

Q    So that will make it easier for all the lawyers.  So you're a lawyer, correct?

A    That's correct.

MR. WESTLING:  And, Your Honor, at this time I want to make sure we offer his declaration into evidence.

THE COURT:  All right.  Well, I know it was filed at Docket 1831.  I presume it's also a separate --

MR. WESTLING:  Yeah.  And if not sure, we'll make sure it is.

THE COURT:  -- Committee document in the bundle.  I admitted 1 through 81 yesterday.  So it is admitted.

MR. WESTLING:  Thank you, Your Honor.

THE COURT:  Okay.

MR. WESTLING:  We'll figure out the numbering for you.

THE COURT:  Okay.

MR. WESTLING:  I apologize for that.

BY MR. WESTLING:

Q    So, Mr. Sapien, you're a lawyer, correct?

A    That's correct.

Q    And you spent some period of your time as an associate counsel at the Office of Inspector General of the Department of Health and Human Services, correct?

A    Yes, I did.  I started my career there.

Q    Tell me what you did there.

A    I was an associate counsel at the Administrative and Civil Remedies Branch.  That is the branch that represents the department in all civil and administrative enforcement actions. So that would entail civil False Claims Act cases, working with the civil side of DOJ on that.

We also represented the agency in carrying out its own enforcement actions, enforcement authorities, such as representing the agency before the Departmental Appeals Board when people are petitioning their exclusion.  Negotiating exclusions as part of civil False Claims Act settlements, as well as monitoring individuals and entities under corporate integrity agreements.

Q    And so is it fair to say that required you to be very familiar with the OIG regulations related to both mandatory and permissive exclusion?

A    Yes, very much so.

Q    Now, you've been in the courtroom for the testimony of Mr. Morrison, correct?

A    That's correct.

Q    And I think you heard him testify that, to the extent there were no further involvement of Mr. Schwartz in any entity that Genie 3 set up to provide healthcare services following this deal, there would be no issue of possible exclusion from the OIG's perspective, correct?

A    Correct.

Q    All right.  And you were an officer with the OIG.  You made decisions about various exclusion issues.  If that matter was presented to you in that role, would you have taken any action?

A    I would not.

Q    Would anyone else that you worked with at that agency have taken action?

A    They would not.

        MR. HALL:  Objection.  Calls for speculation.

        MR. WESTLING:  Why not?

        THE COURT:  Overruled.  Go ahead.

        THE WITNESS:  So when OIG determines or looks at a

case as to whether or not an individual should be excluded or there should be any enforcement action, it looks at whether an excluded individual is in a leadership capacity with an entity, whether they are in an administrative or management capacity, whether they are an executive or an officer, or if they are directly or indirectly furnishing items or services that are directly or indirectly reimbursed by federal healthcare programs. And none of those circumstances exist for Mr. Schwartz.

BY MR. WESTLING:

Q    All right.  And so basically you and Mr. Morrison agree that if Mr. Schwartz would have no further role in this situation, there would be no regulatory risk from the point of view of the Office of Inspector General, correct?

A    I agree, correct.

MR. WESTLING:  All right.  I have no further questions, Your Honor.

THE COURT:  All right.  Any cross?

MR. HALL:  No cross from the Debtors.

THE COURT:  All right.  Thank you.  You're excused.

(Witness excused)

THE COURT:  Committee's next witness.

MR. ZLUTICKY:  Your Honor,  the Committee calls Andrew Turnbull.

THE COURT:  All right.  Mr. Turnbull?

All right.

MR. TURNBULL: Good morning.

THE COURT: Good morning.

ANDREW TURNBULL, COMMITTEE'S WITNESS, SWORN

THE COURT: All right. Please take a seat.

Can someone give me a quick reference to what exhibit in the Committee's binder Mr. Turnbull's declaration is?

MR. ZLUTICKY: It is Committee's Exhibit 8, Your Honor.

THE COURT: Eight. Thank you.

Eight. Thank you.

MR. ZLUTICKY: Your Honor, it's Exhibit 14. 8 was a different declaration. It's Exhibit --

THE COURT: Wait, repeat.

MR. ZLUTICKY: It is Committee's Exhibit 14. 8 was a different declaration.

THE COURT: Okay. Same notebook, Volume 1.

DIRECT EXAMINATION

BY MR. ZLUTICKY:

Q    Good morning, Mr. Turnbull.

A    Good morning.

Q    So, Mr. Turnbull, were you here yesterday listening to the testimony about the auction process and the bidding process generally?

A    I was.

Q    And did that testimony include the testimony of Mr. Robichaux?

A    It did.

Q    Was Houlihan involved in the bid process as a consultation party?

A    Houlihan represents the Committee, which is a consultation party.

Q    How would you describe Houlihan's involvement in the auction process?

A    There was a reasonable degree of activity and participation.

Q    Compared to, and you've handled many of these types of 363 sale, marketing and sale processes, company side, Committee side, correct?

A    I spend most of my time on the company side.

Q    Okay.  How would you compare the involvement of the Committee's investment banker to how you would normally be involved or have the Committee be involved as company counsel?

A    I think we followed the process more and tried to insert ourselves where we possibly could, which would be more than normal.

Q    Why is that?

A    We weren't -- from the get-go in this matter, we've been uncomfortable with the process that's been going on.  So we've been trying to create stability and certainty for bidders so

that we could drive the highest and best result and ultimately generate the best result for the estate and the unsecured creditors.

Q   Were you aware of one of the potential bidders that was interested in the assets being a company called NextGen?

A   Yes.

Q   Were you here yesterday when Mr. Robichaux testified about the communications with NextGen on a potential settlement?

A   I was.

Q   Did you hear Mr. Robichaux say the Debtors were concerned about NextGen settling with Genesis only to then have NextGen use those settlement proceeds to then bid at the auction?

A   Correct.  I heard that.

Q   Mr. Robichaux said NextGen ultimately did not submit a bid.  Did you hear that?

A   I did.

Q   Okay.  Do you remember whether NextGen submitted a bid prior to the bid deadline?

A   I do remember.

Q   And did NextGen submit a bid?

A   They did.

Q   Was the bid qualified by the Debtor?

A   Yes.  I believe they funded a $2-1/2 million deposit and their bid was qualified.

Q   So, Mr. Turnbull, if you could please turn to Committee

Exhibit 67.

MR. ZLUTICKY:  May I approach the witness?

THE COURT:  You may.

(Counsel and witness discuss exhibit)

THE COURT:  Volume 4.

MR. ZLUTICKY:  Thank you.

BY MR. ZLUTICKY:

Q    Mr. Turnbull, Exhibit 67 is a declaration of Mr. Desatnik, and there's a series of emails that are attached to the back of that.  We're specifically referring to Exhibit 10 to the declaration.  I believe it's about halfway through the document, and I'm happy to approach and help you locate it quickly.

A    Go for it.

THE COURT:  Okay.  Mine goes from 9 to 12.

MR. ZLUTICKY:  This is on -- we're getting a copy, Your Honor.

THE COURT:  This is the Desatnik declaration.

MR. ZLUTICKY:  It is, Your Honor.

THE COURT:  Okay.  Well, let me check my other -- this is a Volume 4, and the exhibits behind the Desatnik declaration go from 9 to 12.  But you say -- okay.  Let me see if my law clerk's notebook has it.

Okay.  I have it, so you must have gotten it off the docket.

Okay.  All right.  I'm there.  Is Mr. Turnbull there?

THE WITNESS:  Yes.

THE COURT:  You are.  Okay.

BY MR. ZLUTICKY:

Q    Mr. Turnbull, this was a document that was discussed with Mr. Robichaux yesterday, communications between a Ned Turnbull. And just to confirm, you're not related to Mr. Ned Turnbull, to your knowledge?

A    Correct.  I am not related.

Q    Okay.  And this is an email from Mr. Ned Turnbull.  And one of the terms of this proposed settlement in Item 4, can you read what that is?

A    Item 4 is "BK bid process.  We would like to add a provision stating that Next will not submit a bid in the Genesis bankruptcy sale process, period."

Q    When you saw this email, what was your reaction?

A    I was quite alarmed by it.

Q    Why?

A    Because from my perspective, that felt like collusion. And as I understand it, that's a bankruptcy crime.

Q    And Next Gen did ultimately submit a bid that was qualified, correct?

A    They did.

Q    Okay.  What would have been the impact on the sale process of the Debtors settling with Next Gen on that Term 4?

A     But for the fact that Mr. Carr indicates that they wouldn't participate in collusion, if he hadn't done that and they had signed this agreement, it would have meant one less qualified bid that the Debtors would have received.

Q     And you see that several of the Debtors' professionals are copied on that email, correct?

A     I do.

Q     Including Mr. Robichaux?

A     Correct.

Q     So from your opinion, as an investment banker running a sale process, if you were copied on such a communication, what would you do next?

A     I'd probably have two things I wanted to do.  My first one would probably be go to Debtors' counsel and address the issue. And I'd also make sure that the client was aware.

Q     Mr. Turnbull, I want to talk about some of the issues that you identified in your declaration with the sale process itself.  One of the things that's discussed is the notion of requiring the deposit.  Why would requiring a deposit in this sale be an issue?

A     Generally speaking, the deposit is an important element in the sale process because it commits parties to the transaction. And there's consequences if they don't do what their purchase agreement or other aspects of the deal require them to do, and that is the loss of the deposit.

Q    Okay.  And so in your view, was it appropriate to have a deposit for all of the bidders here?

A    Definitely.

Q    I'm sorry?

A    Definitely.

Q    Okay.  And were there deposits required from all the bidders?

A    No.

Q    Okay.  Who was the deposit not required from?

A    The stalking horse was not required to put a deposit up to be qualified or to participate in the auction.

Q    And how does that impact the sale process?

A    Well, I think it creates an unlevel playing field because, effectively, one party is only as good as their word in their document with no dollars to back it up, especially if it's an SPE entity that perhaps has no wherewithal or assets.  And all of the other people that have to put up real money deposits, $2-1/2 million or $25 million, they have consequences if they don't do what they're committing to do.

Q    But the stalking horse did fund part of the DIP, correct?

A    They did.

Q    Okay.  Was that DIP part of its deposit initially?

A    It was not.

Q    The bidding procedures gave the Debtor the discretion to select a backup bidder.  Is that correct?

A    That's correct.

Q    In your view, what is the significance of selecting a backup bidder on the sale process?

A    It's a safety net or an insurance policy that if notwithstanding the deposit, if the successful bidder has a deposit and they breach their contract and they won't close, you don't have to do two things.  You don't have to start again, which is a busted sale process, as I think about it in the market.  The market is generally not going to perceive that well from a value perspective, but it also saves a lot of time because you have certainty of a transaction alternative that you can proceed forward with to close.

Q    And you heard Mr. Snyder's testimony the other day that it keeps the person in the lead honest.  Would you agree with that?

A    Absolutely, because there's a consequence.  There's someone sitting there who wanted to buy the assets and keeps them honest.  That's right.

Q    Right.  In order to be a qualified bid, all bidders were required to agree to be a backup bidder, correct?

A    All of the bidders that were, I think, before the stalking horse bid was a qualified bid.  Right at the get-go, the stalking horse was not a qualified bidder.  My understanding of the bid procedures were if you were going to submit a bid, at that point you were subjecting yourself to being a backup

bidder.

Q    Okay.  And did that requirement apply to the stalking horse?

A    I believe so.

Q    So you believe the stalking horse, by virtue of being the stalking horse bidder, was required to be a backup bidder?

A    Only if they bid at the auction.

Q    So if the stalking horse bid was ultimately the one approved, they wouldn't have to be a backup bidder?

A    Off their original bid, correct.  But --

Q    What impact does --

A    But -- I'm sorry to finish that.  But if they were approved on their original bid, there wouldn't be a backup bidder because they would be the only bidder.

Q    What impact does that have on the sale process?

A    The fact that there was a disparity between being a backup bidder or not.  The uncertainty of whether the stalking horse was willing to commit to being a backup bidder, as I thought they were obligated to under the bid procedures, creates uncertainty because now, again, you have, if you otherwise had two bids that are equal -- and I know that's a difficult thing to sort of get to -- from a Debtors' perspective, you would take the one who's willing to be the backup bidder and make them the backup bidder.  And the one that was not willing to be the backup bidder, you'd make them the successful bidder

because then you would have the safety net.

The problem with that is competing bidders know that dynamic and, therefore, they're bidding with a disadvantage that the process sets up.

Q   In your deposition, you were asked about communications outreach that bidders had had to you directly.  Do you recall that?

A   I do.

Q   Okay.  And how would you describe the frequency of the outreach that bidders had to you?

A   It was at different amounts at different times in the process, but there was a common theme when bidders were calling me.  And that was that they were uncomfortable with the Debtors' process, they weren't trusting, and they wanted to understand where the Committee was.

I don't know if that's because they had seen the pleadings, the declarations, and the like that the Committee had filed associated with bidding procedures in the DIP, or if they were otherwise disenfranchised by the communications they were having with the Debtors.  But I think they were looking for assurance that the Committee was oversight, aware, and knowledgeable about what was going on, and perhaps would help them ensure that the playing field could be as level as possible.

Q   Based on your conversations with those bidders, what would

you say the market level of confidence was in the process?

A     Low.

Q     Why?

A     People were calling me, sort of telling me that they thought this was set up for the stalking horse to be the winner.  It was difficult to compete.  I had one bidder send an email out to the Debtors and myself said --

MR. INGERMAN:  Your Honor, I'm going to object on hearsay grounds.  He's talking about what other bidders are saying.

THE COURT:  Response?

MR. ZLUTICKY:  Your Honor, this is hearsay testimony, and he's been qualified as an expert according to his declaration, and he's allowed to testify as to what informs his opinion that the process was unfair.

THE COURT:  What is the hearsay exception?

MR. ZLUTICKY:  The hearsay exception is that he's an expert under 702, and an expert can rely on hearsay for his opinion that a market process was not run fairly.  And I'm asking for the support for his opinion that the market process was not run fairly.

THE COURT:  Okay.  Response to that?

MR. INGERMAN:  Your Honor, he can certainly rely generally.  He can say the basis of my opinion is the things I heard from other bidders, but he's not permitted to put the

actual hearsay into the record, what the other bidders said.

MR. ZLUTICKY:  Your Honor, the one thing I would say in response to that is we are not offering this statement for the truth of what these folks told him.  We are simply relying on it for what he is saying he was told and how that informed his opinion.

THE COURT:  It may or may not have been true what they said, but here's what they said to me.

MR. ZLUTICKY:  That's exact -- it is not being offered for the truth of what they said.  It is not being offered for the truth of the statement they told him.

MR. INGERMAN:  Your Honor, that's exactly why he's offering it.  And, by the way, he said it was hearsay.  That's what Mr. Zluticky said.  It's hearsay.  And it's allowed in through the expert.

THE COURT:  You did say that.

MR. INGERMAN:  So, obviously, he's offering it for the truth.

MR. ZLUTICKY:  Your Honor, also, Mr. Robichaux testified about conversations that he had with multiple other individuals yesterday, including us.

THE COURT:  Is that the goose for the gander --

MR. ZLUTICKY:  I mean, I don't remember --

THE COURT:  -- exception to the hearsay?

MR. ZLUTICKY:  Well, I don't remember the year of

that case.  Under goose v. gander, I would argue that hearsay, you know, we've been pretty liberal so far, and he is an expert.  He's simply talking about the auction.

THE COURT:  I'm going to overrule the objection.  I mean, very close call, but you can cross-examine away on this later.  And so I'll admit it.

BY MR. ZLUTICKY:

Q    Mr. Turnbull, can you please answer the question?

A    Could you please restate it?

(Pause)

THE COURT:  He's forgotten after all this.

BY MR. ZLUTICKY:

Q    I knew you were going to ask me that.

A    Thanks for setting me up.

Q    Mr. Turnbull, leading up to the auction when you were speaking about the market process and the conversations with buyers that you were having and that your testimony was confidence was low.  Why is that?

A    The buyers who called me indicated they were uncomfortable with the process, their ability to get a fair shake, for lack of a better term, and that this was a situation where they were concerned that the field was tilted heavily in favor of the stalking horse.

Q    Mr. Turnbull, did you attend the auction that occurred or began on November 18th?

A    I did.

Q    And at that auction, how many Holdco bidders attended?

A    Three.

Q    One of those was the stalking horse, CPE?

A    Correct.

Q    And the other being Genie?

A    Genie was --

Q    And the third being Olumie?

A    Correct.

Q    Was Olumie qualified as a bidder?

A    They were not.

Q    Were they allowed to participate in the auction process?

A    No.

Q    Did you agree with that decision?

A    No.

Q    Why not?

A    There were certainly infirmities, to say the least, with what they had submitted, the process under which they had submitted it.  But my sense was to bring another party in the room, explain to them where the opening bid was or, at that point, the otherwise next highest bid and what they needed to do in order to be put forth a competing bid.  They may very well have said, well, we can't do that, in which case it would have been over.

     But why not define exactly what you need to do to bid in

order to have a higher and better bid?  I mean, when I'm running a sale process, my general theory is I don't pick the winners.  I tell people what they need to bid to be the winner, and they choose whether they want to do it or not and, therefore, decide if they want to be the winner, so to speak. And I, of course, go to the next party and do the same thing.

By creating that certainty and telling people what you need to do, you know, like I said, they may not do it.  But that's their choice, not mine.  So I would have let them in.

Q    And you heard the testimony yesterday, though, that one of the reasons Olumie was not qualified to bid was its inability to show that it could finance the transaction.  Did you hear that?

A    I did.

Q    Okay.  Was committed financing a requirement to become a qualified bidder?

A    The Debtors modified the process to make it clear that it did not need to be committed financing to be qualified.

Q    And was that something that was expressed to all the bidders, to your knowledge?

A    I don't know who the Debtors told that to or not.

Q    Are you aware of any bidder they didn't tell that to?

MR. INGERMAN:  Objection.  He said he doesn't know.

THE COURT:  It looked like he was thinking.  I don't know.

THE WITNESS:  Well, I'm not convinced I can tell you.

THE COURT:  Overruled.

THE WITNESS:  The way you phrased your question, how would I know what they didn't tell people?  That would be difficult for me to do.

THE COURT:  Okay.

MR. ZLUTICKY:  Sounds like sustained.

THE COURT:  Move on, rephrase.  That's, yes, sustained.

MR. ZLUTICKY:  Mr. Turnbull sustained my objection.

THE COURT:  Yes, he did.

(Laughter)

MR. INGERMAN:  My objection.

THE COURT:  Sustained his objection.

THE WITNESS:  That was payback.

MR. ZLUTICKY:  Well, you made it;  He sustained it.

BY MR. ZLUTICKY:

Q    Okay.  So at some point during the auction, did you become aware of an issue referred to yesterday as PA-22?

A    I did.

Q    What is your understanding of what the PA-22 issue was?

A    So there are 22 facilities in the state of Pennsylvania, hence the PA, that are subject to a lease.  There was an amendment or a modification or some like put in place that provided the landlord with the ability to terminate that lease

on approximately 30 days' notice.  These facilities generated, as I understand, a little over $400 million in revenue.  I understand about $18 million of management fees and some amount of EBITDA.

This issue was raised to me by Mr. Farber on behalf of Genie 3.  At some point he was very -- he called very concerned, very upset, that this had not been disclosed to them by the Debtor overtly, but it's something that their team had stumbled upon by tearing through all of the lease agreements, and I think there are 27 leases or so.  So they had found this, and he wanted to know if I knew about it.  I knew nothing about it.

He was concerned because they were being asked to buy these assets or they were part of the assets being offered for sale when they could be taken away in 30 days by Welltower, and that was very concerning for him.

Q    What was your reaction when you heard that?

A    It sounded like it was a real problem.  I talked to the Debtors a little bit about it.  We talked about it with Committee counsel, thinking about it and how did this circumstance come about.

My understanding is there was some further investigation, discovery, that there was a plan perhaps to transition these to a generally loosely referred to it as a Landau-related affiliate as the new operator with Welltower terminating the

lease.  It wasn't certain at that point in time that this was going to happen, but it was a risk, and Mr. Farber had created in his original bid a scenario that said I'll pay more for the assets if the Committee or the Debtor or somebody can get this lease termination option removed.

I'll pay more because I'm getting more, or I'll -- and conversely, I think the structure was also I'll pay less if you can't get it removed.  And so it was sort of a motivation for the estate to try and get this provision taken away so he could retain the assets.

Q    Do you know if the Debtors worked to get that removed?

A    Not that I'm aware of.

Q    So auction begins, it begins with an announcement and Jefferies putting up the initial scorecard.  Do you recall that?

A    I do.

Q    Okay.  So we're going to turn to --

A    I think they actually handed it out.

Q    Yeah.  So we're going to turn to what I believe is Exhibit 31.

          THE COURT:  Are you talking about the scorecard?

          MR. ZLUTICKY:  I am.  The initial scorecard that began the auction, Your Honor.

          THE COURT:  Okay.  Is this Debtor 61 from yesterday?

          MR. ZLUTICKY:  No, it's actually Committee 31.

THE COURT:  Okay.  An earlier version is what you're saying?

MR. ZLUTICKY:  That's correct, Your Honor.

THE COURT:  Okay.

BY MR. ZLUTICKY:

Q    Mr. Turnbull, do you recognize this document?

A    Yes.  It looks like the scorecard materials that the Debtor/Jefferies handed out at the beginning of the auction.

Q    Had you seen a version of this document prior to the beginning of the auction?

A    When you say a version of this document, in the mediation process, we had looked at scorecards on how bids were graded. But I hadn't seen how the Debtors were grading --

Q    Well, we don't want to get into mediation privilege, Mr. Turnbull.

A    I understand.

Q    So the answer is yes.  It's yes, I just don't want you to invade --

Q    Okay.

A    -- mediation privilege.

A    Okay.

Q    This scorecard shows the initial value provided to the stalking horse bid of $122 million more than Genie 3's initial bid.  Is that right?

A    That's correct, at the very bottom of the page.

Q    Okay.  Did the Committee agree with the values on this scorecard?

A    No.

Q    Did the Committee express those views to the Debtors?

A    Yes.

Q    Did the Debtors incorporate those views into this chart before the auction began?

A    No.

Q    Okay.  When you first saw this scorecard, what was your reaction?

A    I was concerned.

Q    Why?

A    I felt that the scorecard was -- didn't include the Committee's input.  It was biased heavily in favor of the stalking horse.  And that by creating Genie 3 at $122 million opening disadvantage vis-a-vis the stalking horse, plus the overbid, let's call it $130 million requirement for that first bid, I was afraid that Genie 3 would rub their hands together, say thanks for nothing, and walk away.  And we would have no auction because of the way the scorecard had been presented.

Q    Genie 3 ultimately did submit a topping bid, though.  Is that right?

A    Thankfully, they did.

Q    Okay.  And at the next round of bidding, I believe, was the first time the stalking horse included a provision called

Bold Quail in their bid. What is your knowledge of Bold Quail?

A So Bold Quail is a joint venture that the Debtors have an interest in. It was something that I think was testified yesterday that they were trying to seek a -- the Debtors were trying to seek a resolution with the Bold Quail joint venture partner to resolve their differences. And I think Mr. Robichaux testified that he had advised Mr. Rowan sometime in October that those settlement discussions had broken down.

When in the stalking horse's first opportunity to bid at the auction, after Genie 3 raised their bid, $130 million, in that first step, thankfully, the stalking horse introduced that they were going to bid with the Bold Quail proceeds based on the agreement that the Debtors had reached the night before or signed the night before.

It was the first that apparently Rowan Farber and Genie 3 team had heard about the settlement. It was the first I had heard about the settlement. Everyone was sort of perplexed by it. I knew there were some discussions going on about it that Mr. Robichaux had talked to me about, but I didn't know that it was done. And clearly, Genie didn't know that it was done.

Q And do you remember what the approximate proceeds were to the estate or available to the bidders if you include the Bold Quail settlement?

A The settlement itself was about a $60 million benefit right out of the gate.

Q    So wait a minute.  So if that Bold Quail settlement had been disclosed prior to the auction beginning that day, what would have been the delta that Genie would have had to overcome just the top initially?

A    Well, if they'd used the $60 million as part of their first deal -- in other words, we won't buy the assets.  We'll let the settlement go through and take the $60 million in proceeds -- it would have been $130 million minus $60 million.  So you would have had a $70 million or so difference.

I think the part that concerned me most about it was, though, it felt like the Debtors had allowed -- the Debtors and the stalking horse had allowed this settlement, $60 million when we were dealing with a $10 million overbid, to be completely unknown to the Committee and completely unknown to the bidder.  If the first round Genie hadn't stepped up and put $130 million on the table, we never -- who knows when we would have found out about Bold Quail.

Frankly, I was very disappointed.  It felt disingenuous to me that such a big, significant issue was introduced only after Genie 3 said, I'm serious, I'm here to win, and they put 130 of other consideration on the table without the 60.  It was a problem.

Q    And nevertheless, bidding kept continuing, and the parties went back and forth and kept increasing their bids.  Is that right?

A    So Genie added the $60 million to their bid and reduced their promissory note as a result of it as their next round, because they only needed to go up by $20 million, the $10 million increment over where the stalking horse was, plus the 10 they were behind effectively.  So they did, yes, the bidding continued on.

Q    Okay.  And you said they increased their cash but decreased their promissory note.  I think as we've established this morning, I'm not very good with numbers.  So is cash more valuable than a promissory note?

A    If they're the same amount, yes.

Q    Mr. Turnbull, there was a discussion yesterday about at some point going to a sealed bid process on day two.  Do you recall that testimony?

A    I do.

Q    Okay.  And did you have discussions with Mr. Robichaux about going to a sealed bid process?

A    We did.

Q    Did you think that was the right decision?

A    I actually went to Mr. Robichaux with the thought process there should be a sealed bid and explained to him why I thought that was the case.

Q    Why is that?

A    So at the end of the first day, it was getting late in the evening, and the last bid that Genie had put on the table was

to increase their promissory note. I can't remember. I think it might have been somebody yesterday, I think it might have been Mr. Snyder, testified that later in an auction people start bidding funny money.

When people start increasing the promissory note, my interpretation was perhaps they're losing -- maybe they're running out of steam, maybe we are getting near their quote/unquote ceiling. My general view is if you have two bidders who are bidding, they both probably come to an auction or have a ceiling of how much they'll pay. If one bidder's ceiling is much higher than the other bidder's ceiling, you should probably try to go to a sealed bid to take advantage of the party with the higher ceiling's flexibility to pay a lot more than the other party, because they'll only pay as much as they have to from a competitive perspective.

So really what happens is in that dynamic, it's a question of timing. When do you do that? When do you think you're making a call? My view at that time was, and I talked to the Committees and other advisors and some of the Committee reps about this, we felt that the stalking horse and Welltower is sort of a combined beneficiary of the stalking horse bid, had a greater ceiling than Genie 3, and we wanted to try and tap it.

So we encouraged the Debtors to think about a stalking horse or a sealed bid process on the first night. The decision was made to come back the next morning, let the stalking horse

bid once more.  I was comfortable because the Debtors were having lots of conversations with the stalking horse, and presumably that meant they were confident the stalking horse was going to bid again, and then we would move straight to a sealed bid.

So that was the sort of evolution of how we ended up sealed bid.  I spent some time writing out what I thought were the appropriate provisions to be put on the record.  I shared them with the Committee team.  Mr. Robichaux, Mr. Finger, and I spent some time talking about those provisions.  Ultimately, that was the path and everyone agreed that that was the right place to go.  Mr. Robichaux took my notes and read them into the record quite well, given my handwriting.

Q   Speaking of your handwriting, not that we need to put this as an exhibit but --

A   Those are my notes.

Q   Yeah.  So, Mr. Turnbull, sealed bid process happens, bids are open.  I think there's been a lot of discussion of how things unfolded after that.  I want to get to a couple of specific points, and then I really want to get to the scorecard.  So the first is the bids were open, and then we had clarification calls with both bidders.  Do you recall that?

A   I do.

Q   Did you attend both of those clarification calls?

A   I did.

Q    Okay.  And on the CPE call specifically, you asked

questions.  Is that right?

A    I did.

Q    Okay.  And one of your questions was about the $25 million

promissory note that was included in CPE's final sealed bid,

right?

A    Correct.

Q    What was your question about?

A    So I guess the comment on handwriting is appropriate.  In

the materials that were submitted, there was a word that within

the Committee professionals, we were debating what it said.  It

turns out the word was "amortizing," but there were a variety

of different estimates of what that word was.  So I had asked

the question of CPE to clarify what that word was.

Q    And what was CPE's response?

A    The immediate reaction from CPE was, well, this is a note

that has a value of $25 million, and went on to explain that

the word was, in fact, amortizing.  And to me, again, words are

-- words are important.  They matter.

     Nobody asked about value.  And so to me, it just said it

was a $25 million note on what was written.  We were very clear

in the rules.  Bids are the bids, and there's no modifications

of them.  But if the answer was that the stalking horse bidder,

CPE, had no idea what the bids were, hadn't seen them, knew

there was going to be a clarification call, and I just asked

about a word, it said to me, hmm, seems like it would be strange for them to get on the call and bid against themselves and make the value 25 instead of the face amount of 25.

Made me wonder, sounds like somebody broke the protocol and talked to them.  I don't know if they did.  Very strange that they'd start the call by bidding against themselves otherwise.

Q    And without getting into everything that happened after, December 1st, Debtors hold the -- they conclude the auction and announce CPE is the high bidder, correct?

A    That's correct.

Q    Okay.  And did they release a final scorecard to the bidders to show how they scored the bids on that day?

A    No, they were asked to, and they said they were not prepared to.

Q    Okay.

A    Or not willing to, sorry.

Q    What was your reaction to that?

A    It was inconsistent with what we had conceived with the Debtors.  I don't think there was any reason to hide behind the evaluation of what the process had entailed for 10 or 11 days. Everyone had been patient.  Everybody had waited.  I didn't understand why they couldn't share the results of their analysis.  It's not like they didn't have time to prepare.

Q    Okay.  But they ultimately did share a version of their

scorecard.  I believe that's the Exhibit 61 that the Court was referring to earlier.

A    Which I did not create, for the record.

MR. ZLUTICKY:  So, Your Honor, we have a demonstrative exhibit that we've given to everyone that we'd like to hand up to the witness, if that's okay.

THE COURT:  All right.

MR. ZLUTICKY:  And we have extra copies if Your Honor would like one, as well.

THE WITNESS:  Thanks.

MR. ZLUTICKY:  My law clerk has just handed me -- these are the documents --

MR. ZLUTICKY:  Your Honor, may I approach?

THE COURT:  You may.  I'm not sure.  Were these sent through Hawaii?  Is that why?

MR. ZLUTICKY:  I think so.

THE COURT:  Okay.  We'll just make sure we have it.

MR. ZLUTICKY:  I think that's probably the same one.

THE COURT:  Okay.  Thank you.

MR. ZLUTICKY:  Okay.

BY MR. ZLUTICKY:

Q    So, Mr. Turnbull, can you describe to me what this exhibit is?

A    Sure.  So, this is taking the Debtors' scorecard schematic generally.  The first two columns of number under Debtors'

views for the stalking horse, CPE, and for Genie 3 and the Debtors' assessment of value, you can see down at the bottom of the page, this is the billion dollars or so in the Genie 3 bid. The separation, which I think the Debtors have at approximately $17 million, based on the various ways they've assessed the bid.

To the right is the Committee's scorecard in this format. And what's highlighted in this table in this sort of squared-out boxes are a few significant differences between the Debtors' view and the UCC's view. The $17 million at the bottom and the delta between the two bids for the Debtors' view is in comparison to the $256 million difference in the UCC's views. Both, of course, both scorecards favoring Genie, both the Debtors and the UCC, but obviously by a very significant difference.

Q    So, even under the Debtors' map, Genie 3 is still the highest bid?

A    Correct.

Q    By at least $17 million?

A    Which I know keeps getting referred to as 2 percent. It's 2 percent of the entire transaction value, sure. But from an unsecured credit recovery, it's a lot more than 2 percent.

Q    When you get into the billions, 2 percent tends to be a pretty high number?

A    I don't get into the billions that often.

Q    So, let's not go through every line by line of this because we'll be here all day and I'll be like four hours over on my time.  But let's just go through the major four points. Number one, on promissory notes, it says that the Genie 3 promissory note was valued by the Debtors at $67 million and the Committee valued the promissory note at $80 million.

Do you see that?

A    I do.

Q    What's the reason for that difference?

