# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTHCARE, INC., *et al.*, | ) | Case No. 25-80185 (SGJ) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF BRIAN TAYLOR OF FTI CONSULTING, INC., FINANCIAL
ADVISOR TO THE STATUTORY UNSECURED CLAIMHOLDERS' COMMITTEE, IN
SUPPORT OF (1) OMNIBUS SALE OBJECTION AND POST-AUCTION SALE
OBJECTION OF THE STATUTORY UNSECURED CLAIMHOLDERS' COMMITTEE
TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO CPE
88988 LLC AND (2) TO DEBTORS' MOTION FOR ENTRY OF ORDER (I)
EXTENDING DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN
AND SOLICIT ACCEPTANCES THEREOF AND (II) GRANTING RELATED RELIEF**

I, Brian Taylor, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to

the best of my knowledge, information, and belief:

1.      I am a Managing Director at FTI Consulting, Inc. ("**FTI**"), with offices located at,

among others, 8251 Greensboro Drive, Suite 400, McLean, VA 22102. FTI has been retained as

financial advisor to the Statutory Unsecured Claimholders' Committee (the "**Committee**") in the

chapter 11 cases (these "**Chapter 11 Cases**") of the above-captioned debtors and debtors in

possession (collectively, the "**Debtors**"). The Committee is represented by Proskauer Rose LLP

and Stinson LLP, as counsel, and Houlihan Lokey as Investment Banker.  FTI together with

Proskauer Rose LLP, Stinson LLP, and Houlihan Lokey comprise the "**Committee Advisors**."

---

[1]   The last four digits of Genesis Healthcare, Inc's federal tax identification number are 4755.  There are 299 Debtors
in these chapter 11 cases, which are being jointly administered for procedural purposes only.  A complete list of
the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete
list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at
https://dm.epiq11.com/Genesis.  The location of Genesis Healthcare, Inc.'s corporate headquarters and the
Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

2.　　FTI is an international consulting firm that provides chapter 11 services to debtor companies as well as their creditors, lenders, stakeholders, directors, ad hoc committees, and trustees in advisory roles including financial advisor, interim manager, Chief Restructuring Officer, expert witness, and investment banker. The firm consistently ranks among the top restructuring advisors in U.S. based chapter 11 matters and has represented constituents in some of the largest and most complex cases in U.S. history. FTI has deep expertise in advising unsecured creditors' committees in many recent, high-profile bankruptcy cases across the country.

3.　　Over the past 17 years, I have conducted and supervised investigations of pre-petition transactions on behalf of creditors' committees and litigation trustees in numerous high profile cases including: *In re LandAmerica 1031 Exchange Services, LLC* (Case No. 08-35995 (KRH)), *In re Alpha Natural Resources* (Case No. 15-33896 (KRH)), *In re Nine West Holdings, Inc., LLC* (Case No. 18-10947 (SCC)), *In re Talen Energy Supply, LLC* (Case No. 22-90054 (MI)), *In re Cineworld Group plc (Regal Cinemas)* (Case No. 22-90168 (MI)), *In re Diamond Sports Group, LLC* (Case No. 23-90116 (CML)), *In re Steward Health Care System LLC* (Case No. 24-90213 (CML)), and others.

4.　　Prior to joining FTI, I worked at Protiviti, Inc. in the Litigation and Restructuring Services group. I am a Certified Public Accountant ("CPA"), Certified Insolvency and Restructuring Adviser ("CIRA"), and hold a Certification in Distressed Business Valuation ("CDBV"). I attended James Madison University where I earned a Bachelor of Science degree (B.S.) and a Master of Business Administration degree (MBA).

5.　　My professional work is routinely designed to develop objective, independent financial evidence for legal counsel and the Court, in connection with the pursuit or defense of bankruptcy litigation matters including solvency, reasonably equivalent value, director and officer

breaches of fiduciary duty, contractual damages, lost profits, preferences, alter ego entities, equitable subordination, debt recharacterization, and other types of financial evidence.

6.    In connection with the designation of the Stalking Horse as the Successful Bidder for the sale of substantially all of the Debtors' assess, I was asked by Proskauer Rose LLP and Stinson LLP ("**Committee Counsel**") to opine on the extent of damages, and prepare a valuation, of select causes of action and other claims that would be sold or released under the terms of the CPE 88988 LLC (the "**Stalking Horse Bid**") and that are excluded from the sale under the bid of Genie 3 Partners, LLC (the "**Genie Bid**").

7.    I submit this declaration (this "**Declaration**")[2] in support of (1) *Omnibus Sale Objection and Post-Auction Sale Objection of the Statutory Unsecured Claimholders' Committee to the Sale of Substantially All of the Debtors' Assets to CPE 88988 LLC* (the "**Sale Objection**") and (2) *Objection of the Statutory Unsecured Claimholders' Committee to  Debtors' Motion for Entry of Order (I) Extending Debtors' Exclusive Periods to File A Chapter 11 Plan and Solicit Acceptances Thereof and (II) Granting Related Relief* (the "**Exclusivity Objection**" and, together with the Sale Objection, the "**Objections**"),[3] each of which are being filed contemporaneously herewith or shortly hereafter.[4]  Except as otherwise indicated herein, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by the Debtors' advisors or Committee Advisors, including my colleagues at FTI; or (c) my review of relevant documents. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

---

[2] Certain portions of this Declaration are redacted and/or filed under seal pursuant to ¶ 15 of the *Order Approving Amended Stipulated and Agreed to Confidentiality Agreement and protective Order* [Docket No. 1206].

[3] Capitalized terms used herein but not otherwise defined shall have the meaning given them in the Objections.

8.      I am authorized to submit this Declaration on behalf of the Committee.

## I.      Executive Summary

9.      The Debtors undervalued the Genie Bid, in part because they undervalue the causes of action being excluded from the Genie Bid and left behind for the benefit of the estates' creditors. The Debtors attributed only $17 million[5] of value on their scorecard for "Causes of Action" being purchased by the Stalking Horse, but not Genie. The Committee Advisors believe the Debtors (1) undervalued certain litigation claims identified by the Debtors' Special Investigation Committee ("**SIC**"), (2) applied too great of a discount to the SIC's valuation of the claims, and (3) failed to include additional causes of action that the SIC either did not consider or did not ascribe any value.

10.      As provided in greater detail in the remainder of this declaration, the total value of "Causes of Action" that should be ascribed to the Genie Bid is at least between $106.3 million and $177.1 million ($91.3 million to $162.1 million for the causes of action plus $15.0 million in value of Directors & Officers claims).  This is $74.3 million to $145.1 million more than the $32 million of total value ascribed to these claims and causes of action by the Debtors (See Exhibit A for a detailed comparison).

## II.      Background: The Special Investigation Committee & UCC Investigations

11.      On July 9, 2025, the Debtors appointed three independent fiduciaries to the Debtors' Board of Directors (the "**Board**"), including Mr. Jonathan Foster and Ms. Elizabeth LaPuma. The Board created the SIC, which is comprised of Mr. Foster and Ms. LaPuma, and delegated to the rights and authority to the SIC to review and value causes of action proposed to

---

[5]   This number is calculated by taking the $32 million on the Debtors scorecard and subtracting the $15 million of value of claims against Directors and Officers being left by behind by both bidders attributed to such claims by the Debtors, which the Debtors assert would be payable from D&O insurance policies.

4

be sold to the Stalking Horse Bidder or released under the Debtors' debtor-in-possession financing order (the "**Final DIP Order**").

12.     On September 5, 2025, the SIC uploaded to the confidential data room an initial report ("**SIC Report**") that provides descriptions of certain of the causes of action proposed to be sold or released under the Stalking Horse bid and a range of likely values for those causes of action of between *$34.5 million* and *$77.9 million* (See Exhibit B)[6].  The range of likely values provided in the September 5, 2025 version of the SIC Report report account for the SIC's "*assessment of the probability of success in litigation based on the merits of the relevant potential claims and causes of action, it does not make adjustments to reflect, among other things, the cost of litigation, the time value of money, and the potential collectability of a final judgment.*"[7] The report stated that the SIC reserves the right to continue its investigation but has not provided any additional updates or revisions to their SIC Report or investigation or valuation of claims.

