# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) |
| GENESIS HEALTHCARE, INC., *et al.*, | ) Case No. 25-80185 (SGJ) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |

**DECLARATION OF ANDREW TURNBULL IN SUPPORT OF (1) OMNIBUS SALE OBJECTION AND POST-AUCTION SALE OBJECTION OF THE STATUTORY UNSECURED CLAIMHOLDERS' COMMITTEE TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO CPE 88988 LLC AND (2) OBJECTION OF THE STATUTORY UNSECURED CLAIMHOLDERS' COMMITTEE TO DEBTORS' MOTION FOR ENTRY OF ORDER (I) EXTENDING DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THEREOF AND (II) GRANTING RELATED RELIEF**

I, Andrew Turnbull, pursuant to Rules 2014(a) and 2016(b) of the Federal Rules of Bankruptcy and Procedure and Rule 2014-1 of the Local Rules, make the following statements as follows:

1. I submit this declaration (the "Declaration") in support of (1) *Omnibus Sale Objection and Post-Auction Sale Objection of the Statutory Unsecured Claimholders' Committee to the Sale of Substantially All of the Debtors' Assets to CPE 88988 LLC* (the "**Sale Objection**") and (2) *Objection of the Statutory Unsecured Claimholders' Committee to  Debtors' Motion for Entry of Order (I) Extending Debtors' Exclusive Periods to File A Chapter 11 Plan and Solicit*

---

[1] The last four digits of Genesis Healthcare, Inc's federal tax identification number are 4755.  There are 299 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only.  A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Genesis.  The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

*Acceptances Thereof and (II) Granting Related Relief* (the "**Exclusivity Objection**" and, together with the Sale Objection, the "**Objections**"),[2]

2.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents and information concerning the Debtors' operations and financial affairs, information provided to me by professionals involved in advising the statutory unsecured claimholders' committee in these chapter 11 cases (the "Committee"), including the Houlihan Lokey (as defined below) team, or my opinions based upon my experience and knowledge.  I am over the age of 18 and authorized to submit this Declaration as the investment banker for the Committee on behalf of the Committee.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

## BACKGROUND

### A.  Personal Background and Qualifications

3.      I am a Managing Director in the Financial Restructuring Group at Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), and I am authorized to make this Declaration on behalf of Houlihan Lokey.  During the course of my career, I have advised debtors and creditors in financial restructurings, distressed mergers and acquisitions, private placements, and fairness opinions.  My notable recent restructuring engagements in the healthcare space include, without limitation, the following: The Stayton at Museum Way (sale of a senior living facility), SantaFe Healthcare (two sale processes for two separate senior living facilities), Christian Care Centers (sale of three senior living facilities), Heywood Healthcare, Inc. (reorganization of two acute care hospitals), Steward Health Care System (sales, transfers and restructuring related to 31 hospitals), Nashville Senior

---

[2]  Capitalized terms used in the Preliminary Statement but not defined herein shall have the meanings otherwise assigned to them in the Objections. Portions of the Objections are redacted and/or filed under seal pursuant to ¶ 15 the *Order Approving Amended Stipulated and Agreed to Confidentiality Agreement and Protective Order* [Docket No. 1206].

Care (sale of five senior living facilities) and Prospect Medical Holdings (sale of various businesses including acute care hospitals, behavioral hospitals, ASC / outpatient facilities and a value based, integrated care delivery network).

4. I received a B.Sc. in Biology from the University of Western Ontario and an Honors Business Administration degree, from the Ivey Business School at the University of Western Ontario.

5. Houlihan Lokey, together with the other subsidiaries of its direct parent company, Houlihan Lokey, Inc., is an internationally recognized investment banking and financial advisory firm, with offices worldwide and approximately 1,900 professionals. Houlihan Lokey is a leader in providing such services to debtors, unsecured and secured creditors, acquirers, and other parties-in-interest involved with financially troubled companies both in and outside of bankruptcy. Houlihan Lokey was selected to serve as an investment banker to the Committee on August 7, 2025. Although Houlihan Lokey is being compensated for its work as the investment banker retained by the Committee, Houlihan Lokey is not being compensated separately for this Declaration or testimony.

6. Since its retention, Houlihan Lokey has worked tirelessly to review and analyze the information provided by the Debtors to assist the Committee in evaluating the Debtors' sale process and otherwise. This included participating in numerous discussions with the Debtors' advisors during the marketing process, participating with the Debtors' advisors in discussions with potential bidders, attending and actively contributing to the Debtors' Auction process conducted in-person on November 18 and November 19, which was continued to December 1, participating in discussions with the Debtors' advisors and Special Restructuring Committee ("SRC") around their evaluation of the competing bids, participating in clarification calls with the final two

Bidders, and reviewing diligence materials submitted by the Bidders in response to diligence requests.

7.    I previously testified and submitted declarations related to the Sale Motion in connection with the Debtors' requested approval of the Bidding Procedures. *See* Docket Nos. 417, 480, and 633 (the "Prior Declarations").  The testimony I submitted in the Prior Declarations relating to my concerns with the Debtors' sale and auction process continues to be true today and is incorporated into this Declaration as if set forth herein.

### B.  The Auction Process and the Final Sealed Bids

8.    On or about November 7, 2025, in addition to CPE 88988 LLC's bid (the "Stalking Horse Bid"), five parties submitted bids pursuant to the Bidding Procedures Order.  Two parties, Genie 3, LLC ("Genie") and Olumie Capital ("Olumie") submitted bids for substantially all of the Debtors' assets (i.e. "WholeCo" bids), while three bids were submitted for certain subsets of the Debtors' facilities or operational assets (i.e. "PartialCo" bids).

9.    On November 18, 2025, the Debtors opened the Auction by (i) disqualifying the WholeCo bid submitted by Olumie on the basis that Olumie had not agreed to serve as a Back-Up Bidder (despite Olumie having funded a $5 million deposit), and (ii) presenting to all competing WholeCo bidders the Debtors' "scorecard" reflecting their assessment and valuation of the competing bids that would be used for purposes of the Auction (the "Debtors' Auction Scorecard").  Despite the Committee and Genie asserting objections to various aspects of the Debtors' Auction Scorecard and the Debtors' flawed scoring process, Genie continued to participate in good faith in the Auction, which continued through November 19, 2025, with both the Stalking Horse and Genie submitting "topping" bids in multiple rounds of bidding.

4

10.    The Auction opened with the Debtors declaring the initial Stalking Horse Bid as the Starting Bid (as defined in the Bidding Procedures) at $873 million, while assigning the initial Genie bid a value of $751 million. The Committee immediately stated on the record that it disagreed with the Debtors' valuation methodology and conclusion. Genie nevertheless proceeded and submitted the first topping bid, increasing the cash component of its bid by $5 million, assuming PTO liabilities consistent with the Stalking Horse, and matching IRS-claim treatment— increases which collectively improved the valuation of its bid per the Debtors' Auction Scorecard by approximately $130 million.

11.    Following submission of this Bid, the Debtors requested to speak directly to Monticello, Genie's proposed lender. Monticello is a well-known player in the industry.  A call was convened with Monticello, Genie, the Debtors, Committee Counsel and me in which Montciello gave high praise to and expressed its confidence in, Genie.

12.     After the call with Monticello, the Debtors went back on the record and announced that they valued the Genie Bid at $880 million, and reflected Genie as the leading bid.

13.    After a recess, the Stalking Horse countered by (i) recognizing the Debtors' previously agreed upon settlement of their disputed joint-venture interests with Bold Quail that would (if approved by the Court) result in the separate sale of such joint venture interests, and (ii) agreeing to exclude additional preference actions against specified trade vendors totaling approximately $12 million.  Prior to its inclusion in the Stalking Horse's bid, I understand that Genie (and certainly not the Committee) knew any such settlement had been reached.  The Debtors valued this bid at $890 million.

14.    Genie then returned with another topping bid by assuming up to $31 million in prepetition state "bed taxes", incorporating the proceeds of the Bold Quail settlement as excluded

5

assets similar to the Stalking Horse Bid, and reducing the amount of its previously proposed promissory note to result in a net $20 million overbid over its last bid.  This brought the Genie bid valuation to approximately $900 million.  This bid was reflected as the leading bid on the Debtors' Auction Scorecard. The Stalking Horse again responded, leaving behind additional trade preference actions against non-insider defendants and improving certain tax-sharing economics from 50% to 100% (up to $28 million)—a bid the Debtors valued at $910 million under the Debtors' Auction Scorecard. Genie made one final open-Auction bid by increasing the note value by $20 million (paid over three years) and asking the Debtors to consider qualitative factors—particularly execution risk and the disparity between its $25 million hard deposit and the Stalking Horse's $1.5 million future deposit.  The Debtors deferred those issues at that time. The Auction adjourned at approximately 1 a.m. on November 19, 2025 and parties were advised that the auction would resume later that morning.

15.    . When the Auction reconvened on November 19, the Debtors announced that Genie's prior bid was valued at $922 million, after crediting a $2 million adjustment for insider-preference differentials, and reflected Genie as the leading bid on the Debtors' Auction Scorecard. The Stalking Horse then submitted another bid, incorporating Genie's note structure and other revisions, bringing the Debtors' valuation to approximately $933 million, which the Debtors deemed the higher bid despite ongoing objections from the Committee about, among others discount-rate assumptions on the promissory notes, valuation of the causes of action under the Genie bid, and lack of evidence regarding the Stalking Horse's ability to service the note.

16.    During the morning and into the afternoon of November 19, 2025, the Debtors' advisors and I discussed potential modifications to the Bidding Procedures with a focus on maximizing the value recovered for the Debtors' estates.  The Debtors and the Committee agreed

on a path intended to achieve the highest and best offer for the Debtors' assets by asking the bidders to submit a sealed bid which would be their final bid with no ability to modify bid terms after submission. Accordingly, each of the Stalking Horse and Genie were granted a little more than one hour to formulate best and final bids, and to submit their sealed bid (the "Sealed Bids").

17.     A summary of the terms of the Sealed Bids submitted by the Stalking Horse and Genie based on the Debtors' Auction Scorecard valuation methodology[3] is set out below along with explanatory notes. Notably, as this is based on the Debtors' Auction Scorecard, the values ascribed to each of the line items below are those set forth by the Debtors. The Committee and I share very different views of some of these line items:

| | **Stalking Horse** | **Genie** | **Explanatory Notes** |
|---|---|---|---|
| **Cash Consideration (net of acquired cash)** | $36mm ($40mm net of $4mm in acquired cash) | $259mm | The Stalking Horse Bid included the acquisition of Excess Cash estimated to be $4mm at projected closing |
| **Promissory Note** | $30mm (valued at $23mm under the Debtors' Auction Scorecard) | $100mm (valued at $73mm under the Debtors' Auction Scorecard) | The Debtors' applied an 18% discount rate to the Promissory Note consideration for both the Stalking Horse and Genie. Further Genie's sealed bid noted that its Promissory Note would have a face value of $100 million and be valued at $73 million (which was based on the Debtors' previous note valuation methodology). |
| **WAX Subordinated Term Loan** | $25mm | n.a. | The Stalking Horse Bid included the contribution of a $25 million of WAX secured debt. On the clarification call with the Stalking Horse, this was revised to refer to $25mm in value as opposed to a $25 mm par amount. Other terms were not specified and amortization was noted as only on terms acceptable to Welltower and Omega. |
| **DIP Credit Bid** | $16mm | n.a. | The Stalking Horse Bid includes a credit bid of CPE 88988 LLC's (or its affiliates') portion of the DIP Facility (approximately $16mm); the cash proceeds of a sale to Genie would be used to pay the DIP Loan in full. |

---

[3] Although the Debtors have refused to provide their Debtors' Auction Scorecard for the final Sealed Bids, having participated in the Auction process and discussed the interim rounds of bidding and Debtors' Auction Scorecard for such rounds, I am familiar with the approach and assumptions that were being used by the Debtors and I am able to apply the same approach and assumptions to the Sealed Bids to develop the final bid comparison under the Debtors' Auction Scorecard.

