# EXHIBIT 3

**STINSON LLP**
Zachary Hemenway (NDTX Bar No.
59670MO)
Nicholas Zluticky (*pro hac vice*)
Miranda Swift (*pro hac vice*)
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone: (816) 842-8600
nicholas.zluticky@stinson.com
zachary.hemenway@stinson.com
miranda.swift@stinson.com

*Co-Counsel to the Statutory Unsecured
Claimholders' Committee of Genesis
Healthcare, Inc., et al.*

**PROSKAUER ROSE LLP**
Brian Rosen (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Timothy Q. Karcher (*pro hac vice*)
Daniel Desatnik (*pro hac vice*)
Eleven Times Square
New York, NY 10036-8299
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: brosen@proskauer.com
        ebarak@proskauer.com
        tkarcher@proskauer.com
        ddesatnik@proskauer.com

– and –

Paul V. Possinger (*pro hac vice*)
Jordan E. Sazant (*pro hac vice*)
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL 60602-4342
Telephone: (312) 962-3570
Email: ppossinger@proskauer.com
        jsazant@proskauer.com

**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| GENESIS HEALTHCARE, INC., et al., | ) ) ) | Case No. 25-80185 (SGJ) |
| Debtors.[1] | ) ) ) | |

---

[1] The last four digits of Genesis Healthcare, Inc's federal tax identification number are 4755.  There are 299 Debtors in these chapter 11 cases, for which the Debtors have requested joint administration.  A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Genesis.  The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 2

BACKGROUND ...................................................................................................................... 14

LEGAL STANDARD............................................................................................................... 20

ARGUMENT............................................................................................................................ 23

I.  THE GENIE BID IS THE HIGHER AND BETTER OFFER ........................................ 23

    A.  The Stalking Horse Bid Does Not Constitute a Qualified Bid ........................... 23

    B.  The Genie Bid is Higher Even on the Debtors' Auction Scorecard ................... 25

    C.  The Genie Bid is Better Qualitatively................................................................. 29

II.  THE STALKING HORSE BID IS NOT IN THE BEST INTERESTS OF THE
DEBTORS' ESTATES AND CANNOT BE APPROVED ........................................... 37

    A.  The Stalking Horse Bid Does Not Withstand Rigorous Scrutiny........................ 37

        1.  No Evidence of a Fair Process Leading to the Stalking Horse Bid ......... 37

        2.  The Proposed Sale Violates Fundamental Due Process
Requirements .......................................................................................... 40

        3.  The Stalking Horse Bid's Terms Are Not Fair ....................................... 42

            a.  The Stalking Horse Bid Is an Impermissible Sub Rosa Plan....... 42

            b.  The Stalking Horse Bid Impermissibly Sells
Unencumbered Causes of Actions Against Insiders, to
Insiders .......................................................................................... 47

    B.  The Stalking Horse Bid Was Not Proposed in Good Faith ................................. 49

    C.  The Stalking Horse is Not Entitled to a Finding That It Is Not a Successor
in Interest to the Sellers..................................................................................... 53

III.  THE COURT HAS ALTERNATIVE PATHS TO MAXIMIZE VALUE ..................... 54

    A.  A Viable Reorganization Path Exists.................................................................. 54

    B.  The Debtors Do Not Have a Valid Business Justification for Proceeding
Through § 363..................................................................................................... 55

CONCLUSION......................................................................................................................... 57

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Cadle Co. v. Mims (In re Moore)*,
608 F.3d 253 (5th Cir. 2010) ..................................................................... 11, 47, 48

*Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*,
59 F.3d 48 (7th Cir. 1995) ....................................................................................53

*Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*,
68 F.3d 914 (5th Cir. 1995) ......................................................................8, 12, 22, 47

*Czyzewski v. Jevic Holding Corp.*,
580 U.S. 451 (2017)..............................................................................................43

*Excluded Lenders v. Serta Simmons Bedding, L.L.C. (In re Serta Simmons Bedding, L.L.C.,)*
125 F.4th 555 (5th Cir. 2024),
*cert. denied*, No. 24-1322, 2025 WL 3132012 (U.S. Nov. 10, 2025)......................................44

*In re Age Ref., Inc.*,
801 F.3d 530 (5th Cir. 2015) ..............................................................................47, 48

*In re Ambac Fin. Grp., Inc.*,
2011 WL 6844533 (S.D.N.Y. 2011),
*aff'd*, 487 F. App'x 663 (2d Cir. 2012).................................................................................3

*In re Anchorage Boat Sales, Inc.*,
29 B.R. 275 (Bankr. E.D.N.Y. 1983)........................................................................21

*In re Aztec Co.*,
107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...................................................................46

*In re Bigler, LP*,
443 B.R. 101 (Bankr. S.D. Tex. 2010) .....................................................................55

*In re Bleaufontaine, Inc.*,
634 F.2d 1383 (5th Cir. 1981) ................................................................................50

*In re Bombay Co.*,
2007 WL 2826071 (Bankr. N.D. Tex. Sept. 26, 2007)........................................................41

*In re CGE Shattuck, L.L.C.*,
   254 B.R. 5 (Bankr. D.N.H. 2000) ............................................................................................45

*In re Cont'l Air Lines, Inc.*,
   780 F.2d 1223 (5th Cir. 1986) .......................................................................................42, 43

*In re Crutcher Res. Corp.*,
   72 B.R. 628 (Bankr. N.D. Tex. 1987)..................................................................................... 43

*In re Fabricators, Inc.*,
   926 F.2d 1458,1465 (5th Cir. 1991) ......................................................................................21

*In re Free Lance-Star Publ'g Co..*,
   512 B.R. 798 (Bankr. N.D. Tex. 2014)...................................................................................27

*In re Garland Corp.,*
   6 B.R. 456 (Bankr. 1st Cir. 1980) .........................................................................................40

*In re Gil-Bern Indus., Inc.*,
   526 F.2d 627, (1st Cir. 1975)................................................................................................55

*In re Gulf Coast Oil Corp.*,
   404 B.R. 407 (5th Cir. 2009) ...........................................................................11, 45, 49, 55

*In re Innkeepers USA Tr.*,
   442 B.R. 227, (Bankr. S.D.N.Y. 2010)...........................................................................21, 37

*In re Jackson Brewing Co.*,
   624 F.2d 599 (5th Cir. 1980) ........................................................................................47, 48

*In re L.A. Dodgers LLC,*
   457 B.R. 308 (Bankr. D. Del. 2011) ............................................................................21, 42

*In re LATAM Airlines Grp. S.A.*,
   620 B.R. 722 (Bankr. S.D.N.Y. 2020)...........................................................................20, 21

*In re McInerney*,
   499 B.R. 574 (Bankr. E.D. Mich. 2013) ...........................................................................8, 33

*In re Med. Software Sols.*,
   286 B.R. 431 (Bankr. D. Utah 2002) ....................................................................................20

*In re Residential Cap., LLC*,
   No. 12-12020, 2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2013) ....................................20

*In re Savage Indus., Inc.,*
   43 F.3d 714 (1st Cir. 1994)...................................................................................................40

*In re Sanchez Energy Corp.*,
   No. 19-34508, 2020 WL 3125276 (Bankr. S.D. Tex. Apr. 30, 2020) ......................................35

*In re Sanchez Energy Corp.*,
   139 F.4th 411, 417–18 (5th Cir. 2025). .................................................................................35

*In re Savage Indus., Inc.*,
   43 F.3d 714 (1st Cir. 1994)....................................................................................................40

*In re Sentry Operating Co. of Tex., Inc.*,
   264 B.R. 850 (Bankr. S.D. Tex. 2001) ...................................................................................45

*In re Tempnology, LLC*,
   542 B.R. 50 (Bankr. D.N.H. 2015),
   *aff'd sub nom. Old Cold, LLC*, 558 B.R. 500 (B.A.P. 1st Cir. 2016),
   *aff'd sub nom. In re Old Cold LLC*, 879 F.3d 376 (1st Cir. 2018)........................................45

*In re Thornhill Bros. Fitness, L.L.C.*,
   85 F.4th 321 (5th Cir. 2023) ..................................................................................................48

*In re Tresha-Mob, LLC*,
   2019 WL 1785431 (Bankr. W.D. Tex. 2019).........................................................................29

*In re Univ. Creek Plaza, Ltd.*,
   176 B.R. 1011 (S.D. Fla. 1995) .............................................................................................50

*In re Xact Telesolutions, Inc.*,
   2006 WL 66665, (D. Md. Jan. 10, 2006)...............................................................................50

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
   339 U.S. 306 (1950)...............................................................................................................40

*Owens-Corning Fiberglas Corp. v. Ctr. Wholesale, Inc. (In re Ctr. Wholesale Inc.)*,
   759 F.2d 1440 (9th Cir. 1985) ...............................................................................................40

*Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*,
   700 F.2d 935 (5th Cir. 1983) ...........................................................................................42, 43

*Pepper v. Litton.*,
   308 U.S. 295 (1939)...............................................................................................................21

*Porretto v. Williams (In re Porretto)*,
   761 F. App'x 437 (5th Cir. 2019) .....................................................................................20, 21

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012)...............................................................................................................35

*Republic Nat'l Bank of Dallas v. Fitzgerald (In the Matter of E.A. Fretz Co., Inc.)*,
   565 F.2d 366 (5th Cir. 1978) ....................................................................................34

*Sandy Ridge Dev. Corp. v. La. Nat'l. Bank (In re Sandy Ridge Development
   Corp.)*,
   881 F.2d 1346 (5th Cir. 1989) ..................................................................................35

*Simmons v. Savell (In re Simmons)*,
   765 F.2d 547, (5th Cir. 1985) ...................................................................................27

*United States v. Chem. Found.*,
   5 F.2d 191 (3d Cir. 1925)..........................................................................................29

*Zerand-Bernal Grp., Inc. v. Cox*,
   23 F.3d 159 (7th Cir. 1994) ......................................................................................53

STATUTES

11 U.S.C. § 102(1) .........................................................................................................40

11 U.S.C. § 363............................................................................................... *passim*

11 U.S.C. § 1104........................................................................................................12, 54

11 U.S.C. § 1106........................................................................................................12, 54

11 U.S.C. § 1129.............................................................................................. *passim*

11 U.S.C. § 1123(a)(4)................................................................................................44, 45

OTHER AUTHORITIES

Fed. R. Bankr. P. 9019 ...................................................................................... *passim*

**OMNIBUS SALE OBJECTION AND POST-AUCTION SALE OBJECTION
OF THE STATUTORY UNSECURED CLAIMHOLDERS' COMMITTEE TO THE
SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO CPE 88988 LLC**

The Statutory Unsecured Claimholders' Committee (the "Committee") of Genesis

Healthcare, Inc., *et al.* (the "Debtors") hereby submits this omnibus sale objection and post-auction

objection (the "Objection") to (i) the *Debtors' Motion for Entry of an Order (I) Approving Bidding*

*Procedures and Expense Reimbursement, (II) Approving the Debtors' Entry Into the Stalking*

*Horse APA, (III) Scheduling Certain Dates and Deadlines, (IV) Approving the Form and Manner*

*of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of*

*Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts,*

*and (VII) Authorizing the Sale of Assets* [Docket No. 117] (the "Sale Motion"),[1] and (ii) the

Debtors' designation, as set forth in the *Notice of Results of Auction and Successful Bidder* [Docket

No. 1692] (the "Notice of Successful Bidder") of CPE 88988 LLC (the "Stalking Horse") as the

Successful Bidder at the Auction beginning on November 18, 2025 pursuant to the *Amended and*

*Restated Asset Purchase Agreement* [Docket No. 1755, Ex. A] (as may be further amended,

modified, or supplemented, the "Stalking Horse APA"), for the sale of all or substantially all of

the Debtors' assets. In support of this Objection, the Committee respectfully submits (a) the

*Declaration of Andrew Turnbull in Support of the Omnibus Sale Objection and Post-Auction Sale*

*Objection of the Statutory Unsecured Claimholders' Committee to the Sale of Substantially All of*

*the Debtors' Assets to CPE 88988 LLC* (the "Turnbull Declaration"), (b) the *Declaration of Brian*

*Taylor in Support of the Omnibus Sale Objection and Post-Auction Sale Objection of the Statutory*

*Unsecured Claimholders' Committee to the Sale of Substantially All of the Debtors' Assets to CPE*

*88988 LLC* (the "Taylor Declaration"), and (c) the *Declaration of Daniel Desatnik in Support of*

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Sale Motion or the Stalking Horse APA, as applicable.

*the Omnibus Sale Objection and Post-Auction Sale Objection of the Statutory Unsecured Claimholders' Committee to the Sale of Substantially All of the Debtors' Assets to CPE 88988 LLC* (the "Desatnik Declaration"), filed concurrently herewith, and respectfully states as follows:

## PRELIMINARY STATEMENT[2]

1.　　From the outset of these cases (the "Bankruptcy Cases"), the Court has rightly focused the parties' efforts toward stabilizing the businesses, safeguarding patient care, and pursuing a going concern transaction that maximizes value to the Debtors' estates. Those efforts yielded two competing bids for substantially all the Debtors' assets: one from the insider Stalking Horse and the other from Genie 3 Partners LLC ("Genie"), a fully independent third-party. Both bids are for a go-forward transaction that would secure patient care, satisfy all secured and priority claims (including administrative expenses), and provide recoveries for unsecured creditors (at levels well in excess of the Debtors' initial proposals). The most significant difference between the two Bids—uncontested even by the Debtors—is that the Genie Bid provides at least tens, and perhaps hundreds, of millions of dollars more to the Debtors' estates than the Stalking Horse Bid.[3]

2.　　The bids confirm that unsecured creditors represent the fulcrum class of creditors, and are the true economic parties-in-interest, while the DIP Lenders and other secured lenders will have their valid claims satisfied in full under either bid.[4] Instead of prioritizing creditor recoveries, the Debtors have chosen the Stalking Horse Bid, the far lower bid, and inexplicably declined to

---

[2]　Capitalized terms used in the Preliminary Statement but not defined herein shall have the meanings otherwise assigned to them in this Objection.  Portions of this Objection are redacted and/or filed under seal pursuant to ¶ 15 the *Order Approving Amended Stipulated and Agreed to Confidentiality Agreement and Protective Order* [Docket No. 1206].

[3]　*See* W. Snyder Dec. 7, 2025 Dep. Tr. at 169:25-170:5 ("Q: On the final scorecard, in terms of total bid consideration, which bid was higher?  A: The Genie 3 bid was higher by like 20 million.").

[4]　This conclusion is not in dispute. As Mr. Simon said at the November 25, 2025 hearing "both of those bids provided more than an additional $100 million of additional value flowing to the estates, most of which is flowing to unsecured creditors."  Nov. 25, 2025 Hr'g Tr. 12:13-15; *see also* W. Snyder Dec. 7, 2025 Dep. Tr. at 103:10-12 ("A: . . . And right now, the Unsecured Creditors are the fulcrum – are the fulcrum creditors.").

even declare the Genie Bid the Back-Up Bid.[5] In doing so, the Debtors have abandoned their

fiduciary duties in favor of the preordained outcome for which they filed these Bankruptcy Cases.

3.         Deference must be given to the voices of the fulcrum class of creditors and victims

of the insider's regimen in making the decision as to which bid to choose.[6] The eleven-member

Committee—which includes go-forward trade creditors, a landlord, a pension fund, tort victims

(past and present patients), and wage claimants, and serves as the fiduciary for all general

unsecured creditors—speaks with one voice in supporting the Genie Bid because it is significantly

higher and better than the insider Stalking Horse Bid. This conclusion, amply supported by the

evidence, should not be overridden by debtor fiduciaries hand-picked by the same insiders who

engineered a process to deliver the business back to themselves free of over $1 billion in unsecured

claims and liability for their own misconduct—and backed by consultation parties going along in

exchange for releases of their own exposure to the Debtors, their creditors, and their victims.

