# EXHIBIT 4

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| GENESIS HEALTHCARE, INC., *et al.*, | ) Case No. 25-80185 (SGJ) |
|  | ) |
| Debtors.[1] | ) (Jointly Administered) |
|  | ) |

**DECLARATION OF DANIEL S. DESATNIK IN SUPPORT OF THE
OMNIBUS SALE OBJECTION AND POST-AUCTION SALE OBJECTION OF THE
STATUTORY UNSECURED CLAIMHOLDERS' COMMITTEE TO THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS TO CPE 88988 LLC AND THE
OBJECTION OF THE STATUTORY UNSECURED CLAIMHOLDERS'
COMMITTEE TO DEBTORS' MOTION FOR ENTRY OF ORDER (I) EXTENDING
DEBTORS' EXCLUSIVE PERIODS TO FILE A CHAPTER 11 PLAN AND
SOLICIT ACCEPTANCES THEREOF AND (II) GRANTING RELATED RELIEF[2]**

Daniel S. Desatnik declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a partner in the law firm of Proskauer Rose LLP ("Proskauer"). I am a lead attorney from Proskauer working on the above-captioned chapter 11 cases. I am a member in good standing of the State Bar of New York, and I have been admitted *pro hac vice* to practice in the United States Bankruptcy Court for the Northern District of Texas. There are no disciplinary proceedings pending against me.

---

[1] The last four digits of Genesis Healthcare, Inc's federal tax identification number are 4755. There are 299 Debtors in these chapter 11 cases, for which the Debtors have requested joint administration. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

[2] Certain exhibits to the Declaration are filed under seal pursuant to ¶ 15 of the *Order Approving Amended Stipulated and Agreed to Confidentiality Agreement and Protective Order* [Docket No. 1206].

2.      I submit this declaration (the "Declaration") in support of the *Omnibus Sale Objection and Post-Auction Sale Objection of the Statutory Unsecured Claimholders' Committee to the Sale of Substantially All of The Debtors' Assets to CPE 88988 LLC* (the "Sale Objection") and the *Objection of the Statutory Unsecured Claimholders' Committee to Debtors' Motion for Entry of Order (I) Extending Debtors' Exclusive Periods to File A Chapter 11 Plan and  Solicit Acceptances Thereof and (II) Granting Related Relief* (the "Exclusivity Objection") The Sale Objection and Exclusivity Objection are being filed substantially concurrently with this Declaration.  These statements are made to the best of my knowledge and based on the facts provided to me.[3]

3.      Attached hereto as **Exhibit 1** is a true and correct copy of the Initial Report of the Special Investigation Committee of the Board of Directors of Genesis Healthcare, Inc. Regarding Description of Causes of Action Proposed to Be Sold or Otherwise Released Under the Stalking Horse Bid and Range of Likely Values Attributable to Such Causes of Action.

4.      Attached hereto as **Exhibit 2** is a true and correct copy of the Omnibus Resolution and Charter of the Restructuring Committee and Special Investigation Committee of the Board of Directors of Genesis Healthcare, Inc. dated July 8, 2025.

5.      Attached hereto as **Exhibit 3** is a true and correct copy of an e-mail from Steven J. Reisman dated November 23, 2025.

6.      Attached hereto as **Exhibit 4** is a letter from Sen. Elizabeth Warren, Sen. Peter Welch, Sen. Richard Blumenthal & Rep. Maggie Goodlander, to Louis Robichaux IV & Russell A. Perry, Genesis HealthCare, Inc. and Joel Landau, Pinta Capital Partners dated October 7, 2025.

---

3  In certain instances, the transcripts below may be subject to ongoing errata due to the short amount of time between the auction and the sale hearing. I reserve the right to amend the Declaration to submit any amended transcripts when and if they become available.

7.      Attached hereto as **Exhibit 5** is a true and correct copy of excerpts from the transcript of the deposition of William Snyder, held on December 7, 2025.

8.      Attached hereto as **Exhibit 6** is a true and correct copy of excerpts from the transcript of the deposition of Aditya Jain, held on December 5, 2025.

9.      Attached hereto as **Exhibit 7** is a true and correct copy of excerpts from the transcript of the deposition of Mark Andrews, held on December 6, 2025.

10.     Attached hereto as **Exhibit 8** is a true and correct copy of excerpts from the transcript of the deposition of Jeffrey Finger, held on December 7, 2025.

11.     Attached hereto as **Exhibit 9** is a true and correct copy of excerpts from the Auction transcript, held on November 18, 2025.

12.     Attached hereto as **Exhibit 10** is a true and correct copy of e-mails between the Debtors and NextGen.

13.     Attached hereto as **Exhibit 11** is a true and correct copy of Genie 3 Partners LLC's due diligence responses.

14.     Attached hereto as **Exhibit 12** is a true and correct copy of CPE 88988 LLC's due diligence responses.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: December 8, 2025
       New York, NY

By: */s/ Daniel S. Desatnik*
       Daniel S. Desatnik

# **<u>Exhibit 1</u>**

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**



# INITIAL REPORT OF THE SPECIAL INVESTIGATION COMMITTEE OF THE BOARD OF DIRECTORS OF GENESIS HEALTHCARE, INC. REGARDING DESCRIPTION OF CAUSES OF ACTION PROPOSED TO BE SOLD OR OTHERWISE RELEASED UNDER THE STALKING HORSE BID AND RANGE OF LIKELY VALUES ATTRIBUTABLE TO SUCH CAUSES OF ACTION

**IN RE GENESIS HEALTHCARE, INC., *ET AL.***
**BANKRUPTCY CASE NO.: 25-80185 (JUDGE STACEY G. C. JERNIGAN)**
**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION**

## September 5, 2025



1

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

## Disclaimer and Reservation of Rights

This Initial Report is submitted pursuant to paragraph 16 of the Bidding Procedures Order[1] and provides a "description of the causes of action proposed to be sold or otherwise released under the Stalking Horse Bid, as well as a range of likely values attributable to such causes of action, as determined solely by the Debtors' Special Investigation Committee." *See* Bidding Procedures Order, paragraph 16.  Neither the Special Investigation Committee nor the Debtors make any representation in this Initial Report as to the actual amount to be recovered from the pursuit of the potential claims and causes of action described herein. As we all know, litigation is inherently uncertain and the ability to succeed in litigation and to collect on the claims, if successful, will depend upon a number of factors, including, among other things, the probability of success in litigation, the difficulties in collection, and the expense and delay of litigation.

While this Initial Report includes the Special Investigation Committee's assessment of the probability of success in litigation based on the merits of the relevant potential claims and causes of action, it does not make adjustments to reflect, among other things, the cost of litigation, the time value of money, and the potential collectability of a final judgment.  These factors are not entirely within the Debtors' control and, notwithstanding the analysis contained herein, litigation of the potential estate claims and causes of action may not result in any incremental distributable value to the Debtors' estates and, in fact, may result in increased administrative expenses.

The Special Investigation Committee reserves the right to continue the Investigation during the chapter 11 cases in accordance with the Delegating Resolutions, including by evaluating

---

[1]   Capitalized terms used in this Disclaimer and Reservation of Rights but not otherwise defined shall have the meanings ascribed to them in the Initial Report.

2

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

additional document productions and further party and non-party witness testimony as it deems necessary in discharging its duties.

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

## TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................................5

II. CONDUCT OF THE INVESTIGATION .....................................ERROR! BOOKMARK NOT DEFINED.

    A. INVESTIGATION BACKGROUND.................................................................................5

    B. SCOPE OF INVESTIGATION ........................................................................................9

III. EXECUTIVE SUMMARY REGARDING POTENTIALLY VALUABLE AND VIABLE CLAIMS AND RANGE OF LIKELY VALUES ..............................................................................12

IV. DESCRIPTION OF THE CAUSES OF ACTION PROPOSED TO BE SOLD OR OTHERWISE RELEASED UNDER THE STALKING HORSE BID AND THE RANGE OF LIKELY VALUES ATTRIBUTABLE TO SUCH CAUSES OF ACTION..................................................................15

    A. POTENTIAL VALUABLE AND VIABLE CLAIMS PROPOSED TO BE SOLD OR OTHERWISE RELEASED UNDER THE STALKING HORSE BID ................................................15

    B. ADDITIONAL CLAIMS PROPOSED FOR SALE OR RELEASE UNDER THE STALKING HORSE BID ....................................................................................................................24

V. CONCLUSION AND RESERVATION OF RIGHTS BY THE SPECIAL INVESTIGATION COMMITTEE......................................................................................................................29

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

## I.   INTRODUCTION

Pursuant to the *Order (I) Approving Bidding Procedures and Expense Reimbursement, (II) Approving the Debtors' Entry into the Stalking Horse APA with Stalking Horse Bidder and Subject to Higher or Otherwise Better Offers at the Auction in Accordance with the Bidding Procedures, (III) Scheduling Certain Dates and Deadlines, (IV) Approving the Form and Manner of Notice Thereof, and (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases* [Docket No. 685] (the "Bidding Procedures Order"),[2] the Special Investigation Committee (the "Special Investigation Committee") of the Board of Directors (the "Board") of Genesis Healthcare, Inc. ("Genesis" and together with certain of its affiliates and subsidiaries as debtors and debtors-in-possession in the above-captioned chapter 11 cases, the "Debtors"), comprising Jonathan Foster and Elizabeth LaPuma, in their capacity as Independent Directors (the "Independent Directors"), hereby submits this Initial Report Regarding Description of Causes of Action Proposed to be Sold or Otherwise Released Under the Stalking Horse Bid and Range of Likely Values Attributable to Such Causes of Action (each, a "Potential Claim" and collectively, the "Potential Claims").

## II.   CONDUCT OF THE INVESTIGATION

### A.   Investigation Background

#### i.   Appointments of Mr. Foster and Ms. LaPuma

1.      On March 25, 2025, Mr. Foster was retained by Genesis as independent consultant to, among other things, conduct an independent investigation (the "Investigation") into potential claims and causes of action that might be asserted by the Debtors with respect to any and all

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order.

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

previous transactions by and between the Debtors, on the one hand, and any current or former equity holder, affiliate, subsidiary, director, manager, officer, or other related stakeholders, on the other (each, a "Related Party" and collectively, the "Related Parties").

2.      On May 16, 2025, Genesis retained Ms. LaPuma as independent consultant to conduct the Investigation together with Mr. Foster.

### ii.      Retention of Katten

3.      As of March 28, 2025, Genesis retained Katten Muchin Rosenman LLP ("Katten") to render independent legal services at the sole direction of Mr. Foster in his capacity as independent consultant and, as may become applicable, as independent director, with respect to, among other things, the Investigation.  Upon Ms. LaPuma's retention, Katten's engagement was expanded to be at the sole direction of both Mr. Foster and Ms. LaPuma. Throughout the Investigation, the Independent Directors met weekly with Katten to direct the Investigation and obtain updates on the workstreams and progress of the Investigation. The substance of these meetings is subject to the attorney-client privilege.

4.      The lead attorneys from Katten working on this engagement are widely regarded as market leaders in the representation of independent directors and, in recent years, have represented independent directors in some of the largest and most complex chapter 11 cases throughout the United States and in additional confidential out-of-court restructuring matters.

### iii.      Formation of Special Investigation Committee and Involvement in Stalking Horse Bid Negotiations

5.      On July 9, 2025, the Genesis Board unanimously adopted resolutions, among other things: (a) appointing Mr. Foster and Ms. LaPuma as Independent Directors and members of the

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

Special Investigation Committee; and (b) delegating specific powers, authorities, and privileges to the Special Investigation Committee (such resolutions, the "Delegating Resolutions").

6. Mr. Foster and Ms. LaPuma are highly qualified to serve as the Independent Directors and have extensive knowledge and experience in investigations and corporate restructurings.

a. Mr. Foster is the Founder and a Managing Director of Current Capital Partners LLC, a mergers and acquisitions advisory, corporate management services and private equity investing firm. Mr. Foster spent a decade at Lazard, primarily focused on mergers and acquisitions advisory work, ultimately as a Managing Director. Mr. Foster has served on more than 50 boards, including Fortune 500 companies, private companies and companies involved in restructurings. Mr. Foster has served as chair, lead director, and on the three major board committees, as well as special, transaction and CEO succession committees. Mr. Foster has been chair of two Fortune 500 audit committees and has been an expert witness in corporate litigation for some 60 cases.

b. Ms. LaPuma has advised on landmark transactions across industries and around the globe for over 20 years and in matters totaling trillions of dollars in value. Ms. LaPuma most recently was the Head of UBS's Balance Sheet Advisory Group, serving as a Managing Director, from 2020 to 2023, particularly focused on representing financial institutions. Ms. LaPuma also ran Alvarez & Marsal Asset Management Services group, from 2013 to 2020, managing a portfolio of assets including a $2.5bn portfolio of debt and equity investments and approximately another $3.0bn of international assets. Prior to that, Ms. LaPuma

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

worked in BlackRock's Financial Advisory Group as well as at Lazard, the global investment bank. Since 2023, Ms. LaPuma has served on over 20 boards, including both private and public companies, including as the chairman of the board. She has served on numerous board committees, including as the chair of audit, compensation, special and nominations and governance committees. Ms. LaPuma earned a Bachelor of Science in finance and a Master of Business Administration from the Wharton School, and a Bachelor of Arts from the School of Arts and Sciences, University of Pennsylvania, graduating summa cum laude and as a Palmer Scholar.

7.      The Delegating Resolutions delegated to the Special Investigation Committee, among other things, the sole and exclusive authority to continue to conduct the Investigation and make recommended factual findings as to the merits and value of any Potential Claim, including the value of consideration under any Related Party Transaction (as defined therein) proposed to purchase or otherwise settle such Potential Claims. The Special Investigation Committee will report its recommended findings to the Special Restructuring Committee[3] for review and consideration in carrying out its duties with regard to any Related Party Transaction.

8.      In their capacities as independent advisors and, upon their appointment to the Genesis Board, as the Independent Directors and members of the Special Investigation Committee, Mr. Foster and Ms. LaPuma, with the assistance of Katten, engaged in robust, arm's-length negotiations with the Stalking Horse Bidder to reach the agreements subsumed within the Stalking

---

[3]   The Delegating Resolutions also constituted the Special Restructuring Committee—composed of Mr. Foster, Ms. LaPuma, and William Snyder as voting members, and Louis E. Robichaux IV and Russell A. Perry (the Debtors' Co-Chief Restructuring Officers) as non-voting advisory members—and delegated to the Special Restructuring Committee specific powers and authorities.

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

Horse APA, which includes the purchase or release of Potential Claims held by the Debtors against certain of the Stalking Horse Bidder's related parties[4] and a fair postpetition marketing and sale process to solicit higher or otherwise better bids.  The Stalking Horse Bid proposes to purchase Potential Claims against the current and former directors and officers of the Debtors (even if those individuals are related to the Stalking Horse Bidder) only to the extent the damages exceed the insurance policies' coverage; the Debtors' estates are retaining those claims, up to the insurance policy cap, with recourse against the Debtors' D&O insurance policies.

### B.      Scope of Investigation

9.      The scope and extent of the Investigation and assessment of the value of the Potential Claims during the prepetition period was broad and detailed, but was limited owing to the need to preserve the confidentiality of chapter 11 preparations.  Accordingly, the Investigation remains ongoing during the chapter 11 cases.  The Special Investigation Committee reserves the right to amend or supplement this Initial Report during the chapter 11 cases.

### i.      Document Requests and Review

10.      In furtherance of the Investigation, Katten, on behalf of the Special Investigation Committee, issued initial and supplemental document and information requests to the Debtors, seeking, among many other things, copies of board materials and minutes, corporate governance documents, relevant transaction documents, financial and accounting information, and related

---

[4]    The "Released Parties" under the Stalking Horse APA are as follows: "collectively, ReGen Healthcare, LLC, WAX Dynasty Partners LLC, MAO 22322 LLC, Pinta Capital Partners, Perigrove, Integra WIP Tenant, Buyer, each of their respective present and former parents, subsidiaries and affiliates, and each of their respective officers, directors, partners, equity holders, managers, members, predecessors, successors, assigns, attorneys, agents, employees, managers, and representatives, each solely in such capacity, including, without limitation, Joel Landau and David Gefner. For the avoidance of doubt, the Debtors' current and former directors and officers shall not be Released Parties."

9

HIGHLY CONFIDENTIAL
REMAINS SUBJECT TO CHANGE
SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS
PROFESSIONAL EYES ONLY

correspondence. Katten also delivered ad hoc document and information requests on various other dates. The initial and supplemental requests are summarized as follows:

| | NAME OF REQUEST | DATE |
|---|---|---|
| 1. | Initial Document and Information Request | March 31, 2025 |
| 2. | First Supplemental Document and Information Request | April 15, 2025 |
| 3. | Second Supplemental Document and Information Request | April 16, 2025 |
| 4. | Third Supplemental Document and Information Request | April 17, 2025 |
| 5. | Fourth Supplemental Document and Information Request | April 21, 2025 |
| 6. | Fifth Supplemental Document and Information Request | May 1, 2025 |
| 7. | Sixth Supplemental Document and Information Request | May 6, 2025 |
| 8. | Seventh Supplemental Document and Information Request | May 21, 2025 |
| 9. | Eighth Supplemental Document and Information Request | May 25, 2025 |
| 10. | Ninth Supplemental Document and Information Request | June 20, 2025 |
| 11. | Tenth Supplemental Document and Information Request | July 30, 2025 |

11. In the aggregate, Katten, on behalf of the Special Investigation Committee, submitted 86 separate expansive categories of document and information requests related to the Investigation. Katten received and reviewed thousands of corporate documents related to the Investigation in response to these requests. Katten also received and reviewed thousands of email and other electronic messages from several Genesis custodians in response to diligence requests related to specific Investigation matters.[5]

12. The Debtors and their professionals have fully cooperated with the Special Investigation Committee in connection with the production of documents for the Investigation.

---

[5] The Special Investigation Committee provided a date range and search parameters to the Debtors in connection with requests for email and other electronic messages. The Genesis custodians on which Debtors ran these search terms are David Harrington (Executive Chairman), Jonathan Kirschner (Chief Financial Officer), Jake Komin (Chief Performance Officer), Chip Thieme (Vice President of Tax), Jim Jackson (Senior Director of Financial Reporting), and Glenn Williams (former Senior Vice President of Finance and Technology).

HIGHLY CONFIDENTIAL
REMAINS SUBJECT TO CHANGE
SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS
PROFESSIONAL EYES ONLY

### ii.      Witness Interviews

13.      Beginning in April 2025 and continuing into August 2025, Katten conducted interviews with certain current or former directors, officers, advisors, and affiliates of the Debtors. The interviews were not recorded or transcribed.  Additional interviews and depositions may be held while the Investigation is ongoing.

14.      A full listing of the interviews conducted by Katten, on behalf of the Special Investigation Committee, is set forth in the table below by witness, affiliation, and date:

| | NAME OF WITNESS | AFFILIATION | DATE(S) |
|---|---|---|---|
| 1. | Jake Komin | Genesis Chief Performance Officer | April 10, 2025 |
| 2. | Jonathan Kirschner | Genesis Chief Financial Officer | April 11, 2025 April 23, 2025 |
| 3. | Lauren Murray | Genesis Chief Operating Officer | April 16, 2025 |
| 4. | Michael Berg | Genesis Deputy General Counsel | April 17, 2025 |
| 5. | David Harrington | Genesis Executive Chairman | April 18, 2025 |
| 6. | Chip Thieme | Genesis Vice President of Tax | April 21, 2025 |
| 7. | Russell Perry of Ankura | Genesis's Financial Advisor | April 25, 2025 |
| 8. | Ben Jones of Ankura | Genesis's Financial Advisor | April 25, 2025 |
| 9. | Ned Turnbull of Williams Mullen | Genesis's Transactional Counsel | April 25, 2025 |
| 10. | Gerry Adest | Genesis Independent Director | May 1, 2025 |
| 11. | James Chow | Genesis Independent Director | May 2, 2025 |
| 12. | Joel Landau | Genesis Controlling Investor | May 15, 2025 |
| 13. | David Gefner | Business Associate of Joel Landau CEO of Integra Health Principal of MAO 22322 LLC ("MAO") | May 15, 2025 |
| 14. | Melissa Powell | Former Genesis Chief Operating Officer | June 2, 2025 |
| 15. | Harry Wilson | Former Genesis Chief Executive Officer | June 3, 2025 |
| 16. | Glenn Williams | Former Genesis Senior Vice President of Finance and Technology | July 23, 2025 |
| 17. | Joe Montgomery | Genesis Chief Information Officer | August 8, 2025 |

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

### iii.    Additional Meetings with Case Parties

15.    Katten, on behalf of the Special Investigation Committee, held numerous meetings with advisors to interested parties throughout the course of the Investigation, including:

a.   Regular meetings with McDermott Will & Shulte (Debtors' counsel), Ankura (Debtors' financial advisor), and Jefferies (Debtors' investment banker);

b.   Multiple meetings with DLA Piper (counsel to the Stalking Horse Bidder and certain of its affiliates) regarding the Potential Claims proposed to be acquired by the Stalking Horse Bidder;

c.   Separate meetings with Gibson Dunn & Crutcher (counsel to Welltower) and Ferguson Braswell Fraser Kubasta (counsel to Omega); and

d.   A meeting with Stinson and Proskauer Rose (co-counsel to the Official Committee of Unsecured Creditors (the "Committee")) regarding the Investigation.  Katten has also responded to document and information requests from the Committee.

16.    Throughout the Investigation, Katten has maintained an ongoing dialogue with the Debtors' advisors to facilitate the efficient production of documentation and information for the Investigation and the coordination of witness interviews.

## III.    EXECUTIVE SUMMARY REGARDING POTENTIALLY VALUABLE AND VIABLE CLAIMS AND RANGE OF LIKELY VALUES

17.    Based on the evidence uncovered in the Investigation, taking into account the facts and circumstances relevant to the context of the matters investigated, the Special Investigation Committee identified certain potentially valuable and viable causes of action against certain of the Stalking Horse Bidder's related parties, which are proposed to be sold under the Stalking Horse

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

Bid.  The chart below contains a list of these Potential Claims, as well as a range of likely values attributable thereto.  Each range of likely values set forth herein reflects the Special Investigation Committee's assessment of the probability of success in litigation based on the merits and risks of the relevant Potential Claims.  Importantly, these ranges of likely values do not include any adjustments to reflect, among other things, the cost of litigation, time value of money, and potential collectability of a final judgment.  Each of the transactions and Potential Claims included in the chart below are explained in further detail herein.[6]

| | Relevant Transaction | Description | Causes of Action[7] | Range of Likely Values (Low) | Range of Likely Values (High) |
|---|---|---|---|---|---|
| 1. | Pinta Consulting Agreement | Genesis entered into an agreement in July 2022 (effective as of January 2022), whereby it paid $350,000 per month for consulting services provided by Pinta, an affiliate of a Related Party. | • Fraudulent Transfer<br>• Breach of Fiduciary Duty<br>• Preferential Transfer<br>• Aiding and Abetting Breach of Fiduciary Duty | $740,000 | $5,050,000 |

---

[6]   The Stalking Horse Bid parties have asserted a number of secured and unsecured claims against the Debtors, which the Stalking Horse Bid waives or otherwise assumes in their entirety, which means that they would not dilute recoveries to other creditors. If the Stalking Horse Bidder is not the prevailing bidder, the Debtors reserve all rights to challenge the validity and priority of those claims.

[7]   The causes of action set forth herein are identified for summary purposes only, do not constitute an exhaustive list of all potential claims evaluated in the Investigation, and are intended to encompass related and ancillary claims. Additionally, the Stalking Horse bid is purchasing fiduciary duty claims against the officers and directors of the Debtors, to the extent the value of those claims exceeds the $20 million insurance cap.  It is also purchasing aiding and abetting claims against Released Parties.

HIGHLY CONFIDENTIAL
REMAINS SUBJECT TO CHANGE
SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS
PROFESSIONAL EYES ONLY

| | Relevant Transaction | Description | Causes of Action[7] | Range of Likely Values (Low) | Range of Likely Values (High) |
|---|---|---|---|---|---|
| 2. | Integra Pennsylvania Sublease | In December 2022, Genesis subleased 34 Pennsylvania properties from Integra, an affiliate of a Related Party. | • Fraudulent Transfer • Breach of Fiduciary Duty • Preferential Transfer • Aiding and Abetting Breach of Fiduciary Duty | $13,900,000 | $42,100,000 |
| 3. | Integra Colorado Sublease | In December 2022, Genesis subleased four (4) Colorado properties from Integra, an affiliate of a Related Party. The sublease was terminated in July 2023. | • Fraudulent Transfer • Breach of Fiduciary Duty • Aiding and Abetting Breach of Fiduciary Duty | $1,100,000 | $1,800,000 |
| 4. | Integra Colorado Sublease Termination Amendment | In December 2023, Genesis amended the July 2023 Colorado sublease termination with Integra, which increased the termination fees owed to Integra, an affiliate of a Related Party. | • Fraudulent Transfer • Breach of Fiduciary Duty • Preferential Transfer • Aiding and Abetting Breach of Fiduciary Duty | $5,400,000 | $7,200,000 |
| 5. | Integra New Jersey Sublease | In February 2023, Genesis subleased one (1) New Jersey property from Integra, an affiliate of a Related Party. | • Fraudulent Transfer • Breach of Fiduciary Duty • Preferential Transfer • Aiding and Abetting Breach of Fiduciary Duty | $1,400,000 | $5,700,000 |
| 6. | Back Rent Transfer | In October 2024, Genesis paid $20 million to WAX Dynasty Partners LLC ("WAX"), an affiliate of a Related Party, on account of certain unpaid rent obligations. | • Fraudulent Transfer • Breach of Fiduciary Duty • Preferential Transfer • Aiding and Abetting Breach of Fiduciary Duty | $12,000,000 | $16,000,000 |
| | TOTALS | | | $34,540,000 | $77,850,000 |

14

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

**IV.   DESCRIPTION OF THE CAUSES OF ACTION PROPOSED TO BE SOLD OR OTHERWISE RELEASED UNDER THE STALKING HORSE BID AND THE RANGE OF LIKELY VALUES ATTRIBUTABLE TO SUCH CAUSES OF ACTION**

18.   As previously stated, the Special Investigation Committee identified certain potentially valuable and viable causes of action against certain of the Stalking Horse Bidder's related parties, which are proposed to be sold under the Stalking Horse Bid.

19.   Below is a brief description of the transactions giving rise to these Potential Claims, as well as the bases for the Potential Claims and a range of likely values attributable thereto. Each range of likely values set forth herein reflects the Special Investigation Committee's assessment of the probability of success in litigation based on the merits and risks of the relevant Potential Claims. Importantly, each range of likely values must be adjusted further to reflect, among other things, the cost of litigation, time value of money, and collectability of a final judgment. The summary below does not attempt to describe every finding and conclusion made by the Special Investigation Committee in the Investigation.

20.   Genesis also had a number of transactions with Related Parties in addition to the ones identified above. The Special Investigation Committee concluded that those transactions do not give rise to valuable and viable Potential Claims. Those transactions are summarized in Section IV.B. below.

**A.   Potential Valuable and Viable Claims Proposed to be Sold or Otherwise Released Under the Stalking Horse Bid**

**i.   Potential Claims Arising from Pinta Consulting Agreement**

21.   As of January 1, 2022, the Debtors entered into a Consulting Agreement with Pinta Capital Partners (an entity affiliated with Joel Landau, a Related Party) ("Pinta"), whereby Pinta

15

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

provides the Debtors with "certain transactional support services" in exchange for a monthly consulting fee of $350,000 (i.e. $4.2 million per year) and reimbursement of reasonable expenses. The Genesis Board approved entry into this agreement in July 2022, retroactive to January 2022. The services provided by Pinta are described in the agreement as follows: "sourcing deals; deal negotiation; due diligence (primarily business and financial); account management; financial modeling; financing – both equity and debt capital raising; other general deal advisory services (including structuring and risk analysis); and identifying risk management and cost control strategies." Under this agreement, Pinta designated five employees to be primarily responsible for rendering these services to Genesis.

22.     The Special Investigation Committee determined that there are potentially valuable and viable causes of action relating to the Pinta Consulting Agreement:[8]

      a. *Constructive Fraudulent Transfer*.   The Special Investigation Committee concluded that a constructive fraudulent transfer claim with respect to the Pinta Consulting Agreement is potentially valuable and viable.  The Debtors may not have received reasonably equivalent value of services for the fees paid and there is evidence of insolvency at the relevant times. The Special Investigation Committee concluded that both elements of this claim would involve factual disputes at trial. The Special Investigation Committee determined that the range of likely values attributable to this cause of action is approximately $735,000 to $5,040,000.

---

[8]     The potential damages and claim values arising from these Potential Claims are likely not cumulative of one another.

16

**HIGHLY CONFIDENTIAL
REMAINS SUBJECT TO CHANGE
SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS
PROFESSIONAL EYES ONLY**

b. *Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty*. The Special Investigation Committee concluded that breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims with respect to the Pinta Consulting Agreement are potentially valuable and viable. The Agreement was approved by potentially conflicted fiduciaries and there is no evidence of benchmarking of the fairness of the consulting fee. Certain Released Parties assisted in getting the agreement approved and implemented. The Special Investigation Committee determined that the range of likely values attributable to these causes of action is approximately $735,000 to $5,040,000.

c. *Preferential Transfer*. The Special Investigation Committee concluded that a preferential transfer claim with respect to the Pinta Consulting Agreement is potentially valuable and viable. The Debtors would likely be able to satisfy the *prima facie* elements of a preference claim. The Special Investigation Committee concluded that such claim would potentially be subject to strong statutory defenses. The Special Investigation Committee determined that the range of likely values attributable to this cause of action is approximately $630,000 to $1,260,000.

#### ii. Potential Claims Arising from the Integra Subleases

23. In November 2022, Welltower, as landlord, transferred the operation of 147 skilled nursing facilities ("SNFs") from ProMedica, a third party, to a new joint venture with Integra Health, an entity that is affiliated with a Related Party. In December 2022, the Debtors entered into master sublease agreements with Integra for thirty-eight SNFs, including four facilities in Colorado and thirty-four facilities in Pennsylvania. In February 2023, the Debtors entered into an

17

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

additional sublease with Integra with respect to one SNF in New Jersey (together with the Integra Pennsylvania and Colorado SNF subleases, the "Integra Subleases").  Prior to the chapter 11 filing, the Debtors divested the Integra Colorado SNFs and the Integra New Jersey SNF, as well as certain of the Integra Pennsylvania SNFs.  During the respective terms of the Integra Subleases, the Debtors paid the following in total rent: (1) approximately $120,222,000 in total rent paid under the Pennsylvania SNF subleases; (2) approximately $5,075,000 in total rent paid under the Colorado SNF subleases; and (3) approximately $7,092,431 in total rent paid under the New Jersey SNF sublease.

24.    The Special Investigation Committee determined that there are potentially valuable and viable causes of action relating to the Integra Subleases:[9]

   a. *Constructive Fraudulent Transfer*.  The Special Investigation Committee concluded that a constructive fraudulent transfer claim with respect to each of the Integra Subleases is potentially valuable and viable.  The Debtors may not have received reasonably equivalent value for the rent paid and there is evidence of insolvency at the relevant times.  The Special Investigation Committee concluded that both elements of this claim would involve factual disputes at trial.  The Special Investigation Committee determined that the range of likely values attributable to this cause of action is: (i) for the Pennsylvania sublease, approximately $13,890,000 to $42,080,000; (ii) for the Colorado sublease, approximately $1,110,000 to $1,780,000; (iii) for the New Jersey sublease, approximately $1,400,000 to $5,670,000.

---

[9]    The potential damages and claim values arising from these Potential Claims are likely not cumulative of one another.

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

b. *Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty*. The Special Investigation Committee concluded that breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims with respect to each of the Integra Subleases are potentially valuable and viable . With respect to the Pennsylvania and Colorado subleases, the Board approved entry into the transactions, but there is evidence that the Board may not have been fully informed. With respect to the New Jersey sublease, there is no record of Board approval. Certain Released Parties assisted in getting the Integra Subleases approved and/or implemented, with limited due diligence. The Special Investigation Committee determined that the range of likely values attributable to these causes of action is: (i) for the Pennsylvania sublease, approximately $13,890,000 to $42,080,000; (ii) for the Colorado sublease, approximately $1,110,000 to $1,780,000; (iii) for the New Jersey sublease, approximately $1,400,000 to $5,670,000.

c. *Preferential Transfer*. The Special Investigation Committee concluded that that a preferential transfer claim with respect to the Integra New Jersey and Pennsylvania Subleases is potentially valuable and viable. The Debtors would likely be able to satisfy the *prima facie* elements of a preference claim. The Special Investigation Committee concluded that such claim would potentially be subject to strong statutory defenses. The Special Investigation Committee determined that the range of likely values attributable to this cause of action is approximately $7,410,000 to $14,820,000.

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

### iii. Potential Claims Arising from the Integra Colorado Lease Termination Amendment

25. On July 15, 2023, the Debtors and Integra entered into a sublease termination agreement to terminate the Integra Colorado master sublease. The termination agreement provided that the Company would make termination payments to Integra equal to "Base Rent" that would have been due under the Colorado master sublease through December 31, 2023 (approximately $3.625 million). The July 2023 termination agreement was amended by the parties in December 2023 (the "CO Termination Amendment") to extend the termination payments owed by the Debtors to Integra through "the earlier of [Welltower's] sale of all Facilities and July 31, 2027." This increased the total amount of termination payments owed from $3.625 million to approximately $20 million, without Genesis receiving additional consideration. The Genesis Board did not approve entry into either the July 2023 termination agreement or the CO Termination Amendment. Prior to the chapter 11 filing, the Debtors paid approximately $9 million to Integra in termination fees related to the Integra Colorado subleases.

26. The Special Investigation Committee determined that there are potentially valuable and viable causes of action relating to the CO Termination Amendment:[10]

    a. *Constructive Fraudulent Transfer*. The Special Investigation Committee concluded that a constructive fraudulent transfer claim with respect to the CO Termination Amendment is potentially valuable and viable. The Debtors may not have received reasonably equivalent value for the termination fees paid and there is evidence of insolvency at the relevant times. The Special Investigation

---

[10] The potential damages and claim values arising from these Potential Claims are likely not cumulative of one another.

20

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

Committee concluded that both elements of this claim would involve factual disputes at trial. The Special Investigation Committee determined that the range of likely values attributable to this cause of action is approximately $5,400,000 to $7,200,000.

b. *Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty*. The Special Investigation Committee concluded that breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims with respect to the CO Termination Amendment are potentially valuable and viable. The transaction was not approved by the Board. Certain Released Parties assisted in getting the CO Termination Amendment implemented. The Special Investigation Committee determined that the range of likely values attributable to these causes of action is approximately $5,400,000 to $7,200,000.

c. *Preferential Transfer*. The Special Investigation Committee concluded that a preferential transfer claim with respect to the CO Termination Amendment is potentially valuable and viable. The Debtors would likely be able to satisfy the *prima facie* elements of a preference claim. The Special Investigation Committee concluded that such claim would potentially be subject to strong statutory defenses. The Special Investigation Committee determined that the range of likely values attributable to this cause of action is approximately $2,476,372 to $3,301,830.

iv. **Potential Claims Arising From 2024 Restructuring Transactions**

27. In September 2024, the Debtors engaged in a complex series of restructuring transactions (the "2024 Restructuring Transactions"). Among other things, the 2024 Restructuring

21

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

Transactions involved: (a) Welltower transferring approximately $84.5 million of the Debtors' secured Term Loan debt and approximately $331.4 million of the Debtors' unsecured Real Estate Loans to Related Parties, WAX (an entity owned and controlled by Mr. Landau) and MAO;[11] and (b) a landlord joint venture consisting of Welltower and Cindat transferring the right to collect approximately $70 million of back rent payable (the "Back Rent Payable") by the Debtors to WAX. In connection with the assignment of the Back Rent Payable, WAX agreed to not take action to collect such back rent until all other master lease obligations to the Welltower/Cindat landlords had been satisfied. The Board approved the 2024 Restructuring Transactions, though there is evidence that the Board approval process was flawed. Approximately two weeks after the 2024 Restructuring Transactions closed, the Debtors paid WAX $20 million of the Back Rent Payable with an agreement to pay an additional $10 million (the "Back Rent Transfer"), which the Board did not approve.

28.     The Special Investigation Committee determined that there are potentially valuable and viable causes of action relating to the Back Rent Transfer:[12]

> a. *Constructive Fraudulent Transfer*. The Special Investigation Committee concluded that a constructive fraudulent transfer claim with respect to the Back Rent Transfer is potentially valuable and viable. The Debtors may not have received reasonably equivalent value for the back rent paid and there is evidence of insolvency at the relevant times. The Special Investigation

---

[11]   WAX and MAO agreed to subordinate their term loan holdings to the term loan debt held by Welltower and Omega.

[12]   The potential damages and claim values arising from the Potential Claims related to the Back Rent Transfer are likely not cumulative of one another.

HIGHLY CONFIDENTIAL
REMAINS SUBJECT TO CHANGE
SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS
PROFESSIONAL EYES ONLY

Committee concluded that both elements of this claim would involve factual disputes at trial. The Special Investigation Committee determined that the range of likely values attributable to this cause of action is approximately $12,000 to $16,000,000.

b.  *Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty*. The Special Investigation Committee concluded that breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims with respect to the Back Rent Transfer are potentially valuable and viable.  The transaction was not approved by the Board.  Certain Released Parties assisted in getting the Back Rent Transfer implemented.  The Special Investigation Committee determined that the range of likely values attributable to these causes of action is approximately $12,000,000 to $16,000,000.

c.  *Preferential Transfer*.  The Special Investigation Committee concluded that a preferential transfer claim with respect to the Back Rent Transfer is potentially valuable and viable.  The Debtors would likely be able to satisfy the *prima facie* elements of a preference claim. The Special Investigation Committee concluded that such claim would potentially be subject to strong statutory defenses.  The Special Investigation Committee determined that the range of likely values attributable to this cause of action is approximately $12,000,000 to $16,000,000.

HIGHLY CONFIDENTIAL
REMAINS SUBJECT TO CHANGE
SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS
PROFESSIONAL EYES ONLY

**B.      Additional Claims Proposed for Sale or Release Under the Stalking Horse Bid**

29.      The Special Investigation Committee determined that the following transactions do not give rise to valuable and viable Potential Claims worthy of pursuit. For the convenience of the bidders, below is a brief factual summary of these transactions:

**i.      2023 ReGen Investment**

30.      In May 2023, the Debtors issued a $25 million promissory note to ReGen Healthcare (an entity controlled by Mr. Landau) ("ReGen").  Prior to entering into this note agreement, the Debtors issued a capital call notice to certain legacy investors, offering them the opportunity to invest an additional $25.05 million in exchange for convertible promissory notes on the same terms as the ReGen note.  No investors accepted that offer.

**ii.      Allure Consulting Agreement**

31.      As of January 31, 2022, the Debtors entered into a consulting agreement with Allure Care (an entity affiliated with Mr. Landau) ("Alure"), whereby Allure's Chief Operating Officer (COO) was contracted to provide COO services to the Debtors without being hired as an employee in exchange for a $55,000 monthly consulting fee (i.e. $660,000 per year). The Genesis Board approved entry into this agreement.  This agreement was terminated in February 2024.

**iii.      New York City Office Lease**

32.      In March 2022, the Debtors entered into a lease for office space in New York City with Aurora Health Network (an entity affiliated with Mr. Landau) ("Aurora") as co-tenant.  The landlord under this lease is not a Related Party.  Upon entering into the lease agreement, the Debtors and Aurora subleased 50% of the lease to a different Genesis subsidiary, which was liable for 50% of the rent and 100% of the security deposit ($885,000).  The fixed rent under this lease

24

HIGHLY CONFIDENTIAL
REMAINS SUBJECT TO CHANGE
SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS
PROFESSIONAL EYES ONLY

is $1,180,140 per year, split equally between the Debtors and Aurora. This transaction was approved by the Genesis Board.

### iv.    Transactions Involving the Genesis-Next Healthcare Joint Venture

33.    The Debtors are party to a joint venture with Next Healthcare called NextGen. In January 2022, the Debtors purchased three SNFs from NextGen. The Genesis Board approved this transaction.

### v.    Therapy Services Agreements with LaVie Care Centers and nSpire

34.    In March 2022, the Debtors amended therapy service agreements with LaVie Care Centers ("LaVie") and nSpire (two entities affiliated with Mr. Landau). Under these agreements, a Genesis subsidiary provides therapy services to SNFs operated by LaVie and nSpire. Each SNF compensates the Debtors in accordance with a schedule attached to the therapy service agreements. The Genesis Board approved these transactions.

### vi.    Sale of Real Estate within the GMF Capital Portfolio

35.    In May 2022, the Debtors worked with GMF (a third-party landlord) to sell to an affiliate of Mr. Landau certain properties that the Debtors were leasing from GMF, with the Debtors then exiting the leases. The Debtors relinquished certain rights, including the right to lease, the right of first opportunity, and certain purchase options, relating to specific centers within the GMF portfolio, while continuing to lease other centers within the GMF portfolio under one or more leases with Mr. Landau's affiliate company on fair market terms. The Genesis Board approved this transaction.

### vii.    SNF Agreement with Longevity Health

36.    In May 2022, the Debtors entered into a SNF agreement with Longevity Health (an affiliate of Mr. Landau) ("Longevity"), whereby SNFs operated by the Debtors are permitted to

25

HIGHLY CONFIDENTIAL
REMAINS SUBJECT TO CHANGE
SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS
PROFESSIONAL EYES ONLY

participate in Longevity's Medicare benefit plans. Longevity bills insurers and/or patients directly, and there are no direct costs to the Debtors. The Genesis Board approved this transaction.

### viii.   Wound Care Consulting Access Agreement with ReNew Wound Care

37.     In May 2022, the Debtors entered into an agreement with ReNew Wound Care (an affiliate of Mr. Landau) ("ReNew"), whereby ReNew provides wound care services to certain SNFs operated by the Debtors. ReNew bills insurers and/or patients directly for its services. The Genesis Board approved this transaction.

### ix.   Telehealth Services Agreement with Vis a Vis Health Care

38.     In May 2022, the Debtors entered into an agreement with Vis a Vis Health Care (an affiliate of Mr. Landau) ("Vis a Vis") to receive overnight telehealth services at Genesis SNFs. Under this agreement, the Debtors paid a call coverage fee to Vis a Vis, with services otherwise reimbursable by insurers and/or patients. The call coverage fee varied based on the number of beds in each facility, ranging from $600 per month to $3,000 per month. The Debtors terminated this agreement and replaced these services with Lumina Care (discussed herein). The Genesis Board approved this transaction.

### x.   SmartLinx Agreement

39.     In September 2022, the Debtors entered into an agreement with SmartLinx to receive certain HR and payment software services. The Debtors viewed this as a third-party transaction, as there were no known connections to SmartLinx. The Debtors later determined that a Genesis officer was also a board member of the parent entity of SmartLinx, which was not disclosed to the Genesis Board prior to entry into this agreement. The Debtors terminated that

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

officer and the Smart Linx agreement in early 2024.  The Debtors paid approximately $1 million to SmartLinx over the term of the agreement.

### xi.     Wound Care Agreement with Gentell

40.     In December 2022, the Debtors entered into a wound care agreement with Gentell (an affiliate of Mr.  Landau), whereby Gentell provides wound care and other medical supplies to residents of certain Genesis SNFs.  The Debtors pay Gentell for services only if Gentell is unable to collect from insurers and/or patients.  The Genesis Board approved this transaction.

### xii.    Sales Representative Agreement with JSL Holdings

41.     In December 2022, the Debtors entered into an agreement with JSL Holdings (an entity owned by Mr. Landau's brother), whereby JSL Holdings assists the Debtors in securing preferential pricing from Synergi Partners, a tax consultant that assists companies in receiving employee retention credits (ERC).  Under this agreement, the Debtors pay JSL Holdings 2% of all savings, refunds, and credits secured by Synergi Partners.  The Genesis Board approved this transaction.

### xiii.   Hospice Service Agreement with LilyCare Holdings

42.     In February 2023, the Debtors entered into a hospice service agreement with LilyCare Holdings (an affiliate of Mr. Landau) ("LilyCare"), whereby LilyCare provides hospice services to residents of certain Genesis SNFs, primarily in New Mexico.  Under this agreement, LilyCare bills insurers and/or patients directly for services rendered, and Genesis SNFs bill LilyCare for room and board services. The Genesis Board approved this transaction.

### xiv.    Laboratory Services Agreement with Ecco Lab

43.     In October 2023, the Debtors entered into an agreement with Ecco Lab (an entity affiliated  with  Mr.  Landau),  whereby  Ecco  Lab  provided  routine  blood  testing  and  other

27

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

phlebotomy services to various Genesis SNFs.  Under this agreement, Ecco Lab billed insurers and/or patients for phlebotomy services based on a Medicare fee schedule. The Debtors terminated this agreement in early 2024.  The Genesis Board approved entry into this transaction.

### xv.      Collection Services Agreement with Omega Business Services

44.      In January 2024, the Debtors entered into a collection services agreement with Omega Business Services (an entity affiliated with Mr. Landau's wife) ("Omega Business"), whereby Omega Business provides revenue collection management services to the Debtors, with a focus on divested centers where the receivables are at least six months old and have already been worked by the Genesis in-house accounts receivable team.  Under this agreement, the Debtors pay Omega Business a fee of 25% of total amounts collected, a fee that is in the range paid by Debtors to its third-party collections agencies. The Genesis Board approved entry into this transaction.

### xvi.     Professional Services Agreement with G-Radar

45.      In October 2023, the Debtors entered into a professional services agreement with G-Radar, whereby G-Radar provides the Debtors with remote-managed-care case management services in exchange for fees of $3 million to $4 million per year.  After the Debtors entered into this agreement, certain Genesis officers invested in G-Radar, at which point the Genesis Board approved the continued use of G-Radar's services under the terms of the existing agreement.

### xvii.    Telehealth Services Agreement with Lumina Care

46.      Following the Debtors' termination of the telehealth services agreement with Vis a Vis (discussed above), the Debtors entered into a telehealth services agreement with Lumina Care (an entity affiliated with Mr. Landau's son) in March 2024.  Lumina Care provides telehealth services at approximately 147 Genesis SNFs.  In exchange for these services, Genesis pays Lumina

28

HIGHLY CONFIDENTIAL
REMAINS SUBJECT TO CHANGE
SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS
PROFESSIONAL EYES ONLY

Care a call coverage fee of $1,000 per month per facility (i.e. approximately $1,764,000 per year). The Genesis Board approved this transaction.

### xviii.   Pharmacy Services Agreement with PharMerica

47.     In August 2024, the Debtors entered into an agreement with PharMerica (a third-party pharmacy benefits manager) to receive PBM services, with rebates obtained by Genesis subject to purchasing through Coral GPO (an affiliate of Mr. Landau).  Under this agreement, PharMerica pays administrative fees to Coral GPO based on a percentage of purchases made by Genesis.  The Genesis Board approved entry into this agreement.

## V.   CONCLUSION AND RESERVATION OF RIGHTS BY THE SPECIAL INVESTIGATION COMMITTEE

48.     This Summary Report contains a factual description of the Investigation and certain conclusions reached by the Special Investigation Committee regarding the value of the Potential Claims proposed to be sold to the Stalking Horse Bidder.  It does not disclose information subject to the work product doctrine or attorney-client privilege as between the Special Investigation Committee and Katten or between the Special Investigation Committee and the Debtors' counsel. The information contained herein is qualified in all respects by work product prepared on behalf of the Special Investigation Committee, communications between the Special Investigation Committee and Katten, and communications between the Special Investigation Committee and the Debtors' counsel.

49.     The Special Investigation Committee reserves the right to continue the Investigation during the chapter 11 cases in accordance with the Delegating Resolutions, including

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

by evaluating additional document productions and further witness testimony as it deems necessary in discharging its duties.

50.      Based upon the Debtors' desire to have a Stalking Horse going concern sale to provide safety and security for the more than 15,000 patients and comfort to the market for future patients and the Debtors' 27,000 employees, the Independent Directors determined that it was in the best interests of the Debtors' estates (including patients, employees, creditors, and stakeholders) to enter into the Stalking Horse Bid, including the proposed sale of potential estate claims and causes of action, subject to the postpetition marketing and sale period and subject to higher and better offers. For the avoidance of doubt, competitive bidders do not need to acquire

**HIGHLY CONFIDENTIAL**
**REMAINS SUBJECT TO CHANGE**
**SUBJECT TO RELEVANT CONFIDENTIALITY AGREEMENTS**
**PROFESSIONAL EYES ONLY**

these potential claims or otherwise provide releases to the Released Parties to be qualified bidders

for the Debtors' assets.

Dated: September 5, 2025

/s/ Steven J. Reisman

**KATTEN MUCHIN ROSENMAN LLP**
Steven J. Reisman (admitted *pro hac vice*)
Cindi M. Giglio (admitted *pro hac vice*)
Marc B. Roitman (admitted *pro hac vice*)
50 Rockefeller Plaza
New York, NY 10020-1605
Telephone: (212) 940-8800
Email: sreisman@katten.com
    cgiglio@katten.com
    marc.roitman@katten.com

**KATTEN MUCHIN ROSENMAN LLP**
Dan Barnowski (admitted *pro hac vice*)
1919 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006-3404
Telephone: (202) 625-3661
Email: dan.barnowski@katten.com

**KATTEN MUCHIN ROSENMAN LLP**
Michaela C. Crocker, SBN: 24031985
2121 N. Pearl St., Suite 1100
Dallas, TX 75201
Telephone: (469) 627-7070
Facsimile: (214) 765-3602
Email: michaela.crocker@katten.com

*Special Counsel to Genesis Healthcare, Inc. at the Sole Direction of Jonathan Foster and Elizabeth LaPuma in their Capacity as Independent Directors and Members of the Special Investigation Committee*

# Exhibit 2

**OMNIBUS RESOLUTION AND CHARTER OF THE
RESTRUCTURING COMMITTEE AND SPECIAL INVESTIGATION
COMMITTEE OF THE BOARD OF DIRECTORS OF
GENESIS HEALTHCARE, INC.**

July 8, 2025

At a duly called and noticed special meeting of the Board of Directors (the "Board") of Genesis Healthcare, Inc., a Delaware corporation (the "Company") held on the date first written above, the Board authorized and adopted the following recitals and resolutions, which resolutions shall have become effective immediately upon the conclusion of such meeting (this "Omnibus Resolution").

## INCREASE IN NUMBER OF DIRECTORS

**WHEREAS**, pursuant to Section 3.1 of the Company's Fourth Amended and Restated Bylaws (the "Bylaws"), the number of directors shall be fixed by resolution of the Board, so long as such number is not less than three nor more than nineteen; and

**WHEREAS**, the Board desires to increase the size of the Board from seven to eight directors and with any such consent rights of ReGen Healthcare, LLC pursuant to Section 5.04(c) and (i) of that certain Investment Agreement dated as of March 2, 2021 having been waived.

**NOW, THEREFORE, IT IS HEREBY RESOLVED**, that the number of directors that shall constitute the whole Board shall be and hereby is, increased from seven to eight.

## ELECTION OF DIRECTORS TO THE BOARD

**WHEREAS**, Article Fifth of the Company's Fourth Amended and Restated Certificate of Incorporation (the "Charter") provides that, subject to any contractual rights of any stockholder, any vacancy in the Board may be filled by a majority of the Board then in office;

**WHEREAS**, the Board desires to fill the vacancies on the Board resulting from the prior resignation of two directors and increase the number of directors on the Board to eight;

**WHEREAS**, the Board has reviewed the specific qualifications of each proposed candidate to serve on the Board, including the extensive experience in restructuring matters of each candidate;

**WHEREAS**, the Company previously retained the services of Jonathan Foster ("Mr. Foster") on March 25, 2025 and Elizabeth LaPuma ("Ms. LaPuma") on May 16, 2025 to direct an independent investigation (the "Independent Investigation") into potential claims and causes of action (each, a "Potential Claim" and collectively, the "Potential Claims") that might be asserted by the Company with respect to any and all previous transactions by and between the Company, on the one hand, and any current or former equity holder, affiliate, subsidiary, director, manager, officer, or other related stakeholders, on the other (each, a "Related Party" and collectively, the "Related Parties");

**WHEREAS**, during the period following their retention, Mr. Foster and Ms. LaPuma have directed the Independent Investigation, with the assistance of independent legal counsel; and

**WHEREAS**, the Board has determined in a sound exercise of its business judgment to elect Mr. Foster, Ms. LaPuma, and Mr. William K. Snyder ("Mr. Snyder") to the Board as disinterested and independent directors to fill the vacancies on the Board.

**NOW, THEREFORE, IT IS HEREBY RESOLVED**, that the Board elects Mr. Foster, Ms. LaPuma, and Mr. Snyder to the Board to serve as disinterested and independent directors of the Company and to hold office until their respective successor is duly appointed or until the earlier death, resignation, or removal of each.

**DIRECTOR COMPENSATION**

**WHEREAS**, the Board has determined that it is advisable and in the best interests of the Company to compensate certain members of the Board for their services; and

**WHEREAS**, the Board considers that the compensation levels set forth in the respective letter agreements setting forth the terms (each, a "Letter Agreement" and collectively, the "Letter Agreements") as to the appointment of Mr. Foster, Ms. LaPuma, and Mr. Snyder to the Board, and approved hereby, are comparable to those paid by other companies of similar size for independent directors with comparable responsibilities.

**NOW, THEREFORE, IT IS HEREBY RESOLVED**, that the Company be and hereby is, authorized to pay Mr. Foster, Ms. LaPuma, and Mr. Snyder the compensation set forth in each respective individual's Letter Agreement and to reimburse each for all reasonable and documented out-of-pocket expenses incurred in connection with their services as a member of the Board.

**CREATION OF RESTRUCTURING COMMITTEE AND APPOINTMENT OF DIRECTORS AND NON-VOTING MEMBERS THERETO**

**WHEREAS**, the Board desires to create a restructuring committee (the "Restructuring Committee") of the Board, which shall have the sole and exclusive authority to negotiate, consider, review, evaluate, and consummate any financing, refinancing, restructuring, recapitalization, merger, consolidation, sale, reorganization, liquidation, or an amendment or modification to the credit facilities of the Company and/or one or more of its direct and indirect subsidiaries and/or similar transactions (any such transaction, a "Restructuring Action") involving a Related Party (any such transaction, a "Related Party Transaction"), and to take such other actions as shall be authorized in this Omnibus Resolution (including voting on any matter referred to the Restructuring Committee by the Board);

**WHEREAS**, the Board has determined that Mr. Foster, Ms. LaPuma, and Mr. Snyder are each disinterested directors (as defined in Section 144 of the General Corporation Law of the State of Delaware (the "DGCL")) with respect to the acts or transactions to be considered by the Restructuring Committee (including any Restructuring Action) and desires to appoint such disinterested directors to serve as the initial members of the Restructuring Committee;

2

**WHEREAS**, the Board has further determined and desires to appoint the Co-Chief Restructuring Officers (Louis E. Robichaux IV and Russell A. Perry) to serve as non-voting advisory members of the Restructuring Committee; and

**WHEREAS**, the Board has determined that the members of the Restructuring Committee shall serve for such term or terms as the Board may determine or until the earlier death, resignation, or removal of each and that the Board may remove any member from the Restructuring Committee at any time with or without cause.

**NOW, THEREFORE, IT IS HEREBY RESOLVED,** that, based on the foregoing, the Board hereby creates the Restructuring Committee and does hereby delegate the aforementioned authority to the Restructuring Committee regarding any Restructuring Action.

**FURTHER RESOLVED**, that, having determined that each of Mr. Foster, Ms. LaPuma, and Mr. Snyder is a disinterested director, specifically that each does not have (i) any actual or potential benefit, including the avoidance of a detriment, other than one which would devolve on the Company or its stockholders generally, that would reasonably be expected to impair the objectivity of such director's judgment when participating in the negotiation, authorization, or approval of the acts or transactions to be considered by the Restructuring Committee (including any Related Party Transaction) and (ii) any familial, financial, professional, employment, or other relationship that would reasonably be expected to impair the objectivity of such director's judgment when participating in the negotiation, authorization, or approval of the acts or transactions to be considered by the Restructuring Committee (including any Related Party Transaction), the Board hereby appoints each of Mr. Foster, Ms. LaPuma, and Mr. Snyder to serve as the initial members of the Restructuring Committee until, as to each, the earlier death, resignation, or removal of such member;

**FURTHER RESOLVED**, that the Co-Chief Restructuring Officers shall be appointed to the Restructuring Committee as non-voting advisory members, effective as of the date first written above, and shall assist and advise the voting members of the Restructuring Committee regarding the consideration of any Restructuring Action or any other matter considered by the Restructuring Committee; and

**FURTHER RESOLVED**, that the Board has determined that the members of the Restructuring Committee shall serve for such term or terms as the Board may determine or until the earlier death, resignation, or removal of each and that the Board may remove any member from the Restructuring Committee at any time with or without cause.

**MEETINGS AND OPERATIONS OF RESTRUCTURING COMMITTEE**

**FURTHER RESOLVED**, that the Restructuring Committee shall meet as often as may be appropriate in the discharge of its responsibilities under this Omnibus Resolution and otherwise as frequently as circumstances dictate. The Restructuring Committee shall act on the affirmative vote of a majority of its members. The Restructuring Committee may act by written consent of all of its members in lieu of a meeting. The Restructuring Committee shall determine its own rules and procedures, including designation of a secretary for its meetings, provided that in the absence thereof, the rules and procedures in the Company's Bylaws applicable to the Board shall be

applicable to the Restructuring Committee. The secretary need not be a member of the Restructuring Committee and shall attend Restructuring Committee meetings and prepare minutes. The Restructuring Committee shall keep written minutes of its meetings, which shall be recorded or filed with the books and records of the Company. Any member of the Board shall be provided with copies of such Restructuring Committee minutes if requested; and

**FURTHER RESOLVED**, that the Restructuring Committee may ask management, employees, outside counsel, auditors, investment bankers, other advisors or consultants, or others (including other directors of the Company) whose advice and counsel are relevant to the issues then being considered by the Restructuring Committee, to attend any meetings and to provide such pertinent information as the Restructuring Committee may request.

<u>RESPONSIBILITIES OF RESTRUCTURING COMMITTEE</u>

**FURTHER RESOLVED**, that the Restructuring Committee shall have the sole and exclusive authority to negotiate and approve the terms, conditions, form, structure, and means of implementation of a Related Party Transaction (except that the Restructuring Committee shall not have the power or authority to (i) approve or adopt, or recommend to the stockholders, any action or matter expressly required by the DGCL to be submitted to the stockholders for approval or (ii) adopt, amend, or repeal any bylaw of the Company, and in such matter shall only have the power and authority to recommend to the Board the taking of such action);

**FURTHER RESOLVED**, that to fullest extent permitted under applicable law, the Board delegates to the Restructuring Committee the authority to determine, in the Restructuring Committee's business judgment, whether any Restructuring Action constitutes a Related Party Transaction and that any such determination shall be binding on the Company;

**FURTHER RESOLVED**, that, to the extent a Restructuring Action is determined not to be a Related Party Transaction, the Restructuring Committee shall otherwise serve in an advisory role to the Board, make recommendations to the Board, and have no legal authority to act on behalf of the Company. For the avoidance of doubt, the Board shall have the sole and exclusive authority to approve and implement, or cause to be implemented, any Restructuring Action not deemed by the Restructuring Committee to be a Related Party Transaction;

**FURTHER RESOLVED**, that, in carrying out its responsibilities, the Restructuring Committee's policies and procedures shall remain flexible to enable the Restructuring Committee to react to changes in circumstances and conditions so that it can fulfill its responsibilities. In addition to such other duties as the Board may from time to time assign, the Restructuring Committee shall negotiate, evaluate, and consider any Restructuring Action and the effect of the foregoing on the Company's businesses, creditors, and other parties in interest. Subject to the foregoing, the Board hereby delegates to the Restructuring Committee, to the fullest extent permitted by law, all of the power and authority of the Board with respect to any Restructuring Action, including, without limitation, the power and authority to:

- review, evaluate, and, in the case of any Related Party Transaction, approve the terms and conditions and various methods to effectuate a Restructuring Action and determine the advisability of a Restructuring Action or any proposal for a

4

Restructuring Action and various methods to effectuate such Restructuring Action or proposal therefor;

- determine whether to:

  - establish, make, reject, or seek to modify the terms and conditions of a Restructuring Action or any proposal for a Restructuring Action;

  - establish, modify, monitor, and direct the process and procedures related to the review and evaluation of a Restructuring Action; and

  - approve a Related Party Transaction and execute and deliver the documents necessary or advisable in connection with the same.

- obtain any necessary or desirable analyses or opinions from the Company's retained legal, financial, and other advisors (including investment bankers), including, without limitation, fairness opinions;

- direct the officers, employees, legal counsel, investment bankers, financial, and other advisors, consultants, agents, and representatives of the Company to provide such information and materials, including, without limitation, books, records, projections, and financial statements as may be useful or helpful to discharge the Restructuring Committee's duties;

- subject to the limitations in this Omnibus Resolution, approve and implement, or cause to be implemented, any Related Party Transaction as informed by any Recommended Findings made by the Investigation Committee on a Potential Claim (each as defined herein); and

- take such other actions related to or arising in connection with advising the Board regarding a Restructuring Action or any proposals for a Restructuring Action as the Restructuring Committee deems necessary, appropriate, or advisable, including, without limitation, exploring and negotiating any proposals with respect to any such Restructuring Action.

**FURTHER RESOLVED**, that, notwithstanding the aforementioned grant of authority, the Restructuring Committee shall have no authority to retain professionals not otherwise retained by the Company with the Board retaining such exclusive authority, *provided* that, the Restructuring Committee may, in its discretion, advise and recommend to the Board that it retain further professionals to assist in any Restructuring Action as facts and circumstances may require and which recommendation the Board shall consider; and

**FURTHER RESOLVED**, that in performing their duties and functions as are authorized herein, the independent director members of the Restructuring Committee are acting in their capacity as directors of the Company and thus shall be entitled to indemnification and reimbursement of expenses for any and all actions performed in connection with their service as independent directors, as provided in the Company's organizational documents and any

5

contractual indemnification or reimbursement of expense provisions, in each case to the maximum extent permitted by law.

**CREATION OF SPECIAL INVESTIGATION COMMITTEE AND APPOINTMENT OF DIRECTORS THERETO**

**WHEREAS**, the Board desires to create a special Investigation Committee (the "Investigation Committee") of the Board to continue the Independent Investigation;

**WHEREAS**, the Board desires to delegate to the Investigation Committee the sole and exclusive authority to make recommended factual findings as to the merits and value of any Potential Claim, including the value of consideration under any Related Party Transaction proposed to purchase or otherwise settle such Potential Claims, and the Investigation Committee shall report its recommended factual findings (the "Recommended Findings") to the Restructuring Committee for review and consideration in carrying out the Restructuring Committee's duties with regard to any Related Party Transaction and to take such other actions as shall be authorized in this Omnibus Resolution or otherwise directed by the Board;

**WHEREAS,** the material facts as to all directors' relationship to, or interest in, the transactions to be considered by the Investigation Committee have been disclosed or are known to all members of the Board; and

**WHEREAS**, the Board has determined that Mr. Foster and Ms. LaPuma are each disinterested directors with respect to the acts or transactions to be considered by the Investigation Committee, were retained by the Company previously to direct the Independent Investigation, and desires to appoint Mr. Foster and Ms. LaPuma to serve as the initial members of the Investigation Committee until the earlier of their death, resignation, or removal.

**NOW, THEREFORE, IT IS HEREBY RESOLVED,** that, based on the foregoing, the Board hereby creates the Investigation Committee and does hereby delegate the aforementioned authority to the Investigation Committee regarding any Potential Claim including the duty to report Recommended Findings to the Board related to the same;

**FURTHER RESOLVED**, that, having determined that each of Mr. Foster and Ms. LaPuma is a disinterested director, specifically that each does not have (i) any actual or potential benefit, including the avoidance of a detriment, other than one which would devolve on the Company generally, that would reasonably be expected to impair the objectivity of such director's judgment when participating in the negotiation, authorization, or approval of the acts or transactions to be considered by the Investigation Committee (including any Potential Claim) or (ii) any familial, financial, professional, employment, or other relationship that would reasonably be expected to impair the objectivity of such director's judgment when participating in the negotiation, authorization, or approval of the acts or transactions to be considered by the Investigation Committee (including any Potential Claim), the Board hereby appoints Mr. Foster and Ms. LaPuma to serve as the initial members of the Investigation Committee until, as to each, the earlier death, resignation, or removal of such member;

6

**FURTHER RESOLVED**, that the members of the Investigation Committee shall serve for such term or terms as the Board may determine or until the earlier of their resignation, death, or removal and that the Board may remove any member from the Investigation Committee at any time with or without cause;

**FURTHER RESOLVED**, that the Investigation Committee shall control any attorney-client work product, or other privilege belonging to the Company in connection with the Independent Investigation, and all materials prepared by or for the Investigation Committee in furtherance of its delegated authority shall be kept confidential.

## MEETINGS AND OPERATIONS OF INVESTIGATION COMMITTEE

**FURTHER RESOLVED**, that the Investigation Committee shall meet as often as may be appropriate in the discharge of its responsibilities under this Omnibus Resolution and otherwise as frequently as circumstances dictate. The Investigation Committee shall act on the affirmative vote of a majority of its members. The Investigation Committee may act by written consent of all of its members in lieu of a meeting. If the result of an affirmative vote of the members of the Investigation Committee results in a tie, such matter shall be referred to the Restructuring Committee and the Restructuring Committee shall have the authority to approve such matter by the affirmative vote of a majority of the Restructuring Committee. The Investigation Committee shall determine its own rules and procedures, including designation of a secretary for its meetings, *provided* that in the absence thereof, the rules and procedures in the  Bylaws applicable to the Board shall be applicable to the Investigation Committee. The secretary need not be a member of the Investigation Committee and shall attend Investigation Committee meetings and prepare minutes. The Investigation Committee shall keep written minutes of its meetings, which shall be recorded or filed with the books and records of the Company.  Any member of the Board or the Restructuring Committee shall be provided with copies of such Investigation Committee minutes if requested;

**FURTHER RESOLVED**, that the Investigation Committee shall have the power and authority to establish additional rules and procedures as it may determine from time to time to be necessary or appropriate to its orderly functioning and its deliberations and to maintain the confidentiality of its proceedings, and any and all materials related thereto shall be kept confidential and not shared with any other members of the Board or management of the Company or any other party, other than any legal, financial, or other advisors or agents of the Investigation Committee; and

**FURTHER RESOLVED**, that the Investigation Committee may ask management, employees, outside counsel, auditors, investment bankers, other advisors or consultants, or others (including other directors of the Company), whose advice and counsel are relevant to any Potential Claim then being considered by the Investigation Committee, to attend any meetings and to provide such pertinent information as the Investigation Committee may request.

## RESPONSIBILITIES OF INVESTIGATION COMMITTEE

**FURTHER RESOLVED**, that the Investigation Committee will have the sole and exclusive authority to investigate, conduct diligence, review documents and materials, and make

7

Recommended Findings as to the merits and value of any Potential Claim, including the value of consideration under any Related Party Transaction proposed to purchase or otherwise settle such Potential Claims. The Investigation Committee will report its Recommended Findings to the Restructuring Committee and the Board on a periodic basis, as determined by the Restructuring Committee or as reasonably requested by any member of the Restructuring Committee or the Board. The Restructuring Committee will consider all Recommended Findings of the Investigation Committee.  For the avoidance of doubt, the Restructuring Committee (subject to the limitations in this Omnibus Resolution) shall have the sole and exclusive authority to approve and implement, or cause to be implemented, any Related Party Transaction as informed by any Recommended Findings made by the Investigation Committee on a Potential Claim; and

**FURTHER RESOLVED**, that, in carrying out its responsibilities, the Investigation Committee's policies and procedures shall remain flexible to enable the Investigation Committee to react to changes in circumstances and conditions so that it can fulfill its responsibilities. In addition to any such further authority or responsibility that the Board may assign to the Investigation Committee from time to time, the Investigation Committee shall be authorized, without limitation, to:

- review and evaluate the documents, materials, facts, circumstances, and any other pertinent information concerning or relating to a Potential Claim and determine the potential value and merits of any Potential Claim, as well as the value of consideration proposed to purchase or otherwise settle such Potential Claims;

- provide Recommended Findings to the Restructuring Committee regarding the potential value and merits of any Potential Claim;

- obtain any necessary or desirable analyses or opinions from the Company's retained legal, financial, and other advisors (including investment bankers), including, without limitation, fairness opinions to the extent such materials relate to a Potential Claim;

- direct the officers, employees, legal counsel, investment bankers, financial, and other advisors, consultants, agents and representatives of the Company to:

  - provide such information and materials, including, without limitation, books, records, projections, and financial statements as may be useful or helpful to discharge the Investigation Committee's duties;

  - report to the Restructuring Committee with respect to any Potential Claims, including to report the Recommended Findings; and

  - respond to questions and provide any requested reports or summaries to the Restructuring Committee with respect to any Potential Claims; and

- take any action as may be necessary or appropriate in its judgment to fulfill the duties and functions of the Investigation Committee as authorized herein.

8

## MISCELLANEOUS INVESTIGATION COMMITTEE PROVISIONS

**FURTHER RESOLVED**, that, in discharging its responsibilities, the Investigation Committee shall have the authority to utilize the services of, and otherwise be granted unfettered access to, any of the Company's retained legal counsel, investment bankers, financial, and other advisors, consultants and agents, and any other committees of the Board, to the extent that the Investigation Committee deems necessary, appropriate, or advisable, to assist it in connection with fulfilling its duties as described in this Omnibus Resolution. The Investigation Committee shall have the power to delegate its authority and duties, subject to the terms of this Omnibus Resolution, to individual members of the Investigation Committee and/or Company management. The Company shall provide appropriate funding, as determined in consultation with the Investigation Committee, for the payment of the reasonable and documented ordinary administrative expenses of the Investigation Committee that are necessary or appropriate in carrying out its duties. The Investigation Committee shall provide periodic and timely reporting on the aforementioned activities to the full Board to be recorded in the minutes;

**FURTHER RESOLVED**, that the Investigation Committee shall have the authority to retain the services of Katten Muchin Rosenman LLP as its independent legal counsel to assist and advise the Investigation Committee in carrying out and discharging its duties pursuant to this Omnibus Resolution;

**FURTHER RESOLVED**, that, notwithstanding the aforementioned grant of authority, the Investigation Committee shall have no authority to retain additional professionals not otherwise retained by the Company with the Board retaining such exclusive authority, *provided* that, the Investigation Committee may, in its discretion, advise and recommend to the Board that it retain further professionals to assist in the Independent Investigation as facts and circumstances may require and which recommendation the Board shall consider; and

**FURTHER RESOLVED**, that in performing their duties and functions as are authorized herein, the members of the Investigation Committee are acting in their capacity as directors of the Company and thus shall be entitled to indemnification and reimbursement of expenses for any and all actions performed in connection with their service as independent directors, as provided in the Company's organizational documents and any contractual indemnification or reimbursement of expense provisions, in each case to the maximum extent permitted by law.

## GENERAL RESOLUTIONS

**FURTHER RESOLVED**, that the executive officers of the Company (collectively, the "Authorized Officers") be and each of them hereby is, authorized and empowered to arrange for and enter into any agreements, instruments, certificates, or documents as may be required in connection with the foregoing and to execute and deliver all such agreements, instruments, certificates, or documents in the name and on behalf of the Company, which shall in their sole judgment be necessary, proper, or advisable in connection therewith and to take all such further action and to pay all expenses as any such Authorized Officer may approve as necessary, proper, convenient, or desirable in order to carry out each of the foregoing resolutions, the taking of any such action and the payment of any such expenses to be conclusive evidence of such approval and of the approval thereof by the Board; and

9

**FURTHER RESOLVED**, that all actions previously taken in connection with the foregoing resolutions by any Authorized Officer be and each of them hereby is, approved, ratified, and confirmed in all respects as the authorized acts and deeds of the Company.

# Exhibit 3

| | |
|---|---|
| **From:** | Reisman, Steven J. |
| **To:** | Rosen, Brian S. |
| **Cc:** | Daniel Simon; Jerry Hall; Marcus Helt; louis.robichaux; Russell Perry; jfinger@jefferies.com; Barnowski, Dan; Barak, Ehud; Desatnik, Daniel; Possinger, Paul V.; Karcher, Timothy Q.; Andrew Turnbull; Ethan Kopp; Sai Kollipara; Brian Taylor; Adam Saltzman; Cliff Zucker; Zahara Kassam; JKrause; Michael G. Farag; Leighton Aiken; Paige Tinkham |
| **Subject:** | Re: Diligence/Meeting Request |
| **Date:** | Sunday, November 23, 2025 6:49:50 PM |

**This email sent by sreisman@katten.com originated from outside the Firm.**

I do not represent the SRC.

I do not speak on behalf of the SRC.

I do not recall ever agreeing that the Committee should speak with the SRC.

The SRC is represented by MWS as its counsel and all communications should go through MWS.

Not sure where this misunderstanding came from — but let's move forward.

I really think we need to be constructive and productive and try and get along — we all know that war is an option — it's the most unfortunate option available.

My best.

STEVEN

PS. Be safe, be smart, be kind, be humble, be generous, be patient, be healthy, be present and be positive.

_____

**Steven J. Reisman**
Partner, Chair, Global Insolvency and Restructuring Practice
**Katten**
**Katten Muchin Rosenman LLP**
50 Rockefeller Plaza / New York, New York 10020-1605
p / +1.212.940.8700 f / +1.212.940.8776 c / +1.212.961.6688
sreisman@katten.com / www.katten.com
Pronouns: He/Him/His

> On Nov 23, 2025, at 1:57 PM, Rosen, Brian S. <brosen@proskauer.com> wrote:
>
> *EXTERNAL EMAIL – EXERCISE CAUTION*
> Dan,
>
> Thank you for email last evening.
>
> The Committee is pleased to consult with the Debtors and the Special Restructuring Committee regarding the questions in the first part of your email outlined below. Mr. Reisman previously suggested the Committee should speak with the SRC directly, and we agree that a direct dialogue would be the most productive means of engaging. To make that conversation as meaningful as possible, we would request the Debtors provide us their current position on the issues below (i.e., a quantitative valuation of the final "sealed" bids, qualitative factors the Debtors are considering, potential risk factors, other impacts on the Chapter 11 cases, and other factors) by your 5pm deadline tomorrow.
>
> As stated in my Saturday email, we are surprised by the new found desire of the Debtors and other Consultation Parties for additional diligence of the bidders when (1) the Debtors claimed throughout the auction they had sufficient information about the Stalking Horse, including to make determinations about discount value on promissory notes, and (2) on the "Clarification Call", you declined Genie 3's offer to provide more information regarding their increased equity infusion. We also view this as beyond the scope of the "sealed" bids that the Debtors and Committee agreed to on the record during the auction. To be clear, to the extent Welltower or Omega seek information regarding adequate assurance in their capacities as landlords, such diligence is inappropriate as they are Consultation Parties solely in their capacity as prepetition lenders.
>
> Regarding our diligence requests, while Genie 3 has shared substantial information with all parties to-date, details about CPE 88988 remain as opaque. Accordingly, we request that the Debtors share (1) all diligence information provided to the Debtors to-date by CPE 88988, and (2) all other diligence information provided by either bidder to all the parties as a result of these diligence requests. Because White Oak already requested several of the diligence questions we would have had for Genie 3, we are adding the following diligence requests of CPE 88988:
>
> CPE 88988
> 1.    Source of the $40 million cash component of its bid;
> 2.    Source of any other financing, including term sheet and commitment letters, for other transactional components;
> 3.    Capital structure upon the closing of a proposed sale; and
> 4.    Information regarding the name, background, experience, ratings and other credentials of the proposed operator, including the principals and affiliated entities.
>
> Finally, we are almost a week out from when the auction was supposed to close (November 17) with no deadline on a determination of the successful bidder. You have represented repeatedly that you would not "jam" the parties on deadlines, yet, the sale hearing remains unchanged from December 10. That time is insufficient for any of the parties, regardless of which bid is selected, to take discovery and prepare for a critical evidentiary hearing. Given the holiday season, we would propose moving the hearing to the week of January 5. Similarly, the Committee's deadline to object to the Debtors' motion to extend plan exclusivity is December 1. The issues involved in that motion are closely connected to the decision on the successful bidder. Accordingly, we request a corresponding extension of deadlines and hearing on that motion (which does not prejudice the Debtors as it would bridge their exclusivity during the adjournment). Please provide confirmation of these issues by 5:00pm CST on November 24, 2025.
>
> All rights reserved. We look forward to hearing from you and the SRC.
>
> Thanks,
>
>                         Brian
>
> **Brian S. Rosen**
> Partner
>
> Proskauer
> Eleven Times Square
> New York, NY 10036-8299
> d 212.969.3380
> m 914.393.3040
> f 212.969.2900
> brosen@proskauer.com
>
> greenspaces
> Please consider the environment before printing this email.

*********************************************************************************************************************************
This message and its attachments are sent from a law firm and may contain information that is confidential and protected by privilege from disclosure.
If you are not the intended recipient, you are prohibited from printing, copying, forwarding or saving them.
Please delete the message and attachments without printing, copying, forwarding or saving them, and notify the sender immediately.
*********************************************************************************************************************************


================================================================
CONFIDENTIALITY NOTICE:
This electronic mail message and any attached files contain information intended for the exclusive
use of the individual or entity to whom it is addressed and may contain information that is
proprietary, privileged, confidential and/or exempt from disclosure under applicable law. If you
are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or
distribution of this information may be subject to legal restriction or sanction. Please notify
the sender, by electronic mail or telephone, of any unintended recipients and delete the original
message without making any copies.

================================================================
NOTIFICATION: Katten Muchin Rosenman LLP is an Illinois limited liability partnership that has
elected to be governed by the Illinois Uniform Partnership Act (1997).
================================================================

# **<u>Exhibit 4</u>**

# Congress of the United States

## Washington, DC 20515

October 7, 2025

Louis Robichaux IV
Co-Chief Restructuring Officer
Genesis Healthcare, Inc.
15950 Dallas Parkway, Suite 750
Dallas, TX 75248

Joel Landau
Managing Partner
Pinta Capital Partners
885 Third Avenue 29th Floor
New York, NY 10022

Russell A. Perry
Co-Chief Restructuring Officer
Genesis Healthcare, Inc.
15950 Dallas Parkway, Suite 750
Dallas, TX 75248

Dear Mr. Robichaux, Mr. Perry, and Mr. Landau,

We write to express our concerns and seek information regarding Genesis HealthCare's July 9, 2025 petition for Chapter 11 bankruptcy.[1] The United States Bankruptcy Court for the Northern District of Dallas will soon hold additional hearings in the Genesis bankruptcy, including a hearing on October 8, 2025 to consider Genesis's request to preemptively protect its executives from litigation. Genesis is one of the largest post-acute care providers in the country, operating nearly 200 skilled nursing facilities and senior living centers across 17 states, and 1,400 rehabilitation therapy centers in 43 states and the District of Columbia.[2] Its bankruptcy jeopardizes care at these facilities, where conditions have already been deteriorating over the past few years.[3] This precarious situation appears to have been the result of years of private equity looting of Genesis, including by JER Partners and, most recently, by Mr. Landau's ReGen Healthcare.

We are further concerned that Genesis and Mr. Landau may be using the bankruptcy system to wipe away Genesis's debts and claims to victims by selling the company at a discount to insiders. Patients and family members hurt by Genesis, together with taxpayers who have paid hundreds of millions of dollars for patient care at Genesis through the Medicaid and Medicare programs and our constituents, deserve answers regarding the cause of this bankruptcy, whether Genesis plans to repay the debts it owes, and whether Genesis is attempting to abuse our bankruptcy system. Such information will enable us to better carry out our responsibilities to

---

[1] Voluntary Petition for Non-Individuals Filing for Bankruptcy, Genesis Healthcare, Inc. (Docket No. 1), https://document.epiq11.com/document/getdocumentbycode?docId=4487840&projectCode=GHI&source=DM.
[2] Genesis Healthcare, About Genesis Healthcare, https://www.genesishcc.com/about-us.
[3] Declaration of Narendra Ganti (Docket No. 415, ¶¶ 25-27), https://document.epiq11.com/document/getdocumentbycode?docId=4500910&projectCode=GHI&source=DM.

pursue legislation to improve the health care system in the interests of our constituents and protect the bankruptcy process from misuse.

### JER Partners and ReGen Healthcare Hollowed Out Genesis

Genesis Healthcare began as Genesis Health Ventures in 1985 with nine nursing homes.[4] That company engaged in a series of mergers and acquisitions over the following 15 years, growing into a $2.4 billion public company encompassing nursing homes as well as rehabilitation therapy, diagnostic testing, respiratory therapy, and pharmacy services.[5] Genesis HealthCare Corporation spun off in 2003, retaining its skilled nursing centers, assisted living and independent living communities, and Genesis Rehabilitation Services.[6]

In 2007, private equity firms JER Partners and Formation Capital bought Genesis.[7] In what we now recognize as a classic move in the private equity playbook,[8] the firms sold "substantially all" Genesis real estate assets to a health care real estate investment trust (REIT) named Health Care REIT, Inc. (now Welltower)[9] for $2.4 billion.[10] The sale comprised 180 facilities and nearly 20,000 assisted-living and long-term care beds, and left Genesis paying rent on real estate that it had previously owned.[11] As the managing director of JER's health team explained at the time, the deal allowed the private equity group to "distribute capital back to our investors by taking advantage of today's exceptionally strong demand for health real estate assets."[12] In other words, the private equity owners saddled Genesis with costly leases and long term debts in order to secure a payout for themselves and other Genesis investors. In court filings, Genesis's lawyers have conceded that these sale-leaseback transactions were a "pivotal moment in the history of the [c]ompany."[13]

Under private equity leadership, Genesis continued buying up nursing home companies to grow into a giant, including acquiring Sun Healthcare Group in 2012 for $215 million[14] and merging with Skilled Healthcare in 2015.[15] By 2016, Genesis was the largest skilled nursing operator in the country, operating more than 500 facilities and more than 60,000 licensed beds across more

---

[4] Genesis Healthcare, History, https://www.genesishcc.com/about-us/company-profile/history.

[5] Id.

[6] Id.

[7] Id.

[8] Axios, "Steward Health's sale puts scrutiny on real estate deals," Caitlin Owens, September 6, 2024, https://www.axios.com/2024/09/06/steward-massachusetts-hospitals-deal.

[9] NBC 24 News, "Toledo-based Health Care Reit becomes Welltower Inc.," Amulya Raghuveer, October 17, 2015, https://nbc24.com/news/local/toledo-based-health-care-reit-becomes-welltower-inc.

[10] PERE News, "JER sells Genesis HealthCare assets in $2.4bn deal," Zoe Hughes, March 1, 2011, https://www.perenews.com/jer-sells-genesis-healthcare-assets-in-2-4bn-deal/.

[11] Id.

[12] Id.

[13] Declaration of Louis E. Robichaux IV in Support of Chapter 11 Petitions and First Day Pleadings (Docket No. 18), ¶ 1, https://document.epiq11.com/document/getdocumentbycode?docId=4488478&projectCode=GHI&source=DM.

[14] PR Newswire, "Genesis HealthCare Acquires Sun Healthcare Group, Inc.," December 3, 2012, https://www.prnewswire.com/news-releases/genesis-healthcare-acquires-sun-healthcare-group-inc-181866581.html.

than 30 states.[16] In March 2021, on the brink of bankruptcy after JER Partners' sale of Genesis's real estate assets and the company's rapid expansion, Genesis accepted a $100 million investment over two years from Mr. Landau's private equity firm ReGen Healthcare LLC[17] in exchange for 93 percent equity and the right to appoint two board members.[18] ReGen acquired the right to appoint an additional board member in 2023 in exchange for an additional $25 million.[19]

The circumstances of this buyout were unusual in their own right. A Senate investigation revealed that the company plunged into financial failure despite receiving $665 million in state and federal assistance in the wake of the Covid-19 pandemic.[20] And the failed Genesis CEO, George V. Hager – who led the company into financial ruin while thousands of its residents died during the pandemic – received $8 million in compensation, including a $5.2 million retention bonus just two months before he left the company.[21]

ReGen's takeover of Genesis has led to worse outcomes for patients. Since then, the proportion of Genesis facilities rated above average (4-5 stars) by the Centers for Medicare & Medicaid Services (CMS) declined from 38 percent to 15 percent, and the average facility rating fell from 2.98 to 2.29 stars.[22] Just last month, CMS moved to close Genesis's Magnolia Ridge facility in Alabama due to the company's failure to "substantially comply with Medicare and Medicaid health and safety participation requirements."[23]

Even before the ReGen takeover, Genesis had a history of mistreating nursing home patients, including failing to properly monitor, treat, and care for patients, leading to "serious, and sometimes fatal, infections and accidents."[24] As a result, Genesis faced a stream of serious claims, including:

---

[15] PR Newswire, "Genesis Healthcare Combines With Skilled Healthcare Group, Inc.," February 2, 2015, https://www.prnewswire.com/news-releases/genesis-healthcare-combines-with-skilled-healthcare-group-inc-300029265.html.

[16] Declaration of Louis E. Robichaux IV in Support of Chapter 11 Petitions and First Day Pleadings (Docket No. 18), https://document.epiq11.com/document/getdocumentbycode?docId=4488478&projectCode=GHI&source=DM.

[17] Id.

[18] First Day Declaration of Louis E. Robichaux IV (Docket No. 18, ¶¶ 27–28, 30), https://document.epiq11.com/document/getdocumentbycode?docId=4488478&projectCode=GHI&source=DM.

[19] First Day Declaration of Louis E. Robichaux IV (Docket No. 18, ¶¶ 82, 39), https://document.epiq11.com/document/getdocumentbycode?docId=4488478&projectCode=GHI&source=DM.

[20] Letter from Sen. Elizabeth Warren to Genesis Healthcare, March 16, 2021, https://www.warren.senate.gov/imo/media/doc/2021.03.16%20Letter%20Response%20to%20Genesis%20Healthcare%20re%20Executive%20Pay%20and%20CARES%20Act%20Funding%20(2).pdf.

[21] Id.

[22] Declaration of Narendra Ganti (Docket No. 415, ¶¶ 25-27), https://document.epiq11.com/document/getdocumentbycode?docId=4500910&projectCode=GHI&source=DM.

[23] Debtors' Emergency Motion for Entry of Order Temporarily Enjoining Decertification of Magnolia Ridge Center (Docket No. 922 ¶ 17), https://document.epiq11.com/document/getdocumentbycode?docId=4512727&projectCode=GHI&source=DM.

[24] Legal Examiner, "Genesis HealthCare Has History of Nursing Home Abuse Lawsuits and Other Legal Troubles," September 26, 2023, https://www.legalexaminer.com/home-family/nursing-home-abuse-lawsuits/genesis-healthcare-has-history-of-nursing-home-abuse-lawsuits-and-other-legal-troubles/.

3

- Improper care of ulcers, wounds, and bed sores
- Failure to diagnose and treat illnesses and infections
- Emotional, physical, and sexual abuse
- Inadequate staff training
- Unsafe and unsanitary conditions
- Medication errors
- Fractures and breaks from falls.[25]

In 2022, the Connecticut Department of Public Health shut down Genesis's Quinnipiac Valley Center nursing home because of the death of two patients and additional safety concerns, and all 94 residents had to be transferred.[26]

> The investigation revealed that the Genesis HealthCare nursing home residents weren't getting their medications on time or given the correct dosage or type, staff weren't trained properly, and that neglect was occurring. One resident died of a heart attack after staff failed to give him his medication. They also discovered that infections at Quinnipiac Valley Center weren't controlled how they should have been to ensure the health and safety of residents and staff.[27]

Two Genesis facilities in Massachusetts were fined the same year for patient neglect and inadequate care of residents.[28]

In 2024, CMS reportedly threatened to stop issuing Medicare and Medicaid payments to the Genesis-owned Lebanon Center in New Hampshire over non-compliance with federal health and safety standards.[29] CMS cited failure to properly administer medication, failure to follow CDC guidelines for infection prevention and control, and failure to provide sufficient nursing staff as among the facility's deficiencies.[30]

Genesis has faced significant legal liabilities as a result of these actions. Prior to filing for bankruptcy, Genesis spent $8 million per month to settle and defend tort claims, and owes $259 million in outstanding litigation costs.[31] The total amount Genesis owes is likely much higher as

---

[25] *Id.*

[26] WSHU, "Deaths and safety concerns shutter a Wallingford nursing home," Sabrina Garone, March 16, 2022, https://www.wshu.org/connecticut-news/2022-03-16/deaths-and-safety-concerns-shutter-a-wallingford-nursing-home.

[27] Legal Examiner, "Genesis HealthCare Has History of Nursing Home Abuse Lawsuits and Other Legal Troubles," September 26, 2023, https://www.legalexaminer.com/home-family/nursing-home-abuse-lawsuits/genesis-healthcare-has-history-of-nursing-home-abuse-lawsuits-and-other-legal-troubles/.

[28] *Id.*

[29] Valley News, "Lebanon Nursing Home Faces Penalties for Care Deficiencies," Clare Shanahan, October 4, 2024, https://vnews.com/2024/10/04/lebanon-nursing-home-does-not-meet-federal-regulations-57252234/.

[30] Centers for Medicare and Medicaid Services, Lebanon Center Inspection Report, July 11, 2024, https://www.medicare.gov/care-compare/inspections/pdf/nursing-home/305050/health/health-inspection?date=2024-07-11.

165 claims remain pending, with some estimating that Genesis owes potential victims more than $344 million more.[32]

## Genesis and ReGen Appear to Be Attempting to Escape Liability by Abusing the Bankruptcy System

Struggling under the weight of mounting debts, Genesis ultimately filed a Chapter 11 bankruptcy petition on July 9, 2025.[33] Almost immediately, the company announced that it had secured $30 million in debtor-in-possession financing from its existing secured lenders, including ReGen.[34] And just one day after its Chapter 11 petition, Genesis filed court documents stating that it had struck an initial deal to be acquired by affiliates of ReGen.[35]

Bankruptcy practitioners have raised concerns about these types of bids made by insiders during Chapter 11 proceedings, called "stalking horse" bids. In particular, experts have highlighted that these insider bids may result in a lower recovery for creditors than liquidation, and that lax standards for reviewing the ultimate fairness of the transaction may allow insiders to shed the company's debts without having to pay a competitive price for the estate.[36] Additionally, the stalking horse bidder often receives bid protections including superpriority status and a breakup fee if the deal is not consummated.[37] Indeed, the U.S. Trustee, the U.S. government's bankruptcy watchdog, has regularly intervened to object to "stalking horse" bidder protections in recent cases with these concerns in mind.[38] Parties in the Genesis bankruptcy have testified that the bidding process is designed to favor the insider bid and that it will chill bids from other potentially interested companies.[39]

---

[31] First Day Declaration of Louis E. Robichaux IV (Docket No. 18, ¶¶ 84-85), https://document.epiq11.com/document/getdocumentbycode?docId=4488478&projectCode=GHI&source=DM.
[32] September 10, 2025 Hearing Transcript, 11:19-25 - 12:1-9 (on file with the Office of Senator Warren).
[33] Voluntary Petition for Non-Individuals Filing for Bankruptcy, Genesis Healthcare, Inc. (Docket No. 1), https://document.epiq11.com/document/getdocumentbycode?docId=4487840&projectCode=GHI&source=DM.
[34] ABL Advisor, "Genesis HealthCare Files Chapter 11, Secures $30MM DIP Financing," July 10, 2025, https://www.abladvisor.com/news/41063/genesis-healthcare-files-chapter-11-secures-30mm-dip-financing.
[35] Bloomberg Law, "Bankrupt Genesis Healthcare Gets Stalking Horse Bid From ReGen," Jonathan Randles, July 10, 2025, https://news.bloomberglaw.com/bankruptcy-law/bankrupt-genesis-healthcare-gets-stalking-horse-bid-from-regen.
[36] ProQuest, "Sales to Insiders: Are They Entirely Fair?," Daniel Carragher, November 2010, https://www.proquest.com/docview/808402306?pq-origsite=gscholar&fromopenview=true&sourcetype=Scholarly%20Journals.
[37] Goodwin Law, "Stalking Horse Bidders: What Bid Protections Can You Expect in a Section 363 Sale?," Robert J. Lemons, Howard S. Steel, and Meredith Mitnick, February 11, 2025, https://www.goodwinlaw.com/en/insights/publications/2025/02/alerts-practices-ma-stalking-horse-bidders-what-bid-protections.
[38] Squire Patton Boggs, "U.S. Trustee Objects to Stalking Horse Bid Protections in Three Recent Delaware Bankruptcy Cases," Kyle Arendsen, March 14, 2025, https://www.restructuring-globalview.com/2025/03/u-s-trustee-objects-to-stalking-horse-bid-protections-in-three-recent-delaware-bankruptcy-cases/.
[39] Turnbull Declaration (Docket No. 417) pp. 9-11, https://document.epiq11.com/document/getdocumentbycode?docId=4500911&projectCode=GHI&source=DM.

Genesis owes hundreds of millions in unsecured debts. These include more than $12 million in unfunded liabilities to its employees' pension fund,[40] and more than $160 million to medical supply, pharmacy, and other vendors.[41] These claims are in addition to the hundreds of millions of dollars in liabilities resulting from neglect, wrongful death, and other suits outlined above. Despite these liabilities, Genesis's sale plan would dedicate only $15 million to pay administrative claims and unsecured creditor debts, and Genesis's Chief Restructuring Officer acknowledged that unsecured creditors like tort victims "may get nothing."[42]

Genesis appears to be attempting to use the bankruptcy system to escape its liabilities, leaving businesses and victims in the lurch. In addition, the same insiders that are attempting to re-purchase Genesis at a discount have snuck provisions into the sale proposal that would release claims against them, allowing them to not only leave monetary claims behind but also escape personal liabilities.[43] The parties seeking releases are Joel Landau, David Gefner, Pinta Capital, and Perigrove.[44]

These provisions are by design: before the bankruptcy petition, Genesis prepared a presentation in which the company described their intention to file for bankruptcy in the Northern District of Texas because of "favorable case law on releases and insider transactions."[45]

### Mr. Landau's Involvement in Genesis Raises Additional Concerns

ReGen is owned by Pinta Capital Partners ("Pinta"),[46] the private equity group co-founded by Mr. Landau[47] and David Harrington, and of which David Gefner is a Director.[48] Mr. Gefner is

---

[40] *Id.*

[41] Voluntary Petition for Non-Individuals Filing for Bankruptcy, Genesis Healthcare, Inc. (Docket No. 1), https://document.epiq11.com/document/getdocumentbycode?docId=4487840&projectCode=GHI&source=DM.

[42] August 27, 2025 Hearing Transcript p. 75; August 21, 2025 Hearing Transcript p. 113 ("Mr. Robichaux: They may get nothing on $1.6 billion in claims. That is correct.").

[43] Bidding Procedures Motion (Docket No. 117 p. 29) ("The Purchased Assets include, to the extent not otherwise released, all Claims and Causes of Action against the Released Parties, certain critical vendors, counterparties to Assumed Contracts and Assumed Leases and any other Claims and Causes of Action (which includes avoidance claims under Chapter 5 of the Bankruptcy Code) other than the Excluded Causes of Action. The Stalking Horse Bid also requires certain releases against the Released Parties by the Debtors and their estates, which shall be approved in the Sale Order.") https://document.epiq11.com/document/getdocumentsbydocket/?docketId=1167843&projectCode=GHI&docketNumber=117&source=DM.

[44] Bidding Procedures Order pp. 77-78 ("Released Parties" includes ReGen Healthcare, LLC, WAX Dynasty Partners LLC, MAO 22322 LLC, Pinta Capital Partners, Perigrove, Integra WIP Tenant, Joel Landau and David Gefner), https://document.epiq11.com/document/getdocumentbycode?docId=4506065&projectCode=GHI&source=DM.

[45] August 21, 2025 Hearing Transcript pp. 123-125 (discussing presentation prepared by debtors' financial advisor which states they chose Northern District of Texas as the venue for bankruptcy because it is favorable on insider releases and insider transactions).

[46] Private Equity Stakeholder Project, "Pulling Back The Veil On Today's Private Equity Ownership of Nursing Homes," Eileen O'Grady, July 2021, p. 9, https://pestakeholder.org/wp-content/uploads/2021/07/PESP_Report_NursingHomes_July2021.pdf.

[47] Pinta Capital Partners, Joel Landau, https://www.pintacapitalpartners.com/team/url/joel-landau.

[48] Supplemental Declaration of Narendra Ganti of FTI Consulting, Inc., Financial Advisor to the Statutory Unsecured Claimholders' Committee, in Support of Objections of the Statutory Unsecured Claimholders'

also a co-founder of Perigrove,[49] a private equity firm that took over prison health care company Corizon Health, Inc. (split into Tehum Care Services, Inc. and YesCare Corporation).[50] At the time of its bankruptcy filing in 2023, Corizon was one of the largest providers of prison health care services in the country and also the repeat target of serious claims of malpractice and patient neglect.[51] As Corizon's debts and liabilities increased, the company was acquired by largely anonymous investors.[52] Rather than facing victims and their families in court, Corizon attempted to shield itself by employing the so-called "Texas Two-Step,"[53] a maneuver through which companies leverage bankruptcy proceedings to attempt to evade liability and, as characterized by Tehum Director Isaac Lefkowitz, "force plaintiffs into accepting lower settlements."[54] Under Perigrove's direction,[55] Corizon appeared to attempt to manipulate the bankruptcy system to escape tort lawsuits and avoid paying bills for tens of millions of dollars' worth of goods and services provided to Corizon by hospitals, small businesses, and former employees.[56]

Mr. Landau's connection to Perigrove through Pinta Partners raises concerns that Genesis could be attempting to repeat Corizon's playbook – this time using a stalking horse bid rather than the Texas Two-Step – in order to avoid claims and liabilities. The hundreds of victims of Genesis's mismanagement deserve better.

To assist us in better understanding Genesis's aims and actions, we request that you provide the following information by October 21, 2025:

---

Committee to the Debtors' Various Requests for Relief (Docket No. 479), https://document.epiq11.com/document/getdocumentsbydocket/?docketId=1175730&projectCode=GHI&docketNumber=479&source=DM.

[49] Supplemental Declaration of Narendra Ganti of FTI Consulting, Inc., Financial Advisor to the Statutory Unsecured Claimholders' Committee, in Support of Objections of the Statutory Unsecured Claimholders' Committee to the Debtors' Various Requests for Relief (Docket No. 479), https://document.epiq11.com/document/getdocumentsbydocket/?docketId=1175730&projectCode=GHI&docketNumber=479&source=DM.

[50] Letter from Senator Warren to YesCare Corporation and Tehum Care Services Inc., October 24, 2023, https://www.warren.senate.gov/imo/media/doc/2023.10.24%20Letter%20re%20Corizon%20Texas%20Two-Step.pdf.

[51] Reuters, "Special Report: U.S. jails are outsourcing medical care – and the death toll is rising," Jason Szep, Oct. 26, 2020, https://www.reuters.com/article/us-usa-jails-privatization-special-repor/special-report-u-s-jails-areoutsourcing-medical-care-and-the-death-toll-is-rising-idUSKBN27B1DH.

[52] Business Insider, "Hidden investors took over Corizon Health, a leading prison healthcare company. Then they deployed the Texas Two-Step," Nicole Einbinder and Dakin Campbell, Aug. 21, 2023, https://www.businessinsider.com/corizon-health-bankruptcy-yescare-texas-two-step-law-2023-8.

[53] *Id.*

[54] *Id.*; Wall Street Journal, "Prison Health Contractor Expands Texas Two-Step Bankruptcy Tactic," Andrew Scurria and Akiko Matsuda, Sept. 19, 2023, https://www.wsj.com/articles/prison-health-contractor-expands-texas-two-step-bankruptcy-tactic-acac4928.

[55] Reuters, "Prison healthcare company restarts mediation after bankruptcy judge Jones quits," Dietrich Knauth, November 14, 2023, https://www.reuters.com/business/healthcare-pharmaceuticals/prison-healthcare-company-restarts-mediation-after-bankruptcy-judge-jones-quits-2023-11-15/.

[56] Wall Street Journal, "Prison Health Contractor Expands Texas Two-Step Bankruptcy Tactic," Andrew Scurria and Akiko Matsuda, September 19, 2023, https://www.wsj.com/articles/prison-health-contractor-expands-texas-two-step-bankruptcy-tactic-acac4928.

7

**Questions Regarding Structure of Genesis and ReGen**

1. Please provide a full description of Genesis' leadership and stakeholder structure, as well as the leadership and ownership of all of the entities' parent companies.
2. Please provide a description of the stalking horse bidder's ownership structure. In your response, please include the identities of each natural person that directly or indirectly holds an equity interest in ReGen, Pinta Capital, and/or Perigrove, and the size of the membership interest(s) held by that natural person.
3. What is Joel Landau's official capacity with respect to Genesis? What are his responsibilities and authorities with respect to Genesis?
4. Please provide a list of every entity that Genesis has done business with in the 1 year prior to bankruptcy that was directly or indirectly owned or controlled by Joel Landau and his family members or David Gefner. For the purposes of this point, ownership means a stake of 10% or more.
5. Since 2021, what rent deferrals, abatements, waivers, or forbearance agreements has Genesis received from REIT or other landlords, and what amounts remain outstanding by counterparty?
6. Please provide a broad accounting of Genesis's liabilities and assets.
7. Please provide a list of all compensation (including salaries, bonuses, stock awards, and any other benefit or perk) each of you and other top executives at Genesis and ReGen have received from Genesis, ReGen and affiliated entities each year from 2021 to the present.

**Questions Regarding Genesis's Bankruptcy and Potential Sale to Insiders**

8. What was the rationale for determining to only engage with an insider stalking horse bidder? Why did the company not engage in any prepetition marketing of assets to non-insiders?
9. Why did the company not seek to reorganize through a Chapter 11 plan?
10. Please explain the decision to file in the Northern District of Texas, including providing any internal analysis comparing venues, expected treatment of third-party releases, and insider transactions.
11. Did Genesis conduct an enterprise valuation before determining to sell the company rather than pursue a plan of reorganization?
12. What steps did Genesis take to facilitate the company's sale in pieces to maximize recovery and interest from other bidders?
13. What safeguards is Genesis putting in place to ensure that administrative expenses are not going to be left behind with the estate while the stalking horse bidder acquires substantially all assets?
14. What steps is Genesis taking to ensure that the stalking horse bidder does not continue the same practices that have led to a dramatic deterioration in the quality of care across Genesis facilities?
15. Please describe all administrative expenses to be assumed by the stalking horse bidder or paid by the estates and provide your analysis of whether the stalking horse asset purchase agreement would render the estate administratively insolvent. How many Genesis workers will lose their jobs as a result of the bankruptcy?

16. Do any lease or sublease agreements contain change-of-control, go-dark, or consent rights that could affect continuity of operations during or after the §363 sale? Please identify them.
17. How many workers and retirees will lose pensions and other benefits?
18. Will you provide severance for workers who lose their jobs?
19. Have there been or will there be any collective bargaining agreements rejected during bankruptcy proceedings?
20. How much does Genesis expect to pay out to unsecured creditors if the sale to the stalking horse bidder is approved? What percentage of outstanding claims does that represent?
21. How much does Genesis expect to pay out to tort claimants if the sale to the stalking horse bidder is approved? What percentage of outstanding claims does that represent?
22. How much does Genesis expect to pay out to workers in outstanding salaries, pensions, and other benefits and liabilities if the sale to the stalking horse bidder is approved? What percentage of outstanding liabilities to workers does that represent?
23. How is Genesis ensuring patients are cared for during the bankruptcy proceedings? How does Genesis plan to improve patient care moving forward?

Sincerely,


Elizabeth Warren
United States Senator


Peter Welch
United States Senator


Richard Blumenthal
United States Senator


Maggie Goodlander
Member of Congress


9

# Exhibit 5

William Snyder - December 7, 2025

Page 44

W. SNYDER

Q.    And the information about Mr. Landau's account, did that give you comfort as to the Stalking Horse Bidder's equity?

A.    Yes, it gave me clarification that that was definitely coming from him or an entity he controlled, yes.

Q.    Okay.  So did you view one Bidder's equity as being more -- scratch that.  I'll start over.

Did you view one Bidder as having an advantage on the other in terms of that equity piece?

A.    Well, I think, yeah.  In my opinion, I believe the fact that almost 10 percent, you know, or more of the bid from Genie 3 was coming from equity gave me comfort.  In other words, there was -- Genie 3 had a much larger portion of their bid was coming from equity, rather than the Stalking Horse bid that was only 40 million.  And so that -- over 10 percent of the Genie 3 bid is coming from equity, so I felt like, you know, when you add it up, these factors, that the

William Snyder - December 7, 2025

Page 45

W. SNYDER

Genie 3 capital structure was better than the Stalking Horse.

Q.   Okay.   You talked about the regulatory issues and the -- how did the regulatory issues compare between Genie 3 and the Stalking Horse?

A.   So --

MR. HELT:   Well, let me say: Objection to the extent it calls for a legal conclusion, but if you can answer about without applying legal advice --

MR. HEMENWAY:   Sorry, Marcus.   I couldn't hear you.   Legal advice or legal conclusion?

MR. HELT:   Sorry.   Good point. Two things.   Two objections. Objection to the extent it calls for a legal conclusion.

MR. HEMENWAY:   Okay.

MR. HELT:   Objection to the extent it invades the attorney-client privilege and the answer relies on attorney-client communication.

William Snyder - December 7, 2025

Page 80

W. SNYDER

I'm going to scroll down past the factors.

MR. HELT:  Zach, it's not on the screen yet.

Q.    While we're pulling that up, just one other question on counsel.  Was there ever any discussion of the SRC having their own separate counsel?

A.    No, that never came up.

MR. HEMENWAY:  Let's go ahead and scroll down to the part towards the end right here.

Q.    So here we have -- here we have the Debtors -- excuse me, here, there is discussion of deliberation following the submission --

MR. HELT:  Zach, hold on one second.  Could you highlight -- there, I see it.  Got it there.

MR. HEMENWAY:  Lower case romanette i describing the deliberation.

BY MR. HEMENWAY:

Q.    So let's start with the six meetings that are referenced.  Were those the

W. SNYDER

the SRC is -- how do we know that's the 254 because the Unsecureds, the Committee -- the Committee spoke to us about, they felt like they had causes of action against Welltower and Omega to knock that down, and speaking to our advisors, that is highly improbable. Those are two public entities, and trying to knock them out is going to be incredibly difficult.  And right now, the Unsecured Creditors are the fulcrum -- are the fulcrum creditors.

So how are you just going to go knock out a senior debt -- and by the way, that senior debt goes across the entire -- the entire spectrum:  Asset class, right, the JVs and the subsidiaries and all this other stuff is -- and I asked that question.  I said, "Guys, how" -- you know, the issue is they've looked at it, and when you look at the bids and the value that came in, the fulcrum is above the senior debt.  And so we believed that that Welltower Omega is 100 percent dollars.

Q.    Did you review the UCC's objection

W. SNYDER

Q.    Exactly.  That's exactly what I was asking.  I appreciate you getting there on an awkwardly worded question.

When you talk about letting the Bidders know where they ended up, do you think it's important to provide that information to all creditors?

A.    Did I provide that information? Did they provide the information to who?

Q.    Do you think it's important to provide the information about both bids to all creditors?

A.    Well, I don't know what that means.  Do you mean the scorecard to all the Creditors?

Q.    Yes.

A.    I don't believe -- other than that motion that was filed in the Court assuming, you know, picking the winning bid -- and that's public, right?  I'm not aware that this scorecard was released to any of the parties other than the participants in the auction that I'm aware of.

Q.    Okay, understood.  On the final

W. SNYDER

scorecard, in terms of total bid consideration, which bid was higher?

A.   The Genie 3 bid was higher by like 20 million.

Q.   Okay.  And I understand that we talked earlier about the bid you chose.  I appreciate that question.

Let's talk about the auction process.  So did the Debtors choose -- did the Debtors designate what's called a Qualified Bidder -- capital Q, capital B -- before the auction?

A.   So prior -- you are asking if prior to the quash -- prior to the auction, were bids deemed to be qualified prior to the auction; is that the question?

Q.   Bidders.

A.   Yes, Bidders.  Whether there was a Qualified Bidder, yes.  My understanding is you had to be a Qualified Bidder to get in that room.  That was my understanding.

Q.   Okay.  And how was the status of a Qualified Bidder determined?

A.   That was determined by Jefferies,

William Snyder - December 7, 2025

Page 174

W. SNYDER

A.      That's my understanding.

Q.      Did the Debtors eventually name a back-up bidder?

A.      What was the question?

Q.      Did the Debtors ever name a back-up bidder?

A.      Well, I think just by the process, I don't know if you name it or you just -- you become one, right?  You're either the Bidder or the -- you're either the winner or the back-up.  I thought it was just, sort of, defaulted to it that.

Q.      Okay.  So did Genie 3 default to the back-up bidder?

A.      Yes.

Q.      Okay.  And when did the SRC make that determination?

MR. HELT:  Objection to the extent it calls for a legal conclusion.

A.      No.  So that decision was made by, I believe, Jefferies in consultation with others.  Jefferies would be the one that made that determination.

# **Exhibit 6**

Aditya Jain  30(b)(6) - December 5, 2025

Page 65

A. JAIN

Q.   Understood.  Any other terms -- have we discussed all the terms on the exit facility that are different from the existing loans?

MR. FOGELMAN:  Objection to form.

BY MR. HEMENWAY:

A.   I believe so, yes.

Q.   Let's move on to the bids.  What is Welltower's view of which bid was the highest and best bid in the auction?

MR. FOGELMAN:  Objection to form.

BY MR. HEMENWAY:

A.   We think the best bid in the auction was the Stalking Horse bid and not the Genie 3 bid.

Q.   What is your basis for that view?

A.   That was our opinion because, one, as I mentioned, there was lack of commitment from their financing and equity and the White Oak ABL.  And, two, it was better for Welltower because they -- you know, the Stalking Horse bid released the cause of

Aditya Jain  30(b)(6) - December 5, 2025

Page 66

A. JAIN

action against us and the Genie 3 bid did not.

So even though we weren't married to those, but we would have to fight it in court and that would cost money and time and effort, so we felt the Stalking Horse bid was better.

Q.    Let's take those one at a time. On the financing commitment, who did Welltower speak to to evaluate the Genie 3 financing?

MR. FOGELMAN:  Objection to form.

BY MR. HEMENWAY:

A.    We asked diligence questions, follow-on diligence questions to the Debtors' Special Restructuring Committee to understand more about it.  I also forgot to mention in my earlier response, there was also an issue with one of the principals, Ari Schwartz, that came to light.  That was another reason we had an issue with the -- why we felt the Stalking Horse bid was better.

Q.    So you asked the diligence

# Exhibit 7

Mark Andrews - December 6, 2025

Page 139

M. ANDREWS

A.    I think the discussions on CPE's side were really to the Debtors, to be clear. I didn't mean to mislead you there.  I don't know that we ever had a conversation -- we, CPE -- with the other Bold Quail joint venture partner.  The only conversations I'm aware of involve just conversations between the Debtors and us related to a proposed settlement they had worked out with the Bold Quail joint venture interest holder.

Q.    Yeah.  When did you first discuss that with the Debtors?

A.    Late.  I want to say I may have heard about it day or two before the auction and then it seemed to me that it hardened into something that sounded like, we can talk about it as opposed to something that was a maybe kind of thing when we got to the auction, but it was late in the timeline.

Q.    You said you first heard there might be something.  How did you hear of that?

A.    I'm sure it was in a meeting with the group.  And, I mean, again, when I say

M. ANDREWS

MR. CATHELL:  Objection; form.

A.    Well, I don't think they -- I
guess I disagree with the first statement.  I
don't think we were very informed until right
up to the 11th hour.  Does that make sense?
Or not does that make sense -- I mean,
that -- that's my answer.  I think some of it
came as a bit of a surprise.  At least that's
the way I read it.

Q.    Sure.  But you heard a few days
before that there might be a deal?

A.    Yes.  It was very close in time to
the auction.  The specific date, I couldn't
tell you, but it was very close in time.

Q.    Was it important to CPE that it be
kept apprised of changes to a joint venture
asset that it was intending to purchase?

MR. CATHELL:  Objection; form.

A.    Like any bidder, you want to know
things that are -- changes to the asset that
you are acquiring.  So you want to know if
there were things that were happening to that
asset.

Q.    So when the Debtors gave you that

Mark Andrews - December 6, 2025

Page 144

M. ANDREWS

information, there was follow-up and future

discussion because you, as any other bidder

would, would want to know that information in

as much detail as you could get it, right?

MR. CATHELL:  Objection; form.

A.    Yeah.  It was relevant to us, yes.

Q.    And as soon as they could possibly

get it to you, so you could have all the

information to make your decisions, correct?

MR. CATHELL:  Objection; form.

A.    Yeah, that's correct.

Q.    Just like any other bidder would?

MR. CATHELL:  Same objection.

A.    Yeah.  All of the people who were

involved in something that is this large want

to keep track of the assets, want to know if

there are any changes to them in character or

common.  All of them will have to expect that

given the size of the Debtors, that it's

difficult to know every piece of every part

of the problem here.  I'm certain there will

be more surprises along the road for

everybody, because there always are in cases

that are this size.  There is a lot of

M. ANDREWS

complexity, and everybody, I take it, was

doing their best, but it's always better to

know early if you can.

Q.    Yeah, they are doing their best to

keep CPE 88988 LLC informed as best they

could?

MR. CATHELL:  Objection; form.

A.    As they would have anybody else.

Q.    You would have expected that same

information to be provided to anybody else?

MR. CATHELL:  Same objection.

A.    Yes.

Q.    So auction begins on the 18th in

the morning; is that your recollection?

A.    Yes.

Q.    I'm happy to refer us to the

transcript of day one of the auction if we

need to, but I can represent to you that the

auction began with the Debtors selecting the

Stalking Horse as the then-current highest

and best bidder; is that your recollection?

A.    Yes.

Q.    Then the other bidders were then

given an opportunity to improve their bids to

M. ANDREWS

A.    Yes.

Q.    There is currently a term sheet for an assumption of the Welltower and Omega term loans; is that right?

A.    Yes.

Q.    And that is a term sheet that has not yet been signed but you've seen iterations of?

MR. CATHELL:  Objection; form.

Go ahead.

A.    That's my memory.

Q.    Okay.  On the assumed debt for WAX and MAO, we have -- $94 million is what is listed, and there is currently a term sheet that is not yet signed for a partial assumption of the WAX Term Loan; is that right?

A.    I think that's correct, yes.

Q.    And no term sheet that you recall on the MAO portion; is that right?

A.    I think that's correct, yes.

Q.    Okay.  At least some portion of this $94 million, there is no agreement yet on whether that's going to be assumed and

Mark Andrews - December 6, 2025

Page 182

M. ANDREWS

how -- and on what terms, sorry; is that
right?

MR. CATHELL:  Objection; form,
scope.

A.    I think that's correct.

Q.    Okay.  And ReGen is -- you know,
we can go back to the numbers, but I can
represent to you that the exhibit you just
saw was showing notes of over $90 million in
principal, and we just talked about that you
don't know whether there is an agreement with
ReGen or not on assumption of those loans,
right?

MR. CATHELL:  Objection; form,
scope.

A.    Correct.

Q.    So sitting here today -- and we
have a sale hearing in four days -- CPE can't
tell me the terms under which it's assuming
hundreds of millions of dollars of debt; is
that right?

MR. CATHELL:  Objection; form,
scope, harassment.

A.    I don't think that's accurate.

Mark Andrews - December 6, 2025

Page 197

M. ANDREWS

A.    Yes.

Q.    And the next line down, the prepetition provider assessments.  Again, is that the provider assessments that we were reviewing in the bid scorecard that were being assumed by CPE?

A.    Yes.

Q.    Okay.  So I just want to circle back to something real quick, because if I don't do it now, I'm going to forget.

Mr. Andrews, your company that you own is the Trinity River Advisors; is that right?

MR. ZLUTICKY:  Objection; scope.

Go ahead, Mark.

A.    Yes.

Q.    And Trinity River Advisors has an engagement agreement with CPE 88988 LLC that provides for the payment of your fees and also a monthly fee; is that correct?

MR. CATHELL:  Same objection.

Go ahead, Mark.

A.    Yes.

MR. CATHELL:  Go ahead, Mark.

M. ANDREWS

Q.    Mr. Andrews, I don't think I could hear you.  If you can answer the question, now that Mr. Cathell made his objections, it would be very much appreciated.

A.    I said "yes."

Q.    Okay.  Thank you.  Does Trinity River Advisors get a success fee or any other type of bonus or other compensation if this deals closes?

MR. CATHELL:  Objection; form, scope.

Go ahead, Mark.

A.    No.

Q.    Do you personally get a bonus success fee, any other compensation, if this deal closes?

MR. CATHELL:  Same objections.

Go ahead, Mark.

A.    Dale is going to shoot me.  No, I do not.

Q.    Mr. Andrews, you are currently a Chapter 11 trustee in a case in the Western District of Texas, right?

MR. CATHELL:  Objection; scope.

M. ANDREWS

A.    Yes.

Q.    And Trinity River is the financial advisors that you've hired in that case?

MR. CATHELL:  Objection; scope.

A.    Not acting as a financial advisor. Just doing some routine reporting in that case.

Q.    And as a Chapter 11 trustee, you're employed by the -- you're appointed by the United States Trustee's office, correct?

A.    Yeah --

MR. CATHELL:  Same objections.

Go ahead, Mark.

Q.    Which is a division of the Department of Justice, right?

MR. CATHELL:  Same objection; scope.  Now it is starting to go into harassment.  Go ahead.

Q.    So did you have a reaction one way or the other, given your knowledge of restructuring and your experience as a Chapter 11 trustee, when you saw the line "DOJ cash settlement" on these projections?

MR. CATHELL:  Objection; form,

M. ANDREWS

A.    No.

Q.    Are you aware of any liabilities that CPE 88988 LLC holds today?

MR. CATHELL:  Same objections.

A.    None other than professional fees that would be charged to CPE.  I can't think of anything else.

Q.    Have you been paid for your work through CPE?

MR. CATHELL:  Objection; scope.

A.    I received a retainer and I go against it.  I don't know if I've sent them a bill for a while, but they have paid me for the work that I have done to date.  I probably owe them a bill at this point.

Q.    When you get paid money, do you receive money from the CPE 88988 LLC operating account?

MR. CATHELL:  Objection; form, scope.

A.    I just received a retainer early, so I haven't been paid since I received that retainer back in July, and to be honest, I don't remember where that funding came from,

M. ANDREWS

if it was a CPE account or something else.  I just don't remember.

Q.    So CPE 88988 LLC, if they are the -- if the Court approves the sale, will acquire approximately 176 skilled nursing facilities; is that right?

A.    Yes.

MR. CATHELL:  Objection; scope, form.

Q.    And the person who is going to be in charge of operating those facilities is Chris Bryson?

MR. CATHELL:  Objection; form, scope.

A.    I couldn't tell you the answer to that because I don't know that that decision has been made.

Q.    Has CPE 88988 LLC had discussions with any other operators about taking over operations of the Genesis HealthCare skilled nursing facilities?

A.    Not that I'm aware of, no.

Q.    In the last paragraph on page 3, it says, "Mr. Bryson is also working with key

Mark Andrews - December 6, 2025

Page 252

M. ANDREWS

members of Synergy Health Care to provide a variety of start-up and support services in support of CPE's Bid."  And then it goes on and then it ends with, "Such services include but are not limited to," and then it lists a range of services.

Do you see that last paragraph I'm referring to?

A.    I do.

Q.    And I agree the paragraph speaks for itself, I'm just pointing you to it.

To your knowledge, does Synergy Healthcare have a written agreement with CPE 88988 LLC?

MR. CATHELL:  Objection; scope.

Go ahead, Mark.

A.    I don't know.

Q.    Who would know?

MR. CATHELL:  Same objection.

A.    I'm not sure.

Q.    Does CPE 88988 LLC think that it's important to know who is going to operate all of these skilled nursing facilities at closing?

M. ANDREWS

MR. CATHELL: Objection; form, scope.

A.    It's important and it's a decision that's not lightly made. Bear in mind closing is no earlier than probably the end of March, and there are a number of discussions with people who are already employed as well as Mr. Bryson and his team that need to take place. So it's an issue that will be front and center, provided the Court designates this bid as the winning bid.

Q.    So that's a decision CPE will make later?

MR. CATHELL: Same objections.

A.    It will be making those decisions between now and the closing.

Q.    But sitting here today, it has not made a decision?

MR. CATHELL: Same objections.

A.    To be specific, it hasn't made a specific decision on who specifically is fulfilling which roles, as opposed to that Synergy is going to be involved in some way, yeah. Are the existing employees going to be

M. ANDREWS

involved in some way, yeah.  How all of that fits together, I think is something that has to be designed as we approach closing.

Q.    As we approach closing, okay.  So that's a decision that will be made as CPE approaches closing, not as CPE approaches approval by the Court, correct?

MR. CATHELL:  Same objections.

A.    I think I said the same thing. All I'd be doing is repeating myself.

Q.    Did CPE have any discussions with Joel Landau about whether one of Joel Landau's operators will take over operations?

MR. CATHELL:  Objection; form, scope.

A.    Not to my knowledge.

MR. ZLUTICKY:  I think here is what I would ask is, Mr. Cathell, if you -- if we can maybe take ten minutes, I may be finished.  I may be almost finished.  I think I probably have, at most, ten minutes or less.  I may be done, but if you can give me just a few minutes to go through my

Mark Andrews - December 6, 2025

Page 255

M. ANDREWS

outline and double-check, I would appreciate it.

Is that okay, if we take a ten-minute break at this time?

MR. CATHELL:  We can take a break, yes.

MR. ZLUTICKY:  So can we come back at 5:25 Eastern?

MR. CATHELL:  Yes.

MR. ZLUTICKY:  Thank you.

(Whereupon, a recess was held.)

MR. ZLUTICKY:  I just have a couple of questions and then I will be finished.

BY MR. ZLUTICKY:

Q.    So, Mr. Andrews, going back to the November 26, 2025, response to the due diligence questions, other than counsel, who prepared or assisted in the preparation of the answers to those due diligence questions?

A.    Mr. Bryson with respect to projections and with respect to, you know, his own personal bio, that kind of thing. Frankly, I'm trying to think whether anybody

# Exhibit 8

Jeffrey Finger - December 7, 2025

Page 48

J. FINGER

BY MR. WESTLING:

Q.   Okay.  All right.  So to the extent
that -- and we talked about this already.  The
issue regarding Mr. Schwartz's role in the
Genie 3 bid surfaced as part of the auction.
Did Jefferies do anything to try to work with
Genie 3 to address that issue?

MR. HALL:  Objection, form.

A.   Jefferies did not.

BY MR. WESTLING:

Q.   Okay.  Do you know if any of the
other parties advising the Debtors did?

MR. HALL:  Objection to form.

A.   I don't believe so, but I don't
recall as it relates to during the auction.

BY MR. WESTLING:

Q.   Okay.  And am I correct that the
issue with Mr. Schwartz was known from the
commencement of the auction?

A.   Known to whom?

Q.   To the Committee is my
understanding, the SRC.  I realize there's a
lot of committees.  That was a terrible
mistake.

Jeffrey Finger - December 7, 2025

Page 53

J. FINGER

bid then sealed.  So the handwritten notes

reflect Genie 3's outline of their sealed bid.

Q.   Okay.  That's helpful.  Thank you.

And I take it then the 933

that's attributed to stalking horse was

not the sealed bid of the stalking horse,

correct?

A.   That's correct.

Q.   Do you know what the value of the

sealed bid of the stalking horse was?

A.   One second.  Give me one minute.

So I believe the bid they

gave us they would have said was like 983.

There was a scorecard.  That may not be

the final number the Debtors determine in

concert with the SRC post the sealed bid,

but I think that's right.

Q.   Okay.  So let me just talk through

this document a little bit with you, and then

we'll talk about how the process ended.

So if I'm looking at this

document, is it fair to say other than the

handwritten notes on it, these are numbers

that were entered by Jefferies?

J. FINGER

that I had judged the outcome at that point in time.

Q.   Did you eventually update the scorecard?

A.   We did.

Q.   Okay.  And based on the updated scorecard, who had the higher bid?

A.   I believe the higher bid was Genie 3.

Q.   Okay.  The scorecard was updated; but that scorecard had not been shared with anyone at this point, correct, other than the Debtor group?

A.   I don't recall whether or not that has since been shared.  There was a lot of information I think that was shared recently. I don't recall.

Q.   But it wasn't provided as of the close of the auction, correct?

A.   As of that evening upon departing, no.  That's correct.

Q.   All right.  So in the Monday session where the decision was announced, there was no final scorecard shared at that point, correct?

Jeffrey Finger - December 7, 2025

Page 59

J. FINGER

A.    I believe that is correct.

Q.    Okay.  So the scorecard is completed, and it shows that Genie has the higher bid.  And I assume that -- let me start there.  Is that true?

A.    That's what it reflects, that's correct.

Q.    Okay.  Following that obviously there were discussions that I assume Jefferies was involved in with the Debtor and their advisors, correct?

A.    Yes, that's correct.

Q.    All right.  And to the extent that Jefferies was involved in those, why didn't Genie 3 end up being the final bidder?  The successful bidder is the word I'm looking for.  I apologize.

MR. HALL:  Objection to form.

A.    The SRC determined that the successful bidder should be the stalking horse.

BY MR. WESTLING:

Q.    Okay.  And I think we touched on this earlier, but do you know all of the

J. FINGER

kind of a change of topic -- that I understand related to the value of the enterprise, if that's a way to put it, had to do with valuing causes of action that were relevant to the company.

Are you familiar with what I'm talking about?

A.   Yes, generally.

Q.   Okay.  So did you get questions from bidders regarding those causes of action and how to better understand them for purposes of -- again, prospective bidders for purposes of making a bid in this process?

A.   From certain of the bidders I recall, yes.

Q.   And what answers did you provide to them about those causes of action, and what was the source of that information?

MR. HALL:  Objection to form.

A.   What we provided to bidders, as I recall -- and I would have to double-check. What we provided to bidders was information pertaining to at a high level the estimated value of those causes of action as

Jeffrey Finger - December 7, 2025

Page 92

J. FINGER

investigated by the Special Investigation

Committee.

BY MR. WESTLING:

Q.   Okay.  And so did you ever undertake

any independent valuation of those causes of

action, or were you simply relying on the

results of the Special Investigative Committee

process?

A.   We did not undertake our own

investigation.

Q.   And so I assume you do not know

whether they are properly valued.  Is that a

fair statement?

A.   I'm relying on what -- those that do

this for a living.  It's not something that

Jefferies does.

Q.   Okay.  To the extent that you

marketed this opportunity to prospective

bidders, to what extent were the causes of

action something you spoke with them about

affirmatively?

MR. HALL:  Objection to form.

Go ahead.

A.   If you could restate that, please.

Jeffrey Finger - December 7, 2025

Page 106

J. FINGER

Q.   What about the underlying work that led to the report?

A.   I believe also some underlying work was provided but nothing that would have been privileged.

Q.   Okay.  You're aware that there was a complaint drafted by the Committee making a variety of additional claims.  Do you know whether that was shared with anyone in connection with valuing causes of action?

MR. HALL:  Objection to form.

A.   I don't believe so.

BY MR. WESTLING:

Q.   Okay.  I'm going to move on to CPE and the stalking horse -- which I understand is the entity behind the stalking horse bid, correct?

A.   Yes, correct.  I think it's got the name of CPE88 --

Q.   Yeah.  There's some numbers.

For the purpose of my questions, could we agree to call it CPE?

A.   I was going to ask you the same.  Thank you.

Jeffrey Finger - December 7, 2025

Page 111

J. FINGER

Q.   And that it would have been a request to Ankura or Jefferies to follow up and find out what was more information about that bank account.  Is that right?

A.   I believe that's what you stated.

Q.   Okay.  I'm asking whether you remember that happening.

A.   I don't recall a specific discussion but -- let me restate.

In looking at the information, William may have raised that. I don't recall specifically.  But if he did, then one of us would have went to try and find out for him.

Q.   And so you would have contacted CPE about it and tried to get additional information.  Is that correct?

A.   Someone would have.

Q.   All right.  And do you know if that happened?

A.   I believe there may have been an inquiry.  It wasn't from Jefferies, though.

Q.   So you believe someone on the Debtors' team -- I don't want to be pejorative

# Exhibit 9

bid procedures.  And we also reserve all rights regarding statements that you made on the record regarding the committee.

We did also agree prior to this auction that you would be reading a certain statement.  I don't know if you want to do it now.  I just want to make sure that that statement will -- commences.

MR. SIMON:  I am happy to do it now. Just let me find it.

So at the request of the committee, and I believe this has been agreed to by the debtors and the secured lenders.  I'll just read it into the record:

"In order to facilitate the ongoing mediation, the committee has not yet filed its standing motion or the complaint, a draft of which was provided to the lenders and the debtors.  Similarly, the committee provided to the debtors prior to the auction a draft claim objection to purported secured claims of the IRS with respect to the Cares Act. That's defined as the IRS claim objection.

The lenders and the debtors agree that the rights of all parties at the auction and any hearing on approval of the motion to approve the winning bid at the auction will be determined as

Page 14

though the standing motion, complaint, and the IRS claim objection had been filed with the court prior to the auction.  This agreement does not alter the fact that the standing motion and complaint must be filed by November 26, 2025, unless that date is further extended by agreement of the parties."

MR. DESATNIK:  Dan, thank you for reading that into the record.  Once again, Daniel Desatnik for the committee.  We just have a very brief statement that we'd like to make in connection with that.  As stated by Mr. Simon, the parties have agreed for purposes of the option and sale hearing to treat the complaint, derivative standing motion, and IRS claim objection as if they had been filed prior to the auction.

The complaint seeks, among other things, disallowance avoidance, subordination and/or re-characterization of purported, secured and unsecured claims asserted by Welltower, Omega, WAX, MAO, and ReGen.  It also contains avoidance actions against these same defendants.

As a result of the counts contained in the complaint, the committee's position is that the claims of Welltower, Omega, WAX, MAO, and ReGen, for purposes of the auction and sale hearing must be

Page 15

is the question?

MR. ROSEN:  What is the deposit?

MR. MUENKER:  Well, Mr. Rosen, as I think you know from reading the bid procedures order, we, as the stalking horse bidder, are a qualified bidder without having to post a deposit.  I think that was the argument that the committee raised in connection to the bid procedures hearing that you lost.

MR. ROSEN:  But --

MR. MUENKER:  That being said, we don't think -- we don't agree with your interpretation of the order.  We don't agree that any deposit is required.  Notwithstanding that fact, we will agree to post a deposit of 10 percent of the cash consideration of our bid as currently valued, which would be $1.5 million.

It is without reservation of our rights as relates to the bid procedures order -- commitment -- post any additional deposit.

And for the laughter, I'll also note for the record, which everyone already knows, that the debtors have $14 million of our money, which is a component of our bid because our bid includes a credit bid.  So that will be on top of the 14 million that

Veritext Legal Solutions
800-336-4000

# **Exhibit 10**

**To:** Carr, James <JCarr@KelleyDrye.com>; Turnbull, Ned <nturnbull@williamsmullen.com>
**Cc:** Greenberg, Nathan S. <NGreenberg@KelleyDrye.com>; Russell Perry <russell.perry@ankura.com>; Krause, Jeffrey C. <JKrause@gibsondunn.com>; Adi Jain <ajain@welltower.com>; Farag, Michael G. <MFarag@gibsondunn.com>; Guerrieri, Will <wguerrieri@mwe.com>; Auman, Yehuda <YAuman@gibsondunn.com>; Shariff, Sara <sshariff@williamsmullen.com>; louis.robichaux <louis.robichaux@ankura.com>; Blakeslee, Krystyna <KBlakeslee@gibsondunn.com>; Goldman, Will <WGoldman@gibsondunn.com>; Sharon Makowsky <smakowsky@welltower.com>; Klein, Steven <SKlein@gibsondunn.com>; NChaudhri@welltower.com; Kirschner, Jonathan <jonathan.kirschner@genesishcc.com>; Michael Zamir <mz@nexthcc.com>; Shimmy Sussman <ss@nexthcc.com>
**Subject:** RE: NextGen All Hands Call [WMIMAN-IWOVRIC.FID2804934]

Email from external sender

Following on the below, I am attaching some cleanup comments removing lingering references to any connection between Next/JV and the WELL Loan so that the prior revisions are consistent throughout, with redline.  Also reflected the Genesis SPV entities as DE LLCs.  This is the final version that Next is prepared to sign.

Thanks.


**Aaron Rokach**

4711 Golf Road, Suite 200

Skokie, IL 60076

Tel:  (847) 745-6938

Fax: (847) 933-9285

arokach@gutnicki.com

www.gutnicki.com


**From:** Carr, James <JCarr@KelleyDrye.com>
**Sent:** Thursday, October 30, 2025 10:12 AM
**To:** Turnbull, Ned <nturnbull@williamsmullen.com>; Aaron Rokach <arokach@gutnicki.com>
**Cc:** Greenberg, Nathan S. <NGreenberg@KelleyDrye.com>; Russell Perry <russell.perry@ankura.com>; Krause, Jeffrey C. <JKrause@gibsondunn.com>; Adi Jain <ajain@welltower.com>; Farag, Michael G. <MFarag@gibsondunn.com>; Guerrieri, Will <wguerrieri@mwe.com>; Auman, Yehuda <YAuman@gibsondunn.com>; Shariff, Sara <sshariff@williamsmullen.com>; louis.robichaux <louis.robichaux@ankura.com>; Blakeslee, Krystyna <KBlakeslee@gibsondunn.com>; Goldman, Will <WGoldman@gibsondunn.com>; Sharon Makowsky <smakowsky@welltower.com>; Klein, Steven <SKlein@gibsondunn.com>; NChaudhri@welltower.com; Kirschner, Jonathan <jonathan.kirschner@genesishcc.com>; Michael Zamir <mz@nexthcc.com>; Shimmy Sussman <ss@nexthcc.com>
**Subject:** RE: NextGen All Hands Call [WMIMAN-IWOVRIC.FID2804934]

CONFIDENTIAL UNDER PROTECTIVE ORDER

No need for a call, Ned. As we indicated in an earlier email, Next is not accepting any additional terms to the draft letter agreement. The attached version of the draft letter agreement that Aaron sent to you yesterday afternoon is acceptable to Next. If the attached is not acceptable to the debtors, then we have no agreement.

Having said that, I am compelled to respond to your 5th point – adding a provision to the draft letter agreement whereby Next will agree to not submit a bid for the debtors' assets. Next will not agree to engage in collusion to chill bidding for the debtors' assets.

Jim

JAMES CARR
Partner, Executive Committee
Kelley Drye & Warren LLP
Tel: (212) 808-7955
Cell: (201) 452-0937

---

**From:** Turnbull, Ned <nturnbull@williamsmullen.com>
**Sent:** Thursday, October 30, 2025 8:59 AM
**To:** Carr, James <JCarr@KelleyDrye.com>; Aaron Rokach <arokach@gutnicki.com>
**Cc:** Greenberg, Nathan S. <NGreenberg@KelleyDrye.com>; Russell Perry <russell.perry@ankura.com>; Krause, Jeffrey C. <JKrause@gibsondunn.com>; Adi Jain <ajain@welltower.com>; Farag, Michael G. <MFarag@gibsondunn.com>; Guerrieri, Will <wguerrieri@mwe.com>; Auman, Yehuda <YAuman@gibsondunn.com>; Shariff, Sara <sshariff@williamsmullen.com>; louis.robichaux <louis.robichaux@ankura.com>; Blakeslee, Krystyna <KBlakeslee@gibsondunn.com>; Goldman, Will <WGoldman@gibsondunn.com>; Sharon Makowsky <smakowsky@welltower.com>; Klein, Steven <SKlein@gibsondunn.com>; NChaudhri@welltower.com; Kirschner, Jonathan <jonathan.kirschner@genesishcc.com>; Michael Zamir <mz@nexthcc.com>; Shimmy Sussman <ss@nexthcc.com>
**Subject:** RE: NextGen All Hands Call [WMIMAN-IWOVRIC.FID2804934]

---

**CAUTION: This message originated outside of Kelley Drye and was sent by: nturnbull@williamsmullen.com**

---

Here are the last remaining open issues in the Letter Agreement:

1.   Title Matters –

1.            In Section 6, in addition to payment of mortgage loans, Genesis would like Seller to commit to clear any other monetary liens that are caused by Seller.

2.            Also, Crestview Center is built on top of a sewer easement to the county (easement prohibits building over the easement area). This is likely cleared by determining how title got comfortable with this at the time of the acquisition, but we will need Next's cooperation to address it.

1.      HUD Reserves – We're ok reimbursing the Seller funded HUD reserves at Closing. The S&U will show WELL funding Next's 54% share of a $2.26M HUD reserve.

2.      HUD Payoff Approval – In Section 9.f, Genesis would like Seller to commit to requesting HUD payoff approval as quickly as possible, but at least within 1 business day, of its notice to Genesis of the issue giving rise to the HUD Payment.

CONFIDENTIAL UNDER PROTECTIVE ORDER

NextGen00409

3.      HUD Indemnification Escrow – In Section 10, Genesis asks that the 3 months debt service deposit be chanced back to an escrow held by the Title Company.  This should only be released for a missed payment.

4.      BK Bid Process – We would like to add a provision stating that Next will not submit a bid in the Genesis Bankruptcy sale process.

5.      Economics and JV Control – Economics prior to HUD payoff are addressed in this Side Letter but control is not addressed. We need a simple clause added to the Letter Agreement that notwithstanding anything to the contrary in the JV Agreement, Next Parties agree that they will not take any action (regardless of whether GEN Member's consent is required under the JVA) that will have a material adverse effect on any of the underlying properties, the joint venture and/or Genesis Member without GEN Member's consent.


Please let us know if these proposals are acceptable, and we will revise the Letter Agreement accordingly.  Happy to still have an all hands call at 10:30 if talking through these points would be helpful and efficient.


Thank you,

Ned


**Ned Turnbull**
*Partner*
T 804.420.6605
email | v-card | website | LinkedIn


Williams Mullen Center | 200 South 10th Street, Suite 1600 | P.O. Box 1320 (23218) | Richmond, VA 23219


NOTICE: Information contained in this transmission to the named addressee is proprietary and is subject to attorney-client privilege and work product confidentiality. If the recipient of this transmission is not the named addressee, the recipient should immediately notify the sender and destroy the information transmitted without making any copy or distribution thereof.


**From:** Carr, James <JCarr@KelleyDrye.com>
**Sent:** Thursday, October 30, 2025 8:40 AM
**To:** Turnbull, Ned <nturnbull@williamsmullen.com>; Aaron Rokach <arokach@gutnicki.com>
**Cc:** Greenberg, Nathan S. <NGreenberg@KelleyDrye.com>; Russell Perry <russell.perry@ankura.com>; Krause, Jeffrey C. <JKrause@gibsondunn.com>; Adi Jain <ajain@welltower.com>; Farag, Michael G. <MFarag@gibsondunn.com>; Guerrieri, Will <wguerrieri@mwe.com>; Auman, Yehuda <YAuman@gibsondunn.com>; Shariff, Sara <sshariff@williamsmullen.com>; louis.robichaux <louis.robichaux@ankura.com>; Blakeslee, Krystyna <KBlakeslee@gibsondunn.com>; Goldman, Will <WGoldman@gibsondunn.com>; Sharon Makowsky <smakowsky@welltower.com>; Klein, Steven <SKlein@gibsondunn.com>; NChaudhri@welltower.com; Kirschner, Jonathan <jonathan.kirschner@genesishcc.com>; Michael Zamir <mz@nexthcc.com>; Shimmy Sussman <ss@nexthcc.com>
**Subject:** RE: NextGen All Hands Call [WMIMAN-IWOVRIC.FID2804934]


Email from external sender

Please send a list of open issues first.

CONFIDENTIAL UNDER PROTECTIVE ORDER

JAMES CARR
Partner, Executive Committee
Kelley Drye & Warren LLP
Tel: (212) 808-7955
Cell: (201) 452-0937

---

**From:** Turnbull, Ned <nturnbull@williamsmullen.com>
**Sent:** Thursday, October 30, 2025 8:33 AM
**To:** Aaron Rokach <arokach@gutnicki.com>
**Cc:** Greenberg, Nathan S. <NGreenberg@KelleyDrye.com>; Russell Perry <russell.perry@ankura.com>; Krause, Jeffrey C. <JKrause@gibsondunn.com>; Adi Jain <ajain@welltower.com>; Farag, Michael G. <MFarag@gibsondunn.com>; Guerrieri, Will <wguerrieri@mwe.com>; Auman, Yehuda <YAuman@gibsondunn.com>; Shariff, Sara <sshariff@williamsmullen.com>; louis.robichaux <louis.robichaux@ankura.com>; Blakeslee, Krystyna <KBlakeslee@gibsondunn.com>; Goldman, Will <WGoldman@gibsondunn.com>; Sharon Makowsky <smakowsky@welltower.com>; Klein, Steven <SKlein@gibsondunn.com>; NChaudhri@welltower.com; Kirschner, Jonathan <jonathan.kirschner@genesishcc.com>; Carr, James <JCarr@KelleyDrye.com>; Michael Zamir <mz@nexthcc.com>; Shimmy Sussman <ss@nexthcc.com>
**Subject:** RE: NextGen All Hands Call [WMIMAN-IWOVRIC.FID2804934]

---

| CAUTION: This message originated outside of Kelley Drye and was sent by: **nturnbull@williamsmullen.com** |
|---|

---

All,

In the interest of finalizing any remaining issues in the Letter Agreement and wrapping this up today, we would like to have an all hands call at 10:30am ET.

WELL and Next Teams – Please let me know if that time works for you.

Thank you,
Ned

**Ned Turnbull**
*Partner*
T 804.420.6605
email | v-card | website | LinkedIn

Williams Mullen Center | 200 South 10th Street, Suite 1600 | P.O. Box 1320 (23218) | Richmond, VA 23219

NOTICE: Information contained in this transmission to the named addressee is proprietary and is subject to attorney-client privilege and work product confidentiality. If the recipient of this transmission is not the named addressee, the recipient should immediately notify the sender and destroy the information transmitted without making any copy or distribution thereof.

CONFIDENTIAL UNDER PROTECTIVE ORDER

# <u>Exhibit 11</u>

# BakerHostetler

Baker & Hostetler LLP

200 South Orange Avenue
Suite 2300
Orlando, FL  32801-3432

T  407.649.4000
F  407.841.0168
www.bakerlaw.com

Elizabeth A. Green
direct dial: 407.649.4036
egreen@bakerlaw.com

November 26, 2025

**VIA E-MAIL**

Jerry Hall
McDermott Will & Schulte LLP
One Vanderbilt Avenue
New York, NY 10017
jerryhall@mwe.com

Re:    *In re Genesis Healthcare, Inc., et al., Case No. 25-80185 (SGJ) (Bankr. N.D. Tex.) (the "Bankruptcy Cases")*

Mr. Hall:

As you know, this firm represents Genie 3 Partners LLC ("Genie") in connection with the Bankruptcy Cases. The purpose of this letter is to respond to your Sunday, November 23, 2025 letter requesting information responsive to the approximately 32 areas of inquiry in your letter (the "Information Requests").

## I.    Background

As an initial matter, we must note our objection to the unusual process being utilized by the Debtors since receiving the sealed bids. As the Debtors are aware, leading up to and at the November 17-18 Auction[1], Genie conducted multiple calls and shared information with the Debtors' professionals regarding Genie's ability to consummate a transaction and operate the Debtors' assets as a going concern. After being named a Qualified Bidder, Genie participated in the Auction in good faith and made three substantive bids that were each deemed to be qualified overbids by the Debtors and constituted the highest and best bids for the Debtors' assets at the time.[2] At the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Bidding Procedures for the Submission, Receipt, and Analysis of Bids in Connection with the Sale of the Debtors' Assets* (Doc. No. 685).

[2] For the avoidance of doubt, nothing herein waives or affects Genie's objections relating to the auction itself, all of which are reserved. Please confirm that the stalking horse and others related to the stalking horse, including Joel Landau, have not communicated with the Debtors or Consultation Parties, and have not taken any action to interfere with Genie 3, its principals, potential funding sources, or the Consultation Parties.

*Atlanta    Chicago    Cincinnati    Cleveland    Columbus    Costa Mesa    Dallas    Denver    Houston
Los Angeles    New York    Orlando    Philadelphia    San Francisco    Seattle    Washington, DC    Wilmington*

November 26, 2025
Page 2

end of the Auction, the Debtors announced a sealed bid process under which sealed bids would be submitted, there would be a "clarifying call" about the bid terms, then the Debtors would decide the winning bidder. Genie appropriately submitted its sealed bid and participated in a November 21 clarifying call.

Based on our experience with Section 363 sales in similar cases and in this case, we were surprised on Sunday evening to receive the roughly 32 Information Requests, and by the significant amount of information demanded by November 26. Much of this information is irrelevant, and to the extent relevant, usually would have been requested before the Auction so that the Debtors could value the highest and best bids (which on three occasions the Debtors deemed to be Genie). The scope of the Information Requests in response to Genie's sealed bid – a bid that reflects more equity contributions and less debt than Genie's prior bids deemed "highest and best" by the Debtors - reflects a unusual shift in how the sale process had been conducted, and give us concerns about whether this supplemental Information Request process is intended to be fair or has the goal of benefitting the Debtors' insider Stalking Horse Bidder.

Notwithstanding the foregoing, we have worked to respond substantively to the Information Requests and Genie's answers are set forth below. We look forward to continuing to work cooperatively with the Debtors and other Consultation Parties to consummate a transaction that maximizes value to the estate and ensures better quality healthcare for the patients going forward.

## II.     Responses

1.  Promissory Note:

    a.  Would the note contemplate restrictions on the Debtors from taking on additional debt that could dilute the position of the promissory note?

        *Genie does not contemplate the Promissory Note restricting further indebtedness of Genie or its affiliates post-closing.*

    b.  Please provide the call price mechanic that would determine the call price for each applicable year.

        *Genie shall utilize the Debtor's assumed 18% discount rate from Closing.  The call price shall equal the discounted face value of the Promissory Note, applying a 18% discount factor per annum and taking into account the remaining balance, during the term of the Promissory Note to calculate the call price.  For illustration purposes, the call price of the Promissory Note shall be based on the following below, which is calculated as the net present value of the remaining Note balance assuming full payment at each anniversary, from Closing:*

        | Month from Closing: | Call Price Amount: |
        | --- | --- |
        | *0 months* | *$73.0 million;* |

136447.000001\4927-5291-2252.3

November 26, 2025
Page 3

| | |
|---|---|
| *12 months* | *$49.0 million;* |
| *24 months* | *$29.0 million;* |
| *36 months* | *$13.0 million; and* |
| *48 months* | *Discounted remaining balance portion on an NPV basis.* |

*[Given that Genie has reduced its Senior Debt up to $175.0 million, Monticello has reduced the pricing to SOFR+600 or approximately 10%. Given that during the Auction the Debtors and Jefferies were calculating the Discount Rate at a 300bps spread to the interest rate on Genie's senior debt quote from Monticello, Genie believes a more appropriate Discount Rate would be 13% (which would affect the NPV calculations above)].*

2. Monticello Facility

   a. Please send any updated Monticello term sheet.

   *Please see attached as **Exhibit 1** (i) the revised Monticello Term Sheet dated November 21, 2025, mentioned by Genie on the clarification call of the same date, and (ii) a confirmatory letter from Monticello's counsel (Cooley LLP) regarding the same.*

   b. $120M equity + $150M financing with $259M cash to estate: What is the ~$11M difference? Reserve requirements? What is the projected working capital reserve you expect to maintain post-closing?

   *Genie intends to invest and be capitalized with a minimum of $120 million in equity. The entire Promissory Note would have to be repaid before the Genie's investors could receive a principal equity payment. Genie has access to up to $340 million of senior debt from Monticello, however given the bid level, Genie only intends to borrow up to $175 million from Monticello at significantly reduced rates. The description of $120 million in equity and $150 million in debt financing, was provided as an approximate split between debt and equity utilized to finance the cash portion of Genie's bid. The difference of $11.0 million has no significance as the equity and debt was not meant to tie to the actual cash amount funded to the estate at closing. Genie projects approximately $80- $100 million of availability for working capital post-closing. This includes availability under Genie's senior debt Monticello facility, from trade vendors (net 60-day terms), accounts receivable collections, and availability from equity sources, if required.*

   c. Is there any flexibility regarding the currently unmet financial covenants listed in the term sheet?

November 26, 2025
Page 4

*We are not aware of "unmet financial covenants" in the revised Monticello Term Sheet. Monticello has stated that they have flexibility on capitalization structure and covenants as discussed and clarified on the conference call at the auction with the Debtors, Jefferies, Genie and Monticello. We recognize that a few of the covenants in the current term sheet that will need to be further tailored to fit the post-closing capitalization and operating architecture of Genesis post-bankruptcy, which can easily be accomplished by Closing according to Monticello. For example, there are several important assumed liabilities that may either be reduced or negated by the bankruptcy process pre-closing, or subject to a payment plan if assumed post-closing. Monticello and Genie remain flexible to accommodate these issues. Monticello has also identified the proposed Promissory Note issued to Debtor and the provided for a payment accommodation under the cashflow waterfall to accommodate the Promissory Note. Given our long-standing relationship and the consistency with which we've performed over the years, Monticello is highly motivated to assist Genie with any flexibility required as we work through any items together towards closing. Our goal is to ensure the structure works for both sides while preserving the strong credit profile you expect.*

d.  Please explain the reasoning behind the decrease of more than $100M in the debt amount.

*The reduction of more than $100M in the proposed debt amount reflects our intention to maintain a conservative capitalization structure that is appropriate for the business going forward. We want to ensure the company carries a sustainable level of leverage that supports long-term stability, consistent cash flow coverage, and covenant compliance through a range of operating scenarios. By sizing the debt more conservatively, we are prioritizing a capital structure that reduces refinancing risk, preserves liquidity, and positions the business to absorb variability in performance without jeopardizing lender protections or our ability to prioritize high quality patient care. This approach ultimately strengthens the credit profile and supports a healthier partnership for all stakeholders.*

i.  With the face value of the debt reduced to $150M, will you seek a lower interest rate or amended terms?

*Yes. Due to the reduced borrowing level, Monticello has already provided a revised term sheet which materially reduces the interest rate to SOFR + 600 bps, which reflects a significant concession relative to the original structure, given the reduced projected leverage. Our focus is on preserving those terms and moving forward within the framework already offered, and Monticello has meaningfully tightened the core interest rate in our favor.*

136447.000001\4927-5291-2252.3

November 26, 2025
Page 5

    ii.   What are the conditions precedent, if any, to providing the equity funds? Do you have an equity commitment letter?

*Genie has the investor experience and capability to fully support the equity required for this transaction. Our equity is available to support closing, based on our redlined APA. At this stage, we do not anticipate any unusual conditions precedent beyond the standard closing deliverables aligned with the final transaction documents and respective bankruptcy court process, such as a final sale order being entered. Redacted proof of funds letters are attached hereto as **Exhibit 2.** At this time, we are not willing to provide unredacted copies because of the risk of retaliation by Mr. Landau and associates.*

e.   Confirm which of Rowan Farber, Jacob Sod, and Ari Schwartz are personal guarantors.

*Rowan Farber and Jacob Sod will serve as the personal guarantors for the transaction. Ari Schwartz is not a personal guarantor. To clarify, Mr. Schwartz is not a direct or indirect equity owner in Genie, and Mr. Schwartz will have no going forward involvement with Genie or the proposed transaction. Mr. Schwartz served as a consultant for Milrose Capital in connection with its bids, but will have no going forward involvement in this matter. Mr. Schwartz has a long-term consulting relationship with Milrose Capital pursuant to a verbal consulting agreement and continues to serve in that capacity for other unrelated business. For the avoidance of doubt, no federal health programs will pay Mr. Schwartz for items or services, including administrative and management services, furnished, ordered, or prescribed by Mr. Schwartz in any capacity.*

f.   Status of White Oak's consent and any commitment to each bidder in respect of assumption of the White Oak indebtedness, inclusive of the proposed payments under the new cash flow purchase notes to be issued by Genie 3, and whether the terms of any such consent might delay or condition payments under the purchase note.

*Genie's understanding is that White Oak is prepared to issue a commitment letter to Genie, for the assumption of the $278.0 million RLOC, based on the White Oak credit facility package outlined in the October 29, 2025 Term Sheet. White Oak is requiring that the $30.0 million Stretch Term Loan (as defined in their term sheet provided by Jefferies) be senior to the Promissory Note, which it would be by definition and structure, as the Stretch Term Loan has a first lien on accounts receivable. The $30.0 million Stretch Term Loan is a portion of*

136447.000001\4927-5291-2252.3

November 26, 2025
Page 6

*the assumption of the $278.0 million of RLOC debt by Genie. The Stretch Term Loan is repayable over a 30 month period, which is effectively a more favorable amortization period for Genie, which is projected to free up additional cashflow available to service the Promissory Note. White Oak will permit annual payments under the Promissory Note.*

g. Provide projections demonstrating satisfaction of the promissory note.

*Please see Genie's projections attached as __Exhibit 3.__ The projections include detailed operating assumptions, and cash-flow coverage, demonstrating the Company's ability to meet all scheduled payments.*

*For illustrative purposes, we generated and calculated a projected P&L analysis utilizing the related party projections and assumptions of the Genesis/Debtor/Stalking Horse -related parties, provided in the Genie Confidential Offering Memorandum (as provided by Jefferies LLC). Under that scenario and sensitivity analysis utilizing those inputs and assumptions, the post-closing Genesis is functionally insolvent and does not generate sufficient cash flow to satisfy the assumed liabilities. The Genesis/Debtor/Stalking Horse-related parties' projection scenario analysis is available upon request. This highlights the need for both a more conservative capital structure and an operator with proven turnaround DNA, with patient safety and respect at the core of our mission, vision and values. The Stalking Horse /Debtor clearly values profits over people, based on their under-whelming patient clinical outcomes, and professional liability claims, and has caused over $1.3+ billion in losses. Our approach is built around pairing the right capital structure with an operator capable of materially improving clinical outcomes, operating performance, grounded in a servant-leadership culture and restoring sustainable financial health.*

h. Please define the formula or any elements of net operating income as used in the promissory note summary of terms.

i. If the provision for 90% of excess NOI is still included, explain how this will function given the WOHCF first priority liens and the excess cash flow agreement under the unsecured note to the estate under the bid.

*We understand White Oak's requirement that the $30.0 million Stretch Term Loan sit senior to the Promissory Note, and we are comfortable with that structure. We also appreciate that White Oak will permit annual payments under the Promissory Note. This framework aligns with the overall credit priorities and provides an appropriate balance between senior lender protections and our ability to meet scheduled obligations.*

November 26, 2025
Page 7

    ii.   If the provision for paydown of Monticello debt upon sale of assets remains, explain how this will function given WOHCF's first priority liens.

*If the provision for paydown of Monticello debt upon a sale of assets remains, it would function senior to WOHCF's second-priority liens against those respective non-ABL assets. Our bid is structured to fully pay off Welltower/Omega's senior term loans, which hold first-priority liens on the PropCo JVs. Any net proceeds from asset sales would first satisfy any senior obligations in full, and only after that would remaining proceeds be available to pay down the Monticello debt. This ensures that all senior lienholders are fully protected while preserving the mechanism for Monticello repayment. In this instance, because Welltower/Omega would be fully paid off at Closing (with any unpaid portion remaining with the Debtor), Monticello would be senior lienholder on the PropCo JV's.*

    iii.   White Oak's understanding/expectation is that the revised Monticello term sheet would delete both (a) the second sentence of the section titled "Working Capital" related to the payoff of the RLOC within 6 months of closing and (b) the entire section titled "Excess Accounts Receivable". Please confirm.

*Yes, we can confirm that both items have been removed from the revised Monticello Term Sheet.*

3. Other

    a.   The amount and source (individuals) of equity to be invested in Genie 3 and evidence these funds are available and committed.

*Milrose Capital has committed to Genie 3 to provide the equity investment necessary after Genie 3 is named the prevailing bidder. Proof of funds letters relating to this commitment are attached as Exhibit 2.*

    b.   Expected timing for obtaining commitments on financing?

*With respect to the White Oak debt, we anticipate receiving a commitment letter shortly after being named and prevailing bidder. With respect to the Monticello debt, we anticipate obtaining a financing commitment within approximately 45 days after entry of the Sale Order. As reflected in the letter from Monticello's counsel (attached hereto as Exhibit 1), Monticello is highly complementary of the principals of Genie and Monticello is comfortable with the personal guaranties of Mr. Sod and Mr. Farber.*

November 26, 2025
Page 8

c. Projections showing ability to meet financial covenants/service assumed obligations/new financing.

*Please see attached Exhibit 3.*

d. Please describe the basis of Lifehouse Retirement Properties, Inc.'s termination of its Stalking Horse APA in In re Haven Eldercare, LLC, Case No. 07-32720 (in the US Bankruptcy Court for the District of Connecticut, New Haven Division).

*Please see attached **Exhibit 4** relating to the Haven Eldercare bankruptcy transaction which occurred over 17 years ago.*

i. Have any of the principals of Genie 3 been involved in entities that did not close on sales under section 363 or chapter 11 plans?

*To the best of their knowledge, to the extent selected as a winning bidder, stalking horse bidder, or plan sponsor, none, other than Haven Eldercare described on Exhibit 4.*

e. What is the status of Intercreditor agreement between the ABL and Term Loan?

*In recent discussions with Monticello, as the term lender, and White Oak, as the ABL lender, we understand they know each other well, and neither party anticipates any issues with completing an intercreditor agreement. It will follow standard market terms and conditions and can be finalized easily by closing.*

f. How much cash do you anticipate having on the balance sheet after closing?

*We anticipate having approximately $30 million of cash on the balance sheet at closing, with additional working capital availability of up to $100 million. This provides more than sufficient liquidity to meet all leverage, assumed liability, operating and clinical needs of the company. Further equity capital is available if needed, and additional debt capacity exists should circumstances warrant it. The company will be solvent, well-capitalized, and substantially stronger post-bankruptcy under the Genie structure. In addition, with better management and asset management and supervision in place, the company will operate more efficiently, reduce waste on unnecessary expenses, including restructuring related charges, and improve patient care, safety, and clinical outcomes.*

g. Why has Integro's portfolio of facilities reduced over time from thirty-eight to approximately ten?

November 26, 2025
Page 9

*Please see the Integro Healthcare Services Company Presentation and track record attached as **Exhibit 5**.*

*By way of background, we founded Integro Healthcare Services over twenty years ago. Integro focuses on consolidating distressed and underperforming Assisted & Independent Living and Skilled Nursing communities across the U.S. We have operated 38+ facilities in California, Michigan, Arizona, New Mexico, Iowa, and Illinois, spanning the full continuum of care. At its peak, Integro managed more than 5,000 beds/units, including approximately 2,700 assisted living units and 2,300 skilled nursing beds, and employed roughly 5,000 employees. Most of its SNF acquisitions have been executed out of bankruptcy, insolvency, or receivership. Turn around is in our DNA. Additionally, Integro or affiliates have led some of the largest regional skilled nursing company bankruptcies in the industry (representing 70+ SNFs) since 2007, often serving as the "stalking horse" lead buyer.*

*Integro has a proven track record of acquiring distressed or underperforming facilities and executing successful turnarounds. Our primary value proposition targets purchasing distressed assets out of bankruptcy or insolvency, paired with a comprehensive clinical, compliance, operational and strategic improvement plan. Integro's platform is supported by a strong operating team with deep experience across healthcare, compliance, clinical, mergers and acquisitions, hospitality, real estate, and construction. Integro's management team has consistently demonstrated the ability to reposition and significantly improve underperforming properties and business units, creating meaningful clinical, operational and financial value.*

*Integro's portfolio has decreased from thirty-eight because the company successfully achieved its clinical, compliance, financial, marketing, patient dignity, customer service, and employee engagement benchmarks, across its portfolio. As stewards of significant equity and debt capital—over $500 million deployed capital on underwritten deals totaling more than $3 billion—once these operating, clinical and financial performance benchmarks were met over the last twenty years, its investors chose to sell the majority of its assets over the last eight years. Management, which has remained together for over 20 years, decided to rebuild the Company, including focusing on the asset management division to share its tested operating turnaround strategies with under-performing businesses, to continue pursuing growth and value creation in the long term healthcare sector.*

November 26, 2025
Page 10

h. Please provide diligence about Genie 3's experience operating skilled nursing facilities, including:

    i. How many SNFs does it currently operate and in which states?

*Milrose Capital, through its affiliates, collectively has managed over 100 nursing homes over the past 10 years in GA, NC, MA, PA, FL, NY, OH, and MO, consisting of over 15,000 beds. Milrose has active relationships with approximately 13 operating groups around the United States. For Milrose's portfolio of facilities, excluding those acquired within the last year, the average CMS star score is approximately 2.8, with seven 5-star facilities. A letter of reference from B.C. Ziegler and Company is attached hereto as* **Exhibit 6.**

*Integro has substantial skilled nursing clinical operations and compliance implementation experience with graduating skilled nursing facilities off a Clinical Corporate Integrity Agreement with CMS, which it had to assume as a successful buyer in the Pleasant Care skilled nursing bankruptcy, of one the largest regional skilled nursing bankruptcies in the last 15 years. Integro developed, implemented and monitored a robust Corporate Compliance Plan, which was monitored by CMS selected, federal quality assurance monitors and surveyors, which enabled Integro to graduate all its purchased skilled nursing facilities off the Clinical Corporate Integrity Agreement with CMS, within the proposed time frame of three years. Integro also graduated several of the same skilled nursing facilities of the CMS Special Focus List.*

*Genie also has a relationship with Select Rehabilitation, LLC, one of the largest providers of rehabilitation services in the United States and intends to partner with Select Rehabilitation LLC relating to post-closing clinical compliance, operational and management support for rehabilitation services. Information relating to Select Rehabilitation LLC is attached hereto as* **Exhibit 7.**

    ii. Who are the key leaders in senior management with SNF experience (including names) who will manage the operations of the portfolio, including from a clinical perspective, and what is their prior experience with large scale portfolio transitions?

*Please see Milrose Capital Overview attached as* **Exhibit 8** *which will be acting as an asset manager. Please see Integro Healthcare Services Overview (attached as Exhibit 7), acting as an asset manager for the company. Biographical information for certain key leaders is attached as* **Exhibit 9.**

November 26, 2025
Page 11

    i.   Please provide clinical outcomes data for Integro, InteGen and PallGen for the past three years, including its CMS star rating, quality measure scores, and re-hospitalization rates (all on a facility basis, not in aggregate).

> *Given the scope of this Information Request, Genie cannot provide this information on the timeline requested. It cannot be disputed that Genie's partners provide higher-quality patient care than the Debtors, and Genie looks forward to improving patient care levels in this case.*

    j.   What compliance or regulatory issues, if any, have Integro, InteGen or PallGen had in the past three years? If available, please send Debtors your compliance program summary/policy.

> *No material issues.*

    k.   Please identify each healthcare-related entity with which you (meaning, Rowan Farber, Ari Schwartz, Jacob Sod, and any control person) have had any affiliation in the past five years.

> *During the last five years, Mr. Farber and Mr. Sod have not been involved in any related businesses. Mr. Farber is primarily engaged in business through Integro Asset Management LLC (dba as Integro Healthcare Services). Mr. Sod is primarily engaged in business through Milrose Capital LLC. Mr. Schwartz is acting as a consultant to Milrose Capital LLC. Prior to Mr. Schwartz's voluntary exclusion (which involved transactions unrelated to Mr. Sod), Mr. Sod and Mr. Schwartz were involved in various healthcare-related businesses, none of which were nursing home operations.*

    l.   Has each bidder committed to assume the Omega Master Lease, the Welltower Master Lease, and all other leases that the Debtors have not indicated an intention to reject/transition?

> *Genie currently intends to assume the Omega Master Lease, the Welltower Master Lease, and other leases the Debtor has not indicated an intention to reject/transition.*

        i.   If so, is either bidder seeking an amendment or modification to the current lease terms, including the financial covenants and capex requirements contained in the leases. If so, please identify those terms.

> *Genie does not currently intend to seek an amendment or modification to the current lease terms.*

November 26, 2025
Page 12

    m.  What transition services do you anticipate needing?

*Genie anticipates a typical Transition Services Agreement for a transaction of this size in bankruptcy. For example, Genie recognizes that the bankruptcy estate may need access to former employees or information as part of the continued administration of the bankruptcy cases and Genie will agree to such access. As for business terms, Genie will work to ensure uninterrupted patient care, reimbursement, as well as targeted support in clinical operations, regulatory compliance, financial management, workforce and labor oversight, and, critically, the ongoing safety and well-being of residents. Genie anticipates the TSA would cover coordination on issues such as (i) payables and receivables, (ii) completing pre-closing financials, (iii) reconciliations , (iv) billing and any associated audits, (v) employee and HR matters, (vi) general data issues (vii) insurance, (viii) systems transfers, and (iv) other typical transition issues.*

*Genie intends to leverage the existing Genesis management team as the foundation for operational continuity. Over the first six months post-closing, we will focus on integrating with the current leadership team, evaluating their strengths, and identifying opportunities to enhance processes and outcomes across the portfolio. During this period, Genie will provide targeted augmentation in key areas, including clinical services, regulatory compliance, operational efficiency, financial management, resident satisfaction, and workforce engagement, retention, and satisfaction. Our goal is to support the existing team while driving sustainable improvements in quality, performance, and overall organizational effectiveness.*

If you have any further questions or would like to discuss, please let us know.

Sincerely,

*/s/ Elizabeth A. Green*

136447.000001\4927-5291-2252.3

# **Exhibit 1**



Cathy Hershcopf                                                                                      Via E-Mail
T: +1 212 479 6138
chershcopf@cooley.com


November 24, 2025

Jefferies, LLC
520 Madison Avenue, 6th Floor
New York, NY 10022
Attn: Jeffrey Finger, Jaspinder Kanwal, and James Burgoyne
project.genie.core@jefferies.com

**Re:      In re Genesis Healthcare, Inc., et al., Case No. 25-80185 (SGL)**

Mr. Finger, Mr. Kanwal, and Mr. Burgoyne:

Cooley represents MONTICELLOAM, LLC ("***MONTICELLOAM***") in connection with proposed financing for Genie 3 Partners, LLC's (***"Genie 3"***) bid for the assets of Genesis Healthcare, Inc. and its affiliated debtors (collectively, ***"Genesis"***) in their pending chapter 11 cases.

MONTICELLOAM was founded in 2014 and is a specialized lending and servicing platform with a core focus on the origination, management, advisory and servicing of multifamily and senior housing bridge loans. Since its inception, MONTICELLOAM has originated more than $10 billion of bridge and mezzanine loans with zero monetary losses.

MONTICELLOAM's founders – Alan Litt, Thomas Lally, and Jonathan Litt – are industry veterans with a long history of developing, owning, operating and lending to multifamily and seniors housing assets. Each principal brings over 30 years of experience across multiple credit cycles. Headquartered in New York City, MONTICELLOAM employs more than 70 professionals in 5 offices and multiple remote locations across the U.S. and offshore.

MONTICELLOAM's bridge lending platform is specifically tailored toward middle-market, conventional multifamily (high and mid-rise apartments, garden-style apartments, affordable/workforce housing) and senior housing (independent living, assisted living, memory care, skilled nursing) properties in need of short-term financing as an interim step to permanent financing.

MONTICELLOAM has provided Genie 3 an amended term sheet, based upon its final written bid submitted at the auction pursuant to which MONTICELLOAM or its affiliates would lend up to $175 Million of acquisition financing to purchase the assets of Genesis on customary terms, subject to bankruptcy court and regulatory approvals, which term sheet was countersigned by Genie 3 after arms length negotiations.

MONTICELLOAM has offered to provide the amended term sheet to the Debtors and Consultation Parties. We understand that the Debtors and Consultation Parties have declined to request a copy.

While the financing is not yet fully committed, MONTICELLOAM is confident the financing evidenced by the amended term sheet will be fully committed after Genie 3 is designated as the successful bidder. As communicated orally to you and others by Mr. Litt, MONTICELLOAM has done its most important diligence, confirming that Genie 3 and Jacob Sod have the best interest of the Genesis residents, family,



November 24, 2025
Page Two

staff, vendors and community as their priorities in purchasing the Genesis assets. The answer to the most important diligence question, "Do they care?" is a resounding YES.

We look forward to the Debtors and the Consultation Parties promptly designating Genie 3 as the successful bidder.

Please reach out to me or Eric Walker (ewalker@cooley.com, mobile: 773.412.7018) for further information.

Sincerely,

/s/

Cathy Hershcopf

CRH

**MONTICELLOAM**

MONTICELLOAM, LLC
600 3rd Avenue
New York, NY 10016

November 21, 2025

Rowan Farber
President
Genie 3 Partners, LLC

Re: Proposed acquisition financing of the Company

Mr. Farber;

This term sheet ("Term Sheet") provides an indication of the terms and conditions of a proposed Credit
Facility ("Facility") for the acquisition of the Company.

## Summary

**Company:**   Including but not limited to the following:
   a) Genesis Inpatient Services: approximately 166 facilities (18,866 beds);
   b) Genesis Rehab Services;
   c) Genesis Respiratory Services;
   d) Alignmed;
   e) Genesis ACO;
   f) Genesis PropCo JVs - Seafire, CCGEN, NEXGEN; and
   g) Accounts Receivable, Prepaid Expenses, and Cash.

## Parties to Facility

**Property Company:**   Single asset entities acceptable to Lender (individually and collectively the "Property Company").

**Operating Company:**   Single asset entities acceptable to Lender (individually and collectively the "Operating Company").

**Ancillary Company:**   Newly formed entities acceptable to Lender owning and operating the various ancillary businesses of the Purchasing Entity (individually and collectively the "Ancillary Company").

This Term Sheet does not constitute an offer, agreement, assurance, guarantee or commitment to make, provide or arrange financing or extension of credit and is subject to change in any and all respects. No oral communication between the parties shall be deemed to supersede this Term Sheet. This Term Sheet and the funding of the Facility are subject to Lender's review of all materials pertinent to each Property, Borrower and Guarantor as applicable, in Lender's sole and absolute discretion.

**MONTICELLOAM**

**Management Company:** Legal entity acceptable to Lender.

**Purchasing Entity:** Genie 3 Partners, LLC and its assignees

**Borrower:** Purchasing Entity, Ancillary Companies, Property Company and Operating Company and any additional entity or entities as required by Lender subject to due diligence (individually and collectively the "Borrower").

**Guarantor & Key Principal:** Rowan Farber, Jacob Sod, and any additional entity or entities or equity partners or individuals as required by Lender subject to due diligence (individually and collectively the "Guarantor" or "KP").

**Lender:** MONTICELLOAM, LLC or its affiliates (together with its successors and assigns, "Lender").

## Basic Mortgage Terms

**Proposed Facility Amount:** Up to $175,000,000

Lender may bifurcate the Facility in conjunction with closing or post-closing into two separate, cross-secured, Facility, an "A" Facility / "B" Facility, a Senior Facility / Mezzanine Facility, or a combination thereof and Borrower shall agree to fully cooperate with Lender.

Estimated Sources and Uses are described on Schedule A of this Term Sheet.

**Funding Constraints:** The Facility Funding is subject to standard conditions precedent, including the following:

- A minimum amount of cash equity shall be contributed at closing in an amount no less than $100,000,000.

- A minimum aggregate purchase price of $1,003,000,000, as per Genie 3 Partners, LLC's auction offer.

- The minimum in-place Adjusted EBITDA of the Company shall be $80,000,000 (pre-replacement reserves) based on Lender's standard underwriting procedures.

This Term Sheet does not constitute an offer, agreement, assurance, guarantee or commitment to make, provide or arrange financing or extension of credit and is subject to change in any and all respects. No oral communication between the parties shall be deemed to supersede this Term Sheet. This Term Sheet and the funding of the Facility are subject to Lender's review of all materials pertinent to each Property, Borrower and Guarantor as applicable, in Lender's sole and absolute discretion.

- A minimum projected Adjusted EBITDA of the Company shall be $95,200,000 (net of replacement reserves) based on Lender's standard underwriting procedures.

**Interest Rate:** A floating rate equal to 1M CME Term SOFR ("SOFR") plus 6.00% (subject to a SOFR floor equal to 3.50%).

**Interest Rate Management:** The Borrower shall purchase an interest rate cap ("Interest Rate Cap") effective at the closing of the Facility with a notional amount not less than the Facility amount, which shall have the effect of capping the 1M CME Term SOFR at a cap determined during underwriting for the entire Facility Term. The counterparty for the Interest Rate Cap shall be rated A2/A or higher. The Interest Rate Cap shall be pledged to the Lender.

**Term:** 36 months

**Extension Options:** Two (2) twelve-month Extension Options. Upon each extension of the Facility, Borrower shall pay Lender an extension fee equal to 1.00% of the original Facility Amount.

**Amortization:** Interest only through month 24 of the Term with a monthly cashflow sweep of 90% of excess cash flow for the purposes of repaying the Facility. Commencing at the beginning of month 25 after the Facility closing and continuing until the Facility is fully repaid, Borrower will be required to make monthly amortization payments based upon the rate established by the Lender and at the greater of (i) a 36-month mortgage style amortization and (ii) a monthly cashflow sweep of 90% of excess cash flow.

**Prepayment:** Locked Out for 18 months (prepayment subject to yield maintenance as defined by Lender) and open to prepayment in full thereafter.

**Original Issue Discount:** Facility shall be structured with a 2.00% Original Issue Discount.

**Exit Fee:** Upon payoff of the Facility, Borrower shall pay Lender an Exit Fee equal to 2.00% of the original Facility Amount.

This Term Sheet does not constitute an offer, agreement, assurance, guarantee or commitment to make, provide or arrange financing or extension of credit and is subject to change in any and all respects. No oral communication between the parties shall be deemed to supersede this Term Sheet. This Term Sheet and the funding of the Facility are subject to Lender's review of all materials pertinent to each Property, Borrower and Guarantor as applicable, in Lender's sole and absolute discretion.

**MONTICELLOAM**

### Additional Mortgage Terms

**Carve-Out Guaranty:** Each Guarantor shall jointly and severally be liable for the Lender's customary recourse carve out events, including, but not limited to, bad boy acts; fraud; misrepresentation; misapplication or misappropriation of rents, security deposits, insurance proceeds or condemnation awards; fees or distributions paid to principals or affiliates in violation of the Facility Documents; gross negligence or criminal acts; loss of regulatory licensure or certification for the facility; breach of special purpose entity covenants; waste; environmental matters; enforcement fees and expenses; breach of due-on-sale/encumbrance covenants; and in the event of a bankruptcy event.

**Guaranty:** In addition, each Guarantor shall jointly and severally guaranty 100% of the Facility Amount, plus all outstanding and accrued interest thereon, yield maintenance, prepayment fees, and exit fees.

**Reserves:** Escrow and Reserve accounts shall be established at closing and maintained and controlled as determined by Lender:

(i) "Replacement Reserve Account" for replacement reserves funded at closing in the amount of $41.67 per month per bed/unit or an amount to be determined by Lender and monthly thereafter.

(ii) "Renovation Reserve Account" for planned capital expenditures and planned renovations, to be funded at closing in the amount of $10,000,000 and released to Borrower as work is completed, in minimum draws of $1,000,000, with priority given to the Genesis PropCo JVs assets.

(iii) "Additional Reserve Account" Lender reserves the right to upsize the Facility by up to $30,000,000 which may be deposited into a reserve controlled by Lender at closing.

Funds from the Replacement and Renovation Reserves shall be advanced by Lender as work is completed (subject to Lender draw requirements to be established in the Facility Documents) such that no default or Event of Default has occurred or would occur as a result.

No interest earnings shall be paid to Borrower on these accounts.

This Term Sheet does not constitute an offer, agreement, assurance, guarantee or commitment to make, provide or arrange financing or extension of credit and is subject to change in any and all respects. No oral communication between the parties shall be deemed to supersede this Term Sheet. This Term Sheet and the funding of the Facility are subject to Lender's review of all materials pertinent to each Property, Borrower and Guarantor as applicable, in Lender's sole and absolute discretion.

**MONTICELLO**AM

**Sale of Company:** In the event Borrower sells a part of or the entire Company ("Divested Company"), Lender shall require a paydown of the Facility equal to the sale price of the Divested Company.

**Taxes & Insurance:** Borrower shall pay a monthly escrow payment determined during underwriting for property taxes and insurance.

**Professional
Liability Insurance:** The minimum required coverage must be obtained from an insurance company acceptable to Lender and meeting FHA guidelines with coverage for:
1) $1,000,000 per occurrence and,
2) $3,000,000 aggregate
3) Maximum per occurrence deductible of $25,000.

Lender shall be named as an additional insured on the hazard, business interruption and loss of rents policies and the named insured on the title policy.

**Non-Financial
Covenants:** The final Facility Documents will contain customary affirmative and negative covenants.

Lender will require the Borrower's full treasury management relationship for the Borrower and Property to be maintained at a bank of its choosing. Further provided, that Lender recognizes that White Oak has a first lien on certain accounts receivable for which Lender will have an initial second lien that will spring to first lien upon repayment of White Oak RLOC.

Lender will require a means of providing for cash flow management, in the form of an account control agreement, including all of the operating accounts for each Property Company and each Operating Company, which will be held at a bank chosen by Lender and will be controlled by the applicable DACA and DAISA agreements. Lender will require view access to the accounts. Further provided, that Lender recognizes that White Oak has a first lien on certain accounts receivable for which Lender will have an initial second lien that will spring to first lien upon repayment of White Oak RLOC.

Borrower will be responsible, at a minimum, to provide the Lender with monthly reports to include, rent roll and/or weekly census reports, operating statements, financial statements, and other information on the operation and maintenance of each Property deemed necessary by the Lender to allow the Lender to monitor its investment. Borrower shall provide annual audited financial statements for each Property Company and each Operating Company (or a consolidated Audit

This Term Sheet does not constitute an offer, agreement, assurance, guarantee or commitment to make, provide or arrange financing or extension of credit and is subject to change in any and all respects. No oral communication between the parties shall be deemed to supersede this Term Sheet. This Term Sheet and the funding of the Facility are subject to Lender's review of all materials pertinent to each Property, Borrower and Guarantor as applicable, in Lender's sole and absolute discretion.

for each Property in the event of Co-Borrowers). The Facility Documents will also include provisions allowing the Lender to inspect the books and records of the Borrower, each Property Company and each Operating Company.

Borrower shall not pledge any assets of the Properties, nor shall the members of Borrower or Guarantor, pledge any of its membership interests, except to Lender.

Borrower shall fully cooperate and comply with all Lender requirements regarding, but not limited to, master lease, cash management and all data requests.

**Financial Covenants:** Financial Covenants, including but not limited to, minimum Adjusted EBITDA, minimum Bridge Debt Service Coverage Ratio, minimum Permanent Debt Service Coverage Ratio, minimum lease coverage ratio, minimum fixed charge coverage, minimum liquidity, restrictions on distributions and other covenants determined by Lender in its sole discretion during underwriting and due diligence. In addition, Lender shall require minimum liquidity of $70,000,000 and minimum tangible net worth of $400,000,000 of the Guarantor(s).

At closing, Current Ratio (current assets divided by current liabilities) of no less than 1.10x, subject to Lender's standard underwriting procedures.

**Security:** The Facility will be secured by (i) a first lien interest in the Purchasing Entity, the Operating Company, and any additional entities as determined by Lender, (ii) a blanket lien and perfected security interest in all assets of the Borrower (iii) a pledge of and perfected security interest in all direct ownership interest in the Borrower, (iv) a pledge of and perfected security interest in all escrow and reserve accounts held by the Borrower, (v) any other security as determined by Lender during underwriting and due diligence, and (vi) a second lien interest in the Accounts Receivable pledged to the White Oak RLOC with a springing first lien with repayment of the White Oak RLOC. All subordinate liens on any property of Borrower entities and pledges of any ownership interest in the Borrower entities are prohibited.

**Debt Service:** Interest shall be due monthly in arrears on the 1st day of each calendar month, during the Term of the Facility through direct payment via ACH transactions. The SOFR rate (subject to the applicable SOFR floor) shall be determined on the first day of each month using the opening SOFR rate from the second to last business day of the prior month. Interest is determined on the basis of a 360-day year and the actual number of days elapsed during the periods for which interest is due. Balloon payment of unpaid principal and any accrued and unpaid interest, fees

This Term Sheet does not constitute an offer, agreement, assurance, guarantee or commitment to make, provide or arrange financing or extension of credit and is subject to change in any and all respects. No oral communication between the parties shall be deemed to supersede this Term Sheet. This Term Sheet and the funding of the Facility are subject to Lender's review of all materials pertinent to each Property, Borrower and Guarantor as applicable, in Lender's sole and absolute discretion.

**MONTICELLO**AM

and other amounts due and payable under the documents will be due and payable at maturity.

**Events of Default:** Events of Default will include, at a minimum, the failure to pay debt service, a breach of representations and warranties, a breach of any of the conditions or contractual provisions of the documents. Additionally, any bankruptcy affecting Borrower or Guarantor will be considered an event of default and will require prepayment of the Facility and full recourse to all Guarantors. Events of Default will be more fully defined in the Facility Documents.

**Default Interest Rate:** The Default Interest Rate will be the lesser of 5.00% over the then current Interest Rate or the maximum allowed by New York law.

**Working Capital:** Lender recognizes that Borrower is assuming $280,000,000 White Oak RLOC.

**Unsecured Credit
To Seller:** Purchasing Entity shall issue $100,000,000 worth of unsecured credit to seller, as defined in the LOI, which shall be unsecured and fully subordinate to the Facility.

**Altira Lease
Purchase:** In the event 30-day cancellation notice is terminated in the Altira Lease and related documents, Lender reserves right to increase Facility by $18,000,000, subject to a TTM EBITDA of $6,000,000 at the Altira assets.

This Term Sheet does not constitute an offer, agreement, assurance, guarantee or commitment to make, provide or arrange financing or extension of credit and is subject to change in any and all respects. No oral communication between the parties shall be deemed to supersede this Term Sheet. This Term Sheet and the funding of the Facility are subject to Lender's review of all materials pertinent to each Property, Borrower and Guarantor as applicable, in Lender's sole and absolute discretion.

**MONTICELLOAM**

**Closing and Legal**

**Closing Conditions:** The closing of the Facility is subject to the Lender's satisfaction, in its sole discretion, with the following requirements, as well as any other requirements set forth in the Facility Documents:

- Approval by the Lender's Investment Committee and satisfactory completion of the Lender's business and legal due diligence.
- Verification and underwriting of existing financial information and pro forma financial information based on the Lender's standard underwriting procedures.
- Full review and approval by Lender of all diligence in Jeffries' data room and any and all diligence received by Borrower.
- All contracts including, but not limited to, all provider agreements and service agreements to be subject to review and approval by Lender.
- Provision of title insurance, current survey, and evidence of zoning, satisfactory to Lender's counsel.
- Credit and Background Check of Borrower, Pledgor and Guarantor. Each Guarantor shall provide a personal financial statement with supporting investment statements to verify liquidity, global cash flow statement, three years of tax returns and any additional information required by Lender.
- Organizational chart and documents for Borrower, Guarantor, Manager, Pledgor, and all other entities shown in the organizational chart.
- Licensure review with the appropriate legal opinions as may be required.
- Confirmation of zoning and operation of the Properties.
- Verification of past and current property taxes due.
- All leases to be provided to and approved by Lender.
- The Asset Purchase Agreement to be provided to and approved by Lender.
- All insurance policies must be in final form, as determined in Lender's sole discretion no less than 2 weeks prior to Facility closing.
- Other standard and customary closing conditions and actions as required by Lender including appointment of an independent manager or director and review and approval of all operating agreements.
- The Facility is not assumable.
- No Properties shall be a Special Focus Facility ("SFF") or a SFF Candidate, other than the Properties which are SFF or SFF Candidate facilities at the time of closing.
- Verification of a minimum of $310,000,000 net collectable Accounts Receivable, subject to Lender's diligence.
- Confirmation of no environmental issues at the Genesis PropCo JVs.
- Minimum occupancy of the Inpatient Facilities shall be 86% at closing.

This Term Sheet does not constitute an offer, agreement, assurance, guarantee or commitment to make, provide or arrange financing or extension of credit and is subject to change in any and all respects. No oral communication between the parties shall be deemed to supersede this Term Sheet. This Term Sheet and the funding of the Facility are subject to Lender's review of all materials pertinent to each Property, Borrower and Guarantor as applicable, in Lender's sole and absolute discretion.

**MONTICELLOAM**

- Closing subject to successful completion of CHOWs.
- HUD TPA process, where applicable, to be successfully completed prior to closing.
- Day 1 cash position to be provided to, reviewed, and approved by Lender.
- Most recent borrowing base of the White Oak RLOC to be provided to and reviewed and approved by Lender.

**Expenses:** Notwithstanding whether the Facility is closed or funded, all expenses incurred by Lender in connection with the Facility including fees, legal fees, and expenses (third party reports, actual out-of-pocket expenses, and underwriting expenses), will be paid or reimbursed by the Borrower and/or Guarantor on a joint and several basis. The provisions of this paragraph shall survive the expiration or termination of this proposal.

**Indemnification:** The Lender (and its affiliates, officers, directors, employees, advisors and agents) will be indemnified and held harmless against any loss, liability, cost or expense (including the reasonable fees, disbursements and other charges of counsel to the indemnified parties, incurred in connection with the financing contemplated hereby or the use of proceeds of the Facility or Revolver, except to the extent they result from such person's gross negligence or willful misconduct. The provisions of this paragraph shall survive the expiration or termination of this proposal.

**Good Faith Deposit:** The Good Faith Deposit in the amount of $500,000 will be paid to Lender. The Good Faith Deposit will be applied toward costs required as part of the due diligence process, including, but not limited to obtaining third party reports and performing site visits. Additional monies due to Lender to cover expenses incurred beyond the Good Faith Deposit will be paid by Borrower within three days after issuance of Lender's invoices therefore. Any amount of the Good Faith Deposit remaining at the time of the closing of the Facility shall be credited towards closing costs. The provisions of this paragraph shall survive the expiration or termination of this proposal.

**Legal Cost:** Borrower shall provide an additional deposit for any legal costs upon request by Lender at such time as legal is engaged.

**Administrative Expense:** During the term of the Facility, Borrower shall pay Lender an Administration Expense of $100,000 per annum, billed monthly.

This Term Sheet does not constitute an offer, agreement, assurance, guarantee or commitment to make, provide or arrange financing or extension of credit and is subject to change in any and all respects. No oral communication between the parties shall be deemed to supersede this Term Sheet. This Term Sheet and the funding of the Facility are subject to Lender's review of all materials pertinent to each Property, Borrower and Guarantor as applicable, in Lender's sole and absolute discretion.

**MONTICELLO**AM

**Confidentiality:** Borrower and Guarantor agree that this Term Sheet, and the terms hereof, are confidential and agree not to disclose the terms to any person or other parties except their legal counsel, accountants and other professional advisors provided that such third parties agree to maintain the confidential nature of the Term Sheet. Further, until the Facility proposed herein is consummated or a determination is made by Lender not to pursue such Facility, Borrower and Guarantor agree to negotiate exclusively with Lender regarding any direct or indirect financing of Borrower, Operating Company, Property Company and Properties. In connection with the requested Facility, Borrower and Guarantor understand that Lender will continue to make financial, legal, and collateral investigations and determinations. Provided that the Lender is still actively pursuing the Facility, consequently, if any or all of Borrower or Guarantor fail to comply with any of the provisions of this paragraph and consummate any transaction  directly or indirectly relating to any Borrower and/or any of the Properties, Companies and/or Collateral, then Borrower and Guarantor (on a joint and several  basis)  shall,  in  addition to any other costs or expenses including legal that are payable to Lender under this proposal, pay Lender liquidated damages equal to three percent of the Facility Amount, which  shall be  deemed earned with the execution of this Term Sheet. Borrower and Guarantor acknowledge that such liquidated damages are intended to compensate Lender for its estimated added administrative costs incurred and the amount of damage sustained by Lender as a result of any or all of Borrower and/or Guarantor failure to comply with the provisions of this paragraph. The provisions of this paragraph shall survive the expiration or termination of this proposal. NOTWITHSTANDING THE FORGOING THIS TERM SHEET AND THE DETAILS HEREIN ARE NOT TO BE SHARED WITH ANY BANKERS, DEBTOR'S COUNSEL OR ANY OTHER PARTY RELATED TO THE BANKRUPTCY PROCEEDING UNLESS EXPRESS CONSENT HAS BEEN PROVIDED BY LENDER.

**Governing Law and Forum:** THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER, AS WELL AS THE FACILITY DOCUMENTS, SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA. THE PARTIES HERETO SUBMIT (AND WAIVE ALL RIGHTS TO OBJECT) TO NON-EXCLUSIVE PERSONAL JURISDICTION IN NEW YORK COUNTY, THE STATE OF NEW YORK FOR THE ENFORCEMENT OF ANY AND ALL OBLIGATIONS UNDER THE FACILITY DOCUMENTS, EXCEPT THAT IF ANY SUCH ACTION OR PROCEEDING ARISES UNDER THE CONSTITUTION, LAWS OR TREATIES OF THE UNITED STATES OF AMERICA, OR IF THERE IS A DIVERSITY OF CITIZENSHIP BETWEEN THE PARTIES THERETO, SO THAT IT IS TO BE BROUGHT IN A UNITED STATES DISTRICT COURT, IT SHALL BE BROUGHT IN THE UNITED

This Term Sheet does not constitute an offer, agreement, assurance, guarantee or commitment to make, provide or arrange financing or extension of credit and is subject to change in any and all respects. No oral communication between the parties shall be deemed to supersede this Term Sheet. This Term Sheet and the funding of the Facility are subject to Lender's review of all materials pertinent to each Property, Borrower and Guarantor as applicable, in Lender's sole and absolute discretion.

**MONTICELLOAM**

STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK OR ANY SUCCESSOR FEDERAL COURT HAVING ORIGINAL JURISDICTION. BORROWER AND GUARANTOR HEREBY EXPRESSLY WAIVE ANY DEFENSE OF FORUM NON CONVENIENS.

**Waiver of Jury Trial:**   APPLICANT PARTIES, INCLUDING BORROWER AND GUARANTOR, AND LENDER WAIVE THE RIGHT ANY OF THEM MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THE FACILITY, THE FACILITY DOCUMENTS OR THIS APPLICATION.  APPLICANT PARTIES ACKNOWLEDGE THAT LENDER HAS BEEN INDUCED TO ISSUE THIS APPLICATION IN PART BY THE PROVISIONS OF THIS WAIVER.

**No Commitment:**   This Term Sheet is not a commitment by Lender to fund the Facility and Lender shall not be obligated to issue a Commitment or to close the Facility, and Lender may terminate its review of the transaction, for any reason or no reason, in its sole and absolute discretion. The issuance of a Commitment shall be conditioned upon satisfactory completion of all due diligence by Lender including, without limitation, title reports, insurance policies and certificates, surveys, engineering and property condition reports, construction and renovation budgets, permits, operating statements and lease information. If Lender does not issue a formal Commitment to make the Facility, or if the Facility fails to close for any reason, Lender shall have no liability to Borrower or Guarantor. Handwritten modifications to this Term Sheet will not be binding upon Lender. This Term Sheet shall be governed and construed in accordance with the laws of the State of New York without application of principles of conflict of law.

If this term sheet is not executed prior to 5:00 PM EDST on November 25, 2025, then this Term Sheet shall expire and be of no force or effect.

**THE REMAINDER OF THE PAGE IS LEFT INTENTIONALLY BLANK**

This Term Sheet does not constitute an offer, agreement, assurance, guarantee or commitment to make, provide or arrange financing or extension of credit and is subject to change in any and all respects. No oral communication between the parties shall be deemed to supersede this Term Sheet. This Term Sheet and the funding of the Facility are subject to Lender's review of all materials pertinent to each Property, Borrower and Guarantor as applicable, in Lender's sole and absolute discretion.

**MONTICELLOAM**

**To begin the Facility review process, please execute and return this Term Sheet by email to
anorman@monticelloam.com and jlally@monticelloam.com.**

**LENDER:**

_Thomas Lally_                                    11/24/25

_____                    _____
MONTICELLOAM, LLC                               Date
Thomas Lally

**ON BEHALF OF BORROWER(S) / GUARANTOR(S):**

_Rowan Farber_                                   11/21/25
_____                    _____
Rowan Farber                                    Date
Of: Genie 3 Partners, LLC

_Jacob Sod_                                      11/24/25
Jacob Sod (Nov 24, 2025 16:03:34 EST)
_____                    _____
Jacob Sod                                       Date
Of: Genie 3 Partners, LLC

This Term Sheet does not constitute an offer, agreement, assurance, guarantee or commitment
to make, provide or arrange financing or extension of credit and is subject to change in any and
all respects. No oral communication between the parties shall be deemed to supersede this Term
Sheet. This Term Sheet and the funding of the Facility are subject to Lender's review of all
materials pertinent to each Property, Borrower and Guarantor as applicable, in Lender's sole and
absolute discretion.

# MAM Integro Genesis Term Sheet - 11.21.25 vF

Final Audit Report                                              2025-11-24

| | |
|---|---|
| Created: | 2025-11-24 |
| By: | James Schlesinger (jschlesinger@monticelloam.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAAJbAfYt6B-5ZDnSwn3npcTdBylFgXgKQ |

## "MAM Integro Genesis Term Sheet - 11.21.25 vF" History

Document created by James Schlesinger (jschlesinger@monticelloam.com)
2025-11-24 - 8:15:31 PM GMT

Document emailed to Thomas Lally (tlally@monticelloam.com) for signature
2025-11-24 - 8:15:36 PM GMT

Email viewed by Thomas Lally (tlally@monticelloam.com)
2025-11-24 - 8:33:58 PM GMT

Document e-signed by Thomas Lally (tlally@monticelloam.com)
Signature Date: 2025-11-24 - 8:35:03 PM GMT - Time Source: server

Document emailed to Rowan Farber (rfarber@integrohcs.com) for signature
2025-11-24 - 8:35:05 PM GMT

Email viewed by Rowan Farber (rfarber@integrohcs.com)
2025-11-24 - 8:50:21 PM GMT

Document e-signed by Rowan Farber (rfarber@integrohcs.com)
Signature Date: 2025-11-24 - 8:51:05 PM GMT - Time Source: server

Document emailed to Jacob Sod (jacob@milrosecap.com) for signature
2025-11-24 - 8:51:07 PM GMT

Email viewed by Jacob Sod (jacob@milrosecap.com)
2025-11-24 - 9:03:08 PM GMT

Document e-signed by Jacob Sod (jacob@milrosecap.com)
Signature Date: 2025-11-24 - 9:03:34 PM GMT - Time Source: server

Agreement completed.
2025-11-24 - 9:03:34 PM GMT

**Adobe Acrobat Sign**

# **Exhibit 2**

# J.P.Morgan

November 24, 2025

To whom it may concern:

This letter is to confirm that JPMorgan Chase Bank, N.A. has maintained a relationship with ████████████
████████████ As of the date of this letter, ████████████ has a current balance of $34,207,553.

It has been my pleasure to have ████████████ client.

Please do not hesitate to contact me at ████████.

Sincerely,

████████████

This reference letter and the information it provides are furnished on the condition that they are strictly confidential, and that no liability or responsibility shall attach to JPMorgan Chase & Co., its subsidiaries or affiliates, or any of its officers, employees or agents, in connection with their content. This letter makes no representation regarding the general condition of its subject, its management or its future ability to meet any obligations. The information presented has been obtained from sources believed to be reliable, without express or implied warranties as to its completeness or accuracy. We expressly disclaim any liability for errors and omissions regarding the information contained in this letter, and any information provided is subject to change, without notice. Any account balances provided in this letter reflect the asset value of such account, net of monies owed to us, excluding mortgages, and reflect the market price of such assets as of the latest practicable date.

Bank products and services, which may include bank-managed investment accounts and custody as part of its trust and fiduciary services, are offered through JPMorgan Chase Bank, N.A. and its affiliates.

Brokerage investment products and services are offered through J.P. Morgan Securities LLC, member FINRA and SIPC.



EQUAL HOUSING
LENDER

JPMorgan Chase Bank, N.A. Member FDIC

**INVESTMENT PRODUCTS: • NOT FDIC INSURED • NO BANK GUARANTEE • MAY LOSE VALUE**    0521-053-CR-EB



Date: 21/9/25

To: █████████████████

Dear customer

At your request, we hereby confirm that you are a valued customer of our branch for a period of 17 years.

We confirm that your account is maintained in good order and to our satisfaction.

We further confirm that you have on deposit with us today a total balance in excess of the equivalent of higher than 100 Million USD.

The above information is given for your use only, and without any obligation or responsibility whatsoever on the part of the Bank or its officers.

Yours faithfully,



Case 25-80185-sgj11   Doc 1928-4   Filed 12/15/25   Entered 12/15/25 15:40:03   Desc
Exhibit 4   Page 138 of 240

# Exhibit 3

**Project Genie - Genie 3 Base Case** — *PRELIMINARY DRAFT - SUBJECT TO MATERIAL REVISION*

*Cash Flow* — *CONFIDENTIAL*

| ($ millions) | | 2026 | | 2027 | | 2028 | | 2029 | | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|
| **EBITDA** | | $ 138.0 | $ | 180.7 | $ | 188.9 | $ | 197.2 | $ | 201.7 |
| (+/-) Change in Working Capital | 5.0% | (1.7) | | (1.9) | | (1.9) | | (1.9) | | (2.6) |
| (+) PL/GL & Trade WC Benefit | | - | | - | | - | | - | | - |
| (-) CapEx | 2.5% | (15.1) | | (15.5) | | (15.9) | | (16.3) | | (16.7) |
| (-) Assumed Postpetition Liabilities Paid-out | | (9.6) | | (9.6) | | (9.6) | | (9.6) | | (9.6) |
| (-) Assumed IRS Obligation - Current Pmt Plan [1] | | (17.3) | | (20.3) | | (22.8) | | (22.3) | | (1.9) |
| **Unlevered Free Cash Flow** | | $ 94.3 | $ | 133.4 | $ | 138.7 | $ | 147.1 | $ | 171.0 |
| *Memo: (-) Depreciation* | | *(21.5)* | | *(22.0)* | | *(22.4)* | | *(22.8)* | | *(23.4)* |
| (-) Interest | | (46.9) | | (45.3) | | (41.1) | | (34.9) | | (29.5) |
| (-) Effective Tax Estimates | 5.0% | (3.5) | | (5.7) | | (6.3) | | (7.0) | | (7.4) |
| **Levered Free Cash Flow (Pre-Amortization)** | | $ 43.9 | $ | 82.5 | $ | 91.4 | $ | 105.3 | $ | 134.0 |
| Mandatory Amortization - TL (Monticello) | | - | | - | | (50.0) | | (50.0) | | (50.0) |
| Mandatory Amortization - TL (Stretch - White Oak) | | (10.0) | | (10.0) | | (10.0) | | (0.0) | | - |
| **Levered Free Cash Flow (Pre-Promissory Note)** | | $ 33.9 | $ | 72.5 | $ | 31.4 | $ | 55.3 | $ | 84.0 |
| Mandatory Amortization - Promissory Note (Genie 3) | | (25.0) | | (25.0) | | (25.0) | | (25.0) | | - |
| **Levered Free Cash Flow** | | $ 8.9 | $ | 47.5 | $ | 6.4 | $ | 30.3 | $ | 84.0 |

Note:

(1) Assumed payment for illustrative purposes only. Genie 3 intends to further negotiate with the IRS post-closing on this obligation.

| **Cash Schedule** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Cash Flow from Financing | | | | | | | | | | |
| Mandatory Amortization - Term Loan (Monticello) | | - | | - | | (50.0) | | (50.0) | | (50.0) |
| Mandatory Amortization - TL (Stretch - White Oak) | | (10.0) | | (10.0) | | (10.0) | | (0.0) | | - |
| Mandatory Amortization - Note (Genie 3) | | (25.0) | | (25.0) | | (25.0) | | (25.0) | | - |
| **Cash Flow From Financing** | | $ (35.0) | $ | (35.0) | $ | (85.0) | $ | (75.0) | $ | (50.0) |
| **Change in Cash** | | $ 8.9 | $ | 47.5 | $ | 6.4 | $ | 30.3 | $ | 84.0 |
| Beginning Cash | $5.0 | 5.0 | | 13.9 | | 61.4 | | 67.8 | | 98.0 |
| Change | | 8.9 | | 47.5 | | 6.4 | | 30.3 | | 84.0 |
| **Ending Cash** | | $ 13.9 | $ | 61.4 | $ | 67.8 | $ | 98.0 | $ | 182.0 |
| Cash for Debt Service | | | | | | | | | | |
| Levered Free Cash Flow (Pre-Amortization) | | $ 43.9 | $ | 82.5 | $ | 91.4 | $ | 105.3 | $ | 134.0 |
| Opening Cash Balance | | 5.0 | | 13.9 | | 61.4 | | 67.8 | | 98.0 |
| Minimum Cash Balance | $0.0 | - | | - | | - | | - | | - |
| Mandatory Amortization - TL (Monticello) | | - | | - | | (50.0) | | (50.0) | | (50.0) |
| Mandatory Amortization - TL (Stretch - White Oak) | | (10.0) | | (10.0) | | (10.0) | | (0.0) | | - |
| Mandatory Amortization - Note (Genie 3) | | (25.0) | | (25.0) | | (25.0) | | (25.0) | | - |
| **Ending Cash** | | $ 13.9 | $ | 61.4 | $ | 67.8 | $ | 98.0 | $ | 182.0 |

| **Interest Expense Summary Schedule** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| HUD Revolver | $ 5.5 | $ | 5.5 | $ | 5.5 | $ | 5.5 | $ | 5.5 |
| Non-HUD Base Revolver | 20.1 | | 20.1 | | 20.1 | | 20.1 | | 20.1 |
| Non-HUD Delayed Draw Revolver | 1.5 | | 1.5 | | 1.5 | | 1.5 | | 1.5 |
| Term Loan (Monticello) | 15.0 | | 15.0 | | 12.5 | | 7.5 | | 2.5 |
| Term Loan (Stretch - White Oak) | 2.2 | | 1.3 | | 0.4 | | 0.0 | | - |
| Unsecured CF Promissory Note (Genie 3) | 2.6 | | 1.9 | | 1.1 | | 0.4 | | - |
| **Total Interest** | $ 46.9 | $ | 45.3 | $ | 41.1 | $ | 34.9 | $ | 29.5 |

# **Exhibit 4**

o    The Haven Healthcare bankruptcy was approximately 17 years ago, with the auction scheduled for late May 2008.

o    LifeHouse (Integro's predecessor) was selected by the Debtor & Creditor's Committee to be the Stalking Horse.

o    LifeHouse had an all cash offer, backed by MatlinPatterson, the highly successful private equity firm, with AUM of $6.0+Bn, that participated in the syndicated purchase of Enron and WorldCom out of bankruptcy, amongst others.  Mark Patterson, while previously the Head of Leverage Finance for Credit Suisse First Boston, had helped hired Mr. Farber at CSFB, where they had worked together for many years.

o    The Haven Healthcare CIM, developed by Debtor with Houlihan Lokey, had projected 2008 EBITDA of $20.0 million.

o    Formation Capital, lead by David Reis and Arnold Whitman were the other potential qualified bidder.

o    The Debtor and Creditor's Committee decided that Mr Farber was the best person to try get "interim rate relief" from the State of Connecticut, which had withheld Haven's rate increases, pending the required investment of approximately $20 million of capital expenditures in its facilities.

o    During the diligence process, to Lifehouse's significant expense, Mr. Farber commissioned a Quality of Earnings (QofE) report on Haven Healthcare that generated only "breakeven EBITDA".

o    When the State of Connecticut mandated that $20MM of CapEx was required to get rate relief worth about $8.0 million (of EBITDA), Mr Farber called Omega REIT, Haven's largest landlord for funding assistance.  Mr. Booth, CIO of Omega stated that they would not provide the CapEx required.

o    Mr. Farber had to revert to Investment Committee at MatlinPatterson, and explain that the deal had changed materially.  LifeHouse would be required to fund an additional $20MM of capital, and the projected 2008P EBITDA was only approximately $8.0 million (not $20.0 million) of previous base case projections by the Debtor and Houlihan.

o    As the auction date got closer, while monitoring the financial results of the Haven portfolio, the movement of AR and AP, along with comparisons to the DIP financing, we noticed that there were significant financial deviations from expectations along with possible discrepancies that were difficult to reconcile.

o    MatlinPatterson pulled their financing commitment and so LifeHouse and Mr. Farber were not able to bid at the Haven auction.  LifeHouse/MPAM were only required to fund a Deposit by the auction date to bid.  The Deposit was not funded and LifeHouse did not bid. My recollection was that Formation Capital, who owed 7-8 leasehold facilities that Haven operated, also decided not to bid at the auction as they wanted a price much lower than the Lifehouse APA, based on the significant MAC clause trigger and EBITDA miss by 100% of that year's projections.

o    LifeHouse decided to exercise its contingency-out on the Haven transaction after receiving interim rate relief with the Connecticut Department of Social Services, which was significantly lower than anticipated. MPAM and LifeHouse jointly decided that the $105MM stalking horse cash offer was no longer appropriate.

o    The damage to Haven Healthcare was done many years before LifeHouse's involvement and got significantly worse up until the bankruptcy auction.  LifeHouse lost over $1.5

million in non-reimbursable diligence expenses on the transaction.

o   The Haven Healthcare CEO was subsequently arrested, tried and jailed for fraud.

o   From Press Release:  Formation Capital LLC of Alpharetta, Ga., said it has signed an agreement to purchase the Middletown, Conn., care provider, which runs 27 facilities in five states, including 15 in Connecticut.

o   From Press Release:  Genesis HealthCare of Kennett Square, PA, will manage and operate the facilities on behalf of Formation Capital and Senior Care Development LLC.

o   After a short due diligence period, Formation and Genesis dropped out of the transaction as well, assuming for similar underwriting reasons that LifeHouse had.  After which, the facilities were turned over to their secured creditors, with four more going into state receivership.

# **Exhibit 5**



*Enhancing Life, Advancing Wellness ™*

# Integro Healthcare Services

Seniors Housing Operator & Programmatic Acquisition Platform

August 2025

# Disclaimer



- The information contained in this confidential information memorandum ("CIM") has been prepared by Integro Asset Management, LLC ("Integro" or "the Company"), to assist interested parties in determining whether to further evaluate a transaction, as further discussed herein. The CIM is furnished solely for use by parties interested in considering a transaction and may not be used for any other purpose.

- By accepting this CIM, the recipient acknowledges and agrees that all information contained herein is subject to the terms of that confidentiality agreement previously executed by and between the recipient and the Company ("Confidentiality Agreement"). Without limiting the generality of the foregoing or the terms and conditions of the Confidentiality Agreement: (i) the recipient shall not reproduce this CIM, in whole or in part, and shall use this CIM solely for purposes of evaluating the recipient's interest in a transaction with the Company; and (ii) if the recipient does not wish to pursue this matter, it will return this CIM to Integro as soon as practicable, together with any other material relating to the Company or the project that the recipient may have received from the Company.

- This CIM does not purport to contain all the information that a party may desire to receive regarding the Brand or a transaction. No representations or warranties as to the accuracy or completeness of the information in this CIM have been or are made herein, and the Company, expressly disclaim any liability whatsoever related to the provision or distribution, or use by any parties, of the information contained in this CIM, or for any omissions from this CIM or any other written or oral communications transmitted to the recipient in the course of the recipient's evaluation of the transaction. In all cases, interested parties should conduct their own investigation and analysis of the Company and the data set forth in this CIM and such other due diligence as is standard within the industry and otherwise prudent. The information contained herein is being made available as of the date of this CIM, unless another time is specified, and the Company has no obligation to update such information.

- This CIM includes certain statements, estimates and projections provided by the Company with respect to the anticipated future performance of Integro. Such statements, estimates and projections reflect various assumptions concerning anticipated results, which assumptions may or may not prove to be correct. The projections are estimates by the Company of anticipated future performance based on interpretations of certain existing circumstances and information, as well as certain assumptions of future economic and other results, which may prove to be incorrect. Such projections and estimates are not necessarily indicative of current value or future performance, which may be significantly more or less favorable than as reflected herein. Accordingly, no representations are made as to the accuracy or completeness of such statements, estimates or projections; and such statements, estimates or projections should not be relied upon as indicative of future value or as a guarantee of future results.

- This CIM is being furnished to a selected group of parties who are believed to have strong rationale for entering a transaction with the Company and who have executed and delivered the Confidentiality Agreement. Those parties who demonstrate a high level of interest may be given access to: (i) additional confidential information, as requested; and (ii) senior management of the Company. However, the Company does not undertake any obligation to provide access to such additional information. Depending upon circumstances prevailing at the time, Integro will make further arrangements for the submission of proposals and will communicate those arrangements to parties during the transaction process.

- The Company reserves the right, without giving any reason therefore, at any time and in any respect, to terminate discussions with any or all parties, to reject any or all proposals or to negotiate with any party with respect to any potential or actual transaction. This CIM places no obligation on the Company to proceed with or consummate any potential or actual transaction with any party.

- In no event should there be any communication about a potential or actual transaction with any employee, vendor or customer of the Company without prior written permission from the Company.

- All communications, inquiries, and requests for information should include **Rowan Farber**.

| Rowan Farber | Kenneth Dao | Tracy Clark |
|:---:|:---:|:---:|
| President & CEO | Managing Director | Chief Financial Officer |
| Integro Asset Management LLC | Integro Asset Management LLC | Integro Asset Management LLC |
| (310) 770 – 7911 | (714) 401 – 9960 | (641) 919 – 5172 |
| rfarber@integrohcs.com | kdao@integrohcs.com | tclark@integrohcs.com |

# Table of Contents



**Executive Summary**

**Company Overview**

**Financial Overview**

**Appendix**










*Enhancing Life, Advancing Wellness ™*

# EXECUTIVE SUMMARY

# Executive Summary



Integro Healthcare Services ("Integro" or the "Company") is an experienced owner, operator, and manager of long-term care communities. Over the past 20 years, Integro has invested $400 million in total capital across 38 long-term care communities. Integro's current focus is on independent living, assisted living and memory care communities ("IL/AL/MCs"), rental Continuing Care Retirement Communities ("CCRCs"), and Super Skilled Nursing Facilities ("SNFs"). Integro provides a platform with an exceptional operating and M&A team with significant experience in healthcare, long-term care, memory and dementia care, finance, hospitality, construction and real estate.

- **Objective:** The Company is seeking a like-minded financial partner to capitalize on the current dislocation in the senior housing market and aggregate a sizeable portfolio across the U.S. in a customizable programmatic joint venture. Integro is seeking to raise approximately $250 million of new equity capital for future value-add acquisitions through its proven transaction approach.

- **Opportunistic Timing of Investing in a Long-term Care Platform:** The long-term care market continues to grow as population over 65 increases. The acquisition strategy will benefit from the "U-shaped recovery" as the post-COVID environment and new norms in the industry create opportunities for consolidation.

- **Value Creation:** $250 million of equity, fully deployed, provides approximately $600 million of acquisition dry powder with 60% senior debt leverage. The projected stabilized Enterprise Value of the platform is ~$900 million generating 22% IRR and 2.4x MOIC.

- **Multiple Monetization Alternatives:** With a diversified portfolio of senior living assets, the proposed structure creates multiple exit opportunities: 1) Refinance and recapitalize equity through HUD, Fannie, Freddie governmental debt programs, 2) selling individual communities, 3) selling IL/AL/MC or CCRC portfolios, 4) separating the Real Estate into PropCo(s) through sale-leaseback transactions creating a Private REIT, 5) taking the Private REIT public (IPO), capturing another 20 – 25% of public arbitrage, or 6) selling the entire portfolio.

## SELECT SUCCESSFULLY DIVESTED ASSETS

**14 ALF PORTFOLIO (MIDWEST)**
TOTAL CAPITALIZATION
$69 MILLION



SALE PRICE
$90 MILLION
GROSS IRR / MOIC
13.1% / 2.03x
DIVESTED AUGUST 2014

**THE MONTECITO (PEORIA, AZ)**
TOTAL CAPITALIZATION
$11 MILLION



SALE PRICE
$36 MILLION
GROSS IRR / MOIC
48.5% / 3.43x
DIVESTED FEBRUARY 2014

**THE MONTECITO SANTA FE (SANTA FE, NM)**
TOTAL CAPITALIZATION
$13 MILLION



SALE PRICE
$22 MILLION
GROSS IRR / MOIC
28.0% / 1.66x
DIVESTED SEPTEMBER 2016

**FREMONT HILLS (2) (FREMONT, CA)**
TOTAL CAPITALIZATION
$11 MILLION



SALE PRICE
$24 MILLION
GROSS IRR / MOIC
20.2% / 2.14x
DIVESTED JULY 2014

# Significant Experience Management Team with Longevity



| NAME | DEPARTMENT | SUMMARY BACKGROUND |
|---|---|---|
| **Integro Healthcare Services Management Team** | | |
| **Rowan Farber** | President, CEO & COO | Founding partner of Integro/LifeHouse (20 years); Managing Director at Wharton Equity; Berenson Minella; Credit Suisse, worked on over $15+ billion financings |
| **Tracy Clark** | Chief Financial Officer | Founding partner of Integro/LifeHouse (20 years); COO/CFO at various small/midsized companies; Sr. Banker at Iowa State Bank, one of SBA largest lender |
| **Kenneth Dao** | M&A / Operations | M&A / Operations at Integro/LifeHouse (18 years); Morgan Stanley; United States Department of Commerce; United Nations |
| **Rod Bailey** | Operations | CEO of Diamondback Healthcare (2 years) (Integro Community); Executive V.P. of Beatitudes campus (1,000 beds in AZ; former COO of Five Star Sr. Living |
| **Rick Strolic** | Financial Services & Analytics | Sr. Director Financial Services at Integro/LifeHouse (14 years); Sr. Director Finance at Sunrise Senior Living (70 ALFs); Generations Healthcare (3+ years) |
| **Scott Davis** | Accounting & Finance | Corporate Controller at Integro/LifeHouse (15 years); Senior Accountant at KPMG |
| **Margaret Costello** | Accounting & Finance | Controller at Integro/LifeHouse (20 years); Controller for multiple companies |
| **Dewey Crayton** | Human Resources | HR Director at Integro (2 years); Regional HR Director several healthcare organizations |
| **Rachel Jordan** | Corporate HR Recruiter | HR Corporate Recruiter (in-house) at Integro (2 years); Recruiter for 15+ years |
| **Earl Thomas** | Payroll Manager | HR Payroll Manager at Integro/LifeHouse (15 years) |
| **Tracy Clark III** | Marketing / Media / Strategic Initiatives | Marketing Director at Integro/LifeHouse (14 years) |
| **Nick Olmstead** | Sales & Marketing | Regional Sales Director at Integro (2 years); Marketing Director at Arbor Springs (Integro Community) (5 years) |
| **Dottie Hagelstein** | Procurement / Accounts Payable | Procurement Director at Integro/LifeHouse (14 years) |
| **Sarah Staniz** | Montessori Program | Montessori Program Director at Integro (1 year); Director of Staff Development at Arbor Springs (Integro Community) (15 years) |
| **Anthony Tolbin** | IT Services | Founder of Advance Network; IT consultant for Integro since 2007 (16 years), handles all IT, technology, systems implementation and monitoring |

# Integro Current Communities Overview



---

➤ Diamondback HC was an empty building built for $30+ million; recommissioned/invested $4 million in CapEx; increased occupancy from 0% to 70%, 60 skilled mix ADC.

➤ Montecito Santa Fe was acquired in bankruptcy at 40% occupancy; currently at 92% occupancy; voted Best Senior Living Community in Santa Fe for 4 straight years.

➤ Montecito Memory Care was developed as add-on expansion; achieved construction budget and opened during COVID; increased occupancy from 0% to 95%.

➤ Villa Palazzo was a distressed acquisition with 6 IJs and 40% occupancy; fixed clinical issues and improved management team; increased occupancy to 70%.

➤ Arbor Springs is a specialized MC; increased occupancy from 70% occupancy during COVID to 98% with waiting list; Integro exercised purchase option to buy R/E.

**Diamondback Healthcare**
**(94 Beds SNF / Ventilator)**
**(Phoenix, AZ)**

Fee Simple Purchase Price
$10.6 Million



Total Development Cost
$30.0 Million

*35% Purchase Price Discount*
Acquired August 2021

**Montecito Santa Fe**
**(117 Units IL / AL)**
**(Santa Fe, NM)**

REIT Sale Lease-back
Purchase Price
$22.0 Million



Total Development Cost
$35 Million

Acquired September 2016

**Montecito Santa Fe**
**(40 Units MC Expansion)**
**(Santa Fe, NM)**

REIT Long-term Lease
Total Development Cost
$8.5 Million



Stabilized Valuation
$12 Million

Certificate Occupancy
November 2020

**Villa Palazzo**
**(156 Units AL / MC)**
**(Sandy Springs, GA)**

Fee Simple Purchase Price
$5.7 Million



Appraised
Stabilized Valuation
$15.0 Million

Acquired April 2021

**Arbor Springs**
**(56 Units/Beds SNF MC)**
**(Des Moines, IA)**

REIT Sale Lease-back
Purchase Price
$7.0 Million



Appraised
Stabilized Valuation
$9.0 Million

Acquired March 2019

# Integro Current Communities Overview (cont'd)



➢ Five Fairmont Senior Living (f/k/a Sunrise Senior Living) AL/MC communities (452 units) located in Midwest acquired for $45 million (~$100k/unit) in July 2022 well below replacement cost for similar real estate asset type.

➢ Re-tooled/upgraded management team at selected communities; deployed ~$4.0 million of CapEx; achieved Montessori Silver Certification working on Gold.

➢ Continue rolling out marketing and re-branding initiatives; increased occupancy from 58% to 75% in January 2024 with continual positive momentum.

**Fairmont Westlake**
**(100 Units AL/MC)**
**(Westlake, OH)**

Fee Simple Purchase Price
$10.0 Million



Acquired July 2022

**Fairmont Washington Township**
**(103 Units AL/MC)**
**(Dayton, OH)**

Fee Simple Purchase Price
$10.3 Million



Acquired July 2022

**Fairmont Northville**
**(105 Units AL/MC)**
**(Northville, MI)**

Fee Simple Purchase Price
$10.5 Million



Acquired July 2022

**Fairmont Farmington Hills**
**(70 Units AL/MC)**
**(Farmington Hills, MI)**

Fee Simple Purchase Price
$7.0 Million



Acquired July 2022

**Fairmont On Clayton**
**(74 Units AL/MC)**
**(Clayton, MO)**

Fee Simple Purchase Price
$7.4 Million



Acquired July 2022

# Successful Acquisitions & Divestitures of Historical Communities



➤ Integro has $115 million of total capital invested with a projected gross 21.9% levered IRR and 2.44x equity multiple (17.3% / 2.05x net) across IL/AL/MC portfolio.

**14 ALF Portfolio
(Midwest)**
Total Capitalization
$69 Million



Sale Price
$90 Million
GROSS IRR / MOIC
13.1% / 2.03x
Divested August 2014

**The Montecito
(Peoria, AZ)**
Total Capitalization
$11 Million



Sale Price
$36 Million
GROSS IRR / MOIC
48.5% / 3.43x
Divested February 2014

**Fremont Hills** (1)
**(Fremont, CA)**
Total Capitalization
$11 Million



Sale Price
$24 Million
GROSS IRR / MOIC
20.2% / 2.14x
Divested July 2014

**The Montecito Santa Fe
(Santa Fe, NM)**
Total Capitalization
$13 Million



Sale Price
$22 Million
GROSS IRR / MOIC
28.0% /1.66x

Divested September 2016

**9 SNFs Portfolio
(California)**
Total Capitalization
$100 Million



Sale Price
$109 Million (2)
GROSS IRR / MOIC
n/a / 1.05x

Divested 2016

9

# Historical Community-Level Track Record



INTEGRO Healthcare

| | | | | | | | | **Performance Analysis (Occupancy Percentage, EBITDA, MOIC & IRR) - At Acquisition & At Sale** | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

*(as of March 29, 2017)*

| | | | | | | | | Occupancy % | | Average Daily Census | | | EBITDA | | | Acquisition Cost / Sale Price | | Imputed Returns | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | Gross[1] | | Net[2] | |
| Categorized by Acquisitions | Investment Vehicle | Status | Number of Beds | Date Acquired[5] | Date Sold | Invested Equity | Total Capitalization[6] | At Acq. | At Sale | At Acq. | At Sale | Net Impact | At Acq. | At Sale | Net Impact | At Acq. | At Sale | MOIC | IRR | MOIC | IRR |
| **5 ALFs Acquisition** | | | | | | | | | | | | | | | | | | | | | |
| Buchanan Meadows | Equity Sponsor Vehicle I | Realized | 40 | Dec-04 | Aug-14 | | | 87.5% | 92.5% | 35 | 37 | 2 | $213,366 | $550,562 | $337,196 | | $7,383,825 | | | | |
| Lakeside Vista | Equity Sponsor Vehicle I | Realized | 141 | Dec-04 | Aug-14 | | | 68.1% | 94.3% | 96 | 133 | 37 | 393,373 | 1,093,438 | 700,065 | | 12,741,987 | | | | |
| Prestige Pines | Equity Sponsor Vehicle I | Realized | 57 | Dec-04 | Aug-14 | | | 53.7% | 66.7% | 31 | 38 | 7 | 230,254 | 277,800 | 47,546 | | 3,598,090 | | | | |
| Prestige Way | Equity Sponsor Vehicle I | Realized | 40 | Dec-04 | Aug-14 | | | 82.5% | 87.5% | 33 | 35 | 2 | 218,787 | 579,130 | 360,343 | | 5,883,230 | | | | |
| Whispering Woods | Equity Sponsor Vehicle I | Realized | 134 | Dec-04 | Aug-14 | | | 69.2% | 96.3% | 93 | 129 | 36 | 26,071 | 1,370,607 | 1,344,536 | | 13,187,256 | | | | |
| Wtd Avg Occupancy / Total | | | 412 | | | | | 69.7% | 90.3% | 287 | 372 | 85 | $1,081,851 | $3,871,536 | $2,789,685 | $28,800,000 | $42,794,388 | 1.80x | 10.8% | | |
| | | | | | | | | | | | | | | | | | | | | | |
| **Crystal Springs & Waldon Woods** | | | | | | | | | | | | | | | | | | | | | |
| Crystal Springs | Equity Sponsor Vehicle I | Realized | 80 | Dec-05 | Aug-14 | | | 57.5% | 95.0% | 46 | 76 | 30 | 251,627 | 1,328,045 | 1,076,418 | | 15,276,884 | | | | |
| Waldon Woods | Equity Sponsor Vehicle I | Realized | 89 | Dec-05 | Aug-14 | | | 85.9% | 96.6% | 76 | 86 | 10 | 419,001 | 485,288 | 66,287 | | 6,320,383 | | | | |
| Wtd Avg Occupancy / Total | | | 169 | | | | | 72.5% | 95.9% | 122 | 162 | 40 | $670,628 | $1,813,333 | $1,142,705 | $10,800,000 | 21,597,267 | 2.43x | 16.7% | | |
| | | | | | | | | | | | | | | | | | | | | | |
| **Golden Orchard** | Equity Sponsor Vehicle I | Realized | 40 | Feb-06 | Aug-14 | | | 67.5% | 97.5% | 27 | 39 | 12 | $146,205 | $546,181 | $399,976 | $3,600,000 | $5,823,408 | 1.96x | 12.5% | | |
| | | | | | | | | | | | | | | | | | | | | | |
| **Liberty Court & The Atrium** | | | | | | | | | | | | | | | | | | | | | |
| Liberty Court | Equity Sponsor Vehicle I | Realized | 36 | Jun-06 | Aug-14 | | | 88.9% | 80.6% | 32 | 29 | (3) | 461,916 | 172,835 | (289,081) | | 2,223,301 | | | | |
| The Atrium | Equity Sponsor Vehicle I | Realized | 40 | Jun-06 | Aug-14 | | | 50.0% | 90.0% | 20 | 36 | 16 | 46,756 | 384,889 | 338,133 | | 4,829,580 | | | | |
| Wtd Avg Occupancy / Total | | | 76 | | | | | 68.4% | 85.5% | 52 | 65 | 13 | $508,672 | $557,724 | $49,052 | $4,600,000 | $7,052,881 | 1.86x | 11.4% | | |
| | | | | | | | | | | | | | | | | | | | | | |
| **Prestige Collection (3 ALFs)** | | | | | | | | | | | | | | | | | | | | | |
| Prestige Centre | Equity Sponsor Vehicle I | Realized | 40 | Apr-07 | Aug-14 | | | 81.6% | 92.5% | 33 | 37 | 4 | 160,897 | 205,805 | 44,908 | | 2,551,698 | | | | |
| Prestige Pointe | Equity Sponsor Vehicle I | Realized | 40 | Apr-07 | Aug-14 | | | 72.2% | 85.0% | 29 | 34 | 5 | 191,649 | 225,854 | 34,205 | | 3,362,839 | | | | |
| Prestige Place | Equity Sponsor Vehicle I | Realized | 40 | Apr-07 | Aug-14 | | | 55.8% | 87.5% | 22 | 35 | 13 | (121,636) | 106,795 | 228,431 | | 1,265,795 | | | | |
| Wtd Avg Occupancy / Total | | | 120 | | | | | 69.9% | 88.3% | 84 | 106 | 22 | $230,910 | $538,454 | $307,544 | $3,700,000 | $7,180,332 | 2.36x | 16.1% | | |
| | | | | | | | | | | | | | | | | | | | | | |
| **Prestige Commons** | Equity Sponsor Vehicle I | Realized | 50 | Jun-08 | Aug-14 | | | 68.0% | 88.0% | 34 | 44 | 10 | $37,930 | $437,701 | $399,771 | $2,500,000 | $5,751,724 | 2.79x | 19.6% | | |
| | | | | | | | | | | | | | | | | | | | | | |
| **Subtotal - 14 Midwest** | | | 867 | | Aug-14 | $24,569,630 | $68,803,979 | 70.0% | 90.9% | 607 | 788 | 181 | $2,676,196 | $7,764,929 | $5,088,733 | $54,000,000 | $90,200,000 | 2.03x | 13.1% | 1.68x | 10.0% |
| | | | | | | | | | | | | | | | | | | | | | |
| **The Montecito** | Equity Sponsor Vehicle III | Realized | 195 | Sep-10 | Feb-14 | $10,751,744 | $10,751,744 | 65.0% | 99.0% | 127 | 193 | 66 | $285,952 | $2,274,874 | $1,988,922 | $9,920,000 | $35,920,000 | 3.43x | 48.5% | 2.87x | 41.0% |
| | | | | | | | | | | | | | | | | | | | | | |
| **The Montecito SF** | Equity Sponsor Vehicle IV | Realized | 146 | Sep-14 | Sep-16 | $12,625,304 | $12,625,304 | 40.0% | 90.0% | 58 | 131 | 73 | ($932,680) | $1,249,809 | $2,182,488 | $10,801,081 | $22,000,000 | 1.66x | 28.0% | 1.54x | 24.2% |
| | | | | | | | | | | | | | | | | | | | | | |
| **Fremont Hills[7]** | Management only | Management only | 102 | Sep-08 | Jul-14 | $10,827,559 | $10,827,559 | 60.0% | 90.0% | 61 | 92 | 31 | $25,139 | $965,024 | $939,885 | $9,787,559 | $23,750,000 | 2.14x | 20.2% | N/A | N/A |
| | | | | | | | | | | | | | | | | | | | | | |
| **The Palazzo CCRC** | Equity Sponsor Vehicle V | Unrealized | 369 | Mar-16 | N/A | $8,801,774 | $22,830,774 | 70.0% | 92.0% | 258 | 339 | 81 | $240,000 | $3,800,000 | $3,560,000 | $16,880,774 | $40,000,000 | 3.31x | 24.8% | 2.82x | 21.0% |
| | | | | | | | | | | | | | | | | | | | | | |
| **Total IL/AL/MCC Portfolio** | | | 1,679 | | | $56,748,452 | $115,011,801 | 66.2% | 91.9% | 1,111 | 1,544 | 432 | $2,294,607 | $16,054,636 | $13,760,028 | $101,389,414 | $211,870,000 | 2.44x | 21.9% | 2.05x | 17.3% |
| | | | | | | | | | | | | | | | | | | | | | |
| **9 SNFs Portfolio** | Equity Sponsor Vehicles I&II | Partially Realized | 1,580 | | | $65,803,909 | $99,930,548 | 70.0% | 85.0% | 1,106 | 1,343 | 237 | $4,987,747 | $9,262,678 | $4,274,931 | $77,177,900 | $108,800,000 | 1.05 x | N/A | 1.05 x | N/A |

*Note: Past performance is not indicative of future returns. Please refer to the Track Record Endnotes for additional information.*

# Overview of Integro Communities – Current & Divested Assets



| Communities Overview | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| *($ in thousands)* | | | | | Projected Stabilized Financials | | | |
| **Current Owned & Leased Assets** | **# of Prop.** | **Total Avail. Units/Beds** | **Total Acreage** | **Total Sq. Ft.** | **Revenue** | **EBITDAR** | **Rent** | **EBITDA** |
| The Montecito Santa Fe - IL/AL/MC [1] | 2 | 157 | 18.0 | 175,867 | $10,283 | $3,242 | $2,530 | $712 |
| Arbors Springs - MC | 1 | 56 | 3.9 | 38,495 | 7,938 | 1,185 | - | 1,185 |
| Villa Palazzo - AL/MC | 1 | 156 | 4.3 | 92,408 | 8,527 | 1,589 | - | 1,589 |
| Diamondback Healthcare Ctr - SNF Vent | 1 | 94 | 4.8 | 67,697 | 15,356 | 3,145 | - | 3,145 |
| 5x Fairmont Senior Living [2] | 5 | 452 | 22.5 | 600,524 | 34,995 | 8,566 | - | 8,566 |
| **Total Owned / Lease Communities** | **10** | **915** | **53.6** | **974,991** | **$77,099** | **$17,727** | **$2,530** | **$15,197** |
| The Palazzo CCRC [3] | 1 | 359 | 13.8 | 335,172 | $15,238 | $3,160 | $0 | $3,160 |
| **Total Current Owned / Lease Communities** | **11** | **1,274** | **67.4** | **1,310,163** | **$92,337** | **$20,887** | **$2,530** | **$18,357** |
| **Divested Assets** | | | | | Run-rate at Sale | | | |
| LifeHouse CA Portfolio - SNF | 9 | 1,580 | 64.2 | 535,757 | $106,336 | $12,847 | $3,584 | $9,263 |
| LifeHouse MI Portfolio - IL/AL/MC | 14 | 867 | 131.7 | 750,400 | 31,950 | 7,765 | - | 7,765 |
| The Montecito - IL/AL | 1 | 195 | 15.0 | 260,252 | 6,749 | 2,275 | - | 2,275 |
| Fremont Hills - AL | 1 | 102 | 2.8 | 62,952 | 4,350 | 965 | - | 965 |
| Wisconsin CCRCs | 2 | 269 | 24.7 | 235,901 | 15,139 | 1,441 | 2,105 | (664) |
| **Total Divested Assets** | **27** | **3,013** | **238.4** | **1,845,262** | **$164,524** | **$25,292** | **$5,689** | **$19,604** |
| **Total Owned, Leased & Divested Assets** | **38** | **4,287** | **305.8** | **3,155,425** | **$256,861** | **$46,179** | **$8,219** | **$37,960** |

*(1) Integro completed a sale-leaseback transaction with a REIT in Sep 2016 and is currently operating the community under a long-term lease*

*(2) Integro acquired 5 Brighton Gardens (Sunrise Sr Living) communities in Mid-West in July 2022 and rebranding as Fairmont Senior Living*

*(3) Integro has a promoted interest in the project with capital sponsor.*

# Investment Strategy



Integro pursues a real estate consolidation strategy by acquiring regional operators and single-asset entities consisting of assisted, memory care, independent living and rental CCRC communities with add-on development opportunities. Additionally, Integro will explore opportunities to acquire SuperSNFs with short-term rehab and respiratory services (ventilator services) or other specialty services, i.e., cardio/stroke, dialysis and related therapy services.

| | |
|---|---|
| **Portfolio Consolidation** | Building a long-term care portfolio will focus on turnaround and distressed communities with a balance of cash flow yield and upside potential. |
| **Class A (Core/Core+) Stabilized & Under-Performing Long-Term Care Focus** | Acquire best-in-class portfolio (Class-A real estate) with fee simple ownership at a reasonable cost basis which have further stabilized occupancy, significant lease-up, pricing and cash flow upside. |
| **Value-Based Community Focus** | Target 2000's built vintage communities with valuable real estate at bargain prices, that require capital expenditure and repositioning to modernize and strengthen competitiveness for optimal return on investments. These locations cater to the sector's middle-market customers that represent 60% of new admissions. |
| **Senior Debt Focus** | Purchase non-performing senior notes from banks/credit unions/agencies utilizing debt as an entry point. Focus on foreclosure generating high-twenty returns for non-performing notes at discount and low teens returns for performing notes. |
| **Newly Built REO Acquisitions** | Purchase newly built REO real estate from construction lenders (that have foreclosed), including SuperSNFs (rapid recovery, short-term rehab, respiratory and dialysis services). |
| **CCRC Rental Model Conversion** | Convert buy-in entrance fees CCRCs to rental properties. Opportunities exist to restructure bonds at discount and renegotiate entrance fee contracts lowering overall entry cost basis. |

# Investment Guidelines



Pricing metrics are determined based upon risk adjusted return expectations and vary depending on the nature of the asset: (i) age of asset; (ii) quality of real estate; (iii) location of real estate; (iv) market size; (v) cash flow and occupancy (stabilized, semi-stabilized, distressed and underperforming); and (vi) management team strength and depth of experience.

| | |
|---|---|
| **Performing Assets** | Initial Cash-on-Cash Equity Yield between 6.0% and 10.0%. |
| **Underperforming Assets and Distressed Assets in Need of Restructuring & Repositioning** | Levered Internal Rate of Return (IRR) of 20.0% - 25.0% and Unlevered IRR between 12.0% - 15.0%. |
| **Newly Built Core / Core+ Assets** | Acquisition Target Price Range: $175k – $235k/unit; Exit Target Price Range: $300k – $350k/unit. |
| **Value-Add Vintage Turnaround Assets** | Acquisition Target Price Range: $60k – $135k/unit; Exit Target Price Range: $175k – 250k/unit. |
| **Debt & REO Acquisitions** | Purchase under-performing or non-performing loans at discount for vintage assets or close-to-par or par value for newly built assets in the Acquisition Target Price Range indicated. |
| **Weighted Average Portfolio Stabilized Cap Rates** | • Independent Living Facilities (stabilized): Targeted Cap Rates between 6.0% – 8.0%.<br>• Assisted Living Facilities (stabilized): Targeted Cap Rates between 7.0% – 9.0%.<br>• Skilled Nursing Facilities (stabilized): Targeted Cap Rates between 9.0% – 11.0%. |

**PROJECTS LOCATED IN GROWING MSA'S WITH AN EMPHASIS ON REGIONS OF THE COUNTRY WITH PROJECTED STRONG LONG-TERM DEMOGRAPHICS AND ECONOMIC GROWTH POTENTIAL.**

# Investment Thesis of Platform



| | |
|---|---|
| **Balanced Approach to Building a Diversified, Multi Region Senior Living Operating and Real Estate Platform** | • Acquisition line will target facilities that contribute positive cash flow, are accretive and provide credit support to the portfolio:<br><br>- Target Total Debt maximum of 8.0x EBITDAR (Out-The-Box), trending to 5.0x to 6.0x within three years.<br><br>- Target Debt Service Coverage Ratio ("DSCR") of 1.1x (Out-The-Box), trending to 1.3x – 1.5x within three years.<br><br>- Target EBITDAR Margins of 15% - 20% (Out-The-Box), trending towards 30%+ withing three years.<br><br>• Upon full deployment of the $600 million of targeted investment, combined platform is projected to have 42 communities with approximately 4,200 units across multiple regions.<br><br>• Target facilities with significant real estate well below current value and replacement cost.<br><br>• Acquired communities provide cash flow support on a portfolio basis.<br><br>• Rollup strategy and scale will create portfolio premium and further credit enhancement.<br><br>• Target equity returns (IRR) of 22%. |
| **Opportunistic Timing to Invest in Senior Housing & Integro's Value Add Turnaround Initiatives** | • The long-term care market continues to grow as the 65+ population continues to grow. Approximately 19% of the Baby Boomer generation will approach retirement age and will need long-term care in the next 10 years, driving high demand.<br><br>• COVID has created many value-based acquisition opportunities due to occupancy and cash flow challenges.<br><br>• Undertake capital improvement programs to reposition undercapitalized and undermanaged properties.<br><br>• Drive census by increasing brand awareness through multimedia marketing campaigns, while concurrently deploying targeted digital tactics to directly reach highly qualified potential residents.<br><br>• Capture growth in demand for high quality MC communities by providing best-in-class Montessori Dementia Program.<br><br>• Ability to increase revenue by implementation of clinical assessment tools to capture appropriate levels of acuity.<br><br>• Re-tool the management team by recruiting regional V.P. caliber level operators to be the Executive Director at each community. |

# Investment Highlights



| | |
|---|---|
| **Experienced Management Team with Institutional Infrastructure & Relationships** | • Multi-state historical operating expertise in Arizona, New Mexico and California, and states across the Midwest.<br>• Well-positioned to consolidate and capitalize on distressed and fragmented ownership in the healthcare real estate sector.<br>• Demonstrated track record of buying underperforming communities, many out of bankruptcy, receivership or insolvency and creating value by turning around community-level operations.<br>• Integro platform consists of professionals with significant experience in healthcare, finance, mergers & acquisitions, hospitality, and real estate; at its peak portfolio, Integro had over 4,000 full-time asset level employees caring for over 4,000 residents. |
| **Proactive Asset and Property Management Approach to Deliver Operational Turnaround** | • Drive census by increasing brand awareness through multimedia marketing and branding strategies with the credibility and trust of the famous celebrity or spokesperson similar to the previous Shirley Jones (Academy Award winning actress) marketing campaign.<br>• Implementation of Montessori-Inspired Lifestyle® program in partnership 13 years with Center for Applied Research and Dementia to drive residents and employee engagement.<br>• Ability to increase revenue by implementation of clinical assessment tools to capture appropriate levels of acuity. |
| **Successful Acquisitions & Divestitures in the IL/AL/MC Space by Increasing EBITDA through Active Asset Management** | • $115 million of total capital invested across 18 IL/AL/MCs with over 1,600 beds (17 realized, 1 unrealized).<br>• Gross 21.9% levered IRR and 2.44x equity multiple (17.3% / 2.05x net) across realized IL/AL/MC portfolio.<br>• Increased EBITDA by nearly 500% and occupancy by nearly 40% across realized IL/AL/MC portfolio. |
| **Access to a Robust Acquisition Pipeline** | • Current pipeline presents an investment opportunity of requiring over $250 million in equity.<br>• Opportunity to roll up existing portfolios of stabilized communities with diversified operators at private market valuations and acquire distressed communities or debt at an attractive cost basis.<br>• Ability to capitalize on significant valuation arbitrage through monetizing real estate values. |

# Acquisition Model – $250 million Equity Deployment



| Acquisitions Roll-up Summary P&L | | | |
|---|---|---|---|
| | Year 1 | Year 2 | Year 5 |
| Number of ALFs Acquire | 34 | 8 | - |
| Cummulative Number of ALFs Acquire | 34 | 42 | 42 |
| Number of ALF Units Acquire | 3,400 | 4,200 | 4,200 |
| Revenue | $104,071,214 | $210,639,147 | $250,870,519 |
| Expense | $79,067,121 | $144,446,553 | $167,572,069 |
| EBITDARM | $25,004,093 | $66,192,594 | $83,298,450 |
| Management Fee | $5,203,561 | $10,531,957 | $12,543,526 |
| **EBITDA** | **$19,800,532** | **$55,660,637** | **$70,754,924** |
| *Margin* | *19.0%* | *26.4%* | *28.2%* |

| Internal Rate of Return Analysis | | | | |
|---|---|---|---|---|
| | Out-the-Box | Year 1 | Year 2 | Year 5 |
| | | | | Exit |
| Total Acquisition Capitalization | | **$515,893,998** | **$121,386,823** | |
| Cummulative Capitalization / Enterprise Value | | **$515,893,998** | **$637,280,821** | **$884,436,556** |
| Value Per Unit | | **$151,734** | **$151,734** | **$210,580** |
| *Exit Cap Rate* | | | | *8.0%* |
| Senior Mortgage Balance (Year-end Balance) | | $309,536,399 | $382,368,492 | $382,368,492 |
| Equity Investment (Transaction Closing) | ($206,357,599) | ($48,554,729) | | |
| PIK payable from CAD | | $5,964,679 | $22,978,768 | $38,902,935 |
| Distributable Equity (less transaction cost) | | | | $475,534,967 |
| **Cash Flow** | **($206,357,599)** | **($42,590,050)** | **$22,978,768** | **$514,437,902** |

| | |
|---|---|
| **Implied IRR** | **22.0%** |
| **Absolute ROI** | **2.44 x** |
| **Absolute Equity Return** | **$ 359,328,998** |

16



*Enhancing Life, Advancing Wellness ™*

# COMPANY OVERVIEW

# Integro Healthcare Services Overview



- Integro Healthcare Services ("Integro" or the "Company"), is an experienced investor, owner, operator, and manager of long-term care communities; LifeHouse is the "brand" Integro utilized in the past for Midwest IL/AL/MC communities (and for 9 California SNFs).

    - $400 million of total capital invested across 39 long-term care communities.

    - Integro's current focus is on independent living, assisted living, and memory care communities ("IL/AL/MC").

    - Recently acquired five Brighton Gardens (Sunrise Senior Living) AL/MC communities (452 units) for $45 million (~$100k/unit) in July 2022.

- Integro's platform provides a strong operating team with significant experience in healthcare, finance, M&A, hospitality, development and real estate.

- Integro has a proven management team with industry leading turn-around experience, infrastructure, systems, processes and relationships.

    - Historically generated positive return-on-investment (ROI) for investors; Integro and its affiliates divested 17 independent and assisted living communities (1,300 beds) generating approximately $85 million of net profit for equity sponsor.

    - Awarded multiple Quality Seal Awards each year from 2008 through 2012 by Michigan Center for Assisted Living for the Michigan LifeHouse portfolio, one of the largest operator in the State of Michigan.

- Integro seeks opportunities in real estate consolidation among local operators and single-asset acquisitions. Integro focuses on assisted living, memory care, and independent living communities, along with additional add-on development opportunities.

- Integro continues to focus on new acquisitions and new development in strategic markets.

# Integro Current Communities



**Fairmont On Clayton (74 units AL/MC) St Louis, MO**



**Fairmont Northville (106 units AL/MC) Northville, MI**



**Fairmont Washington Township (102 units AL/MC) Wash Twsp, OH**



**Fairmont Westlake (104 units AL/MC) Westlake, OH**



**Fairmont Farmington Hills (72 units AL/MC) Farmington Hills, MI**



# Integro Current Communities (Cont'd)



### Diamondback Healthcare (94 units Vent/SNF/Dialysis) Phoenix, AZ



### Villa Palazzo (156 units AL/MC) Sandy Springs, GA



### The Palazzo (359 beds CCRC) Phoenix, AZ (1)



### Arbor Springs (56 units MC) Des Moines, IA



*Note:*
*(1) Integro has a promoted interest.*

### Montecito Santa Fe (117 units IL/AL / 40 units MC) Santa Fe, NM



# Selected Integro Divested IL/AL/MC Communities



**The Montecito (195 units IL/AL) Peoria, AZ**



**Fremont Hills (102 units AL) Fremont Hills, CA**



**Whispering Woods (135 units IL/AL/MC) Whispering Woods MI**



**Lakeside Vista (141 units IL/AL), Holland, MI**



**Waunakee Manor CCRC (215 beds IL/AL/SNF) Waunakee, WI**



# Selected Integro Divested SNFs Communities in CA



**San Diego Healthcare Center (305 beds) 2nd largest SNF in CA**



**San Jose Healthcare Center (198 beds) San Jose, CA**



**Maclay Healthcare Center (141 beds), Sylmar, CA**



**Parkview Healthcare Center (184 beds) Bakersfield, CA**



**Bakersfield Healthcare Center (150 beds), Bakersfield, CA**



**Vista Healthcare Center (184 beds) Vista, CA**



# Successful Acquisition & Divestiture Case Study: The Montecito (Peoria, AZ)



- The Montecito was built in 2003 as a 195-unit independent living community on 15 acres of land for approximately $25 million.

- Consummated a deed-in-lieu transaction shortly after purchasing the Montecito's debt at a discount for approximately $10 million in 2011.

- Repositioned the entire main building into 88 AL units.

- Stabilized average occupancy and EBITDA from 65% and break-even to 99% and ~$2.3 million annualized run-rate, respectively.

- Invested $1 million in repositioning capital bringing its total cost basis to $11 million.

- Divested the asset at a sale price of $36 million representing an ROI of ~3.4x.









# Successful Acquisition & Divestiture
# Case Study: The Montecito Santa Fe (Santa Fe, NM)



**The Montecito Santa Fe
(Santa Fe, NM)**

Total Capitalization
$13 Million



Sale Price
$22 Million

September 2016

- In June 2014, Integro derailed the bankruptcy process with a pre-packaged deal for $7.5 million to acquire community (86 IL/AL units) built for over $30 million.

- Improved monthly EBITDA from ($100K) to $125K and occupancy from 40% to 90% within 24 months.

- Acquired additional 31 condominiums (IL) from independent owners bringing total unit inventory to 117 out of 146. Currently at 92% occupancy.

- Acquired the adjacent 2.5 acres and constructed a brand new 40 unit memory care building during COVID and achieved construction budget.

- MC community currently at 95% occupancy.



*The Art of Santa Fé Senior Living*











24

# Development and Construction Experience in Santa Fe, NM



- Integro developed a standalone dedicated 40 Memory Care building as an expansion to the existing Independent & Assisted Living community set on a 20 acre campus (146 units) in Santa Fe, NM.

- This new building is specifically designed for residents with dementia with a Montessori-Inspired Lifestyle program inspired floor plan creating a "community within a community" concept for more individualized and personalized care.

- Obtained Certificate of Occupancy in November 2020. Achieved development budget despite construction during COVID.

- Opened during COVID, increased occupancy from 0% to 95% (38 out of 40) occupancy rate.

- Achieved Gold Certification from The Center for Applied Research in Dementia.









# Acquisition Case Study: The Palazzo CCRC Acquisition (359 beds); Phoenix, AZ





**The Palazzo CCRC
(Phoenix, AZ)**

Acquisition Cost
$17 Million

Appraised
Stabilized Value
$40 Million

March 2016

| Property Overview | |
|---|---|
| Property Type | IL/AL/MC/SNF |
| Name | *Life*HOUSE at Christown |
| Address | 6250 N. 19th Ave. |
| City/State/Zip | Phoenix, AZ 85015 |
| **Physical Data** | |
| Year Built | 1985 |
| Construction Type | Concrete Frame |
| Gross Building Area | 335,172 SF |
| Land Area | 13.79 Acres |
| Number of Buildings | 2 |
| Number of Stories | 3 |
| Units (existing) | 242 IL / 37 AL / 20 MC / 60 SNF (359 Total) |
| Units (post-conversion) | 115 IL / 115 AL / 57 MC / 60 SNF (347 Total) |
| Current Occupancy | 83.0% |





IL to AL Conversion on 2nd & 3rd Level of IL Building – Preliminary Draft

- In March 2016, LifeHouse acquired The Palazzo (fka Christown) CCRC (359 beds) from one of the largest national providers in the country in an all-cash deal for $17 million ($47.0K per bed), which was 40% less than estimated replacement cost and appraised stabilized value of $40 million ($115K per bed).

- CapEx investment of approximately $5 million is underway repositioning to upgrade and renovate the exterior and interior common areas, FF&E, unit inventory and converting 127 IL units to AL; converted AL unit size averages 800 SF.

- Stabilized EBITDA is projected to achieve $3.8 million (20% margin).

26

# Corporate Support Services



**FINANCE, ACCOUNTING**

- Accounting Services
- Revenue Cycle Management
- Financial Planning and Budgeting
- Financial Analytics and Performance Reporting Tools
- Trend Reporting
- Pricing analysis
- Cost Reporting
- Treasury and Cash Management
- Lockbox Management
- Bank Reconciliation
- Tax and Audit Support
- Patient / Payor Qualification
- Accounts Receivable Collections
- Financial, Accounting and Payroll Application
- Billing and Coding
    - Medicare
    - Medicaid
    - HMO
    - Dual-eligible
    - Share of Cost
    - Private Pay

**HUMAN RESOURCES & OPERATIONS**

- ACA Reporting
- PB&J Reporting
- Recruiting
- Workers Compensation Management
- Training & Education
- Payroll Management / Labor Compliance
- Contracts Negotiations
- Policy Development and Implementation
- Facility Repositioning / Licensing Conversion
- Clinical Consulting / Quality Measures and Skilled Utilization Management
- Assessment Tools
- Physical Plant Management
- Operational Analytics and Performance Reporting Tools
- Operational Training and Education
- Operations / Clinical / Marketing Application Administrators
- Programs & Activities Support (Montessori / Home Care)

**REGULATORY, COMPLIANCE & PROCUREMENT**

- HIPPA Compliance
- HUD Compliance and Reporting
- Licensing with State Department of Health/Licensing
- Risk Management Support
- DSSI Set-up and Maintenance
- Vendor Negotiations
- Group Pricing Agreements
- Managed Care Contracting / Oversight / Compliance

27

# Management Team



### ROWAN FARBER, PRESIDENT & CEO



- Founding partner of Integro/LifeHouse; President & CEO (2003 – current). Significant experience in healthcare operations, asset management and investment banking, including leverage buyouts, M&A, private and public company financings
- Primary responsible include strategic planning and capital allocation providing leadership and direction for business growth, service excellence, and enhancing the company's stability and value among financial partners, property owners and stakeholders
- Led the workouts for several of the largest skilled nursing chain bankruptcies in the Long-term Care Healthcare sector since 2007. Worked on over $15+ billion of financings, leverage buyouts and M&A transactions for sovereign and corporate clients, including Fortune 500 companies. Worked on some of the most high-profile corporate deals on Wall Street as rated by Institutional Investors
- Formerly Managing Director at Wharton Equity Partners; Berenson Minella Company (LBO firm); Worked directly for Vice Chairman at Credit Suisse First Boston
- Bachelor of Commerce at University of Witwatersrand, South Africa

### TRACY CLARK, CHIEF FINANCIAL OFFICER



- Founding partner of Integro/LifeHouse; CFO (2003 – current)
- Primary responsibilities include directing all financial and business operations in addition to overseeing the company's insurance business lines, information technology, compliance, regulatory and legal matters. Significant responsibilities in portfolio divestitures, recapitalization transaction and debt refinancing
- Over 40 years experience in management functions encompassing strategic planning, financial analysis, business development, accounting controls and organizational structure. Formerly CFO and COO for several privately held small to medium sized successful companies and has provided start-up and management consulting for numerous businesses
- Formerly a commercial lender for Iowa State Bank specializing in financing start-up businesses and developing secondary markets for SBA loans; named Banker of the Year by the US Small Business Administration
- Finance and Accounting degrees from University of Iowa

# Management Team (Cont'd)



**KENNETH Q. DAO, VICE PRESIDENT**

- Joined Integro/LifeHouse in 2005 as was internally promoted to Vice President. Closed over $400 million of M&A and $300 million of debt and equity financing transactions with Integro

- Responsible for operations, M&A and corporate financing initiatives, including capital raising, leverage buyouts, and corporate restructuring. For M&A transactions, responsible for origination, underwriting, execution and integration of acquisitions

- Responsible for capital expenditure investments including major renovations, development and construction of numerous senior housing communities. Additional responsibilities include operations oversight, budget development accountability, human resources management, resident and employee relations, property maintenance, risk management and marketing

- Formerly with Morgan Stanley, worked under Senior Vice Presidents in capital raising and in managing equity and fixed income assets for corporations and high net-worth clients. Worked at United Nations and U.S. Department of Commerce in Washington D.C.

- Bachelor degree in Business Economics & Finance from University of California Riverside & University of Hong Kong



# Management Team (Cont'd)



<div style="background:#f0f0f0;">

### ROD BAILEY, CEO OF DIAMONDBACK HEALTHCARE, OPERATIONS



- Joined Integro's Diamondback Healthcare Community as CEO in 2021. Oversee all aspects of Diamondback operations/strategies
- Possesses extensive experience in acute and post-acute care as a licensed administrator with in-depth CCRC Life Plan Communities experience. Licensed in both assisted living and skilled nursing by the State of Arizona Board of Examiners of Nursing Home Administrators and Assisted Living Facility Managers
- Previous served as Senior Vice President for Beatitudes Campus (1,000 beds), Bethesda Senior Living, Friendship Retirement Corporation and the Goodman Group Senior Living as well as the Executive Director for the American Academy of Craniofacial Pain and Arizona Grand Senior Living Community (Phoenix, AZ). Former President and COO of Five Star Care Corporation (Phoenix, AZ and Des Moines, IA) and Assistant Director of Arizona Department of Health Services
- Bachelor degree in Business Administration and Social Welfare (cum laude) from Olivet Nazarene University; Master's in Social Work with an emphasis in Policy, Planning and Administration from the University of Illinois; Ph.D. in Healthcare Administration from Lael University; Retirement Housing Professional credential from the American Association of Homes and Services for Aging

</div>

<div style="background:#f0f0f0;">

### RICK STROLIC, DIRECTOR OF FINANCIAL SERVICES

- Joined Integro/LifeHouse in 2010 as Director of Financial Services
- Over 30 years experience in healthcare operation, management, financial services and analytics
- Served as Senior Director of Finance and Analytics at Sunrise Senior Living oversaw 70 communities and responsible for providing overall leadership and management of corporate functions of accounting and financial services for the portfolio
- Responsible for all aspects of general ledgers, financial statements, forecasting, budgeting and project management. Developed pricing model for clinical services and care delivery
- Bachelor degree in Business Administration at the City University of New York and Master of Business Administration at TelAviv University

</div>



### SCOTT DAVIS, CORPORATE CONTROLLER



- Joined Integro/LifeHouse in 2009 as Senior Accountant was internally promoted to Regional Controller and subsequently to Corporate Controller. As Regional Controller for LifeHouse, oversaw an accounting department managing $100 million revenues generated at the skilled nursing division of LifeHouse

- As Corporate Controller, currently manages and oversees the finance and accounting department at Integro. Responsible for all tax, cash management, accounting and finance functions

- Formerly was the Corporate Controller and head of accounting department for a specialty pharmacy company with over $100 million revenues

- Previously, worked in accounting and audit at Pricewaterhouse Coopers, a Big 4 accounting firm, for six years

- Bachelor degree in Accounting & Finance at California State Fullerton

### MARGARET COSTELLO, REGIONAL CONTROLLER



- Joined Integro/LifeHouse since its inception in 2003.
- Over 20 years experience in management and Leadership roles of accounting, financial reporting, budgeting and treasury functions
- Served as controller for numerous small and mid-sized companies and non-profit organizations. Formerly the Controller for Airbase Services, a $50 million revenue international company. Controller for Aids Emergency Funds; Controller for HBR Hotel Group, Inc.
- Senior finance & accounting manager for numerous companies' accounting department responsible for direction and management of teams and accounting staffs
- Bachelor degree in Accounting at the University of Nebraska

### DEWEY CRAYTON, DIRECTOR OF HUMAN RESOURCES



- Joined Integro as Director of Human Resources since 2021
- Responsible for all human capital related recruiting, retention and conflict resolutions initiatives for Integro communities
- Previously served as a Regional Human Resources Director for several healthcare organizations with multi-facilities oversight experience
- Served in the Human Resources Director role for over 10+ years
- Master degree in Human Resources at Golden State University; certified in Diversity and Inclusion from Cornell University; Bachelor degree in Human Resources at Weber State University

# Management Team (Cont'd)



### RACHEL JORDAN, CORPORATE RECRUITER



- Joined Integro in 2022 as In-House Corporate Recruiter
- Responsible for human capital talent acquisitions for all Integro communities' human capital needs
- Led recruiting efforts that reduced approximately $2.0+ million per annum of agency/registry expenses at Integro communities over the past 12 months
- Served in the recruiter role for various national healthcare organizations for 18+ years
- Bachelor degree in Human Resources at University of Maryland University College

### TRACY CLARK III, DIRECTOR OF MARKETING & MEDIA

- Joined Integro/LifeHouse as Financial Analyst. Was internally promoted to Director of Media in 2010 and eventually as Director of Marketing in 2016. Responsible for all aspects of marketing and consumer interface messaging for the all Integro communities across a variety of media, including, print, radio, television, streaming, PPC and related digital tactics, physical and social media
- Spearheaded rebranding of 38 communities within the Integro/LifeHouse portfolio, developing multiple unique brands with catered assets and multimedia campaigns for each
- MBA degree from the University of Southern California with an emphasis in Strategy and Management Consulting; Bachelor of Arts degree from Chapman University, May 2009; Summa Cum Laude

### NICK OLMSTEAD, LPN, REGIONAL SALES DIRECTOR



- Joined Integro's Arbor Springs Community in 2018 as an LPN Nurse and was promoted as Director of Marketing
- Consistently achieved 98%+ occupancy with waiting list at Arbor Springs
- Promoted to Integro Regional Sales Director in 2022
- Responsible for assisting Integro communities' marketers with sales/marketing and lead generation initiatives
- Previously was a Nurse (LPN) at a skilled nursing facility for 2 years before joining Arbor Springs
- Licensed Practitioner Nurse (LPN) degree at Iowa Central Community College

### EARL THOMAS, PAYROLL MANAGER

- Joined Integro/LifeHouse as Payroll Manager in 2009
- Responsible for payroll management and administration of all Integro/LifeHouse communities
- Managed payroll size of 4,000 employees of $100+ million per annum across Integro/LifeHouse 38 communities currently and historically operated
- Served in various roles within the payroll department at different companies for over 27 years
- U.S. Veteran served in the United States Airforce

# Management Team (Cont'd)



**INTEGRO Healthcare**

**DOTTIE HAGELSTEIN, DIRECTOR OF PROCUREMENT**



- Joined Integro/LifeHouse in 2009 as Account Payable Manager and was internally promoted to Director of Procurement
- Responsible for managing DSSI procurement platform
- Manage vendor relationships with key suppliers Negotiate terms and conditions with suppliers
- Source products and services for the communities

**SARAH STANIZ, MONTESSORI PROGRAM DIRECTOR**

- Joined Integro's Arbor Springs Community in 2004 as Staff Development Director and continued in that role when Integro acquired Arbor Springs in 2018
- Led Arbor Springs in the roll-out of Montessori Dementia Program and helped achieved Gold Certification with CARD
- Promoted as Montessori Program Director at Integro in 2022 to oversee the implementation of Montessori Dementia Program at all Integro communities helping them achieve Gold certifications
- Responsible for staff training and education and Montessori program roll-out in coordination with CARD
- Distinguished Educator of the Year in 2016 by the National Council of Certified Dementia Practitioners for work in staff education

# Value Enhancing Initiatives – Montessori-Inspired Lifestyle Program for Memory Care Communities



- Integro has partnered with Dr. Cameron Camp from Center for Applied Research & Dementia ([www.cen4ard.com](www.cen4ard.com)), founder of the Montessori-Inspired Lifestyle® program and one of the leading and most renowned researchers of Alzheimers in the U.S., in rolling out Montessori-Inspired Lifestyle® program at all Integro communities.

- The Montessori-Inspired Lifestyle® is an evidence-based approach to person centered care. Under this innovative program, we focus on staff education, resident environment, and life enrichment to reduce the use of antipsychotics and improve resident engagement.

- Research has shown that persons participating in Montessori-Inspired Lifestyle® program tend to be more engaged with their environment and exhibit fewer signs of depression, anxiety, and agitation.

- Key Elements of the Montessori-Inspired Lifestyle® include a specialized environment, an individualized Life Enrichment Program, and ongoing staff education provided under the direction of Credentialed Internal Trainers.

- Community team members are trained to empower our friends with memory impairment to be as independent as possible. Focus on each of their remaining strengths, design environments they can thrive in, and help each individual find purposeful activities and meaningful roles within Integro's communities.

- Extensive staff training and education provided by Integro's in-house Director of Montessori program and CARD to ensure community-wide adoption of program.

- All Integro communities are rolling out Montessori; 4 out of 6 have achieved Gold level certification, and 6 out of 10 are at Bronze certifications working towards Silver and Gold.

34

# Value Enhancing Initiatives –
# Shirley Jones Branding & Marketing Strategy



- Creating brand awareness to drive census by utilizing a multimedia marketing and branding strategy that leverages multiple forms of communication, such as web, radio, television, print and direct mail to reach a target group within a market.
  - Enhanced by the credibility and trust of a famous personality. Previous campaign utilized Shirley Jones, Academy Award-winning actress.
- Successfully implemented multi-media branding campaign surrounding Shirley Jones in Grand Rapids, MI market.
  - Radio spots, television ads and billboards through one of the largest billboard providers with America.
- Branded Company website and community websites with Shirley Jones campaign.
- All communities have full-size coaches with Shirley Jones images establishing moving billboards in each local market.
- Similar to Shirley Jones branding and marketing strategy, Integro plans to replicate strategy utilizing another famous celebrity or spokesperson for the new portfolio and larger platform.

> Branding campaign resulted in significant increase in new website visits generating organic leads and shifting away from paid referral sources

**Total Visits Per Month**

4,283

**Total New Visits Per Month**

3,512

LifeHOUSE Main Page — SNF Total — ALF Total

Award Winning Assisted Living
That's *LifeHOUSE!*
1-855-LIFEHOUSE

Shirley Jones



*Enhancing Life, Advancing Wellness ™*

# MARKET OVERVIEW

# Market Overview – U.S. Senior Living



## Industry Overview

- The size of the United States Senior Living market is USD 92.6 billion in 2022 and is anticipated to grow with a CAGR of over 5% through 2028. Additionally, over the past few years, long-term care services type (IL, AL, MC, SNF) have witnessed a remarkable average rate growth of 8%, and specific markets have even exceeded 10% growth.
- There are about 3.15 million units at the roughly 24,500 investment grade seniors housing and care properties in the United States. Nursing care beds account for nearly half of the national units, and nursing care communities account for approximately 46% of the national properties.

## Capitalization Rate Trends



## Rent of Senior Housing Facilities (2016 -2022)



- Before the COVID-19 pandemic, senior housing rents had consistently increased by around 2%-3% per year.

- Due to the impact of Covid, the rents experienced eight quarters of declining growth of about 2%. However, in 2022, rents started to pick up and accelerate. By Q4 2022, primary and secondary markets rents were up 4.9% on an annual basis, as compared to 1.5% at the beginning of 2021.

- About 2% of seniors in the U.S. live in assisted living facilities. The average cost of assisted living in the U.S. is $4,300 monthly.

Note: NIC, Mordor Intelligence, JLL

# Market Overview – Aging Population



## 2022-2032 Population Growth by Age Group



| Age Group | Growth |
| --- | --- |
| Total population | 5% |
| 85 years and over | 43% |
| 80 to 84 years | 57% |
| 75 to 79 years | 36% |
| 70 to 74 years | 19% |
| 65 to 69 years | 0% |
| 60 to 64 years | -8% |
| 55 to 59 years | -10% |

The total population of baby boomers is 71.6 million as of June 2023. Retirees over 70 years old are expected to grow significantly in the next 10 years

According to the U.S. Census Bureau's population projections, about 12,000 people will turn 65 every day in the next year, approximately 4.4 million in 2024. And by 2030, all Boomers — those born from 1946 through 1964 — will be 65 or older

The graying of the baby boomer generation will have a huge impact on retirement planning, health care, Social Security, taxes and investing in 2024 and beyond

## Demographics

- Majority of residents in senior living facilities are female. About 71% of assisted living residents are women.

- Majority of residents are aged 80 and beyond. The average age of assisted living residents is 84.

- Though most facilities allow residents as young as 55, 52% of residents are over 85, and 30% are between 74 and 85.

- About 71% of residents have memory impairments. About 42% of residents have moderate to severe memory loss, and an additional 29% of residents have mild impairments.

## Commentary

- The rapid growth in older populations is leading to increased demand for senior living facilities in the United States. The older population in the U.S. is expected to grow significantly in the next decade, mainly driven by the baby boomers living beyond their retirement ages.

- The senior population is experiencing significantly faster growth than the younger population. For instance, the 80+ population in the U.S. is expected to grow by nearly 50%, from 13.9 million to 20.8 million, in the next decade. By comparison, total U.S. population growth is projected to be a moderate 4.7% in the same period.

- This trend emphasizes the enormous wave of pending demand for additional seniors housing and nursing care facilities.

Note: JLL, Investors

# Market Overview – Marco Backdrop for U.S. Senior Living



Strong demand and revenue growth driven by (1) growing senior population (2) outsized wealth / home price appreciation (3) declining supply of new construction

| Demand Fundamentals | Supply Fundamentals |
|---|---|

### 1. 80+ Year Old Growth (000s)

82 years and 9 months after Victory in Europe day…

### 2. YoY National Home Price Appreciation

21%

### 3. Units Under Construction (000's)

Senior Housing (RHS)     Multi-Family 5+ (LHS)

35% decrease in SH pipeline since 3Q18 compares to 15% increase for multi-family

BPC notes that current challenges to new construction include:

- Covid-impacted fundamentals (still recovering)

- Increasing construction costs

- Lack of construction financing

Source: Census, Case-Shiller, NIC MAP, Green Street Advisors

39

# Market Overview – Impact of Covid-19



Strong demand rebound has followed the massive dislocation caused by Covid pandemic





Source: Bloomberg



*Enhancing Life, Advancing Wellness ™*

www.integrohcs.com

# Exhibit 6



2 Grand Central Tower
140 East 45th Street, Suite 2200
New York, NY 10017

Phone:     212.284.5448

www.ziegler.com

November 25, 2025

To Whom it May Concern:

My name is Christopher Utz, and I serve as Managing Director at B.C. Ziegler and Company, specializing in healthcare investment banking. Over the course of 2024 and 2025, Jacob Sod and Milrose Capital have been active buyers of multiple skilled nursing and long-term care assets that Ziegler has represented in the marketplace.

Working in partnership with their operating teams, Milrose has consistently demonstrated the ability to acquire and successfully reposition distressed facilities—often in circumstances where closure would have been the likely outcome without their intervention. Most recently, this capability was exemplified in two separate transactions involving six skilled nursing facilities located across Western and Central Pennsylvania. The seller, a major nonprofit healthcare system, selected Milrose based on their proven operating track record, commitment to improving care delivery, and long-standing dedication to the sector.

In summary, Milrose Capital has shown exceptional reliability, operational skill, and a mission-driven approach in each engagement we have completed with them. I confidently recommend Jacob Sod and the Milrose team as trusted partners capable of preserving critical healthcare infrastructure and strengthening the communities they serve. Please do not hesitate to contact me should you require any additional information.

Best Regards,

B.C. ZIEGLER AND COMPANY

By: _____
    Mr. Christopher Utz
    Managing Director

B.C. Ziegler and Company

# **Exhibit 7**



# Select Rehabilitation

Company Overview and Summary of Services

# Services Summary

- Company Overview

- Recruiting

- Clinical Offerings

- Outcomes Reporting

- Compliance and Appeals Management

- Software and Data Reporting

- MDS Assistance and Completion of Therapy Related Portions

- CMS Claims Data



2

Better Care. Better Patient Outcomes. Better Results.

# A Select Company

**Providing National Resources with Regional Services**



- Founded in 1998

- National Privately-Held Rehabilitation Company

- Located in 40 States and D.C.

- Over 15,000 Clinicians

- Select Rehabilitation provides comprehensive therapy services in SNFs, CCRCs, Home Health, Schools, and Senior Living Communities including ALF, ILF, and Memory Care.



3

Better Care. Better Patient Outcomes. Better Results.

# Dedicated Therapy Teams & Industry Leading Recruitment

**Unique Recruiting Techniques and Industry Leading Retention Rates**



- Dedicated Therapy Teams led by a Select Program Manager

- Program Manager Meeting Attendance and Facility Liaison.

- Highly Competitive Compensation Packages

- Provision of Inhouse CEUs

- Local, Regional, and National Recruitment

- Campus Relations: Student Intern Program Placing 800+ Students Per Year Throughout the Country

- Internally-developed Software Links Licensure Lists, Zip Codes, Telephone Numbers, and Emails



4

Better Care. Better Patient Outcomes. Better Results.

# Clinical Education

**Committed to Training for Our Therapists and Clients**

- "Select University"
  - CEU for Licensure
  - Web Based (Webinars)
  - On-Site Training

- Monthly Customer Webinars

- >125 Therapy Based Courses

## Sample Therapy CEU Offerings

| | Topic |
|---|---|
| | Addressing Nutritional Needs At-Risk |
| | Aphasia: Evidence-Based Treatment Approaches |
| | Bariatric Safe Patient Handling and Healthy Living |
| | Chronic Obstructive Pulmonary Disease (COPD) Management for the Rehab Professional |
| | Clinical Care for Adults with Behavioral and Mental Health Illnesses |
| | Clinical Documentation for Rehab Services |
| | Clinical Management of Edema & Lymphedema |
| | Infection Control in Long Term Care |
| | Pain Management |
| | Physical Agent Modalities |
| | Rehab and Wound Care |
| | Trauma Informed Care |

## Customer Webinar Topics 2025

| Month | Topic |
|---|---|
| January 15th | Having the Difficult Conversations: What to Say to a Bully |
| February 19th | Addressing Elopement in Senior Living |
| March 19th | Suicide Prevention and Screening for Substance Misuse in the Elderly |
| April 16th | Socializing and Engagement: An Important Part of Memory Care |
| May 7th | Sink or Swim: Navigating Value-Based Care and Reducing Hospital Readmissions |
| May 21st | The Impact of Social Media and AI on Medicine and Clinical Practice |
| June 18th | Strategies for Delivering Difficult Health News |
| July 16th | What is the Impact of an Aging Workforce |
| August 20th | How Virtual Reality is Revolutionizing Rehabilitation |
| September 10th | Ethics in Healthcare |
| September 17th | Next steps in Social Determinants of Health |
| October 8th | Nursing Documentation and Preventing Medical Review |
| October 15th | Regulatory Roundup: What's on the Horizon for 2026 |
| November 19th | Science of Interoception and Aging |
| December 17th | Promoting Successful Transition to Communal Living |



Better Care. Better Patient Outcomes. Better Results.

# Clinical Specialty Programs

## Individualized Rehab Programs

- Wound Management
- Bariatric Program
- Care Management for the Ortho Patient
- Gait and Transfer Training
- Aquatic Therapy
- Low Vision
- Sleep as ADL
- Cardiac Rehab Program
- Dementia Management
- The Rehabilitation Process
- Activities of Daily Living (ADL) Training
- Restraint Reduction
- Behavioral and Mental Health Clinical Care Program
- Cognition
- Amputation Clinical Care Program
- Dysphagia

- Rehab Dining
- Continence Improvement
- Adaptive Positioning/Contracture Management
- Chronic Lung Disease
- Activities Programming
- Care Management for the Neuro Patient
- Pain Management
- Medication Management
- Communication
- Class Before Pass Program
- Balance and Falls Management
- Palliative Care
- Sepsis
- Trach and Vent



6

Better Care. Better Patient Outcomes. Better Results.

# Select Rehabilitation Care Paths

- Cardiac
- Hip Fracture
- Neuro
- Pulmonary
- Sepsis
- Total hip
- Total knee
- Joint replacement



- Select Rehabilitation's Vice Presidents and Education Directors will work with your facility's team to customize care paths based on the following criteria:
  - o Physician-specific procedures and expectations
  - o Managed care organization's metrics and analytics
  - o Patient-specific population characteristics

- Care pathway effectiveness may be monitored by clinical outcomes, length of stay, and re-hospitalization rates



7

Better Care. Better Patient Outcomes. Better Results.

# Outcomes Reporting

## Clients Will Have Access to a Variety of Patient Reports and Related Metrics

**Select Rehabilitation**
**Summary of Patient Outcomes**
April 01, 2024, thru October 01, 2024





- Based on the Care Tool for LTC

- Shared questions with Oasis (home health) and IRF PAI

- Select has tracked outcomes in this format since 2016

- Customize by care path, diagnosis, payer, physician, referral source, discharge destination



8

Better Care. Better Patient Outcomes. Better Results.

# Compliance

**Organization-wide Initiative for Risk Prevention, Detection and Mitigation**

**Following the Seven Fundamental Elements**



Better Care. Better Patient Outcomes. Better Results.

# Appeals and Denials Management



- Led and overseen by 2 RNs with > 65 years of combined LTC experience

- 45-person team of Medical Reviewers and processors comprised of both therapists and nurses

- Working closely with Select's Compliance and Education teams

- Additional specialty team dedicated solely to Outpatient billing and medical review

- Monthly detailed claims tracking and monthly client review of claims status

- Overturn rate 98%



10    Better Care. Better Patient Outcomes. Better Results.

# Therapy Software

**Highest Interface Capability**



• All-Inclusive Therapy Software

• Comprehensive Documentation

• Part B Cap Management

• Detailed MDS Section "O" Report

• Customer Real Time Access to Data

• Up-to-Date Regulatory Compliance

• Mobile Connectivity for Point of Service Documentation

• Billing Exports

• Complete Line-Item Reports

\* Therapy documentation requirement for Sections B, C, D, and K of the MDS





11

Better Care. Better Patient Outcomes. Better Results.

# Section GG Coding

**Active Participation by Therapists and Facility Staff Training**

- Partner to collaborate and complete Section GG

- Therapists are trained on Section GG including the definitions and scales for each item

- Education and training for facility staff on Section GG

- Therapists will collect performance information related to Section GG

- Program Manager will review to ensure all areas are complete and discharge goals established

- Provide Section GG scores to the MDS Coordinator upon admission and discharge





Better Care. Better Patient Outcomes. Better Results.

# Therapy Support for MDS Completion

**Assistance in Accurate Coding, Care Planning & Reimbursement**

Select Rehab therapists will complete the following sections of the MDS, to assist our facilities in accurate coding, care planning and reimbursement

- Section B: Speech / Hearing / Vision

- Section C: Cognition - BIMS

- Section D: Depression – PHQ9

- Section K: Swallowing / Nutrition





13

Better Care. Better Patient Outcomes. Better Results.

# Training Your Staff

**Select's MDS and RAI Coding Specialists are Committed to Training for Our Therapists and Clients**

- PDPM Training and Education including:
  - o Non-Therapy Ancillaries
  - o Nursing Component
  - o Section GG Impact
- Understanding and Application of ICD*10

- MDS Coding and Accuracy
- Cognitive Testing including the BIMS and CPS
- Interim Payment Assessments (IPA)
- CMI
- Clinical Pathways





## An Education Team Led by Nationally Renowned Clinical & MDS Experts

### Dr. Kathleen Weissberg, OTD, OTR/L
Education Director

*Kathleen oversees continued competency and education for Select Rehabilitation.  In her role, she conducts compliance, ethics and jurisprudence training to therapists and nurses, as well as conducts audits and provides denials management and quality improvement planning training for more than 900 sites nationwide.  She has authored several publications that focus on patient wellness, fall prevention, dementia management, therapy documentation, and coding/billing compliance.*

### Donna L. Luby, RN, CCM, CNAC, RAC-CT
Vice President

*Donna is a nationally known RAI and MDS expert.  She is well known for developing clinical, operational, and financial strategic solutions that enable SNFs to successfully adapt to the ever-changing regulatory environments at both State and Federal levels.  Donna has a well-earned reputation for providing extraordinary, accessible customer service that adds sustained value for clients and helps position them successfully for the future.*


Select
Rehabilitation

Better Care. Better Patient Outcomes. Better Results.

# Marketing and Program Development

**Using CMS Claims Data and Analytics to Understand Patient Movement in Local Markets**



## Understanding Your Local Market

- CMS Claims Data Analytics

- Competitive Market Analysis

- Hospital Readmission Rates

- Nursing Home Compare

- Clinical Care Programs and Protocols

- Select Rehabilitation Care Tool Outcomes Measurement



15    Better Care. Better Patient Outcomes. Better Results.

# Select Strategies Report - Sample







Better Care. Better Patient Outcomes. Better Results.



# Select Strategies Report - Sample



## Admissions Market Share

This data is utilized to compare facility average census to competitors, identify market share opportunity for census development, and review admissions trends form top referring

| Facility | Certified Beds | Occupied Beds | % of Bed Occupancy |
|---|---|---|---|
| My Facility | 180 | 70 | 38.9% |
| County | 101 | 69 | 68.6% |
| Market Area | 104 | 72 | 69.5% |
| State | 104 | 71 | 67.8% |
| National Average | 106 | 72 | 67.9% |

*Star Ratings and Bed Count from Care Compare data dated October 10, 2022

| Market Area Stats | |
|---|---|
| Hospital Count (Other IP) | 9(8) |
| SNF Count | 46 |
| # of Hospitals That Discharge to My Facility (Other IP) | 8(0) |
| Market SNF Beds | 4,680 |
| My SNF # of Beds | 180 |
| My Market Share SNF Beds | 3.8% |
| My Market Share of Discharges to SNF | 2.2% |

| Admissions Trending For Top Referring Hospitals For My Facility and Top 3 SNFs | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Q1 19 - Q4 19 | | Q1 20 - Q4 20 | | Q1 21 - Q4 21 | | Q2 21 - Q1 22 | |
| | Admits | % | Admits | % | Admits | % | Admits | % |
| Hospital A | | | | | | | | |
| Competitor B | 128 | 16.7% | 114 | 14.8% | 58 | 11.9% | 54 | 13.1% |
| Competitor A | 36 | 4.7% | 35 | 4.6% | 58 | 11.9% | 45 | 10.9% |
| Competitor C | 19 | 2.5% | 29 | 3.8% | 24 | 4.9% | 30 | 7.3% |
| My Facility | N/A | N/A | N/A | N/A | N/A | N/A | 11 | 2.7% |
| | | | | | | | | |
| HOSPITAL B | | | | | | | | |
| Competitor D | 417 | 22.5% | 360 | 18.2% | 248 | 19.0% | 191 | 16.8% |
| Competitor B | 204 | 11.0% | 288 | 14.6% | 132 | 10.1% | 113 | 9.9% |
| Competitor E | 146 | 7.9% | 113 | 5.7% | 119 | 9.1% | 127 | 11.2% |
| My Facility | N/A | N/A | N/A | N/A | N/A | N/A | 15 | 1.3% |



17    Better Care. Better Patient Outcomes. Better Results.

# Select Strategies Report - Sample

## Hospital Discharge by Facility



Track patient movement to specific post-acute discharge locations including timeframe, volume, and average payment.  Analyze specific patient movement to discharge location and Medicare spending to develop a strategic plan for marketing and/or partnering with

| Hospital | City | Year | Discharges | Admissions | Care Setting | Facility | Average Payment | Market Average Payment | State Average Payment |
|---|---|---|---|---|---|---|---|---|---|
| HOSPITAL A | CITY NAME | DATA RANGE | 2,222 | 92 | SNF | COMPETITOR A | $11,225 | $12,788 | $18,449 |
| HOSPITAL A | CITY NAME | DATA RANGE | 6,483 | 20 | SNF | COMPETITOR B | $10,965 | $12,788 | $18,449 |
| HOSPITAL A | CITY NAME | DATA RANGE | 6,483 | 13 | SNF | COMPETITOR C | $11,151 | $12,788 | $18,449 |
| HOSPITAL A | CITY NAME | DATA RANGE | 6,483 | 13 | SNF | COMPETITOR D | $5,571 | $12,788 | $18,449 |
| HOSPITAL A | CITY NAME | DATA RANGE | 6,483 | 50 | SNF | MY FACILITY | $10,692 | $12,788 | $18,449 |

## Hospital Discharge by DRG-Facility



Track patient movement to specific post-acute discharge locations by DRG including timeframe, volume, and average payment.  Analyze specific patient movement to discharge location by DRG and Medicare spending to develop a strategic plan for marketing and/or partnering with hospitals.

| Hospital | City | Year | Discharges | Diagnostic Related Group | Facility Admissions | Care Setting | Facility | Facility Average Payment | Market Average Payment | State Average Payment |
|---|---|---|---|---|---|---|---|---|---|---|
| HOSPITAL A | CITY NAME | DATA RANGE | 6,483 | INTRACRANIAL HEMORRHAGE OR CEREBRAL INFARCTION | 29 | IRF | INPATIENT REHAB FACILITY A | $23,084 | $22,839 | $31,042 |
| HOSPITAL A | CITY NAME | DATA RANGE | 6,483 | HIP AND FEMUR PROCEDURES EXCEPT MAJOR JOINT | 23 | IRF | INPATIENT REHAB FACILITY A | $20,209 | $21,436 | $28,821 |
| HOSPITAL A | CITY NAME | DATA RANGE | 6,483 | SEPTICEMIA OR SEVERE SEPSIS | 17 | IRF | INPATIENT REHAB FACILITY A | $17,459 | $19,457 | $27,636 |
| HOSPITAL A | CITY NAME | DATA RANGE | 6,483 | MAJOR JOINT REPLACEMENT OR REATTACHMENT OF LOWER EXTREMITY | 16 | IRF | INPATIENT REHAB FACILITY A | $22,259 | $20,712 | $25,294 |
| HOSPITAL A | CITY NAME | DATA RANGE | 6,483 | SEPTICEMIA OR SEVERE SEPSIS | 15 | SNF | MY FACILITY | $8,137 | $10,773 | $19,277 |
| HOSPITAL A | CITY NAME | DATA RANGE | 6,483 | SEPTICEMIA OR SEVERE SEPSIS | 12 | SNF | COMPETITOR B | $13,862 | $10,773 | $19,277 |



Better Care. Better Patient Outcomes. Better Results.

# Partnership Value Proposition

1. Comprehensive Dedicated Therapy Teams led by a Program Manager

2. Value Added Services including Program Manager attendance at daily meetings, Medicare meetings, Care Plans for Residents on Caseload, and Targeted Resident Decline Meetings

3. Regional Manager and VP Oversight

4. Ongoing Quarterly Reviews

5. Assistance with the Therapy Related Portions of the MDS to enhance reporting accuracy and reimbursement capture.

6. Therapy Related CMI assistance (State Specific)

7. True Partnership with Therapy to enhance patient care, improve quality outcomes, and accurately capture reimbursement.



19

Better Care. Better Patient Outcomes. Better Results.

# **Exhibit 8**






# ABOUT US

- Milrose Capital is a private equity firm with a proven track record of maximizing the value of diversified assets.  Founded in 2009, Milrose Capital has grown its portfolio size to over two billion by focusing on:
    - Strategic joint ventures
    - Opportunistic debt financing
    - Complex distressed assets turnarounds
    - Transaction size and investment hold period flexibility
    - Creative structuring with geographically diverse / multi party transactions
    - Comprehensive due diligence with detailed acquisition execution underwriting
    - Strong long term relationships with an extensive network of joint venture partners, third party operators and tenants to actively support the identification and implementation of ambitious growth and asset transformation strategies

# MILROSE INVESTMENTS



| $2.0B+ | 2.0mm+ | 4,000+ | 2,500+ | 70+ | $100mm+ |
|---|---|---|---|---|---|
| **ASSET INVESTMENT PORTFOLIO SIZE** | **SF OF CORE INDUSTRIAL SPACE** | **MULTI FAMILY UNITS** | **CHILDCARE LICENSED ENROLLMENT CAPACITY** | **SKILLED NURSING & DRUG REHAB FACILITIES** | **DEBT PORTFOLIO PARTICIPATION** |

## Multi-Asset and Industry Investment Expertise

- Real estate investments in industrial, office, multi family, retail and healthcare
- Operating company investments in childcare, healthcare, and various other industries
- Successful outcomes optimizing operations and resolving complex regulatory challenges across the portfolio
- Diverse high yield debt investment holdings
- Strong track record of identifying undervalued assets, optimizing going in basis with strategic divestitures, and transforming distressed and turnaround assets

**Investment Footprint**



**Milrose Capital**
Past and present holdings

# CASE STUDY  NJ MULTIFAMILY



## Aggregation Strategy - Realized

> **Aggregated portfolio in target market**

> **Drove occupancy growth**

> **Utilized operational economies of scale**

> **Pricing premium achieved on exit**

| REALIZED - NJ Multifamily | |
|---|---|
| Properties Acquired | 15 |
| Average Property Unit Count | 75 |
| Aggregate Unit Count | 1120 |
| Transaction Size    *(millions)* | $119.0 |
| Equity | $26.8 |
| Total Return | $88.9 |
| Profit | $62.2 |
| Equity Multiple | 3.3x |
| IRR | 43.9% |



















4

# CASE STUDY OHIO CHILDCARE



## Platform Development - Active

| Strategic portfolio and market share growth |
| --- |

| Quality ratings and tuition rate improvement |
| --- |

| Intense focus on operational efficiencies |
| --- |



**2,500+** License Capacity

**17** Programs

**2%** of Ohio's government funded children

**225+** Employees

**4.6** Average SUTQ Star Rating

**1 PLATFORM**



- **2018 market entry**

- **Executed on business plan of portfolio growth with a strategy of add on acquisitions, new center openings and program eligibility expansion**

- **Brought average sub-3-star SUTQ quality location ratings up to a portfolio average of 4.6 stars, translating into state tuition premium increases of up to 40% per location**

- **Unified portfolio into one platform with new name and complete rebranding as Clever Bee Academy in 2023**

- **Achieved multi-year reductions in direct operating expense per enrolled student with intense focus on operational efficiencies**

- **YOY Direct Operating Income growth averaging 29%+ annually 2021 - 2024**

# CASE STUDY  SKILLED NURSING



## Acquisition – Operations Transfer - Active

| Proven Milrose portfolio operator turnaround | |
|---|---|
| **Acquisition Date** | **June 2024** |
| **# Facilities** | **7** |
| **# SNF Beds** | **847** |
| **Locations** | **Port Charlotte, FL** |
| | **Alamonte Springs, FL** |
| | **Jacksonville, FL** |
| | **Brandon, FL** |
| | **Kissimmee, FL** |
| | **Melbourne, FL** |
| | **New Port Richey, FL** |
| | **Pensacola, FL** |

### Pre Operations Change Challenges

- Operating losses of over $12 million annually

- 89% occupancy

- Low skilled mix

- Critical staffing crisis and substantial agency usage

- History of substandard survey results

- Substantial deferred maintenance and life safety issues

- Antiquated and outdated physical plant

### Post Takeover Results

- Substantial financial and operational resources invested

- Improved occupancy to 97% with admission process overhaul

- Non-Medicaid census increased from 18% to over 30%

- Financial turnaround with over $7.0 million in EBITDA annually, representing an over $19 million upward earnings trend

# CASE STUDY  SKILLED NURSING

## Acquisition – Operations Transfer - Active



| Milrose regional portfolio operator turnaround | |
| --- | --- |
| **Aquisition Date** | **May 2024** |
| **Facilities** | **4** |
| **Beds** | **425 SNF** |
| | **36 ALF** |
| | **7 IL** |
| **Locations** | **New Castle, PA - 2 facilities** |
| | **Pittsburgh, PA - 1 facility** |
| | **Franklin, PA - 1 facility** |

### Pre Operations Change Challenges

- Multi-year history of operating losses, with pre-acquisition EBITDAR losses of over $12.5 million annually

- Low 70's% occupancy

- Substantial agency usage of over $15.5 million annually ($107 PPD)

### Post Takeover Results

- By month two of operations achieved positive EBITDAR, with Q4 2024 annualized EBITDAR over $4.0 million

- Q4 2024 occupancy 85%

- Agency decreased month over month until fully eliminated in December 2024



SUGAR CREEK STATION



JAMESON CARE CENTER



AVALON PLACE



HERITAGE PLACE

# CASE STUDY  SKILLED NURSING

## Lease – Operations Transfer - Active

**MILROSE CAPITAL**

| Milrose regional portfolio operator turnaround | |
|---|---|
| **Transition Date** | **March 2022** |
| **# Facilities** | **16** |
| **# SNF Beds** | **1906** |
| **Locations** | **Georgia - 11 facilities** **North Carolina - 5 facilities** |

### Pre Operations Change Challenges

- Combined operating losses of over $13.5 million annually and uncertain future financial viability of ongoing operations
- 70% occupancy
- Low skilled mix
- **Critical staffing crisis and substantial agency usage of over $10 million annually**
- History of substandard survey results
- Substantial deferred maintenance and life safety issues
- Antiquated and outdated physical plant

### Post Takeover Results

- Substantial financial and operational resources invested
profitability
- Grew occupancy to 92%
- Increased non-Medicaid mix from 16% to 32%
- **Eliminated agency and stabilized staffing**
- Maintained quality survey results overall

# CASE STUDY SKILLED NURSING



## Targeted Distressed and Bankruptcy - Examples

> **Targeted bankrupt or deeply distressed facilities with limited transaction timeframes**

> **Brought in strong regional portfolio operating partners and successfully stabilized**

### Washington Rehabilitation & Nursing Center
- $27 million transaction
- Washington, PA
- 288 bed skilled nursing facility
- Troubled county facility with tight closing timeline

### Timberlyn Heights Nursing & Rehabilitation
- All cash rescue transaction of $1 million
- Great Barrington, MA
- 71 bed skilled nursing facility
- **REALIZED – 9.7x Equity Multiple, 264% IRR**

### Dover Nursing & Rehabilitation Center
- $10 million transaction
- Georgetown, KY
- 85 bed skilled nursing facility
- **REALIZED – 6.2x Equity Multiple, 85% IRR**

### The Fountains at Mill Cove
- $35.5 million transaction
- Jacksonville, FL
- 285 unit, 315 bed CCRC
- Delivered 45 day close when Brookdale Senior Living had contract fall out

### Deer Meadows Retirement Community
- $33.5 million transaction
- Philadelphia, PA
- 206 bed CCRC
- Purchased out of bankruptcy from non-profit

### Highlands Portfolio
- $45 million transaction
- Memphis, TN / Dyersburg, TN
- 303 skilled nursing beds
- Critically distressed Skyline facilities
- **REALIZED – 42.6x Equity Multiple, 315% IRR**

### Page Rehabilitation & Healthcare Center
- $19 million transaction
- Ft. Myers, FL
- 185 skilled nursing beds
- Chosen by non-profit for distressed turnaround

### Fort Myers Rehabilitation and Nursing Center
- $8.5 million transaction
- Fort Myers, FL
- 120 skilled nursing beds
- Special Focus Facility purchased out of bankruptcy

### Saunders House
- $29 million transaction
- Wynnwood, PA
- 180 bed skilled nursing facility
- Distressed non-profit acquisition



# OPTIMIZING VALUE

Milrose Capital creates value through strategic investments in a broad spectrum of industries and asset classes.   We pursue and execute on opportunities with REITs, large national and regional networks, and smaller tenants and operators. We are active opportunistic investors with the capacity to close transactions of all sizes.

Our strengths are

- Diverse market knowledge and asset analysis expertise
- Extensive network of proven and reliable regional partners with deep local operational experience
- Track record of closing execution for complex transactions in expedited time frames
- Transforming distressed assets faced with multifaceted regulatory challenges
- Driving platform development with premier tenants and operators
- Strong reputation with buyers, operators, tenants, and financial partners
- Capacity to explore strategic joint ventures, flexible management arrangements, lease to own tenant / operator agreements, and other collaborations to reposition assets and maximize value for all transaction participants
- Commitment to best practices and continuous improvement in all areas of our business



**Milrose Capital**

Past and present holdings

# **Exhibit 9**

***Jacob Sob – Genie Principal & Milrose Capital - President.***  Jacob Sod began his career in healthcare financing and acquisitions over two decades ago, initially focusing on merger and acquisition transactions. As his experience grew, he expanded his expertise across a broad spectrum of business and financial operations. Known for his strong work ethic, attention to detail, and strategic thinking, Jacob quickly established himself as a respected leader in the field. He is a founding member of *Milrose Capital*, a private investment firm focused on healthcare and real estate. Through Milrose, Jacob has spearheaded a diverse range of investments—including skilled nursing facilities, multifamily housing, and industrial assets—delivering strong returns and long-term value creation.

Jacob is also a founding member of *Premier Healthcare Management*, an operator of long-term care facilities along the East Coast. In this role, he has played a central part in shaping operational strategy, overseeing financial performance, and driving quality improvements across the portfolio. His leadership has helped guide multiple organizations to financial stability, even in some of the most challenging  industry and market conditions.

In addition to his investment and advisory work, Jacob is a principal owner and operator of skilled nursing facilities throughout the Northeast. He has also developed strong working relationships with major healthcare labor unions, successfully renegotiating multiple Collective Bargaining Agreements to  strengthen both workforce satisfaction and financial sustainability.

Highlighted Transactions:

- o Acquired a six-facility skilled nursing portfolio totaling nearly 700 beds in Connecticut from  Health Care REIT. This all-cash transaction required significant capital investment and hands-on  operational support to stabilize and reposition the assets.

- o Began acquiring Central New Jersey multifamily properties in 2010, assembling a value-add  portfolio by targeting underutilized buildings from Elizabeth to Newark and driving operational  efficiencies and rent growth.

- o In 2014, recognizing the migration of middle-class professionals from NYC, Jacob acquired 10  buildings in East Orange, NJ. By catering to this shifting demographic, rents saw a substantial  increase within the first year, setting the portfolio on track for a strong IRR in under two years.

- o Expanded into industrial real estate with the acquisition of 8+ acres of warehouse space in Newark's Ironbound District. By identifying the site's strategic location near major transit and port infrastructure, Jacob brought occupancy from 40% to 90% through targeted leasing efforts.

- o In 2017, led the acquisition of the 1.5 million-square-foot Wharton Industrial Center in Wharton, NJ. At purchase, 17% of the facility faced non-renewal risk.

Through strategic lease renegotiations, Jacob stabilized the asset, bringing it to full occupancy with long-term tenants including Refresco's U.S. headquarters

***Rowan Farber – Genie Principal & Integro Healthcare Services - President.*** Mr. Farber is founding partner of *Integro Healthcare Services*, focused on buying destressed healthcare assets in the US. Mr. Farber has significant experience in healthcare operations, asset management and investment banking, including leveraged buyouts, M&A and private and public company financings. Mr. Farber has served as the *President & CEO* of *Integro Healthcare Services* or its predecessor, since June 2004 and also assumed the role of *COO* of the Company, from December 2008 until March 2012. Mr. Farber grew Integro Healthcare Services to over $250.0 million of consolidated revenue, with 5,000 employees and served over 20,000 healthcare patients. Mr. Farber has led some of the largest skilled nursing healthcare company bankruptcies in the long-term care sector, since 2007. Mr Farber worked closely with Jill Snow, former Integro Compliance Officer, managing the Clinical Corporate Integrity Agreement process with the OIG and its appointed monitoring organization, that Integro had to assume as a purchaser of skilled nursing facilities in the *Pleasant Care Healthcare Services* bankruptcy. To date, Mr. Farber has worked on over $15.0 billion of financings, leveraged buyout and M&A transactions for sovereign and corporate clients, including several *Fortune 500* companies. Mr. Farber was formerly a Managing Director at *Wharton Equity Partners* in New York, a private equity firm focused on healthcare, technology, and biotechnology investments. Mr. Farber previously worked at *Berenson Minella & Company* an M&A boutique, providing a wide range of investment banking activities. *Berenson Minella* was founded in 1988 by the former Heads of Merrill Lynch's M&A Group and Leverage Finance Group. Previous to *Berenson Minella*, Mr. Farber worked for the Vice Chairman of Investment Banking of *Credit Suisse First Boston* in New York, where he worked on some of the most high-profile corporate and project finance deals on *Wall Street*, as rated by *Institutional Investor*. Mr. Farber has a bachelor's of commerce degree from the University of the Witwatersrand, South Africa.

***Jill Snow, Consultant – Former VP of Clinical Operations & Compliance.*** Ms. Snow, RN, BSN, MBA, has served the long term care industry in progressive clinical operation roles for more than 20+ years. Her leadership experience includes Vice President and Senior Vice President of Clinical Services roles in companies with more than 150 skilled nursing facilities. In these roles she provided vision and strategic direction for clinical excellence and regulatory outcomes. Her experience includes direct care and nursing management in both acute and long term care, as well as regulatory affairs, survey and certification, operations and executive leadership. Ms. Snow is a past co-chair and current advisory member for the Nurse Executive Council, and served several terms on the AHCA regulatory subcommittee. She has presented at local and national association groups on regulatory and clinical compliance. Currently, Ms. Snow is currently independently

employed and provides clinical, operational and compliance guidance for Integro Healthcare Services. She has been instrumental in developing strategic direction for the company's clinical platform development and compliance activities. She served as the Corporate Compliance Officer for Integro, managing the Clinical Corporate Integrity Agreement process with the OIG and its appointed monitoring organization, that Integro had to assume as a purchaser of skilled nursing facilities in the *Pleasant Care Healthcare Services* bankruptcy.

***Tracy Clark – Chief Financial Officer.*** Mr. Clark is founding partner of Integro Healthcare Services. He has been the Chief Financial Officer of the Company since 2005 and also serves as the Secretary of the Company. He currently sits on the Government Relations Sub-committee of the California Association of Healthcare Communities. During his 30 year management career, he has managed strategic planning, financial analysis, business development, accounting controls, organizational structure, cost containment, and information systems functions. Prior to joining Integro Healthcare Services, he had been the CFO and COO for several successful companies and has provided start-up and management consulting for outside businesses. He has worked in the DME field, helping pioneer several mobility vehicles, as well as in the contract therapist business. In 1982, he was named the Banker of the Year in Iowa by the US Small Business Administration. In his work with the federal and state government agencies, he has successfully obtained changes to significant regulations. His Finance and Accounting degrees are from the University of Iowa.

***Kenneth Q. Dao – Director of Mergers & Acquisitions.*** Mr. Dao manages all aspects of the development of Integro communities, from market analysis to real estate acquisition to construction. He has been an integral part of Integro and LifeHouse's growth and development since 2005.

Ken joined Integro/LifeHouse as a financial analyst and was promoted to Director of Mergers and Acquisitions in 2008. He became Vice President of Acquisitions and Integration in 2012.

He is responsible for the major renovations, development and construction of numerous senior living facilities, and capital reinvestments, acquisitions, facilities management, and capital purchases. During his 17 years with Integro, he has participated in over $400 million of M&A activity and $200 million of debt and equity financing transactions.

His other responsibilities as a senior executive include health-related oversight, budget development accountability, human resources management, resident and employee relations, property maintenance, risk management and marketing.

He also brings a focus on creating a work environment that encourages employees to grow and increase their skills.

Before joining LifeHouse, Ken worked at Morgan Stanley for multiple senior vice presidents on capital raising, managing equity and fixed income assets for corporations and high net-worth clients. He has also worked at the United Nations and the U.S. Department of Commerce in Washington D.C.

Ken has a Bachelor of Science degree in Business Economics & Finance from University of California Riverside and was enrolled in the University of Hong Kong graduate studies program.

***Rick Strolic – Director of Financial Services.***   Mr. Strolic joined *Integro Healthcare Services* in 2010 as the Director of Financial Services. With over 30 years of experience in the healthcare finance, Mr. Strolic has knowledge of SEC reporting and GAAP and Joint Venture protocols. Prior to joining *Integro Healthcare Services*, Mr. Strolic was the Senior Director of Finance and Analysis for Sunrise Senior Living (70 Senior Living Communities) where he was responsible for providing overall leadership and management corporate functions of Operations Accounting and Financial Analysis for the portfolio. At *Integro Healthcare Services*, Mr. Strolic manages all aspects of labor staffing, budgeting, cost controls, general ledgers, financial statements, forecasting and allocating financial plans management, project management, and fiscal and operational services. He has a vast understanding of healthcare and Senior Living, pharmaceutical manufacturer, consultation, and an innate ability to work for the geriatric population. Mr. Strolic completed his Bachelors in Business Administration at the City University of New York and finished his academic career with a Masters in Business Administration at Tel Aviv University.

***Megan Darrow, CFA.***   Ms. Darrow is Chief Investment Officer of Milrose Capital, a private investment firm with a multi-asset class portfolio of over two billion and a material concentration in skilled nursing facilities.  With over 20 years of experience in healthcare and real estate finance and operations, Ms. Darrow brings extensive expertise in skilled nursing, senior living, and behavioral health.  She has been responsible for the acquisition and asset management of over 350 facilities and possesses deep experience in distressed asset turnarounds, restructurings, and value maximization within complex receivership scenarios.  At Milrose Capital, she directs budgeting, financial reporting, and strategic portfolio management.

In previous roles, such as with Formation Capital and Artemis Real Estate Partners, Ms. Darrow managed multiple billion-dollar skilled nursing portfolios, executing a public REIT

take-private, restructuring significant debt, overseeing receivership proceedings and numerous operational transitions.  Ms. Darrow is a CFA Charterholder and holds a BA in Economics with a Finance Concentration from Emory University.

# **<u>Exhibit 12</u>**



**DLA Piper LLP (US)**
1900 North Pearl Street
Suite 2200
Dallas, TX 75201-2467
www.dlapiper.com

James Muenker
james.muenker@us.dlapiper.com
T  214.743.4559
F  214.665.5959

November 26, 2025

**CONFIDENTIAL AND SUBJECT
TO THE MEDIATION PRIVILEGE**

<u>**VIA EMAIL**</u>

Jerry Hall
McDermott Will & Schulte LLP
One Vanderbilt Avenue
New York, NY  10017-3852
<u>jerryhall@mwe.com</u>

Re:     *In re Genesis Healthcare, Inc.*, *et al.*, Case No. 25-80185 (SGJ) (Bankr. N.D. Tex.)

Dear Mr. Hall,

On behalf of CPE 88988 LLC ("<u>CPE</u>"),[1] we are writing in response to the Debtors' letter, dated November 23, 2025, setting forth a list of certain diligence questions and requests (the "<u>Questions</u>") regarding the sealed bid submitted by CPE on November 19, 2025 (the "<u>Bid</u>"). CPE's answers are set forth below each applicable Question.[2]

1.     **Please identify the source of the $40 million cash component of your bid.**

The cash consideration of $40 million will be paid by CPE using funds on hand and/or made available to CPE through an equity contribution by CPE's members. In the event the Debtors select CPE as the Successful Bidder, CPE will post a $10 million deposit

---

[1]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in that certain Asset Purchase Agreement, dated as of August 20, 2025, between the Debtors and CPE (the "<u>APA</u>") or the Bidding Procedures (as defined in that certain *Order (I) Approving Bidding Procedures and Expense Reimbursement, (II) Approving the Debtors' Entry Into the Stalking Horse APA, (III) Scheduling Certain Dates and Deadlines, (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases* [Dkt. No. 685]), as applicable.

[2]     This letter, the exhibits attached hereto and the information provided herein should be treated as "Confidential Information" as such term is defined in that certain Non-Disclosure Agreement between the Debtors and CPE and is provided pursuant to the mediation privilege. This letter shall only be circulated to the Debtors, the Consultation Parties and their respective advisors for the limited purpose of evaluating CPE's Bid. CPE has endeavored to provide responses to all of the Questions, some of which are broad and seek information with respect to an extended period, in the limited time provided. CPE reserves the right to supplement its responses.

CONFIDENTIAL

within ten (10) days of the conclusion of the Auction and will fund the remaining $30 million at closing of the proposed sale transaction in accordance with the terms and conditions of the APA, as modified by the Bid.

Attached hereto as Exhibit A is a screenshot of CPE's bank account showing available cash of $50 million. Therefore, CPE has funds currently available to fulfill its obligations to pay at least $40 million in cash consideration component of its Bid.

2. **Please identify the source of any other financing, including term sheet and commitment letters, for other transactional components.**

CPE has secured funding commitments from Welltower, Omega, WAX Lender and White Oak Healthcare Finance, LLC ("White Oak") in connection with its Bid. In particular, exit financing for (i) the payoff of the Welltower and Omega portions of the DIP Loans, (ii) the Welltower and Omega portions of the Term Loan and (iii) $25 million of the WAX Lender portion of the Term Loan is being provided by Welltower, Omega and WAX Lender in their respective portions (the "Term Loan Exit Financing"). Exit financing for the payoff of the White Oak Facility is being provided by White Oak (the "White Oak Exit Financing"). Importantly, the White Oak Exit Financing provides for a term loan sufficient to address the maximum amount reasonably estimated to be necessary to cure any "hole" in the borrowing base at the time of closing of the proposed sale to CPE.

CPE is not authorized to share all of the information related to the Term Loan Exit Financing or the White Oak Exit Financing without the written consent of the lenders thereto. As you are aware, CPE requested permission from the Debtors to engage with Welltower, Omega and White Oak on November 21 and 25, 2025 regarding the Term Loan Exit Financing and White Oak Exit Financing. To date, the Debtors have not granted such permission and, consequently, CPE has continued to honor the Debtors' instructions to not engage in any discussions with the Debtors or the Consultation Parties, including Omega, Welltower and White Oak. To the extent additional clarification/information is required by, or would be helpful to, the Special Restructuring Committee, CPE requests permission to confer with Welltower, Omega and White Oak solely with respect to the Term Loan Exit Financing and/or the White Oak Exit Financing so that it may provide that information/clarity.

3. **Please describe the capital structure upon the closing of a proposed sale.**

A description of the capital structure is provided in Question Nos. 1 and 2 and the Projections (as defined below), which together reflect the anticipated debt and equity upon closing of the proposed sale to CPE.

4. **To the extent not provided in connection with any requests below, information regarding the name, background, experience, ratings, and other credentials of the proposed operator, including the principals and affiliated entities.**

CPE intends to hire substantially all of the Debtors' facility and regional level employees, who make up the backbone of the Debtors' existing organization, along

2

CONFIDENTIAL

with a substantial number of current corporate level employees to ensure as much continuity in operations and patient care as possible. CPE believes that this will, among other things: (i) pave the way for a seamless transition for residents, families and caregivers, (ii) maintain and provide continuity of clinical/regulatory performance, and (iii) minimize operational disruptions and ensure CPE's ability to fulfill its future financial obligations. In addition, CPE has invested and will continue to invest significant resources, including utilizing an experienced asset manager and services support company that has substantial experience in multi-state operations, bankruptcy transitions, company start-ups and a demonstrated track record of improving organizational performance.

By way of example, CPE is currently working with Chris Bryson, a 30-year SNF professional, in connection with the formulation and implementation of its Bid. Mr. Bryson has been significantly involved in negotiating the Term Loan Exit Financing and the White Oak Exit Financing and will assist CPE in, among other things, identifying and retaining the CEO and other C-suite employees for the new company and overseeing the entire transition. Mr. Bryson's bio is attached hereto as Exhibit B.

Mr. Bryson has spent his career leading organizations of a similar size (like Consulate Health Care and LaVie Care Centers) and has substantial experience acquiring skilled nursing facilities (both in bankruptcy, including Gulf Coast, CMC II and LaVie Care Centers, and outside of bankruptcy, including NSPIRE Healthcare and Avardis Health Care) and building and running organizations and teams in the healthcare industry. He has successfully led multiple organizations through the challenges of regulatory and HUD compliance through the CHOW processes and has a proven track record of closing deals. Mr. Bryson brings a "Big Company, Local Market" philosophy to CPE (and Genesis), that is based on the belief that big companies succeed best when operational decisions that impact the local center are made closest to the market and not at the corporate level.

Mr. Bryson is also working with key members of Synergy Health Care to provide a variety of start-up and support services in support of CPE's Bid. With over 20-years' experience and expertise in a broad range of administrative services, Synergy works behind the scenes to deliver solutions that allow its customers to focus on what they do best - patient and resident care. Such services include, but are not limited to, support related to accounting, asset management, brand management, human resources, licensing and physical plant management.

3

CONFIDENTIAL

5.    **Please identify any contractual restrictions or restricted payment limitations on senior debt regarding payments to junior debt**.

CPE believes that the Term Loan Exit Financing and White Oak Exit Financing will permit any payments on account of junior debt contemplated under CPE's Bid. To the extent additional clarification/information is required by, or would be helpful to, the Special Restructuring Committee, CPE requests permission to confer with its lenders solely with respect to the Term Loan Exit Financing and/or the White Oak Exit Financing so that it may provide that information/clarity.

6.    **Please briefly describe the status of the Intercreditor agreement between the ABL and the Term Loan.**

CPE believes that the Intercreditor Agreement between the White Oak Facility and the Term Loan (the "Intercreditor Agreement") is in effect and shall remain in effect following the closing of the proposed sale to CPE.

7.    **Please provide additional information regarding the core terms (rate, maturity, financial covenants, etc.) of the proposed $25M WAX term loan debt.**

As discussed on the "clarification" call on Friday, CPE's Bid includes secured debt having a value of $25 million on substantially the same terms as the WAX Lender secured debt under the existing Term Loan, plus those additional, favorable changes as may be agreed to by WAX Lender's co-lenders, Welltower and Omega. Additional information regarding the WAX Lender debt is provided in the Projections (as defined below). To the extent additional clarification/information is required by, or would be helpful to, the Special Restructuring Committee, CPE requests permission to confer with Welltower and Omega solely with respect to the Term Loan Exit Financing.

8.    **Please provide additional information regarding the core terms (rate, maturity, financial covenants, etc.) for the DIP-to-exit facility.**

The "DIP-to-exit facility" is included in the Term Loan Exit Facility. See answer to Question No. 11 below and in the Projections (as defined below).

9.    **How much cash do you anticipate having on the balance sheet after closing?**

Given, among other reasons, the present uncertainty regarding the exact closing date for the transaction and, it is difficult to provide an accurate estimate at this time. As set forth in the Projections, however, CPE expects to have sufficient cash and liquidity to meet both its short-term and long-term operating needs.

CPE further submits that the Special Restructuring Committee can take comfort in the proven track record of CPE and its affiliates, including ReGen Healthcare LLC, in providing financial support to Genesis by previously funding approximately $100 million to Genesis under the convertible ReGen notes and CPE's funding $14 million of the existing DIP Loan. CPE's affiliates also have a proven track record of funding

CONFIDENTIAL

and closing on transactions, including the recent acquisition of 44 facilities in LaVie Care Centers' chapter 11 cases.

CPE is confident that it has the funding needed to close on the proposed sale transaction and ensure a smooth transition of operations as evidenced by the account screenshot attached as <u>Exhibit A</u>.  The cash on hand of $50 million provides for not only the $40 million cash consideration of the Bid but an additional $10.0 liquidity cushion, should such additional funding be needed for the transaction.

**10**. **Please provide projections showing ability to meet financial covenants/service assumed obligations, including ability to satisfy promissory note**

Projections are attached hereto as <u>Exhibit C</u> (the "<u>Projections</u>").

**11.** **Please provide any current term sheet for the term loan facilities. Will existing prepetition terms will carry forward?**

The Term Loan Exit Facility will provide for the refinancing of all of the Welltower/Omega portions of the DIP loans, the Welltower/Omega portions of the Term Loan and $25 million of the WAX Lender portion of the Term Loan, as described in the response to Question No. 2, on substantially the same terms as the existing loans. Additional information regarding the Term Loan Exit Facility is provided in the Projections.  To the extent additional clarification/information is required by, or would be helpful to, the Special Restructuring Committee, CPE requests permission to confer with its lenders solely with respect to the Term Loan Exit Financing and/or the White Oak Exit Financing so that it may provide that information/clarity.

**12.** **Have any of the principals of the stalking horse been involved in entities that did not close on sales under section 363 or chapter 11 plans?**

None to our knowledge.  To the contrary, entities affiliated with Mr. Landau recently closed on a sale of approximately 44 facilities under a chapter 11 plan in the bankruptcy cases of LaVie Care Centers, *et al*., in the United States Bankruptcy Court for the Northern District of Georgia.

**13**. **Please provide diligence about CPE's experience operating skilled nursing facilities, including:**

a. **How many SNFs does it currently operate and in which states?**
b. **Who are the key leaders in senior management with SNF experience (including names) who will manage the operations of the portfolio, including from a clinical perspective, and what is their prior experience with large scale portfolio transitions?**

See answer to Question No. 4 above.

CONFIDENTIAL

14. **Please provide clinical outcomes data for the past three years of any entities with which you are affiliated, including their CMS star rating, quality measure scores, and rehospitalization rates (all on a facility basis, not in aggregate).**

See answer to Question No. 4 above.

15. **What compliance or regulatory issues, if any, have the entities with which you are affiliated had in the past three years? If available, please send the Debtors your (or that of any entities with which you are affiliated) compliance program summary/policy.**

See answer to Question No. 4 above.  In addition, CPE is not aware of any material compliance or regulatory issues during the past three years that would negatively impact the proposed sale transaction to CPE.   There are no prohibitions that preclude CPE or its members or affiliates from participating in the Medicare and Medicaid programs.  Given other recent transactions, including those involving HUD, CPE does not anticipate any regulatory barriers.  In fact, as previously noted, affiliates of CPE recently closed on the sale of 44 facilities in the LaVie Care Centers bankruptcy cases.

16. **Please identify each healthcare-related entity with which you (meaning Joel Landau and any control person) have had any affiliation in the past five years.**

Mr. Landau is an experienced investor in the health care space and is affiliated with numerous "healthcare-related entities" in both active and passive capacities.  Identifying every "affiliation" he has made in a "healthcare-related entity" in the past five years would be unduly burdensome, would require the disclosure of confidential and/or proprietary information, and does not seem to be reasonably related to the consideration of CPE's bid.  If you have a more specific question or concern tied to a specific "affiliation," we would be happy to consider that request.

17. **Has each bidder committed to assume the Omega Master Lease, the Welltower Master Lease, and all other leases that the Debtors have not indicated an intention to reject/transition?**

   a. **If so, is either bidder seeking an amendment or modification to the current lease terms, including the financial covenants and capex requirements contained in the leases. If so, please identify those terms.**

CPE has agreed to assume the leases for the Purchased Assets set forth in its APA, including, without limitation, the Omega Master Lease and the Welltower Master Lease.  Welltower and Omega have approved CPE as a new operator under such leases.

CPE is not seeking an amendment or modification to any current lease terms but reserves the right to do so with the consent of any affected landlord.

18. **What transition services do you anticipate needing?**

CONFIDENTIAL

CPE has committed to hire substantially all of the facility level employees for the Purchased Assets as part of its Bid. If CPE is the Successful Bidder, CPE intends to work with the Debtors' existing management to identify those corporate level employees to whom CPE may extend offers of employment. To the extent that CPE does not hire certain employees, CPE may need transition services related to jobs performed by those employees but has not yet identified those services. With respect to any such services, CPE would pay an amount sufficient to cover the Debtors' costs of providing such services. Additionally, CPE intends to engage with the current patient care ombudsmen to identify immediate and long-term areas of improvement at the facilities.

19. **Promissory Note:**
    a. **Would the note contemplate restrictions on the Debtors from taking on additional debt that could dilute the position of the promissory note? Yes.**
    b. **Please provide the call price mechanic that would determine the call price for each applicable year.**

    As announced at the Auction, CPE has agreed to match the terms of the unsecured note offered by Genie 3 Partners LLC, including any terms related to a call price mechanic.

If you have any questions or would like to schedule a call to discuss any of the foregoing responses, please feel free to contact me at james.muenker@us.dlapiper.com or 214-563-7171.

Sincerely,

*/s/ James Muenker*

James Muenker

cc: Daniel M. Simon (dsimon@mwe.com)
Marcus Helt (mhelt@mwe.com)
William A. Guerrieri (wguerrieri@mwe.com)
Emily C. Keil (ekeil@mwe.com)
Brian Rosen (brosen@proskauer.com)
Nicholas Zluticky (Nicholas.zluticky@stinson.com)
Daniel Desatnick (ddesatnick@proskauer.com)
Jeffrey Krause (JKrause@gibsondunn.com)
Michael Farag (MFarag@gibsondunn.com)
Leighton Aiken (laiken@fbfk.law)
Paige Tinkham (paige.tinkham@blankrome.com)

## <u>EXHIBIT A</u>

**Bank Account Screenshot**

 

# Account Information Report

**November 26, 2025**

**Account: *3021 (CPE 88988 LLC OPERATING)**

Current Balance                                                   $50,100,000.54

## __EXHIBIT B__

**Biography of Chris Bryson**

# Chris R. Bryson

**Healthcare Executive | Culture-Driven Operator | Former CEO, Consulate Health Care**

Chris R. Bryson is an accomplished senior healthcare executive with more than two decades of leadership experience across the skilled-nursing, post-acute, and long-term care industries. Best known for his tenure as Chief Executive Officer of Consulate Health Care (CHC), Bryson is widely recognized for leading one of the sector's most visible operational turnarounds—re-anchoring the organization in culture, quality outcomes, and people-first leadership.

Bryson joined Consulate Health Care in 2015 as Chief Operating Officer, bringing to the organization a unique blend of clinical expertise and operational acumen, informed by his foundational training as a pharmacist from the University of Georgia and 10 plus years running a multi-faceted healthcare organization consisting of skilled nursing and assisted living, home health, hospice, pharmacy, rehabilitation company and a managed care company. In 2016, he was appointed CEO of Consulate Health Care. Under his leadership, CHC reassessed its rapid national expansion strategy, streamlining its portfolio and refocusing on operational discipline, market-level autonomy, and the foundational principles of quality care.

A hallmark of Bryson's leadership was his commitment to rebuilding organizational pride and identity. He championed a culture where caregivers felt valued, supported, and empowered—once stating that his goal was for employees to "want to wear their badge after they leave work." He implemented the **Foundations of Excellence** framework, emphasizing four core pillars: Excellent People, Excellent Quality, Excellent Finance, and Excellent Growth. This platform served as the strategic backbone of Consulate's turnaround, aligning thousands of employees toward a common mission of raising clinical standards and enhancing resident outcomes.

Throughout his career, Bryson has served in influential healthcare leadership roles, including Chairman of the Georgia Health Care Association (GHCA). His work has been featured in industry publications such as *Provider Magazine*, highlighting his success in driving cultural revitalization and operational improvement within large, complex care organizations.

Beyond his executive achievements, Bryson is known for his disciplined, data-grounded approach; his belief in transparent, accountable leadership; and his insistence on empowering local teams who know their communities best. His leadership philosophy blends clinical insight, business rigor, and a deep respect for the workforce—qualities that continue to shape his impact across the post-acute care landscape.

Bryson remains a respected voice in healthcare operations, organizational transformation, and culture-centered leadership. His legacy at Consulate Health Care reflects a commitment to elevating care standards, strengthening frontline leadership, and building sustainable organizations in an increasingly complex and regulated industry.

## EXHIBIT C

### Projections

**NewCo Genesis HealthCare**

ECF Summary

| ($ in millions) | Pre/Post<br>Fcst.<br>Year 1 | Post<br>Fcst.<br>Year 2 | Post<br>Fcst.<br>Year 3 | Post<br>Fcst.<br>Year 4 | Cummulative<br>Fcst.<br>All Years |
|---|---|---|---|---|---|
| Facility Count | 166 | 166 | 166 | 166 | |
| Operating Beds | 18,866 | 18,866 | 18,866 | 18,866 | |
| | | | | | |
| Occupancy (%) | 89.0% | 89.0% | 89.0% | 89.0% | |
| Skill Mix (%) | 18.4% | 18.4% | 18.4% | 18.4% | |
| Blended Rate ($) | $ 478 | $ 490 | $ 502 | $ 514 | |
| | | | | | |
| **Cash EBITDA** | **$106.6** | **$113.4** | **$120.2** | **$128.2** | |
| *EBITDA Margin (%)* | *3.6%* | *3.8%* | *3.9%* | *4.1%* | |
| | | | | | |
| **Operating Adjustments:** | | | | | |
| (+/-): Changes in Net Working Capital | 84.3 | (2.3) | (11.5) | (11.7) | |
| (+/-): GLPL | 48.3 | 25.5 | 2.1 | (0.0) | |
| (+/-): Workers' Comp | 0.0 | 0.0 | 0.0 | 0.0 | |
| (+/-): Insurance | (0.1) | (0.1) | (0.1) | (0.1) | |
| | | | | | |
| **Subtotal - Operating Adjustments** | **$132.5** | **$23.1** | **($9.5)** | **($11.8)** | |
| | | | | | |
| **Other Cash Adjustments:** | | | | | |
| (+/-): DOJ Cash Settlement | - | - | - | - | |
| (+/-): IRS Payment Plan | (22.8) | (26.5) | (27.2) | (15.7) | |
| (+/-): Prepetition Provider Assessments | (5.7) | (6.3) | (6.3) | (6.3) | |
| (+/-): Payback of Change HC Advance | - | - | - | - | |
| (+/-): ACO Overpayments | - | - | - | - | |
| | | | | | |
| **Subtotal - Other Cash Adjustments** | **($28.6)** | **($32.8)** | **($33.5)** | **($22.0)** | |
| | | | | | |
| **Investing Adjustments:** | | | | | |
| (+/-): Capital Expenditure | (22.3) | (27.2) | (32.1) | (36.9) | |
| (+/-): Other | - | - | - | - | |
| | | | | | |
| **Subtotal - Investing Adjustments** | **($22.3)** | **($27.2)** | **($32.1)** | **($36.9)** | |
| | | | | | |
| **NCF Available before Debt Service and Rx** | **$188.3** | **$76.6** | **$45.2** | **$57.5** | |
| | | | | | |
| **Financing Adjustments:** | | | | | |
| (+/-): Cash Interest and Fees (ABL) | (23.9) | (23.4) | (23.8) | (25.4) | |
| (+/-): Cash Interest and Fees (Secured Debt) | (30.7) | (31.6) | (31.7) | (31.6) | |
| (+/-): Cash Interest and Fees (Unsecured Debt) | (0.1) | - | - | - | |

CONFIDENTIAL

**NewCo Genesis HealthCare**

ECF Summary

| ($ in millions) | Pre/Post Fcst. Year 1 | Post Fcst. Year 2 | Post Fcst. Year 3 | Post Fcst. Year 4 | Cummulative Fcst. All Years |
|---|---|---|---|---|---|
| (+/-): Cash Interest and Fees (JV Debt) | - | - | - | - | |
| (+/-): Other Long-Term Debt | (0.6) | (0.7) | (0.7) | (0.8) | |
| (+/-): Other | - | - | - | - | |
| | | | | | |
| **Subtotal - Financing Adjustments** | **($55.4)** | **($55.7)** | **($56.2)** | **($57.8)** | |
| | | | | | |
| **Restructuring Adjustments:** | | | | | |
| (+/-): Professional Fees | (14.9) | - | - | - | |
| (+/-): Other Restructuring Items | (45.4) | - | - | - | |
| (+/-): Cash DIP Interest and Fees | (4.3) | - | - | - | |
| (+/-): Exit Bridge Financing Interest and Fees | (5.7) | (1.8) | - | - | |
| | | | | | |
| **Subtotal - Rx Adjustments** | **($70.3)** | **($1.8)** | **$0.0** | **$0.0** | |
| | | | | | |
| **Net Cash Flow** | **$62.6** | **$19.1** | **($11.0)** | **($0.2)** | **$70.4** |
| | | | | | |
| *Chnages in overall Debt Service Assumptions based on Current Bid* | | | | | |
| Remove DIP Payment | 22.7 | | | | 22.7 |
| Remove Financing Adjustments | 55.4 | 55.7 | 56.2 | 57.8 | 225.1 |
| Remove DIP Inteest and Fees | 4.3 | | | | 4.3 |
| Liquidity before Revised Financing Adjustments | $144.9 | $74.8 | $45.2 | $57.5 | $322.4 |
| | | | | | |
| Term Loan Interest (Welltower, Omega, and WAX) | (23.5) | (31.4) | (31.4) | (31.4) | (117.7) |
| Promissory Note (Interest and Principal Payments) | (7.8) | (10.3) | (10.3) | (2.6) | (31.0) |
| White Oak ABL Interest | (25.5) | (25.5) | (25.5) | (25.5) | (102.0) |
| White Oak Term Loan (Interest and Principal Paymer | (11.7) | (15.6) | (15.6) | (3.9) | (46.8) |
| | | | | | |
| **Projected Net Cash Flow based on Current Bid** | **$76.4** | **($8.0)** | **($37.6)** | **($5.9)** | **$24.9** |
| | | | | | |
| **Financial Ratios** | | | | | |
| Debt Service | 1.56 | 1.29 | 1.37 | 1.90 | |
| Net Debt (Term Loans, excludes ABL) | 2.61 | 2.25 | 1.92 | 1.75 | |

<span style="color:red">CONFIDENTIAL</span>

| Category | Assumption |
|---|---|
| **Operating Performance** | - **Inpatient:** Based on a revenue and operating expense bottom-up build by facility using key drivers (e.g. patient days, payor mix and payor rates)<br>- **Occupancy:** Held constant with current performance<br>- **Payor Mix:** Held constant with current performance<br>- **Rate:** Held constant with rate increases as provided by Management; outer years assume 2% inflation increase<br>- **Opex:** Assume 2% inflation increase over current performance<br>- **Rehab / Respiratory:** Each year assume 4% growth on revenue, payroll & benefits, and other opex<br>- **Physician:** Based on recent run-rate performance; with each year assuming 4% growth on revenue, payroll & benefits, and other opex<br>- **ACO:** Revenue of $62.7M based on most recent plan year forecasted (i) person years, (ii) gross savings per beneficiary (iii) 75% CMS shared savings % (iv) quality factor discount and (v) government sequestration; expenses T3M actual performance<br>- **Corporate Overhead:** National and market overhead based on T12M actual performance; assumes total net overhead costs are allocated to the lines-of-business in same proration as historical splits; outer years assumes 2% inflation increase<br>- **Eliminations:** Based on forecasted inpatient expense; dollar for dollar eliminated in rehab / physician / respiratory lines-of-business |
| **Rent** | - **Cash Rent**: Based on current contractual lease obligations with annual rent escalators pursuant to respective lease agreements; no rent is allocated to other lines-of-business |
| **Capex and Other** | - **Capex:** Upon emergence 6-month ramp up to $1,250/bed per year; then assumes $1,500 and $1,750/bed per year; minimal capex assumed for other businesses<br>- **D&A:** Based on historical average run-rate + depreciation of additional capex<br>- **Working Capital**: Assumes blended DSO of ~60 days improving to ~55 days; DPO slowly increasing up to 45 days over 12-months |
| **GLPL Cash Payments** | - **GLPL**: GLPL continues to be accrued, and payments begin to slowly ramp up again after 18 months with annual payments eventually matching accrual rates. |
| **Divestiture Assumptions** | - **Remaining Facilities**: Assumes 166 facilities after December 2025 in the inpatient business<br>- **DivestCo Run-Offs**: Assumes collections from the run-off of DivestCo A/R; no payables run-off as a result of COD assumption with trade vendors<br>- **Liabilities**: No liabilities associated to the divestiture or transition are currently assumed |
| **Post Sale Impacts** | - **Working Capital:** Trade terms gradually increases from 0 to 45 days over 8 months<br>- **GLPL**: GLPL continues to be accrued, and payments begin to slowly ramp up again after 18 months with annual payments eventually matching accrual rates.<br>- **Prepetition PA Provider Assessments:** Assumes 5-year payment plan of ~$28M balance<br>- **IRS Payment Plan:** Payment plan assumed to carry through of full IRS legal obligations |
| **Term Loan and ABL (based on Bid Metrics)** | - **Assumed Term Loans:** Cash Interest Paid at 14% for Welltower $70.4M, Omega $128.8M and WAX $25M<br>- **Promssory Note: $**29.7M at 3% paid over 36 months<br>- **White Oak Term Loan:** $40M at SOFR + 6.5% paid over 36 months (SOFR assumed at 4%)<br>- **White Oak ABL:** Assumed interest on Maximum Commitment Level, $235M Non-HUD and $65M HUD, at SOFR + 4.5%. (SOFR assumed at 4%) |