James P. Muenker (Texas Bar No. 24002659)
**DLA PIPER LLP (US)**
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
Email: james.muenker@us.dlapiper.com

*Counsel to CPE 88988 LLC*

**IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | Case No. 25-80185 (SGJ) |
| Debtors. | (Jointly Administered) |
| | **Related to Docket No. 1945** |

**CPE 88988 LLC'S LIMITED OBJECTION TO U.S. TRUSTEE'S
MOTION TO APPOINT A CHAPTER 11 TRUSTEE**

CPE 88988 LLC ("CPE"), by and through its counsel, DLA Piper LLP (US), hereby submits this limited objection (this "Objection") to the *U.S. Trustee's Motion to Appoint a Chapter 11 Trustee* [Docket No. 1945] (the "Trustee Motion"), and respectfully states as follows:

---

[1] The last four digits of Genesis Healthcare, Inc.'s federal tax identification number are 4755. There are 299 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

1

**PRELIMINARY STATEMENT**

1. The appointment of a chapter 11 trustee is an extraordinary remedy. It requires a movant to meet their burden of proof by clear and convincing evidence. Pursuant to Section 1104(a) of the Bankruptcy Code, the Court can appoint a chapter 11 trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management" or "if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate."

2. Should the Court decide that a trustee is warranted in these cases, that decision should be based on facts and admissible evidence, not speculation and unsubstantiated allegations. Indeed, the Court has emphasized the importance of basing decisions on facts and evidence, including at the conclusion of the first sale hearing where the Court stated that "[c]ontext, facts matter. I have tried mightily to ignore all the background noise…I make decisions based on evidence."[2]

3. CPE files this Objection because the Trustee Motion is premised on precisely the type of "noise" that the Court seeks to filter out. It misrepresents critical facts and relies on unproven allegations that are wholly unsupported and/or directly contradicted by the record. Specifically, rather than cite to evidence, the Trustee Motion relies on accusations of other parties—principally the Statutory Unsecured Claimholders' Committee (the "Committee") and Genie 3, LLC ("Genie 3")—as though they were facts. But statements of counsel in court or in pleadings do not constitute evidence and cannot serve as the basis for appointing a chapter 11 trustee.[3]

---

[2] Dec. 11, 2025 Hr'g Tr. at 314:2-5.

[3] *See, e.g., McClure v. Dome (In re McClure)*, 234 B.R. 889, 890 (Bankr. N.D. Tex. 1999) ("[a]ssertions by counsel do not constitute probative evidence").

2

4. The sworn testimony, corporate records, and admitted evidence tell a very different story from the Trustee Motion. First, the evidence demonstrates that the Debtors are currently controlled, and have been controlled at all relevant times, not by so-called "Landau loyalists" but by experienced, independent directors and fiduciaries. Indeed, Jonathan Foster, one of the Debtors' independent directors with more than 35 years of experience, testified that he had never even met Mr. Landau.[4]

5. Second, the evidence shows that there was transparency regarding the relationship between CPE, ReGen Healthcare LLC ("ReGen"), and certain of their respective affiliates and related entities and the Debtors. Likewise, the Debtors and CPE were forthcoming regarding CPE's stalking horse bid and the Debtors' investigation into and valuation of the alleged claims that were being released and/or sold thereunder.

6. Third, the evidence shows that the so-called "auction irregularities" cited in the Trustee Motion relate to issues that were litigated and decided in connection with the Bidding Procedures Hearing (as defined below) and contradict the plain terms of the Original Bidding Procedures Order (as defined below). The mere fact that parties relied upon the Original Bidding Procedures Order is not a basis for appointing a chapter 11 trustee.

7. Finally, the evidence in these cases also demonstrates that the alleged problems with the first auction were not the result of any bias in favor of CPE or any desire to control or suppress bidding. Rather, the same bidders that objected to the first auction objected to the second auction and raised substantially similar issues – *i.e.*, that there was an alleged lack of transparency

---

[4] Dec. 10, 2025 Hr'g Tr. at 106:13-18, 107:3-4.

