

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 14, 2026**

_____
**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| | § | **BANKRUPTCY CASE** |
| **GENESIS HEALTHCARE, INC., *et al.*,[1]** | § | **NO. 25-80185-SGJ-11** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.** | § | |

## AMENDED* MEMORANDUM OPINION AND ORDER OVERRULING OBJECTIONS OF MADISON MANOR, INC. TO THE DEBTORS' SECTION 363 SALE AND THE ASSIGNMENT OF CERTAIN AGREEMENTS PURSUANT TO SECTION 365

---

\*    This Amended Memorandum Opinion solely amends the one issued on 6/30/2026 to change the reference to section 363(f) to section 365(f) on page 27 in the Conclusion of the Memorandum Opinion.

[1]    The last four digits of Genesis Healthcare, Inc.'s federal tax identification number are 4755. There are 299 Debtors in these Chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm/epiq11.com/case/genesis/info. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennet Square, PA, 19348.

## I.     INTRODUCTION

Before this court is a contested matter in the Chapter 11 bankruptcy case of Genesis Healthcare, Inc. and 298 of its affiliates (the "Debtors"). The contested matter deals with the Debtors' ability to assign: (a) two partnership interests that exist pursuant to a partnership agreement in which two of the Debtors are partners, and also (b) a management agreement, under which one of these two Debtors is the manager for the applicable partnership. These assignments are proposed as simply one discrete and (relatively) small part of a large, complex sale of substantially all of the Debtors' assets.

The Debtors filed bankruptcy on July 9, 2025 (the "Petition Date"). The Debtors are the operators of, and otherwise have interests, in approximately 175 senior living facilities located in several states. The dispute at issue pertains to only one of those senior living facilities (a facility in a small town outside of Washington, D.C., in Prince George's County, Maryland).

During the Chapter 11 case (and as further described below), there have been two separate rounds of robust marketing, bidding, and auctions approved by the court, each of which processes authorized the Debtors to attempt to sell all of their widespread assets under section 363 of the Bankruptcy Code, and assume and assign numerous associated leases and executory contracts, pursuant to section 365. After a second round of bidding and a second auction, an entity known as 101 West State Street Holdings LLC ("WSSH" or the "Buyer") emerged as the successful bidder for all the Debtors' assets, and the court approved a sale to it ("Sale"), pursuant to an order entered on January 26, 2026 ("Sale Order").[2] The Sale Order attached and approved an asset purchase agreement (as amended, the "APA"). A closing date for the Sale is targeted for later this summer, since many regulatory approvals must be obtained. It is not surprising that many regulatory

---

[2]     DE # 2204; Debtors' Exh. 3.

approvals must be obtained, since there are 175 nursing homes involved. Regulatory oversight is important for nursing homes.

Madison Manor, Inc. ("Madison") is the subject of this Memorandum Opinion and Order. Madison is a party-in-interest with regard to only one of the many nursing homes that were subject to the APA and Sale Order. The nursing home that Madison is concerned with is the one earlier mentioned, in Prince George's County, Maryland, and it is known as the Larkin Chase Skilled Nursing Facility ("Larkin Chase"). Specifically, Madison is a partner under a partnership agreement ("Partnership Agreement") with two of the Debtors (the "Bowie Debtors"), which agreement forms a partnership entity called Bowie Center Limited Partnership ("Bowie Center"), which, in turn, actually owns Larkin Chase. Bowie Center itself is not a Debtor. One of the two Bowie Debtors also has a management agreement with Bowie Center to manage Larkin Chase (the "Management Agreement"). To be clear, the court-approved APA contemplates the Buyer acquiring the two Bowie Debtors' partnership interests in Bowie Center, which, in turn, owns Larkin Chase.[3]

Madison has filed multiple objections and reservations of rights during the two separate sale processes (the "Madison Objections").[4] The Madison Objections are mostly centered around *a right of first refusal clause* and an annual purchase option[5] found in the Partnership Agreement (explained below), which Madison argues must be honored—which arguably give Madison the right to carve out from the Sale the Bowie Debtors' partnership interests (if Madison is allowed to—and does—match the Buyer's bid price for those partnership interests), so that Madison could

---

[3]     *See* APA, § 2.01, Debtors' Exh. 4.
[4]     *See* DE # 1323, DE # 1800, and DE # 2144.
[5]     As will be further explained herein, the annual purchase option is no longer an issue in dispute.

have full ownership/control of Bowie Center and Larkin Chase. Madison also opposes the assumption and assignment of the Management Agreement to the Buyer.

This court must now decide a myriad of executory contract issues—among them: (1) whether the Partnership Agreement and Management Agreement (both of which this court considers to be executory contracts) can be assumed and assigned pursuant to Bankruptcy Code section 365(c) and (f)—or might there be "applicable law" that excuses Madison from accepting performance from the Buyer without Madison's consent, and (2) whether the right of first refusal provision in the Partnership Agreement is enforceable and whether, under the facts and circumstances before the court, Madison must be permitted to match the Buyer's now already-approved bid as to the Bowie Debtors' partnership interests relating to Bowie Center/Larkin Chase. Notably, the Buyer did not allocate its more than one-billion-dollar purchase price/bid to each of the approximately 175 nursing home facilities (Madison argues that the Buyer should be required to do so, so that Madison can have the ability to match the Buyer's bid). This second issue involves not only considering whether the right of first refusal is, in essence, an unenforceable restriction on assignability, pursuant to Bankruptcy Code section 365(f), but also looking at the Partnership Agreement's terms and what actually happened leading up to the court-approved Sale.[6]

## II.   FACTS

The relevant facts are undisputed. The evidence submitted to the court can be found at DE ## 2754, 2765, and 2766. The evidence consisted of Debtors' Exhibits 1-11 and Madison's Exhibits 1-3. The court held a hearing on this contested matter on May 27, 2026 (the "Madison

---

[6] This Memorandum Opinion and Order constitute the court's findings of fact and conclusions of law in the contested matter before the court. Any finding of fact that should be characterized as a conclusion of law should be construed as such, and vice versa. The court has authority to exercise bankruptcy subject matter herein pursuant to 28 U.S.C. §§ 1334 & 157 and the Northern District of Texas's Standing Order of Reference. "Core" matters are presented in this contested matter, and no party has objected to this court issuing a final order.

Hearing"). The court also heard from two live witnesses, both of whom were credible, and considered three unopposed declarations of witnesses.

