**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | ) | Case No. 25-80185 (SGJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DEBTORS' AMENDED JOINT CHAPTER 11 PLAN OF**
**GENESIS HEALTHCARE, INC. AND ITS DEBTOR AFFILIATES**

**MCDERMOTT WILL & SCHULTE LLP**
Charles R. Gibbs (TX Bar No. 7846300)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone:  (214) 295-8000
Facsimile:   (972) 232-3098
Email:       crgibbs@mcdermottlaw.com

Gregg M. Galardi (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone:  (212) 547-5400
Facsimile:   (212) 547-5444
Email:       ggalardi@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Catherine L. Bloomberg (admitted *pro hac vice*)
Landon W. Foody (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone:  (312) 372-2000
Facsimile:   (312) 984-7700
Email:       dsimon@mcdermottlaw.com
             ekeil@mcdermottlaw.com
             wguerrieri@mcdermottlaw.com
             cbloomberg@mcdermottlaw.com
             lfoody@mcdermottlaw.com

*Counsel for the Debtors and Debtors-in-Possession*

Date: July 27, 2026

---

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE RELATED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AND BOTH THIS PLAN AND THE DISCLOSURE STATEMENT REMAIN SUBJECT TO MATERIAL REVIEW AND REVISION IN ALL RESPECTS. ALL RIGHTS ARE RESERVED.**

---

[1]   The last four digits of Genesis Healthcare, Inc.'s federal tax identification number are 4755. There are 299 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

**TABLE OF CONTENTS**

Article I. DEFINITIONS, RULES OF INTERPRETATION AND CONSTRUCTION, COMPUTATION OF TIME, AND GOVERNING LAW ........................................................ 9

    A.    Definitions ............................................................................................................ 9

    B.    Rules of Interpretation and Construction ........................................................... 39

    C.    Computation of Time .......................................................................................... 39

    D.    Reference to Monetary Figures ........................................................................... 40

    E.    Controlling Document ......................................................................................... 40

    F.    Governing Law .................................................................................................... 40

Article II. TREATMENT AND ALLOWANCE OF UNCLASSIFIED CLAIMS ...................... 40

    A.    Administrative Expense Claims .......................................................................... 40

    B.    Substantial Contribution Claims ......................................................................... 42

    C.    DIP Claims .......................................................................................................... 42

    D.    Professional Fee Claims ...................................................................................... 43

    E.    Priority Tax Claims ............................................................................................. 44

    F.    Priority Non-Tax Claims ..................................................................................... 46

Article III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........... 46

    A.    Summary of Classification of Claims and Interests ............................................ 46

    B.    Treatment of Claims and Interests ...................................................................... 48

    C.    Repayment of Prepetition Term Loan Claims .................................................... 62

    D.    Special Provision Governing Unimpaired Claims .............................................. 62

    E.    Impaired and Unimpaired Classes ...................................................................... 62

    F.    Classes Entitled to Vote ...................................................................................... 62

    G.    Acceptance by Impaired Classes ........................................................................ 63

    H.    Deemed Rejection if No Votes Cast .................................................................... 63

    I.    Elimination of Vacant Classes ............................................................................ 64

J.    Cramdown Pursuant to Bankruptcy Code Section 1129(b) .................................. 64

K.    Allowed Claims ................................................................................................. 64

L.    Subordination of Claims .................................................................................... 64

M.    Insurance ........................................................................................................... 65

Article IV. MEANS FOR IMPLEMENTATION OF THE PLAN ........................................... 65

A.    General Settlement of Claims, Interests, and Controversies ................................ 65

B.    Corporate Transactions ...................................................................................... 66

C.    Sale Transaction ................................................................................................. 66

D.    Restructuring Transaction Toggle ....................................................................... 66

E.    Administrative Consolidation ............................................................................. 67

F.    The Wind-Down Trust ........................................................................................ 68

G.    The Liquidation Trust ......................................................................................... 74

H.    Cooperation of the Debtors ................................................................................. 83

I.    Vesting of Assets ................................................................................................ 84

J.    Establishment and Maintenance of Disbursement Accounts ................................ 85

K.    Sources of Consideration for Plan Distributions ................................................. 85

L.    Corporate Action and Governance Matters .......................................................... 86

M.    Cancellation of Notes, Interests, Certificates, and Instruments ............................ 89

N.    Books and Records; Medical Records ................................................................. 90

O.    Accounts and Reserves ....................................................................................... 91

P.    Exemption from Certain Transfer Taxes .............................................................. 92

Article V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .... 92

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ......... 92

B.    Cure of Defaults ................................................................................................. 94

C.    Rejection Damages Bar Date .............................................................................. 98

D.     Indemnification Obligations ................................................................. 98

E.     Insurance Policies ............................................................................... 99

F.     Employment Agreements..................................................................... 102

G.     Nonoccurrence of Effective Date......................................................... 102

H.     Modifications, Amendments, Supplements, Restatements, or Other
       Agreements ......................................................................................... 102

I.     Reservation of Rights........................................................................... 103

Article VI. PROVISIONS GOVERNING DISTRIBUTIONS.................................... 103

A.     Time and Manner of Distributions........................................................ 103

B.     Timeliness of Payments ....................................................................... 104

C.     Distributions by the Disbursing Agent ................................................. 104

D.     Manner of Payment under the Plan...................................................... 105

E.     Foreign Currency Exchange Rate ........................................................ 105

F.     Fractional Securities............................................................................. 105

G.     Delivery of Distributions and Undeliverable or Unclaimed Distributions ......... 105

H.     Interest on Claims ............................................................................... 107

I.     No Creditor to Receive More than Payment in Full ............................ 108

J.     Satisfaction of Claims .......................................................................... 108

K.     Compliance with Tax, Withholding, and Reporting Requirements................... 108

L.     Setoffs and Recoupments.................................................................... 108

M.     Procedures for Treating and Resolving Disputed, Contingent, and/or Unliquidated
       Claims .................................................................................................. 109

N.     De Minimis Interim Distributions.......................................................... 112

O.     Allocation of Plan Distributions Between Principal and Interest ......... 112

P.     Distribution Record Date ..................................................................... 112

Q.     Distributions Free and Clear ................................................................ 113

Article VII. INJUNCTION AND RELATED PROVISIONS ....................................................... 113

    A.    Injunction ...................................................................................................... 113

    B.    Release of Liens ............................................................................................ 114

    C.    Protections Against Discriminatory Treatment ............................................ 115

    D.    Retention of Causes of Action and Reservation of Rights ........................... 115

    E.    Ipso Facto and Similar Provisions Ineffective ............................................ 115

    F.    Discharge of the Debtors .............................................................................. 116

Article VIII. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION
OF THE PLAN ......................................................................................................................... 116

    A.    Conditions Precedent to Confirmation .......................................................... 116

    B.    Conditions Precedent to Effective Date ....................................................... 117

    C.    Establishing the Effective Date .................................................................... 120

    D.    Waiver of Conditions ................................................................................... 120

    E.    Effect of Failure of Conditions .................................................................... 120

Article IX. RETENTION OF JURISDICTION ....................................................................... 120

    A.    Retention of Jurisdiction ............................................................................... 120

    B.    Alternative Jurisdiction ................................................................................. 123

    C.    Failure of Court to Exercise Jurisdiction ..................................................... 124

Article X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ........... 124

    A.    Modification and Amendment ...................................................................... 124

    B.    Effect of Confirmation on Modifications ..................................................... 124

    C.    Revocation or Withdrawal of the Plan .......................................................... 124

Article XI. MISCELLANEOUS PROVISIONS ....................................................................... 125

    A.    Immediate Binding Effect ............................................................................. 125

    B.    Filing of Additional Documents ................................................................... 125

    C.    Substantial Consummation ........................................................................... 125

D.       Severability of Provisions ................................................................................. 125

E.       Successors and Assigns...................................................................................... 126

F.       Dissolution of the Creditors' Committee............................................................ 126

G.       Termination and Discharge of PCOs, the Estate Broker, and the Mediator ....... 126

H.       Terminations of Injunctions or Stays................................................................. 127

I.       Service of Documents ....................................................................................... 128

J.       2002 Service List .............................................................................................. 129

K.       Entire Agreement.............................................................................................. 129

L.       Plan Supplement(s)........................................................................................... 129

M.       Votes Solicited in Good Faith............................................................................ 129

N.       Closing of the Chapter 11 Cases....................................................................... 129

O.       Payment of Statutory Fees ............................................................................... 130

P.       No Admissions................................................................................................... 130

Q.       Waiver or Estoppel ........................................................................................... 130

R.       Creditor Default ............................................................................................... 130

S.       Inconsistency.................................................................................................... 131

T.       Reservation of Rights........................................................................................ 131

**EXHIBITS**

Exhibit A       Chapter 11 Debtors
Exhibit B       List of OpCo Facility Debtors (Class 6-A (GUC Distribution Group 1))
Exhibit C       List of Ancillary Business & JV Debtors (Class 6-B (GUC Distribution Group 2))
Exhibit D       List of HoldCo Non-Facility Debtors (Class 6-C (GUC Distribution Group 3))
Exhibit E       List of DivestCo Debtors (Class 6-D (GUC Distribution Group 4))

## **INTRODUCTION**[2]

Genesis Healthcare, Inc. ("Genesis") and 298 of its debtor affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),[3] hereby propose the following joint chapter 11 plan (as may be subsequently modified, amended, or supplemented from time to time, the "Plan")[4] pursuant to Bankruptcy Code section 1121(a).  The Debtors are the proponents of the Plan within the meaning Bankruptcy Code section 1129(a)(2). The Plan provides for the administrative consolidation of the Debtors, as set forth in Article IV.E hereof, for the purposes of voting on the Plan, tabulating the votes to determine which Class or Classes have accepted the Plan, confirming the  Plan, and the resulting treatment of all Claims and Interests and Distributions.

Contemporaneously herewith, the Debtors have filed a proposed disclosure statement (as may be subsequently modified, amended, or supplemented from time to time, the "Disclosure Statement") in accordance with Bankruptcy Code section 1125, which remains subject to approval by the Bankruptcy Court.  Following such approval, the Debtors will distribute the Plan and Disclosure Statement to Holders of Claims against and Interests in the Debtors in connection with (i) the solicitation of acceptances and rejections of the Plan; and (ii) the hearing to consider confirmation of the Plan.  Among other things, the Disclosure Statement discusses the Debtors' history, businesses, properties, operations, the Chapter 11 Cases, risk factors, a summary of the terms of the Plan and the treatment contained therein, and certain other related matters.  The Disclosure Statement also discusses the Confirmation process and the procedures for voting on the Plan, which procedures must be followed by the Holders of Claims entitled to vote to accept or reject the Plan in order for their votes to be counted. In the event of any inconsistencies between the Plan and the Disclosure Statement, the terms and provisions of the Plan shall control.

The Plan constitutes a joint chapter 11 plan for each of the Debtors and sets forth two possible restructuring scenarios: (1) consummation of the Court-approved sale of substantially all of the Debtors' assets, followed by a liquidation of the Debtors and their Estates pursuant to the terms of the Plan and the establishment of a liquidation trust to pursue Claims and Causes of Action and make Distributions on account of Allowed Claims; and (2) a reorganization that would be pursued if and only if the APA is terminated pursuant to which the Debtors would be reorganized and continue to operate as a going concern.  Except as otherwise provided by Order of the Bankruptcy Court and the Plan, Distributions will occur on the Effective Date or as soon thereafter as is practicable.

    1.    **Consummation of the Sale Transaction, Followed by Liquidation:** The Plan provides that, upon the Effective Date and subsequent to consummation of the Sale Transaction, the Liquidation Trust Assets will be transferred to the Liquidation

---

[2]    Capitalized terms used but not defined in this introduction shall have the same meanings set forth in Article I hereof.

[3]    A complete list of the Debtors in these Chapter 11 Cases is attached hereto as **Exhibit A**.

[4]    Copies of all Filings in the Chapter 11 Cases (as defined herein) can be obtained and viewed free of charge at the following web address:  https://dm.epiq11.com/case/genesis.

Trust, the Wind-Down Trust Assets will be administered by the Wind-Down Trust, the Wind-Down Trustee will commence a Wind-Down of the Estates, and the Post-Restructuring Debtors will be dissolved under applicable law as soon as practicable thereafter, but in no event earlier than the transfer of any remaining licenses pursuant to the Sale Transaction. As part thereof, the Liquidation Trust Assets and the Wind-Down Trust Assets will be administered and distributed as soon as practicable pursuant to the terms of the Plan, the Liquidation Trust Agreement, and the Wind-Down Trust Agreement.

2.   **APA Terminated, Followed by Reorganization Toggle**: While the Debtors believe that the Sale Transaction will be consummated as contemplated in accordance with the terms and provisions of the APA, in the event that the APA is terminated and the Sale Transaction is not consummated, the Plan provides a reorganization "toggle" whereby the Debtors will reorganize on the Effective Date and the Post-Restructuring Debtors will (a) continue to operate the Debtors' business with significantly reduced long-term indebtedness, (b) maintain operating capital necessary to satisfy the obligations pursuant to the Plan, and (c) establish the Liquidation Trust to pursue the Assigned Causes of Action and distribute proceeds to creditors. The Liquidation Trust Assets, including the equity interests in the Post-Restructuring Debtors, will be transferred to the Liquidation Trust and will be administered and distributed as soon as practicable pursuant to the terms of the Plan and the Liquidation Trust Agreement. In the event the APA is terminated and the Sale Transaction is not consummated, the Debtors shall file the Restructuring Transaction Toggle Notice (as defined herein) as soon as reasonably practicable following termination of the APA, informing parties-in-interest of the termination of the APA and the Debtors' election to pursue a Restructuring Transaction. The Restructuring Transaction Toggle Notice, among other things, (a) shall be deemed to extend the Voting Deadline and the Confirmation Objection Deadline by no less than twenty-one (21) days from the date set forth in the Disclosure Statement Order (as such dates may be otherwise extended pursuant to the terms thereof); (b) shall set forth a deadline for filing supplemental materials, including financial projections and related documentation, in support of the Restructuring Transaction that is no later than seven (7) days in advance of the extended Voting Deadline and the Confirmation Objection Deadline; and (c) may extend, continue, or adjourn, as applicable, other related dates and deadlines, including, without limitation, the Confirmation Hearing. If the Restructuring Transaction Toggle Notice is not filed, the Debtors shall proceed with consummation of the Sale Transaction and shall not seek approval of a Restructuring Transaction at the Confirmation Hearing.

Subject to the restrictions on modifications set forth in Bankruptcy Code section 1127 of and Bankruptcy Rule 3019 and those restrictions with respect to amendments or modifications to the Plan set forth in Article X hereof, the Debtors expressly reserve the right to alter, amend, or modify the Plan, one or more times, before its substantial consummation.

**RECOMMENDATION**

**THE DEBTORS INTEND TO SEEK CONFIRMATION OF THE PLAN BY THE BANKRUPTCY COURT.  THE DEBTORS URGE EACH HOLDER OF A CLAIM ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO CONSULT WITH ITS OWN ATTORNEYS OR ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THE PLAN AND THE DISCLOSURE STATEMENT.**

**THE DEBTORS, INCLUDING THEIR SPECIAL RESTRUCTURING COMMITTEE, BELIEVE THAT THE COMPROMISES CONTAINED IN THE PLAN ARE FAIR AND EQUITABLE, MAXIMIZE THE VALUE OF EACH OF THE DEBTORS' ESTATES, AND PROVIDE THE BEST OVERALL RECOVERY TO CREDITORS.  AT THIS TIME, EACH OF THE DEBTORS BELIEVE THAT THE PLAN AND RELATED TRANSACTIONS CONTAINED HEREIN REPRESENT THE BEST AVAILABLE ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES AND MAXIMIZING THE VALUE OF THE DEBTORS' ESTATES FOR THE BENEFIT OF THEIR CREDITORS.**

**THE DEBTORS STRONGLY RECOMMEND THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED IN CLASS 1 (PREPETITION ABL CLAIMS), CLASS 3 (IRS SECURED CLAIMS), CLASS 5-A (PREPETITION WELLTOWER & OMEGA TERM LOAN  CLAIMS), CLASS 5-B (PREPETITION WAX & MAO TERM LOAN  CLAIMS), CLASS 6-A (GENERAL UNSECURED CLAIMS (GUC DISTRIBUTION GROUP 1)), CLASS 6-B (GENERAL UNSECURED CLAIMS (GUC DISTRIBUTION GROUP 2)), CLASS 6-C (GENERAL UNSECURED CLAIMS (GUC DISTRIBUTION GROUP 3)), CLASS 6-D (GENERAL UNSECURED CLAIMS (GUC DISTRIBUTION GROUP 4)), CLASS 7 (WAX & MAO UNSECURED NOTE CLAIMS), AND CLASS 8 (CONVENIENCE CLAIMS) VOTE TO <u>ACCEPT</u> THE PLAN BY CHECKING THE APPLICABLE "ACCEPT" BOX ON THEIR SOLICITED BALLOT AND RETURNING THE BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE CLAIMS AND NOTICING AGENT NO LATER THAN <u>SEPTEMBER 21, 2026 AT 5:00 P.M. (PREVAILING CENTRAL TIME)</u> PURSUANT TO THE INSTRUCTIONS CONTAINED IN THE DISCLOSURE STATEMENT FILED CONTEMPORANEOUSLY HEREWITH AND ON THE BALLOTS.**

**THE STATUTORY UNSECURED CLAIMHOLDERS' COMMITTEE ALSO SUBMITS THAT THE PLAN AND RELATED TRANSACTIONS CONTAINED HEREIN REPRESENT THE BEST OPPORTUNITY FOR HOLDERS OF GENERAL UNSECURED CLAIMS TO MAXIMIZE THEIR RECOVERIES.  THE STATUTORY UNSECURED CLAIMHOLDERS' COMMITTEE THEREFORE RECOMMENDS THAT ALL HOLDERS OF GENERAL UNSECURED CLAIMS IN CLASSES 6-A, 6-B, 6-C, AND 6-D, HOLDERS OF WAX & MAO UNSECURED NOTE CLAIMS IN CLASS 7, AND HOLDERS OF CONVENIENCE CLAIMS IN CLASS 8 VOTE TO <u>ACCEPT</u> THE PLAN BY CHECKING THE APPLICABLE "ACCEPT" BOX ON THEIR SOLICITED BALLOT AND RETURNING THE BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE**

8

**CLAIMS AND NOTICING AGENT NO LATER THAN <u>SEPTEMBER 21, 2026 AT 5:00 P.M. (PREVAILING CENTRAL TIME)</u>**.

**ARTICLE I.**
**DEFINITIONS, RULES OF INTERPRETATION AND CONSTRUCTION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

**A.      Definitions**

For purposes of the Plan, except as expressly provided herein or unless the context otherwise requires, all capitalized terms not otherwise defined herein shall have the meanings ascribed to them in this Article I.

**1.1      "<u>503(b)(9) Claim</u>"** means a Claim arising under Bankruptcy Code section 503(b)(9) against the Debtors.

**1.2      "<u>Acquired Medical Records</u>"** means, collectively, all paper and/or electronic medical records relating to current or former patients and/or residents of the Debtors' businesses (a) as required by applicable law to be maintained by the Buyer in connection with the Sale Transaction, or (b) other such records that are requested by the Buyer (to the extent such records are in the Debtors' possession and are transferrable pursuant to applicable law).

**1.3      "<u>Administrative and Priority Claim Reserve</u>"** means, in the event of a Sale Transaction or a Restructuring Transaction, the reserve account established and maintained by the Liquidation Trust and funded by the Debtors on the Effective Date in an amount determined jointly by the Debtors and the Creditors' Committee and disclosed as part of the Plan Supplement, but in no event less than Twenty-Five Million Dollars ($25,000,000.00), to be used solely for the payment of Allowed Administrative Expense Claims (other than Allowed Professional Fee Claims, which shall be paid from the Professional Fee Escrow Account, and Allowed Administrative PL/GL Claims, which shall be paid from the Administrative PL/GL Claim Reserve and/or Liquidation Trust Assets, as applicable), Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims (to the extent not otherwise assumed or satisfied by the Buyer following consummation of the Sale Transaction pursuant to the Sale Transaction Documents).

**1.4      "<u>Administrative Expense Claim</u>"** means a Claim against the Debtors or their Estates constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified in Bankruptcy Code sections 327, 328, 330, 365, or 503(b) and entitled to priority pursuant to Bankruptcy Code sections 507(a)(2), 507(b), or 1114(e)(2), including, without limitation, (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' businesses, (ii) compensation for professional services and reimbursement of expenses awarded or allowed under Bankruptcy Code sections 330(a) or 331, including Professional Fee Claims, (iii) Independent Director Fee Claims, (iv) Statutory Fees, (v) 503(b)(9) Claims, (vi) Allowed Substantial Contribution Claims, (vii) Allowed Administrative PL/GL Claims, and (viii) all other Claims entitled to administrative claim status pursuant to a Final Order of the Bankruptcy Court.

9

**1.5** "**<u>Administrative Expense Claim Bar Date</u>**" means, except with respect to Administrative Expense Claims subject to the Interim Administrative Expense Claim Bar Date, the deadline by which a Claimant must File a request for payment of an Administrative Expense Claim (other than Professional Fee Claims, which shall be governed by the Professional Fee Claims Bar Date) that arose during the period from April 1, 2026 up to and including the Effective Date, which shall be the date that is thirty (30) days after the Effective Date, as set forth in the Confirmation Order.

**1.6** "**<u>Administrative Expense Claim Objection Deadline</u>**" means the date that is no later than seventy-five (75) days after the Administrative Expense Claim Bar Date, unless such objection deadline is extended by Order of the Bankruptcy Court, by which the Liquidation Trust must File any Objection to Administrative Expense Claims asserted by the Interim Administrative Expense Claim Bar Date or the Administrative Expense Claim Bar Date, as applicable; *provided, however*, that, notwithstanding the foregoing, such deadline may be extended without Bankruptcy Court approval for a period of seventy-five (75) days by notice filed by the Liquidation Trust; and, *provided, further*, that, notwithstanding the foregoing, the Professional Fee Claim Objection Deadline shall govern the deadline to object to Final Fee Applications.

**1.7** "**<u>Administrative PL/GL Claim</u>**" means an Administrative Expense Claim for death or personal injuries, including emotional distress, arising from or relating to the Debtors' ownership, operations, provision of services, or care to residents or patients, or management of any of the Facilities during the period from the Petition Date up to, but not including, the Effective Date.

**1.8** "**<u>Administrative PL/GL Claim Reserve</u>**" means, in the event of a Sale Transaction, the reserve established and maintained by the Liquidation Trust and funded by the Debtors with Five Million Dollars ($5,000,000.00) on the Effective Date, and in the event of a Restructuring Transaction, the reserve account established and maintained by the Post-Restructuring Debtors and funded by the Debtors with Five Million Dollars ($5,000,000.00) on the Effective Date.

**1.9** "**<u>Affiliate</u>**" means any Entity that is an "affiliate" of any of the Debtors within the meaning of Bankruptcy Code section 101(2).

**1.10** "**<u>Allowed</u>**" means, when used in reference to a Claim or Interest within a particular Class, an Allowed Claim or Interest in the specified Class or of a specified type.

**1.11** "**<u>Allowed Claim</u>**" means, with respect to any Claim, except as otherwise provided herein: (a) a Claim in a liquidated amount as to which no objection has been Filed prior to the applicable Claims Objection Deadline and that is evidenced by a Proof of Claim timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim pursuant to the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim that is Scheduled in an amount greater than zero in the Schedules by the Debtors as neither disputed, contingent, nor unliquidated, and for which no Proof of Claim has been timely Filed in an unliquidated or a different amount; or (c) a Claim that is upheld or otherwise Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, (iii) pursuant to any contract instrument, indenture, or other agreement entered into or assumed in connection herewith, or (iv) by Final Order (including

any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); *provided, however*, that, with respect to a Claim described in clauses (a) through (c) above, such Claim shall be considered Allowed only if no objection to the allowance of such Claim has been or may be interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order; and, *provided, further*, that, Administrative PL/GL Claims shall be considered Allowed only when such Claims are liquidated upon agreement with the Debtors, the Creditors' Committee, or the Liquidation Trustee, as applicable, or pursuant to Final Order following participation in the Unliquidated Claims Procedures. For purposes of determining the amount of an "Allowed Claim," there shall be deducted therefrom an amount equal to the amount of any Claim which the Debtors may hold against the Holder thereof, to the extent such Claim may be set off pursuant to applicable non-bankruptcy law. For the avoidance of doubt, (i) Claims that are "Allowed" solely for the purpose of voting to accept or reject the Plan pursuant to a Final Order of the Bankruptcy Court shall not be considered "Allowed Claims" unless otherwise specified herein or by Final Order of the Bankruptcy Court; (ii) for any purposes pursuant to the Plan, "Allowed Claim" shall not include interest, fees, costs, or charges on such Claim from and after the Petition Date, except as provided in Bankruptcy Code section 506(b) or as otherwise expressly set forth in the Plan; *provided, however*, that, under all circumstances, an "Allowed Claim" shall include interest calculated at the applicable non-default interest rate and not any applicable default interest rate; and (iii) "Allowed Claim" shall not include any Claim subject to disallowance in accordance with Bankruptcy Code section 502(d), except with respect to the Prepetition Welltower & Omega Term Loan Claims which shall be temporarily Allowed on the Effective Date solely for purposes of voting and Distributions pursuant to the Plan as set forth herein.

**1.12** "**Amended Schedules Bar Date**" means the later to occur of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) twenty-one (21) days from the date on which the Debtors mail notice of an amendment to the Schedules, by which Holders of Claims affected thereby must file Proofs of Claim.

**1.13** "**Ancillary Business & JV Debtors**" means the Debtors that (a) operate the Powerback and AlignMed businesses, (b) administer the Debtors' in-house accountable care organization, or (c) hold membership interests either directly or indirectly in the JVs. A list of the Ancillary Business & JV Debtors is attached hereto as **Exhibit C**.

**1.14** "**APA**" means that certain *Asset Purchase Agreement*, by and among the Debtors, as Sellers, and State Street, as Buyer, dated January 23, 2026, as amended and restated by the Debtors and the Buyer pursuant to that certain *Amended and Restated Asset Purchase Agreement*, dated as of April 17, 2026, as may be subsequently modified, amended, or supplemented.

**1.15** "**Assets**" means, collectively, (a) any right, title, and interest of a Debtor in and to "property" of such Debtor's Estate, as defined in Bankruptcy Code section 541, including such property of whatever type or nature, including real, personal, mixed, intellectual, tangible, and intangible, as is reflected on such Debtor's Books and Records as of the date of the Disclosure Statement Order, unless modified pursuant to the Plan or a Final Order, and (b) all Claims and Causes of Action that have been or may be commenced by a Debtor or other authorized representative for the benefit of such Debtor's Estate, including, without limitation, (i) the

11

Creditors' Committee in accordance with the terms and provisions of the Creditors' Committee Standing Stipulation and Order, unless modified pursuant to the Plan or a Final Order, and (ii) any Claim or Cause of Action pursuant to chapter 5 of the Bankruptcy Code.

**1.16** **"Assigned Causes of Action"** means, collectively, all Claims and Causes of Action asserted, or which may be asserted, by or on behalf of the Debtors or the Debtors' Estates prior to the Effective Date as may be described in the Plan Supplement, including, without limitation, (a) any Claims and Causes of Action referenced in the Creditors' Committee Draft Complaint, (b) any Claims and Causes of Action referred to in the WAX/MAO Complaint, (c) any Claims and Causes of Action which may be asserted, by or on behalf of the Debtors or the Debtors' Estates against any Entity with respect to any Claim, and (d) such other Claims and Causes of Action arising under or pursuant to Bankruptcy Code sections 544, 545, 547, 548, 549, 550, 551, and 553 against the Entities referenced in subsections (a), (b), and (c) above, which shall be conveyed, assigned, and transferred to the Liquidation Trust upon the Effective Date unless otherwise previously released, disposed of, or settled upon the joint written consent of the Debtors and the Creditors' Committee, in accordance with the terms and conditions of the Creditors' Committee Standing Stipulation and Order.  As set forth in and subject to the terms of Article IV.H hereof, in connection with such conveyance, assignment, or transfer, the Liquidation Trust shall have full and complete standing to bring any and all Assigned Causes of Action and succeed to all Privileges of the Debtors and the Estates; *provided, however*, that, on the Effective Date, the WAX/MAO Complaint and the PA-22 Adversary Proceeding shall be deemed amended without further Order of the Bankruptcy Court to reflect that the Liquidation Trust shall automatically assume the roles and positions of the Creditors' Committee and/or the Debtors (as applicable) for all intents and purposes, so that such proceedings can continue without any disruption.

**1.17** **"Assumed Executory Contracts and Unexpired Leases"** means, collectively, those Executory Contracts and Unexpired Leases to be assumed the Debtors pursuant to and as set forth in the Confirmation Order, the Plan, or the Plan Supplement (including any Assumption Schedule), as applicable.

**1.18** **"Assumed Priority Tax Claims"** means, collectively, all Allowed Priority Tax Claims of the Debtors to be paid by the Buyer pursuant to, and in accordance with, the Sale Transaction Documents in an amount not to exceed Thirty One Million Three Hundred Forty-Two Thousand Six Hundred Seventy-Seven Dollars and Sixty Cents ($31,342,677.60), plus any accrued interest thereon or penalties that would otherwise be entitled to priority of payment pursuant to Bankruptcy Code section 507(a)(8); *provided, however*, that the Assumed Priority Tax Claims shall not be funded by the Buyer in the event the APA is terminated and the Sale Transaction is not consummated, and shall be assumed by the Debtors as part of the Restructuring Transaction.

**1.19** **"Assumption Schedule"** means the list of Assumed Executory Contracts and Unexpired Leases to be assumed by the Debtors in accordance with Bankruptcy Code section 365 and Article V.A hereof.  Each Assumption Schedule shall be included with the Plan Supplement and shall be Filed and served on contract counterparties pursuant to the terms of Article V.A hereof.

**1.20** "**Avoidance Actions**" means, collectively, any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors or their Estates arising under (i) chapter 5 of the Bankruptcy Code, including Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550, 551, and 553(b), and (ii) applicable non-bankruptcy law including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers or conveyances, in each case to the extent not waived and released pursuant to Article VII of the Plan.

**1.21** "**Ballot**" means the form of ballot distributed to each Holder of an Impaired Claim entitled to vote with respect to the Plan on which such Holder will (a) indicate either acceptance or rejection of the Plan and (b) elect to have such Holder's General Unsecured Claim, to the extent applicable, treated as a Convenience Claim.

**1.22** "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**1.23** "**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or such other court having jurisdiction over the Chapter 11 Cases.

**1.24** "**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure (as promulgated by the United States Supreme Court under Section 2075 of Title 28 of the United States Code), and the Local Rules of the Bankruptcy Court, as each has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**1.25** "**Bar Date**" shall mean, as applicable, the General Bar Date, the Administrative Expense Claim Bar Date, the Interim Administrative Expense Claim Bar Date, the Professional Fee Claim Bar Date, the Governmental Bar Date, the Rejection Damages Bar Date, or the Amended Schedules Bar Date.

**1.26** "**Books and Records**" means, collectively, any and all books and records of the Debtors, including any and all documents and any and all computer generated or computer-maintained books and records and computer data, as well as electronically generated or maintained books and records or data, along with books and records of the Debtors maintained by or in the possession of third parties, wherever located.

**1.27** "**Business Day**" means any day other than a Saturday, Sunday, any legal holiday (as that term is defined in Bankruptcy Rule 9006(a)), or any other day on which commercial banks in Dallas, Texas are required or authorized to close by law or executive order.

**1.28** "**Buyer**" means State Street.

**1.29** "**Buyer OTA**" means that certain OTA that shall consummate the Debtors' transfer of the operations of their Facilities to the Buyer.

**1.30** **"Buyer Promissory Note"** means, in the event of a Sale Transaction, that certain *Unsecured Promissory Note* to be provided by the Buyer to the Debtors, as contemplated by the APA and the Sale Order and on the terms set forth in the Buyer Promissory Note Term Sheet.

**1.31** **"Buyer Promissory Note Term Sheet"** means that certain unsecured promissory note term sheet attached to the Sale Order as Exhibit B and attached to the Disclosure Statement as Exhibit F.

**1.32** **"Buyer TSA"** means, collectively, any and all transition service agreements which may be entered into by the Debtors or any of their Affiliates and the Buyer as may be necessary to facilitate the consummation of the Sale Transaction, including, without limitation, any agreement necessary to ensure the ongoing operation of the Facilities for licensure purposes.

**1.33** **"Carve-Out"** shall have the meaning set forth in the Final DIP Order.

**1.34** **"Cash"** means lawful currency of the United States of America, including, but not limited to, bank deposits, checks representing good funds, and other similar items.

**1.35** **"Cash Equivalents"** means equivalents of Cash in the form of readily marketable securities or instruments issued by a person other than the Debtors, including, without limitation, readily marketable direct obligations of, or obligations guaranteed by, the United States of America, commercial paper of domestic corporations carrying a Moody's rating of "A" or better, or equivalent rating of any other nationally recognized rating service, or interest-bearing certificates of deposit or other similar obligations of domestic banks or other financial institutions having a shareholders' equity or equivalent capital of not less than One Hundred Million Dollars ($100,000,000.00), having maturities of not more than one (1) year, at the then best generally available rates of interest for like amounts and like periods.

**1.36** **"Causes of Action"** means, collectively, any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, recoupment right, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including on a theory of veil piercing, alter-ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination or recharacterization), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise.  For the avoidance of doubt, "Cause of Action" includes (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to

14

Bankruptcy Code section 362, (d) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in Bankruptcy Code section 558, and (e) any Avoidance Actions.

**1.37** "**Chapter 11 Cases**" means the cases commenced under chapter 11 of the Bankruptcy Code by the Debtors on the Petition Date, styled and jointly administered under *In re Genesis Healthcare, Inc., et al.*, Case No. 25-80185 (SGJ), currently pending before the Bankruptcy Court.

**1.38** "**Claim**" means any right to payment from the Debtors or from property of the Debtors or their Estates, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted, or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtors or from property of the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**1.39** "**Claims and Noticing Agent**" means Epiq or any successor thereto, in its capacity as the Debtors' claims, noticing, solicitation, and tabulation agent.

**1.40** "**Claims Objection Deadline**" means the deadline for objecting to Filed Proofs of Claim or Scheduled Claims, which shall be, unless otherwise extended pursuant to the Plan, (i) the one hundred eightieth (180th) day following the later to occur of (a) the Effective Date and (b) the date that a Proof of Claim is Filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim; or (ii) such later date as may be fixed by the Bankruptcy Court; *provided, however*, that the Post-Restructuring Debtors and the Liquidation Trustee, in their joint discretion, may extend the Claim Objection Deadline for an additional ninety (90) days upon the filing of a notice with the Bankruptcy Court, with further extensions thereafter permitted after notice and a hearing.

**1.41** "**Claims Register**" means the claims register maintained and managed by the Claims and Noticing Agent.

**1.42** "**Class**" means any group of Claims or Interests classified under the Plan pursuant to Bankruptcy Code section 1122(a) and set forth in Article III hereof.

**1.43** "**Clerk**" means the clerk of the Bankruptcy Court.

**1.44** "**Closing Date**" means the date on which the Sale Transaction closes, following the satisfaction of all conditions to such closing or at such earlier or later date and time as may be expressly agreed upon in writing by Buyer and the Debtors, but, unless otherwise extended in accordance with the terms of the APA, not later than September 30, 2026.

**1.45** "**CMS**" means the Centers for Medicare and Medicaid Services.

**1.46** "**Co-CRO**" means Louis E. Robichaux IV and Russell A. Perry, each in their capacity as a Co-Chief Restructuring Officer of the Debtors.

15

**1.47**   **"Collateral"** means any property or interest in property of the Estates of any of the Debtors that is subject to an unavoidable Lien to secure the payment or performance of a Claim.

**1.48**   **"Common Equity Interests"** means, collectively, the authorized (a) 1,000,000,000 shares of Class A Genesis common stock, having a par value of $0.001 per share, (b) 20,000,000 shares of Class B Genesis common stock, having a par value of $0.001 per share, and (c) 150,000,000 shares of Class C Genesis common stock, having a par value of $0.001 per share, including, without limitation, any right to convert into any such share of common stock or acquire any such shares of common stock that was in existence immediately prior to or on the Petition Date.

**1.49**   **"Confirmation"** means the entry of the Confirmation Order, subject to the conditions specified in Article VIII.A hereof having been satisfied or waived pursuant to Article VIII.D hereof.

**1.50**   **"Confirmation Date"** means the date on which the Clerk enters the Confirmation Order on the Docket.

**1.51**   **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court regarding Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**1.52**   **"Confirmation Objection Deadline"** means the deadline by which parties-in-interest must file and serve Objections to Confirmation of the Plan, in accordance with the terms and provisions of the Disclosure Statement Order and as may be continued by the Debtors pursuant to the terms thereof.

**1.53**   **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129.

**1.54**   **"Consummation"** means the consummation of the Plan, which shall occur on the Effective Date.

**1.55**   **"Contingent"** means, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

**1.56**   **"Convenience Claim"** means any Allowed General Unsecured Claim that is either (a) liquidated and equal to or less than Five Thousand Dollars ($5,000.00) or (b) unliquidated, with respect to which the Holder thereof voluntarily elects to receive (by making such election on the Ballot), in full satisfaction, settlement, discharge, and release of, and in exchange for, such Allowed General Unsecured Claim, payment in Cash from the Convenience Claim Reserve in the amount of fifty percent (50%) of the amount asserted in such Allowed General Unsecured Claim; *provided, however,* that, in the event that Holders of Allowed General Unsecured Claims elect to have such Claims be treated as Convenience Claims such that Distributions with respect to the Allowed amount thereof exceeds the amount of the Convenience Claim Reserve, such Holder shall receive Holder's Pro Rata Share of the Convenience Claim Reserve; and, *provided, further*, that, if a Holder of an unliquidated General Unsecured Claim elects to be treated as a Convenience

16

Claim by making such election on the Ballot, such unliquidated General Unsecured Claim shall be assigned an Allowed Convenience Claim in the amount of One Thousand Five Hundred Dollars ($1,500.00).

**1.57**    **"Convenience Claim Reserve"** means the reserve established and maintained by the Liquidation Trust and funded by the Debtors on the Effective Date in the amount of One Million Five Hundred Thousand Dollars ($1,500,000.00) to be used solely for payment of Allowed Convenience Claims.

**1.58**    **"Corporate Transactions"** shall have the meaning set forth in Article IV.B hereof.

**1.59**    **"CPE"** means CPE 88988 LLC, a Delaware limited liability company.

**1.60**    **"Creditor"** means any Person or Entity that is the Holder of a Claim against the Debtors or their Estates, or, pursuant to Bankruptcy Code section 102(2), against property of the Debtors that arose or is deemed to have arisen on or prior to the Petition Date, including, without limitation, a Claim against any of the Debtors of a kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i).

**1.61**    **"Creditors' Committee"** means the Statutory Unsecured Claimholders' Committee appointed in the Chapter 11 Cases by the U.S. Trustee pursuant to Bankruptcy Code section 1102 [Docket Nos. 250, 262, 698, 699, 2095], the membership of which may be further reconstituted by the U.S. Trustee or by Order of the Bankruptcy Court from time to time.

**1.62**    **"Creditors' Committee Consent Rights"** means, subject to the Creditors' Committee's affirmative support of the Plan, the consent rights of the Creditors' Committee with respect to various aspects of the Plan, which such consent shall not be unreasonably withheld.

**1.63**    **"Creditors' Committee Draft Complaint"** means that certain draft adversary complaint attached to the Creditors' Committee Standing Motion as Exhibit A.

**1.64**    **"Creditors' Committee Secured Claim Objection"** means the *Preliminary Objection of the Statutory Unsecured Claimholders' Committee to Determine the Secured Status of Prepetition Term Loan Claims* [Docket No. 1723], as it may be amended or modified.

**1.65**    **"Creditors' Committee Standing Motion"** means the *Motion of the Statutory Unsecured Claimholders' Committee for Leave, Standing, and Authority to Prosecute Certain Claims on Behalf of the Debtors' Estates and for Related Relief* [Docket No. 1722].

**1.66**    **"Creditors' Committee Standing Stipulation and Order"** means the *Stipulation and Agreed Order Regarding Motion of Statutory Unsecured Claimholders' Committee for Leave, Standing, and Authority to Prosecute Certain Claims on Behalf of the Debtors' Estates and Related Relief* [Docket No. 2206], dated January 26, 2026, as amended by the *Amendment to Stipulation and Agreed Order Regarding Motion of Statutory Unsecured Claimholders' Committee for Leave, Standing, and Authority to Prosecute Certain Claims on Behalf of the Debtors' Estates and Related Relief* [Docket No. 2491], dated March 23, 2026.

17

**1.67** **"Cure Cost"** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtors and (ii) permit the Debtors to assume or assume and assign such Executory Contract or Unexpired Lease under Bankruptcy Code section 365(a); *provided, however*, that, in the event the Sale Transaction is consummated, the Buyer shall be responsible for the payment of Cure Costs up to the Cure Cost Cap (as set forth and defined in the APA).

**1.68** **"Cure Dispute"** means an unresolved objection regarding assumption of an Executory Contract or Unexpired Lease pursuant to Bankruptcy Code section 365, including objections based on the appropriate Cure Cost or "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365), or any other issue relating to assumption of an Executory Contract or Unexpired Lease.

**1.69** **"Cure Notice"** means the *Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 920].

**1.70** **"D&O Liability Insurance Policy"** means, collectively, each directors' and officers' liability insurance policy, including, without limitation, any "tail policy," and all agreements, binders, documents, or instruments related thereto issued or providing coverage at any time to the Debtors in effect as of the Petition Date.

**1.71** **"Debtor Intercompany Claim"** means any Intercompany Claim held by a Debtor against another Debtor.

**1.72** **"Debtors"** means Genesis Healthcare, Inc. and its debtor affiliates, as debtors and debtors-in-possession in the Chapter 11 Cases, as reflected on **Exhibit A** hereto.

**1.73** **"DIP Agent"** means Welltower OP LLC.

**1.74** **"DIP Borrowers"** means, collectively, Genesis and FC-GEN, as borrowers under the DIP Credit Agreement.

**1.75** **"DIP Budget"** means the itemized cash flow forecast set forth on Exhibit 2 to the Final DIP Order, as may be updated and amended from time to time.

**1.76** **"DIP Claims"** means any and all Claims inclusive of all principal, fees, expenses, costs, and interest (at the non-default rate) held by the DIP Lenders on account of, arising under, or relating to the DIP Loans, the Final DIP Order, or the DIP Loan Documents, including the DIP Facility Obligations.

**1.77** **"DIP Credit Agreement"** means that certain *Super-Priority Senior Secured Debtor-in-Possession Term Loan Agreement*, entered into as of March 4, 2026, by and among, the DIP Borrowers, the DIP Guarantors, the DIP Lenders, and the DIP Agent.

**1.78** **"DIP Facility"** means that certain postpetition financing provided to the Debtors on a secured junior basis, consisting of a new money term loan facility in an aggregate principal

18

amount up to One Hundred Five Million Dollars ($105,000,000.00), pursuant to the terms and conditions set forth in the Final DIP Order and the DIP Credit Agreement.

**1.79** **"DIP Facility Obligations"** means the obligations, if any as may be outstanding as of the Effective Date, for principal, interest, fees, costs, expenses, obligations (whether contingent or otherwise), and all other amounts, as and when due and payable under and in accordance with the Final DIP Order, the DIP Credit Agreement, and the other DIP Loan Documents.

**1.80** **"DIP Guarantors"** shall have the meaning set forth in the Final DIP Order.

**1.81** **"DIP Lenders"** means, collectively, Markglen, LLC, OHI Mezz Lender LLC, and CPE, each as lenders under the DIP Facility.

**1.82** **"DIP Loan Documents"** means collectively, the DIP Term Sheet (as defined in the Final DIP Order), the DIP Credit Agreement, and any other agreements, instruments, pledge agreements, guarantees, indemnities, security agreements, intellectual property security agreements, control agreements, escrow agreements, instruments, notes, and documents executed in accordance and connection therewith (each as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms thereof).

**1.83** **"DIP Loans"** means, collectively, the loans extended pursuant to the DIP Facility to the DIP Borrowers by the DIP Lenders.

**1.84** **"DIP Motion"** means the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Amend and Extend Their Current Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 2356].

**1.85** **"Disallowed"** means, when used in reference to a Claim or Interest within a particular Class, a Disallowed Claim or Interest in the specified Class or of a specified type.

**1.86** **"Disallowed Claim"** means a Claim or any portion thereof that (a) has been Disallowed by a Final Order, (b) is Scheduled at zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim has been Filed by the applicable Bar Date or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, (c) is not Scheduled, and as to which (i) no Proof of Claim has been Filed by the Bar Date or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, and (ii) no request for payment of an Administrative Expense Claim has been Filed by the Administrative Expense Claim Bar Date or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, or (d) after the Effective Date, has been Disallowed in a written agreement by and between the Liquidation Trust and the Holder of such Claim.

**1.87** **"Disbursement Account(s)"** means the bank account(s) to be established by the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, and/or the Liquidation Trustee, as applicable, on or after the Effective Date, together with any interest earned thereon.

19

**1.88** "**Disbursing Agent**" means, solely in its capacity as agent of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, and the Liquidation Trust to effectuate distributions pursuant to the Plan, the Wind-Down Trustee, the Liquidation Trustee, or such other Entity as may be designated jointly by the Debtors and the Creditors' Committee, appointed by the Bankruptcy Court, and set forth in the Confirmation Order.

**1.89** "**Disclosure Statement**" means the disclosure statement with respect to the Plan, including all exhibits and schedules thereto and references therein that relate to the Plan, as may be amended, supplemented, or modified from time to time, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

**1.90** "**Disclosure Statement Order**" means the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving Solicitation and Voting Procedures in Connection with Confirmation of the Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief*, dated July [__], 2026 [Docket No. [__]].

**1.91** "**Disputed Claim**" means any Claim, or any portion thereof, against the Debtors that is neither an Allowed Claim nor a Disallowed Claim, that (a) has not been Scheduled by the Debtors or has been Scheduled as unknown, contingent, unliquidated, disputed, or at zero, whether or not such Claim is the subject of a Proof of Claim; (b) is the subject of a Proof of Claim that differs in nature, amount, or priority from the Schedules (except to the extent that the Liquidation Trust elects, in its discretion, to treat the Claim asserted in such Proof of Claim as an Allowed Claim); (c) is the subject of an Objection interposed by the Claim Objection Deadline or such other time period fixed by the Bankruptcy Court, which Objection has not been withdrawn or overruled by a Final Order; (d) is the subject to a request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Confirmation Order, which request has not been withdrawn or overruled by a Final Order; or (e) is otherwise disputed by the Debtors or the Liquidation Trustee, as applicable, in accordance with applicable law, which dispute has not been withdrawn or overruled by a Final Order; *provided, however*, that a Claim shall not be deemed a Disputed Claim to the extent it becomes an Allowed Claim or a Disallowed Claim.  For the avoidance of doubt, any and all Claims asserted by CPE or its Affiliates, including, without limitation, the Prepetition WAX & MAO Term Loan Claims, the WAX & MAO Unsecured Note Claims, and the ReGen Indebtedness Claims, shall be deemed Disputed Claims, pursuant to the WAX/MAO Complaint.

**1.92** "**Disputed Claim Amount**" means the lesser of (a) the liquidated amount set forth in the Proof of Claim relating to a Disputed Claim, (b) the amount of a Disputed Claim as may be estimated by the Bankruptcy Court, pursuant to Bankruptcy Code section 502(c), and (c)(i) the amount of such Disputed Claim Allowed by the Bankruptcy Court pursuant to Bankruptcy Code section 502, or (ii) zero, if such Disputed Claim is Disallowed by the Bankruptcy Court pursuant to Bankruptcy Code section 502, in either case, regardless of whether the order or judgment allowing or disallowing such Claim has become a Final Order.

**1.93** "**Disputed Claims Reserve**" means the reserve established on or as soon as reasonably practicable after the Effective Date and maintained by the Liquidation Trust pursuant to and in accordance with the terms of the Liquidation Trust Agreement for the payment of

20

Disputed Claims that become, in whole or in part, Allowed Claims after the Effective Date. The Disputed Claims Reserve need not be maintained by the Liquidation Trust in a segregated account.

**1.94** **"Distribution"** means any distribution to be made by the Disbursing Agent in accordance with the Plan consisting of, as the case may be: (a) Cash or (b) any other consideration or residual value distributed to Holders of Allowed Claims pursuant to the terms and provisions of the Plan.

**1.95** **"Distribution Date"** means the date on which a Distribution is made to Holders of Allowed Claims under the Plan, or as otherwise agreed.

**1.96** **"Distribution Record Date"** means the record date for the purpose of determining Holders of Allowed Claims entitled to receive Distributions pursuant to the Plan on account of Allowed Claims, which date shall be the Confirmation Date or such other date designated in the Confirmation Order or any subsequent Order of the Bankruptcy Court.

**1.97** **"DivestCo Debtors"** means, collectively, the Debtors that were involved with the operations of Facilities that were previously divested by the Debtors, including, without limitation, former Facility operators, former JV partners, and former master tenants. A list of the DivestCo Debtors is attached hereto as **Exhibit E**.

**1.98** **"Docket"** means the docket in the Chapter 11 Cases maintained by the Clerk.

**1.99** **"Effective Date"** means the first (1st) Business Day following the Closing Date and the Confirmation Date on which all conditions to the Consummation and effectiveness of the Plan set forth in Article VIII.B hereof have been satisfied or waived in accordance with Article VIII.D hereof.

**1.100** **"Employment Agreement"** means any agreement relating to the employment of any of the Debtors' current employees.

**1.101** **"Entity"** means a Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the U.S. Trustee, or any other entity as defined in Bankruptcy Code section 101(15).

**1.102** **"Epiq"** means Epiq Corporate Restructuring, LLC, the Debtors' Claims and Noticing Agent.

**1.103** **"Estate Broker"** means Houlihan Lokey Capital, Inc., appointed by the Bankruptcy Court pursuant to that certain *Agreed Order (I) Approving Amended and Restated Bidding Procedures for the Submission, Receipt, and Analysis of Bids in Connection with the Sale of the Debtors' Assets, and (II) Scheduling Certain Auction Dates and Deadlines* [Docket No. 1989], dated December 22, 2025.

**1.104** **"Estates"** means, collectively the estates of the Debtors created upon the commencement of the Chapter 11 Cases pursuant to Bankruptcy Code section 541.

21

**1.105** **"Executory Contract"** means a contract to which any of the Debtors is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

**1.106** **"Exhibit"** means an exhibit attached to the Disclosure Statement or the Plan.

**1.107** **"Existing Common Equity Interests"** means all Common Equity Interests that existed immediately before the Effective Date.

**1.108** **"Face Amount"** means (a) when used in referenced to a Disputed Claim or Disallowed Claim, the amount of such Disputed Claim; and (b) when used in reference to an Allowed Claim, the amount of such Allowed Claim.

**1.109** **"Facilities"** means the skilled nursing facilities, assisted living facilities, and independent living facilities operated by the Debtors.

**1.110** **"FC-GEN"** means FC-GEN Operations Investment, LLC.

**1.111** **"File"**, **"Filed"**, or **"Filing"** means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

**1.112** **"Final Fee Applications"** means all final requests submitted by Professionals for payment of Professional Fee Claims, which must be filed by the Professional Fee Claim Bar Date.

**1.113** **"Final DIP Order"** means the *Final Order (I) Authorizing the Debtors to (A) Amend and Extend Their Current Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief*, dated March 2, 2026 [Docket No. 2393].

**1.114** **"Final Order"** means an Order or judgment of the Bankruptcy Court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, and if an appeal, writ of certiorari, reargument, or rehearing thereof has been sought, such Order shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Bankruptcy Code section 502(j), Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be but has not then been Filed with respect to such Order, shall not cause such Order not to be a Final Order.

**1.115** **"General Bar Date"** means October 31, 2025, at 4:00 p.m. (prevailing Central Time).

**1.116** **"General Unsecured Claim"** means an unsecured Claim against the Debtors arising prior to the Petition Date and classified in each of the respective GUC Distribution Groups, other than a Debtor Intercompany Claim, a Non-Debtor Intercompany Claim, a WAX & MAO Unsecured Note Claim, a Convenience Claim, or a Subordinated Claim.

**1.117** **"Genesis"** means Genesis Healthcare, Inc.

**1.118** **"Genesis Board"** means the board of directors of Genesis.

**1.119** **"Governmental Bar Date"** means January 5, 2026, at 4:00 p.m. (prevailing Central Time).

**1.120** **"Governmental Unit"** shall have the meaning set forth in Bankruptcy Code section 101(27).

**1.121** **"GUC Distribution Assets"** means, collectively, the Liquidation Trust Assets to be made available to Holders of Allowed General Unsecured Claims in each GUC Distribution Group and Allowed WAX & MAO Unsecured Note Claims, in an amount derived from the GUC Distribution Model.

**1.122** **"GUC Distribution Group"** means the applicable distribution group set forth in the GUC Distribution Model for purposes of making distributions to Holders of Allowed General Unsecured Claims and Holders of Allowed WAX & MAO Unsecured Note Claims (to the extent not otherwise Disallowed, subordinated, or avoided), which consist of (a) GUC Distribution Group 1, which includes Holders of Allowed General Unsecured Claims against the OpCo Facility Debtors; (b) GUC Distribution Group 2, which includes Holders of Allowed General Unsecured Claims against the Ancillary Business & JV Debtors; (c) GUC Distribution Group 3, which includes Holders with Allowed General Unsecured Claims and Allowed WAX & MAO Unsecured Note Claims against the HoldCo Non-Facility Debtors; and (d) GUC Distribution Group 4, which includes Holders with Allowed General Unsecured Claims against the DivestCo Debtors.

**1.123** **"GUC Distribution Interests"** means, collectively, the Liquidation Trust Interests to be made available to Holders of Allowed General Unsecured Claims and Allowed WAX & MAO Unsecured Note Claims in an amount derived from the GUC Distribution Model.

**1.124** **"GUC Distribution Model"** means the Distribution percentages set forth on Exhibit E to the Disclosure Statement, pursuant to which the Liquidation Trustee shall make Distributions from the Liquidation Trust Assets among Holders of Allowed General Unsecured Claims and Allowed WAX & MAO Unsecured Note Claims.

**1.125** **"HoldCo Non-Facility Debtors"** means, collectively, the Debtors that are (a) operating holding companies, (b) provide administrative support to the Debtors, or (c) provide various back-office, and miscellaneous services to the Debtors. A list of the HoldCo Non-Facility Debtors is attached hereto as **Exhibit D**.

**1.126** **"Holder"** means a Person or Entity who is the beneficial holder of any Claim or Interest.

**1.127** **"Impaired"** means, with respect to a Class of Claims or Interests, a Claim or an Interest that is impaired within the meaning of Bankruptcy Code section 1124.

**1.128** **"Impaired Class"** means a Class of Claims or Interests that is Impaired.

23

**1.129** **"Independent Directors"** means Jonathan F. Foster, Elizabeth LaPuma, and William K. Snyder, solely in their capacity as independent directors and members of the Genesis Board.

**1.130** **"Independent Director Fee Claims"** means all due and owing unpaid fees and expenses incurred during the period from the Petition Date up to and including the Effective Date, and as of the Effective Date due to the Independent Directors pursuant to their respective director agreements with the applicable Debtor, which (a) shall be deemed Allowed Administrative Expense Claims against the Debtors on the Effective Date, and (b) unpaid fees and expenses shall be evidenced by appropriate documentation and provided to counsel for the Debtors and the Creditors' Committee no later than seven (7) days prior to the Confirmation Hearing.

**1.131** **"Independent Investigation"** means the independent investigation conducted by the Special Investigation Committee into certain of the potential claims and causes of action that might be asserted by the Debtors with respect to certain of the transactions by and between the Debtors, on the one hand, and any current or former equity holder, affiliate, subsidiary, director, manager, officer, or other related stakeholders of the Debtors, on the other.

**1.132** **"Installment Agreements"** means, collectively, those certain *Installment Agreements* (Form 433-D) executed by the Debtors in July 2024 in favor of the IRS, pursuant to which, among other things, (a) certain Debtors agreed to pay to the IRS certain amounts otherwise due and payable relating to outstanding employer payroll taxes, and (b) the obligation for which was secured by Liens on Assets of the applicable Debtors.

**1.133** **"Insurance Policies"** means, collectively, any and all insurance policies (including the D&O Liability Insurance Policies), insurance settlement agreements, coverage-in-place agreements, and other agreements, documents, or instruments  relating to the provisions of insurance entered into by or issued to, or for the benefit of, at any time, the Debtors, or their respective predecessors and employees or directors of the Genesis Board, including, without limitation, any such policies, agreements, or other documents that have been paid in full.

**1.134** **"Insurer"** means any insurance company or third-party administrator that issued or entered into an Insurance Policy.

**1.135** **"Intercompany Claim"** means any Claim, including, without limitation, (a) any account of a Debtor reflecting intercompany book entries with respect to another Debtor or a non-Debtor Affiliate, (b) any Claim not reflected in such book entries that is held by a Debtor against another Debtor or a non-Debtor Affiliate, and (c) any derivative Claim asserted by or on behalf of one Debtor against another Debtor or by or on behalf of a non-Debtor Affiliate.

**1.136** **"Intercompany Interest"** means an Interest in a Debtor other than any Existing Common Equity Interest.

**1.137** **"Interest"** means the legal interests, equitable interests, contractual interests, or ownership interests, or other rights of any Person or Entity in the Debtors, including all partnership interests, limited liability company or membership interests, rights, investment securities, equity securities (as defined in Bankruptcy Code section 101(16)), subscriptions or other agreements and contractual rights to acquire or obtain such an interest in the Debtors, subscription rights and

liquidation preferences, and commitments of any character whatsoever relating to any such equity or ownership interests or obligating the Debtors to issue, transfer, or sell any interests whether or not certificated, transferable, voting, or denominated security.

**1.138** **"Interim Administrative Expense Claim Bar Date"** means June 26, 2026 at 4:00 p.m. (prevailing Central Time), the deadline by which a claimant must File a Proof of Administrative Claim asserting any Administrative Expense Claim (other than a Professional Fee Claim governed by Article II.D hereof) that arose during the period between the Petition Date and March 31, 2026, pursuant to the Interim Administrative Expense Claim Bar Date Order, or such other date as may be extended by the Debtors or pursuant to a Final Order.

**1.139** **"Interim Administrative Expense Claim Bar Date Order"** means the *Order (I) Establishing Interim Administrative Claims Bar Date, (II) Approving Form, Manner, and Sufficiency of Notice Thereof, and (III) Approving Proof of Administrative Claim Form*, dated May 12, 2026 [Docket No. 2700].

**1.140** **"Investigation Related Parties"** means any current or former equity holder, affiliate, subsidiary, director, manager, officer, or other related stakeholders of the Debtors.

**1.141** **"IRS"** means the United States Department of Treasury, Internal Revenue Service.

**1.142** **"IRS Secured Claims"** means the Secured Claims held by the IRS, if any.

**1.143** **"JVs"** means, collectively, those Entities in which one of the Debtors or their Affiliates hold or previously held an operating or proprietary interest, including NextGen Investors, LLC; Magnolia Gardens Limited Liability Company; Magnolia Gardens Real Estate LLC; Bold Quail Holdings LLC; Bold Quail 4 LLC; Courtyard Nursing Care Center Partnership; Franklin Square/Meridian Healthcare Nursing Home Limited Partnership; Capital/Region Genesis ElderCare L.L.C.; CCGEN Holdings, LLC; Seafire NEMA Investment, LLC; and Bowie Center Limited Partnership.

**1.144** **"JV Partners"** means the Debtors' non-Debtor partners in the JVs, including NextGen Investors Holdings, LLC; Next Asset Management II, LLC; Doctors Community Health Ventures, Inc.; New Generation Health, LLC; Lawrence Memorial Hospital of Medford, Inc.; Parkway Ventures, Inc.; Capital Region Health Services Corporation; CCGEN Holdings Member, LLC; Seafire NEMA Holdings, LLC; and Madison Manor, Inc.

**1.145** **"Lead Case"** means Case No. 25-80185 (SGJ), under which all Chapter 11 Cases are being jointly administered.

**1.146** **"Liabilities"** means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, or agreement.

**1.147** **"Lien"** means any charge against or interest in property to secure payment of a debt or performance of an obligation.

**1.148** "**Liquidation Trust**" means the Entity to be created on or prior to the Effective Date by the Creditors' Committee, unless such date is otherwise extended by the Creditors' Committee, in consultation with the Debtors and by notice filed with the Bankruptcy Court, in accordance with the provisions of Article IV.G hereof and the Liquidation Trust Agreement for the benefit of Holders of Allowed Prepetition Term Loan Claims (only applicable if the Sale Transaction is consummated), Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed General Unsecured Claims, Allowed WAX & MAO Unsecured Note Claims, and Allowed Convenience Claims, unless any such Claims are assumed or otherwise satisfied by the Buyer pursuant to the Sale Transaction Documents following consummation of the Sale Transaction.

**1.149** "**Liquidation Trust Agreement**" means the trust agreement, in form and substance satisfactory to the Debtors and the Creditors' Committee and substantially in the form contained in the Plan Supplement, pursuant to which the Liquidation Trust shall, among other things, reconcile Claims, make Distributions to Holders of Allowed Claims, pursue the Assigned Causes of Action, if applicable, and distribute the proceeds thereof, if any.

**1.150** "**Liquidation Trust Assets**" means (a) following consummation of the Sale Transaction, (i) the Liquidation Trust Funding Amount; (ii) all Cash remaining following any and all payments and/or reserves made pursuant to the Sources and Uses; (iii) the Administrative and Priority Claim Reserve; (iv) the Administrative PL/GL Claim Reserve; (v) the Convenience Claim Reserve; (vi) the Assigned Causes of Action; (vii) the Buyer Promissory Note; (viii) the Liquidation Trust Proceeds; (ix) the Priority Tax Claims Savings Amount; and (x) the Wind-Down Trust Assets, once transferred to the Liquidation Trust upon termination of the Wind-Down Trust; or (b) following consummation of the Restructuring Transaction, (i) the Liquidation Trust Funding Amount; (ii) the Assigned Causes of Action; (iii) the Administrative and Priority Claim Reserve; (iv) the Convenience Claim Reserve; (v) the Liquidation Trust Proceeds; and (vi) the Post-Restructuring Debtor Equity Interests; *provided, however*, that, except as otherwise provided herein, the Liquidation Trust Assets shall not include Cash required to fund, or reserve for, the Professional Fee Escrow Account or the Wind-Down Reserve, if applicable.

**1.151** "**Liquidation Trust Beneficiaries**" means, collectively, Holders of Allowed Claims entitled to receive Distributions pursuant to the terms of the Plan, whether or not such Claims are Allowed as of the Effective Date.  In the event of the Sale Transaction, the Liquidation Trust Beneficiaries shall include Holders of (a) Allowed Prepetition Term Loan Claims, (b) Allowed Administrative Expense Claims (including Allowed Administrative PL/GL Claims), (c) Allowed Priority Tax Claims, (d) Allowed Priority Non-Tax Claims, (e) Allowed General Unsecured Claims, (f) Allowed WAX & MAO Unsecured Note Claims, and (g) Allowed Convenience Claims, unless any such Claims are assumed or otherwise satisfied by the Buyer pursuant to the Sale Transaction Documents.  In the event of the Restructuring Transaction, the Liquidation Trust Beneficiaries shall include Holders of (a) Allowed Administrative Expense Claims (other than Allowed Administrative PL/GL Claims), (b) Allowed Priority Tax Claims, (c) Allowed Priority Non-Tax Claims, (d) Allowed General Unsecured Claims, (e) Allowed WAX & MAO Unsecured Note Claims, and (f) Allowed Convenience Claims.

**1.152** "**Liquidation Trust Board**" means the group of five (5) Persons selected by the Creditors' Committee, subject to the consent of the Debtors (which consent shall not be

unreasonably withheld), and appointed prior to the Effective Date, or any replacements thereafter selected in accordance with the provisions of the Liquidation Trust Agreement.

1.153 **"Liquidation Trust Completion Date"** means the date upon which all Liquidation Trust Assets have been sold, abandoned, dissolved, liquidated, or otherwise disposed of, and all Liquidation Trust Proceeds or remaining Cash in the Liquidation Trust have been distributed in accordance with the terms and provisions of the Confirmation Order and the Plan, and as may be further extended by the Bankruptcy Court.

1.154 **"Liquidation Trust Funding Amount"** means Ten Million Dollars ($10,000,000.00) in Cash and Cash Equivalents to be transferred to the Liquidation Trust by the Debtors on or prior to the Effective Date to fund the efforts of the Liquidation Trust to, among other things, review, reconcile, and object to Claims, administer the Unliquidated Claim Procedures, make Distributions to Creditors, and pursue Assigned Causes of Action.

1.155 **"Liquidation Trust Interests"** means the beneficial interests in the Liquidation Trust to be deemed distributed ratably to Holders of Allowed Prepetition Term Loan Claims (only applicable if the Sale Transaction is consummated), Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed General Unsecured Claims, Allowed WAX & MAO Unsecured Note Claims, and Allowed Convenience Claims.

1.156 **"Liquidation Trust Proceeds"** means the proceeds generated by the Liquidation Trust after the Effective Date of the Plan, including, but not limited to, the damages, recoveries, settlements, or Cash proceeds received by the Liquidation Trust in connection with any Assigned Cause of Action from time to time (whether as initial consideration or damages, other recoveries, settlement payments, or through the payment of deferred consideration of the same), after deducting therefrom fees, commissions, costs, taxes, and expenses related thereto, in each case, incurred by the Liquidation Trust and required to be paid by the Liquidation Trust in connection therewith.

1.157 **"Liquidation Trustee"** means the Entity designated by the Creditors' Committee with the consent of the Debtors (which such consent shall not be unreasonably withheld) and approved by the Bankruptcy Court to administer the Liquidation Trust in accordance with the terms and provisions of the Liquidation Trust Agreement and the Plan. The identity and compensation of the Liquidation Trustee shall be disclosed in the Plan Supplement.

1.158 **"Local Rules"** means the Local Rules of the United States Bankruptcy Court for the Northern District of Texas.

1.159 **"MAO"** means MAO 22322 LLC, a Delaware limited liability company.

1.160 **"Markglen"** means Markglen, LLC, a Delaware limited liability company.

1.161 **"Mediator"** means the Honorable Harlan Hale (Retired), as meditator, appointed pursuant to the *Order Authorizing and Directing Mediation* [Docket No. 1398], dated October 27, 2025.

**1.162** **"New Organizational Documents"** means the respective governing documents of the Post-Restructuring Debtors, the forms of which shall be included in the Plan Supplement.

**1.163** **"Non-Debtor Intercompany Claim"** means any Intercompany Claim held by a non-Debtor Affiliate of a Debtor against a Debtor.

**1.164** **"Objection(s)"** means any objection, application, motion, complaint, or other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate, or estimate any Claim (including the resolution of any request for payment of any Administrative Expense Claim).

**1.165** **"Official Bankruptcy Forms"** means the Official Bankruptcy Forms, prescribed by the Judicial Conference of the United States, the observance and use of which is required pursuant to Bankruptcy Rule 9009, as such forms may be amended, revised, or supplemented from time to time.

**1.166** **"Omega"** means Omega Healthcare Investors, Inc., a Maryland corporation.

**1.167** **"Omega DIP Lender"** means OHI Mezz Lender LLC, a Delaware limited liability company.

**1.168** **"OpCo Facility Debtor"** means, collectively, the Debtors that are operating a Facility as of the Effective Date.  A list of the OpCo Facility Debtors is attached hereto as **Exhibit B**.

**1.169** **"Order"** means an order or judgment of the Bankruptcy Court as entered on the Docket.

**1.170** **"OTA"** means an operations transfer agreement pursuant to which the Debtors have or will effectuate transfers of the operations of one or more of their Facilities to new operators.

**1.171** **"Other Secured Claim"** means any Secured Claim arising prior to the Petition Date against any of the Debtors, other than a Prepetition ABL Claim, a Prepetition Term Loan Claim, a Rochester Manor HUD Note Claim, or an IRS Secured Claim.

**1.172** **"PA-22 Adversary Proceeding"** means that certain Adversary Proceeding No. 26-08011, currently pending in the Bankruptcy Court.

**1.173** **"PA-22 Complaint"** means that certain *Complaint* filed by the Debtors on June 25, 2026, commencing the PA-22 Adversary Proceeding.

**1.174** **"PCOs"** mean, collectively, (a) Susan N. Goodman, the Debtors' patient care ombudsman for the Facilities located in New Mexico, West Virginia, Washington, and California [Docket No. 435], (b) Suzanne Koenig, the Debtors' patient care ombudsman for the Facilities located in Alabama, Delaware, Maryland, North Carolina, Tennessee, Virginia, and Pennsylvania [Docket No. 445], and (c) Melanie Cyganowski, the Debtors' patient care ombudsman for the Facilities located in Massachusetts, Maine, New Hampshire, New Jersey, Rhode Island, and Vermont [Docket No. 446].

28

**1.175** **"Penalty Claim"** means any Claim for a fine, penalty, forfeiture, multiple, exemplary or punitive damages or otherwise not predicated upon compensatory damages and that is subject to subordination in accordance with Bankruptcy Code section 726(a)(4) or otherwise, as determined pursuant to a Final Order.

**1.176** **"Pennsylvania Provider Assessments"** means Thirty-One Million Three Hundred Forty-Two Thousand Six Hundred Seventy-Seven Dollars and Sixty Cents ($31,342,677.60) in Provider Assessments charged prior to the Petition Date by the State of Pennsylvania against the Debtors' Facilities operated in the State of Pennsylvania.

**1.177** **"Person"** means a "person" as defined in Bankruptcy Code section 101(41).

**1.178** **"Petition Date"** means July 9, 2025, the date on which the Chapter 11 Cases were commenced.

**1.179** **"Plan"** means this *Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates*, including, without limitation, the Plan Supplement and the exhibits and schedules hereto or thereto, as the same is amended, modified, or supplemented from time to time in accordance with the terms and provisions hereof.

**1.180** **"Plan Supplement"** means the compilation of forms of documents, documents, agreements, schedules, and any exhibits to the Plan Filed by the Plan Supplement Filing Date (each as may be amended, supplemented or modified from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules), including: (a) the identity and compensation of the Liquidation Trustee and the members of the Liquidation Trust Board; (b) the Liquidation Trust Agreement; (c) the identity and compensation of the Wind-Down Trustee and the members of the Wind-Down Trust Board (only applicable following consummation of the Sale Transaction); (d) the Wind-Down Trust Agreement (only applicable following consummation of the Sale Transaction); (e) the schedule of Assigned Causes of Action; (f) the Assumption Schedule(s); (g) the Sale Transaction Documents (to the extent available and not already Filed); (h) the Buyer TSA(s); (i) the form of New Organizational Documents; (j) the modified Unliquidated Claim Procedures; (k) the Sources and Uses (to the extent amended or modified following solicitation); (l) the GUC Distribution Model (to the extent amended or modified following solicitation); (m) the Welltower & Omega Liquidation Trust Promissory Note (only applicable following consummation of the Sale Transaction); (n) the Post-Restructuring Term Loan Promissory Note (only applicable following consummation of the Restructuring Transaction); (o) the identity of the directors and officers of the Post-Restructuring Debtors (only applicable with the Restructuring Transaction), including the members of the Post-Restructuring Board; (p) a schedule of Subordinated Claims; (q) a schedule setting forth the litigation commenced by the Debtors on or after the Petition Date to the extent not otherwise set forth herein; and (r) the amount of the Administrative and Priority Claim Reserve, as determined jointly by the Debtors and the Creditors' Committee.

**1.181** **"Plan Supplement Filing Date"** means the date on which the Plan Supplement is filed with the Bankruptcy Court, which date shall be no later than seven (7) days prior to the Voting Deadline, or such other date as the Bankruptcy Court establishes.

**1.182** **"Post-Restructuring Board"** means the group of five (5) Persons jointly selected by the Debtors and the Creditors' Committee and appointed prior to the Effective Date by the Bankruptcy Court, or any replacements thereafter selected in accordance with the provisions of the New Organizational Documents; *provided, however*, that the Post-Restructuring Board shall only be appointed if the Restructuring Transaction is consummated.

**1.183** **"Post-Restructuring Debtor"** means any Debtor, or any successor thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.

**1.184** **"Post-Restructuring Debtor Equity Interests"** means the equity interests of the Post-Restructuring Debtors to be issued on the Effective Date and held by (a) the Wind-Down Trust for the benefit of the Holders of Liquidation Trust Interests, following consummation of the Sale Transaction, or (b) the Liquidation Trust for the benefit of the Holders of Liquidation Trust Interests, following consummation of the Restructuring Transaction.

**1.185** **"Post-Restructuring Term Loan Promissory Note"** means, in the event of a Restructuring Transaction, that certain seven (7)-year promissory note to be issued by the Post-Restructuring Debtors on the Effective Date to the Prepetition Term Loan Agent for the benefit of Holders of Allowed Prepetition Welltower & Omega Term Loan Claims outstanding as of the Effective Date (or all Allowed Prepetition Term Loan Claims as determined by the Bankruptcy Court in connection with the adjudication of the WAX/MAO Complaint), which shall (a) be issued in the original principal amount of $280.7 million (or such other amount as determined by the Bankruptcy Court in connection with the adjudication of the WAX/MAO Complaint), (b) be secured by a Lien on all Assets of the Post-Restructuring Debtors and no Liens shall attach to any of the Liquidation Trust Assets (other than Causes of Action to collect accounts receivable or accounts and the proceeds thereof), and (c) bear interest at a rate of fourteen percent (14%), paid in cash on a quarterly basis. A form of the Post-Restructuring Term Loan Promissory Note shall be included with the Plan Supplement.

**1.186** **"Prepetition ABL Agent"** means White Oak, as administrative agent for the Prepetition HUD ABL Lenders and the Prepetition Non-HUD ABL Lenders.

**1.187** **"Prepetition ABL Claims"** means, collectively, all Prepetition HUD ABL Claims and all Prepetition Non-HUD ABL Claims, inclusive of all principal, fees, expenses, costs, and interest (at the non-default rate).

**1.188** **"Prepetition ABL Credit Agreements"** means, collectively, the Prepetition HUD ABL Credit Agreement and the Prepetition Non-HUD ABL Credit Agreement.

**1.189** **"Prepetition HUD ABL Agent"** means White Oak, as administrative agent for the Prepetition HUD ABL Lenders.

**1.190** **"Prepetition HUD ABL Claims"** means all Secured Claims arising from or based upon the Prepetition HUD ABL Credit Agreement, inclusive of all principal, fees, expenses, cost and interest (at the non-default rate).

30

**1.191** "**Prepetition HUD ABL Credit Agreement**" means that certain *Third Amended and Restated Revolving Credit Agreement*, dated as of March 6, 2020 (as otherwise amended, supplemented, or otherwise modified from time to time).

**1.192** "**Prepetition HUD ABL Lenders**" means the "Lenders" as defined in the Prepetition HUD ABL Credit Agreement.

**1.193** "**Prepetition Non-HUD ABL Agent**" means White Oak, as administrative agent for the Prepetition Non-HUD ABL Lenders.

**1.194** "**Prepetition Non-HUD ABL Claims**" means all Secured Claims arising from or based upon the Prepetition Non-HUD ABL Credit Agreement, inclusive of all principal, fees, expenses, cost and interest (at the non-default rate).

**1.195** "**Prepetition Non-HUD ABL Credit Agreement**" means that certain *Fifth Amended and Restated Credit Agreement*, dated as of March 9, 2022 (as otherwise amended, supplemented, or otherwise modified from time to time).

**1.196** "**Prepetition Non-HUD ABL Lenders**" means the "Lenders" as defined in the Prepetition Non-HUD ABL Credit Agreement.

**1.197** "**Prepetition Term Loans**" means the term loans provided under the Prepetition Term Loan Credit Facility.

**1.198** "**Prepetition Term Loan Agent**" means Welltower OP LLC, as administrative agent for the Prepetition Term Loan Lenders.

**1.199** "**Prepetition Term Loan Claims**" means, collectively, the Prepetition Welltower & Omega Term Loan Claims and the Prepetition WAX & MAO Term Loan Claims, inclusive of all principal, fees, expenses, costs, and interest (at the non-default rate), solely to the extent of the value of the collateral securing the obligation to repay the Prepetition Term Loans is oversecured.

**1.200** "**Prepetition Term Loan Credit Agreement**" means that certain *Term Loan Agreement*, dated as of July 29, 2016 (as subsequently amended, supplemented, or otherwise modified from time to time).

**1.201** "**Prepetition Term Loan Credit Facility**" means that certain term loan credit facility provided to the borrowers under the Prepetition Term Loan Credit Agreement.

**1.202** "**Prepetition Term Loan Lenders**" means the "Lenders" as defined in the Prepetition Term Loan Credit Agreement.

**1.203** "**Prepetition Term Loan Secured Parties**" means, collectively, the Prepetition Term Loan Lenders and the Prepetition Term Loan Agent.

**1.204** "**Prepetition WAX & MAO Term Loan Claims**" means all Secured Claims arising from or based upon the Prepetition Term Loan Credit Agreement that are attributable to WAX & MAO, inclusive of all principal, fees, expenses, cost and interest (at the non-default rate),

31

the aggregate principal amount of which, as of the Petition Date, was Eighty-Four Million Nine Hundred Thousand Dollars ($84,900,000.00), and allocated as follows: (a) Thirteen Million Eight Hundred Thousand Dollars ($14,800,000.00) to MAO, and (b) Seventy-One One Hundred Thousand Dollars ($71,100,000.00) to WAX.

**1.205** "**Prepetition Welltower & Omega Term Loan Claims**" means all Secured Claims arising from or based upon the Prepetition Term Loan Credit Agreement that are attributable to Welltower and OHI Mezz Lender, LLC, inclusive of all principal, fees, expenses, cost and interest (at the non-default rate), the aggregate principal amount of which, as of the Petition Date, was approximately Two Hundred Thirty-Four Million Dollars ($234,000,000.00), and allocated as follows: (a) approximately One Hundred Twelve Million Eight Hundred Thousand Dollars ($112,800,000.00) to Welltower, and (b) approximately One Hundred Twenty-One Million Two Hundred Thousand Dollars ($121,200,000.00) to Omega.

**1.206** "**Priority Claims**" means, collectively, Priority Non-Tax Claims and Priority Tax Claims.

**1.207** "**Priority Non-Tax Claim**" means any Claim against the Debtors, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment in accordance with Bankruptcy Code sections 507(a)(3), (4), (5), (6), (7), or (9).

**1.208** "**Priority Tax Claim**" means any Claim of a Governmental Unit against the Debtors entitled to priority in payment under Bankruptcy Code sections 502(i) and 507(a)(8).

**1.209** "**Priority Tax Claims Savings Amount**" means an amount equal to the lesser of (a) the difference of Twenty Eight Million Dollars ($28,000,000.00) *minus* the final amount of the Assumed Priority Tax Claims and (b) Twenty Eight Million Dollars ($28,000,000.00); *provided, however*, that the Priority Tax Claims Savings Amount is only applicable following consummation of the Sale Transaction.

**1.210** "**Privileges**" means, collectively, all attorney-client privileges, work product protections, and other applicable privileges, immunities, or protections from disclosure held by any one or more of the applicable Debtors.

**1.211** "**Professional**" means any professional Person retained in the Chapter 11 Cases by the Debtors, the Special Investigation Committee, the Special Restructuring Committee, the PCOs, and the Creditors' Committee, as applicable, pursuant to Bankruptcy Code sections 327, 328, 330, 363, or 1103 and an Order of the Bankruptcy Court and to be compensated for services rendered and reimbursed for expenses incurred pursuant to Bankruptcy Code sections 327, 328, 330, or 331.

**1.212** "**Professional Fee Claim**" means a Claim of a Professional pursuant to Bankruptcy Code sections 327, 328, 330, 331, or 503(b) for compensation for services rendered or reimbursement of costs and expenses relating to services performed after the Petition Date and prior to and including the Effective Date.

**1.213** "**Professional Fee Claim Bar Date**" means the deadline for Filing all Final Fee Applications, which deadline shall be sixty (60) days after the Effective Date.

**1.214** "**Professional Fee Claim Objection Deadline**" means thirty (30) days from the date on which each Final Fee Application is Filed.

**1.215** "**Professional Fee Escrow Account**" means an interest-bearing account funded by the Debtors on the Effective Date with Cash in an amount equal to the aggregate amount of the Professional Fee Estimate.

**1.216** "**Professional Fee Estimate**" means (a) with respect to any Professional, a good-faith estimate of such Professional's anticipated accrued, unpaid Professional Fee Claims as of the Effective Date to be provided by each Professional in writing to the Debtors at least five (5) calendar days prior to the commencement of the Confirmation Hearing, and (b) collectively, the sum of all individual Professional Fee Estimates.

**1.217** "**Proof of Administrative Claim**" means the proof of Administrative Expense Claim that must be Filed before the Interim Administrative Expense Claim Bar Date or the Administrative Expense Claim Bar Date (as applicable) to be considered timely filed.

**1.218** "**Proof of Claim**" means the proof of claim, including a Proof of Administrative Claim, that must be Filed before the applicable Bar Date to be considered timely filed.

**1.219** "**Provider Assessments**" means those certain assessments charged against the Facilities by agencies or departments of the States or Commonwealths of the United States in which they are operated based on the number of residents treated per day in the Facilities, which assessments are typically paid on a monthly, quarterly, or biannual basis, depending on the applicable State or Commonwealth of the United States.

**1.220** "**Pro Rata Share**" means with respect to Claims (a) within the same Class or sub-Class, the proportion that a Claim bears to the sum of all Claims within such Class or sub-Class, and (b) among all Classes, the proportion that a Class of Claims bears to the sum of all Claims; *provided, however*, that, notwithstanding the foregoing, for purposes of distributing Liquidation Trust Interests, "Pro Rata Share" shall not include Convenience Claims.

**1.221** "**Record Date**" means the date or dates established by the Bankruptcy Court in the Ballots, the Disclosure Statement Order, and the Confirmation Order for the purpose of determining the Holders of Allowed Claims and Allowed Interests entitled to receive Distributions pursuant to the Plan.

**1.222** "**ReGen**" means ReGen Healthcare, LLC, a Delaware limited liability company.

**1.223** "**ReGen Indebtedness**" means, collectively, the indebtedness of the Debtors incurred pursuant to that certain (a) *Investment Agreement*, dated March 2, 2021, and (b) *Note Purchase Agreement*, dated May 24, 2023, each as amended, and the documents and investments executed in connection therewith, including, without limitation, pursuant to the ReGen Notes, which, as of the Petition Date, was in the approximate aggregate principal amount of Ninety Nine Million Eight Hundred Thousand Dollars ($99,800,000.00).

**1.224** "**ReGen Indebtedness Claim**" means a Claim arising from and relating to the ReGen Indebtedness.

**1.225** "**ReGen Notes**" means, collectively, (a) that certain $50 million convertible subordinated promissory note issued by FC-GEN to ReGen on March 2, 2021, bearing interest at one percent (1%) per annum (payable at maturity), (b) that certain $10 million convertible subordinated promissory note issued by FC-GEN to ReGen on December 2, 2022, bearing interest at one percent (1%) per annum (payable at maturity), (c) that certain $15 million convertible subordinated promissory note issued by FC-GEN to ReGen on January 4, 2023, bearing interest at one percent (1%) per annum (payable at maturity), and (d) that certain $25 million convertible subordinated promissory note issued by FC-GEN to ReGen on May 24, 2023, bearing interest at one and one-half percent (1.5%) monthly (payable in kind).

**1.226** "**Reinstated**" means the treatment provided for in Bankruptcy Code section 1124.

**1.227** "**Rejection Damages Bar Date**" means the deadline to File a Proof of Claim for damages relating to the rejection of an Executory Contract or Unexpired Lease, which is the latest to occur of (a) thirty (30) days after entry of an Order approving the rejection of any Executory Contract or Unexpired Lease of the Debtors (other than the Confirmation Order), (b) the General Bar Date or the Governmental Bar Date, and (c) the Effective Date (solely for purposes of Executory Contracts or Unexpired Leases rejected pursuant to the Plan), whichever is applicable.

**1.228** "**Restructuring Transaction**" means the restructuring transaction consummated by the Debtors on the Effective Date in the event the APA is terminated and the Sale Transaction is not consummated, pursuant to which the Post-Restructuring Debtors shall reorganize and continue to operate the Debtors' business in the ordinary course.

**1.229** "**Restructuring Transaction Toggle Notice**" means, in the event the APA is terminated and the Sale Transaction is not consummated, that certain notice to be filed as soon as reasonably practicable following termination of the APA, informing parties-in-interest of the termination of the APA and the Debtors' election to pursue a Restructuring Transaction.

**1.230** "**Retained Medical Records**" has the meaning set forth in Article IV.N hereof.

**1.231** "**Retained Records**" has the meaning set forth in Article IV.N hereof.

**1.232** "**Rochester Manor Borrower**" means 40 Whitehall Road Property LLC, a Debtor.

**1.233** "**Rochester Manor HUD Lender**" means Berkadia Commercial Mortgage LLC.

**1.234** "**Rochester Manor HUD Note**" means that certain *Healthcare Facility Note*, dated as of December 1, 2016 issued by the Rochester Manor HUD Lender.

**1.235** "**Rochester Manor HUD Note Claim**" means any Secured Claim arising from or based upon the Rochester Manor HUD Note.

**1.236** "**Sale Order**" means the *Order (I) Approving the Asset Purchase Agreement Between the Debtors and 101 W State Street Holdings LLC; (II) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts*

34

*and Unexpired Leases in Connection Therewith; and (IV) Granting Related Relief*, dated January 26, 2026 [Docket No. 2204].

**1.237** "**Sale Proceeds**" means the proceeds of the Sale Transaction.

**1.238** "**Sale Transaction**" means the Debtors' sale of substantially all Assets to the Buyer, as approved by the Sale Order and as set forth in the Sale Transaction Documents.

**1.239** "**Sale Transaction Documents**" means the definitive documents to effectuate the Sale Transaction, including, but not limited to, the APA, the Buyer OTA, the Buyer Promissory Note, the Sale Order, and the Buyer TSA(s).

**1.240** "**Scheduled**" means, with respect to any Claim, the status and amount, if any, of that Claim as set forth in the Schedules.

**1.241** "**Schedules**" means the respective schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors on September 10, 2025 in accordance with Bankruptcy Code section 521 and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended on or prior to the Effective Date.

**1.242** "**SEC**" means the Securities and Exchange Commission of the United States.

**1.243** "**Secured Claim**" means a Claim against the Debtors or their Estates (a) secured by a Lien on Collateral or (b) subject to set off under Bankruptcy Code section 553, to the extent of the value of the Collateral or to the extent of the amount subject to setoff, as applicable, as determined in accordance with Bankruptcy Code section 506(a); *provided, however*, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim unless, in any such case, the Class of which such Claim is a part makes a valid and timely election in accordance with Bankruptcy Code section 1111(b) to have such Claim treated as a Secured Claim to the extent Allowed.

**1.244** "**Securities Act**" means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as amended, and any similar federal, state or local law.

**1.245** "**Sources and Uses**" means that certain sources and uses setting forth the appropriate Claim and Cash reserves, as applicable, required by the terms of the Plan, which shall be attached to the Disclosure Statement as Exhibit D, as may be amended or modified and included in the Plan Supplement.

**1.246** "**Special Investigation Committee**" means the committee of the Genesis Board, composed of Mr. Jonathan F. Foster and Ms. Elizabeth LaPuma in their capacity as Independent Directors, to which the Genesis Board delegated, among other things, the sole and exclusive authority to continue to conduct the Independent Investigation and make recommended factual findings as to the merits and value of any potential claims against any Investigation Related Parties.

**1.247** "**Special Restructuring Committee**" means the committee of the Genesis Board composed of Mr. Jonathan F. Foster, Ms. Elizabeth LaPuma, and Mr. William K. Snyder as voting members, and the Debtors' Co-CROs (Mr. Louis E. Robichaux IV and Mr. Russell A. Perry) as non-voting advisory members, to which the Genesis Board delegated certain rights, authority, and powers in connection with, among other things, any matter relating to the sale process or the restructuring process involving the Debtors.

**1.248** "**State Street**" means 101 W State Street Holdings LLC, a Delaware limited liability company.

**1.249** "**Statutory Fees**" means any fees due and payable pursuant to section 1930 of Title 28 of the United States Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the United States Code, to the extent applicable.

**1.250** "**Subordinated Claim**" means any Claim that is subject to (i) subordination under Bankruptcy Code section 510(b); (ii) subordination under Bankruptcy Code section 509(c) on account of subrogation; or (iii) equitable subordination as determined by the Court in a Final Order (including in connection with the WAX/MAO Complaint), including, without limitation, the ReGen Indebtedness Claim, a Penalty Claim, or any Claim for or arising from the rescission of a purchase, sale, issuance, or offer of a security of any Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement, indemnification, or contribution allowed under Bankruptcy Code section 502 on account of such Claim.

**1.251** "**Substantial Contribution Claim**" means a Claim under Bankruptcy Code sections 503(b)(3), (b)(4), or (b)(5) for compensation or reimbursement of expenses incurred in making a substantial contribution in the Chapter 11 Cases, which must be asserted in compliance with Article II.B hereof.

**1.252** "**Unclaimed Distribution**" means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

**1.253** "**Unclaimed Distribution Deadline**" means ninety (90) days from the date the Liquidation Trust makes a Distribution of Cash or other property under the Plan to a Holder of an Allowed Claim.

**1.254** "**Unexpired Lease(s)**" means an unexpired lease to which a Debtor is party that is subject to assumption or rejection under Bankruptcy Code section 365.

**1.255** "**Unimpaired**" means, when used in reference to a Claim or a Class, a Claim or a Class that is not impaired within the meaning of Bankruptcy Code section 1124.

**1.256** "**Unliquidated Claims Procedures**" means the mandatory unliquidated claims resolution procedures previously approved through the Unliquidated Claims Procedures Order, as subsequently modified by the Debtors in consultation with the Creditors' Committee and provided in the Plan Supplement.

**1.257** "**Unliquidated Claims Procedures Order**" means the *Order (I) Approving and Authorizing Mandatory Unliquidated Claim Procedures to Resolve Professional Liability and*

*General Liability Claims; (II) Requiring the Debtors' Insurers to Satisfy Their Obligations under the Applicable Policies; and (III) Granting Related Relief* [Docket No. 1527], dated November 6, 2025.

1.258  **"U.S. Trustee"** means the Office of the United States Trustee for Region 6.

1.259  **"Voting Deadline"** means September 21, 2026, at 5:00 p.m. (prevailing Central Time), the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted, as set forth by the Disclosure Statement Order, or such later date as may be agreed to by the Debtors and the Creditors' Committee in accordance with the provisions of the Disclosure Statement Order.

1.260  **"WAX"** means WAX Dynasty Partners LLC.

1.261  **"WAX/MAO Complaint"** means the *Complaint of Debtors and the Statutory Unsecured Claimholders' Committee Objecting to Claims Filed by WAX Dynasty Partners LLC and MAO 22322 LLC* [Adv. Proc. Docket No. 1], dated March 18, 2026.

1.262  **"WAX & MAO Unsecured Notes"** means, collectively, (a) that certain Split Note (Consolidated A-1), dated September 30, 2024 and amended on December 31, 2024, by and among Debtor SHG Resources, LLC, as borrower, and WAX, as lender, (b) that certain Split Note (Consolidated A-2), dated September 30, 2024 and amended on December 31, 2024, by and among Debtor SHG Resources, LLC, as borrower, and MAO, as lender, and (c) that certain Third Amended and Restated Note A-2, dated as of February 21, 2018 and amended on January 30, 2024, February 26, 2024, June 3, 2024, and December 31, 2024, by and among Debtor SHG Resources, LLC, as borrower, and MAO, as lender.

1.263  **"WAX & MAO Unsecured Note Claim"** means any Claim arising from or based upon the WAX & MAO Unsecured Notes.

1.264  **"Welltower"** means, collectively, Welltower, Inc. and Welltower OP LLC.

1.265  **"Welltower & Omega Liquidation Trust Promissory Note"** means that certain promissory note to be issued by the Liquidation Trust on the Effective Date to the Prepetition Term Loan Agent for the benefit of Holders of any Allowed Prepetition Welltower & Omega Term Loan Claims that remain outstanding as of the Effective Date and not otherwise paid with the Sale Proceeds, the obligations of which shall be secured by a Lien on the proceeds of the Sale Transaction constituting Liquidation Trust Assets; *provided, however*, that no Liens shall attach to any of (a) the Liquidation Trust Funding Amount, (b) the Administrative and Priority Claim Reserve, (c) the Administrative PL/GL Claim Reserve, and (d) the Convenience Claim Reserve; and, *provided, further*, that, for the avoidance of doubt, no Liens shall attach to any of the Assigned Causes of Action (other than Causes of Action to collect accounts receivable or accounts) or proceeds of the foregoing, and the form of which shall be included with the Plan Supplement.

1.266  **"White Oak"** means White Oak Healthcare Finance, LLC.

**1.267** **"Wind-Down"** means, following consummation of the Sale Transaction, the wind-down and administration of the Post-Restructuring Debtors and the Estates and the post-Effective Date functions of the Wind-Down Trustee as described in more detail in Article IV.C hereof.

**1.268** **"Wind-Down Reserve"** means, following consummation of the Sale Transaction, Ten Million Dollars ($10,000,000.00) in Cash and Cash Equivalents to be funded into a segregated account established by the Debtors on the Effective Date and to be used from and after the Effective Date by the Wind-Down Trustee in furtherance of the Wind-Down; *provided, however*, that to the extent that the Wind-Down Reserve is exhausted prior to completion of the Wind-Down, the Wind-Down Trustee may request additional funding in furtherance of the Wind-Down from the Liquidation Trust.

**1.269** **"Wind-Down Trust"** means, following consummation of the Sale Transaction, the Entity to be created on or prior to the Effective Date by the Debtors, but in no event later than the date on which the Liquidation Trust is created, in accordance with the provisions of 0 hereof and the Wind-Down Trust Agreement.

**1.270** **"Wind-Down Trust Agreement"** means, following consummation of the Sale Transaction only, the trust agreement, in form and substance satisfactory to the Debtors, subject to the consent of the Creditors' Committee (which such consent shall not be unreasonably withheld), and substantially in the form contained in the Plan Supplement, pursuant to which the Wind-Down Trust shall, among other things, manage and administer the Wind-Down Trust Assets for the benefit of the Liquidation Trust Beneficiaries and effectuate the Wind-Down.

**1.271** **"Wind-Down Trust Assets"** means, from and after the Effective Date following consummation of the Sale Transaction, all Assets of the Post-Restructuring Debtors, including, without limitation, (a) the Post-Restructuring Debtor Equity Interests, (b) all licenses to operate Facilities (unless previously transferred to new operator(s) following requisite regulatory approval), (c) the Buyer TSA(s), (d) the Buyer OTA(s), (e) all OTAs associated with recently divested Facilities, (f) the Wind-Down Reserve, (g) the Retained Medical Records, (h) the Retained Records, and (i) any remaining Assets in each Debtor's Estate; *provided, however*, that, under no circumstances, shall Wind-Down Trust Assets include (a) the Liquidation Trust Funding Amount or (b) the Assigned Causes of Action; and, *provided, further*, that, once the Wind-Down is complete, all remaining Wind-Down Trust Assets shall be transferred to the Liquidation Trust by the Wind-Down Trustee.

**1.272** **"Wind-Down Trust Board"** means, following consummation of the Sale Transaction, the board of directors of the Wind-Down Trust, the members of which shall be designated by the Creditors' Committee, subject to the consent of the Debtors (which consent shall not be unreasonably withheld).

**1.273** **"Wind-Down Trust Interests"** means, following consummation of the Sale Transaction only, the beneficial interests in the Wind-Down Trust to be held by the Liquidation Trust and to be deemed to be allocated to the Liquidation Trust Beneficiaries pursuant to the terms and conditions hereof.

38

**1.274** **"Wind-Down Trustee"** means, following consummation of the Sale Transaction only, the Person or Entity designated by the Debtors, subject to the consent of the Creditors' Committee (which such consent shall not be unreasonably withheld), to administer and wind down each Debtor's remaining business operations subject to the terms of the Wind-Down Trust Agreement, as described in more detail in 0 hereof.  The identity and compensation of the Wind-Down Trustee shall be set forth in the Plan Supplement.

**B.      Rules of Interpretation and Construction**

For purposes of the Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan, the Disclosure Statement, or the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified herein, the rules of construction set forth in Bankruptcy Code section 102 shall apply; (10) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (11) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (12) any effectuating provisions may be interpreted by the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee (as applicable) in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (13) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (14) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (15) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

**C.      Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.  If the date on which a transaction may occur pursuant to the

Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

### D.      Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### E.      Controlling Document

In the event of an inconsistency between the information contained in the Disclosure Statement, the Plan, the Plan Supplement, and any other instrument or document created or executed pursuant thereto, the terms and provisions contained in the Plan shall control.  The provisions of the Plan and the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

### F.      Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) and except as otherwise provided herein or therein, the laws of (i) the State of Texas shall govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with the Plan and (ii) the state of incorporation of the Debtors shall govern corporate governance matters with respect to the Debtors, in either case without giving effect to the principles of conflicts of law thereof.

**ARTICLE II.**
**TREATMENT AND ALLOWANCE OF UNCLASSIFIED CLAIMS**

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Professional Fee Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

### A.      Administrative Expense Claims

On the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim becomes an Allowed Claim, except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each Holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim) shall be entitled to receive, in full satisfaction, settlement, discharge, and release of, and in exchange for, such Claim, either (i) Cash in an amount equal to the full amount of such Allowed Administrative Expense Claim, or (ii) such other treatment consistent with the provisions of Bankruptcy Code section 1129(a)(9). For the avoidance of doubt, Holders of Administrative PL/GL Claims shall only be considered Allowed to the extent liquidated through the Unliquidated Claims Procedures.

40

Following consummation of the Sale Transaction, any Allowed Administrative Expense Claims (including Administrative PL/GL Claims to the extent Allowed following liquidation through the Unliquidated Claims Procedures) shall be paid by the Liquidation Trustee from the Liquidation Trust Assets, including, without limitation, the Administrative and Priority Claim Reserve, the Administrative PL/GL Reserve, and the Liquidation Trust Funding Amount, and neither the Debtors nor the Wind-Down Trust shall have any obligation with respect to such Allowed Administrative Expense Claims.  Any Allowed Administrative Expense Claim assumed by the Buyer pursuant to the Sale Order and the Sale Transaction Documents in connection with consummation of the Sale Transaction shall be, in accordance with the provisions of the APA, the sole obligation and responsibility of the Buyer (including, without limitation, Allowed Administrative Expense Claims which do not become due and payable until after the Closing Date of the Sale Transaction to the extent set forth in the APA), shall not be an obligation of the Debtors, and shall be deemed satisfied in full under the Plan.

Following consummation of a Restructuring Transaction, any Allowed Administrative Expense Claims (other than Allowed Administrative PL/GL Claims) shall be paid by the Liquidation Trustee from the Liquidation Trust Assets, including, without limitation, the Administrative and Priority Claim Reserve and the Liquidation Trust Funding Amount, and neither the Debtors nor the Wind-Down Trust shall have any obligation with respect to such Allowed Administrative Expense Claims.  Allowed Administrative PL/GL Claims shall be assumed and/or paid by the Post-Restructuring Debtors (only to the extent Allowed following liquidation through the Unliquidated Claims Procedures) in the ordinary course of business from either Cash on hand or the Administrative PL/GL Claim Reserve.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court, or as provided herein, requests for payment of Administrative Expense Claims (including Administrative PL/GL Claims) arising on April 1, 2026 and through the Effective Date, other than requests for payment of Professional Fee Claims and Independent Director Fee Claims, must be submitted by Filing a Proof of Administrative Claim with the Claims and Noticing Agent no later than the Administrative Expense Claim Bar Date pursuant to the procedures specified in the Confirmation Order, the notice of the Effective Date, or any other Order entered by the Bankruptcy Court.  The burden of proof for the allowance of Administrative Expense Claims (including Administrative PL/GL Claims) shall remain on the Holder of the asserted Administrative Expense Claim (including Administrative PL/GL Claims).

Objections to Administrative Expense Claims (including Administrative PL/GL Claims) must be Filed and served on the Debtors, the Post-Restructuring Debtors, the Liquidation Trustee, and the requesting party by the Administrative Expense Claim Objection Deadline.  Unless any party-in-interest objects to an Administrative Expense Claim by the Administrative Expense Claim Objection Deadline, such Administrative Expense Claim shall be deemed Allowed in the amount requested.  In the event that the Liquidation Trustee or any other party-in-interest objects to an Administrative Expense Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Expense Claim, unless it is otherwise prohibited from doing so under the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any other applicable law.

**Holders of Administrative Expense Claim(s) (including Administrative PL/GL Claim(s)) that are required to File and serve a request for payment of such Administrative**

**Expense Claim(s) and fail to do so by the Interim Administrative Expense Claim Bar Date
or the Administrative Expense Claim Bar Date, as applicable, shall be forever barred,
estopped, and enjoined from asserting such Administrative Expense Claims (including
Administrative PL/GL Claims) against the Debtors or their Estates, and such Administrative
Expense Claims (including Administrative PL/GL Claims) shall be deemed disallowed,
compromised, settled, and released as of the Effective Date.**

### B.      Substantial Contribution Claims

Any Person or Entity that wishes to make a Substantial Contribution Claim based on facts
or circumstances arising after the Petition Date must File an application with the Clerk of the
Bankruptcy Court, on or before the Administrative Expense Claim Bar Date, and serve such
application on the Debtors, the Post-Restructuring Debtors, the Creditors' Committee, the
Liquidation Trustee, their respective counsel, and the U.S. Trustee and as otherwise required by
the Bankruptcy Court and the Bankruptcy Code, or be forever barred, estopped, and enjoined from
seeking such compensation or expense reimbursement.   Objections, if any, to a Substantial
Contribution Claim must be Filed no later than the Administrative Expense Claim Objection
Deadline, unless otherwise extended by Order of the Bankruptcy Court.

### C.      DIP Claims

As of the Effective Date, the DIP Claims shall be deemed Allowed in an amount equal to
the aggregate amount of the then-outstanding DIP Facility Obligations, including (a) the principal
amount outstanding under the DIP Loans on such date, (b) all interest accrued and unpaid thereon
through and including the date of payment, calculated at the non-default rate of interest, and (c) all
accrued and unpaid fees, discounts, expenses, costs, charges, and indemnification obligations
payable under the DIP Loan Documents.

On the Effective Date, to the extent each DIP Claim has not been previously satisfied in
full in accordance with the terms and conditions of the applicable DIP Loan Documents and/or
Sale Transaction Documents, and, except to the extent that a Holder of a DIP Claim agrees to
different treatment, each Holder of an Allowed DIP Claim shall receive, in full satisfaction,
settlement, discharge, and release of, and in exchange for, such Claim, payment in full in Cash in
the amount of its Allowed DIP Claim by the Debtors.  All adequate protection granted and Liens
and security interests granted to secure the DIP Claims shall be automatically terminated and of
no further force and effect without any further notice to or action, order, or approval of the
Bankruptcy Court or any other Entity.  Notwithstanding anything to the contrary in the Plan or the
Confirmation Order, the provisions of the DIP Loan Documents that expressly survive termination
or maturity of the DIP Credit Agreement shall continue in full force and effect after the Effective
Date in accordance with the terms thereof.

All reasonable and documented unpaid fees and expenses of the DIP Lenders, to the extent
payable pursuant to the DIP Loan Documents, shall be paid in full in Cash pursuant to the DIP
Documents, without any requirement to File a fee application with the Bankruptcy Court or for the
Bankruptcy Court's review or approval.

**D.      Professional Fee Claims**

**1.      Final Fee Applications and Payment of Professional Fee Claims**

Final Fee Applications shall be Filed by each Professional (other than OCPs, which are not required to submit Final Fee Applications) no later than the Professional Fee Claim Bar Date. Objections, if any, to the Final Fee Applications must be Filed and served on the Post-Restructuring Debtors and their counsel, the Wind-Down Trustee and its counsel (if applicable), the requesting Professional, and the U.S. Trustee no later than the Professional Fee Claim Objection Deadline.  The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Orders of the Bankruptcy Court; *provided, however*, that, if no objections are filed to a Final Fee Application by the Professional Fee Claim Objection Deadline, the Bankruptcy Court may enter an Order Allowing and approving the payment of such Professional Fee Claims without further notice and a hearing.

**2.      Professional Fee Escrow Account**

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall fund the Professional Fee Escrow Account with Cash (which shall be paid from the Sale Proceeds following the consummation of the Sale Transaction and Cash on hand following the consummation of the Restructuring Transaction) equal to the Professional Fee Estimate, which estimates shall be provided to the Debtors at least five (5) calendar days prior to the commencement of the Confirmation Hearing.

The Debtors shall escrow such estimated amounts in the Professional Fee Escrow Account (less any retainers), which shall be held in trust for the benefit of the Holders of the Professional Fee Claims until the Final Fee Applications related thereto are resolved by Final Order or agreement of the parties and for no other parties until all Allowed Professional Fee Claims have been paid in full.  Funds held in the Professional Fee Escrow Account shall not be deemed to be property of the Estates or property of the Liquidation Trust or the Wind-Down Trust and shall transfer to the Liquidation Trust as Liquidation Trust Assets only after all Allowed Professional Fee Claims have been irrevocably paid in full.

Professional Fee Claims shall be paid in full in Cash by the Post-Restructuring Debtors or the Wind-Down Trustee, as applicable, from the Professional Fee Escrow Account in such amounts as are Allowed by the Bankruptcy Court (a) on or as soon as reasonably practicable after the date upon which a Final Order relating to any such Allowed Professional Fee Claim is entered, (b) on such other terms as may be mutually agreed upon between the Holder of such an Allowed Professional Fee Claim and the Post-Restructuring Debtors or the Wind-Down Trustee, as applicable, or (c) in accordance with any Order of the Bankruptcy Court.  The obligations of the Debtors, the Post-Restructuring Debtors and the Wind-Down Trustee, as applicable, with respect to Professional Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Professional Fee Escrow Account.  To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Allowed Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Article II.A hereof.  No Liens,

Claims, or Interests shall encumber the Professional Fee Escrow Account in any way, other than the customary Liens in favor of the depository bank at which the Professional Fee Escrow Account is maintained.  When such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall be promptly transferred to the Liquidation Trust without any further action or order of the Bankruptcy Court.

The Post-Restructuring Debtors and the Wind-Down Trustee, as applicable, shall be authorized and directed to act or refrain from acting on the representations of the Professionals with respect to any payments made from the Professional Fee Escrow Account, which are consistent with the Debtors' Books and Records and shall not be held liable for acting or refraining to act pursuant to any such representations.

### 3.        Post-Effective Date Fees and Expenses

The Professionals employed by the Debtors, the Creditors' Committee, the PCOs, the Special Investigation Committee, and the Special Restructuring Committee shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for the preparation and filing of Final Fee Applications, which shall be included in the Professional Fee Estimate provided by each Professional prior to the Confirmation Hearing.  Any time or expenses incurred in the preparation, filing and prosecution of Final Fee Applications shall be disclosed by each Professional in its Final Fee Application, shall be subject to approval of the Bankruptcy Court, and, if approved, shall be paid out of the Professional Fee Escrow Account.  Any Professionals' request for reasonable compensation and reimbursement of actual, necessary expenses incurred in connection with the prosecution of a Final Fee Application shall be subject to the U.S. Supreme Court's holding in *Baker Botts L.L.P. v. Asarco LLC*, 576 U.S. 121 (2015) and all applicable related case law, without prejudice to any parties' right to argue that such decision is or is not applicable to any such request.  Notwithstanding the foregoing, the Professionals of the Creditors' Committee shall be entitled to be compensated from the Professional Fee Escrow Account or the Liquidation Trust Assets, as applicable, for reasonable fees and expenses incurred in connection with services provided post-Effective Date, as set forth in Article XI.F hereof.

Upon the Effective Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331, 363, and 1103 in seeking retention or compensation for services rendered after such date shall terminate, and, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee (as applicable) may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to, or action, Order, or approval of, the Bankruptcy Court; *provided, however*, that any contingency fee or litigation financing arrangements will remain subject to Bankruptcy Court approval, and, to the extent agreed upon by the Debtors and the Creditors' Committee, will be provided for in the Liquidation Trust Agreement.

### E.        Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim shall be entitled to receive Distributions in an amount equal to the full amount of such Allowed Priority Tax Claim.  On, or as soon thereafter as is reasonably practicable, the latest to occur of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (ii) the first Business Day that is thirty

44

(30) days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course, except to the extent that (a) a Holder of an Allowed Priority Tax Claim, and (b)(i) the Debtors or the Liquidation Trustee, as applicable, or (b)(ii) to the extent related to an Allowed Priority Tax Claim assumed by the Buyer pursuant to the Sale Transaction Documents, the Buyer, agree to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall be entitled to receive, in full satisfaction, settlement, discharge, and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of (a) the Debtors or the Liquidation Trustee, as applicable, or (b) to the extent related to an Allowed Priority Tax Claim assumed by the Buyer pursuant to the Sale Transaction Documents, the Buyer: (i) Cash equal to the amount of such Allowed Priority Tax Claim; (ii) such other less favorable treatment as to which (a)(i) the Debtors or the Liquidation Trustee, as applicable, or (a)(ii) to the extent related to an Allowed Priority Tax Claim assumed by the Buyer pursuant to the Sale Transaction Documents, the Buyer, and (b) the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing; (iii) such other treatment such that it will not be Impaired pursuant to Bankruptcy Code section 1124; or (iv) pursuant to and in accordance with Bankruptcy Code sections 1129(a)(9)(C) and 1129(a)(9)(D), Cash in equal quarterly installments, commencing on the first (1st) Business Day following the Effective Date and ending on the fifth (5th) anniversary of the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and (a) the Debtors or the Liquidation Trustee, as applicable, or (b) to the extent related to an Allowed Priority Tax Claim assumed by the Buyer pursuant to the Sale Transaction Documents, the Buyer; *provided, however*, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court.  Any installment payments to be made pursuant to clause (iv) above shall be made in equal quarterly Cash payments beginning on the first (1st) Business Day following the Effective Date and continuing on each subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim.  For the avoidance of doubt, Allowed Priority Tax Claims shall be reconciled and paid by the Liquidation Trustee from the Liquidation Trust Assets, unless otherwise provided for herein, following consummation of a Sale Transaction or a Restructuring Transaction.

Notwithstanding the foregoing, any Priority Tax Claim that is expressly assumed or agreed to be paid by the Buyer pursuant to the Sale Transaction Documents, including the Assumed Priority Tax Claims, shall not be an obligation of the Debtors or the Liquidation Trust following consummation of the Sale Transaction and shall be satisfied by the Buyer or its respective designee in accordance with the Sale Transaction Documents.

The Priority Tax Claims Savings Amount shall be paid by the Buyer to the Liquidation Trust in accordance with the Sale Transaction Documents in the event the amount of Assumed Priority Tax Claims is determined by the Bankruptcy Court in one or more Final Orders to be less than Twenty-Eight Million Dollars ($28,000,000.00).  For the avoidance of doubt, the Priority Tax Claims Savings Amount is applicable only following consummation of the Sale Transaction and shall not be paid by the Buyer if the APA is terminated.

The Debtors or the Liquidation Trustee, as applicable, shall use their reasonable best efforts to have all such Assumed Priority Tax Claims treated as General Unsecured Claims, using counsel chosen by the Buyer.

Notwithstanding anything to the contrary herein, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss shall be treated as a Penalty Claim and the Holder (other than as the Holder of a Penalty Claim) may not assess or attempt to collect such penalty from the Debtors or their respective property.

## F.    Priority Non-Tax Claims

On, or as soon as is reasonably practicable following the latest to occur of (i) the Effective Date, (ii) the date such Priority Non-Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between the Debtors or the Liquidation Trustee, and the Holder of such Allowed Priority Non-Tax Claim, except to the extent such Holder and the Debtors or the Liquidation Trustee, as applicable, agree to less favorable or alternative treatment in writing, and only to the extent that such Allowed Priority Non-Tax Claim has not been paid in full prior to the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall be entitled to receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Non-Tax Claim, at the option of (a) the Debtors or the Liquidation Trustee, as applicable, or (b) to the extent related to an Allowed Priority Non-Tax Claim assumed by the Buyer pursuant to the Sale Transaction Documents, the Buyer: (i) payment in full in Cash; or (ii) such other treatment rendering its Allowed Priority Non-Tax Claim Unimpaired in accordance with Bankruptcy Code section 1129(a)(9)(C).  For the avoidance of doubt, to the extent funded by the Debtors on the Effective Date, Allowed Priority Non-Tax Claims shall be reconciled and paid by the Liquidation Trustee from the Liquidation Trust Assets, unless otherwise provided for herein, following consummation of a Sale Transaction or a Restructuring Transaction.

Notwithstanding the foregoing, in accordance with the Sale Transaction Documents, liabilities for self-insured medical Claims and payroll obligations incurred in the ordinary course of business that are unpaid as of the Closing Date, but not payable until after the Closing Date, excluding personal injury or general liability Claims, shall be assumed by the Buyer or its respective designee in an amount not to exceed Ninety-One Million Dollars ($91,000,000.00) and such amount shall not be an obligation of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust if the Sale Transaction is consummated.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

## A.    Summary of Classification of Claims and Interests

Pursuant to Bankruptcy Code sections 1122 and 1123(a)(1), all Claims against and Interests in the Debtors (except for Claims addressed in Article II hereof) are classified for the purposes of voting and Distribution pursuant to the Plan, as set forth herein.  A Claim or an Interest shall be deemed classified in a particular Class only to the extent that such Claim or Interest qualifies within

46

the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class.

A Claim or an Interest is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date. Except as otherwise specifically provided for herein, the Confirmation Order, or any other Order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed one hundred percent (100%) of the underlying Allowed Claim.

Bankruptcy Code section 1129(a)(10) shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; *provided*, *however*, that, in the event no Holder of a Claim with respect to a specific Class timely submits a Ballot in compliance with the deadline established by the Bankruptcy Court indicating acceptance or rejection of the Plan, such Class will be deemed to have rejected the Plan. The Debtors may seek Confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) with respect to any rejecting Class of Claims or Interests.

All Claims and Interests (other than Administrative Expense Claims (including Administrative PL/GL Claims), DIP Claims, Priority Tax Claims, Priority Non-Tax Claims, and Professional Fee Claims) are placed in the following Classes for all purposes, including, without limitation, for voting, Confirmation, and Distribution pursuant to the Plan and Bankruptcy Code sections 1122 and 1123(a)(1):

| Class | Claim / Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Prepetition ABL Claims | Impaired | ***Entitled to Vote*** |
| 2 | Rochester Manor HUD Note Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | IRS Secured Claims | Impaired | ***Entitled to Vote*** |
| 4 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5-A | Prepetition Welltower & Omega Term Loan Claims | Impaired | ***Entitled to Vote*** |
| 5-B | Prepetition WAX & MAO Term Loan Claims | Impaired | ***Entitled to Vote*** |
| 6-A | General Unsecured Claims (GUC Distribution Group 1) | Impaired | ***Entitled to Vote*** |
| 6-B | General Unsecured Claims (GUC Distribution Group 2) | Impaired | ***Entitled to Vote*** |
| 6-C | General Unsecured Claims (GUC Distribution Group 3) | Impaired | ***Entitled to Vote*** |

| Class | Claim / Interest | Status | Voting Rights |
|---|---|---|---|
| 6-D | General Unsecured Claims (GUC Distribution Group 4) | Impaired | ***Entitled to Vote*** |
| 7 | WAX & MAO Unsecured Note Claims | Impaired | ***Entitled to Vote*** |
| 8 | Convenience Claims | Impaired | ***Entitled to Vote*** |
| 9 | Subordinated Claims | Impaired | Not Entitled to Vote (Deemed Not to Accept) |
| 10-A | Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed Not to Accept) |
| 10-B | Non-Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed Not to Accept) |
| 11 | Existing Common Equity Interests | Impaired | Not Entitled to Vote (Deemed Not to Accept) |
| 12 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed Not to Accept) |

**B.      Treatment of Claims and Interests**

**1.      Class 1: Prepetition ABL Claims**

(a)      Classification: Class 1 consists of all Prepetition ABL Claims.

(b)      Allowance: On the earlier to occur of (i) the Closing Date or (ii) the Effective Date, as applicable, the Prepetition ABL Claims shall be deemed Allowed in the aggregate amount of $268.8 million.[5]

(c)      Treatment:

      i.      ***If the Sale Transaction is Consummated***: On the Closing Date, pursuant to the terms of the Sale Transaction Documents, the Allowed Prepetition ABL Claim (exclusive of any interest accrued at the default rate) shall, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Prepetition ABL Claim, be deemed discharged in full by the Buyer upon consummation of the Sale Transaction.  Following consummation

---

[5]      The foregoing amount reflects the estimated dollar amount of Prepetition ABL Claims as of the Closing Date of the Sale Transaction and remains subject to further adjustment, including potential indemnification claims asserted by new operators as described in the Disclosure Statement.  The Debtors and the Creditors' Committee reserve all rights to reconcile and object to the potential indemnification claims.

of the Sale Transaction, all Allowed Prepetition ABL Claims shall be deemed satisfied in full under the Plan, shall not be an obligation of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, and the Holder(s) thereof shall not be entitled to any Distributions on account of such Claims pursuant to the Plan.

ii. ***If the Restructuring Transaction is Consummated***: On, or as soon as reasonably practicable after, the Effective Date, the Prepetition ABL Agent, on behalf of each Holder of an Allowed Prepetition ABL Claim, shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, one of the following from the Post-Restructuring Debtors: (a) Reinstatement of such Claim (exclusive of any interest accrued at the default rate), (b) payment in full in Cash (exclusive of any interest accrued at the default rate) of such Claim, or (c) deferred payments in Cash pursuant to the terms of a seven (7)-year promissory note to be issued by the Post-Restructuring Debtors on the Effective Date to the Prepetition ABL Agent for the benefit of Holders of Allowed Prepetition ABL Claims outstanding as of the Effective Date, which shall (i) be issued in the original principal amount of $268.8 million (or such other amount as determined by the Bankruptcy Court), and (ii) otherwise have terms and conditions consistent with Bankruptcy Code section 1129(b)(2)(A).

(d) <u>Voting</u>: Class 1 is Impaired, and therefore, the Holder of the Prepetition ABL Claim in Class 1 is entitled to vote to accept or reject the Plan.

**2. Class 2: Rochester Manor HUD Note Claim**

(a) <u>Classification</u>: Class 2 consists of the Rochester Manor HUD Note Claim.

(b) <u>Treatment</u>:

i. ***If the Sale Transaction is Consummated***: On the Closing Date, pursuant to the terms of the Sale Transaction Documents, the Allowed Rochester Manor HUD Note Claim shall, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Rochester Manor HUD Note Claim, be assumed or otherwise satisfied in full by the Buyer. Accordingly, following such assumption, the Allowed Rochester Manor HUD Note Claim shall be deemed satisfied in full under the Plan, shall not be an obligation of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, and the Holder thereof shall not be entitled to any Distributions on account of such Claims pursuant to the Plan.

ii. ***If the Restructuring Transaction is Consummated***: On, or as soon as reasonably practicable after, the Effective Date, the Holder of the Allowed Rochester Manor HUD Note Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, one of the following from the Post-Restructuring Debtors: (a) Reinstatement of such Claim, (b) payment in full in Cash of such Claim, or (c) such other treatment rendering such Claim Unimpaired.

(c) <u>Voting</u>: Class 2 is Unimpaired, and the Holder of the Rochester Manor HUD Note Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f).  Therefore, the Holder of the Rochester Manor HUD Note Claim in Class 2 is not entitled to vote to accept or reject the Plan.

3. **Class 3: IRS Secured Claims**

(a) <u>Classification</u>: Class 3 consists of all IRS Secured Claims.

(b) <u>Allowance</u>: On the earlier to occur of (i) the Closing Date or (ii) the Effective Date, as applicable, the IRS Secured Claims shall be deemed Allowed in an amount to be determined by the Bankruptcy Court.

(c) <u>Treatment</u>:

i. ***If the Sale Transaction is Consummated***: Unless otherwise agreed between the Holder of the IRS Secured Claims and the Buyer, the Holder of the Allowed IRS Secured Claims shall receive in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed IRS Secured Claim, payment in full in Cash by the Buyer in equal annual installments over a period ending not more than seven (7) years after such IRS Secured Claims become Allowed; *provided* that, pursuant to the Sale Transaction Documents, Buyer shall only be obligated to pay Allowed IRS Secured Claims in an aggregate amount not to exceed $90,000,000.00, and any amount over that cap shall be satisfied by the Debtors or the Liquidation Trust, as applicable.  For the avoidance of doubt, any IRS Secured Claims assumed or otherwise satisfied by the Buyer pursuant to the Sale Transaction Documents shall not be an obligation of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, and the Holder thereof shall not be entitled to any Distributions on account of such Claims pursuant to the Plan.

ii. ***If the Restructuring Transaction is Consummated***: Unless otherwise agreed between the Holder of the IRS Secured Claims and the Debtors, the Holder of the Allowed IRS Secured Claims shall

50

receive in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed IRS Secured Claim, payment in full in Cash by the Post-Restructuring Debtors in equal quarterly installments over a period ending not more than five (5) years after the Petition Date.

(d)     Voting: Class 3 is Impaired, and therefore, the Holder of the IRS Secured Claims in Class 3 is entitled to vote to accept or reject the Plan.

4.     **Class 4: Other Secured Claims**

(a)     Classification: Class 4 consists of all Other Secured Claims.

(b)     Treatment: Following consummation of either the Sale Transaction or the Restructuring Transaction, on or as soon as reasonably practicable after, the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, one of the following Distributions, in the discretion of the Liquidation Trust or the Post-Restructuring Debtors, as applicable: (a) the payment of such Holder's Allowed Other Secured Claim in full in Cash; (b) the sale or disposition proceeds of the property securing any Allowed Other Secured Claim to the extent of the value of their respective interests in such property; (c) the surrender to the Holder or Holders of any Allowed Other Secured Claim of the property securing such Claim; or (d) such other Distributions as shall be necessary to satisfy the requirements of chapter 11 of the Bankruptcy Code. For the avoidance of doubt, any Other Secured Claims assumed or otherwise satisfied by the Buyer following consummation of the Sale Transaction pursuant to the Sale Order or the Sale Transaction Documents shall be deemed satisfied in full, shall not be an obligation of the Debtors, the Post-Restructuring Debtors, or the Wind-Down Trust, or the Liquidation Trust, and the Holder of such Other Secured Claim shall not be entitled to, and shall not receive, any Distributions pursuant to the Plan on account thereof.

(c)     Voting: Class 4 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Therefore, Holders of Other Secured Claims in Class 4 are not entitled to vote to accept or reject the Plan.

5.     **Class 5-A: Prepetition Welltower & Omega Term Loan Claims**

(a)     Classification: Class 5-A consists of all Prepetition Welltower & Omega Term Loan Claims.

51

(b)   Allowance: On the Effective Date, the Prepetition Welltower & Omega Term Loan Claims shall be temporarily Allowed in the aggregate amount of $271.8 million.[6]

(c)   Treatment:

   i.   ***If the Sale Transaction is Consummated***: On the Effective Date, except to the extent such Holder and the Debtors (subject to the Creditors' Committee Consent Rights) or the Liquidation Trustee, as applicable, agree to alternative treatment in writing, the Prepetition Term Loan Agent, on behalf of each Holder of an Allowed Prepetition Welltower & Omega Term Loan Claim, and to the extent funded by the Debtors, shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Prepetition Welltower & Omega Term Loan Claim (exclusive of interest accrued at the default rate), payment in Cash from either the Sale Proceeds or remaining Cash on hand following any and all payments and/or reserves made pursuant to the Sources and Uses. To the extent the Sale Proceeds and remaining Cash on hand are insufficient to provide for payment in full of the Allowed Prepetition Welltower & Omega Term Loan Claim in Cash on the Effective Date, the Prepetition Term Loan Agent, on behalf of each Holder of an Allowed Prepetition Welltower & Omega Term Loan Claim, shall be paid the remaining outstanding amount of each Allowed Prepetition Welltower & Omega Term Loan Claim in full in Cash by the Liquidation Trust from the proceeds of the Welltower & Omega Liquidation Trust Promissory Note, the obligations of which shall be secured by a Lien on the proceeds of the Sale Transaction constituting Liquidation Trust Assets; *provided, however*, that no Liens shall attach to any of (a) the Liquidation Trust Funding Amount, (b) the Administrative and Priority Claim Reserve, (c) the Administrative PL/GL Claim Reserve, and (d) the Convenience Claim Reserve; and, *provided, further*, that, for the avoidance of doubt, no Liens shall attach to any of the Assigned Causes of Action (other than Causes of Action to collect accounts receivable or accounts) or proceeds of the foregoing. In the event any portion of such Prepetition Welltower & Omega Term Loan Claim is ultimately found and determined by a Final Order to be disallowed, subordinated, or unsecured pursuant to the Creditors' Committee Secured Claim Objection, then such amount of Cash or other form of Distributions to be made hereunder shall be repaid in

---

[6]   The foregoing amount reflects the estimated dollar amount of the Prepetition Welltower & Omega Term Loan Claims as of the Closing Date of the Sale Transaction and remains subject to further adjustment and, to the extent of any unauthorized Distributions, to objection and reconciliation, including, without limitation, as a result of the Creditors' Committee Secured Claim Objection.

Cash to the Liquidation Trust by the Prepetition Term Loan Agent on behalf of the applicable Holder of such Prepetition Welltower & Omega Term Loan Claim within five (5) Business Days of entry of such Final Order.

ii. ***If the Restructuring Transaction is Consummated***: On the Effective Date, except to the extent such Holder and the Debtors (subject to the Creditors' Committee Consent Rights) or the Liquidation Trustee, as applicable, agree to alternative treatment in writing, the Prepetition Term Loan Agent, on behalf of each Holder of an Allowed Prepetition Welltower & Omega Term Loan Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Prepetition Welltower & Omega Term Loan Claim (exclusive of interest accrued at the default rate), shall retain its Liens on all Assets of the Post-Restructuring Debtors, and shall be entitled to receive payments in Cash pursuant to the terms of the Post-Restructuring Term Loan Promissory Note, which note shall be issued and delivered to the Prepetition Term Loan Agent by the Post-Restructuring Debtors on the Effective Date, until such Claims are paid in full; *provided, however*, that no Liens shall attach to the Liquidation Trust Assets, other than Causes of Action to collect accounts receivable or accounts and the proceeds thereof. In the event that any portion of such Prepetition Welltower & Omega Term Loan Claim is ultimately found and determined by a Final Order of the Bankruptcy Court to be disallowed, subordinated, or unsecured pursuant to the Creditors' Committee Secured Claim Objection, then the amount owed by the Post-Restructuring Debtors to the Holders of Prepetition Welltower & Omega Term Loan Claims pursuant to the Post-Restructuring Term Loan Promissory Note shall be reduced accordingly and any amount of Cash or other form of Distributions to be made hereunder or pursuant to the Post-Restructuring Term Loan Promissory Note shall be repaid in Cash to the Liquidation Trust by the Prepetition Term Loan Agent on behalf of the applicable Holder of such Prepetition Welltower & Omega Term Loan Claim within five (5) Business Days of entry of such Final Order.

(d) <u>Voting</u>: Class 5-A is Impaired, and therefore, the Prepetition Term Loan Agent, on behalf of the Holders of Prepetition Welltower & Omega Term Loan Claims in Class 5-A, is entitled to vote to accept or reject the Plan.

**6.    Class 5-B: Prepetition WAX & MAO Term Loan Claims**

(a) <u>Classification</u>: Class 5-B consists of all Prepetition WAX & MAO Term Loan Claims, which constitute Disputed Claims.

(b)   Allowance: The Prepetition WAX & MAO Term Loan Claims are Disputed Claims pursuant to the Creditors' Committee Secured Claim Objection and the WAX/MAO Complaint and shall not be entitled to any Distributions on the Effective Date, except to the extent otherwise ordered by a Final Order of the Bankruptcy Court.  To the extent Allowed by Final Order of the Bankruptcy Court, the Holders of Prepetition WAX & MAO Term Loan Claims shall be entitled to recover as set forth below.

(c)   Treatment:

i.   ***If the Sale Transaction is Consummated***: In the event that the Prepetition WAX & MAO Term Loan Claims are avoided, Disallowed, or subordinated following adjudication of the WAX/MAO Complaint, the Holders of Prepetition WAX & MAO Term Loan Claims shall not be entitled to Distributions under the Plan.  In the event that the Prepetition WAX & MAO Term Loan Claims become Allowed Secured Claim(s) pursuant to a Final Order, the Prepetition Term Loan Agent, on behalf of such Holder(s), in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Prepetition WAX & MAO Term Loan Claims, shall receive a junior Lien on the proceeds of the Sale Transaction constituting Liquidation Trust Assets (subject to the terms hereof), and shall be paid the remaining outstanding amount of each Allowed Prepetition WAX & MAO Term Loan Claim in full in Cash by the Liquidation Trust from the Liquidation Trust Assets; *provided, however*, that no Liens shall attach to any of (a) the Liquidation Trust Funding Amount, (b) the Administrative and Priority Claim Reserve, (c) the Administrative PL/GL Claim Reserve, and (d) the Convenience Claim Reserve; and, *provided, further*, that, for the avoidance of doubt, no Liens shall attach to any of the Assigned Causes of Action (other than Causes of Action to collect accounts receivable or accounts) or proceeds of the foregoing.  In the event that the Prepetition WAX & MAO Term Loan Claims become, in whole or in part, an Allowed General Unsecured Claim pursuant to a Final Order, the Prepetition Term Loan Agent, on behalf of such Holder(s), shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Prepetition WAX & MAO Term Loan Claims, Distributions from the Liquidation Trust in Class 6-A, Class 6-B, Class 6-C, and/or Class 6-D, as applicable, in an aggregate amount equal to such Holder's Pro Rata Share of (i) the GUC Distribution Assets and the GUC Distribution Interests attributable to the applicable GUC Distribution Group in Class 6-A, Class 6-B, Class 6-C, and/or Class 6-D, as applicable, and (ii) such amounts of Cash as may be allocated to a Holder of an Allowed General Unsecured

54

Claim in such GUC Distribution Group pursuant to the GUC Distribution Model.

    ii.    ***If the Restructuring Transaction is Consummated***: To the extent that the Prepetition WAX & MAO Term Loan Claims are avoided, Disallowed, or subordinated following adjudication of the WAX/MAO Complaint, the Holders of Prepetition WAX & MAO Term Loan Claims shall not be entitled to Distributions under the Plan and the amount of the Post-Restructuring Term Loan Promissory Note shall be reduced on a dollar-for-dollar basis as a result thereof. In the event that the Prepetition WAX & MAO Term Loan Claims become Allowed Secured Claim(s) pursuant to a Final Order, the Prepetition Term Loan Agent, on behalf of such Holder(s), shall, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Prepetition WAX & MAO Term Loan Claim, (i) retain its Liens on certain of the Assets of the Post-Restructuring Debtors (other than (a) Avoidance Actions, (b) all Causes of Action except for Causes of Action to collect accounts receivable or accounts, and (c) the proceeds of each of the foregoing), and (ii) receive payments in Cash pursuant to the terms of the Post-Restructuring Term Loan Promissory Note (the amount of which shall be increased accordingly) until such Claims have been satisfied in full; *provided, however*, that no Liens shall attach to the Liquidation Trust Assets, other than Causes of Action to collect accounts receivable or accounts and the proceeds thereof. In the event that the Prepetition WAX & MAO Term Loan Claims become, in whole or in part, an Allowed General Unsecured Claim pursuant to a Final Order, the Prepetition Term Loan Agent, on behalf of such Holder(s), shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Prepetition WAX & MAO Term Loan Claims, Distributions from the Liquidation Trust in Class 6-A, Class 6-B, Class 6-C, and/or Class 6-D, as applicable, in an aggregate amount equal to such Holder's Pro Rata Share of (i) the GUC Distribution Assets and the GUC Distribution Interests attributable to the applicable GUC Distribution Group in Class 6-A, Class 6-B, Class 6-C, and/or Class 6-D, as applicable, and (ii) such amounts of Cash as may be allocated to a Holder of an Allowed General Unsecured Claim in such GUC Distribution Group pursuant to the GUC Distribution Model.

    (d)    <u>Voting</u>: Class 5-B is Impaired, and therefore, the Prepetition Term Loan Agent, on behalf of the Holders of Prepetition WAX & MAO Term Loan Claims in Class 5-B, is entitled to vote to accept or reject the Plan; *provided, however*, that, because the Prepetition WAX & MAO Term Loan Claims in Class 5-B constitute Disputed Claims pursuant to the WAX/MAO

Complaint, the Prepetition Term Loan Agent shall be entitled to cast a provisional ballot with respect to the Plan in the amount of $1.00 with respect to Holders of Prepetition WAX & MAO Term Loan Claims (which may be increased following entry of an Order pursuant to Bankruptcy Rule 3018 temporarily allowing such Claims for voting purposes only).

7. **Class 6-A: General Unsecured Claims (GUC Distribution Group 1)**

   (a) <u>Classification</u>: Class 6-A consists of all General Unsecured Claims against the OpCo Facility Debtors in GUC Distribution Group 1.

   (b) <u>Treatment</u>: Following consummation of either the Sale Transaction or the Restructuring Transaction, commencing on the Effective Date, each Holder of an Allowed General Unsecured Claim in GUC Distribution Group 1 shall be entitled to receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim in GUC Distribution Group 1, Distributions from the Liquidation Trust in an aggregate amount equal to such Holder's Pro Rata Share of (i) the GUC Distribution Assets and the GUC Distribution Interests attributable to such GUC Distribution Group and (ii) such amounts of Cash as may be allocated to a Holder of an Allowed General Unsecured Claim in such GUC Distribution Group; *provided, however*, that such Distributions shall be made subject to the GUC Distribution Model. For the avoidance of doubt, any General Unsecured Claim in GUC Distribution Group 1 assumed or otherwise satisfied by the Buyer following consummation of the Sale Transaction pursuant to terms and provisions of the Sale Order or the Sale Transaction Documents shall be deemed satisfied in full under the Plan, shall not be an obligation of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, and shall not be entitled to any Distributions under the Plan on account thereof.

   (c) <u>Voting</u>: Class 6-A is Impaired and therefore, Holders of General Unsecured Claims against the OpCo Facility Debtors in Class 6-A (GUC Distribution Group 1) are entitled to vote to accept or reject the Plan.

8. **Class 6-B: General Unsecured Claims (GUC Distribution Group 2)**

   (a) <u>Classification</u>: Class 6-B consists of all General Unsecured Claims against the Ancillary Business & JV Debtors in GUC Distribution Group 2.

   (b) <u>Treatment</u>: Following consummation of either the Sale Transaction or the Restructuring Transaction, commencing on the Effective Date, each Holder of an Allowed General Unsecured Claim in GUC Distribution Group 2 shall be entitled to receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim in GUC Distribution Group 2, Distributions from the Liquidation Trust in an aggregate amount equal to such Holder's Pro Rata Share of (i) the GUC

Distribution Assets and the GUC Distribution Interests attributable to such GUC Distribution Group and (ii) such amounts of Cash as may be allocated to a Holder of an Allowed General Unsecured Claim in such GUC Distribution Group; *provided, however*, that such Distributions shall be made subject to the GUC Distribution Model. For the avoidance of doubt, any General Unsecured Claim in GUC Distribution Group 2 assumed or otherwise satisfied by the Buyer following consummation of the Sale Transaction pursuant to terms and provisions of the Sale Order or the Sale Transaction Documents shall be deemed satisfied in full under the Plan, shall not be an obligation of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, and shall not be entitled to any Distributions under the Plan on account thereof.

(c)    Voting: Class 6-B is Impaired and therefore, Holders of General Unsecured Claims against the Ancillary Business & JV Debtors in Class 6-B (GUC Distribution Group 2) are entitled to vote to accept or reject the Plan.

9.    **Class 6-C: General Unsecured Claims (HoldCo Non-Facility Debtors)**

(a)    Classification: Class 6-C consists of all General Unsecured Claims against the HoldCo Non-Facility Debtors in GUC Distribution Group 3.

(b)    Treatment: Following consummation of either the Sale Transaction or the Restructuring Transaction, commencing on the Effective Date, each Holder of an Allowed General Unsecured Claim in GUC Distribution Group 3 shall be entitled to receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim in GUC Distribution Group 3, Distributions from the Liquidation Trust in an aggregate amount equal to such Holder's Pro Rata Share of (i) the GUC Distribution Assets and the GUC Distribution Interests attributable to such GUC Distribution Group and (ii) such amounts of Cash as may be allocated to a Holder of an Allowed General Unsecured Claim in such GUC Distribution Group; *provided, however*, that such Distributions shall be made subject to the GUC Distribution Model. For the avoidance of doubt, any General Unsecured Claim in GUC Distribution Group 3 assumed or otherwise satisfied by the Buyer following consummation of the Sale Transaction pursuant to terms and provisions of the Sale Order or the Sale Transaction Documents shall be deemed satisfied in full under the Plan, shall not be an obligation of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, and shall not be entitled to any Distributions under the Plan on account thereof.

(c)    Voting: Class 6-C is Impaired and therefore, Holders of General Unsecured Claims against the HoldCo Non-Facility Debtors in Class 6-C (GUC Distribution Group 3) are entitled to vote to accept or reject the Plan.

10.   **Class 6-D: General Unsecured Claims (GUC Distribution Group 4)**

(a)   Classification: Class 6-D consists of all General Unsecured Claims against the DivestCo Debtors in GUC Distribution Group 4.

(b)   Treatment: Following consummation of either the Sale Transaction or the Restructuring Transaction, commencing on the Effective Date, each Holder of an Allowed General Unsecured Claim in GUC Distribution Group 4 shall be entitled to receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim in GUC Distribution Group 4, Distributions from the Liquidation Trust in an aggregate amount equal to such Holder's Pro Rata Share of (i) the GUC Distribution Assets and the GUC Distribution Interests attributable to such GUC Distribution Group and (ii) such amounts of Cash as may be allocated to a Holder of an Allowed General Unsecured Claim in such GUC Distribution Group; *provided, however*, that such Distributions shall be made subject to the GUC Distribution Model. For the avoidance of doubt, any General Unsecured Claim in GUC Distribution Group 4 assumed or otherwise satisfied by the Buyer following Consummation of the Sale Transaction pursuant to terms and provisions of the Sale Order or the Sale Transaction Documents shall be deemed satisfied in full under the Plan, shall not be an obligation of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, and shall not be entitled to any Distributions under the Plan on account thereof.

(c)   Voting: Class 6-D is Impaired and therefore, Holders of General Unsecured Claims against the DivestCo Debtors in Class 6-D are entitled to vote to accept or reject the Plan.

11.   **Class 7: WAX & MAO Unsecured Note Claims**

(a)   Classification: Class 7 consists of all WAX & MAO Unsecured Note Claims, which constitute Disputed Claims. To the extent Allowed by Final Order of the Bankruptcy Court, the WAX & MAO Unsecured Note Claims shall recover as set forth below. To the extent the Court determines pursuant to a Final Order that the WAX & MAO Unsecured Note Claims should be classified as part of Class 6-C (GUC Distribution Group 3), or any other Class set forth herein, the Claims and Noticing Agent shall revise the classification of the WAX & MAO Unsecured Note Claims accordingly.

(b)   Treatment: In the event that the WAX & MAO Unsecured Note Claims are avoided, Disallowed, or subordinated, the Holders of the WAX & MAO Unsecured Note Claims shall not be entitled to Distributions pursuant to the Plan. Following consummation of either the Sale Transaction or the Restructuring Transaction, commencing on the Effective Date, unless otherwise determined by a Final Order of the Bankruptcy Court in connection with the adjudication of the WAX/MAO Complaint, each

58

Holder of an Allowed WAX & MAO Unsecured Note Claim shall be entitled to receive, on account of such Allowed WAX & MAO Unsecured Note Claim, Distributions in an aggregate amount equal to such Holder's Pro Rata Share of (i) the GUC Distribution Assets and the GUC Distribution Interests attributable to Holders of Allowed General Unsecured Claims in Class 6-C (GUC Distribution Group 3) and (ii) such amounts of Cash as may be allocated to a Holder of an Allowed WAX & MAO Unsecured Note Claim in GUC Distribution Group 3; *provided, however*, that such Distributions shall be made subject to the GUC Distribution Model.

(c)     Voting: Class 7 is Impaired, and therefore, the Holders of WAX & MAO Unsecured Note Claims in Class 7, is entitled to vote to accept or reject the Plan; *provided, however*, that, because WAX & MAO Unsecured Note Claims constitute Disputed Claims pursuant to the WAX/MAO Complaint, the Holders of WAX & MAO Unsecured Note Claims in Class 7 shall be entitled to cast a provisional ballot in the amount of $1.00 (which may be increased following entry of an Order pursuant to Bankruptcy Rule 3018 temporarily allowing such Claims for voting purposes only).

**12.     Class 8: Convenience Claims**

(a)     Classification: Class 8 consists of all Convenience Claims.

(b)     Treatment: Following consummation of either the Sale Transaction or the Restructuring Transaction, on or as soon as reasonably practicable after the Effective Date, any Holder of any Allowed General Unsecured Claim that is either (a) liquidated and equal to or less than Five Thousand Dollars ($5,000.00) or (b) unliquidated, with respect to which the Holder thereof voluntarily elects to receive (by making such election on the Ballot), in full satisfaction, settlement, discharge, and release of, and in exchange for, such Allowed General Unsecured Claim, payment in Cash from the Convenience Claim Reserve in the amount of fifty percent (50%) of the amount asserted in such Allowed General Unsecured Claim; *provided, however,* that, in the event that Holders of Allowed General Unsecured Claims elect to have such Claims be treated as Convenience Claims such that Distributions with respect to the Allowed amount thereof exceeds the amount of the Convenience Claim Reserve, such Holder shall receive Holder's Pro Rata Share of the Convenience Claim Reserve; and, *provided, further*, that, if a Holder of an unliquidated General Unsecured Claim elects to be treated as a Convenience Claim by making such election on the Ballot, such unliquidated General Unsecured Claim shall be assigned an Allowed Convenience Claim in the amount of One Thousand Five Hundred Dollars ($1,500.00).

(c)     Election: The election to be treated as a Convenience Claim must be made on the Ballot and be received by the Claims and Noticing Agent on or prior to the Voting Deadline.  Any election made after the Voting Deadline shall

59

not be binding upon the Debtors unless the Voting Deadline is expressly waived, in writing, by the Debtors; *provided, however*, that, under no circumstances may such waiver by the Debtors, in consultation with the Creditors' Committee, occur on or after the Effective Date.

(d)     Voting: Class 8 is Impaired and, therefore, Holders of Convenience Claims in Class 8 are entitled to vote to accept or reject the Plan.

**13.     Class 9: Subordinated Claims**

(a)     Classification: Class 9 consists of all Subordinated Claims, including the ReGen Indebtedness Claim and, to the extent subordinated by a Final Order pursuant to the WAX/MAO Complaint, the Prepetition WAX & MAO Term Loan Claims and the WAX & MAO Unsecured Note Claims.  To the extent the WAX/MAO Complaint results in avoidance rather than subordination of the Prepetition WAX & MAO Term Loan Claims and the WAX & MAO Unsecured Note Claims, any such avoided amounts shall be recoverable by the Liquidation Trust.

(b)     Treatment: On the Effective Date, following consummation of either the Sale Transaction or the Restructuring Transaction, each Subordinated Claim shall be cancelled, released, and extinguished, and each Holder of a Subordinated Claim shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Subordinated Claim.

(c)     Voting: Class 9 is Impaired.  Holders of Subordinated Claims are conclusively deemed to have rejected the Plan under Bankruptcy Code section 1126(g). Therefore, Holders of Subordinated Claims in Class 9 are not entitled to vote to accept or reject the Plan.

**14.     Class 10-A: Debtor Intercompany Claims**

(a)     Classification: Class 10-A consists of all Debtor Intercompany Claims.

(b)     Treatment: On, or as soon as reasonably practicable after, the Effective Date, following consummation of either the Sale Transaction or the Restructuring Transaction, each Debtor Intercompany Claim shall, at the option of the applicable Debtor(s) or the Liquidation Trustee, as applicable, be (i) Reinstated or (ii) extinguished, compromised, addressed, setoff, cancelled, or settled, potentially without any Distribution on account of such Debtor Intercompany Claim.

(c)     Voting: Holders of Debtor Intercompany Claims are either (i) Unimpaired and such Holders are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f), or (ii) Impaired, and such Holders are conclusively deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g). Therefore, Holders of Allowed Debtor

Intercompany Claims in Class 10-A are not entitled to vote to accept or reject the Plan.

15.     **Class 10-B: Non-Debtor Intercompany Claims**

(a)     Classification: Class 10-B consists of all Non-Debtor Intercompany Claims.

(b)     Treatment: On, or as soon as reasonably practicable after, the Effective Date, following consummation of either the Sale Transaction or the Restructuring Transaction, each Non-Debtor Intercompany Claim shall, at the option of the applicable Debtor(s) or the Liquidation Trustee, as applicable, be (i) Reinstated or (ii) extinguished, compromised, addressed, setoff, cancelled, or settled, potentially without any Distribution on account of such Non-Debtor Intercompany Claim.

(c)     Voting: Holders of Non-Debtor Intercompany Claims are either (i) Unimpaired and such Holders are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f), or (ii) Impaired, and such Holders are conclusively deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g). Therefore, Holders of Allowed Non-Debtor Intercompany Claims in Class 10-B are not entitled to vote to accept or reject the Plan.

16.     **Class 11: Existing Common Equity Interests**

(a)     Classification: Class 11 consists of all Existing Common Equity Interests.

(b)     Treatment: On the Effective Date, following consummation of either the Sale Transaction or the Restructuring Transaction, Existing Common Equity Interests shall be deemed cancelled and extinguished, and Holders of Existing Common Equity Interests shall receive no recovery on account of such Interests.

(c)     Voting: Class 11 is Impaired.  Holders of Existing Common Equity Interests are conclusively deemed to have rejected the Plan under Bankruptcy Code section 1126(g). Therefore, Holders of Existing Common Equity Interests in Class 11 are not entitled to vote to accept or reject the Plan.

17.     **Class 12: Intercompany Interests**

(a)     Classification: Class 12 consists of all Intercompany Interests.

(b)     Treatment: On, or as soon as reasonably practicable after, the Effective Date, following consummation of either the Sale Transaction or the Restructuring Transaction, and without the need for any further corporate or limited liability company action or approval of any board of directors, board of managers, member, manager, management, or security holders of

61

any Debtor, at the option of the applicable Debtor(s) or the Liquidation Trustee, all Intercompany Interests shall be either (i) reinstated for administrative convenience only or (ii) extinguished, compromised, addressed, setoff, cancelled, or settled.

(c)   Voting: Holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f) or deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g).  Therefore, Holders of Allowed Intercompany Interests in Class 12 are not entitled to vote to accept or reject the Plan.

## C.   Repayment of Prepetition Term Loan Claims

For the avoidance of doubt, Holders of Allowed General Unsecured Claims shall not receive any Distributions from the Liquidation Trust Assets against which Holders of Prepetition Term Loan Claims in Classes 5-A and 5-B held a Lien as of the Petition Date, including the Buyer Promissory Note, unless and until (i) Holders of Allowed Prepetition Welltower & Omega Term Loan Claims in Class 5-A are paid in full (subject to the temporary allowance provisions contained in the Class 5.A treatment section) and (ii) (A) entry of an Order by the Bankruptcy Court disallowing, avoiding, or subordinating the Prepetition WAX & MAO Term Loan Claims in Class 5-B or (B) Holders of Allowed Prepetition WAX & MAO Term Loan Claims in Class 5-B are paid in full; *provided, however*, that Holders of Allowed General Unsecured Claims, may receive Distributions from the Liquidation Trust Assets that were unencumbered as of the Petition Date, including, without limitation, unencumbered Causes of Action, prior to payment in full of Allowed Prepetition Term Loan Claims.

## D.   Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, the Confirmation Order, any other Order of the Bankruptcy Court, or any document or agreement enforceable pursuant to the terms of the Plan, nothing shall affect the rights and defenses, both legal and equitable, of the Debtors and/or the Liquidation Trust with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against any such Unimpaired Claims.

## E.   Impaired and Unimpaired Classes

Holders of Claims in Classes 2 and 4 are Unimpaired under the Plan.  Holders of Claims and Interests in Classes 1, 3, 5-A, 5-B, 6-A, 6-B, 6-C, 6-D, 7, 8, 9, and 11 are Impaired under the Plan.  Holders of Claims and Interests in Classes 10-A, 10-B, and 12 are either Unimpaired or Impaired under the Plan.

## F.   Classes Entitled to Vote

### 1.   Unimpaired Classes Not Entitled to Vote

Each Holder of a Claim or Interest in an Unimpaired Class is deemed to have accepted the Plan in accordance with Bankruptcy Code section 1126(f) and is not entitled to vote to accept or

reject the Plan. Accordingly, Holders of Claims in Classes 2 and 4 are not entitled to vote on the Plan. Depending on their treatment, Holders of Claims or Interests in Classes 10-A, 10-B, and 12 may be Unimpaired and deemed to accept the Plan pursuant to Bankruptcy Code section 1126(f) and, if so, shall not be entitled to vote to accept or reject the Plan.

### 2.    Impaired Classes Entitled to Vote

Each Holder of a Claim or Interest in an Impaired Class (not otherwise deemed not to accept the Plan) shall be entitled to vote to accept or reject the Plan. Accordingly, Holders of Claims in Classes 1, 3, 5-A, 5-B, 6-A, 6-B, 6-C, 6-D, 7, and 8 are the only Classes entitled to vote on the Plan; *provided, however*, that Prepetition WAX & MAO Term Loan Claims in Class 5-B and WAX & MAO Unsecured Claims in Class 7 are Impaired but constitute Disputed Claims pursuant to the Creditors' Committee Secured Claim Objection and the WAX/MAO Complaint, and the Holders of such Claims shall be entitled to cast provisional ballots in the amount of $1.00 (which may be increased following entry of an Order pursuant to Bankruptcy Rule 3018 temporarily allowing such Claims for voting purposes only).

### 3.    Impaired Classes Not Entitled to Vote

Each Holder of a Claim or Interest in Classes 9 and 11 is Impaired, deemed not to have accepted the Plan pursuant to Bankruptcy Code section 1126(g), and not entitled to vote to accept or reject the Plan. Depending on their treatment, Holders of Claims or Interests in Classes 10-A, 10-B, and 12 may be Impaired and deemed not to accept the Plan pursuant to Bankruptcy Code section 1126(g) and accordingly shall not be entitled to vote to accept or reject the Plan.

### 4.    Controversy Concerning Impairment

In the event of a controversy as to whether any Claim or any Class of Claims or Interests is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## G.    Acceptance by Impaired Classes

An Impaired Class of Holders of Claims shall have accepted the Plan in satisfaction of Bankruptcy Code section 1129(a)(10) if the Plan is accepted by (a) Holders of at least two-thirds (2/3) in dollar amount of the Allowed Claims actually voting in such Class and (b) Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class. An Impaired Class of Holders of Interests shall have accepted the Plan in satisfaction of Bankruptcy Code section 1129(a)(10) if the Plan is accepted by at least two-thirds (2/3) in amount of the Allowed Interests actually voting in such Class. The Debtors hereby request Confirmation of the Plan under Bankruptcy Code section 1129(b) with respect to any Class that is deemed not to accept the Plan pursuant to Bankruptcy Code section 1126(g).

## H.    Deemed Rejection if No Votes Cast

With respect to each Debtor, if a Class contains Claims eligible to vote and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be deemed rejected by the Holders of such Claims or Interests in such Class.

## I.        Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018 as of the Disclosure Statement Hearing shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies Bankruptcy Code section 1129(a)(8) with respect to such Class.

## J.        Cramdown Pursuant to Bankruptcy Code Section 1129(b)

If all applicable requirements for Confirmation of the Plan are met as set forth in Bankruptcy Code sections 1129(a)(1) through (16), except subsection (8) thereof, then the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code section 1129(b), notwithstanding the failure to satisfy the requirements of Bankruptcy Code section 1129(a)(8), on the basis that the Plan does not discriminate unfairly, and if fair and equitable, with respect to each Class of Claims that is Impaired under, and has not accepted, the Plan.  Because certain classes of Claims and Interests have been deemed not to accept the Plan, the Debtors will seek confirmation of the Plan notwithstanding the failure of certain Classes of Claims and Interests to accept the Plan.   The Debtors will seek to demonstrate satisfaction of the foregoing standard at the Confirmation Hearing.

## K.        Allowed Claims

Notwithstanding any provision herein to the contrary, the Disbursing Agent shall only make Distributions to Holders of Allowed Claims.  No Holder of a Disputed Claim, including the WAX & MAO Unsecured Note Claims and the Prepetition WAX & MAO Term Loan Claims, shall receive any Distribution on account thereof until (and then only to the extent that) its Disputed Claim becomes an Allowed Claim in whole or in part.  Pursuant to the treatment of Claims in Class 5-A, Welltower and Omega are entitled to receive Distributions, subject to the required repayment thereof by the Prepetition Term Loan Agent in the event such Claims are Disallowed (in whole or in part) pursuant to a Final Order. The Debtors and/or the Liquidation Trustee may, in their discretion, withhold Distributions otherwise due hereunder to any Holder until the Claims Objection Deadline, to enable a timely Objection thereto to be Filed.  Any Holder of a Claim that becomes an Allowed Claim, in whole or in part, after the Effective Date shall receive its Distribution in accordance with the terms and provisions of the Plan, the Wind-Down Trust Agreement, and/or the Liquidation Trust Agreement, as applicable.

## L.        Subordination of Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, contract, Bankruptcy Code section 510(b), or otherwise.  Pursuant to Bankruptcy Code section 510, the Debtors or the Liquidation Trustee, as applicable, reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance

64

with any contractual, legal, or equitable subordination relating thereto, subject in all respects to the Plan and the Final DIP Order.

**M.      Insurance**

Notwithstanding anything to the contrary in the Plan, if any Claim is subject to coverage under an Insurance Policy, including, but not limited to, the D&O Liability Insurance Policies, payments on account of such Claim will first be made from proceeds of such Insurance Policy in accordance with the terms thereof, with the balance of such Claim, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.  Nothing in the Plan or the Confirmation Order shall cause the invalidation of the Insurance Policies, including the D&O Liability Insurance Policies, or result in the loss of applicable coverage.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

In addition to the provisions set forth elsewhere in the Plan, the following shall constitute the means for implementation of the Plan:

**A.      General Settlement of Claims, Interests, and Controversies**

Pursuant to Bankruptcy Code section 1123(b)(2) and Bankruptcy Rule 9019, and in consideration for the classification, distribution, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that Holders of Claims or Interests may have with respect to any Allowed Claim or Interest or any Distribution to be made on account of such Allowed Claim or Interest, including pursuant to all Corporate Transactions implemented in accordance with the Plan.

The Plan also incorporates a proposed compromise and settlement of certain issues including whether the Estates of each of the Debtors should be treated separately for purposes of making payments to Creditors, whether and to what extent proceeds from the liquidation of Assets, including Assigned Causes of Action, or from the Sale Transaction should be allocated among the Debtors based upon their respective claims of ownership to such Assets.  The provisions of the Plan relating to administrative consolidation of the Debtors and the treatment of each Class of Claims under the Plan reflect this compromise and settlement, which, upon the Effective Date, shall be binding upon the Debtors, all Creditors, and all Entities receiving any payments or other Distributions under the Plan.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Interests, and controversies under Bankruptcy Code section 1123 and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such compromise, settlement, and transactions are in the best interests of the Debtors, their Estates, and Holders of Allowed Claims and Interests, are fair, equitable, and within the range of

65

reasonableness.  Subject to the provisions of the Plan governing Distributions, all Distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

The Debtors expressly reserve the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle any and all Claims against it and claims that it may have against other Persons and Entities at any time up to and including the Effective Date, subject to the provisions of the Creditors' Committee Standing Stipulation and Order and the Creditors' Committee Consent Rights.

## B.  Corporate Transactions

On and after the Effective Date, the Debtors, the Post-Restructuring Debtors, the Liquidation Trustee, or the Wind-Down Trustee (as applicable) shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, the Sale Transaction, the Restructuring Transaction, the Wind-Down, the Consummation of the Plan, one or more mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, purchases, or other corporate transactions (collectively, the "Corporate Transactions").  The actions to implement the Corporate Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

## C.  Sale Transaction

Following consummation of the Sale Transaction, the Liquidation Trust Assets, including the Buyer Promissory Note, will be transferred to the Liquidation Trust, the Wind-Down Trust Assets will be administered by the Wind-Down Trust, the Wind-Down Trustee will commence a Wind-Down of the Estates, and the Post-Restructuring Debtors will be dissolved under applicable law as soon as practicable thereafter, but in no event earlier than the transfer of any remaining licenses pursuant to the Sale Transaction.  As part thereof, the Liquidation Trust Assets and the Wind-Down Trust Assets will be administered and distributed as soon as practicable pursuant to the terms of the Plan, the Liquidation Trust Agreement, and the Wind-Down Trust Agreement.

## D.  Restructuring Transaction Toggle

In the event that the APA is terminated and the Sale Transaction is not consummated, the Plan provides for a toggle to a Restructuring Transaction, pursuant to which the Post-Restructuring

Debtors will reorganize on the Effective Date and continue to operate the Debtors' business as a going concern. If and only if the APA is terminated and the Sale Transaction is not consummated, the Debtors shall file the Restructuring Transaction Toggle Notice as soon as reasonably practicable following termination of the APA, informing parties-in-interest of the termination of the APA and the Debtors' election to pursue a Restructuring Transaction. The Restructuring Transaction Toggle Notice, among other things, (a) shall be deemed to extend the Voting Deadline and the Confirmation Objection Deadline by no less than twenty-one (21) days from the date set forth in the Disclosure Statement Order (as such dates may be otherwise extended pursuant to the terms thereof); (b) shall set forth a deadline for filing supplemental materials, including financial projections and related documentation, in support of the Restructuring Transaction that is no later than seven (7) days in advance of the extended Voting Deadline and the Confirmation Objection Deadline; and (c) may extend, continue, or adjourn, as applicable, other related dates and deadlines, including, without limitation, the Confirmation Hearing. If the Restructuring Transaction Toggle Notice is not filed, the Debtors shall proceed with consummation of the Sale Transaction and shall not seek approval of a Restructuring Transaction at the Confirmation Hearing.

## E.    Administrative Consolidation

The Plan is premised in part upon the administrative consolidation of the Estates of (i) the OpCo Facility Debtors, (ii) the Ancillary Business & JV Debtors, (iii) the HoldCo Non-Facility Debtors, and (iv) the DivestCo Debtors, solely for the purpose of voting, tabulation, and Distributions with respect to Holders of General Unsecured Claims and WAX & MAO Unsecured Note Claims. Such deemed consolidation shall not constitute a transfer of assets or liabilities between Debtors for any other purpose, and each Debtor shall continue to maintain its separate corporate existence for all purposes other than the treatment of General Unsecured Claims and WAX & MAO Unsecured Note Claims under the Plan.

On the Effective Date, with respect to Distributions for Allowed General Unsecured Claims and Allowed WAX & MAO Unsecured Note Claims (to the extent not otherwise avoided, Disallowed, or subordinated pursuant to the WAX/MAO Complaint) only: (1) all Allowed General Unsecured Claims or Allowed WAX & MAO Unsecured Note Claims, as applicable, against each of the Debtors in each of the GUC Distribution Groups shall be deemed merged and treated as Claims or Interests against the Debtors in such GUC Distribution Group on a consolidated basis to the extent Allowed; (2) each Allowed General Unsecured Claim or Allowed WAX & MAO Unsecured Note Claim in each respective GUC Distribution Group shall be deemed a single Claim against the Debtors in such GUC Distribution Group on a consolidated basis; (3) all guaranties by any Debtor of the obligations of any other Debtor in each GUC Distribution Group shall be deemed eliminated and extinguished so that any Allowed General Unsecured Claim or Allowed WAX & MAO Unsecured Note Claim against any Debtor in such GUC Distribution Group and any guarantee thereof executed by any Debtor and any joint or several Allowed General Unsecured Claim or Allowed WAX & MAO Unsecured Note Claim against any of the Debtors in such GUC Distribution Group shall be deemed to be one obligation of the Debtors in such GUC Distribution Group; and (4) each Holder of an Allowed General Unsecured Claim(s) or an Allowed WAX & MAO Unsecured Note Claim(s) against a Debtor in a GUC Distribution Group shall be entitled to recover on account of the aggregate amount of such Claims against all Debtors in a GUC Distribution Group in accordance with the treatment provided under the Plan for such Class,

67

regardless of whether such Holder filed Proofs of Claim against multiple Debtors or has Claims against multiple Debtors based on the same or similar debt.

The Plan's treatment shall not affect (1) any subordination provisions set forth in any agreement relating to any Claim or Interest, (2) the ability of the Liquidation Trustee, as applicable, to seek to have any Claim subordinated in accordance with Bankruptcy Code section 510 or other applicable law, (3) any aspects, rights, benefits, privileges, liens, security interests, or claims under the New Organizational Documents, or the legal and entity structure of the Debtors or the Post-Restructuring Debtors, (4) any obligations under any contracts, licenses, or leases that were entered into during the Chapter 11 Cases or Executory Contracts or Unexpired Leases that have been or will be assumed pursuant to the Plan or assumed and assigned pursuant to the Sale Transaction Documents, (5) the vesting of assets in separate Post-Restructuring Debtors, or (6) guarantees that are required to be maintained after the Effective Date, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any of the Debtors' assets.

**F.      The Wind-Down Trust**

The following section shall be applicable only in the event that the Sale Transaction is consummated and shall have no force or effect in the event the Sale Transaction is not consummated and the APA is terminated.  For the avoidance of doubt, the Wind-Down Trust shall not be established, and no Wind-Down Trustee shall be appointed, in the event that the APA is terminated and the Restructuring Transaction is consummated.

**1.      Establishment and Purpose**

On or prior to the Effective Date, but in no event later than the date on which the Liquidation Trust is created, following consummation of the Sale Transaction, the Wind-Down Trust shall be established by the Debtors in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.  The Wind-Down Trust shall be administered by the Wind-Down Trustee in accordance with the terms and provisions of the Wind-Down Trust Agreement.

The Wind-Down Trust Agreement generally will provide for, among other things: (a) the transfer of the Wind-Down Trust Assets to the Wind-Down Trust; (b) the mechanics of the use and administrative of the Wind-Down Reserve; (c) the retention of counsel, accountants, financial advisors, or other professionals; (d) the management and administration of the Wind-Down Trust Assets; and (e) as soon as reasonable practicable after the completion of the Wind-Down, the transfer of the Wind-Down Trust Assets to the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries.

**2.      Transfer of Assets**

On the Effective Date, and periodically thereafter if additional Wind-Down Trust Assets become available, the Debtors or the Post-Restructuring Debtors, as applicable, shall transfer and assign to the Wind-Down Trust all of their right, title, and interest in and to all of the Wind-Down Trust Assets and in accordance with Bankruptcy Code section 1141, all such assets shall automatically vest in the Wind-Down Trust free and clear of all Claims, Liens, and other interests,

subject only to the interests of the Liquidation Trust Beneficiaries in the Wind-Down Trust Assets. Thereupon, neither the Debtors nor the Post-Restructuring Debtors shall have any interest in or with respect to the Wind-Down Trust Assets.

### 3.    Wind-Down Trust Interests

On the Effective Date, the Liquidation Trust shall, by operation of the Plan, be deemed to have received uncertificated Wind-Down Trust Interests.  No other Person or Entity shall have any interest, legal, beneficial, or otherwise in the Wind-Down Trust Assets upon the assignment and transfer of such assets to the Wind-Down Trust.  The Liquidation Trust, in such capacity as the Holder of the Wind-Down Trust Interests, shall have no voting rights or any authority over the activities of the Wind-Down Trust.

### 4.    Wind-Down Trust Distributions

As set forth in the Wind-Down Trust Agreement, to the extent not previously made, Distributions from the Wind-Down Trust on account of the Wind-Down Trust Interests shall be made from the Wind-Down Trust to the Liquidation Trust upon the termination of the Wind-Down Trust.

### 5.    The Wind-Down Trustee

#### a.    Appointment

The identity of the Wind-Down Trustee shall be disclosed in the Plan Supplement and shall be designated by the Debtors, subject to the consent of the Creditors' Committee (which such consent shall not be unreasonably withheld).  The appointment of the Wind-Down Trustee shall be approved in the Confirmation Order, and, in the event the Sale Transaction is consummated, such appointment shall be effective as of the Effective Date.  The Wind-Down Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and the Wind-Down Trust Agreement.  In the event that the Wind-Down Trustee resigns, is removed, terminated, or otherwise unable to serve as the Wind-Down Trustee, then a successor shall be appointed as set forth in the Wind-Down Trust Agreement.  Any successor Wind-Down Trustee appointed shall be bound by and comply with the terms of the Plan, the Confirmation Order, and the Wind-Down Trust Agreement.

#### b.    Funding, Compensation, and Expenses of the Wind-Down Trust

The Wind-Down Trust Reserve shall be funded from the Sale Proceeds and shall be utilized by the Wind-Down Trust to finance the Wind-Down, including the cost of the services enumerated in Article IV.F.5.c.  All costs, expenses, and obligations incurred by the Wind-Down Trustee in administering the Plan, overseeing the Post-Restructuring Debtors, or in any manner connected, incidental or related thereto, in effecting distributions from the Post-Restructuring Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid in Cash from the Wind-Down Reserve.  The post-Effective Date compensation of the Wind-Down Trustee will be set forth in the Plan Supplement and shall be paid solely from the Wind-Down Reserve.

The Wind-Down Trustee shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Wind-Down Trustee, are necessary to assist the Wind-Down Trustee in the performance of his or her duties.  Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Wind-Down Trustee on or after the Effective Date (including taxes imposed on the Post-Restructuring Debtors) and any reasonable fees and expenses (including attorneys' fees and expenses) incurred by the Wind-Down Trustee or his or her retained professionals in connection with the Wind-Down Trustee's duties shall be paid in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash solely from the Wind-Down Reserve, as applicable, if such amounts relate to any actions taken hereunder.

The Wind-Down Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  However, in the event that the Wind-Down Trustee is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash solely from the Wind-Down Reserve.

### c.      Powers and Responsibilities

The Wind-Down Trustee shall retain and have all the rights, powers, obligations, and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order.  The Wind-Down Trustee shall be the exclusive trustee of the Wind-Down Trust Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the sole representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3)(B).

Following the Effective Date, the powers, obligations, and responsibilities of the Wind-Down Trustee shall include, but not be limited to, any and all powers and authority to implement the Plan and the Sale Transaction and wind down the business and affairs of the Debtors and the Post-Restructuring Debtors, including, but not limited to:

1)      providing revenue cycle management services, including, but not limited to, managing revenue cycle vendors, billing and collections, cash reconciliation, and refund requests;

2)      maintaining oversight of the Debtors' and the Post-Restructuring Debtors' regulatory and financial reporting compliance;

3)      providing transition services pursuant to the Buyer TSA(s) and complying with any continuing post-Closing Date obligations required under the Sale Transaction Documents, including maintaining, facilitating, and/or transitioning, as applicable, necessary licensures and governmental approvals, to the extent required thereunder, all as approved pursuant to the Sale Order;

4)      providing post-Effective Date transition services required under the Buyer TSA(s) and any OTA entered into by the Debtors and any third party during the Chapter 11 Cases or any other Order entered by the Bankruptcy Court prior to the Effective Date;

70

5)   providing financial services, including, but not limited to, cash management services, financial reporting services, payroll processing services, accounts payable and receivable processing services, and management of patient trust accounts;

6)   procuring the necessary insurance to facilitate the Wind-Down;

7)   administering employee termination and wind-down matters, including preparing and filing any employee-related tax documents, administering the Debtors' employee benefit programs, transitioning human resource matters, addressing employee bonus issues, and processing final payroll;

8)   maintaining the Professional Fee Escrow Account and making distributions to Professionals for Allowed Professional Fee Claims from the Professional Fee Escrow Account;

9)   maintaining necessary IT infrastructure, including network and server maintenance;

10)  establishing and maintaining bank accounts in the name of the Post-Restructuring Debtors;

11)  subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals, without the need for retention applications, to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary;

12)  paying all reasonable fees, expenses, debts, charges, and liabilities of the Post-Restructuring Debtors after the Effective Date;

13)  administering and paying taxes of the Post-Restructuring Debtors, including filing tax returns (to the extent not the obligation of the Buyer) and distributing information statements as required for U.S. federal income tax and other applicable tax purposes;

14)  representing the interests of the Post-Restructuring Debtors before any taxing authority in all matters, including any action, suit, proceeding, or audit;

15)  filing (i) any pre-confirmation monthly operating reports not Filed as of the Effective Date and (ii) any post-confirmation quarterly reports for the quarterly period during which the Chapter 11 Cases are closed as set forth herein, and pay Statutory Fees to the U.S. Trustee in accordance with 28 U.S.C. § 1930 for such periods (except for any Statutory Fees for such period with respect to Distributions made by the Liquidation Trustee during such period);

71

16) filing an application for entry by the Bankruptcy Court of a final decree closing the Chapter 11 Cases of the Post-Restructuring Debtors, other than the Lead Case;

17) coordinating with the Liquidation Trustee in accordance with the Liquidation Trust Agreement;

18) preparing and filing any final federal or state Medicare or Medicaid cost reports on behalf of the Post-Restructuring Debtors;

19) maintaining and distributing the Wind-Down Reserve;

20) managing, selling, administering, and monetizing the Wind-Down Trust Assets, as applicable;

21) dissolving the Post-Restructuring Debtors when appropriate; and

22) exercising such other powers as may be vested in it pursuant to Order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan and consistent with the Liquidation Trust Agreement.

### 6. Investment Powers

The right and power of the Wind-Down Trustee to invest assets transferred to the Wind-Down Trust, the proceeds thereof, or any income earned by the Wind-Down Trust, shall be limited to the right and power to invest such assets in Cash Equivalents; *provided, however*, that the scope of any such permissible investments shall be limited to include only those investments, shall be expanded to include any additional investments, as the case may be, that a liquidation trust, within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

### 7. Annual Distribution; Withholding

The Wind-Down Trustee shall distribute at least annually to the Liquidation Trust all net Cash income plus all net Cash proceeds from the liquidation of Wind-Down Trust Assets, if any (including all Cash Equivalents); *provided, however*, that the Wind-Down Trust may retain such amounts and expend the Wind-Down Trust Assets (a) as reasonably necessary to meet contingent liabilities and to maintain the value of the Wind-Down Trust Assets during liquidation, (b) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Wind-Down Trust or fees and expenses in connection with the liquidation of the Wind-Down Trust Assets), and (c) to satisfy other liabilities incurred or assumed by the Wind-Down Trust (or to which the Wind-Down Trust Assets are otherwise subject) in accordance with the Plan or the Wind-Down Trust Agreement.

**8.**      **Securities Exempt; Transferability**

The Wind-Down Trust shall be structured so as not to be subject to the Securities Act, the Securities Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended. The interests in the Wind-Down Trust, and any right to receive a distribution from the Wind-Down Trust, shall not be evidenced by any certificate, security, receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the Wind-Down Trust by the Wind-Down Trustee. The Wind-Down Trust Interests, and any rights to receive Distributions from the Wind-Down Trust, shall not constitute "securities" and shall not be registered pursuant to the Securities Act. If it is determined that such interests in the Wind-Down Trust or rights constitute "securities," the exemption provisions of Bankruptcy Code section 1145(a)(1) would be satisfied and such securities would be exempt from registration. The Wind-Down Trust Interests may not be transferred (except as otherwise provided in the Wind-Down Trust Agreement).

**9.**      **Tax Matters**

**a.**      **Post-Restructuring Debtors' Tax Returns and Tax Liability**

After the Effective Date, the Wind-Down Trustee (to the extent not the responsibility of Buyer pursuant to the Sale Transaction Documents) shall complete and file all final or otherwise required federal, state, and local tax returns for each Debtor reflecting all tax consequences relating to the activities of the Post-Restructuring Debtors as attributable to and for the account of the applicable Debtor and shall pay taxes required to be paid for any of the Debtors, their Estates, or the Post-Restructuring Debtors.  Pursuant to Bankruptcy Code section 505(b), the Wind-Down Trustee may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws.  For the avoidance of doubt, the Wind-Down Trustee shall not be responsible for preparing or filing any tax forms for Holders of Existing Common Equity Interests in the Debtors (which shall be cancelled pursuant to the Plan) but shall provide such Holders with any information reasonably required to prepare such forms.

**b.**      **Federal Income Tax**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Wind-Down Trustee of a private letter ruling if the Wind-Down Trustee (or the Debtors or the Post-Restructuring Debtors) so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Wind-Down Trustee), the Wind-Down Trustee shall file returns for the Wind-Down Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).  The Wind-Down Trustee shall also annually send to the Liquidation Trustee a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their federal income tax returns.

**c.**      **Allocations of Wind-Down Trust Taxable Income**

Allocations of Wind-Down Trust taxable income shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on Distributions described herein) if, immediately prior to such deemed

73

distribution, the Wind-Down Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the Liquidation Trust, taking into account all prior and concurrent Distributions from the Wind-Down Trust.

Similarly, taxable loss of the Wind-Down Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidation distribution of the Wind-Down Trust Assets. The tax book value of the Wind-Down Trust Assets for this purpose shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Wind-Down Trust, adjusted in either case in accordance with tax accounting principles prescribed by the Internal Revenue Code, the regulations and other applicable administrative and judicial authorities and pronouncements.

### d. Other Reporting Requirements

The Wind-Down Trustee shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Wind-Down Trust that are required by any Governmental Unit.

### 10. Termination

The Wind-Down Trust shall terminate on the earlier to occur of: (a) final liquidation, administration, and effectuation of the Wind-Down and administration of the Wind-Down Trust Assets in accordance with the terms of the Plan and the Wind-Down Trust Agreement, and its full performance of all other duties and functions as set forth in the Plan or the Wind-Down Trust Agreement; and (b) the third (3rd) anniversary of the Effective Date; *provided, however*, that, on or prior to the date that is three (3) months prior to such termination, the Bankruptcy Court, upon motion by a party-in-interest, may extend the term of the Wind-Down Trust if it is necessary to the Wind-Down. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained at least three (3) months prior to the expiration of each extended term. Upon termination of the Wind-Down Trust, all Wind-Down Assets held by the Wind-Down Trust shall be transferred to the Liquidation Trust.

### G. The Liquidation Trust

The following section shall be applicable following consummation of either the Sale Transaction or the Restructuring Transaction.

### 1. Establishment and Purpose of the Liquidation Trust

On the Effective Date, the Liquidation Trust shall be established pursuant to the Liquidation Trust Agreement for the purpose of liquidating the Liquidation Trust Assets, in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. The Liquidation Trust shall be administered by the Liquidation Trustee in accordance with the terms and provisions of the Liquidation Trust Agreement. The Liquidation Trust Agreement generally will provide for, among other things: (a) the transfer of the Liquidation Trust Assets to the Liquidation Trust; (b) the mechanics of the payment of any expenses of the Liquidation Trust; (c) the retention of counsel, accountants, financial advisors, or other professionals; (d) the litigation of any Assigned Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of

Action; and (e) making Distributions to Holders of Liquidation Trust Interests, as provided in the Plan.

### 2.      Funding, Compensation, and Expenses of the Liquidation Trust

In accordance with the Liquidation Trust Agreement and any agreements entered into in connection therewith, upon the creation of the Liquidation Trust, on or prior to the Effective Date, following consummation of the Sale Transaction or the Restructuring Transaction, the Debtors shall transfer all Liquidation Trust Assets and the Liquidation Trust Funding Amount to the Liquidation Trust.  The Liquidation Trust Funding Amount shall be funded from the Sale Proceeds following consummation of the Sale Transaction or Cash on hand following consummation of the Restructuring Transaction, as applicable, and shall be utilized by the Liquidation Trust to, among other things, review, reconcile, and object to Claims, administer the Unliquidated Claims Procedures, make Distributions to creditors, and pursue Assigned Causes of Action, as set forth in greater detail in Article IV.G.7 hereof. Upon transfer of all Liquidation Trust Assets, including the Liquidation Trust Funding Amount, the Debtors, the Post-Restructuring Debtors, and the Wind-Down Trustee (if applicable) shall have no further obligation to provide any funding with respect to the Liquidation Trust.

The post-Effective Date compensation of the Liquidation Trustee will be set forth in the Plan Supplement and shall be paid solely from the Liquidation Trust Funding Amount and proceeds of the Liquidation Trust Assets.  For the avoidance of doubt, any and all expenses of the Liquidation Trust shall be paid from the Liquidation Trust Assets and none of the Post-Restructuring Debtors, the Wind-Down Trustee (if applicable), or the Wind-Down Trust (if applicable) shall be responsible for any costs, fees, or expenses of the Liquidation Trust.

### 3.      Liquidation Trust Assets

On the Effective Date, and periodically thereafter, if additional Liquidation Trust Assets become available, in accordance with the Wind-Down Trust Agreement (if applicable), the Debtors or the Post-Restructuring Debtors, as applicable, shall transfer and assign to the Liquidation Trust all of their right, title, and interest in and to all of the Liquidation Trust Assets and in accordance with Bankruptcy Code section 1141, all such assets shall automatically vest in the Liquidation Trust free and clear of all Claims, Liens, and other interests, subject only to the interests of the Liquidation Trust Beneficiaries in the Liquidation Trust Assets and the expenses of the Liquidation Trust, as set forth in the Plan and the Liquidation Trust Agreement.  Thereupon, neither the Debtors nor the Post-Restructuring Debtors shall have any interest in or with respect to the Liquidation Trust Assets, and the Liquidation Trust shall be solely responsible for any and all costs and expenses associated with the Liquidation Trust Assets.

The transfer of the Assigned Causes of Action shall be made for the ratable benefit of the Holders of Allowed Claims in Classes 5-A and 5-B (following consummation of a Sale Transaction only and only to the extent of such Holders' Liens on the Liquidation Trust Assets), 6-A, 6-B, 6-C, 6-D, and 7 only to the extent such Holders in such Classes are entitled to Distributions under the Plan.  Upon the transfer of the Assigned Causes of Action, the Debtors shall have no interest in or with respect to the Assigned Causes of Action or the Liquidation Trust. On and after the Effective Date, except as otherwise provided for in the Plan or the Confirmation

75

Order, with respect to the Liquidation Trust Assets, the Liquidation Trust may use, acquire, or dispose of property, and compromise or settle any Assigned Causes of Action that constitute Liquidation Trust Assets.  The act of transferring the Liquidation Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such Assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidation Trust as if the Asset or right was still held by the applicable Debtor.

### 4.    Assumption of Claims by the Liquidation Trust

On the Effective Date, and except as provided in the Plan, including, without limitation, in connection with a Restructuring Transaction (other than with respect to Administrative PL/GL Claims which shall remain the responsibility of the Post-Restructuring Debtors following a Restructuring Transaction), without further action of any Person, the Liquidation Trust shall assume the liabilities, obligations, and responsibilities of the Debtors for reconciling Claims and making Distributions as set forth in the Plan and the Liquidation Trust Agreement.  The Liquidation Trustee shall implement procedures in accordance with the Liquidation Trust Agreement to reach resolution of Claims and determine the Liquidation Trust's liability for such Claims.  Distributions in accordance with the Liquidation Trust Agreement and in accordance with the procedures contemplated therein shall be the sole source of recovery, if any, against the Debtors, their Estates, or the Post-Restructuring Debtors in respect of such Claims, and the Holders of such Claims shall have no other or further recourse to the Debtors, their Estates, or the Post-Restructuring Debtors.  In furtherance of the foregoing, the Liquidation Trust, subject to and only to the extent provided in the Liquidation Trust Agreement, shall have all defenses, cross-claims, offsets, and recoupments regarding Claims that the Debtors, as applicable, have or would have had under applicable law, but solely to the extent consistent with the Liquidation Trust Agreement and the Plan.

### 5.    Valuation of Assets

As soon as possible after the creation of the Liquidation Trust, but in no event later than sixty (60) days thereafter, the Liquidation Trust Board shall inform, in writing, the Liquidation Trustee of the value of the Assets transferred to the Liquidation Trust, based on the good faith determination of the Liquidation Trust Board, and the Liquidation Trustee shall apprise, in writing, the Liquidation Trust Beneficiaries of such valuation.  The valuation shall be used consistently by all parties (including the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee (if applicable), the Liquidation Trustee, and the Liquidation Trust Beneficiaries) for all federal income tax purposes.

### 6.    Appointment of the Liquidation Trustee

The identity and compensation of the Liquidation Trustee shall be disclosed in the Plan Supplement and shall be determined by the Creditors' Committee, subject to the consent of the Debtors (which such consent shall not be unreasonably withheld).  The appointment of the Liquidation Trustee shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date.  The Liquidation Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and Liquidation Trust Agreement.  In the event that the Liquidation Trustee resigns, is removed, terminated, or otherwise unable to serve

76

as the Liquidation Trustee, then a successor shall be appointed as set forth in the Liquidation Trust Agreement. Any successor Liquidation Trustee appointed shall be bound by and comply with the terms of the Plan, the Confirmation Order, and the Liquidation Trust Agreement.

### 7. Powers, Responsibilities, and Duties of the Liquidation Trustee

(a) The Liquidation Trustee, upon direction by the Liquidation Trust Board and the exercise of their collective reasonable business judgment, shall, in an expeditious, but order, manner, liquidate, and convert to Cash the Liquidation Trust Assets, make timely Distributions, and not unduly prolong the duration of the Liquidation Trust. The liquidation of the Assigned Causes of Action may be accomplished either through the prosecution, compromise, settlement, abandonment, or dismissal of any or all of the Assigned Causes of Action, or otherwise. The Liquidation Trustee, upon direction by the Liquidation Trust Board, shall have the absolute right to pursue or not to pursue any and all Assigned Causes of Action as it determines is in the best interests of the Liquidation Trust Beneficiaries, and consistent with the purposes of the Liquidation Trust, and shall have no liability for the outcome of its decision except for any damages caused by willful misconduct, gross negligence, or fraud. The Liquidation Trustee may incur any reasonable and necessary expenses in liquidation and converting the Liquidation Trust Assets to Cash and shall be reimbursed from the Liquidation Trust Assets in accordance with the provisions of the Liquidation Trust Agreement.

(b) The Liquidation Trustee shall have the power to (i) prosecute for the benefit of Holders of Allowed Claims in Classes 5-A and 5-B (following consummation of a Sale Transaction only and only to the extent of such Holders' Liens on the Liquidation Trust Assets), 6-A, 6-B, 6-C, 6-D, and 7 all Assigned Causes of Action (whether such suits are brought in the name of the Liquidation Trust or otherwise), and (ii) to otherwise perform the functions and take the actions provided for or permitted herein or in any other agreement executed by the Liquidation Trustee pursuant to the Plan, including, but not limited to, the Liquidation Trust Agreement. Any and all proceeds generated from such Assigned Causes of Action shall be the property of the Liquidation Trust and shall be distributed in accordance with the terms hereof.

(c) The Liquidation Trust shall have the authority to administer, amend, modify, or supplement the Liquidation Trust Agreement and the procedures set forth therein in accordance with the Liquidation Trust Agreement and the terms of the Plan. Subject to and to the extent set forth in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or any other Order of the Bankruptcy Court entered in connection therewith, the Liquidation Trust and the Liquidation Trustee shall be empowered, without the need for Bankruptcy Court approval, to:

1. perform all actions and execute all agreements, instruments, and other documents necessary to effectuate the purpose of the Liquidation Trust, including the Welltower & Omega Liquidation Trust Promissory Note (if applicable);

2. establish, maintain, and administer trust accounts, which shall be segregated to the extent appropriate in accordance with the Plan;

77

3. accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the Liquidation Trust Assets in accordance with the Plan;

4. except to the extent any other Claims have already been Allowed, control and effectuate the Claims allowance and reconciliation process with respect to Claims, including to object to, seek to subordinate, recharacterize, compromise, or settle any and all such Claims against the Debtors, including Disputed Claims, pursuant to the procedures prescribed in the Plan and the Liquidation Trust Agreement

5. reconcile applicable Claims in accordance with the Unliquidated Claims Procedures;

6. replace the Debtors in any appeals in the Chapter 11 Cases pending as of the Effective Date in which the Debtors are an appellee, including, but not limited to, the appeals of the Final DIP Order, the Unliquidated Claims Procedures, and any order denying relief from the automatic stay;

7. pursue the Assigned Causes of Action, elect not to pursue any such Assigned Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Assigned Causes of Action, as is in the best interests of the Holders of Allowed Claims in Classes 5-A and 5-B (following consummation of a Sale Transaction only and only to the extent of such Holders' Liens on the Liquidation Trust Assets), 6-A, 6-B, 6-C, 6-D, and 7;

8. calculate and make Distributions of the proceeds of the Liquidation Trust Assets to Holders of Liquidation Trust Interests, in accordance with the Plan and the Liquidation Trust Agreement;

9. prepare and file appropriate tax returns and other reports on behalf of the Liquidation Trust and pay taxes or other obligations owed by the Liquidation Trust;

10. retain, compensate, and employ professionals to represent the Liquidating Trust; *provided, however*, that any contingency fee or litigation financing arrangements will remain subject to Bankruptcy Court approval;

11. exercise such other powers as may be vested in the Liquidation Trust under the Liquidation Trust Agreement and the Plan, or as are deemed by the Liquidation Trustee to be necessary and proper to

implement the provision of the Liquidation Trust Agreement and effectuate the purpose of the Liquidation Trust; and

12.     dissolve the Liquidation Trust in accordance with the terms of the Liquidation Trust Agreement.

## 8.     Liquidation Trust Distributions

Distributions from the Liquidation Trust on account of Liquidation Trust Interests shall be made from the Liquidation Trust Assets in accordance with the Plan and the Liquidation Trust Agreement.  Such Distributions shall be made after paying, reserving against, or satisfying, among other things, the operating and administrative expenses of the Liquidation Trust, including but not limited to all reasonable and documented costs, expenses, and obligations incurred by the Liquidation Trustee (or professionals who may be employed by the Liquidation Trustee in administering the Liquidation Trust) in carrying out its responsibilities to the Liquidation Trust under the Liquidation Trust Agreement, or in any manner connected, incidental, or related thereto.

## 9.     Preservation of Assigned Causes of Action

In accordance with Bankruptcy Code section 1123(b), the Liquidation Trust shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Assigned Causes of Action, whether arising before or after the Petition Date, and the Liquidation Trustee's rights to commence, prosecute, or settle such Assigned Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  For the avoidance of doubt, the Debtors, the Post-Restructuring Debtors, and their Estates shall not release any estate Causes of Action, including, but not limited to, the Assigned Causes of Action.

The Liquidation Trust may pursue the Assigned Causes of Action, as appropriate, in accordance with the best interests of Holders of Allowed Claims in Classes 5-A and 5-B (following consummation of a Sale Transaction only and only to the extent of such Holders' Liens on the Liquidation Trust Assets), 6-A, 6-B, 6-C, 6-D, and 7.  No Person or Entity may rely on the absence of a specific reference in the Plan or the Plan Supplement to any Assigned Cause of Action against it as any indication that the Liquidation Trust will not pursue any and all available Assigned Causes of Action against it.  Except as specifically released under the Plan or pursuant to a Final Order of the Bankruptcy Court, the Liquidation Trust expressly reserves all rights to prosecute any and all Assigned Causes of Action against any Entity, except as otherwise expressly provided in the Plan, the Liquidation Trust Agreement, or pursuant to a Final Order (including the Final DIP Order).  Unless any Assigned Cause of Action held against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order (including the Final DIP Order), the Liquidation Trust expressly reserves all Assigned Causes of Action, or later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to the Assigned Causes of Action upon, after, or as a consequence of Confirmation or Consummation of the Plan; *provided, however*, that nothing in the Plan modifies, extends, or otherwise tolls any applicable statute of limitations or other period of repose with respect to the Assigned Causes of Action.  The Debtors, the Special Investigation Committee, the Special Restructuring Committee, the Creditors' Committee (and each of its members), and the

79

Professionals of each of the foregoing shall be required to preserve any and all documents and communications related to the Debtors, the Chapter 11 Cases, and the Assigned Causes of Action. Nothing in the Plan shall waive any defenses, claims (including contribution, reimbursement, or indemnification claims), counterclaims, objections, or related rights of any Person or Entity with respect to such Assigned Causes of Action, all of which are expressly preserved and shall survive Confirmation and Consummation of the Plan.

The Liquidation Trust reserves and shall retain such Assigned Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with Bankruptcy Code section 1123(b)(3), and except as expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, any Assigned Causes of Action held against any Entity shall vest in the Liquidation Trust, except as otherwise expressly provided in the Plan. The Liquidation Trust, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Assigned Causes of Action. Subject to approval by the Bankruptcy Court, the Liquidation Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Assigned Causes of Action and to decline to do any of the foregoing.

### 10.    Liquidation Trust Interests

The Liquidation Trust Interests shall be uncertificated and shall be non-transferable except upon death of the Holder or by operation of law. Holders of Liquidation Trust Interests, in such capacity, shall have no voting rights or any authority over the activities of the Liquidation Trust. The Liquidation Trustee shall maintain a registry of the Holders of Liquidation Trust Interests.

On the Effective Date, each Liquidation Trust Beneficiary shall, by operation of the Plan, be deemed to have received its uncertificated Pro Rata Share of the Liquidation Trust Interests pursuant to and consistent with the treatment and distribution terms of the Plan. Liquidation Trust Interests shall be reserved for Holders of Disputed Claims and issued by the Liquidation Trust to, and held by, the Liquidation Trustee, pending allowance or disallowance of such Claims. No other Person or Entity shall have any interest, legal, beneficial, or otherwise in the Liquidation Trust Assets upon the assignment and transfer of such assets to the Liquidation Trust.

Distributions from the Liquidation Trust shall be made from the Liquidation Trust Assets after paying, reserving against, or satisfying, among other things, the operating and administrative expenses of the Liquidation Trust, including, but not limited to, costs, expenses, and obligations incurred by the Liquidation Trust and the Liquidation Trustee in fulfilling responsibilities of the Liquidation Trust and the Liquidation Trustee, respectively, or in any manner connected, incidental, or related thereto.

### 11.    Investment Powers

The right and power of the Liquidation Trustee to invest assets transferred to the Liquidation Trust, the proceeds thereof, or any income earned by the Liquidation Trust, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Article VI of the Plan) in Cash Equivalents; *provided, however*, that (a) the scope of any such

permissible investments shall be limited to include only those investments, shall be expanded to include any additional investments, as the case may be, that a Liquidation Trust, within the meaning of Treasury Regulation Section 301.7701-4(d) may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise, and (b) the Liquidation Trustee may expend the assets of the Liquidation Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidation Trust Assets during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Liquidation Trust or fees and expenses in connection with the liquidation of the Liquidation Trust Assets), and (iii) to satisfy other liabilities incurred or assumed by the Liquidation Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Liquidation Trust Agreement; *provided further* that under no circumstances shall the Liquidation Trust segregate the Liquidation Trust Assets on the basis of classification of the Holders of Liquidation Trust Interests, other than with respect to Distributions to be made on account of Disputed Claims in accordance with the provisions hereof.

### 12.     Securities Exempt; Transferability

The Liquidation Trust shall be structured so as not to be subject to the Securities Act, the Securities Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended. The interests in the Liquidation Trust, and any right to receive a distribution from the Liquidation Trust, shall not be evidenced by any certificate, security, receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the Liquidation Trust by the Liquidation Trustee. The Liquidation Trust Interests, and any rights to receive Distributions from the Liquidation Trust, shall not constitute "securities" and shall not be registered pursuant to the Securities Act. If it is determined that such interests in the Liquidation Trust or rights constitute "securities," the exemption provisions of Bankruptcy Code section 1145(a)(1) would be satisfied and such securities would be exempt from registration. The Liquidation Trust Interests may not be transferred (except as otherwise provided in the Liquidation Trust Agreement).

### 13.     Annual Distribution; Withholding

The Liquidation Trustee shall distribute at least annually to the Holders of Liquidation Trust Interests all net cash income plus all net cash proceeds from the liquidation of Liquidation Trust Assets (including as Cash for this purpose, all Cash Equivalents); *provided, however*, that the Liquidation Trust may retain such amounts (a) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidation Trust Assets during liquidation, (ii) to pay reasonable administrative expenses (including any taxes imposed on the Liquidation Trust or in respect of the assets of the Liquidation Trust), and (iii) to satisfy other liabilities incurred or assumed by the Liquidation Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Liquidation Trust Agreement. All such distributions shall be *pro rata* based on the number of Liquidation Trust Interests held by a Holder compared with the aggregate number of Liquidation Trust Interests outstanding, subject to the terms of the Plan and the Liquidation Trust Agreement. The Liquidation Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Liquidation Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

**14.**     **Tax Treatment**

  **a.**  **Federal Income Tax**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidation Trustee of a private letter ruling if the Liquidation Trustee (or the Debtors) so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee shall file returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a).  The Liquidation Trustee shall also annually send to each Holder of a Liquidation Trust Interest a separate statement setting forth the Holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their federal income tax returns.

  **b.**  **Allocations of Liquidation Trust Taxable Income**

Allocations of Liquidation Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on Distributions described herein) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the Holders of the Liquidation Trust Interests, taking into account all prior and concurrent Distributions from the Liquidation Trust (including all distributions held in escrow pending the resolution of Disputed Claims). Similarly, taxable loss of the Liquidation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidation distribution of the Assigned Causes of Action.  The tax book value of the Assigned Causes of Action for this purpose shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Liquidation Trust, adjusted in either case in accordance with tax accounting principles prescribed by the Internal Revenue Code, the regulations and other applicable administrative and judicial authorities and pronouncements.

  **c.**  **Other**

The Liquidation Trustee shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidation Trust that are required by any Governmental Unit.

**15.**  **Termination**

The Liquidation Trust shall terminate on the earlier of: (a) the final liquidation, administration, and Distribution of the Liquidation Trust Assets in accordance with the terms of the Plan and the Liquidation Trust Agreement, and its full performance of all other duties and functions as set forth in the Plan or the Liquidation Trust Agreement; and (b) the fifth (5th) anniversary of the Effective Date; *provided, however*, that, on or prior to the date that is three (3) months prior to such termination, the Bankruptcy Court, upon motion by a party-in-interest, may extend the term of the Liquidation Trust if it is necessary to the liquidation of the Assigned Causes of Action.  Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained at least three (3) months prior to the expiration of each extended term.

**H.    Cooperation of the Debtors**

Subject to the terms of this section, the Liquidation Trustee shall succeed to the Privileges formerly held by the Debtors on the Effective Date.  Following the Effective Date, the Post-Restructuring Debtors and the Wind-Down Trustee (if applicable) shall reasonably cooperate with the Liquidation Trust, the Liquidation Trustee, and their agents and representatives in the administration of the Liquidation Trust, including providing reasonable access to (a) the Books and Records of the Debtors, including, without limitation, those pertaining to the investigation, prosecution, compromise, and/or settlement of the Assigned Causes of Action, solely to the extent such Books & Records are in the Debtors' possession, (b) contesting, settling, compromising, reconciling, and objecting to Claims, and (c) administering the Liquidation Trust; *provided, however*, that, no Privilege shall be waived by the foregoing access or disclosures to the Liquidation Trustee or the sharing of the Debtors' documents, information, or communications subject to any privilege, protection, or immunity, or protections from disclosure held by the Debtors.  The Post-Restructuring Debtors and the Wind-Down Trustee (if applicable) shall take all reasonable efforts to assist the Liquidation Trust in connection with the foregoing, and the Liquidation Trustee may enter into agreements with the Post-Restructuring Debtors in order to obtain information from the Post-Restructuring Debtors on a confidential basis, without being restricted by or waiving any applicable Privilege.  If and to the extent privileged documents, information, or communications not in the possession of the Debtors or otherwise transferred to the Post-Restructuring Debtors are sought by the Liquidation Trust from any counsel or advisor of the Debtors, including, but not limited to, their Professionals, such privileged documents, information, or communications, if any exist, shall only be required to be provided to the Liquidation Trust if (a) the Debtors would have been entitled to receive such privileged documents, information, or communications under applicable law and (b) the Liquidation Trust provides for payment of the fees, costs, and expenses necessary for such party to provide such documents. Following receipt of a request by the Liquidation Trust for privileged documents, information, or communications not in the possession of the Debtors or otherwise transferred to the Post-Restructuring Debtors, the applicable counsel, advisor, or Professional shall provide to the Liquidation Trust an estimate of fees, costs, and expenses necessary for such party to provide such documents.  Following receipt of such estimate, the Liquidation Trust and the applicable party will meet and confer regarding the estimate and any other related matters, and the rights of all parties, including, but not limited to, the right to seek adjudication of any dispute before the Bankruptcy Court, are expressly reserved. Notwithstanding anything to the contrary contained in this section, the Plan, or the Confirmation Order, no counsel to the Debtors shall have any obligation to produce any documents currently in their possession as a result of or arising in any way out of their representation of the Debtors or work product that was previously provided to the Debtors or the Creditors' Committee.

Counsel to the Independent Directors comprising the Special Investigation Committee shall produce to the Liquidation Trust, prior to or shortly after the Effective Date: (a) a list of all interviews requested and conducted in the Independent Investigation; and (b) all documents produced to the Special Investigation Committee by the Debtors and/or any third parties. The Independent Directors comprising the Special Investigation Committee's agreement to produce these materials does not constitute a waiver of any Privileges or work product protections that might exist and may not be used by any Person or Entity to argue that such a waiver has occurred. The Independent Directors comprising the Special Investigation Committee will discuss in good

83

faith whether to produce any additional factual documentation or information related to the Independent Investigation, which shall not include any legal analysis, privileged or work product protected communications, legal memoranda, or research.  Notwithstanding the Debtors, the Post-Restructuring Debtors, the Independent Directors, the Wind-Down Trustee (if applicable), or any party-in-interest providing any privileged information to the Liquidation Trust, such privileged information shall be without waiver in recognition of the joint and/or successor interest in investigating and prosecuting the Liquidation Trust Assets and shall remain privileged.  For the avoidance of doubt, the actions taken by the Special Investigation Committee, Special Restructuring Committee, the Debtors, the Post-Restructuring Debtors, or the Wind-Down Trustee (if applicable) in connection with the Plan or the formation of the Liquidation Trust shall not be (or deemed to be) a waiver of any Privilege of any of the Independent Directors comprising the Special Investigation Committee, the Independent Directors comprising the Special Restructuring Committee, the Debtors, and the Post-Restructuring Debtors, as applicable, including any Privilege attaching to any document or communications (whether written or oral) transferred to the Liquidation Trust. The Privileges of the Independent Directors are hereby recognized and shall remain in full force and effect and shall not be waived, nor shall any such privileged documents be turned over to any Person or Entity without express written consent of the Independent Directors.

## I.      Vesting of Assets

### 1.      Title to Assets

#### a.      Following Consummation of the Sale Transaction

Except as otherwise provided in the Confirmation Order or in the Plan, on the Effective Date, title to all Assets and properties encompassed by the Plan shall vest in the Wind-Down Trust and the Liquidation Trust, as applicable, free and clear of all Liens and in accordance with Bankruptcy Code section 1141 and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors except as provided in the Plan.

#### b.      Following Consummation of the Restructuring Transaction

Except as otherwise provided in the Confirmation Order or in the Plan, on the Effective Date, pursuant to Bankruptcy Code sections 1141(b) and (c), title to all Assets and all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan, except with respect to the Liquidation Trust Assets, shall vest in each respective Post-Restructuring Debtor, free and clear of all Liens, Claims, charges, other encumbrances, and interests.  On and after the Effective Date, except as otherwise provided in the Plan, each Post-Restructuring Debtor may operate its business and may use, acquire, or dispose of property, enter into transactions, agreements, understandings or arrangements, whether in or other than in the ordinary course of business and execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects.

**J.      Establishment and Maintenance of Disbursement Accounts**

**1.      Establishment of Disbursement Account(s)**

On or prior to the Effective Date, the Liquidation Trustee shall establish one or more Disbursement Accounts in the name of the Liquidation Trustee as Disbursing Agent under the Plan, which accounts shall be trust accounts for the benefit of Holders of Allowed Prepetition Term Loan Claims (following consummation of the Sale Transaction only), Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed General Unsecured Claims, Allowed WAX & MAO Unsecured Notes Claims, and Allowed Convenience Claims pursuant to the Plan.

**2.      Maintenance of Disbursement Account(s)**

Disbursement Account(s) shall be maintained at one or more domestic banks or financial institutions having a shareholder's equity or equivalent capital of not less than $100 million.

**K.      Sources of Consideration for Plan Distributions**

**1.      Following Consummation of the Sale Transaction**

Subject to the provisions of the Plan concerning the Professional Fee Escrow Account and the Wind-Down Reserve, the Liquidation Trustee shall fund Distributions to Holders of Allowed Claims under and in accordance with the express terms of the Plan from (a) the Liquidation Trust Assets, (b) the Liquidation Trust Proceeds, and (c) the Debtors' Cash on hand, if any.   Each Distribution and issuance referred to in the Plan shall be governed by the terms and conditions of the instruments or other documents evidencing or relating to such Distribution or issuance, which terms and conditions shall bind each Entity receiving such Distribution or issuance.   The issuance, distribution, or authorization, as applicable, of certain securities in connection with the Plan will be exempt from SEC registration, as described more fully in Article IV.F.8 and Article IV.G.12 herein.

**2.      Following Consummation of the Restructuring Transaction**

Subject to the provisions of the Plan concerning the Professional Fee Escrow Account, the Liquidation Trustee shall fund Distributions to Holders of Allowed Claims under and in accordance with the express terms of the Plan from (a) the Liquidation Trust Assets and (b) the Liquidation Trust Proceeds.   Each Distribution and issuance referred to in the Plan shall be governed by the terms and conditions of the instruments or other documents evidencing or relating to such Distribution or issuance, which terms and conditions shall bind each Entity receiving such Distribution or issuance.   The issuance, distribution, or authorization, as applicable, of certain securities in connection with the Plan will be exempt from SEC registration, as described more fully in Article IV.F.8 and Article IV.G.12 herein.

**L.      Corporate Action and Governance Matters**

**1.      Corporate Action**

On the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects and all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate or organizational structure of the Debtors or the Post-Restructuring Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Post-Restructuring Debtors, as applicable, in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the equity holders, members, directors, or officers of the Debtors or the Post-Restructuring Debtors, as applicable.

On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors shall be authorized and, as applicable, directed, to issue, execute, and deliver the agreements, documents, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Restructuring Debtors. The authorizations and approvals contemplated by this Article IV.L.1 shall be effective notwithstanding any requirements under non-bankruptcy Law.  The Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee (acting pursuant to the terms of the Wind-Down Trust Agreement), and the Liquidation Trustee (acting pursuant to the terms and conditions of the Liquidation Trust Agreement), as applicable, shall be authorized to execute, deliver, file, or record such documents, instruments, releases, and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Without limiting the foregoing, from and after the Confirmation Date, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee (if applicable), and the Liquidation Trustee may take any and all actions deemed appropriate in order to consummate the transactions contemplated herein and, notwithstanding any provision contained in the Debtors' governing documents to the contrary, such Entities shall not require the affirmative vote of Holders of Common Equity Interests in order to take any corporate action including to (a) consummate a sale transaction, (b) compromise and settle Claims and Causes of Action of or against the Debtors and their Estates, or (c) dissolve, merge, or consolidate with any other Entity.

Without limiting the foregoing, on the Effective Date and following satisfaction of the Debtors' requirements set forth in the Plan, the Debtors shall have no further duties or responsibilities in connection with implementation of the Plan, and the directors and officers, including the Co-CROs and the Independent Directors, of the Debtors shall be deemed to have resigned in favor of the ongoing administration of the Debtors' affairs by the Wind-Down Trustee or the Post-Restructuring Board, as applicable.  From and after the Effective Date, the Wind-Down Trustee, following consummation of the Sale Transaction only, or the Post-Restructuring Board, following consummation of the Restructuring Transaction only, shall be authorized to act on behalf of the Debtors' Estates, *provided, however*, that the Wind-Down Trustee shall not have duties other than as expressly set forth in the Plan, the Confirmation Order, and the Wind-Down Trust Agreement.

## 2.    New Organizational Documents

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically adopted, authorized, and approved by the Post-Restructuring Debtors in all respects, in each case without further notice or Order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person or Entity, including, without limitation, any action by the Holders of Existing Common Equity Interests of the Debtors.  To the extent required under the Plan or applicable non-bankruptcy law, each of the Post-Restructuring Debtors will file its New Organizational Documents with the applicable authorities in its respective jurisdiction of organization.

The cancellation of all Existing Common Equity Interests and other matters provided pursuant to the Plan involving the corporate structure of the Post-Restructuring Debtors or corporate action by the Post-Restructuring Debtors shall be deemed to have occurred, be authorized, and shall be in effect without requiring further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders of the Debtors or the Post-Restructuring Debtors.

The New Organizational Documents shall include, among other things, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Bankruptcy Code section 1123(a)(6).  The New Organizational Documents of Genesis Healthcare, Inc. shall also include a provision decreasing the number of authorized shares to 5,000, with no par value.

On or after the Effective Date, the Post-Restructuring Debtors may amend and restate their respective New Organizational Documents in accordance with the terms thereof, and the Post-Restructuring Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of their respective jurisdictions of incorporation or formation and the New Organizational Documents.

## 3.    Corporate Governance

### a.    Dissolution of Genesis Board; Independent Directors' Privilege

On the Effective Date, following consummation of either the Sale Transaction or the Restructuring Transaction, the current Genesis Board shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, members, or governing bodies, and any remaining officers (including the Co-CROs), directors (including the Independent Directors), managers, shareholders, members, or governing bodies shall be dismissed and shall be deemed to have resigned as of the Effective Date, solely in their capacities as such.

Except as otherwise set forth in the Plan, the Independent Directors shall not have any of their work product protected or privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Post-Restructuring Debtors, the Wind-Down Trust (if applicable), the Liquidation Trust, or any other Entity without the Independent Directors' prior written consent. Each Independent Director retains the right to review, approve,

87

and make decisions, and to file papers and be heard before the Bankruptcy Court prior to and after the Effective Date, on all matters under their continuing authority.

### b.      Following Consummation of the Sale Transaction

On and after the Effective Date, in the event the Sale Transaction is consummated, the Wind-Down Trustee shall act for the Post-Restructuring Debtors in the same fiduciary capacity as applicable to a board of managers, directors, officers, or other governing body, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  From and after the Effective Date, in the event the Sale Transaction is consummated, the Wind-Down Trustee shall be appointed as the sole manager, director, officer, and representative of the Post-Restructuring Debtors, and shall succeed to the powers of the Debtors' managers, directors, officers, and other governing bodies subject to the determination of the Wind-Down Trust Board. The foregoing shall not limit the authority of the Post-Restructuring Debtors or the Wind-Down Trustee, as applicable, to continue the employment of any former manager or officer as required under applicable law, including for regulatory purposes, or pursuant to any Buyer TSA(s) or other agreement entered into on or after the Effective Date.

### c.      Following Consummation of the Restructuring Transaction

On the Effective Date, the new directors and officers of the Post-Restructuring Debtors, including the Post-Restructuring Board, shall be appointed pursuant to the New Organizational Documents.  The identity of the members of the Post-Restructuring Board and the officers of the Post-Restructuring Debtors shall be disclosed in the Plan Supplement.  Except to the extent that a current member of the Genesis Board is designated to serve as a director, manager, or sole manager of a Post-Restructuring Debtor, as applicable, the current members of the Genesis Board prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Post-Restructuring Debtors on or after the Effective Date, and each such director shall be deemed to have resigned or shall otherwise cease to be a director of the Debtors on the Effective Date.  Each of the directors, managers, sole managers, and officers of each of the Post-Restructuring Debtors shall serve pursuant to the terms of the applicable New Organizational Documents of such Post-Restructuring Debtor and may be designated, replaced, or removed in accordance with such New Organizational Documents.

### 4.      Continued Corporate Existence and/or Dissolution

### a.      Following Consummation of the Sale Transaction

From and after entry of the Confirmation Order, the Debtors and the Post-Restructuring Debtors, as applicable, shall continue to exist for the limited purposes of complying with and fulfilling their obligations under the Sale Transaction Documents, the OTAs, the Wind-Down Trust Agreement, the Liquidation Trust Agreement, and the Plan until their dissolution as provided herein.

Following the Effective Date, the Wind-Down Trustee shall be given full power of attorney and has the authority to execute and/or endorse documentation or take any action necessary on behalf of the Debtors and the Post-Restructuring Debtors in furtherance of the Plan and the

Debtors' liquidation, as set forth in the Wind-Down Trust Agreement and Article IV.F.5.c hereof. The filing by the Wind-Down Trustee of any applicable Post-Restructuring Debtor's certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the members, managers, board of directors, or other governing body of the Post-Restructuring Debtors.

Notwithstanding the foregoing, the Post-Restructuring Debtors shall not be dissolved until each of the following has been satisfied for the Post-Restructuring Debtors that currently operate Facilities: (a) Medicare has issued a written notice to the corresponding new operator advising that the provider agreement entered into between Medicare and the applicable Post-Restructuring Debtor that previously operated the applicable Facility has been assigned to such new operator and such new operator is authorized to submit claims retroactively to the date on which such new operator assumed operations at such Facility; and (b) Medicaid has issued a new provider agreement to the corresponding new operator effective as of the date on which such new operator assumed operations at such Facility.

### b.     Following Consummation of the Restructuring Transaction

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor, as Post-Restructuring Debtors, shall continue to exist on and after the Effective Date as a separate legal Entity with all the powers available to such Entity pursuant to the applicable Law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other organizational documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other organizational documents) are amended, amended and restated, or replaced under the Plan or otherwise, including pursuant to the New Organizational Documents, in each case, consistent with the Plan, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).  On or after the Effective Date, the respective certificate of incorporation and bylaws (or other organizational documents) of one or more of the Post-Restructuring Debtors may be amended or modified in accordance with the terms thereof without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  On or after the Effective Date, one or more of the Post-Restructuring Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### M.     Cancellation of Notes, Interests, Certificates, and Instruments

Except as otherwise provided in the Plan, and in any contract, instrument, or other agreement or document created in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article VI hereof, any and all notes, instruments, certificates, credit agreements, indentures, securities, and other documents evidencing or governing Claims or Interests (other than those Claims or Interests Reinstated under the Plan) shall be cancelled and the rights of the Holders thereof and obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no

force or effect, without any further act or action under any applicable agreement, law, regulation, order or rule. Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to the Plan or the Confirmation Order. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligations of the Debtors or any of their counterparts under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed or assumed and assigned by the Debtors pursuant to a Final Order or hereunder.

**N.      Books and Records; Medical Records**

   **1.      Following Consummation of the Sale Transaction**

      **a.      Buyer Obligations**

The Buyer's obligations with respect to Books and Records, including, but not limited to, the Acquired Medical Records, shall be governed by the Sale Transaction Documents. Nothing contained herein shall enlarge or modify the Buyer's obligations pursuant to the APA.

From and after the Effective Date, the Wind-Down Trustee and the Liquidation Trustee shall be entitled to exercise, enforce, and benefit from all contractual rights of the Debtors pursuant to the APA relating to Books and Records, electronically stored information, cooperation, or other information from the Buyer, but only to the extent such contractual rights are assigned by the Debtors or the Post-Restructuring Debtors pursuant to the terms of the APA.

      **b.      Debtor Obligations**

The Debtors shall retain (a) all records relating to any Assets not being sold pursuant to the Sale Transaction, (b) any records that are required by applicable law or by Order of the Bankruptcy Court to be retained by the Debtors, and (c) confidential personnel or other records to the extent pertaining to any current or former employee who is not a "Transferred Employee" (as defined in the Sale Transaction Documents) (collectively, the "Retained Records"). The Retained Records shall be transferred to, preserved, and maintained by the Wind-Down Trust (or the Liquidation Trust following the transfer of the Wind-Down Trust Assets) for a period of seven (7) years after the Closing Date, or such greater amount of time required by applicable law.

As soon as practicable after the Liquidation Trust exhausts the assets of the Debtors' Estates by making the final Distribution under the Plan and the Liquidation Trust Agreement and has complied with and fulfilled its obligations under the Plan and after the Wind-Down Trustee has complied with and fulfilled all of its obligations under the Plan, the Liquidation Trustee or the Wind-Down Trustee, as applicable, shall be free, in their discretion, to abandon, destroy, or otherwise dispose of the Books and Records their possession in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, without the need for any other or further Court Order.

### c.      Potential Disposal of Medical Records

Subject to any alternative language in the Confirmation Order, at the election of the Wind-Down Trustee or the Post-Restructuring Debtors, as applicable, the notice of Effective Date filed, served, and published in one or more appropriate newspapers by the Post-Restructuring Debtors following the Effective Date may act as the notice pursuant to Bankruptcy Code section 351(1)(a) apprising patients, residents, and/or insurance providers, as applicable, that, if any medical records retained by the Post-Restructuring Debtors (the "Retained Medical Records") are not claimed by the applicable resident or insurance provider within one year after the date of such notification, the Post-Restructuring Debtors or the Wind-Down Trustee, as applicable, shall be authorized to destroy, abandon, or otherwise dispose of any Retained Medical Records. During the first 180 days of such one-year period, the Wind-Down Trustee or the Post-Restructuring Debtors, as applicable, shall promptly attempt to provide notice to each patient or resident that is the subject of the patient records and appropriate Insurer concerning the Retained Medical Records by mailing to the most recent known address of that patient or resident, or a family member or contact person for that patient, and to the appropriate Insurer, an appropriate notice regarding the claiming or disposing of the Retained Medical Records. If the Retained Medical Records are not claimed by a resident or insurance provider within one year after such notice is provided, the Post-Restructuring Debtors shall be and hereby are authorized to destroy, abandon, or otherwise dispose of the Retained Medical Records.

### 2.      Following Consummation of the Restructuring Transaction

The Post-Restructuring Debtors shall maintain the Debtors' Books and Records, including all medical records, in the ordinary course of business for the period of time required by applicable law.

## O.      Accounts and Reserves

### 1.      Disbursement Account(s)

On or prior to the Effective Date, the Disbursement Account(s) will be established and maintained in one or more federally insured domestic banks in the name of the Post-Restructuring Debtors, the Liquidation Trust, or the Wind-Down Trust, as applicable.

### 2.      Professional Fee Escrow Account

Pursuant to the terms set forth in Article II.D.2 hereof, which are incorporated herein by reference, as soon as practicable after Confirmation and not later than the Effective Date, the Professional Fee Escrow Account shall be funded with Cash in the Amount of the Professional Fee Estimate, shall be maintained in trust for the Professionals by the Post-Restructuring Debtors or the Wind-Down Trustee (if applicable), and shall be used to pay the Allowed Professional Fee Claims. Such funds shall not be considered property of the Debtors' Estates or the Liquidation Trust Assets. After all Professional Fee Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid by the Post-Restructuring Debtors or the Wind-Down Trustee (if applicable), any remaining Cash in the Professional Fee Escrow Account shall be transferred to the Liquidation Trust and shall become a Liquidation Trust Asset.

### 3. Other Reserves

The Debtors or the Liquidation Trust, as applicable, shall establish and administer any other necessary reserves that may be required under the Plan or the Liquidation Trust Agreement, including, without limitation, the Disputed Claims Reserve, the Administrative and Priority Claim Reserve, the Administrative PL/GL Claim Reserve, the Convenience Claim Reserve, and the Wind-Down Reserve (if applicable), as outlined in the Sources and Uses.

### P. Exemption from Certain Transfer Taxes

Pursuant to Bankruptcy Code section 1146(a), any transfers of property pursuant hereto shall not be subject to any stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, personal property tax, sales tax, use tax, privilege tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local government officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the assuming and assigning any contract, lease or sublease; (3) any transaction authorized by the Plan; (4) any sale of an Asset by the Liquidation Trust in furtherance of the Plan, including but not limited to any sale of personal or real property; (5) any transfer tax in connection with the Sale Transaction; and (6) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan.

### ARTICLE V.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A. Assumption and Rejection of Executory Contracts and Unexpired Leases

### 1. Sale Transaction

The Debtors' assumption and assignment of Executory Contracts and Unexpired Leases to the Buyer in connection with the Sale Transaction shall occur on the Closing Date and shall be governed by and subject to the terms of the Sale Transaction Documents.  To the extent that the Debtors seek to assume any Executory Contracts or Unexpired Leases not otherwise selected for assumption and assignment by the Buyer, such assumption shall be governed by the terms of Article V.A.1 and Article V.B.1 herein.

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases to which any Debtor is a party shall be deemed automatically rejected by the Debtors as of the Effective Date, unless such contract or lease (1) previously has been assumed, assumed and assigned to the Buyer, or rejected by the applicable Debtor with the approval of the Bankruptcy Court; (2) expired or terminated pursuant to its own terms; (3) is the subject of a motion to assume or reject pending before the Bankruptcy Court as of the Confirmation Date; (4) is specifically identified in the Plan, the Plan Supplement (including an Assumption Schedule), or other notice filed on the docket of the Chapter 11 Cases as an Executory Contract or Unexpired

Lease to be assumed by the Debtors, or assumed and assigned by the Debtors to the Buyer as of the Closing Date; or (5) is subject to a pending Cure Dispute as of the Effective Date and shall be assumed, assumed and assigned, or rejected, as applicable, upon the resolution of such Cure Dispute.  Nothing contained in the Plan, nor the inclusion of a document on an Assumption Schedule, shall constitute an admission by a Debtor that any such contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or its successors and assigns has any liability thereunder.  The Debtors reserve their rights, at any time before the Confirmation Date, to assume or assume and assign any Executory Contract or Unexpired Lease that was not already rejected prior to the Confirmation Date.  For the avoidance of doubt, all decisions with respect to assumption and assignment by the Buyer shall be made by the Buyer in advance of the designation deadline set forth in the APA and all decisions with respect to assumption of any Executory Contracts or Unexpired Leases not otherwise selected for assumption and assignment by the Buyer shall be made by the Debtors in advance of the Confirmation Date.

To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to the Plan or any prior order of the Bankruptcy Court (including, without limitation, any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (1) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (2) any Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease, or (3) the Confirmation or Consummation of the Plan, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

### 2.   Restructuring Transaction

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, including an Assumption Schedule, each of the Executory Contracts and Unexpired Leases to which any Debtor is a party shall be deemed automatically rejected by the Debtors as of the Effective Date, unless such contract or lease (1) previously has been assumed, assumed and assigned, or rejected by the applicable Debtor with the approval of the Bankruptcy Court; (2) expired or terminated pursuant to its own terms; (3) is the subject of a motion to assume or reject pending before the Bankruptcy Court as of the Confirmation Date; (4) is specifically identified in the Plan, the Plan Supplement (including an Assumption Schedule), or other notice filed on the docket of the Chapter 11 Cases as an Executory Contract or Unexpired Lease to be assumed by the Debtors, or assumed and assigned by the Debtors to the Buyer as of the Closing Date; or (5) is subject to a pending Cure Dispute as of the Effective Date and shall be assumed, assumed and assigned, or rejected, as applicable, upon the resolution of such Cure Dispute; *provided*, *however*, that, nothing contained in the Plan, nor the inclusion of a document on an Assumption Schedule, shall constitute an admission by a Debtor that any such contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or its successors and assigns has any liability thereunder; and, *provided, further*, that the Debtors reserve their rights, at any time before the Confirmation Date, to assume or assume and assign any

93

Executory Contract or Unexpired Lease that was not already rejected prior to the Confirmation Date.  For the avoidance of doubt, all decisions with respect to assumption or assumption and assignment shall be made by the Debtors in advance of the Confirmation Date.  The Confirmation Order shall constitute an order approving such assumption, assumption and assignment, or rejection, as applicable, of Executory Contracts or Unexpired Leases as of the Effective Date pursuant to Bankruptcy Code section 365(a).

To the extent any provision in any Executory Contract or Unexpired Lease assumed by the Debtors pursuant to the Plan or any prior order of the Bankruptcy Court (including, without limitation, any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (1) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (2) any Debtor's assumption of such Executory Contract or Unexpired Lease, or (3) the Confirmation or Consummation of the Plan, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

**B.      Cure of Defaults**

**1.      Sale Transaction**

In the event of a proposed assumption by the Debtors of an Executory Contract or Unexpired Lease not otherwise selected by the Buyer for assumption and assignment in advance of the Closing Date, the Debtors, after the Closing Date, shall File and serve upon counterparties to such Executory Contracts and Unexpired Leases, an Assumption Schedule of their proposed assumption which will: (1) list the applicable Cure Cost, if any; (2) identify the applicable Debtor assuming the Executory Contract or Unexpired Lease; (3) describe the procedures for filing objections thereto; and (4) explain the process by which related disputes will be resolved by the Bankruptcy Court.  The Filing and service of any such Assumption Schedule shall not obligate the Debtors to assume any Executory Contract or Unexpired Lease set forth in such Assumption Schedule.  The listing of a document on the Assumption Schedule shall not constitute an admission by the Debtors that such document is an Executory Contract or Unexpired Lease or that the Debtors have any liability thereunder, with the exception of the amount of any proposed Cure Cost listed thereon.  Unless otherwise specified on the Assumption Schedule, each Executory Contract or Unexpired Lease listed on the Assumption Schedule shall include all exhibits, schedules, riders, modifications, amendments, supplements, attachments, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument or other document is listed on the Assumption Schedule.  In the event that the Debtors determine to amend the Assumption Schedule prior to the Confirmation Date, (1) the Debtors shall file a notice of any such amendment with the Bankruptcy Court and serve such notice on any affected party and (2) any Executory Contract or Unexpired Lease deleted from the Assumption Schedule shall be deemed rejected unless otherwise assumed as of the Effective Date.

**Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or any related Cure Cost set forth in an Assumption Schedule, must be Filed, served, and actually received by counsel to the Debtors by no later than 4:00 p.m. (prevailing Central Time) on the date that is seven (7) calendar days after the date of service of an Assumption Schedule;** *provided, however*, **that, to the extent the counterparty to an Executory Contract or Unexpired Lease was previously served with the Cure Notice, then the procedures set forth therein govern such counterparty's ability to object (as opposed to the procedures set forth in the preceding clause).** Any counterparty to an Executory Contract or Unexpired Lease that does not timely object to the notice of the proposed assumption of such Executory Contract or Unexpired Lease shall be deemed to have consented to assumption of the applicable Executory Contract or Unexpired Lease notwithstanding any provision thereof that purports to (1) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (2) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (3) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor or Post-Restructuring Debtor, under such Executory Contract or Unexpired Lease; or (4) create or impose a Lien upon any property or Asset of any Debtor or Post-Restructuring Debtor, as applicable. Each such provision shall be deemed to not apply to the assumption of such Executory Contract or Unexpired Lease pursuant to the Plan and counterparties to assumed Executory Contracts or Unexpired Leases that fail to object to the proposed assumption in accordance with the terms set forth herein, shall forever be barred and enjoined from objecting to the proposed assumption or the validity of such assumption (including with respect to any proposed Cure Cost or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

Unless another Order is entered by the Bankruptcy Court approving the proposed assumption prior to the Confirmation Date, the Confirmation Order shall constitute an Order of the Bankruptcy Court approving the proposed assumption of Executory Contracts and Unexpired Leases pursuant to Bankruptcy Code sections 365 and 1123 as of the Effective Date.

In the event of a Cure Dispute regarding (1) the amount of any Cure Cost, (2) the ability of any Debtor to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the applicable payment of the Cure Cost required by Bankruptcy Code section 365(b)(1) shall be made following the entry of a Final Order resolving the dispute and approving such assumption, or the settlement of any dispute regarding the Cure Cost or the nature thereof by the Debtors or the Post-Restructuring Debtors, as applicable. To the extent a Cure Dispute relates solely to the Cure Cost, the Debtors may assume the applicable Executory Contract or Unexpired Lease prior to the resolution of the Cure Dispute; *provided, however*, that the Debtors or the Post-Restructuring Debtors (as applicable) must reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Cost by the non-Debtor party (or such smaller amount as may be fixed or estimated by the or otherwise agreed to by such non-Debtor party and the Debtors or the Post-Restructuring Debtors (as applicable)). The Debtors or the Post-Restructuring Debtors (as applicable) may settle any dispute regarding the Cure Cost or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

95

Any defaults or Cure Costs under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied by the Debtors, as applicable, pursuant to and to the extent required by Bankruptcy Code section 365(b)(1), by payment of the applicable Cure Cost on the Effective Date, or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree in writing.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, and payment of any Cure Costs relating thereto, shall, upon satisfaction of the applicable requirements of Bankruptcy Code section 365, result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or non-monetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, as provided in Bankruptcy Code section 365.  Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed by Final Order and for which such Cure Costs have been satisfied, settled, or waived shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

## 2.        Restructuring Transaction

In the event of a proposed assumption by the Debtors of an Executory Contract or Unexpired Lease under the Plan in connection with a Restructuring Transaction, the Debtors, at least fourteen (14) days prior to the deadline to object to Confirmation of the Plan, shall File and serve upon counterparties to such Executory Contracts and Unexpired Leases, an Assumption Schedule of their proposed assumption which will: (1) list the applicable Cure Cost, if any; (2) identify the applicable Debtor assuming the Executory Contract or Unexpired Lease; (3) describe the procedures for filing objections thereto; and (4) explain the process by which related disputes will be resolved by the Bankruptcy Court.  The Filing and service of any such Assumption Schedule shall not obligate the Debtors to assume any Executory Contract or Unexpired Lease set forth in such Assumption Schedule.  The listing of a document on the Assumption Schedule shall not constitute an admission by the Debtors that such document is an Executory Contract or Unexpired Lease or that the Debtors have any liability thereunder, with the exception of the amount of any proposed Cure Cost listed thereon.  Unless otherwise specified on the Assumption Schedule, each Executory Contract or Unexpired Lease listed on the Assumption Schedule shall include all exhibits, schedules, riders, modifications, amendments, supplements, attachments, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument or other document is listed on the Assumption Schedule.  In the event that the Debtors determine to amend the Assumption Schedule prior to the Confirmation Date, (1) the Debtors shall file a notice of any such amendment with the Bankruptcy Court and serve such notice on any affected party and (2) any Executory Contract or Unexpired Lease deleted from the Assumption Schedule shall be deemed rejected unless otherwise assumed as of the Effective Date.

**Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or any related Cure Cost set forth in an Assumption Schedule, must be Filed, served, and actually received by counsel to the Debtors by no later than 4:00 p.m. (prevailing Central Time) on the date that is fourteen (14) calendar days after the date of**

96

**service of an Assumption Schedule.** Any counterparty to an Executory Contract or Unexpired Lease that does not timely object to the notice of the proposed assumption or assumption and assignment of such Executory Contract or Unexpired Lease shall be deemed to have consented to assumption of the applicable Executory Contract or Unexpired Lease notwithstanding any provision thereof that purports to (1) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (2) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (3) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor or Post-Restructuring Debtor, under such Executory Contract or Unexpired Lease; or (4) create or impose a Lien upon any property or Asset of any Debtor or Post-Restructuring Debtor, as applicable. Each such provision shall be deemed to not apply to the assumption of such Executory Contract or Unexpired Lease pursuant to the Plan and counterparties to assumed Executory Contracts or Unexpired Leases that fail to object to the proposed assumption in accordance with the terms set forth herein, shall forever be barred and enjoined from objecting to the proposed assumption or the validity of such assumption (including with respect to any proposed Cure Cost or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

Unless another Order is entered by the Bankruptcy Court approving the proposed assumption prior to the Confirmation Date, the Confirmation Order shall constitute an Order of the Bankruptcy Court approving the proposed assumption of Executory Contracts and Unexpired Leases pursuant to Bankruptcy Code sections 365 and 1123 as of the Effective Date.

In the event of a Cure Dispute regarding (1) the amount of any Cure Cost, (2) the ability of any Debtor to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the applicable payment of the Cure Cost required by Bankruptcy Code section 365(b)(1) shall be made following the entry of a Final Order resolving the dispute and approving such assumption, or the settlement of any dispute regarding the Cure Cost or the nature thereof by the Debtors or the Post-Restructuring Debtors, as applicable. To the extent a Cure Dispute relates solely to the Cure Cost, the Debtors may assume the applicable Executory Contract or Unexpired Lease prior to the resolution of the Cure Dispute; *provided, however*, that the Debtors or the Post-Restructuring Debtors (as applicable) must reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Cost by the non-Debtor party (or such smaller amount as may be fixed or estimated by the or otherwise agreed to by such non-Debtor party and the Debtors or the Post-Restructuring Debtors (as applicable)). The Debtors or the Post-Restructuring Debtors (as applicable) may settle any dispute regarding the Cure Cost or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Any defaults or Cure Costs under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied by the Debtors, as applicable, pursuant to and to the extent required by Bankruptcy Code section 365(b)(1), by payment of the applicable Cure Cost on the Effective Date, or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree in writing.

97

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, and payment of any Cure Costs relating thereto, shall, upon satisfaction of the applicable requirements of Bankruptcy Code section 365, result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or non-monetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, as provided in Bankruptcy Code section 365. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed by Final Order and for which such Cure Costs have been satisfied, settled, or waived shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

## C. Rejection Damages Bar Date

If the rejection of an Executory Contract or Unexpired Lease pursuant to Article V.A hereof gives rise to a Claim for damages stemming from such rejection by the other party or parties to such contract or lease following consummation of the Sale Transaction or a Restructuring Transaction, such Claim shall be forever barred and shall not be enforceable against the Debtors, their Estates, the Post-Restructuring Debtors, the Wind-Down Trust (if applicable), the Liquidation Trust, or their respective successors, assets, or properties unless a Proof of Claim is Filed with the Claims and Noticing Agent by the Rejection Damages Bar Date. Unless otherwise Ordered by the Bankruptcy Court, all Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be treated as General Unsecured Claims against the applicable Debtor in the applicable GUC Distribution Group class under the Plan and shall, if Allowed, be treated in accordance with the provisions thereunder, including the GUC Distribution Model. Any Proofs of Claim for rejection damage claims not Filed by the Rejection Damages Bar Date will be Disallowed automatically, forever barred from assertion, and shall not be enforceable against the Debtors, their Estates, the Post-Restructuring Debtors, the Wind-Down Trust (if applicable), the Liquidation Trust, or their respective successors, assets, or properties.

## D. Indemnification Obligations

On the Effective Date, any obligations of the Debtors pursuant to their organizational documents, including amendments, entered into any time prior to the Effective Date, to indemnify or reimburse any Person pursuant to the Debtors' operating agreements, bylaws, charters, limited liability company agreements, organizational documents, policy of providing employee indemnification, applicable state law or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such Persons based upon any act or omission related to such Persons' service with, for or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits and proceedings relating to the Debtors shall be deemed rejected by the Debtors as of the Effective Date; *provided, however*, that such obligations shall survive confirmation of the Plan and except as set forth herein, remain unaffected thereby, and shall not be discharged, irrespective of whether such defense, indemnification, reimbursement has accrued or is owed in connection with an occurrence before or after the Petition Date, solely to the extent necessary for any Person to assert (i) a claim under any applicable Insurance Policy or (ii) a General Unsecured Claim against the Debtors for such prepetition obligations, which shall be filed no later than the Rejection Damages Bar Date; *provided, further*, that any limitation of

98

liability or state law exculpation provisions pursuant to the Debtors' operating agreements, bylaws, charters, limited liability company agreements, organizational documents, policy of providing employee indemnification, applicable state law or specific agreement shall not be impaired by the foregoing.  For the avoidance of doubt, all related monetary obligations with respect to the foregoing shall be limited solely to (i) available coverage under the Insurance Policies (solely to the extent such limitation does not invalidate the Insurance Policies or result in the loss of applicable coverage), or (ii) to the extent such Holder asserts a General Unsecured Claim that is subsequently Allowed, such Holder shall be entitled to receive its Pro Rata Share of Distributions from the Liquidation Trust Assets pursuant to the GUC Distribution Model.  Neither the Post-Restructuring Debtors nor the Wind-Down Trust (if applicable) shall be liable for any of the foregoing.

The foregoing section shall not apply to or cover any Claims, suits or actions against a Person that result in a final order determining that such covered person is liable for breach of the duty of loyalty, bad faith, intentional misconduct, knowing violations of law, improper personal benefit, or liability pursuant to section 174 of the Delaware General Corporation Code.  For the avoidance of doubt, this Article V.D shall not apply to or govern the Prepetition ABL – New Operator Indemnification Claims (as defined in the Disclosure Statement), which shall remain subject to the indemnification provisions set forth in the Prepetition ABL Documents, to the extent applicable, and shall be addressed in connection with the treatment of the Prepetition ABL Claims, including all liabilities associated therewith, pursuant to the Sale Transaction Documents and/or the Plan.  The Prepetition ABL Secured Parties and the Debtors reserve all rights with respect to the same.

**E.     Insurance Policies**

**1.     Following Consummation of the Sale Transaction**

**a.     General**

All Insurance Policies to which any Debtor is a party or beneficiary as of the Effective Date, including the D&O Liability Insurance Policies, shall be transferred as Assets of the Estates to the Liquidation Trust by the applicable Debtor effective as of the Effective Date and shall continue in full force and effect thereafter in accordance with their respective terms.  Nothing in the Plan or the Confirmation Order, including the transfer of the Insurance Policies to the Liquidation Trust, shall alter the rights and obligations of the Insurers under the Insurance Policies (which rights and obligations shall be determined under the applicable Insurance Policies and applicable non-bankruptcy law relating thereto) or modify the coverage thereunder, and all of the Insurance Policies shall continue in full force and effect according to their terms and conditions. Nothing in the Plan or the Confirmation Order shall cause the invalidation of the Insurance Policies or result in the loss of applicable coverage.

Continuing obligations of Insurers under Insurance Policies that have ceased to be executory on or prior to the Effective Date, including, without limitation, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, or to provide indemnification, contribution or reimbursement, will continue and will be binding on such third parties, notwithstanding any provision to the contrary in the Plan, unless otherwise

specifically terminated by the Debtors (or following the transfer contemplated by this section, the Liquidation Trust) or by order of the Bankruptcy Court.

### b.    D&O Liability Insurance Policies

Confirmation of the Plan shall not discharge, impair, or otherwise modify any defense or indemnity obligations assumed by the transfer of the D&O Liability Insurance Policies to the Liquidation Trust.  Nothing in the Plan or the Confirmation Order shall cause the invalidation of the Insurance Policies, including the D&O Liability Insurance Policies, or result in the loss of applicable coverage.  For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall amend, modify, or otherwise alter any rights of any current or former officers or directors of the Debtors with respect to the D&O Liability Insurance Policies.  Prior to and following the transfer of the D&O Liability Insurance Policies to the Liquidation Trust, coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals insured thereunder, including, but not limited to, all directors (including the Independent Directors), managers, officers (including the Co-CROs), and employees who served in such capacity at any time prior to the Effective Date.

The Liquidation Trust shall maintain tail coverage under any D&O Liability Insurance Policies for the six (6) year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the D&O Liability Insurance Policies; *provided, however*, that any such obligation shall be subject to the Debtors' prior payment or funding of all such premium obligations.  In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases.  Subject to the above premium payment or funding obligation, in no event shall the Post-Restructuring Debtors or the Wind-Down Trust have any obligation to satisfy or pay any deductible, retention, or other financial obligation under the D&O Liability Insurance Policies after the Effective Date and the Liquidation Trust shall be solely responsible for any such expenses.

After the Effective Date, the Liquidation Trust shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors (including the Independent Directors), managers, officers (including the Co-CROs), and employees, as applicable, of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the benefits of any such D&O Liability Insurance Policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors, managers, and/or officers, as applicable, remain in such positions after the Effective Date; *provided, however*, that, any of the foregoing individuals shall provide notice to the Liquidation Trustee of his or her intent to file such claim under the D&O Liability Insurance Policies.

With respect to any Assigned Cause of Action against any directors, officers, managers, or employees of the Debtors who are entitled to the benefits of any D&O Liability Insurance Policies, the Liquidation Trustee shall seek to satisfy any obligations of such directors, officers, managers, or employees arising from an Assigned Cause of Action, first, from the proceeds of such D&O Liability Insurance Policies.

100

### 2. Following Consummation of the Restructuring Transaction

#### a. General

All Insurance Policies to which any Debtor is a party or beneficiary as of the Effective Date, other than the D&O Liability Insurance Policies, shall be deemed an Executory Contract and shall be automatically assumed by the applicable Debtor, effective as of the Effective Date, pursuant to Bankruptcy Code sections 365 and 1123 of the Bankruptcy Code. Nothing in the Plan or the Confirmation Order shall alter the rights and obligations of the Insurers under the Insurance Policies (which rights and obligations shall be determined under the applicable Insurance Policies and applicable non-bankruptcy law relating thereto) or modify the coverage thereunder, and all of the Insurance Policies shall continue in full force and effect according to their terms and conditions. Nothing in the Plan or the Confirmation Order shall cause the invalidation of the Insurance Policies or result in the loss of applicable coverage.

Continuing obligations of Insurers under Insurance Policies that have ceased to be executory on or prior to the Effective Date, including, without limitation, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, or to provide indemnification, contribution or reimbursement, will continue and will be binding on such third parties, notwithstanding any provision to the contrary in the Plan, unless otherwise specifically terminated by the Post-Restructuring Debtors or by order of the Bankruptcy Court.

#### b. D&O Liability Insurance Policies

The D&O Liability Insurance Policies shall be transferred as Assets of the Estates to the Liquidation Trust by the applicable Debtor effective as of the Effective Date and shall continue in full force and effect thereafter in accordance with their respective terms. Nothing in the Plan or the Confirmation Order shall cause the invalidation of the Insurance Policies, including the D&O Liability Insurance Policies, or result in the loss of applicable coverage. Confirmation of the Plan shall not discharge, impair, or otherwise modify any defense or indemnity obligations assumed by the transfer of the D&O Liability Insurance Policies to the Liquidation Trust. For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall amend, modify, or otherwise alter any rights of any current or former officers or directors of the Debtors with respect to the D&O Liability Insurance Policies. Prior to and following the transfer of the D&O Liability Insurance Policies to the Liquidation Trust, coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals insured thereunder, including, but not limited to, all directors (including the Independent Directors), managers, officers (including the Co-CROs), and employees who served in such capacity at any time prior to the Effective Date.

The Liquidation Trust shall maintain tail coverage under any D&O Liability Insurance Policies for the six (6) year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the D&O Liability Insurance Policies; *provided, however*, that any such obligation shall be subject to the Debtors' prior payment or funding of all such premium obligations. In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases. Subject to the above premium payment or funding obligation, in no event shall the Post-Restructuring Debtors or the Wind-Down Trust have any obligation to satisfy or pay

101

any deductible, retention, or other financial obligation under the D&O Liability Insurance Policies after the Effective Date and the Liquidation Trust shall be solely responsible for any such expenses.

After the Effective Date, the Liquidation Trust shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors (including the Independent Directors), managers, officers (including the Co-CROs), and employees, as applicable, of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the benefits of any such D&O Liability Insurance Policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors, managers, and/or officers, as applicable, remain in such positions after the Effective Date; *provided, however*, that, any of the foregoing individuals shall provide notice to the Liquidation Trustee of his or her intent to file such claim under the D&O Liability Insurance Policies.

With respect to any Assigned Cause of Action against any directors, officers, managers, or employees of the Debtors who are entitled to the benefits of any D&O Liability Insurance Policies, the Liquidation Trustee shall seek to satisfy any obligations of such directors, officers, managers, or employees arising from an Assigned Cause of Action, first, from the proceeds of such D&O Liability Insurance Policies.

## F.   Employment Agreements

### 1.   Following Consummation of the Sale Transaction

Any Employment Agreement not assumed and assigned by the Debtors to the Buyer pursuant to the Sale Transaction Documents as part of the Sale Transaction shall be deemed rejected pursuant to Bankruptcy Code sections 365 and 1123 on the Effective Date of the Plan.

### 2.   Following Consummation of the Restructuring Transaction

Any Employment Agreement not assumed by the Debtors shall be deemed rejected pursuant to Bankruptcy Code sections 365 and 1123 on the Effective Date of the Plan.

## G.   Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Bankruptcy Code section 365(d)(4), unless such deadline has expired.

## H.   Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided herein or by separate Order of the Bankruptcy Court, each Executory Contract and Unexpired Lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed in the Assumption Schedule(s).

102

**I.       Reservation of Rights**

Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors or the Post-Restructuring Debtors that any such contract or lease is or is not an Executory Contract or Unexpired Lease or that the Debtors or their respective Affiliates have any liability thereunder.  Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Post-Restructuring Debtors under any executory or non-executory contract or unexpired or expired lease.  Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, the Wind-Down Trust, the Liquidation Trust, or the Liquidation Trustee, as applicable, under any executory or non-executory contract or unexpired or expired lease.   If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption or assumption/assignment under the Plan, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee (if applicable), or the Liquidation Trustee, as applicable, shall have thirty (30) calendar days following entry of an Order resolving such dispute to alter their treatment of such contract or lease.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

**A.       Time and Manner of Distributions**

Distributions under the Plan shall be made to each Holder of an Allowed Claim as follows:

1.       <u>Liquidation Trust Initial Distributions of Cash</u>: On or as soon as practicable after the Effective Date, the Liquidation Trust shall distribute, or cause to be distributed, to (a) Holders of Allowed Prepetition Term Loan Claims (applicable only following consummation of the Sale Transaction), Allowed Administrative Expense Claims (including Allowed Administrative PL/GL Claims), Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Convenience Claims, Cash as determined in accordance with the provisions of Article II and Article III hereof; and (b) each Holder of an Allowed General Unsecured Claim and Allowed WAX & MAO Unsecured Notes Claim such Creditor's share, if any, of the GUC Distribution Assets and the GUC Distribution Interests, as determined pursuant to the GUC Distribution Model. For the avoidance of doubt, Holders of Allowed General Unsecured Claims shall not receive any Distributions from the Liquidation Trust Assets against which Holders of Prepetition Term Loan Claims in Classes 5-A and 5-B held a Lien as of the Petition Date, including the Buyer Promissory Note, unless and until (i) Holders of Allowed Prepetition Welltower & Omega Term Loan Claims in Class 5-A are paid in full (subject to the temporary allowance provisions contained in the Class 5.A treatment section) and (ii) (A) entry of an Order by the Bankruptcy Court disallowing, avoiding, or subordinating the Prepetition WAX & MAO Term Loan Claims in Class 5-B or (B) Holders of Allowed Prepetition WAX & MAO Term Loan Claims in Class 5-B are paid in full; *provided, however*, that Holders of Allowed General Unsecured Claims, may receive Distributions from the

103

Liquidation Trust Assets that were unencumbered as of the Petition Date, prior to payment in full of Allowed Prepetition Term Loan Claims.

2.    Distributions of Professional Fee Claims: On or as soon as practicable after entry of an Order approving and allowing the Professional Fee Claims set forth in each Final Fee Application, the Post-Restructuring Debtors or the Wind-Down Trustee, as applicable, shall distribute to Professionals an amount equal to their Allowed Professional Fee Claim from the Professional Fee Escrow Account or Liquidation Trust Assets, as applicable.

3.    Liquidation Trust Subsequent Distributions of Cash: On the first (1st) Business Day that is after the close of one (1) full calendar quarter following the date of the initial Effective Date Distributions, and, thereafter, on each first (1st) Business Day following the close of two (2) full calendar quarters, the Liquidation Trustee, as Disbursing Agent, shall distribute, or cause to be distributed, to Holders of Disputed Claims, and to each Holder of an Allowed Claim an amount equal to such Creditor's Pro Rata Share, if any, of the proceeds of the Liquidation Trust Assets in Cash until such time as such proceeds are depleted.

Notwithstanding any other provision of the Plan to the contrary, no Distribution shall be made on account of any Claim or portion thereof that (1) has been satisfied after the Petition Date; (2) is listed in the Schedules as contingent, unliquidated, disputed or in a zero amount, and for which a Proof of Claim has not been timely Filed; (3) is subject to an Objection by the Debtors or the Liquidation Trust; or (4) is evidenced by a Proof of Claim that has been amended by a subsequently Filed Proof of Claim.

## B.    Timeliness of Payments

Any payments or Distributions to be made pursuant to the Plan shall be deemed to be timely made if made within twenty (20) days after the dates specified in the Plan. Whenever any Distribution to be made under the Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the applicable due date.

Distributions made after the Effective Date to Holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

## C.    Distributions by the Disbursing Agent

All Distributions under the Plan shall be made by the Post-Restructuring Debtors or the applicable Disbursing Agent, including the Wind-Down Trustee or the Liquidation Trustee, as applicable.   The Disbursing Agent may (1) effect all actions and execute all agreements, instruments, and other documents necessary to carry out the provisions of the Plan, the Wind-Down Trust Agreement, and the Liquidation Trust Agreement, as applicable; (2) make all Distributions contemplated hereby; and (3) perform such other duties as may be required pursuant to the Plan, the Wind-Down Trust Agreement, or the Liquidation Trust Agreement or as deemed

104

by the Disbursing Agent to be necessary and proper to implement the provisions hereof. The applicable Disbursing Agent shall be deemed to hold all property to be distributed hereunder in Trust for the Persons entitled to receive the same. The applicable Disbursing Agent shall not hold an economic or beneficial interest in such property. No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties. The Disbursing Agent shall be authorized and directed to rely upon the Debtors' Books and Records and the Liquidation Trust's representatives and professionals in determining Allowed Claims entitled to Distributions under the Plan in accordance with the terms and conditions of the Plan.

### D.    Manner of Payment under the Plan

Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made shall be made at the election and in the sole discretion of the applicable Disbursing Agent by check drawn on a domestic bank or by wire transfer from a domestic bank selected by the Disbursing Agent; *provided, however*, that no Cash payments shall be made to a Holder of an Allowed Claim until such time as the amount payable thereto is equal to or greater than Ten Dollars ($10.00).

### E.    Foreign Currency Exchange Rate

As of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal* on the Effective Date.

### F.    Fractional Securities

No fractional shares of Liquidation Trust Interests or Wind-Down Trust Interests (if applicable) shall be issued. Fractional shares of Liquidation Trust Interests and Wind-Down Trust Interests shall be rounded to the next greater or next lower number of shares in accordance with the following method: (a) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number, and (b) fractions of less than one-half (1/2) shall be rounded to the next lower whole number. The total number of shares or interests of Liquidation Trusts Interests to be distributed to a Class hereunder shall be adjusted as necessary to account for the rounding provided for in this Article VI.F.

Notwithstanding any other provision of the Plan, the Disbursing Agent shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

### G.    Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### 1.    Delivery of Distributions in General

Distributions and deliveries to Holders of Allowed Claims shall be made by the applicable Disbursing Agent (a) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address, (b) at the addresses set forth on the Proofs of Claim Filed by such Holders (or at the last known addresses of such Holders if no Proof of Claim is Filed or if the Debtors have been notified of a change of

105

address), (c) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim, after sufficient evidence of such addresses as may be requested by the applicable Disbursing Agent is provided, (d) at the addresses set forth in the other records of the Debtors or the applicable Disbursing Agent at the time of the Distribution, or (e) in the case of the Holder of a Claim that is governed by an agreement and is administered by an agent or servicer, at the addresses contained in the official records of such agent or servicer.

In making Distributions under the Plan, the applicable Disbursing Agent may rely upon the accuracy of the Claims Register maintained by the Claims and Noticing Agent in the Chapter 11 Cases, as modified by any Final Order of the Bankruptcy Court disallowing Claims in whole or in part.

## 2.    Undeliverable Distributions

(a)    Holding of Undeliverable Distributions: If any Distribution to any Holder of an Allowed Claim is returned to the applicable Disbursing Agent as undeliverable, no further Distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address and such Holder provides sufficient evidence of such address as may be requested by the Disbursing Agent, at which time all missed Distributions shall be made to such Holder without interest, subject to the time limitations set forth below. Undeliverable Distributions shall remain in the possession of the Liquidation Trust until the earlier of (a) such time as a Distribution becomes deliverable or (b) such undeliverable Distribution becomes an Unclaimed Distribution. Nothing contained in the Plan or the Liquidation Trust Agreement shall require the Debtors, the Liquidation Trust, the Liquidation Trustee, or any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

(b)    Failure to Claim Undeliverable Distributions: On or about the second (2nd) anniversary of the Effective Date, the Liquidation Trustee shall file a list with the Bankruptcy Court setting forth the names of those Entities for which Distributions have been made hereunder and have been returned as undeliverable as of the date thereof. Any Holder of an Allowed Claim that does not assert its rights pursuant to the Plan to receive a Distribution within one-hundred and eighty (180) days from and after the Effective Date shall have its entitlement to such undeliverable Distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan. In such case, any consideration held for Distribution on account of such Claim shall revert to the Liquidation Trust for redistribution to Holders of Allowed Claims in accordance with the provisions of Article II and Article III hereof.

## 3.    Unclaimed Distributions

Any Cash or other property to be distributed under the Plan shall revert to the Liquidation Trustee and/or the Liquidation Trust, as applicable, if it is not claimed by the Entity on or before the Unclaimed Distribution Deadline. If such Cash or other property is not claimed on or before the Unclaimed Distribution Deadline, the Distribution made to such Entity shall be deemed to be reduced to zero and any consideration held for Distribution on account of such Claim shall revert to the Liquidation Trust for redistribution to Holders of Allowed Claims in accordance with the provisions of Article II and Article III hereof.

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not cashed or deposited within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (a) the second (2nd) anniversary of the Effective Date or (b) ninety (90) days after the date of issuance of such check, if such check represents a final Distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Liquidation Trustee shall retain all monies related thereto for the sole purpose of redistribution to Creditors in accordance with the terms and provisions hereof.

In the case of Unclaimed Distributions on account of Administrative Expense Claims, Priority Tax Claims, or Priority Non-Tax Claims, any Cash otherwise reserved for Unclaimed Distributions shall revert to the Liquidation Trust. In the case of Unclaimed Distributions on account of Liquidation Trust Interests, any Cash otherwise reserved for Unclaimed Distributions shall revert to the Liquidation Trust, and all title to and all beneficial interests in the Liquidation Trust Assets represented by any such Unclaimed Distributions shall revert to and/or remain in the Liquidation Trust and shall be distributed in accordance with the Liquidation Trust Agreement and the Plan. The reversion of such Cash to the Liquidation Trust shall be free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be treated in accordance with the terms of the Plan and the Liquidation Trust Agreement.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an Unclaimed Distribution by the Unclaimed Distribution Deadline shall be deemed to have forfeited its Claim for such Unclaimed Distribution and shall be forever barred and enjoined from asserting any such claim for an Unclaimed Distribution against the Debtors and their Estates, the Post-Restructuring Debtors, the Liquidation Trust, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its or their property.

If there is any residual unclaimed property at the time of dissolution of the Liquidation Trust, such residual unclaimed property shall be available for a subsequent Distribution on a Pro Rata Share basis to other Liquidation Trust Beneficiaries or donated to a charitable organization at the sole discretion of the Liquidation Trustee.

## H.     Interest on Claims

Unless otherwise specifically provided for in the Final DIP Order, the Plan, or the Confirmation Order, or required by applicable law, postpetition interest shall not accrue or be paid on any Claims, and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim. Except as otherwise specifically provided for in the Plan, or the Confirmation Order, or required by applicable law, interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

**I.      No Creditor to Receive More than Payment in Full**

Notwithstanding any other provision hereof, no Holder of an Allowed Claim shall receive more than full payment of its applicable Allowed Claim, including any interest, costs, or fees that may be payable with respect thereto under or pursuant to the Plan.

**J.      Satisfaction of Claims**

Notwithstanding any other provision hereof, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of, and in exchange for, such Allowed Claims, and no Holder shall receive more than full payment of its applicable Allowed Claim, including any interest, costs or fees that may be payable with respect thereto under or pursuant to the Plan.

**K.      Compliance with Tax, Withholding, and Reporting Requirements**

In accordance with Bankruptcy Code section 346 and in connection with the Plan and all Distributions hereunder, the applicable Disbursing Agent shall, to the extent applicable, comply with all withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority.  The Disbursing Agent shall be authorized to take any and all actions necessary and appropriate to comply with such requirements.

All Distributions hereunder shall be subject to withholding and reporting requirements.  As a condition of making any Distribution under the Plan, each Person and Entity holding an Allowed Claim is required to provide any information necessary in writing, including returning W-9 statements, to affect the necessary information reporting and withholding of applicable taxes with respect to Distributions to be made under the Plan as the Disbursing Agent may request.  The Disbursing Agent shall be entitled in its sole discretion to withhold any Distributions to a Holder of an Allowed Claim who fails to provide tax identification or social security information within the timeframe requested in writing by the Disbursing Agent to such Holder of an Allowed Claim, which timeframe shall not be less than 30 days. **Unless the Liquidation Trust agrees, in its sole and absolute discretion, all Distributions to any Holder of an Allowed Claim that fails to timely respond to a request for tax information deemed necessary or appropriate by the Liquidation Trust shall be waived and forfeited and the applicable Claim shall be deemed Disallowed without further order of the Bankruptcy Court.**

Notwithstanding any other provision of the Plan, each Person and Entity receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of tax obligations on account of any such Distribution.

**L.      Setoffs and Recoupments**

Subject to the terms and conditions of the Liquidation Trust Agreement, the Debtors, the Post-Restructuring Debtors, and/or the Liquidation Trust, as applicable, pursuant to the Bankruptcy Code and applicable bankruptcy and/or non-bankruptcy law, without the approval of the Bankruptcy Court, may, but shall not be required to, set off or recoup against any Allowed Claim and the payments or other Distributions to be made under the Plan on account of the Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the

108

Debtors may have against the Holder thereof; *provided*, *however*, that any such right of setoff or recoupment that is exercised shall be allocated, first, to the principal amount of the related Claim, and thereafter to any interest portion thereof, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors and/or the Liquidation Trust of any such claims, rights, or Causes of Action that the Debtors may have against such Holder, and nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff subject to the provisions of Bankruptcy Code section 553.

**M. Procedures for Treating and Resolving Disputed, Contingent, and/or Unliquidated Claims**

**1. Claims Administration Responsibilities**

On or after the Effective Date, the Liquidation Trustee shall have the sole authority to: (a) File, withdraw, or litigate to judgment, Objections to Claims or Interests asserted against the Debtors; (b) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, Order, or approval by the Bankruptcy Court with respect to such Claims and Interests; *provided, however*, that the Objection to and settlement of Professional Fee Claims shall not be subject to this Article VI.M, but rather, shall be governed by Article II.D hereof. In the event that any Objection Filed by the Debtors remains pending as of the Effective Date, the Liquidation Trustee shall be deemed substituted for the Debtors, as applicable, as the objecting party. The Liquidation Trustee shall also be deemed substituted for the Debtors with respect to the Unliquidated Claims Procedures previously approved by the Bankruptcy Court, as subsequently modified or amended in the Plan Supplement. The Liquidation Trust shall be entitled to assert all of the Debtors' rights, claims, defenses, offsets, rights of recoupment, setoffs, rights of disallowance, subrogation, recharacterization and/or equitable subordination and counterclaims with respect to Claims.

**2. Objection Deadline; Prosecution of Objections**

Except as set forth in the Plan with respect to Professional Fee Claims, Administrative Expense Claims, and Substantial Contribution Claims, all Objections to Claims must be Filed and served on the Holders of such Claims by the Claims Objection Deadline. If an Objection has not been Filed to a Proof of Claim or the Schedules have not been amended with respect to a Claim that (a) was Scheduled by the Debtors but (b) was not Scheduled as contingent, unliquidated and/or disputed, by the Claims Objection Deadline, as the same may be extended by order of the Bankruptcy Court, the Claim to which the Proof of Claim or Scheduled Claim relates shall be treated as an Allowed Claim if such Claim has not been previously Allowed. Notice of any motion for an Order extending the Claims Objection Deadline shall be required to be given only to those Persons or Entities that have requested notice in the Chapter 11 Cases in accordance with Bankruptcy Rule 2002 following the Effective Date pursuant to Article XI.J hereof.

**3. No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan or the Liquidation Trust Agreement, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim

109

unless and until all Objections to such Disputed Claim, including, without limitation, pursuant to the WAX/MAO Complaint, have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

To the extent that a Claim is not a Disputed Claim but is held by a Holder that is or may be liable to the Debtors or the Liquidation Trust on account of an Assigned Cause of Action, no payments or Distributions shall be made with respect to all or any portion of such Claim unless and until such Claim and liability have been settled or withdrawn or have been determined by Final Order of the Bankruptcy Court, administrative tribunal, or such other court having jurisdiction over the matter.

**4.     Estimation of Claims**

Before or after the Effective Date, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Debtors had previously Objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such Objection. The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any Objection to such Claim or during the appeal relating to such Objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions), and the Liquidation Trust may elect to pursue any supplemental proceedings to Object to any ultimate Distribution on such Claim.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidation Trust may pursue supplementary proceedings to Object to the allowance of such Claim.  Notwithstanding Bankruptcy Code section 502(j), in no event shall any Holder of a Claim that has been estimated pursuant to Bankruptcy Code section 502(c) or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim is estimated.

Notwithstanding any provision otherwise herein, a Claim that has been expunged or disallowed from the Claims Register, but is either subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars ($0.00) unless otherwise ordered by the Bankruptcy Court or as otherwise provided pursuant to a Final Order of the Bankruptcy Court (including any stipulation).  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee as applicable, may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.

**5.     Claims Resolution Procedures Cumulative**

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

110

### 6.     Adjustment to Claims Register Without Objection

Any Claim or Interest that (a) is a duplicate, (b) has been paid or satisfied, or (c) has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Liquidation Trust, as applicable, upon agreement between the parties in interest without an Objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7.     Disputed Claims Reserve

On the Distribution Date, the Liquidation Trust shall withhold on a Pro Rata Share basis from property that would otherwise be distributed to Holders of Claims entitled to Distributions under the Plan on such date, in a separate Disputed Claims Reserve, such amounts or property as may be necessary or appropriate pursuant to the Sources and Uses.  The Liquidation Trust may request, if necessary, estimation for any Disputed Claim that is contingent or unliquidated, or for which the Liquidation Trust determines to reserve less than the face amount.  If the Liquidation Trust elects not to request such an estimation from the Bankruptcy Court with respect to a Disputed Claim that is contingent or unliquidated, the Liquidation Trust shall withhold the applicable Disputed Claims Reserve based upon the good faith estimate of the amount of such Claim by the Liquidation Trust.  If practicable, the Liquidation Trust shall invest any Cash that is withheld as the Disputed Claims Reserve in an appropriate manner to ensure the safety of the investment, in accordance with the Liquidation Trust Agreement.  However, nothing in the Plan or the Liquidation Trust Agreement shall be deemed to entitle the Holder of a Disputed Claim to postpetition interest on such Claim.

### 8.     Disallowance of Claims or Interests

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Liquidation Trustee under Bankruptcy Code sections 542, 543, 550, or 553 or that the Liquidation Trustee alleges is a transferee of a transfer that is avoidable under Bankruptcy Code sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) shall be disallowed if: (a) the Entity, on the one hand, and the Liquidation Trustee, on the other hand, agree, or the Bankruptcy Court has determined by Final Order, that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

All Claims held by Persons or Entities against whom or which the Debtors or the Liquidation Trustee (as applicable) has commenced a proceeding asserting a Cause of Action under Bankruptcy Code sections 542, 543, 544, 545, 547, 548, 549, or 550 or that is a transferee of a transfer avoidable under Bankruptcy Code section 522(f), 522(h), 544, 545, 548, 549 or 724(a) shall be deemed Disputed Claims pursuant to Bankruptcy Code section 502(d), and Holders of such Claims shall not be entitled to vote to accept or reject the Plan.  A Claim deemed Disputed pursuant to this Article VI.M.8 shall continue to be Disputed for all purposes until the relevant proceeding against the Holder of such Claim has been settled or resolved by a Final Order and any sums due to the Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, from such Holder have been paid.

**9.      Disallowance of Late Claims**

Except as provided herein or otherwise agreed to by the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, any Holder of a Claim Filed via Proof of Claim after the applicable Bar Date shall not receive any Distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

**10.     Amendments to Claims**

Except as provided herein, on or after the Effective Date, without the prior authorization of the Bankruptcy Court, the Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, a Claim may not be Filed or amended, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

**11.     Distributions After Allowance**

Payments and Distributions to Holders of Disputed Claims that ultimately become Allowed Claims shall be deemed to have been made on the Effective Date and shall be made in accordance with provisions of the Plan and the Liquidation Trust Agreement that govern Distributions to Holders of Allowed Claims.  No interest shall accrue or be paid on any Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Claim unless the Plan provides otherwise.

**N.      De Minimis Interim Distributions**

The Liquidation Trust shall not be required to make any interim distributions to Holders of Allowed Claims aggregating less than One Hundred Dollars ($100.00) in Cash.  Cash that otherwise would be payable to Holders of Allowed Claims but for this Article VI.N shall remain Liquidation Trust Assets to be later Distributed pursuant to the Sources and Uses, the GUC Distribution Model, and the Liquidation Trust Agreement.  If the Cash available for the final distribution is less than the cost to distribute the funds, the Liquidation Trustee may donate such funds to the unaffiliated charity of its choice.

**O.      Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a Distribution under the Plan comprises indebtedness and accrued but unpaid interest thereon, such Distribution shall, for all U.S. federal income tax purposes, be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest with respect to such Claim.

**P.      Distribution Record Date**

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any

of the Claims or Interests.  Consistent with the Plan, the Wind-Down Trust Agreement, and the Liquidation Trust Agreement, the applicable Disbursing Agent shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring on or after the Distribution Record Date.  The applicable Disbursing Agent shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

**Q.      Distributions Free and Clear**

Except as otherwise provided in the Plan, any Distribution or transfer made under the Plan, including Distributions to any Holder of an Allowed Claim, shall be free and clear of any Liens, Claims, encumbrances, charges, and other interests, and no other entity shall have any interest, whether legal, beneficial, or otherwise, in property distributed or transferred pursuant to the Plan.

**ARTICLE VII.**
**INJUNCTION AND RELATED PROVISIONS**

**A.      Injunction**

**Except as otherwise provided in the Plan or the Confirmation Order, effective as of the Effective Date, all Persons and Entities that hold, have held, or may hold a claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, action, proceeding, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment, or liability of any nature whatsoever against the Debtors or their Estates shall be permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from and after the Effective Date from taking any of the following actions (other than actions to enforce any rights or obligations under the Plan or any other related documents) against, as applicable, the Debtors or the Post-Restructuring Debtors and the Estates: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Persons or Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Persons or Entities or the property or the estates of such Persons or Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Persons or Entities or against the property of such Persons or Entities on account of or in connection with or with respect to any such claims or interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest, or Cause of Action or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan; and (6) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

113

**By accepting Distributions pursuant to the Plan, each Holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunction set forth herein and all transactions, documents, and agreements contemplated hereunder that govern the property that is the subject of such Distribution.  Upon the entry of the Confirmation Order, all Holders of Claims and Interests and all other parties-in-interest, along with their respective present and former Affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan or the occurrence of the Effective Date, including, but not limited to, the actions enumerated in the preceding paragraph.**

**B.      Release of Liens**

Except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for any Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Restructuring Debtors and their successors and assigns, in each case without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Post-Restructuring Debtors.  Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Post-Restructuring Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Post-Restructuring Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Post-Restructuring Debtors, at the sole cost and expense of the Post-Restructuring Debtors, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Post-Restructuring Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

**C.      Protections Against Discriminatory Treatment**

Consistent with Bankruptcy Code section 525 and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidating Trustee (as applicable), or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidating Trustee (as applicable), or another Entity with whom the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidating Trustee have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**D.      Retention of Causes of Action and Reservation of Rights**

Except as otherwise provided in the Plan or the Sale Transaction Documents, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver, release, or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law.  Except as otherwise provided in the Plan, the Liquidation Trust, on behalf of the Debtors, shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

For the avoidance of doubt, the Plan shall not operate as a waiver or release of (a) any Person (i) named or subsequently named as a defendant in any action commenced by or on behalf of the Debtors, the Creditors' Committee, or the Liquidation Trust, including any Assigned Causes of Action prosecuted by the Liquidation Trust, and (ii) adjudicated or subsequently adjudicated by, a court of competent jurisdiction to have engaged in acts of dishonesty or willful misconduct detrimental to the interests of the Debtors or (b) any claim (i) with respect to any loan, advance or similar payment by the Debtors to any such Person, (ii) with respect to any contractual obligation owed by such Person to the Debtors, (iii) relating to such person's knowing fraud, or (iv) to the extent based upon or attributable to such Person gaining in fact a personal profit to which such Person was not legally entitled, including, without limitation, profits made from the purchase or sale of equity securities of the Debtors which are recoverable by the Debtors pursuant to section 16(b) of the Securities Exchange Act of 1934, as amended; *provided, however,* that the foregoing is not intended, nor shall it be construed, to release any of the Debtors' claims that may exist against the D&O Liability Insurance Policies.

**E.      Ipso Facto and Similar Provisions Ineffective**

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor or JV shall be void and of no further force or effect with respect to any

115

Debtor or JV to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor or JV as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of the Chapter 11 Cases, or (iii) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation.

**F.      Discharge of the Debtors**

    **1.      Following Consummation of the Sale Transaction**

Pursuant to Bankruptcy Code section 1141(d)(3), Confirmation shall not discharge Claims against the Debtors; *provided, however*, no Holder of a Claim or Interest may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, the Liquidation Trust, the Liquidation Trustee, or their respective successors, assigns, and/or property, except as expressly provided in the Plan.

    **2.      Following Consummation of the Restructuring Transaction**

Pursuant to, and to the maximum extent provided by, Bankruptcy Code section 1141(d) and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services that employees of the Debtors have performed prior to the Effective Date, and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (c) the holder of such a Claim or Interest has accepted the Plan. The Confirmation Order, if applicable, shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

**ARTICLE VIII.**
**CONDITIONS PRECEDENT TO CONFIRMATION AND**
**CONSUMMATION OF THE PLAN**

**A.      Conditions Precedent to Confirmation**

The following are conditions precedent to Confirmation of the Plan, each of which must be satisfied or waived:

116

1.      The Plan, the Plan Supplement(s), the Confirmation Order, and any other related documents shall be in form and substance reasonably acceptable to the Debtors and the Creditors' Committee (subject to the Creditors' Committee Consent Rights).

2.      The Disclosure Statement Order shall not have been stayed, modified, or vacated on appeal, and shall have become a Final Order.

**B.      Conditions Precedent to Effective Date**

**1.      If the Sale Transaction is Consummated**

Following consummation of the Sale Transaction, the occurrence of the Effective Date and the substantial Consummation of the Plan are subject to the satisfaction of the following conditions precedent, each of which must be satisfied or waived:

1.      The Confirmation Order shall have been entered by the Bankruptcy Court (in form and substance reasonably satisfactory to the Debtors and the Creditors' Committee), shall not have been stayed, vacated, or reversed, and shall have become a Final Order.

2.      The Sale Transaction shall have been consummated substantially on the terms described in the Sale Order and the Sale Transaction Documents (as applicable) and the Debtors shall have received the Sale Proceeds.

3.      The Plan and the Sale Transaction Documents shall be in full force and effect.

4.      The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the Plan.

5.      The Welltower & Omega Liquidation Trust Promissory Note shall have been executed by the Liquidation Trustee.

6.      The New Organizational Documents shall have become effective (or shall become effective concurrently with the Effective Date).

7.      All conditions precedent to Confirmation of the Plan shall have either been satisfied or waived.

8.      The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan.

9.      No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing, or prohibiting the Consummation of the Plan.

10.     The Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless, subject to the Creditors' Committee Consent

117

Rights, the Creditors' Committee has provided written consent to such material amendment, alteration, or modification.

11. The Professional Fee Escrow Account, the Wind-Down Reserve, the Administrative and Priority Claim Reserve, the Administrative PL/GL Claim Reserve, and the Convenience Claim Reserve shall have been funded in Cash in full.

12. The Liquidation Trustee and the members of the Liquidation Trust Board shall have been appointed in accordance with the terms hereof and shall have accepted such appointment.

13. The Liquidation Trust Agreement shall have been executed.

14. The Liquidation Trust shall have been established and the Liquidation Trust Assets shall have been transferred to and vested in the Liquidation Trust free and clear of all Claims and Liens, except as specifically provided in the Plan and the Liquidation Trust Agreement.

15. The Wind-Down Trustee and the members of the Wind-Down Trust Board shall have been appointed in accordance with the terms hereof and shall have accepted such appointment.

16. The Wind-Down Trust Agreement shall have been executed.

17. The Wind-Down Trust shall have been established and the Wind-Down Trust Assets shall have been transferred to and vested in the Wind-Down Trust free and clear of all Claims and Liens, except as specifically provided in the Plan and the Wind-Down Trust Agreement.

18. All other actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Plan shall have been effectuated or executed and delivered, as applicable.

**2. If the APA is Terminated and the Restructuring Transaction is Consummated**

If the APA is terminated, the Debtors will seek to consummate the Restructuring Transaction. The occurrence of the Effective Date and the substantial Consummation of the Plan are subject to the satisfaction of the following conditions precedent, each of which must be satisfied or waived:

1. The Confirmation Order shall have been entered by the Bankruptcy Court (in form and substance reasonably satisfactory to the Debtors and the Creditors' Committee (subject to the Creditors' Committee Consent Rights)), shall not have been stayed, vacated, or reversed, and shall have become a Final Order.

2. The Plan shall be in full force and effect.

3.      The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the Plan.

4.      The Post-Restructuring Term Loan Promissory Note shall have been executed by the Debtors.

5.      The New Organizational Documents shall have become effective (or shall become effective concurrently with the Effective Date) and the members of the Post-Restructuring Board shall have been appointed in accordance with the terms thereof.

6.      All conditions precedent to Confirmation of the Plan shall have either been satisfied or waived.

7.      The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan.

8.      No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing, or prohibiting the Consummation of the Plan.

9.      The Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless, subject to the Creditors' Committee Consent Rights, the Creditors' Committee has provided written consent to such material amendment, alteration, or modification.

10.     The Professional Fee Escrow Account, the Administrative and Priority Claim Reserve, the Administrative PL/GL Claim Reserve, and the Convenience Claim Reserve shall have been funded in Cash in full.

11.     The Liquidation Trustee and the members of the Liquidation Trust Board shall have been appointed in accordance with the terms hereof and shall have accepted such appointment.

12.     The Liquidation Trust Agreement shall have been executed.

13.     The Liquidation Trust shall have been established and the Liquidation Trust Assets shall have been transferred to and vested in the Liquidation Trust free and clear of all Claims and Liens, except as specifically provided in the Plan and the Liquidation Trust Agreement.

14.     All other actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Plan shall have been effectuated or executed and delivered, as applicable.

C.      **Establishing the Effective Date**

    1.      **Sale Transaction**

The calendar date to serve as the Effective Date shall be the first (1st) Business Day following the Closing Date, subject to the satisfaction or waiver of all conditions to the Effective Date.  On or within two (2) Business Days of the Effective Date, the Debtors shall File and serve a notice of occurrence of the Effective Date.  Such notice shall contain, among other things, the Administrative Expense Claim Bar Date, the Professional Fee Claims Bar Date, and the Rejection Damages Bar Date with respect to Executory Contracts or Unexpired Leases rejected pursuant to the Plan.

    2.      **Restructuring Transaction**

The calendar date to serve as the Effective Date shall be the first (1st) Business Day following the satisfaction or waiver of all conditions to the Effective Date.  On or within two (2) Business Days of the Effective Date, the Debtors shall File and serve a notice of occurrence of the Effective Date.  Such notice shall contain, among other things, the Administrative Expense Claim Bar Date, the Professional Fee Claims Bar Date, and the Rejection Damages Bar Date with respect to Executory Contracts or Unexpired Leases rejected pursuant to the Plan.

D.      **Waiver of Conditions**

Each of the conditions precedent to Confirmation and the occurrence of the Effective Date set forth in Article VIII hereof may be waived, in whole or in part, by the Debtors, subject to the Creditors' Committee Consent Rights, without any other notice to or approval of any other parties-in-interest or the Bankruptcy Court.  The failure to satisfy or waive any condition to Confirmation or the occurrence of the Effective Date may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied.  The failure of any party to exercise any of its foregoing rights shall not be deemed a waiver of any of its other rights, and each such right shall be deemed an ongoing right that may be asserted thereby at any time.

E.      **Effect of Failure of Conditions**

If Consummation does not occur as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims or Liens by the Debtors, any Holders of Claims or Interests, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

**ARTICLE IX.**
**RETENTION OF JURISDICTION**

A.      **Retention of Jurisdiction**

On or after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases as is legally permissible to the fullest extent permitted under 28 U.S.C. §§ 157

120

and 1334, including, without limitation, such jurisdiction as is necessary to ensure that the interests and purposes of the Plan are carried out.

The Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, out of, or related to the Chapter 11 Cases and the Plan pursuant to Bankruptcy Code sections 105(a) and 1142, including jurisdiction to:

1. determine (a) the allowance, disallowance, estimation, classification, or priority of Claims upon Objection by any party-in-interest entitled to File an Objection, or (b) the validity, extent, priority, and nonavoidability of consensual and nonconsensual Liens and other encumbrances against assets of the Estates, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust;

2. issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person or Entity, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other Order of the Bankruptcy Court, to issue such Orders as may be necessary for the implementation, execution, performance, and Consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Person or Entity;

3. enforce the terms and conditions of the Plan, the Disclosure Statement Order, the Confirmation Order, the Final DIP Order, the Sale Order, the Sale Transaction Documents, and all Orders previously entered by the Bankruptcy Court;

4. protect the Assets or property of the Estates, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, including Assigned Causes of Action, from claims against, or interference with, such assets or property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens or other encumbrances on any assets of the Estates, the Post-Restructuring Debtors, the Wind-Down Trust or the Liquidation Trust;

5. ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

6. hear and determine any other rights, claims, or Causes of Action that may be brought by or assigned to the Liquidation Trustee;

7. hear and adjudicate any and all applications for allowance of Professional Fee Claims;

8. hear and determine any Priority Tax Claims, Priority Non-Tax Claims, or Administrative Expense Claims entitled to priority under Bankruptcy Code section 507(a);

121

9.     determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

10.     hear and resolve disputes concerning any reserves with respect to Disputed Claims, including under the Unliquidated Claim Procedures, or the administration thereof;

11.     hear and resolve any dispute arising under or related to the implementation, execution, Consummation, or interpretation of the Plan and the making of Distributions hereunder;

12.     modify the Plan under Bankruptcy Code section 1127, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out their intent and purposes;

13.     adjudicate, decide, or resolve any and all matters related to Bankruptcy Code section 1141;

14.     enter and implement such Orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement;

15.     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

16.     enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

17.     consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18.     hear and determine any and all motions and disputes related to the rejection, assumption, or assumption and assignment of Executory Contracts or Unexpired Leases, including, but not limited to, any Cure Dispute or any dispute regarding whether a contract or lease is or was executory or expired, or determine any issues arising from the deemed rejection of Executory Contracts and Unexpired Leases set forth in Article V.A hereof;

19.     except as otherwise provided herein, to hear and determine all applications, motions, adversary proceedings, contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases;

20.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

21.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VII hereof and

122

enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

22.    hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VII hereof;

23.    enter one or more final decrees or Order closing the Chapter 11 Cases;

24.    hear and determine any tax disputes concerning the Debtors or the Post-Restructuring Debtors and to determine and declare any tax effects under the Plan; *provided, however*, that nothing herein shall be construed to confer jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liabilities and federal tax treatment, except as provided under Bankruptcy Code section 505;

25.    enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed);

26.    resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases, the Bar Date, the Governmental Bar Date, the Rejection Damages Bar Date, the Interim Administrative Expense Claim Bar Date, the Administrative Expense Claim Bar Date, the Professional Fee Claim Bar Date, and/or the Confirmation Hearing for the purpose of determining whether a Claim, or Interest is released, satisfied and/or enjoined hereunder or for any other purpose;

27.    determine any other matters that may arise in connection with or related to the Plan, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created or implemented in connection with the Plan; and

28.    hear any other matter not inconsistent with the Bankruptcy Code over which the Bankruptcy Court has jurisdiction.

As of the Effective Date, notwithstanding anything in this Article IX to the contrary, the New Organizational Documents and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

**B.**    **Alternative Jurisdiction**

In the event that the Bankruptcy Court is without jurisdiction to resolve any matter, then such other administrative tribunal or court of competent jurisdiction shall hear and determine such matter.

## C.      Failure of Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Article IX.A hereof, the provisions of Article IX.A hereof shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

## A.      Modification and Amendment

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules and subject to the Creditors' Committee Consent Rights, to amend or modify the Plan any time prior to the Confirmation Date.  Alterations, amendments, or modifications of the Plan may be proposed in writing by the Debtors (subject to the Creditors' Committee Consent Rights), at any time before the Confirmation Date; *provided, however,* that the Plan, as altered, amended or modified, satisfies the conditions of Bankruptcy Code sections 1122 and 1123, and the Debtors shall have complied with Bankruptcy Code section 1125.  Additionally, after the Confirmation Date and prior to substantial consummation of the Plan, the Debtors may, under Bankruptcy Code section 1127(b), subject to the Creditors' Committee Consent Rights, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan; *provided, however,* that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court.  A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such Holder.

## B.      Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to Bankruptcy Code section 1127(a) and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

## C.      Revocation or Withdrawal of the Plan

The Debtors, subject to the Creditors' Committee Consent Rights, reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan is revoked or withdrawn, or if Confirmation or the occurrence of the Effective Date as to such Debtor does not occur, then as to such Debtor (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for Consummation of the Plan, shall (a) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the

124

Debtors or any other Person or Entity, (b) prejudice in any manner the rights of such Debtor or any other Person or Entity, or (c) constitute an admission of any sort by the Debtors or any other Person or Entity.

**ARTICLE XI.**
**MISCELLANEOUS PROVISIONS**

**A.      Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, the Wind-Down Trustee, the Liquidation Trust, the Liquidation Trustee, the Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests (1) are Impaired or Unimpaired, (2) have, or are deemed to have accepted the Plan, or (3) failed to vote to accept or reject the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described herein, each Entity acquiring property under the Plan, any and all non-Debtor parties to Executory Contracts and Unexpired Leases, and each of their respective successors and assigns.  Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

**B.      Filing of Additional Documents**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan (solely in their capacity as such), shall from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may reasonably be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

**C.      Substantial Consummation**

On the Effective Date, the Plan shall be deemed to be substantially consummated (within the meaning set forth in Bankruptcy Code section 1101) pursuant to Bankruptcy Code section 1127(b).

**D.      Severability of Provisions**

If, prior to the Confirmation Date, any term or provision of the Plan shall be held by the Bankruptcy Court to be invalid, void, or unenforceable, including, without limitation, the inclusion of one or more of the Debtors in the Plan, then the Bankruptcy Court, at the request of the Debtors and subject to the Creditors' Committee Consent Rights, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.

Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Post-Restructuring Debtors (as applicable); and (iii) nonseverable and mutually dependent.

## E.      Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, beneficiaries or guardian, if any, of each Entity.

## F.      Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee shall automatically dissolve, whereupon the members thereof shall be discharged from all rights and duties from or related to the Chapter 11 Cases, except with respect to (i) prosecuting Final Fee Applications of its Professionals and (ii) prosecuting, defending, or participating in any appeal of the Confirmation Order or any request for reconsideration thereof.   For the avoidance of doubt, the obligations of the Creditors' Committee, its members, Professionals, and agents arising from confidentiality agreements shall remain in full force and effect following the Effective Date.

The Debtors, the Post-Restructuring Debtors, and the Wind-Down Trustee, as applicable, shall no longer be responsible for paying any fees or expenses incurred by the members of or Professionals retained by the Creditors' Committee after the Effective Date except with respect to the reasonable fees and expenses incurred by the Creditors' Committee and its retained Professionals in connection with the matters described in clauses (i) and (ii) above without further order of the Bankruptcy Court, subject to the U.S. Supreme Court's holding in *Baker Botts L.L.P. v. Asarco LLC*, 576 U.S. 121 (2015).

## G.      Termination and Discharge of PCOs, the Estate Broker, and the Mediator

### 1.      PCOs

To the extent not already addressed in any Order of the Bankruptcy Court prior to the Effective Date, the duties, responsibilities, and obligations of the PCOs in connection with the Chapter 11 Cases, and the retention or employment of the PCOs' attorneys, financial advisors, and other agents, shall be terminated on the Effective Date.   Effective as of the Effective Date, in recognition of their services during the Chapter 11 Cases, each of the PCOs shall be released and discharged by each and all of the Debtors, the Post-Restructuring Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Claims, Interests, obligations, suits, damages, Causes of Action, remedies, and liabilities, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that any of the Debtors, the Post-

Restructuring Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to the services provided by the PCOs during the Chapter 11 Cases.

Until the Effective Date, the PCOs shall continue to serve and be authorized to perform the following functions: (i) to review, analyze, and prepare advisory reports with respect to the operation of the Facilities during the period up to and including the Effective Date; and (ii) if necessary, appear before the Bankruptcy Court with respect to any such matter. Upon termination, the PCOs shall dispose of any documents provided to them in the course of their reporting with the exception of any documents the PCOs may be required to retain in accordance with any applicable policies or law. The PCOs and their professionals shall be entitled to file Final Fee Applications for allowance and payment of any fees and expenses incurred to and including the Effective Date.

Prior to issuing or serving upon any PCO or her professionals any formal or informal discovery request, including, but not limited to, subpoena, request for production of documents, requests for admissions, interrogatories, subpoenas duces tecum, requests for testimony, or any other discovery of any kind whatsoever in any way related to the Debtors, the Chapter 11 Cases, the PCOs' evaluation(s), or their report(s) (collectively, the "Discovery"), any creditor or party-in-interest in the Chapter 11 Cases must first file an appropriate pleading with the Bankruptcy Court to request permission to initiate the Discovery.

### 2. Mediator

To the extent not already addressed in any Order of the Bankruptcy Court prior to the Effective Date, the duties, responsibilities, and obligations of the Mediator in connection with the Chapter 11 Cases shall be terminated on the Effective Date. Upon termination, the Mediator shall dispose of any documents provided to him in connection with mediation with the exception of any documents the Mediator may be required to retain in accordance with any applicable policies or law. The Mediator shall be entitled to payment of any fees and expenses incurred to and including the Effective Date as an Allowed Administrative Expense Claim without Filing a Final Fee Application.

### 3. Estate Broker

To the extent not already addressed in any Order of the Bankruptcy Court prior to the Effective Date, the duties, responsibilities, and obligations of the Estate Broker in connection with the Chapter 11 Cases shall be terminated on the Effective Date. Houlihan, including in its capacity as Estate Broker, shall be entitled to file a Final Fee Application for allowance and payment of any fees and expenses incurred to and including the Effective Date.

## H. Terminations of Injunctions or Stays

Except as otherwise provided in the Plan, to the maximum extent permitted by applicable law and subject to the Bankruptcy Court's post-Confirmation jurisdiction to modify the injunctions and stays under the Plan (1) all injunctions with respect to or stays against an action against property of the Debtors or the Debtors' Estates arising under or entered during the Chapter 11

127

Cases under Bankruptcy Code sections 105 or 362, and in existence on the date the Confirmation Order is entered, shall remain in full force and effect until the Effective Date; and (2) all other injunctions and stays arising under or entered during the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 shall remain in full force and effect until the earliest of (a) the date that the Chapter 11 Cases are closed pursuant to a final order of the Bankruptcy Court, or (b) the date that the Chapter 11 Cases are dismissed pursuant to a final order of the Bankruptcy Court.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect indefinitely.

## I.   Service of Documents

In order for all notices, requests, and demands (each, a "Notice") to or upon the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, the Liquidation Trust, and/or the Liquidation Trustee, as applicable, to be effective, such Notices shall be (i) in writing (including by electronic mail) and, unless otherwise expressly provided herein, (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) first class mail, or (e) facsimile transmission; and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received by the following parties:

| Entity | Contact Information |
|---|---|
| Debtors and Post-Restructuring Debtors | Genesis Healthcare, Inc. c/o Ankura Consulting Group, LLC 2021 McKinney Ave., Suite 340 Dallas, TX 75201 Attn: Louis E. Robichaux IV (louis.robichaux@ankura.com) and Russell A. Perry (russell.perry@ankura.com)  with a copy to: McDermott Will & Schulte LLP 1180 Peachtree St. NE, Suite 3350 Atlanta, GA 30309 Attn: Daniel M. Simon (dsimon@mcdermottlaw.com) |
| Wind-Down Trustee | TBD |
| Liquidation Trustee | TBD |

A Notice is deemed to be given and received (a) if sent by personal delivery or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt, provided that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section. Any party may change its address for service from time to time by providing a Notice in accordance with the foregoing.  Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed.  Sending a copy of a Notice to a party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the Notice

128

to that party.  The failure to send a copy of a Notice to legal counsel does not invalidate delivery of that Notice to a party.

**J.      2002 Service List**

After the Effective Date, any Entities or Persons that want to continue to receive notice in these Chapter 11 Cases must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002 no later than thirty days after the Effective Date; *provided, however*, that the U.S. Trustee shall be excused from this requirement and shall remain on the Bankruptcy Rule 2002 service list.  To the extent a renewed request is not timely Filed with the Bankruptcy Court, the Post-Restructuring Debtors, the Wind-Down Trustee, and the Liquidation Trustee (as applicable) are authorized to limit notice and not include such Entities or Persons on any post-Effective Date Bankruptcy Rule 2002 service list.

**K.      Entire Agreement**

On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**L.      Plan Supplement(s)**

All exhibits to the Plan not attached hereto shall be Filed in one or more Plan Supplements by the Plan Supplement Filing Date.  Any Plan Supplement (and amendments thereto) Filed by the Debtors shall be deemed an integral part of the Plan and shall be incorporated by reference as if fully set forth herein.  Substantially contemporaneously with their Filing, the Plan Supplement may be viewed at the Debtors' case website (https://dm.epiq11.com/genesis).  Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, the Plan Supplement shall control.  All documents in the Plan Supplement are considered an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

**M.      Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to Bankruptcy Code section 1125(e), the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code and, therefore, no such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan.

**N.      Closing of the Chapter 11 Cases**

As soon as reasonably practicable after the Effective Date, the Wind-Down Trustee shall File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and Local Rule 3022-1(a) and any applicable order necessary to close the Chapter 11 Cases except for the Lead

129

Case, which shall remain open pending the full administration of the Liquidation Trust and the Wind-Down Trust. Promptly thereafter, the Liquidation Trustee shall seek authority from the Bankruptcy Court to close the Lead Case in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

## O.    Payment of Statutory Fees

All fees payable through the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid by the Debtors, the Post-Restructuring Debtors, or the Wind-Down Trustee, as applicable, on or as soon as practicable after the Effective Date. The Wind-Down Trustee shall (i) File (a) any pre-confirmation monthly operating reports not Filed as of the Effective Date and (b) any post-confirmation quarterly reports through and including the quarterly period during which the Chapter 11 Cases are closed as set forth herein, and (ii) pay Statutory Fees to the U.S. Trustee in accordance with 28 U.S.C. § 1930 for such periods; *provided, however*, that the Liquidation Trustee shall pay such Statutory Fees to the U.S. Trustee for such periods solely with respect to Distributions made by the Liquidation Trust during such periods. Thereafter, until the Lead Case is closed or converted and/or the entry of a final decree with respect to the Lead Case, the Liquidation Trustee shall File post-confirmation quarterly reports for the Lead Case and the Liquidation Trust and pay Statutory Fees to the U.S. Trustee in accordance with 28 U.S.C. § 1930 arising from distributions made by the Liquidation Trust as well as the minimum Statutory Fee ($250) for the Lead Case. The U.S. Trustee shall not be required to File a request for payment of its quarterly fees, which shall be deemed an Allowed Administrative Expense Claim against the Debtors and their Estates.

## P.    No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by any Entity with respect to any matter set forth herein.

## Q.    Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

## R.    Creditor Default

An act or omission by a Holder of a Claim or an Interest in contravention of the provisions of the Plan shall be deemed an event of default under the Plan. Upon an event of default, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, in remedying such default. Upon the finding of such a default by a creditor, the Bankruptcy Court may: (1) designate a party to appear, sign and/or accept the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (2) enforce the Plan by order of specific performance; (3) award judgment against such defaulting creditor in favor of the Post-Restructuring Debtors, the Wind-Down

Trustee, or the Liquidation Trustee, as applicable, in an amount, including interest, to compensate the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, for the damages caused by such default; and (4) make such other order as may be equitable that does not materially alter the terms of the Plan.

**S.      Inconsistency**

In the event of any inconsistency among the Plan and any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

**T.      Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or Holders of Claims or Interests before the Effective Date.

*[Remainder of Page Intentionally Left Blank]*

Dated: July 27, 2026

GENESIS HEALTHCARE, INC, *et al.*
Debtors and Debtors-in-Possession

By:  /s/ *DRAFT*
Louis E. Robichaux IV
Co-Chief Restructuring Officer

/s/ *DRAFT*
Charles R. Gibbs (TX Bar No. 7846300)
**MCDERMOTT WILL & SCHULTE LLP**
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone:   (214) 295-8000
Facsimile:   (972) 232-3098
Email:       crgibbs@mcdermottlaw.com

- and -

Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Catherine L. Bloomberg (admitted *pro hac vice*)
Landon W. Foody (admitted *pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone:   (312) 372-2000
Facsimile:   (312) 984-7700
Email:       dsimon@mcdermottlaw.com
             ekeil@mcdermottlaw.com
             wguerrieri@mcdermottlaw.com
             cbloomberg@mcdermottlaw.com
             lfoody@mcdermottlaw.com

- and -

Gregg M. Galardi (admitted *pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
One Vanderbilt Avenue
New York, New York 10017
Telephone:  (212) 547-5400
Facsimile:  (212) 547-5444
Email:       ggalardi@mcdermottlaw.com

*Counsel for Debtors and Debtors-in-Possession*

## EXHIBIT A

### Chapter 11 Debtors

| Debtor Name | EIN Number |
|---|---|
| Genesis Healthcare, Inc. | 20-3934755 |
| 1 Glen Hill Road Operations LLC | 83-3800183 |
| 1 Sutphin Drive Operations LLC | 26-0798393 |
| 10 Woodland Drive Operations LLC | 26-3157524 |
| 100 Abbeyville Road Operations LLC | 88-4293103 |
| 100 Chambers Street Operations LLC | 26-0796788 |
| 100 W. Queen Street Operations LLC | 92-1075272 |
| 105 Chester Road Operations LLC | 37-1787889 |
| 1000 Lincoln Drive Operations LLC | 26-0798815 |
| 1008 Thompson Street Operations LLC | 92-1055669 |
| 101 13th Street Operations LLC | 26-0798876 |
| 101 Development Group, LLC | 26-3764579 |
| 1020 South Main Street Operations LLC | 26-0831465 |
| 106 Tyree Street Operations LLC | 26-0798930 |
| 1070 Stouffer Avenue Operations LLC | 92-1055714 |
| 11 Dairy Lane Operations LLC | 26-0797280 |
| 1100 Norman Eskridge Highway Operations LLC | 26-0789197 |
| 1104 Welsh Road Operations LLC | 26-0831607 |
| 1105 Perry Highway Operations LLC | 92-1060178 |
| 113 W. McMurray Road Operations LLC | 92-1040208 |
| 115 S. Providence Road Operations LLC | 92-1149731 |
| 12-15 Saddle River Road Operations LLC | 26-0858429 |
| 1245 Church Road Operations LLC | 26-0832125 |
| 1248 Hospital Drive Operations LLC | 36-4813989 |
| 125 Holly Road Operations LLC | 26-0833210 |
| 128 East State Street Associates, LLC | 20-5229040 |
| 136 Donahoe Manor Road Operations LLC | 92-1085905 |
| 1361 Route 72 West Operations LLC | 26-0858998 |
| 1539 Country Club Road Operations LLC | 26-1446436 |
| 1543 Country Club Road Manor Operations LLC | 26-1446339 |
| 161 Bakers Ridge Road Operations LLC | 26-0798986 |
| 1631 Ritter Drive Operations LLC | 26-0799048 |
| 1650 Galisteo Street Operations LLC | 38-4089170 |
| 1680 Spring Creek Road Operations LLC | 26-0834593 |
| 1700 Market Street Operations LLC | 88-4312980 |
| 1700 Pine Street Operations LLC | 26-0837632 |
| 175 Blueberry Lane Operations LLC | 26-0902592 |
| 1770 Barley Road Operations LLC | 92-1100285 |
| 1848 Greentree Road Operations LLC | 92-1100372 |

| Debtor Name | EIN Number |
|---|---|
| 191 Hackett Hill Road Operations LLC | 61-1745358 |
| 2 Blackberry Lane Operations LLC | 37-1787899 |
| 20 Maitland Street Operations LLC | 26-0902639 |
| 200 Pauline Drive Operations LLC | 92-1085955 |
| 200 Reynolds Avenue Operations LLC | 26-0865155 |
| 200 South Ritchie Avenue Operations LLC | 26-0802292 |
| 201 Wood Street Operations LLC | 26-0802570 |
| 2021 Westgate Drive Operations LLC | 92-1071278 |
| 2029 Westgate Drive Operations LLC | 92-1071366 |
| 2101 Fairland Road Operations LLC | 27-3286015 |
| 211-213 Ana Drive Operations LLC | 32-0445595 |
| 2125 Elizabeth Avenue Operations LLC | 88-4303273 |
| 22 Tuck Road Operations LLC | 26-3157262 |
| 225 Evergreen Road Operations LLC | 26-0837946 |
| 227 Evergreen Road Operations LLC | 26-0838035 |
| 23 Fair Street Operations LLC | 38-3974821 |
| 23 Fair Street Property, LLC | 37-1790621 |
| 24 Old Etna Road Operations LLC | 26-0902883 |
| 2400 Kingston Court Operations LLC | 88-4314431 |
| 25 East Lindsley Road Operations LLC | 26-0865287 |
| 25 Ridgewood Road Operations LLC | 26-0902937 |
| 2507 Chestnut Street Operations LLC | 26-0838130 |
| 2600 Northampton Street Operations LLC | 92-1075101 |
| 262 Toll Gate Road Operations LLC | 26-0838226 |
| 2720 Charles Town Road Operations LLC | 26-0802645 |
| 279 Cabot Street Operations LLC | 32-0473527 |
| 279 Cabot Street Property LLC | 38-3975205 |
| 2800 Palo Parkway Operations LLC | 88-4420565 |
| 290 Hanover Street Operations LLC | 26-3156358 |
| 292 Applegarth Road Operations LLC | 26-0865549 |
| 3 Industrial Way East Operations LLC | 26-0865899 |
| 30 West Avenue Operations LLC | 26-2602152 |
| 300 Pearl Street Operations LLC | 38-3975338 |
| 3000 Windmill Road Operations LLC | 88-4314481 |
| 302 Cedar Ridge Road Operations LLC | 26-0802735 |
| 330 Franklin Turnpike Operations LLC | 26-0865965 |
| 333 Green End Avenue Operations LLC | 26-0796847 |
| 3430 Huntingdon Pike Operations LLC | 88-4304543 |
| 3485 Davisville Road Operations II LLC | 92-1105056 |
| 3514 Fowler Avenue Operations LLC | 30-1116161 |
| 3590 Washington Pike Operations LLC | 37-1800646 |
| 3720 Church Rock Street Operations LLC | 36-4906274 |
| 390 Red School Lane Operations LLC | 26-0866040 |
| 40 Crosby Street Operations LLC | 32-0573730 |

2

| Debtor Name | EIN Number |
|---|---|
| 40 Whitehall Road Operations LLC | 30-0878413 |
| 40 Whitehall Road Property LLC | 36-4814745 |
| 400 McKinley Avenue Operations LLC | 93-3663691 |
| 4140 Old Washington Highway Operations LLC | 26-0814286 |
| 419 Harding Street Operations LLC | 37-1905331 |
| 422 23rd Street Operations LLC | 26-0806381 |
| 425 Buttonwood Street Operations LLC | 92-1040323 |
| 450 East Philadelphia Avenue Operations LLC | 26-0838908 |
| 462 Main Street Operations LLC | 26-0796131 |
| 50 Mulberry Tree Street Operations LLC | 26-0804456 |
| 50 Pheasant Road Operations LLC | 61-1896882 |
| 500 East Philadelphia Avenue Operations LLC | 26-0840575 |
| 501 Thomas Jones Way Operations LLC | 92-1086015 |
| 505 Weyman Road Operations LLC | 92-1086060 |
| 530 Macoby Street Operations LLC | 26-0840740 |
| 54 Sharp Street Operations LLC | 26-0866164 |
| 5485 Perkiomen Avenue Operations LLC | 26-0840797 |
| 550 South Negley Avenue Operations LLC | 92-1089430 |
| 5609 Fifth Avenue Operations LLC | 92-1116989 |
| 590 North Poplar Fork Road Operations LLC | 26-0802814 |
| 60 Highland Road Operations LLC | 88-4292979 |
| 600 Paoli Pointe Drive Operations LLC | 26-0842139 |
| 600 W. Valley Forge Road Operations LLC | 88-4293566 |
| 613 Hammonds Lane Operations LLC | 26-0816065 |
| 624 N. Converse Street Property, LLC | 32-0467257 |
| 640 Bethlehem Pike Operations LLC | 92-1044499 |
| 642 Metacom Avenue Operations LLC | 26-3157291 |
| 660 Commonwealth Avenue Operations LLC | 26-0796908 |
| 677 Court Street Operations LLC | 26-0903080 |
| 7 Baldwin Street Operations LLC | 26-0903110 |
| 700 Marvel Road Operations LLC | 26-0789419 |
| 700 Town Bank Road Operations LLC | 26-0866369 |
| 715 East King Street Operations LLC | 37-1690544 |
| 723 Summers Street Operations LLC | 26-0804524 |
| 724 N. Charlotte Street Operations LLC | 92-1045090 |
| 735 Putnam Pike Operations LLC | 26-3156030 |
| 75 Hickle Street Operations LLC | 26-0842502 |
| 777 Lafayette Road Operations LLC | 26-3157593 |
| 8 Rose Street Operations LLC | 26-0804585 |
| 8 Snow Road Operations LLC | 36-4904863 |
| 80 Maddex Drive Operations LLC | 26-0804643 |
| 800 Court Street Circle Operations LLC | 92-1089501 |
| 803 Hacienda Lane Operations LLC | 36-4905637 |
| 8100 Washington Lane Operations LLC | 26-0842681 |

3

| Debtor Name | EIN Number |
|---|---|
| 825 Summit Street Operations LLC | 26-0804702 |
| 84 Cold Hill Road Operations LLC | 26-0866432 |
| 840 Lee Road Operations LLC | 26-0805378 |
| 850 12th Avenue Property, LLC | 61-1762114 |
| 867 York Road Operations LLC | 26-0842583 |
| 885 MacBeth Drive Operations LLC | 92-1055531 |
| 900 Tuck Street Operations LLC | 92-1055607 |
| 91 Country Village Road Operations LLC | 26-0903160 |
| 940 Walnut Bottom Road Operations LLC | 92-1089574 |
| 98 Hospitality Drive Operations LLC | 36-4814147 |
| Albuquerque Heights Healthcare and Rehabilitation Center, LLC | 26-0675040 |
| Albuquerque Heights Property, LLC | 36-4739932 |
| Belen Meadows Healthcare and Rehabilitation Center, LLC | 26-0675094 |
| Belfast Operations, LLC | 20-5541877 |
| Brier Oak on Sunset, LLC | 95-4212165 |
| Camden Operations, LLC | 20-5542380 |
| Canyon Albuquerque Property, LLC | 61-1715791 |
| Canyon Transitional Rehabilitation Center, LLC | 26-0675157 |
| Clovis Healthcare and Rehabilitation Center, LLC | 26-0675210 |
| Courtyard JV LLC | 27-3653462 |
| Encore GC Acquisition LLC | 36-4746246 |
| Encore Pediatrics, LLC | 92-0850640 |
| Encore Preakness, LLC | 25-1805051 |
| Encore Rehabilitation Services, LLC | 20-8215706 |
| Falmouth Operations, LLC | 20-5542263 |
| Farmington Operations, LLC | 20-5542206 |
| FC-GEN Operations Investment, LLC | 27-3237005 |
| Five Ninety Six Sheldon Road Operations LLC | 26-3157551 |
| Forty Six Nichols Street Operations LLC | 26-3157432 |
| Fountain Holdco, LLC | 61-1690655 |
| Franklin Woods JV LLC | 27-3653701 |
| GEN BQ JV Holdings, LLC | 83-4680177 |
| GEN CCG JV Holdings LLC | 84-4231317 |
| GEN Operations I, LLC | 27-3237090 |
| GEN Operations II, LLC | 27-3237225 |
| GEN SF JV Holdings, LLC | 84-2030307 |
| GEN-CCG WO Master Tenant LLC | 84-4852373 |
| GEN-Next Holdco I LLC | 83-3196600 |
| Genesis Administrative Services LLC | 30-0847166 |
| Genesis CT Holdings LLC | 26-0787896 |
| Genesis CT XCL Operations LLC | 83-4097388 |
| Genesis DE Holdings LLC | 26-0788062 |
| Genesis Dynasty Operations LLC | 35-2579085 |
| Genesis Eldercare Network Services, LLC | 23-2107987 |

4

| Debtor Name | EIN Number |
|---|---|
| Genesis ElderCare Physician Services, LLC | 06-1156428 |
| Genesis HealthCare LLC | 27-3237296 |
| Genesis HealthCare of Maine, LLC | 36-4725000 |
| Genesis Holdings LLC | 30-0843337 |
| Genesis MA Holdings LLC | 26-0788158 |
| Genesis MD Holdings LLC | 26-0788216 |
| Genesis Midwest II Operations LLC | 61-1866165 |
| Genesis NH Holdings LLC | 26-0902542 |
| Genesis NHG Operations LLC | 37-1904639 |
| Genesis NHG-GEN Operations LLC | 83-4098117 |
| Genesis NJ Holdings LLC | 26-0856500 |
| Genesis OMG Operations LLC | 45-2036948 |
| Genesis Operations III LLC | 27-3956918 |
| Genesis Operations IV LLC | 45-2014515 |
| Genesis Operations LLC | 26-0787826 |
| Genesis Operations V LLC | 45-2015148 |
| Genesis Operations VI LLC | 45-2015863 |
| Genesis Orion Operations LLC | 46-3646227 |
| Genesis PA Holdings LLC | 26-0788305 |
| Genesis Partnership LLC | 61-1747445 |
| Genesis Physician Services MSO, LLC | 37-1896412 |
| Genesis PM CO Operations LLC | 92-1398777 |
| Genesis PM NJ Operations LLC | 92-1881394 |
| Genesis PM PA Operations LLC | 92-1071670 |
| Genesis RI Holdings LLC | 26-0788381 |
| Genesis SNI Operations LLC | 84-2628539 |
| Genesis Tang Operations LLC | 38-4021426 |
| Genesis VA Holdings LLC | 26-0874971 |
| Genesis VT Holdings LLC | 26-0822458 |
| Genesis WV Holdings LLC | 26-0788494 |
| GHC Holdings LLC | 26-0740682 |
| GHC JV Holdings LLC | 27-3451063 |
| GHC Payroll LLC | 26-1091992 |
| GHC TX Operations LLC | 61-1750087 |
| Granite Ledges JV LLC | 27-3653829 |
| Harborside Danbury Limited Partnership | 06-1528119 |
| Harborside Health I LLC | 51-0304578 |
| Harborside Healthcare Advisors Limited Partnership | 04-2985690 |
| Harborside Healthcare Limited Partnership | 04-2985687 |
| Harborside Healthcare, LLC | 04-3307188 |
| Harborside New Hampshire Limited Partnership | 04-3284611 |
| Harborside Rhode Island Limited Partnership | 05-0495209 |
| Harborside Toledo Business LLC | 04-3274482 |
| HBR Kentucky, LLC | 20-2512086 |

| Debtor Name | EIN Number |
|---|---|
| HBR Trumbull, LLC | 20-4599841 |
| HC 63 Operations LLC | 26-0805549 |
| Kansas City Transitional Care Center, LLC | 38-3879014 |
| Kennebunk Operations, LLC | 20-5542183 |
| Kennett Center, L.P. | 34-1975968 |
| KHI LLC | 51-0304577 |
| Leasehold Resource Group, LLC | 20-0083961 |
| Lewiston Operations, LLC | 20-5541920 |
| LTC ACO, LLC | 37-1787111 |
| Maryland Harborside, LLC | 04-3168713 |
| Magnolia JV LLC | 27-3653937 |
| Metro Therapy, Inc. | 11-3068922 |
| Nine Haywood Avenue Operations LLC | 26-0797562 |
| Odd Lot LLC | 27-5191122 |
| Orono Operations, LLC | 20-5542044 |
| PAI Participant 1, LLC | 83-4164482 |
| PAI Participant 2, LLC | 83-4164572 |
| PAI Participant 3, LLC | 83-4164685 |
| PAI Participant 4, LLC | 83-4164813 |
| PBR Intermediate Holdings, LLC | 88-3920334 |
| PDDTSE, LLC | 46-2458197 |
| Peak Medical Assisted Living, LLC | 52-2088942 |
| Peak Medical Las Cruces No. 2, LLC | 20-0068615 |
| Peak Medical Las Cruces, LLC | 71-0950059 |
| Peak Medical New Mexico No. 3, LLC | 85-0484183 |
| Peak Medical Roswell, LLC | 20-0068604 |
| Peak Medical, LLC | 52-2088940 |
| Pine Tree Villa LLC | 20-2513222 |
| Post-Acute Innovations, LLC | 37-1932430 |
| Powerback Pediatrics of Arkansas, LLC | 88-4247749 |
| Powerback Pediatrics of Georgia, LLC | 99-0921365 |
| Powerback Pediatrics of Missouri, LLC | 92-0863507 |
| Powerback Pediatrics of Nebraska, LLC | 92-0886808 |
| Powerback Pediatrics of South Carolina, LLC | 99-0921075 |
| Powerback Pediatrics of Vermont, LLC | 99-0921658 |
| Powerback Rehabilitation, LLC | 23-2446104 |
| PRMC/GEC at Salisbury Center, LLC | 23-3010869 |
| Property Resource Holdings, LLC | 37-1712484 |
| Regency Health Services, LLC | 33-0210226 |
| Respiratory Health Services LLC | 52-2054967 |
| Romney Health Care Center Limited Partnership | 55-0689584 |
| Route 92 Operations LLC | 26-0805623 |
| Saddle Shop Road Operations LLC | 26-0805711 |
| Salisbury JV LLC | 27-3654054 |

| Debtor Name | EIN Number |
|---|---|
| Scarborough Operations, LLC | 20-5542088 |
| SHG Partnership, LLC | 36-4802236 |
| SHG Resources, LLC | 20-0084078 |
| Skies Healthcare and Rehabilitation Center, LLC | 26-0675263 |
| Skiles Avenue and Sterling Drive Urban Renewal Operations LLC | 61-1717930 |
| Skilled Healthcare, LLC | 20-0084014 |
| Skowhegan SNF Operations, LLC | 20-5541352 |
| St. Anthony Healthcare and Rehabilitation Center, LLC | 26-0675327 |
| St. Catherine Healthcare and Rehabilitation Center, LLC | 20-8386337 |
| St. John Healthcare and Rehabilitation Center, LLC | 20-8386810 |
| St. Theresa Healthcare and Rehabilitation Center, LLC | 26-0675370 |
| State Street Associates, L.P. | 23-2799332 |
| State Street Kennett Square, LLC | 23-2446105 |
| Stillwell Road Operations LLC | 26-0805824 |
| Summit Care Parent, LLC | 38-3901040 |
| Summit Care, LLC | 95-3656297 |
| Sun Healthcare Group, Inc. | 13-4230695 |
| SunBridge Beckley Health Care LLC | 31-1042548 |
| SunBridge Care Enterprises, LLC | 95-3311961 |
| SunBridge Clipper Home of North Conway, LLC | 02-0417606 |
| SunBridge Clipper Home of Wolfeboro, LLC | 02-0382521 |
| SunBridge Dunbar Health Care LLC | 55-0593873 |
| SunBridge Gardendale Health Care Center, LLC | 58-2238801 |
| SunBridge Goodwin Nursing Home, LLC | 02-0303002 |
| SunBridge Healthcare, LLC | 85-0370802 |
| SunBridge Nursing Home, LLC | 91-1572371 |
| SunBridge Putnam Health Care LLC | 31-0996773 |
| SunBridge Regency-North Carolina, LLC | 56-1954175 |
| SunBridge Regency-Tennessee, LLC | 33-0690226 |
| SunBridge Retirement Care Associates, LLC | 43-1441789 |
| SunBridge Salem Health Care LLC | 31-0996769 |
| SunDance Rehabilitation Agency, LLC | 30-0141695 |
| SunDance Rehabilitation Holdco, Inc. | 38-3954180 |
| SunDance Rehabilitation, LLC | 06-1310410 |
| The Rehabilitation Center of Albuquerque, LLC | 26-0675426 |
| Thirty Five Bel-Aire Drive SNF Operations LLC | 26-0797624 |
| Three Mile Curve Operations LLC | 26-0806097 |
| Waterville SNF Operations LLC | 20-5541966 |
| Westbrook Operations, LLC | 20-5542347 |
| Westwood Medical Park Operations LLC | 26-0797458 |

## EXHIBIT B

### List of OpCo Facility Debtors (Class 6-A (GUC Distribution Group 1))

| Case # | Debtor Name |
|---|---|
| 25-80334 | SunBridge Care Enterprises, LLC |
| 25-80407 | SunBridge Regency-North Carolina, LLC |
| 25-80480 | SunBridge Healthcare, LLC |
| 25-80420 | SunBridge Retirement Care Associates, LLC |
| 25-80457 | Franklin Woods JV LLC |
| 25-80224 | Granite Ledges JV LLC |
| 25-80195 | 1 Sutphin Drive Operations LLC |
| 25-80222 | 100 Abbeyville Road Operations LLC |
| 25-80228 | 100 Chambers Street Operations LLC |
| 25-80232 | 100 W. Queen Street Operations LLC |
| 25-80311 | 1000 Lincoln Drive Operations LLC |
| 25-80315 | 1008 Thompson Street Operations LLC |
| 25-80234 | 101 13th Street Operations LLC |
| 25-80317 | 1020 South Main Street Operations LLC |
| 25-80253 | 106 Tyree Street Operations LLC |
| 25-80319 | 1070 Stouffer Avenue Operations LLC |
| 25-80210 | 11 Dairy Lane Operations LLC |
| 25-80323 | 1100 Norman Eskridge Highway Operations LLC |
| 25-80327 | 1104 Welsh Road Operations LLC |
| 25-80260 | 115 S. Providence Road Operations LLC |
| 25-80214 | 12-15 Saddle River Road Operations LLC |
| 25-80335 | 1245 Church Road Operations LLC |
| 25-80265 | 125 Holly Road Operations LLC |
| 25-80343 | 1361 Route 72 West Operations LLC |
| 25-80346 | 1539 Country Club Road Operations LLC |
| 25-80350 | 1543 Country Club Road Manor Operations LLC |
| 25-80279 | 161 Bakers Ridge Road Operations LLC |
| 25-80354 | 1631 Ritter Drive Operations LLC |
| 25-80357 | 1650 Galisteo Street Operations LLC |
| 25-80361 | 1680 Spring Creek Road Operations LLC |
| 25-80365 | 1700 Market Street Operations LLC |
| 25-80367 | 1700 Pine Street Operations LLC |
| 25-80284 | 175 Blueberry Lane Operations LLC |
| 25-80389 | 1770 Barley Road Operations LLC |
| 25-80287 | 191 Hackett Hill Road Operations LLC |
| 25-80220 | 20 Maitland Street Operations LLC |

| Case # | Debtor Name |
|---|---|
| 25-80293 | 200 Pauline Drive Operations LLC |
| 25-80303 | 200 South Ritchie Avenue Operations LLC |
| 25-80306 | 201 Wood Street Operations LLC |
| 25-80397 | 2021 Westgate Drive Operations LLC |
| 25-80401 | 2029 Westgate Drive Operations LLC |
| 25-80406 | 2101 Fairland Road Operations LLC |
| 25-80186 | 211-213 Ana Drive Operations LLC |
| 25-80189 | 2125 Elizabeth Avenue Operations LLC |
| 25-80192 | 22 Tuck Road Operations LLC |
| 25-80198 | 225 Evergreen Road Operations LLC |
| 25-80199 | 227 Evergreen Road Operations LLC |
| 25-80208 | 24 Old Etna Road Operations LLC |
| 25-80211 | 2400 Kingston Court Operations LLC |
| 25-80215 | 25 East Lindsley Road Operations LLC |
| 25-80217 | 25 Ridgewood Road Operations LLC |
| 25-80223 | 2507 Chestnut Street Operations LLC |
| 25-80227 | 2600 Northampton Street Operations LLC |
| 25-80230 | 262 Toll Gate Road Operations LLC |
| 25-80233 | 2720 Charles Town Road Operations LLC |
| 25-80236 | 279 Cabot Street Operations LLC |
| 25-80245 | 290 Hanover Street Operations LLC |
| 25-80247 | 292 Applegarth Road Operations LLC |
| 25-80249 | 3 Industrial Way East Operations LLC |
| 25-80254 | 30 West Avenue Operations LLC |
| 25-80259 | 3000 Windmill Road Operations LLC |
| 25-80264 | 302 Cedar Ridge Road Operations LLC |
| 25-80190 | 330 Franklin Turnpike Operations LLC |
| 25-80193 | 333 Green End Avenue Operations LLC |
| 25-80197 | 3430 Huntingdon Pike Operations LLC |
| 25-80213 | 3514 Fowler Avenue Operations LLC |
| 25-80218 | 3590 Washington Pike Operations LLC |
| 25-80225 | 3720 Church Rock Street Operations LLC |
| 25-80231 | 390 Red School Lane Operations LLC |
| 25-80240 | 40 Crosby Street Operations LLC |
| 25-80244 | 40 Whitehall Road Operations LLC |
| 25-80263 | 400 McKinley Avenue Operations LLC |
| 25-80268 | 4140 Old Washington Highway Operations LLC |
| 25-80272 | 419 Harding Street Operations LLC |
| 25-80276 | 422 23rd Street Operations LLC |
| 25-80282 | 425 Buttonwood Street Operations LLC |

| Case # | Debtor Name |
|---|---|
| 25-80286 | 450 East Philadelphia Avenue Operations LLC |
| 25-80289 | 462 Main Street Operations LLC |
| 25-80294 | 50 Mulberry Tree Street Operations LLC |
| 25-80301 | 50 Pheasant Road Operations LLC |
| 25-80310 | 500 East Philadelphia Avenue Operations LLC |
| 25-80333 | 530 Macoby Street Operations LLC |
| 25-80337 | 54 Sharp Street Operations LLC |
| 25-80342 | 5485 Perkiomen Avenue Operations LLC |
| 25-80356 | 590 North Poplar Fork Road Operations LLC |
| 25-80364 | 600 Paoli Pointe Drive Operations LLC |
| 25-80371 | 600 W. Valley Forge Road Operations LLC |
| 25-80375 | 613 Hammonds Lane Operations LLC |
| 25-80379 | 640 Bethlehem Pike Operations LLC |
| 25-80390 | 660 Commonwealth Avenue Operations LLC |
| 25-80393 | 677 Court Street Operations LLC |
| 25-80408 | 7 Baldwin Street Operations LLC |
| 25-80428 | 700 Marvel Road Operations LLC |
| 25-80432 | 700 Town Bank Road Operations LLC |
| 25-80436 | 715 East King Street Operations LLC |
| 25-80440 | 723 Summers Street Operations LLC |
| 25-80447 | 724 N. Charlotte Street Operations LLC |
| 25-80453 | 75 Hickle Street Operations LLC |
| 25-80455 | 777 Lafayette Road Operations LLC |
| 25-80458 | 8 Rose Street Operations LLC |
| 25-80462 | 8 Snow Road Operations LLC |
| 25-80467 | 80 Maddex Drive Operations LLC |
| 25-80468 | 800 Court Street Circle Operations LLC |
| 25-80469 | 803 Hacienda Lane Operations LLC |
| 25-80471 | 8100 Washington Lane Operations LLC |
| 25-80472 | 825 SUMMIT STREET OPERATIONS LLC |
| 25-80473 | 84 Cold Hill Road Operations LLC |
| 25-80474 | 840 Lee Road Operations LLC |
| 25-80475 | 867 York Road Operations LLC |
| 25-80476 | 900 Tuck Street Operations LLC |
| 25-80477 | 91 Country Village Road Operations LLC |
| 25-80478 | 940 Walnut Bottom Road Operations LLC |
| 25-80266 | Albuquerque Heights Healthcare and Rehabilitation Center, LLC |
| 25-80273 | Belen Meadows Healthcare and Rehabilitation Center, LLC |
| 25-80296 | Canyon Transitional Rehabilitation Center, LLC |
| 25-80299 | Clovis Healthcare and Rehabilitation Center, LLC |

3

| Case # | Debtor Name |
|---|---|
| 25-80316 | Falmouth Operations, LLC |
| 25-80324 | Five Ninety Six Sheldon Road Operations LLC |
| 25-80369 | Nine Haywood Avenue Operations LLC |
| 25-80414 | Peak Medical Las Cruces No. 2, LLC |
| 25-80416 | Peak Medical Las Cruces, LLC |
| 25-80421 | Peak Medical New Mexico No. 3, LLC |
| 25-80216 | Romney Health Care Center Limited Partnership |
| 25-80219 | Route 92 Operations LLC |
| 25-80221 | Saddle Shop Road Operations LLC |
| 25-80251 | Skies Healthcare and Rehabilitation Center, LLC |
| 25-80267 | Skowhegan SNF Operations, LLC |
| 25-80271 | St. Anthony Healthcare and Rehabilitation Center, LLC |
| 25-80278 | St. Catherine Healthcare and Rehabilitation Center, LLC |
| 25-80283 | St. John Healthcare and Rehabilitation Center, LLC |
| 25-80288 | St. Theresa Healthcare and Rehabilitation Center, LLC |
| 25-80300 | Stillwell Road Operations LLC |
| 25-80328 | SunBridge Beckley Health Care LLC |
| 25-80374 | SunBridge Dunbar Health Care LLC |
| 25-80377 | SunBridge Gardendale Health Care Center, LLC |
| 25-80382 | SunBridge Goodwin Nursing Home, LLC |
| 25-80400 | SunBridge Nursing Home, LLC |
| 25-80403 | SunBridge Putnam Health Care LLC |
| 25-80418 | SunBridge Regency-Tennessee, LLC |
| 25-80423 | SunBridge Salem Health Care LLC |
| 25-80435 | The Rehabilitation Center of Albuquerque, LLC |
| 25-80439 | Thirty Five Bel-Aire Drive SNF Operations LLC |
| 25-80443 | Three Mile Curve Operations LLC |
| 25-80451 | Westwood Medical Park Operations LLC |
| 25-80277 | Belfast Operations, LLC |
| 25-80285 | Camden Operations, LLC |
| 25-80318 | Farmington Operations, LLC |
| 25-80321 | Kennebunk Operations, LLC |
| 25-80341 | Lewiston Operations, LLC |
| 25-80378 | Orono Operations, LLC |
| 25-80235 | Scarborough Operations, LLC |
| 25-80446 | Waterville SNF Operations LLC |
| 25-80448 | Westbrook Operations, LLC |

4

## EXHIBIT C

**List of Ancillary Business & JV Debtors (Class 6-B (GUC Distribution Group 2))**

| Case# | Debtor Name |
|---|---|
| 25-80352 | Magnolia JV LLC |
| 25-80207 | GHC JV Holdings LLC |
| 25-80370 | Genesis ElderCare Physician Services, LLC |
| 25-80209 | Respiratory Health Services LLC |
| 25-80302 | Encore GC Acquisition LLC |
| 25-80305 | Encore Pediatrics, LLC |
| 25-80309 | Encore Preakness, LLC |
| 25-80312 | Encore Rehabilitation Services, LLC |
| 25-80363 | Metro Therapy, Inc. |
| 25-80399 | PBR Intermediate Holdings, LLC |
| 25-80449 | Powerback Pediatrics of Arkansas, LLC |
| 25-80452 | Powerback Pediatrics of Georgia, LLC |
| 25-80456 | Powerback Pediatrics of Missouri, LLC |
| 25-80460 | Powerback Pediatrics of Nebraska, LLC |
| 25-80463 | Powerback Pediatrics of South Carolina, LLC |
| 25-80465 | Powerback Pediatrics of Vermont, LLC |
| 25-80191 | Powerback Rehabilitation, LLC |
| 25-80433 | SunDance Rehabilitation, LLC |
| 25-80425 | SunDance Rehabilitation Agency, LLC |
| 25-80248 | Harborside Healthcare Limited Partnership |
| 25-80459 | GEN BQ JV Holdings, LLC |
| 25-80464 | GEN SF JV Holdings, LLC |
| 25-80461 | GEN CCG JV Holdings LLC |
| 25-80466 | GEN-Next Holdco I LLC |
| 25-80347 | LTC ACO, LLC |

## **EXHIBIT D**

**List of HoldCo Non-Facility Debtors (Class 6-C (GUC Distribution Group 3))**

| Case# | Debtor Name |
|---|---|
| 25-80372 | Genesis HealthCare LLC |
| 25-80252 | Harborside Healthcare, LLC |
| 25-80349 | Genesis Administrative Services LLC |
| 25-80366 | Genesis Eldercare Network Services, LLC |
| 25-80246 | 101 Development Group, LLC |
| 25-80330 | Fountain Holdco, LLC |
| 25-80419 | Genesis Partnership LLC |
| 25-80404 | PDDTSE, LLC |
| 25-80238 | SHG Partnership, LLC |
| 25-80388 | PAI Participant 2, LLC |
| 25-80391 | PAI Participant 3, LLC |
| 25-80395 | PAI Participant 4, LLC |
| 25-80295 | State Street Kennett Square, LLC |
| 25-80239 | 279 Cabot Street Property LLC |
| 25-80256 | 40 Whitehall Road Property LLC |
| 25-80373 | Odd Lot LLC |
| 25-80340 | GEN Operations I, LLC |
| 25-80344 | GEN Operations II, LLC |
| 25-80376 | Genesis HealthCare of Maine, LLC |
| 25-80409 | Genesis Operations IV LLC |
| 25-80412 | Genesis Operations V LLC |
| 25-80413 | Genesis Operations VI LLC |
| 25-80417 | Genesis PA Holdings LLC |
| 25-80444 | Genesis VT Holdings LLC |
| 25-80445 | Post-Acute Innovations, LLC |
| 25-80345 | GEN-CCG WO Master Tenant LLC |
| 25-80362 | Genesis Dynasty Operations LLC |
| 25-80392 | Genesis NHG Operations LLC |
| 25-80396 | Genesis NHG-GEN Operations LLC |
| 25-80411 | Genesis Operations LLC |
| 25-80415 | Genesis Orion Operations LLC |
| 25-80426 | Genesis PM NJ Operations LLC |
| 25-80438 | Genesis SNI Operations LLC |
| 25-80441 | Genesis Tang Operations LLC |
| 25-80336 | Leasehold Resource Group, LLC |
| 25-80270 | 128 East State Street Associates, LLC |

| Case# | Debtor Name |
|---|---|
| 25-80307 | HC 63 Operations LLC |
| 25-80185 | Genesis Healthcare, Inc. |
| 25-80320 | FC-GEN Operations Investment, LLC |
| 25-80380 | Genesis Holdings LLC |
| 25-80196 | GHC Holdings LLC |
| 25-80243 | Harborside Healthcare Advisors Limited Partnership |
| 25-80290 | HBR Kentucky, LLC |
| 25-80332 | KHI LLC |
| 25-80359 | Maryland Harborside, LLC |
| 25-80437 | Peak Medical, LLC |
| 25-80202 | Property Resource Holdings, LLC |
| 25-80206 | Regency Health Services, LLC |
| 25-80242 | SHG Resources, LLC |
| 25-80261 | Skilled Healthcare, LLC |
| 25-80304 | Summit Care Parent, LLC |
| 25-80308 | Summit Care, LLC |
| 25-80429 | SunDance Rehabilitation Holdco, Inc. |
| 25-80237 | Harborside Health I LLC |
| 25-80281 | Harborside Toledo Business LLC |
| 25-80325 | Kennett Center, L.P. |
| 25-80292 | State Street Associates, L.P. |
| 25-80384 | PAI Participant 1, LLC |
| 25-80422 | Genesis Physician Services MSO, LLC |
| 25-80212 | GHC Payroll LLC |
| 25-80182 | 624 N. Converse Street Property, LLC |
| 25-80183 | 850 12th Avenue Property, LLC |
| 25-80386 | Genesis Midwest II Operations LLC |
| 25-80322 | Sun Healthcare Group, Inc. |

## EXHIBIT E

### List of DivestCo Debtors (Class 6-D (GUC Distribution Group 4))

| Case# | Debtor Name |
|---|---|
| 25-80454 | Courtyard JV LLC |
| 25-80226 | Salisbury JV LLC |
| 25-80280 | Brier Oak on Sunset, LLC |
| 25-80297 | 200 Reynolds Avenue Operations LLC |
| 25-80274 | Harborside Rhode Island Limited Partnership |
| 25-80298 | HBR Trumbull, LLC |
| 25-80410 | Peak Medical Assisted Living, LLC |
| 25-80430 | Peak Medical Roswell, LLC |
| 25-80255 | Skiles Avenue and Sterling Drive Urban Renewal Operations LLC |
| 25-80348 | 550 South Negley Avenue Operations LLC |
| 25-80353 | Genesis CT Holdings LLC |
| 25-80358 | Genesis DE Holdings LLC |
| 25-80381 | Genesis MA Holdings LLC |
| 25-80385 | Genesis MD Holdings LLC |
| 25-80387 | Genesis NH Holdings LLC |
| 25-80398 | Genesis NJ Holdings LLC |
| 25-80405 | Genesis Operations III LLC |
| 25-80424 | Genesis PM CO Operations LLC |
| 25-80427 | Genesis PM PA Operations LLC |
| 25-80431 | Genesis RI Holdings LLC |
| 25-80434 | Genesis VA Holdings LLC |
| 25-80187 | Genesis WV Holdings LLC |
| 25-80205 | 23 Fair Street Property, LLC |
| 25-80269 | Albuquerque Heights Property, LLC |
| 25-80291 | Canyon Albuquerque Property, LLC |
| 25-80188 | 1 Glen Hill Road Operations LLC |
| 25-80204 | 10 Woodland Drive Operations LLC |
| 25-80250 | 105 Chester Road Operations LLC |
| 25-80331 | 1105 Perry Highway Operations LLC |
| 25-80258 | 113 W. McMurray Road Operations LLC |
| 25-80338 | 1248 Hospital Drive Operations LLC |
| 25-80275 | 136 Donahoe Manor Road Operations LLC |
| 25-80394 | 1848 Greentree Road Operations LLC |
| 25-80200 | 2 Blackberry Lane Operations LLC |
| 25-80203 | 23 Fair Street Operations LLC |
| 25-80257 | 300 Pearl Street Operations LLC |

| Case# | Debtor Name |
|---|---|
| 25-80201 | 3485 Davisville Road Operations II LLC |
| 25-80313 | 501 Thomas Jones Way Operations LLC |
| 25-80329 | 505 Weyman Road Operations LLC |
| 25-80351 | 5609 Fifth Avenue Operations LLC |
| 25-80360 | 60 Highland Road Operations LLC |
| 25-80383 | 642 Metacom Avenue Operations LLC |
| 25-80450 | 735 Putnam Pike Operations LLC |
| 25-80470 | 885 MacBeth Drive Operations LLC |
| 25-80479 | 98 Hospitality Drive Operations LLC |
| 25-80326 | Forty Six Nichols Street Operations LLC |
| 25-80229 | Harborside Danbury Limited Partnership |
| 25-80262 | Harborside New Hampshire Limited Partnership |
| 25-80339 | SunBridge Clipper Home of North Conway, LLC |
| 25-80368 | SunBridge Clipper Home of Wolfeboro, LLC |
| 25-80241 | 2800 Palo Parkway Operations LLC |
| 25-80314 | Kansas City Transitional Care Center, LLC |
| 25-80194 | PRMC/GEC at Salisbury Center, LLC |
| 25-80442 | Pine Tree Villa LLC |
| 25-80184 | GHC TX Operations LLC |
| 25-80355 | Genesis CT XCL Operations LLC |
| 25-80402 | Genesis OMG Operations LLC |