A    There's a timing -- there's two elements of it.  I think the perhaps biggest piece will be the fact that the Debtors used a discount rate of the cash flows of this note of 18 percent.  The higher the discount rate, the lower the value. And the Committee used 13 percent.

I think one of the important elements here is when thinking about the discount rate is you're effectively trying to put a number on what is the likelihood of payment.  I believe that there should be a lower discount rate than 18 because this is a note that's going to be outstanding from an entity where we know two things are happening.  There's $120 million of equity capital being infused into the transaction, which would be junior to this note.

There aren't many people I've ever come across that would invest $120 million and not expect a return on that.  If the $120 million equity investor gets a return, this note's not

worth $80 million.  It's worth a hundred -- there's $100 million of payments plus interest.  So I think the likelihood of getting repayment is greater than the Debtors gave rise to, and that's why you have a separation in the discount rate that are used.

Q    And that results in a difference of a $13 million increase to the Genie 3 bid under the Committee's view?

A    That's correct.

Q    So the second box that's highlighted is the term loan of Welltower and Omega.  The Debtors valued CPE's assumption of the Welltower debt as consideration of $254 million for their bid, and the Committee valued it at $124 million.  Why the difference?

        MR. HALL:  Your Honor, I want to object.  Two reasons.  One, during Mr. Turnbull's deposition, the Committee asserted privilege and would not allow him to answer questions about the nature or the analysis of the alleged undersecured position of the Welltower/Omega senior debt.

        And secondly, Mr. Turnbull has no possible basis for knowing how this $130 million delta was assessed.

        THE COURT:  Response.

        MR. ZLUTICKY:  So, Your Honor, two things.  I'm not asking him for legal analysis.  I'm asking him for the reason between the difference between the two numbers.  If I start to get into what's the reason for why we believe it's

undersecured, totally fair to make a privilege objection, and I'd be happy to discuss it at that time. But right now I'm just asking him what the basis is for the difference.

And then second of all, Mr. Turnbull helped create the scorecard. He has knowledge of this issue, and he has knowledge of the basis for the scorecard.

THE COURT: All right. Overruled. You can cross on this. Okay.

BY MR. ZLUTICKY:

Q    What's the reason for the difference?

A    The Committee's professional team has spent a considerable amount of time looking at the collateral that supports the Welltower agented term loan facility and come to the conclusion that they believe the collateral value is insufficient to cover the $254 million of debt.

Q    And is that the basis for the objection or for the difference between the 254 and the 124?

A    That's correct.

Q    Okay. So how does the Debtor value the Welltower note for purposes of valuing CPE's bid?

A    They valued it at par.

Q    At par, no discount whatsoever.

A    Correct.

Q    And what's the difference in value if you take the Debtors' view of CPE's assumption of the Welltower debt?

A     I don't understand your question.

Q     What's the difference -- what's the impact of this difference on the bid?

A     I'm sorry.  I thought we already covered -- the $130 million.

Q     The next line I want to get to is the causes of action, and I'm not asking you to tell us the legal basis for evaluating the causes of action.  I'm just asking, there's a difference here between the Debtors' value of $32 million and the Committee's value of $100 million.  Do you see that?

A     I do.

MR. HALL:  Your Honor, I appreciate how you're going to rule, but I need the record to have the same objection for the same reason.

THE COURT:  Okay.  Overruled.

THE WITNESS:  So there's been a lot of discussion about the causes of action yesterday and less so today.  I think of there are three buckets maybe worth talking about here.  The first is the $15 million threshold, and that is the amount that is estimated by the parties that the D&O insurance policy will provide as recoveries related to claims.  And I think it's a $20 million policy, I think I've heard, and $5 million for either defense costs or inapplicability.  So that's the first 15.

To get to the Debtors' view of the Genie 3 bid,

there's an incremental $17 million related to causes of action against insiders who are being released under the CPE transaction or whose claims -- or the claims against who are being purchased by the buyer.  There's an incremental $17 million in their mind, in the Debtors' mind, based on what the Committee put together.

The difference between the 32 and the 100, which has really got two components in it, it's the value that the Committee's team put together that's greater than the $17 million against the release parties, as well as additional causes of action that the SIC did not investigate that weren't against the parties, the insiders, et cetera.  Welltower is the example, and from the Committee's team's work, there are significant claims.

The $100 million, as I understand, is a very conservative and illustrative number that has been put in here just to demonstrate how significant the separation is between the bids and the Committee's views, not trying to push the envelope at all, but trying to be reasonable and still coming up with a number that's not $17 million but hundreds of millions.

Q    So this is not, this $100 number is not how much the Committee values the causes of action, correct?

A    Correct.  It was just a conservative way of saying there is a significant benefit that the Committee views in the Genie 3 bid because these claims are left behind, and whether settled

or prosecuted, will give rise to considerably more

consideration to the bankruptcy estate.

Q    And the difference in value increases the score on the
Genie 3 bid by how much?

A    It increases it by $68 million.

Q    The last line I want to ask you about is the 1L litigation
estimate.  In the Debtors' scorecard, they decrease the value
of the Genie 3 bid by $28 million, and that's removed in the
Committee's.  Why is that?

        MR. HALL:  Your Honor, same objection for the same
reasons as the first two -- the above two boxes.

        THE COURT:  Okay.  Overruled.

        THE WITNESS:  So let me talk about where the 28 comes
from.  So we were advised that the Special Investigation
Committee did an analysis of the WAX/MAO term loan.  This is a,
call it a last-out participation in the Welltower agented term
loan, the 254 million-dollar-124 number we talked about above.
This is an interest that WAX/MAO acquired for $10,000 from
Welltower.

        The understanding we were given by the SIC's review
was that they felt that the likelihood that this claim would be
eliminated was 70 percent.  When we talked about it, they said,
well, it's never less than 10 percent from a litigation, so
this one we think is a pretty high likelihood.

        So what the Debtors did is they took 30 percent, the

chance of not successfully eliminating the claim, multiplied it by the $94 million or so of total claim amount, and said that's $28 million. That's a disadvantage to the Genie bid because of the 30 percent risk that the $94 million claim becomes legitimate.

BY MR. ZLUTICKY:

Q Okay. So there's a 70 percent chance the claim's gone. It's zero. So --

A According to the SIC.

Q Okay. So does that mean, is this binary? Does that mean there's a 30 percent chance that the claim's worth $94 million?

A Correct. It's --

Q According --

A -- under their math, it seems like I suppose you could perhaps there'd be a settlement or something. You'd have something in between. But if the claim's valid, the claim would be valid. And if it's not valid, it would be zero.

Q And what impact does this have on the difference in the values for the Genie bid?

A It's a $28 million difference.

Q Okay. So after accounting for those differences, what is the Committee's score of the Genie 3 bid over the stalking horse bid?

A The Committee's view is that there is, you know, $250 million of separation or more between the two bids. Candidly,

we were -- that's why we were so concerned, or I was particularly concerned at the beginning of the auction when we showed $130 million spread, because I felt the spread was a lot closer.

Frankly, I thought Genie's bid was better than the stalking horse's bid, and that I was concerned that Genie 3 would walk away.  There would be -- Olumie was already been dismissed at that point.  The auction would be over as quickly as it began, and we would be stuck with the stalking horse bid with no backup and with no overbids.

Q   Thank you, Mr. Turnbull.  You can put that exhibit away.

Very quickly, I wanted to ask you a couple of questions. You heard testimony from the Debtors that they're concerned about administrative insolvency.  Is that right?

A   I heard those comments made yesterday by, I think, particularly Mr. Snyder.

Q   That if the sale doesn't close by the end of March, there's a problem.

A   I heard that statement, too.  I heard something about there will only be $4 million of cash.

Q   Okay.  So under the stalking horse APA, what happens to all of the Debtors' cash at closing?

A   So the way that the stalking horse APA was structured -- unique, bizarre, whatever you want to call it -- was that they were not assuming sort of, for example, post-petition trade

obligations.

So the way the Debtors' team at Ankura have projected, right before the transaction closing, March 31st as an example, you know, the day before that, the Debtors would use its existing cash balance and disburse those proceeds to pay off all of the various administrative claims that would otherwise not get picked up.  Because the way the Debtors' APA with the stalking horse worked is if there was excess cash over $15 million, the buyer gets the cash.

So as Mr. Perry had said on various calls, we're going to do everything in our power to make sure there's no excess cash and we've paid every claim we possibly can because otherwise we're just giving money away.

Q    And the payables, if you don't pay them under the stalking horse APA, but they accrued before closing, who's responsible for those?

A    The estate would stay responsible.  And if you left cash on the table that was excess cash, then the buyer gets the cash.  You keep the payable.  Silly mistake.  So Mr. Perry's strategy was the right one, which is pay them all off before I get to the closing so there's no excess cash or minimize any excess cash and make sure you've paid everything you can.

That's why there would be $4 million.  It's because an affirmative decision you would make heading into the closing to sort of pay these amounts down, as opposed to if you were

rolling over into the next month for another month of operations, you would have considerably more than $4 million of cash.

Q     Under the Genie APA, what happens to the Debtors' cash at closing?

A     It's retained.

Q     Okay.  So would the Debtor have the same incentive to push all the cash out the door under the Genie APA?

A     I mean, they'd have the ability to make those disbursements post-closing, so there's less time pressure.

Q     Okay.  Under a Genie bid, if a sale occurred after March, would the Debtors still face this $4 million cash shortfall?

A     No, because what would effectively happen is the Debtors would operate on a go-forward basis for the month of April. And presumably if you were selling to the stalking horse, if it was determined that they were the best bidder, you'd be selling at the end of the month.  You'd do the same exact protocol on the last business day of the month, pay off all of the obligations, minimize the cash so that there was no excess cash, and you would just roll things forward.

I think one important consideration is how's the cash performed.  I went back and we looked at the Debtors' original budget back when we were talking about the DIP and the case and the two different pieces of paper.  The last report we received from the Debtors was that they had $94 million of cash.  I

think it was a week ago, Friday.  That budget from the beginning of the case estimated, ironically, that they would have 47, 48 million dollars as of the end of November.  They have doubled the cash that they expected to have at the beginning of the case.

So when we adjusted that, took out the ACO adjustments, catchup in professional fees because they've been higher than expected, take out the DIP financing, the Debtor has been producing round numbers over the actual period of time, about a million dollars of cash a week.  The expectation is, unless there's some aberration, one more month would mean you perhaps would generate a million dollars a week, call it 4 million dollars, maybe 5 through the closing.  But even if you don't -- even if you have a bad month and you generate zero, you'd be in the exact same spot one month later as you were at the end of March.

Q   So, Mr. Turnbull, I'm going to hand you two demonstratives that we sent over last night.

MR. ZLUTICKY:  I believe, Your Honor, these were the demonstratives you were looking at earlier when you were looking for the first demonstrative.

THE COURT:  Okay.

MR. ZLUTICKY:  I'm going to hand these to the witness, if I can approach the witness, Your Honor.

THE COURT:  You may.

MR. ZLUTICKY:  Thank you.

THE WITNESS:  Thanks.

(Counsel confer briefly)

THE COURT:  The ones you handed me.  Uh-huh.

BY MR. ZLUTICKY:

Q    So, Mr. Turnbull, there was a lot of discussion yesterday about a waterfall and about sort of seeing, okay, we see how the bids are scored, and we see the difference, but let's talk about how this money actually flows through in the case.

And you heard testimony that under the stalking horse bid, there would be $155 million for unsecured creditors, and under the Committee's -- under the Genie bid, which is the Committee's preferred bid at the moment, it wouldn't leave anything for the estate.  It could leave nothing.

Did you hear that testimony yesterday?

A    I did hear that testimony.

Q    Okay. So, these demonstratives are sort of in parallel, right?  You can kind of look at them side by side, but can you kind of explain to me what we're looking at here?

A    Sure.  So, what we tried to do is take the Debtors' scorecard, which I think there was some confusion created yesterday, and try and summarize.

So, maybe if we start with the first page of the packet that says, "Stalking horse, Debtors' scorecard."  Behind it, just to orient everybody, the second page of that stapled group

is the Genie bid, the Debtors' perspective on that, and then the other two stapled pages are the Committee's scorecard.

So, if I take the exhibit we were talking about for this one from prior, where we did the side by side, you'll notice that the box, for example, that says $984 million on stalking horse Debtors' scorecard, ties to this page, the one -- the exhibit we just -- or the demonstrative we just finished talking about, the 984 at the bottom. Those numbers in each of these four pages tie to those four numbers on the bottom of the page, just to try and orient.

What we were trying to do is sort of distill down, what are the forms of consideration coming into the transaction? So, again, sticking with stalking horse Debtors' scorecard just to orient us, what are the sources and uses of cash? So, the sources of cash would be the stalking horse's cash consideration of $40 million. There's the $60 million of Bold Quail cash. So, there would be a total of $100 million. There would be a requirement to pay down $55 million of Bold Quail-related obligations. This is between Welltower and White Oak. And that would leave $45 million of cash to go to the bankruptcy estate on a cash basis.

The other forms of consideration the stalking horse is proposing are on the left-hand side in blue boxes. So, the amount of assumed debt is $868 million. These are existing debt obligations that would be assumed by CPE going forward.

CPE is issuing $46 million of new notes that would be distributed to the estate.  And CPE is excluding two assets, the D&O proceeds and the preference claims for $40 million.

So, those are the components of the bid.  Cash, assumed debt, new notes issued by the buyer, excluded assets left in the bankruptcy estate that form the aggregate consideration of the bid.  And hopefully, this structure is helpful for all of the parties to understand how the scorecard gets to a value of $984 million.

There's one observation I will make, and that is that there's this Debtors' risk adjustment, which is immediately above the total bid value amount.  This is sort of the adjustment that the Debtors' scorecard factors in for the bidders.  This is $15 million in the CPE Debtors' scorecard on the basis of there would be a lot of litigation going on and a lot of incremental administrative costs, just like today.  The same number on the next page is the $28 million number that you saw the Debtors assess on the Genie bid.  That's the 30 percent risk that you have to pay on the WAX/MAO debt.

Q    Wait, are you describing today as a lot of litigation going on?

A    Yes.

Q    So let's focus on the Committee's scorecard for -- or actually, I'm sorry, the Debtors' scorecard for the Genie bid.

A    Okay.

Q    So can you walk us through how the cash flows under the Debtors' scorecard of the Genie bid?

A    Sure.  So the Genie sealed bid contemplated $259 million of cash, $60 million of cash coming from the Bold Quail transaction.  And then the incremental four, this is -- I just spoke about the excess cash.

So if you pay off all of the post-petition trade, for example, right before closing, and any excess cash would go to CPE, CPE would grab the $4 million of cash because that's an acquired asset because it exceeds.  And in this case, that cash would be available for distribution to -- or retention by the bankruptcy estate for distribution to creditors.

The uses of that cash would be because Genie is not assuming the Welltower/Omega term loans, you have to pay them off.  So that's $254 million to pay them off in full.  However, there would be the dispute about are they -- are they secured or not.  So that money would be funded into an escrow pending resolution of are they undersecured or not.

The next component that you see is you have to satisfy the DIP obligation.  The estimate is that would be about $34 million.  And assuming all of the money sits in the term loan escrow, there would be $35 million to go to the bankruptcy estate.

Q    And then below is the summary of the value of all the various components, correct?

A     That's right.

Q     Okay.  So now let's flip back to the stalking horse bid and the Debtors' scorecard.  Let's compare that side by side now with the stalking horse bid Committee's scorecard and how cash flows through.

      Can you explain to me how cash flows through on the Committee's scorecard and how that's different from the Debtors' scorecard?

A     There is no difference.

Q     So here it shows that there's $100 million of cash -- or $100 million usage, correct?  So $45 million to the bankruptcy estate?

A     That's correct.

Q     Okay.  And then the other items of consideration that would be given to the estate here are the assumed liabilities of 738, the $46 million note, $40 million in excluded assets, and then the risk adjustment for a total bid value of 854.  Is that right?

A     That's correct.

Q     Okay.  So now let's flip one last time for the Genie bid and the Debtors' scorecard and the Committee's scorecard.  So how do these two compare?

A     So as with the stalking horse bid, the cash -- the cash between the two scorecards is the same.

Q     Okay.  And in terms of the cash, however, the sources of

the cash were showing $323 million. But then when you get to assumed debt and you get to the new note and the excluded assets, we're starting to see some differences. And this is what we talked about on the scorecard at the beginning.

So can you kind of walk the Court through how those flow into the ultimate --

A    Sure. There's no difference between the Debtors' scorecard and the Committee's scorecard on the assumed liabilities under the Genie debt. The only differences are what is the value of the promissory note -- or I guess what are the values of the promissory notes because there are two. Well, no, sorry. In this case, there's only one.

What's the value of that promissory note? This is the 80 million dollars versus the 67. As I spoke about earlier, the difference in discount rate being a big significant contributor to that because there's a lot of equity capital and personal guarantees being put behind that. And then the biggest component here is instead of leaving behind $59 million of assets for the estate

(Audio interference from Webex)

THE COURT: Everyone should have their device on mute on the video.

MR. ZLUTICKY: Not so well.

THE COURT: Mike?

(Audio interference from Webex)

THE COURT: Okay, you're busted. Brendan K. Cassaw (phonetic), you need to put your device on mute. Okay, we'll cut you off if we unfortunately get another disruption.

Okay, thank you. I'm sorry, go ahead.

THE WITNESS: Okay, no problem. So the biggest difference here is the amount of excluded assets that Genie's bid is leaving behind. And sort of the large issue, of course, is it's not related to the D&O proceeds. It's not related to the preference claims, which I think the Debtor and the Committee agree on. The difference here is the value of the causes of action. This is the incremental claims. This is the 100 million-dollar difference versus the 32. That's what's giving rise to this significant difference.

BY MR. ZLUTICKY:

Q   And so under both scorecards, is there sufficient cash to set aside to pay the WAX -- or the Welltower/Omega term debt in full if the Court rules against the Committee on literally every single objection the Committee has to the Welltower and Omega secured claim?

A   Correct. There is sufficient cash to pay that in full.

Q   And fund the DIP?

A   And fund the DIP.

Q   And under the current projections, as the Debtors have already stated, all admin fees will be paid in full, and there's still going to be another $4 million left over?

A    All admin claims, not just fees.

Q    So really, all we're sort of talking about left in terms of secured loans that are not being assumed, because White Oak's being assumed, IRS is being assumed, is the WAX/MAO claim, correct?

A    That's correct.

Q    The one they bought for $10,000?

A    Correct.

Q    Okay.  Do you think they'd give it back to us for $11,000?

A    No.

Q    Okay.  But if we did litigate with them, and we've certainly asserted this, if ultimately the WAX/MAO claim is determined to be an allowed secured claim, will the Debtors have sufficient assets to pay that claim?

A    Yes.

Q    And you heard yesterday Mr. Snyder testify that this is somehow a litigation plan, that it could take years to litigate against WAX and MAO, that they're sophisticated parties, they're not going away any time quickly.  Does that stop payments on the promissory note from coming in?

A    No.

Q    Okay.  Does that stop the liquidating trust from pursuing the preferences?

A    No.  And I think what you're also -- the step you're skipping is, does it stop the sale, the patients, the

employees, and everyone from leaving the bankruptcy?

A    No.   That happens.

Q    And that's the same with Welltower and Omega, correct,
because their --

A    Correct.

Q    -- claim is being escrowed in full, even if they win, even
if they're right?

A    That's correct.

Q    Okay.  So is there any impediment by the structure of this
to the closing of the sale?

A    Not that I'm aware of.

Q    Okay.  And is there anything in either the Debtors' view
or the Committee's view that would lead to the estate being
administratively insolvent, they're not able to pay its claims
on the Genie bid?

A    Not that I'm aware of.

Q    Okay.  And so really we're talking about when we maybe get
to a plan, what maybe happens with WAX and MAO.  Is that right?

A    Correct, if their claim is -- if there's been an allowance
or a disallowance or if it's still a pending dispute.

Q    Yeah, and I'm not going to ask you for your opinion about
the indubitable equivalent or anything like that.  But you're
generally familiar that secured claims can be treated various
ways under the Code?

A    Correct.

Q    Okay.  And the Court's an expert on that.  I'm not going to ask you to opine on that.

A    Good.

Q    Mr. Turnbull, was this marketing process run fairly?

A    No.

Q    Was the auction process and marketing and sale process conducted in good faith?

A    I want to say yes, but there are issues that happened in the process that caused me pause.

Q    Are there any issues that caused you pause other than what you've already testified to today or in your declaration?

A    Yes.

Q    What are they?

A    So two issues that I think have come up, and they sort of -- they touch on the same thread.  The first one is this question about Mr. Schwartz and his involvement.  The auction continued on, notwithstanding the issue being surfaced on the second day.

If it was going to become a deciding factor and people wanted to reserve the right for that, maybe they didn't know very much or didn't know enough at the point in time, so I guess I can as the benefit of the doubt, perhaps, maybe on that one.  But the auction continued on, notwithstanding the risk of that being sort of a disqualifying item, sort of as something the Debtor might bring up.

The one that I think I heard yesterday that's more concerning, which is a perspective, is that while the Debtors permitted bidders to qualify as a bidder without committed financing, yesterday the Debtors indicated it could have been a standard under which they would disqualify or effectively choose the winning bidder.

If that's the case, then I would say that the auction was conducted in bad faith, at least, on the basis of we were asking Genie 3 to bid up.  This is to the detriment of the stalking horse.  We were asking Genie 3 to bid up, knowing that they didn't have committed financing, knowing that we told them, you don't have to have committed financing.  And then at the deciding hour say, you know what, committed financing is a reason to effectively consider your bid no longer comparable from a dollar's perspective.

If I'm the stalking horse or, frankly, if I'm another bidder and I've been bidding against somebody who, I mean, they've been using another bidder to bid me up, and then they just yank the rug out from underneath the other bidder after I've raised my bid $150 million, I'd be quite upset about that.

And I think it speaks to the overall process, which was it wasn't clean.  It wasn't done as it should have been done.  And I don't know why.  I can't figure out.  I don't understand the motivations.  It's troubled me.  I wake up thinking about this case because it seems crazy that we find ourselves on this

square with this -- with this record.

Q    Mr. Turnbull, if committed financing was going to be used as a reason to score someone's bid higher and you didn't receive committed financing from both parties, what would you do when you saw those bids and you went to those parties at the end?  Would you just tell them, I'm sorry, you don't have committed financing, you lose?

A    Thanks for helping me bid up the people who did.  I mean, that's the problem.  It's not right.

Q    Why wouldn't you go back to them and just ask them to go get financing commitments?

A    Getting a financing commitment costs money, as I think was talked about yesterday.  Not just commitment fees, but in many cases work fees.  It takes time.  I don't think it's market.

It would be great if you could have all 363 auctions where there are deposits.  There's no limitation for liquidated damages to the deposit amount.  You've got unlimited damages, specific performance remedies, and everybody had to come with committed financing.  But that's not reality.  That's not where 363 processes are.  From a seller's perspective, at least, it's unfortunately not where they are.

That's reality, though.  You can't expect to be able to drive a competitive auction dynamic.  You get a deposit so it's painful, but you're not going to get committed financing.  I don't think that's market.  I think the Debtor chose correctly

to qualify people, but I don't think they can assess bids when people have put up real money, they're making real representations, they've got a real money deposit up.  It's just -- it doesn't seem appropriate to me.

MR. ZLUTICKY:  Your Honor, I have no further questions for this witness and pass the witness.

THE COURT:  All right.  Let's discuss timing real quick.  Are we going to have any other direct examination?

(No audible response)

THE COURT:  Okay.  So after we break, we'll go to cross.

Brock, do we know anything about my 2:00 docket at this point?

MR. GILES:  (Indiscernible).

THE COURT:  Oh, just one thing.  Okay.  So we're going to take a late lunch break.  I have a very short 1:30 docket and a very, very short 2:00 docket.  I'm talking five minutes probably for each one of those.  So I'm thinking we'll go -- well, we'll see -- I'm thinking 1-ish to allow staff to take a lunch break.  We'll probably take a lunch break 1-ish to 2-ish.  But let's take a 10-minute break right now and we'll resume.

THE CLERK:  All rise.

(Recess at 11:58 a.m./Reconvened at 12:12 p.m.)

THE CLERK:  All rise.

THE COURT:  Please be seated.  We're back on the record in Genesis Healthcare.  We will resume with the testimony of Andrew Turnbull.  And we're ready for -- whoops.

MR. INGERMAN:  Sorry, Your Honor.  One quick housekeeping matter on the exhibits.

THE COURT:  Can you come to the podium --

MR. INGERMAN:  I'm sorry.

THE COURT:  -- just so we make sure we get it on the record clearly?

MR. INGERMAN:  Thank you.

Brett Ingerman, DLA Piper for CPE.

THE COURT:  Okay.

MR. INGERMAN:  I have determined at the break that all of CPE's exhibits are subsumed in the Debtor exhibits that have been admitted.

THE COURT:  Okay.

MR. INGERMAN:  And so just, I only have five, so I'll put them on the record real quick with the corresponding numbers.

THE COURT:  Okay.

MR. INGERMAN:  If that's okay.  So CPE Exhibit 1 is Debtor Exhibit 16 in evidence.  CPE Exhibit 2 is Debtor Exhibit 5 in evidence.  CPE Exhibit 3, Debtor Exhibit 14 in evidence. CPE Exhibit 4, Debtor Exhibit 13 in evidence.  CPE Exhibit 5, Debtor Exhibit 16 in evidence.  Thank you, Your Honor.

THE COURT:  All right.  So those are all in the record already.  We won't burden the record with admitting them twice.

MR. INGERMAN:  Exactly.  Thank you, Your Honor.

THE COURT:  All right, thank you.  We have some other housekeeping matter?

MR. AIKEN:  Your Honor, Leighton Aiken on behalf of Omega.  We had one exhibit on our exhibit list.  I've talked to the Committee, and they've stipulated to its admissibility.

THE COURT:  Okay.  And what is that?

MR. AIKEN:  It's the prepetition inter-creditor agreement and first amendment thereto between White Oak, the Debtors, and Welltower.

THE COURT:  Okay.  And so those -- it's one Omega witness -- exhibit?

MR. AIKEN:  Well, exhibit.  Yes, Your Honor.

THE COURT:  Okay.  So stipulation to admissibility?

MR. ZLUTICKY:  Yes, Your Honor.  Stipulated.

THE COURT:  Okay.  So that will be admitted.

(Omega's Exhibit Number 1 admitted into evidence)

MR. AIKEN:  Thank you, Your Honor.

MR. ZLUTICKY:  Thank you, Your Honor.

THE COURT:  Okay.  Thank you.  We will now allow cross of Mr. Turnbull.

(Counsel confer briefly)

THE COURT:  Again, I'm going to say we're going to break 1-ish.  But I say "ish" because if we're five minutes away from a good breaking point or something like that, we'll carry over as appropriate.

You may proceed.

MR. HALL:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. HALL:

Q    Good afternoon, Mr. Turnbull.

A    Good afternoon.

Q    At one point in your direct examination, you were testifying about excess cash provisions in the stalking horse APA.  Do you recall?

A    I do.

Q    And I think you pointed out that the stalking horse is picking up all the excess cash, correct?

A    Correct.

Q    And you said that Genie 3 is leaving it all behind, correct?

A    That's my understanding.

Q    Okay.  Could you go to Exhibit 21 of your binder?

THE COURT:  UCC or Debtor?

MR. HALL:  This would be Debtors' 21, Your Honor. And it should be a Genie 3/Genesis Healthcare APA.

THE COURT:  Okay.

MR. SIMON:  Your Honor, if you'd like, we could put it on the screen.

THE COURT:  Please.  Yes.

MR. SIMON:  Sometimes there's a lag, so.

THE COURT:  Okay.  Yeah.  And just to be clear, while we do this, the Debtors' exhibits were all delivered to my staff in a whatever you call those things, a link --

MR. HALL:  A thumb drive, or --

THE COURT:  -- a thumb drive or -- not a thumb drive but some sort of link.  And I have hard copy books from the Committee.  So sometimes it's just faster to do it this way for me.

MR. HALL:  Understood.

THE COURT:  Okay.

MR. HALL:  If we could just go straight to Page 30?

THE WITNESS:  Yeah, I'm there.

BY MR. HALL:

Q    You've already identified the excluded cash provision?

A    Correct.

Q    Okay.  So I'll let the courtroom catch up, and then I'll ask you my questions.  I just want to focus you on the last three lines of that excluded cash provision.  Would you agree with me that, after budgeted expenses, any remaining cash shall be purchased assets and paid over to the buyer?

A    So those are the words on the page.  I think this is a

tortured consequence of the structure that exists for the stalking horse agreement.  I'd have to go back and look at the transcript for the auction.  But the Debtors' scorecard contemplates that the $4 million of excess cash under the Genie bid is an available asset, so to speak, under the Genie bid.

So unless the Debtor is telling me that the scorecard they have is wrong, there's not some other agreement or that this wasn't the intent of the parties, then the sort of question's going to be okay, how are we going to deal with the fact that there's a DIP lender approving budgeted expenses and figuring out how much could be paid at the end of the budget and how much can't be paid, trying to force excess cash.

It's a consequences, as I said, of the tortured structure between an asset purchase agreement for a stalking horse who also is a DIP lender and has this bizarre concept of excess cash being an excluded, or an acquired asset.

Q   So you agree that the Genie APA includes excess cash as a purchase asset, correct?

A   I don't know if there will be excess cash in the Genie situation because of the way we've got this sort of issue to work through.

Q   But if there is.

A   I suppose technically, if this is the final signed agreement and this is what the parties intended, there is no modification of the auction, then I guess the words are what

the words are.

Q    Okay.  I want to focus on the scorecard.  Do you have a demonstrative --

A    Can I put this beast away?

Q    I'm  sorry?

A    Can I put this beast away?

Q    Oh, yeah, yeah.  We're not going back to that.

A    Sorry.

Q    So you should have the demonstrative which is the Genesis Healthcare Scorecard Comparison that you used on direct.  Do you recall that?

A    (No audible response)

Q    And can you also, just for convenience, go to Page 12 of your declaration which includes a Genesis Healthcare Scorecard Comparison with four boxes that identify differences.

A    I have them both in front of me.

        THE COURT:  Remind me of the number for his declaration you're --

        MR. HALL:  Yeah.  We'll put it up.

        THE COURT:  Okay.  I'll go to that instead then.

        MR. HALL:  Your Honor, may I approach the bench?

        THE COURT:  Oh, you've got a hard copy.  Great. Thank you.

        MR. HALL:  Your Honor, do you have both?

        THE COURT:  I have both.

BY MR. HALL:

Q    So you've identified four differences between the Debtors'
view of the value of the bids and the Committee's view of the
value of the bids, correct?

A    We identified four for purposes of this demonstrative/
table in the declaration, correct.

Q    And if I recall your earlier testimony, the key difference
is the causes of action, correct?

A    I don't know that I testified it's key.  If you're an
unsecured creditor and your recovery is $21 million, I think --
or sorry, if the difference between the bids is 5 million -- or
is $21 million, and that's you know, the question is how do you
define key?  I mean, all of the differences are meaningful,
whether it's a $6 million difference or $130 million
difference.  They're all important.

Q    I notice that in the demonstrative, the delta is $13
million increase to Genie 3 bid, correct?

A    Associated with the note?

Q    Correct.

A    That's correct.

Q    And in your declaration, the delta is $6 million, correct?

A    Correct.

Q    And I also notice that -- well, let me back up for a
second.  This demonstrative is intended to reflect the
advantages that the Committee believes Genie 3's bid should

have received but didn't?

A    I don't know that I really follow your question.  The advantages that Genie 3 bid, do you mean --

Q    The increases in --

A    -- the assessment that one would use when comparing an apple and an orange?  Is that what you mean?

Q    The increases to Genie 3's bid value that Debtors did not provide to Genie that the Committee believes the Debtors should have.

A    I understand.  So you're saying that what it's intended to, isn't intended to -- or maybe I'll just state it in the affirmative.  It is intended to identify the differences between how the Debtors score bids and how the UCC is scoring bids.  And these four items are mechanisms in which the Committee scores the bids greater in Genie's favor relative to what the Debtor's scoring them as.

Q    Is that what the purpose of this chart is?

A    I think it was also to try and focus people on as few items as possible and talk about where the real differences are between how the Debtors scored the bids and how the Committee scores the bids.

Q    Is the Debtors' view column in this chart in your declaration historical?

A    The Debtors had a variety of different disclosures.  When we put this together late on whatever the day you took my

deposition, we put it -- I put it together with the information I had at that time.  It was not predicated on what had been filed on the record or anything like that which was more information.