13.     The Committee Advisors separately began investigating the claims and causes of action to be sold or released under the Stalking Horse bid immediately upon being hired by the Committee in August 2025.

14.     Through its own investigation, the Committee agreed that the claims identified by the SIC are material and viable, but the Committee places a higher aggregate value on those causes of action based on the Committee Advisors' analysis and valuation of the claims.  The Committee Advisors also identified significant additional claims not reviewed or evaluated by the SIC, which are valued in this declaration.  It is my understanding that the Committee Counsel had access to

---

[6] Initial Report of The Special Investigation Committee of the Board Of Directors Of Genesis Healthcare, Inc. Regarding Description of Causes of Action Proposed to Be Sold or Otherwise Released Under the Stalking Horse Bid and Range of Likely Values Attributable to Such Causes of Action, dated September 5, 2025 at 13-14.

[7] *Id.* At 2.

substantially more documents than the SIC as a result of the Court compelling productions of documents from Welltower.

**III.      Background: The Auction and Valuation of Bids**

15.      On August 28, 2025, the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "**Court**") approved bidding procedures to auction substantially all of the Debtors' assets ("**WholeCo**"). *See Order (I) Approving Bidding Procedures and Expense Reimbursement, (II) Approving the Debtors' Entry Into the Stalking Horse APA with Stalking Horse Bidder and Subject to Higher or Otherwise Better Offers at the Auction in Accordance with the Bidding Procedures, (III) Scheduling Certain Dates and Deadlines, (IV) Approving the Form and Manner of Notice Thereof, and (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases* [Docket No. 685].

16.      On November 18, 2025, the Debtors commenced the Auction. I attended the Auction along with other advisors to the Committee as one of the Consultation Parties selected by the Debtors.

17.      On the first day, the Debtors determined two WholeCo bidders were qualified bidders, Genie and the Stalking Horse. Over the two days, the two WholeCo bidders submitted over three rounds of bids until the Debtors and the Consultation Parties agreed to a protocol in which the two bidders would submit their best and final bids in sealed envelopes.

18.      Throughout the Auction, the Debtors maintained a "scorecard" to show the value of each bid and to determine if each bid was an overbid. The scorecard listed the value of "Causes of Action" in the assets excluded from the purchased assets. Any causes of action excluded from purchase from a bid increased the bidder's bid value, since those actions would be left behind for the benefit of creditors.

## IV.     Values used for Causes of Action at Auction

19.     The bids from the Stalking Horse bidder excluded (left behind for the benefit of the estate) only causes of action up to policy limits against the Directors and Officers, which the Debtors valued at $15 million,[8]  after accounting for collectability, the probability of success (litigation risk), and cost to litigate, and certain preference actions the Debtors valued at $23 million.

20.     Each of the bids from Genie excluded (left behind) all estate causes of action.  The Debtors valued the causes of action excluded from the Genie bids at $32 million, after purportedly accounting for collectability, the probability of success (litigation risk), and cost to litigate.

21.     However, after accounting for the $15 million of claims against Directors and Officers, the Debtors ascribed only a value of $17 million on their scorecard for "Causes of Action" being purchased by the Stalking Horse.

## V.     The Debtors' Valuation of Causes of Action

22.     It is my understanding that the Debtors relied on the SIC to determine the value of the causes of action for purposes of their Auction scorecard and comparing the competing bids.

23.     As mentioned previously, the SIC published the SIC Report based on an initial investigation of certain claims.[9] The SIC report "*includes the Special Investigation Committee's assessment of the probability of success in litigation* based on the merits of the relevant potential claims and causes of action, it does not make adjustments to reflect, among other things, the cost

---

[8] I understand that the Committee has expressed concerns on whether actions can be left behind only to the extent of policy limits and that such a design could invalidate coverage. Absent further discussion of how this would be structured, the Committee does not necessarily ascribe $15 million of value to these policies.

[9] As explained in depth below, it is my understanding the SIC only examined a subset of claims, and did so with far less discovery than the Committee had during its investigation.

of litigation, the time value of money, and the potential collectability of a final judgment."
(Emphasis added.)

24.     The range of values provided by the SIC report is $34.5 million to $77.9 million,
as summarized in the table below.

*$ in millions*

| | | SIC Range of Value [1] | |
| --- | --- | --- | --- |
| **SIC Valuation of Claims** | | | |
| **Ref** | **Transaction** | **Low** | **High** |
| 1. Pinta Consulting Agreement | | $    0.7 | $    5.1 |
| 2. Integra Subleases (PA, CO, & NJ) | | 16.4 | 49.6 |
| 3. Integra Colorado Sublease Termination Fee | | 5.4 | 7.2 |
| 4. Back Rent Transfer | | 12.0 | 16.0 |
| **Total** | | $  34.5 | $   77.9 |

[1] After accounting for probability of a successful litigation.

25.     The Debtors did not provide a detailed analysis for how they reduced the ranges of
values provided by the SIC to $17 million that was included in the scorecard for the Genie Bid.

26.     To arrive at a $17 million value, the Debtor needed to discount the midpoint of the
SIC report range ($56.2 million) by approximately 70%, after the SIC had already accounted for
probability of success.  The table below illustrates how the Debtors may have arrived at their value.

*$ in millions*

| | | SIC Range of Value [1] | | Value Used at Auction | | |
| --- | --- | --- | --- | --- | --- | --- |
| **SIC Valuation of Claims** | | | | | | |
| **Ref** | **Transaction** | **Low** | **High** | **SIC Midpoint** | **Discount [2]** | **Value Used at Auction** |
| 1. Pinta Consulting Agreement | | $   0.7 | $    5.1 | $   2.9 | 70% | $   0.9 |
| 2. Integra Subleases (PA, CO, & NJ) | | 16.4 | 49.6 | 33.0 | 70% | 10.0 |
| 3. Integra Colorado Sublease Termination Fee | | 5.4 | 7.2 | 6.3 | 70% | 1.9 |
| 4. Back Rent Transfer | | 12.0 | 16.0 | 14.0 | 70% | 4.2 |
| **Total** | | $  34.5 | $   77.9 | $  56.2 | 70% | $  17.0 |

[1] After accounting for probability of a successful litigation.
[2] Assumed discount for time value of money, collectability, and cost of litigation based on the value ascribed
     to the Genie 3 bid.

8

27.     The Debtors have provided no support or explanation to the Committee for applying such a steep 70% discount to the SIC's evaluation, which already included a discount for probability of success in litigation.

28.     In addition to applying a steep discount to the SIC's range of values, the Debtors' valuation undervalued certain claims and only accounts for a small subset of the valuable claims and causes of action identified by the Committee in its investigation.  Other claims include, but are not limited to, claims against Welltower, Omega, WAX/MAO, ReGen, Joel Landau, and other insiders not accounted for by the SIC.

29.     Sections VI. and VII. of this declaration provide the Committee's view on appropriate values for (1) claims undervalued by the SIC and (2) claims not accounted for by the SIC.

## VI.     Causes of Action Undervalued by the SIC

30.     The Committee Advisors' investigation found that the SIC and the Debtors significantly undervalued certain claims, as further explained in this section, and failed to value other claims. The table below provides a summary comparison of the SIC values and the Committee values, after first considering probability of success and then an estimated recovery which accounts for collection risk and cost of litigation.  The SIC appears to have applied a flat 70% discount to all claims after initial reductions for the probability of success. The Committee adjusts claims for several factors depending on the specific collection risks and costs involved with each action (discounted an average of 43% for probability of success and an additional discount of 37% on average for collection risk, time value of money, and cost of litigation).