| | **Stalking Horse** | **Genie** | **Explanatory Notes** |
|---|---|---|---|
| **Assumed Financial Debts** | $558mm<br><br>*(comprised of: $278mm White Oak ABL Facility;*<br><br>*$18mm non-CPE DIP;*<br><br>*$8mm HUD Term Loan; and*<br><br>*$254mm of value attributable to assuming the Welltower/Omega portion of the prepetition term loan and zero value attributable to the WAX/MAO portion of the prepetition term loan)* | $286mm<br><br>*(comprised of: $278mm White Oak ABL Facility; and $8mm HUD Term Loan)* | Both the Stalking Horse Bid and Genie assumed the White Oak ABL facility ($278mm) and the $8mm HUD TL.<br><br>The Stalking Horse Bid assumes or will pay in cash the non-CPE portion of the DIP loan and assumes additional purportedly secured debt in the Welltower/Omega Term Loan facility, which is subject to objection and disallowance following the filing of the Term Loan Claim Objection. This assumption also includes the subordinated portion of the Welltower/Omega Term Loan (i.e. the WAX/MAO portion) for which the Debtors ascribed materially discounted value during the Auction by way of a negative value adjustment to the Genie bid of $28 million (based on the Special Investigative Committee's estimate that there was only a 30% probability that this was a valid secured claim). |
| **Prepetition Provider Assessments** | $28mm | $28mm | Any reductions, refunds, or savings, including from an objection to the claim that determines the claim is an unsecured claim, must be turned over to the Debtors' estates. |
| **Other Liabilities** | $266mm | $266mm | The Stalking Horse and Genie aligned on the assumption of other operational liabilities (e.g., employee compensation, PTO, etc.) during the course of the auction |
| **Bold Quail Settlement** | $5mm | $60mm | Both the Stalking Horse and Genie agreed to exclude the Bold Quail JV interest and proceeds (valued at $60mm) from the settlement with the Bold Quail JV partner from the Purchased Assets. Since the Stalking Horse is assuming the Welltower/Omega Term Loan debt that is being paid down by $55mm from the Bold Quail JV, the Bold Quail settlement in this row of the table provides only $5mm of incremental cash value to the Stalking Horse Bid. The balance of the benefit under the Stalking Horse Bid is reflected in the assumption of $254 million of such debt under Assumed Financial Debts above. |

8

|  | Stalking Horse | Genie | Explanatory Notes |
|---|---|---|---|
| Causes of Action | $15mm | $32mm | The Stalking Horse is acquiring and/or releasing causes of action against itself and its affiliates, with the exception of any proceeds from D&O insurance to the Estate up to the policy limit (valued by the Debtors at $15mm) for causes of action assertable against the Debtors' directors and officers for the violation of their fiduciary duties, among other things.<br><br>The Genie Bid does not acquire causes of action which were collectively valued at $32 million, $15 million of which is related to proceeds from D&O insurance to the Estate up to the policy limit. The balance of $17 millionis substantially less than the Special Investigation Committee's range of values ($35mm to $78mm) for the causes of action that it investigated.[4] |
| Preferences | $25mm | $27mm | The Stalking Horse Bid and the Genie Bid each exclude preference claims to be pursued by the Estate.The Stalking Horse is acquiring preference claims against insiders that were valued at an incremental $2mm in favor of Genie for the purposes of comparing the bids. |
| Risk Adjustment | $(15)mm | $(28)mm | The Debtors applied a risk assessment to the Stalking Horse Bid for incremental litigation costs ($15million). As noted, above, the Debtors applied a risk adjustment to the Genie Bid based on a presumptive 30% risk of failing to disallow or otherwise subordinate the WAX/MAO portion of the Term Loan. |
| TOTAL | $982mm | $1,003mm | The Genie bid is higher than the Stalking Horse bid based on the Debtors' Auction Scorecard$21 million. |

18.     The Bidders submitted their Sealed Bids to the Debtors and the Committee on November 19, with the expectation as described by the Debtors on the record that clarification calls to ask any questions necessary to understand the terms of the respective Sealed Bid would be held between each Bidder, on the one hand, and the Debtors and Consultation Parties on the other, would be conducted on November 20.  It was made clear that these calls would be for clarification purposes only and bid modifications would not be accepted.  As the protocol for the sealed bid round of the auction was further described, the Debtors anticipated that by midday the day

---

[4] On December 4, 2025, the Committee filed its motion for derivative standing, along with a proposed Complaint.  A substantial portion of the claims and causes of action asserted in the Complaint are supported by documents discovered from Welltower which were unavailable to the Special Investigation Committee, and which Welltower only divulged after being compelled by the Court to do so.  The Special Investigation Committee's investigation was limited in scope and voluntary in nature.

9

thereafter (November 21, 2025), they would be able to convene a call on the record, where the Debtors' decision will be announced in terms of the Successful Bidder and designation of the Backup Bidder. After opening and reviewing the Sealed Bids, the Debtors adjourned the Auction until December 1, 2025. Together with the Consultation Parties, I participated in clarification calls with each of the Bidders, which calls were delayed to November 21. Each clarification call lasted approximately 10-15 minutes. On December 1, 2025, the Debtors reconvened the Auction to announce their selection of the Stalking Horse Bid as the Successful Bidder. When the Debtors were back on the record at the auction, they refused to answer questions about the selection, would not provide the updated Debtors' Auction Scorecard despite parties requesting they do so, did not provide any substantive explanation for their selection of the Stalking Horse Bid, and would not provide a rationale for failing to designate a Back-up Bid.

19. During this "deliberation" period between the November 19 and December 1, the Debtors requested the Committee provide written responses to them regarding "(i) the quantitative valuation employed by the Debtors in connection with each bid; (ii) potential risk factors in connection with the bids; (iii) other qualitative factors that the Debtors should consider in evaluating the bids; (iv) other impacts to the Chapter 11 Cases in connection with a determination of the Successful Bidder; and (v) any other factors you wish to provide the SRC as they evaluate the matter. ". When the Committee asked for the Debtors, as the proponents of the Sale Motion, to provide their own perspectives on these same questions, the Debtors refused. As of the date of this Declaration, the Debtors have still refused to provide any explanation or reasoning regarding their selection of the Stalking Horse Bid over the higher Genie Bid, or determining not to name the Genie Bid as the Back-Up Bid, except as otherwise compelled through depositions or document requests.

10

## ANALYSIS

### A.  The Genie Bid is the Highest and Best Bid for the Debtors' Estates

20.     Pursuant to the structure of the Debtors' Auction Scorecard, as set out below, the Genie Bid provided approximately $1.003 billion of consideration to the Debtors' estates, while the Stalking Horse Bid offered approximately $982 million.  Thus, based on the Debtors' Auction Scorecard, the Genie Bid beat the Stalking Horse Bid by more than $20 million *before* even accounting for any of the deficiencies in the Debtors' Auction Scorecard identified by the Committee and described further below.

**Debtors' Scorecard Approach (Used during the Auction)**

| ($ millions) | Key | Stalking Horse | Genie |
|---|---|---|---|
| Cash (Net of Acquired Cash) | | $36 | $259 |
| Promissory Note Bid Value[(1)] | | 23 | 73 |
| WAX Subordinated Term Loan | | 25 | n.a. |
| Credit Bid of DIP Claim | | 16 | n.a. |
| **Purchase Consideration** | [A] | $100 | $332 |
| | | | |
| Assumed Financial Debts | | 558 | 286 |
| Assumed Operating Liabilities | | 294 | 294 |
| **Assumed Liabilities** | [B] | 852 | 580 |
| | | | |
| Value to Estate from Bold Quail Settlement | [C] | 5 | 60 |
| | | | |
| **Bid Value Before Causes of Action, Preferences, etc.** | [A] + [B] + [C] = [D | $957 | $972 |
| | | | |
| *Genie Excess Value over Stalking Horse Before Causes of Action, Preferences, etc.* | | | $15 |
| | | | |
| Causes of Action | | 15 | 32 |
| Other Preference Claims | | 25 | 27 |
| **Total Causes of Action and Preference Claims** | [E] | $40 | $59 |
| | | | |
| **Bid Value before Debtor Risk Adjustment** | [D] + [E] = [F] | $997 | $1,031 |
| | | | |
| Debtor Risk Adjustment | [G] | (15) | (28) |
| | | | |
| **Grand Total Bid Value under Debtors' Auction Scorecard** | = [F] + [G] | $982 | $1,003 |
| | | | |
| *Genie Total Excess Value over Stalking Horse* | | | $21 |

1) *The Debtors' methodology assumed a discount to the Promissory Notes based on an 18% discount rate. Using this methodology, the Stalking Horse note of $30 million is valued at $23 million and the Genie note of $100 million is valued at $73 million*

**Figure 1.**

21.    During the Auction, the Committee and other parties asserted on the record disagreements with the Debtors' valuation assessments.  These disagreements are set out in the table below along with the quantification of the difference and explanatory notes:

**Genesis Healthcare**
Scorecard Comparison

| | Final Sealed Bids | | | |
| | Debtors' View | | UCC's View | |
| | CPE | Genie 3 | CPE | Genie 3 |
|---|---|---|---|---|
| **Purchase Consideration** | | | | |
| Cash | 40 | 259 | 40 | 259 |
| Credit Bid | 16 | - | 16 | - |
| Promissory Note (Net) | 23 | 73 | 24 | 80 |
| WAX Junior Term Loan Consideration | 25 | - | 25 | - |
| Purchased Cash | (4) | - | (4) | - |
| **Sub-Total** | **100** | **332** | **101** | **339** |
| **Assumed Liabilities** | | | | |
| Welltower - Omega DIP Term Loan | 18 | - | 18 | - |
| HUD TL | 8 | 8 | 8 | 8 |
| White Oak ABL | 278 | 278 | 278 | 278 |
| Term Loan (Welltower/Omega) | 254 | - | 124 | - |
| Term Loan (WAX/MAO) | - | - | - | - |
| Provider Assessment -- Postpetition | 48 | 48 | 48 | 48 |
| Provider Assessment -- Prepetition | 28 | 28 | 28 | 28 |
| Accrued Compensation - PTO | 38 | 38 | 38 | 38 |
| Accrued Compensation - Non-PTO | 91 | 91 | 91 | 91 |
| IRS Obligations | 86 | 86 | 86 | 86 |
| Other Postpetition Liabilities | 3 | 3 | 3 | 3 |
| **Sub-Total** | **852** | **580** | **722** | **580** |
| **Excluded Assets** | | | | |
| Excess Accounts Receivable | - | - | - | - |
| Causes of Action | 15 | 32 | 15 | 100 |
| Other Preference Claims | 25 | 27 | 25 | 27 |
| Bold Quail JV Interest | 5 | 60 | 5 | 60 |
| **Sub-Total** | **45** | **119** | **45** | **187** |
| **Qualitative Risk Adjustment** | | | | |
| 1L Litigation Estimate ($) | - | (28) | - | - |
| UCC Sale Hearing Objection Estimate ($) | (15) | - | (15) | - |
| **Total Bid Consideration** | | | | |
| Purchase Consideration | 100 | 332 | 101 | 339 |
| Assumed Liabilities | 852 | 580 | 722 | 580 |
| Excluded Assets | 45 | 119 | 45 | 187 |
| **Bid Consideration --- Quantitative** | **997** | **1,031** | **868** | **1,106** |
| Less: Qualitative Risk Adjustment | (15) | (28) | (15) | - |
| **Bid Consideration --- Risk Adjusted** | **982** | **1,003** | **853** | **1,106** |
| *Genie 3 Excess Over CPE (Stalking Horse)* | | *$21* | | *$253* |

Debtors used a discount rate of 18%. UCC used a discount rate of 13% (based on market yields of CCC rated debt).
**DIFFERENCE IN VALUE:**
  **$6 million increase to Genie 3 Bid**

UCC value of the Welltower / Omega Term Loans is reduced from the par amount of claim as such debt is asserted to be undersecured for the reasons set forth in the Complaint.
**DIFFERENCE IN VALUE:**
  **$130 million reduction to CPE** Bid

Debtors' value of non D&O Causes of Action valued at $17 million ($32 million total claims value less $15 million D& claims value).
UCC value of all causes of action of $100 million which estimate is risk adjusted, conservative and illustrative.
**DIFFERENCE IN VALUE:**
  **$68 million increase to Genie 3 Bid**

Debtors' Special Investigation Committee estimated a 70% likelihood that the WAX/MAO Term Loan would not be deemed an allowed secured claim.  Debtors' scorecard noted that the 30% likelihood of the claim's allowance is a "cost" to the Genie bid. UCC value acknowledges the legal and practical reality that a claim and bona fide dispute is a post-sale dispute that does not impact the risk of closing (any liens attach to proceeds of the sale until resolved)
**DIFFERENCE IN VALUE:**
  **$28 million increase to Genie 3 Bid**

22. As noted above, under the Debtors' Auction Scorecard, the Genie Bid exceeds the Stalking Horse Bid by over $20 million. Modifying the Debtors' Auction Scorecard to account for the issues set forth above, the Committee Scorecard demonstrates the Genie Bid is actually several hundred million dollars greater than the Stalking Horse bid.