4.         **The Genie Bid is Higher by $20 to $250 Million.** The Debtors concede the Genie

Bid is the higher bid. Based on their own "scorecard" used for purposes of the Auction (predicated

upon valuations skewed heavily in favor of the insider Stalking Horse Bid), the Genie Bid provides

over $1 billion in value and over $20 million more than the Stalking Horse bid. *See* Turnbull Decl.,

Fig. 1 (the "Auction Scorecard"). When properly valued, however, the Genie Bid delivers

---

[5]   The Debtors declined to designate a Back-up Bid despite the Special Restructuring Committee's understanding that they had in fact designated Genie as a Back-up Bid. W. Snyder Dec. 7, 2025 Dep. Tr. at 174:14-16 ("Q: So did Genie 3 default to [being] the back-up bidder?  A: Yes."). The Special Restructuring Committee believes naming a Back-up Bidder was beneficial "to keep the stalking horse honest" and ensure certainty of closing.  *Id*. at 175:25-176:16.

[6]   In the context of two confirmable competing chapter 11 plans, section 1129(c) requires the court to consider "the preferences of creditors and equity security holders in determining which plan to confirm." 11 U.S.C. § 1129(c). Here, because either bid preserves the enterprise, the Court should likewise consider the unsecured creditors' preferences. *See also In re Ambac Fin. Grp., Inc.,* 2011 WL 6844533 at *6 (S.D.N.Y. 2011) ("The Bankruptcy Court was justified in placing significant weight on the Creditors Committee's" views where "the unsecured creditors . . . are the parties who stand to benefit from any recovery" in respect of the claims subject to the 9019 settlement),  *aff'd*, 487 F. App'x 663 (2d Cir. 2012).

3

*hundreds of millions* more in economic value to the estates, with all of that excess flowing to unsecured creditors. *See* Turnbull Decl., Fig. 2 (the "Committee Scorecard"):[7]

**Debtors' Scorecard Approach (Used during the Auction)**

| ($ millions) | Key | Stalking Horse | Genie |
|---|---|---|---|
| Cash (Net of Acquired Cash) | | $36 | $259 |
| Promissory Note Bid Value[(1)] | | 23 | 73 |
| WAX Subordinated Term Loan | | 25 | n.a. |
| Credit Bid of DIP Claim | | 16 | n.a. |
| **Purchase Consideration** | [A] | **$100** | **$332** |
| Assumed Financial Debts | | 558 | 286 |
| Assumed Operating Liabilities | | 294 | 294 |
| **Assumed Liabilities** | [B] | **852** | **580** |
| Value to Estate from Bold Quail Settlement | [C] | 5 | 60 |
| **Bid Value Before Causes of Action, Preferences, etc.** | [A] + [B] + [C] = [D | **$957** | **$972** |
| *Genie Excess Value over Stalking Horse Before Causes of Action, Preferences, etc.* | | | **$15** |
| Causes of Action | | 15 | 32 |
| Other Preference Claims | | 25 | 27 |
| **Total Causes of Action and Preference Claims** | [E] | **$40** | **$59** |
| **Bid Value before Debtor Risk Adjustment** | [D] + [E] = [F] | **$997** | **$1,031** |
| Debtor Risk Adjustment | [G] | (15) | (28) |
| **Grand Total Bid Value under Debtors' Auction Scorecard** | = [F] + [G] | **$982** | **$1,003** |
| *Genie Total Excess Value over Stalking Horse* | | | **$21** |

1) The Debtors' methodology assumed a discount to the Promissory Notes based on an 18% discount rate. Using this methodology, the Stalking Horse note of $30 million is valued at $23 million and the Genie note of $100 million is valued at $73 million

**Committee View**

| ($ millions) | Key | Stalking Horse | Genie |
|---|---|---|---|
| Cash (Net of Acquired Cash) | | $36 | $259 |
| Promissory Note Bid Value[(1)] | | 24 | 80 |
| WAX Subordinated Term Loan | | 25 | n.a. |
| Credit Bid of DIP Claim | | 16 | n.a. |
| **Purchase Consideration** | [A] | **$101** | **$339** |
| Assumed Financial Debts | | 428 | 286 |
| Assumed Operating Liabilities | | 294 | 294 |
| **Assumed Liabilities** | [B] | **722** | **580** |
| Value to Estate from Bold Quail Settlement | [C] | 5 | 60 |
| **Bid Value Before Causes of Action, Preferences, etc.** | [A] + [B] + [C] = [D | **$828** | **$979** |
| *Genie Excess Value over Stalking Horse Before Causes of Action, Preferences, etc.* | | | **$151** |
| Causes of Action | | 15 | 100 |
| Other Preference Claims | | 25 | 27 |
| **Total Causes of Action and Preference Claims** | [E] | **$40** | **$127** |
| **Bid Value before Debtor Risk Adjustment** | [D] + [E] = [F] | **$868** | **$1,106** |
| Debtor Risk Adjustment | [G] | (15) | - |
| **Grand Total Bid Value under Debtors' Auction Scorecard** | = [F] + [G] | **$853** | **$1,106** |
| *Genie Total Excess Value over Stalking Horse* | | | **$253** |

1) The Committee's methodology assumed a discount to the Promissory Notes based on a 13% discount rate. Using this methodology, the Stalking Horse note of $30 million is valued at $24 million and the Genie note of $100 million is valued at $80 million

---

[7] The Committee Scorecard valuation includes a conservative estimate of the value of the Causes of Action for illustrative purposes only.

5. The gulf between the Debtors' and Committee's valuations is driven primarily by two factors. First, the Debtors only ascribed $17 million of value to the estate claims and causes of action being left behind by Genie—actions the Stalking Horse Bid seeks to buy and bury—even though its own Special Investigation Committee (the "SIC") valued a mere *subset* of these actions at $35 million-78 million. The Committee's investigation revealed dozens of additional valuable actions against insiders and the incumbent lenders, which the SIC failed to even consider. We know the SIC could not have considered the additional actions because the actions are based on information and documents that were **not made available by the defendants to the SIC**,[8] yet the Debtors did not ascribe a single penny of value to those actions at the Auction. Second, the insider Stalking Horse "pays" for the assets primarily by assuming deeply undersecured debts that it does not own—ascribing 100 cent value to debts that the Committee has objected to, **some of which the SIC admits are highly likely to be avoided, disallowed, or subordinated**. These claims are subject to pending objections and disallowed, thus their assumption provides no value to the estate.[9] Nevertheless, the Debtors gave the Stalking Horse full credit for their assumption.

6. **The Genie Bid is Better**. The qualitative advantages of the Genie Bid are equally pronounced. As a preliminary matter, having formally concluded that Landau extracted tens of

---

[8] A substantial portion of the claims and causes of action asserted in the Complaint are supported by documents discovered from Welltower which were unavailable to the SIC, and which Welltower only divulged after being compelled by the Court to do so following a hearing in which Welltower's counsel stated that it had "already" produced the "relevant documents" that "could exist on those three transactions," which are the same transactions subject of the Complaint, and averring that the Committee was attempting to "pry into Welltower's confidential proprietary business transactions that have nothing to do with the Debtor or even the claims or challenges they claim to want to make here in these proceedings . . . Nothing." *See* Oct. 3, 2025, Hr'g Tr. at 19:21-22; 18:3-7. It is unlikely that even the Complaint fully encapsulates the universe of valuable assertable claims being purchased without the SIC having actually investigated, valued, or marketed them.

[9] The Complaint and Term Loan Claim Objection were shared with the Debtors prior to the Auction but not filed at their request while mediation remained ongoing. The parties further agreed that, as a result, the Auction was conducted and "the motion to approve the winning bid at the auction will be determined as though the standing motion, complaint, and the IRS claim objection had been filed with the court prior to the auction." *See The Statutory Unsecured Claimholders' Committee's Exhibit List for the Hearing on December 10-11, 2025, at 9:30 a.m. (Prevailing Central Time)* [Docket No. 1792] (the "Committee Exhibit List"), Exhibit 37 at 14:2-15:3.

millions in value through misconduct before bankrupting Genesis, the Debtors now ask the Court to accept the incongruous proposition that Landau is nevertheless the most suitable party to control the enterprise going forward. So much so, that his stewardship bridges the $20 to $250 million chasm in the value of the Bids. That position defies logic and fiduciary duty in equal measure.

7.    The form of consideration being offered by Genie further underscores its superiority: the Genie Bid provides the estate distributable cash consideration of approximately $316.5 million, funded with at least $120 million of new equity, resulting in a substantially de-levered balance sheet and far stronger liquidity—$30 million of cash at closing and an additional $80 million–$100 million of available financing. Even the Debtors' Special Restructuring Committee ("SRC") acknowledges that "the Genie 3 capital structure was better than the Stalking Horse." W. Snyder Dep. Tr. Dec. 7, 2025 at 44:25-45:3. By contrast, the insider Stalking Horse (a) refuses to explain how it will sustain a post-sale capital structure burdened by an additional nearly $300 million in debt, (b) offers no operational improvements to remedy the failures that generated more than $1.6 billion in unsecured liabilities, (c) provides no clarity on its expected cash at closing, and (d) will not disclose whether the insider WAX/MAO and ReGen debts (totaling ~ $535 million) will be assumed or forgiven—leaving the enterprise substantially over-leveraged and its viability in doubt. Because both bids rely on long-term notes and payment plans, the estates have a direct stake in the go-forward operator's financial health, and for the Committee's constituency—which includes current patients and long-standing vendors dependent on a stable Genesis—the Genie Bid offers far greater assurance of value and continuity.

8.    Moreover, the Stalking Horse Bid would perpetuate the same cycle of problematic patient care that contributed to Genesis's financial distress the insiders now seek to exploit, increasing the likelihood of another chapter 11 cycle. Genie offers superior operational credentials,

6

including an average CMS rating of 2.8 compared to 2.29 stars for Genesis. The Genie Bid is also supported by comprehensive operational and clinical plans, reputable operators and asset managers (Milrose and Integro), and demonstrated turnaround experience. In contrast, the insider Stalking Horse provides virtually no transparency and, rather than turnaround *bona fides*, is comprised of the same parties responsible for bankrupting Genesis, LaVie Care Centers, and Corizon, leaving a trail of uncompensated tort victims as a result of substandard care. Indeed, operations are so poor under Genesis management (who also control the Stalking Horse) that the Debtors were spending $8 million monthly to defend and settle tort claims,[10] and, during the five months of these Bankruptcy Cases, have faced numerous "immediate jeopardy" findings by CMS and decertification of one of its facilities. The magnitude of opposition and filings in these cases by tort claimants should speak volumes about what patients really think of the "Landau standard of care" they are receiving—and the Court should not enable those who have already failed in the care of this vulnerable population, especially with the same day-to-day management and a heavily-leveraged opening balance sheet.

9.      **Genie preserves estate claims; the Stalking Horse buys and buries them**. Genie's Bid is also superior because it leaves behind all estate claims and causes of action—including those against insiders and incumbent lenders—as unencumbered value distributable for the benefit of unsecured creditors. On the flip side, the cornerstone of the Debtors' preplanned bankruptcy was for the insider Stalking Horse to purchase and bury those claims,[11] and indeed, the

---

[10]  *Declaration of Louis E. Robichaux IV in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 18] (the "First Day Declaration") at ¶ 84.

[11]  This is not conjecture. In May 2025, the Debtors prepared a "Reorganization Roadmap" presentation for Welltower and Omega, where the Debtors explained their intention to file in a venue with "favorable case law on releases, insider transactions" and a Rule 9019 settlement.  What makes this roadmap more shocking, is this plan was hatched *before* the SRC was even formed and *before* the SIC had completed its investigation. *Objection of the Statutory Unsecured Claimholders' Committee  to Debtors' Emergency Motion for Entry of Interim and Final  Orders (I) Authorizing the Debtors to (A) Obtain Postpetition  Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to*

7

Stalking Horse Bid includes the purchase of causes of action and grants broad releases (including releasing Landau and third party Landau affiliates unrelated to the Debtors or the Stalking Horse, for no consideration). In short, the Stalking Horse bid ensures that the very parties responsible for the Debtors' collapse walk away scot-free without accountability. At the same time, the Stalking Horse would graciously leave behind preference actions against hundreds of non-insider creditors, allowing their payments to be clawed back while insiders keep every dollar of the claims asserted against them. Adding insult to injury, the primary consideration for the Stalking Horse's purchase of these unencumbered actions is its assumption of (a) purportedly secured debt (recently bought by these very same insiders paying less than pennies on the dollar) and (b) unsecured liabilities owed to themselves, despite over $100 million of that amount being explicitly subordinated to all other unsecured creditors—effectively limiting the value flowing to unsecured creditors, and simultaneously allocating as much of that value as possible to themselves with no operational benefit. No credible fiduciary could conclude that such an outcome is fair or consistent with the Bankruptcy Code's foundational principles of equitable distribution.[12]

10.     **Insider-driven process pre-ordained the Stalking Horse outcome**. The Debtors nevertheless designated the insider Stalking Horse as the Successful Bidder—an outcome pre-destined by a sale process designed *by* insiders, *for* insiders. Not only that, the Debtors seek to force the Court's hand to approve their Sale by refusing to even designate the Genie Bid a Back-Up Bid despite professing to require all other bidders to serve as Back-Up Bidder to ensure a sale

---

*Prepetition Secured Parties, (III) Modifying the  Automatic Stay, (IV) Scheduling A Final Hearing,  and (V) Granting Related Relief* [Docket No. 412] (the "DIP Objection") at 16.

[12] *See, e.g., Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.),* 68 F.3d 914, 919 (5th Cir. 1995) ("The court's scrutiny must be great when the settlement is between insiders and an overwhelming majority of creditors in interest oppose such settlement of claims"); *In re McInerney,* 499 B.R. 574, 598 (Bankr. E.D. Mich. 2013) (denying 9019 motion because, among other reasons, "general unsecured creditors will lose an opportunity to realize much more in distributions in this case if the claim is pursued to judgment (or ultimately, to a much larger settlement)").

closes. From day one, the Debtors engineered this process to ensure the assets would remain in the hands of Joel Landau, cleansed of more than $1.6 billion of unsecured liabilities arising from his own insider transactions and run up through the tortious operations of Genesis's facilities. The Committee has sounded this alarm since its appointment. Other stakeholders and even Members of the United States Senate and Congress have raised the same concerns. And, while the Auction generated competitive bidding, the Auction's playing field was unfair and heavily slanted in favor of the Stalking Horse. The Debtors are effectively seeking approval of a private section 363 sale. Nevertheless, Genie played on the Debtors' "home turf," utilizing the Auction Scorecard for bidding, and remains committed with an offer that is both higher and better than the Stalking Horse.

11. The Debtors' determination to deliver the company to insiders despite the presence of a higher and better independent bid cannot meet any applicable standard of review—and certainly not the heightened scrutiny required for insider transactions. The Debtors will surely attempt to invoke the "business judgment" rule and raise specters of closing risks, lender consents, DIP obligations, and already-resolved regulatory concerns. But in a case where the Debtors and their professionals are hopelessly conflicted and the Committee's constituency is the fulcrum class of creditors, the Debtors are not entitled to business-judgment deference, and must meet the rigorous heightened scrutiny standard. Their arguments ring hollow and do not carry their burden.

12. **Comparing the Bids is not a close call**. In a normal case, this wouldn't even be a close call. Genie submitted a significantly higher bid, provided a $25 million deposit, has the ability and track record to run and enhance the businesses, is well-positioned to close, and has every incentive to do so. Indeed, notwithstanding the Debtors' shenanigans, Genie continues to expend its resources pursuing its bid in this Court. The DIP Lenders and Prepetition Secured Lenders will all have their debts satisfied in full or assumed in the same manner as the Stalking

9

Horse through the Genie Bid, so there is no reasonable basis for them to withhold consent to the transaction. Nonetheless, certain Prepetition Secured Lenders oppose a sale to Genie because, under the Stalking Horse Bid, they get the added benefit of releases from significant causes of action and claim objection exposure for no consideration—thereby receiving far more than 100 cent recoveries on their claims.

13.     Conversely, the Stalking Horse bid is not approvable. As an initial matter, the latest Stalking Horse Bid is not a Qualified Bid pursuant to the Debtors' constructed Bidding Procedures Order because the Stalking Horse has not committed to provide a compliant Good Faith Deposit nor has it consented to being held to its commitment to serve as a Back-Up Bidder. While the original Stalking Horse bid was deemed to be a Qualified Bid and exempt from those requirements, the exemption did not apply to subsequent "Overbids" by the Stalking Horse. Once participating in an active auction, the Stalking Horse was required to compete on an even playing field. These are not insignificant details—the Debtors disqualified another bidder shortly before the start of the Auction because, although it made a cash deposit, it would not consent to being a Back-Up Bid. The Debtors cannot wield the Bidding Procedures as a sword to fend off competing offers, while shielding the Stalking Horse from the same requirements.