3

or allegedly improper valuations of their bids and/or that they were allegedly wrongly excluded from bidding due to miscommunication regarding the need for committed financing.[5]

8. Throughout these cases, CPE has acted in good faith and in compliance with the Court's orders. CPE's stalking horse bid was negotiated with the Debtors' independent Special Restructuring Committee and filed publicly on the docket. When parties objected to the Bidding Procedures and CPE's designation as stalking horse, the Court held a contested hearing during which parties were afforded ample opportunity to present evidence in support of their objections. After considering all of the evidence and the arguments of various parties, the Court overruled those objections and entered the Original Bidding Procedures Order. Pursuant to the Original Bidding Procedures Order, CPE was designated as the stalking horse bidder and a Qualified Bidder, a determination on which it was entitled to rely. CPE attended the first auction, followed the rules established by the Debtors and the Court, and increased its bid by $100 million for the benefit of the Debtors' estates. Despite all of this, CPE and Mr. Landau have remained the constant target of unfounded attacks. The Trustee Motion is simply the latest example. This Court should distinguish between allegations and evidence and deny the Trustee Motion to the extent it is based on unsupported and false allegations.

---

[5] *See Objection to Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Expense Reimbursement, (II) Approving the Debtors' Entry into the Stalking Horse APA, (III) Scheduling Certain Dates and Deadlines, (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, and (VII) Authorizing the Sale of Assets* [Docket No. 1779] (the "Olumie First Auction Objection") ¶¶ 32-36, 42, 45; *Joinder of Genie 3 Partners, LLC in the Committee's Omnibus Sale Objection and Argument Regarding Standing* [Docket No. 1820] (the "Genie 3 First Auction Objection") ¶¶ 2, 14-15; *Genie 3 Partners, LLC's Objection and Reservation of Rights Regarding Sale Hearing* [Docket No. 2149] (the "Genie 3 Second Auction Objection") ¶¶ 5(i)-(iii); *Objection to the Approval of the Debtors' Auction* [Docket No. 2150] (the "Olumie Second Auction Objection") ¶¶ 1-3, 33, 37, 41

4

## BACKGROUND

**A. Debtors' Prepetition Financial Distress and ReGen's Rescue Financing.**

9. By all accounts, in early 2021, the Debtors were on the brink of collapse. *See Declaration of Louis E. Robichaux IV in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 18] (the "First Day Declaration")[6] ¶ 26. In fact, "[a]s a result of its mounting legacy tort and vendor liabilities and the challenging post-COVID landscape in the industry, the [Debtors] began preparations to file for chapter 11 protection in late 2020 and early 2021." *Id*. However, the Debtors "narrowly avoided a bankruptcy filing and solved its impending liquidity crisis (at least temporarily) through an out-of-court capital infusion by ReGen . . . in exchange for certain convertible subordinated notes issued by FC-GEN and a lease restructuring agreement with Welltower." *Id*.

10. As discussed in the First Day Declaration, in March 2021, ReGen provided the Debtors with a $50.0 million capital infusion pursuant to the Investment Agreement in exchange for a $50.0 million convertible subordinated note and the right to appoint two (2) directors on the Board of Directors. *See id.* ¶ 27. In the years that followed, ReGen loaned an additional approximately $50.0 million to the Debtors in exchange for additional convertible subordinated notes. *See id*. ¶ 30.

11. Despite ReGen's capital infusion of approximately $100.0 million and the Debtors' operational turnaround, the Debtors' liquidity profile worsened due to, among other things, the following: "cash interest (approximately $50 million annually), necessary capital expenditures (approximately $20 million annually), Litigation Claim settlements and defense costs (nearly $100 million annually), IRS installment payments (approximately $20 million annually), and

---

[6] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day Declaration.

repayments to Change Healthcare on account of advances they made to the [Debtors] following a cyber security attack in February 2024 (approximately $23 million annually)." *Id.* ¶ 98.