### A.     The Relationship Between Madison and the Debtors

Madison is an affiliate of the University of Maryland Medical System ("UMMS"). Madison owns a 0.25% general partnership interest in Bowie Center (again, Bowie Center, itself, is a non-debtor). Madison also owns a 24.75% limited partnership interest in Bowie Center. Thus, Madison, altogether, owns 25% of the equity in Bowie Center. Meanwhile, one of the Bowie Debtors, which is called Maryland Harborside, LLC ("Bowie Debtor #1") owns a 0.75% general partnership interest in Bowie Center. The second Bowie Debtor, which is called Harborside Healthcare Limited Partnership ("Bowie Debtor #2"), owns a 74.25% limited partner interest in Bowie Center. Thus, the two Bowie Debtors, altogether, own 75% of the equity interests in Bowie Center. The equity interests in Bowie Center shall sometimes be referred to herein, collectively, as the "Bowie Partnership Interests." As noted earlier, Bowie Center owns and operates Larkin Chase, which is a 120-bed licensed nursing home located in the town of Bowie, Maryland.

The nursing home at issue has been around for many years (although it closed for approximately three years in 2022, due to an explosion in the kitchen that required renovations;[7] it reopened in the Spring of 2025). In 2015, Madison and the two Bowie Debtors executed a Second Amended and Restated Agreement of Limited Partnership ("Partnership Agreement").[8] Madison and the two Bowie Debtors are the only three partners in Bowie Center. Bowie Center and Bowie Debtor #2 are parties to a Management Agreement dated April 7, 1993, which appoints Bowie Debtor #2 as manager of Larkin Chase.[9] Notably, while Madison is a counterparty to the

---

[7]     *See* Transcript from May 27, 2026, hearing ("Madison Hearing Transcript"), DE # 2810, at p. 27, lines 9–24.
[8]     Debtors' Exh. 1.
[9]     Debtors' Exh. 2.

Partnership Agreement, it is not a counterparty to the Management Agreement. Both the

Partnership Agreement and the Management Agreement provide that they are to be construed

under and in accordance with the laws of the state of Maryland.

### 1.    The Partnership Agreement

The Partnership Agreement contains a purchase option ("Purchase Option") at Section 6.7,

which gives Madison—after a milestone date that has already occurred—the annual option to

purchase the Bowie Partnership Interests. This Memorandum Opinion and Order will not discuss

in detail the annual Purchase Option since—*significantly, in this court's view*—the Debtors and

Buyer both agree that the annual Purchase Option will remain intact and still be enforceable by

Madison after the Sale.[10]

More importantly, the Partnership Agreement also provides Madison with a right of first

refusal ("ROFR"). The ROFR, which is found in Section 5.2 of the Partnership Agreement, entitled

"Right of First Refusal with Respect to Sale of Partnership Interest," is explained in three pertinent

subparts of Section 5.2 as follows:

> 5.2.1 <u>Offering Notice</u>. If . . . [Bowie Debtor #1 and Bowie Debtor #2] jointly wish to dispose of their entire Partnership interests to a third party . . . and have received from such third party a bona fide written offer to purchase all [Bowie Debtor #1's and Bowie Debtor #2's] Partnership interest, [Bowie Debtor # 1 and Bowie Debtor #2] shall, by written notice . . . first tender to Madison . . . an offer to sell such interest in the Partnership at the same price and on the same terms and conditions as offered by the third party.

> 5.2.2 <u>Acceptance</u>. [Madison] shall notify [Bowie Debtor # 1 and Bowie Debtor #2] in writing, within thirty (30) days following the date of the receipt of the Offering Notice, of [Madison]'s election either (i) to accept the sale offer . . . or (ii) to decline the sale offer.  . . . Failure to give such written notice within the required thirty (30) day period shall be deemed an election by [Madison] to decline the sale offer."

---

[10]    *See* Madison Hearing Transcript, DE # 2810, at 7-8. This seems so significant that the court is almost left wondering why the parties continue to argue about the ROFR. There's likely an economic reason.

5.2.4 <u>Right to Sell to Third Party</u>. If [Madison] has declined the sale offer . . . or is deemed to have done so pursuant to the provisions of Section 5.2.2, [Bowie Debtor #1 and Bowie Debtor #2] shall . . . be free to sell [their] Partnership interest . . . to the third party on the same terms which were offered to [Madison]. . . .

**2.      The Management Agreement**

As noted earlier, the Management Agreement is between Bowie Center and Bowie Debtor #2. Thus, Madison is not a counterparty to it.[11] In any event, the Management Agreement first makes clear that the entity Bowie Center (of which Madison is a minority partner) retains "all authority and control" over Larkin Chase (which was known by a different name back in 1993—"Oakwood Life Center"—when the Management Agreement was executed). The Management Agreement also makes clear that Bowie Debtor #2, as manager (which also had a different general partner signing for it back in 1993—one called "KHI Corporation) "shall perform its duties in accordance with the policies, bylaws, and directives of" Bowie Center.[12] Under the Management Agreement, as manager, Bowie Debtor #2 is tasked with providing "advice, expertise and supervision in all general management areas including marketing, plant maintenance, personnel administration, finance, risk management and quality assurance."[13] Bowie Debtor #2 is also tasked with providing "Key Personnel" including a "duly licensed nursing home administrator" that are employees of Bowie Debtor #2.[14] The Management Agreement tasks Bowie Debtor #2 with oversight regarding food services, bookkeeping, billing and collections, maintenance and repairs, purchases and leases, quality control assurance programs, and public and community relations and marketing programs.[15] It further requires Bowie Debtor #2 to establish and maintain a patient trust

---

[11]    The court notes that the Management Agreement states that there are no third-party beneficiaries to it. Management Agreement § 8.11, Debtors' Exh. 2.
[12]    *Id.* at § 1.00.
[13]    *Id.* at § 1.01.
[14]    *Id.* at §§ 1.02, 1.03.
[15]    *Id.* at §§ 1.04–1.10.

account, to exercise reasonable care in managing the income of the nursing home, to timely pay all operating expenses and other bills, obtain and maintain insurance, and maintain confidentiality of all files and records.[16] Finally, Bowie Debtor #2 must "take all steps reasonably necessary to maintain the Nursing Home's compliance with all governmental requirements applicable."[17]

The Management Agreement does not name specific individuals that will perform any services. Madison's witness, Lafe Bauer, testified that, naturally, personnel had come and gone during the 33 years since the execution of the Management Agreement.[18]