But, as I think we clearly identified between you drilling me for seven hours and then trying to get a declaration done before midnight, there was no time to look at anything else.

Q    Okay.

A    If that's what you're getting at.

Q    What I'm getting at is the demonstrative's not just a replication of your testimony through your declaration as evidenced by this chart, correct?

A    I mean, we updated a few items on the demonstrative last night.  Frankly, we actually updated them the first night before the hearings, before yesterday's hearing, and then updated again for the best information we had at that time on how the Debtors were scoring.  So you see in the top part of this category, in the purchase consideration, I believe the only modifications are to how the Debtors are scoring the bids.

We changed the 21, or the 23 in the declaration to 21 as the Debtors' score CPE's promissory note.  And the 73 as the Debtors scored Genie 3's promissory note to 67.  The Debtors modified its behavior or how it's scoring bids from what we had understood before.  We did not with I guess the exception, CPE we reduced from 24 to 21 on the promissory note, as well.

Q    That was on --

A    So we reflected the Debtors' view of it.

Q    And the reduction from 24 to 21, that was an update that the Committee -- well, was it an update that you performed subsequent to your declaration?

A    No.  We were taking what the Debtors projected as the CPE -- of the value of the CPE promissory note.  I mean, the challenge we have with the promissory note from CPE is --

Q    Well, hold on.  I just want you to answer the question I asked.

A    All right.

Q    Is the 24, which becomes in this demonstrative 21, a reflection of additional analysis that you did?

A    Yes.

Q    Okay.  You meaning you personally.

A    Sure.

Q    Okay.  Is the change from 23 in the promissory note, in the Debtors' view, to 21 a reflection of an analysis that you did?

A    If you -- the answer to that question is yes if you think analysis includes looking at what the Debtors' done.  I do.

Q    Okay.  And the net consequence of the changes that you made is to increase the $6 million difference to $13 million. Is that right?

A    Correct.  An incremental seven.

Q    Okay.  You also have a difference in the value of the Welltower/Omega term loans of $130 million, correct?

A    Between the two charts, or just the 254 is not the same number as 124?

Q    Well, the latter.  But there's also no difference on those points between the two charts, correct?

A    Correct.  They're consistent between the declaration and the demonstrative.

Q    Okay.  That's more than half the value of the Genie 3 excess over the stalking horse in the Committee's view of value?

A    Correct.

Q    You included this number because Committee Counsel told you to do so?

A    I don't think I would say that Committee Counsel tells me to do something and I just jump.  I think from the discussions with Committee Counsel, we understand that this is an analysis that has been undertaken, try and get our head around --

Q    I'll pause you for a second because I don't want you to say anything privileged.  In fact, you've done no analysis on the delta between the 254 and the 124, correct?

A    No.  Incorrect.

Q    Okay.  When you were being deposed, you had done no analysis.  Is that right?

A    Incorrect.

Q    So you had already done an analysis, even when you were being deposed?

A    So when you say you, me Andrew, not so much.  Houlihan was -- spent some time looking at the joint venture interests.

Q    I'm sorry, who did?

A    Houlihan Lokey, the firm I work for.

Q    Yeah.

A    Did some work associated with value associated with drug venture interests, which was a component of this entire process.

Q    So you recall giving a deposition.  You've already testified to that, right?

A    I do.

Q    Do you recall me asking you what the basis of the Committee's contention that the debt was under secured in reference to this Welltower/Omega debt?

A    I generally remember the line of questioning.

Q    And do you remember Mr. Zlutecky --

A    Zluticky?

Q    Zluticky objecting and instructing you not to answer?

A    I do.

Q    And do you remember following his instructions?

A    I did.

Q    And do you remember telling me that Brian Taylor was the person at FTI who provided the input for this analysis?

A    So all of the other inputs other than JV's that we spent
time putting together came from Brian Taylor.  It's my
understanding.  I'm assuming he spent time with counsel, too.

Q    You have no independent basis to assess the merits of the
legal positions that could result in Welltower being deemed
under secured, correct?

A    Correct.

Q    This is a litigation outcome that would reflect the
difference in value of $130 million, correct?

A    If there's not a settlement, it could end up in
litigation.  Correct.

Q    That litigation has been filed, correct, in the form of an
objection?

A    I believe there was either a complaint or a derivative
standing motion or something to that effect.

Q    And if the Welltower/Omega debt is not under secured, that
is if it's fully secured, then this difference in value does
not exist, correct?

A    If there -- can you restate that question, or repeat it
for me, please?

Q    Sure.  (Indiscernible).  If the debt is fully secured,
then the delta that is in your chart does not exist, correct?

A    Correct.

Q    And the same is true for the Debtors' value causes of
action.  The Committee values these causes of action in this

chart at $100 million, correct?

A    These causes of action, the ones that --

Q    The ones that are referenced --

A    -- are in that line item?  Correct.

Q    Yeah, causes of action line item.  And again, do you recall declining to testify about the UCC's analysis of the causes of action because of an instruction of Counsel?

A    No.  But I'll take your word for it.

Q    Do you want to see?

A    No.

Q    Okay.  So you believe that you would have followed your Counsel's instruction on this?

A    My recollection is every time Counsel instructed me not to answer during my deposition, I chose to follow his guidance and not answer.

Q    So there's no view that you could express without waiving privilege about whether this $100 million number has any merit, correct?

A    I don't know if that's a true statement or not.

Q    You didn't analyze the merits of the causes of action, did you?

A    I did not.

Q    This is another litigation outcome that the UCC is counting on, correct?

A    Counting on I think is -- I don't understand what you mean

by counting on.  In what regard?

Q    If the litigation of these causes of action does not

result in $100 million, then this -- sorry.  Let me say it

differently.  If the litigation does not result in $32 million,

more than $32 million, then no difference would exist between

the Committee view of value and the Debtors' view of value,

correct?

A    I think you just asked me to confirm if the sun rises in

the east, does it rise in the east.  Yes.

Q    Right.  And you have no view about the merits of this

number because you didn't do the analysis of the legal merits

of the causes of action, correct?

A    Correct.

Q    Okay.  Is Mr. Taylor going to testify to that?

A    I don't know.

Q    If the causes of action are litigated and result in less

than $32, that would mean that the Debtors gave too much credit

to the causes of action, correct?

A    For scorecard purposes only, yes.

Q    The third box is the WAX/MAO term loan.  Here, the

Committee has essentially given -- the Committee ascribes no

deduction for a risk that the WAX/MAO debt is not entirely

avoided.  Is that correct?

A    Correct.

Q    You didn't assess the merits of the likelihood of that

happening, did you?

A As I understand, the SIC some time ago assessed the merits, said there's a 30 percent or 70 percent likelihood this claim should be eliminated. And for some strange reason, the Debtors have not pursued an elimination of the claim to this point, notwithstanding the guidance that the Counsel gave the SIC. I can't explain that.

Q Can you explain whether the Committee is taking a position that there is a 100 percent chance that the WAX/MAO debt will be eliminated?

A I think the answer is any deduct in here I think is we haven't factored in on the basis of there's been a lot of work done by the SIC that suggested the likelihood this should be eliminated, this $10,000 purchase price should be eliminated, should be quite low. That's what the scorecard factors in.

Q The scorecard gives 100 percent probability or risk adjustment for success to the WAX/MAO debt, correct?

A Yeah. I don't think you can compare the number for the 28 because the 28 is sort of, as we talked about on direct, if you lose this argument, it's 94. If you win, it's zero. So the Debtors didn't put in the value to litigate. They put in a risk-weighted adjustment based on the SIC's assessment of 30 percent of the value of the debt.

So there was never a number in here for fees to prosecute that. They just sort of put the -- it's why I think it's a

little crazy because it's either you either put zero or you put 94. The 28 is just the risk adjustment not including costs to get there. So following the Debtors' lead on the scorecard, the costs must otherwise be somewhere else because they're not in the 28, either.

Q    Risk adjusting contingent assets is not unusual, is it?

A    I don't know what that means.

Q    Risk adjusting litigation is not unusual, is it?

A    I think for purposes of the scorecard, I understand why they put 28 in. But what I'm saying to you is if the costs associated with prosecuting that claim, i.e. seeking the disallowance of the claim all together, or at least subordinating that claim, if this is risk adjusted as the Debtor risk adjusted it, 30 percent of the total value of the claim, then the costs associated with pursuing that claim aren't in the Debtors' scorecard, and they're not in the Committee's scorecard.

Maybe I'm not being clear. So they're treated equally between the two scorecards. I know you don't like that answer, but that's -- that is the answer.

Q    I don't understand that answer. But I'm going to move on. The WAX/MAO adjustment is another litigation adjustment, correct? Another litigation-based adjustment, correct?

A    It's the result of it is based on litigation. Correct.

Q    From your declaration, all but 6 million, and from the

demonstrative all but $13 million of the difference between the

Debtors' view of value and the Committee's view of value is

based upon litigation outcomes, correct? Welltower's --

A   Correct.

Q   -- litigation outcome. Okay. There's been some

conversation about committed versus uncommitted financing. All

of the things being equal, do you prefer committed or

uncommitted financing?

A   You have to give me the context.

Q   All of the things being equal.

A   No.

Q   You do not prefer committed over uncommitted financing,

all other things being equal?

A   So, I'll give you an example. I don't prefer requiring

bidders coming into a 363 auction to have committed financing

because likely it will chill bidding. So I would, in that

context, I would prefer uncommitted financing with deposits.

Q   Okay. At the end of the auction, would you prefer

committed or uncommitted financing? Or is it true that

throughout the auction, you would prefer uncommitted financing?

A   I would prefer -- in that circumstance, I would maintain

my stance so that I didn't operate the auction in bad faith.

Some might argue something worse because if I change the rules,

and if I encourage a bidder -- if I've got two bidders, one's

got committed financing and the other does not, and I say you

can both enter the auction and bid equally, and they bid it out, the person with committed financing is being bid out by somebody without committed financing.  And at the end of the day, I say time out, changing the rules, committed financing is important.

If I'm that bidder, I'm like well, I should have just stopped bidding right out of the gate, stuck with my opening bid, compare the opening bid to the non-committed financing bid, and on the theory that the debtor's going well, committed is more important, I don't have to pay more and I still win. It's a bad-faith auction.

Q   Are you suggesting that a seller should not consider, as part of its probability of closing analysis, whether -- well, the strength of the financing and its likelihood to close?

A   I'm okay with considering it.

Q   Okay.

A   I'm also okay with the fact that I've got a deposit, and under the appropriate structure I now have a backup bidder because I've bidded out in an equitable fashion and my conscious is clean when I get to the end.  There is a risk, of course, that the successful bidder can't procure the commitment for financing.  They lose their deposit and I have to pivot to the backup bidder.

The place that that becomes a real problem is when the deposit amount is less than the spread between the successful

bidder and the backup bidder because that motivates the

successful bidder to say why don't I just give up my deposit,

pay a little bit less.  I'm still greater than the backup

bidder, and I can save a little bit of money.  We don't have

that fact pattern in this case.

Q    So it's fair to consider it as part of the closing risk

package that a seller would consider --

        THE COURT:  Let me stop.  Mike, are you picking this

all up --

        MR. HALL:  Sorry.

        THE COURT:  -- on audio?  You're sometimes --

        MR. HALL:  Too far away?

        THE COURT:  -- wandering a bit.  Yeah.

        MR. HALL:  Apologies.

        THE COURT:  Okay.

BY MR. HALL:

Q    It's appropriate to consider, correct?

A    Can you state the full question, please?

Q    Sure.  It's appropriate to consider the strength of the

financing, the likelihood that it will close?

A    It's one of many considerations, correct.

Q    Yes.  And the strength of financing was one of the

considerations that were listed in the bid procedures as

something that the Debtors would have the right to consider,

correct?

A    That's when the Debtors had bid procedures that contemplated committed financing, I think that's something we objected to as part of the bid procedures.  Notwithstanding that, the Debtors didn't change it is my recollection.

Q    And in the auction, the Debtors advised the parties that they reserve the right to consider all factors, including strength of financing, correct?

A    After the Debtor, before the auction I understand, and they've testified to, told bidders you don't have to have committed financing to have a qualified bid.

Q    Correct --

A    I have actually encouraged Mr. Robichaux and Mr. Finger that I thought it was a mistake to insist on committed financing.  And ultimately, the Debtor made the right decision.

Q    Correct.  Debtors did not insist on committed financing to be qualified.

A    Correct.

Q    But the Debtors reserved the right to consider whether financing was committed in assessing the strength and merits of the bids, correct?

A    The Debtors generally made a commitment to -- or a statement that they would consider multiple issues.  My view is, since they had changed their stance from committed to not committed in order to be qualified, it would be disingenuous, I think I used the words bad faith, to run an auction and then

yank the rug out of underneath somebody who didn't have

committed financing.

Q    Right.  But you're not really yanking the rug out from

somebody if they know that this is a risk, and they have the

ability to deal with the risk if they want to, or if they can,

correct?

A    I think it's yanking the rug.  I think it would be,

quote/unquote, slimy.

Q    Okay.  In your declaration for the White Oak ABL, you have

$278 million listed all the way across the row, correct?

A    Correct.

Q    Stalking horse does have committed White Oak ABL

financing, correct?  And funded committed -- a funded

commitment, sorry.  Correct?

A    I haven't seen a commitment letter.

Q    Okay.  and the Genie bidder does not have a funded White

Oak commitment, correct?

A    So, I had an opportunity to catch up with White Oak's

representative, or their advisor who's here today who advised

me that if the Monticello financing comes through, if the

equity funding that's contemplated by the Genie bid comes

through, and if there is a market intercompany agreement that

can be -- or intercreditor agreement that can be worked out,

that White Oak is prepared to provide financing or commitment

to finance the Genie 3 bid, as well.  As I think I said in my

declaration, they have informed me that they are Switzerland and not straying into France.

Q Right. That sounds like a long way and an indirect way of saying yes, Genie does not have funded commitments from White Oak right now.

A Correct.

Q Should the Genie 3 278 be a lower number on account of it having -- on account of it not having funded commitment from White Oak in contrast to the Debtors who do -- sorry, the Debtors -- the stalking horse who does?

A I do not believe so, and neither did the Debtor.

Q Do you know whether or not Genie and White Oak have exchanged any creditor agreements?

A It was discussed at the auction when there was a -- when there were conversations going on that that would be the expectation. And my understanding was that the parties thought reaching a, quote, market intercreditor agreement wouldn't be -- would not likely be a problem.

Q Okay. Genie is a combination of two separate parties who were interested in the whole company prior to forming as a combined bid, correct? Integro and Milrose Capital?

A Correct.

Q And prior to them combining to become Genie 3, you had conversations with Integro?

A Mr. Farber had called me on a few occasions, correct.

Q    Did you have conversations with Milrose?

A    No.

Q    Who -- you mentioned in your direct having a concern, let me see if I can find it here, about NextGen potential settlement.  Remember that email?

A    Correct.

Q    And --

A    Collusion email?

Q    I'm sorry?

A    The collusion email?

Q    Yes.  The collusion email, the bankruptcy crime, that's not the only time that you became quite alarmed about the risk of collusion, correct?  In this --

A    Incorrect.

Q    Incorrect, okay.  When you learned that Integro was joining with Milrose to submit a combined bid, you were concerned, right?

A    Yeah.  I wouldn't say quite alarmed.

Q    You were concerned about the risk of collusion?

A    My recommendation was Mr. Farber needed to immediately get in contact with the Debtors.  But let me back up.  When it became evident that Mr. Farber at Integro, as I understand I think from Mr. Finger, their original source of capital, they had decided not to continue performing or working together in the transaction, and that I think he made reference to the fact

that there was a connection coming up with Milrose.

I, of course, had the benefit of knowing that Milrose had submitted indemnification of interest.  But I didn't know if Mr. Farber knew.  So after asking him a bunch of questions to try and figure it out, he indicated that he did know they had submitted an indication of interest.

And at that point I sort of encouraged him to get in contact with the Debtor immediately.  It was an important issue that he get authority from the Debtor to have that communication.  I think the first call I made when I hung up was to Debtors' Counsel.  And the second call I made was to the Debtors.

Q    And the reason you made those phone calls is because you were concerned about collusion?

A    I wasn't quite, I think you said, quite alarmed.  I wanted to make sure that this issue was taken care of.  My theory was that having one bidder who's willing to bid is better than two parties that are unwilling to bid.  And if that meant merging them together, so be it.  But that wasn't my decision.  That was the Debtors'.

Q    So my question is, were you concerned about collusion?

A    Yes.

Q    You're aware that Mr. Schwartz is an excluded person? We've heard a lot about that past 24, 36 hours?

A    At least.

Q    You agree with me that collusion -- sorry, that exclusion is a serious matter?

A    So I've come to learn.

Q    Did you know it when you first learned about it that it was a serious matter?

A    No.

Q    Okay.  You're aware that Mr. Schwartz settled allegations of fraud and misrepresentation?

A    My recollection is that's correct.

Q    Have you seen the settlement agreement that he signed?

A    Both, yes.

Q    Federal and the state?

A    Correct.

Q    Do you agree with me it's fair for the SRC to consider the issue of exclusion in analyzing the bids?

A    If it's applicable to the parties that are submitting bids, yes.

Q    Did the Committee investigate the circumstances surrounding Mr. Schwartz's exclusion settlement?

A    Not to my knowledge.

Q    Okay.  Did the Committee know that a business associate to whim Mr. Schwartz turned ownership of the provider he was supposed to operate over to -- sorry.  That that person was charged with a crime?  Potentially unrelated crime, but that that was his business associate?

A    That was a pretty complicated question.

Q    Yeah.  Let me --

A    I don't know who --

Q    -- try to re-ask it.

A    -- his business associate is, if that helps you get the answer that you're looking for.

Q    Sure.

A    I don't know.

Q    That is the Committee never uncovered the name Joseph Schwartz?

A    This information came to light when we were in a lockdown period, and we couldn't talk to anyone without everyone.

Q    Okay.  Does that mean that the Committee did not uncover that name?

A    I don't know that -- if the Committee did, I don't know. I'm not sure who it is you're speaking about.

Q    Okay.  Joseph Schwartz, you don't know that name?

A    No.

Q    Okay.

THE COURT:  What did you just say, Joseph Schwartz?

MR. HALL:  Yes, ma'am.

THE COURT:  Okay.  I don't know who that is, so I'm just --

MR. HALL:  I understand.

THE COURT:  That was --

THE WITNESS:  Makes me feel better.

THE COURT:  Okay.

BY MR. HALL:

Q    Your declaration notes that the Debtors sought diligence from Genie on November 23, and that Genie responded.  This is the diligence response letter on November 26.  Do you remember that letter?

A    Was the 23 your letter to them, the 26 was the day before Thanksgiving?

Q    Correct.

A    Yes, generally.

Q    Okay.  It's referred to in your declaration, correct?

A    (No audible response)

Q    I'm going to get you there in a second.  Page 20, Paragraph 32.

A    I'm sorry, what was the paragraph?

Q    Page 20, Paragraph 32.  Page 20.

A    Okay.  Got it.

Q    All right.  Basically, this is a response letter that says Ari Schwartz will ignore Joseph Schwartz.  Ari Schwartz is a consultant to Milrose, correct?

A    It actually says past tense.

Q    Yes.  Served as a consultant.

A    Yeah, not -- I think you said serves.  He served.

Q    And it also says will have no going-forward involvement in

this matter, correct?

A    It says that, correct.

Q    Okay.  And you say in Paragraph 33, toward the end, "I found the clarifications made by Genie to adequately and appropriately address any concerns" -- sorry, "any issues concerning Ari Schwartz.  Do you see it?

A    I do.

Q    Okay.  Did I read it right?

A    I believe so.

Q    The letter -- the response that you excerpted from the letter, it doesn't say anything about Mr. Schwartz having any equity involvement in Genie, correct?

A    I think it says he will have no, not qualified in any regard, no going-forward involvement with Genie or the proposed transaction.  I interpret that to mean none.

Q    Full wall.

A    That's how I read it.

Q    Okay.  I meant to ask you a kind of a different question.  This response does not address any potential prior involvement of Mr. Schwartz as having equity involvement in Genie, correct?

A    It's a little tortured because you know, it's a response about personal guarantors.  It does talk about his prior involvement in the sense of it said he served as a consultant for Milrose Capital which would be, we all understand, is a participant in the Genie 3 bid.  So it does talk about his past

role, as I read it.  Maybe I'm misreading it.

Q    Okay.  It also doesn't say anything in this response about Mr. Schwartz having any -- having had any potential involvement in any aspect of the Genie bid to the extent of healthcare real estate, correct?

A    That's correct.

Q    You were satisfied by Genie's response?

A    Yes.  I also, as I think I told you in the deposition, my understanding from Mr. Farber that his involvement was real estate focused, if any.  I don't know if the consequence of the Debtors' decision associated with Bold Quail changed that interest or not.  I don't have all of the details on that. Frankly, when this issue came up, we were in the lockdown period.  And so from -- it hasn't been something that I've particularly focused on at all since I read this language and know he's out.  As you said, cut off.

Q    And you couldn't have had any prior knowledge because Genie never disclosed this issue, correct?

A    The issue that he was an excluded party, correct.  Mr. Schwartz's involvement hadn't sort of focused on in what capacity he was involved.

Q    Okay.  To the extent that this response says that he was a consultant, was, you've never known a consultant to sign a term sheet for a loan as a guarantor with one of its clients, have you?

A     I can't think of a scenario where I have.

Q     You've never known a consultant to sign an interest rate letter related to a term sheet for a loan?

A     I can't remember one.

Q     Do you think that the exclusion issue reflects at all on Genie their failure to disclose the fact that he was involved in whatever capacity?

A     Look, I'm sort of the perspective of I'll take all information.  I think as comes up a lot, you know, the facts are important.  And so I consider all of them at the point in time where I'm trying to make an assessment of a situation.  So I think about it, for sure.  I don't think there's anything wrong with that.

Q     You'd agree with me that there is inconsistent information regarding Mr. Schwartz's prior involvement in the documents that the partiers now have received and reviewed?

A     Correct.

Q     It is appropriate for the SRC to take account of that inconsistency, is it not?

A     I can't answer that question for you.  I don't --

Q     Would you take account of that inconsistency?

A     I think the most important thing that I would take account of is what assurances, what commitments am I getting with regard to Mr. Schwartz's involvement going forward.  What consequences are there that I'm getting from a bidder.

I mean, I think this goes to a broader concept which is when I have a sale transaction like this --

Q    Is it a --

A    -- and an issue comes up, my goal is to solve the --

Q    I want you to --

A    -- problem, not to --

Q    -- answer my question, please.

A    -- shine a spotlight on it.  I'm still answering your question.

Q    Is it reasonable to be skeptical of parties that you have been concerned about in the context of collusion?

A    No.  I think in this case it was, as I said, my comments to the Debtor were I thought putting two parties together who were perhaps unlikely to bid to make one party to bid was the right decision and would merit this scenario.  I think the bidding procedures contemplate, especially from the get-go what I was hopeful we would be able to find, piecemeal bidders that could form a consortium.

There had to be a protocol to do that.  It would be difficult to sort of connect those pieces together without sort of trying to understand who's out there and who's willing to participate.  And so that's why I think I said I wasn't highly alarmed or whatever phrase you used.  But it was something that needed the Debtors' immediate attention.

Q    Do you know Mr. Foster from -- Mr. Foster, one of the SRC

members, from any of your prior work?

A    I don't believe I've worked with Mr. Foster before.

Q    Do you have any reason to believe that Mr. Foster is biased or conflicted in this matter?

A    Not that I'm aware of.

Q    Do you know Ms. LaPuma from any of your prior work?

A    I don't know her.  I've heard her name here.  And at our holiday event last week in New York I had an opportunity to speak with her for a while.  But we spent very little time touching on this case, and most about our international travel experience.

Q    I'm sorry.  Most about?

A    About her international travel experience, which is significant.

Q    Do you have any evidence or any basis to believe that she is biased or conflicted in this matter?

A    No.

Q    How about Mr. William Snyder?  Do you have any basis to believe that he's biased or conflicted in this matter?

A    No.

MR. HALL:  Your Honor, can I take a moment just to consult?

THE COURT:  You may.

MR. HALL:  I know we're close.

(Pause)

MR. HALL:  All right.  Pass the witness, Your Honor.

THE COURT:  Any more CPE or Welltower or Special Committee?  And I'll ask, do you have quite a bit or only a short amount?

MR. KRAUSE:  (No audible response)

THE COURT:  Okay.  Go ahead.

MR. KRAUSE:  Hopefully not a lawyer's short amount.

CROSS-EXAMINATION

BY MR. KRAUSE:

Q    Good afternoon, Mr. Turnbull.

A    Hello, Mr. Krause.

Q    Jeffrey Krause of Gibson Dunn & Crutcher on behalf of Welltower as Agent and as Landlord.  You testified about the PA-22 leases.  Who is Genesis' lessor under the PA-22 leases currently?

A    I believe it's Welltower or a Welltower-affiliated landlord.

Q    Welltower is the owner of the properties.  It is the lessor of the properties.  Isn't Genesis a sub-lessee?

A    I think as I had understood from some of the analysis that was done, there are a variety of -- there's, like, a sub-lessee and a sub-lessee of that.  I can't walk you through the entire sort of complicated structure that was established on this issue.

Q    So, but when you testified earlier that the lease that

Genesis is a party to has a 30-day termination term. It would be the lessor under that lease that has a termination right, correct?

A I don't know the details, as I just said. I think what I can tell you is my understanding is that there's an ability for the landlord somewhere up the food chain or somewhere to be able to terminate the lease, therefore have the assets that the Debtor in the Acquireco assets as opposed to the Divestco because there was that bifurcation at the beginning, removed notwithstanding the fact that it wasn't sort of highlighting the projections or they weren't in the Divestco property, or in the Divestco pool, so to speak. So --

Q So, but -- I apologize. I didn't mean to cut you off.

A It's all right.

Q When you said earlier in your direct or in the prior cross-examination Welltower had the right to terminate, you didn't know whether or not it was Welltower?

A My understanding is somewhere up the food chain, some Welltower entity, Welltower influenced entity or somebody associated with Welltower has that ability. Perhaps that's incorrect.

Q What do you base that on?

A Conversations that I had with Committee's advisors and conversations that I had with Mr. Farber.

Q Okay. So you don't have any personal knowledge that

that's true?

A    Other than the information that I received from the Committee's advisors and Mr. Farber, that's true.

Q    So what they told you is completely inconsistent with the contracts.  You don't have any basis to know that's not correct.

A    That's correct.

Q    Okay.  Do you know who the original lessee and sub-lessor of the PA-22 properties was when Genesis first subleased them?

A    If I'm not mistaken, these go back to ProMedica.

Q    So the ProMedica leases that the Committee has said were hugely unprofitable and horrible for Genesis were these leases, among others.

A    My understanding is there were modifications made to the rent between that date and today.

Q    That it was increased?

A    I don't know.

Q    Would increasing the rent make them more profitable?

A    Increasing the rent would make them less profitable to the tenant.  However, there are significant management fees that are a part of this business that are feeding the manager.  To my understanding, it's 18 or so million dollars that -- so I think about it.  It's EBITDA is one thing.  But cash flow is a different one from the operator's perspective.

Q    You said earlier that WAX paid $10,000 for its share of

the term loan, correct?

A    I did say that.

Q    Do you have any personal knowledge of that?

A    I haven't seen the check, if that's what you're asking. But I understand that from Committee Counsel and the investigations that they did.

Q    So if they were completely wrong about that, you have no basis to know what WAX paid for the term loan?

A    Like I said, I didn't see the check.

Q    You didn't see any document that reflects a payment which is, in fact, nowhere near correct for the term loan.

A    I guess the only documents I've seen are pleadings and references to it in court over the course of this hearing and otherwise.

Q    Do you know the current balance of the term loan, total, all-in, subordinated and senior term loan?

A    So I think there's -- without looking at the demonstrative, I think there was 244 of term loan to Welltower and Omega.  There's 94 or so in the last out tranche.  My understanding is there has been -- I believe that it's non-cash pay during the bankruptcy.  So there will be some incremental interests associated with that and to the extent that it is determined to be fully secured.

Q    So 254 and 94.  Is that what you said?

A    I think so.  What's that, 346?

Q    I apologize.

A    Three forty-eight?

Q    Sorry.  Three forty-eight --

A    Yeah.

Q    -- as of the petition date.

A    Sounds about right.

Q    Okay.  And do you know what interest rate it accrues at?

A    I do not.

Q    Okay.  And so the balance of the loan that is the disputed loan is $348 million plus interest from the petition date plus all of the attorneys' fees accrued that have not been paid as of the time of closing.  Correct?

A    I'd have to go and look at the, presumably the cash collateral order, the credit agreement, all facts that I don't have in front of me right now.

Q    And your demonstrative, of the Committee's demonstrative assumes that the amount escrowed will be $254 million?

A    We're using the comparable number that the Debtors' been using.  And if your facts or your, you know, insinuations are correct, Mr. Krause, then I guess the Debtors' demonstrative that we all sat and used at the auction you're telling me is incorrect.

Q    The Debtors' demonstrative in terms of the consensual deal with CPE, or the litigated deal?

A    Both because what you're telling me is you think the

scorecard might be incorrectly scoring the bid of CPE in the Debtors' perspective because it's factoring in 254 for that tranche.  And I think what you're insinuating is you think it's greater.  Apparently, the Debtor doesn't, or the Debtor got it wrong.

Q    So coming back, you do not know the balance of what the debt will be as of the time the litigation starts under the Committee's proposed Genie 3 supported deal?

A    Correct.

MR. KRAUSE:  All right.  I have no further questions, Your Honor.  Thank you, Mr. Turnbull.

THE WITNESS:  Thank you.

THE COURT:  Oh, you're going to --

MR. INGERMAN:  I can go after lunch.  That's fine.

THE COURT:  Let's go after lunch.  Okay.  So let me clarify.  I have a 1:30 video only consumer docket that's I think going to be five-ish minutes.  And then I have a 2:00 video only consumer docket that likewise is five or ten minutes.

So why don't we say come back at 2:10.  People can stick around in the courtroom if they want, but you don't have to worry about lawyers on other matters because these are all video.

Do we have to do anything different to the video, or will those consumer lawyers just join in?  Okay.  So if you're

on the video, you can stay on the video, but we're going to resume this hearing in one hour at 2:10.

THE CLERK:  All rise.

(Recess at 1:09 p.m./Reconvened at 2:11 p.m.)

THE COURT:  Okay.  So my time prediction was pretty good, right?  We are starting back up at 11 minutes after 2:00 Central Time in Genesis Healthcare after a lunch break.  And we've got people coming back in the courtroom.

Mr. Turnbull, as you know, you're still under oath.

So we have more cross-examination?

MR. INGERMAN:  Yes, ma'am.

THE COURT:  Counsel?

MR. INGERMAN:  Thank you.  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. INGERMAN:

Q    Brett Ingerman, DLA Piper, for CPE.  Good afternoon, Mr. Turnbull.

A    Good afternoon.

Q    I'm kind of a simple lawyer, so I'm going to try to ask some simple questions and see if we can --

THE COURT:  Uh-oh.

MR. INGERMAN:  -- get this --

THE COURT:  Famous line.

MR. INGERMAN:  The famous, the infamous line.

BY MR. INGERMAN:

Q    If I understood your testimony, Mr. Turnbull, you said this was a little bit of an unusual bankruptcy for you because you were more involved than you ordinarily are on the committee side.  Is that fair?

A    I think I said that I was more involved than I think traditional investment bankers are who represent committees.

Q    Okay.  I'll take your answer, all right.  And you were doing everything you could to maximize the value to the estate for the assets that were being marketed, including the causes of action, right?

A    I was -- I would limit it to I was trying to do everything I could to maximize the value for the estate.

Q    Of the assets, including the causes of action, right?

A    I think my answer was I was trying to maximize the value of the assets.

Q    Including the causes of action, right?

A    I didn't do anything to try to maximize the value of the causes of action specifically.

Q    No, but --

A    That's why I'm saying --

Q    -- they were a part of the package of assets that you were trying to maximize the value of, yes?

A    I was trying to maximize the value of the estate's assets.

Q    Okay.  And when you say estate's assets, that includes the causes of action, right?

A    If that's what you think they do, sure.

Q    I'm asking you.

A    I told you what I tried to do which is maximize the value of the estate for its creditors.

Q    Mr. Turnbull, are you unable to tell us and the Judge whether the assets that you were maximizing the value of included the causes of action or not?