9

*$ in millions*

| Ref | Transaction | Claim Value Adjust for Probability of Success | | | Estimated Recovery [1] | | |
|---|---|---|---|---|---|---|---|
| | | SIC Midpoint | UCC Midpoint | Difference | SIC Midpoint | UCC Midpoint | Difference |
| 1. | Pinta Consulting Agreement | $ 2.9 | $ 7.4 | $ 4.5 | $ 0.9 | $ 4.1 | $ 3.2 |
| 2. | Integra Subleases (PA, CO, & NJ) | 33.0 | 41.6 | 8.6 | 10.0 | 27.8 | 17.8 |
| 3. | Integra Colorado Sublease Termination Fee | 6.3 | 6.3 | - | 1.9 | 4.2 | 2.3 |
| 4. | Back Rent Transfer | 14.0 | 17.0 | 3.0 | 4.2 | 9.4 | 5.2 |
| **Total** | | $ 56.2 | $ 72.2 | $ 16.0 | $ 17.0 | $ 45.5 | $ 28.5 |

[1] Reflects a 70% discount applied by the SIC / Debtors.  UCC values are discounted approx. 37% for collection risk, time value of money, and pro rata share of litigation cost (after a 43% discount for probability of success).

Pinta Consulting Agreement

31.     As set forth in the Committee's Complaint, in July 2022, Genesis entered into a consulting agreement with Pinta Capital Partners, a private equity firm where Joel Landau and David Harrington are Managing Partners.  The agreement provides the Debtors with "certain transactional support services" in exchange for a monthly consulting fee of $350,000 (i.e. $4.2 million per year) and reimbursement of reasonable expenses.[10] The agreement was backdated to January 1, 2022, circumventing the period requiring independent board approval of related party transactions, which expired in March 2022.  The total amount of consulting fees was $14.7 million paid between July 2022 and the Petition Date (for "services" for 42 months between January 2022 and the Petition Date).

32.     The day before the Board Meeting to approve the Pinta Consulting Agreement, Michael S. Sherman, Genesis' Executive Vice President and Chief Legal Officer, raised multiple concerns.  Sherman noted that $350,000 per month "seem[ed] like a whole lot," that "there is not a lot of description here to show it is FMV [fair market value] for the services" and that "some of

---

[10] GENESIS_UCC00011417 (Consulting Agreement dated Jan. 1, 2022 between Genesis Administrative Services, LLC and Pinta Capital Partners LTC LCC) at 2.

their work could be deemed to be for Pinta's account not Genesis."[11]  He also warned that "the totality of related party relationships is substantial, and IMO remains likely to be subject to shareholder or governmental scrutiny," noting that "[t]his is something for Joel and everyone with fiduciary duties to be aware of."[12]

33.     The SIC Report concluded there are viable causes of action related to these payments for constructive fraudulent transfers, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and preferences.  The SIC Report states the Debtors may not have received reasonably equivalent value of services for the fees paid and there is evidence of insolvency at the relevant times. The SIC determined a likely range of values for constructing fraudulent transfer, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty to be approximately $735,000 to $5,050,000.[13]

34.     The Committee Advisors also reviewed claims related to the Pinta consulting fees and agree with the SIC's conclusion that viable claims exist.  Given remarks by the Debtors' own executive and the lack of evidence that Genesis needed these consulting services (for which there were no similar consultants hired by Genesis prior to this agreement), there was likely less than reasonably equivalent value provided for the services. In addition, based on assertions of insolvency made by the SIC and other observations that color these claims, the UCC professionals assume a high probability of successful litigation.  _The UCC advisors believe there is conservatively a 40% to 60% probability of success which would result in a value of between $5.9 million and $8.8 million before other discounts_ as compared to the SIC range of approximately $0.7 million to $5.1 million.

---

[11] GENESIS_UCC00072426 (Email dated July 11, 2022, from Michael Sherman to Orrin Feingold and Harrington with the subject line "Re: Final - Consulting Agreement Overview- Pinta Partners LLC").
[12] *Id.*
[13] SIC Report at 13.

35.     After applying discounts for probability of success, collection risk, the time value of money, and a pro rata share of estimated litigation cost, the midpoint of the Committee Advisors' valuation is $4.1 million versus an estimated $0.9 million ascribed value in the Debtors' scorecard for the Genie bid.[14]

### 2022 Integra Transaction & Integra Subleases

36.     As set forth in the Complaint, in 2022, Welltower faced pressure from the market and concern for its tenant ProMedica's long-term viability. Welltower and Joel Landau, through his entity Integra Health ("**Integra**"), struck a deal to find new operators for 147 ProMedica facilities (the "**2022 Integra Transaction**").[15] Integra would buy ProMedica's 15% interest in the Welltower JV that owned the properties, ultimately paying an estimated $160 million.[16] As the lessee under the master lease, Integra would go on to find new operator sublessors and take a cut of any above-market rent received under those subleases.

37.     Certain facilities were losing money at the time of Integra's transaction, making it difficult to lease to a third party for any amount of rent. Integra subleased 39 of these loss-making facilities to Genesis as part of the first tranche of the 2022 Integra Transaction – 38 facilities in December 2022 and one facility in February 2023. Genesis paid approximately $132 million in rent on the subleases between the transaction and the Petition Date.[17]

---

[14] Values include deducting litigation costs, and therefore do not tie to Exhibit A. In Exhibit A, the litigation costs are deducted before the bottom line valuation.

[15] PR Newswire, *Welltower Announces Initial Closing of Real Estate Joint Venture with Integra Health* (December 23, 2022), https://www.prnewswire.com/news-releases/welltower-announces-initial-closing-of-real-estate-joint-venture-with-integra-health-301709588.html.

[16] $160 million is $233.8 million (purchase price) less $73.8million (lease inducement fee). WELLGEN00028602 (Fifth Amendment to Amended And Restated Membership Interest Purchase Agreement dated October 16, 2024) at 3 and Exhibit D-1, WELLGEN00028232 (Amended and Restated Membership Interest Purchase Agreement dated December 22, 2022) Section 7.1.

[17] SIC Report at 18.

38.     Following the transaction announcement, from November 7 to November 11, 2022, Welltower's stock price increased ~14% and market capitalization increased by *~$4 billion*.

39.     The SIC Report concluded that the Debtors may not have received reasonably equivalent value for the rent paid to Integra related to the facilities in the 2022 Integra Transaction, and that there are viable causes of action related to these payments for constructive fraudulent transfers, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and preferences. The SIC determined a likely range of values for constructive fraudulent transfer, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty to be approximately $16.4 million to $49.5 million, after accounting for reasonably equivalent value defenses and the probability of success.[18]

40.     The Committee Advisors also reviewed claims related to the 2022 Integra Transaction and agreed with the SIC's conclusion that viable claims exist.  The Committee Advisors found that the transaction damaged the Debtors in two ways:

> (1) above-market rent as identified by the SIC, although the Committee Advisors found these damages to be greater than the SIC valuation, and

> (2) the losses caused from operating the facilities for approximately 2.5 years before filing bankruptcy, which were not identified in the SIC valuation.

41.     First, to value the claim for above-market rent, FTI assessed reasonably equivalent value arguments by estimating what market rent would have been (using market rent as a proxy for the value provided by Integra). FTI determined market rent for the facilities based on a rent coverage ratio[19].

---

[18] *Id.* at 14.

[19] JLL and other appraisers of skilled nursing and senior housing real estate typically determine market rent by utilizing a lease coverage ratio, as buyers want to see that there are sufficient earnings to cover rent obligations.

42.     For the rent coverage ratio analysis, FTI used stabilized EBITDAR (Earnings Before Interest, Tax, Depreciation, Amortization and *Rent*) for each facility after a turnaround, as opposed to financial results at the time the subleases were signed, since, as mentioned above, these were initially loss-making facilities. Using an EBITDAR-to-rent coverage ratio range of 1.1x to 1.5x[20], based on comparable coverage ratios in 2022[21], FTI estimated total market rent between $54.6 million and $74.4 million, and therefore, the total above-market rent paid from the transaction date to the Petition Date was between $58.0 million and $77.8 million, based on $132.4 million actual rent paid (See Exhibit C).