23. Regardless of whether using the Debtors' Auction Scorecard or the Committee Scorecard, the result is clear: the Genie Bid provides higher value to the Debtors' estates than the Stalking Horse Bid. Since general unsecured creditors will receive recoveries under either bid, it is the general unsecured creditor class that will benefit from the Debtors maximizing the value of the sale by choosing the Genie Bid. I understand the Debtors have nonetheless determined to select the Stalking Horse Bid as the Successful Bidder, referencing vague non-monetary qualitative factors to justify that decision without providing a meaningful explanation beyond listing the general factors they considered. In selecting the Stalking Horse Bid, the Debtors provided a list of criteria they assessed in selecting the Stalking Horse's lower (under both the Debtors' Auction Scorecard approach and the Committee Scorecard) bid. A comparison of the bids under these criteria are set out below, which demonstrates the overall superiority of the Genie Bid based on the Debtors' own list of criteria.

24. As set forth in further detail below, based on information received in response to the Debtors' diligence requests (received during the Debtors' extended process of attempting to disqualify Genie's Bid) or ascertainable from information provided by the Bidders during the marketing and auction process or otherwise publicly available, the Genie Bid is superior to the Stalking Horse Bid across all the Debtors' listed criteria relevant to selecting a successful bid:

13

|  | **Stalking Horse** | **Genie** | **Weight** |
|---|---|---|---|
| **I. The amount and nature of the total consideration, which includes but is not limited to, assumed liabilities (administrative liabilities, Cure Costs), and Executory Contracts and Unexpired Leases that will be assumed** | | | |
| **Overall** | See above analysis on the Scorecards | | Genie |
| **II. The likelihood of the Qualified Bidder's ability to close a transaction and the timing thereof** | | | |
| **Overall Execution Posture** | Relies on insider/aligned counterparties and repeatedly withholds specifics, asserting it is "not authorized" to share certain financing details and requesting permission to approach those very counterparties post-selection.  Several answers are conclusory rather than documented. | Remains actively engaged in the process despite clear bias. Provided detailed written responses to numerous diligence requests (post-auction). Included updated term sheet from Monticello, confirmatory lender letter, personal guarantors, infusion of substantial equity and projections demonstrating note service. | Neutral |
| **Deposit and Estate Protections** | Initially took the position no deposit was required under the order, then offered a deposit equal to 10% of the "cash consideration" at the auction (stated on the record as ~$1.5 million). Later, in its written response, proposes a $10 million deposit "within ten days" of auction's end, not immediate.   Stated that DIP would be part of deposit so long as no DIP default, which it would be able to call if it is not selected as the Successful Bidder. Enables the Stalking Horse to walk away with no consequence if not selected; no affirmative commitment on the record to be a Back-up Bid. | Substantial nonrefundable deposit of $25 million has been funded. Even though they were not selected as the successful bidder Genie has indicated that it is not seeking a return of the money in escrow at this time. | Genie |
| **Financing Package and Transparency** | States "secured funding commitments" from Welltower, Omega, WAX, and White Oak for DIP/Term payoff and ABL "hole," but declines to provide underlying terms or commitments absent third-party consent; offers a one-page bank balance screenshot and general references to "Projections." Stalking Horse capital structure is unclear. | Discloses minimum $120 million equity, up to $175 million senior debt from Monticello at SOFR + 600 bps (revised down due to lower leverage); White Oak ABL assumption plus $30 million stretch term loan senior to the promissory note; provides confirmatory lender correspondence and executed term sheet. | Neutral |
| **Financing Commitment Status** | States "secured funding commitments" from Welltower, Omega, WAX, and White Oak for DIP/Term payoff and | Monticello revised term sheet produced; Letter from Monticello's counsel offered to | Stalking Horse |

|  | **Stalking Horse** | **Genie** | **Weight** |
|---|---|---|---|
|  | ABL "hole," but declines to provide underlying terms or commitments absent third-party consent. At the time of the SRC made its determination there was no locked and signed financing commitment. | Debtors and Consultation Parties; personal guarantors identified; proof-of-funds letters provided. White Oak terms addressed (stretch loan senior to estate note; annual promissory note payments permitted). |  |

**II. The net economic effect of any changes to the value to be received by each of the Debtors' estates from the transaction contemplated by the Bid Documents**

|  | **Stalking Horse** | **Genie** | **Weight** |
|---|---|---|---|
| **Unsecured Promissory Note to Estate** | Agrees to "match" Genie's note terms when required, but does not provide independent analysis or call schedule. Also doesn't disclose the accurate capital structure to post closing, so appropriate discount rate is hard to ascertain | Provides transparent call-price schedule based on an 18% discount rate used by the Debtors; | Genie |
| **Post-acquisition Capital Structure** | No disclosure as to whether WAX/MAO secured debt, WAX/MAO unsecured debt, and ReGen debt will be assumed, waived, or forgiven, impacting the amount of debt on the cap sheet by ~$545 million. | Lower leverage by design, targeted to reduce refinancing risk and preserve liquidity; projects ~$30 million cash at close plus $80 million to –$100 million of availability; positions more conservative coverage and headroom. | Genie |
| **Liquidity and Working Capital** | Calls a cash-at-closing estimate "difficult" to provide. No firm estimate of post-close cash; states only that liquidity will be "sufficient," supported by affiliates' history and general projections. | ~ $30 million cash at close and up to $100 million availability; emphasizes conservative capitalization and targeted TSA to stabilize operations during transition. | Genie |

**III. The Debtors' regulatory requirements**

|  | **Stalking Horse** | **Genie** | **Weight** |
|---|---|---|---|
| **Regulatory Concerns and Ratings** | Declines to provide CMS ratings, though Genesis' CMS rating is reported to be 2.2 stars. Provides biography of one individual – no additional information on operating qualifications. Leans on continuity of existing Genesis staff and consultants; points to affiliates' transactional experience and general assertions of prior closings; provides fewer operational or clinical improvement details.<br>It is not clear who stands behind CPE as they are only two trusts that are members of the LLC. In addition, Weltower testified that Landau was negotiating on behalf of CPE but CPE said the Landau wasn't an officer or had any official role. | Provides CMS rating of 2.8 stars. Provides decks naming asset managers/operators (Milrose/Integro), track record through restructurings, and specific clinical/compliance plans; points to partner capabilities and turnaround capabilities. | Genie |

15

| | Stalking Horse | Genie | Weight |
|---|---|---|---|
| **IV. Tax consequences of such Qualified Bid** | | | |
| **Administrative and Priority Tax Claims** | Being assumed on the same basis by each bidder | | Neutral |
| **V. The certainty of a Qualified Bid leading to a confirmed chapter 11 plan** | | | |
| **Administrative Solvency** | The Debtors' forecast being able to satisfy administrative claims out of current cash flow up to a projected closing. | | Neutral |
| **Ability to Satisfy DIP, Term Loans and ABL at Closing** | Asserts exit facilities from Welltower/Omega/WAX and White Oak will handle DIP/Term and White Oak "hole," but refuses to provide details now; claims clarity could be provided if allowed to speak with those lenders post-selection. | States clear plan: use equity plus reduced Monticello debt; assumes White Oak RLOC and $30 million stretch loan (senior to the estate note) with lender alignment on waterfall; liens under the Welltower agented term loans will attach to proceeds at closing if not otherwise paid with cash proceeds. | Neutral |
| **Lease assumptions (Welltower / Omega)** | States Welltower and Omega "have approved" CPE as operator and that no amendments are sought. | Intends to assume the master leases and not seek amendments; plans standard TSA and targeted augmentation across clinical, regulatory, operations, and finance. | Stalking Horse |
| **Litigation / Execution Risk** | Execution risk is masked by insider alignment, but disclosures remain contingent. Repeated deferrals on financing specifics, intercreditor, and day-one cash create residual uncertainty that must be resolved after selection. | Lower leverage and pre-papered third-party financing support reduce closing fragility; personal guarantees in place; clear deposit at risk; detailed responses to note waterfalls and ABL priorities. Acknowledges it did not close on a prior 363 sale but explains it was due to fraud for which the transaction party's CEO was subsequently convicted. | Neutral |
| **VI. Operating history, including financial performance and any material survey issues, any investigations, or corporate integrity agreements related to the Qualified Bidder's operations** | | | |
| **Operational Credentials** | Declines to provide CMS ratings, though Genesis' CMS rating is 2.0. Provides biography of one individual – no additional information on operating qualifications. Leans on continuity of existing Genesis staff and consultants; | Provides CMS rating of 2.8. Provides decks naming asset managers/operators (Milrose/Integro), track record through restructurings, and specific clinical/compliance | Genie |

16

| | Stalking Horse | Genie | Weight |
|---|---|---|---|
| | points to affiliates' transactional experience and general assertions of prior closings; provides fewer operational or clinical improvement details. | plans; points to partner capabilities and turnaround capabilities. | |
| **VII. The impact on non-insider employees, collective bargaining agreements and employee benefit plans, and the proposed treatment of employee obligations owing to such non-insider employees and plans** | | | |
| **Treatment of Employees and Employee-related Obligations** | The bids are substantially equivalent in treatment of employees and both bids assume employee-related obligations | | Neutral |

## B.  The Selection of the Stalking Horse Bid is the Result of a Biased Sale Process

25.     I have participated in chapter 11 auction processes countless times over the last 30 years as an investment banker in the restructuring space.  Throughout this time, I have not encountered a sale process conducted in a manner so heavily tilted towards a pre-determined outcome.  In addition to the biases embedded in the Debtors' Auction Scorecard, the procedural deficiencies and seemingly deliberate imbalances in the Debtors' conduct began during the marketing stage and continued throughout the Auction all the way through to the selection of the Stalking Horse Bid as the Successful Bid. I incorporate my Prior Declarations as to my concerns regarding the bidding procedures and marketing process. I believe that many of my concerns regarding the auction and marketing process materialized, and even though the Auction generated competitive bidding and ultimately higher and better bids, it was slanted heavily towards the Stalking Horse.

26.     **During the Marketing Period.**  Post-petition, after not having played a role negotiating the initial Stalking Horse Bid, the Debtors' investment banker commenced the marketing process to solicit competing bids for the Debtors' assets.  On multiple occasions during

17

this process, I personally received outreach from interested parties who expressed concern regarding the Debtors' process and their ability to compete on level playing field.  Indeed, as an interim bid deadline approached, one interested strategic bidder informed myself and the Debtors by email that "… Try as we may, we don't see how anyone is going to be able to unstack the deck (as it were) that Is stacked in Joel's favor."  *See* Exhibit A.

27.     **During the Auction.**  Many of the professed concerns proved prescient, as the biases inherent in the process continued through to the Auction itself.  Although Olumie submitted a $5 million deposit, appeared in-person at the auction with counsel, and was prepared to make a WholeCo bid, the Debtors disqualified them from participating because they would not agree to be a Back-up Bid.  The Debtors, however, did not similarly disqualify the Stalking Horse Bid from refusing to commit to make a deposit or serve as the Back-up Bid.  Moreover, the Debtors declined to even declare a Back-Up Bid as part of the determination of the Successful Bid.  In my experience, bidders competing in a process like this would view this disparate treatment as a significant disadvantage because one party could keep bidding the assets up but not have to stand by its bid should it not win, while the competing bidder, which is required to be a Back-Up Bid, would have to stand ready to close with a real money deposit at risk.

28.     It also was confirmed that the Stalking Horse was privy to material information about the Debtors that was not disclosed to other parties in the process.  For example, Genie 3 indicated to me that the Debtors failed to provide it with key information associated with the status of the PA 22 facilities and provided them with misleading financial projections that incorporated the PA22 facilities even though it was known that the facility lease would most likely be terminated in the near term and the facilities no longer a part of the continuing operations.  In my view, and based on communications during the Auction with Genie, the undisclosed information around the

18

PA-22 Facilities had a material influence on how Genie developed its bid. This information was known to the Stalking Horse and gave the Stalking Horse a key and unfair advantage.

29.     Additionally, the Debtors did not disclose to any bidders that, on November 17—the *day before* the Auction—they entered into a term sheet to resolve a dispute regarding the Bold Quail facilities, effectively selling the interests in those facilities for $57.5 million. While that information was apparently disclosed to the Stalking Horse, who used the consideration from the settlement to increase its bid and become a topping bid, Genie and the Committee only learned about this agreement upon the Stalking Horse's related bid modifications.

30.     Finally, the Debtors provided incomplete information related to the potential estate causes of action and failed to effectively market such assets for inclusion in the Sale. The Debtors entered into the initial Stalking Horse agreement at the recommendation of the Special Restructuring Committee following the Special Investigation Committee's preliminary and admittedly limited investigation into a subset of the Debtors' estate causes of action. Thereafter, the Special Investigation Committee published a conclusory valuation report (the "SIC Valuation Report"), valuing a subset of the causes of action against a subset of potential defendants at between $35 million to $78 million. At the time the Debtors sent out solicitation materials, the Special Investigation Committee had not completed its investigation. Nor did the materials consider causes of action against Welltower and/or Omega, or include the substantive participation of Welltower and Joel Landau, each of whom I understand refused to provide requested information and/or sit for interviews. In addition, while the Stalking Horse maintained the benefit of having read a draft of the Complaint through mediation, no other Bidders were entitled to receive similar information. Genie ultimately only received the list of potential causes of action at the eleventh hour of the auction with little to no time to evaluate their worth.