14.     **The Stalking Horse Bid violates core chapter 11 protections and functions as an impermissible sub rosa plan**. Even if it were a Qualified Bid under the Bidding Procedures, the Stalking Horse Bid is not approvable because it violates core chapter 11 protections by effectuating an end-run around the plan confirmation process. While sales of substantially all of a debtor's assets are generally permissible, the Fifth Circuit prohibits such sales when used to

10

override specified protections afforded by chapter 11.[13] The Stalking Horse Bid could not form the basis of a confirmable plan and must be denied because: (a) it inappropriately dictates creditor recoveries by assuming disputed secured debts in full even though those debts are subject to pending objections and may be disallowed (thus providing them more than 100 percent of their allowed claim, in addition to granting valuable releases), (b) it discriminates unfairly by paying insider unsecured debts in full while paying other unsecured claims less than pennies on the dollar, (c) it violates absolute priority by providing value to the insider ReGen Notes, which are expressly subordinate to unsecured debts, (d) it seeks to sell estate causes of action to the defendants of those causes of action without satisfying the Rule 9019 standard, as required by Fifth Circuit law,[14] and (e) it contains none of the disclosures necessary for creditors to determine feasibility. The Genie Bid, on the other hand, pays sufficient cash consideration to permit the Sale to be consummated while the parties administer and distribute the estates' assets in an orderly and efficient manner in accordance with the priorities and rights of each party as determined under the Bankruptcy Code, including permitting the parties and the Court to determine the merits of asserted claims.

15. **The Court has better paths available to maximize value and protect the integrity of the bankruptcy system**. The Court can and should decline to approve the Sale to the Stalking Horse. Where a major difference between the competing Bids comes down to the assessment of the value of the estate's causes of action, the Debtors' motion to sell those causes of action to or for the benefit of the defendants serves equally as a request to settle those causes of action. *In re Moore*, 608 F.3d 253. Under such circumstances, the Debtors cannot meet the rigorous

---

[13] *In re Gulf Coast Oil Corp*, 404 B.R. 407 (5th Cir. 2009) (declining to approve a proposed sale because it would deprive creditors of protections they would otherwise have received if the sale were conducted as part of the chapter 11 plan confirmation process).

[14] *Cadle Co. v. Mims* (*In re Moore*), 608 F.3d 253, 266 (5th Cir. 2010) ("In the event an auction is held and the trustee selects defendants' offer, the bankruptcy court must assess the transaction as both a proposed sale under § 363 and a proposed compromise under rule 9019.").

11

heightened scrutiny standard. In addition, Fifth Circuit case law is clear that the Court must consider "the paramount interest of creditors with proper deference to their reasonable views." *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortg. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995) (reversing settlement between debtor and an insider because the bankruptcy court failed to consider that agreement was negotiated without creditor participation and near-unanimous creditor opposition). The Committee stands in opposition to the Sale to the insider Stalking Horse.

16.     A sale of this magnitude should be pursued pursuant to a plan with full disclosures consistent with the protections afforded by the Bankruptcy Code. In conjunction herewith, the Court should decline to extend the Debtors' exclusivity to permit the Committee to file a competing plan supported by the Genie Bid or another equally-strong sponsor, and allow creditors to vote on the outcome they believe is best. The need for transparency is particularly pronounced where the Debtors failed to disclose the competing bids or the Auction transcript, and threatened legal actions against those that sought to disclose and bring sunshine to these details.[15] Creditors were deprived of the ability to evaluate the bids and the auction process and determine if the insider Stalking Horse bid was best and highest and the process that elicited the bid was fair.

17.     Alternatively, the Court should grant the pending motion to appoint an examiner with expanded powers under 11 U.S.C. §§ 1104 and 1106(b) for the purpose of reopening the Auction, determining qualified bidders, and overseeing the selection of the best and highest bid free and clear of insider manipulation.[16] A reopened Auction would maximize value for the

---

[15] *Healthcare Negligence Claimants' Emergency Motion to (A) Appoint Examiner to Review Implementation of Bidding Procedures with Expanded Powers to Select the Successful Bidder and (B) Continue Sale Hearing* [Docket No. 1733] (the "Examiner Motion"), ¶ 11

[16] The Court has the power to appoint an examiner with expanded powers on its own initiative and without a motion. *In re UNR Industries, Inc.*, 72 B.R. 789 (Bankr. N.D. Ill. 1987) (appointing examiner *sua sponte* under §§ 105(a), 1104, and 1106(b) to break a five-year negotiation impasse; court noted examiner may be given "additional duties as the circumstances warrant" under § 1106(b)'s legislative history); *In re Public Service Co. of New Hampshire*, 99 B.R. 177 (Bankr. D.N.H. 1989) (holding court may appoint an examiner on its own initiative; rejecting debtor's objection to sua sponte authority; relying on §§ 1104(b) and 1106(a)(3) to authorize examiner with expanded duties to mediate

Debtors' estates by permitting an unbiased arbiter to evaluate all competing Bids, including the bidder unjustly disqualified for not agreeing to serve as a backup should it desire to participate.[17]

18. If, however, the Court is inclined to approve a sale to the insider Stalking Horse, and it should not, the Sale Order should at a minimum be modified to protect the estates and preserve the rights of unsecured creditors. These modifications include: (i) preserving creditors' appellate rights by declining to endorse a good faith purchaser finding; (ii) declining to find that the assets are sold free and clear of future successor liability claims; and (iii) explicitly preserving the Committee's pending Challenge and other objections to the secured claims being "assumed," with the requirement that if the Committee were to prevail, the consideration otherwise allocated to those "assumed" claims be paid to the estates in accordance with creditors' allowed claims and priorities against each of the respective individual Debtor entities.

19. While there are numerous factual and legal issues before the Court, this dispute ultimately boils down to one simple observation: if the Stalking Horse Bid were best and highest, the Committee and general unsecured creditors would support it, regardless of whether it was an insider deal. The Committee is not a litigation crusader, it simply wants the higher and better deal this process yielded. With two bids that ensure all allowed secured claim, administrative expenses and priority claims are satisfied in full, the most relevant voices are those of the fulcrum unsecured creditor constituency. Those voices speak resoundingly in opposition to the Stalking Horse and in favor of Genie.

---

and address deadlocked plan negotiations); *In re Landscaping Services, Inc.,* 39 B.R. 588 (Bankr. E.D.N.C. 1984) (appointing examiner without any party request; court stated it "need not stand helplessly by" waiting for a motion and may act *sua sponte* where necessary to protect the case's integrity).

[17] The Court may reopen an auction if there are concerns about the auction or bidding process. *In re Food Barn Stores, Inc.*, 107 F.3d 558 (8th Cir. 1997) (emphasizing court's broad discretion to reopen bidding where fairness, value maximization, or bidder expectations so require, particularly in flexible or informal auction procedures); *In re Muscongus Bay Co.*, 597 F.2d 11 (1st Cir. 1979) (affirming decision to reopen bidding where the original bid was far below appraised value and the original bid was "grossly inadequate"; reiterating that when a sale price is substantially below value, the policy favoring finality yields to the need to obtain a better return for the estate).

## BACKGROUND

20. The insider dealings leading up to these Bankruptcy Cases, and Landau's playbook of taking over struggling SNFs, siphoning value, running them through bankruptcy to wash the unwanted and mounting tort liabilities, and selling the assets free and clear to himself, have been comprehensively documented by the Committee in other pleadings. The Committee hereby incorporates its DIP Objection [Docket No. 412], Bidding Procedures Objection [Docket No. 413], and Complaint [Docket No. 1722-B], as if fully set forth herein. These pleadings collectively describe deficiencies in the secured lenders' liens, as well as hundreds of millions of dollars of asserted claims and causes of action against the Debtors' insiders, including Welltower, Joel Landau, and his related entities, affiliates, and partners.

21. On November 7, 2025, in addition to the Stalking Horse Bid, five (5) parties submitted qualified bids pursuant to the Bidding Procedures Order. Two (2) parties submitted Bids for substantially all of the Debtors' assets (i.e. "WholeCo" bids), while three (3) bids were submitted for certain subsets of the Debtors' facilities or operational assets (i.e. "PartialCo" bids).

22. On November 18, 2025, the Debtors opened the Auction by (a) disqualifying the WholeCo bid submitted by Olumie Capital ("Olumie") on the basis that Olumie had not agreed to serve as a Back-Up Bidder (despite having funded a $5 million deposit), and (b) presenting to all competing WholeCo bidders the Auction Scorecard, reflecting their assessment and valuation of the competing bids for purposes of the Auction.[18] Despite the Committee and Genie asserting objections to various aspects of the Auction Scorecard and the Debtors' flawed methodology, Genie continued to participate in good faith in the Auction lasting multiple days, with both the

---

[18] Although the Debtors utilized the Auction Scorecard to perform all Auction valuations, the Debtors only began to share the Auction Scorecard publicly with the competing Bidders and the Consultation Parties once the Bids topped $900 million.

14

Stalking Horse and Genie submitting multiple "topping" bids. *See* Turnbull Decl. for more details regarding each round of bidding.

23.     In the afternoon of November 19, 2025, the Debtors and the Committee agreed the highest and best offer for the Debtors' assets could be obtained by requiring the remaining bidders to submit to blind bidding against one another, as their last, best and final bids, not subject to further change. The Debtors' lead financial advisor, Louis Robichaux, announced the rules regarding the bids to be submitted. Thereafter, each of the Stalking Horse and Genie were given an hour to submit their best and final offer in a sealed envelope (the "Sealed Bids").[19]

24.     Under the Debtors' flawed Auction Scorecard, the final Genie Bid valuation exceeded the final Stalking Horse Bid by over $20 million.[20] Rather than disclose this information to the competing Bidders and Consultation Parties, the Debtors refused to display the final Auction Scorecard.[21] While the Auction Scorecard shows the Genie Bid is higher than the Stalking Horse Bid, there are many significant flaws in the Auction Scorecard's methodology that do not pass muster and artificially depress the Genie Bid's valuation. As set forth in the Committee Scorecard, the true difference once accounting for the Auction Scorecard's deficiencies is over $250 million.

25.     **Auction Scorecard Deficiencies**. The Auction Scorecard was designed to maximize the value associated with elements unique to the Stalking Horse Bid, while devaluing the Genie Bid. Most notably, the Debtors attributed only $17 million of value to the estate causes of action being purchased, including, but not limited to, those claims set forth in the Complaint. This despite the SIC's limited investigation, which did not include claims against Welltower and

---

[19]   A summary of the terms of the Sealed Bids submitted by the Stalking Horse and Genie based on the Auction Scorecard, alongside explanations of the differences between them, are set forth in the Turnbull Declaration, and are set forth in the Auction Scorecard above.

[20]   *See* W. Snyder Dec. 7, 2025 Dep. Tr. at 169:24-170:5.

[21]   *See* J. Finger Dec. 7, 2025 Dep. Tr. at 58:23-59:2 ("Q: So in the Monday session where the decision was announced, there was no final scorecard shared at that point, correct?  A: I believe that is correct.").

other insiders, valuing a subset of such claims between $35 million-78 million, and the Committee

valuing such claims between **$106.3 million and $177.1 million on a risk-adjusted basis**. This

glaring discrepancy shows how heavily weighted the scale is in favor of the Stalking Horse.

26.     Similarly, the Debtors granted the Stalking Horse full credit for the assumption of

undersecured term loan obligations owed to Welltower and Omega, despite these claims being

subject to objection. *See* Complaint, ¶¶ 290-293; *see also Preliminary Objection of the Statutory

Unsecured Claimholders' Committee to Determine the Secured Status of Prepetition Term Loan

Claims* [Docket No. 1723] (the "Term Loan Claim Objection"). As set forth in the Term Loan

Claim Objection, the Term Loan liens are unperfected in various ways, the claims are significantly

undersecured by at least $100 million, and are therefore (a) subject to a pending objection pursuant

to section 502(a) of the Bankruptcy Code, (b) deemed disallowed pursuant to section 502(d) of the

Bankruptcy Code due to avoidance actions against the holders of such claims, (c) in *bona fide*

dispute for purposes of the Auction and Sale, and (d) not capable of being credit bid pursuant to

section 363(k) of the Bankruptcy Code. Nonetheless, the Debtors granted the Stalking Horse Bid

full credit for the assumption of $254 million owed on account of the term loan, inflating the value

of the Stalking Horse Bid by almost $100 million greater than the benefit to the Debtors' estates.

27.     These counterweights alone place an additional $120-$180 million in the Stalking

Horse Bid's ledger, an overwhelming bias. The Auction's biases did not end there.

28.     **Process Deficiencies**. The Debtors touted their marketing process as an "unfettered

process" with the goal of "qualify[ing] as many bidders as possible," and "considering any and all

offers." Aug. 27, 2025, Hr'g. Tr. 17:2-18. In actuality, the Debtors conducted the marketing

process in a manner to discourage and chill competitive bidding. As stated by one of the bidders

that dropped out after frustrations over not getting due diligence questions answered: "Try as we

16

may, we don't see how anyone is going to be able to unstack the deck (as it were) that is stacked in Joel's favor."[22] There are several instances of the Debtors favoring the Stalking Horse.

29.    *First*, the Debtors omitted key information and provided materially misleading diligence materials. The Debtors asked each bidder to incorporate the Debtors' five-year go-forward projections as the basis for their assessment of the business' profitability, debt capacity, and other factors. Incorporated into the Debtors' projections were revenues from the presumptive operation of approximately 22 facilities in Pennsylvania subject to a master lease (the "PA-22 Facilities"). Unbeknownst to bidders other than the Stalking Horse, the master lease for the PA-22 Facilities contained a "poison pill" provision permitting the landlord to unilaterally terminate the lease on 30 days' notice for any reason (a termination that would be exercised if any non-Landau entity sought to acquire the facilities).[23] This information was known to the Stalking Horse, but not disclosed to other bidders, who did not know the Debtors had egregiously misrepresented the revenue base over which the bidders were competing, until they were at the Auction. Turnbull Decl., ¶ 28.

30.    *Second*, the Debtors sought to protect the Stalking Horse from competition by limiting participants in the bidding process. A lawyer representing the Debtors sent an email to NextGen, copying Debtors' bankruptcy counsel and Welltower, regarding the negotiation of a letter agreement concerning the parties. The Debtors' lawyer wrote "BK Bid Process – We would like to add a provision stating that Next will not submit a bid in the Genesis Bankruptcy sale process." Counsel to NextGen replied "Next will not agree to engage in collusion to chill bidding for the debtors' assets." Desatnik Decl., Ex. 10. NextGen submitted a Qualified Bid at the auction.

---

[22]    *See* Turnbull Decl., Ex. A.

[23]    Not only that, rejecting the master lease to return the assets to the Debtors' estates to avoid the fraudulent transfer of these valuable assets would trigger a default under the Final DIP Order. *See* DIP Credit Agreement, § 8(o)(xvi) (it is an Event of Default to file "a motion to reject the PA-22 Sub-Subleases or PA-22 OTA . . .")

31.     *Third*, although Olumie submitted a $5 million deposit, appeared in-person at the auction with counsel, and was prepared to make a significant WholeCo bid, the Debtors disqualified Olumie from participating because it declined to be a Back-up Bid for an indefinite time. Turnbull Decl., ¶ 9. The Debtors, however, did not similarly disqualify the Stalking Horse Bid for refusing to commit to pay a deposit or serve as the Back-up Bid for any of its topping bids.

32.     *Fourth*, the Debtors failed to disclose to any bidders other than the Stalking Horse that, the day before the Auction, they entered into a term sheet with NewGen to resolve disputes regarding the Bold Quail facilities, effectively selling the interests in those facilities and all related assets for $57.5 million. While the Stalking Horse knew that information in advance,[24] other bidders became aware only when the Stalking Horse used the settlement consideration in its bid.