12. Furthermore, the Debtors' liquidity was "further hampered by borrowing availability under the White Oak Prepetition ABL Credit Facilities. Over the past couple of years, the [Debtors'] borrowing base has contracted due to, among other things, divestiture of facilities and adjustments to revenue and liquidity factors used to calculate borrowing availability. These constraints have made it even more challenging for the [Debtors'] to manage operations and finance outstanding liabilities." *Id.* ¶ 99.

13. In spite of this record, the Trustee Motion repeats the baseless allegations that Mr. Landau "drained the Debtors' assets, leaving them without sufficient funds to operate." Trustee Motion ¶ 5. The Trustee cites no evidence for this claim, and the facts plainly show the opposite: ReGen injected approximately $100.0 million in financing that kept the Debtors out of bankruptcy while they attempted to save their business. *See* First Day Decl. ¶¶ 27, 30. There is no evidence to suggest that Mr. Landau or his affiliates caused the Debtors' liquidity issues or these chapter 11 cases; rather the undisputed evidence is that the Debtors would have filed for bankruptcy in 2021 but for the funding provided by ReGen.

**B. Mr. Landau Is Not an Officer, Director or Interest Holder in the Debtors.**

14. The Trustee Motion asserts, without evidentiary support, that Mr. Landau controlled the Debtors and manipulated the bankruptcy process. *See* Trustee Motion, Summary. The testimony of the Debtors' Co-Chief Restructuring Officer, Louis Robichaux, and the Debtors' corporate records tell a different story. At the hearing held on August 27, 2025 (the "<u>Bidding Procedures Hearing</u>"), Mr. Robichaux was unequivocal about Mr. Landau's role:

> Q: Post-petition, who makes decisions on behalf of Genesis?
>
> A: On behalf of Genesis?

6

> Q: Yes.
>
> A: Non-restructuring-related decisions related to Genesis are made by the Genesis board. And restructuring-related decisions are made by the Special Restructuring Committee.
>
> Q: Prior to the petition date, who made decisions on behalf of Genesis?
>
> A: The board, the Genesis board.
>
> Q: Is Mr. Landau on that board?
>
> A: No.
>
> Q: Is Mr. Landau an officer?
>
> A: No.
>
> Q: Does Mr. Landau make decisions on behalf of Genesis?
>
> A: No.
>
> Q: At any time?
>
> A: Not to my knowledge.

Bidding Procedures Hr'g Tr. at 179:7-23.

15. The Trustee Motion also incorrectly states that ReGen acquired a controlling interest in the Debtors. *See* Trustee Motion ¶ 4. As set forth in the First Day Declaration, in exchange for its $100.0 million investment, ReGen received convertible notes that, **upon conversion**, would have provided approximately 93% of the voting shares of Debtor Genesis Healthcare Inc. ("GHI") on a fully diluted basis. *See* First Day Decl. ¶ 30. But the notes were never converted; ReGen thus holds no voting shares in GHI, let alone a controlling interest. *Id.*; *see also* the *List of Equity Security Holders of Genesis Healthcare, Inc*. [Docket No. 1]. Therefore, neither ReGen nor any affiliated entity or individual owned equity in the Debtors prior to or as of the Petition Date and certainly did not own a controlling interest as alleged in the Trustee Motion.

16. Additionally, while the Trustee Motion correctly states that ReGen has the right to appoint three members of GHI's board of directors under the Investment Agreement, it misstates the size of GHI's board. *See* Trustee Motion ¶ 4. The board has seven members, not five. ReGen's three appointees are therefore a minority incapable of controlling board decisions. *See Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy* [Docket No. 858] at 39; *see also* Investment Agreement §5.04(i); Fourth Amended and Restated Bylaws of Genesis Healthcare Inc.