### B.  The Debtors' Two Auctions and Madison's Objections

Early in this Chapter 11 case—on August 28, 2025—the court entered an order ("First Sale Procedures Order") approving bidding procedures and approving the Debtors' entry into a stalking horse asset purchase agreement.[19] Attached to the First Sale Procedures Order was an asset purchase agreement between the Debtors and the first stalking horse bidder ("First Stalking Horse Bidder") in this bankruptcy case, which provided the purchase price and other terms of the proposed sale to the First Stalking Horse Bidder. The First Sale Procedures Order was broadly noticed—Madison does not dispute receiving notice of it. In fact, prior to the first auction taking place, on October 17, 2025, Madison filed its first objection to the Debtors' section 363 sale in accordance with the First Sale Procedures Order (the "First Madison Objection").[20] In the First Madison Objection, Madison requested that any sale preserve its rights under the ROFR and the Purchase Option. It also complained that the First Stalking Horse Bidder's asset purchase agreement did not allocate a portion of the overall purchase price to the Bowie Partnership Interests

---

[16]     *Id. at* §§ 1.13(B), 1.14, 1.15, 3.01, 4.01.
[17]     *Id.* at § 5.01.
[18]     *See* Madison Hearing Transcript, DE # 2810, at p. 20, lines 13-24.
[19]     *See* DE # 685.
[20]     *See* DE # 1323.

and that this fact prevented Madison from exercising its ROFR. It also made traditional "adequate assurance" arguments under section 365.

On November 18–19, 2025, the Debtors convened the first auction for their assets (the "First Auction"). At this First Auction, the Debtors entertained bids for all of the Debtors' assets ("WholeCo Bids") as well as bids for ***specific portions of the Debtors' assets ("Piecemeal Bids")***. The Debtors qualified four Piecemeal Bids for select assets, ancillary segments, or joint venture interests of the Debtors.[21] The Debtors also qualified two WholeCo Bids.[22] While Madison had filed it First Madison Objection a month earlier, seeking to preserve its rights under the ROFR, ***Madison did not attend the First Auction, where it might have requested as part of the bidding process, that an allocation be made for the Bowie Partnership Interests, as the bidding transpired. It did not seek to submit a Piecemeal Bid, nor did Madison seek to submit a WholeCo Bid.***[23]

The Debtors selected the First Stalking Horse Bidder as the successful bidder at the First Auction. On December 8, 2025, the Debtors filed a revised asset purchase agreement between the Debtors and the First Stalking Horse Bidder.[24] Once again, the revised asset purchase agreement provided the purchase price and other terms of the proposed sale. On that same day, Madison filed its Post-Auction Objection (the "Second Madison Objection")[25] to the Debtors' proposed sale to the First Stalking Horse Bidder. The Second Madison Objection complained that there was some ambiguity regarding what the Debtors were proposing to assume and assign with regard to Larkin

---

[21]  *See* DE # 1856, Filing of Auction Transcript, p. 15, lines 14–16.
[22]  *See id.* at p. 21, ln. 14.
[23]  *See* Madison Hearing Transcript, DE # 2810, at pp. 42-46. The testimony of Madison witness Lafe Bauer, at places, referred to Madison providing "multiple notices" or "requesting or making offers" for Larkin Chase. *Id.* at 43. However, no written notice was offered into evidence, and based on the objections of Madison's counsel, the witness appeared to be referring to offers made in settlement discussions. Moreover, the time frame for this was stated to have been after the "Second Auction." *Id.* at p. 45.
[24]  *See* DE # 1755.
[25]  *See* DE # 1800.

Chase and, once again, raised issues surrounding the ROFR—arguing that the Debtors must present Madison with what portion of the First Stalking Horse Bidders' overall purchase price related to the Bowie Partnership Interests.

Ultimately, the court did not approve the sale to the First Stalking Horse Bidder, sustaining objections raised by the Official Committee of Unsecured Creditors ("UCC") regarding the overall fairness of the First Auction and the potential that certain bidders who had shown up at the First Auction had been wrongfully excluded. This resulted in a renewed auction process. Revised bidding procedures were filed on December 17, 2025—this time naming a new, replacement stalking horse ("Replacement Stalking Horse"). On January 7, 2026, the court entered an order approving the Debtors' entry into the Replacement Stalking Horse asset purchase agreement.[26] The Replacement Stalking Horse asset purchase agreement included a purchase price and other terms of the proposed sale.

On January 13, 2026, the Debtors held a second auction (the "Second Auction"). This Second Auction was presided over by the investment banker for the UCC, along with the investment banker for the Debtors. There was also even an auction "monitor/mediator," as agreed to between the UCC and Debtors, to ensure fairness.[27] As with the First Auction, WholeCo Bids *and Piecemeal Bids* were being entertained. The Debtors received three WholeCo Bids and six Piecemeal Bids at the Second Auction.[28] *Madison, once again, did not attend the Second Auction.* Therefore, it did not participate and interject and ask during the bidding process (for example, ask the investment bankers presiding over the Second Auction, or the Debtors' principals, or the competing purchasers, *or even the monitor/mediator),* that it be given a price allocation for the

---

[26]   *See* DE # 2060.
[27]   A representative for the U.S. Trustee also attended the Second Auction.
[28]   *See* DE # 2182, Transcript of Second Auction, p. 136, lines 10–11.

Bowie Partnership Interests. It did not submit a WholeCo bid nor a Piecemeal Bid. It did not, in real time during the Second Auction, say "we want to match any offer, pursuant to the ROFR." The Buyer, WSSH, was ultimately named the successful bidder of the Second Auction.

Subsequently, on January 16, 2026, Madison filed its Post-Second Auction Objection ("Third Madison Objection")[29] raising issues once again surrounding the ROFR and the annual Purchase Option. Madison continued to argue that the Debtors had not presented to Madison an offer to purchase the Bowie Partnership Interests as required under Section 5.2 of the Partnership Agreement, in addition to other section 365 arguments.