A    I'm trying to understand the distinction you're drawing from my question, and I don't understand it.

Q    You don't understand whether the related party causes of action are assets that you were marketing as part of the overall asset package.  You don't understand that?

A    I was not marketing the company's assets.

Q    Okay.  So you don't know whether the assets include the related party causes of action or not?

A    I'm sorry.  Why are you making that gesture on me?

Q    I'm just, I didn't think it was that hard of a question.

A    I'm not understanding how I haven't already answered this question.

Q    I'm sorry?

A    I'm not understanding how I haven't answered this question.

Q    I'm asking you whether or not you can tell the Judge whether or not the assets that you were out there trying to maximize the value of included the related party causes of

action.  Yes or no.

A    I was trying to maximize the value of all of the assets in total, whether that means, you know, selling them individually or selling them as part of a package.  I was trying to make the aggregate package the maximum value.

Q    And the aggregate package of the assets included the causes of action for the related parties, yes?

A    It might have done; it might not have done.

Q    Okay.  Maybe you could have carved them out?

A    That's exactly right.

Q    Okay.  All right.  And if you carved them out, you would have tried to maximize the value for the causes of action carved out, yes?

A    I was trying to -- I was trying to look at all of the scenarios to maximize the value of the assets, period.

Q    Okay.  And you've been doing this a long time, yes?

A    No offense taken.  Yes.

Q    I've been doing it a long time, too, so.  And have you marketed causes of action before?

A    No.

Q    Never?

A    I don't -- I mean, I would say ordinarily, causes of action are not something that's being sold with the going concern business.  I've been involved in cases where causes of action have been sold as part of a process we're running.

Q    Okay.  And so you know litigation finance, litigation funders, investors that buy claims?

A    Or finance them, correct.

Q    Or finance them.  You know lots, you know lots of those folks?

A    I know some.

Q    Okay.  Did you reach out to any of them in connection with trying to maximize the value of the causes of action in this case?

A    I wasn't affirmatively running the sale process.  I didn't reach out to anyone myself.

Q    So that's a no?

A    Correct.

Q    Okay.  All right.  Now, I want to talk to you a little bit about one of the demonstrative exhibits that you were shown.

        MR. INGERMAN:  And I don't think Committee Counsel marked it as any particular number, Your Honor, but it's the one that says Scorecard Comparison, the one-pager.  Yes, ma'am.

BY MR. INGERMAN:

Q    Do you have that in front of you, Mr. Turnbull?

A    Is it this one?

Q    Yes, sir.

A    Yes, sir.

Q    Okay.  And you went through I think three differences, maybe four differences.  There are four different boxes,

numbers that have boxes around them on this demonstrative

exhibit, right?

A     There are eight numbers with boxes around them in four

line items.

Q     Okay.  And the first one that you highlighted was the

difference in the valuation of the promissory note, the

Debtors' view, Genie 3, 67 million, and the UCC's view 80

million, right?

A     Correct.

Q     And you attribute that to a difference in the applied

discount rate, right?

A     That's one of the components.

Q     Okay.  And the UCC applied a lower discount rate than the

Debtors, right?

A     Correct.

Q     All right.  And the UCC applied a 13 percent discount

rate.  The Debtor applied an 18 percent discount rate, right?

A     Correct.

Q     All right.  And reasonable minds could differ over whether

it's 18 or 13.  Would you agree with that?

A     I suppose the answer to that question in my mind is there

-- if you told me reasonable minds could differ between 13 and

36, then I might disagree with you.  There is a gradient of

when I think it wouldn't be reasonable.  It's hard for me to

say definitively.  Thirteen to eighteen, that's reasonable.

Thirteen to nineteen, maybe it's on the gray.  So it's -- I think it's a question of considering all of the factors in valuation, coming up with what you think is the best answer. And our conclusion was 13.

Q    Okay.  And the Debtors' best conclusion was 18, right?

A    Correct.

Q    Okay.  And the next line that's got boxes around it on this scorecard comparison is the term loan WellCare Omega, right?

A    Welltower.

Q    Welltower, sorry.  Term loan Welltower/Omega.  And the Debtors' view for the CPE bid was 254 million.  And the UCC's view on the Genie 3 bid was -- on the CPE bid, I'm sorry, was 124 million, right?

A    That's what it says.

Q    And the difference there is assuming that the estate wins the litigation against Welltower and Omega, right?

A    The difference here is assuming that the Welltower and Omega portion of the term loan is determined to be under secured.

Q    Through litigation, right?

A    Perhaps.

Q    Is there another way?

A    Settlement.

Q    Without litigation?

A    Correct.

Q    Okay.  So either settlement or litigation is what accounts for the difference in those two numbers.

A    Correct.

Q    Okay.  And then the third, the next box, the next line is causes of action.  And the Debtors' view on Genie 3 is 32 million.  And the UCC's view of Genie 3 is 100 million, right?

A    That's what it says.

Q    Okay.  And the difference there is, again, how much you win in litigation or settlements on the related party causes of action.

A    Is that a question?

Q    Yes.

A    The answer is no.

Q    No?  The difference is how they're valued?

A    No.  There are different claims included in the right-hand column in the 100 than what are included in the 32 column under the Debtors' view.

Q    Okay.  So they're additional claims in the 100 that aren't in the 32?

A    Correct.

Q    That have to be won or settled in order to realize value.

A    Correct.

Q    Because nobody's buying it, right?  Nobody's offered to buy it.

A      Not yet.

Q      Okay.  Well, the complaint's on file publicly now, right?

A      Correct.

Q      Has anybody reached out to you to buy that -- buy the claims?

A      I wouldn't expect them to.

Q      That wasn't my question.

A      Nobody's reached out to me, no.

Q      Okay.  Do you know how long that complaint is?

A      I'm sorry?

Q      Do you know how long the complaint is?

A      I read it a while ago.  I haven't read it recently.

Q      Sixty-plus pages?

A      Sounds about right.

Q      Been on public file since when?  Do you know?

A      I don't know if it was the end of last week, beginning of this week.  Somewhere in that zip code.

Q      Okay.  So if I understand the differences here, the promissory note under purchase consideration, the difference is discount rate application, right?

A      That was one component of it.

Q      One component.  The term loan Welltower/Omega is -- the difference is contingent on winning or settling the under secured, or the Welltower and Omega debt being considered under secured either through settlement or litigation, right?

A    Correct.

Q    And the causes of action, that difference is contingent on winning or settling additional claims and other claims against the related parties.

A    And I think also the factor we -- the 100 is a conservative estimate based on the people who evaluated the claim.

Q    Okay.  Let me ask you to turn in the Debtors' exhibits to Debtor Exhibit 59.  Do you have that binder, sir?

A    I'm sure I have it.

Q    Yeah.  A white one.

A    White 59?

Q    Yes, sir.

        THE COURT:  And if we could pull it up.

BY MR. INGERMAN:

Q    Do you want to just, it's only two pages, Mr. Turnbull. If you want to look on the screen, you can.

A    I think I might have actually accomplished it.  This is the -- did we look at this before?

Q    I don't know.

A    Yes, we must have then if you're asking me about it.

Q    I don't know if we looked at it before.

        MR. INGERMAN:  It's titled -- for the record, it's titled Bid Comparison.  And it's dated November 17, 2025.

        THE WITNESS:  I have it in front of me.

MR. INGERMAN:  Okay.  And let's go to the first page if we could, first, please.  All right.  And this is, it says Bid Comparison.  It's dated November 17, 2025.  Do you have it, Your Honor?

THE COURT:  I do.

MR. INGERMAN:  Okay.

THE COURT:  It's here on the screen.

BY MR. INGERMAN:

Q    And this was part of the bid package that went out to every bidder before the auction, right?

A    I don't know that it -- I don't know that it went out before the auction.  I seem to remember this was what was handed out at the beginning of the auction.

Q    All right.  So it went out to every bidder at the beginning of the auction.

A    And how do you define every bidder?

Q    You tell me.  Who did it go to.

A    You asked the question.

Q    I'm asking you the question; who did it go to?

A    I believe this was handed out to the qualified bidders in attendance at the auction, some of whom were in person, some of whom were virtual.

Q    Okay.  And if we go to the second page, it's got the bid comparisons between the stalking horse bid and Genie 3, right?

A    Correct.

Q    All right.  And on the left side, it says selected
commentary.  Do you see that, sir?

A    Correct.

Q    Okay.  And if we go down to the third paragraph, it says,
"Debtors reserve the right to also evaluate non-quantitative
factors including, without limitation, ability to confirm a
Chapter 11 plan, certainty to close, financing commitments, and
other execution risks."  Right?

A    Correct.

Q    So prior to the auction, all of the qualified bidders were
on notice that the Debtors reserve the right to evaluate
financing commitments as part of the bid evaluation process.
True?

A    Not quite true because I think we just established that
this wasn't done prior to the auction.  But other than that,
true.

Q    Okay.  I'll take your qualification.  And I think you told
me in response to one of Mr. Hall's -- you didn't tell me.  You
told Mr. Hall in response to one of his questions that
sometimes, you don't require committed financing if there's a
deposit.  That gets you as comfortable sometimes as committed
financing.  Is that a fair paraphrase of what you said?

A    No.

Q    No?

A    Correct.

Q    It is or it is not.

A    It is not a fair paraphrase.

Q    Okay.  In this case, are you aware that the Genie 3 bid includes a $25 million deposit?

A    Yes.

Q    All right.  And you know that in the Genie 3 bids asset purchase agreement, there is an out where Genie 3 gets that $25 million back if they don't close the White Oak financing.

A    I understand that sort of as it's one of the relics of the crazy structure in this stalking horse's bid.  And I don't believe it was edited out at the time they submitted their bid.

Q    Okay.  So the answer is yes, it's in their bid, right?

A    I believe so.

Q    Okay.  So if Genie 3 is unable to close on White Oak financing, they get their $25 million back, right?

A    Depends on what other basis -- if they're otherwise in default, I don't have it in front of me, but I'm going to guess there's a provision that says you can't terminate for things like that if you're already in default as an example they wouldn't get it back.

Q    And what if they're not in default otherwise?  They get their money back, right?

A    Right.

Q    Okay.  And that is a contingency that my client, CPE, took out of their APA, right?

A    Not at that stage in the auction.  But yes.

Q    As we sit here today, right?

A    Correct.

Q    Okay.  And you know that my client, CPE, does have a signed term sheet with White Oak, right?

A    I think I've heard that there's a commitment.  I can't - honestly, I just I'm not sure that there's been a lot of have they actually signed it or not.  I thought Mr. Andrews said it wasn't signed.  But --

Q    No.

A    -- I may have that wrong.

Q    I don't think that's --

A    Maybe --

Q    -- what he said.

A    -- it was Welltower he didn't have signed?

Q    Welltower signed it but --

A    Or was signed on one way --

Q    -- he didn't.

A    -- but he didn't.  That's right.

Q    Didn't require his signature, actually.

A    Correct.

Q    Are you aware that my client, CPE, has a signed term sheet with White Oak?

A    I haven't seen it, but I'll take your word for it if you're telling me or representing this is.

Q    Okay.  And --

A    I think this is the discussion we had about White Oak's advisor and what they had told me about Switzerland.

Q    Yes.  So let's talk about that.  What were the four things that the White Oak advisor told you had to happen before they would even give a term sheet to Genie 3?  You said there were four -- or three or four contingencies.

A    I think it was a commitment letter, not a term sheet.

Q    Okay.

A    And I think the answer was procure the Monticello financing, fund the equity, presumably have to be the successful bidder, and agree to a market terms of an intercreditor agreement.

Q    And if those things don't happen, no White Oak financing, right?

A    No.  You stated it in the affirmative.

Q    Okay.

A    If they did happen, White Oak financing.

Q    You don't know what would happen if they didn't happen.

A    You didn't tell me.

        MR. INGERMAN:  No further questions, Your Honor.

        THE COURT:  Any other cross?  Redirect?

        MR. ZLUTICKY:  No redirect, Your Honor.

        THE COURT:  No redirect.  Okay.  Let me think before you're excused.  Let me think if I got it all answered.  Oh, I

know what's been lingering in my brain.

EXAMINATION

BY THE COURT:

Q    And I raised this yesterday.  The Landlord picture, is there anything about, we've talked about the PA-22 I think is the term.  Is there anything that makes one of these bids more favorable than the other based on the set of leases out there?  And this PA-22, I know that none of us have our head totally wrapped around that.

A    So --

Q    Anything you can shed light on?

A    Sure.  I'll try.  So from the estate's perspective I understand is how you're asking the question.  So my understanding is for both Genie 3 and CPE, all of the leases are being assumed without modification.

     The difference, though, is in the case of CPE, the estates are effectively foregoing the ability to pursue causes of action against parties that may be landlords for which they receive no incremental consideration whereas in Genie 3, those rights are sort of preserved, those causes of action rights.

Q    Okay.  So we know Welltower and Omega are major landlords.  I think maybe Mr. Snyder said they had about a third.

A    I think --

Q    I'm not sure if that was just Welltower or both of them.

A    Yeah.  I think -- my understanding is Welltower has

approximately a third of the buildings. I think it's -- I think it was 50 of about 170, so roughly a third, a little bit less. My understanding is there are 27 leases and 23 landlords. So there's a lot of smaller folks, smaller landlord relationships in addition to Welltower. And I think Welltower's 50 is covered across two leases.

Q Okay. Now, I have in my brain from prior hearings that a Landau affiliate is a major landlord. True or false, or do you know?

A I believe that -- it's complicated because there's so many Landau-related entities. But somehow in the PA-22 structure, I guess actually the Landau affiliate's going to become the new tenant when the lease is canceled. So the assets will come away from the Debtor, and they'll go to a new tenant.

That is a -- or I think it might actually be a Gefner-related entity that's going to become the tenant. But I think in that hierarchy that Mr. Krause was talking about, there are -- there could be landlords in there that are Landau-related. Somebody might actually be able to sort of decipher all of this. It's a bit of a complicated -- it is a complicated mess.

Q Okay. Well, I'm just wondering how that impacts the achievability of a sale to a Genie, to Olumie, someone else. Are there factors that make it a whole lot more accomplishable, if you will, if it's the stalking horse?

A I suspect, Your Honor, if -- as I understand, the lease

terms aren't being modified.  And so it comes down to an adequate assurance of future performance discussion between the tenants.  And I think one of the considerations is probably how much equity capital is being invested.  I mean, so in Genie 3 you have a minimum of 120.

You have two of the principals providing personal guaranties on the debt.  They're all in on making sure that things go well.  My colleague ten or more years ago sold a Rowan Farber-related senior living business.

And so I know that the focus -- and it's weighed into a lot of my sort of viewpoints on -- they're putting a lot at stake, personal guaranty.  I mean, someone said to me what's more important, a personal guaranty from someone with a lot of money or someone with a little bit of money.  And the answer to me is I'm not really sure because both of them are pretty impactful.

If you don't have much and you could lose it all, so I think that's an important consideration.  And I think I would argue it would weigh in favor of adequate assurance of future performance for somebody who's saying I'm all-in on this investment with the $120 million I'm putting in.

Q    Okay.  But you've not heard about major monetary defaults under these leases that would have to be cured in connection with a 365 assumption and assignment?

A    My understanding is the lease, the rent payments are being

made current is why the company has these aberrations in cash flow.  So the first week of every calendar month is a poor cash month, or poor cash week, and then it progressively gets better to the end when there are meaningful collections, no rent.  And that happens once a month, and you have working capital cycles that you're familiar with.

I don't know off the top of my head if there was an outstanding rent at the petition date.  In other words, had - were they in a non-payment position, filed for bankruptcy, and that was addressed?  I don't -- I'm not aware of it.  But honestly, I haven't really studied that question.  But I think the rent on a monthly basis is about $20 million.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  You're excused from the witness box.

(Witness excused)

THE COURT:  Committee's next witness?

MR. DESATNIK:  Your Honor, the Committee calls Brian Taylor to the stand.

THE COURT:  Mr. Taylor.  Welcome.  Please raise your right hand.

BRIAN TAYLOR, COMMITTEE'S WITNESS, SWORN

THE COURT:  Thank you.

MR. DESATNIK:  Your Honor, the Committee has submitted Mr. Taylor's declaration for his direct testimony.

So we are making him available for cross-examination.

THE COURT:  Okay.  Thank you.  And we're trying to --
okay.  I'm trying to retrieve the declaration.

MR. BARNOWSKI:  Your Honor, while you do that, we
will give Mr. Taylor a copy of his deposition transcript in
case we refer to it.

THE COURT:  All right.

MR. BARNOWSKI:  Thank you.

THE COURT:  Okay.

MR. BARNOWSKI:  And, Your Honor, I know you had
questions just now for Mr. Turnbull about PA-22.  If there
comes an appropriate time, the SIC has done an investigation of
PA-22 and we're happy to share the results of that with you --

THE COURT:  Okay.

MR. BARNOWSKI:  -- as to what was found.

THE COURT:  So I have Mr. Taylor's declaration.  It
is at Docket 1805.  I'm sure it's a Committee exhibit in
addition to that.  So this is the direct testimony in the
declaration.  We're now having cross.

MR. BARNOWSKI:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. BARNOWSKI:

Q   Good morning, Mr. Taylor.  It's nice to see you again.

A   Good to see you.

Q   Dan Barnowski, Katten Muchin for the SIC.  Can you and I

agree that your declaration attempts to value the causes of action that you believe and that the UCC believes could be brought under a Genie 3 bid and compares those values with the SIC's valuation of causes of action?

A    That's correct.

Q    And the way you valued those causes of action is by determining the damages you believe could be recovered for each cause of action and then multiplying that amount by the likelihood of succeeding under that cause of action, and then subtracting the fees associated with litigating them, correct?

A    I'm also accounting for collectability risk.

Q    So everything I said --

A    Definitely.

Q    -- plus a subtraction for collectability risk?

A    Yes.  That's right.

Q    Thank you. And you've heard -- you've been in court for the last two days, right?

A    I have.

Q    You've heard there's been a lot of back and forth about the importance of the difference in that range, correct?

A    Sure.

Q    Okay.  And based on that exercise that you just described that you did, you concluded that the SIC undervalued those causes of action by $109 million.  Is that correct?

A    That's correct.

Q    And that includes potential claims and causes of action against Welltower, correct?

A    That's right.

Q    I looked at your list.  In your declaration, I think there are five causes of action that you list against Welltower, including two that are solely against Welltower, correct?

A    That's right.

Q    To be clear, though, you have never testified in court or in a deposition as a litigation claim valuation expert, correct?

A    I have not.

Q    And you've never testified in any capacity on the likelihood of succeeding in a litigation, correct?

A    Correct.  I've never testified.  But I do have extensive experience valuating litigation claims.

Q    But you don't have any experience whatsoever in assessing the likelihood of succeeding in a litigation, correct?

A    That's right.  I relied upon my Counsel --

Q    And would --

A    -- and UCC's Counsel.

Q    When you say you, your Counsel, you mean UCC's Counsel, correct?

A    UCC's Counsel, yes.

Q    So --

A    And -- sorry.  And it's a similar approach to what the SIC

did.

Q    Okay.  Well, you were in court for the SIC, for Mr. Foster's testimony, weren't you?

A    I was.

Q    Mr. Foster never said that I came up -- that I relied solely on counsel to value these claims.  He said repeatedly that the SIC, the committee members who have done this extensively came to conclusions about the values of the claims, correct?

A    Which sounds very similar to our approach.

Q    Well, we'll talk about that.

A    Okay.

Q    The assessed probability of success of these claims is a key component to the evaluation.  Can you and I agree on that?

A    We can agree, yes.

Q    And I'd like to understand a little bit about how you assessed that probability.  So you are not a trained lawyer, correct?

A    Correct.

Q    You're not a litigator.

A    That's right.

Q    And you personally interviewed no witnesses and attended no depositions, correct?

A    That's right.

Q    You relied entirely, entirely on UCC Counsel to tell you

the likelihood of succeeding on each and every claim in this

report, correct?

A    Let me explain a little bit about the process --

Q    No.

A    -- of how we got there.

Q    Hold on.  One sec.  My question's just a yes or no.  And

the question is, you relied entirely on UCC Counsel to tell you

the likelihood of succeeding on each and every claim in this

report.  Is that correct?

A    I can't answer it with a yes or no question -- answer.

Q    Okay.  Let's look at your deposition testimony, Page 17 if

you would, because I ask you the same question two days ago,

right?

A    I'm sure.

Q    If you look at Page 17, Line 21.  I'm sorry.  17, Line 14.

A    Uh-huh.

Q    "You, yourself, are not responsible for the ranges of

likely success of the causes of action, fair?"  You said, "I'm

not solely responsible for that."  And then I said, "Well --"

and you said, "I'm not responsible for that."  Right?  Did I

read that correctly?

A    That's right.

Q    Okay.

A    I still have some potential --

Q    Okay.

A    -- clarification.

Q    And you simply dropped the percentages that UCC Counsel gave you into the report and then multiplied them by what you determined was a damage?

A    Yes.  At this stage of the valuation I dropped the percentages in after I looked at them myself to see whether or not I thought they were reasonable.

Q    You are not advocating in support of the accuracy of any of those success ranges, correct?

A    The accuracy of those success ranges --

Q    Correct.

A    -- are based on the collective knowledge of our litigators.  And I have confidence in that.  But I did not come up with the ranges myself.

Q    And in fact, you're not here to advocate for or against or otherwise validate any of those ranges, are you?

A    No.

Q    And you and I can agree that, at least in your deposition two days ago, you were not allowed to explain what Counsel said to you about the basis or rationale for any of those ranges, correct?

A    I believe so.  I think that was the record.

Q    Because it was blocked on privilege grounds, correct?

A    That's right.  I had --

Q    Okay.

A     -- calls with Counsel about the ranges.

Q     And you understand, by the way, that the UCC lawyers who told you what percentages to use in assessing the likelihood of success of these claims have not interviewed any witnesses in this case, correct?

A     Understood, yes.

Q     Nor have they asked to interview any witnesses in this case.

A     I've heard we asked for access to the interviews.  But they haven't asked to interview anyone.

Q     Okay.  And when you say access to the interviews, they asked for the written reports of Counsel, correct?

A     Correct.

Q     Okay.  And you haven't interviewed anyone, either.

A     I have not.

Q     And in fact, you haven't attended anyone's deposition except for your own.

A     Correct.

Q     And to be clear, your report purports to assess the likelihood of success and the value of breach of fiduciary duty claims.  But you don't know what duties were supposedly breached, correct?

A     That's in the complaint.  And I'm relying on Counsel for identifying the specific duties that were --

Q     But sitting here today, and sitting two days ago in your

deposition, you weren't even able to tell me what fiduciary duties were at issue, duty of loyalty, duty of care, duty of good faith, correct?

A    Right.  I --

Q    Nor were you able to tell me the elements of the breach of duty of loyalty claim, correct?

A    Correct.

Q    And you don't know whether, for any of these claims, there was a fulsome description of the conflict, the underlying conflict in the transaction, or whether the transaction was approved by majority of the disinterested members of the board, correct?

A    I was part of the initial investigation for four months where I helped Counsel identify these claim.

Q    Do you understand my question?  You don't know whether, for any of these claims, a fulsome description of the conflict, the supposed conflict was made, or whether the transaction was approved by a majority of the disinterested members of the board.  Yes or no?

A    Not sitting here today.  I believe I, at some point, have looked at that.

Q    Nor two days ago.

A    Nor two days ago, no.

Q    And your report purports to assess the likelihood of success and value of a RICO claim.  But you don't know the

elements of a RICO claim.

A    Correct.

Q    And you've not litigated a RICO claim.

A    I've not litigated a RICO claim.

Q    And in fact, you've never played any role whatsoever in the litigation of a RICO claim.

A    That's right.

Q    You've never even worked --

A    Not on a --

Q    -- on a RICO claim.

A    -- RICO claim.

Q    And your report purports to assess the likelihood of success and the value of a fraudulent inducement and fraud claims, but you can't tell me the elements of a fraud claim, can you?

A    I would have referenced that at some point, but not sitting here today.  No.

Q    Nor two days ago.

A    Nor two days ago.

Q    And you cannot tell me whether anyone relied on any allegedly false representations to their detriment, can you?

A    I'm trying to think.  Maybe I can, but no.  I'm going to say no.  No.

Q    Okay.  And your report mentions a ReGen claim, a claim against ReGen --

A     Correct.

Q     -- or rising out of the ReGen transaction.

A     Yes.

Q     Fair?  You're alleging in that claim, or at least the UCC is alleging in that claim, that Genesis would not have entered the transaction if it had only known that the source of the money received was from Welltower.  But neither you nor UCC Counsel has asked anybody at Genesis whether they would have entered that transaction if only they had known that the source of the money was Welltower, correct?

A     Right.  The basis is based on documents we've received and text messages.

Q     Or as you said the other day in your deposition, it's based on one document.

A     Correct.

Q     And that document is an internal email from Welltower that says something to the effect of we shouldn't tell them, something like that, right?

A     I think it was a text message.

Q     Text message.

A     Yes.

Q     But you've seen nothing from -- any document from Genesis that suggests that they would not enter this transaction by which they received $50 million and avoided a liquidity crisis for four years if only they had known that that $50 million was

coming from Welltower.  You've not seen anything like that from Genesis, correct?

A    That's correct.

Q    You state throughout your report that the SIC only gave $17 million of value to the litigation claims.  But just to be clear, you understand that the SIC attributed $32 million of value to those claims, correct?

A    Yes.  The $32 million appears on the scorecard for Genie 3 as the amount that the SIC valued those claims.  And my point I'm making in my declaration is that the SIC gave $15 million of value to the stalking horse for D&O insurance.

And so I have adopted that value in that if you look at the Genie 3 $32 million, you can litigate the remaining claims and still have the damages I believe that you have ascribed in the SIC report.  So it would be -- I think it would -- it, in essence, creates an issue where you have only valued at 17 million.

Q    But you're not a litigator, right?  We've already established that.

A    Right.  I'm not a litigator.  But --

Q    So you're not --

A    -- I am a --

Q    Understood.

A    I am a financial advisor.

Q    But you --

A     And I --

Q     -- understand that you can't recover --

          MR. DESATNIK:  Objection, Your Honor.  The witness is trying to finish the answer here.

          THE COURT:  Sustained.  Let him finish.

BY MR. BARNOWSKI:

Q     Okay.  Were you done?  Go ahead.

A     I'm not a litigator.  But I have valued businesses.  I'm a CPA.  I've done these similar investigations and valued claims in many UCC cases, Diamond Sports, Talon Energy, most recently some other small SNFs.  I've been part of damages reports that have been $10 billion worth of damages.  And the way I view this $15 million versus the $32 million is that if you have $15 million in a D&O insurance policy, you're able to collect on that, then you can also sue for the remainder of the damages that are outlined in the SIC report.

Q     The remainder?

A     Yes.

Q     But you certainly can't recover -- and this may be unfair because you're not a litigator, I know that, and you're not a lawyer.  But you're not arguing that you can recover the same damages --

A     Not the same damages.

Q     Let me --

A     No.

Q    Let me finish, too.

A    Okay.

Q    It's all right, it's all right.  We're just going to have a messy transcript.  You can't recover the same damages from two different parties, correct?

A    Correct.

Q    Okay.  Your report deducts from the value of each claim, as we talked about earlier, the cost of litigating it all the way through appeal, correct?

A    Yes.

Q    To be clear, that deduct that you've applied to litigating all of these claims against all of these parties including a RICO claim all the way through judgment and appeal is $11.9 million, correct?

A    That's right.  It's a 10 to $15 million range.  And I've discounted it back based on the timing of the payments you'd need to make to litigate it.

Q    And that was based on your estimate of the costs of litigating all of these claims.

A    That's my estimate.  And then, you know, Counsel for the UCC reviewed it.

Q    You've never litigated any claim through judgment, correct?

A    Not as a litigator, no.  I've been part of many litigations.

Q    But not a RICO one?

A    Not a RICO one.

Q    And you and I talked about in your deposition the average length of a RICO case to get through judgment is four to five years, correct?

A    Sure.

Q    Okay.  And you don't know how long it takes to litigate --

MR. BARNOWSKI:  Strike that.

BY MR. BARNOWSKI:

Q    Can you and I agree that the typical charge that a plaintiff's contingency firm charges for litigating a case is 33 percent of the value received?

A    Yes.

Q    Or, I'm sorry, the judgment?

A    Yes.  But I don't think that a contingency fee in this case makes sense.

Q    Can you and I agree that the average price charge by a plaintiff's contingency firm for litigating a case through trial if they're forced to go through trial is 40 percent?

A    That sounds like it could be right.  I would say that the claims here have potentially a completely different set of facts where --

Q    They're all plaintiffs' claims, right?

A    Two law firms have investigated.  There's been 65,000 documents produced.  People have reviewed those documents.

They've come up with damages estimates.  And now we have a

complaint that's ready to file.  So while I agree, you know, in

most cases that would be appropriate.  But I think in this

case, there's not a scenario where you would be paying 40

percent contingency.

Q    There's not a scenario in which you'd be paying 40

percent?  Is that what you just said?

A    I did say that, yes.

Q    Okay.  You and I can agree, by the way, that already in

this case, UCC Counsel is above 11.9 million for six months'

worth of work, correct?

A    Correct.  And that's for a bankruptcy case that's been

highly litigated.

Q    For six months.

A    For six months.  And --

Q    With no depositions.

A    And that seems to be sunk some costs into the litigation

where we've --

Q    Sorry.  With no depositions until the last --

        (Laughter)

        UNIDENTIFIED SPEAKER:  I was like objection, Your

Honor.  We had a thousand in the last week.

BY MR. BARNOWSKI:

Q    No depositions until the last week, correct?

A    Correct.

Q    And by the way, you and I can agree that if you were to try most of these cases, you would need to have an expert reports written, correct?

A    Yes.

Q    And you, I think, testified in your deposition, do you still stand by your statement that that would cost around two million bucks?

A    Yes, 2 to $3 million.

Q    So now you're allocating $9.9 million for litigating all of these cases against all of these parties including Welltower who's got a fair amount of money to defend such a case, through trial and judgment and appeal is 9.9 million?

A    And, yeah.  And part of that estimate is the fact that the SIC has reviewed the claims, has already said they're strong claims.  Our Counsel and I have reviewed the claims, extremely strong claims.  And we have, you know, put in a lot of effort already.

Q    And no witness interviews.

A    No witness interviews.

Q    Okay.

A    I'd say that the witness interviews would definitely get you further, right.  But we've already identified the claim.

Q    Can you and I agree that if you were to apply a one-third, a 33 percent deduct for the cost of litigating these claims, that would reduce the recovery by $46 million from your total

damages?

A    That's right.  I feel like that would be an undue reduction, but yes.

Q    Fair enough.  And it would make the parties' valuation closer by $34 million because you've attributed 12, correct?

A    Sounds right --

Q    So --

A    -- in terms of the math.

Q    -- at that point, the gap or the delta between the two valuations would be 75 million, not 109?

A    Sounds right based on the math.  Yes.

Q    And are you testifying -- this is just a yes or no, but are you testifying that it was unreasonable for the SIC in its business judgment to conclude that the midpoint range that would be charged to litigate a case like this, cases like these would be one-third?

A    I don't think it's unreasonable depending on the circumstances.

Q    Okay.  That's fair.  Can you and I agree that $27.8 million of the difference between your valuation and the SIC's valuation comes from litigating the RICO and alter ego claims?

A    That sounds right, yes.

Q    So I'm just going to say $28 million to round it up.  You okay with that?

A    Yes.  Do you have a copy of my declaration and the

exhibit?

Q    Oh, would you like to look at your declaration?

A    If we're talking about individual claims, it would be helpful.

THE COURT:  Thank you.

MR. BARNOWSKI:  I'd give you mine, but unfortunately I wrote on it.

THE WITNESS:  I'll take that copy then.

MR. BARNOWSKI:  It's Committee Exhibit 15, so it will be the black binder.

THE WITNESS:  Black binders?

MR. BARNOWSKI:  And just so the Court can follow along, we are on Exhibit 1 of that report.

THE COURT:  Okay.

MR. BARNOWSKI:  At the very back, there are a couple of exhibits.

THE COURT:  Exhibit A?

MR. BARNOWSKI:  Yeah.  I'm sorry, Exhibit A.  It's at the bottom; it says Page 1 of 1.  But I think it's --

THE COURT:  Yeah, got it.

MR. BARNOWSKI:  -- actually Page, like, 29.