**$ in millions**

| Year | 1.1x Rent Coverage Ratio | | | 1.3x Rent Coverage Ratio | | | 1.5x Rent Coverage Ratio | | |
|---|---|---|---|---|---|---|---|---|---|
| | (a) Total Paid Rent | (b) Total Pro Forma Rent | (a) – (b) Amount Above Market | (a) Total Paid Rent | (b) Total Pro Forma Rent | (a) – (b) Amount Above Market | (a) Total Paid Rent | (b) Total Pro Forma Rent | (a) – (b) Amount Above Market |
| 2023 | $ 56.8 | $ 29.6 | $ 27.2 | $ 56.8 | $ 25.1 | $ 31.7 | $ 56.8 | $ 21.7 | $ 35.1 |
| 2024 | 52.0 | 29.4 | 22.6 | 52.0 | 24.9 | 27.1 | 52.0 | 21.6 | 30.4 |
| 2025 | 23.6 | 15.4 | 8.2 | 23.6 | 13.0 | 10.6 | 23.6 | 11.3 | 12.3 |
| | $ 132.4 | $ 74.4 | $ 58.0 | $ 132.4 | $ 63.0 | $ 69.4 | $ 132.4 | $ 54.6 | $ 77.8 |

43.     In addition to above-market rent, the facilities lost an estimated $83.1 million for the Debtors prior to the Petition Date.[22]  Upon entry into the sublease, the facilities were generating *negative* EBITDAR.  FTI calculated an annualized EBITDAR of *negative* $34.9 million (based on financial results for the last three months as of March 2023 annualized).[23] Ultimately, the facilities lost an estimated $83.1 million through negative cash flow for the Debtors prior to the Petition

---

[20] EBITDAR coverage is EBITDAR / Rent, or the number of times earnings covers rent.  An EBITDAR rent coverage of 1.0x means EBITDAR equals Rent and no earnings are available after paying rent. A EBITDAR rent coverage ratio less than 1.0x means the facility is generating losses after paying rent.

[21] Omega Healthcare Investors, Inc. (OHI), Ventas, Inc. (VTR), and Welltower reported EBITDAR coverage ratios ranging from 1.1x (OHI) to 1.5x (VTR) in the third and fourth quarter of 2022 (See Exhibit C).

[22] $83.1 million in losses is negative illustrative cash flow in terms of EBITDA minus Capital Expenditures.
[23] GENESIS_UCC00092078 (Project Guardian Facility Performance file for April 2023).

Date.[24] After losing money for the Debtors, 17 facilities were divested, and the remaining 22 turned

around to better financial results by the Petition Date.  The remaining 22 are projected to generate

negative $0.8 million in EBITDA and positive $43.7 million in EBITDAR in 2025 per the Debtors'

projections.[25]

44.      Exhibit D provides the financial results of the Integra facilities by year for the 2.5

years during which the Debtors operated the facilities prior to bankruptcy.

45.      The transfer of the facilities into Genesis would give rise to separate causes of

action related to breach of fiduciary duties and fraudulent conveyance. However, these damages

may be considered duplicative of the above-market rent damages.  In total, damages relating to the

Integra Subleases are at least $83.1 million (a portion related to above-market rent and a portion

related to other losses that Genesis would not have otherwise experienced).

46.      The Committee Advisors valued the total $83.1 million in damages (combined

above-market rent and facility losses) between $24.4 million to $36.5 million after applying

discounts for probability of success, collection risk, and the time value of money.  These discounts

reflect the SIC's agreement with the existence of a viable claim, the Committee Advisors'

identification of additional, related causes of action connected to the same facilities, and multiple

potential defendants, including Integra and Welltower.

47.      After applying discounts for probability of success, collection risk, the time value

of money, and a pro rata share of estimated litigation cost, the midpoint of the Committee

---

[24] See Exhibit D for details. GENESIS_UCC00090584, CTRL0000003469, CTRL0000000933, CTRL0000000938, CTRL0000000929, CTRL0000000931, CTRL0000000934 (Project Guardian Facility Performance files).
[25] Excel workbook titled  "2.3.3_Genesis - Landlord and Facility Projections (2025.10.13).xlsx" from the Jefferies data room.

Advisors' valuation is $27.8 million versus an estimated $10.1 million ascribed value in the

Debtors' scorecard for the Genie Bid.[26]

Integra Colorado Sublease Termination Fee

48.    As set forth in the Complaint, on July 15, 2023, Genesis and Integra entered into a

sublease termination agreement for the Colorado facilities.  In that agreement, Genesis agreed to

pay a termination fee to Landau-controlled Integra of $3.625 million over several months.[27]

Months later, in December 2023, the termination agreement was amended, without explanation

and without any apparent consideration, to increase Genesis' obligation to approximately *$20

million*.[28]  The Debtors paid $9 million of the $20 million fee prior to the Petition Date.[29]

49.    The SIC Report concluded that there are viable causes of action related to these

payments for constructive fraudulent transfers, breach of fiduciary duty and aiding and abetting

breach of fiduciary duty, and preferences.  The report states that the Debtors may not have received

reasonably equivalent value of services for the fees paid and there is evidence of insolvency at the

relevant times. The SIC assigned a high probability of success and determined a likely range of

values for constructing fraudulent transfer, breach of fiduciary duty, and aiding and abetting breach

of fiduciary duty to be approximately $5.4 million to $7.2 million.[30]  The SIC range does not

account for other discounts, like the risk of collection, needed to estimate recovery value.

50.    The Committee Advisors valued the claim for the return of $9 million paid as a

termination fee between $4.0 million to $5.3 million after applying discounts for probability of

success, collection risk, and the time value of money.  These discounts reflect the SIC's agreement

---

[26] Values include deducting litigation costs, and therefore do not tie to Exhibit A. In Exhibit A, the litigation costs
are deducted before the bottom line valuation.
[27] GENESIS_UCC00467556 (Sublease Termination Agreement, dated July 15, 2023).
[28] GENESIS_UCC00237607 (Amendment to Sublease Termination Agreement, dated December 28, 2023).
[29] Genesis Healthcare, Inc. and Subsidiaries Consolidated Financial Statements December 31, 2024 and 2023 at 25.
[30] SIC Report at 14.

with the existence of viable claims, multiple causes of action (fraudulent conveyance, preferences, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty), the Committee Advisors' views on the strength of the claim, and the lack of reasonably equivalent value provided, among other factors.

51.     After applying discounts for probability of success, collection risk, the time value of money, and a pro rata share of estimated litigation cost, the midpoint of the Committee Advisors' valuation is $4.2 million versus an estimated $1.9 million ascribed value in the Debtors' scorecard for the Genie Bid.[31]

Cindat $20 Million Transfer to Gefner in 2024

52.     As described further in the Complaint, as part of a September 2024 Transaction, WAX sent Genesis a form letter seeking $30 million in settlement for the Cindat back rent, $20 million up front and $10 million deferred.  Jonathan Kirschner immediately approved the payment and Genesis sent WAX $20 million. David Gefner received that $20 million, according to text messages between Kirchner and Landau on October 15, 2024.

53.     The SIC Report concluded that there are viable causes of action related to these payments for constructive fraudulent transfers, breach of fiduciary duty and aiding and abetting breach of fiduciary duty, and preferences.  The report states that the Debtors may not have received reasonably equivalent value of services for the fees paid and there is evidence of insolvency at the relevant times. The SIC determined a likely range of values for constructive fraudulent transfer, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty to be approximately $12.0 million to $16.0 million.[32]  The Debtors used a value of approximately $4.2 million for this

---

[31] Values include deducting litigation costs, and therefore do not tie to Exhibit A. In Exhibit A, the litigation costs are deducted before the bottom line valuation.
[32] SIC Report at 14.

claim of the total $17.0 million used in their scorecard (assuming that a 70% discount from the

midpoint of $14.0 million was applied for the Auction scorecard).

54. The Committee Advisors valued the claim between $9.1 million to $11.5 million

after applying discounts for probability of success, collection risk, and the time value of money.