19

31.     **After the Auction.**  On the morning of the second day of the Auction, I spoke from the Debtors' co-CRO as well as received a general text message from him, relating to a potential issue with Genie related to an exclusion agreement between Ari Schwartz and the Department of Justice, Office of the Inspector General and Department of Health and Human Services.  In discussing this issue, I believe Mr. Robichaux used the expression that 'there are no saints' in this industry and that the Debtors were not making an issue out of this.  With knowledge of the purported exclusion issue, the Debtors permitted Genie to participate in the Sealed Bid protocol, and therein anticipated by the next couple of days to be able to go back on the record, where the debtor's decision on the results of the sealed bid would be announced in terms of the designation of the successful bidder and the backup bidder.  Thereafter when conducting the "Clarification Call" with Genie two days after the opening of the sealed bids, the Debtors did not raise this issue with Genie and sought no clarification on the topic and Mr. Schwartz's role.

32.     On November 23, 2025, two days after the Clarification Calls, the Debtors sought additional diligence information from the bidders.  In the context of the broad request from Genie the Debtors asked Genie 3 to "Confirm which of Rowan Farber, Jacob Sod, and Ari Schwartz are personal guarantors.".  In response, Genie answered:

> *Rowan Farber and Jacob Sod will serve as the personal guarantors for the transaction.  Ari Schwartz is not a personal guarantor. To clarify, Mr. Schwartz is not a direct or indirect equity owner in Genie, and Mr. Schwartz will have no going forward involvement with Genie or the proposed transaction. Mr. Schwartz served as a consultant for Milrose Capital in connection with its bids, but will have no going forward involvement in this matter. Mr. Schwartz has a long-term consulting relationship with Milrose Capital pursuant to a verbal consulting agreement and continues to serve in that capacity for other unrelated business. For the avoidance of doubt, no federal health programs will pay Mr. Schwartz for items or services, including administrative and management services, furnished, ordered, or prescribed by Mr. Schwartz in any capacity.*

33.     It is my opinion that sophisticated parties like Monticello and Milrose would not commit to infusing hundreds of millions in debt and equity financing if there is a risk that Ari Schwartz' involvement on Genie ability to operate the Debtors' business and receive reimbursement for CMS related patients, which account for approximately 75% of the Debtors' inpatient payor mix.  I found the clarifications made by Genie to adequately and appropriately address any issues concerning Ari Schwartz.  It is my understanding that neither the Debtors nor any of the other Consultation Party requested more information from any of the Bidders.

34.     It is also unclear to me why after determining that the Stalking Horse bid was the Successful Bidder, the Debtors' did not designate the Genie Bid as the Back-Up Bid.  It is my opinion that this conduct by the Debtors is highly unusual.

35.     The Debtors have a fiduciary duty to maximize value.  When a debtor is presented with a higher bid, it is the debtor's duty to determine whether they can make it better and resolve any perceived issues.  The opposite happened here—the Debtors seemingly found a pretense on which to declare the Stalking Horse Bid the Successful Bidder and were determined to use it.  This bias is revealed not just by the actions described above, but also the Debtors' inaction in generating and enhancing superior offers.

36.     In my opinion, the Debtors altered the rules of the game retroactively to disqualify Genie to avoid their disfavored outcome.  I do not believe that is an appropriate manner to conduct an Auction process.

37.     On December 8, 2025, I had my deposition taken by the Debtors. My deposition concluded at approximately 2:30 P.M. CST. Between 2:30 P.M. CST and the date I am signing this declaration, I have reviewed nothing that has been filed in this case today or any exhibits exchanged today or any declarations that may have been submitted today.

21

Dated:   December 8, 2025
        Chicago, Illinois

                                              */s/ Andrew Turnbull*
                                              Andrew Turnbull, Managing Director
                                              Houlihan Lokey, Inc.

## Exhibit A

### D. Reis Email



---

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Monday, September 22, 2025 20:35
**To:** Jaspinder Kanwal <jkanwal@jefferies.com>; Matthew Decker <mdecker@jefferies.com>; Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>; Turnbull, Andrew <ATurnbull@HL.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com <JFinger@Jeffries.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com <ekeil@mwe.com>; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Miguel Gonzales <mgonzales@fundamental.com>; Sarah Lombard <slombard@haslaw.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>
**Subject:** Re: [EXT] RE: GEN Documents

**This message is from an external sender.**

---

Thanks for your email. Try as we may, we don't see how anyone is going to be able to unstack the deck (as it were) that Is stacked in Joel's favor.

David Reis
Chief Executive Officer

www.SeniorCareDevelopment.com
203-222-6262

---

**From:** Jaspinder Kanwal <jkanwal@jefferies.com>
**Sent:** Monday, September 22, 2025 9:11:55 PM
**To:** Matthew Decker <mdecker@jefferies.com>; David Reis <dreis@seniorcaredevelopment.com>; Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com <JFinger@Jeffries.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com <ekeil@mwe.com>; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Miguel Gonzales <mgonzales@fundamental.com>; Sarah Lombard <slombard@haslaw.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>
**Subject:** RE: [EXT] RE: GEN Documents

Hi David – we wanted to check in given today's indication of interest deadline for the Genesis sale process, as we had not received a proposal from Senior Care Development.

Please let us know if you are still planning to send, so that we may include SCD in any materials for the Debtors' Special Restructuring Committee.

Hope all is well.

---

**From:** Matthew Decker <mdecker@jefferies.com>

**Sent:** Sunday, September 14, 2025 9:43 PM
**To:** David Reis <dreis@seniorcaredevelopment.com>; Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Miguel Gonzales <mgonzales@fundamental.com>; Sarah Lombard <slombard@haslaw.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>
**Subject:** RE: [EXT] RE: GEN Documents

David,

As an update, we've uploaded updated balance sheets for the Bold Quail facilities to folder #4.4.1.3 (with the exception of Monroe House for which May remains the latest we have received from the JV).

We've requested details on the outstanding debt by instrument/facility from the BQ JV and will revert with additional information as soon as possible. Thank you for your patience.

Best,
Matt

**Matt Decker**
Jefferies LLC | Investment Banking
520 Madison Avenue
New York, NY 10022
Tel: 332.236.6860
Cell: 929.486.9396
mdecker@jefferies.com

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Thursday, September 11, 2025 4:27 PM
**To:** Matthew Decker <mdecker@jefferies.com>; Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Miguel Gonzales <mgonzales@fundamental.com>; Sarah Lombard <slombard@haslaw.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>
**Subject:** RE: [EXT] RE: GEN Documents

Matt

How much debt is on Bold Quail? Thanks

David Reis
Chief Executive Officer
https://link.edgepilot.com/s/49df07bc/VwUH06YuZUCaD9k0hHk-Cw?u=http://www.seniorcaredevelopment.com/
203-222-6262

**From:** Matthew Decker <mdecker@jefferies.com>
**Sent:** Thursday, September 4, 2025 11:21 AM
**To:** Connor Bishop <cbishop2@jefferies.com>; David Reis <dreis@seniorcaredevelopment.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Miguel Gonzales <mgonzales@fundamental.com>; Sarah Lombard <slombard@haslaw.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>
**Subject:** RE: [EXT] RE: GEN Documents

Hi David,

We'd like to flag that financials for the Bold Quail facilities were uploaded last night to folder #4.4 for the TTM period ending May 2025. We will promptly post any updated financials as soon as available.

Additionally, we have uploaded a process letter to the dataroom in folder #1.2 (also attached here for convenience) outlining the key upcoming dates in the sale process which are summarized below. Please let us know if any questions, and we are happy to set up a call to discuss if helpful. Thank you.

- Initial Indications of Interest ("IOI"): September 22, 2025
    - *Please note that submission of an IOI is not a requirement to submit a Qualified Bid*
- Qualified Bid Deadline: November 7, 2025
- Auction: November 13, 2025
- Sale Hearing: November 18, 2025

Best,
Matt

**Matt Decker**
Jefferies LLC | Investment Banking
520 Madison Avenue
New York, NY 10022
Tel: 332.236.6860
Cell: 929.486.9396
mdecker@jefferies.com

**From:** Connor Bishop <cbishop2@jefferies.com>
**Sent:** Saturday, August 30, 2025 9:29 AM
**To:** David Reis <dreis@seniorcaredevelopment.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Miguel Gonzales <mgonzales@fundamental.com>; Sarah Lombard <slombard@haslaw.com>; Matthew Decker <mdecker@jefferies.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>
**Subject:** RE: [EXT] RE: GEN Documents

David,

Apologies for the technical issues. We've coordinated on our end to reset your dataroom permissions. You should now see all form 1065s from 2020 to 2024 within folder #10.1.2.

Please let us know if the issue persists and we'll figure out a different way to distribute the materials.

Thanks,

**Connor Bishop**
Investment Banking | Jefferies LLC
520 Madison Avenue, New York, NY 10022
**C:** (347) 931-3414
**O:** (212) 284-3421

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Saturday, August 30, 2025 8:54 AM
**To:** Matthew Decker <mdecker@jefferies.com>; Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Miguel Gonzales <mgonzales@fundamental.com>; Sarah Lombard <slombard@haslaw.com>
**Subject:** RE: [EXT] RE: GEN Documents

Matt

I don't see: The 2023 Form 1065 with attachments can be found at #10.1.2.5.

Can you check again and send to me? Thanks.

David Reis
Chief Executive Officer

https://link.edgepilot.com/s/3ad91ee4/vEg_2OA7oUyhOMaVxmjicQ?u=http://www.seniorcaredevelopment.com/
203-222-6262

**From:** Matthew Decker <mdecker@jefferies.com>
**Sent:** Friday, August 29, 2025 5:08 AM
**To:** David Reis <dreis@seniorcaredevelopment.com>; Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Miguel Gonzales <mgonzales@fundamental.com>; Sarah Lombard <slombard@haslaw.com>
**Subject:** RE: [EXT] RE: GEN Documents

David,

We've uploaded the latest status / active audits for Medicare and Medicaid to #6.4.1.

We're working on getting the 2022 Form 1065 with all attachments and will revert. The 2023 Form 1065 with attachments can be found at #10.1.2.5.

Thanks,
Matt

**Matt Decker**
Jefferies LLC | Investment Banking
520 Madison Avenue
New York, NY 10022
Tel: 332.236.6860
Cell: 929.486.9396
mdecker@jefferies.com

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Thursday, August 28, 2025 7:49 PM
**To:** Matthew Decker <mdecker@jefferies.com>; Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Miguel Gonzales <mgonzales@fundamental.com>; Sarah Lombard <slombard@haslaw.com>
**Subject:** RE: [EXT] RE: GEN Documents

Matt,

Can you put both

2022 Form 1065 for FC-Gen Operations, LLC
2023 Form 1065 for FC-Gen Operations, LLC

In the data room as well?

Regarding Medicare/Medicaid audits, can you comment on when they were last ongoing and results from same for the last 5 years? thanks

**David Reis**
**Chief Executive Officer**

SENIOR CARE DEVELOPMENT LLC

https://link.edgepilot.com/s/6e64a4df/uN6fVx0fAkOX99uAn1veBg?u=http://www.seniorcaredevelopment.com/
203-222-6262

---

**From:** Matthew Decker <mdecker@jefferies.com>
**Sent:** Thursday, August 28, 2025 7:30 PM
**To:** David Reis <dreis@seniorcaredevelopment.com>; Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Miguel Gonzales <mgonzales@fundamental.com>; Sarah Lombard <slombard@haslaw.com>
**Subject:** RE: [EXT] RE: GEN Documents

David,

Would like to flag that the 2024 Form 1065 with attachments was uploaded to #10.1.2.6, and additional detailing breaking out the topside allocations for rehabilitation therapy margin and incentive comp was uploaded to #3.4.5 (adjacent to the Real Estate Source Book). Please let us know if any questions about either.

The Company has also confirmed compliance with all COVID stimulus programs (and no lingering liabilities) with the exception of the ~$103.1mm secured IRS claim.

With regard to the Medicare/Medicaid audits could you please clarify any specific time period you are seeking?

We're tracking down information on the additional requests and appreciate your patience. Thanks.

Best,
Matt

**Matt Decker**
Jefferies LLC | Investment Banking
520 Madison Avenue
New York, NY 10022
Tel: 332.236.6860
Cell: 929.486.9396
mdecker@jefferies.com

---

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Wednesday, August 27, 2025 4:14 PM
**To:** Matthew Decker <mdecker@jefferies.com>; Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Miguel Gonzales <mgonzales@fundamental.com>; Sarah Lombard <slombard@haslaw.com>
**Subject:** RE: [EXT] RE: GEN Documents

Matt

Can we get the full 2024 Form 1065 for FC Gen-Operations Investment , LLC?