33.     *Fifth*, the Debtors provided incomplete information related to the potential estate claims and causes of action and failed to effectively market such assets for inclusion in the Sale. Turnbull Decl., ¶ 30. The Debtors entered into the initial Stalking Horse agreement at the recommendation of the SRC following the SIC's preliminary and admittedly limited investigation into a subset of the Debtors' estate causes of action. Thereafter, the SIC published a report (the "SIC Report"), valuing a subset of the causes of action against a subset of the potential defendants at between $35 million-78 million. At the time the Debtors sent out solicitation materials, the SIC had not completed its investigation. Nor did the SIC Report consider causes of action against Welltower and/or Omega. While the Stalking Horse had the benefit of reading a draft of the Complaint through mediation, no other Bidders were entitled to receive similar information.[25]

---

[24]  M. Andrews Dec. 7, 2025, Dep. Tr. at 139:12-15 ("Q: When did you first discuss [the settlement of the Bold Quail JV interest dispute] with the Debtors? A: Late. I want to say I may have heard about it a day or two before the auction").

[25]  J. Finger Dec. 7, 2025, Dep. Tr. at 106:7-13 ("Q. You're aware that there was a complaint drafted by the Committee making a variety of additional claims. Do you know whether that was shared with anyone in connection with valuing causes of action? A. I don't believe so.").

34.     Finally, by no later than the beginning of second day of the Auction, the Debtors claimed to learn of a potential issue with Genie related to an exclusion agreement between Ari Schwartz, a consultant to Milrose Capital (an investor in Genie), and the Department of Justice, Office of the Inspector General and Department of Health and Human Services. Nevertheless, the Debtors continued the Auction, and permitted Genie to make further Qualified topping bids without concern. Only after the Auction concluded, Sealed Bids were opened, and Genie emerged as the best and highest bid, did the Debtors begin to voice issues with the exclusion agreement.

35.     While the Debtors have professed concern about the impact of the agreement on the sale process, the Debtors did not use the diligence period to raise this with Genie or ask them a single question about it. [26] Instead, after Committee counsel questioned why the Debtors would not give Genie an opportunity to address it, the Committee sent Genie three diligence questions regarding the agreement, including any role Mr. Schwartz may have with Genie and whether such role would implicate the agreement. In their response, Genie confirmed that:

> *Ari Schwartz is not a personal guarantor. To clarify, Mr. Schwartz is not a direct or indirect equity owner in Genie, and Mr. Schwartz will have no going forward involvement with Genie or the proposed transaction. Mr. Schwartz served as a consultant for Milrose Capital in connection with its bids, but will have no going forward involvement in this matter. Mr. Schwartz has a long-term consulting relationship with Milrose Capital pursuant to a verbal consulting agreement and continues to serve in that capacity for other unrelated business. For the avoidance of doubt, no federal health programs will pay Mr. Schwartz for items or services, including administrative and management services, furnished, ordered, or prescribed by Mr. Schwartz in any capacity.*

Desatnik Decl., Ex. 11. The notion that Mr. Schwartz has any role with Genie, including a role that would preclude closing of a sale to Genie, is pure fiction.

---

[26] *See* J. Finger Dec. 7, 2025 Dep. Tr. at 48:3-10 ("Q: . . . So to the extent that . . . [t]he issue regarding Mr. Schwartz's role in the Genie 3 bid surfaced as part of the auction. Did Jefferies do anything to try to work with Genie 3 to address that issue? . . . A: Jefferies did not."). On the other hand, when the Debtors had questions that needed to be resolved related to the account holding the Stalking Horse's financing for the venture, the Debtors made sure to get the necessary information. J. Finger Dec. 7, 2025 Dep. Tr. at 111:16-23 ("Q: And so you would have contacted CPE about it and tried to get additional information. Is that correct? A: Someone would have. Q: All right. And do you know if that happened? A: I believe there may have been an inquiry. It wasn't from Jefferies though.").

36.     On the final day of the Auction, after agreeing to a protocol whereby best and final bids would be submitted in sealed envelopes and the successful bidder would be announced the following day, the Debtors reneged on that agreement and spent twelve days purportedly deliberating before announcing the Successful Bid. It is clear to the Committee that the Debtors were using that time to come up with justifications to select the insider Stalking Horse bid after, to their surprise, the final Genie Bid was higher. During those twelve days, the Debtors refused to share their scorecard or answer any questions regarding their evaluation of the bids.[27] Rather than try to resolve any purported issues to determine if the higher bid is workable, the Debtors appeared to use the time to find reasons to choose the Stalking Horse over a third party. Turnbull Decl., ¶ 31. When the Debtors went back on the record at the Auction, they refused to answer questions, would not provide their updated auction scorecard despite parties requesting they do so, did not provide any explanation for their selection of the Stalking Horse Bid, and would not provide a rationale for failing to designate a Back-up Bid. The Debtors refused to make the bids and auction transcript public, and threatened legal action against those that dared to do so. *See* Examiner Motion, ¶ 11.

## **LEGAL STANDARD**

37.     In determining whether to approve a transaction to a debtor or insider, including a sale under section 363, courts apply a "heightened scrutiny" standard. *In re LATAM Airlines Grp. S.A.*, 620 B.R. 722, 769 (Bankr. S.D.N.Y. 2020); *see also In re Residential Cap., LLC*, No. 12-12020, 2013 WL 3286198, at \*19 (Bankr. S.D.N.Y. June 27, 2013); *In re Med. Software Sols.*, 286 B.R. 431, 445 (Bankr. D. Utah 2002) ("because the asset sale is to a purported insider, the purchaser has a heightened responsibility to show that the sale is proposed in good faith and for

---

[27] J. Finger Dec. 7, 2025 Dep. Tr. at 58:23-59:1 ("Q: All right.  So in the Monday session where the decision was announced, there was no final scorecard shared at that point, correct?  A: I believe that is correct.").

fair value"); *Matter of Porretto*, 761 Fed.App'x. 437 (5th Cir. 2019) (transaction with insider subject to heightened scrutiny. A heightened standard is necessary given that transactions with insiders "are inherently suspect because 'they are rife with the possibility of abuse.'" *In re LATAM Airlines Grp. S.A.*, 620 B.R. at 769 (citation omitted). In *Pepper v. Litton*, the Supreme Court noted that dealings between an entity and its controlling shareholder "are subjected to rigorous scrutiny and where any of [the insider's] contracts or engagements with the [entity] is challenged, the burden is on the [insider to] not only to prove the good faith of the transaction but also to show its inherent fairness." 308 U.S. 295, 306 (1939).

38.     The Fifth Circuit has adopted the Supreme Court's reasoning, holding that "a claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts," and that, when applying this heightened scrutiny to an insider transaction with the debtor, the burden of proof shifts to the insider, *In re Fabricators, Inc.*, 926 F.2d 1458, 1465 (5th Cir. 1991), who then has the burden of proving the "inherent fairness and good faith of the challenged transaction," *Porretto v. Williams (In re Porretto)*, 761 F. App'x 437, 443-44 n.9 (5th Cir. 2019) (citation omitted) (affirming the District Court's decision). This burden has two prongs, requiring a showing that both (a) the process leading to the transaction and (b) the price and terms of the transaction "not only appear fair but are fair." *In re Innkeepers USA Tr.*, 442 B.R. 227, 231 (Bankr. S.D.N.Y. 2010); *see also Pepper*, 308 U.S. at 306-07; *In re L.A. Dodgers, LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (insider DIP financing "requires proof of fair dealing and fair price and terms"); *In re Anchorage Boat Sales, Inc.*, 29 B.R. 275, 278 (Bankr. E.D.N.Y. 1983). As the Supreme Court has explained, this standard "is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders." *Pepper*, 308 U.S. at 307. Likewise, when considering a settlement of claims against insiders (a significant component of the

Stalking Hose Bid), the Fifth Circuit "consider[s] the amount of creditor support for a compromise settlement as a 'factor bearing on the wisdom of the compromise,' as a way to show deference to the reasonable views of the creditors." *In re Foster Mortg. Corp.*, 68 F.3d at 918 (citation omitted).

39. Here, it cannot be credibly contested that the Stalking Horse is an insider and the Stalking Horse Bid is an insider transaction. Despite the Debtors characterizing it as a "related party," concealing Joel Landau's involvement, and arguing that "business judgment" applies, the Court already cut through that argument when it found in connection with the Final DIP Order and Bid Procedures that the Stalking Horse is an insider and subjected the transaction to "extra scrutiny."[28] *See* Aug. 27, 2025 Hr'g Tr. at 206:8-12 ("I don't think the fact that we have an insider bidder who's also a part of the DIP loan is going to chill the bidding . . . . We've given it the extra scrutiny that we should when an insider is involved.").

40. What the Debtors would not admit then, but which is admitted now by its SIC, is that Joel Landau is the "Controlling Investor" in Genesis. SIC Report at 11. The diligence materials produced by the Stalking Horse close the loop that this is an insider sale by acknowledging that Landau is the Stalking Horse's principal.[29] Landau's involvement also extends to the Debtors' lenders. The Debtors have acknowledged throughout these proceedings that the Stalking Horse is an affiliated party of its insiders, including ReGen, WAX, MAO, Pinta, and Landau himself

---

[28] *See* Aug. 27, 2025 Hr'g Tr. at 206:8-12 ("I don't think the fact that we have an insider bidder who's also a part of the DIP loan is going to chill the bidding . . . . We've given it the extra scrutiny that we should when an insider is involved."). The involvement of the supposedly independent SRC does not cure the insider nature of the transaction. The SRC was formed just prior to the Petition Date, after the SIC conducted only a limited investigation, is represented by Landau's chosen counsel and advised by Landau's chosen financial advisor, and did not even receive the cooperation of its limited set of witness and document requests. *See* Section II(b) *infra*. Given the lack of any true separation between the SRC and the rest of the Debtors' leadership, the Court should apportion no persuasive weight to the SRC's blessing of the Stalking Horse Bid.

[29] *See* Desatnik Decl., Ex. 12 at 5 ("Q: Have any of the *principals* of the stalking horse been involved in entities that did not close on sales under section 363 or chapter 11 plans? A: None to our knowledge. To the contrary, entities affiliated with Mr. Landau recently closed on a sale of approximately 44 facilities under a chapter 11 plan in the bankruptcy cases of LaVie Care Centers.") (emphasis added).

(collectively, the "Insiders"). *See* Sale Motion ¶ 10. The Stalking Horse, which is also one of the DIP Lenders, is an affiliate of WAX, "a term loan lender and an entity that shares common beneficial ownership with [ReGen]." *Id*. ¶ 10 n.7.

## ARGUMENT

### I.     THE GENIE BID IS THE HIGHER AND BETTER OFFER

41.     The Debtors cannot meet their burden under the rigorous heightened scrutiny standard because (a) selecting the Stalking Horse Bid over the higher and better Genie Bid is unfair to creditors, who are the fulcrum class of creditors and parties most affected by the selection, and are owed a fiduciary duty, and (b) the Sale is not being proffered in good faith due to numerous violations of the Bidding Procedures and Due Process, among other serious issues.

#### A.     The Stalking Horse Bid Does Not Constitute a Qualified Bid

42.     As a preliminary matter, the Stalking Horse Bid cannot be the *Successful* Bid because it does not even meet the requirements to be a *Qualified* Bid. A bid must satisfy all Qualified Bid requirements to be a Qualified Bid.[30] Two of these requirements are particularly important: (1) Good Faith Deposit ("The Bid must be accompanied by a cash deposit in the amount equal to ten percent (10%) of the cash component of the Bid…"); and (2) Back-Up Bid commitment ("Each Bid shall provide that the Acceptable Bidder will serve as a Back-Up Bidder…"). Bidding Procedures § IV(b), (u). Both requirements are **mandatory** and **non-waivable**:

> Notwithstanding the foregoing sentence, to be a Qualified Bid, *each* Bid must satisfy the provisions of subsections/subparagraphs: 4(b) (Good Faith Deposit), 4(f) (No Qualified Bidder Bid Protections), 4(u) (Back-Up Bid), and 4 (x)(No Fees), as the foregoing waiver does not apply to these subsections/subparagraphs.

---

[30]   Bidding Procedures § XI(a), ("Only Qualified Bidders may participate in or make subsequent Bids at the Auction."); § IV ("Only Bids fulfilling all of the preceding requirements … may be deemed to be qualified bids").

43.     In exchange for serving as the stalking horse, the Stalking Horse Bid was arguably excused from these requirements *for its initial bid.* Bidding Procedures § IV(4)(o) ("the Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse APA is a Qualified Bid."). Importantly, the Bidding Procedures do not state that any *subsequent* topping bid made by the Stalking Horse is also deemed a Qualified Bid. This silence is dispositive, because § XI(a) prohibits the Stalking Horse from making Overbids unless its bid is Qualified. And, every subsequent bid is a new "Bid" that must comply with all non-waivable requirements.[31]   Thus, any Stalking Horse topping bid must include a ten percent (10%) deposit and a Back-Up Bid commitment. The Bidding Procedures Order contains no exemption for the Stalking Horse in this respect.

44.     The final Stalking Horse Bid is not a Qualified Bid because it failed to (a) timely make a Good Faith Deposit and (b) commit to be a Back-Up Bid, both in violation of the Bidding Procedures Order and conferring it an unfair advantage relative to other bidders.

45.     Unlike its prior bids, the final Stalking Horse Bid appears to commit to fund a $10 million cash deposit.[32] Despite a requirement to submit that deposit within one business day of submitting its Bid, Bidding Procedures at 10, the Stalking Horse inappropriately conditioned its submission of its deposit on being selected as the Successful Bidder, and continues to default on that obligation under the Bidding Procedures. The deposit was not funded within one business day of November 19, 2025, when the final Stalking Horse Bid was submitted, nor within ten business days of being named as Successful Bidder, and has since apparently been delayed another ten business days. Stalking Horse APA, § 3.02. The Stalking Horse Bid is not a Qualified Bid.

---

[31]   Bidding Procedures § XI(a); § IV ("each Bid must satisfy … 4(b)… 4(u)… as the foregoing waiver does not apply…").

[32]   *Id*., § IV(b) ("To the extent that a Bid is modified at or prior to the Auction, the applicable Acceptable Bidder must adjust its Good Faith Deposit so that it equals ten percent (10%) of the increased aggregate cash component of the Bid promptly and in no event later than one business day following the conclusion of the Auction")

46.    As the Auction progressed, the Stalking Horse continued to refuse to serve as a Backup Bid. Despite the Committee and other bidders raising this objection to the Debtors, the Debtors did not demand the Stalking Horse make this commitment,[33] a requirement that is not waivable under the Bid Procedures. This preferential treatment sharply contrasts with the Debtors' disqualification of Olumie for not agreeing to be a Back-up Bid. Turnbull Decl., ¶ 9. Moreover, even if the Stalking Horse had agreed to be a Back-up Bid, because it would only make the $10 million deposit if it were the Successful Bid, there would be nothing to hold it firm to a Back-up commitment and it could effectively walk at any time without repercussion.[34] Because the Stalking Horse Bid is not a Qualified Bid, the Court cannot approve the Sale to the Stalking Horse.

**B.    The Genie Bid is Higher Even on the Debtors' Auction Scorecard**

47.    Since the Auction concluded, the Debtors have refused to share or make available to either the Consultation Parties (at least, not the Committee as a Consultation Party) or the competing Bidders the final version of the Auction Scorecard, which had been updated and displayed to all parties during each of the later rounds of bidding. The Debtors have not done so because it would make the outcome irrefutable—the Genie Bid is significantly higher and beats the Stalking Horse Bid by over $20 million even based on the Debtors' slanted valuations. This was confirmed by Mr. Snyder on behalf of the SRC during his deposition.[35] Evaluated

---

[33] Nov. 18, 2025 Auct. Tr. at 45:13-14 ("Mr. Muenker: . . . We don't agree that any deposit is required."); Nov. 19, 2025 Auct. Tr. 7:23-8:6 ("Mr. Zluticky: . . .Mr. Muenker, is the Stalking Horse bidder willing to serve as the backup bidder in the event that it is not named as a successful bidder?" "Mr. Muenker: . . . We stand by the terms of our bid, and we'll fully comply with the bid procedures order." "Mr. Zluticky: . . . Mr. Muenker, that is not responsive.").