## C. Independent Governance Structures Controlled Related Party Decisions.

17. Prior to the Petition Date, the Debtors took extraordinary steps to ensure independent oversight of the stalking horse bid negotiation process and investigation of potential claims against CPE and related parties and individuals. Specifically, the Debtors appointed three experienced independent fiduciaries to the board of directors, established the Special Investigation Committee, retained independent special counsel Katten Muchin Rosenman LLP, conducted a comprehensive three-month investigation, valued claims and evaluated consideration, and formed the Special Restructuring Committee to exercise exclusive authority over the sale process involving CPE or any related parties. *See* First Day Decl. ¶ 114; *see also* Dec. 10, 2025 Hr'g Tr. at 108:24-109:2 ("So we are fully empowered to analyze, consider, deliberate, and ultimately decide on what we think is the most appropriate party to sell the assets to").

## D. The Debtors and CPE Were Fully Transparent Regarding CPE's Stalking Horse APA.

18. From the very onset of the Debtors' chapter 11 cases, the Debtors have been transparent about the related party nature of the stalking horse bid. *See* July 11, 2025 Hr'g Tr. at 27:22-25; *see also* First Day Decl. ¶¶ 6, 103. In fact, in the First Day Declaration, CPE's bid was described as "heavily negotiated in good faith and at arm's length by the Debtors and independent director members of the Special Investigation Committee," with the assistance of independent

8

special counsel. First Day Decl. ¶ 6. Counsel for the Special Committees confirmed at the Bidding Procedures Hearing (as defined below) that the stalking horse arrangement was not a settlement but rather a floor bid subject to higher and better offers, and that "in no way are the results of this bidding process predetermined." Bidding Procedures Hr'g Tr. at 28:25-29:1.

19. On August 11, 2025, the Committee filed the *Objection of the Statutory Unsecured Claimholders' Committee to Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Expense Reimbursement, (II) Approving the Debtors' Entry into the Stalking Horse APA, (III) Scheduling Certain Dates and Deadlines, (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, and (VII) Authorizing the Sale of Assets* [Docket No. 413] (the "Committee Bidding Procedures Objection"). Therein, the Committee objected to the Stalking Horse APA (as defined below) on numerous grounds, including that it didn't include a cash deposit nor require CPE to serve as a back-up bidder. *See* Committee Bidding Procedures Objection ¶¶ 6, 34.

20. On August 17, 2025, the Debtors filed the *Notice of Filing of Asset Purchase Agreement* [Docket No. 457] that attached thereto a copy of the Asset Purchase Agreement between the Debtors and CPE (the "Stalking Horse APA").

21. On August 21-22 and 27, 2025, the Court conducted a contested hearing (the "Bidding Procedures Hearing") on the Debtors' DIP Financing Motion and Bidding Procedures Motion.[7] During that hearing, the Court heard from various witnesses, including Mr. Robichaux,

---

[7] "DIP Financing Motion" refers to *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 17]. "Bidding Procedures Motion" refers to *Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Expense Reimbursement, (II) Approving the Debtors' Entry Into the Stalking Horse APA, (III) Scheduling Certain Dates and Deadlines, (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the*

9

the Debtors' Co-Chief Restructuring Officer, Mr. Finger, the Debtors' investment banker, and Mr. Turnbull, the Committee's investment banker, regarding, among other issues, the Stalking Horse APA. In particular, during cross-examination at the Bidding Procedures Hearing, the Committee's counsel asked numerous questions regarding the fact that the Stalking Horse APA did not provide for a deposit nor did it require CPE to commit to being a back-up bidder. *See, e.g.*, Bidding Procedures Hr'g Tr. at 90:20-91:9, 94:8-22.

22. After hearing all of the evidence and arguments from parties,[8] including with respect to the deposit and back-up designation issues, the Court found that "the revised bid procedures are an exercise of reasonable business judgment" and that "we have given it the extra scrutiny that we should when an insider is involved." Bidding Procedures Hr'g Tr. at 205:23-24, 206:11-12.