## III.   ISSUES PRESENTED

The issues before the court can be distilled down to the following: (1) can the Partnership Agreement and Management Agreement be assumed and assigned pursuant to Bankruptcy Code section 365(c) and (f)—or might there be "applicable law" that excuses Madison from accepting performance from the Buyer without Madison's consent; (2) assuming these agreements are generally assumable and assignable pursuant to section 365, whether the ROFR language of Section 5.2 of the Partnership Agreement required the Bowie Debtors to present an offer to Madison for the Bowie Partnership Interests and, assuming the language did, whether the Debtors complied with the terms (i.e., the ROFR language) in the Partnership Agreement, and (3) whether a right of first refusal generally—or at least the one in the Partnership Agreement before the court—runs afoul of section 365(f)'s prohibition on contractual provisions that purport to prohibit *or restrict* assignments.[30]

---

[29]   *See* DE # 2144.

[30]   At one time, Madison was arguing about the power of the Debtors to sell the Bowie Partnership Interests, pursuant to Bankruptcy Code section 363(f), free and clear of the ROFR, but Madison orally withdrew that legal argument at the Madison Hearing.

## IV.    ANALYSIS

### A.    First, does "Applicable Law" Prevent the Assumption and Assignment of the Partnership Agreement and Management Agreement Without Madison's Consent?

The court starts with a determination that the Partnership Agreement and Management Agreement should both be considered executory contracts. The Fifth Circuit has concluded that "a contract is executory if 'performance remains due to some extent on both sides' and if 'at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party.'"[31] This follows the so-called "Countryman" definition of an executory contract.  In the case of *Stumpf v. McGee (In re O'Connor)*, the Fifth Circuit assumed without fanfare that a partnership agreement was an executory contract, where the issue was not disputed (noting that other courts had done the same).[32]  Here, no one seems to seriously dispute that the two subject agreements are executory in nature.

Section 365 of the Bankruptcy Code, of course, generally allows a debtor-in-possession to assume an executory contract.[33] The debtor-in-possession may then assign the executory contract to a third party pursuant to section 365(f).[34] However, section 365(c) provides a limitation, such that a debtor-in-possession may not assume or assign an executory contract if *applicable law excuses a party to the contract, other than the debtor, from accepting performance or rendering performance to an entity other than the debtor-in-possession and the party does not consent to*

---

[31]     *In re Provider Meds, L.L.C.,* 907 F.3d 845, 851 (5th Cir. 2018) (quoting *In re Murexco Petroleum, Inc.,* 15 F.3d 60, 62-63 (5th Cir. 1994)).

[32]     258 F.3d 392, 400 n.3 (5th Cir. 2001) (citing *Summit Inv. & Dev. Corp. v. Leroux,* 69 F.3d 608, 610 n.3 (1st Cir. 1995); *Breeden v. Catron (In re Catron),* 158 B.R. 624, 626 (Bankr. E.D. Va. 1992), *aff'd,* 158 B.R. 629 (E.D. Va. 1993), *aff'd,* 25 F.3d 1038 (4th Cir. 1994)).

[33]     11 U.S.C. § 365(a).

[34]     11 U.S.C. § 365(f).

12

*the assumption or assignment*.[35] Both the Management Agreement and Partnership Agreement are governed by Maryland law.

Is there something under Maryland law that excuses Madison from accepting performance from the Buyer, as an assignee of these agreements? One of the most common examples of "applicable law" that might prevent assumption and assignment of an executory contract (without the consent of the non-debtor counterparty) is a contract that is a "personal services" contract.[36] But "applicable law" under section 365(c) is not limited to "personal services" contracts.[37]

### 1.   Are the Partnership Agreement and Management Agreement Personal Services Contracts? No.

Madison argues that the Partnership Agreement and Management Agreement are "*personal services*" *agreements* such that Madison is not required to accept performance thereunder by a party other than the Debtors, under applicable law (i.e., Maryland law). Madison states that a partnership agreement is fundamentally based on "personal trust and confidence of the partners."[38] Madison presents a handful of cases that it believes support this notion, but none of those cases interpreted Maryland law.[39] Madison did not provide, and this court cannot find, any Maryland case law that finds a partnership agreement to be a personal services contract. Madison does not provide any cases pertaining to management agreements.

---

[35]   11 U.S.C. § 365(c) (emphasis added).

[36]   *In re Braniff Airways, Inc.*, 700 F.2d 935, 943 (5th Cir. 1983).

[37]   *See O'Connor,* 258 F.3d at 402, n.4.

[38]   First Madison Objection, DE # 1323, p. 14.

[39]   *In re Catron*, 158 B.R. at 627 (interpreting Virginia law); *In re Schick*, 235 B.R. 318, 323 (Bankr. S.D.N.Y. 1999) (interpreting New York's Revised Limited Partnership Act); *In re Daugherty Const., Inc.*, 188 B.R. 607, 614 (Bankr. D. Neb. 1995) (court grappled with whether an LLC and debtor's membership interest therein terminated upon commencement of a Chapter 11 case by a member and simply stated "[t]he fact that a partnership agreement . . . constitutes an intensely personal contract" is relevant as to whether the partnership agreement can be assigned to a third party under section 365(c)—and even went on to state "[p]artnership agreements have been found to be assumable executory contracts in the case of a Chapter 11 debtor partner."); *In re Sunset Developers*, 69 B.R. 710, 713 (Bankr. D. Idaho 1987) (Madison quoted the court for one sentence that has been superseded by Idaho state law and for two sentences, the rationales for which were superseded by the 1984 amendments to section 365(c)(1)).

13

Madison's argument stresses that the Management Agreement and the Partnership Agreement are both "intensely personal contracts." They also suggest the significance of nursing homes being in a highly regulated industry. While certain partnership agreements and management agreements in the world might be "intensely personal," facts always matter. And the facts do not seem to support the argument here. And Maryland law does ***not*** seem to support Madison on this point. Under Maryland state law, contracts are personal services contracts, not only if they are "of a personal or unique character," but typically involve "rare genius and extraordinary skill."[40]

The Maryland Court of Appeals (now known as the "Supreme Court of Maryland") made these pronouncements in the *Macke* case, quoting the Supreme Court of California, which provided examples of "rare genius and extraordinary skill" that are not transferable: "All painters do not paint portraits like Sir Joshua Reynolds, nor landscapes like Claude Lorraine, nor do all writers write dramas like Shakespeare or fiction like Dickens."[41] A Maryland federal district court cited this same "rare genius and extraordinary skill" standard and stated that "*delectus personae*" (choice of person) must have been "an agreement of the bargain."[42]

With respect, there is no evidence to show that the Bowie Debtors are the Shakespeare or Rembrandt of the nursing home world.[43] The Bowie Debtors are not like former National Hockey League defensive player Jack Johnson who had a $30 million five-year contract to play for the Los