BY MR. BARNOWSKI:

Q    So just for the record, Mr. Taylor, you're turning to Exhibit A to your report.  Is that right?

A    Yes.

Q    Of your declaration.  And just because I know there's been a little bit of a disruption, we were talking about the fact that you attributed $28 million of the difference on litigating the RICO and alter ego claims, correct?

A    That's correct.

Q    And UCC Counsel themselves have told you that those claims have only a 10 and 15 percent chance of success at the midpoint, respectively, correct?

A    Correct.

Q    And I want to do just a couple math questions.  They're just yes or no questions.  Your report assesses a likelihood of collecting on those two claims at 20 and 10 percent respectively, correct?

A    Correct.

Q    Okay.  And the RICO claim has a ten percent chance of success according to UCC Counsel, and a 20 percent chance of collecting on the judgment according to your analysis.  So basic principles of math say that the chance of collecting on a successful judgment is .2 times .1, or 2 percent.  Did I do the math correct?

A    Yes.

Q    Okay.  So two percent is one in fifty.  Also do the math, right?

A    That's right.

Q    I went to law school because I'm terrible at math.  So I

apologize if I'm getting the math wrong.  But the same exercise
results in a 1.5 percent for collecting on the alter ego
claims, 15 percent times 10 percent.  Did I do that math
correct?

A     So can you --

Q     Hold --

A     -- repeat that?

Q     Yeah.  The same exercise, the same pure math,
multiplication question for the alter ego claims.  Fifteen
percent times ten percent equals 1.5 percent, correct?

A     Fifteen percent times ten percent, yes.

Q     and 1.5 percent is, again pure math, 1 in 70 roughly,
correct?

A     Right.  But I have a question about your 1 in 70 --

Q     That's okay.  Well, I get to ask the questions.  But
that's fair.

A     Okay.  Well, it's hard for me to answer it if I don't
understand.

Q     Okay.  So let me just ask you the next question.  You've
attributed $28 million of claims that your own Counsel has said
the chance of success is ten to fifteen percent, right?

A     Right.

Q     Okay.  So if I were to deduct the 33 percent attorneys'
fees that we just talked about, so the $34 million difference,
and I were to deduct from this chart, the claims that your own

Counsel have told you have a 10 and 15 percent chance

likelihood of success, now the delta between the SIC's

valuation and your valuation is 32 million, correct?

A    Yes, if you completely ignore those claims.

Q    Okay.  And by the way, you would not advocate to this

Court that it should make decisions about the healthcare and

living arrangements of 15,000 people based on the chance of

winning claims that your own Counsel says have a 10 and 15

percent chance, would you?

A    The premise of that question --

Q    Just that's a yes or no.  I can --

A    There's --

Q    I can read you your deposition testimony on that question.

        MR. DESATNIK:  Objection, Your Honor.

        MR. BARNOWSKI:  If you'd like.

        MR. DESATNIK:  This is outside the scope of his

declaration.

        THE COURT:  Well, response to that?  How is it within

the scope of his declaration?

        MR. BARNOWSKI:  He's testified to the valuation of

claims that are -- that he's acknowledged have a 10 and 15

percent chance of likelihood of success.  I think it's relevant

whether -- okay, I'll strike the question.  I'll move on.

        THE COURT:  Okay.  Sustained.

BY MR. BARNOWSKI:

Q    Litigation claims is an asset of the Debtors' estate, right?

A    Correct.

Q    One of the may assets that belong to the estate?

A    Correct.

Q    And one of the primary ways to assess the value of an asset is by determining what would be paid for that asset on the open market, correct?

A    That's correct.

Q    And that's called the market value test?

A    Yes.

Q    And that's one of the three or four most universally accepted methodologies for assessing the value of an asset, correct?

A    Yes.

Q    You offer the asset for sale.  You let the market tell you what it's worth, correct?

A    Correct.

Q    And you know, sitting here today, that all of the causes of action owned by the Debtors, all of them were made available for sale, correct?

A    Yes, I do.

Q    Okay.  And you are aware that the highest bid received for those causes of action after four months of marketing in an open auction was $5 million, correct?

A    The IOI was $5 million that you received --

Q    Right.

A    -- is what you're saying?  Yeah.

Q    And if the UCC believed more information should have been provided to those bidders, it certainly could have given it to them, couldn't it?

A    I, sitting here, don't know the timing of the marketing process.

Q    Well, it ran all the way through the middle of November, didn't it?

A    If you're telling me yes, then sure.

Q    And the UCC drafted their complaint and circulated it at least to parties in this room in I think it was October 10th, correct?

A    Correct.

Q    So for a whole month, that complaint could have been given to anyone who wanted to bid on those causes of action, correct?

A    I don't know.  I don't know what restrictions were placed on it.

Q    You're not advocating that that marketing -- I'm sorry, that that -- the results of the market practice valuation be ignored, are you?

A    No.  But I don't think that I can say that it would be a market value result with, you know, without understanding more about the marketing process itself, one.  And two, I do know,

or at least I heard in testimony yesterday I believe that there were maybe 100 documents related to the claims that were --

Q    Who did you hear --

A    -- provided.

Q    Who said that?

A    I think it might have been Jeff Finger.  I'm not sure.

Q    To be clear, you did not attend the question and answer sessions that were held with potential litigation buyers, correct?

A    I did not.

Q    Okay.  And you're not aware that after -- well, let me just -- let me --

        MR. BARNOWSKI:  Strike that.  I'll start over again.

BY MR. BARNOWSKI:

Q    Were you aware that after those question and answer sessions, those potential buyers were invited to request information from the parties, and in fact, the SIC provided significant amount of documents to those parties to help their valuation?

A    Sure.  I think that's a reasonable belief, yes.  I think you've mentioned it during my depo.

Q    Take a look at Page -- Paragraph 56 of your report, if you would.  There's a whole list in that paragraph of additional claims that UCC Counsel told you that could be pursued.  Is that right?

A    Well, I helped identify the claims.  And then they weighed in on whether or not they thought they were strong enough to be pursued, yes.

Q    When you say you helped identify the claims, these are claims that you don't know the elements for and that you've never litigated, correct?

A    Right.  But I've, in many cases, identified claims that ultimately are fiduciary duty claims, fraudulent conveyance claims.

Q    And sitting here today, you are not opining that these are valid claims, are you?

A    No.  All I'm saying is I'm relying on my Counsel and the fact that they've -- not my counsel but UCC Counsel.

Q    UCC Counsel, yeah.  I understand.

A    Who thinks the claims are strong enough to put them in a complaint.

Q    But you don't have an opinion one way or the other.

A    I don't have an opinion in terms of -- well, in reviewing the documents along the way in this investigation, I certainly pointed out that this is likely a fiduciary duty claim.  But in terms of the -- in terms of the likelihood of success, the specific legal terms of the duties under fiduciary duty, say, I'm relying upon them, yes.

Q    Okay. So when you pointed out what you thought might be a fiduciary duty claim, you did so without knowing the elements

of fiduciary duty, and you didn't know whether you were talking about the duty of loyalty or the duty of care.  Is that fair?

A    That's fair.

Q    Okay.  Can you and I agree that almost $75 million of the delta between your and the UCC's damages range, and the SIC's damages come from four claims and four claims alone, the RICO claim which we just talked about, you've assessed is a ten percent likelihood of success.

The alter ego claim that you've assessed is a 15 percent chance of success.  And then two others, the ReGen transaction and the WAX/MAO transaction, fair?

MR. DESATNIK:  Your Honor, objection.  Counsel is saying that he's assessed as the likelihood of success, and he's told this Court many times that he did not assess the likelihood of success.

THE COURT:  Response?

MR. BARNOWSKI:  My response is he's put it in a declaration that he's filed before this Court that that's the likelihood of success.  But I'm willing to amend the question to say that his -- that the UCC Counsel has indicated --

THE COURT:  Okay.

MR. BARNOWSKI:  -- has a 10 to 15 percent --

THE COURT:  Sustained with that change.

BY MR. BARNOWSKI:

Q    Is my math right, though?

A     You may have to --

Q     Yeah.  I apologize.

A     -- state it again.

Q     So $75 million of this gap, this delta between the SIC's analysis and the UCC and your analysis comes from four claims. The RICO claim which the UCC Counsel has said has a ten percent chance of success.  The alter ego claim which UCC Counsel has said has a 15 percent chance of success.  And two others, the WAX/MAO transfer and the ReGen transaction, right?

A     Right.

Q     Okay.  So I'm not going to go back and talk again about RICO and alter ego.  But with respect to the WAX/MAO transfer, isn't it true that the stalking horse bid assumes complete and total responsibility for that claim, meaning it's gone, the effective of litigating it and winning it has already occurred, correct?

A     I think there's a distinction there.

Q     You disagree with what I just said about the stalking horse bid agreeing in its bid to assume full responsibility for the WAX/MAO transfer claim?

A     No.  I agree with that part.

Q     Okay.  That's the only part of the question.

A     There's a relevant distinction.  Maybe we'll get to it.

Q     Okay.  If you take that claim away, alone that eliminates $21 million of that delta, correct?

A    Yes.  But that 21 that you're pointing to doesn't relate specifically to the -- to the expunging of that debt.

Q    Okay.  So the debt is off the books entirely.  It doesn't block flowing of funds that come into the UCC -- I'm sorry, the unsecured creditors.  It's gone.  It's expunged, correct?

A    Correct.

Q    And if you were to litigate that claim all the way through judgment and win, and win on appeal, it would be gone from the books.  It would be expunged.  Poof, right?

A    Yes.  But the scorecard --

Q    I'm not asking questions about the scorecard.  I'm just asking about litigation.

A    Okay.  Well, maybe we'll get to it.

Q    So if I remove $21 million of the delta, we're at 88 million, correct?

A    Correct, if you ignore the claims.

Q    If I remove 28 million for the two claims that have a 10 and 15 percent chance of success, the delta's 60 million, correct?

A    Sounds' right.

Q    If I remove 33 percent attorneys' fees, the gap is now 24 million apart, correct?

A    Sounds right.

Q    So let's talk about the last one that I want to talk about, ReGen.  You've assessed it at $26 million value at the

midpoint, correct?

A    That's correct.

Q    You are aware that Genesis received a $50 million infusion as part of that transaction, correct?

A    I'm aware that they received an infusion from ReGen, yes.

Q    And that that infusion enabled the company to avoid a liquidity crisis for another three to four years, correct?

A    Correct.

Q    And you are aware that the UCC's complaint on the ReGen transaction is based in fraud and fraudulent inducement, correct?

A    That's right.

Q    The UCC alleges that Genesis would not have entered the transaction if it had only known that Welltower was the source of the infused funds, correct?

A    That's right.

Q    And you and I can also agree that neither you nor UCC Counsel has asked anyone at Genesis whether that allegation is true, correct?

A    That's correct.

Q    And you and I can agree that asking that question would be extremely helpful to understanding whether that claim is valuable.  Agreed?

A    I think we're basing that on the text messages we saw, yes.

Q    The text message, the one.

A    Sure.

Q    Correct?  But that text message was not sent or received by Genesis, correct?

A    Correct.

Q    And it doesn't tell us whether Genesis relied to its detriment on any representation at all, let alone that it would never have engaged in this transaction if it had known that Welltower was the source of the funds, correct?

A    That's correct.

Q    Okay.  And so let's go backwards again.  I'm going to ask my question.  You and I agree that asking that question and getting the answer would be incredibly helpful to understanding whether that claim was valuable, wouldn't you?

A    Yes.  Based on how it's pled, yes.

Q    And you would defer to a claims analysis and a valuation of that claim to someone who actually interviewed those witnesses and asked that question, wouldn't you?

A    I don't have access to the interviews.  But sure.

Q    Did you ask UCC Counsel whether the SIC had asked that question to Genesis when they performed their interviews?

        THE COURT:  Would you talk --

        UNIDENTIFIED SPEAKER:  Are you asking me --

        THE COURT:  -- into the microphone, please?

        MR. BARNOWSKI:  I apologize.

THE COURT: Okay.

MR. BARNOWSKI: I apologize.

BY MR. BARNOWSKI:

Q    Did you ask UCC Counsel when you prepared your report whether the SIC Counsel had asked that question to Genesis representatives?

A    I did not.

MR. DESATNIK: Your Honor, I just want to interject with an objection that this is seeking answer that intrudes into the attorney/client privilege.

MR. BARNOWSKI: I think he answered it already.

THE COURT: Sustained.

MR. DESATNIK: And can I strike that answer from the record, please?

THE COURT: It will be stricken.

MR. DESATNIK: Thank you.

BY MR. BARNOWSKI:

Q    If that $26 million claim disappears too, in addition to the attorneys' fees, in addition to the WAX/MAO, in addition to the RICO and the alter ego claims, under basic principles of math, the $109 million delta between your valuation and the SIC's is gone, isn't it?

A    Yes. If you ignore all of those claims, yes.

MR. BARNOWSKI: No further questions, Your Honor.

THE COURT: Other cross? Mr. Aiken's getting up.

CROSS-EXAMINATION

BY MR. AIKEN:

Q   Good afternoon, Mr. Taylor.  My name's Leighton Aiken.  I represent the Omega parties including the Omega Landlords in this action.  Do you understand that?

A   Yes.  Nice to meet you.

Q   Nice to meet you.  You understand that Omega has a master lease with the Debtors?

A   Yes, I do.

Q   You were present at the auction, were you not?

A   I was.

Q   And you understand and you're privy to the fact that at the end of the second day of the auction, there were sealed bids submitted.

A   I --

        MR. DESATNIK:  Your Honor, objection.  This is way outside the scope of his declaration, his direct testimony.

        THE COURT:  Okay.

        MR. AIKEN:  I'm --

        THE COURT:  Your response?

        MR. AIKEN:  I'm getting to his opinion on the preference actions against Omega.  I'm laying a foundation.

        THE COURT:  Okay.  Overruled.  I'll allow it.

BY MR. AIKEN:

Q   You can answer the question.

A      Sealed bids?

Q      Yes.

A      Was I aware of the sealed bids?

Q      Yes.

A      Yes.

Q      And you understand that after the sealed bids, due diligence inquiries were sent to both of the bidders, correct?

A      Correct.

Q      And in response to those due diligence inquiry, both bidders responded that they were going to assume or it was their intention to assume the Welltower and Omega master leases, correct?

A      Correct.

Q      And you understood that, that both leases were going to be assumed, before you authored the declaration Committee Exhibit 15 on December 8th, correct?

A      Correct.

Q      So at the time of the declaration that you authored, notwithstanding the fact that you understood that both leases were going to be assumed by the bidders, you're representing to this Court that Omega is subject to a preference claim for pre-petition payment of rent in the amount of $4.5 million.  Is that correct?

A      I believe so.  I think that is for rent.

Q      And Exhibit A to your declaration, if you'll look at it.

Under Roman numeral II, additional claims identified by

Committee advisors, I guess 12, preferences, Omega $4.5,

correct?

A     Yes.

Q     Damages for preference payments on an assumed lease,

correct?

A     (No audible response)

Q     Or a lease to be assumed.

A     Yes.

Q     And your Counsel -- in Footnote 2 you write, "The range of

probability of success was provided by Committee Counsel."

Committee Counsel, notwithstanding the fact that it knew that

the Omega lease was going to be assumed, they ascribed and told

you to put into the report a 40 percent to 60 percent chance of

recovery.  Is that correct?

A     That's --

        MR. DESATNIK:  Your Honor, once again, this is asking

about his conversations with counsel.  So I would object on

those grounds.

        THE COURT:  Overruled.  You can answer without

revealing a conversation with Counsel, okay?

        THE WITNESS:  The probabilities --

        MR. AIKEN:  Yes.

        THE WITNESS:  -- in Exhibit A were provided by

Committee Counsel.

BY MR. AIKEN:

Q    Right, at 40 to 60 percent.

A    Yes.

Q    Notwithstanding the leases were going to be assumed.

A    Correct.

Q    Are you aware of any potential breaches or claims for breaches against Omega or Welltower under their respective master leases?

A    No.

Q    Have you reviewed the terms of the Omega or Welltower master leases?

A    Not in total.

Q    Well, in part, are you aware that the Omega master lease and the Welltower master lease cross-default payment under the term loans with performance under the master lease?

A    I'm aware of that.

Q    So if Omega or Welltower are not paid in full under the term loan, it's a default under their master leases, correct?

        MR. DESATNIK:  Your Honor, objection.  This calls for a legal conclusion.

        THE COURT:  Overruled.

        THE WITNESS:  If you're telling me that it caused - yes.

        MR. AIKEN:  No further questions, Your Honor.

        THE COURT:  Any other cross?  Any redirect?

MR. DESATNIK:  Yes, Your Honor.  Just briefly.

REDIRECT EXAMINATION

BY MR. DESATNIK:

Q    Good afternoon, Mr. Taylor.  Are you here today in the capacity of a lawyer?

A    No.

Q    Tell me a little bit about what qualifications do you have.  What are your certifications?

A    I'm a Certified Public Accountant, a CPA.  I have a CIRA which is Certified Insolvency Restructuring Advisor.  And I have a certification in distressed business valuation.

Q    And we heard a lot about the inputs that you used from Counsel in preparing your analysis of the valuation of causes of action.  Is that practice appropriate for somebody with your certifications?

A    Yes, definitely.  Not only, you know, have I done a similar valuation in many other cases before, I think I listed a few earlier, just in valuation in general you can use external inputs in order to arrive at your valuation conclusion.  And those external inputs can come from experts in certain fields or with more knowledge than you.

A good example of that might be say management of a company providing projections, and then you looking at the reasonableness of it and then using the projections.  And then also, as a CPA, in the accounting profession, auditors often

rely on letters from attorneys that will provide the probability of the loss on a particular lawsuit. And they use that to book contingent liabilities under ASC 450.

MR. BARNOWSKI: Your Honor, I would object.

THE COURT: I can't hear you.

MR. BARNOWSKI: I apologize.

THE COURT: I know these people can't.

MR. BARNOWSKI: I would object to this witness just dumping into the record wholesale UCC Counsel's assessment of the likelihood of success on claims that he has no basis to, and that the UCC has refused to explain to anyone. It's very different from what the SIC did which involved professionals and value claims and were prepared --

THE COURT: This is argument. He's allowed to give his side of the story. He's -- it is what it is. You got to cross --

MR. BARNOWSKI: Okay.

THE COURT: -- now he can redirect.

MR. BARNOWSKI: Thank you.

THE COURT: Okay.

BY MR. DESATNIK:

Q   Mr. Taylor, you just heard Mr. Barnowski said that what you did was very different from what the SIC did. You've seen the SIC's report?

A   I have.

Q    On that report, do you know if it says it was prepared by any firm in particular?

A    I believe it's Katten.

Q    So is it your understanding that the SIC also relied on their law firm to investigate the probability of the success of those actions?

A    Yes.

Q    And you were here when Mr. Foster was testifying.  Did Mr. Foster say that he, himself, ascribed the likelihood of success on the causes of action?

A    He, himself, no.

Q    Did he, himself, say that he sifted through 65,000 documents in determining the likelihood of success of the causes of action?

A    He did not.

Q    Did you hear Mr. Foster say that he reviewed -- or that the SIC reviewed 65,000 documents?

A    I do recall I heard that yesterday, yes.  It may have been Mr. Foster.

Q    But you do believe you recall Mr. Finger saying that he put about 100 documents related to the causes of action in the data room?

A    Yes.

Q    So we heard about a market test.  Apparently there was one offer for $5 million for the causes of action.  Do you believe

that that is indicative of the true market value of the causes of action?

A    No.  As I stated earlier, I think that the market participants in this marketing process likely didn't have the same information that I have sitting here today.  They didn't have 65,000 documents.  They didn't have the Committee's complaint. And they wouldn't have the wherewithal or the time to be able to do a full review of all of those documents and come to their own conclusions.

Q    Mr. Barnowski wanted to know how come we didn't just share those documents with the public.  But you reviewed many of those documents, right?

A    Yes.

Q    Did they have any confidentiality designation on them?

A    I believe they were at least confidential and probably PEO --

Q    And --

A    -- professional eyes only.

Q    Thank you, professional eyes only.

Q    Right.

Q    And is it your understanding -- strike that.  You're aware that the Committee filed its complaint publicly a handful of days ago?

A    Yes.

Q    Do you know if that complaint was redacted?

A      It was.

Q      Do you know if it was heavily redacted?

A      It was heavily redacted.

Q      Could that have been because all those documents were provided to us on a professional eyes only basis?

A      That's the reason it was redacted, yes.

Q      Thank you.  Mr. Barnowski said that the UCC had not deposed any witnesses.  Are you aware that we deposed several witnesses in connection with the DIP and bid procedures?

A      Yes.

Q      Okay.  So I think you said no, but you recall now that we did?

A      Yes.

Q      And in connection, I think we all know with this hearing, we've deposed quite a number of witnesses, correct?

A      Sure.

Q      Are you aware that the UCC asked to depose Mr. Landau?

A      I am aware, yes.

Q      Do you know if Mr. Landau ever responded to that deposition?

A      Not to my knowledge.  I don't think he did.

Q      Do you know if the UCC subpoenaed Mr. Landau to appear here today?

A      I believe that we, or that the UCC did.

           MR. BARNOWSKI:  Your Honor, I'm going to object

because it is a Dallas, Texas subpoena to Mr. Landau in New York. Last time I checked, Brooklyn is more than 100 miles from Dallas. So I don't know what we're talking about here with a subpoena issued to somebody in New York to appear in Dallas.

MR. DESATNIK: Your Honor, it sounds like --

THE COURT: He's the major investor in the Debtor who chose to file bankruptcy here. Right? So how does that work, in your view?

MR. BARNOWSKI: He didn't decide to file bankruptcy.

MR. DESATNIK: I'm confused if he's counsel to --

THE COURT: Okay.

MR. DESATNIK: -- Mr. Landau.

THE COURT: I know what the Civil Rules of Procedure say about subpoena power. So, you know, overruled.

MR. DESATNIK: Thank you, Your Honor.

BY MR. DESATNIK:

Q    And, Mr. Taylor, do you see Mr. Landau in the courtroom here today?

A    I don't know what he looks like, but I don't think he's here.

MR. DESATNIK: Okay. Thank you, Mr. Taylor.

THE COURT: Any other redirect? Any more recross on that redirect?

UNIDENTIFIED SPEAKER: No, Your Honor.

THE COURT:  Okay.  Thank you.  You're excused.

(Witness excused)

THE COURT:  We have now had nine witnesses.  Next witness?  And where are we on time on the 12-hour tabulation?

MR. SIMON:  Yeah.  We were just discussing.  So we're both closing in.  The Debtors have about 55 minutes left on the timer.  The Committee has about 45 minutes.

THE COURT:  Okay.

MR. SIMON:  And obviously, we haven't even got to closing arguments.  I know it's been a long two days, so trying to figure out what parties want to do, if we want to finish tonight because we might need a little bit more time.  But I don't know what Your Honor's schedule is.  I know you have a confirmation hearing tomorrow.  But I certainly --

MR. HEMENWAY:  In addition to the Committee, Your Honor, there are other parties, of course, who want to present evidence.  And so it's not just about our closings.  It's their evidence.

THE COURT:  Yeah.  I want to hear at least all the evidence.  Now whether we defer closing arguments, that's a different issue.  But that goes into the 12 hours, right?  Or no.

MR. HEMENWAY:  And I think that's our concern.  With the amount of time that was allotted, both of us are concerned that there's not enough time for Your Honor to hear all the

evidence and have closings.

THE COURT:  Okay.

MR. HEMENWAY:  And so we're both suggesting that there might need to be additional time for closings.

THE COURT:  Okay.  Let's hear all the evidence.  And what I'm hearing is your agreement about 12 hours didn't include closing arguments.  Yes, no?

MR. SIMON:  I don't know if it was clear.  But we would be okay if there was an extension of the 12 hours that would apply equally.

MR. HEMENWAY:  I think if you look at the agreement, it did --

THE COURT:  I'm looking at it right now.

MR. HEMENWAY:  -- but we both are hoping that you did not see that, Your Honor.

THE COURT:  Okay.  So we're going to finish our evidence.  And I'll assume the 12 hours doesn't include closing arguments.  And I'm thinking we'll probably come back -- when are we coming back?  Is it the --

MR. SIMON:  17th.

THE COURT:  17th, next --

UNIDENTIFIED SPEAKER:  Wednesday.

THE COURT:  -- is that Wednesday?  And I'll hear closing arguments.  I may give you some gut on what I think would be useful to say or address.  So maybe that is a good

thing to have a little bit of a break.

But we're also, remember, going to be set on the Debtors' motion to extend exclusivity to which the Creditor has objected. And I don't -- how busy a day do we have on the 17th? How much time do we seem to have for that hearing?

(Court and clerk confer)

THE COURT: We have all day. So --

UNIDENTIFIED SPEAKER: We'll take it all.

THE COURT: You're not going to take it all. Okay. So let's finish the evidence today, and then we'll come back on the 17th for closing arguments. And again --

MR. HEMENWAY: Just as we all intended, Your Honor.

THE COURT: Okay. Yeah. We'll go with that. So next witness of the opposition?

MR. HEMENWAY: And just as a housekeeping matter, Your Honor, the Committee has no further witnesses. Other opponents have witnesses they want to present.

THE COURT: Okay.

MR. LAYDEN: Good afternoon, Your Honor. I'm Andrew Layden from the Counsel for Genie 3 from BakerHostetler.

THE COURT: Okay.

MR. LAYDEN: We would call Mr. Rowan Farber.

THE COURT: Mr. Farber? There you are. Okay.

MR. ZLUTICKY: Your Honor?

THE COURT: Yes.

MR. ZLUTICKY:  I'm incredibly sorry to ask for this. I've never asked for this before, hope I never have to again. I really think that we need to take a short recess and have a meeting with you in chambers with Counsel for the Committee, Counsel for the Debtors, the United States Trustee's Office, and Genie 3's Counsel.  And I'm asking you if you would please allow us to do that because I really think we need to do that. I feel like --

THE COURT:  You're going to have to tell me more because I started this hearing with transparency, transparency, stop the ceiling, stop --

MR. ZLUTICKY:  I wish I --

MS. KIPPES:  Your Honor, the U.S. Trustee objects to any in-camera discussion.  If we're going to have discussion, we're going to have transparency.

MR. ZLUTICKY:  Okay.

THE COURT:  Okay.

MR. ZLUTICKY:  Understood.

THE COURT:  I just, yeah, don't know what that's about.

MS. GREEN:  Can we take a short recess?

THE COURT:  Maybe I will at some point if it --

MS. GREEN:  No.  This is actually quite serious.  Is it possible that we could just take a short recess and talk with the U.S. Trustee?

THE COURT:  I'll give a break, if for no other reason a bathroom break.

MR. ZLUTICKY:  I apologize, Your Honor.  The intent here is not to hide anything from anyone.

MS. GREEN:  It's to protect some people.

MR. ZLUTICKY:  I think it would be best, Your Honor, if it's okay, if Your Honor is willing to give us a short recess to talk to the U.S. Trustee's Counsel, and then maybe we can come back and figure out what to do next.  But I completely understand Your Honor's concerns about wanting to have things on the record and be transparent.  I want to be sensitive to that.

THE COURT:  Okay.  So I'm not inclined to do it.  But you said UCC Counsel, Debtor Counsel, Genie Counsel, U.S. Trustee?

MR. ZLUTICKY:  Yes.  And, but, Your Honor, I'm not asking for that right now.  I think in light of what the U.S. Trustee just said, and we respect that, I think what I'm really just asking for is a five- to ten-minute break if Your Honor would be okay with that so that we can speak with Counsel for the U.S. Trustee.  And then maybe we can go back on the record?

THE COURT:  Okay.  You take the break --

MS. KIPPES:  I'm happy to talk to them, Your Honor.

THE COURT:  Pardon?

MS. KIPPES:  I'm happy --

THE COURT:  Of course you are.

MS. KIPPES:  I'm happy to talk to them.

THE COURT:  So yes.  I encourage everybody to talk to each other.  But I am going to be extremely reluctant to do anything in-camera.

MR. ZLUTICKY:  Understood.

THE COURT:  Fishbowl of bankruptcy unless, you know, life and health and safety are somehow involved where I have to get a U.S. Marshal down here or something crazy like that, I'm unlikely to do it.  Okay.

MR. ZLUTICKY:  Like I said, Your Honor, I've never asked for this before.  I hope I never have to again.

THE COURT:  Okay.  Okay.  Well, ten-minute break.

MR. ZLUTICKY:  Thank you, Your Honor.

(Recess at 3:32 p.m./Reconvened at 3:45 p.m.)

THE CLERK:  All rise.

THE COURT:  Please be seated.  We are back on the record.  I've been in chambers.  I haven't heard anything about what's being discussed by lawyers.  But we're back on the record in Genesis.  The lawyers are coming back in the courtroom.

What would you all like to say at this time?

MR. HALL:  Your Honor, the relevant lawyers are still on their way back.  Mr. Turnbull went to get them when we heard that Your Honor was ready to come back on the record.  So I

believe you'll have them in just a moment.

THE COURT:  It looks like they're all walking back in.

MR. HALL:  Exactly, so --

THE COURT:  Okay.

MR. SIMON:  And I'll just note that Debtors' Counsel tried to find out what was going on, and Debtors' Counsel was excluded.  So I don't know.

THE COURT:  Where, oh where, is Committee Counsel? I'm saying Committee Counsel because I always mispronounce his name.

UNIDENTIFIED SPEAKER:  Mr. Zluticky is --

THE COURT:  Zluticky?  Zluticky.

(Pause)

THE COURT:  Okay.  Do we have all our Counsel who Mr. Zluticky -- okay.  Who are we missing that we need?

(Pause)

THE COURT:  Do we have everyone back?  Okay.  Shall we start with Mr. Zluticky who is the one who wanted a chambers conference?  You've talked to the U.S. Trustee.  Where do we stand?

MR. ZLUTICKY:  So, Your Honor, I don't quite know where we stand on having a chambers conference itself.  No? Okay.

MS. KIPPES:  Still no.

MR. ZLUTICKY:  Okay.  That's fine.  We understand.

THE COURT:  Do you want to shed a little light on what this is about?

MR. ZLUTICKY:  Yeah, absolutely.  So, Your Honor, in candor to the Court, I felt like as soon as I heard what I heard, I needed to report it.  And I needed to do that in a way that made everybody still safe.  And so that's why I asked for it.

I've now told the U.S. Trustee's Counsel, and I'm happy to share whatever I can share with the Court, whatever the U.S. Trustee's comfortable with.  But I do feel like, as you said, that safety is a big concern.

THE COURT:  And when I say safety, I mean physical safety, okay, not --

MR. ZLUTICKY:  Okay.  Understood.

MS. GREEN:  Understood.

THE COURT:  Are we talking about something crazy like a physical threat?

MR. ZLUTICKY:  I don't believe that there's been a physical threat.

THE COURT:  Okay.

MR. ZLUTICKY:  I don't know that there has been one.

THE COURT:  Okay.

MR. ZLUTICKY:  I don't.

THE COURT:  Can we just --

MR. ZLUTICKY:  Okay.  So what happened was Ms. -- so Ms. Green asked me to speak to her in a conference room.  And I went into the conference room.  And in there was Ms. Green's client, one of Ms. Green's clients, Jacob Sod.

And I was told by Ms. Green and Jacob Sod that one of the investors in Genie who we've been talking about having the bank statements come in, Your Honor wants everything out in the open, unredacted, that the bank statement had been unredacted, that it was from a bank.  I'm not going to name the bank right now on the record, but if I need to, I will, that that letter did come from a bank.  It was to this investor that I don't have a copy of this bank statement.

What I am told, though, is that this investor has now told Milrose to Jacob Sod not to share that letter with anyone, including the Court, because he's being threatened.  And the only way that any -- my concern is --

MS. GREEN:  My concern is that the person who provided the letter isn't in this proceeding, Your Honor.  And he's scared.  I've heard him, and he is frightened.  If he's physically frightened, I don't know.  But in certain religions there's certain ways to threaten people, and that's what's happening.  And it's happening right now as we're talking still.

THE COURT:  A party in interest in this bankruptcy case is threatening him?

MS. GREEN: Yes.

THE COURT: Well, is there a reason we're not saying who it is who's doing the threatening?

MS. GREEN: Mr. Landau.

THE COURT: So what are you wanting me to do with this? I mean --

MS. GREEN: Well --

THE COURT: -- call the marshals and say go seize him?

MS. GREEN: So for one, I can't use this letter at this point. But more importantly, I don't think it's appropriate for this conduct to be happening. Like, I told you yesterday morning that the investors were afraid of retribution. And this is exactly what they were afraid of.