These discounts reflect the SIC's agreement with the existence of viable claims, multiple causes

of action (fraudulent conveyance, preferences, breach of fiduciary duty, and aiding and abetting

breach of fiduciary duty), the Committee Advisors' views on the strength of the claim, and the

lack of reasonably equivalent value provided, among other factors.

55. After applying discounts for probability of success, collection risk, the time value

of money, and a pro rata share of estimated litigation cost, the midpoint of the Committee

Advisors' valuation is $9.4 million versus an estimated $4.2 million ascribed value in the Debtors'

scorecard for the Genie Bid.[33]

**VII.** **Other Causes of Action Not Included in the SIC report**

---

[33] Values include deducting litigation costs, and therefore do not tie to Exhibit A. In Exhibit A, the litigation costs
are deducted before the bottom line valuation.

56.    The Committee Advisors' investigation found many other causes of action either not identified by the SIC, or not assigned a value by the SIC. The table below provides a summary of these potential actions.

**$ in millions**

| Ref | Transaction | Midpoint of Est. Damages [1] | Estimated Value [2] |
|---|---|---|---|
| 5. 2021 ReGen/Welltower Transaction | | $ 86.3 | $ 26.1 |
| 6. WAX/MAO Receives Term Loan Welltower Agreed to Forgive | | 68.8 | 20.8 |
| 7. Welltower Cash Interest & Extension Fee | | 17.6 | 6.4 |
| 8. Above Market Rent Paid to Cindat | | 23.8 | 5.2 |
| 9. Related Party Vendors (18 Vendors) | | TBD | TBD |
| 10. Altira Consulting Agreement | | 2.1 | 0.6 |
| 11. Unexplained Payments to Integra | | 1.0 | 0.3 |
| 12. Preferences - Omega | | 4.5 | 1.6 |
| 13. RICO Claims (Landau + Welltower) | | 652.8 | 12.0 |
| 14. Alter Ego / Succesor Liability (Landau) | | 1,150.0 | 15.8 |
| **Total** | | **$ 2,006.9** | **$ 88.9** |

[1] After accounting for applicable reasonably equivalent value and ordinary courses defenses.
[2] Midpoint of range after discounts for probability of success, risk of collection, and time value of money.
    Presented prior to reduction for litigation costs. Litigation costs applied in Exhibit A.

### 2021 ReGen/Welltower Transaction

57.    As set forth in detail in the Complaint, Genesis' Board of Directors had been considering a bankruptcy filing late 2020 and early 2021.  Welltower faced market scrutiny that Genesis, one of its major tenants was in financial distress. To help solve this issue for Welltower, in interconnected transactions, Genesis divested from 51 facilities owned by Welltower (i.e. Welltower moved the facilities leased by Genesis to other operators) and Joel Landau gained control of the Debtors through investments made by ReGen in exchange for highly dilutive convertible debt and Board seats.  The SIC did not have the benefit of additional discovery productions from Welltower and Joel Landau obtained by the Committee that showed that a significant amount of the ReGen funding came directly from Welltower and that Welltower and

19

Joel Landau hid this fact from Genesis's Board.  This was the initial transaction that allowed all subsequent transactions from which the SIC has identified claims.

58.     In exchange for divesting from the 51 facilities, Genesis was due to receive an $86.3 million termination fee, which the transaction agreement required Genesis to use to pay down unsecured debt owed to Welltower. For the ReGen investment of $50.0 million, the Debtors provided convertible notes with a face value of that same amount and two board seats.

59.     The Committee Advisors believe the estates have viable claims for fraudulent conveyances and fraudulent inducement arising from this transaction. The Debtors may not have received reasonably equivalent value of services for the fees paid and there is evidence of insolvency at the relevant times.  The Committee Advisors assert that damages may include the value of Genesis foregoing bankruptcy and agreeing to abandon marketable leases, so that Welltower could benefit by renting to new tenants, and/or the loss of enterprise value from Genesis agreeing to ReGen and Welltower's plan instead of filing for bankruptcy.

60.     While additional analysis is needed to fully estimate damages, the Committee Advisors conservatively estimate damages to be equal to the amount of the $86.3 million termination fee. The Committee Advisors valued the claim between $20.9 million to $31.3 million after applying discounts for probability of success, collection risk, and the time value of money.

WAX / MAO Receive Term Loan Welltower Agreed to Forgive

61.     As described further in the Complaint, as part of the same September 2024 transaction that resulted in the back rent transfer raised as a claim by the SIC, Welltower also transferred an estimated $68.8 million of the Genesis secured Term Loan to MAO, a Gefner and Landau-affiliated entity, and WAX, which Welltower described as a "Landau SPE."  While planning the transaction, a Welltower executive vice president stated that Welltower would agree

20

to forgive the loans. However, in the end, portions of the term loan were instead transferred to the WAX and MAO entities.

62.     The Committee Advisors believe that the estates have viable claims for usurpation of corporate opportunity (against Landau/WAX/MAO), aiding and abetting breach of fiduciary duty (against Welltower and Landau), and breach of fiduciary duty (against Genesis D&Os). The Committee Advisors estimate damages to be equal to the amount of the term loan transfers or $68.8 million and valued the claim between $16.6 million to $25.0 million after applying discounts for probability of success, collection risk, and the time value of money.

Welltower Extension Fee & Cash Interest

63.     On June 3, 2024, Genesis entered into the 14th Amendment to the Term Loan, which extended its maturity to June 30, 2025. Later, on June 28, 2024, Genesis executed a Fee Letter with Welltower, where Welltower obligated the Debtors to an Extension Fee of $11.5 million to be paid in 12 monthly installments of $958,333.33. The Extension Fee installment payments were reduced to less than half starting February 2025. The Debtors paid Welltower approximately $7.9 million of the Extension Fee in the year prior to the Petition Date.

64.     In addition, as part of the 15th Amendment to the Term Loan Agreement executed on September 30, 2024, the term loan was extended to June 30, 2026 and interest due under the Welltower portion of the term loan converted from paid-in-kind interest to cash interest beginning January 1, 2025. The Debtors paid Welltower an estimated $9.7 million in cash interest in 2025 leading up to their bankruptcy filing.

65.     The Committee Advisors believe the estates have viable claims for preferences and fraudulent conveyances against Welltower for the $7.9 million Extension Fee paid and $9.7 million cash interest paid. Committee Advisors estimate the full amount of the $17.6 million to be

21

recoverable and valued the claim between $5.2 million to $7.7 million after applying discounts for probability of success, collection risk, and the time value of money.

Above-Market Rent Paid to Cindat

66.     While the SIC identified causes of action against Welltower and Landau's entity, Integra, for above-market rent, the SIC did not consider the same claims related to Cindat, a joint venture involving Welltower.  The Committee Advisors observed the rent obligations were significantly outsized when compared to other landlords, including Omega.

67.     FTI performed a similar market rent analysis to the analysis performed to assess Integra's above-market rent.  Removing back rent payments accounted for in the claims identified by the SIC and using EBITDAR-to-rent coverage ratio range of 1.1x to 1.5x based on comparable coverage ratios[34], FTI found that the $161.5 million in rent charged to Genesis between June 2021 and the Petition Date was between $46.8 million and $77.4 million above market at times when Genesis was likely insolvent.  Adjusting for the joint venture interest owned by Welltower at various times (25% ownership and then 100% ownership October 2024 forward), FTI found Welltower's portion of above-market rent to be between $16.1 million to $31.5 million (see Exhibit E).

---

[34] Per REIT filings and earnings call comments, as well as industry market reports and research papers, the skilled nursing industry-standard EBITDAR-to-rent coverage ratio ranged between 1.3x and 1.4x at the time the Cindat master lease was entered into.