Thanks.

**David Reis**
**Chief Executive Officer**

SENIOR CARE DEVELOPMENT LLC

https://link.edgepilot.com/s/fb3486e0/xmnLKcV0FkagIv43Vf3wfg?u=http://www.seniorcaredevelopment.com/
203-222-6262

---

**From:** Matthew Decker <mdecker@jefferies.com>
**Sent:** Tuesday, August 26, 2025 12:55 PM

**To:** David Reis <dreis@seniorcaredevelopment.com>; Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Miguel Gonzales <mgonzales@fundamental.com>; Sarah Lombard <slombard@haslaw.com>
**Subject:** RE: [EXT] RE: GEN Documents

David,

The balance of the White Oak facilities was frozen as of the petition date. The balance of the Non-HUD facility is ~$224.2mm and the balance of the HUD facility is ~$55.9mm. These balances are not expected to change. Thank you.

Best,
Matt

**Matt Decker**
Jefferies LLC | Investment Banking
520 Madison Avenue
New York, NY 10022
Tel: 332.236.6860
Cell: 929.486.9396
mdecker@jefferies.com

---

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Tuesday, August 26, 2025 12:05 PM
**To:** Matthew Decker <mdecker@jefferies.com>; Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Miguel Gonzales <mgonzales@fundamental.com>; Sarah Lombard <slombard@haslaw.com>
**Subject:** RE: [EXT] RE: GEN Documents

Matt

In looking at the June Borrowing Base (BB) just put in the data room today, can you please tell me why the June BB doesn't show the outstanding loan amount anymore like it did in the May BB you posted? It is **IMPOSSIBLE to know where the BB is without this critical information. Someone clearly appears to be playing "hide the salami" with us and all interested DIP lenders and potential Bidders.**

David Reis
Chief Executive Officer

https://link.edgepilot.com/s/a8c201c2/8FMcQ9ZQO0Gt2H3uhC8ZkA?u=http://www.seniorcaredevelopment.com/
203-222-6262

---

**From:** Matthew Decker <mdecker@jefferies.com>
**Sent:** Sunday, August 24, 2025 6:57 PM
**To:** David Reis <dreis@seniorcaredevelopment.com>; Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Miguel Gonzales <mgonzales@fundamental.com>; Sarah Lombard <slombard@haslaw.com>
**Subject:** RE: [EXT] RE: GEN Documents

David,

Apologies for the delay. Please see below responses to many of your questions and we'll continue to provide information either in this thread or through the VDR as soon as it is available. Thank you.

1. For example, the data room only includes AR information as of end May. We are now into August. Is it so hard to post the borrowing base that White Oak provides you monthly (if not daily and weekly)? White Oak has not provided borrowing base detail for June and July yet. If and when received, we will upload to the VDR promptly.
2. It's been a week since we last asked you for the Bold Quail and Magnolia Gardens update and yet nothing has been put in the data room regarding this. Is this too hard to upload? We are following up on the financials for these non-debtor entities and will revert as soon as possible.
3. Why is the full set of WAX/Mao loan documents not uploaded yet? The WAX/MAO holdings are part of the 2016 and 2018 Term Loans and are under the same term loan documentation; documents for those terms loans can be found in VDR folder 3.3.1.2. (additional detail under question 20 below). Please let us know if there are any specific term loan documents you do not believe are in the VDR.
4. Where are the loan statement for each loan?
5. PA bed tax: only have amounts ($57.7MM as of 6/16/25). We need to understand if this is considered a secured creditor PA bed taxes incurred prior to filing will be prepetition priority unsecured claims, not a secured creditor.
6. JV Purchase options
    1. Where can we find those agreements and validate the payments, debt and related performance metrics?
    2. Bold Quail: updates on the purchase option. We understanding the operator has exercised their option so we'd like a status update on that, anticipated proceeds from that sale (after debt) and when it's occurring / if any Genesis will own the RE or OpCo post purchase option.

7. Topside Allocations: We need a clear answer. We need a breakdown of those costs to understand if these are costs we'd continue to incur or if we can add that back to the EBITDA. We are following up to get supporting backup calculations for the topside allocations in the real estate source book and will revert.

8. Leases: Sabra and Rainbow leases are being cancelled as part of the BK but we excluded them as part of the calculation. Is that confirmed? What's the reasoning provided for that and are there other leases that we are expecting to be cancelled through the bankruptcy process? Yes, this is confirmed. A final order was entered at docket #562 (attached). There are also other leases in this same approved order, as well as a separate motion that was filed to reject other leases at docket #296 (also attached). In the case of Sabra and Rainbow these were for facilities that the Company previously operated but were since divested and are now operated by new operators. At this point, the Company only has a sublease arrangement with the new operator that they lose money on. The new operator will likely have to negotiate a new separate lease with the landlord that removes Genesis as the intermediary.

9. Major and material agreements for ancillary businesses are not in data room.

10. Explanations on historical ACO cashflows between different files. Could you please clarify which different cashflows you are referring to? For 2025, the latest projections are found in folder 9.2.1.2.4 and we will share the unembargoed result for 2024 as soon as available.

11. Houlihan Lokey previous sales materials or information on ancillary companies including additional bids for Genesis business units. As previously discussed, prior bids for Genesis business units will not be shared as part of the process. Jefferies understands that no CIM was prepared in the recent ACO and AlignMed processes, and incremental information has been posted to the VDR in the ancillary folder #9.

12. Recent Medicare/Medicaid audits.

13. Confirmation of compliance with all COVID stimulus programs (and no lingering potential government liabilities)

14. List of any amounts currently owed to critical vendors None.

15. Updates and any communication with any RE JV partners regarding potential acquisitions or dispositions of JV interests

16. Any appraisals or other forms of valuation of RE JV interests (or related properties) and any other Genesis business lines

17. Update on company intent to pay ACO executives their bonus in Sept / Oct. of 2025 The current expectation is these will be paid and a motion related to the ACO profit share is in process.

18. How much post-petition interest is expected to accrue during the bankruptcy and at what rate (e.g. normal or default rate)? Post-petition term loan interest is expected to accrue at ~$3.6mm / month with the 2016 Term Loan accruing interest at 14.0% per annum and the 2018 Term Loan accruing interest at a rate of 10.0% per annum. These are the normal, not default, interest rates.

7. Can you show us which secured creditors have which collateral? The White Oak ABL facility are secured by a first lien on the cash and accounts receivable assets (the "ABL Collateral") of the Company and a second lien on the Company's other assets, including equipment, leased real estate, IP, etc (the "Term Loan Collateral").

The Welltower/Omega term loans hold a first lien the Term Loan collateral (except certain HUD OpCos) in the inpatient facilities, ancillary businesses, and JV HoldCos, and a second lien on the ABL collateral. For HUD OpCos, the term loan collateral position secures guaranties by those OpCos in favor of HUD and certain HUD-insurance backed lenders on a facility by facility basis.

The IRS secured claim has a third lien on substantially all assets of the Company, excluding the JV HoldCo entities.

The currently proposed DIP facility would be junior to the ABL and Welltower/Omega term loans, but would be senior to the IRS and would have a first lien on any unencumbered assets including causes of action.

20. What facilities are actually secured by each lender? We have seen a lien waterfall from the data room which seems to show certain facilities for Welltower and Omega but I didn't see any for the WAX/MAO term loans. The Welltower and Omega 2016 and 2018 Term Loans are also held by WAX and MAO with the WAX and MAO holdings secured under the same credit facilities. Please refer to holdings schedule from the First Day Declaration for additional detail on which facility each holding is under.

| Prepetition Secured Debt Obligations | | | |
|---|---|---|---|
| Secured Debt | Interest | Maturity Date | Estimated Amount Outstanding ($ in millions) |
| White Oak Prepetition ABL Revolving Credit Facilities | | | |
| *White Oak Prepetition Non-HUD ABL Credit Facility* | | | |
| White Oak Non-HUD Revolver | SOFR + 4.85% | 3/9/27 | $223.6 |
| *White Oak Prepetition HUD ABL Credit Facility* | | | |
| White Oak HUD Revolver | SOFR + 6.00% | 3/9/27 | $55.7 |
| Prepetition Term Loan Credit Facility | | | |
| *2016 Term Loan Credit Facility* | | | |
| Welltower Term Loan ($120M) | 14.0% | 6/30/26 | $72.6 |
| Omega Term Loan ($120M) | 14.0% | 6/30/26 | $97.7 |
| WAX Term Loan ($120M) | 14.0% | 6/30/26 | $69.8 |
| MAO Term Loan ($120M) | 14.0% | 6/30/26 | $13.7 |
| *2018 Term Loan Credit Facility* | | | |
| Welltower Term Loan ($40M) | 10.0% | 6/30/26 | $39.9 |
| Omega Term Loan ($40M) | 10.0% | 6/30/26 | $23.1 |
| MAO Term Loan ($40M) | 10.0% | 6/30/26 | $1.0 |
| Other Secured Debt | | | |
| HUD Operator Agreements | Various | Various | $0.0 |
| Rochester Manor – HUD Loan | 2.99% | 1/1/52 | $8.3 |
| Internal Revenue Service | Statutory Rate | N/A | $103.1 |
| *Total Secured Liabilities* | | | **$708.5** |

19. **What security are the WAX / MAO term loans secured by?** WAX/MAO took assignment of certain Welltower loans and have the same security package as other term loans.

1. Response: The 2024 taxes are not expected to be paid during the chapter 11 cases and will be outstanding at emergence with treatment chosen by the winning bidder(s). The current expectation is that 2025 PA taxes during the BK will be paid, subject to the state agreeing to apply any amounts received to the 2025 balance and not to 2024. Where does this stand? Please post any/all correspondence on this issue. The Company recently received confirmation that PA would apply postpetition payments to 2025 balances, thus we have started to make payments related to 2025 PA taxes.

**Matt Decker**
Jefferies LLC | Investment Banking
520 Madison Avenue
New York, NY 10022
Tel: 332.236.6860
Cell: 929.486.9396
mdecker@jefferies.com

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Sunday, August 24, 2025 6:36 PM
**To:** Matthew Decker <mdecker@jefferies.com>; Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Miguel Gonzales <mgonzales@fundamental.com>; Sarah Lombard <slombard@haslaw.com>
**Subject:** RE: [EXT] RE: GEN Documents

Matt

4 more days, and still the data room has not been populated with the information asked for weeks ago and as latest on 8/20 per the below. It is the lack of information as supplied by the Debtor to date that precludes us from bidding competitively for the DIP in anything but a priming position, and I am sure this fact is lost upon no one from the Debtors side. It really is not right.

David Reis
Chief Executive Officer

https://link.edgepilot.com/s/3b027bc9/WqzTrMW3D0OnvGgdfjWA4g?u=http://www.seniorcaredevelopment.com/
203-222-6262

---

**From:** David Reis
**Sent:** Wednesday, August 20, 2025 8:10 PM
**To:** Matthew Decker <mdecker@jefferies.com>; Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Miguel Gonzales <mgonzales@fundamental.com>; Sarah Lombard <slombard@haslaw.com>
**Subject:** RE: [EXT] RE: GEN Documents

Matt and Dan

It is unreasonable as to the length of time it is taking for information to be populated in the GEN data room.

1. For example, the data room only includes AR information as of end May. We are now into August. Is it so hard to post the borrowing base that White Oak provides you monthly (if not daily and weekly)?
2. It's been a week since we last asked you for the Bold Quail and Magnolia Gardens update and yet nothing has been put in the data room regarding this. Is this too hard to upload?
3. Why is the full set of WAX/Mao loan documents not uploaded yet?
4. Where are the loan statement for each loan?
5. PA bed tax: only have amounts ($57.7MM as of 6/16/25). We need to understand if this is considered a secured creditor (1)
6. JV Purchase options
    1. Where can we find those agreements and validate the payments, debt and related performance metrics?
    2. Bold Quail: updates on the purchase option. We understanding the operator has exercised their option so we'd like a status update on that, anticipated proceeds from that sale (after debt) and when it's occurring / if any Genesis will own the RE or OpCo post purchase option.
7. Topside Allocations: We need a clear answer. We need a breakdown of those costs to understand if these are costs we'd continue to incur or if we can add that back to the EBITDA.
8. Leases: Sabra and Rainbow leases are being cancelled as part of the BK but we excluded them as part of the calculation. Is that confirmed? What's the reasoning provided for that and are there other leases that we are expecting to be cancelled through the bankruptcy process?
9. Major and material agreements for ancillary businesses are not in data room.
10. Explanations on historical ACO cashflows between different files.
11. Houlihan Lokey previous sales materials or information on ancillary companies including  additional bids for Genesis business units.
12. Recent Medicare/Medicaid audits.
13. Confirmation of compliance with all COVID stimulus programs (and no lingering potential government liabilities)
14. List of any amounts currently owed to critical vendors
15. Updates and any communication with any RE JV partners regarding potential acquisitions or dispositions of JV interests
16. Any appraisals or other forms of valuation of RE JV interests (or related properties) and any other Genesis business lines
17. Update on company intent to pay ACO executives their bonus in Sept / Oct. of 2025
18. How much post-petition interest is expected to accrue during the bankruptcy and at what rate (e.g. normal or default rate)?
19. Can you show us which secured creditors have which collateral?
20. What facilities are actually secured by each lender? We have seen a lien waterfall from the data room which seems to show certain facilities for Welltower and Omega but I didn't see any for the WAX/MAO term loans.
21. **What security are the WAX / MAO term loans secured by?**

1. Response: The 2024 taxes are not expected to be paid during the chapter 11 cases and will be outstanding at emergence with treatment chosen by the winning bidder(s). The current expectation is that 2025 PA taxes during the BK will be paid, subject to the state agreeing to apply any amounts received to the 2025 balance and not to 2024. Where does this stand? Please post any/all correspondence on this issue.