[34] While the Stalking Horse professes to have also included its portion of the DIP loan as a deposit, this characterization is a falsity as it is contingent upon the DIP not being in default, which would be triggered by the selection of an alternative purchaser. *See* Final DIP Order, Ex. A, § 8(o)(xx) (triggering a DIP default if the Debtors file a motion to sell their assets to a party to which the Stalking Horse and other DIP Lenders do not all consent).

[35] W. Snyder Dec. 7, 2025 Dep. Tr. at 169:24-170:5 ("Q: On the final scorecard, in terms of total bid consideration, which bid was higher? A: The Genie 3 bid was higher by like 20 million."); *see also* J. Finger Dec. 7, 2025 Dep. Tr. at 53:10-14 ("Q:Do you know what the value of the sealed bid of the [S]talking [H]orse was? A: . . . I believe the bid [the Stalking Horse] gave us they would have said was like $983 [million]."); 58:7-10 ("Q: Okay. And based on the updated scorecard, who had the higher bid?  A: I believe the higher bid was Genie 3.").

appropriately, as set forth in the Committee Scorecard and described further below, the Genie Bid exceeds the Stalking Horse Bid by upwards of hundreds of millions of dollars of additional value to the Debtors' estates. The Court should deny the Sale because the Genie Bid is substantially higher and better than the insider Stalking Horse Bid.

48.    At the outset of these chapter 11 cases, as the Debtors testified, general unsecured creditors were likely to receive "zero" recovery from the Stalking Horse Bid. Aug. 21, 2025 Hr'g Tr. at 113:10-13. The Auction process, though slanted in favor of the Stalking Horse, nonetheless generated significant additional consideration to the Debtors' estates. In fact, under either the Stalking Horse Bid or the Genie Bid, value near or above a hundred million dollars will flow to general unsecured creditors on account of their claims. Nov. 25, 2025 Hr'g Tr. at 12:12-15. The major difference between the two Bids, at least as assessed by the Debtors, is who receives that value. Under the Genie Bid, the estates will receive over $316.5 million in immediate cash (inclusive of the "Bold Quail Settlement"), plus a $100 million promissory note, sufficient (along with Genie's agreement to assume the White Oak and IRS secured debts) to satisfy all purported secured and priority claims and provide general unsecured creditors a ratable share of the excess, while also benefiting from the significant upside available from all of the estates' causes of action, which would be left behind. Meanwhile, under the Stalking Horse Bid, the Debtors' insiders will have their secured, unsecured, and subordinated debts repaid in full while non-favored general unsecured creditors such as the Debtors' tort victims will be left with nothing.

49.    An analysis of the Auction Scorecard on the Debtors' valuation makes clear the Genie Bid exceeds the Stalking Horse Bid in total consideration to the Debtors' estates. Under the Auction Scorecard, the Genie Bid provides an aggregate total of approximately $1.003 billion to the Debtors' estates, over $20 million greater than the Stalking Horse's $982 million bid. The

26

difference is even more pronounced under the Committee's scorecard, with the Genie Bid

providing an aggregate total of approximately $1.106 billion, approximately $125 million more

than the Debtors' valuation of the Stalking Horse Bid.

50.     Even though the Genie Bid is higher than the Stalking Horse Bid using the Debtors'

own valuations, the gap is exponentially wider on the Committee's Scorecard because it corrects

for a number of improper valuations:

- Discount for Assumption of Disputed Secured Debt: The Debtors unfairly overvalue the Stalking Horse Bid by giving it full dollar-for-dollar credit for its assumption of disputed secured debt. The Committee has filed claim objections to the Term Loan debt of Welltower, Omega, and WAX/MAO.[36] The Stalking Horse Bid effectively attempts to credit bid secured debt that it does not own as its currency to purchase the assets. But a third party cannot have greater rights to credit bid than the holder of the debt itself. Courts in the Fifth Circuit have made clear that a party may credit bid under § 363(k) only to the extent it holds an allowed, secured claim, and once a claim is objected to, it is no longer "allowed" within the meaning of § 502(a) and therefore cannot support a dollar-for-dollar credit bid. *See Simmons v. Savell (In re Matter of Simmons)*, 765 F.2d 547, 552–53 (5th Cir. 1985) (an objected to claim is only deemed allowed until an objection is filed, and cannot be allowed until that objection is resolved). Courts in this District apply the same rule in the section 363 context, holding that the right to credit bid is limited to the amount of an allowed secured claim, and that where the validity, extent, or priority of the lien is in bona fide dispute, the court may—and should—deny or limit credit bidding "for cause." *See In re Free Lance-Star Publ'g Co.*, 512 B.R. 798, 805–06 (Bankr. N.D. Tex. 2014) (denying credit bid where liens were subject to challenge and therefore not unquestionably secured); 11 U.S.C. §§ 363(k), 502(a). Accordingly, when a claim has been objected to, the creditor does not possess an allowed secured claim and cannot credit bid at full face value; at most, any credit bidding must be discounted or conditioned to reflect the unresolved dispute. This principle prevents exactly the kind of distortion the Debtors seek here—treating disputed, and potentially avoidable, insider debt as if it were indisputably worth 100 cents on the dollar.

- Reduction of Genie and Stalking Horse Bid: The Debtors' application of "risk adjustments" to the competing bids further underscores the arbitrary and results-

---

[36] *See generally* Complaint and Term Loan Claim Objection.  As stated on the Auction record by Debtors' counsel Dan Simon: "In order to facilitate the ongoing mediation, the committee has not yet filed its standing motion or the complaint, a draft of which was provided to the lenders and the debtors. . . . The lenders and the debtors agree that the rights of all parties at the auction and any hearing on approval of the motion to approve the winning bid at the auction will be determined as though the standing motion, complaint, and the [] claim objection had been filed with the court prior to the auction."  Exhibit 37 at 14:14-15:3.

driven nature of their valuation. Although they reduced the Stalking Horse bid by only $15 million for what they labeled the "UCC Sale Hearing Objection" risk adjustment, they applied nearly **double** that discount to the Genie Bid under the guise of a "First Lien Litigation Estimate." There is no legal or economic basis for imposing any such reduction—let alone a disproportionate one—because the first-lien secured claims are indisputably paid **in full** under the Genie Bid. When secured creditors are unimpaired and receive full cash satisfaction, there is no conceivable litigation risk that justifies discounting the consideration offered by the higher bid. The Debtors' asymmetric adjustments therefore lack rational grounding and function only to artificially depress the Genie Bid's value relative to the insider Stalking Horse Bid.

- <u>WAX Note Valuation</u>: The final Stalking Horse Bid provides $27.5 million in face value of WAX Notes that the Debtors value at $25 million. This valuation is drastically at odds with the fact that approximately $80 million of this debt was sold by Welltower to Joel Landau for $10,000 in the months prior to the Petition Date. Complaint, ¶¶ 240, 253. In other words, the market has demonstrated the debt is virtually worthless. Moreover, the Debtors ascribed zero dollars to the Stalking Horse Bid's assumption of that same debt because the SIC found a high likelihood that the debt would be disallowed or avoided.

- <u>Genie Promissory Note</u>: The Debtors valued Genie's $100 million face value unsecured promissory note at $73 million. This was using a discount rate during the auction before Genie revealed they would be infusing $120 million of equity value into the business, materially deleveraging the successor. The Committee believes the note is more appropriately valued at $80 million as a result of the reduction in leverage and financial projections. Turnbull Decl., p. 15.

- <u>Estate Causes of Action</u>: The most significant difference between the Auction Scorecard and the Committee Scorecard relates to the valuation of the estate causes of action. The Debtors valued the estate causes of action at only $17 million (net of insurance policy coverage), after purportedly accounting for collectability, the probability of success (litigation risk), and cost to litigate. Taylor Decl., ¶ 20. This despite the fact the SIC valued a *subset* of the actions at $35 million-78 million after accounting for probability of success. It is the Committee's understanding the Debtors applied an additional 70% discount for costs of litigation and collectability, which is drastically out of proportion to those realities. *Id.* at ¶ 26. The Debtors, however, did not ascribe a single penny of value to the actions against Welltower, Joel Landau, and others outlined in the Complaint, because neither they nor their SIC did any investigation into them. Moreover, despite significant evidence beyond the scope of that which the SIC was able to uncover, the SIC attributed no additional value to the causes of action against Welltower. Regardless of divergence in perspectives on the merits, it is completely unjustifiable to value those actions at zero dollars. The SIC's investigation and valuation of the actions it did investigate is deficient because it did not benefit from the discovery the Committee obtained from Welltower. The SIC's investigation is deficient compared to the Committee in several ways. The SIC states it "requested an Investigation interview with a

28

Welltower representative," but "Welltower…did not agree to sit for an interview," offering instead a written high-level summary.[37] Welltower's counsel also said Welltower was "not prepared to incur the expense and spend the time" to review records to produce communications with certain individuals (Joel Landau and David Gefner), characterizing any such production as duplicative.[38] The SIC further notes that it asked Joel Landau to produce emails and electronic communications responsive to search terms, but "responsive documents were not provided".[39] As explained in the Taylor Declaration, the Committee believes the appropriate value of all actions, including the actions in its Complaint are worth between $106.8 million to $178.1 million (a midpoint of $142.4 million). *Id.*, ¶ 82.

### C. The Genie Bid is Better Qualitatively

51. The Committee acknowledges "the highest bid is not always the best bid," but that is only the case where the debtor demonstrates "conditions sufficient to overbalance the difference between the two [bids]." *In re Tresha-Mob, LLC*, 2019 WL 1785431 at *2 (Bankr. W.D.Tex. 2019) (quoting *United States v. Chem. Found.*, 5 F.2d 191, 206 (3d Cir. 1925)). Regardless of whether the Court determines the Genie Bid exceeds the Stalking Horse Bid by $20 million or $250 million, that it is a higher bid is not reasonably disputed. The Debtors cannot overcome the chasm between the two bids on qualitative factors because the Genie Bid is superior on a qualitative basis as well.

52. In the Notice of Successful Bidder, the Debtors identify six (6) non-quantitative factors considered in evaluating the two competing WholeCo Bids in addition to the regulatory considerations. Notice of Successful Bidder at 3-4. As set forth below, Genie meets or exceeds the Stalking Horse in each qualitative metric as well.

53. First, on *likelihood of closing*, the record demonstrates that Genie offers far greater execution certainty than the insider Stalking Horse. Genie has committed financing, has shown bank accounts with funds necessary to make the committed equity infusions, has already advanced a substantial, non-refundable $25 million deposit—multiple times the Stalking Horse's tentative

---

[37] Exhibit 33, August 20, 2025 Katten letter to B. Rosen.

[38] Exhibit 68, June 30, 2025 Email from J. Krause to D. Barnowsi.

[39] Exhibit 33, August 20, 2025 Katten letter to B. Rosen.

and still-unfunded deposit—and has provided confirmatory lender correspondence, an updated lender term sheet and commitment letter from a sophisticated healthcare lender, and personal guarantees. Its diligence responses were detailed, timely, and substantiated with supporting materials. By contrast, the insider Stalking Horse repeatedly has refused to provide financing details, asserting it was "not authorized" to disclose the very information necessary to evaluate its ability to close.[40] It offered only a delayed deposit—fundable ten days after selection—and made clear that its purported contribution of DIP funds could evaporate if it engineered a DIP default. The contrast is stark: Genie has put real capital and real commitments at risk, while the Stalking Horse has carefully preserved optionality. On this fundamental metric, only Genie gives the estates, patients, and creditors the certainty that a transaction will close.

54.     Second, the ***net economic effect*** of the two bids reinforces Genie's superiority. Genie proposes a capital structure grounded in substantial fresh equity—at least $120 million—paired with a modest, sustainable senior-secured financing package. Its post-acquisition balance sheet is deliberately de-levered, providing ample liquidity and preserving headroom to service the unsecured note payable to the estates. The Stalking Horse, by contrast, would saddle the post-sale Debtors with over half a billion dollars of insider-aligned secured and unsecured obligations, on top of an already distressed operational platform. Its refusal to clarify whether the WAX, MAO, and ReGen debts—totaling approximately $535 million—will be assumed, released, or forgiven renders its true leverage incalculable. The Stalking Horse would not identify its day-one liquidity, its refinancing maturity schedule, or even the terms of its own promissory note. Moreover, the

---

[40] *See* M. Andrews Dec. 7, 2025, Dep. Tr. 197-199 (Stalking Horse's authorized representative testifying regarding his lack of knowledge of the Stalking Horse's bank account, including who opened it, the amounts currently therein, and who has access).

Genie Bid leaves behind for the estate indisputably valuable claims and causes of action which provide incremental value for creditor recoveries.

55.     Third, as to *tax consequences*, the Committee is unaware of, and neither the Debtors nor the bidders have disclosed, any tax advantage that one bid holds over the other. To the extent the Stalking Horse may be able to take advantage of net operating loss (NOL) tax attributes due to its insider nature, those NOLs are unencumbered assets and the benefit of that use would inure to the Stalking Horse and not the Debtors' estates. The Stalking Horse should be required to furnish additional consideration for those NOL attributes that it is acquiring and that Genie would not acquire.

56.     Fourth, on *certainty of plan confirmation*, Genie offers a cleaner and more confirmable path. Because Genie intends to pay asserted secured and priority claims in cash (to the extent valid and perfected), the estates can hold proceeds in escrow pending resolution of claim objections and then allocate the cash according to creditors' valid rights and priorities. No structural or legal impediment bars a plan funded by the Genie Bid. The Stalking Horse Bid, by contrast, imports multiple threshold plan-confirmation defects into a section 363 sale: it dictates creditor recoveries by assuming debts in full that are subject to pending objections, it provides value to subordinated claims in violation of absolute priority, and it settles claims against insiders without even setting forth how such a settlement satisfies the requirements of Rule 9019, let alone actually satisfying them. It also makes substantive consolidation a *fait accompli*. In short, Genie enhances confirmability; the Stalking Horse undermines it.

57.     Fifth, the *operational history and future viability* of the competing bidders favor Genie. Genie's partners collectively manage healthcare facilities with an average CMS rating of 2.8, and they presented detailed transition, clinical quality, and regulatory compliance plans

31

supported by credible operators (Milrose and Integro). Their materials demonstrate familiarity with distressed turnarounds and a plan to stabilize and improve patient care from day one. The Stalking Horse provided none of these elements. It offered no CMS data,[41] no operational decks, and no concrete plan to reverse the catastrophic decline that occurred under its own watch—decline that included multiple "immediate jeopardy" findings, significant tort exposure, and the bankruptcy of Genesis, LaVie, and Corizon. Its bid relies on the same management ecosystem responsible for the liabilities that plunged Genesis into chapter 11.[42] The Stalking Horse provides no insight into any changes it intends to make in the operations that have heretofore resulted in poor and diminishing patient care, poor financial performance, and secretive, inappropriate transactions. Moreover, the Stalking Horse provided no clarity on its post-acquisition capital structure, including whether it would be assuming $550 million in insider debt, or such debts would be waived. If the go-forward company is carrying over half a billion extra in debt on its balance sheet, the risk of a future bankruptcy filing is dramatically increased. For a healthcare enterprise whose ongoing viability is fundamental to the value of the estates' long-term notes, the difference between the two bidders is not merely qualitative—it is existential.

58.    With respect to *employee impact*, both bidders purport to preserve the Debtors' workforce and assume PTO liabilities, but only Genie pairs that commitment with a capital and operational structure capable of supporting stable employment. Genie's robust liquidity profile— approximately $30 million cash at closing plus $80 million–$100 million in additional availability—provides cushion for payroll, training, compliance, and recruitment necessary to

---

[41] As previously explored in the *Declaration of Narendra Ganti of FTI Consulting, Inc., Financial Advisor to the Statutory Unsecured Claimholders' Committee, in Support of Objections of the Statutory Unsecured Claimholders' Committee to the Debtors' Various Requests for Relief* [Docket No. 415] (the "Ganti Decl."), Genesis' CMS Five-Star Ratings have fallen precipitously from 2.98 stars to approximately 2.29 since Landau's takeover.  Ganti Decl., ¶¶ 26-27.