23. On August 28, 2025, the Court entered the *Order (I) Approving Bidding Procedures and Expense Reimbursement, (II) Approving the Debtors' Entry Into the Stalking Horse APA, (III) Scheduling Certain Dates and Deadlines, (IV) Approving the Form and Manner of Notice Thereof, and (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases* [Docket No. 685] (the "Original Bidding Procedures Order") that, among other things, authorized the Debtors' entry into the Stalking Horse APA.

24. Additionally, as noted in the excerpt below, the Bidding Procedures attached to the Original Bid Procedures Order clearly states that the Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse APA is a Qualified Bid:

---

*Assumption and Assignment of Contracts and Leases, (VI) Authorizing the Assumption and Assignment of Assumed Contracts, and (VII) Authorizing the Sale of Assets* [Docket No. 117].

[8] Notably, the U.S. Trustee did not raise an objection with respect to either the deposit or back-up designation issue prior to or during the Bidding Procedures Hearing yet now argues it is somehow evidence of "auction irregularities."

10

Case 25-80185-sgj11    Doc 685    Filed 08/28/25    Entered 08/28/25 15:24:07    Desc
Main Document    Page 36 of 170

    (i)    The proposed assignee (the "Proposed Assignee") and any guarantors, as applicable;

    (ii)    Financial statements for the calendar or fiscal years ended 2023 and 2024 for the Proposed Assignee and any guarantors, as applicable, and other financial information about the Proposed Assignee to demonstrate its ability to provide adequate assurance of future performance; and

    (iii)    A summary of the Proposed Assignee's proposed use of the premises.

    o.    **Stalking Horse Bidder is a Qualified Bidder.** For the avoidance of doubt, the Stalking Horse Bidder is a Qualified Bidder and the Stalking Horse APA is a Qualified Bid.

25. Moreover, and notwithstanding the clear terms of the Original Bidding Procedures Order which the Debtors and CPE were entitled to rely upon (and, in fact, all parties were bound to follow), the alleged issue regarding the deposit was effectively mooted at the first auction when CPE further improved its bid by agreeing to post a $10 million cash deposit and pledged its DIP loan as an additional deposit, facts that were omitted from the Trustee Motion. *See Notice of Filing of Revised Asset Purchase Agreement* [Docket No. 1757], Ex. A, § 3.02. CPE funded the $10 million deposit on December 8, 2025.

**E. CPE Participated in the First Auction in Good Faith.**

26. The Trustee Motion alleges (by simply reciting the Committee's allegations) that the First auction was unfair and skewed toward CPE. *See* Trustee Motion ¶ 10. However, these allegations are unfounded because the evidence demonstrates that the Debtors waived bid requirements and made other accommodations for Genie 3 that resulted in CPE to increasing its bid and competing against a bidder that had not demonstrated the financial wherewithal to close the transaction and/or had other serious closing risks.

11

27. For example, Section IV(d) of the Bidding Procedures provides, in relevant part, that in order to participate in the auction, a bidder must deliver an irrevocable offer that "must include committed financing" and that "[s]uch funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors."

28. Yet, Genie 3 did not have an executed commitment letter from White Oak at the time of the first auction, and Genie 3's non-binding financing commitment letter with Monticello dated as of November 7, 2025, contained nineteen (19) closing conditions, including the following:[9]

   i. Approval by the Lender's Investment Committee and satisfactory completion of the Lender's business and legal due diligence;

   ii. Full review and approval by Lender of all diligence in Jefferies' data room and any and all diligence received by Borrower;

   iii. All contracts including, but not limited to, all provider agreements and service agreements to be subject to review and approval by Lender;

   iv. Confirmation of zoning and operation of the Properties;

   v. Verification of a minimum of $310,000,000 net collectible Accounts Receivable, subject to Lender's diligence; and

   vi. Minimum occupancy of the Inpatient Facilities shall be 86% at closing

*See Debtors' Amended Exhibit List for Hearing on December 10-11, 2025 at 9:30 a.m. (Prevailing Central Time)* [Docket No. 1876] (the "Sale Hearing Exhibit List"), Ex. 26.