---

[40]   *Macke Co. v. Pizza of Gaithersburg, Inc.*, 259 Md. 479, 484 (1970).
[41]   *Id.*
[42]   *Mahul's Inv. Corp. v. ABC Advs., Inc.*, 130 F. Supp 2d 700, 705 (D. Md. 2001).
[43]   Interestingly, on July 14, 1656, Rembrandt the painter (Rembrandt Harmenszoon van Rijn) did file for "bankruptcy," applying to the High Court in The Hague for *cessio bonorum*—literally, "surrender of goods"—a type of insolvency whereby he ceded control of his assets. STACEY JERNIGAN & JULIANNE PARKER, REMBRANDT'S BANKRUPTCY, 19th Annual International Bankruptcy Law Seminar, State Bar of Texas Bankruptcy Law Section (April 2024). There is no record of whether Rembrandt attempted to assume and assign any of his painting contracts to a lesser-genius third-party painter during his insolvency proceeding.

Angeles Kings when he went bankrupt.[44] The duties of the Bowie Debtors, while certainly important and significant, do not require rare genius and extraordinary skill. No specific individuals are named in either the Partnership Agreement or the 33-year-old Management Agreement as to whom will perform any particular service. Moreover, the evidence at the Sale hearing established that the Buyer, WSSH, is very capable of performing the duties contemplated by both agreements. And WSSH intends to retain most of the same employees of the Debtors.[45] The Partnership Agreement and Management Agreement in this case are not personal services contracts.

**2.      Even Though Not a Personal Services Contract, is there Other Maryland Law that Might Excuse Madison from Accepting Performance Under the Partnership Agreement from the Buyer, Without its Consent? No.**

Madison places heavy reliance on *In re O'Connor* from the Fifth Circuit, in which the court was interpreting Louisiana law, and concluded that a partnership agreement was not assumable under section 365(c)(1) since the non-debtor counterparty to the partnership agreement did not consent to assumption.[46] Madison likens Maryland statutory law to the Louisiana statute at issue in *O'Connor*. Below is the relevant language of Louisiana Civil Code Article 2812.

> "A partner may share his interest in the partnership with a third person without the consent of his partners, but he cannot make him a member of the partnership." La. Civ. Code Ann. art. 2812 (2025).

Recall, that the Bowie Debtors have both a general partnership share (in the case of Bowie Debtor #1) and a limited partnership share (in the case of Bowie Debtor #2) under the Partnership Agreement. The Code of Maryland Corporations and Associations ("CMC&A"), section 10-301,

---

[44] *In re Johnson*, 2016 W.L. 8853601 (Bankr. S.D. Oh. Nov. 10, 2016). The common law of every state in the U.S. would not allow him to sell this deal; performance by Johnson was "personal" to the counterparty. Hat tip (not hat trick) to Jay Westbrook. *See* E. WARREN, J. WESTBROOK, K. PORTER, AND J. POTTOW, THE LAW OF DEBTORS AND CREDITORS, p. 552 (8th ed Wolters Kluwer 2021).

[45] *See* Madison Hearing Transcript, p. 21, lines 1–9.

[46] 258 F.3d. at 402.

governs admission of limited partners, while CMC&A section 10-401 governs admission of additional general partners. These statutes govern partnerships in Maryland. They would not be applicable, obviously, to the Management Agreement.

*Limited Partnership Interests*. Section 10-301 of the CMC&A, dealing with limited partnership interests, is divided into two subsections. The applicable subsection to this matter is section 10-301(b)(2), which provides that an assignee may be admitted as an additional limited partner by a partner who has the power to grant an assignee the right to become a limited partner under section 10-703 "upon the exercise of that power and compliance with any conditions limiting the grant or exercise of the power."[47] Section 10-703(a) then states that an assignee of a partnership interest "may become a limited partner if and to the extent that (1) the assignor gives the assignee that right in accordance with authority described in the partnership agreement; *or* (2) all other partners consent."[48] Thus, an assignee may become a limited partner if the assignor acts in accordance with authority in a partnership agreement that gives the assignor the right to make an assignment.

*General Partnership Interest*. Section 10-401 of the CMC&A is more straightforward. It provides "*except as otherwise provided* in the partnership agreement . . . additional general partners may be admitted with the consent of all general partners and a majority in interest of limited partners. . . ."[49] So, if the partnership agreement provides an avenue for a general partner to be admitted without consent, it controls.

Madison's reliance on *O'Connor* is misplaced. While it is true that the Louisiana statute at issue required consent to make a new member in the partnership, and the Maryland statutes provide

---

[47]   Md. Code Ann., Corp. & Ass'ns § 10-301(b)(2) (Westlaw through 2026 Reg. Sess.).
[48]   Md. Code Ann., Corp. & Ass'ns § 10-703(a) (Westlaw through 2026 Reg. Sess.) (emphasis added).
[49]   Md. Code Ann., Corp. & Ass'ns § 10-401 (Westlaw through 2026 Reg. Sess.) (emphasis added).

consent *as an avenue* to admit new partners, the Maryland statutes give *an alternative route to admitting new limited partners or general partners*. The Maryland statutes allow parties to contract around consent, as shown by the word "or" in section 10-703(a) (dealing with admitting new limited partners), and by the phrase "except as otherwise provided" in section 10-401 (dealing with admitting new general partners). Both Maryland statutes allow an assignee to become a limited partner or a general partner by following procedures set forth in the applicable partnership agreement. Thus, the next step is to look at the Partnership Agreement since, under applicable Maryland law, the Bowie Debtors can transfer both their limited partnership interest and their general partnership interest in accordance with the terms of the Partnership Agreement, even without the consent of Madison.

The Partnership Agreement allows the Bowie Debtors to assign their limited partnership shares and general partnership interests. While Section 5.1 of the Partnership Agreement contains a general prohibition on the partners transferring their interests, there are six exceptions to that prohibition. Section 5.1(f) is the relevant exception, stating that there can be:

> A transfer by [the Bowie Debtors], jointly but not separately, of their entire General Partner Percentage Interest and Limited Partner Percentage Interest to a Person other than [a Bowie Debtor #1] Affiliate or a Madison Competitor . . . subject to the right of first refusal of the other Partners and other restrictions set forth in Section 5.2 hereof.