And they're going to probably just not be very happy that we're having this conversation with the Court, which is why I asked for a chambers conference. I understand openness to the Court and whatnot. But, I mean, this is a serious matter from my perspective.

THE COURT: Okay. If I get testimony from this person, then there might be something that I decide is appropriate to do. But I can't -- I don't --

MS. GREEN: All right. Well, I mean, in that case, you know what, I'm going to just go talk to my client and decide what we want to do going forward. I can't put them in

this position.

THE COURT: Okay. Well, hopefully he understands the position that I'm in. I can't just hear about it, as much as I may respect the lawyers involved, I can't do anything based on this.

MR. ZLUTICKY: And I want to be very clear, Your Honor, that the reason why I came in here like I did before a witness was being questioned is because the -- it was raised that it was not just this happened in the past. It was a continuing, ongoing. And I thought I needed to bring it to someone's, the tribunal's attention, Ms. Kippes attention, as an estate fiduciary. And so I apologize for interrupting the proceedings like I did, but that's why I did it.

THE COURT: Okay. Well, I can't do anything with this. Okay. Of I had a person under oath tell me about this, I could judge their credibility and --

MR. ZLUTICKY: Absolutely.

THE COURT: -- decide that I need to base a decision on that testimony. but I --

MR. ZLUTICKY: Okay. No, I completely understand. I'm just reporting what I've been told, Your Honor. I understand that's not testimony.

THE COURT: Okay.

MR. ZLUTICKY: I'm not proposing to speak for others at all.

THE COURT:  Okay.  Thank you.  What do you know about this?

UNIDENTIFIED SPEAKER:  Well, obviously Your Honor, I don't know anything about it.  I'm incredibly shocked to hear it, I think as everyone in the courtroom is shocked to hear it. I find it incredibly unlikely, to put it mildly.  It's a serious matter.

THE COURT:  I've seen everything after --

UNIDENTIFIED SPEAKER:  Well --

THE COURT:  -- all these years.

UNIDENTIFIED SPEAKER:  -- Your Honor, I will just say, you know, one of the things that I said in my very brief comments at the beginning of this hearing was that I was confident that as the evidence came in and Your Honor heard from the witnesses that a couple things would be found to be true by Your Honor.

And one is that the auction process was not skewed in our favor.  And I think even the Committee's own expert witness agrees that it was run in a manner that resulted in us increasing our bid by a whole lot of money.

THE COURT:  Mr. Turnbull said it was not fair.

UNIDENTIFIED SPEAKER:  And it was not fair to us as it relates to the price that we bid up given the fact that we were bidding as a party that didn't have financing.  But notwithstanding that fact, at the beginning of the hearing I

said we were prepared to stand by our bid.

I just want the record to be clear.  You know, just like Your Honor cannot respond to something without a witness, I just want it to be very clear I don't believe it happened.  I find the timing of it extremely suspect, you know, that it's come up at this point at the hearing from a party that I think there are a lot of issues associated with their bid.

We reserve our rights.  It's a serious matter.  We acknowledge that.  I don't know anything about it, and I just wanted the record to be clear about it.

THE COURT:  Okay.

UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

THE COURT:  Thank you.

MS. KIPPES:  Your Honor, Meredyth Kippes on behalf of the United States Trustee.  What I'm about to say was going to be part of my closing, but I've been asked by the United States Trustee to go ahead and let you know now.

THE COURT:  Okay.

MS. KIPPES:  The United States Trustee has instructed me to request that the Court order that the auction be reopened and require bids to be copied to a U.S. Trustee employee, and allow a U.S. Trustee employee or employees to attend the auction to monitor the bidding.

Various irregularities that have been described in testimony today, and I know we're not done with evidence.

Extremely concerning, the NextGen settlement email with the term, the proposed term to not bid, and then NextGen not being a qualified bidder and not attending.

We've had testimony about asymmetric information. We've had testimony from Mr. Turnbull that even if the playing field were not really skewed, the perception was wildly that it was skewed in favor of the stalking horse.

Failure to work with Olumie to get them qualified so we can have a third person in the room, these all go into the U.S. Trustee's decision to ask me to ask you to reopen the auction and let us be part of the action.

THE COURT:  Okay.

MS. KIPPES:  Thank you.

THE COURT:  Thank you.  And I am considering the request.

MS. KIPPES:  Thank you.

THE COURT:  We'll hear the rest of the evidence, and we'll circle back to it.

MS. KIPPES:  I appreciate that, Your Honor.  Thank you.

THE COURT:  Okay.  Thank you.

So, where we left off was Genie's Counsel, I think, was about to call a witness.

MR. LAYDEN:  Yes, Your Honor.  Andrew Layden on behalf of Genie 3.  We would call Mr. Rowan Farber.

THE COURT:  Mr. Farber.  Okay.  Reset.  Please raise your right hand.

ROWAN FARBER, GENIE 3'S WITNESS, SWORN

THE COURT:  Okay.  Thank you.  And I have Mr. Farber's declaration in front of me.  It's filed at Docket Entry 1798.  I think it's also separately in the exhibits.

MR. LAYDEN:  Is Your Honor -- and I have one housekeeping matter that I should have just raised.  The Debtors and Committee and Genie 3, Your Honor, prior to all the hearing starting, agreed that the Genie 3 exhibits would be admitted into evidence by stipulation.

I believe there was an earlier announcement where the Debtor and the Committee exhibits came in, but I don't believe there's been a formal admission of the Genie exhibits into evidence.  And so the exhibit list is at Docket Entry 1835.

THE COURT:  So I'm looking at that.  We did not earlier talk about Genie's exhibits being pre-admitted.  It looks like -- okay.  There are 13 exhibits being offered.  Is that right?

MR. LAYDEN:  Your Honor, there are 26.

THE COURT:  Oh, wait.  Wait, wait, wait.  Wait, wait, wait.  I didn't look at the back there.

MR. LAYDEN:  Yes, Your Honor.  The second page --

THE COURT:  Twenty-six exhibits being offered.

MR. LAYDEN:  Yes, Your Honor.

THE COURT: Okay. Admitted by stipulation?

MR. HALL: Your Honor, admitted or judicial notice as appropriate, whether it's a pleading or not.

THE COURT: Okay. So those will be admitted.

(Genie 3's Exhibit Numbers 1 through 26 admitted into evidence)

MR. LAYDEN: Thank you, Your Honor.

THE COURT: Okay.

DIRECT EXAMINATION

BY MR. LAYDEN:

Q Good afternoon, Mr. Farber.

A Good afternoon.

Q We are running a little bit short on time, so I'm going to ask you to be a little bit brief. But can you please tell us a little bit about your background and about Integro?

A I'll give you the elevator speech. And thank you for your time. Started out at Credit Suisse First Boston in New York working for the vice chairman of investment banking, worked on about $15 billion worth of transactions mostly for Fortune 50 companies and sovereign governments.

Then ended up working for Ray Minella and Jeff Berenson. Ray ran a global leverage fund at Merrill Lynch. Jeff ran global M&A. They started their own firm. They were a leverage buyout firm. Spent several years working with Ray. He actually landed up running the healthcare group at Jefferies,

as well.

And then landed up at Wharton Equity Partners investing in buyout technology, healthcare, and real estate.  And then decided that I want to go from the investment side to the operations side.  I got tired of writing people checks and hoping they would write me bigger ones back.

So I founded LifeHOUSE which was the predecessor to Integro.  Essentially, we had a mission to consolidate senior housing communities and really go out to some of the most distressed communities that were delivering the worst patient care so that we felt that I could at least spend, you know, the next part of my career helping America's most frail.

To that event, we, over about a 20-year period, we put a team -- I put a team together of national operators.  Our mission, vision, and values was a servant leadership healthcare service delivery model that was really focused on patient care.

We consolidated about 39 communities.  We've run everything -- every community we bought, we bought out of bankruptcy, receivership, or insolvency.  We've operated communities across the spectrum from independent living, assisted living, memory care, skilled nursing, CCRCs.  We've taken care of over 40,000 patients to date.  The management team has been together for about 20 years.

We were institutional funded for the most part.  And we sold most of the portfolio several years ago.  I kind of took a

hiatus. I'm married, had a baby. And then we started -- we kept the team together and we started rebuilding the company. Today we have about eight communities.

Q Thank you. Can you talk again very briefly about the experience that Integro has with facilities with low standards of care or compliance requirements, things like that?

A Sure. I think probably one of the best case studies was the Pleasant Care bankruptcy. I've been the stalking horse on two of the largest regional bankruptcies, as well. Our average entry point has been about 50 to 60 percent occupancy. We've left all the communities, you know, once we've sold them, they've been at over 90 percent occupancy.

I like to think that we've improved them for the residents, and equally for the employees, and they've taken care of our shareholders along the way. So, Your Honor, we've deployed about half a billion dollars' worth of capital. We've probably underwritten over three to four billion dollars' worth of transactions. We've been underwriters for HUD on deals that they were upside-down on and wanted to decide what to do with them. A lot of their paper landed up in the HUD auctions.

We've bought distressed debt. You know, so we've really been around the restructuring side of the healthcare sector for the last 20 years.

Q Thank you. Have you -- has Integro ever operated or owned facilities that have corporate compliance agreements or similar

agreements like that?

A    Yeah.  Thank you for -- the Pleasant Care bankruptcy that I mentioned at the beginning was about 37 SNFs.  The Department of Health in California decided about a day before the auction, we were the stalking horse, they didn't want any buyer to take all of then given how bad the clinical outcomes were.

So we put a consortium together.  All of the buyers in that Pleasant Care bankruptcy had to assume, we actually had new CIAs, corporate integrity agreements with the OIG, which was a fun experience since you've got nurses with guns and badges and federal monitors.

But at that point, I had hired Joel Snow (phonetic) who was the VP of clinical (indiscernible) senior care.  They had about 200 communities at a time.  Joel had graduated (indiscernible) at CIA and David Zimmerman who is a corporate -- is a federal monitor for the OIG had recommended her.  And then I hired Scott Melgren (phonetic) as well who ran all of rehab for Saebo which was probably a little bigger than Powerback at the time.

We graduated all of our communities.  We obviously built, implemented a corporate compliance plan, very robust.  These communities were in dire straits.  Some of them were one survey away from being decertified by the Department of Health in California.  We knew that going on.  Not sure it's something I would do today.

But we got them all graduated off of the corporate integrity agreement within three years.  Most of them go four. It definitely was an amazing experience not only because of the clinical care that we could deliver to a lot of those residents, but the fact that those communities went on to be some of the best performing communities in California from a clinical perspective.

Q   If Genie is the successful bidder in this case, is Genie committed to utilizing the same experience to help improve patient care at Genesis?

A    I think, you know, coming from the background that I did getting into -- I've always, you know, wanted to figure out how to work with Genesis.  Maybe it's just the size of the company and the scope and the amount of impact that you could have.

You know, when I think about Genesis, even though it's 166 buildings going forward, there's really 60 that have clinical problems.  So in my experience, you spend about 80 and 90 percent of your time focusing on the communities that have the worst clinical outcomes, rebuilding the culture, rebuilding the service delivery model through a compliance program.

Those are often the communities that are financially the worst.  I like to tell my team if you show me a community that's losing money, and I'll show you one with a culture problem in the employee pool, and I'll show you one with a clinical problem.

And ultimately, as we think about Genesis, we've already put together a clinical and corporate compliance team. We have Select Rehab as part of our consulting partner disclosed in the bid. Select is the largest rehab company in the U.S. They have about 600 sites. They are several times larger than Powerback.

And their VP of clinical, their VP of compliance, their CEO who built the company from scratch has agreed to join the compliance team and the clinical team. And we have the three former monitors from Pleasant Care including David Zimmerman who I spoke to, and he would welcome being part of their team, as well.

And the idea is there that we would replicate what we did. We would, as far as putting in a clinical and compliance plan, it would be obviously much broader which is the plan is the same, you just need more resources.

We also have, through Milrose Capital, six or seven regional operators that generate EBITDA margins almost double of Genesis. And I mention that because you've got to get everything right clinically, and from a service delivery model to generate good financial returns.

They have tremendous clinicians, tremendous capability and strength. And the idea is that we would bring in some of those operators as consultants to the regional portfolios of Genesis as part of those 60 communities that are running at either

break-even or losing money.

And to give you a sense of magnitude, those 60 communities lose about $78 million a year. So if you just solve those problems, you just got them back to break-even, you would put 70 to 80 million dollars of cash back into the company.

If you got them to the same 10 percent EBITDA module that the other 100 communities are generating, which is about 154 million, you know, you would be pushing at 200 to $250 million of cash flow at the Genesis, you know, corporate level which would be about $150 million increase from where they are today.

So there's a strong financial incentive in order to create a company that is solvent, that has a plan going forward. And Powerback alone, they generate 500 million. They make 10 million of EBITDA. Industry standard, rehab companies like Select generates about a 6 to 8 percent EBITDA margin. Just getting Powerback to 6 to 8 percent is a pickup of 30 to 50 million dollars of cash flow.

So our going-forward plan, you know, would be to leverage the resources that we have through our 20 years of experience in the business, all the consultants that we've worked with along the way, and then working with a lot of the Milrose operating tenants, as well, who are some regional teams that, you know, would love to help us out.

MR. LAYDEN: Thank you. Given time constraints here, we're going to stand on your declaration, and I will pass the

witness for cross-examination.

THE COURT:  First, any direct from the friendly parties shall we say, the Committee or?  No.  We have someone standing up maybe?  Oh, okay.  Okay.  Cross?

CROSS-EXAMINATION

BY MR. SIMON:

Q    Good afternoon, Mr. Farber.

A    Good afternoon, Mr. Simon.  Good to see you again.

Q    Good to see you again.

A    Please, I think after eight hours we spent together, you can call me Rowan.

Q    Mr. Farber, do you have in front of you your declaration?

A    I do not.

Q    It's Genie Exhibit 1.  I'm not sure if you have it.  It's not our exhibit, so.

A    I don't have any exhibits with me, so I apologize, but.

MR. SIMON:  I'll take a binder.  Thank you.

THE WITNESS:  Thank you.

UNIDENTIFIED SPEAKER:  Your Honor, do you --

THE COURT:  I have it.

BY MR. SIMON:

Q    Will you please go to Paragraph 5?  This declaration is true and correct to the best of your knowledge?

A    Yes.

Q    And you submitted this on Monday?

A    I believe so.

Q    And when were you deposed?

A    I think, what, did we spend a day together two days ago now?

Q    I'm not sure, either.

A    They're blurring for me.  I haven't slept much.

Q    I'm not sure either.  Paragraph 5, the second sentence says, "At one point, Integro managed more than 5,000 beds, units, including approximately 2,700 assisted living units and 2,300 skilled nursing beds."  Do you see that?

A    Yes.

Q    When you say, "At one point," you don't mean now, do you?

A    No.

Q    And when was that?

A    Roughly at our peak there was probably about, I don't know, seven to eight years ago.

Q    Okay.  And you say 2,300 skilled nursing beds.  How many do you operate now?

A    Now we had sold most of our skilled nursing communities.  So at this point, we just have one left.

Q    You operate skilled nursing facility, correct?

A    Correct.

Q    And how many did you operate last year?

A    Last year we operated two.

Q    And what about the year before?

A     It would have been the same two.

Q     Okay.  Do you think that this statement kind of paints the picture that you operate more than one or two?

A     No.  I think that at the end of the day, you know, it's all this was meant to do was give you a sense of context of the experience that we've had, of how many communities we've brought out of bankruptcy and stabilized.

Q     Okay.

A     And it was a conscious decision, Mr. Simon, to obviously sell the company.  A lot of it was investor-driven because we had generated stability, and they were looking to recycle capital.  But I also, I think it's fair for the context to say that I bought the Diamondback community in Arizona which was empty at the time, a brand new community.  I wanted to go back to being an operator at the grassroots level and spend a few years working on some communities that, as opposed to some large portfolios.

It was a community that had a fire on the second floor, sprinklers were set off.  So it was completely I would say derelict.  We spent about $8 million getting it relicensed. And then within about two-and-a-half years, we had got it to a 70 percent quality mix, Medicare mix which is one of the highest in the nation.  U.S. News awarded it the top 100 SNFs in the country.

And it had about 1,000 discharges and admissions a year,

which would probably put it in the fifth -- ninety-fifth

percentile with, you know, a five-star rating, great clinical

results.  So I just wanted a different experience, you know,

given I wanted to spend more time at home and more time in the

family.

Q    But you don't operate that facility now?

A    No.  We sold it.

Q    When did you sell it?

A    Last year.

Q    Paragraph 6 says, "Under my leadership, Integro has grown

to over $250 million of consolidated revenue."  Do you see

that?

A    Yes.

Q    At what period did you have $250 million of revenue?

A    If you would look at the consolidated revenue of the

company, about six to seven years ago we had hit that number.

Q    So not now?

A    Not now.

Q    Not last year, not in the last five years?

A    No.

Q    Do you think that maybe paints an inaccurate picture?

A    I apologize if it gives you the wrong framework, but once

again, I was just trying to provide context of my resume and

background and what we had achieved as a team at Integro.

Q    Do you work from Integro's corporate office?

A     No.  I work from home.

Q     You work from home?

A     Yeah.

Q     Does Integro have a corporate office?

A     We had a corporate office during COVID, and then we disbanded it.  We have about 17 professionals.  During COVID -- we've all been together for the most part for 20 years.  And I think that everyone still works so efficiently from home that there was really no need to spend the time and the money reestablishing a corporate office.

I think it's a huge employee perk.  I certainly enjoy it because I get to spend two hours a day more with my family versus commuting.  And it hasn't inhibited the -- our ability to do what we do since I always tell my work associates that our true work is in the community, it's not sitting around some corporate office.

Q     When you say in the communities, you live in California, right?

A     Yes.

Q     You don't have any facilities in California, do you?

A     Not in California.

Q     Okay.  And with one skilled nursing facility, you could probably work from home, right?

A     Yeah.  If we scaled up to a point where we needed to reestablish corporate offices, we absolutely would do that.

You know, my understanding, Genesis has a half-a-million-dollar lease in New York with just a CFO there.  The rest are Mr. Landau and ReGen, you know, employees.  It's probably a corporate office we wouldn't need.

Q    Are you familiar with Genesis' corporate office in Pennsylvania?

A    Yes.

Q    Okay.

A    I'm aware of it.

Q    Okay.

A    Yeah.

Q    Let's talk about financing for a second.  At the time of the auction, did you have committed financing from White Oak?

A    No.

Q    You didn't have a commitment letter?

A    We didn't have a commitment letter, but I had spoken to Keith Reuben who is the president.  He's formally from CapSource.  We've known each other a long time.  I've been a borrower.  And what he said to me is he really wants to remain Switzerland.

He said, Rowan, if you and Genie 3 win, I'd be prepared to issue a commitment letter in very short order.  Ultimately, we think we (indiscernible) good.  At the time, they had $485 million of accounts receivable with a $280 million static (indiscernible).  And he said he would love to work with us

going forward.  He's certainly known us a long time.

Q     But sitting here --

A     And he thinks very highly of Jacob.

Q     But sitting here today, you don't -- at the auction, you didn't have a commitment letter.  And today, you don't have a commitment letter, correct?

A     We didn't think we needed one for a large carrier.  Twelve days since the auction, we were barred from having any conversations with White Oak.  And then that was lifted.  I spent the next couple days in deposition and reading and getting buried with paperwork.  And then we got on planes and flew to Dallas for the sale hearing, so.

Q     And I think you referenced in --

A     And I have had a conversation with him since.

Q     And I think you referenced in your declaration that you have a commitment to commit.  Is that right?

A     Yes.  Yes.

Q     And have you --

A     What I would also say, Dan, if you -- if I may is --

Q     I'd like you to answer my questions as opposed to --

A     I'm sorry.  I'm sorry.  Continue.

Q     Have you talked to White Oak about the out of formula balance on the ABL?

A     Yes.  Are you talking about the stretch term loan?

Q     Yes.  And what is your understanding of that stretch term

loan?

A     Well, in the term sheet they provided to us is the stretch term loan which is part of a $278 million total debt, is about $30 million.  And that's going to have a bid amortization period of about 30 months versus having to have it paid down over your normal, you know, 30- to 60- day cycle depending on your average (indiscernible) outstanding and your revenue coming in, which to me seemed fair.

It seemed like a great way to help with liquidity to the company.  I certainly appreciate White Oak.  I'm very grateful that they would provide a stretch loan term piece like that. We had had conversations around some of the reserves.  In speaking to and doing some of our diligence, you know, our understanding was that White Oak's reserves were on the higher side.

Keith acknowledged that that was the case, and that some of those reserves were probably going to be dialed back given what happens with a lot of the different bid components at the bankruptcy auction, once the dust settles.  But it was a very warm conversation.

And I spoke to him about two days ago.  And once again, he stressed he was Switzerland.  He told me that he had a little bit of concern about Monticello's 45-day notice to get to a commitment letter, or get to a commitment because I said to him give -- no one really issues commitment letters anymore.  And

we weren't going to pay anyone $3 million to have a commitment letter for an auction.

And in all the auctions I've participated in, that's never been a requirement.  And I appreciate the Debtor waiving that requirement, and I agree with Andrew Turnbull that that was a great way to encourage active bidding.

But coming, circling back to White Oak, I'm fully confident that if we're awarded the winning bid, we will have no problem getting an intercreditor agreement in place between White Oak and Monticello.  Those are standard, plain vanilla. And certainly happy about the stretch piece.  Happy about the terms.  We've discussed them.  And --

Q   My question is whether you've had discussions with White Oak about whether $30 million is sufficient.

A   It certainly wasn't raised in the call over the last two days.

Q   Has Genie prepared a borrowing base projection as of the closing date?

A   We are still -- we have not.  I know that we've done a fair amount of work working with the information that was provided by Ankura.  I think you're probably familiar with the fact that there's been a tremendous amount of diligence and discussion around the use of cash and, you know, the draw down of cash, especially given about $100 million of projected professional fees in this case which concern me a lot because I

know that that's going to be utilized by a lot of that excess cash.

Having said that, we're still working through and digesting a lot of the analysis that was provided to us, you know, days before the auction when we had requested it weeks before the auction.  It was surprising to me that Ankura who's billed, I don't know, $14 million in professional fees, didn't have an A/R analysis that they could share with us that ties into a cash projection.

We got it, I don't know, maybe a day or two before the auction.  And ever since, you know, we've kind of -- I'm going to say we've been sitting on our hands.  But you know, the -- we were meant to get results in a day or two.  It's been 12 days.  Then we've been tied up in this process.  Respect the process, but haven't had a lot of other time to go back and start looking at closing projections on cash.

And my sense is I appreciate the stewardship and the work that Ankura's done.  I know FDI's been helping out.  I know it's a big team effort.  And I'm sure that once we can re-engage with White Oak hopefully over the next few days, if there is a larger amount needed, we would certainly appreciate any facility that they would be prepared to extend versus us having to put up more equity.

Q    So my only question was whether you prepared a borrowing base projection as of the closing.  That was a yes or no.  The

answer's no, correct?

A    Sorry.  I was -- next time ask me yes or no.  But --

Q    I will.

A    -- it was more of an open-ended question.  Apologies.

Q    Okay.  So there's a $30 million stretch loan in the White Oak term sheet, correct?

A    Yes.

Q    And if it's more -- if more is required, because White Oak has taken the position that their borrowing base is diminishing through this case, who's going to fund that hole?  Have you had that discussion with White Oak?

A    I have not.

Q    Have you had that discussion with anyone?

A    I've had some conversations with White Oak's Counsel, but I'm not sure if that's considered privileged.

Q    Did you seek financing from Welltower in this transaction?

A    I've known Welltower.  I mean, anyone in the industry's known Welltower.  It would have been, you know, unusual for me not to reach out to some of the senior lenders involved in the case, one to understand what they thought about the asset, what they thought about the whole -- the opportunity in general, and to see if they would be open to either provide financing, sell debt if they were looking to exit ag a discount.  That often helps us rebase deals and makes it, you know, easier to get transactions done.

Q     So --

A     It would be the -- it was the normal exploratory call that I would have.

Q     Okay.  So yes or no question.  Do you already have a loan outstanding with Welltower?

A     I have a loan outstanding with Key Bank, and Welltower is a participant.

Q     So, yes?

A     Yes.

Q     And are you in default of that loan?  Yes or no.

A     So we haven't received -- it's not as simple as a yes or no, Dan.  And I'm happy to give you context because I understand where you're going with this question.

Q     Your counsel can clean it up on redirect.  Yes or no.  Are you in default on the loan?

A     We haven't -- there's a technical default.  We haven't received -- on $5 million, we haven't received a default letter from them.  We received terms from Key Bank agreeing to extend it for a year, and we've paid them down $29 million of a $34 million loan.  And the first time I've ever heard about it literally that it was even an issue was from you.

Q     But Welltower declined to finance your bid, correct?

A     They had said that they would be -- they would rather be paid off, which quite honestly, I respected because for each -- in these types of transactions, they're considered bad loans.

They're taxable loans.  Personally, as much as I love Welltower and Omega as landlords, I'd much rather have Monticello as a dedicated lender.  They're typically more flexible.  And on that issue, at some point I would love to discuss some of the exhibits that I saw from some of your experts yesterday as it relates to some of the cash flow projections and Welltower's debt.

Q    I'm glad you brought up projections.  So you prepared projections for Genie 3, correct?

A    I did with the team, yes.

Q    And you shared those projections with Ankura?

A    Ankura had requested those projections from us in order to -- as had Jefferies and the Debtor in order to evaluate the probability of us being able to service the promissory note.

Q    So yes, they --

A    So, yes.

Q    -- have your projections?

A    Yes, they do.

Q    And those projections are quite loftier than the Debtors' projections, correct?

A    Could you define loftier?

Q    Well, in years one and two, you believe you can achieve roughly $60 million more of EBITDA than the Debtors' projections.  Is that correct?

A    Yes.  I believe that the money, $8 million, and I don't

have it in front of me so I'm talking from memory, but I think that we could get them to -- that we could achieve about $180 million of run rate EBITDA over the next 24 months from closing.

Q    And one of the key assumptions baked into that, those projections or the increase in those projections, is how you would handle tort liability.  Is that right?

A    In the projections that -- we have a few different scenarios.  The projections we shared with you, we tried to keep it simple.  And I think that we kept the categories.  We didn't assume any increase in quality mix.  We didn't assume any increase in census.

We just assumed that there would be some savings on PL/GL premiums, savings on the $100 million that Genesis is spending on contract labor which is horrendous for healthcare services. The service delivery model, the quality of care typically goes to patient safety.  It's the first thing we try and eliminate in any acquisition, obvious reasons.

And I believe that there was also some increase related to our work with Select in order to increase the EBITDA margin of Powerback GRS because it's running at a minimal one percent.

Q    So, Mr. Farber, I don't want to move to strike your answers.

A    Okay.

Q    I'm asking you very specific questions.  Let's stay on

topic.

A    Okay.

Q    Is PL/GL, is modifying the PL/GL or tort liability a big modification in your projections as compared to the Debtors' projections?  Yes or no.

A    I'm not sure what you mean by a big modification.  We're --

Q    Twenty million dollars a year.

A    We assumed $2,000 per resident which is on the high end of industry standard assumptions.  Most use $1,000.

Q    And that $20 million savings, is that because you believe you can go get risk shifting insurance coverage?  Yes or no.

A    Conversations with Lockton which is a Fortune 500 broker, and some other brokers that we've had, they feel that there are ways to redesign the PL/GL coverage in order to provide the -- certainly shift risk and to get savings.

Q    To actually get insurance policies for the SNFs, correct?

A    Potentially.  Or high (indiscernible) coverage.  I think that the -- there's putting money in a projection as a placeholder assumption, and then there's also -- that's the quantitative side.  The qualitative side is that if you're going to eliminate registry, contract labor, and have a better healthcare service delivery model where, you know, the outcome of that is less tort claims, that ultimately that's going to show up in tort savings, as well, whether it's through premium

or whether it's through lack of tort claims.

Now, the one thing we didn't put in the projections, Mr. Simon, is within the first three years, you typically, I think Genesis is incurring $5 million a month.  Tort claims typically take two to three years to season.  What we didn't put in those projections that you're looking at is 50, 60 million dollars of cash flow savings that the company won't have to be paying out in the two to three years after bankruptcy.  Sure, you might have to reserve for it, but you'll still have cash available.

Q    So, Mr. Farber --

A    Those weren't put in the projections.  I consider them to be relatively conservative.

Q    Mr. Farber, in the first year, you're looking at $20 million of tort liability savings based upon getting insurance policies.  Is that correct?  Yes or no.

A    Yes.

Q    Yes.  And you believe you can go onto the market and get risk shifting insurance policies.  Yes or no?

A    It might --

Q    Yes or no.

A    It might only be in certain states.  Then you own the questions.  I got to own the answers.  And it's a very complicated business.  So it's not just a yes or no.  When you're talking about buying liability insurance for a company as large as Genesis, there could be certain states that have

lower tort claims where carriers are prepared to provide coverage.

It might not be on the entire company.  But if it's on 50 or 60 percent, those risk shifting policies might achieve that. And then you might figure out some other way to contain risk within the other states.  It's not a one-size-fits-all.

I personally think that having zero coverage, liability coverage, is let's just say an interesting decision by the Debtor.

Q    But you, in your deposition the other day, you stated you haven't done any state-by-state analysis on that, correct?

A    That's not to say that our insurance brokers in Lockton and some of the others we've contacted felt that there could be an ability to buy coverage by community even, by state. There's so many different ways that you could design this.

Q    And you said --

A    You could spend the next hour and a half you have talking about it.

Q    And you mentioned contract labor.  You said on your deposition that you think you could cut $50 million in the first six months.  Do you recall that?

A    I didn't have the projections in front of me.  I've subsequently had the ability to go and take a look at the projections that were put together by my team.  And I believe the savings and contract labor, there's $100 million a year

which is I consider not only low-hanging fruit but it's the most -- if you're going to ask me for three priorities, eliminating contract labor would be first, second, and third because patient safety and care is at the heart of what we do. And to me, that's the fastest way to stabilize the Genesis business.

And typically, you've got a one-and-a-half time payroll load with agency.  It can go up to two, two-and-a-half depending on how bad your staffers are at bringing in an agency.  But we felt that there was about $30 million of savings.  And I think it was maybe 20 million in the first year and 10 million in the second year, that it was small relative to Genesis getting stabilized as a business based on what I described before.

You've got 60 communities losing $78 million.  Of you can just get those to break even, and I'm not talking about ten percent which is your average margin which would be us saying we're just happy to be mediocre and average.  Talking about just figure out how to get those 60 communities just back to break even, you could pick up $78 million of EBITDA right there.

So we can sit here and pass through a few projections and assumptions, but there's so many ways to achieve growing this cash flow line from $98 million to $200 million.  We have several different sets of projections depending on where we're

able to be successful.

Q   But one way to do it is just cut $30 million of contract labor, you believe?

A   Not cut.  Eliminate.

Q   Eliminate.

A   Yes.  If we can hire full-time employees that know our residents that can provide consistent care to those residents as opposed to contract labor that comes in and picks up one shift here and there, and they leave and go and work in another building.  And if they don't do something or they do something bad, they don't really care.  There's no -- there's very little accountability.

Q   And you don't believe Genesis has already reduced the contract labor in the states that they're in?

A   I have made a career out of buying communities from national and regional operators, Kindred, Sava Senior Care, Sunrise Senior Living, Brookdale, these are the largest organizations, some of the largest senior housing and long-term care operators in the country.  We're a different type of operator, Dan.  We're a very high-touch operator.

A lot of these larger companies are what I would call babysitters.  They don't have the bandwidth when communities really go sidewards to send in a team like ours.  Turnaround is in our DNA.  It's all we've done, it's all we've ever done, and it's all we want to do.

Q    But you're basing your contract labor projections based upon the fact that you've owned no more than two skilled nursing facilities basically since COVID has started.  Is that correct?  Yes or no.

A    But we've owned other communities that have contract labor in senior housing.  So I find it a little strange that -- labor is labor.  Whether you -- whether -- and culture is culture. Whether you're running assisted living or independent living or skilled nursing or CCRCs, we're in the people business, Mr. Simon.  We're not in the healthcare business.

And you've got to encourage that workforce.  You've got to retain them, you've got to motivate them, you've got to keep them engaged.  The turnover in this industry is 70, 80 percent in your caregivers.  Your caregivers are 80 percent of the touches on your residents.  So if you're turning them over every seven, eight months, the consistency of care on your residents is going to be horrendous.