$ in millions

| Period | 1.1x Rent Coverage Ratio | | | 1.3x Rent Coverage Ratio | | | 1.5x Rent Coverage Ratio | | |
|---|---|---|---|---|---|---|---|---|---|
| | (a) Total Paid Rent | (b) Total Pro Forma Rent | (a) - (b) Amount Above Market | (a) Total Paid Rent | (b) Total Pro Forma Rent | (a) - (b) Amount Above Market | (a) Total Paid Rent | (b) Total Pro Forma Rent | (a) - (b) Amount Above Market |
| 6/2021 – 12/2021 | $ 34.4 | $ 21.2 | $ 13.2 | $ 34.4 | $ 17.9 | $ 16.5 | $ 34.4 | $ 15.5 | $ 18.9 |
| 1/2022 – 12/2022 | 62.3 | 41.0 | 21.3 | 62.3 | 34.7 | 27.6 | 62.3 | 30.1 | 32.2 |
| 1/2023 – 4/2023 | 20.5 | 14.1 | 6.4 | 20.5 | 11.9 | 8.5 | 20.5 | 10.3 | 10.1 |
| Pre-Settlement Total | $ 117.2 | $ 76.3 | $ 40.9 | $ 117.2 | $ 64.6 | $ 52.6 | $ 117.2 | $ 55.9 | $ 61.2 |
| 10/2024 – 12/2024 | 13.0 | 10.9 | 2.1 | 13.0 | 9.2 | 3.8 | 13.0 | 8.0 | 5.0 |
| 1/2025 – 7/2025 | 31.3 | 27.5 | 3.8 | 31.3 | 23.3 | 8.0 | 31.3 | 20.2 | 11.1 |
| Post-Settlement Total | $ 44.3 | $ 38.4 | $ 5.9 | $ 44.3 | $ 32.5 | $ 11.8 | $ 44.3 | $ 28.2 | $ 16.2 |
| Pre- and Post-Settlement Total | $ 161.5 | $ 114.7 | $ 46.8 | $ 161.5 | $ 97.0 | $ 64.5 | $ 161.5 | $ 84.1 | $ 77.4 |
| Apply WT 25% JV Interest (Pre-Settlement) | $ 29.3 | $ 19.1 | $ 10.2 | $ 29.3 | $ 16.1 | $ 13.2 | $ 29.3 | $ 14.0 | $ 15.3 |
| Apply WT 100% JV Interest (Post-Settlement) | $ 44.3 | $ 38.4 | $ 5.9 | $ 44.3 | $ 32.5 | $ 11.8 | $ 44.3 | $ 28.2 | $ 16.2 |
| Welltower Total | $ 73.6 | $ 57.5 | $ 16.1 | $ 73.6 | $ 48.6 | $ 25.0 | $ 73.6 | $ 42.1 | $ 31.5 |

68.    The Committee Advisors believe the estates have viable claims for fraudulent conveyances against Welltower through Cindat for the above-market rent paid by the Debtors. Committee Advisors estimate the value of the claim to be between $3.5 million to $7.0 million on the above-market rent of $16.1 million to $31.5 million after applying discounts for probability of success, collection risk, and the time value of money.

Other Transactions with Entities Connected to Joel Landau

69.    As set forth in the Complaint, pursuant to the Investment Agreement for the ReGen investment, any transactions between Genesis and ReGen or any of its affiliates were to be pre-approved by an independent committee of three independent directors, but this independent committee was only required to remain in place for a year after the March 2, 2021, effective date.

70.    Shortly after the expiration of the requirement for the independent committee, the Debtors began to enter into agreements with entities affiliated with or related to Joel Landau, beginning with an office lease in March 2022. The SIC identified many of these vendors, and noted that the vendors provided legitimate business services.

71.    The Committee Advisors estimate that the Debtors executed agreements with 18 vendors and other entities in addition to Pinta, Integra, ReGen, WAX/MAO, and Altira, which are

23

discussed separately in this Declaration. The Committee Advisors believe that claims may exist for preferences and fraudulent conveyances to these vendors.  Due to the lack of information at this time, the Committee Advisors did not assign value to the majority of potential claims against these entities.

72.     Genesis entered into a Consulting Agreement with Altira on January 1, 2025 which called for the Debtors to pay Altira an Administrative Fee of 1% of the net revenue of the 22 remaining Integra facilities. Based on the Committee Advisors' investigation, Genesis paid Altira $2.1 million in fees prior to the Petition Date.

73.     In addition, the Committee Advisors identified two payments made to Integra of approximately $478,000 each, which do not appear to be for rent and therefore are not captured by the SIC Report.

74.     The Debtors did not provide payment information for related parties prior to the 90 days before the Petition Date, because the Debtors did not consider these related party vendors to be insiders.  Therefore, there may be additional payments to Integra and other related party vendors that would give rise to additional value to the estate.

75.     The Committee Advisors believe that at least the payments to Altira and Integra should be challenged as fraudulent conveyances and preferences.  Committee Advisors estimate the full amount of the $3.1 million to be recoverable damages and valued the claim between $0.7 million to $1.1 million after applying discounts for probability of success, collection risk, and the time value of money.

<u>Preference Claims Against Omega</u>

76.     The Committee Advisors reviewed payments made to Omega in the 90 days prior to the Petition Date and found approximately $4.5 million in payments with suspect timing and/or amounts.

77.     The Committee Advisors believe the estates have viable claims for preferences against Omega for the $4.5 million in payments.  The Committee Advisors value the claim between $1.3 million to $2.0 million after applying discounts for probability of success, collection risk, and the time value of money.

RICO Act Claims

78.     As described in the Committee's Complaint, the Committee asserts that the actions of Landau, Welltower and other members and associates constitute violations of the Racketeering Influenced and Corrupt Organizations (RICO) Act.

79.     RICO Act violations give rise to treble damages which would add another $650 million or more in potential damages in addition to the damages previously identified in this Declaration. The Committee Advisors conservatively applied a lower probability of success and higher collection risk than the other claims.  The Committee Advisors value the claim between $6.0 million to $17.9 million after adjusting for probability of success, collection risk, and the time value of money.

Alter Ego

80.     As set forth in the Complaint, the Committee Advisors found indications of viable claims of alter ego against Joel Landau controlled entities including, but not limited to, Pinta, Integra, and ReGen.

81.     Based on the combination of findings, the Committee Advisors believe the estates have viable alter ego claims.  Alter ego claims would give rise to damages in the amount of the shortfall to general unsecured creditors which could be $1 billion or more. The Committee Advisors conservatively applied a lower probability of success and higher collection risk than the other claims.  The Committee Advisors value the claim between $10.5 million to $21.1 million after adjusting for probability of success, collection risk, and the time value of money.

25

**VIII.** **Conclusion**

82.     The value placed on the causes of action have a considerable impact on the bid comparison scorecard used to determine the highest bidder.  The Debtors assigned a collectible recovery value of only $32 million to the Genie Bid, including $15 million in claims against Directors and Officers covered by insurance that are excluded under both bids, which undervalues some actions and does not consider other actions. The Committee Advisors believe between $106.3 million to $177.1 million (a midpoint of $141.7 million) should be ascribed to the Genie Bid for "Causes of Action" on the Debtors' Auction scorecard ($91.3 million to $162.1 million for released causes of action plus $15 million in value of Directors & Officers claims).

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge, information, and belief.