Thanks.

David Reis
Chief Executive Officer

https://link.edgepilot.com/s/3b027bc9/WqzTrMW3D0OnvGgdfjWA4g?u=http://www.seniorcaredevelopment.com/
203-222-6262

---

**From:** Matthew Decker <mdecker@jefferies.com>
**Sent:** Wednesday, August 13, 2025 6:29 PM
**To:** David Reis <dreis@seniorcaredevelopment.com>; Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Miguel Gonzales <mgonzales@fundamental.com>
**Subject:** RE: [EXT] RE: GEN Documents

Hi David,

Please see below a few additional responses in blue. Understand that Bold Quail financials are a priority and we're working to provide what we can as soon as possible. Let us know if any questions. Thank you.

Best,
Matt

**Matt Decker**
Jefferies LLC | Investment Banking
520 Madison Avenue
New York, NY 10022
Tel: 332.236.6860
Cell: 929.486.9396
mdecker@jefferies.com

---

**From:** Matthew Decker
**Sent:** Tuesday, August 12, 2025 3:12 AM
**To:** David Reis <dreis@seniorcaredevelopment.com>; Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Miguel Gonzales <mgonzales@fundamental.com>
**Subject:** RE: [EXT] RE: GEN Documents

Hi David,

We're continuing to work through the below questions with the Company, but please see below an initial batch of responses. We'll aim to provide remaining responses over the next few days. Let us know if any further questions as you and your team continue your work or if any clarification on the below is helpful. Thank you.

1. Thanks for the ACO participant explanation. Is it the Companies intent to see the ACO executives paid their bonus paid in Sept / Oct. of 2025? The Company is still determining whether to seek approval of the ACO Profit Share program, and if so, any associated modifications to the program.  The ACO Profit Share to be paid in October of 2025 relates to the 2024 program.

2. Any tax loss carryforward worksheets, plus, Partnership tax returns for FC-GEN as previously requested for the last 5 years. The tax returns for FC-GEN Operations Investment LLC, including the requested K-1s, are found in folder 10.1. Workpapers related to tax loss carryforward attributes and credits are found in folder 10.2

3. The Palmcrest Associates deal has no facilities associated with it in the real estate source book and no lease maturity date on the real estate source book. Why is this? The Alta Gardens facility (for which Palmcrest was the landlord) was sold to the Bold Quail joint venture on 3/1/25, and GHC no longer operates the facility, which is why those items do not show up. The transaction is noted in row 14 of the "1. Transaction Summary" tab of the June 2025 Real Estate Source Book

4. How were the "Topside Allocations" determined in the real estate sourcebook? Topsides are the profit margin on ancillary services delivered to the facilities and to right-size the cost as if the services were delivered in house. It also includes ICP reversals for buildings we don't believe will be eligible but continue to accrue for it at the facility.

5. Are leases with individual landlords "crossed" or do they stand on their own? Please provide a list of any "crossed" leases. Each master lease stands on its own. Welltower does guarantee a couple of the leases but there are no cross lease guarantees.

6. Are the facilities that are subleased (Rainbow Real Estate Partners and Sabra) subleased to maturity? Both of these subleases are being rejected as part of the BK; otherwise our understanding is they are subleased to lease maturity

7. There is a meaningful discrepancy in EBITDA of the ACO based on Landlord and Facility Projections (2025.07.25) file (VDR #2.3.2.2) and the LTCO ACO – EBITDA file (VDR # 9.2.6). Would it be possible to let us know which is correct and why? The EBITDA file in the VDR (after some reorganizing for clarity index 9.2.1.2.4) is the Company's latest view on the 2025 budget and should be viewed as more recent that the long-term projections prepared for VDR #2.3.2.2.

8. Assuming the LTC ACO file is correct, do you have a similar file for the other lines of businesses? Please refer to the latest Alignmed 2025 budget file posted to the VDR as file # 9.2.1.1.8

9. What is the "rent" that was included on historical financials for the rehab portion of the business? For the Company's direct bill sites (~400 sites), Powerback pays rent to their customers for gym space within their facility, and this makes up the majority of the historical rent amounts

10. Can you provide more background on the purchase options in the CIM? We note that Genesis has exercised them, so would a buyer be expected to complete the purchase and pay proceeds to the partner that is selling? Are any payments planned to made pre BK exit?

11. Can you please provide financial information on Franklin Woods, Larkin Chase, Bold Quail, and Magnolia Gardens that are listed as n/a, blank or immaterial in the CIM?
    - For Franklin Woods and Larkin Chase, key financials can be found the Landlord and Facility Projections file (2.3.2.2) in the "Facility Performance (175)" tab. Revenue, EBITDARM, EBITDAR, and EBITDA begin in rows 197, 387, 767, and 1147, respectively
    - Operational stats for those two facilities can be found in the "Market Stats" tab of the Long-Term Model (2.3.2.1) – rows 35 and 239, respectively
    - We are working with the Company on Bold Quail and Magnolia Gardens and will revert

12. Regarding the PA Bed Tax spreadsheet uploaded. It states the $57m was owed in 3/25 and 6/25. Can you tell us the Companies position on these amounts as we assume they have not been paid? How does the Company think they will be handled in the BK? Thanks. The Company's outstanding balance with the state of PA for 2024 provider assessment taxes was ~$31.3mm. The 2024 taxes are not expected to be paid during the chapter 11 cases and will be outstanding at emergence with treatment chosen by the winning bidder(s). The current expectation is that 2025 PA taxes during the BK will be paid, subject to the state agreeing to apply any amounts received to the 2025 balance and not to 2024.

13. Regarding the Aging of Receivables By Vendor as uploaded today, can you confirm whether the amounts stated are in thousands or some other format? We are not quite sure how to read the 30/60/90 day aging numbers and totals. The file shows amounts in nominal dollars, and is shown on an invoice-level basis. The vendor is in column H, with total amount in column M, days outstanding in column AB, and the bucketing for days in columns AC - AG. Let us know if any further questions.

**Matt Decker**
Jefferies LLC | Investment Banking
520 Madison Avenue
New York, NY 10022
Tel: 332.236.6860
Cell: 929.486.9396
mdecker@jefferies.com

---

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Saturday, August 9, 2025 6:54 PM
**To:** Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Matthew Decker <mdecker@jefferies.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Miguel Gonzales <mgonzales@fundamental.com>
**Subject:** RE: [EXT] RE: GEN Documents

Connor

Not sure how someone picked the random assortment of tax info put into the data room this weekend, but, at a minimum, can the 2024 FC-Gen tax return be posted? Thanks.

David Reis
Chief Executive Officer

https://link.edgepilot.com/s/3a7942a1/-e-FzpGDikaiU0R7oY_d3w?u=http://www.seniorcaredevelopment.com/
203-222-6262

---

**From:** David Reis
**Sent:** Friday, August 8, 2025 9:03 PM
**To:** Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Matthew Decker <mdecker@jefferies.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Miguel Gonzales <mgonzales@fundamental.com>
**Subject:** RE: [EXT] RE: GEN Documents

Connor

One additional question.

11. Regarding the PA Bed Tax spreadsheet uploaded. It states the $57m was owed in 3/25 and 6/25. Can you tell us the Companies position on these amounts as we assume they have not been paid? How does the Company think they will be handled in the BK? Thanks.

12. Regarding the Aging of Receivables By Vendor as uploaded today, can you confirm whether the amounts stated are in thousands or some other format? We are not quite sure how to read the 30/60/90 day aging numbers and totals.

Thanks.

David Reis
Chief Executive Officer

https://link.edgepilot.com/s/3a7942a1/-e-FzpGDikaiU0R7oY_d3w?u=http://www.seniorcaredevelopment.com/
203-222-6262

---

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Friday, August 8, 2025 8:54 PM
**To:** Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Matthew Decker <mdecker@jefferies.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Miguel Gonzales <mgonzales@fundamental.com>
**Subject:** Re: [EXT] RE: GEN Documents

Adding one more person to this string. Thanks.

David Reis
Chief Executive Officer

https://link.edgepilot.com/s/3a7942a1/-e-FzpGDikaiU0R7oY_d3w?u=http://www.seniorcaredevelopment.com/
203-222-6262

---

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Friday, August 8, 2025 8:49 PM

**To:** Connor Bishop <cbishop2@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com <JFinger@Jeffries.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>;
ekeil@mwe.com <ekeil@mwe.com>; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan
Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Matthew Decker <mdecker@jefferies.com>;
Project.Genie.Core <Project.Genie.Core@jefferies.com>
**Subject:** RE: [EXT] RE: GEN Documents

Connor

1. Thanks for the ACO participant explanation. Is it the Companies intent to see the ACO executives paid their bonus paid in Sept / Oct. of 2025?

I think it will be easier for us to keep our Q/A on one email string so please see additional questions below. As we have begun to build a model of the deal we would appreciate the timely receipt to all the open questions posed.

2. Any tax loss carryforward worksheets, plus, Partnership tax returns for FC-GEN as previously requested for the last 5 years.
3. The Palmcrest Associates deal has no facilities associated with it in the real estate source book and no lease maturity date on the real estate source book. Why is this?
4. How were the "Topside Allocations" determined in the real estate sourcebook?
5. Are leases with individual landlords "crossed" or do they stand on their own? Please provide a list of any "crossed" leases.
6. Are the facilities that are subleased (Rainbow Real Estate Partners and Sabra) subleased to maturity?
7. There is a meaningful discrepancy in EBITDA of the ACO based on Landlord and Facility Projections (2025.07.25) file (VDR #2.3.2.2) and the LTCO ACO – EBITDA file (VDR # 9.2.6). Would it be possible to let us know which is correct and why?
8. Assuming the LTC ACO file is correct, do you have a similar file for the other lines of businesses?
9. What is the "rent" that was included on historical financials for the rehab portion of the business?
10. Can you provide more background on the purchase options in the CIM? We note that Genesis has exercised them, so would a buyer be expected to complete the purchase and pay proceeds to the partner that is selling? Are any payments planned to made pre BK exit?
11. Can you please provide financial information on Franklin Woods, Larkin Chase, Bold Quail, and Magnolia Gardens that are listed as n/a, blank or immaterial in the CIM?


David Reis
Chief Executive Officer

https://link.edgepilot.com/s/3a7942a1/-e-FzpGDikaiU0R7oY_d3w?u=http://www.seniorcaredevelopment.com/
203-222-6262

---

**From:** Connor Bishop <cbishop2@jefferies.com>
**Sent:** Friday, August 8, 2025 7:48 PM
**To:** David Reis <dreis@seniorcaredevelopment.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard
<Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane
<RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>; Matthew Decker <mdecker@jefferies.com>; Project.Genie.Core <Project.Genie.Core@jefferies.com>
**Subject:** RE: [EXT] RE: GEN Documents

David,

Building on the message below, please refer to our response to Question #1 in blue. As mentioned, an example of the profit-sharing program materials provided to each new participant is available in the data room under VDR index 9.3.5.9.

Thank you,

**Connor Bishop**
Investment Banking | Jefferies LLC
520 Madison Avenue, New York, NY 10022
**C:** (347) 931-3414
**O:** (212) 284-3421

---

**From:** Matthew Decker <mdecker@jefferies.com>
**Sent:** Friday, August 8, 2025 10:42 AM
**To:** David Reis <dreis@seniorcaredevelopment.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Jaspinder Kanwal <jkanwal@jefferies.com>; Russell
Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>;
ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin
<rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>
**Subject:** RE: [EXT] RE: GEN Documents

Thanks David,

Appreciate the clarification. Please see below updated responses to your questions in red. Thank you.

1. Can you upload to the data room the written agreement wherein the ACO staff is promised a "profit share" of the savings the ACO generates as noted in the recent ACO uploads. Related to this, please include an ORG chart of all executives sharing in this.