[42] *See* M. Andrews Dec. 7, 2025, Dep. Tr. 250:18-255:8.

rebuild an overstressed labor environment. The Stalking Horse, by contrast, has declined to state how much cash it will have at closing and relies on heavily leveraged insider financing that leaves little margin for wage continuity or quality-of-care investments. Employees, like residents and vendors, rely on a functioning operator with adequate capitalization; Genie alone provides that foundation. When these factors are assessed collectively, they reinforce the same conclusion reached by every constituency whose recoveries are at risk: Genie's Bid is not only higher economically but overwhelmingly superior on every material qualitative dimension.

59. In addition to the six qualitative factors described above, the Genie Bid is qualitatively superior because it comports with creditors' rights under the Bankruptcy Code and advances the core policies of transparency, fairness, and accountability. Unlike the insider Stalking Horse Bid, the Genie Bid would preserve all estate causes of action for the benefit of creditors—an outcome courts recognize as essential to maximizing recoveries and ensuring that avoidance and fiduciary-duty claims serve their intended purpose. *See In re McInerney*, 499 B.R. 574, 587–88 (Bankr. E.D. Mich. 2013). Genie does not dictate creditor recoveries by pre-ordaining disputed secured and insider claims as valid; rather, it provides fungible consideration—$316.5 million in distributable cash and a $100 million note—that can be allocated in accordance with the results of the Committee's pending objections and the Code's priority scheme.

60. The Committee anticipates the Debtors will try to focus the Court's attention to professed regulatory concerns relating to the alleged involvement of Mr. Ari Schwartz in advising one of the investors financing Genie's Bid, and the exclusion agreement he entered into with the Department of Justice. While the Committee appreciates the seriousness of the issues, it has looked into them extensively, and has concluded, in consultation with numerous experts in the field, that, as a factual and legal matter, Mr. Schwartz' exclusion agreement has no bearing on a sale to Genie.

61.    Responses to joint diligence requests from the Debtors and Consultation Parties show that Ari Schwartz is not a member, employee, director, or principal of Genie, and has no involvement in Genie's operations. *See* Turnbull Decl., ¶ 32. He serves only as a real estate consultant to a third-party investor in Genie.

62.    From a common-sense standpoint, no investor or lender would agree to put hundreds of millions of dollars on the line if they believed there was even a slight risk of exclusion where governmental revenues make up a majority of the Debtors' revenues, and especially not the sophisticated financiers involved in the transaction.

### D.    *The Genie Bid Leads to a Confirmable Plan*

63.    If the Debtors had proceeded with a sale motion to Genie, there would have been no barrier to the Court approving it under section 363. Under section 363(f), the trustee may sell property free and clear of any interest if there is consent or "(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (4) such interest is in bona fide dispute; or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." The Genie bid need only satisfy one of these prongs, but satisfies several of them. With respect to the asserted Welltower/Omega and WAX/MAO secured debts, those are in *bona fide* dispute via the Committee's pending claim objections. In any event, the aggregate cash funded by the Genie Bid of $316.5 million (according to the Debtors) is greater than the aggregate value of non-assumed liens asserted in the property.

64.    Once the sale is approved, any valid liens of these asserted secured creditors would attach to the proceeds. *Republic Nat'l Bank of Dallas v. Fitzgerald (In re E.A. Fretz Co.,)*, 565 F.2d 366, 369 (5th Cir. 1978). ("Fretz's equipment and inventory were sold pursuant to Court order. Valid liens and encumbrances were to attach to the proceeds of the sale."). A plan is confirmable so long as it provides these secured lenders the collateral subject to their liens. 11 U.S.C.

34

§ 1129(b)(2)(A)(iii); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 647 (2012) ("…[clause] (iii) is a residual provision covering dispositions under all other plans—for example, one under which the creditor receives the property itself, the 'indubitable equivalent' of its secured claim."); *Sandy Ridge Dev. Corp. v. La. Nat'l. Bank (In re Sandy Ridge Dev. Corp.)*, 881 F.2d 1346, 1350 (5th Cir. 1989) ("…the transfer on plan approval of all its collateral to a secured creditor… gives that creditor the indubitable equivalent of its secured claim.").[43] While those claims do not need to be paid in their full asserted amount to confirm a plan, *the Genie bid provides enough consideration to pay them in full even if they are found to be fully valid and secured in the asserted amounts*. This conclusion is supported by the SRC's concessions that, under either bid, the unsecured creditors are the fulcrum security. Nevertheless, below is an explanation of how Genie's bid covers all asserted secured claims.

65.     **White Oak ABL**. The White Oak ABL of $278 million is being assumed in full under both the Genie and Stalking Horse bids.

66.     **The Asserted Welltower/Omega Term Loan.** Welltower and Omega assert a secured term loan in the amount of $254 million. Genie's bid provides cash of $259 million plus $57.5 million from the Bold Quail transaction, for a total cash of $316.5 million. This cash amount can be put in escrow and would satisfy the Welltower/Omega term loan in full to the extent of a valid security interest, leaving behind a minimum of $62.5 million.

---

[43] The confirmation structure in *Sanchez Energy*—which allowed the Chapter 11 plan to go effective while reserving lien litigation for post-confirmation adjudication—complies with the Bankruptcy Code and 11 U.S.C. § 1129(b). The plan preserved secured creditors' rights by conditionally allocating sale proceeds (in the form of reserved equity) pending a final determination of lien validity. If the liens were upheld, the secured creditors would receive the full value of their collateral, satisfying the "fair and equitable" requirement. *See In re Sanchez Energy Corp.*, No. 19-34508, 2020 WL 3125276, at *3–4 (Bankr. S.D. Tex. Apr. 30, 2020). The Fifth Circuit later reversed a post-confirmation ruling on unrelated grounds without questioning the plan's confirmation or structure. *See In re Sanchez Energy Corp.*, 139 F.4th 411, 417–18 (5th Cir. 2025).

67.    **The Asserted WAX/MAO secured debt**. WAX/MAO assert secured debt in the amount of $94 million. This debt was purchased by WAX/MAO for $10,000 prior to the petition date, *see* Complaint at ¶ 90, and the SIC has concluded a 70% likelihood it would be found to be invalid and/or disallowed. In the unlikely 30% chance it is found to be valid, the Genie bid provides consideration to more than satisfy this debt in full. The Debtors value Genie's $100 million promissory note at $73 million and the estate causes of action at $32 million and preference claims at $27 million. In addition to the $62.5 million in residual cash, the Genie bid has value of $194.5 million to provide the "indubitable equivalent" of $94 million to satisfy this claim. *See* 11 U.S.C. § 1129(b)(2)(A)(iii) (cramdown of secured debt is permitted so long as plan provides "for the realization by such holders of the indubitable equivalent of such claims".

68.    **DIP Loan**. The DIP Loan balance is projected to be approximately $34 million as of closing. Even if the WAX/MAO debt must be satisfied in full, there would be $100.5 million in value available to fully satisfy the DIP.

69.    **Assumption of other secured and priority debts**. The Genie bid assumes in full asserted secured debts from the IRS of $86 million and asserted priority provider assessment claims, among others.

70.    **No risk of administrative insolvency**. The Debtors' financial projections used at the Auction project positive cash of $4 million *after* satisfying all administrative expenses. The Committee anticipates the Debtors and lenders will threaten a DIP default as a reason why the Stalking Horse Bid is superior. Given the DIP Loan will be paid in full under the Genie Bid, Genie can prepay the purchase price (including its funded $25 million deposit) as a replacement DIP.[44]

---

[44] Moreover, there is no basis for the DIP lenders to call a default since the DIP is being paid in full under the Genie bid. The threat is not credible because doing so would amount to throwing the baby out with the bathwater as these lenders would lose the repayment of hundreds of millions on their secured debt and go-forward lease partner.

71.      The SRC also testified, erroneously, that the Genie bid risked administrative insolvency because the Committee would consume estate resources litigating estate causes of action. . This is incorrect. The Genie bid would obviate the need for litigation of the estate causes of action during the case. Those actions would be placed into a liquidating trust that would pursue them with trust assets, not estate funds and only after secured and admin claims were satisfied in full.

72.      As discussed below, it is the Stalking Horse bid that would not give rise to a confirmable plan because it dictates creditor recoveries on disputed claims and violates foundational rules of absolute priority and unfair discrimination, among other issues.

## II.    THE STALKING HORSE BID IS NOT IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND CANNOT BE APPROVED

### A.    The Stalking Horse Bid Does Not Withstand Rigorous Scrutiny

73.      Since the Genie Bid is higher and better, the Debtors' selection of the insider Stalking Horse does not withstand rigorous scrutiny. However, even if the Court were somehow to determine the Stalking Horse bid is higher and better, the Sale pursuant to the Stalking Horse Bid would still fail to withstand rigorous scrutiny because of the issues with process, good faith, and the obligation to restructure through a plan rather than a section 363 sale.

#### 1.    *No Evidence of a Fair Process Leading to the Stalking Horse Bid*

74.      To obtain approval for a deal with an insider, the Debtors must show that the process leading to the agreement was entirely fair. *In re Innkeepers USA Tr.*, 442 B.R. at 231. Where an agreement with an insider "was not 'shopped' in the market prior to signing," the agreement is not the product of a fair process. *Id.* Here, despite having retained Jefferies, LLC over two months prior to the Petition Date, the Debtors concede that they did **no** prepetition marketing before inking the Stalking Horse Term Sheet. Aug. 27, 2025 Hr'g Tr. at 85:15-19. The Debtors

also admit that no other party was ever engaged regarding serving as the stalking horse. *Id.* In fact, almost two months before these Bankruptcy Cases were filed, the Debtors outlined their Reorganization Roadmap in a presentation. The roadmap showed they would file the case with an insider DIP to achieve an insider sale. In their own words, they sought a venue favorable on insider releases and insider transactions.

75.     The Debtors' sale process began with an initial Stalking Horse Bid negotiated by the Debtors through Landau's hand-selected financial advisor and without any input or involvement from either the insider-anointed SRC or the Debtors' investment banker. From there, the process was abused every step of the way to insulate the Stalking Horse Bid from competition.

76.     Before the Auction had even commenced, interested bidders were withdrawing from the process in the face of a "stacked deck" in favor of the Stalking Horse. Turnbull Decl., Ex. A. At the Auction itself, again, the Debtors acted to protect the Stalking Horse by disqualifying Olumie from participating in the Auction because it would not agree up-front to serve as a backup bidder. Olumie had submitted a $5 million deposit and an otherwise qualifying bid, but this single point of contention—one somehow less troublesome when the culprit is the Stalking Horse—was sufficient to eliminate a third-party competitor from the bidding.

77.     More substantively, during the Auction, it became apparent quickly that the Stalking Horse was privy to material information about the Debtors and their assets that was not disclosed to other parties in the process. For example, the Debtors omitted key information and provided materially misleading diligence materials. The Debtors asked each bidder to utilize the Debtors' five-year go-forward projections as the basis for their assessment of the business' profitability, debt capacity, and other factors. As mentioned above, incorporated into the Debtors' projections were revenues from the presumptive operation of the PA-22 facilities, concealing that

38

the lease for the PA-22 Facilities contained a "poison pill" provision permitting the landlord to unilaterally terminate the leases on 30 days' notice for any reason (a termination that would be exercised if any non-Landau entity sought to acquire the facilities). Even more troubling was that the Debtors had entered into an operations transfer agreement (OTA) for the PA-22 Facilities that was not disclosed to other bidders until the evening before the Auction. The OTA effectively foreclosed potential bidders from continuing to operate the PA-22 Facilities and bidders were not aware that Debtors had egregiously misrepresented the revenue base over which the bidders were competing by over $400 million.

78.     Additionally, the Debtors did not disclose to any bidders that, on November 17— the *day before* the Auction—they entered into a term sheet with NewGen to resolve a dispute regarding the Bold Quail facilities, effectively selling the interests in those facilities for $57.5 million. While that information was disclosed to the Stalking Horse, who used the consideration from the settlement to increase its bid and become a topping bid, it was only disclosed to other Bidders afterwards who then were forced to respond in kind without having conducted any diligence. The Stalking Horse itself admitted that this information was important for any bidder attempting to bid on the Debtors assets and that the Stalking Horse was updated about this development at least a few days prior to the auction.[45]

79.     Altogether, these informational asymmetries and procedural deficiencies severely tainted the Sale process undertaken by the Debtors and run roughshod over the Auction process

---

[45] M. Andrews Dec. 7, 2025 Dep. Tr. 143:16-145:13 ("Q: Was it important to CPE that it be kept apprised of changes to [Bold Quail] a joint venture asset that it was intending to purchase? A: Like any bidder, you want to know things that are – changes to the asset that you are acquiring. So you want to know if there were things that were happening to that asset . . . . Q: Yeah, they are doing their best to keep CPE 88988 LLC informed as best they could?  A: As they would have anybody else.  Q: You would have expected that same information to be provided to anyone else?  A: Yes.").

approved by this Court. Because there was no fair process, the Stalking Horse Bid cannot meet the entire fairness standard and should not be approved.

## 2. *The Proposed Sale Violates Fundamental Due Process Requirements*

80.     Section 102(1) of the Bankruptcy Code defining the requirement of "notice and a hearing" is grounded in "fundamental notions of procedural due process." *In re Savage Indus., Inc.*, 43 F.3d 714, 721 (1st Cir. 1994). Courts have long held that due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties" of matters affecting their rights and to permit a meaningful opportunity to object. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). *See also Owens-Corning Fiberglas Corp. v. Ctr. Wholesale, Inc. (In re Ctr. Wholesale Inc.),* 759 F.2d 1440, 1449 (9th Cir. 1985) (holding that short notice of a dispositive hearing "violated the requirements of the Due Process Clause" and was insufficient to permit creditor to prepare and present objections); *In re Garland Corp.*, 6 B.R. 456, 459 (Bankr. 1st Cir. 1980) ("The right to be heard 'has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest.'" (citation omitted)). Section 363(b)(1) incorporates these constitutional principles by permitting a debtor to sell estate assets outside the ordinary course only after notice and a hearing that are appropriate under the circumstances, and only after providing parties in interest a fair opportunity to evaluate and challenge the proposed transaction. 11 U.S.C. §§ 102(1), 363(b)(1). A section 363 sale is therefore permissible only where parties in interest have the information and opportunity necessary to stress test the debtor's process and challenge insider favoritism.

81.     The Debtors' approach violates these foundational requirements. By designating the Auction transcripts and competing bids as "confidential" and threatening litigation against anyone who discloses them, the Debtors have prevented parties in interest—especially the general unsecured creditors whose recoveries turn on this Sale—from determining whether the insider

40

Stalking Horse Bid is in fact the highest and best. Deprived of the very materials necessary to the assess the Bids and the Debtors' conduct at the Auction, creditors cannot meaningfully test its legality. Without access to this core information, they have been denied the "meaningful opportunity to object" that due process requires.

82. Compounding this secrecy is the Debtors' refusal to provide even basic disclosures. They have not articulated why they selected the Stalking Horse Bid over the Genie Bid, are withholding until the hearing their reasons for declining to even name Genie as Back-Up Bidder, and refuse to disclose the Auction Scorecard or other metrics used to evaluate "highest and best" for the Sealed Bids. At the auction itself, the Debtors declined to answer any questions regarding their determinations. Creditors cannot evaluate the Debtors' supposed decision-making if the Debtors do not explain the bases for their decision. This opacity is incompatible with Section 363(b), which presupposes transparency sufficient for parties in interest to evaluate the merits of a proposed sale.