---

[9] Even after the auction, the revised financing commitment letters provided by Genie 3 has the same closing conditions. It is unclear to CPE whether the closing conditions tied to the Debtors' operations are even achievable.

12

29. Under the terms of the Bidding Procedures, Genie 3 was **not** a Qualified Bidder. Yet, the Debtors elected to waive that requirement and permitted Genie 3 to participate in the first auction – a step that was clearly **not** skewed in CPE's favor.[10]

30. Additionally, during the second day of the first auction, the Debtors learned that "one of the three principal individuals associated with the Genie 3 Bid (Mr. Alan "Ari" Schwartz) is currently subject to a voluntary 10-year federal healthcare funding exclusion effective as of February 27, 2023." *Declaration of Louis E. Robichaux in Support of Debtors' Proposed Sale of Substantially All Assets to Successful Bidder* [Docket No. 1808] ("Robichaux Sale Declaration") ¶ 48. Given the lack of disclosure and the significant closing risk related to such an exclusion, the Debtors could have eliminated Genie 3 from further participation at the first auction. However, the Debtors elected to continue with the auction – a step that was clearly **not** skewed in CPE's favor. *See id.* CPE increased its bid substantially after the Debtors became aware of that potentially disqualifying fact.

31. Moreover, Mr. Andrews testified about other aspects of the first auction that CPE believed were to its detriment, including, among other things, disagreements regarding the Debtors' valuation of Genie 3's initial overbid and treatment of various differences in the execution risks between the bids. *See Declaration of Mark Andrews in Support of Debtors' Motion for Entry of an Order (I) Approving Bidding Procedures and Expense Reimbursement, (II) Approving the Debtors' Entry Into the Stalking Horse APA, (III) Scheduling Certain Dates and Deadlines, (IV) Approving the Form and Manner of Notice Thereof, (V) Establishing Notice and Procedures for the Assumption and Assignment of Contracts and Leases, (VI) Authorizing the*

---

[10] Curiously, despite alleging that CPE benefitted from special treatment under the Bidding Procedures with respect to the deposit and back-up bid issues, the Committee took no issue with the Debtors' waiver of a critical requirement of the Bidding Procedures as it related to Genie 3.

13

*Assumption and Assignment of Assumed Contracts, and (VII) Authorizing the Sale of Assets* [Docket No. 1802] (the "Andrews Sale Declaration") ¶ 15.

32. Despite waivers of requirements under the Original Bidding Procedures Order that benefited Genie 3 and disadvantaged CPE, at all times prior to, during and after the first auction, CPE participated in good faith, following the rules as they were communicated. The result was a competitive auction in which CPE's bid increased by approximately $100 million. *See, e.g.,* Andrews Sale Decl. ¶ 23.

**F. The Trustee Motion Mischaracterizes the Sale Hearing.**

33. The Trustee Motion's characterization of various aspects of the sale hearing is also misguided; it draws unwarranted inferences from the testimony of Mark Andrews and William Snyder while ignoring other aspects of their testimony or the testimony of other witnesses, and it inappropriately elevates Genie 3's counsel's unsubstantiated claim of alleged threats by Mr. Landau.

34. With respect to Mr. Andrews, the Trustee Motion emphasizes that he testified that he does not know who owns ReGen and could not articulate the precise relationship between CPE and Mr. Landau. Trustee Motion ¶¶ 8–9. But Mr. Andrews is the authorized representative of CPE, not ReGen. Andrews Sale Decl. ¶ 1. More fundamentally (and relevant), the Debtors were already familiar with ReGen given its $100 million equity infusion in 2021 and the ownership structure of CPE was fully disclosed to the Debtors. On November 11, 2025, CPE's counsel sent a letter to Debtors' counsel detailing that CPE is owned by two trusts and identifying ReGen as an affiliate. A copy of that letter was admitted into evidence pursuant to the Sale Hearing Exhibit List as Exhibit 30. The relevant point is not whether Mr. Andrews could diagram every corporate relationship on the witness stand but whether the relationships were disclosed, which they were.