Section 5.2, quoted earlier, is the ROFR section of the Partnership Agreement. Thus, we are back to the ROFR. Reading the Partnership Agreement as a whole, Article V expressly contemplates that there can be a transfer of the Bowie Partnership Interests to an unrelated third-party transferee, absent consent—so long as the assignor complies with the ROFR procedures. The court, therefore, cannot conclude that applicable law (i.e., Maryland law) excuses Madison from accepting performance under the Partnership Agreement from Buyer, absent Madison's consent—

17

when the Maryland statutes allow parties to contract around consent in a partnership agreement, and the Partnership Agreement here, indeed, contracts around consent, by authorizing nonconsensual transfers *so long as there has been compliance with the ROFR in Section 5.2*.

**B.      Assuming that the ROFR Language of Section 5.2 of the Partnership Agreement is Enforceable, What Did the ROFR Language Require?**

So, was there compliance with the ROFR—by the Bowie Debtors? By Madison?

As has been noted, the Partnership Agreement is governed by Maryland law. Maryland courts follow the objective theory of contract interpretation.[50] Under that approach, Maryland courts interpret the language—unless ambiguous—of a contract based on what a "reasonable person in the position of the parties would have understood the language to mean and not the subjective intent of the parties at the time of formation."[51] While interpreting the plain language of a contract in context, Maryland courts "construe the contract as a whole, interpreting separate provisions harmoniously, so that, if possible, all of them may be given effect."[52] "Construing the contract as a whole requires that effect be given to each clause to avoid an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed."[53] Maryland courts are instructed to "enforce the terms of unambiguous written contracts without regard to the consequences of that enforcement."[54]

For convenience, the court will set forth again the ROFR provisions of Section 5.2 of the Partnership Agreement (with emphasis added in places by the court):

> 5.2.1 <u>Offering Notice</u>. If . . . [Bowie Debtor #1 and Bowie Debtor #2] jointly wish to dispose of their entire Partnership interests to a third party . . . and have received *from such third party a bona fide written offer* to purchase all [Bowie Debtor #1's and Bowie Debtor #2's]

---

[50]   *Lithko Contracting, LLC v. XL Ins. Am., Inc.*, 487 Md. 385, 401 (2024).
[51]   *Id.*
[52]   *Id.* at 403 (cleaned up).
[53]   *Id.* (cleaned up).
[54]   *Id.* (cleaned up).

Partnership interest, [Bowie Debtor # 1 and Bowie Debtor #2] shall, by *written notice . . . first tender to Madison . . . an offer to sell such interest in the Partnership at the same price and on the same terms and conditions* as offered by the third party.

5.2.2 <u>Acceptance</u>. *[Madison] shall notify* [Bowie Debtor # 1 and Bowie Debtor #2] *in writing, within thirty (30) days* following the date of the receipt of the Offering Notice, *of [Madison]'s election* either (i) to accept the sale offer . . . or (ii) to decline the sale offer. . . . *Failure to give such written notice within the required thirty (30) day period shall be deemed an election by [Madison] to decline the sale offer*."

5.2.4 <u>Right to Sell to Third Party</u>. If [Madison] has declined the sale offer . . . or is deemed to have done so pursuant to the provisions of Section 5.2.2, [Bowie Debtor #1 and Bowie Debtor #2] shall . . . be free to sell [their] Partnership interest . . . to the third party on the same terms which were offered to [Madison]. . ..

Objectively interpreting this ROFR language, when Madison entered into the Partnership Agreement, it agreed that the Bowie Debtors could sell their Bowie Partnership Interests, subject to providing an Offering Notice first to Madison."[55] The Offering Notice provision required that the Bowie Debtors tender to Madison "an offer to sell such interest in the Partnership at the same price and on the same terms and conditions as offered by the third party."[56] This language places no limitation on the structure of the third-party transaction—"such interest" simply identifies the property subject to the right of first refusal (i.e., the Bowie Partnership Interests). Reading plainly, the Debtors must have given Madison notice that a third party (*e.g.*, the First Stalking Horse Bidder, the Replacement Stalking Horse Bidder, the Buyer) had made an offer to purchase the Bowie Partnership Interests and given Madison the opportunity to buy the Bowie Partnership Interests at the same price and on the same terms and conditions as offered by the Buyer. Madison

---

[55]     *See* Section 5.2.1 of the Partnership Agreement, Debtors' Exh. 1.
[56]     *Id.*

19

then had 30 days after receipt of the Offering Notice to accept (essentially match) the sale offer, or it would be deemed to decline it.

### C.   Did the Bowie Debtors Comply with the Section 5.2 ROFR Language?

To be clear, the Section 5.2.1 "Offering Notice" provision of the Partnership Agreement required Bowie Debtor #1 and Bowie Debtor #2, once they received an offer from a third party to purchase their assets (which offer might encompass the Bowie Partnership Interests) to first tender to Madison, through a written notice (*no magic form specified*), the offer, so as to give Madison, essentially, the right to match such offer. It is undisputed that Madison received written notice of the multiple proposed sale transactions that contemplated selling all of the Debtors' assets, which could be inclusive of the Bowie Partnership Interests. As earlier discussed, the court entered the First Sale Procedures Order on August 28, 2025, approving the Debtors' entry into a stalking horse asset purchase agreement with the First Stalking Horse Bidder and approving further competitive bidding procedures.[57] Attached to the First Sale Procedures Order was an asset purchase agreement between the Debtors and the First Stalking Horse Bidder, which provided the purchase price and other terms of the proposed sale to the First Stalking Horse Bidder. Madison does not dispute receiving notice—in fact, it filed the First Madson Objection on October 17, 2025 (roughly a month-and-a-half later), requesting that any sale preserve its rights under the ROFR and the Purchase Option.[58] As earlier noted, on November 18–19, 2025, the Debtors convened the First Auction, at which it entertained both WholeCo Bids for all of the Debtors' assets as well as Piecemeal Bids (and, indeed, there were some bidders who made Piecemeal Bids). While Madison had filed its First Madison Objection a month earlier, purporting to preserve its rights under the ROFR, *Madison did not attend the First Auction and did not submit a bid (Piecemeal or*

---

[57]   *See* DE # 685.
[58]   *See* DE # 1323.

20

*WholeCo) and did not insist that it be informed during the First Auction of the winning bidder's*

*allocation of its purchase price to the Bowie Debtors' Partnership Interests*.