And that's going to show up in lack of patient safety, in hundreds of millions of dollars of tort liability and expense because to rehire those employees and retrain them is a hidden expense that most operators aren't even aware of what they spend.  And I'm not suggesting that we're the Genie in the bottle, that you know, we are smarter than anyone.  I just know that we've done this for 20 years, 39 times.

Our last communities that we bought from Sunrise Senior

Living, arguably one of the best assisted living and memory care operators in America, there was five communities.  We bought them during COVID.  They were losing $3 million of cash flow.  Now they're making, two-and-a-half years later, $3 million of cash flow.  It's a $6 million turnaround.  Two-and-a-half million of that was eliminating contract labor.

And by the way, these are the same communities --

Q    All right.

A    -- that you claim are in default with Welltower.

Q    I'm going to have to start striking this testimony.

A    Okay.

Q    Next time we go off on a tangent.  I've tried to be patient.

A    I'm sorry, I'm just trying to answer your questions.  They --

Q    No, I understand.

A    -- they're complicated answers.

Q    But you haven't talked to the management team about that at all.  Yes or no?

A    I haven't had access to the management team.  And ultimately, these aren't solutions that happen quickly.

Q    All of the bidders have had access to the management team.

A    Well, when I asked if we could have access to the management team, I was told we couldn't.  And that once we were the winning buyer, we could then start talking to them about

transition plans.  And I said, you know what, I actually respect that because we plan on augmenting the management team anyway.

We don't go into any organization thinking we know better, we know more.  We partner with them.  It's just -- it's a culture.  We get in alongside them.  We understand where their processes are broken down.  It's hard to evaluate people without process and, likewise, the capability of process without the right people.  Some people are in the wrong position.  A clinical advisory board we've put together with some of the best clinicians can help us evaluate where we can make improvements.  And this is a collaborative process.

Q   Do you recall some discussions we had in the auction room around Pennsylvania provider assessments.  Yes or no?

A   Yes, I certainly do.  We've been speaking about it for months.

Q   And this concerned you, correct?

A   Yes, it did.

Q   Okay.  And did you speak with Mr. Turnbull about this?  I did.

A   Yes?  You did?

A   I did.

Q   Do you speak with Mr. Turnbull often?

A   Not often.

Q   You said not often?

A    Not often, no.

Q    Did you text with Mr. Turnbull about it?

A    Maybe to the point of, Mr. Turnbull, are you available for a call, I'd like to get your understanding on this issue because -- yes, maybe, you know, to set up a call.

Q    But you don't text with him often, do you?

A    I mean, I don't know what often is.  I don't know what you consider frequent.

Q    Well, let's look at your deposition transcript.  If we go to Page 74.  I ask you, Line 7,

"Q    Did you speak to Andrew Turnbull after December 1st? "

     Wait, hold on.  Sorry, later in that,

"Q    How many times have you texted with Andrew Turnbull since December 1st?

"A    I don't believe I have.

"Q    Have you texted with Andrew Turnbull since November 18th or 19th?

"A    No.  I don't believe so.

"Q    Do you recall the last time you texted with Andrew Turnbull?

"A    I don't recall.

"Q    Fair to say you don't text with him often?

"A    I don't recall texting with him, Dan."

     Do you see that?

A    What I probably meant is I don't recall texting with him

often, Dan.  I don't -- yes.

Q     Okay.

A     I can see what you're saying.

Q     Will you pull Debtors' Exhibit 90?  It's one of the white -- we can actually put it on the screen.

A     Debtors' Exhibit 90.

Q     And there's a lot of pages to this, so you may just want to scroll through.  Do you have -- you might as well get --

A     Sorry, what page again, Dan?  This closed on me.  Was this Page 73?

Q     It's Debtors' Exhibit 90.

A     And what page was the testimony again?

Q     71.  Do you want to take a look at it?  There's about, I don't know, 15 pages of text messages with you and Mr. Turnbull.  I don't know if you want to take a look at them. In fact --

A     This is October 18th, I'm seeing, right?

Q     You could keep flipping.

A     Yeah, but can you -- sorry, can you tell me the page of the testimony?  Because I think you had some exact dates.  I think you had December 1st to November 17th or 18th from memory.

Q     It was Page 74.

A     74.

        MR. SIMON:  Can we just keep scrolling?

THE WITNESS:  I'm sorry, I'm completely lost on your exhibits here.

BY MR. SIMON:

Q    Page 90, the first about 20 pages, and they skip every other page for some reason.  But the first 20 pages or so are text with you and Mr. Turnbull.  Sometimes you send screenshots to Mr. Turnbull.  You've spoken with him many times or texted with him a number of times.

A    This is November 1st, November 2nd.  Your question was between November 17th and 18th and then December 1st.

Q    No.  What the deposition transcript says is, "How many times have you texted with Andrew Turnbull since December 1st?"  You said, "I don't believe I have."

      The next question was,

"Q    Have you texted with Andrew Turnbull since November 18th or 19th?

"A    No, I don't believe so.

"Q    Do you recall the last time you texted with Mr. Turnbull?

"A    I don't recall.

"Q    Fair to say you don't text with him often.

"A    I don't recall texting with him."

      And my question to you is your deposition transcript from two days ago.

A    Maybe I understood the last part.  But everything you're showing me on the screen is November 8th.  That's before the

November 17th and 18th you spoke about, and certainly nowhere near December 1st.  We're still on November 8th.  This is like right at the beginning --

Q    Do you want to go to the text after December 1st?

A    I'm just looking at what you've given me here.  This is like me trying to figure out diligence to understand what you have described and your experts have described as an extremely complex -- complex business, especially when we both know I wasn't getting a fair shake and I wasn't getting information from the Debtor and the Debtors' experts in Ankura that fairly described the issues around the pre-petition claims and what we've later now called P-22, the (indiscernible) lease --

Q    Can we go back to the text --

A    -- which is $411 million of --

Q    Excuse me, Mr. Farber.  The question is you testified two days ago that you don't text with him, that you haven't texted with him since December 1st.  And my question to you --

A    And --

Q    My question to you is was that testimony incorrect?  Yes or no?

A    It was incorrect, I think, mostly as it relates to that last question, which was a follow-on question after December 1st.

Q    Do you see some texts since December 1st?

A    I'm on November --

Q    From the days prior --

A    I'm on November 12th.

MR. SIMON:  Sorry, can we --  I know, it's lagging, sorry.  I think that was it.  That was it.

BY MR. SIMON:

Q    So there are texts from December 1st.  There were texts in the days prior.

A    I'm looking at November 14th still in front of me, Dan.

Q    Sorry, it's scrolling.

A    And this is as it relates to a DIP, as it relates to Centerbridge.  I wanted to find out whether there was other DIP lenders.  This is before I realized that the DIP --

Q    But the answer was yes, you were texting with Mr. Turnbull in the days prior to the deposition, and then you testified that you can't even recall the last time you testified --

A    No.  These were -- these were November 17th and 18th, if you go back to your question.

Q    Okay.  I think the record --

A    I'm still looking at November --

Q    I think the record is clear and the exhibit is in.  Let's move on.

A    Okay.

Q    We'll try to stick with -- I want to talk about Mr. Ari Schwartz.  And you were deposed two days ago, correct?  And you testified that the first time you were introduced to

Mr. Schwartz was in mid-October, correct?

A    Correct.

Q    Around October 18th?

A    Correct.

Q    And you didn't know him previously, correct?

A    Correct.

Q    And you testified at that time that you were aware in mid-October of his Medicare exclusion.

A    Correct.

Q    Correct?

A    Yes.

Q    And had you seen the settlement agreement?

A    I hadn't.

Q    You hadn't?

A    I had no reason to -- I would take him -- I would take him at his word.

Q    You took him at his word that he was excluded from Medicare for 10 years?

A    Yes.  He disclosed it to me.  I wasn't going to ask him to send me the agreement.  I'm not an attorney.

          MR. SIMON:  So can we pull up Debtors' Exhibit 40, please?

          THE WITNESS:  Sorry, can I find it?  Where can I find it, Dan?

BY MR. SIMON:

Q    It's all in the white binders, 40.  Do you need some help?

A    So is it not this binder anymore?

Q    I don't know which binder.  Exhibit 40 isn't?  I think it's this one.

          THE COURT:  It's on the screen, right?

          THE WITNESS:  Okay.

BY MR. SIMON:

Q    And this is just at the top.  This is an agreement between DOJ, OIG, HHS, and Mr. Schwartz, correct?

A    I have never seen this before.

Q    Do you know whether Saratoga Springs is a skilled nursing facility?

A    I guess if it's in here and it's part of a settlement agreement, it by its nature would probably be a skilled nursing facility.

Q    Okay.  Recital C, do you believe that Recital C means that Ari Schwartz knowingly presented or caused to be presented false and fraudulent claims for payments?  Is that your understanding?

A    If that's what's alleged in the settlement agreement.

Q    And in Recital F, if you look at that, do you believe it states that Ari Schwartz lacked adequate financial resources to fund initial operating costs at the facility?

          MR. LAYDEN:  Your Honor, objection just because that's not a correct reading of that first sentence.

THE COURT:  Ari Schwartz and they lacked adequate financial resources to fund the initial operating costs of the three nursing homes.

MR. LAYDEN:  That's correct.

THE COURT:  Okay, so the question?

BY MR. SIMON:

Q    Do you understand that Mr. Schwartz lacked adequate financial resources on that nursing home based upon your reading of it?

A    I think you're enlightening me.  I'm seeing this for the first time.

Q    Okay.

A    That's what it says, yes.

Q    And you would agree that Recital J contends that he certified information under penalty of perjury?

A    That's what it says.

Q    Is that correct?

A    That's what it says.

Q    And then the very next recital, it says that he misrepresented that relationship.  Based upon what you've seen, are you concerned that Mr. Schwartz misrepresented his relationship to you?

A    No.  To put it in -- Dan, no one was trying to hide the ball here.  I have grown up in a bulge bracket investment banking environment, and I've operated for 20 years in the

second most regulated industry in the U.S. after nuclear power, skilled nursing and assisted living. Everything we do has to be in regulatory compliance.

So -- and we brought him to the auction. If I would look -- why would have Ari come to the auction if any Google search could turn up that he's under an exclusion agreement? Ari was simply a consultant to Milrose Capital and, if anything, he was going to be a minority non-control investor in one of the real estate entities.

Genie 3 is not an operator. It's never going to be an operator. It's a bidding entity. And if we were successful at closing the transaction, in estimation there are going to be three entities formed for every SNF. That's 175 times 3, you do the math. It's roughly about 550 entities. They're going to be intermediate Holdco companies. They're going to be separate entities for all of the ancillary companies. And all of those are going to have different regulatory scrutiny.

Now, my understanding, and it's a business professional understanding. I'm not a lawyer. But I have met -- some of my landlords, and some of the most successful people I know in senior housing were former operators that landed up being excluded, and so they went on to the landlord side. And they don't have to deal with the headache of operations. They're extremely successful. Some of them have 50 to 100 communities, and it happens.

Q    So you don't think you had to disclose that by making a bid in a very public bankruptcy, that one of the members of that bid was part of a 10-year voluntary exclusion?  You don't think that that's important for the Debtors to know?

A    Dan, you guys have billed this estate, I don't know, $26 million.  No one was trying to hide anything from you.  You're some of the most --

Q    But you didn't disclose it, right?

A    But you're some of the most competent guys.  I never thought -- we never thought it was an issue, because Ari was never going to own anything to do with operations.  We were never going to let him do anything that would jeopardize our bid.  And maybe I'm guilty of being stupid, but certainly we would never do anything that would jeopardize the regulatory framework of his exclusion agreement.

We've got major counsel, we've got major regulatory counsel, and everything we do is based on the advice of counsel.

Q    So, Mr. Farber, can you turn to Paragraph P?  There's a reference in Paragraph P, it that says that --

A    Right.

Q    -- Ari Schwartz acquiesced to Joseph Schwartz.  Do you recall earlier when Mr. Hall mentioned Joseph Schwartz and the Court said, I hadn't heard that name.  Do you know the name Joseph Schwartz?

A     I do not.

Q     You don't know?  You don't know if he served three years for fraud?

A     I do not know Joseph Schwartz.

Q     Okay.  And do you see that Mr. Schwartz signed this document?

A     I do not.

        MR. SIMON:  Can we scroll down?

        THE WITNESS:  I haven't seen this --

BY MR. SIMON:

Q     You have the --

A     I haven't seen this document before.  I mean, if you show me a signature, I'll take your word for it that he signed it.

Q     Right there.  He signed it?  Just take a look at that signature.  It's very short, right?

A     (No audible response)

Q     Okay.  On October 30th, Genie submitted an LOI to Genesis, correct?

A     Correct.

Q     And that's Debtors' Exhibit 18.  Can we pull that up?  And if you look at it.

A     I'm sorry, 18 here, I've got --

Q     18.

A     -- I've got an initial warrant letter.  Am I just --

Q     18?

A     Could you at least give me the exhibits, please, that you're going to be asking me about today?  It would --

Q     We're pulling them up on the screen.

A     I know, but.

Q     18 is right here.

A     18 and there is a warrant agreement.

Q     This is 18.  It's the white --

A     I think it's this one, right?

I'm sorry, Dan.  There's no 18 in this one.  But why don't we carry on.  I'm respectful of the Court's time.  There's no 18.  It starts --

Q     We'll just pull it up on the screen.

A     It starts at 22.

Q     We'll just pull it up on the screen.  This is Genie 3 Partners LLC letterhead, correct?

A     Correct.

Q     And it says your name, Rowan Farber, President, correct?

A     Yes.

        MR. SIMON:  Okay.  Can we go to Paragraph 12?

BY MR. SIMON:

Q     And Paragraph 12 says, "Genie 3 Partners LLC is a joint venture between Milrose Capital, LLC, Palladium M&S Capital Partners, LLC, and Integro Asset Management, correct?

A     Correct.

Q     Integro is you, correct?

A      Integro is me.

Q      And Milrose is Jacob Sod, correct?

A      Yes.

Q      And Palladium is Ari Schwartz, correct?

A      Yes, it is.

Q      So it's a JV with those three entities.

A      It's -- these are the financing sources that are going to be providing capital to --

Q      That's not what that says, though.  That says Genie 3 Partners LLC is a joint venture between Milrose, Palladium, and Integro, correct?

A      Correct.  But it's under the topic "Financing Sources." And to the extent that it's -- you're going to construe it as a joint venture then, maybe Palladium -- the intent at the time is he would be a joint venture partner, small minority, non-controlled interest in the real estate since we knew that there was about $500 million worth of real estate that we were going to have to raise capital for in order to exercise the purchase options of NextGen and CCGen, $420 million.

Bold Quail, potentially there was another $60 million there if we would have the ability to buy out that joint venture partner.  And then there was Seafire, which I understood was like another $25 million.  So that's my roughly billion dollars.  We were trying to get organized very quickly. Ari has a tremendous Rolodex with respect to real estate.  It's

all he does because of his exclusion agreement and the fact

that he's got no interest in being an operator.

And I would have no interest in him being an operator and

putting his hands on any one of our residents. He's not a

clinician. He's not an operator. He loves his real estate

role. And as I've said, we're going to form 500 entities.

Most of -- some of those entities are going to be entities with

respect to acquiring the real estate for the joint venture

Propcos that's Genesis' interest in those real estate Propcos.

And that's where Ari was going to spend his time from a

capital-raising perspective and potentially an asset management

perspective if we were successful.

Q     You know that Genesis owns one real property, correct?

A     I know that Genesis has -- no, I don't know that to be the

fact. I know that Genesis has equity interests and purchase

options on $420 million worth of real estate.

Q     So they have minority interest in joint ventures that own

real estate, correct? But they only own one?

A     And if they exercise their purchase options, Mr. Simon,

it's going to require $420 million. I wish I had the time back

in my life that I've spent on the phone with REITs convincing

them to provide us financing to exercise these purchase

options.

Other than the billion dollars that we've committed in our

bid to Genesis, we're still working on coming up with another

-- we were working on coming up with another $500 million.

Remember, you've been working on this for nine months. You

know, I picked this up weeks before this LOI. I've been

working on this for maybe two-and-a-half, three months.

So we were all hands on deck. We were trying to pull all

the levers we can to get organized to comply with what we

thought were some very, very difficult, you know, bidding

procedures. But we wanted to make sure that we could comply

and play the game by your rules.

Q    So the bid submission date was November 7th, correct?

A    Correct.

Q    And Genie 3 submitted a bid, right?

A    You're looking at it.

Q    Actually, let me go back. Genie 3 was formed a day or two

before this letter, correct? Before October 30th?

A    It was formed specifically as a bidding entity, yes.

Q    And it was a joint venture between those three parties,

correct?

A    Genie 3, once again, was a --

Q    That's what that said. I'm using your words, not mine.

You signed that letter, correct?

A    So Genie 3 is really a joint -- as it relates to the Genie

3 Holdco, the joint venture entity is myself and Jacob Sod.

I'm the bankruptcy guy. I'm the guy who's going to be doing

the operating, who's going to be figuring out the operations.

Mr. Schwartz is a real estate guy.  And ultimately, he was going to have a participation, something we would figure out, depending on what real estate we were actually going to be able to buy within the bidding process.

Q    Let's go to the bid submission.  Let's go to Debtors' Exhibit 20, okay?

A    Yeah.

Q    Actually, I'm sorry.  Let's go to Debtors' Exhibit 27, which is a Monticello term sheet dated November 7th.

A    Correct.

Q    That's the same date as the bid submission, correct?

A    Yes.

Q    Can we go to the signature line, please?

A    Please.  Can we just stop in the recitals for a second?

Q    Sure.

A    If we could just back it up?  We were talking about the company and what we're bidding on.  Could you read F for me?

Q    So -- no.

A    Okay.

Q    I'm going to ask the questions --

A    I'm sorry, okay.

Q    -- and your counsel can clean it up --

A    Okay, thank you.

Q    -- if it can be cleaned up.  So on Exhibit 27, you signed this document, correct?

Farber - Cross/Simon

A      I did.

Q      And you signed it on behalf of Genie 3?

A      Yes.

Q      And Mr. Sod signed it on behalf of Genie 3?

A      Yes.

Q      And Mr. Schwartz signed it on behalf of Genie 3?

A      He did.

Q      That signature looks familiar, doesn't it?

A      (No audible response)

Q      Okay.  And then can we go to --

A      And this is for three --

Q      -- Page 2?

A      Was this the one for $340 million?

Q      It's for $340 million.

A      Okay.

Q      So on Page 2, it says, "Guarantor and Key Principal."

A      Yes.

Q      And do you see it references Rowan Farber, Jacob Sod, and Ari Schwartz, correct?

A      Yes.

Q      And see where it says "Guarantee," I think maybe slightly down.

A      "Guarantor and Key Principles?"  What are we -- I'm sorry, you're moving around really quickly.

Q      So you're a guarantor on this, correct?

A    On this non-binding letter of intent, I am willing to be a guarantor, but I won't be a guarantor until I sign an actual guarantee agreement.

Q    But you were going to provide a personal guarantee under this term sheet, correct?

A    Those are the terms of this term sheet.

Q    And Mr. Schwartz was going to provide a personal guarantee on this, correct?

A    Correct.

Q    And it was for $340 million, correct?

A    We were pulling out all the resources we can in order to be competitive because we knew that we were going to have to use part of this $340 million loan to buy real estate.  And to the extent that the loan would be used to buy real estate, Ari would be a guarantee.

Q    But let's go to Page 4.

A    This is a non-binding LOI.

Q    But let's go to Page 4.

A    This is not a guarantee agreement.

Q    So on Page 4 --

A    Just for clarification because you asked me that question.

Q    Hold on, Mr. Farber.  On Page 4 --

A    Yes.

Q    -- do you see where it says "Guarantee?"  It says, "Each guarantor shall jointly and severally guarantee 100 percent of

the facility amount, correct?

A    That's what it says.

Q    So based upon the words on the Page, you would guarantee $340 million, Mr. Sod would guarantee $340 million, and Ari Schwartz would guarantee $340 million, correct?

A    Yes.

Q    And later you disclosed that Mr. Schwartz is a consultant, correct?

A    Mr. Schwartz has always been a consultant to Milrose, as I understood it.

Q    And a consultant would sign a $340 million personal guarantee?

A    To the extent, Mr. Simon, that we bought $500 million worth of real estate and we had to use part of this $340 million, which is $165 million higher than the $175 million revised term sheet we have for Monticello, which I'm sure you're going to show me in a moment, to the extent that we have to draw down that extra $165 million, yes, Mr. Schwartz was prepared to sign on those loans with respect to the real estate we were buying as identified in little F --

Q    But there's nothing --

A    -- at the beginning of this term sheet.

Q    But there's nothing in here that separates out real estate versus something else, correct?

A    Because it's a non-binding letter of intent for a

bankruptcy where we didn't even know how much we were going to have to spend.  We came in at our opening bid, and Mr. Schwartz, Jacob, or myself, had no idea where this was going to bid to and what assets we were going to be purchasing and what assets we weren't going to be purchasing.  And there were some surprises at the auction as it relates to real estate.

And as we -- as the dust settled, we realized that the purchase options for NextGen and CCGen were subjects of massive litigation.  So it would be less likely that we would be purchasing that real estate.  And Bold Quail, lo and behold, which we were told was subject to litigation and was not going to settle, became an issue where you showed up with a settlement agreement, I think it's 6:00 on Monday during the auction.  And now that real estate was off the table.

Q     So Mr. Schwartz [*sic*]?

A     So --

Q     Mr. Schwartz, there's nothing in this document that's --

A     I'm not Mr. Schwartz, I'm Mr. Farber.

Q     I'm sorry.  I'm sorry.  You're right.

Mr. Farber, there's nothing in this document that separates it out.  Under this document, he was going to be the personal guarantor under $340 million, correct?  Yes or no?

A     I'm sorry, that was a very long question.  Would you mind --

Q    There's nothing in this document that separates out real estate versus operations, correct?

A    Not in this document because --

Q    Okay, that's all.

A    -- this is Holdco bidding document.

Q    That's all.  Next question --

A    It's not the final loan agreements.

Q    So the first time that you referenced this real estate was actually in your declaration, correct?  The fact that he was only interested in the real estate.  Is that correct?

A    Because we were responding to information requests from you guys.

Q    But the week before, you submitted a diligence request and it said nothing about real estate, correct?  It actually just said he was a consultant.

A    You would have to show me --

Q    I will.

A    -- the page you're referring to.

Q    I will.

A    Please.

Q    You were at the auction, correct?

A    You saw me at the auction, Dan.  I'm sorry, you --

Q    And was Mr. Schwartz at the auction?

A    He was.

Q    And was he active at the auction?

A    Ari's a big personality.  He's always active.

Q    He was a big personality and he was on the record multiple times, correct?

A    Yes.

Q    And during your deposition -- and the auction, he was at both days of the auction on November 18th and November 19th, correct?

A    Yes.

Q    And during your deposition, you testified that you and Ari agreed in the day or two after that auction that he was out of the deal.  Do you recall that?

A    Within a couple of days after the deal.

Q    Within a couple of days.

A    Yes.

Q    So 18th and 19th, it was within a couple of days, correct?

A    I didn't -- when you say I testified that he was out, it was a mutual -- it was a mutual decision to go down different paths or an alternative path here because there was no real estate involved anymore and we had bid the deal to over a billion dollars.

And Ari said, look, guys, I'm not interested in putting money into a billion-dollar deal at this point.  We started out at 720 and there's no real estate involved because Bold Quail's gone.  NextGen and CCGen are unlikely to be exercised.  And I understand that Seafire has already said that there is no

Farber - Cross/Simon

interest from Genesis.  So at that point --

Q    But Genesis still owns one facility and Bold -- I'm glad you brought up Bold Quail.

A    But one facility is about as interesting to Ari Schwartz as a heart attack.

Q    I'm glad you brought up Bold Quail because you said Mr. Schwartz would never have an interest in operations, correct?

A    Correct.

Q    Bold Quail operates the facilities.  You know that, correct?

A    But there was real estate from Bold Quail.

Q    But you know that Bold Quail operates its facilities?

A    I know Bold Quail operates its own facilities.  What I also know is that they -- what I believe I understand, because I've been given a lot of very conflicting information in this diligence process, is that there might have been an opportunity to buy out the Bold Quail joint venture partner, both the real estate and the operations, potentially on a fee-simple basis.

Q    So just to be clear, you stated -- the auction was on Tuesday and Wednesday.  And you stated very clearly that we went back and forth on the record at the deposition.  There was confusion, and we cleaned it up.

Q    Okay.

A    Mr. Schwartz bowed out a day or two after.  So the auction

was Tuesday -- and this is important because schedule is important. The auction was Tuesday and Wednesday. And that means he bowed out Thursday and Friday. Or Friday. You agree, correct?

A     No, I don't agree.

Q     That's what your -- do we need to go to your deposition?

A     We can if you want. But the intent was that within the next few days, and you can interpret that as one or two, within the next few days, certainly by the time that we answered your information request, Ari was no longer going to be involved in any of the real estate deals.

Q     So we requested a letter -- we sent a letter on November 23rd, correct?

A     If you show me -- I don't remember the days the way you do.

Q     Let's go to Debtors' Exhibit 29.

A     You're looking at them. So if you want to share an exhibit with me, I'm happy to look at it.

Q     Go to Debtors' Exhibit 29, please. So we sent this letter, it's from Jerry Hall, on November 23rd. Have you seen this letter?

A     I have.

Q     And one of the questions, if you scroll down, in E --

          MR. SIMON:  -- sorry, E, a little up --

BY MR. SIMON:

Q     -- is confirm which of Rowan Farber, Jacob Sod, and Ari Schwartz are personal guarantors.  Do you see that?

A     I certainly do.

Q     And then Genie 3 responded a few days later on November 26th.

A     Correct.

Q     November 26th, correct?

A     Yes, correct.

Q     And that's Debtors' Exhibit 30.  And there you attached a new term sheet from Monticello dated December -- I'm sorry, November 21st, correct?

A     Not correct.  We attached a revised term sheet because we no longer needed $340 million of debt to close a -- the cash component of our deal was about $316.5 million, of which $57.5 million was cash that were the proceeds of Bold Quail.  The $259 million that we bid, in order to finance that, we no longer needed $340 million of debt.

And I kept hearing the Debtors complain that they're not going to value our promissory note unless they feel that there's a minimum amount of equity, first-loss dollars.  The Committee said the same thing.  It would give them a lot more comfort if they knew we had a large amount of equity in the transaction.

So in our final bid, we clarified that we would have a minimum $120 million of equity.

Q    Mr. Farber?

A    And we bid $260 million, so we figured we would need about $175 million of senior debt, $150 to make up that gap, and another $25 million for closing costs and everything else.

Q    Mr. Farber, I want to be efficient, okay?  I want to focus on the schedule, okay?

A    Sure.

Q    I'm going to hand you a demonstrative.  With Your Honor's permission, I'll hand you a demonstrative, because the schedule is important.

So you would agree on here that day one of the auction is November 18th, correct?  It's a yes or no.

A    Yes, if that's what it was.

Q    And you would agree that day two of the auction is November 19th, correct?

A    Correct.

Q    And that concluded with the final sealed bids, correct?

A    Correct.

Q    And then we received a new Monticello term sheet dated November 21st.  Do you want me to pull that up for you?

A    I know that there was a -- I know that there were documents coming out of Monticello, some of which on the revised term sheet were incorrect.  So pull it up and let's look.  But I know they were late, they were replaced.  But I'm sure you're going to show me all the versions of them.

Q    So we have the November 21st.  We're going to pull that up.

THE COURT:  Can I just ask, how are we on time?

MR. SIMON:  Only a few more minutes.

THE COURT:  Well, no.

MR. SIMON:  I'm sorry.

THE COURT:  On the six and six.

MR. SIMON:  Oh.

UNIDENTIFIED SPEAKER:  My understanding from our request is that the Debtors are out of time on the six and six. I'm not trying to cut off Mr. Simon.  And then we have --

THE COURT:  How much over have they gone?  Five minutes?

UNIDENTIFIED SPEAKER:  About five minutes.  I think it was about approximately five minutes.  Let's say I got told that --

THE COURT:  Okay.  Let's wrap it up in another five minutes.

MR. SIMON:  Sure.

THE COURT:  I'm giving you 10 overage.

BY MR. SIMON:

Q    So on -- this is the November 21st.  This is the November -- if we scroll down to the term sheet, it's dated November 21st, correct?

A    Correct.

Farber - Cross/Simon

Q    And if you go to the signature line --

A    Sorry.  Can I just see the amount of this term sheet so that I can -- because you're moving.  I don't have the exhibits in front of me.  This is the one for $175 million.

Q    As part of your diligence request, you sent a November 21st term sheet.  And as part of those diligence requests --

A    Yes.

Q    -- which were sent according to the schedule on November 26th, right, you sent a letter on November 21st, and you said Mr. Schwartz is out, correct?  He has no go-forward role, correct?

A    Correct.

Q    Okay.  And --

A    And the date of this, that was on November 26th, right?

Q    You sent it on November 26th, but this letter is dated November 21st, correct?

A    Okay.  Yes.

Q    Okay.

A    Yes.

Q    And so in the November 21st date, there's no reference if you go to the guarantors of Mr. Schwartz.

A    Can you show me the guarantors?

Q    Sure.

A    I don't have it in front of me, please.

Q    It's up.  Right there.  Guarantor and key principal.

Rowan Farber, Jacob Sod.  No --

A    No Ari Schwartz.

Q    We've removed Ari Schwartz, correct?

A    Correct, as a guarantor and principal.

Q    Correct.

A    Yeah.

Q    But on November 24th, Ari Schwartz actually signed this term sheet, and it was predated --

A    Can you show me the signature block?

Q    There's no --

A    On this term sheet.

Q    On this term sheet --

A    On this term sheet.

Q    -- there's no Ari Schwartz.

A    Sorry?

Q    Scroll down to the signature.  There's no Ari Schwartz.

A    On -- yes.  So you have the right term sheet then?

Q    Correct.

A    Okay, because Ari wasn't going to sign on a loan on a deal he was no longer involved in.

Q    But on November 24th, you actually asked for a fully executed term sheet with Ari Schwartz, correct?

A    I asked where the signed term sheets were.  I didn't have --

Q    So we were --

A    -- I didn't have control of documents.  I was buried in paper.  If I was looking for a copy of the term sheet --

Q    So let me see if this refreshes your recollection.

A    Okay.

Q    This was produced to us last night.

A    Okay.

MR. SIMON:  It's Debtors' Exhibits 95?

THE COURT:  Okay.

BY MR. SIMON:

Q    So on November 24th --

A    Yeah.

Q    -- at 4:12 p.m., you asked for a fully executed one with Ari and Jacob, correct?

A    Yes, that's what the email says.

Q    And, in fact, if you go to the second page, there's a fully executed version attached, and Ari Schwartz is on there. And, in fact, if you go below, Mr. Schwartz signed on the 22nd, correct?

So Mr. Schwartz signed the term sheet.  Maybe it was dated the 21st, but Mr. Schwartz signed this term sheet, correct? Based upon this email chain?

A    There was what I understand to be a term sheet that was signed by Ari Schwartz of a revised term sheet.  When we caught the error and Ari had decided that he no longer wanted to be involved, we asked our lender to reissue another term sheet,

which was provided to you, which is on the screen.

Q   So later that night, you asked for Mr. Schwartz to be removed, correct?

A   What night are you speaking about specifically?

Q   November 24th.

A   I don't know what I'm asking for.  I'm asking to see --

Q   Well, November 24th at 4:00, you asked for the fully executed one with Mr. Schwartz, correct?

a   I'm seeing this at, yes, 4:12.

Q   At 4:12, you were asking for the fully executed one.  And then at 9:02 --

A   I don't know what -- there was -- I don't know what I was --

Q   Would you like to see an email?

A   I don't know what I was asking you then.  You sent me a fully executed term sheet, but Ari and Jacob, maybe it was a typo.

Q   This is Debtors' Exhibit 99.

A   Okay.

        THE COURT:  I think you're about to be out of time, if not.

        MR. SIMON:  I'll be two minutes.

BY MR. SIMON:

Q   And you asked at 9:00, at 9:00, for him to be removed, correct?

A    The same doc without Ari.

Q    And you're aware that on November 24th, the Debtors actually made a disclosure about the issue, correct?  Yes or no?

A    I'm not aware when you guys made a disclosure about the issue.