Dated: December 8, 2025                    /s/ *Brian Taylor*

                                                              Brian Taylor

Exhibit A

Genesis Healthcare, Inc., et al.
Taylor Declaration - Exhibit A

Case 25-80185-sgj11   Doc 1928-1   Filed 12/15/25   Entered 12/15/25 15:40:03   Desc
Exhibit 1   Page 30 of 38

## A. Special Investigative Committee / Debtors' Auction Scorecard Value

*$ in millions*

| Ref | Transaction | Defendants | Midpoint of Est. Damages | Probability of Success | | Claim Value Adjusted for Probability of Success | | | Additional Adjustment - 70% Discount [1] | Value Used At Auction | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Low | High | Low | High | Midpoint | | Low | High | Midpoint |
| **I. Claims Identified by the SIC** | | | | | | | | | | | | |
| 1. Pinta Consulting Agreement | Landau / Affiliates | NP | NP | NP | $ 0.7 | $ 5.1 | $ 2.9 | 70% | 0.2 | 1.5 | $ 0.9 | |
| 2. Integra Subleases (PA, CO, & NJ) | Landau / Affiliates; Welltower | NP | NP | NP | 16.4 | 49.6 | 33.0 | 70% | 5.0 | 15.0 | 10.0 | |
| 3. Integra Colorado Sublease Term. Fee | Landau / Affiliates; Welltower | NP | NP | NP | 5.4 | 7.2 | 6.3 | 70% | 1.6 | 2.2 | 1.9 | |
| 4. Back Rent Transfer | Landau / Affiliates | NP | NP | NP | 12.0 | 16.0 | 14.0 | 70% | 3.6 | 4.8 | 4.2 | |
| **Total** | | **NP** | **NP** | **NP** | **$ 34.5** | **$ 77.9** | **$ 56.2** | | **$ 10.5** | **$ 23.6** | **$ 17.0** | |
| *Plus: Estimated Value of D&O Litigation (Assuming Collection of up to Policy Limit)* | | | | | | | | | 15.0 | 15.0 | 15.0 | |
| **Value Used in the Genie 3 Scorecard** | | | | | | | | | **$ 25.5** | **$ 38.6** | **$ 32.0** | |

## B. UCC's Adjusted Scorecard Value

*$ in millions*

| Ref | Transaction | Defendants | Midpoint of Est. Damages | Probability of Success [2] | | Claim Value Adjusted for Probability of Success | | | Probability of Collection [3] | Claim Value Adjusted for Collection Risk | | | Present Value Discount Factor [4] | Estimated Present Value of Claims (UCC) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Low | High | Low | High | Midpoint | | Low | High | Midpoint | | Low | High | Midpoint |
| **I. Claims Identified by the SIC** | | | | | | | | | | | | | | | | |
| 1. Pinta Consulting Agreement | Landau / Affiliates | $ 14.7 | 40% | 60% | $ 5.9 | $ 8.8 | $ 7.4 | 66% | $ 3.9 | $ 5.8 | $ 4.9 | 0.92 | $ 3.6 | $ 5.3 | $ 4.4 |
| 2. Integra Subleases (PA, CO, & NJ) | Landau / Affiliates; Welltower | 83.1 | 40% | 60% | 33.2 | 49.9 | 41.6 | 80% | 26.6 | 39.9 | 33.2 | 0.92 | 24.4 | 36.5 | 30.4 |
| 3. Integra Colorado Sublease Term. Fee | Landau / Affiliates; Welltower | 9.0 | 60% | 80% | 5.4 | 7.2 | 6.3 | 80% | 4.3 | 5.8 | 5.0 | 0.92 | 4.0 | 5.3 | 4.6 |
| 4. Back Rent Transfer | Landau / Affiliates | 20.0 | 75% | 95% | 15.0 | 19.0 | 17.0 | 66% | 9.9 | 12.5 | 11.2 | 0.92 | 9.1 | 11.5 | 10.3 |
| **Total** | | **$ 126.8** | **47%** | **67%** | **$ 59.5** | **$ 84.9** | **$ 72.2** | **75%** | **$ 44.7** | **$ 64.0** | **$ 54.4** | **0.92** | **$ 40.9** | **$ 58.6** | **$ 49.8** |
| **II. Additional Claims Identified by the Committee Advisors** | | | | | | | | | | | | | | | | |
| 5. 2021 ReGen/Welltower Transaction | Landau / Affiliates | $ 86.3 | 40% | 60% | $ 34.5 | $ 51.8 | $ 43.2 | 66% | $ 22.8 | $ 34.2 | $ 28.5 | 0.92 | $ 20.9 | $ 31.3 | $ 26.1 |
| 6. WAX/MAO Receives Term Loan | Landau / Affiliates | 68.8 | 40% | 60% | 27.5 | 41.3 | 34.4 | 66% | 18.2 | 27.2 | 22.7 | 0.92 | 16.6 | 25.0 | 20.8 |
| 7. Welltower Cash Interest & Extension Fee | Welltower | 17.6 | 40% | 60% | 7.0 | 10.6 | 8.8 | 80% | 5.6 | 8.4 | 7.0 | 0.92 | 5.2 | 7.7 | 6.4 |
| 8. Above Market Rent Paid to Cindat | Welltower | 23.8 | 20% | 40% | 4.8 | 9.5 | 7.1 | 80% | 3.8 | 7.6 | 5.7 | 0.92 | 3.5 | 7.0 | 5.2 |
| 9. Related Party Vendors (18 Vendors) | Landau / Affiliates | TBD | 40% | 60% | TBD | TBD | TBD | 66% | TBD | TBD | TBD | 0.92 | TBD | TBD | TBD |
| 10. Altira Consulting Agreement | Landau / Affiliates | 2.1 | 40% | 60% | 0.8 | 1.3 | 1.1 | 66% | 0.6 | 0.8 | 0.7 | 0.92 | 0.5 | 0.8 | 0.6 |
| 11. Unexplained Payments to Integra | Landau / Affiliates | 1.0 | 40% | 60% | 0.4 | 0.6 | 0.5 | 66% | 0.3 | 0.4 | 0.3 | 0.92 | 0.2 | 0.4 | 0.3 |
| 12. Preferences - Omega | Omega | 4.5 | 40% | 60% | 1.8 | 2.7 | 2.3 | 80% | 1.4 | 2.2 | 1.8 | 0.92 | 1.3 | 2.0 | 1.6 |
| 13. RICO Claims (Landau + Welltower) | Landau / Affiliates; Welltower | 652.8 | 5% | 15% | 32.6 | 97.9 | 65.3 | 20% | 6.5 | 19.6 | 13.1 | 0.92 | 6.0 | 17.9 | 12.0 |
| 14. Alter Ego / Succesor Liability (Landau) | Landau / Affiliates | 1,150.0 | 10% | 20% | 115.0 | 230.0 | 172.5 | 10% | 11.5 | 23.0 | 17.3 | 0.92 | 10.5 | 21.1 | 15.8 |
| **Total** | | **$ 2,006.9** | **11%** | **22%** | **$ 224.5** | **$ 445.6** | **$ 335.1** | **29%** | **$ 70.7** | **$ 123.5** | **$ 97.1** | **0.92** | **$ 64.7** | **$ 113.1** | **$ 88.9** |
| **Total I. & II.** | | | | | | | | | | | | | | **$ 105.7** | **$ 171.7** | **$ 138.7** |
| *Less: Present Value of the Cost of Litigation [4]* | | | | | | | | | | | | | | (14.3) | (9.5) | (11.9) |
| **Total After Litigation Costs** | | | | | | | | | | | | | | **$ 91.3** | **$ 162.1** | **$ 126.7** |
| *Plus: Estimated Value of D&O Litigation (Assuming Collection of up to Policy Limit)* | | | | | | | | | | | | | | 15.0 | 15.0 | 15.0 |
| **UCC Adjusted Value - Range & Midpoint** | | | | | | | | | | | | | | **$ 106.3** | **$ 177.1** | **$ 141.7** |

[1] It appears the Debtors adjusted the value of the causes of action provided by the SIC to 30% of the midpoint of the SIC range (a 70% discount). This discount is likely to account for collection risk and time value of money.

[2] Range of probability of success provided by Committee Counsel.

[3] Assumed Probability of Collection based on the specific defendants, number of defendants, and assumptions by the Committee Advisors.

[4] Assumes collection of judgements 2.5 years from today and payment of professional fees monthly starting 6 months from today, discounted using the risk free rate (3-year treasury bond yield)

Exhibit B

**Genesis Healthcare, Inc., et al.**
**Taylor Declaration**
**Exhibit B - Special Investigation Committee - Likely Range of Value of Causes of Action**

*$ in millions*

| | | SIC Valuation of Claims | |
|---|---|---|---|
| | | **SIC Range of Value [1]** | |
| **Ref** | **Transaction** | **Low** | **High** |
| 1. Pinta Consulting Agreement | | $ 0.7 | $ 5.1 |
| 2. Integra Subleases (PA, CO, & NJ) | | 16.4 | 49.6 |
| 3. Integra Colorado Sublease Termination Fee | | 5.4 | 7.2 |
| 4. Back Rent Transfer | | 12.0 | 16.0 |
| **Total** | | **$ 34.5** | **$ 77.9** |

[1] After accounting for probability of a successful litigation.