*The ACO profit sharing program was put into place for PY 2023. In PY 2023 and 2024, participation included all members of the ACO senior leadership team in place during those periods. The ACO profit sharing program was designed to incent and retain the ACO leadership in lieu of equity participation, sharing up to 20% of PY EBITDA with the ACO team if performance targets were met or exceeded. It was also designed to recognize the valuable business the ACO founders and leadership team built, and the business' positive cumulative cash flow contribution to the overall Genesis enterprise. The team has exceeded its goals in all years since the program's inception and is on track to do so in PY 2025. The individuals listed below participated in the program in PY 2024 (most also participated in 2023) and each have individual executed written agreements in place that describe the program terms and the individual's share of the ACO Profit Sharing Pool. Payments are due within 30 days of receipt of the shared savings payment from CMS to the ACO for PY 2024 (expected Sept-Oct 2025). These obligations have not yet been submitted to the bankruptcy court for review and approval, therefore the ACO leadership team members listed below are at significant risk of retention.*
   *Strategy & Program Development Officer and ACO Co-founder*

- *VP of Data Analytics*
- *Head of ACO IT*
- *Sr. Director of Financial Planning & Analysis*
- *Sr. Director of Network Development (sales)*
- *Sr. Director of Clinical Performance*
- *Director of Credentialing*
- *Director of Quality Performance*
- *ACO Compliance Officer*

*Other leadership members that were included in the program in 2023 and 2024, but are no longer with the company include the former ACO President, CEO & Co-founder, and the ACO COO. Per the executed participation contracts, their shares are reallocated to active participants in the program during the PY.*

*For PY 2025, the program was expanded to include all ACO staff, plus our consulting Clinical Strategy Officer. An example of the program material sent to each new participant in the program is in the dataroom (VDR index #9.3.5.9).*

2. Can you put in the data room the CIM Houlihan and Lokey prepared for the Company. Nothing confidential there, and all information that should be made available to all bidders, sophisticated or not. The Jefferies and Ankura teams' understanding is that a CIM was not created for the process, and we are working with the Genesis team to determine if possible to access any data that may have been in the Houlihan Lokey dataroom.
3. Can you confirm that the (approx.) $11m in shared savings owed third parties practice groups as of 9/1 is actually going to be paid to them. Confirming this will be paid, and is included in the DIP Budget.
4. Is there anything in the data room regarding any claims from the State of PA surrounding their bed tax? If not, can you upload any correspondence with the State of PA on this issue. Please refer to file 2.2.9 in the dataroom which provides the latest detail on the PA Provider Assessments as of June 2025. Let us know if any further questions or clarifications needed on this item.

**Matt Decker**
Jefferies LLC | Investment Banking
520 Madison Avenue
New York, NY 10022
Tel: 332.236.6860
Cell: 929.486.9396
mdecker@jefferies.com

---

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Thursday, August 7, 2025 1:34 PM
**To:** Matthew Decker <mdecker@jefferies.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Jaspinder Kanwal <jkanwal@jefferies.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>
**Subject:** RE: [EXT] RE: GEN Documents

Matt

Let me rephase the request regarding #2 below. Can you put in the data room the CIM Houlihan and Lokey prepared for the Company. Nothing confidential there, and all information that should be made available to all bidders, sophisticated or not. Thanks.

David Reis
Chief Executive Officer

https://link.edgepilot.com/s/53bca66f/UAkWA7onWUGgKMnXJDv5Ww?u=http://www.seniorcaredevelopment.com/
203-222-6262

---

**From:** Matthew Decker <mdecker@jefferies.com>
**Sent:** Thursday, August 7, 2025 10:54 AM
**To:** David Reis <dreis@seniorcaredevelopment.com>; Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Jaspinder Kanwal <jkanwal@jefferies.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Project.Genie.Core <Project.Genie.Core@jefferies.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>
**Subject:** RE: [EXT] RE: GEN Documents

Hi David,

Confirming receipt of the below items and we'll aim to provide additional information on the ACO and PA bed tax items over the next 1-2 days.

With regard to question #2 below, we are not planning to share valuations or IOIs that may have been received as part of prior processes. As a sophisticated bidder for these types of assets, I hope you can appreciate the sensitivity on providing such items.

Thanks, and let us know if any questions.

Best,
Matt

**Matt Decker**
Jefferies LLC | Investment Banking
520 Madison Avenue
New York, NY 10022

Tel: 332.236.6860
Cell: 929.486.9396
mdecker@jefferies.com

---

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Wednesday, August 6, 2025 5:51 PM
**To:** Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Jaspinder Kanwal <jkanwal@jefferies.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Project.Genie.Rx <Project.Genie.Rx@jefferies.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>
**Subject:** RE: [EXT] RE: GEN Documents

Louis

Thank you for seeing that the report highlighted below was uploaded to the data room today along with the June Real-Estate Source Book. I assume you will continue to upload these monthly as we go along.

We do have several questions I am hoping you can get us answers to per the below.

1. Can you upload to the data room the written agreement wherein the ACO staff is promised a "profit share" of the savings the ACO generates as noted in the recent ACO uploads. Related to this, please include an ORG chart of all executives sharing in this.
2. Can you upload to the data site any and all valuations and summary of any offers received of the ACO and Align Med prepared for the Company from Houlihan and Lokey who we hear were hired to market the ACO recently.
3. Can you confirm that the (approx.) $11m in shared savings owed third parties practice groups as of 9/1 is actually going to be paid to them.
4. Is there anything in the data room regarding any claims from the State of PA surrounding their bed tax? If not, can you upload any correspondence with the State of PA on this issue.

Thanking you in advance as we continue to work towards a valuation of the Company.

David Reis
Chief Executive Officer

https://link.edgepilot.com/s/2a739148/ps-Y6SZRGUWd-A0zrIRkPw?u=http://www.seniorcaredevelopment.com/
203-222-6262

---

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Tuesday, August 5, 2025 5:15 AM
**To:** Louis Robichaux <Louis.Robichaux@ankura.com>; Simon, Daniel <dsimon@mwe.com>; Jaspinder Kanwal <jkanwal@jefferies.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Project.Genie.Rx <Project.Genie.Rx@jefferies.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>
**Subject:** Re: [EXT] RE: GEN Documents

Louis.

The report does not have a cover page… it's an Excel spreadsheet with ~30 tabs (see below for list).  Jonathan Kirshner calls this the monthly CFO report.  Genesis has been producing this for many years off the PeopleSoft ledger. Really appreciate your help in getting us this actionable information.

Current Period vs Last Year -->
GHC Flash YoY
GHC IS YoY
Current Period vs Budget ----->
GHC Flash
GHC IS
Centers Consol OS
Active Centers OS
NE1 (CT+MA+RI+ME) Market OS
NE2 (NH+VT) Market OS
MidAtlantic Market OS
PA Legacy Market OS
Southeast Market OS
WV North Market OS
WV South Market OS
NM Market OS
NM WA Market OS
Senior Living Market OS
PA22 Market OS
Div V (CY Divestitures) OS
Div VI (PY Divestitures) OS
NewGen1 OS (CA)
Zev RI3 OS
Div X (Inactives) OS
PowerBack Rehab OS (Excl China)
PowerBack Rehab OS
AlignMed Partners OS
LTC ACO IS
Trended BS
Days in AR

David Reis
Chief Executive Officer

https://link.edgepilot.com/s/2a739148/ps-Y6SZRGUWd-A0zrIRkPw?u=http://www.seniorcaredevelopment.com/

203-222-6262

---

**From:** Louis Robichaux <Louis.Robichaux@ankura.com>
**Sent:** Monday, August 4, 2025 9:09 PM
**To:** David Reis <dreis@seniorcaredevelopment.com>; Simon, Daniel <dsimon@mwe.com>; Jaspinder Kanwal <jkanwal@jefferies.com>; Russell Perry <Russell.Perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com <JFinger@Jeffries.com>; Project.Genie.Rx <Project.Genie.Rx@jefferies.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com <ekeil@mwe.com>; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>
**Subject:** RE: [EXT] RE: GEN Documents

David:

Please delete my old email addresses from your system.  I was very distraught to have missed all the action over the weekend (not really, I actually appreciate it – HA!).  In all seriousness, both me and Russell need to be involved in these important communications.

In the interest of clarity and not wasting time, can you please send us a prior version of the CFO report you are mentioning?  That would help us immensely in tracking down exactly what you're looking for.

Many thanks!


**Louis E. Robichaux IV**
+1.214.924.1575 Mobile



---

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Monday, August 4, 2025 7:57 PM
**To:** Simon, Daniel <dsimon@mwe.com>; Jaspinder Kanwal <jkanwal@jefferies.com>; Russell Perry <Russell.Perry@ankura.com>; Louis Robichaux <Louis.Robichaux@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Project.Genie.Rx <Project.Genie.Rx@jefferies.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; ekeil@mwe.com; Chris Hebard <Chris.Hebard@ankura.com>; Ben Jones <Ben.Jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>
**Subject:** [EXT] RE: GEN Documents

Dan

Thanks for following up on this.

The "CFO Report" is an Excel spreadsheet titled: "CFO Summary Statements – Hard Close" with the date of production in its title. Just as important is getting the full Real Estate Source Book as of the end of the second quarter (6/30). I have attached the cover sheet of same for march 2025. It's about 80 pages and is critical to getting us up to speed on the buildings.

The following is in response to Chris Hebard's email dated today at 7:31pm.

Chris, I still think we are lacking basic information to have an informed conversation with Jeffries (yet) and don't want to waste your time. That said, from the information uploaded this morning to the data site regarding the ACO (thanks for getting on this, hoping the GPO and other ancillary business follow soon) we have one question for you. To wit:

Can you clearly articulate a response and/or reports that solve for the (apparent) discrepancy regarding the r/t LTC ACO attributed Lives.  On the "9.2.5_LTC ACO – Flagged Lives (2025)" document, it reflects **31,413 Flagged Lives**, 65% being LTC SNF.  However, on the "9.2.6_LTC ACO 2022-2025 EBITDA (August 2025)" document **it projects 13,761 attributed lives**.  As both of these indicate they are for CY25 can you help us out on this? Thanks.


David Reis
Chief Executive Officer

https://link.edgepilot.com/s/5eab404a/oFTZgBUvv0Gfhb09ncbaoQ?u=http://www.seniorcaredevelopment.com/
203-222-6262

---

**From:** Simon, Daniel <dsimon@mwe.com>
**Sent:** Monday, August 4, 2025 4:10 PM
**To:** David Reis <dreis@seniorcaredevelopment.com>; Jaspinder Kanwal <jkanwal@jefferies.com>; Robichaux Louis E. IV <lrobichaux@bridgellc.com>; Russell Perry <russell.perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Project.Genie.Rx <Project.Genie.Rx@jefferies.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; Keil, Emily <Ekeil@mwe.com>; Chris Hebard <chris.hebard@ankura.com>; Ben Jones <ben.jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>
**Subject:** RE: GEN Documents

David,

We are struggling to understand your reference to the "monthly CFO reports."  There are quarterly board reports, but those typically aren't referred to in this way.  While we've made several attempts with the management team to understand your request, we are unsure of your reference to the "CFO reports."  If you have one of them handy that you can send to us, we can then make sure we are loading the specific documents that you are requesting.

Thank you,
Dan

**Dan Simon**
Partner, Restructuring

**T:** +1 404 260 8554 | **M:** +1 440 666 1970
dsimon@mwe.com | LinkedIn

McDermott Will & Schulte LLP | mwe.com
1180 Peachtree St. NE, Suite 3350, Atlanta, GA 30309

---

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Sunday, August 3, 2025 10:36 AM
**To:** Jaspinder Kanwal <jkanwal@jefferies.com>; Simon, Daniel <dsimon@mwe.com>; Robichaux Louis E. IV <lrobichaux@bridgellc.com>; Russell Perry <russell.perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Project.Genie.Rx <Project.Genie.Rx@jefferies.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; Keil, Emily <Ekeil@mwe.com>; Chris Hebard <chris.hebard@ankura.com>; Ben Jones <ben.jones@ankura.com>; Jason Brodsky <jasonbrodsky@fundamental.com>; Ryan Martin <rmartin@fundamentalam.com>; Ryan Keane <RKeane@fundamental.com>; Jon Stern <JStern@BearCreekAM.com>
**Subject:** RE: GEN Documents

[ External Email ]
Jaspinder

Thank you for your email. I am glad you have a system to track requests made to Jeffries. That said, I think you need to revisit the methodology you are using. For example, if something is in "Process", then by definition it cannot be "Closed". Therefore, please look to correct items:

#4: As you have not provided a process letter to date, this item needs to remain open, not closed.

#5: As key BK filings continue, this item needs to remain open, not closed.