83. Even assuming the Debtors had been willing to make these disclosures, the outrageously truncated timeline from the announcement of the Successful Bidder to the Sale Hearing is itself an independent due process violation. *See In re Bombay Co.*, 2007 WL 2826071, at *3 (Bankr. N.D. Tex. Sept. 26, 2007) (warning that the "forced nature" of an accelerated sale schedule is "inconsistent with the Code, due process of law, the exercise of the court's authority and simple common sense"). Here, the Debtors took twelve days to select a successful bidder, but have allotted creditors only eight days to conduct discovery, analyze competing proposals, prepare expert and fact testimony, and file objections—while other parties have no opportunity at all because they were barred from accessing Auction information. This asymmetry mirrors the very

"time trap" condemned in *Bombay*, where truncated notice paired with a dispositive hearing was deemed insufficient to enable creditors to "assess fully the proposed transaction." *Id.*

### 3. *The Stalking Horse Bid's Terms Are Not Fair*

84. To pass muster under the entire fairness standard, the Debtors must also demonstrate the substantive terms of the Stalking Horse Bid are fair. *In re L.A. Dodgers, LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) (insider DIP financing "requires proof of . . . fair price and terms"). The Debtors have not met that burden. Indeed, it is impossible for them to meet that burden because, as described below, the Stalking Horse Bid impermissibly circumvents the Bankruptcy Code's protections for creditors, and offers less value than can otherwise be obtained through a plan. *See Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983); *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1227-1228 ("Undertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan").

### a. *The Stalking Horse Bid Is an Impermissible Sub Rosa Plan*

85. The Stalking Horse Bid is not a routine § 363 asset sale; it is a *sub rosa* plan (dubbed by the Debtors as a "holistic integrated solution")[46] that violates chapter 11's confirmation requirements. The Stalking Horse Bid inappropriately dictates the allocation of value among creditors and limits liability, all without the safeguards and visibility of the plan confirmation process. Critically, the Stalking Horse Bid impermissibly fixes creditors' recoveries (*i.e.*, their treatment). Among other terms, the Stalking Horse Bid dictates that all of the Debtors' secured debt is assumed, along with over $450 million of unsecured debt purportedly owed to certain of

---

[46] July 11, 2025 Hr'g Tr. at 54:13-16 (Mr. Kanwal reassuring the Court that this is "not a DIP that you'd say, well, is this term market, is that term market, in totality is it market?" because the "DIP Financing is one piece of a holistic, integrated solution [with the Stalking Horse Bid]").

the Insiders and offering no operational benefit to the go-forward enterprise. Whatever proceeds remain after the payment of administrative and priority expenses would then be distributed to general unsecured creditors. That is, recovery for all of the Debtors' stakeholders is established by this Sale, something that can only be appropriately done through a plan. Under similar circumstances, this Court rejected a section 363 sale where, among other things, (1) there was no possibility of reorganization following the sale, (2) the debtors were attempting to rush the case to prevent appropriate examination of the entities, (3) the sale would effectively result in substantive consolidation, and (4) there were questions regarding the propriety of guarantees and releases. *In re Crutcher Res. Corp.*, 72 B.R. 628 (Bankr. N.D. Tex. 1987).

86.     Not only does the Stalking Horse Bid pre-determine creditor treatment in a manner only appropriately done through a plan, but, as further described below, it does so in a manner that violates numerous procedural protections of the Bankruptcy Code. *See In re Cont'l Air Lines, Inc.,* 780 F.2d at 1226 (5th Cir. 1986) ("When a proposed transaction specifies terms for adopting a reorganization plan, the parties and the district court must scale the hurdles erected in Chapter 11.") (quotations omitted); s*ee also Pension Benefit Guaranty Corp.*, 700 F.2d at 940 (debtor cannot "short circuit the requirements of Chapter 11 for confirmation" in § 363 sale).

87.     *§ 1129(b)(2)(B)*. The Stalking Horse Bid cannot be approved because it is an unauthorized gift to the Debtors' equity interest holders in violation of the Bankruptcy Code's priority scheme. A fundamental principle of bankruptcy law is that creditors must be paid in full before subordinated creditors or equity interest holders receive anything on account of their claims. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("The Code's priority system constitutes a basic underpinning of business bankruptcy law."). The Stalking Horse bid violates absolute priority because it provides for the assumption, in full, of the insider ReGen Notes. The

ReGen Notes are "explicitly subordinate to all other unsecured claimholders of the Debtors" (ReGen Note, § 7), and the broader transaction structure confirms that the ReGen Notes were never intended to function as true debt but rather as a disguised equity infusion. The Notes "do not require any payment of principal for at least five years, and do not permit prepayment" (ReGen Note, § 3.4). Likewise, their token one percent (1%) interest rate, which was "less than half the rate on U.S. Treasury bonds at the time" and payable only if the Debtors generated net income, reflects the risk-bearing nature of equity rather than a lender's expectation of repayment (ReGen Note, § 2.1). Repayment was triggered only upon a "change of control" away from Landau's entities (ReGen Note, § 3.2)—again mirroring equityholder protections, not creditor remedies. Most decisively, the parties themselves agreed that the ReGen Notes "are intended to be treated for federal income tax purposes as an equity interest in [Genesis]" (Investment Agreement § 5.09).

88.    *§§ 1123(a)(4) and 1129(b)(1)*. The Stalking Horse Bid cannot be approved because it creates a gross disparity in treatment among similarly situated claims, thereby violating the Bankruptcy Code's equal treatment requirement in § 1123(a)(4) and/or unfair discrimination under § 1129(b)(1). 11 U.S.C. § 1123(a)(4) ("[A] plan shall ... provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."). The unsecured insider debts of WAX and MAO are assumed and effectively paid in full, as are the undersecured Prepetition Term Loans of Welltower, Omega, WAX, and MAO. Stalking Horse APA §§ 2.03(f)–(h). Meanwhile, all other unsecured claims will receive less than pennies on the dollar. The Bankruptcy Code prohibits this outcome, and it is precisely the gross unfair discrimination the Fifth Circuit has held violates § 1123(a)(4). *Excluded Lenders v. Serta Simmons Bedding, L.L.C. (In re Serta Simmons Bedding, L.L.C.,)* 125 F.4th 555, 591 (5th Cir. 2024), as revised (Jan. 21, 2025), as revised (Feb. 14, 2025)

44

(finding the receipt of disparate value among co-class members violated § 1123(a)(4)), *cert. denied*, No. 24-1322, 2025 WL 3132012 (U.S. Nov. 10, 2025). Courts have refused to approve this approach even outside of the plan context. *In re CGE Shattuck, LLC*, 254 B.R. 5, 10 (Bankr. D.N.H. 2000) (denying creditor-proposed foreclosure sale that paid "some, but not all, non-insider general unsecured creditors" a 50% dividend because it violated § 1123(a)(4)). The Debtors should not be allowed to accomplish through a sale what they cannot in a plan.

89.     Assuming the Debtors attempted to separately classify the favored unsecured claims (*i.e.*, those held by ReGen, WAX, MAO, Omega, and Welltower), the Stalking Horse Bid still could not be approved because it would "discriminate unfairly" against a dissenting class. 11 U.S.C. § 1129(b)(1). Paying certain unsecured creditors 100% while relegating all others to fractions thereof is textbook unfair discrimination. *In re Sentry Operating Co. of Tex.*, Inc., 264 B.R. 850, 860 (Bankr. S.D. Tex. 2001) (finding 99% payout differential between unsecured classes to be "gross discrimination"). It is no more permissible under § 363 than it is in a plan. *In re Gulf Coast Oil Corp.*, 404 B.R. at 428 (Bankr. S.D. Tex. 2009) (denying § 363 sale where court could not "conclude that creditors with equal rights are treated alike" because "some unsecured creditors will probably be paid and others will not be paid").

90.     To be sure, the assumption of some but not all liabilities in a § 363 sale is not *per se* improper, and courts have recognized that "sound business reasons" may justify it. *In re Tempnology, LLC*, 542 B.R. 50, 66 (Bankr. D.N.H. 2015), *aff'd sub nom. Old Cold, LLC*, 558 B.R. 500 (B.A.P. 1st Cir. 2016), *aff'd sub nom. In re Old Cold LLC*, 879 F.3d 376 (1st Cir. 2018). But no such justification exists here to assume non-operational undersecured and unsecured liabilities to Insiders. Self-dealing and favoritism are not sound business reasons and cannot override black letter law requiring equal or similar treatment of similarly situated creditors. *See In re Aztec Co.*,

107 B.R. 585, 588 (Bankr. M.D. Tenn. 1989) (plan unfairly discriminated by paying insider unsecured claims in full while paying deficiency claim 3%).

91.    *§ 1129(a)(11)*. The Stalking Horse APA cannot be approved because there is no evidence that it is feasible as mandated by § 1129(a)(11). Since assuming control in 2021, the operator has accumulated hundreds of millions of dollars in tort and wrongful death liabilities, all while patient care ratings have steadily deteriorated.[47] Now, the Debtors propose to "transfer" their assets to this same operator who caused the surge of wrongful death and personal injury liabilities that now burden the Debtors, without any evidence that the Stalking Horse can operate in a manner that will avoid the continued deterioration of patient care and accumulation of the same overwhelming economic and tort liabilities. In fact, the Stalking Horse proposes to assume over $500 million of secured and unsecured liabilities that Genesis could not previously sustain, in addition to $30 million of new promissory notes proposed to be payable to the estates, all without providing any new capital investment or offering any operational adjustment. The Debtors' proposed path forward raises substantial concerns whether a sale to the Stalking Horse will even stabilize the company and, more importantly, improve or, at the very least, ensure continuity of patient care. And despite the Debtors' post-Auction diligence requests, the Stalking Horse itself cannot explain its own post-acquisition capital structure.[48] Unsecured creditors are the fulcrum class of creditors whose recoveries are at risk, and need to be able to assess the risk of non-payment on the long term notes and payment plans that are part of the Stalking Horse Bid. There is simply

---

[47]    Notably, the Debtors' patient care ratings, as measured by the Centers for Medicare & Medicaid Services' Five-Star Quality Rating System has declined substantially from 37.8% of facilities grading out as above average (4 or 5 stars) in 2021 when ReGen took over, to only 15.3% exceeding that grade today, more than double the rate of decline experienced by other healthcare providers over the same time period. *Declaration of Narendra Ganti of FTI Consulting, Inc., Financial Advisor to the Statutory Unsecured Claimholders' Committee, in Support of Objections of the Statutory Unsecured Claimholders' Committee to the Debtors' Various Requests for Relief* [Docket No. 415] ¶¶ 26-27.

[48]    M. Andrews Dec. 7, 2025, Dep. Tr. 181:13-182:17 (expressing a lack of knowledge as to whether or not certain insider liabilities would be assumed and released or assumed and remain a liability on the capital structure post-sale).

no evidence that the Stalking Horse will be able to sustain such liabilities while also ensuring the continuity of patient care.

92.     If this sale is permitted to proceed pursuant to § 363, the only "safeguard" in place will be the post-auction requirement that the Stalking Horse show adequate assurance of future performance to vendors. But, adequate assurance of future performance is a narrow inquiry, not the rigorous, holistic assessment required to demonstrate feasibility under § 1129(a)(11). Feasibility must take on heightened importance for healthcare companies, where operational viability is directly tied to the quality and continuity" of patient care. The consequences of failure here are not limited to creditor recoveries, they extend to vulnerable patients who rely on the Debtors' services. Under these circumstances, the Stalking Horse Bid is not feasible and should not be approved.

<b>b.</b>     <b><i>The Stalking Horse Bid Impermissibly Sells Unencumbered Causes of Actions Against Insiders, to Insiders</i></b>

93.     The Insiders' Stalking Horse Bid cannot be approved because it does not comport with Fifth Circuit law, which requires that the sale of the causes of actions to the defendants of those causes of action must be assessed "as both a proposed sale under § 363 and a proposed compromise under rule 9019." *In re Moore*, 608 F.3d at 266. Fifth Circuit courts may approve a proposed compromise pursuant to Rule 9019 "only when the settlement is fair and equitable and in the best interest of the estate." *In re Age Ref., Inc.*, 801 F.3d 530, 540 (5th Cir. 2015) (quoting *In re Foster Mortg. Corp.,* 68 F.3d 914, 917 (5th Cir.1995)). In determining whether a compromise is fair and equitable and in the best interest of the estate, the Fifth Circuit focuses on "comparing the terms of the compromise with the likely rewards of litigation," (*In re Age Ref., Inc.*, 801 F.3d at 540 (quoting *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980)) by balancing (a) "the [debtor's] probability of success in litigation," (b) "[t]he complexity and likely duration of

47

the litigation and any attendant expense, inconvenience and delay," and (c) "[a]ll other factors bearing on the wisdom of the compromise," (collectively, the "Jackson Brewing Factors") (*In re Thornhill Bros. Fitness, L.L.C.*, 85 F.4th 321, 328 (5th Cir. 2023) (quoting *In re Jackson Brewing Co.*, 624 F.2d 599, 602 (5th Cir. 1980))). The "other factors" include (x) "the best interests of the creditors, with proper deference to their reasonable views" and (y) "the extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion" (collectively, the "Foster Factors," and together with the Jackson Brewing Factors, the "9019 Factors"). *In re Age Ref., Inc.*, 801 F.3d at 540 (5th Cir. 2015). Moreover, because this is an insider sale, the Court must still apply the rigorous entire fairness standard of review in considering the application of the 9019 Factors to the sale of the causes of actions against Insiders.

94.     The Debtors cannot satisfy their Rule 9019 burden because they have not even attempted to do so.[49] They have not introduced any evidence regarding all the causes of action they seek to effectively settle—the SIC Report, at best, provides conclusory findings on a limited subset of the actions being sold. There is no discussion of the claims, no provision of the facts and details around the claims, no evaluation of the merits of the claims, no explanation of the bases for the discount for probability of success, collection risks, and litigation costs. The Debtors' argument is merely that, because the Stalking Horse wants to buy and operate all assets, they are willing to throw these actions in as a sweetener.

95.     Moreover, it is axiomatic that a debtor cannot sell an asset through a Bankruptcy Code § 363 sale unless the debtor adequately markets the asset. *See In re Moore*, 608 F.3d at 263

---

[49] Any attempt by the Debtors to satisfy the requirements of Bankruptcy Rule 9019 at the hearing to consider the Sale Motion should be barred. Neither the Committee nor any other creditor or party in interest would have the opportunity to review and respond to these new assertions, thus impairing their Due Process rights. Instead, the Debtors must file a formal motion to approve the settlement of any claims they seek to sell, which will provide all parties with the ability to respond, take discovery, and challenge the settlement at a hearing.

("[T]he trustee must demonstrate that the proposed sale price is the highest and best offer."); *In re Gulf Coast Oil Corp.*, 404 B.R. at 424 ("The principal justification for § 363(b) sales is that aggressive marketing in an active market assures that the estate will receive maximum benefit."). The Debtors fall short of meeting this requirement as it pertains to estate causes of action because they failed to provide any information regarding the claims and causes of action to be sold during the marketing process.[50] Instead, the Debtors distributed a conclusory SIC Report that only examined a subset of the claims being sold to the Stalking Horse. The Committee, through the ongoing discovery process, has obtained far more documents than made available to the SIC during its investigation. Indeed, these documents led to the discovery of many of the causes of action identified in the Committee's Omnibus Complaint. *See* n. 8, *supra*. Yet, only the Stalking Horse received these documents during the marketing and auction process, despite diligence requests from multiple bidders regarding the claims to be sold. Furthermore, when Bidders requested information regarding the estates' causes of action, the Debtors failed to respond to those requests.

96.     In any event, the "other factors" are especially compelling here where (a) the Committee and numerous parties in interest oppose approval of the Stalking Horse Bid and (b) for the reasons discussed herein, the sale of the causes of action against Insiders is not the product of arm's-length bargaining.

### B.     The Stalking Horse Bid Was Not Proposed in Good Faith

97.     To satisfy the inherent fairness test, the Debtors carry the burden to prove the good faith of the transaction. This is particularly relevant because the Debtors seek an express finding that the Stalking Horse APA was proposed in good faith (i.e., a "good faith purchaser" finding),

---

[50] J. Finger Dec. 7, 2025 Dep. Tr. 91:17-92:3 ("Q: And what answers did you provide to them about those causes of action, and what was the source of that information? A: We provided to bidders . . . information pertaining to at a high level the estimated value of those causes of action as investigated by the Special Investigation Committee.").