14

And the Trustee's Motion ignores Mr. Andrews' direct testimony entirely which was contained in the Andrews Sale Declaration.

35. The Trustee Motion's reliance on Mr. Snyder's testimony is equally misplaced. The Trustee Motion notes that Mr. Snyder testified that he did not know whether Mr. Landau and Mr. Geffner were covered by the Debtors' director and officer insurance policies. *See* Trustee Motion ¶ 15. But the Trustee Motion minimizes what Mr. Snyder also testified: that neither Mr. Landau nor Mr. Geffner were officers or directors of the Debtors. *Id*. It also omits Mr. Robichaux's testimony on the subject, in which he stated that he "wouldn't imagine [Mr. Landau and Mr. Geffner] would be insured parties in the eyes of the insurance provider." Bidding Procedures Hr'g Tr. at 67:10-23. Nor does the Trustee Motion explain how or why that is even relevant.

36. The Trustee Motion also asserts that the $32 million valuation of the alleged insider claims[11] was manufactured "post facto," but that too is contradicted by the record. As discussed at the Bidding Procedures Hearing and directed in the Bidding Procedures Order, the Debtors provided potential bidders with a summary of the claims they had investigated against various related parties, along with the Debtors' valuation of those claims, in the sale data room. *See* Sale Hearing Exhibit List, Exs. 67, 68. With the assistance of Jefferies, the Debtors also actively marketed those claims to ten well-known litigation finance buyers. *Declaration of Jeffrey Finger in Support of Debtors' Proposed Sale of Substantially All Assets to the Successful Bidder* [Docket No. 1807] ¶ 14. Seven of those potential buyers were then given access to additional materials,

---

[11] These claims remain disputed. *See Reply of Welltower OP LLC in Support of Debtors' Motion for Entry of Order Approving Sale* [Docket No. 1849] ¶¶ 29-48; *Statement of CPE 88988 LLC in Support of Debtors' Proposed Sale of Substantially All Assets to Successful Bidder* [Docket No. 1855] ¶ 14; *Welltower OP LLC's Objection to Motion of the Statutory Unsecured Claimholders' Committee for Leave, Standing, and Authority to Prosecute Certain Claims on Behalf of the Debtors' Estates and Related Relief* [Docket No. 2086].

including the claims valuation report produced by the Special Investigation Committee, yet only one party submitted a non-binding indication of interest for the claims—with a total proposed purchase price of just $5 million for the Debtors' causes of action. *Id*. ¶¶ 15, 23.

37. Finally, the Trustee Motion cites Genie 3's allegation that Mr. Landau allegedly threatened one of its equity partners. Trustee Motion ¶ 16. Yet again, the Trustee relies on disputed allegations made by a competing bidder that had absolutely no evidentiary support. In fact, even the Court expressed skepticism at the allegation when it stated "[i]f I get testimony from this person, then there might be something that I decide is appropriate to do . . . I can't just hear about it . . . I can't do anything based on this . . . If [sic] I had a person under oath tell me above, I could judge their credibility and . . . decide that I need to base a decision on that testimony." Dec. 11, 2025 Hr'g Tr. at 221:20-222:16. However, Genie 3 never offered a witness to provide testimony, nor did it provide any evidence at the sale hearing in support of its allegation.