Same with the Replacement Stalking Horse Bid during the renewed bid process and the Second Auction. Revised bidding procedures were filed by the Debtors on December 17, 2025—this time naming the Replacement Stalking Horse.[59] On January 7, 2026, the court entered an order approving the Debtors' entry into the Replacement Stalking Horse asset purchase agreement.[60] The Replacement Stalking Horse asset purchase agreement included a purchase price and other terms of the proposed sale. Madison does not dispute receiving written notice of this. Then, on January 13, 2026, the Debtors held the Second Auction. The Debtors received three WholeCo Bids and six Piecemeal Bids at the Second Auction on January 13, 2026.[61] Similar to the First Auction, *Madison did not attend the Second Auction and did not submit a WholeCo bid nor a Piecemeal Bid after the Replacement Stalking Horse bid's terms and conditions were noticed out, nor after the Buyer (as winner) was noticed out to thousands of parties, including Madison.* To be clear, the sale and auction procedures permitted bidders to submit either WholeCo Bids or Piecemeal Bids. Madison possessed information regarding price, terms, and conditions available to any third-party bidder and had the same opportunity to acquire the Bowie Partnership Interests. However, now, in its post-sale briefing and arguments, Madison has unilaterally calculated that $4.5 million of the Buyer's purchase price should be allocated to the Bowie Partnership Interests, and it should be able to pay that now and get the Bowie Partnership Interests pursuant to the ROFR. With regard to the timeline (described above—spanning from August 2025 to the present), the court notes that Section 8.13 of the Partnership Agreement stated that "any consent, approval, or *other action*

---

[59]     *See* DE # 1952.
[60]     *See* DE # 2060.
[61]     *See* DE # 2182, Transcript of Second Auction, p. 136, lines 10–11.

required . . . under or in connection with this Agreement shall not ***unreasonably be*** withheld or ***delayed***."[62] The delay here is concerning.

On balance, the court concludes that the Debtors substantially complied with Section 5.2.1 of the Partnership Agreement and tendered to Madison an "Offering Notice" pursuant to that section—i.e., a written notice with the terms and conditions of the proposed sale of the Bowie Partnership Interests—first as proposed by the First Stalking Horse, then the Replacement Stalking Horse, and ultimately the Buyer (WSSH)—and Madison had the opportunity to respond, in accordance with Section 5.2.2 of the Purchase Agreement. While Madison filed three objections along the way during the process—purporting to preserve its rights, including the ROFR, ***the court cannot conclude that this was tantamount to Madison notifying the Debtors "in writing, within thirty (30) days following the date of the receipt of the Offering Notice, of [Madison]'s election either (i) to accept the sale offer . . . or (ii) to decline the sale offer," as contemplated by Section 5.2.2 of the Partnership Agreement***. Thus, Madison should be deemed to have declined the opportunity to match, and the Bowie Debtors have the right to proceed with a sale of the Bowie Partnership Interest to the Buyer (WSSH), pursuant to Section 5.2.4 of the Partnership Agreement. Notably, the Maryland Court of Appeals has held that "it is well settled-law in Maryland that to be an effective exercise of an option, the exercise of that option 'must be unequivocal and in accordance with the terms of the option.'"[63]

There was some testimony at the Madison Hearing, from a witness for Madison, Lafe Bauer, that ***after receiving the results of the Second Auction***, Madison indeed made an offer to

---

[62]    Partnership Agreement, § 8.13, p. 27.
[63]    *Bramble v. Thomas*, 396 Md. 443, 455 (2007) (citing, *inter alia*, *Foard v. Snider*, 205 Md. 435, 446 (1954) ("Whatever the option requires must be done. As in the case of all offers, revocable or irrevocable, the exercise must be unconditional and in ***exact accord*** with the terms of the option")).

the Debtors for just the Bowie Partnership Interests[64]—although technically not an offer at the same price and on the same terms and conditions as was offered by the Buyer (because the Buyer, of course, made a WholeCo offer).[65] First, ***no written offer was offered into evidence*** for the court to assess whether Madison might be deemed to have made an election to match (thus, exercising its ROFR, pursuant to Section 5.2.2). Moreover, based on objections lodged by Madison's counsel to the witness's testimony, the witness appeared to be referring to offers made in settlement discussions. Finally, the time frame for this alleged offer by Madison was stated to have been after the "Second Auction"—seemingly well after 30 days from receipt of the "Offering Notice" (whether one construes the Offering Notice to have been made when the First Sale Procedures Order was served and notice of the First Auction given, or the Replacement Sale Procedures Order was served, and the notice of the Second Auction given). Section 5.2.4 of the Partnership Agreement provides that if Madison has failed to exercise its ROFR within the 30-day period following receipt of the Offering Notice, then the Debtors are "free to sell" the Bowie Partnership Interests to the third party. The court, therefore, concludes that the Debtors are free to consummate the sale of the Bowie Partnership Interests to the Buyer, unfettered by the ROFR.

The court hastens to add that the parties announced that they have all agreed that the annual Purchase Option in the Partnership Agreement (Section 6.7—mentioned earlier—***which is something wholly separate from the ROFR and gives Madison the option to purchase the Bowie***

---

[64]      *See* Madison Hearing Transcript, at pp. 42-46.

[65]      The offer for just the Bowie Partnership Interest could be construed as a counteroffer, but the court is not making this determination. *See In re New Era Resorts, LLC*, 238 B.R. 381 (Bankr. E.D. Tenn. 1999) (finding an offer to purchase part of a tract of land rather than matching an offer for the whole constituted a rejection and a counteroffer, thus rendering a purported exercise of a right of first refusal ineffective). The court notes that both Maryland and Texas law seem to contemplate that a property owner of a property subject to a ROFR remains "master of conditions under which he will relinquish his interest, as long as those conditions are commercially reasonable, imposed in good faith, and not specifically designed to defeat the preemptive rights." *West Texas Transmission, L.P. v. Enron Corp.,* 907 F.2d 1554, 1563 (5th Cir. 1990) (cited approvingly by *Bramble*, 396 Md. at 457–61)).

*Partnership Interests, which may be exercised annually after a certain milestone date that has already been reached, and under certain defined procedures*) will remain intact after the sale to the Buyer. This seems very significant—certainly from a fairness standpoint for Madison.

**D.      Is the ROFR (Regardless of Compliance) Even Enforceable Under Section 365(f)(1)?**

A vexing question that some courts have pondered is whether a right of first refusal in an executory contract is even enforceable, because of section 365(f). Might a ROFR—particularly the one here—be an unenforceable restraint on assignment pursuant to section 365(f)?