Q    So between 4:00 and 9 p.m., the Debtors made a disclosure, and you went and took Ari out, correct?

A    We had had conversations from the end of the auction until the 25th of what Ari's role was going to be.  And there really wasn't a role for Ari And Ari didn't want a role since there was going to be no real estate so --

Q    I know we're out of time.

A    --  so we were spending time --

Q    I just want to do one more thing.

A    -- providing documents to you guys that you needed, and there were a bunch of different term sheets floating around. And when I saw that it had Ari on --

MR. SIMON:  Can we go to the November 21st --

THE WITNESS:  -- I asked for the one that didn't have Ari on because he didn't need to be on it.

BY MR. SIMON:

Q    On the November 21st term sheet --

THE COURT:  Last question.

BY MR. SIMON:

Q    On the November 21st term sheet, it was actually signed in the evening on November 24th, correct?

A    I don't know.

Q    Let's pull up the signature block.  There's a Docusign.

A    Okay.  We signed it when we signed it, but it was before we made the disclosure on the 25th that Ari wasn't going to be involved, and Ari is not going to be involved.

Q    So it just happened to be right after the Debtors made the disclosure that Ari was removed, not because of the real estate and not because he was a consultant, correct?

A    Dan, you can try and spin this any way that works the Debtor, but it's -- you know, your -- not my circus, not my monkeys.  At the end of the day, Ari is not involved.  We --

THE COURT:  Okay.

THE WITNESS:  -- and that's --

MR. SIMON:  I have no further questions.

THE COURT:  All right.  Any redirect?

MR. LAYDEN:  Your Honor, I have four questions.

THE COURT:  Okay.  And I don't know, where are the opponents on their timing?

UNIDENTIFIED SPEAKER:  Your Honor, we have approximately 31 minutes left for the --

THE COURT:  Thirty-one.

UNIDENTIFIED SPEAKER:  -- opponents.

THE COURT:  Okay.

MR. LAYDEN:  I have one clarification for the record, Your Honor.  Mr. Simon at one point said that document produced by Genie was produced last night.  It would have been produced before the beginning of the hearing, so at least 24 hours before that.

THE COURT:  Okay.

REDIRECT EXAMINATION

BY MR. LAYDEN:

Q    The four questions I have for you, Mr. Farber, are is Mr. Ari Schwartz a part of Genie's bid or proposed transaction in any way?

A    Going forward?

Q    Yes.

A    No.

Q    Will Mr. Ari Schwartz ever be involved in the transaction?

A    No.

Q    Is Genie okay with an order from this Court confirming those things?

A    Yes.

Q    Is Genie willing to pay for a monitor to ensure that those things remain true?

A    Yes.

MR. LAYDEN:  No further questions.

THE COURT:  Okay.  Thank you.

THE WITNESS:  Thank you.

THE COURT:  You're excused from the witness box.

(Witness excused)

THE COURT:  All right.  So it sounds like the opponents have 30 minutes if they choose to use it.

(Pause)

MR. SPECTOR:  I want to put a housekeeping issue on the record.

THE COURT:  All right.  Mr. Spector, go ahead.

MR. SPECTOR:  Olumie wants to call one witness.  We need about 10 minutes of the 30 minutes left.  I'm advised that Genie wants two more witnesses.  As long as I get my 10 minutes, I don't care.

THE COURT:  Okay.  Is Genie listening to what Mr. Spector is saying?  If you've got 30 minutes, he wants 10 of it.

UNIDENTIFIED SPEAKER:  I'm sorry, Your Honor.

THE COURT:  Thirty minutes left.  Mr. Spector, Olumie wants 10 minutes of that.

(Counsel confer briefly)

THE COURT:  Okay.  Who do we have here?  The witness is?

MR. WALKER:  Good morning, Your Honor.  First --

THE COURT:  It's not morning.

MR. WALKER:  Sorry.  Good afternoon, Your Honor.

THE COURT:  Maybe in China it is.

MR. WALKER:  It's been a long day.  I understand.

THE COURT:  Okay.

MR. WALKER:  My name is Eric Walker.  I'm with the law firm Cooley.  We represent Monticello.  The next witness would be Joseph Borenstein from Monticello.

THE COURT:  Okay.  Please raise your right hand.

JOSEPH BORENSTEIN, MONTICELLO'S WITNESS, SWORN

THE COURT:  Okay.  Please be seated.  All right.  And I do have a declaration that was filed --

MR. WALKER:  Excellent.

THE COURT:  -- right in front of me.  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. WALKER:

Q    Good afternoon, Mr. Borenstein.  With whom are you employed?

A    Monticelloam.

Q    What is your title at Monticello?

A    Senior Managing Director.

Q    How long have you worked at Monticello?

A    It'll be 10 years this March.

Q    Could you briefly describe for the judge the nature of Monticello's business?

A    Monticello is a bridge lending company.  We're a bridge lending firm.  We lend particularly to skilled nursing

facilities.  Throughout our legacy, we've originated over $10 billion in loans to skilled nursing owner operators, with a heavy focus on distressed and turnaround facilities.

Q    Has Monticello closed any significant loans to borrowers who operate skilled nursing facilities in the past 12 months?

A    Yes.

(Clearing throat) Excuse me.

In the calendar year, this calendar year, we will have originated over a billion and a half in loans to skilled nursing and senior living owners and operators.  And within the last 12 months, we originated two separate loans to two separate portfolios of skilled nursing facilities, each of which was for over $400 million.

Q    Did Monticello provide a term sheet to finance a bid by the Genie bidder in these bankruptcy cases?

A    Yes.

Q    Was that term sheet turned into a final commitment letter?

A    Yes.

Q    Is a copy of that final commitment letter attached as Exhibit F to your declaration that has been submitted in this case?

A    Yes, it is.

Q    Was Monticello paid a commitment fee or any other payment for the commitment letter?

A    (No audible response)

Q    Is Monticello being paid to travel to Dallas and sit in court for the past two days with its counsel and testify at the hearing today?

A    No.

Q    So your participation in this hearing is completely voluntary?

A    That is correct.

Q    Why is Monticello doing this?

A    We're here to support our borrower.

Q    Did Monticello also enter into two side letters that include additional terms relating to this funding proposal?

A    Yes.

Q    What additional terms were included in those side letters?

A    It was two different side letters, each of which had two separate terms, one of which reflected additional economics in the form of equity warrants that we were to receive as part of this transaction. The second one included a supplemental obligor for which we had additional interest that we would be paid from that obligor.

Q    And so we'll call the equity warrants side letter, the equity warrants side letter, is a copy of the final equity warrants side letter attached as Exhibit G to your declaration that's been submitted in this case?

A    That is correct.

Q    And is a copy of the second side letter that you

described, which we'll call the final interest rate side letter

attached as Exhibit H to your declaration that's been submitted

in this case?

A     That is correct.

Q     Could you describe for the Court briefly why those terms

were included in side letters as opposed to the term sheet and

commitment letter?

A     Yeah.

Each of the side letters for different reasons.  We, as I

mentioned earlier, were a lender primarily.  It was that when

we came to the determination that there was going to be

economics in the form of equity, just given that we've rarely

ever had equity interests, just as papering goes, we put it

into a side letter to reflect economic interest in equity,

economic interest in debt.

The second side letter that we had was because of, as I

mentioned, there was a supplemental obligor that was not an

obligor to the primary term sheet.  And given that it was a

separate obligor, we reflected those terms and conditions into

its own side letter.

Q     Thank you.  We've heard about an individual by the name of

Ari Schwartz a lot over the past two days.  Is Ari Schwartz a

key person or guarantor under the final Monticello commitment

letter?

A     No.

Q    Is Ari Schwartz a party to either of the final side letters that you just testified about?

A    No.

Q    Why did Monticello remove Ari Schwartz from the lending documents?

A    There's only one key principal to us, and that is Jacob Sod.  We were asked to remove Ari.  He's told he was not in the deal.  It didn't matter to us.

Q    And just so we're clear, what is your understanding about whether Ari Schwartz remains involved in the Genie bid in any fashion?

A    He is not involved, is my understanding, at all.

Q    Mr. Borenstein, you were here all day yesterday too, correct?

A    Yes.

Q    Do you recall hearing Louis Robichaux testify about his understanding that Monticello relied upon all three of Rowan Farber, Jacob Sod, and Ari Schwartz --

A    Yes.

Q    -- in its commitment to fund the Genie bid?

A    Yes.

Q    Is that true?

A    No.

Q    Why is that not true?

A    We did not rely on all three of those principals.  In our

term sheet, we did put all three principals, but there was only one that we relied on, and that was Jacob.  It was that we were able to put all three of them in there, but we never needed all three.  Jacob was the only principal we were relying on.

Q   Does the removal of Ari Schwartz impact Monticello's continued willingness to provide funding for Genie 3's bid in this case?

A   No.

Q   Based on what you heard yesterday and so far today, does Monticello have any concerns regarding the lending commitment that Monticello has made to Genie as part of its bid?

A   No.

Q   Does Monticello still intend to close on the proposed financing to Genie 3 based on the terms and conditions of the final commitment letter and the two final side letters?

A   Yes.

MR. WALKER:  I have no further questions, Your Honor. I'll pass the witness.

THE COURT:  Okay.  Any other opposition questions because the Debtors used up its time?

Nope.

UNIDENTIFIED SPEAKER:  No, Your Honor.

THE COURT:  Okay.  Thank you, Mr. Borenstein.  You're excused.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  Okay.  I guess Genie had one more witness.

MS. GREEN:  We have one more witness, Your Honor.

Your Honor, I call Mr. Sod, please?

THE COURT:  Mr. Sod.  Please raise your right hand.

JACOB SOD, GENIE'S WITNESS, SWORN

THE COURT:  Thank you.

DIRECT EXAMINATION

BY MS. GREEN:

Q    Good afternoon, Mr. Sod.  It's been a long two days, huh?

A    The best two days of my life.

Q    You have an interesting --

THE COURT:  Sarcasm, yeah.

BY MS. GREEN:

Q    -- interesting concept of best two days.  Are you affiliated with Milrose Capital?

A    Yes.

Q    And how are you affiliated with Milrose?

A    I am the president of Milrose Capital.

Q    And --

THE COURT:  I'm sorry.  Could you repeat the answer? I was turned around.

THE WITNESS:  I lost my voice a bit, I'm sorry.  I am the president of Milrose Capital.

BY MS. GREEN:

Q     And what does Milrose Capital do?

A     Primarily invest in healthcare and healthcare real estate assets.

Q     And how many healthcare and healthcare real estate assets does Milrose Capital have investment right now?

A     One hundred plus.

Q     Do you invest generally in operations?

A     Typically not.  Primarily nursing home real estate or healthcare real estate.

Q     Have you been involved in other deals that involve deposits?

A     Multiple.

Q     Have you ever lost a deposit in any of your deals?

A     Never in my career.

Q     Why not?

A     I close.

Q     And whose money is at risk in the deposit?

A     Genie deposit is my money, $25 million.

Q     And can -- so it's $25 million, okay.  You heard about the money not being at risk because of this White Oak ABL condition.  Do you recall that?

A     Yes.

Q     Are you willing to waive the White Oak condition to closing?

A    Absolutely.

Q    In terms of the equity, how much equity are you putting in the deal?

A    Our equity commitment is $120 million.

Q    And where are you going to obtain that equity from?

A    It's in Milrose, its affiliates and partners.

Q    And do you have commitments from your various investors and partners for that $120 million?

A    Yes.

Q    And is Milrose committed to providing that equity?

A    Absolutely.

Q    So we've heard a lot of talk about Ari Schwartz.  Why was Mr. Schwartz at the auction?

A    Mr. Schwartz typically acts as my consultant and a minority real estate investor.

Q    Did he have decision-making authority for Milrose?

A    No.  Contrary to what he may have said.

Q    Who made the decisions?

A    Myself.

Q    Did he have decision-making authority for Genie?

A    No.

Q    Did he have an equity interest in Genie?

A    Nope.

Q    If Genie is the successful bidder, would Genie ever be a provider or an operator?

A     No.

Q     Why not?

A     Genie was a Bidco, a company formed specifically for the bid.  Once a transaction is awarded and closed, there are multiple layers of a company's form to hold different interests.

Q     Is Milrose a provider or operator?

A     Milrose is not.

Q     Because it's an investment?

A     Correct.  It's an investment company.

Q     Is Mr. Schwartz part of Genie's bid in any way?

A     No.

Q     Will Mr. Schwartz ever be involved in Genie's deal?

A     Nope.

Q     Would you agree to put in the order from this Court that Genie would never be -- I mean, that Mr. Schwartz would never be involved in the deal?

A     Absolutely.

Q     Are you willing to pay for a monitor to monitor that?

A     Yes.

Q     Do you intend to close on this transaction?

A     Absolutely.

Q     And why is that?

A     We believe that this process has been compared to -- I heard a great quote, it's been compared to as, I think, a

Sod - Direct/Green

Venezuelan election.  So just vis-a-vis process-wise, we think we got the short end of the stick.  Ultimately, we do believe we could provide tremendous value to all interested parties, residents, and employees.

Q    And do you have any concern that you won't be able to close on the deal?

A    No.  I have $25 million at risk behind that.

MS. GREEN:  Your Honor, I don't have anything further.  We have Mr. Sod's declaration.

THE COURT:  Okay.  Any other, essentially, direct testimony?

(No audible response)

THE COURT:  Okay.  Thank you.  You are excused.

THE WITNESS:  Thank you.

(Witness excused)

THE COURT:  All right.  So, Mr. Spector, you are up, and this will be our last witness of today.

MR. SPECTOR:  Good afternoon, Your Honor.

Howard Mark Spector for Olumie Capital.  And Olumie would call Mr. Clinton Phillips.

THE COURT:  Mr. Phillips, please raise your right hand.

CLINTON PHILLIPS, OLUMIE'S WITNESS, SWORN

THE COURT:  Okay.  You may be seated.  And I have his declaration, okay.

MR. SPECTOR:  Yes.  Just for the record, his declaration is at Docket Number 1787, and the exhibit list, which includes the exhibits referred to in the declaration, is at Docket Number 1786.

We would offer Exhibits 1 through 6, which I understand there is no objection to, and Exhibits 8, 9, and 10 are pleadings.

THE COURT:  Okay.  Let me make sure.  The exhibits are at Docket Entry, you said 1786?

MR. SPECTOR:  1786.  There are six exhibits that are not pleadings, 1 through 6.  I've conferred with opposing counsel, and I don't believe anyone has any objection to 1 through 6.

THE COURT:  Okay.  Any --

MR. HALL:  Correct, Your Honor.

THE COURT:  Okay.  Those are admitted, then.

MR. HALL:  I'm saying admitted or judicial notice, yes.

THE COURT:  Okay.  They're all admitted.

(Olumie's Exhibits 1 through 6 admitted into evidence)

MR. SPECTOR:  Okay.  Thank you, Judge.  May I proceed?

THE COURT:  You may.

DIRECT EXAMINATION

BY MR. SPECTOR:

Q State your name for the record, please.

A Clinton Phillips.

Q And how are you engaged in this transaction?

A I'm the general counsel of Olumie Capital.

Q Okay. And how long have you been there?

A I've been with the series of companies that Olumie represents for about six years.

Q Were you involved in the pre-auction discussions between the Debtors and Olumie?

A I was.

Q And did Olumie tender an Asset Purchase Agreement redline from the Debtors' form Asset Purchase Agreement?

A Yes, we did.

Q And did they do that before the auction commenced?

A We did.

Q Did Olumie fund a deposit prior to the auction was commenced?

A We did.

Q And how much was the deposit?

A It was $5 million, but at the time, we were willing to go to 10 when we were at the auction.

Q Did you communicate that to the Debtors?

A We did.

Q How did you arrive at a $10 million calculation?

A It was a bit difficult, honestly, because when we kind of

started looking at the cash component of it, it got really

pretty interesting.  So ultimately, we kind of decided we were

going to come through this transaction with about $100 million

in equity.  So we just said $10 million was kind of the right

number.  We put $5 million in as a good-faith deposit to be

there.

Q    Do you have the summary of the Olumie bid, which is

Exhibit 6?

A    Which one of these?  Do you have a copy?  Thank you.

        MR. SPECTOR:  Do you need a copy, Judge?

        THE COURT:  I would love a hard copy if you've got

one.

        MR. SPECTOR:  May I approach?

        THE COURT:  Oh, wait, wait, wait, I've got it.  Thank

you.

BY MR. SPECTOR:

Q    Could you just briefly take the Court through the summary

of the Olumie bid?

A    Yeah, absolutely.  Would you like to start with the

secured or the unsecured portion?

Q    Whatever you want.

A    Okay.  So we looked at the secured portion as mostly

things that we were going to assume or refinance.  This

included everything except for the WAX and MAO and most of the

IRS issues that were here.  We had brought our financing with

us to the auction to kind of go through that and make sure that we were able to actually finance all of it.  They're actually here in the room with us now.  Greystone is here.

Q    And let's just stop on the financing piece for a minute.

A    Sure.

Q    Were you told explicitly or implicitly about a financing contingency or a financing commitment prior to the auction?

A    Not prior to the auction, no.

Q    When you showed up at the auction, was financing discussed?

A    It became an issue at the auction, yes.

Q    And how did it become an issue?

A    We were told for the first time that we had to have basically secured financing, a little bit more than kind of a letter of interest that was there.  Again, we had the bank in the room with us at that time.  So they really just kind of started to point out that they were not willing to qualify us without having that.

Q    And by that, you mean a commitment of financing?

A    Yes.  A binding commitment, yes.

Q    Okay.  And the bank in this case is?

A    It's Greystone.

Q    Okay.  And could you describe your relationship with Greystone?

A    Yeah.  So we have done quite a few deals with Greystone.

Just kind of napkin math, I'd say somewhere in the range of 100, 200 million dollars of deals that we've done with them in the past. We've never had an issue closing. And so it's kind of been a great relationship we had with them.

Q And do you have any understanding of Greystone's sort of reputation in the industry?

A They're a fairly large lender in the industry, so I think they have a great reputation.

Q Okay. Let's continue on with the bid summary.

A Sure. When we get down to the unsecured portion, we did look at assuming kind of the accrued compensation, the non-PTO compensation. And then we issued a very large unsecured note, a hope note. Part of that would have been to appoint somebody from the estate as a non-voting member of the board of any future company so that they could oversee this.

We had intended to pay this out via portions of the net proceeds that came out. So we were going to do a 60/40 split with the estate.

Q So essentially it's a profit note?

A Yep.

Q Was the size of the cash deposit an issue?

A Well, it became one very quickly once we got to the bidding procedure. We were invited to come, and we thought the $5 million good-faith deposit kind of got us in the door. We realized that probably wasn't the right number overall.

However, once we were at McDermott's office for the bid and the auction, they let us know that they wanted something closer to like $30 million.  I think it ultimately was 28.5 to 30 million.  And I'm not going to say they gave us five minutes to get this all together, but it was something like 10 to 15 or we needed to leave.

Q    Okay.  So within, let's just say a half hour, you couldn't get a financing commitment for, let's just put a number out there, $500 million in a half hour, and you couldn't put together a $30 million deposit in 30 minutes either?

A    That's correct.

Q    So you were shown the door?

A    We were.

Q    And were you escorted out of McDermott's office?

A    We were escorted, yes.  Yes, we were.  I believe Mr. Simon was a part of that.

Q    Were you surprised by that result?

A    I was.  I think we had been working with them back and forth all the way up to this to try to get some answers to questions that they had, some answers to questions that we had. We thought we were headed in the right direction with them.  We really thought the only real issue kind of walking in the door was going to be that we refused to be the backup bidder. So, yeah, I was very surprised by that.

Q    And they knew you had flown down from New York or

Louisville to participate in the auction?

A    I would certainly hope they knew that. That's the only way I could get there.

Q    Could you describe Olumie's current operational experience in this space?

A    Sure. So Olumie Capital is kind of the investment acquisition arm of a family of companies. One of those companies is Prestige Healthcare. It owns and operates 115 skilled nursing facilities and, correction, two of those might be ALFs.

And then -- so we operate throughout Michigan. We've got a very good history there, throughout Ohio, Michigan, Tennessee, multiple states, and have done very well. I heard some gentleman, I guess as part of our testimony earlier, that came from a witness saying that people don't actually reduce agency. Prestige happily can tell you they have zero agency in any of their buildings at all.

In addition to that, we have another company that strictly focuses on distressed assets within the healthcare space. It's called Everest Management Solutions. We come in. We've acted as management under receiverships quite a few times. That company, on average, kind of floats between 20 and 60 facilities, depending on what's going on with receiverships at that time. So we have a long history of dealing with distressed assets in these kind of situations.

Q    Based on what you've heard testimony-wise over the last two -- you've been sitting in the gallery the whole time, right?

A    I have, yes.

Q    Do you understand what cash or cash equivalent the stalking horse bid had as a deposit at the time of the auction?

A    My understanding is they didn't have anything at the time of the auction.  It sounds like they put it in last week.

Q    Okay, but they had the DIP facility.

A    Yeah, I think that was 10, 14 million dollars, something like that.

Q    Okay, so the Debtors were requiring from Olumie twice as much of a deposit?

A    That's correct.

Q    And did the stalking horse agree to be the backup bidder?

A    Not to my knowledge.

Q    And the Debtors didn't designate Genie as a backup bidder either?

A    They did not.  Yeah, they required us to be one if we were going to come.

Q    So as a condition of participating, you had to agree to be the backup bidder but, at the end of the day, there was no backup bidders chosen?

A    Correct.

         MR. SPECTOR:  Okay.  I'll pass the witness.

THE COURT:  Anyone wish to further examine Mr. Phillips?  Looking at Committee counsel?  No?

UNIDENTIFIED SPEAKER:  No, Your Honor.

THE COURT:  Okay.  I just want to be clear.  If you were permitted to bid, Olumie, would it be bidding on causes of action or does it not care anything about those?

THE WITNESS:  No, Your Honor.  We would leave those behind.

THE COURT:  Okay.

THE WITNESS:  It's not something we have any interest in pursuing.

THE COURT:  Okay.  Anything else?

MR. SPECTOR:  No, Judge.  I'm sorry.  I didn't anticipate you had questions.

THE COURT:  Oh, well --

MR. SPECTOR:  So I shouldn't have walked away from the podium.

THE COURT:  Okay.  Thank you.  You're excused.

THE WITNESS:  Thank you, Your Honor.

(Witness excused)

MR. SPECTOR:  Thank you, Judge.  We have nothing further.

THE COURT:  All right.  So let's talk.  Anything else as far as a housekeeping matter or loose end?

(No audible response)

THE COURT:  No?   All right.  So I said yesterday at the time of ruling on the motion for continuance that I wanted to hear all the evidence.  We've had 13 witnesses, in case anyone has lost count.  And what I would likely do is defer any ruling until our setting on whatever day it is, Wednesday next week, the 17th.  It's Wednesday, right?  I've asked multiple times.

UNIDENTIFIED SPEAKER:  Yes.

THE COURT:  We've got a setting starting at 9:30 next Wednesday.  And I said I'd kind of hear whatever supplemental evidence people might want to put on with regard to the motion to extend exclusivity and would rule on today's sale at the same time as exclusivity.

I hate it when I change my mind and throw people off.  And I know you all have not done closing arguments.  But I really want to shortcut this as I think is appropriate based on the evidence and the law.  I am not going to approve the sale to our stalking horse.  And I'll just quickly throw a few things out there.

Number one, I do think the legal standard is not business judgment, not deferring to the Debtors' sound business justifications.  I think it is a higher scrutiny because I've heard undisputed evidence that Mr. Landau is, I think at one point the words used was he's Genesis controlling investor.  Obviously, there is a lot of overlap between him and the Debtor

and ReGen and WAX and MAO. So, I think the Court must look at what is proposed with a higher scrutiny because of the insider connections.

Now, a very good point is made by the Debtor. We have an independent committee. And so that sort of cleanses any -- well, I don't know if cleanses is the right word, but it kind of reverts the standard back to business judgment. In my view, it is a factor that in the higher scrutiny legal standard, it's a significant factor, but it doesn't mean all of a sudden we just revert completely back to business judgment.

So viewing all the evidence I've heard in a very long two days, I cannot under this higher scrutiny standard approve the sale. The comments I make are not a reflection on any one person or witness, but let me just say I do think in the end we did not have a fair auction process, okay. I mean, whether there was any kind of intent versus something else, just trying to do what people thought was the right thing at the time, I just think we did not have a fair and fulsome auction process.

I said I wasn't going to point to any one witness, but I do, I'm going to go back on what I said. I'm going to point to Mr. Turnbull. His testimony was very compelling. I'm not, again, being critical of other people. I just think much of what he said was very compelling. His view of what should have been done, things that seem a little irregular to me. You don't require a deposit of the stalking horse, and not only do

you require it for the competing bidders, but oh, you're not willing to be the backup bid. We don't care about the money, the skin in the game. Saying you can bid without a financing commitment and then, oh, well, we just thought that was too risky a thing to make you a backup bidder or, I don't know, to consider your higher bid better. I just feel way too uncomfortable about so much of what I've heard.

I guess the last thing I'm going to say is the releases, the releases, the releases. This is not the last thing. This is the next to last thing. I agree with Ms. Kippes' opening statement in her pleading that really you have to analyze this as a compromise and settlement, a 9019 compromise and settlement, and look at is it fair and equitable, is it in the best interest of the estate, is it within the range of reasonableness.

And I don't think she used these words -- someone did -- are we getting into Braniff sub-rosa plan territory? I don't read Braniff as strictly as a lot of human beings do, but in this situation, gosh, it looks like a big deal issue that I don't have evidence to find these releases are fair and equitable in the best interest of the estate when I've got two bidders who are like, we don't give a wit about the releases. We want everything else. They can stay with the estate. It just seems like we need to have an auction that doesn't tie in estate releases of some of these parties.

So what I am going to do is -- oh, and I said I had one more thing. Context, facts. Context, facts matter. I have tried mightily to ignore all the background noise. I said at the beginning, I say it all the time, I make decisions based on evidence, okay? I try not to read the press. Sometimes I accidentally -- there it is on my screen because I want to just rely on evidence. But for goodness sakes, I think people saw I have an amicus brief from a senator or a couple of senators and a congresswoman.

My point in saying this is I am aware that there is huge concern about Mr. Landau. And he is not here. His decision, I have a feeling, was his and his alone and not any particular advisors. But it could have gone a long, long way today if I had a witness, "I am Joel Landau and I felt good about the auction, the releases."

There is no way I can approve these releases without him on the witness stand and me being convinced of his good faith. I am not even sure how I could find CPE to be a good-faith purchaser for value as I know everyone wants to have when -- well, I had Mr. Andrews who is always a good trustworthy person in this court. But ultimately, he did not know anything about the releases and why that was critical.

I think Mr. Landau would have had to be the person to provide testimony to make me think it was all in good faith. And I heard the four people, Zalman Schapiro, Mr. Andrews,

Mr. Chris Bryson would be involved. But I did understand that ultimately Mr. Landau was behind the special purpose entity in some meaningful capacity. So how can I find CPE as a good-faith purchaser for value without hearing, I'm sorry, I know that I've got a representative, I've got a special purpose entity, I've got trustworthy counsel for them. But I think based on everything flying around in this case, Joel Landau would have been a necessary witness for me to hear from.

So I'm not approving the sale. But what I need people to think about, caucus about, and hopefully have a proposal for on Wednesday is what would a reset auction look like? Timing and whatnot. And we have some mechanics. I would accept Ms. Kippes' proposal that the U.S. Trustee be permitted to sit through the auction and monitor the auction. And I can't remember if you said anything else besides that as far as the role of the U.S. Trustee. The fairness of the process has been put an issue, and so I can't think of any more reasonable way to address that.

MS. KIPPES: The other thing we ask for, Your Honor, is to be given copies of the bids so that we can evaluate them.

THE COURT: Okay. So I'm telling you, and this is not a ruling today, this is just giving you some help in maybe coming up with a reset auction concept. The U.S. Trustee would have to be provided copies of the bids and sit through the auction. I think I've heard enough where Genie 3 and -- I keep

saying that wrong -- Olumie, they should get to participate. The stalking horse can still participate, but this is going to be an auction for everything but the releases.  People can always come in with a 9019 motion as a separate freestanding thing, but the auction needs to just be anything and everything other than causes of action.

I sat through a lot of testimony about what value they might or they may not have.  I don't know.  I don't know. I just know that this is more of a 9019 thing that requires a more fulsome type of evidence than just a, here's part of the consideration.  We're attributing $32 million to it, and it still is unclear to me if that was reasonable.

So you've heard U.S. Trustee monitor, for sure Genie and Olumie need to be allowed to participate.  Stalking horse can still participate.  No sell of causes of action.  And here is perhaps a very awkward part of this.  I want you all to talk about it, but I think Mr. Turnbull needs to be the point person in this auction.  It's not unheard of for a creditors' committee investment banker or financial advisor to be put in charge of the auction.  This is awkward for me, but that is my view.  If you don't otherwise have a proposal for me, that's what I would order.

There's an examiner motion.  I don't know when it's set.  I told my courtroom deputy it can be set in the ordinary course of business, not on an expedited basis.  So I don't know

if -- it wasn't the Committee that filed it. It was the Tort Claimant Committee. I don't know if you've got a setting on it yet, but I'm just once again going to give you all some help, signal my view.

UNIDENTIFIED SPEAKER: It helps a lot, Your Honor.

THE COURT: Okay.

UNIDENTIFIED SPEAKER: Very likely to be withdrawn, but I just want to get --

THE COURT: I alluded to this. An examiner, his or her job is to examine, investigate something with whatever scope the Court grants. It seems very -- well, I'm not saying it's never happened, but for this person to be, I am the person who makes the decision on who is the winning bid.

As I said, I get to make that decision. I guess you could have an examiner make a recommendation, but that doesn't sound proper to me. That sounds like I hear the evidence and I make the ruling. If an examiner -- if you want to propose something else at an ultimate hearing, but I kind of like this idea of the U.S. Trustee being sort of a monitor and the Creditors' Committee investment banker being the point person, and maybe that will resolve your examiner motion. I'm just throwing that out there.

UNIDENTIFIED SPEAKER: I think that resolves it, and Mr. Turnbull has full confidence of my clients and I'm sure of the Committee, as well.

THE COURT: Yeah.

UNIDENTIFIED SPEAKER: That certainly covers (indiscernible).

THE COURT: So your mission, if you choose to accept it, Mr. Turnbull, and I cannot even remember what the terms of your compensation are. I'm kind of reminded of a case, and maybe Ms. Kippes remembers where when I was a lawyer, a law partner and I were sitting on the back row. We offered for, let's say, a friend -- that sounds made up -- but who was a Debtors' counsel, we'll watch and maybe we'll consider getting involved. And the judge, Ms. Kippes' first boss, pointed to us and said, What are you doing back there? Y'all are in, Debtors' counsel is out, and no retainer, and a miserable two years. And Ms. Kippes remembers the case, I guarantee you.

But anyway, so I don't mean to sound flippant. I cannot remember what the terms of your compensation is, but that could be something else that is discussed if it's something that doesn't even begin to contemplate this role.

So is everyone clear what we're going to come back? And I hope I'm going to get a proposal for this reset auction. I have no idea what the deadline should be. I know that I have heard the Debtor will be in a liquidity pickle, I'll just use that legal term, March 31st. So I would not expect my decision today to contemplate a February auction or something like that. But I don't know if we should make it January, with the

holidays that people observe.  You all talk about what makes sense, but I expect it to be not to greatly delay the point we're at today.  Okay?

All right, I will see you Wednesday at 9:30..

MS. GREEN:  May I address the Court?

THE CLERK:  All rise.

THE COURT:  Did I --

MS. GREEN:  May I address the Court for one second?

THE COURT:  Okay.

MS. GREEN:  I'm sorry.

THE COURT:  One second.

MS. GREEN:  I'm not going to be complicated.

THE COURT:  Okay.

MS. GREEN:  I just wanted to know if I could appear by Zoom, if possible, on the 17th.  I have a medical appointment.

THE COURT:  You may.

MS. GREEN:  Thank you.

THE COURT:  We'll have Zoom available, as always.  And you may.

MS. GREEN:  Thank you.

THE CLERK:  All rise.

(Proceedings adjourned at 6:02 p.m.)

                    * * * * *

C E R T I F I C A T I O N

I, DIPTI PATEL, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

_____

DIPTI PATEL, AAERT CET-997

Expires: December 6, 2026

Liberty Transcripts                    Date:   December 15, 2025