Page 1 of 1

Exhibit C

**Genesis Healthcare, Inc., et al.**
**Taylor Declaration**
**Exhibit C - Estimated Fraudulent Conveyance Amounts based on Above Market Rent paid to Integra**

**I. Above Market Rent - Calculation using Actual Rent Paid per the SIC ($132.4 million) less Estimated Market Rent Using Coverage Ratios**

*$ in millions*

| Year | 1.1x Rent Coverage Ratio | | | 1.3x Rent Coverage Ratio | | | 1.5x Rent Coverage Ratio | | |
|---|---|---|---|---|---|---|---|---|---|
| | (a) Total Paid Rent | (b) Total Pro Forma Rent | (a) - (b) Amount Above Market | (a) Total Paid Rent | (b) Total Pro Forma Rent | (a) - (b) Amount Above Market | (a) Total Paid Rent | (b) Total Pro Forma Rent | (a) - (b) Amount Above Market |
| 2023 | $ 56.8 | $ 29.6 | $ 27.2 | $ 56.8 | $ 25.1 | $ 31.7 | $ 56.8 | $ 21.7 | $ 35.1 |
| 2024 | 52.0 | 29.4 | 22.6 | 52.0 | 24.9 | 27.1 | 52.0 | 21.6 | 30.4 |
| 2025 | 23.6 | 15.4 | 8.2 | 23.6 | 13.0 | 10.6 | 23.6 | 11.3 | 12.3 |
| | $ 132.4 | $ 74.4 | $ 58.0 | $ 132.4 | $ 63.0 | $ 69.4 | $ 132.4 | $ 54.6 | $ 77.8 |

**II. Range of Fraudulent Conveyance Amounts**

| | |
|---|---|
| Low | $ 58.0 |
| Mid | $ 69.4 |
| High | $ 77.8 |

---

**Comparable Market Data Used Above**

| Landlord | Coverage Ratio | Time Period |
|---|---|---|
| Omega | 1.09x | 3Q 22 |
| | 1.14x | 4Q 22 |
| Ventas | 1.50x | 4Q 22 |
| Welltower | 1.31x | Q3 22 |
| | 1.34x | Q4 22 |

| | |
|---|---|
| Average | 1.28 |
| Low | 1.09 |
| High | 1.50 |

Exhibit D

**Genesis Healthcare, Inc., et al.**
**Taylor Declaration**
**Exhibit D - Integra Facility Losses - Summary**

| Genesis Loss from 2022 ProMedica/Integra Transaction | | | | |
|---|---|---|---|---|
| *($ in millions)* | LTM 12.31.23 | LTM 12.31.24 | YTD 06.30.25 | Total |
| Revenue | $ 546.1 | $ 574.5 | $ 205.4 | $ 1,326.0 |
| EBITDAR | (0.9) | 39.8 | 20.5 | 59.4 |
| Allocated Rent [1] | 55.6 | 49.4 | 22.5 | 127.5 |
| (-) Additional Rent Paid as noted by the SIC | (2.6) | (1.1) | (4.9) | (4.9) |
| EBITDA | (57.7) | (12.2) | (3.1) | (72.9) |
| Illustrative CapEx | (4.7) | (3.9) | (1.5) | (10.1) |
| **Illustrative FCF after Additional Rent Paid as noted by the SIC** | **$ (62.4)** | **$ (16.1)** | **$ (4.6)** | **$ (83.1)** |

[1] Rent paid based on the SIC Report.

Sources: Project Guardian Facility Performance files on the Relativity Database.
  (GENESIS_UCC00090584, CTRL0000003469, CTRL0000000933, CTRL0000000938,
  CTRL0000000929, CTRL0000000931, CTRL0000000934)

Exhibit E

**Genesis Healthcare, Inc., et al.**

**Taylor Declaration**

**Exhibit E - Estimated Fraudulent Conveyance Amounts based on Above Market Rent paid to Cindat**

**I. Above Market Rent - Calculation using Actual Rent Paid per the Debtor's Project Guardian workbooks ($161.5 million) less Estimated Market Rent Using Coverage Ratios**

*$ in millions*

| Period | 1.1x Rent Coverage Ratio | | | 1.3x Rent Coverage Ratio | | | 1.5x Rent Coverage Ratio | | |
|---|---|---|---|---|---|---|---|---|---|
| | (a) Total Paid Rent | (b) Total Pro Forma Rent | (a) - (b) Amount Above Market | (a) Total Paid Rent | (b) Total Pro Forma Rent | (a) - (b) Amount Above Market | (a) Total Paid Rent | (b) Total Pro Forma Rent | (a) - (b) Amount Above Market |
| 6/2021 - 12/2021 | $ 34.4 | $ 21.2 | $ 13.2 | $ 34.4 | $ 17.9 | $ 16.5 | $ 34.4 | $ 15.5 | $ 18.9 |
| 1/2022 - 12/2022 | 62.3 | 41.0 | 21.3 | 62.3 | 34.7 | 27.6 | 62.3 | 30.1 | 32.2 |
| 1/2023 - 4/2023 | 20.5 | 14.1 | 6.4 | 20.5 | 11.9 | 8.5 | 20.5 | 10.3 | 10.1 |
| Pre-Settlement Total | $ 117.2 | $ 76.3 | $ 40.9 | $ 117.2 | $ 64.6 | $ 52.6 | $ 117.2 | $ 55.9 | $ 61.2 |
| 10/2024 - 12/2024 | 13.0 | 10.9 | 2.1 | 13.0 | 9.2 | 3.8 | 13.0 | 8.0 | 5.0 |
| 1/2025 - 7/2025 | 31.3 | 27.5 | 3.8 | 31.3 | 23.3 | 8.0 | 31.3 | 20.2 | 11.1 |
| Post-Settlement Total | $ 44.3 | $ 38.4 | $ 5.9 | $ 44.3 | $ 32.5 | $ 11.8 | $ 44.3 | $ 28.2 | $ 16.2 |
| Pre- and Post-Settlement Total | $ 161.5 | $ 114.7 | $ 46.8 | $ 161.5 | $ 97.0 | $ 64.5 | $ 161.5 | $ 84.1 | $ 77.4 |
| Apply WT 25% JV Interest (Pre-Settlement) | $ 29.3 | $ 19.1 | $ 10.2 | $ 29.3 | $ 16.1 | $ 13.2 | $ 29.3 | $ 14.0 | $ 15.3 |
| Apply WT 100% JV Interest (Post-Settlement) | $ 44.3 | $ 38.4 | $ 5.9 | $ 44.3 | $ 32.5 | $ 11.8 | $ 44.3 | $ 28.2 | $ 16.2 |
| **Welltower Total** | **$ 73.6** | **$ 57.5** | **$ 16.1** | **$ 73.6** | **$ 48.6** | **$ 25.0** | **$ 73.6** | **$ 42.1** | **$ 31.5** |

**II. Range of Fraudulent Conveyance Amounts**

| | |
|---|---|
| **Low** | $ 16.1 |
| **Mid** | $ 25.0 |
| **High** | $ 31.5 |

**Comparable Market Data Used Above**

| Landlord | Coverage Ratio | Time Period |
|---|---|---|
| Omega | 1.33x | 4Q 16 |
| | 1.33x | 1Q 17 |
| | 1.51x | 4Q 20 |
| | 1.50x | 1Q 21 |
| Welltower | 1.39x | 4Q 16 |
| | 1.34x | 1Q 17 |
| | 1.00x | 4Q 20 |
| | 1.37x | 1Q 21 |

| | |
|---|---|
| **Average** | 1.35 |
| **Low** | 1.00 |
| **High** | 1.51 |