#6: Can you please show me by building, and/or provider/practice where the breakdown is for the following line items. Further, as you say more data will be uploaded soon, this item should also be marked, open vs. closed.
  Rehab
  Respiratory
  Physician
  ACO
  Other - CSU / Corporate

#8: As you say more data will be uploaded soon, this item should also be marked open vs. closed.

#19. While you refer to certain extracts from the Board supplied **Real Estate Source Book**, we are specifically asking for the ENTIRE Book itself as presented monthly to the Board for the last two years. This should be very simple to produce.

#20: Anything that is marked "N/A" really means its "Open". You do need to provide it. Telling us that any GPO info won't be provided till "later" means we cannot value a substantial asset of the Company.

#24: It may be beneficial to break multi-part answers into different line items so it accurately reflects a partial vs. open item.

In your matrix of items, I do not see a specific reference to the "**CFO Reports**" that have been provided monthly to the Board. We would really appreciate it if you would upload these full reports to the data room. Further, while you acknowledge

So to recap, even though each line may contain multiple items, the 14 items you show closed, total only 9 items closed (due to status of items 4,5,6,8,24. This represents only 37.50% of all the items we are (initially) looking for.

Further, we really have little to no detail on the ACO and GPS, which is a big part of our valuation to dig into.

Regarding a call, I will get back to you after our meeting tomorrow.

While two weeks into the filing we would wish more information was available, I appreciate your willingness to track open items, and now just hope we can have some speed in receipt of the information we are seeking.

David Reis
Chief Executive Officer

https://link.edgepilot.com/s/7ef3afd4/bFJ55oMKKkGB8bFc5AwDAA?u=http://www.seniorcaredevelopment.com/
203-222-6262

---

**From:** Jaspinder Kanwal <jkanwal@jefferies.com>
**Sent:** Sunday, August 3, 2025 3:40 AM
**To:** David Reis <dreis@seniorcaredevelopment.com>; Simon, Daniel <dsimon@mwe.com>; Robichaux Louis E. IV <lrobichaux@bridgellc.com>; Russell Perry <russell.perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Project.Genie.Rx <Project.Genie.Rx@jefferies.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; Keil, Emily <Ekeil@mwe.com>; Chris Hebard <chris.hebard@ankura.com>; Ben Jones <ben.jones@ankura.com>
**Subject:** RE: GEN Documents

Hi David,

Please see the attached a diligence tracker (with the latest status on your diligence requests), including detail on a few items related to the model / facility projections which are currently in the dataroom.  We note that additional detail on underlying model assumptions is in-process and we expect to share that this upcoming week.

Confirming we are also working on the additional ACO and tax-related items with the Company and will get back to you shortly on those as well as the other open items (with the exception of referral source data, which is not being shared at this point in the process).

We are available this weekend and early next week to answer any questions or provide clarification, as needed.

Lastly, following up our prior email thread, could you please let us know times for Tuesday that work for you and your team to connect?

Thank you.

--
**Jaspinder S. Kanwal**
Jefferies LLC | Investment Banking Division
520 Madison Avenue, 6th Floor | New York, NY 10022
O: (646) 805-5447 | M: (347) 501-0241 | E: jkanwal@jefferies.com

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Saturday, August 02, 2025 11:27 AM
**To:** Simon, Daniel <dsimon@mwe.com>; Robichaux Louis E. IV <lrobichaux@bridgellc.com>; Russell Perry <russell.perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Project.Genie.Rx <Project.Genie.Rx@jefferies.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; Keil, Emily <Ekeil@mwe.com>; Chris Hebard <chris.hebard@ankura.com>; Ben Jones <ben.jones@ankura.com>
**Subject:** RE: GEN Documents

[External Message]

Thanks. I have known Louis for almost 20 years, he knows what we need.

It would be very helpful to have any of our requests fulfilled before Monday morning as it will make a team meeting we have set up then much more productive. Specifically, the two Board reports which were produced up until a month prior to the BK ("Real-Estate Source Book" and the "CFO Reports") would be of tremendous help

David Reis
Chief Executive Officer

https://link.edgepilot.com/s/f27a5d29/gJvHhKxAPEO0sRfC9r5B5Q?u=http://www.seniorcaredevelopment.com/
203-222-6262

**From:** Simon, Daniel <dsimon@mwe.com>
**Sent:** Saturday, August 2, 2025 11:19 AM
**To:** David Reis <dreis@seniorcaredevelopment.com>; Robichaux Louis E. IV <lrobichaux@bridgellc.com>; Russell Perry <russell.perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Project.Genie.Rx <project.genie.rx@jefferies.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; Keil, Emily <Ekeil@mwe.com>; Chris Hebard <chris.hebard@ankura.com>; Ben Jones <ben.jones@ankura.com>
**Subject:** RE: GEN Documents

You have my personal contact info below, including cell phone, below if issues arise. We are on it, and will be back to you this weekend. Thanks.

DAN SIMON
Partner, Restructuring
**McDermott Will & Emery LLP** 1180 Peachtree St. NE, Suite 3350, Atlanta, GA 30309
**Tel** +1 404 260 8554 **Mobile** +1 440 666 1970 **Email** dsimon@mwe.com
Biography | Website | vCard | LinkedIn

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Saturday, August 2, 2025 11:17 AM
**To:** Simon, Daniel <dsimon@mwe.com>; Robichaux Louis E. IV <lrobichaux@bridgellc.com>; Russell Perry <russell.perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Project.Genie.Rx <project.genie.rx@jefferies.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; Keil, Emily <Ekeil@mwe.com>; Chris Hebard <chris.hebard@ankura.com>
**Subject:** RE: GEN Documents

**[ External Email ]**
Thanks Dan. Much appreciated.

David Reis
Chief Executive Officer

https://link.edgepilot.com/s/43e42780/vSdTXAe0H0SmjfJ5KdVV0g?u=http://www.seniorcaredevelopment.com/
203-222-6262

**From:** Simon, Daniel <dsimon@mwe.com>
**Sent:** Saturday, August 2, 2025 11:14 AM
**To:** David Reis <dreis@seniorcaredevelopment.com>; Robichaux Louis E. IV <lrobichaux@bridgellc.com>; Russell Perry <russell.perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Project.Genie.Rx <project.genie.rx@jefferies.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; Keil, Emily <Ekeil@mwe.com>; Chris Hebard <chris.hebard@ankura.com>
**Subject:** RE: GEN Documents

David – you have my attention. Let me get with the team and we will be back to you this weekend.

DAN SIMON
Partner, Restructuring
**McDermott Will & Emery LLP** 1180 Peachtree St. NE, Suite 3350, Atlanta, GA 30309
**Tel** +1 404 260 8554 **Mobile** +1 440 666 1970 **Email** dsimon@mwe.com
Biography | Website | vCard | LinkedIn

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Saturday, August 2, 2025 11:05 AM
**To:** Simon, Daniel <dsimon@mwe.com>; Robichaux Louis E. IV <lrobichaux@bridgellc.com>; Russell Perry <russell.perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Project.Genie.Rx <project.genie.rx@jefferies.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; Keil, Emily <Ekeil@mwe.com>; Chris Hebard <chris.hebard@ankura.com>
**Subject:** RE: GEN Documents

**[ External Email ]**
Dan

Please see the original data request sent Jeffries and the Company on 7/25/2025 (PDF attached), as well as a Word document with emails for previous requested information sent to the Company dated:
7/31/2025
8/1/2025
8/2/2025

Any help you can bring to focus Jeffries on what bidders are actually looking for, would be much appreciated.

David Reis
Chief Executive Officer

https://link.edgepilot.com/s/eb7056fe/xx2K8x-Rk0OxF8wEQ1hdvA?u=http://www.seniorcaredevelopment.com/
203-222-6262

---

**From:** Simon, Daniel <dsimon@mwe.com>
**Sent:** Saturday, August 2, 2025 10:43 AM
**To:** David Reis <dreis@seniorcaredevelopment.com>; Robichaux Louis E. IV <lrobichaux@bridgellc.com>; Russell Perry <russell.perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com; Project.Genie.Rx <project.genie.rx@jefferies.com>; Helt, Marcus <Mhelt@mwe.com>; Guerrieri, Will <wguerrieri@mwe.com>; Keil, Emily <Ekeil@mwe.com>; Chris Hebard <chris.hebard@ankura.com>
**Subject:** Re: GEN Documents

David:

Can you please provide a list of specific documents that you are looking for that is not currently in the data room, so we can be responsive to your requests? If you have already provided, I apologize if I have missed it. Thank you.

DAN SIMON
Partner, Restructuring
**McDermott Will & Emery LLP** 1180 Peachtree St. NE, Suite 3350, Atlanta, GA 30309
**Tel** +1 404 260 8554 **Mobile** +1 440 666 1970 **Email** dsimon@mwe.com
**Website** | **vCard** | **Twitter** | **LinkedIn**

**From:** David Reis <dreis@seniorcaredevelopment.com>
**Sent:** Saturday, August 2, 2025 10:36:12 AM
**To:** Robichaux Louis E. IV <lrobichaux@bridgellc.com>; Russell Perry <russell.perry@ankura.com>
**Cc:** Fish Bill <wfish@haslaw.com>; JFinger@Jeffries.com <JFinger@Jeffries.com>; Simon, Daniel <dsimon@mwe.com>
**Subject:** GEN Documents

**[ External Email ]**
Louis and Perry

When it gets to the point that Jeffries continues to shovel crap like this into the Data Room, and does not directly respond to our specific outstanding requests for information that is actually needed to evaluate this Company, I am sure the Judge is not going to like their courtroom being used to sandbag what should be a competitive process. None of the below, or last several days of data has any relevance from a valuation perspective and it would not take much for us to get an investment banker to testify to that.

## 10:24

LTE

<

 Datasite®
Where deals are made

# New Documents Available

## Project: Genie

## 3 New documents have been posted to
Project Genie

Project Genie

**Folder:** 5.1 Location Listings

- 5.1.4 2024 and 2025 New Starts and Terms

**Folder:** 2.2 Unaudited Historical Financials

- 2.2.4 Line of Business SEC IS - FY2024 at Dec24 Actual v1

**Folder:** 2.2 Unaudited Historical Financials

- 2.2.5 Line of Business SEC IS - FY2023 at Dec23 Actual v1



David Reis
Chief Executive Officer

https://link.edgepilot.com/s/98e90e1a/EWjo3YCVJkiz_edYyQCXYQ?u=http://www.seniorcaredevelopment.com/
203-222-6262

*********************************************************************************************************
This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our Privacy Policy explains how we may use your personal information. Thank you.
*********************************************************************************************************

Please visit https://link.edgepilot.com/s/95d42fef/FKXA23bowEyIfbJ4Q0fuew?u=http://www.mwe.com/ for more information about our Firm.

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

Confidentiality Notice:
This email and any attachments may be confidential and protected by legal privilege. This communication is for the exclusive use of the intended recipient(s). If you are not the intended recipient(s), be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If you have received this email in error, please notify us immediately by replying to the sender and then delete this copy and the reply from your system. Thank you for your cooperation.

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

Jefferies archives and monitors outgoing and incoming e-mail. The contents of this email, including any attachments, are confidential to the ordinary user of the email address to which it was addressed. If you are not the addressee of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. This email may be produced at the request of regulators or in connection with civil litigation. Jefferies accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited.

**HOULIHAN LOKEY EMPLOYEES ARE ONLY AUTHORIZED TO CONDUCT ELECTRONIC BUSINESS COMMUNICATION VIA HL.COM EMAIL ADDRESSES, BLOOMBERG MESSAGE, OR MICROSOFT TEAMS. PLEASE DO NOT USE TEXT MESSAGING, SOCIAL MEDIA APPS, INSTANT MESSAGING APPS, OR ANY OTHER MEANS OF COMMUNICATION WITH HOULIHAN LOKEY EMPLOYEES FOR ELECTRONIC BUSINESS COMMUNICATION PURPOSES.**

Please consider the environment before printing.

Houlihan Lokey is a trade name for Houlihan Lokey, Inc., and its subsidiaries and affiliates, which include in the United States: Houlihan Lokey Capital, Inc., an SEC-registered broker-dealer and member of FINRA (www.finra.org) and SIPC (www.sipc.org) (investment banking services); and Houlihan Lokey Financial Advisors, Inc. (financial advisory services). Houlihan Lokey affiliates may share information and resources with other Houlihan Lokey affiliates to bring relevant resources to bear on its various engagements and such affiliates may perform services in connection with such engagements. This email message and any attachments are for the sole use of the intended recipient(s) and may contain confidential information. If you are not an intended recipient, or an intended recipient's authorized agent, you are hereby notified that any dissemination, distribution, or copying of this email message or any attachments is strictly prohibited. If you have received this message in error, please notify the sender by replying to this email and then delete this email message and any attachments from your computer system.