49

which would effectively insulate the transaction from appeal under 11 U.S.C. § 363(m) unless a stay pending appeal were granted. *See* Sale Motion ¶¶ 48-51. As the Debtors themselves confirm, "[a]n appropriate characterization of good faith in a bankruptcy sale is a lack of 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" Sale Motion ¶ 49 (quoting *In re Bleaufontaine, Inc.*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981)). The Stalking Horse Bid does not satisfy this standard because (1) the Debtors and Stalking Horse have not been forthright about the insider nature of the transactions, (2) the overarching purpose of the transaction is to buy and bury causes of action against insiders and their accomplices rather than maximize value to the estates, and (3) the events surrounding the marketing and bidding process demonstrate a heavily skewed playing field and blatant favoritism.

98.     Rather than publicize the insider nature of the Stalking Horse Bid, the Debtors initially denied any connections between the Stalking Horse and the Debtors. *See* Sale Motion at 26 ("The sale is not to an insider. Rather, the sale is to CPE 88988 LLC, an entity under common control with WAX, or a controlled affiliate thereof."). As the SIC confirms, Landau was a controlling investor throughout the entire period in question. *See* ¶ 41 *supra*. The Committee's Complaint provides overwhelming evidence to support the SIC's conclusion that Landau is the individual pulling the strings, and was installed by Welltower, who provided him with the funds necessary for Landau to gain control of Genesis for their own purposes.[51]

99.     The Debtors' and Stalking Horse's concealment of the Insider nature of the Stalking Horse Bid itself negates any finding of good faith.[52] By trying to hide the connections under a

---

[51] Complaint, ¶¶ 40-45.

[52] *See, e.g.*, *In re Univ. Creek Plaza, Ltd.*, 176 B.R. 1011, 1019 (S.D. Fla. 1995) (finding debtor failed to propose the plan of reorganization in good faith under 11 U.S.C § 1129(a)(3) where debtor concealed insider status of creditor for voting purposes); *In re Xact Telesolutions, Inc.*, 2006 WL 66665, at *6 (D. Md. Jan. 10, 2006) (noting when reviewing the good faith nature of an insider purchaser, "courts have considered whether the sale involved full disclosure to the court and to the parties involved in the proceeding").

"related party" rather than "insider" title, the Debtors seek to ram through an insider transaction under "business judgement" rather than the rigorous fairness standard.

100.    The illicit relationships between Landau and the parties in interest do not end here. Landau and Welltower acted in conjunction to control the Debtors and ensure Landau and Welltower siphoned away all potential value from the Debtors. *See* Complaint *generally*. Despite the clear and well-documented relationship between Landau and Welltower, the Debtors provided Welltower with consent rights over the sale of its assets, as well as numerous other means of controlling the Debtors' bankruptcy cases. The Debtors now point to Welltower's levers of control, which the Debtors handed to them, as reasons to select the Stalking Horse Bid over the Genie Bid. But, this argument betrays itself: it shows the marketing and bid process were always a sham because any third party bid would always fail under Welltower's consent right, since Welltower admitted in its deposition that it is motivated by the release of actions against it in assessing the Stalking Horse as the better Bid. Moreover, it shows that the Debtors abdicated any independent judgment they may have since it would be subject to and superseded by Welltower's consent rights.

101.    The hypothetical counterweight to the tidal wave of Landau and Welltower influence is the SRC. In reality, however, Landau tainted the SRC from the outset. The Debtors created the impression that Katten Muchin Rosenman LLP ("Katten") provided the SRC with independent counsel. Not so. The SRC is actually represented by McDermott, the same legal counsel as the Debtors.[53] The SRC also receives financial advice from the same advisor as the Debtors—Ankura, embedded with Landau for years prior to the filing. Further tainting any purported independence, Mr. Robichaux and Mr. Perry (both of whom work for Ankura) sit on the SRC in a non-voting capacity. The SRC is not "independent" when it is advised exclusively by

---

[53] Katten confirmed this fact, stating that it does not speak for or represent the SRC despite making multiple appearances at the hearings on behalf of "Members of the Special Restructuring Committee".

professionals selected by and beholden to Landau and includes these same professionals as non-voting members on its board.

102.    The Stalking Horse continued this theme of subterfuge and distraction. Throughout the Auction, the Stalking Horse refused to answer simple questions. *See* n. 33, *supra*. Afterwards, the Stalking Horse provided similarly vague answers to the Committee's diligence requests. The Stalking Horse should not be rewarded for failing to participate fulsomely in the Sale process.

103.    In addition, the Debtors have declined to name the Genie Bid as a Back-Up Bid, despite requiring Genie and all other Qualified Bidders to agree to serve in such capacity as part of the auction process. If available, a truly independent fiduciary of the Debtors' estates would designate a Back-Up Bid to help ensure a sale occurs. Indeed, the SRC's Rule 30(b)(6) witness agreed a Back-Up Bid was important to the process, and believed Genie was designed by Jefferies as the Back-Up Bid—showing the Debtors made the decision not to designate without authority from the SRC.[54] By removing Genie as Back-Up Bidder, the Debtors have intentionally limited the Court's options to either approving the insider Stalking Horse, or denying the sale without a backup, which they will claim risks a cascading laundry list of negative consequences for the Debtors' bankruptcy cases. Those consequences are overblown and easily resolvable, but, in either case, this is not how a good faith fiduciary of *all* estate creditors acts.[55]

104.    Since before the Petition Date, the Debtors and Landau have plotted a process to ensure Landau's bidder lands on top. They denied his involvement, hid the connections between

---

[54] After touting the benefits of a back-up bid to "keep[] the Stalking Horse horse honest" and enhancing value to the Debtors' estates, the Debtors' SRC testified it was its understanding Jefferies had designated Genie as Back-Up Bid for those reasons. W. Snyder Dec. 7, 2025 Dep. Tr. at 175:13-15 ("Q: So did Genie 3 default to [being] the back-up bidder? A: Yes. Q: Okay. And when did the SRC make that determination? A: No. So that decision was made by, I believe, Jefferies in consultation with others. Jefferies would be the one that made that determination")

[55] If the Debtors held legitimate concerns over selecting Genie as the backup bidder, the Debtors owed a duty to the estate to seek answers to those concerns through questions and diligence. They did not do so.

the Stalking Horse and Landau, and granted Landau's partner (Welltower) substantial control over the bankruptcy cases. The only potentially unbiased decision maker, the SRC, is represented by Landau-selected advisors and includes Landau-chosen committee members. And the Debtors declined to submit the Genie Bid as a Back-Up Bid, despite requiring Genie's consent to so serve. This blatant favoritism bars any potential finding of good faith in the sale process. As a result, the Court should decline the Debtors' request for a good faith finding under 11 U.S.C. § 363(m).

C.     **The Stalking Horse is Not Entitled to a Finding That It Is Not a Successor in Interest to the Sellers**

105.     Even if the Court approves the Stalking Horse APA, the Court should decline to enter a Sale Order that (a) authorizes and approves "the sale of the Purchased Assets to Buyer on the terms and conditions set forth herein, free and clear of all Liens, Claims and Liabilities . . ." or (b) provides "neither Buyer nor any of its Affiliates shall be deemed a successor in interest to Sellers" ((a) and (b) together, the "Successor Liability Provisions"). Stalking Horse APA § 1.01 (defining Sale Order). Although some courts have adopted an expansive reading of § 363(f) to extinguish successor liability claims, the Fifth Circuit has not, and this Court should instead follow the Seventh Circuit's narrower approach. In *Zerand* and *Tasemkin*, the Seventh Circuit made clear that bankruptcy courts lack "blanket power" to immunize purchasers from future lawsuits and rejected efforts to shield buyers where doing so would frustrate unsecured creditors by enabling the same enterprise to reemerge minus its liabilities—precisely the circumstance here.[56]

---

[56] *Zerand-Bernal Grp., Inc. v. Cox*, 23 F.3d 159, 163 (7th Cir. 1994) ("Zerand") (explaining bankruptcy courts do not enjoy "blanket power to enjoin all future lawsuits against a buyer at a bankruptcy sale in order to maximize the sale price"); *see also Chicago Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 51 (7th Cir. 1995) ("Tasemkin") (holding a district court "not absolutely precluded by the bankruptcy proceedings from finding successor liability against New Tasemkin" where "the apparent nature of the acquisition of Old Tasemkin by New Tasemkin … clearly had the effect, intended or no, of frustrating unsecured creditors while resurrecting virtually the identical enterprise").

106. The Successor Liability Provisions likewise fail because any claims for successor liability are not property of the estate and cannot be released or settled by the Debtors. Successor liability claims arise, if at all, only *post*-closing and thus are not currently property of the estate subject to sale. Under settled Fifth Circuit law, a claim belongs to the estate only if the debtor could have asserted it at the commencement of the case. It would be untenable to suggest that a hypothetical, future claim could be manufactured today in order to release it. And even if such claims were somehow deemed estate property, their extinguishment here would require heightened scrutiny under Rule 9019. The Debtors cannot meet that standard: the proposed provisions are not in the best interests of creditors, face unified Committee opposition, and—most critically—are not the product of arm's-length bargaining, but rather an insider-driven attempt to insulate those whose own conduct generated the very liabilities at issue.

107. In sum, if the Court determines to approve the Stalking Horse APA, it should strike the Successor Liability Provisions from the Sale Order.

## III. THE COURT HAS ALTERNATIVE PATHS TO MAXIMIZE VALUE

### A. *A Viable Reorganization Path Exists*

108. As explained in the Committee's Exclusivity Objection filed concurrently herewith, the Committee is prepared to file a plan with Genie as the plan sponsor and reflecting the terms of the Genie Bid. The Court should not permit an insider sale outside of a plan where a higher and better confirmable plan is available. The Court should promote confidence in the fairness of the sale process and the bankruptcy system by enabling creditors to vote on their preferred path with the benefit of full disclosure to all interested parties.

109. Alternatively, the Court can *sua sponte* appoint an examiner with expanded powers under 11 U.S.C. §§ 1104 and 1106(b) for the discrete purpose of reopening the Auction, to

54

reestablish confidence in the Auction process by determining qualified bidders, and overseeing the selection of the best and highest bid free and clear of insider manipulation.

110.    The Court may reopen an auction if there are concerns about the auction or bidding process. *In re Bigler, LP*, 443 B.R. 101 (Bankr. S.D. Tex. 2010); *In re Gil-Bern Indus., Inc.*, 526 F.2d 627, 628-29 (1st Cir. 1975) (recognizing Courts can reopen an auction where the highest bid is "manifestly inadequate" or there is a "substantial disparity" indicating the process failed to protect the estate). A reopened Auction would maximize value for the Debtors' estates by permitting an unbiased arbiter to evaluate the competing Bids and also determine whether Olumie was inappropriately disqualified from bidding.

**B.      *The Debtors Do Not Have a Valid Business Justification for Proceeding Through § 363***

111.    The Debtors "must have a valid business justification for the [sale] process occurring separate from the plan confirmation process and being consummated without satisfaction of the plan confirmation procedures and requirements." *In re Gulf Coast Oil Corp.*, 404 B.R. at 423. This requirement is especially critical here, where the Stalking Horse APA is a *sub rosa* plan and the Debtors seek to accomplish through § 363 what the Bankruptcy Code reserves for a plan. Yet, the Debtors have provided no valid justification or otherwise demonstrated that the sale must be approved prior to confirmation of a chapter 11 plan.

112.    No exigent circumstances exist (other than the milestones concocted by Landau and Welltower and set forth in the Final DIP Order) here that necessitate proceeding with the proposed sale through § 363 instead of through a plan. The Debtors have offered no declaration, operations report, or expert testimony suggesting that patient care would be in jeopardy or that operations cannot be maintained during the plan confirmation process. The Debtors identify no specific operational risks, regulatory deadlines, or resident care issues that compel an accelerated sale. In

55

fact, compressing operator transitions and diligence can destabilize staffing and continuity of care, risking worse outcomes for patients and residents, the opposite of what the Debtors contend a rushed sale protects. Arguably, nothing could be worse for patient care than to permit the Debtors to leave behind their obligations to patients they have killed and otherwise harmed and continue onwards with Landau's "Profits over Patients" business model that got them here in the first place. The Debtors have failed to show that a compressed sale timeline is necessary. There is no melting ice cube, no expiring regulatory license, no threat to operations, and no looming covenant default that compels a sprint to the finish line.

113. Accordingly, the Committee submits that a sale, if any, should only be consummated after satisfaction of the plan confirmation procedures and requirements. If, however, the Court is inclined to approve a sale to the insider Stalking Horse, the Sale Order should be modified to protect the estates and preserve the rights of unsecured creditors. These modifications include: (i) preserving creditors' appellate rights by declining to endorse a good faith purchaser finding; (ii) declining to find that the assets are sold free and clear of future successor liability claims; (iii) explicitly preserving the Committee's pending Challenge and other objections to the secured claims being "assumed," with the requirement that if the Committee prevails, the consideration otherwise allocated to those "assumed" claims be paid to the estates in accordance with creditors' allowed claims and priorities; and (iv) explicitly finding that, unless the Debtors' cases are substantively consolidated, the purchase price must be allocated by Debtor.

## NO WAIVER OF AUTOMATIC STAY PURSUANT TO FRBP 6004(h) AND 6006(d)

114. The Debtors' request that the Court grant a waiver of the automatic stay of the effectiveness of any order approving the Sale is inappropriate and should not be granted. As the Debtors note, "the purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time

56

for an objecting party to appeal before an order can be implemented." Sale Motion, ¶ 70. The Debtors project to require months to close any proposed sale transaction, with a targeted closing by March 31, 2026. There is simply no cause or other justification for the request to proscribe parties in interest from appealing the Sale. It should come as no surprise that parties in interest— from the Committee, to individual creditors or competing Bidders—may seek to appeal the sale of the Debtors' estate causes of action to the Insider defendants over the objection of nearly every non-conflicted party with a vested interest in the outcome. Indeed, the Bidding Procedures Order has already been appealed. With no ability to close the prospective Sale prior to the expiration of the automatic fourteen-day stays imposed by Bankruptcy Rules 6004(h) and 6006(d), the Court should not truncate those protections.

## **RESERVATION OF RIGHTS**

115.    As of the date of this filing, the Debtors have still not filed the Stalking Horse APA they propose to submit for Court approval, and are "engaged in discussions and negotiations regarding the final form of Stalking Horse APA to be consummated between the Debtors and the Successful Bidder and the final form of proposed Sale Order …" Notice of Successful Bidder at 5. The Committee has not had an opportunity to review the final form of Stalking Horse APA or Sale Order, and reserves the right to supplement, amend, or otherwise modify this Objection and make any additional objections related to the terms of the Stalking Horse APA or Sale Order, including if the Court grants the pending request to adjourn the Sale Hearing.

## **CONCLUSION**

The Committee respectfully requests the Court enter an order (i) denying the approval of the Stalking Horse APA and (ii) granting such other and further relief as the Court deems just and proper.

**STINSON LLP**

*/s/ Zachary Hemenway*
Nicholas Zluticky (*pro hac vice*)
Zachary Hemenway (NDTX Bar No. 59670MO)
Miranda Swift (*pro hac vice*)
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone: (816) 842-8600
nicholas.zluticky@stinson.com
zachary.hemenway@stinson.com
miranda.swift@stinson.com

- and -

**PROSKAUER ROSE LLP**

Brian S. Rosen (*pro hac vice*)
Timothy Q. Karcher (*pro hac vice*)
Ehud Barak (*pro hac vice*)
Daniel Desatnik (*pro hac vice*)
Eleven Times Square
New York, New York 10036-8299
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
Email: brosen@proskauer.com
       tkarcher@proskauer.com
       ebarak@proskauer.com
       ddesatnik@proskauer.com

- and -

Paul V. Possinger (*pro hac vice*)
Jordan E. Sazant (*pro hac vice*)
Three First National Plaza
70 West Madison, Suite 3800
Chicago, IL 60602-4342
Telephone: (312) 962-3570
Email: ppossinger@proskauer.com
       jsazant@proskauer.com

*Counsel to the Statutory Unsecured Claimholders'
Committee to Genesis Healthcare, Inc., et al.*

58

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on December 8, 2025 the foregoing document was

electronically filed with the court using the CM/ECF system, which sent notification to all parties

of interest participating in the CM/ECF System.


*/s/ Zachary Hemenway*
*Counsel to the Statutory Unsecured Claimholders'*
*Committee to Genesis Healthcare, Inc., et al.*