**G. The Objections to the Second Auction Demonstrate that CPE Was Not the Problem with the First Auction.**

38. The objections filed by Genie 3 and Olumie Capital, LLC ("Olumie") following the second auction are substantially identical to those raised after the first auction, despite the fact that CPE did not participate in the second auction. In each of its objections, Genie 3 contended that its bid was improperly valued compared to the successful bidder, that the auction process lacked transparency, and that the auction was biased in favor of the prevailing party. *See* Genie 3 First Auction Objection ¶¶ 2, 14-15; Genie 3 Second Auction Objection ¶¶ 5(i)-(iii). Likewise, Olumie twice alleged that the Debtors applied shifting and inconsistent requirements, imposed stricter financing demands on Olumie than on other parties, and ran a process skewed in favor of the successful bidder. *See* Olumie First Auction Objection ¶¶ 32-36, 42, 45; Olumie Second Auction Objection ¶¶ 1-3, 33, 37, 41. The repeated complaints regarding valuation methodology,

16

transparency, treatment of financing, and overall fairness following the second auction evidence that in both auctions grievances were raised and that any alleged irregularities have nothing to do with CPE.

**ARGUMENT**

39. Section 1104(a)(1) of the Bankruptcy Code provides that a court may order the appointment of a trustee "for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management." 11 U.S.C. § 1104(a)(1). The appointment of a trustee pursuant to section 1104(a)(1) is an extraordinary remedy, and the moving party has the burden of proof, which they must meet by clear and convincing evidence. *In re Cajun Elec. Power Coop.*, 69 F.3d 746, 749 (5th Cir. 1995); *see also In re NRA of Am.*, 628 B.R. 262, 283 (Bankr. N.D. Tex. 2021). The clear and convincing burden of persuasion "does not shrink or shift." *In re G-I Holdings, Inc.*, 385 F.3d 313, 320 (3d Cir. 2004).

40. Undoubtedly, the Trustee Motion does not meet this standard. Rather than present evidence of fraud, dishonesty, incompetence, or gross mismanagement, the Trustee Motion recites, in part, unsupported theories and allegations advanced by the Committee and Genie 3 that were advanced in an effort to publicly undermine CPE, Mr. Landau and others in an attempt to gain leverage and a competitive advantage. "Conjecture is not clear and convincing evidence." *In re Schneider*, No. 23-10337, 2023 Bankr. LEXIS 1302, at *24 (Bankr. S.D. Ohio May 5, 2023). As set forth above, the allegations upon which the Trustee Motion relies are either demonstrably false or entirely unsupported by the record.

41. CPE takes no position on whether other circumstances in these cases may warrant appointment of a trustee. However, to the extent the United States Trustee seeks relief based on

17

the inaccurate and unsubstantiated contents of the Trustee Motion as it relates to CPE or its affiliates, it should be denied.

## CONCLUSION

**WHEREFORE**, CPE respectfully requests that the Court deny the Trustee Motion and grant such other relief as is just and proper.

Dated: January 22, 2026  
       Dallas, Texas

Respectfully submitted,

**DLA PIPER LLP (US)**

*/s/ James P. Muenker*  
James P. Muenker (Texas Bar No. 24002659)  
1900 North Pearl Street, Suite 2200  
Dallas, Texas 75201  
Telephone:    (214) 743-4500  
Facsimile:    (214) 743-4545  
Email: james.muenker@us.dlapiper.com

- and -

Rachel Nanes (admitted *pro hac vice*)  
200 South Biscayne Boulevard, Suite 2500  
Miami, Florida 33131  
Telephone:    (305) 423-8500  
Facsimile:    (305) 437-8131  
Email: rachel.nanes@us.dlapiper.com

*Counsel to CPE 88988 LLC*

## CERTIFICATE OF SERVICE

I, James P. Muenker, hereby certify that on this 22nd day of January 2026, I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which has sent a notification of such filing to all parties requesting transmission of Notices of Electronic Filing generated by CM/ECF.

    /s/ *James P. Muenker*

James P. Muenker (Texas Bar No. 24002659)
**DLA PIPER LLP (US)**
1900 North Pearl Street, Suite 2200
Dallas, Texas 75201
Telephone: (214) 743-4500
Facsimile: (214) 743-4545
Email: james.muenker@us.dlapiper.com