Under section 365(f)(1), except as provided in section 365(b) and section (c), a debtor-in-possession can assign an executory contract notwithstanding a provision in that contract or in applicable law "that prohibits, *restricts*, or *conditions* the assignment of such contract."[66] In essence, an anti-assignment provision clause in a contract, or under some nonbankruptcy law, is unenforceable (subject to what was discussed above, concerning applicable law that might actually excuse a counterparty from accepting performance from someone other than the debtor).[67] Although a right of first refusal is not an ***anti-assignment*** provision *per se*, it does somewhat *restrict* or *condition* the assignment of a contract. Accordingly, rights of first refusals have been held to be unenforceable under section 365(f).[68] Certainly one can envision that they could chill bidding and interfere with a trustee's or debtor-in-possession's efforts to maximize value for an estate.[69]

---

[66]     Emphasis added.

[67]     *See* 3 Collier on Bankruptcy ¶ 365.09[3], at 365-86 (Richard Levin & Henry J. Sommer eds., 16th ed. 2024).

[68]     *In re Adelphia Commc'ns Corp.*, 359 B.R. 65, 85 (Bankr. S.D.N.Y. 2007); *see also In re Mr. Grocer, Inc.*, 77 B.R. 349, 355 (Bankr. D.N.H. 1987).

[69]     *See Adelphia.*, at 86–87 (applying a "facts and circumstances" test and not a *per se* rule in analyzing the enforceability of a right of first refusal).

24

Courts have recognized both the practical and policy concerns raised by enforcing rights of first refusal in bankruptcy. In *Mr. Grocer*, the bankruptcy court held that a landlord's right of first refusal was unenforceable under section 365(f)(1) because it constituted a provision that "restricts" or "conditions" assignment within the meaning of the statute.[70] The court began with a plain language analysis of section 365(f)(1), emphasizing that the statute invalidates provisions that "prohibit[], restrict[] or condition[]" assignment, and that those terms are written in the disjunctive.[71] The court reasoned that a right of first refusal fell within that language because it conditioned assignment on the landlord first having the opportunity to take the leasehold interest from the proposed assignee.[72] The court also noted that enforcing such a right could chill bidding because potential purchasers could make the initial effort to submit a bid only to have the right-holder match that bid without making a higher or better offer.[73] The court, therefore, concluded that the debtor could assume and assign a lease free of the right of first refusal, provided the other statutory requirements were satisfied.[74]

In *Adelphia*, the bankruptcy court likewise recognized that rights of first refusal may be unenforceable under section 365(f)(1) when they restrict assignment to an impermissible degree. The court did not apply a *per se* rule; rather, it applied a facts-and-circumstances approach to determine whether the restriction hindered assignment sufficiently to render it unenforceable.[75] Relying on *Mr. Grocer*, the court observed that enforcing a right of first refusal may discourage prospective purchasers from undertaking the effort to formulate and submit bids that can later be matched by the holder of the right.[76] The court found the concern especially significant in multi-

---

[70]    *Mr. Grocer*, 77 B.R. at 352–53.
[71]    *Id.* at 352.
[72]    *Id.*
[73]    *Id.* at 353–54.
[74]    *Id.* at 355.
[75]    *Adelphia*, 359 B.R. at 86 n.71.
[76]    *Id.* at 87.

asset bankruptcy sales, where enforcing rights of first refusal as to only part of the transaction could be destructive to maximizing value and could chill future bankruptcy auctions.[77] The court, therefore, held that rights of first refusal before it were unenforceable to the extent they were not saved by the section 365(c)(1) applicable-law exception.[78]

The court—under the facts and circumstances of the present case—finds the reasoning of both *Adelphia* and *Mr. Grocer* persuasive. In this case, as has been discussed, 175 nursing homes are involved. Most of the interested bidders during the robust sale process, that took place over many weeks, were interested in the whole company—in other words, they saw value in paying for the entire enterprise. Most bids were aggregate bids that did not allocate value to each and every nursing home, for tax and other business reasons. As is often the case, the whole enterprise did not necessarily equal the sum of the parts. Moreover—due to thousands of creditors, a highly complex capital structure, and an active UCC in this case—there were many safeguards in the auction process, not the least of which was a mediator/monitor during the reconvened Second Auction. The mediator/monitor was put in place at the request of parties-in-interest. Both the First Auction and the Second Auction were set up where Piecemeal Bids would be considered. The instructions were clear on this point. There was ample opportunity for Madison to have participated in the auctions to perhaps get the benefit of its bargain that was inherent in the ROFR. Additionally, as has been noted, Madison still has an annual Purchase Option that might be exercisable later with the Buyer, if certain terms are achieved. The parties have agreed this Purchase Option survives.

Finally, the evidence at the Sale hearing was convincing that the Buyer, WSSH, is qualified in experience and with financial resources and can provide adequate assurance of future performance as a new owner. Applying the same facts-and-circumstances approach as did the

---

[77]     *Id.* at 87–88.
[78]     *Id.* at 89–90.

*Adelphia* and *Mr. Grocer* courts, this court determines that enforcing the ROFR in this situation would improperly restrict an assumption of the assignment of the Bowie Partnership Interests, contrary to the dictates of section 365(f)—an assumption and assignment for which there is a sound business justification and that benefits all concerned.

## V.    CONCLUSION

Madison has essentially argued that the ROFR under the Partnership Agreement required the Debtors, after running two court-approved auctions, to make a follow-up offer to Madison, for just the Bowie Partnership Interests, so that Madison can decide whether to match. Assuming the ROFR is even enforceable, this is not a reasonable interpretation of the Partnership Agreement. The Partnership Agreement is not specific as to the required structure of a written Offering Notice, except that it must be given to Madison and then Madison has 30 days to accept or decline. This Offering Notice concept was substantially complied with in this case during two different auction processes. Madison received written notice of two stalking horse bids and two auctions and could have shown up to say "we want to match the winning bid as to Larkin Chase, so please give us an allocation and we will match if we choose." It did not. But, more importantly, the court believes applying the ROFR in the way Madison is requesting would run afoul of section 365(f) and be tantamount to an unenforceable restriction or condition on assignability of the Partnership Agreement.

The Madison Objections are overruled.

**# # # # END OF MEMORANDUM OPINION AND ORDER # # # #**