**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

**ENTERED**

**THE DATE OF ENTRY IS ON**
**THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed October 14, 2026**

**United States Bankruptcy Judge**

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | ) | Case No. 25-80185 (SGJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMING THE DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN OF GENESIS HEALTHCARE, INC. AND ITS DEBTOR AFFILIATES**

Genesis Healthcare, Inc. and its affiliates and subsidiaries as debtors and debtors-in-possession (collectively, the "Debtors")[2] in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases") having:

[1] The last four digits of Genesis Healthcare, Inc.'s federal tax-identification number are 4755. There are 299 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

[2] Capitalized terms used but not otherwise defined in this order (this "Confirmation Order") shall have the meanings ascribed to such terms in the Plan, the Disclosure Statement, or the Disclosure Statement Order (each as defined herein), as applicable. The rules of interpretation set forth in Article I.B of the Plan shall apply hereto. For the avoidance of doubt, unless otherwise specified, all references herein to "Articles" refer to articles of the Plan.

i. commenced the Chapter 11 Cases beginning on July 9, 2025 (the "Petition Date") by each filing a voluntary petition in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code");

ii. continued to operate and manage their businesses and properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108;

iii. filed, on September 15, 2025, the *Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 920];

iv. obtained, on December 22, 2025, the *Agreed Order (I) Approving Amended and Restated Bidding Procedures for the Submission, Receipt, and Analysis of Bids in Connection with the Sale of the Debtors' Assets, and (II) Scheduling Certain Auction Dates and Deadlines* [Docket No. 1989], which, among other things, approved revised bidding procedures for a reopened auction and appointed Houlihan Lokey Capital, Inc. as the estate broker (the "Estate Broker");

v. obtained, on January 26, 2026, the *Order (I) Approving the Asset Purchase Agreement Between the Debtors and 101 W State Street Holdings LLC; (II) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; and (IV) Granting Related Relief* [Docket No. 2204] (the "Sale Order"), approving that certain Asset Purchase Agreement, dated as of January 23, 2026 (as amended, supplemented, or otherwise modified, the "APA"), by and among the Debtors and 101 W State Street Holdings LLC (the "Buyer"), and authorizing the sale of the purchased assets to Buyer free and clear of liens, claims, interests, and encumbrances to the fullest extent permitted by law, other than assumed liabilities and permitted liens as set forth in the APA (the "Sale");

vi. filed, on February 24, 2026, the *Debtors' Motion for Entry of an Order (I) Approving the Settlement Between Debtors, NewGen, LLC, Bold Quail Entities, and Their Affiliates, and (II) Granting Related Relief* [Docket No. 2396];

vii. obtained, on April 20, 2026, the *Order (I) Approving Settlement Related to Bold Quail Entities and (II) Granting Related Relief* [Docket No. 2617], which included an amended and restated APA;

viii. filed, on May 11, 2026,

a. the *Debtors' Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates* [Docket No. 2693]; and

b. the *Disclosure Statement for the Debtors' Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates* [Docket No. 2694];

ix. filed, on May 26, 2026, the *Debtors' Motion for Entry of Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving Solicitation and Voting Procedures in Connection with Confirmation of Plan; (III) Approving the Forms of Ballots and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* [Docket No. 2767] (the "Disclosure Statement Motion");

x. filed, on July 27, 2026,

a. the *Debtors' Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and Its Debtor Affiliates* [Docket No. 3041]; and

b. the *Disclosure Statement for the Debtors' Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and Its Debtor Affiliates* [Docket No. 3042];

xi. filed, on July 30, 2026,

a. the *Debtors' Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and Its Debtor Affiliates* [Docket No. 3066];

b. the *Disclosure Statement for the Debtors' Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and Its Debtor Affiliates* [Docket No. 3070]; and

c. the *Certificate of Counsel Regarding Debtors' Motion for Entry of Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving Solicitation and Voting Procedures in Connection with Confirmation of Plan; (III) Approving the Forms of Ballots and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief*, which included a revised proposed order with respect to the relief requested in the Disclosure Statement Motion;

xii. obtained, on August 4, 2026, the *Order (I) Approving the Adequacy of the Disclosure Statement; (II) Approving Solicitation and Voting Procedures in Connection with Confirmation of Plan; (III) Approving the Forms of Ballots and Notices in Connection Therewith; (IV) Scheduling Certain Dates with Respect Thereto; and (V) Granting Related Relief* [Docket No. 3099] (the "Disclosure Statement Order"), approving the Disclosure Statement and approving the solicitation procedures and tabulation rules set forth in the Disclosure Statement Order (collectively, the "Solicitation Procedures");

xiii. filed, on August 5, 2026,

a. the solicitation version of the *Debtors' Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and Its Debtor Affiliates* [Docket No. 3101] (the "Solicited Plan");

b. the solicitation version of the *Disclosure Statement for the Debtors' Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and Its Debtor Affiliates* [Docket No. 3102] (the "Disclosure Statement");

c. the *Notice of (I) Hearing on Confirmation of the Debtors' Proposed Chapter 11 Plan; and (II) Deadline to Objection to Confirmation* [Docket No. 3103] (the "Confirmation Hearing Notice"); and

d. the *Notice to Residents & Patients of (I) Hearing on Confirmation of Chapter 11 Plan and (II) Deadline to Object to Confirmation* [Docket No. 3105] (the "Resident & Patient Notice");

xiv. caused to be distributed, on August 10, 2026,

a. the Resident & Patient Notice on all of the Debtors' current residents and patients residing or being treated in the Debtors' facilities; and

b. the Disclosure Statement (including the Solicited Plan), the Confirmation Hearing Notice, the Resident & Patient Notice, and an 11x17 poster-size of the Resident & Patient Notice for display in the common areas of each of the Debtors' facilities to each of the Debtors' facility administrators;

xv. filed, on August 11, 2026 and August 12, 2026, respectively, *Certificates of Service* with respect to the foregoing service [Docket Nos. 3134, 3136, 3144] (collectively, the "Resident COS");

xvi. published, on August 11, 2026, the Confirmation Hearing Notice in the national edition of *The Wall Street Journal*, as evidenced by the affidavit of publication filed on August 12, 2026 [Docket No. 3142] (the "WSJ Publication Affidavit");

xvii. published, on August 12, 2026, the Confirmation Hearing Notice in the national edition of *USA Today*, as evidenced by the affidavit of publication filed on August 12, 2026 [Docket No. 3143] (the "USA Today Publication Affidavit" and together with the WSJ Publication Affidavit, the "Publication Affidavits");

xviii. caused to be distributed, on August 13, 2026, in accordance with the terms of the Disclosure Statement Order,

a. Solicitation Packages to Holders of Claims in the Voting Classes (as defined herein); and

b. Non-Voting Notice Packages to Holders of Claims and Interests in the Non-Voting Classes (as defined herein);

xix. caused to be distributed, on August 13, 2026, the Confirmation Hearing Notice in accordance with the applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules");

xx. filed, on August 13, 2026, the *Certificate of Service of Solicitation Documents* with respect to service of the Solicitation Packages, the Non-Voting Notice Packages, and the Confirmation Hearing Notice [Docket No. 3202] (the "Solicitation COS");

xxi. filed, on September 14, 2026, the *Notice of Plan Supplement with Respect to the Debtors' Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates* [Docket No. 3339] (the "Initial Plan Supplement");

xxii. filed, on September 23, 2026, the *Notice of (I) Executory Contracts and Unexpired Leases to be Assumed by the Debtors Pursuant to the Plan; (II) Cure Amounts, if Any; and (III) Related Procedures in Connection Therewith* [Docket No. 3407];

xxiii. filed, on October 4, 2026, the *Debtors' Second Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates* [Docket No. 3550];

xxiv. filed, on October 5, 2026,

a. the *Amended Declaration of Emily Young, on Behalf of Epiq Corporate Restructuring, LLC, Regarding Solicitation and Tabulation of Ballots Cast in Connection with the Debtors' Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates* [Docket No. 3563] (the "Voting Declaration"); and

b. the *Notice of Continued Confirmation Hearing Set for October 6, 2026 at 9:30 a.m. (Prevailing Central Time)* [Docket No. 3572];

xxv. filed, on October 6, 2026, the *Notice of (I) Rescheduled Confirmation Hearing Set for October 13, 2026 at 1:30 p.m. (CT) and (II) Reserved Hearing on October 8, 2026 at 9:30 a.m. (CT) for Motion to Authorize APA Amendment* [Docket No. 3587];

xxvi. filed, on October 7, 2026, the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Amendments to Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 3588];

xxvii. filed, on October 8, 2026,

a. the *Notice of Filing of Second Amended and Restated Asset Purchase Agreement* [Docket No. 3600];

b. the *Notice of Filing of Redline of Second Amended and Restated Asset Purchase Agreement* [Docket No. 3601]; and

c. the *Notice of First Amended Plan Supplement with Respect to the Debtors' Second Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates* [Docket No. 3619] (the "First Amended Plan Supplement");

xxviii. obtained, on October 8, 2026, the *Order (I) Authorizing Amendments to Asset Purchase Agreement and (II) Granting Related Relief* [Docket No. 3614] (the "APA Amendment Order");

xxix. filed, on October 11, 2026,

a. the *Debtors' Second Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates* [Docket No. 3635] (as subsequently amended, supplemented, or modified, the "Plan"); and

b. the *Notice of Filing of Proposed Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Second Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates* [Docket No. 3637];

xxx. filed, on October 12, 2026,

a. the *Declaration of Russell A. Perry in Support of Confirmation of Debtors' Second Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates* [Docket No. 3638] (the "Perry Declaration"); and

b. the *Debtors' (I) Memorandum of Law in Support of Confirmation of the Debtors' Second Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates and (II) Omnibus Reply to Objections to Confirmation* [Docket No. 3639] (the "Confirmation Brief"); and

xxxi. filed, on October 13, 2026,

a. the *Notice of Second Amended Plan Supplement with Respect to the Debtors' Second Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates* [Docket No. 3649] (the "Second Amended Plan Supplement" and, together with the Initial Plan Supplement and the First Amended Plan Supplement, as subsequently amended, modified, or supplemented, the "Plan Supplement"); and

b. the *Notice of Continued Confirmation Hearing to October 14, 2026 at 9:30 a.m. (Prevailing Central Time)* [Docket No. 3655];

xxxii. filed, on October 14, 2026,

a. the *Notice of Filing of Revised Proposed Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Second Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates* [Docket No. 3657].

The Bankruptcy Court having:

i. entered the Disclosure Statement Order on August 4, 2026;

ii. set July 28, 2026 as the voting record date (the "Voting Record Date") for purposes of voting on the Plan;

iii. set September 21, 2026 at 5:00 p.m. (prevailing Central Time) as the deadline for Holders of Claims in the Voting Classes to accept or reject the Plan (the "Voting Deadline");[3]

iv. set September 21, 2026 at 5:00 p.m. (prevailing Central Time) as the deadline for parties-in-interest to file and serve objections to the confirmation of the Plan (the "Objection Deadline");[4]

v. set October 6, 2026 at 9:30 a.m. (prevailing Central Time) as the date and time for the commencement of the hearing on Confirmation of the Plan (the "Confirmation Hearing");

vi. reviewed and considered the Plan, the Disclosure Statement, the Plan Supplement, the Solicitation COS, the Publication Affidavits, the Resident COS, the Perry Declaration, the Voting Declaration, the Confirmation Brief, the *Statement of the Statutory Unsecured Claimholders' Committee in Support of Confirmation of Debtors' Second Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates* [Docket No. 3640] (the "UCC Statement"), the Confirmation Hearing Notice, and all other filed pleadings, exhibits, statements, responses, and comments regarding Confirmation, including all objections, statements, and reservations of rights filed by parties-in-interest on the docket in these Chapter 11 Cases (collectively, the "Confirmation Objections");

---

3 The Objection Deadline was extended for certain parties in interest by the Debtors, including, but not limited to, the Plan Settling Parties.

4 The Voting Deadline was extended for certain parties in interest by the Debtors, with the consent of the Creditors' Committee. The Voting Deadline for the Holders of Claims in Class 5-A, Class 5-B, and Class 7 was extended to October 4, 2026.

vii. found that the notice provided regarding the Confirmation Hearing, and the opportunity for any party in interest to object to Confirmation of the Plan, having been adequate and appropriate under the circumstances and no further notice being required;

viii. held the Confirmation Hearing on October 14, 2026 at 9:30 a.m. (prevailing Central Time);

ix. heard the statements and arguments made by counsel at the Confirmation Hearing with respect to Confirmation of the Plan, as well as the Confirmation Objections;

x. considered and having taken judicial notice of, as applicable, all filings, oral representations, declarations, live testimony, written direct testimony, exhibits, documents, filings, and other evidence, statements, and arguments made, proffered, adduced, or presented at the Confirmation Hearing;

xi. found that such evidence in support of the relief granted herein (a) is reasonable, persuasive, credible, and accurate as of the date each such evidence was proffered, adduced, or presented, (b) utilizes reasonable and appropriate methodologies and assumptions, and (c) has not been controverted by other evidence;

xii. taken judicial notice of all papers and pleadings filed in these Chapter 11 Cases, all evidence proffered or adduced in these Chapter 11 Cases, and all arguments made at hearings held before the Bankruptcy Court during the pendency of these Chapter 11 Cases;

xiii. issued a ruling on the record at the Confirmation Hearing; and

xiv. overruled any and all outstanding objections to the Plan, Confirmation, and all statements and reservations of rights not consensually resolved, agreed to, or withdrawn, unless otherwise indicated.

NOW THEREFORE, it appearing to the Court that the legal and factual bases set forth in the documents filed in support of approval of Confirmation, including the Confirmation Brief, the UCC Statement, the Perry Declaration, and the Voting Declaration, and other evidence presented at the Confirmation Hearing and the record in these Chapter 11 Cases, establish just cause for the relief granted herein; and after due deliberation thereon and good cause appearing therefor; and the Court, having considered statements of counsel at the Confirmation Hearing and all evidence of record, including, but not limited to, the Voting Declaration and the Perry Declaration; and for

the reasons stated on the record at the Confirmation Hearing, the Court hereby FINDS, DETERMINES, AND CONCLUDES as follows:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[5]

### General Findings and Conclusions

A. Findings and Conclusions. The findings and conclusions set forth herein and in the record of the Confirmation Hearing constitute the Court's findings of fact and conclusions of law under rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014. To the extent any of the following conclusions of law constitute findings of fact, or vice versa, they are adopted as such.

B. Judicial Notice. The Court takes judicial notice of (and deems admitted into evidence for the Confirmation Hearing) the docket of these Chapter 11 Cases maintained by the Clerk of the Court or its duly appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, all hearing transcripts, and all evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of the Chapter 11 Cases, including, but not limited to, the Confirmation Hearing.

C. Eligibility for Relief. The Debtors were, and are, entities eligible for relief under Bankruptcy Code section 109. The Debtors are proper proponents of the Plan under Bankruptcy Code section 1121.

D. Bankruptcy Rules 3016(a)-(b). In accordance with Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as the proponent of the Plan. The filing of the Disclosure Statement with the Court satisfied Bankruptcy Rule 3016(b).

---

[5] For the avoidance of doubt, the findings and conclusions of law set forth herein are in support of Confirmation in connection with consummation of the Sale Transaction and not in connection with any Restructuring Transaction, of which the Debtors are not seeking approval at this time.

E. Objections. All parties have had a full and fair opportunity to litigate all issues raised, or which might have been raised, in connection with the Confirmation Hearing. All objections with respect to the Confirmation of the Plan that have not been withdrawn, waived, or settled are hereby **OVERRULED** and **DENIED** on the merits, with prejudice.

**Jurisdiction, Venue, Core Proceeding**

F. Jurisdiction, Venue, Core Proceeding. The Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of whether the Plan complies with the applicable provisions of the Bankruptcy Code, including the requisite factors for confirmation of the Plan, constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2). This Court has jurisdiction to enter a final order with respect thereto consistent with Article III of the United States Constitution. Venue is proper in this District and before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**Administration of the Chapter 11 Cases**

G. Commencement and Joint Administration of the Chapter 11 Cases. On the Petition Date, each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code, commencing the Chapter 11 Cases. In accordance with the *Order (I) Directing Joint Administration of the Debtors' Chapter 11 Cases and (II) Granting Related Relief* [Docket No. 51], these Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1. The Debtors have continued to operate their businesses and manage their assets and affairs as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee or examiner has been appointed pursuant to Bankruptcy Code section 1104.

H. Appointment of the Creditors' Committee. On July 30, 2025, the Office of the United States Trustee for Region 6 (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Creditors' Committee") in the Chapter 11 Cases pursuant to Bankruptcy Code section 1102(a). *See* Docket No. 250. The constitution of the Creditors' Committee was subsequently amended during the Chapter 11 Cases. *See* Docket Nos. 262, 593, 698, 699, 2095.

I. Appointment of the Patient Care Ombudsmen. On August 15, 2025, the U.S. Trustee appointed the following three patient care ombudsmen (each, a "PCO" and collectively, the "PCOs") in the Chapter 11 Cases: Susan Goodman, Suzanne Koenig, and Melanie Cyganowski. *See* Docket Nos. 435, 445, 446.

**Disclosure Statement, Solicitation, and Notice**

J. Disclosure Statement. On August 4, 2026, the Court entered the Disclosure Statement Order, which, among other things: (a) approved the Disclosure Statement as containing adequate information within the meaning of Bankruptcy Code section 1125 and Bankruptcy Rule 3017; (b) approved the forms of ballots and notices in connection with confirmation of the Plan; (c) scheduled September 21, 2026 at 5:00 p.m. (prevailing Central Time) as the Voting Deadline and the Objection Deadline, each of which was subsequently extended by the Debtors for certain parties-in-interest, including the Plan Settling Parties; and (d) set October 6, 2026 at 9:30 a.m. (prevailing Central Time) as the date of the Confirmation Hearing. *See* Docket No. 3099.

K. Notice of the Confirmation Hearing. As set forth in the Voting Declaration, the Confirmation Hearing Notice was filed and served on or about August 13, 2026 via first class mail and/or electronic mail on the Debtors' entire creditor matrix as of the Voting Record Date, as reflected in the Solicitation COS and the Resident & Patient Notice was filed and served on or about August 10, 2026, via first class mail and/or electronic mail on all residents and patients of

the Debtors as of the Voting Record Date, as reflected in the Resident COS. Additionally, copies of the Disclosure Statement (including the Solicited Plan), the Confirmation Hearing Notice, the Resident & Patient Notice, and an 11x17 poster-size of the Resident & Patient Notice for display in the common areas of each of the Debtors' facilities were sent to each of the Debtors' facility administrators, as reflected in the Resident COS. Further, the Confirmation Hearing Notice was published in the national edition of *The Wall Street Journal* on August 11, 2026 and in the national edition of *USA Today* on August 12, 2026, in compliance with Bankruptcy Rule 2002(l) and as evidenced by the Publication Affidavits. Given the foregoing, all parties required to be given notice of the Confirmation Hearing (including the deadline for filing and serving objections to confirmation of the Plan) have been given due, proper, timely, and adequate notice of, and had a full and fair opportunity to be heard in connection with, confirmation of the Plan, in accordance with the Disclosure Statement Order and in compliance with the Bankruptcy Code, the Bankruptcy Rules (including Bankruptcy Rules 2002 and 3017), and applicable non-bankruptcy law and such parties have had an opportunity to appear and be heard with respect thereto. Accordingly, no other or further notice is required.

L. Voting Classes. Holders of Claims in Class 1 (Prepetition ABL Claims), Class 3 (IRS Secured Claims), Class 5-A (Prepetition Welltower & Omega Term Loan Claims), Class 5-B (Prepetition WAX & MAO Term Loan Claims), Class 6-A (General Unsecured Claims (GUC Distribution Group 1)), Class 6-B (General Unsecured Claims (GUC Distribution Group 2), Class 6-C (General Unsecured Claims (GUC Distribution Group 3)), Class 6-D (General Unsecured Claims (GUC Distribution Group 4)), Class 7 (WAX & MAO Unsecured Note Claims)), and Class 8 (Convenience Claims)) were eligible to vote on the Plan (collectively, the "Voting Classes"). The form of ballots attached as Exhibits 2-A through 2-I to the Disclosure Statement Order

(collectively, the "Ballots") that the Debtors used to solicit votes to accept or reject the Plan from Holders in the Voting Classes adequately addressed the particular needs of the Chapter 11 Cases and were appropriate for Holders in the Voting Classes to vote to accept or reject the Plan.

M. Service of the Solicitation Packages. As described in the Voting Declaration, the Solicitation COS, and the Resident COS, the Debtors provided due, adequate, and sufficient notice of the Disclosure Statement, the Plan, and the Confirmation Hearing, together with all deadlines for voting to accept or reject the Plan as well as objecting to Confirmation of the Plan. Specifically, the Solicitation Packages were transmitted and served on or about August 13, 2026 to all Holders of Claims in the Voting Classes that held a Claim against the Debtors as of the Voting Record Date. The establishment and notice of the Voting Record Date were approved by the Disclosure Statement Order. Transmission and service of the Solicitation Packages was timely, adequate, and sufficient under the facts and circumstances of these Chapter 11 Cases, and complies with the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, including Bankruptcy Rules 3017, 3018, and 3019, and the Disclosure Statement Order, and no further notice is required. Under the circumstances and including any extensions heretofore provided in connection therewith, the period during which the Debtors solicited acceptances or rejections to the Plan was a reasonable and sufficient period of time for Holders in the Voting Classes to make an informed decision to accept or reject the Plan, and solicitation complied with Bankruptcy Code section 1126(b). Pursuant to Bankruptcy Code sections 1126(f) and 1126(g), the Debtors were not required to solicit votes from the Holders of Claims or Interests, as applicable, in the Non-Voting Classes, each of which received a notice of non-voting status and is conclusively presumed to have accepted, or deemed to have rejected, the Plan.

N. Good Faith Solicitation. As described in the Voting Declaration, solicitation of votes on the Plan complied with the solicitation procedures set forth in the Disclosure Statement Order, was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases, was conducted in good faith, and was in compliance with Bankruptcy Code sections 1125 and 1126 and any other applicable provisions of the Bankruptcy Code, Bankruptcy Rules 3017 and 3018, and any other applicable Bankruptcy Rules, the Local Rules, and applicable non-bankruptcy law. Accordingly, the Plan was solicited in good faith and in compliance with applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, and the Bankruptcy Rules. Specifically, the Debtors have acted in "good faith" within the meaning of Bankruptcy Code section 1125(e) and in compliance with the applicable provisions of the Bankruptcy Code, Bankruptcy Rules, and the Local Bankruptcy Rules in connection with all of their respective activities relating to support of the Plan and this Confirmation Order, including the solicitation of acceptances of the Plan, their participation in the Chapter 11 Cases, and the activities described in Bankruptcy Code section 1125, and are entitled to the protections afforded by Bankruptcy Code section 1125(e).

O. Non-Voting Classes. Holders of Claims or Interests in Classes 2 (Rochester Manor HUD Note Claims), Class 4 (Other Secured Claims), Class 9 (Subordinated Claims), Class 10-A (Debtor Intercompany Claims), Class 10-B (Non-Debtor Intercompany Claims, Class 11 (Existing Common Equity Interests), and Class 12 (Intercompany Interests) were either (i) Unimpaired and not entitled to vote to accept or reject the Plan, (ii) Impaired under the Plan and deemed to reject the Plan, or (iii) potentially Unimpaired/Impaired and either presumed to accept or deemed to reject the Plan (collectively, the "Non-Voting Classes"), pursuant to Bankruptcy Code sections 1126(f)-(g). The Debtors served the Notice of Non-Voting Status and the Confirmation Hearing

Notice on all Holders of Claims or potential Claims in the Non-Voting Classes; *provided, however*, that, pursuant to the Disclosure Statement Order, the Debtors were not required to serve such notices on (i) Holders of Claims that have already been paid in full during the Chapter 11 Cases or that are authorized to be paid in full in the ordinary course of business pursuant to an order previously entered by this Court or (ii) Holders of Claims and Interests in Class 10-A (Debtor Intercompany Claims), Class 10-B (Non-Debtor Intercompany Claims, or Class 12 (Intercompany Interests), as each such Claim or Interest is held by a Debtor or a Debtor's affiliate and either (x) will receive no distribution under the Plan and is deemed to reject the Plan or (y) will be Unimpaired and is presumed to accept the Plan.

**Tabulation**

P. Tabulation. On October 5, 2026, the Debtors filed the Voting Declaration, certifying the method and results of Ballot tabulation for each of the Classes entitled to vote to accept or reject the Plan. As evidenced by the Voting Declaration, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in compliance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Disclosure Statement, and any applicable non-bankruptcy law. As set forth in the Voting Declaration, Class 1 (Prepetition ABL Claims), Class 5-A (Prepetition Welltower & Omega Term Loan Claims), Class 5-B (Prepetition WAX & MAO Term Loan Claims), Class 6-A (General Unsecured Claims (GUC Distribution Group 1)), Class 6-B (General Unsecured Claims (GUC Distribution Group 2)), Class 6-C (General Unsecured Claims (GUC Distribution Group 3)), Class 6-D (General Unsecured Claims (GUC Distribution Group 4)), and Class 8 (Convenience Claims) voted to accept the Plan, in accordance with the requirements of Bankruptcy Code sections 1124, 1126, and 1129. Based on the foregoing, and as evidenced by the Voting Declaration, at least one Impaired Class of Claims

(excluding the acceptance by any insiders of the Debtors) has voted to accept the Plan in accordance with the requirements of Bankruptcy Code sections 1124 and 1126.

**Plan Supplement and Plan Modifications**

Q. Plan Supplement. The contents, filing, and notice of the Plan Supplement (and any subsequent amendments, modifications, and supplements thereto filed with the Court) are proper and in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Complex Procedures, the Disclosure Statement Order, and applicable law, and no other or further notice is or shall be required. All documents included in the Plan Supplement are integral to, part of, and incorporated by reference into the Plan. Subject to the terms of the Plan (including certain consent and approval rights to the extent provided in the Plan), and only consistent therewith, the Debtors may amend, update, supplement, or otherwise modify the Plan Supplement at any time before the Effective Date. To the extent that any modifications to the Plan Supplement made to date are determined to be modifications to the Plan, in accordance with Bankruptcy Rule 3019, any such modifications do not (i) constitute material modifications of the Plan under Bankruptcy Code section 1127, (ii) require additional disclosure under Bankruptcy Code 1125, (iii) cause the Plan to fail to meet the requirements of Bankruptcy Code sections 1122 and 1123, (iv) materially and adversely change the treatment of any Claims or Interests, (v) require re-solicitation of any Holders of Claims or Interests, or (vi) require that any such Holders be afforded an opportunity to change previously cast acceptances or rejections of the Plan.

R. Plan Modifications. Pursuant to Bankruptcy Code section 1127, any modifications to the Plan, including, but not limited to, those set forth in the Plan filed on October 4, 2026 and on October 11, 2026, and any additional modifications to the Plan set forth in this Confirmation Order or in any Plan filed prior to the entry of this Confirmation Order or the Effective Date

(collectively, the "Plan Modifications"), constitute technical or clarifying changes, changes with respect to particular Claims by agreement with Holders of such Claims, or modifications that do not otherwise materially and adversely affect or change the treatment of any other Claim or Interest under the Plan, and are not inconsistent with the terms of the Plan Settlement Agreement. Without limiting the foregoing, the Plan Modifications relating to the ACO Transaction do not materially and adversely affect the treatment of any Claim or Interest because all Claims against the ACO Entities (unless such Claims constitute ACO Assumed Liabilities) shall be satisfied from the Liquidation Trust Assets and the applicable reserves established under the Plan in the same amounts and manner as would have applied absent the ACO Transaction, and the consideration for the ACO Transaction is being provided by the Buyer for the benefit of the Estates. These Plan Modifications are consistent with the disclosures previously made pursuant to the Disclosure Statement and Solicitation Packages served pursuant to the Disclosure Statement Order, and notice of these Plan Modifications by filing revised documents on the docket was adequate and appropriate under the facts and circumstances of these Chapter 11 Cases. In accordance with Bankruptcy Rule 3019, the Plan Modifications do not require additional disclosure under Bankruptcy Code section 1125 or the re-solicitation of votes under Bankruptcy Code section 1126, and they do not require that Holders of Claims in the Voting Classes be afforded an opportunity to change previously cast acceptances or rejections of the Plan. Accordingly, the Plan, as modified, is properly before this Court, and all votes cast with respect to the Plan prior to any such modifications shall be binding and shall apply with respect to the Plan as so modified

**Compliance with Bankruptcy Code Section 1129**

S. The Plan Complies with Bankruptcy Code Requirements (11 U.S.C. § 1129(a)(1)). As set forth herein, the Plan complies with the applicable provisions of the Bankruptcy Code,

including Bankruptcy Code sections 1122 and 1123, thereby satisfying Bankruptcy Code section 1129(a)(1). Additionally, the Plan and all Plan Modifications are dated and identify the Entities submitting them, thereby satisfying Bankruptcy Rule 3016(a).

i. Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)). The classification of Claims and Interests into seventeen (17) separate Classes and sub-Classes,[6] as set forth in Article III of the Plan, is proper under the Bankruptcy Code and satisfies the requirements of sections 1122(a) and 1123(a)(1) thereof. In accordance with Bankruptcy Code section 1122(a), the Claims and Interests placed in each Class under Article III of the Plan are substantially similar to other Claims and Interests, as the case may be, in each such Class. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims and Interests created under the Plan, and such classification does not unfairly discriminate between Holders of Claims and Interests. The classifications were not promulgated for any improper purpose, and the creation of such Classes does not unfairly discriminate between or among Holders of Claims or Interests. Therefore, the Plan satisfies Bankruptcy Code sections 1122 and 1123(a)(1).

ii. Specified Treatment of Unimpaired Classes (11 U.S.C. § 1123(a)(2)). Article III of the Plan specifies that Claims in Class 2 (Rochester Manor HUD Note Claims) and Class 4 (Other Secured Claims) are Unimpaired under the Plan within the meaning of Bankruptcy Code section 1124, conclusively presumed to have accepted the Plan, and thus not entitled to vote to accept or reject the Plan, thereby satisfying Bankruptcy Code section 1123(a)(2). Article III of the Plan also specifies that Claims and Interests in Class 10-A (Debtor Intercompany Claims), Class 10-B (Non-Debtor Intercompany Claims), and Class 12 (Intercompany Interests) are

[6] Article II of the Plan provides that Administrative Expense Claims, Administrative PL/GL Claims, Priority Non-Tax Claims, Priority Tax Claims, Professional Fee Claims, and DIP Claims are not separately classified under the Plan and shall be paid in accordance with the terms of the Plan.

Unimpaired/Impaired (depending on the treatment they receive under the Plan), presumed to accept or deemed to reject the Plan, and thus not entitled to vote pursuant to Bankruptcy Code section 1126(f) or section 1126(g), respectively. Accordingly, the Plan satisfies the requirements of Bankruptcy Code section 1123(a)(2).

iii. Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3)). Article III of the Plan specifies that Claims in Class 1 (Prepetition ABL Claims), Class 3 (IRS Secured Claims), Class 5-A (Prepetition Welltower & Omega Term Loan Claims), Class 5-B (Prepetition WAX & MAO Term Loan Claims), Class 6-A (General Unsecured Claims (GUC Distribution Group 1)), Class 6-B (General Unsecured Claims (GUC Distribution Group 2)), Class 6-C (General Unsecured Claims (GUC Distribution Group 3)), Class 6-D (General Unsecured Claims (GUC Distribution Group 4)), Class 7 (WAX & MAO Unsecured Note Claims), Class 8 (Convenience Claims), Class 9 (Subordinated Claims), and Class 11 (Existing Common Equity Interests) are Impaired, and Class 10-A (Debtor Intercompany Claims), Class 10-B (Non-Debtor Intercompany Claims), and Class 12 (Intercompany Interests) are potentially Impaired, as the case may be, under the Plan within the meaning of Bankruptcy Code section 1124 and the Plan specifies the treatment of the Claims and Interests in those Classes. As such, the Plan satisfies Bankruptcy Code section 1123(a)(3).

iv. No Discrimination (11 U.S.C. § 1123(a)(4)). The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class unless the Holder of a particular Claim or Interest has agreed to or elected a less favorable or different treatment of such Claim or Interest, thereby satisfying Bankruptcy Code section 1123(a)(4).

v. Adequate Means for Implementation (11 U.S.C. § 1123(a)(5)). The Plan (including Article IV), the Plan Supplement, and this Confirmation Order provide adequate and

proper means for the implementation of the Plan and the transactions contemplated thereby, satisfying Bankruptcy Code section 1123(a)(5).

vi. Non-Voting Equity Securities (11 U.S.C. § 1123(a)(6)). As set forth in Article IV.P.2, pursuant to, and only to the extent required by, Bankruptcy Code section 1123(a)(6), the New Organizational Documents shall be amended or deemed amended to include a provision prohibiting the issuance of non-voting equity securities. Additionally, the form of governing documents for the ACO Entities filed with the Plan Supplement also contain a provision prohibiting the issuance of non-voting equity securities, thereby satisfying Bankruptcy Code section 1123(a)(6).

vii. Designation of Directors and Officers (11 U.S.C. § 1123(a)(7)). In accordance with Article IV.P.3 of the Plan, as of the Effective Date, the existing directors and officers of the Debtors, including the Co-Chief Restructuring Officers and the Independent Directors, shall be deemed to have resigned without any further action required. From and after the Effective Date, the Wind-Down Trustee, who was identified in the Plan Supplement, shall be authorized to act on behalf of the Estates, other than the ACO Entities from and after the ACO Effective Date; *provided, however*, that the Wind-Down Trustee shall have no duties other than as expressly set forth in the Plan, this Confirmation Order, or any agreement governing the Wind-Down Trustee's duties and responsibilities, as applicable. From and after the ACO Effective Date, the managers, officers, and authorized signatories of each ACO Entity shall be the persons designated by the Buyer in accordance with Article IV.P.3.b of the Plan, whose identities were disclosed in the Plan Supplement. The appointment of the Wind-Down Trustee and the designation of the managers, officers, and authorized signatories of the ACO Entities are consistent

with the interests of creditors and with public policy. Therefore, the Plan satisfies the requirements of Bankruptcy Code section 1123(a)(7).

viii. Debtors Are Not Individuals (11 U.S.C. §§ 1123(a)(8), 1123(c)). The Debtors are not individuals. Accordingly, the requirements of Bankruptcy Code sections 1123(a)(8) and 1123(c) are inapplicable.

ix. Additional Plan Provisions (11 U.S.C. § 1123(b)). The Plan contains certain provisions that may be construed as permissive but are not required for confirmation under the Bankruptcy Code. These discretionary provisions comply with Bankruptcy Code section 1123(b), are appropriate, in the best interest of the Debtors and their Estates, and consistent with the applicable provisions of the Bankruptcy Code.

a. Impairment/Absence of Impairment of Classes of Claims and Interests (11 U.S.C. § 1123(b)(1)). Article III of the Plan delineates Classes of Claims and Interests that are Unimpaired, Impaired, or Unimpaired/Impaired, as applicable. Accordingly, the Plan is consistent with Bankruptcy Code section 1123(b)(1).

b. Assumption and Rejection (11 U.S.C. § 1123(b)(2)). Article V of the Plan addresses the assumption and rejection of Executory Contracts and Unexpired Leases and meets the requirements of Bankruptcy Code section 365(b). The Plan, therefore, is consistent with Bankruptcy Code section 1123(b)(2).

c. Settlement of Claims and Interests (11 U.S.C. § 1123(b)(3)). Article IV.A-C of the Plan incorporates various settlements of Claims, Interests, and certain Causes of Action, including, but not limited to, the Plan Settlement Agreement, the Administrative PL/GL Claim Settlement Term Sheet, and the proposed general settlement of Allowed Claims, Interests, and controversies. Based on the evidence provided at the Confirmation Hearing or this Bankruptcy Court's prior determinations in connection with the Plan Settlement Approval Order and the Administrative PL/GL Claim Settlement Approval Order, the foregoing settlements are in the best interests of the Debtors, their Estates, and Holders of Allowed Claims and Interests, are fair, equitable, and within the range of reasonableness, and represent a sound exercise of the Debtors' business judgment.

Therefore, the Plan is consistent with Bankruptcy Code section 1123(b)(3) and Bankruptcy Rule 9019.

d. Sale of Substantially All Assets (11 U.S.C. § 1123(b)(4)). The sale of substantially all of the Debtors' assets occurred pursuant to the Sale Order and not through the Plan, meaning that Bankruptcy Code section 1123(b)(4) is inapplicable. To the extent the ACO Transaction, which is implemented through the Plan, is deemed to constitute a sale of all or substantially all of the property of the ACO Entities, such sale complies with Bankruptcy Code section 1123(b)(4).

e. Treatment of Rights of Holders of Claims (11 U.S.C. § 1123(b)(5)). Article II and Article III of the Plan modify or leave unaffected, as is applicable, the rights of certain Holders of Claims, as permitted by Bankruptcy Code section 1123(b)(5). As such, the Plan is consistent with Bankruptcy Code section 1123(b)(5).

f. Additional Plan Provisions (11 U.S.C. § 1123(b)(6)). The remaining discretionary provisions of the Plan are appropriate and consistent with the applicable provisions of the Bankruptcy Code, thereby satisfying Bankruptcy Code section 1123(b)(6).

x. Cure of Defaults (11 U.S.C. § 1123(d)). The Plan satisfies the requirements of Bankruptcy Code section 1123(d). Article V.B of the Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed by the Debtors under the Plan by payment of the applicable Cure Cost, if any, in Cash on the Effective Date, in the ordinary course of business, or on such other terms as the parties may otherwise agree in writing, subject to the provisions described in Article V.B of the Plan and the APA, satisfying Bankruptcy Code section 1123(d).

T. The Debtors Complied with the Bankruptcy Code (11 U.S.C. § 1129(a)(2)). As proponents of the Plan, the Debtors have complied with the applicable provisions of the Bankruptcy Code, thereby satisfying Bankruptcy Code section 1129(a)(2). Specifically, each Debtor:

i. is an eligible debtor under Bankruptcy Code section 109 and a proper proponent of the Plan under Bankruptcy Code section 1121(a);

ii. has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of the Court; and

iii. has complied with the applicable provisions of the Bankruptcy Code, including sections 1125 and 1126 thereof, the Bankruptcy Rules, the Local Rules, any applicable non-bankruptcy law, rule, and regulation, the Disclosure Statement Order, and all other applicable law, in transmitting the Solicitation Packages, the Non-Voting Notice Packages, the Confirmation Hearing Notice, and related documents and notices, and in soliciting and tabulating the votes on the Plan.

U. Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)). The Debtors proposed the Plan in good faith and not by any means forbidden by law, satisfying Bankruptcy Code section 1129(a)(3). In so determining, the Bankruptcy Court has examined the totality of the circumstances surrounding the filing, negotiating, revision, and solicitation of the Plan and the process leading to Confirmation, including the support of the majority of Holders of Claims in the Voting Classes, and the transactions to be implemented pursuant thereto. These Chapter 11 Cases were filed, and the Plan was proposed, with the legitimate purpose of allowing the Debtors to consummate the Sale Transaction, implement the transactions contemplated by the Plan for the benefit of all parties in interest, and to maximize the value of the Estates in furtherance of creditor recoveries. In furtherance of the foregoing, the Plan and all documents necessary to effectuate the Plan were negotiated at arm's length and in good faith among representatives of the Debtors, the Creditors' Committee, the Plan Settling Parties, the Buyer, their respective professionals, and other parties-in-interest. The Plan itself and the process leading to its formulation provide independent evidence of the Debtors' good faith, serve the public interest, and assure fair treatment of Holders of Claims and Interests. In addition to achieving a result consistent with the objectives of the Bankruptcy Code, the Plan allows the Debtors' economic stakeholders to realize the highest

possible recoveries under the circumstances. Accordingly, the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(3).

V. Payment for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)). All payments made or to be made by the Debtors or the Post-Restructuring Debtors, as applicable, for services or for costs and expenses in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been authorized by, approved by, or are (or will be) subject to the approval of, the Bankruptcy Court. The procedures set forth in Article II.E.1 of the Plan for the filing of Professional Fee Claims, the process for filing objections with respect thereto, and the Bankruptcy Court's review and ultimate determination of Allowed Professional Fee Claims, satisfy the objectives of, and are in compliance with, Bankruptcy Code section 1129(a)(4).

W. Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)). The Plan provides for the dissolution of the Genesis Board, as well as the immediate dismissal and deemed resignation of any remaining directors or officers of the Debtors, including the Co-Chief Restructuring Officers and the Independent Directors, as of the Effective Date with no further action. The Plan identifies the Wind-Down Trustee, whose identity was disclosed in the Plan Supplement, as the sole officer, manager, director, and representative of the Debtors, other than the ACO Entities, following the Effective Date. The selection of the Wind-Down Trustee may be modified prior to, or after the Effective Date, and the Debtors (or the Wind-Down Trust, as applicable) will file a notice on the docket reflecting such replacement or successor Wind-Down Trustee. From and after the ACO Effective Date, the managers, officers, and authorized signatories of each ACO Entity shall be the persons designated by the Buyer in accordance with Article IV.P.3.b of the Plan,

whose identifies were disclosed in the Plan Supplement. Accordingly, the Debtors have satisfied the requirements of Bankruptcy Code section 1129(a)(5).

X. No Rate Changes (11 U.S.C. § 1129(a)(6)). The Plan does not provide for rate changes by the Debtors that would require governmental regulatory approval. Thus, Bankruptcy Code section 1129(a)(6) is not applicable to these Chapter 11 Cases.

Y. Best Interests of Creditors (11 U.S.C. § 1129(a)(7)). The Plan satisfies Bankruptcy Code section 1129(a)(7) because each Holder of a Claim or Interest either (i) has voted to accept the Plan, (ii) is Unimpaired and deemed to have accepted the Plan, or (iii) shall receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code on such date. In addition, the Liquidation Analysis, attached as Exhibit C to the solicited Disclosure Statement, the analysis provided in the Confirmation Brief, and other evidence proffered or adduced at the Confirmation Hearing, including the Perry Declaration, establish that, with respect to each Impaired Class of Claims or Interests, each Holder of an Allowed Claim or Interest in such Class shall receive under the Plan on account of such Allowed Claim or Interest property of a value, as of the Effective Date, that is not less than the amount such Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Such evidence and analysis: (i) are reasonable, persuasive, credible, and accurate as of the dates such analysis or evidence was prepared, presented, or proffered; (ii) utilize reasonable and appropriate methodologies and assumptions; and (iii) have not been controverted by other evidence. Accordingly, the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(7) and the "best interests of creditors" test.

Z. Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8)). As set forth in the Voting Declaration, eight of the ten Voting Classes—Class 1 (Prepetition ABL Claims), Class 5-A (Prepetition Welltower & Omega Term Loan Claims), Class 5-B (Prepetition WAX & MAO Term Loan Claims), Class 6-A (General Unsecured Claims (GUC Distribution Group 1)), Class 6-B (General Unsecured Claims (GUC Distribution Group 2)), Class 6-C (General Unsecured Claims (GUC Distribution Group 3)), Class 6-D (General Unsecured Claims (GUC Distribution Group 4)), and Class 8 (Convenience Claims)—voted to accept the Plan pursuant to Bankruptcy Code section 1126(c). No Holders of Claims in Class 3 (IRS Secured Claims) cast a Ballot in advance of the Voting Deadline and, therefore, Class 3 (IRS Secured Claims) is deemed to reject the Plan under its terms. All WAX & MAO Unsecured Note Claims in Class 7 were extinguished, released, and discharged by the Holders of such Claims effective as of October 2, 2026, meaning that there were no remaining Claims in Class 7 eligible to vote as of the Voting Deadline (as extended for the Plan Settling Parties). Additionally, five of the seven Non-Voting Classes—Class 9 (Subordinated Claims), Class 10-A (Debtor Intercompany Claims), Class 10-B (Non-Debtor Intercompany Claims), Class 11 (Existing Common Equity Interests), and Class 12 (Intercompany Interests)—are, or may be, Impaired Classes that are deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g). Although Bankruptcy Code section 1129(a)(8) has not been satisfied with respect to Class 3 (IRS Secured Claims), Class 9 (Subordinated Claims), Class 11 (Existing Common Equity Interests) and, if applicable, Class 10-A (Debtor Intercompany Claims), Class 10-B (Non-Debtor Intercompany Claims), and Class 12 (Intercompany Interests) (collectively, the "Rejecting Classes"), the Plan is confirmable pursuant to Bankruptcy Code section 1129(b), as described further below.

AA. Treatment of Claims Entitled to Priority Under Bankruptcy Code Section 507(a) (11 U.S.C. § 1129(a)(9)). The treatment of Allowed Administrative Expense Claims, Administrative PL/GL Claims, Other Secured Claims, Priority Non-Tax Claims, Priority Tax Claims, Professional Fee Claims, and DIP Claims pursuant to Article II and Article III of the Plan satisfies the requirements of and complies in all respects with the treatment required by Bankruptcy Code section 1129(a)(9). Except as otherwise provided herein or in the Plan, Holders of Administrative Expense Claims, Administrative PL/GL Claims, Other Secured Claims, Priority Non-Tax Claims, Priority Tax Claims, Professional Fee Claims, and DIP Claims that failed to object to the treatment of such Claims by the Objection Deadline are deemed to have consented to such treatment.

BB. Acceptance by at Least One Impaired Class (11 U.S.C. § 1129(a)(10)). As evidenced by the Voting Declaration, seven of the ten Voting Classes—Class 1 (Prepetition ABL Claims), Class 5-A (Prepetition Welltower & Omega Term Loan Claims), Class 6-A (General Unsecured Claims (GUC Distribution Group 1)), Class 6-B (General Unsecured Claims (GUC Distribution Group 2)), Class 6-C (General Unsecured Claims (GUC Distribution Group 3)), Class 6-D (General Unsecured Claims (GUC Distribution Group 4)), and Class 8 (Convenience Claims)—voted to accept the Plan by the requisite numbers and amounts of interests specified under Bankruptcy Code section 1126(c), without including any acceptance of the Plan by any "insider" (as that term is defined in Bankruptcy Code section 101(31)), thereby satisfying Bankruptcy Code section 1129(a)(10).

CC. Feasibility (11 U.S.C. § 1129(a)(11)). As the Plan proposes a liquidation and wind-down of the Debtors (other than the ACO Entities) following consummation of the Sale Transaction, the feasibility requirements of Bankruptcy Code section 1129(a)(11) are satisfied.

With respect to the ACO Entities, which shall continue in existence and in business as reorganized Entities wholly owned by the Buyer (or its designee) from and after the ACO Effective Date, Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the ACO Entities because (i) all Claims against the ACO Entities (other than the ACO Assumed Liabilities) shall be satisfied solely from the Liquidation Trust Assets and the applicable reserves established under the Plan in accordance with Article III.D of the Plan, (ii) the ACO Excluded Liabilities shall be assumed by the applicable Debtors and shall not be liabilities of any ACO Entity, and (iii) the ACO Entities shall be owned and operated by the Buyer following the ACO Effective Date. Moreover, the evidence supporting the Plan proffered or adduced by the Debtors at or before the Confirmation Hearing: (i) is reasonable, persuasive, credible, and accurate as of the dates such evidence was prepared, presented, or proffered; (ii) has not been controverted by other persuasive evidence; (iii) establishes that the Plan is feasible, given that it proposes a liquidation; (iv) establishes that the Plan may be implemented and has a reasonable likelihood of success; (v) establishes that the Post-Restructuring Debtors, the Wind-Down Trust, and the Liquidation Trust, as applicable, will have sufficient funds available to meet their obligations under the Plan; and (vi) establishes that the Wind-Down Trust or the Liquidation Trust, as applicable, will have the financial wherewithal to satisfy their obligations following the Effective Date. Thus, the Plan satisfies the requirements of Bankruptcy Code section 1129(a)(11).

DD. Payment of Statutory Fees (11 U.S.C. § 1129(a)(12)). Article XI.O of the Plan provides that all fees currently payable under section 1930 of title 28, United States Code, as determined by the Bankruptcy Code, have been or will be paid on or as soon as reasonably practicable after the Effective Date by the Wind-Down Trust or the Liquidation Trust, as applicable, thereby satisfying the requirements of Bankruptcy Code section 1129(a)(12).

EE. Non-Applicability of Certain Sections (11 U.S.C. §§ 1129(a)(13), (14), (15), (16)). The Debtors do not have any obligation to pay retiree benefits (as defined in Bankruptcy Code section 1114). The Debtors do not owe domestic support obligations, are not individuals, and are not nonprofit corporations. Accordingly, Bankruptcy Code sections 1129(a)(13), (14), (15), and (16) are inapplicable to the Plan.

FF. No Unfair Discrimination; Fair and Equitable (11 U.S.C. § 1129(b)). Notwithstanding the deemed rejection of the Plan by the Rejecting Classes, the Plan may nevertheless be confirmed pursuant to Bankruptcy Code section 1129(b)(1). Based upon the record before the Bankruptcy Court and the treatment provided on account of such Claims and Interests in the Rejecting Classes, (i) the Plan satisfies all the requirements for Confirmation set forth in Bankruptcy Code section 1129(a), except for Bankruptcy Code section 1129(a)(8), and (ii) the Plan does not discriminate unfairly against, and is fair and equitable with respect to, the Rejecting Classes. The evidence in the Record in support of Confirmation of the Plan regarding the Debtors' classification and treatment of Claims and Interests and the requirements for Confirmation of the Plan under Bankruptcy Code section 1129(b) (i) is reasonable, persuasive, credible, and accurate, (ii) utilizes reasonable and appropriate methodologies and assumptions, and (iii) has not been controverted by other credible evidence. Accordingly, the Plan satisfies the requirements of Bankruptcy Code section 1129(b).

GG. Only One Plan (11 U.S.C. § 1129(c)). The Plan is the only plan that has been filed in the Chapter 11 Cases and meets the requirements of Bankruptcy Code sections 1129(a) and (b), thereby satisfying the requirements of Bankruptcy Code section 1129(c).

HH. Principal Purpose of the Plan (11 U.S.C. § 1129(d)). The principal purpose of the Plan is neither the avoidance of taxes nor the avoidance of the application of section 5 of the Securities Act of 1933, thereby satisfying the requirements of Bankruptcy Code section 1129(d).

II. Not Small Business Cases (11 U.S.C. § 1129(e)). None of the Chapter 11 Cases is a "small business case" as that term is defined in the Bankruptcy Code, meaning that Bankruptcy Code section 1129(e) is inapplicable to the Plan.

JJ. Satisfaction of Confirmation Requirements. Based on the foregoing, all other pleadings, documents, exhibits, statements, declarations, and affidavits filed in connection with Confirmation of the Plan, and all evidence and arguments made, proffered, or adduced at the Confirmation Hearing, the Plan satisfies the requirements for Confirmation thereof set forth in Bankruptcy Code section 1129.

**Findings Relating to the Sale Transaction and the ACO Transaction**

KK. Sale Order; Sale Transaction. The Sale Order and the APA Amendment Order have been entered, have not been stayed, vacated, or reversed, and remain in full force and effect. The Sale Transaction was authorized and approved by, and is governed by, the Sale Order, the APA Amendment Order, and the Sale Transaction Documents. The Plan provides the means for implementing the remaining steps of the Sale Transaction, including the ACO Transaction, pursuant to Bankruptcy Code section 1123(a)(5), and does not re-approve, modify, or supersede any of the foregoing. The ACO Transaction is a component of the Sale Transaction, is being implemented pursuant to the Plan and the APA in accordance with Article IV.F of the Plan, and is supported by the consideration provided by the Buyer under the APA. Nothing in the Plan, the Plan Supplement, or this Confirmation Order affects, impairs, modifies, or supersedes the Sale Order, the APA Amendment Order, or the Sale Transaction Documents (including the APA, as

amended with the approval of the Bankruptcy Court), or any right, remedy, finding, or protection of the Buyer thereunder, including the findings that the Buyer is a good faith purchaser entitled to the protections of Bankruptcy Code section 363(m), that the Sale is free and clear of all Liens, Claims, Interests, and encumbrances (other than Assumed Liabilities and Permitted Liens, each as defined in the APA), and that the Buyer is not a successor to the Debtors or their Estates. All such findings and protections apply with equal force to all Purchased Assets (as defined in the APA) transferred or to be transferred to the Buyer or its designee(s) on or after the Closing Date, including any Purchased Assets the transfer of which is delayed pending receipt of any regulatory approval or otherwise, and to the ACO Transaction.

LL. Good Faith; Section 363(m). The APA and the ACO Transaction were negotiated, proposed, and entered into by the Debtors and the Buyer at arm's length, in good faith, and without collusion. The Buyer is not an "insider" or "affiliate" of any Debtor within the meaning of Bankruptcy Code section 101, and neither the Buyer nor any of its Affiliates or designees has engaged in any conduct that would cause or permit the ACO Transaction to be avoided, or any costs or damages to be imposed, under Bankruptcy Code section 363(n). The Buyer is a good faith purchaser of the Reorganized ACO Equity within the meaning of Bankruptcy Code section 363(m) and is entitled to all of the protections thereof, including in the event that this Confirmation Order or the authorization provided herein to consummate the ACO Transaction is reversed or modified on appeal.

MM. Free and Clear; Satisfaction of Sections 363(f) and 1141(c). The ACO Transaction is to be consummated under the Plan, and the ACO Equity, the Reorganized ACO Equity, the ACO Entities, and the ACO Purchased Assets are dealt with by the Plan and this Confirmation Order within the meaning of Bankruptcy Code section 1141(c). In addition, the conditions of Bankruptcy

Code section 363(f) have been satisfied with respect to the ACO Transaction. Accordingly, the Reorganized ACO Equity may be issued to the Buyer (or its designee), and the ACO Purchased Assets may vest in the ACO Entities, free and clear of all Liens, Claims (including any "claim" as defined in Bankruptcy Code section 101(5)), Interests, charges, encumbrances, rights of setoff or recoupment, rights of first refusal, consent rights, and other interests of any kind or nature whatsoever (other than as expressly provided in the Sale Transaction Documents), pursuant to Bankruptcy Code sections 363(f), 1123, 1129, and 1141(c). All Holders of Liens, Claims, Interests, or encumbrances in or against the ACO Equity, the ACO Entities, or the ACO Purchased Assets (a) that did not object, or that withdrew their objections, to the ACO Transaction are deemed to have consented thereto pursuant to Bankruptcy Code section 363(f)(2), and (b) are bound by the Plan and this Confirmation Order pursuant to Bankruptcy Code section 1141(a). Such Holders are adequately protected by having their Liens, Claims, Interests, or encumbrances, if any, attach solely to the consideration received by the applicable Debtor under the APA with the same validity, force, effect, and priority as existed immediately prior to the ACO Transaction, subject to any claims and defenses of the Debtors and their Estates with respect thereto, and with such Liens, Claims, Interests, and encumbrances being treated in accordance with the Plan or the Sale Transaction Documents.

NN. Continued Existence of the ACO Entities. Notwithstanding the cancellation of the ACO Equity, each ACO Entity shall continue in existence from and after the ACO Effective Date as the same legal Entity, with the same federal tax identification number, licenses, permits, provider numbers and identifiers, provider and participation agreements, contracts, and other Assets, and the ACO Transaction does not constitute a dissolution, liquidation, merger, consolidation, or formation of a new Entity for any purpose. The ACO Entities are not being

liquidated under the Plan and will continue to engage in business following consummation of the Plan.

OO. No Successor or Transferee Liability. None of the Buyer, its Affiliates, its designees, or, from and after the ACO Effective Date, the ACO Entities is, or shall be deemed to be, (a) a successor to, or a related person, successor in interest, or successor employer of, any Debtor (other than, in the case of an ACO Entity, itself), any Estate, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, including with respect to any employee benefit plan, collective bargaining agreement, or employment-related liability of any Debtor other than as expressly assumed under the Sale Transaction Documents; (b) an Entity that has, de facto or otherwise, merged or consolidated with or into any Debtor or Estate; (c) a mere continuation or substantial continuation of any Debtor, any Estate, or the enterprise of any Debtor; (d) an alter ego of any Debtor or Estate; or (e) except as expressly set forth in the Sale Transaction Documents, liable for any act, omission, Claim, Cause of Action, or liability of any Debtor or Estate (including, in the case of an ACO Entity, any ACO Excluded Liability) arising prior to the ACO Effective Date, whether under any theory of successor or transferee liability, de facto merger, substantial continuity, or otherwise, and whether known or unknown, fixed or contingent, or now existing or hereafter arising.

**Other Findings and Conclusions**

PP. Burden of Proof—Confirmation of the Plan. The Debtors, as proponents of the Plan, have met their burden of proving the applicable elements under Bankruptcy Code sections 1129(a) and 1129(b) by a preponderance of the evidence, which is the applicable evidentiary standard for Confirmation of the Plan. In addition, and to the extent applicable, the Plan is confirmable under the clear and convincing evidentiary standard. Furthermore, each witness

whose testimony was proffered or adduced on behalf of the Debtors at or in connection with the Confirmation Hearing was credible, reliable, and qualified to testify as to the topics addressed in his or her testimony.

QQ. Disclosure of All Material Facts. The Debtors disclosed all material facts regarding the Disclosure Statement, the Plan, the Plan Supplement, and the adoption, execution, and implementation of the other matters provided for under the Plan involving corporate action to be taken by or required of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, and the Liquidation Trust, as applicable.

RR. Implementation. All of the terms of the Plan and all documents and agreements necessary to implement the transactions contemplated by the Plan, including those contained or summarized in the Plan Supplement, and all other relevant and necessary documents are essential elements of the Plan, have been negotiated in good faith and at arms' length, are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and shall not be in conflict with any federal, state, or local law. The Debtors have exercised reasonable business judgment in determining which agreements to enter into and have provided sufficient and adequate notice of such documents and agreements. The Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, and the Liquidation Trust, as applicable, without any further notice to, or action, order, or approval of, are authorized to take any action reasonably necessary, advisable, or appropriate to consummate such agreements and the transactions contemplated thereby, to finalize, execute, and deliver all agreements, documents, instruments, and certificates relating to the Plan, and to perform their obligations under such agreements, documents, instruments, and certificates in accordance with the Plan.

SS. Administrative Consolidation. Article IV.H of the Plan provides for the administrative consolidation of the Debtors solely for the purposes of voting on the Plan, tabulating the votes to determine which Class or Classes have accepted the Plan, confirming the Plan, and the resulting treatment of all Claims and Interests and Plan Distributions, but shall not constitute a transfer of assets or liabilities between Debtors for any other purpose. Therefore, the Plan serves as, and is deemed to be, a motion for entry of an order administratively consolidating Debtors. Based on the record at the Confirmation Hearing, (i) no Class of Claims or Interests is disadvantaged by such administrative consolidation of the Debtors and (ii) such administrative consolidation of the Debtors is justified, appropriate, and in the best interests of the Debtors, their Estates, creditors, and all other parties in interest.

TT. Injunction, Channeling Injunction, Mutual Releases. The Bankruptcy Court has jurisdiction under 28 U.S.C. § 1334, and authority under 28 U.S.C. § 157, to approve the mutual releases set forth in Article VII.A of the Plan (the "Mutual Releases"), the injunction set forth in Article VII.B of the Plan (the "Injunction"), the channeling injunction set forth in Article VII.C of the Plan (the "Channeling Injunction"), and the related provisions contained in Article VII of the Plan. Bankruptcy Code sections 105(a), 1123(b)(3), and 1123(b)(6) permit issuance of the Injunction and the Channeling Injunction and approval of the Mutual Releases set forth in the Plan. Accordingly, based on the record before the Bankruptcy Court, including prior Orders of the Bankruptcy Court, the Injunction, Channeling Injunction, and Mutual Releases set forth in the Plan are hereby approved, as they (i) are the product of extensive good faith and arm's-length negotiations, (ii) are fair, equitable, reasonable, and appropriate under the circumstances, (iii) confer a material benefit on, and is in the best interests of the Debtors, their Estates, and their creditors, (iv) are essential, integral, and non-severable components of the Plan, Consummation,

and resolution of the Chapter 11 Cases, (v) are appropriately and narrowly tailored, (vi) are supported by good and valuable consideration (including the Plan Settling Parties' contributions to facilitate the resolution of the Chapter 11 Cases and implementation of the Plan), (vii) are being granted after due notice and opportunity for hearing, (viii) are consistent with the Bankruptcy Code and applicable law, (ix) are intended to promote finality and prevent parties from circumventing or attempting to circumvent the Plan, (x) are supported by the Debtors and their key stakeholders, including the Creditors' Committee and the Plan Settling Parties (and are an integral part of the Plan Settling Parties' entry into the Plan Settlement Agreement and their agreement to support the Plan), (xi) constitute good faith compromises and settlements of the matters covered thereby, and (xii) are the result of a fair and valid exercise of the Debtors' business judgment. In consideration for the Distributions contemplated by the Plan and other benefits provided under the Plan, and as a mechanism to effect a fair distribution of value to the Debtors' various constituencies, the Plan shall also constitute a good faith compromise and settlement of certain Claims and controversies incorporated in the Plan, which are fair, equitable, reasonable, and are in the best interests of the Debtors, their Estates, and the Holders of such Claims and Interests.

UU. Plan Settlement Agreement. Pursuant to Bankruptcy Code section 1123(b)(2) and Bankruptcy Rule 9019, and in exchange for the consideration and other benefits provided pursuant to the Plan Settlement Agreement, as approved by the Plan Settlement Approval Order, (a) was negotiated at arm's-length and in good faith by the Debtors, the Creditors' Committee, and the Plan Settling Parties; (b) constitutes a good faith compromise and settlement of the Claims and Causes of Action set forth in the Plan Settlement Agreement; (c) is fair, equitable, and in the best interests of the Debtors, their Estates, and all parties-in-interest; and (d) represents a sound exercise of the Debtors' business judgment. Notwithstanding anything to the contrary herein or in the Plan

(including the Plan Supplement), in the event of any inconsistency between the Plan (including the Plan Supplement) or the Confirmation Order, on one hand, and the Plan Settlement Agreement and the Plan Settlement Approval Order, on the other hand, the terms of the Plan Settlement Agreement and the Plan Settlement Approval Order shall govern and control.

VV. Satisfaction of Conditions Precedent to Confirmation. The conditions precedent to Confirmation, as set forth in Article VIII.A of the Plan, have been satisfied or waived in accordance with Article VIII.D of the Plan.

WW. Likelihood of Satisfaction of Conditions Precedent to the Effective Date. Each of the conditions precedent to the Effective Date, as set forth in Article VIII.B of the Plan, has been or is reasonably likely to be satisfied or, as applicable, waived in accordance with Article VIII.D of the Plan.

XX. Tax Status of Wind-Down Trust and Liquidation Trust. Each of the Wind-Down Trust and the Liquidation Trust are intended to qualify as a "liquidating trust" within the meaning of Treasury Regulation § 301.7701-4(d) and as described in U.S. Internal Revenue Service Revenue Procedure 94-45, 1994-2 C.B. 684, and, thus, as a "grantor trust" within the meaning of Sections 671 through 679 of the U.S. Internal Revenue Code of 1986, as amended, of which the respective beneficiaries of the Wind-Down Trust and the Liquidation Trust, as applicable, are the grantors and the deemed owners of the underlying assets.

YY. Tax Status of Administrative PL/GL Claim Fund. The Administrative PL/GL Claim Fund is intended to qualify as a "qualified settlement fund" within the meaning Treasury Regulation § 1.468B-1. For federal income tax purposes, the Debtors shall be treated as the "transferor" with respect to the Contribution within the meaning of Treasury Regulation § 1.468B-1(d), and the Contribution shall be treated as transferred by the Liquidation Trust on behalf of the

Debtors within the meaning of Treasury Regulation § 1.468B-1(d)(1). The Administrative PL/GL Claim Fund Administrator is classified as the "administrator" within the meaning of Treasury Regulation § 1.468B-2(k)(3).

ZZ. Plan Provisions and Plan Documents Valid and Binding. Upon entry of this Confirmation Order, each term and provision of the Plan is valid, binding, and enforceable pursuant to its terms. Any and all documents necessary to implement the Plan, including those contained in the Plan Supplement (subject to any consent rights under the Plan), have been negotiated in good faith and at arms'-length, and shall be, upon completion of documentation and execution and delivery, valid, binding, and enforceable agreements and not be in conflict with any federal or state law.

AAA. Retention of Jurisdiction. From and after the Effective Date, the Court shall retain jurisdiction over the matters arising in, under, and related to, the Chapter 11 Cases, as set forth in Article IX of the Plan.

BBB. Assigned Causes of Action. The provisions regarding the preservation and transfer of Assigned Causes of Action to the Liquidation Trust in the Plan, including the Plan Supplement, are appropriate, fair, equitable, and reasonable, and are in the best interests of the Debtors, the Estates, and Holders of Claims and Interests.

CCC. Essential Element of the Plan. Each security to be issued under the Plan, the creation of the Wind-Down Trust and the Liquidation Trust, and the issuance of the Wind-Down Trust Interests and the Liquidation Trust Interests are an essential element of the Plan, necessary for Confirmation and Consummation of the Plan, and critical to the overall success and feasibility of the Plan. Entry into the instruments evidencing or relating to such securities, including the New Organizational Documents, the Wind-Down Trust Agreement, and the Liquidation Trust

Agreement is in the best interests of the Debtors, their Estates, and all Holders of Claims or Interests. The Debtors have exercised reasonable business judgment in determining to enter into the instruments evidencing or relating to such securities, including the New Organizational Documents, and have provided sufficient and adequate notice of the material terms of such instruments, which material terms were filed as part of the Plan Supplement. The terms and conditions of the instruments evidencing or relating to such securities, including the New Organizational Documents, the Wind-Down Trust Agreement, and the Liquidation Trust Agreement, are fair and reasonable, and were negotiated in good faith and at arm's-length.

DDD. Best Interests. Confirmation of the Plan is in the best interest of the Debtors, their Estates, Holders of Claims and Interests, and all other parties-in-interest.

## ORDER[7]

**BASED ON THE FOREGOING FINDINGS OF FACT AND CONCLUSIONS OF LAW, IT IS THEREFORE ORDERED, ADJUDGED, DECREED, AND HEREBY DETERMINED THAT:**

1. Findings of Fact and Conclusions of Law. The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014. To the extent that any finding of fact is determined to be a conclusion of law, it is deemed so, and vice versa.

2. Solicitation. The solicitation of votes on the Plan complied with the Disclosure Statement Order, was appropriate and satisfactory based upon the circumstances of the Chapter 11

[7] For the avoidance of doubt, this Confirmation Order and the relief granted herein solely relates to Confirmation in connection with consummation of the Sale Transaction and not in connection with any Restructuring Transaction, of which the Debtors are not seeking approval at this time.

Cases, was done in good faith based on adequate information, and was in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules, and applicable non-bankruptcy law.

3. Notice of the Confirmation Hearing. Notice of the Confirmation Hearing complied with the terms of the Disclosure Statement Order, the Bankruptcy Code, and the Bankruptcy Rules, and was appropriate and satisfactory based upon the circumstances of the Chapter 11 Cases.

4. Confirmation of the Plan. All requirements for the Confirmation of the Plan have been satisfied. The Plan complies with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the Complex Procedures. Accordingly, the Plan, attached hereto as **Exhibit A**, as and to the extent modified by this Confirmation Order, is approved and **CONFIRMED** in its entirety pursuant to Bankruptcy Code section 1129. All terms of the Plan and all documents (and any amendments, modifications, and supplements thereto) necessary for implementation of the Plan, including those in the Plan Supplement, are hereby approved and incorporated herein by reference as an integral part of this Confirmation Order. The failure to include, discuss, or refer to any particular article, section, or provision of the Plan, the Plan Supplement, or any related document, agreement, or exhibit shall have no effect on the validity, binding effect, and enforceability of such article, section, or provision, it being the intent of this Confirmation Order that the Plan, the Plan Supplement, and any related document, agreement, or exhibit are approved in their entirety and incorporated herein by reference. For the avoidance of doubt, each provision of the Plan shall have the same validity, binding effect, and enforceability as if fully set forth herein. Subject to the terms of the Plan (including certain consent and approval rights to the extent provided in the Plan), the Debtors may amend, update, supplement, or otherwise modify the Plan, the Plan Supplement, and related documents prior to the Effective Date. Once finalized and executed, the Plan Supplement and applicable documents

shall, as applicable, constitute legal, valid, binding, and authorized obligations of the respective parties thereto, enforceable in accordance with their terms and the terms of the Plan and this Confirmation Order.

5. Objections. All Confirmation Objections (including any reservations of rights contained therein) to approval of Confirmation of the Plan that have not been withdrawn, waived, or settled prior to entry of this Confirmation Order, are not cured by the relief granted herein, or are not otherwise resolved as stated by the Debtors on the record of the Confirmation Hearing, are **OVERRULED** and **DENIED** on the merits and in their entirety. All objections to entry of this Confirmation Order or to the relief granted herein that were not timely filed and served prior to the Objection Deadline are deemed waived and forever barred, and all withdrawn objections are deemed withdrawn with prejudice. The record of the Confirmation Hearing is hereby closed.

6. Authority to Act. The Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, and the Liquidation Trustee are each authorized to enter into and execute all documents and agreements related to the Plan (including all exhibits and attachments thereto and documents referred to therein and herein), and the execution, delivery, and performance thereafter by the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, and the Liquidation Trustee are hereby authorized and approved. Except as set forth in the Plan or this Confirmation Order, all actions authorized to be taken pursuant hereto or to the Plan shall be effective on, prior to, or after the Effective Date pursuant to the Plan and this Confirmation Order, as applicable, without further notice to, or action, order, or approval of, the Bankruptcy Court or further action by the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee.

7. Effectiveness of All Actions. Except as set forth in the Plan, all actions authorized to be taken pursuant to the Plan shall be effective on, before, or after the Effective Date pursuant

to this Confirmation Order, without further application to, or order of this Court, or further action by the respective officers, directors, managers, members, or stockholders of the Debtors or the Post-Restructuring Debtors and with the effect that such actions had been taken by unanimous action of such officers, directors, managers, members, or stockholders. This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, and regulations of all states and any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, agreements, any amendments or modifications thereto, and any other acts and transactions referred to in or contemplated by the Plan, the Plan Supplement, the Disclosure Statement, and any documents, instruments, securities, agreements, and any amendments or modifications thereto.

8. Compromise of Controversies. Pursuant Bankruptcy Code section 1123 and Bankruptcy Rule 9019, in consideration for the Distributions and other benefits provided under the Plan, and as a mechanism to effect a fair distribution of value to the Debtors' constituencies, the provisions of the Plan shall also constitute a good faith compromise and settlement of those Claims, Causes of Action (other than Assigned Causes of Action), and controversies incorporated in the Plan and are hereby approved. The entry of this Confirmation Order constitutes the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements, are (a) in the best interest of the Debtors, their Estates, and other parties-in-interest and (b) fair, equitable, and reasonable. Subject to Article VI of the Plan, all Distributions made to Holders of Allowed Claims are intended to be and shall be final.

9. Administrative Consolidation. Pursuant to Article IV.H, and based on the record at the Confirmation Hearing, the terms of the Debtors' proposed administrative consolidation are

approved. Specifically, the administrative consolidation of the Debtors in GUC Distribution Group 1, GUC Distribution Group 2, GUC Distribution Group 3, and GUC Distribution Group 4, solely for the purposes of voting on the Plan, tabulating the votes to determine which Class or Classes have accepted the Plan, confirming the Plan, and the resulting treatment of all Claims and Interests and Distributions, is hereby approved.

10. Preservation of Assigned Causes of Action.

(a) In accordance with Bankruptcy Code section 1123(b)(3), and except as expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Plan Settlement Agreement, the Plan Settlement Approval Order, the Final DIP Order, the Sale Order, the APA Amendment Order, or the Sale Transaction Documents, or pursuant to a Final Order, any Assigned Causes of Action held against any Entity shall vest in the Liquidation Trust. The Liquidation Trust, through its authorized agents or representatives, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Assigned Causes of Action, whether arising before or after the Petition Date, and the Liquidation Trustee's rights to commence, prosecute, or settle such Assigned Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

(b) Subject to approval by the Bankruptcy Court, the Liquidation Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Assigned Causes of Action and to decline to do any of the foregoing. For the avoidance of doubt, the Debtors, the Post-Restructuring Debtors, and their Estates shall not release any Estate Causes of Action, including, but not limited to, the Assigned Causes of Action, other than the Claims and Causes of Action expressly released or otherwise settled pursuant to the Plan, the APA, or the Plan Settlement Agreement. **No Person or Entity may rely on the absence of a specific reference in the Plan or the Plan Supplement to any Assigned Cause of Action against it as any indication that the Liquidation Trust will not pursue any and all available Assigned Causes of Action against it.**

(c) Unless any Assigned Cause of Action held against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the APA, the Plan Settlement Agreement, or a Final Order (including the Final DIP Order), all Assigned Causes of Action are expressly reserved and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel

(judicial, equitable, or otherwise), or laches, shall apply to the Assigned Causes of Action upon, after, or as a consequence of Confirmation or Consummation of the Plan; *provided, however*, that nothing in the Plan modifies, extends, or otherwise tolls any applicable statute of limitations or other period of repose with respect to the Assigned Causes of Action.

(d) The Debtors, the Special Investigation Committee, the Special Restructuring Committee, the Creditors' Committee (and each of its members), and the Professionals of each of the foregoing shall preserve any and all documents and communications related to the Debtors, the Chapter 11 Cases, and the Assigned Causes of Action. Nothing in this paragraph shall impose any obligation on the Buyer or the ACO Entities, whose obligations with respect to Books and Records shall be governed exclusively by the Sale Transaction Documents. Nothing in the Plan shall waive any defenses, claims (including contribution, reimbursement, or indemnification claims), counterclaims, objections, or related rights of any Person or Entity with respect to such Assigned Causes of Action, all of which are expressly preserved and shall survive Confirmation and Consummation of the Plan.

11. Approval of the ACO Transaction. The ACO Transaction, as a component of the Sale Transaction approved by the Sale Order and the APA Amendment Order, is authorized and approved pursuant to Article IV.F of the Plan, and this Confirmation Order constitutes the order contemplated by Article IV.F of the Plan with respect thereto. The Debtors, the ACO Entities, and the Buyer are authorized to consummate the ACO Transaction and to execute, deliver, perform under, and implement all agreements, instruments, and documents reasonably necessary or desirable to implement the ACO Transaction, without further notice to or action, order, or approval of the Bankruptcy Court. Without limiting the generality of the foregoing:

(a) Cancellation and Issuance. On the ACO Effective Date, pursuant to Bankruptcy Code sections 105, 363, 1123(a)(5), 1129, and 1141(b) and (c), and in accordance with Article IV.F of the Plan and the APA, (i) all ACO Equity shall be deemed cancelled, released, and extinguished without any Distribution on account thereof and without any further action by any Debtor or any other Person, and the Debtor holding such ACO Equity shall have no further right, title, or interest therein, and (ii) each ACO Entity, as reorganized, shall issue the Reorganized ACO Equity to the Buyer (or its designee), which Reorganized ACO Equity shall constitute all of the issued and outstanding equity interests of such ACO Entity and shall be duly

authorized, validly issued, fully paid, and non-assessable. The ACO Transaction shall be deemed consummated as of 12:01 a.m. (prevailing Central Time) on the ACO Effective Date. The issuance of the Reorganized ACO Equity to the Buyer (or its designee) pursuant to the Plan and this Confirmation Order shall be a legal, valid, enforceable, and effective issuance and transfer of such interests, and this Confirmation Order shall be the sole and sufficient evidence of the Buyer's (or its designee's) ownership of the Reorganized ACO Equity.

(b) Free and Clear. The Reorganized ACO Equity shall be issued to, and shall vest in, the Buyer (or its designee), and the ACO Purchased Assets shall vest in the applicable ACO Entity pursuant to Bankruptcy Code sections 1141(b) and (c), in each case free and clear of all Liens, Claims (including any "claim" as defined in Bankruptcy Code section 101(5)), Interests, charges, rights, liabilities, mortgages, deeds of trust, pledges, security interests of whatever kind or nature, rights of first refusal, rights of offset or recoupment, conditional sale or title retention agreements, hypothecations, preferences, debts, suits, licenses, options, rights of recovery, judgments, orders and decrees of any court or governmental entity, taxes, covenants, restrictions, consent rights, claims for reimbursement, contribution, indemnity, or exoneration, encumbrances, Causes of Action, and other interests of any kind or nature whatsoever, whether known or unknown, fixed or contingent, or arising prior to or after the Petition Date (collectively, the "Encumbrances"), other than as expressly provided in the Sale Transaction Documents. Any Encumbrance in or against the ACO Equity, the ACO Entities, or the ACO Purchased Assets shall attach solely to the consideration received by the applicable Debtor under the APA with the same validity, force, effect, and priority as existed immediately prior to the ACO Transaction, subject to the rights, claims, and defenses of the Debtors and their Estates with respect thereto, and shall be treated in accordance with the Plan. Any Lien securing a Claim against any ACO Entity shall be deemed released and discharged as of the ACO Effective Date in accordance with Article III.D of the Plan, and the Holder of such Claim shall look solely to the treatment of such Claim under the Plan, unless such Claim constitutes an ACO Assumed Liability (which shall be paid by the Buyer pursuant to the terms of the APA). The Plan and this Confirmation Order shall be conclusively deemed to be adequate notice that any Encumbrance in or against the ACO Equity, the ACO Entities, or the ACO Purchased Assets is being extinguished, and any Person or Entity holding any such Encumbrance shall be conclusively deemed to have consented to the ACO Transaction and to the issuance and vesting of the Reorganized ACO Equity and the ACO Purchased Assets free and clear thereof. The ACO Transaction shall be of full force and effect regardless of whether any Debtor lacks good standing in any jurisdiction in which it is formed or authorized to transact business.

(c) Continued Existence; No New Entity. Notwithstanding the cancellation of the ACO Equity, each ACO Entity shall continue in existence from and after the ACO Effective Date as the same legal Entity, with the same federal tax identification number, licenses, permits, provider numbers and identifiers, provider and participation agreements, contracts, and other Assets, and the ACO Transaction shall not constitute a dissolution, liquidation, merger, consolidation, or formation of a new Entity for any purpose. Nothing in the Plan or this Confirmation Order (including the administrative consolidation approved herein and Articles IV.H, IV.J, IV.K, and IV.P.4 of the Plan) shall cause any ACO Entity to be merged, consolidated, or dissolved, shall vest any Asset of any ACO Entity (other than the ACO Excluded Assets) in the Wind-Down Trust or the Liquidation Trust, or shall subject any ACO Entity to the authority of the Wind-Down Trustee or the Liquidation Trustee from and after the ACO Effective Date.

(d) No Successor or Transferee Liability. Except as expressly provided in the Sale Transaction Documents, none of the Buyer, its Affiliates, its designees, or, from and after the ACO Effective Date, the ACO Entities shall be a successor to, or shall assume, be deemed to have assumed, or in any way be responsible for, any liability or obligation of any Debtor (other than, in the case of an ACO Entity, obligations of such ACO Entity that are Assumed Liabilities under the APA, are not ACO Excluded Liabilities, and that are not treated, satisfied, or released under the Plan), any Estate, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, whether arising prior to or after the ACO Effective Date, under any theory of successor or transferee liability, de facto merger, substantial continuity, alter ego, or otherwise, including any liability (i) under any employee benefit plan, employment agreement, collective bargaining agreement, or similar arrangement of any Debtor, (ii) for any Medicare, Medicaid, or other governmental program overpayment, recoupment, penalty, or assessment attributable to any period prior to the ACO Effective Date except as expressly provided in the Sale Transaction Documents or the U.S. Sale Stipulation (as defined herein), (iii) for any tax of any Debtor, (iv) under any federal, state, or local labor, employment, revenue, pension, or ERISA law, rule, or regulation, including the Employee Retirement Income Security Act of 1974, the Internal Revenue Code, the Fair Labor Standards Act, the WARN Act and any state analogue, Title VII of the Civil Rights Act of 1964, the National Labor Relations Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act, and section 4980B of the Internal Revenue Code and Part 6 of Title I of ERISA ("COBRA"), including for any individual who is an "M&A qualified beneficiary" within the meaning of Treasury Regulation section 54.4980B-9 by reason of the Sale Transaction or the ACO Transaction, (v) under any environmental, products liability, or antitrust law, (vi) on account of any litigation or threatened litigation against any Debtor, (vii) on account of any intercompany loan, advance, receivable, or guaranty among the Debtors or

their Affiliates, or (viii) on account of any Claim that is treated, satisfied, or released under the Plan. The operations of the Buyer, its Affiliates, its designees, and the ACO Entities shall not be deemed a continuation of the Debtors' businesses by reason of the Sale Transaction or the ACO Transaction.

(e) Statutory Fees; Closing of the ACO Entities' Chapter 11 Cases. The ACO Entities shall not have any liability for any fees payable under 28 U.S.C. § 1930 or for any other administrative cost or expense of the Chapter 11 Cases, including with respect to the Chapter 11 Cases of the ACO Entities, all of which shall be paid by the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, as applicable, in accordance with the Plan. As soon as reasonably practicable following the ACO Effective Date, the Debtors or the Wind-Down Trustee, as applicable, shall file a motion for entry of a final decree closing the Chapter 11 Cases of the ACO Entities, and none of the Buyer, its Affiliates, its designees, or the ACO Entities shall have any post-ACO Effective Date reporting or other obligation in such Chapter 11 Cases. Except as expressly provided in the Sale Transaction Documents and the Plan, in no event shall the Buyer, any of its Affiliates or designees, or any ACO Entity be liable for, have any liability on account of, fund, or have any obligation to fund (whether Allowed or otherwise) any Claim referenced in the Plan (unless such Claim is an ACO Assumed Liability), any reserve established under the Plan, the Wind-Down Trust, the Liquidation Trust, the Administrative PL/GL Claim Fund, or any fee or expense of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, the Liquidation Trustee, or the Creditors' Committee, all of which shall be paid exclusively from the Liquidation Trust Assets, the Wind-Down Trust Assets, and the applicable reserves in accordance with the Plan, as applicable, and no Holder of any of the foregoing shall have any recourse against the Buyer, any of its Affiliates or designees, or any ACO Entity, or their respective property.

(f) Effect of Non-Occurrence of the Effective Date. The occurrence of the ACO Effective Date, and the effectiveness of the ACO Transaction and of the provisions of the Plan and this Confirmation Order relating to the ACO Entities, the Buyer, and the Buyer's Affiliates and designees, shall not be conditioned upon or affected by the occurrence or non-occurrence of the Effective Date with respect to any other Debtor, and if the Effective Date does not occur with respect to any other Debtor following the ACO Effective Date, the ACO Transaction and all such provisions shall nonetheless remain in full force and effect and shall not be subject to paragraph 82 of this Confirmation Order. Nothing in paragraph 82 of this Confirmation Order shall affect the Sale Order, the APA Amendment Order, the Sale Transaction Documents, or the consummation of the Sale.

(g) Relationship to Sale Order and APA Amendment Order. The provisions of this paragraph 11 supplement, and shall be construed consistently with the Sale Order, the APA Amendment Order, and the Sale Transaction Documents. In the event of any inconsistency between this paragraph 11 and any other provision of the Plan, the Plan Supplement, or this Confirmation Order (including any provision that purports to be preemptory or supervening or to apply notwithstanding any other provision), this paragraph 11, the Sale Order, the APA Amendment Order, and the Sale Transaction Documents shall govern and control with respect to the Buyer, its Affiliates and designees, the ACO Entities, the Sale Transaction, and the ACO Transaction.

12. No Action Required; Corporate Action. Under Bankruptcy Code section 1142(b) and any other comparable provisions under applicable law, no action of the respective directors, equity holders, managers, or members of the Debtors is required to authorize the Debtors to enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, the Sale Transaction (including the ACO Transaction), and any contract, assignment, certificate, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan. On or before the ACO Effective Date or the Effective Date, as applicable, all actions contemplated under the Plan or the Plan Supplement shall be deemed authorized and approved in all respects, including implementation of the transactions contemplated by the Plan (whether to occur before, on, or after the ACO Effective Date or the Effective Date, as applicable). All matters provided for in the Plan involving the corporate structure of the Debtors or the Post-Restructuring Debtors, as applicable, and any corporate action required by the Debtors or the Post-Restructuring Debtors, as applicable, in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Post-Restructuring Debtors, as applicable. On or (as applicable) prior to the ACO Effective Date or the Effective Date, as applicable, the appropriate officers of the Debtors or the Post-Restructuring

Debtors, as applicable, shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to affect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Restructuring Debtors, including any and all agreements, documents, securities, and instruments.

13. Vesting of Assets. Except as otherwise provided in the Plan, the Plan Settlement Agreement, the Final DIP Order, the Sale Order, the APA Amendment Order, the Sale Transaction Documents, or this Confirmation Order, on and after the Effective Date, pursuant to Bankruptcy Code sections 1141(b) and (c), (a) all property in each Debtor's Estate (other than the Liquidation Trust Assets, including the Assigned Causes of Action, and other than the ACO Equity, the Reorganized ACO Equity, the ACO Purchased Assets, and any other Purchased Assets (as defined in the APA)) and any property acquired by the Debtors under or in connection with the Plan shall vest in each respective Post-Restructuring Debtor or the Wind-Down Trust, as applicable, subject only to the expenses of the Wind-Down Trust as set forth herein and in the Wind-Down Trust Agreement; and (b) the Liquidation Trust Assets, including the Assigned Causes of Action, shall vest in the Liquidation Trust, in each case free and clear of all Claims, Liens, encumbrances, charges, Causes of Action, or other interests, subject only to the Allowed Claims of the Holders of Liquidation Trust Interests as set forth in the Plan and the expenses of the Liquidation Trust as set forth herein and in the Liquidation Trust Agreement. On the ACO Effective Date, the ACO Purchased Assets shall vest in the applicable ACO Entity, and the Reorganized ACO Equity shall vest in the Buyer (or its designee), in each case pursuant to Bankruptcy Code sections 1141(b) and (c) and free and clear of all Encumbrances as provided in paragraph 11 of this Confirmation Order.

14. Wind-Down Trustee. In accordance with the Plan and terms of the Wind-Down Trust Agreement, the appointment of Russell A. Perry of Ankura Consulting Group, LLC, or such

other person or Entity as may be named in the Plan Supplement prior to the Effective Date, as the Wind-Down Trustee is hereby **APPROVED**. Subject to occurrence of the Effective Date, the Wind-Down Trustee is authorized to take any action on behalf of the Debtors or the Post-Restructuring Debtors (other than the ACO Entities, except solely as custodian for the Buyer prior to the ACO Effective Date in accordance with Article IV.F of the Plan, and other than with respect to any Purchased Asset (as defined in the APA) held by any Debtor pending transfer to the Buyer or its designee, which shall be held, maintained, and disposed of solely in accordance with Article IV.E of the Plan and the Sale Transaction Documents) to carry out all rights and duties set forth in and consistent with the Plan (including the Wind-Down Trust Agreement) and this Confirmation Order. The Bankruptcy Court shall have sole jurisdiction over claims and causes of action against the Wind-Down Trustee (solely in its capacity as such) arising out of the performance of the Wind-Down Trustee's duties from and after the Effective Date, and the Wind-Down Trustee (in such capacity) may not be sued, or have claims asserted against it, in any other forum without leave of the Bankruptcy Court. The Wind-Down Trustee and any professionals retained by the Wind-Down Trustee may be compensated by the Wind-Down Trust in connection with any services provided to or on account of the Wind-Down Trust from and after the Effective Date, subject to and in accordance with the terms of the Plan and the Wind-Down Trust Agreement.

15. Purpose of the Wind-Down Trust. On the Effective Date, the Wind-Down Trust shall be established pursuant to the Wind-Down Trust Agreement for the purpose of, among other things, (a) winding down the business and affairs of the Debtors and the Post-Restructuring Debtors (other than the ACO Entities), (b) providing post-Effective Date transition services pursuant to the Sale Transaction Documents, (c) maintaining the Professional Fee Escrow Account and making Distributions to Professionals for Allowed Professional Fee Claims, (d) paying all

reasonable fees, expenses, debts, charges, and liabilities of the Post-Restructuring Debtors after the Effective Date, and (e) coordinating with the Liquidation Trustee in accordance with the Liquidation Trust Agreement. The Wind-Down Trust Agreement may establish certain powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Wind-Down Trust as a "liquidating trust" for United States federal income tax purposes.

16. Tax Treatment and Reporting of Wind-Down Trust. (A) All parties (including the Wind-Down Trustee, the Debtors, and the Liquidation Trustee) shall report for all U.S. federal income tax purposes consistently with the treatment of the Wind-Down Trust as a "liquidating trust" in accordance with Treasury Regulation Section 301.7701-4(d) and as described in IRS Revenue Procedure 9445, 1994-2 C.B. 684, including treating the transfer of the Wind-Down Trust Assets to the Wind-Down Trust as (i) a deemed transfer of the Wind-Down Trust Assets (subject to applicable liabilities and obligations) to the Wind-Down Trust beneficiaries, followed by (ii) a deemed transfer of such assets by the Wind-Down Trust beneficiaries to the Wind-Down Trust; (B) accordingly, all parties shall treat the Wind-Down Trust as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code of which the Wind-Down Trust beneficiaries are the grantors and the deemed owners of the Wind-Down Trust Assets; (C) all parties shall report consistently with the valuation of the Wind-Down Trust Assets transferred to the Wind-Down Trust as determined by the Wind-Down Trustee (or its designee) for all U.S. federal income tax purposes; (D) the Wind-Down Trustee shall be responsible for filing returns for the Wind-Down Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and any other tax returns that may be required with respect to the Wind-Down Trust; and (E) the Wind-Down Trustee shall provide to the Liquidation Trust a separate statement regarding the receipts and

expenditures of the Wind-Down Trust as relevant for U.S. federal income tax purposes and shall cooperate with reasonable requests from the Liquidation Trust for additional information for tax purposes.

17. Liquidation Trustee. In accordance with the Plan and terms of the Liquidation Trust Agreement, the appointment of Matthew Dundon of Dundon Advisers LLC as the Liquidation Trustee is hereby **APPROVED**. Subject to occurrence of the Effective Date, the Liquidation Trustee is authorized to carry out all rights and duties set forth in and consistent with the Plan (including the Liquidation Trust Agreement) and this Confirmation Order. The Bankruptcy Court shall have sole jurisdiction over claims and causes of action against the Liquidation Trustee (solely in its capacity as such) arising out of the performance of the Liquidation Trustee's duties from and after the Effective Date, and the Liquidation Trustee (in such capacity) may not be sued, or have claims asserted against it, in any other forum without leave of the Bankruptcy Court. The Liquidation Trustee and any professionals retained by the Liquidation Trustee may be compensated by the Liquidation Trust in connection with any services provided to or on account of the Liquidation Trust from and after the Effective Date, subject to and in accordance with the terms of the Plan and the Liquidation Trust Agreement.

18. Purpose of the Liquidation Trust. On the Effective Date, the Liquidation Trust shall be established pursuant to the Liquidation Trust Agreement for the purpose of, among other things, (a) holding and administering the Liquidation Trust Assets; (b) prosecuting any objections to Claims that the Liquidation Trustee deems appropriate and resolving such objections, pursuant to the Trust Distribution Procedures (as defined in the Liquidation Trust Agreement) or otherwise; (c) retaining professionals or other advisors to assist in the performance of its duties; (d) making Distributions from the Liquidation Trust to Holders of Allowed Holders of (i) Allowed

Administrative Expense Claims (including Holders of Allowed Administrative PL/GL Claims who validly opt out of the Administrative PL/GL Claim Settlement), (ii) Allowed Other Secured Claims, (iii) Allowed Priority Tax Claims, (iv) Allowed Priority Non-Tax Claims, (v) Allowed General Unsecured Claims, and (vi) Allowed Convenience Claims (with respect to the Convenience Claim Reserve only), as provided for in the Plan and the Liquidation Trust Agreement; and (e) litigating any Assigned Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action. The Liquidation Trust Agreement may establish certain powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Liquidation Trust as a "liquidating trust" for United States federal income tax purposes.

19. Tax Treatment and Reporting of the Liquidation Trust. (A) All parties (including the Liquidation Trustee, the Debtors, and the Liquidation Trust Beneficiaries) shall report for all U.S. federal income tax purposes consistently with the treatment of the Liquidation Trust as a "liquidating trust" in accordance with Treasury Regulation Section 301.7701-4(d) and as described in IRS Revenue Procedure 9445, 1994-2 C.B. 684, including treating the transfer of the Liquidation Trust Assets to the Liquidation Trust as (i) a deemed transfer of the Liquidation Trust Assets (subject to applicable liabilities and obligations) to the Liquidation Trust Beneficiaries, followed by (ii) a deemed transfer of such assets by the Liquidation Trust beneficiaries to the Liquidation Trust; (B) accordingly, all parties shall treat the Liquidation Trust as a "grantor trust" within the meaning of sections 671 through 679 of the Tax Code of which the Liquidation Trust beneficiaries are the grantors and the deemed owners of the Liquidation Trust Assets; (C) all parties shall report consistently with the valuation of the Liquidation Trust Assets transferred to the Liquidation Trust as determined by the Liquidation Trustee (or its designee) for all U.S. federal

income tax purposes; (D) the Liquidation Trustee shall be responsible for filing returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and any other tax returns that may be required with respect to the Liquidation Trust; and (E) the Liquidation Trustee shall provide to the Liquidation Trust Beneficiaries a separate statement regarding the receipts and expenditures of the Liquidation Trust as relevant for U.S. federal income tax purposes and shall cooperate with reasonable requests from the Liquidation Trust Beneficiaries for additional information for tax purposes.

20. Administrative PL/GL Claim Fund Administrator. In accordance with the Plan, the Administrative PL/GL Claim Settlement Approval Order, and the terms of the Administrative PL/GL Claim Settlement Fund Agreement, the appointment of Anthony & Partners PLLC as the Administrative PL/GL Claim Fund Administrator is hereby **APPROVED**. Subject to occurrence of the Effective Date, the Administrative PL/GL Claim Fund Administrator is authorized to carry out all rights and duties set forth in and consistent with the Plan (including the Administrative PL/GL Claim Settlement Fund Agreement) and this Confirmation Order. The Bankruptcy Court shall have sole jurisdiction over claims and causes of action against the Administrative PL/GL Claim Fund Administrator (solely in its capacity as such) arising out of the performance of the Administrative PL/GL Claim Fund Administrator's duties, and the Administrative PL/GL Claim Fund Administrator (in such capacity) may not be sued, or have claims asserted against it, in any other forum without leave of the Bankruptcy Court. The Administrative PL/GL Claim Fund Administrator and any professionals retained by the Administrative PL/GL Claim Fund Administrator may be compensated, subject to and in accordance with the terms of the Plan and the Administrative PL/GL Claim Settlement Fund Agreement.

21. Tax Treatment and Reporting of the Administrative PL/GL Claim Fund. The Administrative PL/GL Claim Fund is intended to qualify as a "qualified settlement fund" within the meaning Treasury Regulation § 1.468B-1. For federal income tax purposes, the Debtors shall be treated as the "transferor" with respect to the Administrative PL/GL Claim Contribution within the meaning of Treasury Regulation § 1.468B-1(d), and the Administrative PL/GL Claim Contribution shall be treated as transferred by the Liquidation Trust on behalf of the Debtors within the meaning of Treasury Regulation § 1.468B-1(d)(1). The Administrative PL/GL Claim Fund Administrator is classified as the "administrator" within the meaning of Treasury Regulation § 1.468B-2(k)(3). The Administrative PL/GL Claim Fund Administrator shall cause to be prepared and filed all required federal, state, and local income tax returns, information returns, and reports for the Administrative PL/GL Claim Fund in accordance with Treasury Regulation § 1.468B-2(k) and (l) and applicable law and shall pay all taxes and associated expenses of the Fund from the Administrative PL/GL Claim Fund without further order of the Bankruptcy Court. The Fund Administrator shall comply with all applicable withholding, backup-withholding, and information-reporting requirements, and may retain an independent certified public accountant to advise the Administrative PL/GL Claim Fund Administrator with respect to such matters. The Administrative PL/GL Claim Fund Administrator may request an expedited determination of the taxes of the Administrative PL/GL Claim Fund under Bankruptcy Code section 505(b) with respect to all returns filed by or on behalf of the Administrative PL/GL Claim Fund for all taxable periods through the termination of the Administrative PL/GL Claim Fund.

22. No Change of Control. Other than the ACO Transaction, no transaction contemplated by or set forth in the Plan, including the transfer of Post-Restructuring Equity

Interests or the dissolution and dismissal of the current directors and officers of the Debtors, shall constitute a change of equity ownership under applicable state or federal law.

23. Deemed Acceptance of the Plan as Modified. Following solicitation of the Plan, the Debtors modified the Plan to reflect the terms of the Plan Settlement Agreement and the Administrative PL/GL Claim Settlement, both of which were separately approved by the Bankruptcy Court and made certain other nonmaterial modifications and clarifications. The Debtors' key constituents affected by such modifications, including the parties to the Plan Settlement Agreement and the Administrative PL/GL Claim Settlement Term Sheet, support these changes. In accordance with Bankruptcy Code section 1127 and Bankruptcy Rule 3019, all Holders of Claims or Interests who voted to accept the Plan or who are conclusively presumed to accept the Plan are deemed to have accepted the Plan, as modified by the Plan Modifications and this Confirmation Order. No Holder of a Claim or Interest shall be permitted to change its vote as a consequence of any Plan Modifications.

24. Plan Classifications Controlling. The categories listed in Article III of the Plan classify Claims against, and Interests in, each of the Debtors, pursuant to Bankruptcy Code sections 1122 and 1123(a)(1), for all purposes, including voting, Confirmation of the Plan, and distributions pursuant to the Plan, and shall be controlling. The Bankruptcy Court hereby holds that (a) the classifications of Claims and Interests under the Plan (i) are fair, reasonable, and appropriate and (ii) were not done for any improper purpose, (b) valid business, legal, and factual reasons exist for separately classifying the various Classes of Claims and Interests under, and as in fact so classified in, the Plan, and (c) the creation of such Classes does not unfairly discriminate between or among Holders of Claims or Interests. The classifications set forth on the Ballots tendered to or returned by the Holders of Claims in connection with voting on the Plan: (a) were set forth thereon solely

for purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim as representing the actual classification of such Claim under the Plan for distribution purposes; and (d) shall not be binding on the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust except for voting purposes.

25. Subordination of Claims. The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, contract, Bankruptcy Code section 510(b), or otherwise. Pursuant to Bankruptcy Code section 510, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee (as applicable) reserve the right to re-classify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto, subject in all respects to the Plan, the Plan Settlement Agreement, and the Final DIP Order.

26. Privileges. On the Effective Date, all attorney-client privileges, work product protections, and other applicable privileges, immunities, or protections from disclosure, and all other similar immunities belonging to the Debtors or their Estates (other than the ACO Entities) (collectively, "Privileges") shall vest in the Post-Restructuring Debtors and the Wind-Down Trust. Subject to the terms of Article IV.L of the Plan, the Liquidation Trustee shall succeed to the Privileges formerly held by the Debtors (other than the ACO Entities) on the Effective Date. Following the Effective Date, the Wind-Down Trustee shall have the sole right to waive Privileges

and no Privilege shall be waived by access or disclosures to the Liquidation Trustee. All Privileges of each ACO Entity shall remain with such ACO Entity from and after the ACO Effective Date, and nothing herein shall authorize the Wind-Down Trustee or the Liquidation Trustee to waive any Privilege of any ACO Entity, the Buyer, or any of the Buyer's Affiliates or designees.

27. Means for Implementation. The provisions governing the means for implementation of the Plan set forth in Article IV of the Plan shall be, and hereby are, approved in their entirety and the Debtors are authorized to take all actions reasonably necessary to implement the Plan on the terms set forth in Article IV. Further, upon the Effective Date, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, the Liquidation Trust, and the Administrative PL/GL Claim Fund Administrator, as applicable, are authorized to make the payments or other distributions contemplated by Article II and Article III of the Plan. To that end, in accordance with Bankruptcy Code section 1142(b), upon the entry of this Confirmation Order, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, the Wind-Down Trustee, the Liquidation Trust, the Liquidation Trustee, and the Administrative PL/GL Claim Fund Administrator, as applicable, each acting by and through its respective officers and agents, are authorized to take any and all actions necessary or appropriate to implement the Plan, including, without limitation, (a) transferring and assigning all assets held by the Debtors (other than the ACO Equity, the Reorganized ACO Equity, and the ACO Purchased Assets) to the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, as applicable, on or before the Effective Date, free and clear of all Liens, claims, encumbrances, and other interests; (b) consummating the Plan Settlement Agreement and the Administrative PL/GL Claim Settlement; (c) forming the Wind-Down Trust, entering into the Wind-Down Trust Agreement (substantially in the form included in the Plan Supplement), and complying with, and satisfying the obligations set forth under the Wind-

Down Trust Agreement; (d) forming the Liquidation Trust, entering into the Liquidation Trust Agreement (substantially in the form included in the Plan Supplement), and complying with, and satisfying the obligations set forth under the Liquidation Trust Agreement; (e) forming the Administrative PL/GL Claim Fund, entering into the Administrative PL/GL Claim Fund Trust Agreement (substantially in the form included in the Plan Supplement); (f) complying with, and satisfying the obligations set forth under, the Plan; (g) assigning the Assigned Causes of Action to the Liquidation Trust; and (h) consummating the ACO Transaction in accordance with Article IV.F of the Plan, the Sale Transaction Documents, and paragraph 11 of this Confirmation Order, in each case, without any further order of the Court. The Wind-Down Trust, the Liquidation Trust, and the Administrative PL/GL Claim Fund shall be deemed for all purposes to have been created in connection with the Plan and this Confirmation Order. Subject to payment of any applicable filing fees under applicable non-bankruptcy law, each federal, state, commonwealth, local, foreign, or other governmental agency is authorized to accept for filing and/or recording any and all documents, mortgages, and instruments necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the Plan and this Confirmation Order.

28. Plan Supplement. The documents contained in the Plan Supplement are integral to the Plan and are approved by the Court. Subject to the terms of the Plan, the Debtors may alter, amend, update, or modify the Plan Supplement at any time on or before the Effective Date; *provided, however*, that any such amendment, updated, or modification shall not be inconsistent with the Plan Settlement Agreement. The documents contained in the Plan Supplement relating to the ACO Entities (including the schedule of Executory Contracts and Unexpired Leases to be assumed by the ACO Entities) shall be in the form and substance acceptable to the Buyer and may

be amended, updated, or modified by the Buyer in accordance with the Sale Transaction Documents through the ACO Effective Date.

29. Exemption from Transfer Taxes. To the maximum extent provided by Bankruptcy Code section 1146(a), any transfers of property pursuant hereto shall not be subject to any stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, personal property tax, sales tax, use tax, privilege tax, or other similar tax or governmental assessment in the United States, and the appropriate federal, state or local government officials or agents are hereby directed to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (a) the creation of any mortgage, deed of trust, lien or other security interest; (b) the assuming and assigning any contract, lease or sublease; (c) any transaction authorized by the Plan, the Plan Settlement Agreement, or the Plan Supplement; (d) any sale of an Asset by the Wind-Down Trustee or the Liquidation Trustee in furtherance of the Plan, including but not limited to any sale of personal or real property; (e) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan; (f) the ACO Transaction, including the cancellation of the ACO Equity, the issuance of the Reorganized ACO Equity to the Buyer (or its designee), and the vesting of the ACO Purchased Assets in the ACO Entities; and (g) the transfer of any Purchased Asset (as defined in the APA), including any real property, lease, license, or other Asset the transfer of which to the Buyer or its designee(s) occurs on or after the Confirmation Date pursuant to the Sale Transaction Documents.

30. Sale Order and APA Amendment Order. Notwithstanding anything to the contrary in the Plan, the Plan Supplement, or this Confirmation Order (including any provision that purports to be preemptory or supervening or to apply notwithstanding any other provision, but excluding paragraph 11 of this Confirmation Order, which supplements the Sale Order and the APA Amendment Order), nothing in the Plan, the Plan Supplement, or this Confirmation Order shall affect, impair, modify, or supersede the Sale Order, the APA Amendment Order, or the Sale Transaction Documents, each of which remains in full force and effect and governs in the event of any inconsistency with the Plan, the Plan Supplement, or this Confirmation Order.

31. General Settlement of Claims, Interests, and Controversies. Pursuant to Bankruptcy Code section 1123(b)(2) and Bankruptcy Rule 9019, and in consideration for the distributions and other benefits provided pursuant to the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that Holders of Claims or Interests may have with respect to any Allowed Claim or Interest or any Distribution to be made on account of such Allowed Claim or Interest, including pursuant to all Corporate Transactions implemented in accordance with the Plan. Such compromise and settlement of all Allowed Claims, Interests, and controversies is hereby approved under Bankruptcy Code section 1123 and Bankruptcy Rule 9019 and shall be effective immediately and binding on all parties-in-interest on the Effective Date.

32. Plan Settlement Agreement. Pursuant to Bankruptcy Code section 1123(b)(2) and Bankruptcy Rule 9019, and in exchange for the consideration and other benefits provided pursuant to the Plan Settlement Agreement, as approved by the Plan Settlement Approval Order, (a) was negotiated at arm's-length and in good faith by the Debtors, the Creditors' Committee, and the

Plan Settling Parties; (b) constitutes a good faith compromise and settlement of the Claims and Causes of Action set forth in the Plan Settlement Agreement; (c) is fair, equitable, and in the best interests of the Debtors, their Estates, and all parties-in-interest; and (d) represents a sound exercise of the Debtors' business judgment. All parties to the Plan Settlement Agreement are hereby authorized and directed to take all actions as may be necessary or appropriate to effectuate any transaction described therein pursuant to the terms thereof without further Order of the Bankruptcy Court. The Liquidation Trust Assets shall exclude, and the Liquidation Trust shall have no standing to assert, any claim or cause of action released pursuant to the terms of the Plan Settlement Agreement. No party to the Plan Settlement Agreement shall object to, or seek to disallow, subordinate, recharacterize, reduce, avoid, offset, or recoup, any Allowed Claim of a party released pursuant to the Plan Settlement Agreement on any ground, including under Bankruptcy Code sections 502(d), 506, 510, 544, 545, 547, 548, 549, 550, or 553. The Bankruptcy Court shall retain original and exclusive jurisdiction to interpret, implement, and enforce the Plan Settlement Agreement. Notwithstanding anything to the contrary herein or in the Plan (including the Plan Supplement), in the event of any inconsistency between the Plan (including the Plan Supplement) or the Confirmation Order, on one hand, and the Plan Settlement Agreement and the Plan Settlement Approval Order, on the other hand, the terms of the Plan Settlement Agreement and the Plan Settlement Approval Order shall govern and control. Nothing in the Plan, the Plan Supplement, or the Confirmation Order shall amend, modify, impair, or abridge any right, remedy, or protection of the Plan Settling Parties pursuant to the terms of the Plan Settlement Agreement.

33. Administrative PL/GL Claim Settlement. Pursuant to Bankruptcy Code section 1123(b)(2) and Bankruptcy Rule 9019, and in exchange for the consideration and other benefits provided pursuant to the Administrative PL/GL Claim Settlement Term Sheet, the Administrative

PL/GL Claim Settlement, as approved by the Administrative PL/GL Claim Settlement Approval Order, (a) was negotiated at arm's-length and in good faith by the Debtors, the Creditors' Committee, and Anthony & Partners PLLC, on behalf of an ad hoc group of postpetition tort claimants; (b) constitutes a good faith compromise and settlement; and (c) is fair, equitable, and in the best interests of the Debtors, their Estates, and all parties-in-interest. All parties to the Administrative PL/GL Claim Settlement Term Sheet are hereby authorized and directed to perform pursuant to the terms thereof without further Order of the Bankruptcy Court.

34. Treatment of Executory Contracts and Unexpired Leases. Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, each of the Executory Contracts and Unexpired Leases to which any Debtor is a party shall be deemed automatically rejected by the Debtors as of the Effective Date in accordance with the provisions and requirements of Bankruptcy Code sections 365 and 1123, unless such contract or lease (a) previously has been assumed, assumed in connection with the ACO Transaction, assumed and assigned to the Buyer, or rejected by the applicable Debtor with the approval of the Bankruptcy Court; (b) expired or terminated pursuant to its own terms; (c) is the subject of a motion to assume or reject pending before the Bankruptcy Court as of the Confirmation Date; (d) is specifically identified in the Plan, the Plan Supplement (including an Assumption Schedule), or other notice filed on the docket of the Chapter 11 Cases as an Executory Contract or Unexpired Lease to be assumed by the Debtors (including in connection with the ACO Transaction), or assumed and assigned by the Debtors to the Buyer as of the Closing Date; (e) is subject to a pending Cure Dispute as of the Effective Date and shall be assumed, assumed and assigned, or rejected, as applicable, upon the resolution of such Cure Dispute; or (f) is an intercompany Executory Contract or Unexpired Lease to which only Debtor Entities are a party

(except for (i) those to which solely the ACO Entities are a party, or to which the ACO Entities, on the one hand, and another Debtor Entity on the other, are party, all of which, unless identified on an Assumption Schedule, shall be automatically rejected as of the ACO Effective Date, and (ii) that certain *Amended and Restated Sub-Sublease Agreement* dated January 1, 2025 between Debtor Genesis PM PA Operations LLC and various Debtor Entities with respect to 22 Facilities in Pennsylvania, which shall be automatically rejected as of the Effective Date). Such rejection, along with the assumption or assumption and assignment, as applicable, of such Executory Contracts or Unexpired Leases, as provided for in the Plan or the Plan Supplement is hereby approved, pursuant to Bankruptcy Code sections 365(a) and 1123 effective as of the Effective Date. Any motions to assume or reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date by a Final Order. To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to the Plan or any prior order of the Bankruptcy Court (including, without limitation, any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (a) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (b) any Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease, (c) the Confirmation or Consummation of the Plan, or (d) the consummation of the Sale Transaction or the ACO Transaction (including any change in the direct or indirect ownership or control of any ACO Entity), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to

exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan. Nothing in this paragraph or in Article V of the Plan shall limit, modify, or impair the Buyer's rights under the Sale Order, the APA Amendment Order, and the Sale Transaction Documents with respect to the assumption and assignment of Executory Contracts and Unexpired Leases, the payment or allocation of Cure Costs, or the designation of Executory Contracts and Unexpired Leases for assumption and assignment or rejection, all of which shall continue to be governed by the Sale Order, the APA Amendment Order, and the Sale Transaction Documents.

35. Rejection Damages Bar Date. If the rejection of an Executory Contract or Unexpired Lease pursuant to Article V.A of the Plan gives rise to a Claim for damages stemming from such rejection, such Claim shall be forever barred and shall not be enforceable against the Debtors, their Estates, the Post-Restructuring Debtors, the Wind-Down Trust, the Liquidation Trust, the ACO Entities, or their respective successors, assets, or properties unless a Proof of Claim is filed with the Claims and Noticing Agent no later than thirty (30) days after the Effective Date or the ACO Effective Date, as applicable, and served on the Liquidation Trustee and its counsel. For the avoidance of doubt, no Claim arising from the rejection of any Executory Contract or Unexpired Lease (including any Executory Contract or Unexpired Lease rejected by an ACO Entity) shall be enforceable against the ACO Entities, the Buyer, or any of the Buyer's Affiliates or designees. Unless otherwise ordered by the Bankruptcy Court, all Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be treated as General Unsecured Claims against the applicable Debtor in Class 6-A, Class 6-B, Class 6-C, or Class 6-D, as applicable, under the Plan and shall, if Allowed, be treated in accordance with the provisions thereunder, including the GUC Distribution Model. Notwithstanding any contrary or inconsistent

provision of the Plan, any party to an Executory Contract or Unexpired Lease that is rejected pursuant to the Plan, this Confirmation Order, or any other Order entered in the Chapter 11 Cases who filed a Proof of Claim on or before the General Bar Date asserting a General Unsecured Claim (in whole or part) for amounts owed as of the Petition Date on account of such Executory Contract or Unexpired Lease shall not be required to file a separate Proof of Claim for damages relating to such rejection and, in the absence of such separate Proof of Claim, the Proof of Claim filed on or before the General Bar Date shall, to the extent it asserts a General Unsecured Claim, be treated as a timely filed Proof of Claim for damages relating to such rejection.

36. Administrative Expense Claim Bar Date. Administrative Expense Claims (other than Professional Fee Claims or Independent Director Fee Claims) or Administrative PL/GL Claims that arose or accrued between April 1, 2026 and the Effective Date or the ACO Effective Date, as applicable, must be submitted by filing a Proof of Administrative Claim with the Claims and Noticing Agent by no later than thirty (30) days after the Effective Date or the ACO Effective Date, as applicable, and serving the same on (a) in the case of Administrative Expense Claims, the Liquidation Trustee and its counsel, and (b) in the case of Administrative PL/GL Claims, the Administrative PL/GL Claim Fund Administrator. Holders of Administrative Expense Claims or Administrative PL/GL Claims that are required to, but do not, file a Proof of Administrative Claim for payment of such Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims or Administrative PL/GL Claims against the Debtors, their Estates, the Post-Restructuring Debtors, the Wind-Down Trust, the Liquidation Trust, the Administrative PL/GL Claim Fund, the Buyer, the Buyer's Affiliates or designees, or any ACO Entity, as applicable, or their respective property and such Administrative Expense

Claims or Administrative PL/GL Claims shall be deemed discharged as of the Effective Date or the ACO Effective Date, as applicable, without further notice or objection.

37. Professional Fee Claims. Final Fee Applications shall be filed by each Professional (other than OCPs, which are not required to submit Final Fee Applications) no later than sixty (60) days after the Effective Date and served on the Post-Restructuring Debtors and their counsel, the Wind-Down Trustee and its counsel (if applicable), and the U.S. Trustee. Objections, if any, to the Final Fee Applications must be Filed and served on the Post-Restructuring Debtors and their counsel, the Wind-Down Trustee and its counsel (if applicable), the requesting Professional, and the U.S. Trustee no later than thirty (30) days from the date on which the Final Fee Application is filed. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Orders of the Bankruptcy Court; *provided, however*, that, if no objections are filed to a Final Fee Application by the Professional Fee Claim Objection Deadline, the Bankruptcy Court may enter an Order Allowing and approving the payment of such Professional Fee Claims without further notice and a hearing. Any Professional Fee Claim that is not asserted in accordance with Article II.E of the Plan shall be deemed Disallowed under the Plan and shall be forever barred against the Debtors, their Estates, the Post-Restructuring Debtors, the Wind-Down Trust, the Liquidation Trust, the ACO Entities, or any of their assets or property, and the Holder thereof shall be enjoined from commencing or continuing any action, employment of process, or act to collect, offset, recoup, or recover such Claim and shall be subject to the Injunction.

38. Professional Fee Escrow Account. As soon as practicable after Confirmation and not later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Estimate. The Professional Fee Escrow Account

shall be maintained in trust solely for the benefit of the Holders of the Professional Fee Claims until the Final Fee Applications related thereto are resolved by Final Order or agreement of the parties and for no other parties until all Allowed Professional Fee Claims have been paid in full. No Liens, claims, or interests shall encumber the Professional Fee Escrow Account or Cash held in the Professional Fee Escrow Account in any way, and such funds shall not be considered property of the Estates, the Debtors, or the Post-Restructuring Debtors. Professional Fee Claims shall be paid in full in Cash by the Post-Restructuring Debtors or the Wind-Down Trustee, as applicable, from the Professional Fee Escrow Account in such amounts as are Allowed by the Bankruptcy Court (a) on or as soon as reasonably practicable after the date upon which a Final Order relating to any such Allowed Professional Fee Claim is entered, (b) on such other terms as may be mutually agreed upon between the Holder of such an Allowed Professional Fee Claim and the Post-Restructuring Debtors or the Wind-Down Trustee, as applicable, or (c) in accordance with any Order of the Bankruptcy Court. To the extent any Cash is remaining in the Professional Fee Escrow Account following irrevocable payment in full of all Allowed Professional Fee Claims (including Allowed Professional Fee Claims arising after the Confirmation Date), such Cash shall be transferred to the Liquidation Trust without any further action or order of the Bankruptcy Court and, under no circumstances, shall such remaining amount be included in the "Purchased Assets" (as defined in the APA).

39. Post-Effective Date Fees and Expenses. Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors and, to the extent

applicable, the Creditors' Committee. Upon the Effective Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331, 363, and 1103 in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

40. Potential Disposal of Medical Records. At the election of the Wind-Down Trustee or the Post-Restructuring Debtors, as applicable, the Notice of Effective Date (as defined herein) filed, served, and published in one or more appropriate newspapers by the Post-Restructuring Debtors following the Effective Date may act as the notice pursuant to Bankruptcy Code section 351(1)(a) apprising patients, residents, and/or insurance providers, as applicable, that, if any medical records retained by the Post-Restructuring Debtors (collectively, the "Retained Medical Records") are not claimed by the applicable resident or insurance provider within one year after the date of such notification, the Post-Restructuring Debtors or the Wind-Down Trustee, as applicable, shall be authorized to destroy, abandon, or otherwise dispose of any Retained Medical Records. During the first 180 days of such one-year period, the Wind-Down Trustee or the Post-Restructuring Debtors, as applicable, shall promptly attempt to provide notice to each patient or resident that is the subject of the patient records and appropriate Insurer concerning the Retained Medical Records by mailing to the most recent known address of that patient or resident, or a family member or contact person for that patient, and to the appropriate Insurer, an appropriate notice regarding the claiming or disposing of the Retained Medical Records. If the Retained Medical Records are not claimed by a resident or insurance provider within one year after such notice is provided, the Post-Restructuring Debtors shall be and hereby are authorized to destroy, abandon, or otherwise dispose of the Retained Medical Records. Nothing in this paragraph shall

impose any obligation on the Buyer, any of its Affiliates or designees, or any ACO Entity, whose obligations with respect to medical records and other Books and Records shall be governed exclusively by the Sale Transaction Documents.

41. Employment Agreements. Any Employment Agreement not (i) assumed or (ii) assumed and assigned pursuant to the Sale Transaction Documents as part of the Sale Transaction or the ACO Transaction shall be deemed rejected pursuant to Bankruptcy Code sections 365 and 1123 on the Effective Date or the ACO Effective Date, as applicable.

42. Provisions Governing Distributions. The distribution provisions of Article VI of the Plan shall be, and hereby are, approved in their entirety. Except as otherwise set forth in the Plan or this Confirmation Order, the applicable Distribution Agent shall make all Distributions required under the Plan and the timing of Distributions required under the Plan or this Confirmation Order shall be made in accordance with and as set forth in the Plan, the Plan Supplement, or this Confirmation Order, as applicable. To the extent the Plan does not specify the recipient of any Estate assets or property (including in the event that the Claim of the specified recipient of such Estate assets or property is paid or otherwise satisfied in full), such Estate assets or property shall be turned over to the applicable Disbursing Agent for Distribution to Holders of Claims in accordance with the claims and priority waterfall set forth in the Plan.

43. Provisions for Resolving Disputed, Contingent, and Unliquidated Claims. The procedures for estimating, settling, or otherwise resolving contingent, unliquidated, and disputed Claims contained in Article VI.M of the Plan shall be, and hereby are, approved in their entirety.

44. Trust Distribution Procedures. The Trust Distribution Procedures, including those for submitting, resolving, and making distributions with respect to Unliquidated Claims provided

for in the Liquidation Trust Agreement, shall be, and hereby are, approved in their entirety. All objections filed with respect thereto are hereby overruled.

45. Payment of Statutory Fees; Post-Confirmation Reporting. All fees payable through the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid by the Debtors, the Post-Restructuring Debtors, or the Wind-Down Trustee, as applicable, on or as soon as practicable after the Effective Date. As soon as reasonably practicable after the Effective Date, the Wind-Down Trustee shall (a) file (i) any pre-confirmation monthly operating reports not filed as of the Effective Date and (ii) any post-confirmation quarterly reports through and including the quarterly period during which the Chapter 11 Cases (other than the Lead Case) are closed as set forth herein, and (ii) pay Statutory Fees to the U.S. Trustee in accordance with 28 U.S.C. § 1930 for such periods; *provided, however*, that the Liquidation Trustee shall pay such Statutory Fees to the U.S. Trustee for such periods solely with respect to Distributions made by the Liquidation Trust during such periods. Following the closing of the Chapter 11 Cases (other than the Lead Case), until the Lead Case is closed or converted and/or the entry of a final decree with respect to the Lead Case, the Liquidation Trustee shall file post-confirmation quarterly reports for the Lead Case and the Liquidation Trust, and the Liquidation Trust shall pay Statutory Fees to the U.S. Trustee in accordance with 28 U.S.C. § 1930 arising from distributions made by the Liquidation Trust as well as the minimum Statutory Fee ($250) for the Lead Case, for neither of which the Wind-Down Trust shall have responsibility. None of the Buyer, its Affiliates, its designees, or the ACO Entities shall have any responsibility for payment of any Statutory Fees, including with respect to the Chapter 11 Cases of the ACO Entities, or for post-confirmation reporting. Notwithstanding anything to the contrary herein, the U.S. Trustee shall not be required to file a Proof of Claim or

any other request for payment of its quarterly fees, which shall be deemed an Allowed Administrative Expense Claim against the Debtors and their Estates.

46. Post-Confirmation Modifications. Following the entry of this Confirmation Order, the Debtors or the Post-Restructuring Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with the terms thereof (including, for the avoidance of doubt, Article X.A of the Plan, which governs modifications and amendments thereto) and with Bankruptcy Code section 1127(b), or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. Any such amendment or modification shall be subject to the consent rights of the Buyer set forth in section 6.21 of the APA, including the Debtors' obligation to provide any proposed Plan Modification to the Buyer prior to filing it with the Court and the Buyer's right to seek an expedited hearing with respect to any Plan Modification that is materially adverse to the Buyer.

47. Governing Law. Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of Texas, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan (except as may be provided otherwise in any such agreements, documents, or instruments, in which case the governing law of such agreement shall control) and (b) the laws of the state of incorporation of the Post-Restructuring Debtors shall govern corporate governance matters with respect to the Post-Restructuring Debtors, in each case without giving effect to the principles of conflicts of law thereof.

48. Applicable Non-Bankruptcy Law. Pursuant to Bankruptcy Code section 1123(a) and 1142(a), the provisions of this Confirmation Order, the Plan, the Plan Supplement, and related documents, or any amendments or modifications thereto, shall apply and be enforceable notwithstanding any otherwise applicable non-bankruptcy law or any requirements related thereto.

49. Government Approvals Not Required. This Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state, federal, or other governmental authority with respect to the dissemination, implementation, or consummation of the Plan and the Disclosure Statement, any certifications, documents, instruments or agreements, and any amendments or modifications thereto, and any other acts referred to in, or contemplated by, the Plan and the Disclosure Statement. Each federal, state, commonwealth, local, foreign, or other governmental authority is hereby authorized to accept any and all documents, mortgages, deeds of trust, security filings, financing statements, and instruments necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the Plan and this Confirmation Order.

50. Compliance with Tax, Withholding, and Reporting Requirements. In accordance with Bankruptcy Code section 346 and in connection with the Plan and all Distributions made pursuant thereto, the applicable Disbursing Agent shall, to the extent applicable, comply with all withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority. The Disbursing Agent shall be authorized to take any and all actions necessary and appropriate to comply with such requirements. As a condition of making any Distribution under the Plan, each Person and Entity holding an Allowed Claim is required to provide any information necessary in writing, including returning W-9 statements, to affect the necessary information reporting and withholding of applicable taxes with respect to Distributions to be made

under the Plan as the Disbursing Agent may request. The Disbursing Agent shall be entitled in its sole discretion to withhold any Distributions to a Holder of an Allowed Claim who fails to provide tax identification or social security information within the timeframe requested in writing by the Disbursing Agent to such Holder of an Allowed Claim, which timeframe shall not be less than thirty (30) days. Unless the Liquidation Trust agrees, in its sole and absolute discretion, all Distributions to any Holder of an Allowed Claim that fails to timely respond to a request for tax information deemed necessary or appropriate by the Liquidation Trust shall be waived and forfeited and the applicable Claim shall be deemed Disallowed without further order of the Bankruptcy Court. Notwithstanding the above or any other provision of the Plan, each Person and Entity receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations on account of any such Distribution.

51. Special Provisions Regarding the United States. As to the United States, its agencies, or any instrumentalities thereof (collectively, the "United States"), notwithstanding anything contained in the Disclosure Statement, the Plan, this Confirmation Order, any Plan Supplement, and any other instrument or document created or executed pursuant thereto to the contrary, but subject in all respects to the terms of the *Stipulation and Agreed Order Regarding the United States' Sale Objections* [Docket No. 3620] (the "U.S. Sale Stipulation") which shall govern any and all aspects of the Sale Transaction, nothing shall:

(a) limit or be intended to or be construed to bar the United States from pursuing any police or regulatory action or any criminal action;

(b) discharge, release, exculpate, impair or otherwise preclude: (i) any obligation or liability to the United States that is not a "claim" within the meaning of Bankruptcy Code section 101(5); (ii) any Claim of the United States arising on or after the Confirmation Date; (iii) any liability of the Debtors or any Post-Restructuring Debtor under police or regulatory statutes or regulations to the United States as the owner, lessor, lessee or operator of property that such Debtor or Post-Restructuring Debtor owns,

operates or leases after the Effective Date; or (iv) any liability owed to the United States, including but not limited to any liabilities arising under the federal environmental, criminal, civil or common law, by any non-Debtor, *provided*, *however*, that the foregoing shall not (A) diminish the scope of any exculpation to which any Person is entitled under Bankruptcy Code section 1125(e) or (B) limit the scope of discharge granted to the Debtors under Bankruptcy Code sections 524 and 1141;

(c) enjoin or otherwise bar the United States from asserting or enforcing, outside the Bankruptcy Court, any obligation or liability described in the preceding clause (b); *provided*, *however*, that the non-bankruptcy rights and defenses of all Entities with respect to (i)–(iv) in clause (b) are likewise fully preserved;

(d) limit or otherwise affect any right of setoff of the United States (subject to the limitations in Bankruptcy Code section 553) against any of the Debtors or any Post-Restructuring Debtor; *provided*, *however*, that the rights and defenses (other than any rights or defenses based on language in the Plan or the Confirmation Order that may extinguish or limit setoff rights) of the Debtors or any Post-Restructuring Debtor with respect thereto are fully preserved;

(e) limit or otherwise affect any right of recoupment of the United States against any of the Debtors or any Post-Restructuring Debtor; *provided*, *however*, that the rights and defenses (other than any rights or defenses based on language in the Plan or the Confirmation Order that may extinguish or limit recoupment rights) of the Debtors or any Post-Restructuring Debtor with respect thereto are fully preserved;

(f) confer exclusive jurisdiction upon the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code);

(g) authorize the assumption, assignment, sale or other transfer of any federal (i) grants, (ii) grant funds, (iii) contracts, (iv) agreements, (v) awards, (vi) task orders, (vii) property, (viii) intellectual property, (ix) patents, (x) leases, (xi) certifications, (xii) applications, (xiii) registrations, (xiv) billing numbers, (xv) national provider identifiers, (xvi) provider transaction access numbers, (xvii) licenses, (xviii) permits, (xix) covenants, (xx) inventory, (xxi) guarantees, (xxii) indemnifications, (xxiii) data, (xxiv) records, or (xxv) any other interests belonging to the United States (collectively, "Federal Interests") without compliance with all terms of the Federal Interests and with all applicable non-bankruptcy law, unless authorized by the U.S. Sale Stipulation;

(h) be interpreted to set cure amounts related to any Federal Interests or to require the United States to novate, approve or otherwise consent to the assumption, assignment, sale, or other transfer of any Federal Interests, unless authorized by the U.S. Sale Stipulation;

(i) constitute or be deemed an approval or consent by the United States;

(j) waive, alter, or otherwise limit the United States' property rights;

(k) be construed as a compromise or settlement of any liability, Claim, Cause of Action or interest of the United States; or

(l) modify the scope of Bankruptcy Code section 525.

Further, in the event of an inconsistency or conflict between any provision of the Disclosure Statement, Plan, the Plan Supplement, any other instrument or document created or executed pursuant thereto, or the Confirmation Order, then, as to the United States, the provisions of this Confirmation Order and federal law shall control; *provided, however*, that the U.S. Sale Stipulation shall govern any and all aspects of the Sale Transaction as it pertains to the United States. Nothing in this paragraph 51 shall modify, impair, or abridge any right, remedy, finding, or protection of the Buyer, any of its Affiliates or designees, or any ACO Entity under the Sale Order, the APA Amendment Order, the Sale Transaction Documents, or the U.S. Sale Stipulation.

52. <u>UHC Entities and Change Entities</u>.

(a) Notwithstanding anything in the Plan or this Confirmation Order to the contrary, if and only if the contracts by and between any of the Debtor(s) and UnitedHealth Group Inc. and its direct and indirect subsidiaries (collectively, the "<u>UHC Entities</u>") pursuant to which any Debtor provides healthcare services to members of health plans insured or administered by any of the UHC Entities (each, a "<u>UHC Network Contract</u>") are not assumed and assigned to the Buyer in connection with consummation of the Sale Transaction or assumed by an ACO Entity pursuant to the Plan, any and all defenses of setoff and/or recoupment of the UHC Entities are hereby preserved solely for the purpose of asserting such defenses in connection with a claim or cause of action asserted against the UHC Entities following the Effective Date. The defensive rights of setoff or recoupment of Change Healthcare Operations, LLC and Change Healthcare Technologies, LLC (together, the "<u>Change Entities</u>") arising from or relating to the Change

Agreement (as defined in the *Limited Objection to Debtors' Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates* [Docket No. 3400] (the "UHC Objection") and the TFAP Claim (as defined in the UHC Objection) are also hereby preserved as set forth herein. It shall not be necessary for the UHC Entities or Change Entities to seek any court order or other relief to be able to assert any such existing defenses in any litigation or arbitration with the Debtors, the Post-Restructuring Debtors, the Liquidation Trustee, or the Wind-Down Trustee, or any of their successors or assigns, to the extent applicable; *provided, however*, that such setoff and/or recoupment rights may only be exercised if and only if (a) such rights existed prepetition or postpetition under the UHC Network Contract or, with regard to the Change Entities, under the Change Agreement or applicable law, (b) the exercise of such rights would not violate the Bankruptcy Code or other applicable law, and (c) such rights are used as a defense to a claim or cause of action asserted against the UHC Entities or the Change Entities following the Effective Date.

(b) Notwithstanding anything in the Plan or Confirmation Order to the contrary, solely to the extent of assumption and assignment to the Buyer of the UHC Network Contract(s), the UHC Entities, the Debtors or the Post-Restructuring Debtors, and the Buyer, as applicable, may agree to allow post-closing offset or recoupment in connection with the cure of any amounts owed pre-closing under the UHC Network Contracts to resolve the objections filed by the UHC Entities related to cure at Docket Nos. 1766 & 2119. Except as may be expressly agreed in connection with the prior sentence, nothing in this paragraph 52 shall preserve or create any right of setoff or recoupment against the Buyer, any of its Affiliates or designees, or any ACO Entity, or their respective property, except as expressly provided in the Sale Transaction Documents or in any UHC Network Contract or Change Agreement assumed and assigned to the Buyer or assumed by an ACO Entity, in each case in accordance with the terms thereof and applicable law, and in any event solely with respect to obligations accruing after the Closing Date (or, as to an ACO Entity, after the ACO Effective Date).

(c) Notwithstanding anything in the Plan or this Confirmation Order to the contrary, if and only if the Plan toggles to a Restructuring Transaction and the Debtors subsequently seek to reject any UHC Network Contract under the terms of the Plan, the Debtors agree to provide the UHC Entities with fifty (50) days' prior written notice of the rejection of such UHC Network Contract prior to the effective date of such rejection.

53. Elevance Entities.

(a) Notwithstanding anything in the Plan or this Confirmation Order to the contrary, if and only if the contracts by and between any of the Debtor(s)

and Elevance Health, Inc. and its direct and indirect subsidiaries (collectively, the "Elevance Entities") pursuant to which any Debtor provides healthcare services to members of health plans insured or administered by any of the Elevance Entities (each a "Elevance Network Contract") are not assumed and assigned to the Buyer in connection with consummation of the Sale Transaction or assumed by an ACO Entity pursuant to the Plan, any and all defenses of setoff and/or recoupment of the Elevance Entities are hereby preserved solely for the purpose of asserting such defenses in connection with a claim or cause of action asserted against the Elevance Entities following the Effective Date. It shall not be necessary for the Elevance Entities to seek any court order or other relief to be able to assert any such existing defenses in any litigation or arbitration with the Debtors, the Post-Restructuring Debtors, the Liquidation Trustee, or the Wind-Down Trustee, or any of their successors or assigns, to the extent applicable; *provided, however*, that such setoff and/or recoupment rights may only be exercised if and only if (a) such rights existed prepetition or postpetition under the Elevance Network Contracts, (b) the exercise of such rights would not violate the Bankruptcy Code or other applicable law, and (c) such rights are used as a defense to a claim or cause of action asserted against the Elevance Entities following the Effective Date.

(b) Notwithstanding anything in the Plan or Confirmation Order to the contrary, the Elevance Entities, solely to the extent of assumption and assignment to the Buyer of the Elevance Network Contract(s), the Debtors or the Post-Restructuring Debtors, and the Buyer, as applicable, may agree to allow post-closing offset or recoupment in connection with the cure of any amounts owed pre-closing under the Elevance Network Contracts to resolve the objections filed by the Elevance Entities related to cure at Docket Nos. 1759 & 2110. Except as may be expressly agreed in connection with the prior sentence, nothing in this paragraph 53 shall preserve or create any right of setoff or recoupment against the Buyer, any of its Affiliates or designees, or any ACO Entity, or their respective property, except as expressly provided in the Sale Transaction Documents or in any Elevance Network Contract assumed and assigned to the Buyer or assumed by an ACO Entity, in each case in accordance with the terms thereof and applicable law, and in any event solely with respect to obligations accruing after the Closing Date (or, as to an ACO Entity, after the ACO Effective Date).

(c) Notwithstanding anything in the Plan or this Confirmation Order to the contrary, if and only if the Plan toggles to a Restructuring Transaction and the Debtors seek to reject any Elevance Network Contract under the terms of the Plan, the Debtors agree to provide the Elevance Entities with fifty (50) days' prior written notice of the rejection of such Elevance Network Contract prior to the effective date of such rejection.

54. Charitable Donations. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, in the event the Liquidation Trust determines to donate funds not distributed to creditors to an unaffiliated charity of its choice under Article VI.N of the Plan, the Liquidation Trust shall file a motion for authority to make such donation identifying the charity with notice to the affected creditor or creditors and parties in interest. Such motion may be filed on negative notice in accordance with Local Rule 9007-1.

55. Tennessee Department of Revenue. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, Priority Tax Claims filed by the Tennessee Department of Revenue, to the extent Allowed under the terms of the Plan, shall be paid pursuant to and in accordance with based on 11 U.S.C. § 1129(a)(9)(C) with interest based on 11 U.S.C. § 511. Under no circumstances shall Priority Tax Claims filed by the Tennessee Department of Revenue be treated as General Unsecured Claims, unless such Priority Tax Claims are timely objected to by any party-in-interest and such objection is sustained by the Court. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, consistent with Bankruptcy Code 503(b)(1)(D), the Tennessee Department of Revenue shall not be required to file a request for the payment of an expense described in Bankruptcy Code 503(b)(1)(B) or Bankruptcy Code 503(b)(1)(C), as a condition of its being an allowed administrative expense.

56. Texas Comptroller – Unclaimed Property. The following provisions of this Confirmation Order shall govern the duties and responsibilities of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, and the Liquidation Trust relating to all unclaimed property presumed abandoned (the "Texas Unclaimed Property") under Texas Property Code, Title 6, Chapters 72-76 and other applicable Texas laws (the "Texas Unclaimed Property Laws"):

(a) Nothing in the Plan or this Confirmation Order shall convert the Texas Unclaimed Property, if any, to property of the Debtors' estates or vest such

property in the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, and the Texas Unclaimed Property shall continue to be held by the Debtors, Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust as applicable, until such time it is presumed abandoned, at which time the Texas Unclaimed Property shall be reported and remitted to the Texas Comptroller in accordance with the Texas Unclaimed Property Laws; *provided, however*, that the foregoing (i) remains subject to all of the rights, claims, counterclaims, defenses, and arguments preserved pursuant to subparagraph (d) hereof and (ii) does not prejudice the Debtors', Post-Restructuring Debtors', Wind-Down Trust's, or the Liquidation Trust's right or ability to challenge the determination of what property of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, if any, constitutes Texas Unclaimed Property.

(b) Notwithstanding Bankruptcy Code section 362 and any injunction contained in the Plan, after the Effective Date, the Texas Comptroller and its agents may commence and/or proceed with an audit of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, as applicable, in accordance with the Texas Unclaimed Property Laws (the "Texas Unclaimed Property Audit") and pursue recovery of any unremitted Texas Unclaimed Property identified pursuant to the Texas Unclaimed Property Audit in connection with these Chapter 11 Cases, subject to the rights, claims, counterclaims, defenses, and arguments preserved pursuant to subparagraph (d) hereof. To the extent previously filed prior to the applicable bar date, the Texas Comptroller may amend its Proof(s) of Claim in these Chapter 11 Cases following the Effective Date as a result of the filing of any property reports or in the ordinary course of the Texas Unclaimed Property Audit and all rights of any party-in-interest to object to any Proof(s) of Claim filed by the Texas Comptroller are expressly preserved.

(c) The Post-Restructuring Debtors, the Wind-Down Trust, and the Liquidation Trust, as applicable, shall reasonably cooperate with the auditors to enable them to accurately and timely perform the Texas Unclaimed Property Audit. Upon completion of the Texas Unclaimed Property Audit, the Texas Comptroller will promptly inform the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, as applicable, that such audit is complete. The Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, as applicable, shall continue to comply with Texas Unclaimed Property Laws regarding retention of records to the extent applicable.

(d) Should an agreement between the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust and the Texas Comptroller be reached, or a court or other tribunal with jurisdiction make a final

determination, as to the amount of unremitted Texas Unclaimed Property, if any, that is due in connection with the Texas Unclaimed Property Audit, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, as applicable, shall turn over such unremitted Texas Unclaimed Property to the Texas Comptroller pursuant to said agreement or determination. All rights, claims, counterclaims, defenses, and arguments of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, the Liquidation Trust, and the Texas Comptroller with respect to any allegations and/or claims asserted against the Debtors, Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust arising from or relating to the Texas Unclaimed Property and Texas Unclaimed Property Audit are hereby preserved.

(e) The Debtors, Post-Restructuring Debtors, Wind-Down Trust, and the Liquidation Trust, as applicable, remain subject to, and nothing herein precludes the Debtors, Post-Restructuring Debtors, Wind-Down Trust, or the Liquidation Trust, as applicable, from compliance with, continuing obligations, including reporting and remitting requirements, under the Texas Unclaimed Property Laws.

Except as otherwise provided in paragraph 46 of the Sale Order, nothing in this paragraph 56 shall impose any duty, responsibility, or liability on the Buyer, any of its Affiliates or designees, or any ACO Entity.

57. Target Building Construction, Inc. To the extent it was validly perfected under applicable law, nothing contained in the Plan or this Confirmation Order shall release, impair, modify, or affect (i) the mechanics' lien (the "Mechanics' Lien") asserted by Target Building Construction, Inc. ("Target") in the Court of Common Pleas of Montgomery County, Pennsylvania, against the property located at 3430 Huntingdon Pike, Huntingdon Valley, Pennsylvania 19006, owned by non-Debtor 3430 Huntingdon Pike PA Owner LLC (the "Non-Debtor Owner"), or (ii) any claim Target has or may assert against the Non-Debtor Owner concerning events giving rise to the Mechanics' Lien (the "Claim"). All rights of any party in interest (including, but not limited to, the Debtors and any successor in interest) to challenge or

otherwise object to the Mechanics' Lien, the Claim and any related claims Target has or may subsequently assert are expressly preserved.

58. CNA Insurance Companies.

(a) Notwithstanding anything else to the contrary in this Confirmation Order or the Plan, and to the extent of any conflict, the *Stipulation and Agreed Order Regarding Assumption and Assignment of Insurance Program and Related Program Agreements* [Docket No. 3630] (the "CNA Assumption Stipulation") shall govern all rights, remedies, claims, and privileges related to the Program, the Program Agreements, the CNA Collateral, and the Policies (each as defined in the CNA Assumption Stipulation) in all respects. As set forth in the CNA Assumption Stipulation, the Program, the Program Agreements, the CNA Collateral, and the Policies shall be assumed and assigned to the Buyer to the extent set forth therein and as expressly provided under the CNA Assumption Stipulation, which shall govern the terms and conditions of such assumption and assignment in all respects.

(b) Notwithstanding anything else to the contrary in this Confirmation Order or the Plan, and to the extent of any conflict, the *Stipulation and Agreed Order Regarding the Sun Healthcare Program and Related Program Agreements Maintained by Continental Casualty Company and Applicable Affiliates* [Docket No. 3621] (the "CNA Stipulation") shall govern all rights, remedies, claims, and privileges related to the SHG Program, the SHG Program Agreements, the SHG Program Collateral, and the SHG Policies (each as defined in the CNA Stipulation) in all respects.

59. Pennsylvania Provider Taxes. The Commonwealth of Pennsylvania (the "Commonwealth"), by and through the Pennsylvania Department of Human Services, timely filed various proofs of claim against the Debtors operating skilled nursing facilities in Pennsylvania, asserting priority unsecured tax claims pursuant to Bankruptcy Code section 507(a)(8)(E) and general unsecured claims on account of the Nursing Facility Assessment Program in the aggregate amount of $44,142,681.51 (the "Commonwealth Priority Tax Claims"). The Debtors and the Commonwealth, acting through the Pennsylvania Attorney General, have consensually resolved the Commonwealth Priority Tax Claims as follows: the Commonwealth Priority Tax Claims will be modified to assert an aggregate priority unsecured tax claim of no

more than $1,126,000.00 (the "Amended Commonwealth Priority Tax Claim"). The Amended Commonwealth Priority Tax Claim shall be Allowed in an amount equal to $1,126,000.00 and entitled to priority in such amount pursuant to 11 U.S.C. § 507(a)(8)(E). The claims register shall be updated to reflect the Amended Commonwealth Priority Tax Claim and this resolution. Neither the Commonwealth nor any other person shall be entitled to recover any amount on the Commonwealth Priority Tax Claims in excess of the Allowed amount of Amended Commonwealth Priority Tax Claim from the Debtors, the Buyer, or any other party, including, without limitation, through payment, setoff, recoupment, or otherwise. Nothing herein shall be construed as an admission of liability or waiver by the Debtors or the Buyer.

60. 101 Lease Security Deposit. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, 885 3rd Avenue Master Lessee LLC, in its capacity as lessor (the "Landlord") under the Agreement of Lease dated March 2, 2022 (as amended, supplemented, or modified, the "101 Lease") and that certain related Guaranty of Lease (the "101 Guaranty," and together with the 101 Lease, the "101 Agreements"), shall retain the security deposit (the "Security Deposit") held under the 101 Lease until (a) the Debtors, the Post-Restructuring Debtors, the Liquidation Trustee, or the Wind-Down Trustee, on the one hand, and the Landlord, on the other hand, agree on the application of such Security Deposit to any claims and/or damages arising under or in connection with the 101 Agreements, (b) further Order of this Bankruptcy Court, or (c) application of the Security Deposit by the Landlord pursuant to applicable non-bankruptcy law, following any required notice and expiration of any applicable cure period under the 101 Lease, with copies of such notice to the Post-Restructuring Debtors, the Liquidation Trustee, and the Wind-Down Trustee, in each case to the extent then in existence, at their respective notice addresses designated in the Plan or the Plan Supplement or otherwise provided to the Landlord in

writing. Nothing in this Confirmation Order constitutes a determination that the Security Deposit, or any portion thereof, is property of the Debtors' estates, and all rights of the Debtors, the Post-Restructuring Debtors, the Liquidation Trustee, the Wind-Down Trustee, the Landlord, and any non-Debtor party with respect to the Security Deposit, including, without limitation, the Landlord's rights under article 31 of the 101 Lease and the Landlord's rights of setoff and recoupment, are hereby reserved. For the avoidance of doubt, the Landlord shall not be required to file any motion or other pleading, including under Article VII.B of the Plan, as a condition to the preservation or exercise of the rights reserved in this paragraph. This paragraph shall be binding upon and inure to the benefit of the Debtors, the Post-Restructuring Debtors, the Liquidation Trustee, the Wind-Down Trustee, the Landlord, and each of their respective successors and assigns.

61. Chubb. Solely to the extent that Chubb withdraws, prior to the Confirmation Hearing, its limited objection to Confirmation [Docket No. 3391] and any and all of its objections and opposition to Confirmation of the Plan, then notwithstanding anything to the contrary in this Confirmation Order, the Plan, the Plan Supplement, the Sale Transaction Documents, any bar date order or notice or claim objection, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, Article V.E of the Plan and any corresponding paragraphs of the Confirmation Order, and any other provision that purports to be preemptory or supervening, grants an injunction, discharge, or release, or confers Bankruptcy Court jurisdiction):

(a) after effectuating the cancellation and/or assumption of each such Insurance Policy as set forth in Article V.E.1.a of the Plan, nothing shall alter, modify, supplement, change, expand, or diminish the rights, duties, obligations, and defenses of ACE American Insurance Company, ACE Property & Casualty Insurance Company, Westchester Fire Insurance Company, ACE Fire Underwriters Insurance Company, Illinois Union Insurance Company,

Westchester Surplus Lines Insurance Company, Federal Insurance Company, Executive Risk Indemnity Inc., Executive Risk Specialty Insurance Company and/or each of their U.S.-based affiliates, predecessors and successors (collectively, and solely in their capacities as insurers, "Chubb"), the Debtors (or, after the Effective Date, the Liquidation Trust), or any other individual or entity under all insurance policies that have been issued at any time by Chubb to (or providing coverage to) any of the Debtors or any of their affiliates or predecessors, all extensions and renewals thereof, and all agreements, documents, or instruments related thereto (each as amended, modified or supplemented and including any exhibit or addenda thereto, collectively, the "Chubb Insurance Program"), and any such rights, duties, obligations, and defenses shall be determined under the Chubb Insurance Program and applicable non-bankruptcy law;

(b) on the Effective Date, solely to the extent they are Executory Contracts, all current D&O Liability Insurance Policies that are part of the Chubb Insurance Program shall be, pursuant to Bankruptcy Code sections 105 and 365, assumed in their entireties by the applicable Debtors and assigned to the Liquidation Trust, and the Liquidation Trust shall become and remain jointly and severally liable in full dollars for all of its and the Debtors' obligations under such D&O Liability Insurance Policies regardless of whether any such obligations arise or become due before, on, or after the Effective Date;

(c) on and after the Effective Date, the Chubb Insurance Program shall vest in the Liquidation Trust, and Chubb shall be entitled, to draw upon, apply, use, or set-off (each, in full dollars) the Chubb Collateral (as defined herein) to satisfy any monetary obligation of the Debtors (or, if after the Effective Date, the Liquidation Trust) under the Chubb Insurance Program pursuant to the terms thereof after effectuating the cancellation and/or assumption of each such Insurance Policy as set forth in Article V.E.1.a of the Plan and may do so without filing or serving a notice, request, motion, or application for payment, or Proof of Claim, Administrative Expense Claim, or for setoff or recoupment, but in each case subject to the terms and conditions of, and any rights, duties, obligations, and defenses of the Debtors (or, if after the Effective Date, the Liquidation Trust) and Chubb under the Chubb Insurance Program and applicable non-bankruptcy law;

(d) nothing shall release, discharge, modify, or otherwise alter Chubb's interests in (including any security interests in and liens on) any and all letter of credit, cash, trusts, accounts, credits and other collateral and security provided or held in relation to the Chubb Insurance Program (collectively, the "Chubb Collateral") and any such rights, duties, obligations, and defenses shall be determined under the Chubb Insurance Program and applicable non-bankruptcy law after effectuating the cancellation and/or

assumption of each such Insurance Policy as set forth in Article V.E.1.a of the Plan;

(e) except as expressly provided in Article V.E.1 of the Plan and this paragraph, nothing shall permit or otherwise effect a sale, assignment or other transfer of the Chubb Insurance Program and/or any rights, benefits, claims, proceeds, rights to payment, or recoveries under and/or relating to the Chubb Insurance Program without the prior express written consent of Chubb; and

(f) on and after the Effective Date, the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VII of the Plan (or any corresponding paragraph of the Confirmation Order), if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action claims against Chubb under applicable non-bankruptcy law to proceed with their claims; (II) Chubb to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) workers' compensation claims, (B) claims where a claimant asserts a direct claim against Chubb under applicable non-bankruptcy law, or where a Final Order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article VII of the Plan (or any corresponding paragraph of the Confirmation Order) to proceed with its claim, and (C) all costs in relation to each of the foregoing; (III) subject to, and to the extent permissible under, the terms of the Chubb Insurance Program, Chubb to draw upon the Chubb Collateral and any or all other collateral or security provided by or on behalf of the Debtors and/or the Liquidation Trust at any time and to hold the proceeds thereof as security for the obligations of the Liquidation Trust and/or apply such proceeds to the obligations of the Liquidation Trust under the Chubb Insurance Program (and, solely to the extent permissible under the Chubb Insurance Program); and (IV) Chubb to cancel any Insurance Policy under the Chubb Insurance Program and take other actions relating to the Chubb Insurance Program, (including effectuating a setoff or recoupment), in each case in accordance with the applicable terms of the Chubb Insurance Program and/or applicable non-bankruptcy law.

Nothing in this paragraph 61 shall modify, impair, or abridge the Sale Order, the APA Amendment Order, or the Sale Transaction Documents, or any insurance policy, program, right, benefit, claim, or proceed that constitutes a Purchased Asset (as defined in the APA) or an Asset of an ACO

Entity, or impose any obligation on the Buyer, any of its Affiliates or designees, or any ACO Entity.

62. Sureties. Arch Insurance Company and its affiliated sureties (collectively, "Arch"), Liberty Mutual Insurance Company (collectively, "Liberty"), and Westchester Fire Insurance Company and its affiliated sureties (collectively, "Westchester" and Arch, Liberty, and Westchester are hereafter collectively referred to as the "Sureties") issued one or more surety bonds (collectively, the "Surety Bonds" and each individually, a "Surety Bond") on behalf of the Debtors and any non-Debtor affiliates, if any (and, together with the Debtors, the "Debtor Entities"). Certain of the Debtor Entities have entered into, or are potentially otherwise liable under, one or more indemnity agreements, amendments thereto, riders and/or related agreements with each of the Sureties, as applicable (collectively, the "Indemnity Agreements" and each, an "Indemnity Agreement").

(a) No Transfers or Assignments. Except as expressly consented to in writing by the Sureties (including by stipulation), nothing in the Plan Documents shall be deemed to be a sale, transfer, assumption or assumption and assignment of any Surety Bond or any Indemnity Agreement, or any documents or rights related to any Surety Bond or any Indemnity Agreement.

(b) Existing Collateral and Related Agreements. All collateral upon which any Surety (and any bond beneficiaries/obligees) had a perfected security interest as of the Petition Date, and all control agreements, trust agreements, deposit accounts, letters of credit and/or proceeds therefrom issued to a Surety as security for any Debtor Entities' obligations under the Surety Bonds and any agreements relating thereto (collectively, the "Surety Collateral") shall remain in place to secure all payment and performance obligations under the Surety Bonds or for obligations arising under the Indemnity Agreements. Nothing in the Plan Documents shall be deemed to apply to the rights of the Sureties to pursue the Surety Collateral, nor shall the Plan Documents be interpreted to bar, impair, prevent, or otherwise limit the Sureties from exercising their valid rights under or with respect to any of the Surety Bonds, the Indemnity Agreements, or any related indemnity agreements, deposit agreements, control agreements, trust agreements, deposit accounts, letters of credit (collectively, the "Surety Documents") or

applicable law, including the common law of suretyship. Moreover, any letter of credit and/or the proceeds thereof serving as collateral for the obligations of any Debtor Entities under the Surety Documents do not constitute property of the Estate and the Sureties may exercise their rights against such letter(s) of credit and/or the proceeds thereof.

(c) Substitution of Principal. Nothing in the Plan Documents shall be deemed to provide a Surety's consent to the involuntary substitution of any principal under any Surety Bond, and the Indemnity Agreements remain in full force and effect.

(d) Debtors' Affiliates. Nothing in the Plan Documents relieves any non-Debtor affiliate of any obligations under the Indemnity Agreements.

(e) Surety Rights as to Third Parties Unaffected; No Waiver. Nothing in the Plan Documents shall be interpreted to diminish the rights (including, but not limited to, subrogation rights) or increase the obligations of the Sureties with respect to state and federal agencies, third parties or otherwise under any Surety Bonds, any Indemnity Agreement or applicable law nor shall any of the foregoing be deemed to enjoin any Surety from asserting any rights, claims or defenses, with respect to or against any state and federal agencies, third parties including, without limitation, any of the Sureties' indemnitors, insurers, or otherwise under any Surety Bond, Indemnity Agreement, Surety Collateral or applicable non-bankruptcy law.

(f) Use of Surety Documents. Further, notwithstanding any other provision in the Plan Documents, unless the Surety provides its express written consent, the Surety Documents may not be used in any manner for the direct or indirect benefit of any purchaser (including, but not limited to, use in connection with any transition service agreement or any similar agreement between the Debtors and the purchaser that requires the Surety to continue bond obligations during any transition period).

(g) Setoff and Recoupment. Notwithstanding any other provision in the Plan Documents, all set-off and recoupment rights of the Sureties and any obligees or beneficiaries under any of the Surety Bonds are preserved. All rights, claims, and defenses of the Debtor Entities with respect to the foregoing setoff and recoupment rights are preserved.

(h) Nothing in the Plan Documents or otherwise impacts (i) the *Stipulation and Agreed Order Regarding Liberty Mutual's Sale Objections* [Docket No. 3452], (ii) the *Stipulation and Agreed Order Regarding Arch Insurance Company's Sale Objection* [Docket No. 3455], (ii) the *Stipulation and Agreed Order Regarding the Westchester Fire Insurance Company's Sale Objections* [Docket No. 3473], and (iv) the *Stipulation and Agreed Order Regarding RLI Insurance Company's Sale Objections* [Docket No. 3565],

each of which remain in full force and effect and are incorporated herein by reference.

To the extent of any conflict between this paragraph on the one hand, and any other paragraph of the Plan Documents, on the other hand, this paragraph shall govern and control. Nothing in this paragraph 62 shall modify, impair, or abridge the Sale Order, the APA Amendment Order, or the Sale Transaction Documents, or impose any obligation on the Buyer, any of its Affiliates or designees, or any ACO Entity, and the Stipulations and Agreed Orders referenced in subparagraph (h) shall remain in full force and effect.

63. Capital One Matters.

(a) Notwithstanding anything to the contrary in the Plan, the Plan Supplement, the Liquidation Trust Agreement, the Wind-Down Trust Agreement, this Confirmation Order, or any other Order (other than the Capital One Stipulation (as defined herein)) entered in these Chapter 11 Cases (collectively, the "Plan Documents"), (i) that certain Continuing Agreement for Irrevocable Standby Letters of Credit, executed March 6, 2018 (as amended, the "LC Reimbursement Agreement"), by and between Capital One, National Association ("Capital One"), the Debtors, and certain non-debtor affiliates of the Debtors, shall remain in full force and effect, (ii) nothing in the Plan Documents shall, or shall be deemed to, alter, amend, or otherwise modify the LC Reimbursement Agreement, and (iii) nothing in the Plan Documents shall, or shall be deemed to, alter, amend, modify, impair, or derogate from the rights, claims, or remedies of Capital One under or in connection with (a) the LC Reimbursement Agreement or (b) the cash now or in the future (1) collateralizing any standby letters of credit issued by Capital One pursuant to the LC Reimbursement Agreement that are not cancelled in connection with the Sale Transaction and remain outstanding on the Effective Date (the "Remaining Letters of Credit"), which, for the avoidance of doubt, shall not include any Replaced Letter of Credit (as defined in the Capital One Sale Stipulation (as defined below)), and/or (2) collateralizing the repayment of the reimbursement obligations of the Debtors to Capital One under, as to, or in connection with such Remaining Letters of Credit or any other issued Letters of Credit which Capital One has honored but remains unreimbursed for payment of any such Letter of Credit as of the Effective Date (the "Drawn Letters of Credit"), including the funds on deposit in the interest-bearing deposit account maintained by the Debtors at Capital One pursuant to the LC Reimbursement Agreement (the "LC Cash Collateral Account" and such cash collateral, the "Capital One LC Cash Collateral").

(b) Nothing in the Plan Documents shall, or shall be deemed to, alter, amend, or otherwise modify the obligations of the applicable Debtors under or in connection with the LC Reimbursement Agreement; *provided*, that, upon the occurrence of the Effective Date, the Wind-Down Trustee or the Liquidation Trustee, as applicable, may exercise any and all rights of the applicable Debtors pursuant to the LC Reimbursement Agreement without further approval, notice, or Order, subject in all respects to the terms and conditions of the LC Reimbursement Agreement.

(c) Genesis Healthcare LLC shall continue to own, subject to Capital One's security interests and rights as of the Effective Date, the LC Cash Collateral Account and the Capital One LC Cash Collateral. The LC Cash Collateral Account and the Capital One LC Cash Collateral shall not constitute Liquidation Trust Assets or vest, "free and clear" or otherwise, in the Liquidation Trust, the Wind-Down Trust, the Post-Restructuring Debtors, the Buyer, or any other Entity, and the LC Cash Collateral Account and the Capital One LC Cash Collateral shall not constitute "Purchased Assets" pursuant to the APA; *provided, however*, that all deposits, cash collateral, and other amounts transferred to the Buyer or any of its Affiliates, or deposited by or on behalf of the Buyer or any of its Affiliates, pursuant to (i) the *Stipulation and Agreed Order Regarding Capital One, National Association's Sale Objections* [Docket No. 3633] (the "Capital One Sale Stipulation") or the Buyer LC Reimbursement Agreement (as defined in the Capital One Sale Stipulation) or (ii) the *Stipulation and Agreed Order Regarding RLI Insurance Company's Sale Objections* [Docket No. 3565] (the "RLI Sale Stipulation"), including any cash collateral held by RLI Insurance Company ("RLI") (for the avoidance of doubt, Capital One is not a party to the RLI Sale Stipulation and has no obligations or duties thereunder or with respect to any of such cash collateral held by RLI), in each case, wherever held, shall not constitute Capital One LC Cash Collateral or property of the Debtors' estates and shall not be subject to this paragraph 63. Capital One's security interests in and liens on the Capital One LC Cash Collateral shall survive confirmation and consummation of the Plan and shall not be released, discharged, cancelled, subordinated, primed, set off against, or enjoined by any provision of the Plan Documents, whether or not referenced herein, including any provision for the cancellation of notes, instruments, or agreements, the release of Liens or collateral, setoff or recoupment, injunction, or discharge, and any lien the Debtors, the Liquidation Trust, or the Wind-Down Trust may have on any interest in the Capital One LC Cash Collateral shall be subordinate and junior to Capital One's liens.

(d) Nothing in the Plan Documents constitutes, effects, or approves the assumption, assumption and assignment, or rejection (including any deemed or automatic rejection) of the LC Reimbursement Agreement under

Bankruptcy Code section 365 by and/or to the Debtors or any successor to the Debtors, and no provision of the Plan Documents or this Confirmation Order governing Executory Contracts and Unexpired Leases applies to the LC Reimbursement Agreement; *provided, however*, that the Wind-Down Trustee or the Liquidation Trustee, as applicable, may exercise any and all rights of the Debtors pursuant to the LC Reimbursement Agreement (including, but not limited to, the right to terminate the LC Reimbursement Agreement as set forth therein), as set forth above, subject in all respects to the terms and conditions of the LC Reimbursement Agreement.

(e) As of the Effective Date, the "Maximum Credit Amount" (as defined in the LC Reimbursement Agreement) is reduced from $60,000,000.00 to the aggregate face amount of the Remaining Letters of Credit then outstanding and shall automatically reduce further by the face amount of any Remaining Letter of Credit (or portion thereof) that is subsequently drawn, reduced, cancelled, returned, or expires. For the avoidance of doubt, 101% of the maximum aggregate face value of all Remaining Letters of Credit as of the Effective Date, subject to any draws, cancellations, or returns of any Remaining Letter of Credit outstanding as of the date of this Confirmation Order prior to the Effective Date, is $9,938,341.42.

(f) Upon (i) honoring any draw on a Remaining Letter of Credit or (ii) any Fronting Fees, fees, expenses, costs, or other amounts becoming due and payable to Capital One under the LC Reimbursement Agreement, in each case, whether before or after the Effective Date, Capital One may, without further notice, hearing, or order of this Court, debit the LC Cash Collateral Account and apply the proceeds to all reimbursement obligations, Fronting Fees, and other amounts owed under the LC Reimbursement Agreement, including, without limitation, reasonable and documented attorneys' fees incurred by Capital One and other fees, expenses, and costs incurred in connection with the enforcement of the LC Reimbursement Agreement, and Capital One shall provide notice of such debits and reasonable documentation of any attorneys' fees to be debited to the Wind-Down Trustee and the Liquidation Trustee at least two (2) business days prior to any such debit, and the automatic stay and the Plan injunction are modified, without further notice, hearing or order of this Court, to the extent necessary to permit the foregoing. As required under the LC Reimbursement Agreement, to the extent the balance of the LC Cash Collateral Account falls below 101% of the maximum aggregate face amount of all Remaining Letters of Credit then outstanding, whether as a result of any debit described above or otherwise, at any time or from time to time, upon Capital One's demand, the Debtors or, after the Effective Date, the Wind-Down Trustee or the Liquidation Trustee, as applicable, shall promptly (and within no more than two (2) business days) replenish the LC Cash Collateral Account in the amount necessary to restore such balance to not less than 101% of the maximum aggregate face amount of all Remaining Letters of Credit then

outstanding. Any and all obligations of the Debtors, the Wind-Down Trust, and the Liquidation Trust with respect to the LC Reimbursement Agreement shall terminate in accordance with the terms of the LC Reimbursement Agreement, including, but not limited to, as a result of the exercise of the parties' rights (including those of the Wind-Down Trustee or the Liquidation Trustee on behalf of the Debtors) set forth in Section 17 of the LC Reimbursement Agreement, subject to all other terms and conditions in the LC Reimbursement Agreement, including that all Remaining Letters of Credit have or have been drawn, cancelled, returned, or have expired, and all amounts due and payable to Capital One pursuant to the LC Reimbursement Agreement have been satisfied.

(g) The Debtors (or the Wind-Down Trustee or Liquidation Trustee, as applicable) and Capital One shall enter into a stipulation, and seek approval from the Court of such stipulation no later than two (2) business days following entry of this Confirmation Order, providing for relief from stay to Capital One in order to permit Capital One to debit from the Capital One LC Cash Collateral such outstanding reimbursement obligations and attorneys' fees that are due and payable as a result of Capital One's honoring of, and disbursement of the applicable face amounts to the beneficiaries of, (i) the Drawn Letter of Credit previously issued in favor of the Ohio Bureau of Workers' Compensation, and with Sun Healthcare Group, Inc. (on behalf of Americare Corporation) as applicant, in an original face amount of $2,800,000.00, which has been reduced to a current face amount of $640,000.00, and (ii) the Drawn Letter of Credit previously issued in favor of RLI, and with Genesis Healthcare LLC as applicant, in an original face amount of $5,181,309.00, which, as amended, has a current face amount of $2,093,226.65.

(h) Notwithstanding anything to the contrary in this paragraph 63, in the event of any conflict between the provisions of this paragraph 63 and the Capital One Sale Stipulation, the Capital One Sale Stipulation shall control.

64. Utility Order. On or as reasonably practicable after the Effective Date, and only after all postpetition, but pre-Effective Date, Claims on account of utility services have been paid and any disputes with respect to such Claims have been resolved, the Post-Restructuring Debtors are authorized to withdraw the funds held in the segregated escrow account pursuant to the *Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment; (II) Establishing Procedures for Resolving Objections by Utility Providers; (III) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief* [Docket No. 59]

(the "Final Utility Order"), and the Post-Restructuring Debtors shall have no further obligations to comply with the Final Utility Order. If applicable, all utilities, including any Person or Entity that received a deposit or other form of adequate assurance of performance under Bankruptcy Code section 366 during the Chapter 11 Cases in compliance with the Final Utility Order or otherwise, must return such deposit or other form of adequate assurance of performance to the Debtors or the Post-Restructuring Debtors, as the case may be, on or before the Effective Date, *provided* that any such utility, with the Post-Restructuring Debtors' consent, may apply such deposit or other form of adequate assurance of performance to the Post-Restructuring Debtors' account within thirty (30) days after the Effective Date.

65. Mutual Releases, Injunction, Channeling Injunction, and Related Provisions under the Plan. The Mutual Releases, Injunction, Channeling Injunction, discharge, and related provisions set forth in Article VII of the Plan are incorporated herein in their entirety, are hereby approved and authorized in all respects, are so ordered, and shall be immediately effective on the Effective Date without further order or action on the part of this Bankruptcy Court or any other party.

(a) Mutual Releases Pursuant to Plan Settlement Agreement. The Mutual Releases contained in Article VII.A.1 and Article VII.A.2 of the Plan, and the limitations with respect to D&O Claims set forth therein, are hereby approved in their entirety and made enforceable to the fullest extent permitted by applicable law.

(b) Injunction. The Injunction contained in Article VII.B of the Plan is hereby approved in its entirety and made enforceable to the fullest extent permitted by applicable law.

(c) Channeling Injunction. The Channeling Injunction contained in Article VII.C of the Plan is hereby approved in its entirety and made enforceable to the fullest extent permitted by applicable law.

(d) Discharge. Pursuant to Bankruptcy Code section 1141(d)(3), Confirmation shall not discharge Claims against the Debtors; *provided, however*, no

Holder of a Claim or Interest may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against, the Debtors, the Post-Restructuring Debtors, the ACO Entities, the Buyer, the Buyer's Affiliates and designees, the Wind-Down Trustee, the Liquidation Trust, the Liquidation Trustee, or their respective successors, assigns, and/or property, except as expressly provided in the Plan. Pursuant to Bankruptcy Code sections 1141(c) and 363(f), on and after the ACO Effective Date, all Persons and Entities are forever prohibited and enjoined from taking any action against the Buyer, any of its Affiliates or designees, or any ACO Entity, or their respective property based on any Claim, Interest, Lien, or Encumbrance to the extent such Claim, Interest, Lien, or Encumbrance is treated, satisfied, or released pursuant to the Plan or this Confirmation Order.

(e) Release of Liens. The release of Liens contained in Article VII.D of the Plan is hereby approved in its entirety and made enforceable to the fullest extent permitted by applicable law.

66. Protections Against Discriminatory Treatment. Consistent with Bankruptcy Code section 525 and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Post-Restructuring Debtors, the Wind-Down Trustee, the Liquidation Trustee (as applicable), or the ACO Entities, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Post-Restructuring Debtors, the Wind-Down Trustee, the Liquidation Trustee (as applicable), or the ACO Entities or another Entity with whom the Post-Restructuring Debtors, the Wind-Down Trustee, the Liquidation Trustee, or the ACO Entities have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

67. Protected Health Information and Individually Identifiable Health Information. For purposes of this Confirmation Order, "PHI" shall have the same definition as "protected health

information" set forth in 45 C.F.R. § 160.103 and includes, but is not limited to, names, addresses, prescription numbers, health plan numbers, and dates related to an individual, other than year, such as the date of dispensing. Subject to the requirements below, the disclosure by the Debtors or the Post-Restructuring Debtors of PHI and other individually identifiable health information created, received, or maintained by the Debtors or the Post-Restructuring Debtors (collectively, the "IIHI") to the Wind-Down Trust, the Liquidation Trust, and the Administrative PL/GL Claim Fund (collectively, the "Recipients") in response to requests made in good faith by the Recipients related to (a) review, reconciliation, evaluation, settlement, or objecting to Claims asserted against the Debtors or (b) in furtherance of pursuing, prosecuting, or settling the Assigned Causes of Action is hereby ordered by the Bankruptcy Court through and upon approval of this Plan and, as such, the IIHI disclosure, including PHI, is required by law and, therefore, is permitted to be disclosed under HIPAA pursuant to 45 C.F.R. § 164.512(e)(1)(i). Furthermore, none of the Debtors or the Post-Restructuring Debtors shall be liable for violating any confidentiality or privacy protections as a result of transferring Books and Records to the Recipients, including, but not limited to, IIHI. As a precondition of any request or receipt of IIHI by the Recipients, the Recipients agree as follows:

(a) Recipients are prohibited from using or disclosing the IIHI for any other purpose and must return to the Debtors or securely destroy the IIHI, including all copies made, once the processes described in (a) are complete.

(b) Recipients must maintain the privacy and security of all IIHI in accordance with applicable law and appropriate administrative, technical, and physical safeguards. Recipients must ensure that they do not file any IIHI in the public record. Recipients must comply with all privacy and data security laws and rules applicable to the Debtors and the Post-Restructuring Debtors (including all relevant court rules) when filing materials in the public record. Without limiting the foregoing, prior to filing materials in the public record, Recipients shall first remove all direct identifiers, including those listed in 45 C.F.R. § 164.514(e)(2)(i)-(xvi). Recipients shall seek leave to file material containing any subset of IIHI, including aggregated or redacted

data (the "Derived Data") under seal with the Bankruptcy Court unless otherwise directed by the Bankruptcy Court or the Debtors agree otherwise in writing.

(c) IIHI may not be disclosed to any other person without the prior written consent of the Debtors (which may be made via email), except pursuant to a court order or as otherwise required by law. No Recipient shall, without prior leave of the Bankruptcy Court, use IIHI or Derived Data in order to contact any patient or resident of the Debtors.

(d) Immediately upon discovery of a use or disclosure of IIHI or Derived Data not permitted by this Confirmation Order, the Recipients shall immediately report such use or disclosures to the Wind-Down Trustee. In the event that the Recipients, including any agent of a Recipient (which shall include any counsel, including any partners, associates, secretaries, and paralegals, experts, consultants, and vendors of such counsel), improperly or inadvertently uses or discloses IIHI or Derived Data in a manner not permitted by this Confirmation Order, the Recipients shall provide any legally required notices to individuals, applicable government entities, and other applicable third parties as required under applicable laws and at Recipients' expense. Recipients must provide the Debtors with a reasonable opportunity to review and approve the wording of such notices, and such approval shall not be unreasonably conditioned, withheld, or delayed. Recipients shall indemnify and hold harmless the Debtors and the Post-Restructuring Debtors with respect to any such use or disclosure and any related reporting, as well as any third party claims or government enforcement actions brought against the Debtors or the Post-Restructuring Debtors relating to any use or disclosure and any related reporting, as well as any third party claims or government enforcement actions brought against the Debtors relating to any use or disclosure of IIHI or Derived Data by Recipients, solely to the extent caused by any act, omission, or negligence of Recipients and their agents (which shall include any counsel, including any partners, associates, secretaries, and paralegals, experts, consultants, and vendors of such counsel).

68. Document Preservation. Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Debtors (and any successors and assigns, including the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee appointed under the Plan) shall preserve—in an accessible native format (only to the extent currently available in such format)—all of the Debtors' books, records, documents, files, electronic data, and any tangible materials that are potentially relevant to the litigation pending in the United States District Court

for the Eastern District of Pennsylvania under the caption, *Cindy Plumley, Individually and as Representative of a Class of Participants and Beneficiaries on Behalf of the Genesis Healthcare Health and Welfare Plan, Plaintiff v. Nicole Garrett, Karen Halsted, Suzannah Herring, and Does 1-30, Defendants*, Case No. 26-06651 (GAM) (the "ERISA Litigation") (collectively, the "Potentially Relevant Books and Records"), until the earlier of: (i) the term of retention required by applicable law, including, but not limited to, the Federal Rules of Civil Procedures and ERISA; (ii) the date of entry of a final judgment (including after the final resolution of any appeal) or the effective date of any settlement in the ERISA Litigation; and (iii) entry of a Final Order by the Bankruptcy Court or another court of competent jurisdiction authorizing the destruction, abandonment, or other disposition of the Potentially Relevant Books and Records, provided that the lead plaintiff and any class representative in the ERISA Litigation (the "ERISA Plaintiff") is given no less than twenty (20) days' notice and an opportunity to object to the entry of such order. No later than sixty (60) days after the occurrence of the Effective Date, notwithstanding anything to the contrary in the Plan or this Confirmation Order, the ERISA Plaintiff is authorized to and shall serve a subpoena upon the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, and/or the Liquidation Trustee requesting the production of any Potentially Relevant Books and Records; *provided, however*, that, if no subpoena is served by the ERISA Plaintiff in accordance with the foregoing, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, and/or the Liquidation Trustee shall have no obligation to retain any Potentially Relevant Books and Records pursuant to this paragraph other than for such retention period as required by the APA (including as required by applicable law). All rights, claims, counterclaims, privileges, and defenses of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, the Liquidation Trustee, and the ERISA Plaintiff, as applicable, with respect to the ERISA Litigation and any

document, discovery, interrogatory, or other informational requests submitted by the ERISA Plaintiff to any of the foregoing entities with respect to the Potentially Relevant Books and Records are hereby preserved.

69. Altira.

(a) Altira Release. The Debtors, their Estates, and the Creditors' Committee (and any successor in interest with respect to any of the foregoing, including the Liquidation Trust) hereby, as of the Effective Date, unconditionally and irrevocably release, acquit, and forever discharge the Altira Parties (as defined below) and each of the Altira Parties' respective past or present subsidiaries, direct or indirect parents, affiliates, successors, and predecessors, shareholders, members, officers, directors, employees, professional advisors, attorneys, agents, auditors, and accountants, in each case solely in their capacities as such, of and from any and all Claims and Causes of Action that (x) are property of the Estates, and (y) may be settled or compromised by the Estates, in each case, as broadly as applicable law permits (collectively, the "Released Claims"). The Released Claims include the claims asserted in the PA-22 Adversary Proceeding, which shall be dismissed with prejudice promptly after the Effective Date. The Released Claims shall not constitute Assigned Causes of Action.

(b) Altira Reserve. Within five (5) Business Days of the Effective Date, the Liquidation Trust shall establish a segregated account and, upon receipt of the Liquidation Trust Assets, deposit Seven Hundred Fifty Thousand Dollars ($750,000) (the "Altira Reserve") for the benefit of OPA OpCo Parent LLC, ("Altira Parent"), Altira Health Group, LLC ("Altira Health"), and certain direct or indirect affiliates thereof (the "PA-22 Sublessors" and, together with Altira Parent and Altira Health, collectively, the "Altira Parties") who sublease 22 Pennsylvania facilities to the Debtors, all as described more fully in the PA-22 Complaint (the "PA-22 Facilities"). The Altira Reserve shall be available solely to reimburse an Altira Party for any amount that such Altira Party is liable to pay in respect of a written third-party claim by a Person other than an Altira Party, Buyer, or any of their respective Affiliates, successors or assigns, asserted against such Altira Party or the Landlord (as defined in that certain Assignment and Assumption of and First Amendment to Master Lease Agreement) (the "Welltower Parties"), but only to the extent such claim (i) is asserted against an Altira Party or the Welltower Parties in writing during the nine (9)-month period following the Effective Date (the "Reserve Period"), (ii) arises from an obligation or liability relating to the Debtor's operation of the PA-22 Facilities or acts or omissions of such Debtor during the period prior to October 14, 2026, and (iii) is not cured (pursuant to the APA), satisfied or otherwise barred against an Altria Party or a Welltower Party,

as appliable, pursuant to the Bankruptcy Case, the Amended Plan or any order of the Bankruptcy Court (a "Covered Claim"); *provided*, that no Assumed Obligation (as defined in the Assignment and Assumption of and First Amendment to Master Lease Agreement) shall constitute a Covered Claim. The Altira Parties shall be subject to a single satisfaction from the Altira Reserve with respect to the same liability regardless of whether the liability is asserted against more than one of the Altira Parties or the Welltower Parties. Each Altira Party shall use commercially reasonable efforts to mitigate any Covered Claim.

(c) If no Covered Claim has been asserted against the Altira Parties or the Welltower Parties in writing and notice thereof delivered in writing to the Liquidation Trust (a "Claim Notice") before expiration of the Reserve Period, the Altira Reserve shall be finally and indefeasibly released to the Liquidation Trust and shall become property of the Liquidation Trust with no recourse against the Liquidation Trust by the Altira Parties. If a Covered Claim set forth in a valid, timely Claim Notice remains unresolved upon expiration of the Reserve Period, only the portion of the Altira Reserve reasonably necessary to satisfy such Covered Claim, not to exceed the amount claimed, shall continue to be held in the Altira Reserve, and the balance thereof shall be finally and indefeasibly released to the Liquidation Trust. Any retained amount remaining after final resolution of any such Covered Claim shall be promptly released to the Liquidation Trust with no recourse by the Altira Parties against the Liquidation Trust. Notwithstanding anything to the contrary in this Order or any other agreement or instrument delivered in connection herewith, (i) in no event shall the aggregate amount payable from the Altira Reserve, or the aggregate liability of the Liquidation Trust, the Debtors, their respective estates or Affiliates with respect to Covered Claims, exceed $750,000, and (ii) no Altira Party or any of its Affiliates shall have any recourse against the Liquidation Trust, the Debtors, their respective estates or Affiliates, or any of their assets other than the funds then remaining in the Altira Reserve, nor shall any of the Altira Parties or their respective Affiliates assert any administrative expense or other claim in the Bankruptcy Case on account thereof.

(d) The applicable Altira Party shall promptly notify the Liquidation Trust of any third-party claim that may give rise to a Covered Claim. The Liquidation Trust shall have the right, at its election, to contest, defend or compromise any such claim, and the Altira Parties shall reasonably cooperate in good faith with the Liquidation Trust in contesting, defending or settling such claim. No Altira Party shall pay, settle, compromise or admit liability with respect to any Covered Claim without the Liquidation Trust's prior written consent, not to be unreasonably withheld, conditioned or delayed.

70. Waiver or Estoppel. Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, as an Other Secured Claim, not subordinated, or otherwise by virtue of an agreement made with the Debtors or their counsel (or any other Entity), if such agreement was not disclosed in the Plan, the Sale Order, the Plan Supplement, the Disclosure Statement, or other papers filed with the Bankruptcy Court or evidenced by a written instrument acknowledged by the Debtors or their counsel before the Confirmation Date.

71. Adjustment to Claims or Interests Without Objection. Any Claim that has been paid, satisfied, or assumed by the Buyer in the Sale Transaction, or any Claim that (a) is a duplicate, (b) has been paid or satisfied, or (c) has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, the Liquidation Trustee, as applicable, upon agreement between the parties in interest without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. The Debtors' Claims and Noticing Agent is directed to adjust or expunge such Claims in the Claims Register, as applicable.

72. Cancellation of Notes, Interests, Certificates, and Instruments. Except as otherwise provided in the Plan, and in any contract, instrument, or other agreement or document created in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article VI of the Plan, any and all notes, instruments, certificates, credit agreements, indentures, securities, and other documents evidencing or governing Claims or Interests (other than those Claims or Interests Reinstated under the Plan, and other than the ACO Equity and the Reorganized ACO Equity) shall be cancelled and the rights of the Holders thereof

and obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect, without any further act or action under any applicable agreement, law, regulation, order or rule. Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to the Plan or the Confirmation Order. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligations of the Debtors or any of their counterparts under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed or assumed and assigned by the Debtors pursuant to a Final Order or hereunder.

73. Cancellation of Existing Common Equity Interests. On the Effective Date, all Existing Common Equity Interests in Debtor Genesis Healthcare, Inc. shall be cancelled and Genesis Healthcare, Inc. shall issue 5,000 authorized shares to the Wind-Down Trust, pursuant to the New Organizational Documents. The equity interests, partnership interests, or membership interests, as applicable, in the rest of the Post-Restructuring Debtors, other than Genesis Healthcare, Inc., shall be held by the same legal entities that held such interests prior to the Petition Date. The cancellation of all Existing Common Equity Interests and other matters provided pursuant to the Plan involving the corporate structure of the Post-Restructuring Debtors or corporate action by the Post-Restructuring Debtors shall be deemed to have occurred, be authorized, and shall be in effect without requiring further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders of the Debtors or the Post-Restructuring Debtors. Notwithstanding the foregoing, the ACO Equity shall be cancelled,

released, and extinguished on the ACO Effective Date in accordance with the ACO Transaction and paragraph 11 of this Confirmation Order.

74. Terms of Injunctions or Stays. Unless otherwise provided in the Plan or in this Confirmation Order, to the maximum extent permitted by applicable law and subject to the Bankruptcy Court's post-confirmation jurisdiction to modify the injunctions and stays under the Plan (a) all injunctions with respect to or stays against an action against property of the Debtors or the Debtors' Estates arising under or entered during the Chapter 11 Cases under Bankruptcy Code sections 105 or 362, and in existence on the date this Confirmation Order is entered, shall remain in full force and effect until such property is no longer property of the Debtors or the Debtors' Estates; and (b) all other injunctions and stays arising under or entered during the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 shall remain in full force and effect until the earliest of (i) the date that the Chapter 11 Cases are closed pursuant to a final order of the Bankruptcy Court, or (ii) the date that the Chapter 11 Cases are dismissed pursuant to a final order of the Bankruptcy Court. All injunctions or stays contained in the Plan or this Confirmation Order (including the Injunction) shall remain in full force and effect in accordance with their terms.

75. Reporting. After entry of this Confirmation Order, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, shall have no obligation to file with the Bankruptcy Court, serve on any parties, or otherwise provide any party with any other report that the Debtors were obligated to provide under the Bankruptcy Code or an order of the Bankruptcy Court, including obligations to provide any reports to any parties otherwise required under the "first" and "second" day orders entered in these Chapter 11 Cases; *provided* that the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the

Liquidation Trustee, as applicable, will comply with the U.S. Trustee's quarterly reporting requirements, as set forth in the Plan.

76. Notice of Entry of Confirmation Order. In accordance with Bankruptcy Rules 2002 and 3020(c), within 14 calendar days of the date of entry of this Confirmation Order, the Debtors or the Post-Restructuring Debtors, as applicable, shall file a notice of entry of this Confirmation Order, substantially in the form attached hereto as **Exhibit B** (the "Notice of Confirmation Order"), which form is hereby approved. The Debtors shall serve the Notice of Confirmation Order by electronic mail or first-class mail on each of the following at their respective addresses last known to the Debtors: (a) the U.S. Trustee; (b) all parties on the Core Service List in the Chapter 11 Cases; (c) all known creditors of the Debtors; and (d) all known Holders of Interests in the Debtors. The Notice of Confirmation Order need not be mailed to any person if a previous mailing to such person has been returned as "undeliverable as addressed," "moved, left no forwarding address," or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing of a corrected address for such person. For those parties receiving electronic service, filing on the docket is deemed sufficient to satisfy such service and notice requirements. The Notice of Confirmation Order shall have the effect of an Order of the Bankruptcy Court and shall constitute good and sufficient notice of the entry of this Confirmation Order, the relief granted herein, pursuant to Bankruptcy Rules 2002 and 3020(c). The Notice of Confirmation Order shall also constitute sufficient notice of this Confirmation Order to filing and recording officers and will be a recordable instrument notwithstanding any contrary provision of applicable non-bankruptcy law. Such notice is adequate under the particular circumstances of these Chapter 11 Cases, and no other or further notice of entry of this Confirmation Order or the occurrence of the Effective Date need to be given.

77. Notices of Effective Date. The form of the notice of the occurrence of the Effective Date attached hereto as **Exhibit C** (the "Notice of Effective Date"), and the form of the notice of the occurrence of the ACO Effective Date, attached hereto as **Exhibit D** (the "Notice of ACO Effective Date" and, together with the Notice of Effective Date, the "Notices of Effective Date") are hereby approved. Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c), as soon as reasonably practicable after the Effective Date and the ACO Effective Date, as applicable, the Debtors shall file the applicable Notice of Effective Date and serve it by electronic mail or first-class mail on the same parties served with the Notice of Confirmation Order. The Notices of Effective Date need not be mailed to any person if a previous mailing to such person has been returned as "undeliverable as addressed," "moved, left no forwarding address," or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing of a corrected address for such person. For those parties receiving electronic service, filing on the docket is deemed sufficient to satisfy such service and notice requirements. Such notice is adequate under the particular circumstances of these Chapter 11 Cases, and no other or further notice of entry of this Confirmation Order or the occurrence of the Effective Date or the ACO Effective Date need be given. To the extent that the Effective Date or the ACO Effective Date, as applicable, occurs within fourteen (14) calendar days of the date of entry of this Confirmation Order, the Debtors shall be authorized to combine the Notice of Confirmation Order and the applicable Notice of Effective Date into one notice. To the extent that the Effective Date and the ACO Effective Date occur on the same date, the Debtors shall be authorized to combine the Notices of Effective Date into one notice.

78. Conditions Precedent to Effective Date. The Plan shall not become effective unless and until the conditions set forth in Article VIII.B of the Plan have been satisfied or waived

pursuant to Article VIII.D of the Plan; *provided, however*, that, in accordance with Article VIII.B.1 of the Plan, the Effective Date with respect to the ACO Entities shall be the ACO Effective Date, which shall occur upon satisfaction of the conditions set forth in the definition thereof in the Plan, whether or not the conditions set forth in Article VIII.B of the Plan have been satisfied or waived as to the other Debtors. Prior to the Effective Date, the Debtors and their officers, directors, agents, affiliates, and advisors are authorized to take any and all actions necessary to cause the satisfaction of all conditions to the Effective Date.

79. Substantial Consummation. On the Effective Date, the Plan shall be deemed to be substantially consummated (within the meaning set forth in Bankruptcy Code section 1101) pursuant to Bankruptcy Code section 1127(b).

80. Separate Plans. Notwithstanding the combination of separate chapter 11 plans for the Debtors set forth in this Plan for purposes of economy and efficiency, this Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm this Plan with respect to one or more Debtors, it may still confirm this Plan with respect to any other Debtor that satisfies the Confirmation requirements of Bankruptcy Code section 1129.

81. Modifications or Amendments. The provisions governing the modification, revocation, or withdrawal of the Plan set forth in Article X of the Plan shall be, and hereby are, approved in their entirety. For the avoidance of doubt, the Plan shall not be amended, modified, or supplemented, whether before or after the Confirmation Date, in any manner that materially adversely affects the Buyer or its rights under the Sale Transaction Documents without the prior written consent of the Buyer, as provided in Article X.A of the Plan.

82. Failure of Plan Consummation. If the Effective Date does not occur, then: (a) the Plan and this Confirmation Order will be null and void in all respects except as expressly set forth

in this paragraph; (b) any settlement or compromise embodied in the Plan or this Confirmation Order, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (c) nothing contained in the Plan or this Confirmation Order shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action, (ii) prejudice in any manner the rights of any Debtor or any other Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity, and all parties shall revert to the status quo as if this Confirmation Order had not been entered. Notwithstanding the foregoing, (i) nothing in this paragraph shall affect the Sale Order, the APA Amendment Order, the Sale Transaction Documents, or the consummation of the Sale, and (ii) if the ACO Effective Date has occurred, the ACO Transaction and all provisions of the Plan and this Confirmation Order relating to the ACO Entities, the Buyer, and the Buyer's Affiliates and designees shall remain in full force and effect notwithstanding the non-occurrence of the Effective Date with respect to any other Debtor.

83. Notice Parties. After the Effective Date, the Post-Restructuring Debtors, the Wind-Down Trust, and the Liquidation Trust, as applicable, are authorized to limit the list of Entities or Persons receiving documents in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 to (a) those Entities or Persons whose rights are affected by such documents; and (b) those Entities or Persons who have filed renewed requests to receive documents no later than thirty (30) days after the Effective Date; *provided, however*, that the U.S. Trustee shall be excused from this requirement and shall remain on the Bankruptcy Rule 2002 service list. Except as otherwise provided in the Plan or in this Confirmation Order, notice of all subsequent pleadings in these Chapter 11 Cases after the Effective Date is required to be served upon only the following parties: (a) the U.S. Trustee; (b) any Entity or Person known to be directly affected by the relief sought by

such pleadings; and (c) any Entity or Person that filed renewed requests to receive documents no later than thirty (30) days after the Effective Date. The Debtors' Claims and Noticing Agent shall not be required to file updated service lists.

84. Dissolution of the Creditors' Committee. On the Effective Date, the Creditors' Committee shall automatically dissolve, whereupon the members thereof shall be discharged from all rights and duties from or related to the Chapter 11 Cases, except with respect to (a) prosecuting Final Fee Applications of its Professionals and (b) prosecuting, defending, or participating in any appeal of the Confirmation Order or any request for reconsideration thereof. For the avoidance of doubt, the obligations of the Creditors' Committee, its members, Professionals, and agents arising from confidentiality agreements shall remain in full force and effect following the Effective Date.

85. Termination of Estate Broker. To the extent not already addressed in any Order of the Bankruptcy Court prior to the Effective Date, the duties, responsibilities, and obligations of the Estate Broker in connection with the Chapter 11 Cases shall be terminated on the Effective Date. Houlihan Lokey Capital, Inc., including in its capacity as Estate Broker, shall be entitled to file a Final Fee Application for allowance and payment of any fees and expenses incurred to and including the Effective Date.

86. Termination of Mediator. To the extent not already addressed in any Order of the Bankruptcy Court prior to the Effective Date, the duties, responsibilities, and obligations of the Mediator in connection with the Chapter 11 Cases shall be terminated on the Effective Date. Upon termination, the Mediator shall dispose of any documents provided to him in connection with mediation with the exception of any documents the Mediator may be required to retain in accordance with any applicable policies or law. The Mediator shall be entitled to payment of any

fees and expenses incurred to and including the Effective Date as an Allowed Administrative Expense Claim without filing a Final Fee Application.

87. Termination and Discharge of Patient Care Ombudsmen. To the extent not already addressed in any Order of the Bankruptcy Court, the duties, responsibilities, and obligations of the PCOs in connection with the Chapter 11 Cases, and the retention or employment of the PCOs' attorneys, financial advisors, and other agents, shall be terminated on the Closing Date. Effective as of the Closing Date, in recognition of their services during the Chapter 11 Cases, each of the PCOs shall be released and discharged by each and all of the Debtors, the Post-Restructuring Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Claims, Interests, obligations, suits, damages, Causes of Action, remedies, and liabilities, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that any of the Debtors, the Post-Restructuring Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to the services provided by the PCOs during the Chapter 11 Cases. Until the Closing Date, the PCOs shall continue to serve and be authorized to perform the following functions: (a) to review, analyze, and prepare advisory reports with respect to the operation of the Facilities during the period up to and including the Closing Date; and (b) if necessary, appear before the Bankruptcy Court with respect to any such matter. Upon termination, the PCOs shall dispose of any documents provided to them in the course of their reporting with the exception of any documents the PCOs may be required to retain in accordance with any applicable policies or law. The PCOs and their Professionals shall be entitled to file Final Fee Applications for allowance

and payment of any fees and expenses incurred to and including the Closing Date. Prior to issuing or serving upon any PCO or her Professionals any formal or informal discovery request, including, but not limited to, subpoena, request for production of documents, requests for admissions, interrogatories, subpoenas duces tecum, requests for testimony, or any other discovery of any kind whatsoever in any way related to the Debtors, the Chapter 11 Cases, the PCOs' evaluation(s), or their report(s) (collectively, the "Discovery"), any creditor or party-in-interest in the Chapter 11 Cases must first file an appropriate pleading with the Bankruptcy Court to request permission to initiate the Discovery.

88. Recordable Form. This Confirmation Order shall be, and hereby is, declared to be in recordable form and shall be accepted by any filing or recording officer or authority of any applicable Governmental Unit for filing and recording purposes without further or additional orders, certifications, or other supporting documents. Further, the Court authorizes the Debtors to file a memorandum of this Confirmation Order in any appropriate filing or recording office as evidence of the matters herein contained.

89. Reversal or Vacatur. If any or all of the provisions of this Confirmation Order are hereafter reversed, modified, or vacated by subsequent order of this Court or any other court, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Debtors' receipt of written notice of any such order. Notwithstanding any such reversal, modification, or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Confirmation Order prior to the effective date of such reversal, modification, or vacatur shall be governed in all respects by the provisions of this Confirmation Order and the Plan or any amendments or modifications thereto.

90. Final Order; Immediate and Binding Effect. For good cause shown, the stay of this Confirmation Order provided by any Bankruptcy Rule, including, but not limited to, the 14-day stay contemplated by Bankruptcy Rule 3020(e), is hereby waived. This Confirmation Order is a Final Order, the provisions of which shall be self-executing, and shall be effective and enforceable immediately upon its entry by this Bankruptcy Court, notwithstanding anything to the contrary in the Plan or the Bankruptcy Rules, including Bankruptcy Rules 3020(e), 6004(h), 6006(d), and 7062. Pursuant to Bankruptcy Code section 1141, on or after entry of this Confirmation Order and subject to the occurrence of the Effective Date, the provisions of the Plan (including the exhibits and schedules thereto and all documents and agreements executed pursuant thereto or in connection therewith, including those contained in the Plan Supplement) and this Confirmation Order shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Post-Restructuring Debtors, the ACO Entities, the Buyer, the Buyer's Affiliates and designees, the Wind-Down Trust, the Wind-Down Trustee, the Liquidation Trust, the Liquidation Trustee, all Holders of Claims against and Interests in the Debtors (irrespective of whether such Claims or Interests are Allowed, Disallowed, or Impaired under the Plan or whether the Holders of such Claims or Interests accepted or are deemed to have accepted the Plan), each Entity receiving, retaining, or otherwise acquiring property under the Plan, any and all non-Debtor parties to Executory Contracts and Unexpired Leases, any Entity making an appearance in the Chapter 11 Cases, all parties that filed objections to confirmation of the Plan, any other party-in-interest in the Chapter 11 Cases, and the respective heirs, executors, administrators, successors, or assigns, if any, of any of the foregoing.

91. Effect of Conflict. Subject to the terms (including, for the avoidance of doubt, paragraph 32 hereof), this Confirmation Order supersedes any Court order issued prior to the

Confirmation Date that may be inconsistent with this Confirmation Order, other than the Sale Order and the APA Amendment Order, each of which shall remain in full force and effect and shall govern and control in the event of any inconsistency with the Plan, the Plan Supplement, or this Confirmation Order as provided in paragraph 30 of this Confirmation Order and Article I.E of the Plan. The provisions of the Plan, the Plan Supplement, and this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided, however*, that if there is any inconsistency between the terms of the Plan, the Plan Supplement, and this Confirmation Order, the terms of this Confirmation Order govern and control and shall be deemed a modification to the Plan.

92. Nonseverability of Plan Provisions. This Confirmation Order constitutes a judicial determination that the provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth herein, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and this Confirmation Order, respectively, and may not be deleted or modified except in accordance with Article X.A of the Plan, and (c) nonseverable and mutually dependent on each other term of this Confirmation Order and the Plan.

93. Headings. The headings of the paragraphs in this Confirmation Order are for convenience of reference only, do not constitute a part of the Plan or this Confirmation Order for any other purpose, and shall not limit or otherwise affect the meaning of this Confirmation Order. Whenever the words “include,” “includes,” or “including” (or other words of similar import) are used in this Confirmation Order, they shall be deemed to be followed by the words “without limitation.”

94. Retention of Jurisdiction. From the Confirmation Date and until the Effective Date, the Bankruptcy Court retains jurisdiction over all matters arising out of, or relating to, the Chapter

11 Cases and the Plan. Notwithstanding the entry of this Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court retains jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan pursuant to Bankruptcy Code sections 105(a) and 1142 in accordance with the Plan, including Article IX, and any challenges to or efforts to modify, reverse, withdraw, or amend any provision of the Plan or this Confirmation Order.

# # # END OF ORDER # # #

Prepared and presented by:

*<u>/s/ Charles R. Gibbs</u>*
Charles R. Gibbs (TX 7846300)
**MCDERMOTT WILL & SCHULTE LLP**
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
Email: crgibbs@mcdermottlaw.com

- and -

Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Catherine L. Bloomberg (admitted *pro hac vice*)
Landon W. Foody (admitted *pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
Email: dsimon@mcdermottlaw.com
ekeil@mcdermottlaw.com
wguerrieri@mcdermottlaw.com
cbloomberg@mcdermottlaw.com
lfoody@mcdermottlaw.com

- and -

Gregg M. Galardi (admitted *pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
Email: ggalardi@mcdermottlaw.com

*Counsel for the Debtors and Debtors-in-Possession*

# EXHIBIT A

**Debtors' Second Amended Joint Chapter 11 Plan of
Genesis Healthcare, Inc. and its Debtor Affiliates**

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | ) | Case No. 25-80185 (SGJ) |
| Debtors. | ) | (Jointly Administered) |

**DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN OF**
**GENESIS HEALTHCARE, INC. AND ITS DEBTOR AFFILIATES**


**MCDERMOTT WILL & SCHULTE LLP**
Charles R. Gibbs (TX Bar No. 7846300)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
Email: crgibbs@mcdermottlaw.com

Gregg M. Galardi (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
Email: ggalardi@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Catherine L. Bloomberg (admitted *pro hac vice*)
Landon W. Foody (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
Email: dsimon@mcdermottlaw.com
ekeil@mcdermottlaw.com
wguerrieri@mcdermottlaw.com
cbloomberg@mcdermottlaw.com
lfoody@mcdermottlaw.com

*Counsel for the Debtors and Debtors-in-Possession*


Date: October 14, 2026

[1] The last four digits of Genesis Healthcare, Inc.'s federal tax identification number are 4755. There are 299 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

# TABLE OF CONTENTS

Article I. DEFINITIONS, RULES OF INTERPRETATION AND CONSTRUCTION, COMPUTATION OF TIME, AND GOVERNING LAW ... 3

A. Definitions ... 3

B. Rules of Interpretation and Construction ... 37

C. Computation of Time ... 38

D. Reference to Monetary Figures ... 38

E. Controlling Document ... 38

F. Governing Law ... 39

Article II. TREATMENT AND ALLOWANCE OF UNCLASSIFIED CLAIMS ... 39

A. Administrative Expense Claims ... 39

B. Administrative PL/GL Claims ... 40

C. Substantial Contribution Claims ... 42

D. DIP Claims ... 42

E. Professional Fee Claims ... 43

F. Priority Tax Claims ... 45

G. Priority Non-Tax Claims ... 46

Article III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ... 47

A. Summary of Classification of Claims and Interests ... 47

B. Treatment of Claims and Interests ... 48

C. Special Provision Governing Unimpaired Claims ... 61

D. Special Provision Governing Claims Against and Interests in the ACO Entities ... 62

E. Impaired and Unimpaired Classes ... 62

F. Classes Entitled to Vote ... 62

G. Acceptance by Impaired Classes ... 63

H. Deemed Rejection if No Votes Cast ... 63

I. Elimination of Vacant Classes ... 63

J. Cramdown Pursuant to Bankruptcy Code Section 1129(b) ... 64
K. Allowed Claims ... 64
L. Subordination of Claims ... 64
M. Insurance ... 64
Article IV. MEANS FOR IMPLEMENTATION OF THE PLAN ... 65
A. General Settlement of Claims, Interests, and Controversies ... 65
B. The Plan Settlement ... 66
C. Administrative PL/GL Claim Settlement ... 66
D. Corporate Transactions ... 67
E. Sale Transaction ... 67
F. ACO Entities; ACO Transaction ... 68
G. Restructuring Transaction Toggle ... 69
H. Administrative Consolidation ... 70
I. Separate Plans ... 71
J. The Wind-Down Trust ... 71
K. The Liquidation Trust ... 77
L. Cooperation of the Debtors ... 86
M. Vesting of Assets ... 88
N. Establishment and Maintenance of Disbursement Accounts ... 88
O. Sources of Consideration for Plan Distributions ... 89
P. Corporate Action and Governance Matters ... 89
Q. Cancellation of Notes, Interests, Certificates, and Instruments ... 94
R. Books and Records; Medical Records ... 95
S. Accounts and Reserves ... 96
T. Exemption from Certain Transfer Taxes ... 97
Article V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ... 97

A. Assumption and Rejection of Executory Contracts and Unexpired Leases ..... 97

B. Cure of Defaults ..... 100

C. Rejection Damages Bar Date ..... 104

D. Indemnification Obligations ..... 104

E. Insurance Policies ..... 105

F. Employment Agreements ..... 109

G. Nonoccurrence of Effective Date ..... 109

H. Modifications, Amendments, Supplements, Restatements, or Other Agreements ..... 109

I. Reservation of Rights ..... 109

Article VI. PROVISIONS GOVERNING DISTRIBUTIONS ..... 110

A. Time and Manner of Distributions ..... 110

B. Timeliness of Payments ..... 111

C. Distributions by the Disbursing Agent ..... 111

D. Manner of Payment under the Plan ..... 112

E. Foreign Currency Exchange Rate ..... 112

F. Fractional Securities ..... 112

G. Delivery of Distributions and Undeliverable or Unclaimed Distributions ..... 112

H. Interest on Claims ..... 114

I. No Creditor to Receive More than Payment in Full ..... 115

J. Satisfaction of Claims ..... 115

K. Compliance with Tax, Withholding, and Reporting Requirements ..... 115

L. Setoffs and Recoupments ..... 115

M. Procedures for Treating and Resolving Disputed, Contingent, and/or Unliquidated Claims ..... 116

N. De Minimis Interim Distributions ..... 119

O. Allocation of Plan Distributions Between Principal and Interest ..... 119

P. Distribution Record Date ... 120

Q. Distributions Free and Clear ... 120

Article VII. INJUNCTION AND RELATED PROVISIONS ... 120

A. Mutual Releases Pursuant to Plan Settlement Agreement ... 120

B. Injunction ... 121

C. Channeling Injunction of Administrative PL/GL Claims ... 122

D. Release of Liens ... 122

E. Protections Against Discriminatory Treatment ... 123

F. Retention of Causes of Action and Reservation of Rights ... 123

G. Ipso Facto and Similar Provisions Ineffective ... 124

H. Discharge of the Debtors ... 124

Article VIII. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN ... 125

A. Conditions Precedent to Confirmation ... 125

B. Conditions Precedent to Effective Date ... 125

C. Establishing the Effective Date ... 128

D. Waiver of Conditions ... 129

E. Effect of Failure of Conditions ... 129

Article IX. RETENTION OF JURISDICTION ... 129

A. Retention of Jurisdiction ... 129

B. Alternative Jurisdiction ... 132

C. Failure of Court to Exercise Jurisdiction ... 132

Article X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ... 133

A. Modification and Amendment ... 133

B. Effect of Confirmation on Modifications ... 133

C. Revocation or Withdrawal of the Plan ... 134

Article XI. MISCELLANEOUS PROVISIONS ... 134

A. Immediate Binding Effect .......... 134

B. Filing of Additional Documents .......... 134

C. Substantial Consummation .......... 135

D. Severability of Provisions .......... 135

E. Successors and Assigns .......... 135

F. Dissolution of the Creditors' Committee .......... 135

G. Termination and Discharge of PCOs, the Estate Broker, and the Mediator .......... 136

H. Terminations of Injunctions or Stays .......... 137

I. Service of Documents .......... 137

J. 2002 Service List .......... 139

K. Entire Agreement .......... 139

L. Plan Supplement(s) .......... 139

M. Votes Solicited in Good Faith .......... 139

N. Closing of the Chapter 11 Cases .......... 139

O. Payment of Statutory Fees .......... 140

P. No Admissions .......... 140

Q. Waiver or Estoppel .......... 140

R. Creditor Default .......... 140

S. Inconsistency .......... 141

T. Reservation of Rights .......... 141

**EXHIBITS**

Exhibit A Chapter 11 Debtors
Exhibit B List of OpCo Facility Debtors (Class 6-A (GUC Distribution Group 1))
Exhibit C List of Ancillary Business & JV Debtors (Class 6-B (GUC Distribution Group 2))
Exhibit D List of HoldCo Non-Facility Debtors (Class 6-C (GUC Distribution Group 3))
Exhibit E List of DivestCo Debtors (Class 6-D (GUC Distribution Group 4))

# INTRODUCTION[2]

Genesis Healthcare, Inc. ("Genesis") and 298 of its debtor affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),[3] hereby propose the following second amended joint chapter 11 plan (as may be subsequently modified, amended, or supplemented from time to time, the "Plan")[4] pursuant to Bankruptcy Code section 1121(a). The Debtors are the proponents of the Plan within the meaning Bankruptcy Code section 1129(a)(2). The Plan provides for the administrative consolidation of the Debtors, as set forth in Article IV.H hereof, for the purposes of voting on the Plan, tabulating the votes to determine which Class or Classes have accepted the Plan, confirming the Plan, and the resulting treatment of all Claims and Interests and Distributions.

The Debtors previously filed, and the Bankruptcy Court subsequently approved, a disclosure statement (as may be subsequently modified, amended, or supplemented from time to time, the "Disclosure Statement") in accordance with Bankruptcy Code section 1125. The Debtors subsequently distributed the Plan and Disclosure Statement to Holders of Claims against and Interests in the Debtors who were entitled to vote on the Plan in connection with (i) the solicitation of acceptances and rejections of the Plan; and (ii) the hearing to consider confirmation of the Plan. A notice of non-voting status was distributed to Holders of Claims deemed to reject the Plan or otherwise not entitled to vote to accept or reject the Plan. Among other things, the Disclosure Statement discusses the Debtors' history, businesses, properties, operations, the Chapter 11 Cases, risk factors, a summary of the terms of the Plan and the treatment contained therein, and certain other related matters. The Disclosure Statement also discusses the Confirmation process and the procedures for voting on the Plan, which procedures must be followed by the Holders of Claims entitled to vote to accept or reject the Plan in order for their votes to be counted. In the event of any inconsistencies between the Plan and the Disclosure Statement, the terms and provisions of the Plan shall control.

The Plan constitutes a joint chapter 11 plan for each of the Debtors and sets forth two possible restructuring scenarios: (1) consummation of the Court-approved sale of substantially all of the Debtors' assets, followed by a liquidation of the Debtors and their Estates pursuant to the terms of the Plan and the establishment of a liquidation trust to pursue Claims and Causes of Action and make Distributions on account of Allowed Claims; and (2) a reorganization that would be pursued if and only if the APA is terminated pursuant to which the Debtors would be reorganized and continue to operate as a going concern. Except as otherwise provided by Order of the Bankruptcy Court and the Plan, Distributions will occur on the Effective Date or as soon thereafter as is practicable.

---

[2] Capitalized terms used but not defined in this introduction shall have the same meanings set forth in Article I hereof.

[3] A complete list of the Debtors in these Chapter 11 Cases is attached hereto as **Exhibit A**.

[4] Copies of all Filings in the Chapter 11 Cases (as defined herein) can be obtained and viewed free of charge at the following web address: https://dm.epiq11.com/case/genesis.

1. **<u>Consummation of the Sale Transaction, Followed by Liquidation:</u>** The Plan provides that, upon the Effective Date and subsequent to consummation of the Sale Transaction, the Liquidation Trust Assets will be transferred to the Liquidation Trust, the Wind-Down Trust Assets will be administered by the Wind-Down Trust, the Wind-Down Trustee will commence a Wind-Down of the Estates, and the Post-Restructuring Debtors will be dissolved under applicable law as soon as practicable thereafter, but in no event earlier than the transfer of any remaining licenses pursuant to the Sale Transaction. As part thereof, the Liquidation Trust Assets and the Wind-Down Trust Assets will be administered and distributed as soon as practicable pursuant to the terms of the Plan, the Liquidation Trust Agreement, and the Wind-Down Trust Agreement.

2. **<u>APA Terminated, Followed by Reorganization Toggle</u>**: While the Debtors believe that the Sale Transaction will be consummated as contemplated in accordance with the terms and provisions of the APA, in the event that the APA is terminated and the Sale Transaction is not consummated, the Plan provides a reorganization "toggle" whereby the Debtors will reorganize on the Effective Date and the Post-Restructuring Debtors will (a) continue to operate the Debtors' business with significantly reduced long-term indebtedness, (b) maintain operating capital necessary to satisfy the obligations pursuant to the Plan, and (c) establish the Liquidation Trust to pursue the Assigned Causes of Action and distribute proceeds to creditors. The Liquidation Trust Assets, including the equity interests in the Post-Restructuring Debtors, will be transferred to the Liquidation Trust and will be administered and distributed as soon as practicable pursuant to the terms of the Plan and the Liquidation Trust Agreement. In the event the APA is terminated and the Sale Transaction is not consummated, the Debtors shall file the Restructuring Transaction Toggle Notice (as defined herein) as soon as reasonably practicable following termination of the APA, informing parties-in-interest of the termination of the APA and the Debtors' election to pursue a Restructuring Transaction. The Restructuring Transaction Toggle Notice, among other things, (a) shall be deemed to extend the Voting Deadline and the Confirmation Objection Deadline by no less than twenty-one (21) days from the date set forth in the Disclosure Statement Order (as such dates may be otherwise extended pursuant to the terms thereof); (b) shall set forth a deadline for filing supplemental materials, including financial projections and related documentation, in support of the Restructuring Transaction that is no later than seven (7) days in advance of the extended Voting Deadline and the Confirmation Objection Deadline; and (c) may extend, continue, or adjourn, as applicable, other related dates and deadlines, including, without limitation, the Confirmation Hearing. If the Restructuring Transaction Toggle Notice is not filed, the Debtors shall proceed with consummation of the Sale Transaction and shall not seek approval of a Restructuring Transaction at the Confirmation Hearing. As of the date hereof, the Debtors have not filed a Restructuring Transaction Toggle Notice.

Subject to the restrictions on modifications set forth in Bankruptcy Code section 1127 of and Bankruptcy Rule 3019 and those restrictions with respect to amendments or modifications to

the Plan set forth in Article X hereof, the Debtors expressly reserve the right to alter, amend, or modify the Plan, one or more times, before its substantial consummation.

## ARTICLE I.
## DEFINITIONS, RULES OF INTERPRETATION AND CONSTRUCTION, COMPUTATION OF TIME, AND GOVERNING LAW

### A. Definitions

For purposes of the Plan, except as expressly provided herein or unless the context otherwise requires, all capitalized terms not otherwise defined herein shall have the meanings ascribed to them in this Article I.

**1.1** **"<u>503(b)(9) Claim</u>"** means a Claim arising under Bankruptcy Code section 503(b)(9) against the Debtors.

**1.2** **"<u>ACO Assumed Liabilities</u>"** means, with respect to each ACO Entity, all liabilities and obligations of such ACO Entity that constitute Assumed Liabilities (as defined in the APA) as of the Closing Effective Time.

**1.3** **"<u>ACO Effective Date</u>"** means the first (1st) Business Day on which (a) the Confirmation Order shall have been entered by the Bankruptcy Court and shall not be subject to a stay, and (b) the Closing Date shall have occurred. The ACO Transaction shall be deemed to occur as of 12:01 a.m. (prevailing Central Time) on the ACO Effective Date; *provided, however*, that the ACO Effective Date shall not occur unless all conditions to the consummation of the ACO Transaction under the APA shall have been satisfied or waived in accordance therewith.

**1.4** **"<u>ACO Entities</u>"** means, collectively, LTC ACO, LLC and PAI Participant 1, LLC, each in its capacity as a Debtor and, from and after the ACO Effective Date, as reorganized pursuant to the Plan, and "ACO Entity" means either of them.

**1.5** **"<u>ACO Excluded Assets</u>"** means, with respect to each ACO Entity, any Asset of such ACO Entity that constitutes an Excluded Asset (as defined in the APA) under the APA as of the Closing Effective Time.

**1.6** **"<u>ACO Excluded Liabilities</u>"** means, with respect to each ACO Entity, all liabilities and obligations of such ACO Entity that constitute Excluded Liabilities (as defined in the APA) as of the Closing Effective Time.

**1.7** **"<u>ACO Equity</u>"** means all of the issued and outstanding membership interests in each of the ACO Entities.

**1.8** **"<u>ACO Purchased Assets</u>"** means, with respect to each ACO Entity, all Assets of such ACO Entity that constitute Purchased Assets (as defined in the APA) under the APA as of the Closing Effective Time.

**1.9** **"<u>ACO Transaction</u>"** means, collectively, (a) the transfer of the ACO Excluded Assets to, and the assumption of the ACO Excluded Liabilities by, the applicable Debtors, and (b)

immediately following such transfer, the cancellation of the ACO Equity and the issuance of the Reorganized ACO Equity to the Buyer, in each case pursuant to the terms of the Plan and the APA, as set forth in Article IV.F hereof.

**1.10** "**Acquired Medical Records**" means, collectively, all paper and/or electronic medical records relating to current or former patients and/or residents of the Debtors' businesses (a) as required by applicable law to be maintained by the Buyer in connection with the Sale Transaction, or (b) other such records that are requested by the Buyer (to the extent such records are in the Debtors' possession and are transferrable pursuant to applicable law).

**1.11** "**Administrative and Priority Claim Reserve**" means, in the event of the Sale Transaction or a Restructuring Transaction, the reserve account established and maintained by the Liquidation Trust and funded by the Debtors on the Effective Date in an amount determined jointly by the Debtors and the Creditors' Committee and disclosed as part of the Plan Supplement, but in no event less than Twenty-Five Million Dollars ($25,000,000.00), to be used solely for the payment of Allowed Administrative Expense Claims (other than Allowed Professional Fee Claims, which shall be paid from the Professional Fee Escrow Account, and Allowed Administrative PL/GL Claims, which shall be paid from the Administrative PL/GL Claim Fund or the Liquidation Trust Assets, as applicable), Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims, to the extent such Claims are not otherwise assumed or satisfied by the Buyer following consummation of the Sale Transaction pursuant to the Sale Transaction Documents.

**1.12** "**Administrative Expense Claim**" means a Claim against the Debtors or their Estates constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified in Bankruptcy Code sections 327, 328, 330, 365, or 503(b) and entitled to priority pursuant to Bankruptcy Code sections 507(a)(2), 507(b), or 1114(e)(2), including, without limitation, (i) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' businesses, (ii) compensation for professional services and reimbursement of expenses awarded or allowed under Bankruptcy Code sections 330(a) or 331, including Professional Fee Claims, (iii) Independent Director Fee Claims, (iv) Statutory Fees, (v) 503(b)(9) Claims, (vi) Allowed Substantial Contribution Claims, and (vii) all other Claims entitled to administrative claim status pursuant to a Final Order of the Bankruptcy Court, other than Administrative PL/GL Claims.

**1.13** "**Administrative Expense Claim Bar Date**" means, except with respect to Administrative Expense Claims or Administrative PL/GL Claims subject to the Interim Administrative Expense Claim Bar Date, the deadline by which a Claimant must File a request for payment of an Administrative Expense Claim (other than Professional Fee Claims, which shall be governed by the Professional Fee Claims Bar Date) or an Administrative PL/GL Claim that arose during the period from April 1, 2026 up to and including the Effective Date, which shall be the date that is thirty (30) days after the Effective Date or the ACO Effective Date, as applicable and as set forth in the Confirmation Order.

**1.14** "**Administrative Expense Claim Objection Deadline**" means the deadline for objecting to Administrative Expense Claims or Administrative PL/GL Claims Filed by the Interim Administrative Expense Claim Bar Date or the Administrative Expense Claim Bar Date, as applicable, which shall be, unless otherwise extended pursuant to the Plan, (i) the one hundred and

fifth (105th) day following the later to occur of (a) the Effective Date and (b) the date that an Administrative Expense Claim or an Administrative PL/GL Claim is Filed or amended; or (ii) such later date as may be fixed by the Bankruptcy Court; *provided, however*, that, notwithstanding the foregoing, the Administrative Expense Claim Objection Deadline may be extended without Bankruptcy Court approval for a period of seventy-five (75) days by notice filed by the Liquidation Trust, the Administrative PL/GL Claim Fund Administrator, or such other entity designated pursuant to a separate Order (which Order may be the Confirmation Order), with further extensions thereafter permitted after notice and a hearing; and, *provided, further*, that, notwithstanding the foregoing, the Professional Fee Claim Objection Deadline shall govern the deadline to object to Final Fee Applications.

**1.15 "Administrative PL/GL Claim"** means a Claim for death or personal injuries, including emotional distress, arising from or relating to the Debtors' ownership, operations, provision of services, or care to residents or patients, or management of any of the Facilities during the period from the Petition Date up to, but not including, the Effective Date that the Claimant asserts constitutes an administrative expense or is otherwise entitled to administrative expense priority under the Bankruptcy Code, including, without limitation, pursuant to sections 503(b), 507(a)(2), or 507(b) thereof, whether or not such Claim has been Allowed and regardless of whether the Claimant identifies a particular statutory basis for such asserted status or priority.

**1.16 "Administrative PL/GL Claim Contribution"** means, the one-time contribution of Twenty-Four Million Dollars ($24,000,000.00) to the Administrative PL/GL Claim Fund to be made by the Liquidation Trust on or as soon as reasonably practicable after the Effective Date following consummation of the Plan Settlement from the proceeds of the Plan Settlement Amount.

**1.17 "Administrative PL/GL Claim Fund"** means the qualified settlement fund established and maintained by the Administrative PL/GL Claim Fund Administrator effective as of the Effective Date and funded with the Administrative PL/GL Claim Contribution.

**1.18 "Administrative PL/GL Claim Fund Administrator"** means Anthony & Partners PLLC, solely in its capacity as administrator of the Administrative PL/GL Claim Fund, or any successor administrator in accordance with the provisions of the Administrative PL/GL Claim Settlement Fund Agreement.

**1.19 "Administrative PL/GL Claim Settlement"** means that certain settlement by and among the Debtors, the Creditors' Committee, and an ad hoc group of Holders of asserted Administrative PL/GL Claims represented by Anthony & Partners PLLC, the terms of which are set forth in the Administrative PL/GL Claim Settlement Term Sheet and the Administrative PL/GL Claim Settlement Fund Agreement and approved by the Bankruptcy Court in accordance with the Administrative PL/GL Claim Settlement Approval Order.

**1.20 "Administrative PL/GL Claim Settlement Approval Order"** means the *Order (I) Approving Postpetition Tort Claim Settlement Pursuant to Federal Rule of Bankruptcy Procedure 9019, and (II) Granting Related Relief* entered by the Bankruptcy Court on September 29, 2026 [Docket No. 3481].

**1.21 "Administrative PL/GL Claim Settlement Fund Agreement"** means that certain *Amended Postpetition Tort Claims QSF Fund Trust Agreement* in furtherance of the Administrative PL/GL Claim Settlement, filed at Docket No. 3454, a copy of which shall be filed with the Plan Supplement.

**1.22 "Administrative PL/GL Claim Settlement Motion"** means the *Joint Emergency Motion of the Debtors and the Statutory Committee of Unsecured Claimholders for Entry of an Order (I) Approving Postpetition Tort Claim Settlement Pursuant to Federal Rule of Bankruptcy Procedure 9019, and (II) Granting Related Relief*, dated September 14, 2026 [Docket No. 3337].

**1.23 "Administrative PL/GL Claim Settlement Term Sheet"** means that certain settlement term sheet approved by the Administrative PL/GL Claim Settlement Approval Order, as may be amended, modified, or supplemented.

**1.24 "Affiliate"** means any Entity that is an "affiliate" of any of the Debtors within the meaning of Bankruptcy Code section 101(2).

**1.25 "Allowed"** means, when used in reference to a Claim or Interest within a particular Class, an Allowed Claim or Interest in the specified Class or of a specified type.

**1.26 "Allowed Claim"** means, with respect to any Claim, except as otherwise provided herein: (a) a Claim in a liquidated amount as to which no objection has been Filed prior to the applicable Claims Objection Deadline and that is evidenced by a Proof of Claim timely Filed by the applicable Bar Date or that is not required to be evidenced by a Filed Proof of Claim pursuant to the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim that is Scheduled in an amount greater than zero in the Schedules by the Debtors as neither disputed, contingent, nor unliquidated, and for which no Proof of Claim has been timely Filed in an unliquidated or a different amount; or (c) a Claim that is upheld or otherwise Allowed (i) pursuant to the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court, (iii) pursuant to any contract instrument, indenture, or other agreement entered into or assumed in connection herewith, or (iv) by Final Order (including any such Claim to which the Debtors had objected or which the Bankruptcy Court had disallowed prior to such Final Order); *provided, however*, that, with respect to a Claim described in clauses (a) through (c) above, such Claim shall be considered Allowed only if no objection to the allowance of such Claim has been or may be interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order; and, *provided, further*, that Administrative PL/GL Claims shall be considered Allowed only when such Administrative PL/GL Claims are liquidated pursuant to either (x) the terms of the Administrative PL/GL Claim Settlement Fund Agreement or (y) if the Holder of such Administrative PL/GL Claim validly opts out of the Administrative PL/GL Claim Settlement, upon agreement with the Debtors, the Creditors' Committee, or the Liquidation Trustee, as applicable, following participation of such Holder in the Trust Distribution Procedures set forth in the Liquidation Trust Agreement. For purposes of determining the amount of an "Allowed Claim," there shall be deducted therefrom an amount equal to the amount of any Claim which the Debtors may hold against the Holder thereof, to the extent such Claim may be set off pursuant to applicable non-bankruptcy law. For the avoidance of doubt, (i) Claims that are "Allowed" solely for the purpose of voting to accept or reject the Plan pursuant to a Final Order of the Bankruptcy Court

shall not be considered "Allowed Claims" unless otherwise specified herein or by Final Order of the Bankruptcy Court; (ii) for any purposes pursuant to the Plan, "Allowed Claim" shall not include interest, fees, costs, or charges on such Claim from and after the Petition Date, except as provided in Bankruptcy Code section 506(b) or as otherwise expressly set forth in the Plan; *provided, however*, that, under all circumstances, unless otherwise set forth herein or in the Plan Settlement Agreement, an "Allowed Claim" shall include interest calculated at the applicable non-default interest rate and not any applicable default interest rate; and (iii) "Allowed Claim" shall not include any Claim subject to disallowance in accordance with Bankruptcy Code section 502(d).

**1.27 "<u>Amended Schedules Bar Date</u>"** means the later to occur of (i) the General Bar Date or the Governmental Bar Date, as applicable, and (ii) twenty-one (21) days from the date on which the Debtors mail notice of an amendment to the Schedules, by which Holders of Claims affected thereby must file Proofs of Claim.

**1.28 "<u>Ancillary Business & JV Debtors</u>"** means the Debtors that (a) operate the Powerback and AlignMed businesses, (b) administer the Debtors' in-house accountable care organization, or (c) hold membership interests either directly or indirectly in the JVs, a list of which is attached hereto as **<u>Exhibit C</u>**.

**1.29 "<u>APA</u>"** means that certain *Asset Purchase Agreement*, by and among the Debtors, as Sellers, and State Street, as Buyer, dated January 23, 2026, as amended and restated by the Debtors and the Buyer pursuant to that certain *Amended and Restated Asset Purchase Agreement*, dated as of April 17, 2026, as further amended and restated by the Debtors and the Buyer pursuant to that certain *Second Amended and Restated Asset Purchase Agreement*, dated as of October [13], 2026, as may be subsequently modified, amended, or supplemented.

**1.30 "<u>APA Amendment Order</u>"** means that certain *Order (I) Authorizing Amendments to Asset Purchase Agreement, and (II) Granting Related Relief* [Docket No. 3614], entered by the Bankruptcy Court on October 8, 2026.

**1.31 "<u>Assets</u>"** means, collectively, (a) any right, title, and interest of a Debtor in and to "property" of such Debtor's Estate, as defined in Bankruptcy Code section 541, including such property of whatever type or nature, including real, personal, mixed, intellectual, tangible, and intangible, as is reflected on such Debtor's Books and Records as of the date of the Disclosure Statement Order, unless modified pursuant to the Plan or a Final Order, and (b) all Claims and Causes of Action that have been or may be commenced by a Debtor or other authorized representative for the benefit of such Debtor's Estate, including, without limitation, (i) the Creditors' Committee in accordance with the terms and provisions of the Creditors' Committee Standing Stipulation and Order, unless modified pursuant to the Plan or a Final Order, and (ii) any Claim or Cause of Action pursuant to chapter 5 of the Bankruptcy Code.

**1.32 "<u>Assigned Causes of Action</u>"** means, collectively, all Claims and Causes of Action asserted, or which may be asserted, by or on behalf of the Debtors or the Debtors' Estates prior to the Effective Date as may be described in the Plan Supplement, including, without limitation, any Claims and Causes of Action arising under or pursuant to Bankruptcy Code sections 544, 545, 547, 548, 549, 550, 551, and 553 which may be asserted, by or on behalf of the Debtors or the Debtors' Estates against any Entity with respect to any Claim, which shall be conveyed, assigned,

and transferred to the Liquidation Trust upon the Effective Date unless otherwise previously released, disposed of, or settled upon the joint written consent of the Debtors and the Creditors' Committee, in accordance with the terms and conditions of the Creditors' Committee Standing Stipulation and Order, the Plan Settlement Agreement, or the Plan. As set forth in and subject to the terms of Article IV.L hereof, in connection with the conveyance, assignment, or transfer of the Assigned Causes of Action, the Liquidation Trust shall have full and complete standing to bring any and all Assigned Causes of Action and succeed to all Privileges of the Debtors and the Estates; *provided, however*, that, on the Effective Date, unless otherwise settled, dismissed, or resolved, the PA-22 Adversary Proceeding shall be deemed amended without further Order of the Bankruptcy Court to reflect that the Liquidation Trust shall automatically assume the roles and positions of the Creditors' Committee and/or the Debtors (as applicable) for all intents and purposes, so that such proceedings can continue without any disruption.

**1.33 "Assumed Executory Contracts and Unexpired Leases"** means, collectively, those Executory Contracts and Unexpired Leases to be assumed the Debtors pursuant to and as set forth in the Confirmation Order, the Plan, or the Plan Supplement (including any Assumption Schedule), as applicable.

**1.34 "Assumed Priority Tax Claims"** means, collectively, all Allowed Priority Tax Claims of the Debtors to be paid by the Buyer pursuant to, and in accordance with, the Sale Transaction Documents in an amount not to exceed Thirty One Million Three Hundred Forty-Two Thousand Six Hundred Seventy-Seven Dollars and Sixty Cents ($31,342,677.60), plus any accrued interest thereon or penalties that would otherwise be entitled to priority of payment pursuant to Bankruptcy Code section 507(a)(8); *provided, however*, that, in the event the APA is terminated and the Sale Transaction is not consummated, the Assumed Priority Tax Claims shall not be funded by the Buyer and shall be assumed by the Debtors as part of the Restructuring Transaction.

**1.35 "Assumption Schedule"** means the list of Assumed Executory Contracts and Unexpired Leases to be assumed by the Debtors in accordance with Bankruptcy Code section 365 and Article V.A hereof. Each Assumption Schedule shall be included with the Plan Supplement and shall be Filed and served on contract counterparties pursuant to the terms of Article V.A hereof. For the avoidance of doubt, the Executory Contracts and Unexpired Leases referenced on the Assumption Schedule(s) shall not be assumed and assigned to the Buyer as of the Closing Date.

**1.36 "Avoidance Actions"** means, collectively, any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors or their Estates arising under (i) chapter 5 of the Bankruptcy Code, including Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550, 551, and 553(b), and (ii) applicable non-bankruptcy law including any state or foreign law governing fraudulent or otherwise avoidable obligations, transfers or conveyances, in each case to the extent not waived and released pursuant to Article VII of the Plan or the Plan Settlement Agreement.

**1.37 "Ballot"** means the form of ballot distributed to each Holder of an Impaired Claim entitled to vote with respect to the Plan on which such Holder will (a) indicate either acceptance or rejection of the Plan and (b) elect to have such Holder's General Unsecured Claim, to the extent applicable, treated as a Convenience Claim.

**1.38 "Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, as such title has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**1.39 "Bankruptcy Court"** means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, or such other court having jurisdiction over the Chapter 11 Cases.

**1.40 "Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure (as promulgated by the United States Supreme Court under Section 2075 of Title 28 of the United States Code), and the Local Rules of the Bankruptcy Court, as each has been, or may be, amended from time to time, to the extent that any such amendment is applicable to the Chapter 11 Cases.

**1.41 "Bar Date"** shall mean, as applicable, the General Bar Date, the Administrative Expense Claim Bar Date, the Interim Administrative Expense Claim Bar Date, the Professional Fee Claim Bar Date, the Governmental Bar Date, the Rejection Damages Bar Date, or the Amended Schedules Bar Date.

**1.42 "Books and Records"** means, collectively, any and all books and records of the Debtors, including any and all documents and any and all computer generated or computer-maintained books and records and computer data, as well as electronically generated or maintained books and records or data, along with books and records of the Debtors maintained by or in the possession of third parties, wherever located.

**1.43 "Business Day"** means any day other than a Saturday, Sunday, any legal holiday (as that term is defined in Bankruptcy Rule 9006(a)), or any other day on which commercial banks in Dallas, Texas are required or authorized to close by law or executive order.

**1.44 "Buyer"** means State Street or its designee, as applicable.

**1.45 "Buyer OTA"** means that certain OTA that shall consummate the Debtors' transfer of the operations of their Facilities to the Buyer.

**1.46 "Buyer Promissory Note"** means, in the event of the Sale Transaction, that certain *Subordinated Promissory Note* to be executed and delivered by the Buyer to the Debtors, as contemplated by the APA and the Sale Order and on the terms set forth in the Buyer Promissory Note Term Sheet.

**1.47 "Buyer Promissory Note Term Sheet"** means that certain unsecured promissory note term sheet attached to the Sale Order as Exhibit B, as subsequently amended in connection with the *Order (I) Approving Settlement Related to Bold Quail Entities and (II) Granting Related Relief* [Docket No. 2617], attached to the Disclosure Statement as Exhibit F, and included in the Plan Supplement as Exhibit K.

**1.48 "Buyer TSA"** means, collectively, any and all transition service agreements which may be entered into by the Debtors or any of their Affiliates and the Buyer as may be necessary to facilitate the consummation of the Sale Transaction, including, without limitation, any agreement necessary to ensure the ongoing operation of the Facilities for licensure purposes.

**1.49** **"Carve-Out"** shall have the meaning set forth in the Final DIP Order.

**1.50** **"Cash"** means lawful currency of the United States of America, including, but not limited to, bank deposits, checks representing good funds, and other similar items.

**1.51** **"Cash Equivalents"** means equivalents of Cash in the form of readily marketable securities or instruments issued by a person other than the Debtors, including, without limitation, readily marketable direct obligations of, or obligations guaranteed by, the United States of America, commercial paper of domestic corporations carrying a Moody's rating of "A" or better, or equivalent rating of any other nationally recognized rating service, or interest-bearing certificates of deposit or other similar obligations of domestic banks or other financial institutions having a shareholders' equity or equivalent capital of not less than One Hundred Million Dollars ($100,000,000.00), having maturities of not more than one (1) year, at the then best generally available rates of interest for like amounts and like periods.

**1.52** **"Causes of Action"** means, collectively, any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, recoupment right, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, reimbursement claim, license, and franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, asserted or unasserted, accrued or unaccrued, assertable directly or derivatively (including on a theory of veil piercing, alter-ego, vicarious liability, predecessor liability, successor liability, mere continuation, domination and control, mere instrumentality, inadequate capitalization, single business enterprise or common enterprise, equitable subordination or recharacterization), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory (including under any state or federal securities laws), and whether arising under federal law, state statutory law, common law, or any other applicable international or domestic law, rule, statute, regulation, treaty, right, duty, requirement, or otherwise. For the avoidance of doubt, "Cause of Action" includes (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to Bankruptcy Code section 362, (d) any claim or defense, including fraud, mistake, duress, and usury and any other defenses set forth in Bankruptcy Code section 558, and (e) any Avoidance Actions.

**1.53** "**Chapter 11 Cases**" means the cases commenced under chapter 11 of the Bankruptcy Code by the Debtors on the Petition Date, styled and jointly administered under *In re Genesis Healthcare, Inc., et al.*, Case No. 25-80185 (SGJ), currently pending before the Bankruptcy Court.

**1.54** **"Claim"** means any right to payment from the Debtors or from property of the Debtors or their Estates, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted, or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtors or from property of

the Debtors, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**1.55** **"Claims and Noticing Agent"** means Epiq or any successor thereto, in its capacity as the Debtors' claims, noticing, solicitation, and tabulation agent.

**1.56** **"Claims Objection Deadline"** means the deadline for objecting to Filed Proofs of Claim or Scheduled Claims, which shall be, unless otherwise extended pursuant to the Plan, (i) the one hundred eightieth (180th) day following the later to occur of (a) the Effective Date and (b) the date that a Proof of Claim is Filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a Holder of such Claim; or (ii) such later date as may be fixed by the Bankruptcy Court; *provided, however*, that the Post-Restructuring Debtors or the Liquidation Trustee, as applicable, in their respective discretion, may extend the Claim Objection Deadline for an additional ninety (90) days upon the filing of a notice with the Bankruptcy Court, with further extensions thereafter permitted after notice and a hearing.

**1.57** **"Claims Register"** means the claims register maintained and managed by the Claims and Noticing Agent.

**1.58** **"Class"** means any group of Claims or Interests classified under the Plan pursuant to Bankruptcy Code section 1122(a) and set forth in Article III hereof.

**1.59** **"Clerk"** means the clerk of the Bankruptcy Court.

**1.60** **"Closing Date"** means the date on which the Sale Transaction closes, following the satisfaction of all conditions to such closing or at such earlier or later date and time as may be expressly agreed upon in writing by Buyer and the Debtors, but, unless otherwise extended in accordance with the terms of the APA, not later than October 14, 2026.

**1.61** **"Closing Effective Time"** means the Effective Time (as defined in the APA), being 12:01 a.m. (prevailing Central Time) on the Closing Date.

**1.62** **"CMS"** means the Centers for Medicare and Medicaid Services.

**1.63** **"Co-CRO"** means Louis E. Robichaux IV and Russell A. Perry, each in their capacity as a Co-Chief Restructuring Officer of the Debtors.

**1.64** **"Collateral"** means any property or interest in property of the Estates of any of the Debtors that is subject to an unavoidable Lien to secure the payment or performance of a Claim.

**1.65** **"Common Equity Interests"** means, collectively, the authorized (a) 1,000,000,000 shares of Class A Genesis common stock, having a par value of $0.001 per share, (b) 20,000,000 shares of Class B Genesis common stock, having a par value of $0.001 per share, and (c) 150,000,000 shares of Class C Genesis common stock, having a par value of $0.001 per share, including, without limitation, any right to convert into any such share of common stock or acquire any such shares of common stock that was in existence immediately prior to or on the Petition Date.

**1.66 "Confirmation"** means the entry of the Confirmation Order, subject to the conditions specified in Article VIII.A hereof having been satisfied or waived pursuant to Article VIII.D hereof.

**1.67 "Confirmation Date"** means the date on which the Clerk enters the Confirmation Order on the Docket.

**1.68 "Confirmation Hearing"** means the hearing held by the Bankruptcy Court regarding Confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

**1.69 "Confirmation Objection Deadline"** means the deadline by which parties-in-interest must file and serve Objections to Confirmation of the Plan, in accordance with the terms and provisions of the Disclosure Statement Order and as may be continued by the Debtors pursuant to the terms thereof.

**1.70 "Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129.

**1.71 "Consummation"** means the consummation of the Plan, which shall occur on the Effective Date.

**1.72 "Contingent"** means, with reference to a Claim, a Claim that has not accrued or is not otherwise payable and the accrual of which, or the obligation to make payment on which, is dependent upon a future event that may or may not occur.

**1.73 "Convenience Claim"** means any Allowed General Unsecured Claim that is either (a) liquidated and equal to or less than Five Thousand Dollars ($5,000.00) or (b) unliquidated, with respect to which the Holder thereof voluntarily elects to receive (by making such election on the Ballot), in full satisfaction, settlement, discharge, and release of, and in exchange for, such Allowed General Unsecured Claim, payment in Cash from the Convenience Claim Reserve in the amount of fifty percent (50%) of the amount asserted in such Allowed General Unsecured Claim; *provided, however,* that, in the event that Holders of Allowed General Unsecured Claims elect to have such Claims be treated as Convenience Claims such that Distributions with respect to the Allowed amount thereof exceeds the amount of the Convenience Claim Reserve, such Holder shall receive Holder's Pro Rata Share of the Convenience Claim Reserve; and, *provided, further*, that, if a Holder of an unliquidated General Unsecured Claim elects to be treated as a Convenience Claim by making such election on the Ballot, such unliquidated General Unsecured Claim shall be assigned an Allowed Convenience Claim in the amount of One Thousand Five Hundred Dollars ($1,500.00).

**1.74 "Convenience Claim Reserve"** means the reserve established and maintained by the Liquidation Trust and funded by the Debtors on the Effective Date in the amount of One Million Five Hundred Thousand Dollars ($1,500,000.00), to be used solely for payment of Allowed Convenience Claims.

**1.75 "Corporate Transactions"** shall have the meaning set forth in Article IV.B hereof.

**1.76** **"CPE"** means CPE 88988 LLC, a Delaware limited liability company.

**1.77** **"Creditor"** means any Person or Entity that is the Holder of a Claim against the Debtors or their Estates, or, pursuant to Bankruptcy Code section 102(2), against property of the Debtors that arose or is deemed to have arisen on or prior to the Petition Date, including, without limitation, a Claim against any of the Debtors of a kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i).

**1.78** **"Creditors' Committee"** means the Statutory Unsecured Claimholders' Committee appointed in the Chapter 11 Cases by the U.S. Trustee pursuant to Bankruptcy Code section 1102 [Docket Nos. 250, 262, 698, 699, 2095], the membership of which may be further reconstituted by the U.S. Trustee or by Order of the Bankruptcy Court from time to time.

**1.79** **"Creditors' Committee Consent Rights"** means the consent rights of the Creditors' Committee with respect to various aspects of the Plan, which such consent shall not be unreasonably withheld; *provided, however*, that such consent rights shall not be effective in the event the Creditors' Committee withdraws support of the Plan prior to any proposed modifications of the Plan by the Debtors.

**1.80** **"Creditors' Committee Draft Complaint"** means that certain draft adversary complaint attached to the Creditors' Committee Standing Motion as Exhibit A.

**1.81** **"Creditors' Committee Secured Claim Objection"** means the *Preliminary Objection of the Statutory Unsecured Claimholders' Committee to Determine the Secured Status of Prepetition Term Loan Claims* [Docket No. 1723], as it may be amended or modified.

**1.82** **"Creditors' Committee Standing Motion"** means the *Motion of the Statutory Unsecured Claimholders' Committee for Leave, Standing, and Authority to Prosecute Certain Claims on Behalf of the Debtors' Estates and for Related Relief* [Docket No. 1722].

**1.83** **"Creditors' Committee Standing Stipulation and Order"** means the *Stipulation and Agreed Order Regarding Motion of Statutory Unsecured Claimholders' Committee for Leave, Standing, and Authority to Prosecute Certain Claims on Behalf of the Debtors' Estates and Related Relief* [Docket No. 2206], dated January 26, 2026, as amended by the *Amendment to Stipulation and Agreed Order Regarding Motion of Statutory Unsecured Claimholders' Committee for Leave, Standing, and Authority to Prosecute Certain Claims on Behalf of the Debtors' Estates and Related Relief* [Docket No. 2491], dated March 23, 2026.

**1.84** **"Cure Cost"** means the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtors and (ii) permit the Debtors to assume or assume and assign such Executory Contract or Unexpired Lease under Bankruptcy Code section 365(a); *provided, however*, that, in the event the Sale Transaction is consummated, the Buyer shall be responsible for the payment of Cure Costs up to the Cure Cost Cap (as set forth and defined in the APA).

**1.85** **"Cure Dispute"** means an unresolved objection regarding assumption of an Executory Contract or Unexpired Lease pursuant to Bankruptcy Code section 365, including

objections based on the appropriate Cure Cost or "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365), or any other issue relating to assumption of an Executory Contract or Unexpired Lease.

**1.86** **"Cure Notice"** means the *Notice to Contract Parties to Potentially Assumed Executory Contracts and Unexpired Leases* [Docket No. 920].

**1.87** **"D&O Claims"** means any Claims against the Debtors' current and former directors and officers.

**1.88** **"D&O Liability Insurance Policies"** means, collectively, each directors' and officers' liability insurance policy, including, without limitation, any "tail policy," and all agreements, binders, documents, or instruments related thereto issued or providing coverage at any time to the Debtors in effect as of the Petition Date.

**1.89** **"Debtor Intercompany Claim"** means any Intercompany Claim held by a Debtor against another Debtor.

**1.90** **"Debtors"** means Genesis Healthcare, Inc. and its debtor affiliates, as debtors and debtors-in-possession in the Chapter 11 Cases, as reflected on **Exhibit A** hereto.

**1.91** **"DIP Agent"** means Welltower OP LLC.

**1.92** **"DIP Borrowers"** means, collectively, Genesis and FC-GEN, as borrowers under the DIP Credit Agreement.

**1.93** **"DIP Budget"** means the itemized cash flow forecast set forth on Exhibit 2 to the Final DIP Order, as may be updated and amended from time to time.

**1.94** **"DIP Claims"** means any and all Claims inclusive of all principal, fees, expenses, costs, and interest (at the non-default rate) held by the DIP Lenders on account of, arising under, or relating to the DIP Loans, the Final DIP Order, or the DIP Loan Documents, including the DIP Facility Obligations.

**1.95** **"DIP Credit Agreement"** means that certain *Super-Priority Senior Secured Debtor-in-Possession Term Loan Agreement*, entered into as of March 4, 2026, by and among, the DIP Borrowers, the DIP Guarantors, the DIP Lenders, and the DIP Agent.

**1.96** **"DIP Facility"** means that certain postpetition financing provided to the Debtors on a secured junior basis, consisting of a new money term loan facility in an aggregate principal amount up to One Hundred Five Million Dollars ($105,000,000.00), pursuant to the terms and conditions set forth in the Final DIP Order and the DIP Credit Agreement.

**1.97** **"DIP Facility Obligations"** means the obligations, if any as may be outstanding as of the Effective Date, for principal, interest, fees, costs, expenses, obligations (whether contingent or otherwise), and all other amounts, as and when due and payable under and in accordance with the Final DIP Order, the DIP Credit Agreement, and the other DIP Loan Documents.

**1.98 "DIP Guarantors"** shall have the meaning set forth in the Final DIP Order.

**1.99 "DIP Lenders"** means, collectively, Markglen, LLC, OHI Mezz Lender LLC, and CPE, each as lenders under the DIP Facility.

**1.100** "**DIP Loan Documents**" means collectively, the DIP Term Sheet (as defined in the Final DIP Order), the DIP Credit Agreement, and any other agreements, instruments, pledge agreements, guarantees, indemnities, security agreements, intellectual property security agreements, control agreements, escrow agreements, instruments, notes, and documents executed in accordance and connection therewith (each as amended, restated, supplemented, waived, or otherwise modified from time to time in accordance with the terms thereof).

**1.101 "DIP Loans"** means, collectively, the loans extended pursuant to the DIP Facility to the DIP Borrowers by the DIP Lenders.

**1.102 "DIP Motion"** means the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Amend and Extend Their Current Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 2356].

**1.103 "Disallowed**" means, when used in reference to a Claim or Interest within a particular Class, a Disallowed Claim or Interest in the specified Class or of a specified type.

**1.104 "Disallowed Claim"** means a Claim or any portion thereof that (a) has been Disallowed by a Final Order, (b) is Scheduled at zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim has been Filed by the applicable Bar Date or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, (c) is not Scheduled, and as to which (i) no Proof of Claim has been Filed by the Bar Date or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, and (ii) no request for payment of an Administrative Expense Claim or an Administrative PL/GL Claim has been Filed by the Interim Administrative Expense Claim Bar Date or the Administrative Expense Claim Bar Date, as applicable, or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or under applicable law, or (d) after the Effective Date, has been Disallowed in a written agreement by and between the Liquidation Trust and the Holder of such Claim.

**1.105 "Disbursement Account(s)"** means the bank account(s) to be established by the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, and/or the Liquidation Trustee, as applicable, on or after the Effective Date, together with any interest earned thereon.

**1.106 "Disbursing Agent"** means, solely in its capacity as agent of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, the Liquidation Trust, and the Administrative PL/GL Claim Fund to effectuate distributions pursuant to the Plan, the Wind-Down Trustee, the Liquidation Trustee, the Administrative PL/GL Claim Fund Administrator, or such other Entity as may be designated jointly by the Debtors and the Creditors' Committee, appointed by the Bankruptcy Court, and set forth in the Confirmation Order.

**1.107 "Disclosure Statement"** means the *Disclosure Statement for Debtors' Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates*, filed on August 5, 2026 [Docket No. 3102].

**1.108 "Disclosure Statement Order"** means the *Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving Solicitation and Voting Procedures in Connection with Confirmation of the Plan, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto, and (V) Granting Related Relief*, dated August 4, 2026 [Docket No. 3099].

**1.109 "Disputed Claim"** means any Claim, or any portion thereof, against the Debtors that is neither an Allowed Claim nor a Disallowed Claim, that (a) has not been Scheduled by the Debtors or has been Scheduled as unknown, contingent, unliquidated, disputed, or at zero, whether or not such Claim is the subject of a Proof of Claim; (b) is the subject of a Proof of Claim that differs in nature, amount, or priority from the Schedules (except to the extent that the Liquidation Trust elects, in its discretion, to treat the Claim asserted in such Proof of Claim as an Allowed Claim); (c) is the subject of an Objection interposed by the Claim Objection Deadline or such other time period fixed by the Bankruptcy Court, which Objection has not been withdrawn or overruled by a Final Order; (d) is the subject to a request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Confirmation Order, which request has not been withdrawn or overruled by a Final Order; or (e) is otherwise disputed by the Debtors or the Liquidation Trustee, as applicable, in accordance with applicable law, which dispute has not been withdrawn or overruled by a Final Order; *provided, however*, that a Claim shall not be deemed a Disputed Claim to the extent it becomes an Allowed Claim or a Disallowed Claim. For the avoidance of doubt, any and all Claims asserted by CPE or its Affiliates, including, without limitation, the Prepetition WAX & MAO Term Loan Claims, the WAX & MAO Unsecured Note Claims, and the ReGen Indebtedness Claims, shall be deemed Disputed Claims, pursuant to the WAX/MAO Complaint.

**1.110 "Disputed Claim Amount"** means the lesser of (a) the liquidated amount set forth in the Proof of Claim relating to a Disputed Claim, (b) the amount of a Disputed Claim as may be estimated by the Bankruptcy Court, pursuant to Bankruptcy Code section 502(c), and (c)(i) the amount of such Disputed Claim Allowed by the Bankruptcy Court pursuant to Bankruptcy Code section 502, or (ii) zero, if such Disputed Claim is Disallowed by the Bankruptcy Court pursuant to Bankruptcy Code section 502, in either case, regardless of whether the order or judgment allowing or disallowing such Claim has become a Final Order.

**1.111 "Disputed Claims Reserve"** means the reserve established on or as soon as reasonably practicable after the Effective Date and maintained by the Liquidation Trust pursuant to and in accordance with the terms of the Liquidation Trust Agreement for the payment of Disputed Claims that become, in whole or in part, Allowed Claims after the Effective Date. The Disputed Claims Reserve need not be maintained by the Liquidation Trust in a segregated account.

**1.112 "Distribution"** means any distribution to be made by the Disbursing Agent in accordance with the Plan consisting of, as the case may be: (a) Cash or (b) any other consideration or residual value distributed to Holders of Allowed Claims pursuant to the terms and provisions of the Plan.

**1.113 "Distribution Date"** means the date on which a Distribution is made to Holders of Allowed Claims under the Plan, or as otherwise agreed.

**1.114 "Distribution Record Date"** means the record date for the purpose of determining Holders of Allowed Claims entitled to receive Distributions pursuant to the Plan on account of Allowed Claims, which date shall be the Confirmation Date or such other date designated in the Confirmation Order or any subsequent Order of the Bankruptcy Court.

**1.115 "DivestCo Debtors"** means, collectively, the Debtors that were involved with the operations of Facilities that were previously divested by the Debtors, including, without limitation, former Facility operators, former JV partners, and former master tenants, a list of which is attached hereto as **Exhibit E**.

**1.116 "Docket"** means the docket in the Chapter 11 Cases maintained by the Clerk.

**1.117 "Effective Date"** means the first (1st) Business Day following the Closing Date and the Confirmation Date on which all conditions to the Consummation and effectiveness of the Plan set forth in Article VIII.B hereof have been satisfied or waived in accordance with Article VIII.D hereof; *provided, however*, that, as to the ACO Entities, "Effective Date" means the ACO Effective Date.

**1.118 "Employment Agreement"** means any agreement relating to the employment of any of the Debtors' current employees.

**1.119 "Entity"** means a Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the U.S. Trustee, or any other entity as defined in Bankruptcy Code section 101(15).

**1.120 "Epiq"** means Epiq Corporate Restructuring, LLC, the Debtors' Claims and Noticing Agent.

**1.121 "Estate Broker"** means Houlihan Lokey Capital, Inc., appointed by the Bankruptcy Court pursuant to that certain *Agreed Order (I) Approving Amended and Restated Bidding Procedures for the Submission, Receipt, and Analysis of Bids in Connection with the Sale of the Debtors' Assets, and (II) Scheduling Certain Auction Dates and Deadlines* [Docket No. 1989], dated December 22, 2025.

**1.122 "Estate Released Parties"** has the meaning set forth in Article VII.A.2 hereof.

**1.123 "Estates"** means, collectively the estates of the Debtors created upon the commencement of the Chapter 11 Cases pursuant to Bankruptcy Code section 541.

**1.124 "Executory Contract"** means a contract to which any of the Debtors is a party that is subject to assumption or rejection under Bankruptcy Code section 365.

**1.125 "Exhibit"** means an exhibit attached to the Disclosure Statement or the Plan.

**1.126 "Existing Common Equity Interests"** means all Common Equity Interests that existed immediately before the Effective Date.

**1.127 "Face Amount"** means (a) when used in referenced to a Disputed Claim or Disallowed Claim, the amount of such Disputed Claim; and (b) when used in reference to an Allowed Claim, the amount of such Allowed Claim.

**1.128 "Facilities"** means the skilled nursing facilities, assisted living facilities, and independent living facilities operated by the Debtors.

**1.129 "FC-GEN"** means FC-GEN Operations Investment, LLC.

**1.130 "File"**, **"Filed"**, or **"Filing"** means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

**1.131 "Final Fee Applications"** means all final requests submitted by Professionals for payment of Professional Fee Claims, which must be filed by the Professional Fee Claim Bar Date.

**1.132 "Final DIP Order"** means the *Final Order (I) Authorizing the Debtors to (A) Amend and Extend Their Current Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief*, dated March 2, 2026 [Docket No. 2393].

**1.133 "Final Order"** means an Order or judgment of the Bankruptcy Court as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending, and if an appeal, writ of certiorari, reargument, or rehearing thereof has been sought, such Order shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied or reargument or rehearing shall have been denied or resulted in no modification of such Order, and the time to take any further appeal, petition for certiorari or move for reargument or rehearing shall have expired; *provided, however*, that the possibility that a motion under Bankruptcy Code section 502(j), Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be but has not then been Filed with respect to such Order, shall not cause such Order not to be a Final Order.

**1.134 "General Bar Date"** means October 31, 2025, at 4:00 p.m. (prevailing Central Time).

**1.135 "General Unsecured Claim"** means an unsecured Claim against the Debtors arising prior to the Petition Date and classified in each of the respective GUC Distribution Groups, other than a Debtor Intercompany Claim, a Non-Debtor Intercompany Claim, a WAX & MAO Unsecured Note Claim, a Convenience Claim, or a Subordinated Claim.

**1.136 "Genesis"** means Genesis Healthcare, Inc.

**1.137 "Genesis Board"** means the board of directors of Genesis.

**1.138 "Governmental Bar Date"** means January 5, 2026, at 4:00 p.m. (prevailing Central Time).

**1.139 "Governmental Unit"** shall have the meaning set forth in Bankruptcy Code section 101(27).

**1.140 "GUC Distribution Assets"** means, collectively, the Liquidation Trust Assets to be made available to Holders of Allowed General Unsecured Claims in each GUC Distribution Group in an amount derived from the GUC Distribution Model.

**1.141 "GUC Distribution Group"** means the applicable distribution group set forth in the GUC Distribution Model for purposes of making distributions to Holders of Allowed General Unsecured Claims, which consist of (a) GUC Distribution Group 1, which includes Holders of Allowed General Unsecured Claims against the OpCo Facility Debtors; (b) GUC Distribution Group 2, which includes Holders of Allowed General Unsecured Claims against the Ancillary Business & JV Debtors; (c) GUC Distribution Group 3, which includes Holders with Allowed General Unsecured Claims against the HoldCo Non-Facility Debtors; and (d) GUC Distribution Group 4, which includes Holders with Allowed General Unsecured Claims against the DivestCo Debtors.

**1.142 "GUC Distribution Interests"** means, collectively, the Liquidation Trust Interests to be made available to Holders of Allowed General Unsecured Claims in an amount derived from the GUC Distribution Model.

**1.143 "GUC Distribution Model"** means the Distribution percentages set forth on Exhibit E to the Disclosure Statement and revised in the Plan Supplement, pursuant to which the Liquidation Trustee shall make Distributions from the Liquidation Trust Assets among Holders of Allowed General Unsecured Claims.

**1.144 "HoldCo Non-Facility Debtors"** means, collectively, the Debtors that are (a) operating holding companies, (b) provide administrative support to the Debtors, or (c) provide various back-office, and miscellaneous services to the Debtors. A list of the HoldCo Non-Facility Debtors is attached hereto as **Exhibit D**.

**1.145 "Holder"** means a Person or Entity who is the beneficial holder of any Claim or Interest.

**1.146 "IMA"** means each interim management agreement entered into by and between a Debtor or Post-Restructuring Debtor and the Buyer.

**1.147 "Impaired"** means, with respect to a Class of Claims or Interests, a Claim or an Interest that is impaired within the meaning of Bankruptcy Code section 1124.

**1.148 "Impaired Class"** means a Class of Claims or Interests that is Impaired.

**1.149 "Independent Directors"** means Jonathan F. Foster, Elizabeth LaPuma, and William K. Snyder, solely in their capacity as independent directors and members of the Genesis Board.

**1.150 "Independent Director Fee Claims"** means all due and owing unpaid fees and expenses incurred during the period from the Petition Date up to and including the Effective Date, and as of the Effective Date due to the Independent Directors pursuant to their respective director agreements with the applicable Debtor, which (a) shall be deemed Allowed Administrative Expense Claims against the Debtors on the Effective Date, and (b) unpaid fees and expenses shall be evidenced by appropriate documentation and provided to counsel for the Debtors and the Creditors' Committee no later than five (5) days before the Effective Date.

**1.151 "Independent Investigation"** means the independent investigation conducted by the Special Investigation Committee into certain of the potential claims and causes of action that might be asserted by the Debtors with respect to certain of the transactions by and between the Debtors, on the one hand, and any current or former equity holder, affiliate, subsidiary, director, manager, officer, or other related stakeholders of the Debtors, on the other.

**1.152 "Installment Agreements"** means, collectively, those certain *Installment Agreements* (Form 433-D) executed by the Debtors in July 2024 in favor of the IRS, pursuant to which, among other things, (a) certain Debtors agreed to pay to the IRS certain amounts otherwise due and payable relating to outstanding employer payroll taxes, and (b) the obligation for which was secured by Liens on Assets of the applicable Debtors.

**1.153 "Insurance Policies"** means, collectively, any and all insurance policies (including the D&O Liability Insurance Policies), insurance settlement agreements, coverage-in-place agreements, closeout agreements, and any other agreements, documents, or instruments relating to the provisions of insurance entered into by or issued to, or for the benefit of, at any time, the Debtors, or their respective predecessors and employees or directors of the Genesis Board, including, without limitation, any such policies, agreements, or other documents that have been paid in full.

**1.154 "Insurance Rights"** has the meaning set forth in Article V.E.1.a(ii) of the Plan.

**1.155 "Insurer"** means any insurance company or third-party administrator that issued or entered into an Insurance Policy.

**1.156 "Intercompany Claim"** means any Claim, including, without limitation, (a) any account of a Debtor reflecting intercompany book entries with respect to another Debtor or a non-Debtor Affiliate, (b) any Claim not reflected in such book entries that is held by a Debtor against another Debtor or a non-Debtor Affiliate, and (c) any derivative Claim asserted by or on behalf of one Debtor against another Debtor or by or on behalf of a non-Debtor Affiliate.

**1.157 "Intercompany Interest"** means an Interest in a Debtor other than any Existing Common Equity Interest.

**1.158 "Interest"** means the legal interests, equitable interests, contractual interests, or ownership interests, or other rights of any Person or Entity in the Debtors, including all partnership interests, limited liability company or membership interests, rights, investment securities, equity securities (as defined in Bankruptcy Code section 101(16)), subscriptions or other agreements and contractual rights to acquire or obtain such an interest in the Debtors, subscription rights and liquidation preferences, and commitments of any character whatsoever relating to any such equity

or ownership interests or obligating the Debtors to issue, transfer, or sell any interests whether or not certificated, transferable, voting, or denominated security.

**1.159 "Interim Administrative Expense Claim Bar Date"** means June 26, 2026 at 4:00 p.m. (prevailing Central Time), the deadline by which a claimant must File a Proof of Administrative Claim asserting any Administrative Expense Claim (other than a Professional Fee Claim governed by Article II.E hereof) or an Administrative PL/GL Claim that arose during the period between the Petition Date and March 31, 2026, pursuant to the Interim Administrative Expense Claim Bar Date Order, or such other date as may be extended by the Debtors or pursuant to a Final Order.

**1.160 "Interim Administrative Expense Claim Bar Date Order"** means the *Order (I) Establishing Interim Administrative Claims Bar Date, (II) Approving Form, Manner, and Sufficiency of Notice Thereof, and (III) Approving Proof of Administrative Claim Form*, dated May 12, 2026 [Docket No. 2700].

**1.161 "Investigation Related Parties"** means any current or former equity holder, affiliate, subsidiary, director, manager, officer, or other related stakeholders of the Debtors.

**1.162 "IRS"** means the United States Department of Treasury, Internal Revenue Service.

**1.163 "IRS Secured Claims"** means the Secured Claims held by the IRS, if any.

**1.164 "JVs"** means, collectively, those Entities in which one of the Debtors or their Affiliates hold or previously held an operating or proprietary interest, including NextGen Investors, LLC, Magnolia Gardens Limited Liability Company, Magnolia Gardens Real Estate LLC, Bold Quail Holdings LLC; Bold Quail 4 LLC, Courtyard Nursing Care Center Partnership, Franklin Square/Meridian Healthcare Nursing Home Limited Partnership, Capital/Region Genesis ElderCare L.L.C., CCGEN Holdings, LLC, Seafire NEMA Investment, LLC, and Bowie Center Limited Partnership.

**1.165 "JV Partners"** means the Debtors' non-Debtor partners in the JVs, including NextGen Investors Holdings, LLC, Next Asset Management II, LLC, Doctors Community Health Ventures, Inc., New Generation Health, LLC, Lawrence Memorial Hospital of Medford, Inc., Parkway Ventures, Inc., Capital Region Health Services Corporation, CCGEN Holdings Member, LLC, Seafire NEMA Holdings, LLC, and Madison Manor, Inc.

**1.166 "Lead Case"** means Genesis Healthcare, Inc., Case No. 25-80185 (SGJ), under which all Chapter 11 Cases are being jointly administered.

**1.167 "Liabilities"** means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction, or agreement.

**1.168 "Lien"** means any charge against or interest in property to secure payment of a debt or performance of an obligation.

**1.169 "<u>Liquidation Trust</u>"** means the Entity to be created on or prior to the Effective Date by the Creditors' Committee, unless such date is otherwise extended by the Creditors' Committee, in consultation with the Debtors and by notice filed with the Bankruptcy Court, in accordance with the provisions of Article IV.K hereof and the Liquidation Trust Agreement for the benefit of Holders of Allowed Other Secured Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed General Unsecured Claims, and Allowed Convenience Claims, unless any such Claims are assumed or otherwise satisfied by the Buyer pursuant to the Sale Transaction Documents following consummation of the Sale Transaction.

**1.170 "<u>Liquidation Trust Agreement</u>"** means the trust agreement, in form and substance satisfactory to the Debtors and the Creditors' Committee and substantially in the form contained in the Plan Supplement, pursuant to which the Liquidation Trust shall, among other things, reconcile Claims, make Distributions to Holders of Allowed Claims, pursue the Assigned Causes of Action, if applicable, and distribute the proceeds thereof, if any.

**1.171 "<u>Liquidation Trust Assets</u>"** means (a) following consummation of the Sale Transaction and consummation of the Plan Settlement: (i) the Plan Settlement Amount; (ii) the Liquidation Trust Funding Amount; (iii) all Cash remaining following any and all payments and/or reserves made pursuant to the Plan Settlement Agreement and the Sources and Uses; (iv) the Administrative and Priority Claim Reserve; (v) the Convenience Claim Reserve; (vi) the Disputed Claim Reserve; (vii) Assigned Causes of Action; (viii) the Promissory Notes; (ix) the Liquidation Trust Proceeds; (x) the Priority Tax Claims Savings Amount; (xi) the Wind-Down Trust Assets, once transferred to the Liquidation Trust upon termination of the Wind-Down Trust; and (xii) the Insurance Rights and any D&O Liability Insurance Policy assumed and assigned to the Liquidation Trust pursuant to Article V.E.1.a; or (b) following consummation of the Restructuring Transaction: (i) the Liquidation Trust Funding Amount; (ii) the Assigned Causes of Action; (iii) the Administrative and Priority Claim Reserve; (iv) the Convenience Claim Reserve; (v) the Disputed Claim Reserve; (vi) the Liquidation Trust Proceeds; and (vii) the Post-Restructuring Debtor Equity Interests; *provided, however*, that, except as otherwise provided herein, the Liquidation Trust Assets shall not include the ACO Equity, the Reorganized ACO Equity, the ACO Purchased Assets, or Cash required to fund, or reserve for, the Professional Fee Escrow Account or the Wind-Down Reserve, if applicable.

**1.172 "<u>Liquidation Trust Beneficiaries</u>"** means, collectively, Holders of Allowed Claims entitled to receive Distributions pursuant to the terms of the Plan (other than Holders of Professional Fee Claims), whether or not such Claims are Allowed as of the Effective Date. In the event of the Sale Transaction, the Liquidation Trust Beneficiaries shall include Holders of (a) Allowed Administrative Expense Claims (including Holders of Allowed Administrative PL/GL Claims who validly opt out of the Administrative PL/GL Claim Settlement), (b) Allowed Other Secured Claims, (c) Allowed Priority Tax Claims, (d) Allowed Priority Non-Tax Claims, (e) Allowed General Unsecured Claims, and (f) Allowed Convenience Claims (with respect to the Convenience Claim Reserve only), unless any such Claims are assumed or otherwise satisfied by the Buyer pursuant to the Sale Transaction Documents. In the event of the Restructuring Transaction, the Liquidation Trust Beneficiaries shall include Holders of (a) Allowed Administrative Expense Claims (including Holders of Allowed Administrative PL/GL Claims who validly opt out of the Administrative PL/GL Claim Settlement), (b) Allowed Priority Tax Claims,

(c) Allowed Priority Non-Tax Claims, (d) Allowed General Unsecured Claims, and (e) Allowed Convenience Claims (with respect to the Convenience Claim Reserve only).

**1.173 "Liquidation Trust Board"** means the group of five (5) Persons selected by the Creditors' Committee, subject to the consent of the Debtors (which consent shall not be unreasonably withheld), and appointed prior to the Effective Date, or any replacements thereafter selected in accordance with the provisions of the Liquidation Trust Agreement.

**1.174 "Liquidation Trust Completion Date"** means the date upon which all Liquidation Trust Assets have been sold, abandoned, dissolved, liquidated, or otherwise disposed of, and all Liquidation Trust Proceeds or remaining Cash in the Liquidation Trust have been distributed in accordance with the terms and provisions of the Confirmation Order and the Plan, and as may be further extended by the Bankruptcy Court.

**1.175 "Liquidation Trust D&O Subcommittee"** means that certain subcommittee of the Liquidation Trust consisting of two (2) members (one (1) of which shall be selected by the Plan Settling Parties and one (1) of which shall be selected by the Special Restructuring Committee), which shall have full and exclusive authority regarding the Liquidation Trust's pursuit of any recovery on any D&O Claim(s) in the event that damages with respect to such D&O Claim(s) exceed(s) the proceeds of any available coverage from the D&O Liability Insurance Policies.

**1.176 "Liquidation Trust Funding Amount"** means Ten Million Dollars ($10,000,000.00) in Cash and Cash Equivalents to be transferred to the Liquidation Trust by the Debtors on or prior to the Effective Date to fund the efforts of the Liquidation Trust to, among other things, review, reconcile, and object to Claims, administer the Unliquidated Claim Procedures, make Distributions to Creditors, and pursue Assigned Causes of Action.

**1.177 "Liquidation Trust Interests"** means, collectively, the beneficial interests in the Liquidation Trust to be deemed distributed ratably to Holders of Allowed Claims entitled to receive Distributions pursuant to the terms of the Plan (other than Holders of Professional Fee Claims), whether or not such Claims are Allowed as of the Effective Date. Liquidation Trust Interests shall be deemed distributed to Holders of Allowed Administrative Expense Claims (including Holders of Allowed Administrative PL/GL Claims who validly opt out of the Administrative PL/GL Claim Settlement), Allowed Other Secured Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed General Unsecured Claims, and Allowed Convenience Claims, unless any such Claims are assumed or otherwise satisfied by the Buyer pursuant to the Sale Transaction Documents.

**1.178 "Liquidation Trust Proceeds"** means, collectively, the proceeds generated from the Liquidation Trust Assets after the Effective Date of the Plan, including, but not limited to, the damages, recoveries, settlements, or Cash proceeds received by the Liquidation Trust in connection with any Assigned Cause of Action from time to time (whether as initial consideration or damages, other recoveries, settlement payments, or through the payment of deferred consideration of the same), after deducting therefrom fees, commissions, costs, taxes, and expenses related thereto, in each case, incurred by the Liquidation Trust and required to be paid by the Liquidation Trust in connection therewith.

**1.179 "Liquidation Trustee"** means the Entity designated by the Creditors' Committee with the consent of the Debtors (which such consent shall not be unreasonably withheld) and approved by the Bankruptcy Court to administer the Liquidation Trust in accordance with the terms and provisions of the Liquidation Trust Agreement and the Plan. The identity and compensation of the Liquidation Trustee shall be disclosed in the Plan Supplement.

**1.180 "Local Rules"** means the Local Rules of the United States Bankruptcy Court for the Northern District of Texas.

**1.181 "MAO"** means MAO 22322 LLC, a Delaware limited liability company.

**1.182 "Markglen"** means Markglen, LLC, a Delaware limited liability company.

**1.183 "Mediator"** means the Honorable Harlan Hale (Retired), as meditator, appointed pursuant to the *Order Authorizing and Directing Mediation* [Docket No. 1398], dated October 27, 2025.

**1.184 "New Organizational Documents"** means the respective governing documents of the Post-Restructuring Debtors, other than the ACO Entities. The form of the New Organizational Documents of Genesis Healthcare, Inc. shall be included in the Plan Supplement.

**1.185 "Non-Debtor Intercompany Claim"** means any Intercompany Claim held by a non-Debtor Affiliate of a Debtor against a Debtor.

**1.186 "Objection(s)"** means any objection, application, motion, complaint, or other legal proceeding seeking, in whole or in part, to disallow, determine, liquidate, classify, reclassify, or establish the priority, expunge, subordinate, or estimate any Claim (including the resolution of any request for payment of any Administrative Expense Claim or Administrative PL/GL Claim).

**1.187 "OCP"** means any ordinary course professional retained by the Debtors during the Chapter 11 Cases pursuant to the OCP Order.

**1.188 "OCP Order"** means the *Order (I) Authorizing the Debtors to Retain and Compensation Professionals Used in the Ordinary Course of Business and (II) Granting Related Relief* entered by the Bankruptcy Court on August 28, 2025 [Docket No. 689].

**1.189 "Official Bankruptcy Forms"** means the Official Bankruptcy Forms, prescribed by the Judicial Conference of the United States, the observance and use of which is required pursuant to Bankruptcy Rule 9009, as such forms may be amended, revised, or supplemented from time to time.

**1.190 "Omega"** means Omega Healthcare Investors, Inc., a Maryland corporation.

**1.191 "Omega DIP Lender"** means OHI Mezz Lender LLC, a Delaware limited liability company.

**1.192 "OpCo Facility Debtor"** means, collectively, the Debtors that are operating a Facility as of the Effective Date. A list of the OpCo Facility Debtors is attached hereto as **Exhibit B**.

**1.193 "Order"** means an order or judgment of the Bankruptcy Court as entered on the Docket.

**1.194 "OTA"** means an operations transfer agreement pursuant to which the Debtors have or will effectuate transfers of the operations of one or more of their Facilities to new operators.

**1.195 "Other Secured Claim"** means any Secured Claim arising prior to the Petition Date against any of the Debtors, other than a Prepetition ABL Claim, a Prepetition Term Loan Claim, a Rochester Manor HUD Note Claim, or an IRS Secured Claim.

**1.196 "PA-22 Adversary Proceeding"** means that certain Adversary Proceeding No. 26-08011, commenced by filing the PA-22 Complaint on June 25, 2026 in the Bankruptcy Court.

**1.197 "PA-22 Complaint"** means that certain *Complaint* filed by the Debtors on June 25, 2026, commencing the PA-22 Adversary Proceeding.

**1.198 "PA-22 Promissory Note"** means, in the event of the Sale Transaction, that certain *Subordinated Promissory Note* to be executed and delivered by NewGen Administrative Services, LLC, an affiliate of the Buyer, to the Debtors, as contemplated by the APA.

**1.199 "PCOs"** mean, collectively, (a) Susan N. Goodman, the Debtors' patient care ombudsman for the Facilities located in New Mexico, West Virginia, Washington, and California [Docket No. 435], (b) Suzanne Koenig, the Debtors' patient care ombudsman for the Facilities located in Alabama, Delaware, Maryland, North Carolina, Tennessee, Virginia, and Pennsylvania [Docket No. 445], and (c) Melanie Cyganowski, the Debtors' patient care ombudsman for the Facilities located in Massachusetts, Maine, New Hampshire, New Jersey, Rhode Island, and Vermont [Docket No. 446].

**1.200 "Penalty Claim"** means any Claim for a fine, penalty, forfeiture, multiple, exemplary or punitive damages or otherwise not predicated upon compensatory damages and that is subject to subordination in accordance with Bankruptcy Code section 726(a)(4) or otherwise, as determined pursuant to a Final Order.

**1.201 "Pennsylvania Provider Assessments"** means Thirty-One Million Three Hundred Forty-Two Thousand Six Hundred Seventy-Seven Dollars and Sixty Cents ($31,342,677.60) in Provider Assessments charged prior to the Petition Date by the State of Pennsylvania against the Debtors' Facilities operated in the State of Pennsylvania.

**1.202 "Person"** means a "person" as defined in Bankruptcy Code section 101(41).

**1.203 "Petition Date"** means July 9, 2025, the date on which the Chapter 11 Cases were commenced.

**1.204 "Plan"** means this *Second Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates*, including, without limitation, the Plan Supplement and the exhibits and schedules hereto or thereto, as the same is amended, modified, or supplemented from time to time in accordance with the terms and provisions hereof.

**1.205 "Plan Settlement"** means that certain settlement by and among the Debtors, the Creditors' Committee, and the Plan Settling Parties, the terms of which are set forth in the Plan Settlement Agreement.

**1.206 "Plan Settlement Agreement"** means that certain *Settlement and Plan Support Agreement*, dated August 18, 2026, setting forth the terms of the Plan Settlement by and among the Debtors, the Creditors' Committee, and the Plan Settling Parties, as approved by the Plan Settlement Approval Order.

**1.207 "Plan Settlement Amount"** means the consideration to be paid or otherwise provided on the Plan Settlement Effective Date by the Plan Settling Parties to the Liquidation Trust (or, if prior to the Effective Date, such account as designated by the Debtors and the Creditors' Committee) in the aggregate amount of One Hundred Fifty Million Dollars ($150,000,000.00), which may take the form of one or a combination of (a) Cash, (b) reduction, forgiveness, or assignment of all or a portion of the Prepetition Welltower & Omega Term Loan Claims, and (c) the elimination of any amounts due to CPE as deal protection for its staking horse bid and/or fee reductions, as determined by the Plan Settling Parties in their sole discretion.

**1.208 "Plan Settlement Approval Motion"** means the *Joint Emergency Motion of the Debtors and the Statutory Committee of Unsecured Claimholders for Entry of an Order (I) Approving Settlement and Plan Support Agreement Pursuant to Federal Rule of Bankruptcy Procedure 9019 and (II) Granting Related Relief* filed by the Debtors and the Creditors' Committee on August 28, 2026 [Docket No. 3246].

**1.209 "Plan Settlement Approval Order"** means the *Order (I) Approving Settlement and Plan Support Agreement Pursuant to Federal Rule of Bankruptcy Procedure 9019 and (II) Granting Related Relief* entered by the Bankruptcy Court on September 15, 2026 [Docket No. 3345].

**1.210 "Plan Settlement Effective Date"** means the earlier to occur of (a) the first business day on which each of the conditions set forth in paragraph 2 of the Plan Settlement Agreement have been satisfied or waived in accordance with its terms and (b) the date the Debtors, with the consent of the Creditors' Committee, satisfy in full the Prepetition Welltower & Omega Term Loan Claims, as set forth in paragraph 3(a) of the Plan Settlement Agreement.

**1.211 "Plan Settlement Mutual Releases"** means the mutual releases provided by the Plan Settlement Agreement by the Debtors, the Creditors' Committee, and the Estates (and any successor thereto, including the Liquidation Trust and any chapter 7 trustee), on the one hand, and the Plan Settling Parties and their respective affiliates, subsidiaries, and related parties, as set forth in section 11 of the Plan Settlement Agreement and Article VII.A hereof.

**1.212 "Plan Settling Parties"** means Joel Landau, David Gefner, WAX, MAO, ReGen, CPE, Pinta Capital Partners, Integra Healthcare LLC, Integra WIP Tenant LLC, Welltower, Markglen, and the Omega DIP Lender.

**1.213 "Plan Settling Party Released Parties"** has the meaning set forth in Article VII.A.1 hereof.

**1.214 "Plan Supplement"** means the compilation of forms of documents, documents, agreements, schedules, and any exhibits to the Plan Filed by the Plan Supplement Filing Date (each as may be amended, supplemented or modified from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules), including: (a) the identity and compensation of the Liquidation Trustee and the members of the Liquidation Trust Board; (b) the Liquidation Trust Agreement; (c) the identity and compensation of the Wind-Down Trustee and the members of the Wind-Down Trust Board (only applicable following consummation of the Sale Transaction); (d) the Wind-Down Trust Agreement (only applicable following consummation of the Sale Transaction); (e) the schedule of Assigned Causes of Action; (f) the Assumption Schedule(s), including the Assumption Schedule with respect to the Executory Contracts and Unexpired Leases to be assumed by the ACO Entities; (g) the form of New Organizational Documents for Genesis Healthcare, Inc.; (h) the modified Unliquidated Claim Procedures (which shall be the Trust Distribution Procedures reflected in the Liquidation Trust Agreement); (i) the Promissory Notes; (j) the Sources and Uses (to the extent amended or modified following solicitation); (k) the GUC Distribution Model (to the extent amended or modified following solicitation); (l) the Post-Restructuring Term Loan Promissory Note (only applicable in connection with the Restructuring Transaction); (m) the identity of the directors and officers of the Post-Restructuring Debtors, including the members of the Post-Restructuring Board (only applicable in connection with the Restructuring Transaction); (n) a schedule of Subordinated Claims; (o) a schedule setting forth the litigation commenced by the Debtors on or after the Petition Date to the extent not otherwise set forth herein; (p) the amount of the Administrative and Priority Claim Reserve, as determined jointly by the Debtors and the Creditors' Committee; (q) the Administrative PL/GL Claim Settlement Fund Agreement; (r) the forms of organizational documents of the ACO Entities, as designated by the Buyer in accordance with Article IV.F hereof (only applicable following consummation of the Sale Transaction); and (s) the identity of the directors and officers of the ACO Entities, to the extent known.

**1.215 "Plan Supplement Filing Date"** means the date on which the Plan Supplement is filed with the Bankruptcy Court, which date shall be no later than seven (7) days prior to the Voting Deadline, or such other date as the Bankruptcy Court establishes.

**1.216 "Post-Restructuring Board"** means the group of five (5) Persons jointly selected by the Debtors and the Creditors' Committee and appointed prior to the Effective Date by the Bankruptcy Court, or any replacements thereafter selected in accordance with the provisions of the New Organizational Documents; *provided, however*, that the Post-Restructuring Board shall only be appointed if the Restructuring Transaction is consummated.

**1.217 "Post-Restructuring Debtor"** means any Debtor (other than the ACO Entities), or any successor thereto, by merger, consolidation, reorganization, or otherwise, in the form of a

corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date.

**1.218 "Post-Restructuring Debtor Equity Interests"** means the equity or membership interests, as applicable, of the Post-Restructuring Debtors to be issued on the Effective Date and held by either (a) the Post-Restructuring Debtors or the Wind-Down Trust, as applicable, for the benefit of the Holders of Liquidation Trust Interests, following consummation of the Sale Transaction, or (b) the Liquidation Trust for the benefit of the Holders of Liquidation Trust Interests, following consummation of the Restructuring Transaction. Effective as of the ACO Effective Date, the ACO Equity shall be deemed cancelled and the Reorganized ACO Equity, which shall not constitute Post-Restructuring Debtor Equity Interests, shall be issued to the Buyer as set forth in Article IV.F hereof and as contemplated by the APA.

**1.219 "Post-Restructuring Term Loan Promissory Note"** means, in the event of a Restructuring Transaction, that certain seven (7)-year promissory note to be issued by the Post-Restructuring Debtors on the Effective Date to the Prepetition Term Loan Agent for the benefit of Holders of Allowed Prepetition Welltower & Omega Term Loan Claims outstanding as of the Effective Date (or all Allowed Prepetition Term Loan Claims as determined by the Bankruptcy Court in connection with the adjudication of the WAX/MAO Complaint), which shall (a) be issued in the original principal amount of $280.7 million (or such other amount as determined by the Bankruptcy Court in connection with the adjudication of the WAX/MAO Complaint), (b) be secured by a Lien on all Assets of the Post-Restructuring Debtors, and no Liens shall attach to any of the Liquidation Trust Assets (other than Causes of Action to collect accounts receivable or accounts and the proceeds thereof), and (c) bear interest at a rate determined by the Bankruptcy Court but in no event greater than fourteen percent (14%) per annum, paid in cash on a quarterly basis. A form of the Post-Restructuring Term Loan Promissory Note shall be included with the Plan Supplement, following the filing of the Restructuring Transaction Toggle Notice.

**1.220 "Prepetition ABL Agent"** means White Oak, as administrative agent for the Prepetition HUD ABL Lenders and the Prepetition Non-HUD ABL Lenders.

**1.221 "Prepetition ABL Claims"** means, collectively, all Prepetition HUD ABL Claims and all Prepetition Non-HUD ABL Claims, inclusive of all principal, fees, expenses, costs, and interest (at the non-default rate).

**1.222 "Prepetition ABL Credit Agreements"** means, collectively, the Prepetition HUD ABL Credit Agreement and the Prepetition Non-HUD ABL Credit Agreement.

**1.223 "Prepetition HUD ABL Agent"** means White Oak, as administrative agent for the Prepetition HUD ABL Lenders.

**1.224 "Prepetition HUD ABL Claims"** means all Secured Claims arising from or based upon the Prepetition HUD ABL Credit Agreement, inclusive of all principal, fees, expenses, cost and interest (at the non-default rate).

**1.225 "Prepetition HUD ABL Credit Agreement"** means that certain *Third Amended and Restated Revolving Credit Agreement*, dated as of March 6, 2020 (as otherwise amended, supplemented, or otherwise modified from time to time).

**1.226 "Prepetition HUD ABL Lenders"** means the "Lenders" as defined in the Prepetition HUD ABL Credit Agreement.

**1.227 "Prepetition Non-HUD ABL Agent"** means White Oak, as administrative agent for the Prepetition Non-HUD ABL Lenders.

**1.228 "Prepetition Non-HUD ABL Claims"** means all Secured Claims arising from or based upon the Prepetition Non-HUD ABL Credit Agreement, inclusive of all principal, fees, expenses, cost and interest (at the non-default rate).

**1.229 "Prepetition Non-HUD ABL Credit Agreement"** means that certain *Fifth Amended and Restated Credit Agreement*, dated as of March 9, 2022 (as otherwise amended, supplemented, or otherwise modified from time to time).

**1.230 "Prepetition Non-HUD ABL Lenders"** means the "Lenders" as defined in the Prepetition Non-HUD ABL Credit Agreement.

**1.231 "Prepetition Term Loans"** means the term loans provided under the Prepetition Term Loan Credit Facility.

**1.232 "Prepetition Term Loan Agent"** means Welltower OP LLC, as administrative agent for the Prepetition Term Loan Lenders.

**1.233 "Prepetition Term Loan Claims"** means, collectively, the Prepetition Welltower & Omega Term Loan Claims and the Prepetition WAX & MAO Term Loan Claims, inclusive of all amounts due and owing on the Petition Date, and solely to the extent the value of the collateral securing the Prepetition Term Loans permits the accrual of post-petition fees, expenses, costs, and interest (at the non-default rate) in accordance with Bankruptcy Code section 506 and applicable law, such additional post-petition amounts.

**1.234 "Prepetition Term Loan Credit Agreement"** means that certain *Term Loan Agreement*, dated as of July 29, 2016 (as subsequently amended, supplemented, or otherwise modified from time to time).

**1.235 "Prepetition Term Loan Credit Facility"** means that certain term loan credit facility provided to the borrowers under the Prepetition Term Loan Credit Agreement.

**1.236 "Prepetition Term Loan Lenders"** means the "Lenders" as defined in the Prepetition Term Loan Credit Agreement.

**1.237 "Prepetition Term Loan Secured Parties"** means, collectively, the Prepetition Term Loan Lenders and the Prepetition Term Loan Agent.

**1.238 "Prepetition WAX & MAO Term Loan Claims"** means all Secured Claims arising from or based upon the Prepetition Term Loan Credit Agreement that are attributable to WAX & MAO, inclusive of all principal, fees, expenses, cost and interest (at the non-default rate), the aggregate principal amount of which, as of the Petition Date, was Eighty-Four Million Nine Hundred Thousand Dollars ($84,900,000.00), and allocated as follows: (a) Thirteen Million Eight

Hundred Thousand Dollars ($14,800,000.00) to MAO, and (b) Seventy-One Million One Hundred Thousand Dollars ($71,100,000.00) to WAX. Upon the Plan Settlement Effective Date, the Prepetition WAX & MAO Term Loan Claims shall be deemed cancelled, released, and extinguished pursuant to the terms of the Plan Settlement Agreement, and none of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust shall have any liability or obligation with respect thereto.

**1.239 "Prepetition Welltower & Omega Term Loan Claims"** means all Secured Claims arising from or based upon the Prepetition Term Loan Credit Agreement that are attributable to Welltower and OHI Mezz Lender, LLC, inclusive of all principal, fees (including professional fees, whether incurred before, on, or after the date of the Plan Settlement Agreement to the extent set forth in paragraph 6 thereof), expenses, cost and interest (at the base rate plus one percent (1%)), the aggregate principal amount of which, as of the Petition Date, was approximately Two Hundred Thirty-Four Million Dollars ($234,000,000.00), and allocated as follows: (a) approximately One Hundred Twelve Million Eight Hundred Thousand Dollars ($112,800,000.00) to Welltower, and (b) approximately One Hundred Twenty-One Million Two Hundred Thousand Dollars ($121,200,000.00) to Omega.

**1.240 "Priority Claims"** means, collectively, Priority Non-Tax Claims and Priority Tax Claims.

**1.241 "Priority Non-Tax Claim"** means any Claim against the Debtors, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment in accordance with Bankruptcy Code sections 507(a)(3), (4), (5), (6), (7), or (9).

**1.242 "Priority Tax Claim"** means any Claim of a Governmental Unit against the Debtors entitled to priority in payment under Bankruptcy Code sections 502(i) and 507(a)(8).

**1.243 "Priority Tax Claims Savings Amount"** means an amount equal to the lesser of (a) the difference of Twenty-Eight Million Dollars ($28,000,000.00) *minus* the final amount of the Assumed Priority Tax Claims and (b) Twenty-Eight Million Dollars ($28,000,000.00); *provided, however*, that the Priority Tax Claims Savings Amount is only applicable following consummation of the Sale Transaction.

**1.244 "Privileges"** means, collectively, all attorney-client privileges, work product protections, and other applicable privileges, immunities, or protections from disclosure held by any one or more of the applicable Debtors.

**1.245 "Professional"** means any professional Person retained in the Chapter 11 Cases by the Debtors, the Special Investigation Committee, the Special Restructuring Committee, the PCOs, and the Creditors' Committee, as applicable, pursuant to Bankruptcy Code sections 327, 328, 330, 363, or 1103 and an Order of the Bankruptcy Court and to be compensated for services rendered and reimbursed for expenses incurred pursuant to Bankruptcy Code sections 327, 328, 330, or 331.

**1.246 "Professional Fee Claim"** means a Claim of a Professional pursuant to Bankruptcy Code sections 327, 328, 330, 331, or 503(b) for compensation for services rendered or reimbursement of costs and expenses relating to services performed after the Petition Date and prior to and including the Effective Date.

**1.247 "Professional Fee Claim Bar Date"** means the deadline for Filing all Final Fee Applications, which deadline shall be sixty (60) days after the Effective Date.

**1.248 "Professional Fee Claim Objection Deadline"** means thirty (30) days from the date on which each Final Fee Application is Filed.

**1.249 "Professional Fee Escrow Account"** means an interest-bearing account funded by the Debtors on the Effective Date with Cash in an amount equal to the aggregate amount of the Professional Fee Estimate.

**1.250 "Professional Fee Estimate"** means (a) with respect to any Professional, a good-faith estimate of such Professional's anticipated accrued, unpaid Professional Fee Claims as of the Effective Date to be provided by each Professional in writing to the Debtors at least five (5) calendar days prior to the Effective Date, and (b) collectively, the sum of all individual Professional Fee Estimates.

**1.251 "Promissory Notes"** means, collectively, the Buyer Promissory Note and the PA-22 Promissory Note.

**1.252 "Proof of Administrative Claim"** means the proof of Administrative Expense Claim or Administrative PL/GL Claim that must be Filed before the Interim Administrative Expense Claim Bar Date or the Administrative Expense Claim Bar Date (as applicable) to be considered timely filed.

**1.253 "Proof of Claim"** means the proof of claim, including a Proof of Administrative Claim, that must be Filed before the applicable Bar Date to be considered timely filed.

**1.254 "Provider Assessments"** means those certain assessments charged against the Facilities by agencies or departments of the States or Commonwealths of the United States in which they are operated based on the number of residents treated per day in the Facilities, which assessments are typically paid on a monthly, quarterly, or biannual basis, depending on the applicable State or Commonwealth of the United States.

**1.255 "Pro Rata Share"** means with respect to Claims (a) within the same Class or sub-Class, the proportion that a Claim bears to the sum of all Claims within such Class or sub-Class, and (b) among all Classes, the proportion that a Class of Claims bears to the sum of all Claims; *provided, however*, that, notwithstanding the foregoing, for purposes of distributing Liquidation Trust Interests, "Pro Rata Share" shall not include Convenience Claims.

**1.256 "Record Date"** means July 28, 2026, the date established by the Bankruptcy Court in the Ballots, the Disclosure Statement Order, and the Confirmation Order for the purpose of determining the Holders of Allowed Claims and Allowed Interests entitled to receive Distributions pursuant to the Plan.

**1.257 "ReGen"** means ReGen Healthcare, LLC, a Delaware limited liability company.

**1.258 "ReGen Indebtedness"** means, collectively, the indebtedness of the Debtors incurred pursuant to that certain (a) *Investment Agreement*, dated March 2, 2021, and (b) *Note*

*Purchase Agreement*, dated May 24, 2023, each as amended, and the documents and investments executed in connection therewith, including, without limitation, pursuant to the ReGen Notes, which, as of the Petition Date, was in the approximate aggregate principal amount of Ninety Nine Million Eight Hundred Thousand Dollars ($99,800,000.00).

**1.259 "ReGen Indebtedness Claim"** means a Claim arising from and relating to the ReGen Indebtedness. Upon the Plan Settlement Effective Date, the ReGen Indebtedness Claims shall be deemed cancelled, released, and extinguished pursuant to the terms of the Plan Settlement Agreement, and none of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust shall have any liability or obligation with respect thereto.

**1.260 "ReGen Notes"** means, collectively, (a) that certain $50 million convertible subordinated promissory note issued by FC-GEN to ReGen on March 2, 2021, bearing interest at one percent (1%) per annum (payable at maturity), (b) that certain $10 million convertible subordinated promissory note issued by FC-GEN to ReGen on December 2, 2022, bearing interest at one percent (1%) per annum (payable at maturity), (c) that certain $15 million convertible subordinated promissory note issued by FC-GEN to ReGen on January 4, 2023, bearing interest at one percent (1%) per annum (payable at maturity), and (d) that certain $25 million convertible subordinated promissory note issued by FC-GEN to ReGen on May 24, 2023, bearing interest at one and one-half percent (1.5%) monthly (payable in kind).

**1.261 "Reinstated"** means the treatment provided for in Bankruptcy Code section 1124.

**1.262 "Rejection Damages Bar Date"** means the deadline to File a Proof of Claim for damages relating to the rejection of an Executory Contract or Unexpired Lease, which is the latest to occur of (a) thirty (30) days after entry of an Order approving the rejection of any Executory Contract or Unexpired Lease of the Debtors (other than the Confirmation Order), (b) the General Bar Date or the Governmental Bar Date, or (c) thirty (30) days after the Effective Date or the ACO Effective Date, as applicable (solely for purposes of Executory Contracts or Unexpired Leases rejected pursuant to the Plan and the Confirmation Order), whichever is applicable.

**1.263 "Reorganized ACO Equity"** means one hundred percent (100%) of the limited liability company interests of each ACO Entity, as reorganized, to be issued to the Buyer (or its designee) on the ACO Effective Date pursuant to Article IV.F hereof and the APA, free and clear of all Liens, Claims, charges, Interests, and other encumbrances.

**1.264 "Restructuring Transaction"** means the restructuring transaction consummated by the Debtors on the Effective Date in the event the APA is terminated and the Sale Transaction is not consummated, pursuant to which the Post-Restructuring Debtors shall reorganize and continue to operate the Debtors' business in the ordinary course.

**1.265 "Restructuring Transaction Toggle Notice"** means, in the event the APA is terminated and the Sale Transaction is not consummated, that certain notice to be filed as soon as reasonably practicable following termination of the APA, informing parties-in-interest of the termination of the APA and the Debtors' election to pursue a Restructuring Transaction.

**1.266 "Retained Medical Records"** has the meaning set forth in Article IV.R hereof.

**1.267 "Retained Records"** means all Books and Records relating to any of the Excluded Assets or Excluded Liabilities, each as defined in the APA.

**1.268 "Rochester Manor Borrower"** means 40 Whitehall Road Property LLC, a Debtor.

**1.269 "Rochester Manor HUD Lender"** means Berkadia Commercial Mortgage LLC.

**1.270 "Rochester Manor HUD Note"** means that certain *Healthcare Facility Note*, dated as of December 1, 2016 issued by the Rochester Manor HUD Lender.

**1.271 "Rochester Manor HUD Note Claim"** means any Secured Claim arising from or based upon the Rochester Manor HUD Note.

**1.272 "Sale Order"** means the *Order (I) Approving the Asset Purchase Agreement Between the Debtors and 101 W State Street Holdings LLC; (II) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances; (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith; and (IV) Granting Related Relief*, dated January 26, 2026 [Docket No. 2204].

**1.273 "Sale Proceeds"** means the proceeds of the Sale Transaction.

**1.274 "Sale Transaction"** means the Debtors' sale of substantially all Assets to the Buyer, including the ACO Transaction pursuant to Article IV.F hereof, as approved by the Sale Order and as set forth in the Sale Transaction Documents.

**1.275** "**Sale Transaction Documents**" means the definitive documents to effectuate the Sale Transaction, including, but not limited to, the APA (including all exhibits and the Disclosure Schedules thereto), the Buyer OTA(s), the Promissory Notes, the Sale Order, the APA Amendment Order, the Buyer TSA(s), the IMA(s), and each of the Interim Sublease Agreements, the Powerback Management Agreements, the Bill of Sale, Assignment and Assumption Agreement, the Lease Assignment and Assumption Agreements, the Commitment Letters, and the ACO Documents (each of the foregoing as defined in the APA) and such other agreements, documents, and instruments executed or delivered in connection with the Sale Transaction, in each case as may be amended, modified, or supplemented from time to time.

**1.276 "Scheduled"** means, with respect to any Claim, the status and amount, if any, of that Claim as set forth in the Schedules.

**1.277 "Schedules"** means the respective schedules of assets and liabilities and the statements of financial affairs Filed by the Debtors on September 10, 2025 in accordance with Bankruptcy Code section 521 and the Official Bankruptcy Forms of the Bankruptcy Rules, as such schedules and statements have been or may be supplemented or amended on or prior to the Effective Date.

**1.278 "SEC"** means the Securities and Exchange Commission of the United States.

**1.279 "Secured Claim"** means a Claim against the Debtors or their Estates (a) secured by a Lien on Collateral or (b) subject to set off under Bankruptcy Code section 553, to the extent of the value of the Collateral or to the extent of the amount subject to setoff, as applicable, as determined in accordance with Bankruptcy Code section 506(a); *provided, however*, that, to the extent that the value of such interest is less than the amount of the Claim which has the benefit of such security, the unsecured portion of such Claim shall be treated as a General Unsecured Claim unless, in any such case, the Class of which such Claim is a part makes a valid and timely election in accordance with Bankruptcy Code section 1111(b) to have such Claim treated as a Secured Claim to the extent Allowed.

**1.280 "Securities Act"** means the Securities Act of 1933, 15 U.S.C. §§ 77c-77aa, as amended, and any similar federal, state or local law.

**1.281 "Sources and Uses"** means that certain sources and uses setting forth the appropriate Claim and Cash reserves, as applicable and for illustrative purposes only, contemplated by the terms of the Plan, which was attached to the Disclosure Statement as Exhibit D, as may be amended or modified and included in the Plan Supplement.

**1.282 "Special Investigation Committee"** means the committee of the Genesis Board, composed of Mr. Jonathan F. Foster and Ms. Elizabeth LaPuma in their capacity as Independent Directors, to which the Genesis Board delegated, among other things, the sole and exclusive authority to continue to conduct the Independent Investigation and make recommended factual findings as to the merits and value of any potential claims against any Investigation Related Parties.

**1.283 "Special Restructuring Committee"** means the committee of the Genesis Board composed of Mr. Jonathan F. Foster, Ms. Elizabeth LaPuma, and Mr. William K. Snyder as voting members, and the Debtors' Co-CROs (Mr. Louis E. Robichaux IV and Mr. Russell A. Perry) as non-voting advisory members, to which the Genesis Board delegated certain rights, authority, and powers in connection with, among other things, any matter relating to the sale process or the restructuring process involving the Debtors.

**1.284 "State Street"** means 101 W State Street Holdings LLC, a Delaware limited liability company.

**1.285 "Statutory Fees"** means any fees due and payable pursuant to section 1930 of Title 28 of the United States Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the United States Code, to the extent applicable.

**1.286 "Subordinated Claim"** means any Claim that is subject to (i) subordination under Bankruptcy Code section 510(b); (ii) subordination under Bankruptcy Code section 509(c) on account of subrogation; or (iii) equitable subordination as determined by the Court in a Final Order (including in connection with the WAX/MAO Complaint), including, without limitation, the ReGen Indebtedness Claim, a Penalty Claim, or any Claim for or arising from the rescission of a purchase, sale, issuance, or offer of a security of any Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement, indemnification, or contribution allowed under Bankruptcy Code section 502 on account of such Claim.

**1.287 "<u>Substantial Contribution Claim</u>"** means a Claim under Bankruptcy Code sections 503(b)(3), (b)(4), or (b)(5) for compensation or reimbursement of expenses incurred in making a substantial contribution in the Chapter 11 Cases, which must be asserted in compliance with Article II.B hereof.

**1.288 "<u>Trust Distribution Procedures</u>"** means the mandatory unliquidated claims resolution procedures set forth in the Liquidation Trust Agreement, which shall supersede and replace the unliquidated claim procedures previously approved through the Unliquidated Claims Procedures Order.

**1.289 "<u>Unclaimed Distribution</u>"** means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

**1.290 "<u>Unclaimed Distribution Deadline</u>"** means ninety (90) days from the date the Liquidation Trust makes a Distribution of Cash or other property under the Plan to a Holder of an Allowed Claim.

**1.291 "<u>Unexpired Lease(s)</u>"** means an unexpired lease, sublease, or sub-sublease to which a Debtor is party that is subject to assumption or rejection under Bankruptcy Code section 365.

**1.292 "<u>Unimpaired</u>"** means, when used in reference to a Claim or a Class, a Claim or a Class that is not impaired within the meaning of Bankruptcy Code section 1124.

**1.293 "<u>Unliquidated Claims Procedures Order</u>"** means the *Order (I) Approving and Authorizing Mandatory Unliquidated Claim Procedures to Resolve Professional Liability and General Liability Claims; (II) Requiring the Debtors' Insurers to Satisfy Their Obligations under the Applicable Policies; and (III) Granting Related Relief* [Docket No. 1527], dated November 6, 2025.

**1.294 "<u>U.S. Trustee</u>"** means the Office of the United States Trustee for Region 6.

**1.295 "<u>Voting Deadline</u>"** means September 21, 2026, at 5:00 p.m. (prevailing Central Time), the date and time by which all Ballots to accept or reject the Plan must be received in order to be counted, as set forth by the Disclosure Statement Order, or such later date as may be agreed to by the Debtors and the Creditors' Committee in accordance with the provisions of the Disclosure Statement Order.

**1.296 "<u>WAX</u>"** means WAX Dynasty Partners LLC.

**1.297 "<u>WAX/MAO Complaint</u>"** means the *Complaint of Debtors and the Statutory Unsecured Claimholders' Committee Objecting to Claims Filed by WAX Dynasty Partners LLC and MAO 22322 LLC* [Adv. Proc. Docket No. 1], dated March 18, 2026.

**1.298 "<u>WAX & MAO Unsecured Notes</u>"** means, collectively, (a) that certain Split Note (Consolidated A-1), dated September 30, 2024 and amended on December 31, 2024, by and among Debtor SHG Resources, LLC, as borrower, and WAX, as lender, (b) that certain Split Note (Consolidated A-2), dated September 30, 2024 and amended on December 31, 2024, by and among

Debtor SHG Resources, LLC, as borrower, and MAO, as lender, and (c) that certain Third Amended and Restated Note A-2, dated as of February 21, 2018 and amended on January 30, 2024, February 26, 2024, June 3, 2024, and December 31, 2024, by and among Debtor SHG Resources, LLC, as borrower, and MAO, as lender.

**1.299 "WAX & MAO Unsecured Note Claim"** means any Claim arising from or based upon the WAX & MAO Unsecured Notes. Upon the Plan Settlement Effective Date, the WAX & MAO Unsecured Note Claims shall be deemed cancelled, released, and extinguished pursuant to the terms of the Plan Settlement Agreement, and none of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust shall have any liability or obligation with respect thereto.

**1.300 "Welltower"** means, collectively, Welltower, Inc. and Welltower OP LLC.

**1.301 "White Oak"** means White Oak Healthcare Finance, LLC.

**1.302 "Wind-Down"** means, following consummation of the Sale Transaction, the wind-down and administration of the Post-Restructuring Debtors and the Estates and the post-Effective Date functions of the Wind-Down Trustee as described in more detail in Article IV.E hereof.

**1.303 "Wind-Down Reserve"** means, following consummation of the Sale Transaction, Ten Million Dollars ($10,000,000.00) in Cash and Cash Equivalents to be funded into a segregated account established by the Debtors on the Effective Date and to be used from and after the Effective Date by the Wind-Down Trustee in furtherance of the Wind-Down; *provided, however*, that to the extent that the Wind-Down Reserve is exhausted (or anticipated to be exhausted) prior to completion of the Wind-Down, the Wind-Down Trustee may request additional funding in furtherance of the Wind-Down from the Liquidation Trust.

**1.304 "Wind-Down Trust"** means, following consummation of the Sale Transaction, the Entity to be created on or prior to the Effective Date by the Debtors, but in no event later than the date on which the Liquidation Trust is created, in accordance with the provisions of Article IV.I hereof and the Wind-Down Trust Agreement.

**1.305 "Wind-Down Trust Agreement"** means, following consummation of the Sale Transaction only, the trust agreement, in form and substance satisfactory to the Debtors, subject to the consent of the Creditors' Committee (which such consent shall not be unreasonably withheld), and substantially in the form contained in the Plan Supplement, pursuant to which the Wind-Down Trust shall, among other things, manage and administer the Wind-Down Trust Assets for the benefit of the Liquidation Trust Beneficiaries and effectuate the Wind-Down.

**1.306 "Wind-Down Trust Assets"** means, from and after the Effective Date following consummation of the Sale Transaction, all Assets of the Post-Restructuring Debtors (whether held directly by the Wind-Down Trust or indirectly by a Post-Restructuring Debtor and administered by the Wind-Down Trustee in accordance with Article IV.J.2 hereof), including, without limitation, (a) the Post-Restructuring Debtor Equity Interests, (b) the Buyer TSA(s), (c) the Buyer OTA(s), (d) all IMAs, (e) all OTAs associated with recently divested Facilities, (f) the Wind-Down Reserve, (g) the Retained Medical Records, (h) the Retained Records, and (i) any remaining Assets in each Debtor's Estate; *provided, however*, that, under no circumstances, shall Wind-Down Trust

Assets include (a) the Liquidation Trust Funding Amount, (b) the Assigned Causes of Action, (c) the ACO Equity, the Reorganized ACO Equity, or the ACO Purchased Assets, or (d) the Insurance Rights or any D&O Liability Insurance Policy assumed and assigned to the Liquidation Trust pursuant to Article V.E.1.a; and, *provided, further*, that, once the Wind-Down is complete, all remaining Wind-Down Trust Assets shall be transferred to the Liquidation Trust by the Wind-Down Trustee.

**1.307 "Wind-Down Trust Board"** means, following consummation of the Sale Transaction, the board of directors of the Wind-Down Trust, the members of which shall be designated by the Creditors' Committee, subject to the consent of the Debtors (which consent shall not be unreasonably withheld).

**1.308 "Wind-Down Trust Interests"** means, following consummation of the Sale Transaction only, the beneficial interests in the Wind-Down Trust to be held by the Liquidation Trust and to be deemed to be allocated to the Liquidation Trust Beneficiaries pursuant to the terms and conditions hereof.

**1.309 "Wind-Down Trustee"** means, following consummation of the Sale Transaction only, the Person or Entity designated by the Debtors, subject to the consent of the Creditors' Committee (which such consent shall not be unreasonably withheld), to administer and wind down each Debtor's remaining business operations (other than the ACO Entities) subject to the terms of the Wind-Down Trust Agreement, as described in more detail in Article IV.I hereof. The identity and compensation of the Wind-Down Trustee shall be set forth in the Plan Supplement.

## B. Rules of Interpretation and Construction

For purposes of the Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan, the Disclosure Statement, or the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified herein, the rules of construction set forth in Bankruptcy Code section 102 shall apply; (10) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the docket numbers under the Bankruptcy Court's CM/ECF system; (11) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (12) any effectuating provisions may be interpreted by the

Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee (as applicable) in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; (13) any references herein to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; (14) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (15) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

**C. Computation of Time**

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

**D. Reference to Monetary Figures**

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

**E. Controlling Document**

In the event of an inconsistency between the information contained in the Disclosure Statement, the Plan, the Plan Supplement, and any other instrument or document created or executed pursuant thereto, the terms and provisions contained in the Plan shall control. The provisions of the Plan and the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided, however*, that if there is determined to be any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

Notwithstanding anything to the contrary in the Plan, nothing in the Plan or the Plan Supplement shall affect, impair, or supersede the Sale Order, the APA Amendment Order, or the other Sale Transaction Documents, each of which remains in full force and effect and governs in the event of any inconsistency with the Plan or the Plan Supplement.

Notwithstanding anything else to the contrary herein, in the event of any inconsistency between the Plan (including the Plan Supplement) or the Confirmation Order, on one hand, and the Plan Settlement Agreement and the Plan Settlement Approval Order, on the other hand, the terms of the Plan Settlement Agreement and the Plan Settlement Approval Order shall govern and control. Nothing in the Plan, the Plan Supplement, or the Confirmation Order shall amend, modify, impair, or abridge any right, remedy, or protection of the Plan Settling Parties pursuant to the terms of the Plan Settlement Agreement.

### F. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) and except as otherwise provided herein or therein, the laws of (i) the State of Texas shall govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with the Plan and (ii) the state of incorporation of the Debtors shall govern corporate governance matters with respect to the Debtors, in either case without giving effect to the principles of conflicts of law thereof.

## ARTICLE II.
## TREATMENT AND ALLOWANCE OF UNCLASSIFIED CLAIMS

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Expense Claims, Administrative PL/GL Claims, Priority Tax Claims, Priority Non-Tax Claims, Professional Fee Claims, and DIP Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

### A. Administrative Expense Claims

On the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim becomes an Allowed Claim, except to the extent that a Holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each Holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim) shall be entitled to receive, in full satisfaction, settlement, discharge, and release of, and in exchange for, such Claim, either (i) Cash in an amount equal to the full amount of such Allowed Administrative Expense Claim, or (ii) such other treatment consistent with the provisions of Bankruptcy Code section 1129(a)(9).

Following consummation of the Sale Transaction, any Allowed Administrative Expense Claims shall be paid by the Liquidation Trustee from the Liquidation Trust Assets, including, without limitation, the Administrative and Priority Claim Reserve and the Liquidation Trust Funding Amount, and neither the Debtors nor the Wind-Down Trust shall have any obligation with respect to such Allowed Administrative Expense Claims. Any Allowed Administrative Expense Claim assumed by the Buyer pursuant to the Sale Order and the Sale Transaction Documents in connection with consummation of the Sale Transaction shall be, in accordance with the provisions of the APA, the sole obligation and responsibility of the Buyer (including, without limitation, Allowed Administrative Expense Claims which do not become due and payable until after the Closing Date of the Sale Transaction to the extent set forth in the APA), shall not be an obligation of the Debtors, and shall be deemed satisfied in full under the Plan.

Following consummation of a Restructuring Transaction, any Allowed Administrative Expense Claims shall be paid by the Liquidation Trustee from the Liquidation Trust Assets, including, without limitation, the Administrative and Priority Claim Reserve and the Liquidation Trust Funding Amount, and neither the Debtors nor the Wind-Down Trust shall have any obligation with respect to such Allowed Administrative Expense Claims.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court, or as provided herein, requests for payment of Administrative Expense Claims arising on April 1, 2026 and through the Effective Date, other than requests for payment of Professional Fee Claims

and Independent Director Fee Claims, must be submitted by Filing a Proof of Administrative Claim with the Claims and Noticing Agent no later than the Administrative Expense Claim Bar Date pursuant to the procedures specified in the Confirmation Order, the notice of the Effective Date, or any other Order entered by the Bankruptcy Court. The burden of proof for the allowance of Administrative Expense Claims shall remain on the Holder of the asserted Administrative Expense Claim.

Objections to Administrative Expense Claims must be Filed and served on the Post-Restructuring Debtors, the Liquidation Trustee, and the requesting party by the Administrative Expense Claim Objection Deadline. Unless any party-in-interest objects to an Administrative Expense Claim by the Administrative Expense Claim Objection Deadline, such Administrative Expense Claim shall be deemed Allowed in the amount requested. In the event that the Liquidation Trustee or any other party-in-interest objects to an Administrative Expense Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Expense Claim, unless it is otherwise prohibited from doing so under the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any other applicable law.

**Holders of Administrative Expense Claim(s) that are required to File and serve a request for payment of such Administrative Expense Claim(s) and fail to do so by the Administrative Expense Claim Bar Date, as applicable, shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors, their Estates, the Post-Restructuring Debtors, the ACO Entities, the Wind-Down Trust, or the Liquidation Trust, and such Administrative Expense Claims shall be deemed disallowed, compromised, settled, and released as of the Effective Date.**

### B. Administrative PL/GL Claims

From and after the Effective Date, in connection with either the Sale Transaction or a Restructuring Transaction, the Administrative PL/GL Claim Fund Administrator shall, among other things, (a) administer, liquidate, and resolve Administrative PL/GL Claims and determine Distributions from the Administrative PL/GL Claim Fund in accordance with the procedures set forth in the Administrative PL/GL Claim Settlement Trust Agreement, and (b) have full power and standing to liquidate all Allowed Administrative PL/GL Claims channeled to the Administrative PL/GL Claim Fund, whether by consensual resolution with the applicable Holder or by binding arbitration.

Following liquidation of all Allowed Administrative PL/GL Claims covered by the Administrative PL/GL Claim Fund (or such earlier date as the Administrative PL/GL Claim Fund Administrator deems appropriate), the Administrative PL/GL Claim Fund Administrator shall distribute the Administrative PL/GL Claim Fund assets to Holders of Allowed Administrative PL/GL Claims based on the Allowed amount of each such Claim; *provided, however*, that, prior to any such Distributions, the Administrative PL/GL Claim Fund Administrator shall first deduct from the Administrative PL/GL Claim Contribution (i) the Administrative PL/GL Claim Fund Administrator's compensation and (ii) all other reasonable costs and expenses incurred by the Administrative PL/GL Claim Fund Administrator in administering the Administrative PL/GL Claim Fund, including, without limitation, arbitration costs, professional fees, and other administrative expenses. For the avoidance of doubt, Holders of Administrative PL/GL Claims

shall only be considered Allowed to the extent liquidated, settled, or resolved through the procedures set forth in the Administrative PL/GL Claim Settlement Fund Agreement.

No Holder of an Allowed Administrative PL/GL Claim shall receive more than full satisfaction of his or her Allowed Administrative PL/GL Claim and, to the extent funds remain after satisfaction of all Allowed Administrative PL/GL Claims and payment of all reasonable costs and all tax and other liabilities of the Administrative PL/GL Claim Fund, the remaining assets of the Administrative PL/GL Claim Fund shall be distributed as directed by further Order of the Bankruptcy Court. For any Allowed Administrative PL/GL Claim held by an incapacitated adult or a decedent's estate, Distribution shall be conditioned on any court approval, guardian ad litem appointment, probate court approval, or friendly suit order required under applicable non-bankruptcy law, and the Administrative PL/GL Claim Fund Administrator shall not be required to make any such Distribution until reasonably satisfactory evidence of such approval is provided. The reasonable costs of obtaining any such approval shall borne by the applicable Claimant's share of the Distribution.

If any Holder of an Administrative PL/GL Claim timely and validly opts out of participating in the Administrative PL/GL Claim Fund, such Holders shall not receive Distributions from the Administrative PL/GL Claim Fund and shall be liquidated, settled, or otherwise resolved by the Liquidation Trust in accordance with the Unliquidated Claim Procedures set forth in the Liquidation Trust Agreement. Holders of Allowed Administrative PL/GL Claims shall receive Distributions pursuant to Article II.A and the Liquidation Trust Agreement; *provided, however*, that Administrative PL/GL Claims shall only be Allowed once liquidated, settled, or otherwise resolved pursuant to the Unliquidated Claim Procedures set forth in the Liquidation Trust Agreement.

Except as otherwise provided by a Final Order previously entered by the Bankruptcy Court, or as provided herein, requests for payment of Administrative PL/GL Claims arising on April 1, 2026 and through the Effective Date must be submitted by Filing a Proof of Administrative Claim with the Claims and Noticing Agent no later than the Administrative Expense Claim Bar Date pursuant to the procedures specified in the Confirmation Order, the notice of the Effective Date, or any other Order entered by the Bankruptcy Court. The burden of proof for the allowance of Administrative PL/GL Claims shall remain on the Holder of the asserted Administrative PL/GL Claim. Objections to Administrative PL/GL Claims must be Filed and served on the Administrative PL/GL Claim Fund Administrator or the Liquidation Trustee, as applicable, and the requesting party by the Administrative Expense Claim Objection Deadline.

**Holders of Administrative PL/GL Claim(s) that are required to File and serve a request for payment of such Administrative PL/GL Claim(s) and fail to do so by the Interim Administrative Expense Claim Bar Date or the Administrative Expense Claim Bar Date, as applicable, shall be forever barred, estopped, and enjoined from asserting such Administrative PL/GL Claims against the Debtors, their Estates, the Post-Restructuring Debtors, the ACO Entities, the Wind-Down Trust, the Liquidation Trust, or the Administrative PL/GL Claim Settlement Fund, and such Administrative PL/GL Claims shall be deemed disallowed, compromised, settled, and released as of the Effective Date.**

## C. Substantial Contribution Claims

Any Person or Entity that wishes to make a Substantial Contribution Claim based on facts or circumstances arising after the Petition Date must File an application with the Clerk of the Bankruptcy Court, on or before the Administrative Expense Claim Bar Date, and serve such application on the Debtors, the Post-Restructuring Debtors, the Creditors' Committee, the Liquidation Trustee, the U.S. Trustee, the respective counsel of each of the foregoing, and as otherwise required by the Bankruptcy Court and the Bankruptcy Code, or be forever barred, estopped, and enjoined from seeking such compensation or expense reimbursement. Objections, if any, to a Substantial Contribution Claim must be Filed no later than the Administrative Expense Claim Objection Deadline, unless otherwise extended by Order of the Bankruptcy Court.

## D. DIP Claims

As of the Effective Date, the DIP Claims shall be deemed Allowed in an amount equal to the aggregate amount of the then-outstanding DIP Facility Obligations, including (a) the principal amount outstanding under the DIP Loans on such date, (b) all interest accrued and unpaid thereon through and including the date of payment, calculated at the non-default rate of interest, and (c) all accrued and unpaid fees, discounts, expenses, costs, charges, and indemnification obligations payable under the DIP Loan Documents.

On the Closing Date, to the extent each DIP Claim has not been previously satisfied in full in accordance with the terms and conditions of the applicable DIP Loan Documents and/or Sale Transaction Documents, and, except to the extent that a Holder of a DIP Claim agrees to different treatment, each Holder of an Allowed DIP Claim shall receive, in full satisfaction, settlement, discharge, and release of, and in exchange for, such Claim, payment in full in Cash in the amount of its Allowed DIP Claim by the Debtors. All adequate protection granted and Liens and security interests granted to secure the DIP Claims shall be automatically terminated and of no further force and effect without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided, however*, that, nothing in the Plan shall eliminate, modify, or otherwise impact the rights of the Prepetition Term Loan Secured Parties to assert a Prepetition Term Loan Adequate Protection Superpriority Claim(s) (as defined in the Final DIP Order) solely to the extent of, and in an aggregate amount equal to, any "Diminution in Value" of their perspective Prepetition Collateral (as defined in the Final DIP Order); and, *provided, further*, that, the rights of any party to contest the validity and the amount of any asserted Prepetition Term Loan Adequate Protection Superpriority Claim are expressly preserved. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the provisions of the DIP Loan Documents that expressly survive termination or payment of the DIP Facility Obligations in full shall continue in full force and effect after the Effective Date in accordance with the terms thereof.

Pursuant to the Plan Settlement Agreement, all fees and expenses of professionals retained by the Prepetition Term Loan Lenders, CPE, WAX, MAO, ReGen, Mr. Landau, and Mr. Gefner, whether incurred before, on, or after the date of entry of the Plan Settlement Agreement, in connection with the Chapter 11 Cases or the Plan Settlement Agreement and not previously paid, shall be paid in full in Cash as DIP Facility Obligations and superpriority Administrative Expense Claims of the Debtors prior to or on the Plan Settlement Effective Date, without any requirement to File a fee application with the Bankruptcy Court or for the Bankruptcy Court's review or

approval. Neither the Debtors nor the Creditors' Committee shall object to the allowance of payment of such fees. Notwithstanding the foregoing, none of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, and the Liquidation Trust shall have any liability with respect to, or be obligated to pay or otherwise satisfy, any such fees and expenses incurred in excess of the aggregate amount of Eleven Million Dollars ($11,000,000.00).

## E. Professional Fee Claims

### 1. Final Fee Applications and Payment of Professional Fee Claims

Final Fee Applications shall be Filed by each Professional (other than OCPs, which are not required to submit Final Fee Applications) no later than the Professional Fee Claim Bar Date. Objections, if any, to the Final Fee Applications must be Filed and served on the Post-Restructuring Debtors and their counsel, the Wind-Down Trustee and its counsel (if applicable), the requesting Professional, and the U.S. Trustee no later than the Professional Fee Claim Objection Deadline. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Orders of the Bankruptcy Court; *provided, however*, that, if no objections are filed to a Final Fee Application by the Professional Fee Claim Objection Deadline, the Bankruptcy Court may enter an Order Allowing and approving the payment of such Professional Fee Claims without further notice and a hearing. Pursuant to the Plan Settlement Agreement, none of the Plan Settling Parties shall object to the allowance or payment of the Professional Fee Claims asserted by the Professionals retained by the Debtors or the Creditors' Committee.

### 2. Professional Fee Escrow Account

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall fund the Professional Fee Escrow Account with Cash (which shall be paid from the Sale Proceeds following the consummation of the Sale Transaction and Cash on hand following the consummation of the Restructuring Transaction) equal to the Professional Fee Estimate, which estimates shall be provided to the Debtors at least five (5) calendar days prior to the Effective Date.

The Debtors or the Post-Restructuring Debtors, as applicable, shall escrow such estimated amounts in the Professional Fee Escrow Account (less any retainers), which shall be held in trust for the benefit of the Holders of the Professional Fee Claims until the Final Fee Applications related thereto are resolved by Final Order or agreement of the parties and for no other parties until all Allowed Professional Fee Claims have been paid in full. Funds held in the Professional Fee Escrow Account shall not be deemed to be property of the Estates or property of the Liquidation Trust or the Wind-Down Trust and shall transfer to the Liquidation Trust as Liquidation Trust Assets only after all Allowed Professional Fee Claims have been irrevocably paid in full.

Professional Fee Claims shall be paid in full in Cash by the Post-Restructuring Debtors or the Wind-Down Trustee, as applicable, from the Professional Fee Escrow Account in such amounts as are Allowed by the Bankruptcy Court (a) on or as soon as reasonably practicable after the date upon which a Final Order relating to any such Allowed Professional Fee Claim is entered,

(b) on such other terms as may be mutually agreed upon between the Holder of such an Allowed Professional Fee Claim and the Post-Restructuring Debtors or the Wind-Down Trustee, as applicable, or (c) in accordance with any Order of the Bankruptcy Court. The obligations of the Debtors, the Post-Restructuring Debtors, and the Wind-Down Trustee, as applicable, with respect to Professional Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Professional Fee Escrow Account. To the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Allowed Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Article II.A hereof. No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account in any way, other than the customary Liens in favor of the depository bank at which the Professional Fee Escrow Account is maintained. When such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall be promptly transferred to the Liquidation Trust without any further action or order of the Bankruptcy Court and, under no circumstances, shall such remaining amount be included in the "Purchased Assets" (as defined in the APA).

The Post-Restructuring Debtors and the Wind-Down Trustee, as applicable, shall be authorized and directed to act or refrain from acting on the representations of the Professionals with respect to any payments made from the Professional Fee Escrow Account, which are consistent with the Debtors' Books and Records and shall not be held liable for acting or refraining to act pursuant to any such representations.

### 3. Post-Effective Date Fees and Expenses

The Professionals employed by the Debtors, the Creditors' Committee, the PCOs, the Special Investigation Committee, and the Special Restructuring Committee shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for the preparation, filing, and prosecution of Final Fee Applications, which shall be included in the Professional Fee Estimate provided by each Professional prior to the Effective Date. Any time or expenses incurred in the preparation, filing, and prosecution of Final Fee Applications shall be disclosed by each Professional in its Final Fee Application, shall be subject to approval of the Bankruptcy Court, and, if approved, shall be paid out of the Professional Fee Escrow Account. Any Professionals' request for reasonable compensation and reimbursement of actual, necessary expenses incurred in connection with the prosecution of a Final Fee Application shall be subject to the U.S. Supreme Court's holding in *Baker Botts L.L.P. v. Asarco LLC*, 576 U.S. 121 (2015) and all applicable related case law, without prejudice to any parties' right to argue that such decision is or is not applicable to any such request. Notwithstanding the foregoing, the Professionals of the Creditors' Committee shall be entitled to be compensated from the Professional Fee Escrow Account or the Liquidation Trust Assets, as applicable, for reasonable fees and expenses incurred in connection with services provided post-Effective Date, as set forth in Article XI.F hereof.

Upon the Effective Date, any requirement that Professionals comply with Bankruptcy Code sections 327 through 331, 363, and 1103 in seeking retention or compensation for services rendered after such date shall terminate, and, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee (as applicable) may employ and pay any Professional for services rendered or expenses incurred after the Effective Date in the ordinary course of business without any further notice to, or action, Order, or approval of, the Bankruptcy

Court; *provided, however*, that any contingency fee or litigation financing arrangements will remain subject to Bankruptcy Court approval, and, to the extent agreed upon by the Creditors' Committee, will be provided for in the Liquidation Trust Agreement.

## F. Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim shall be entitled to receive Distributions in an amount equal to the full amount of such Allowed Priority Tax Claim. On, or as soon thereafter as is reasonably practicable, the latest to occur of (i) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (ii) the first Business Day that is thirty (30) days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course, except to the extent that (a) a Holder of an Allowed Priority Tax Claim, and (b)(i) the Debtors, the Post-Restructuring Debtors, or the Liquidation Trustee, as applicable, or (b)(ii) to the extent related to an Allowed Priority Tax Claim assumed by the Buyer pursuant to the Sale Transaction Documents, the Buyer, agree to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall be entitled to receive, in full satisfaction, settlement, discharge, and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of (a) the Debtors, the Post-Restructuring Debtors, or the Liquidation Trustee, as applicable, or (b) to the extent related to an Allowed Priority Tax Claim assumed by the Buyer pursuant to the Sale Transaction Documents, the Buyer: (i) Cash equal to the amount of such Allowed Priority Tax Claim; (ii) such other less favorable treatment as to which (a)(i) the Debtors, the Post-Restructuring Debtors, or the Liquidation Trustee, as applicable, or (a)(ii) to the extent related to an Allowed Priority Tax Claim assumed by the Buyer pursuant to the Sale Transaction Documents, the Buyer, and (b) the Holder of such Allowed Priority Tax Claim shall have agreed upon in writing; (iii) such other treatment such that it will not be Impaired pursuant to Bankruptcy Code section 1124; or (iv) pursuant to and in accordance with Bankruptcy Code sections 1129(a)(9)(C) and 1129(a)(9)(D), Cash in equal quarterly installments, commencing on the first (1st) Business Day following the Effective Date and ending on the fifth (5th) anniversary of the Petition Date, plus simple interest at the rate required by applicable non-bankruptcy law on any outstanding balance from the Effective Date, or such lesser rate as is agreed to in writing by a particular taxing authority and (a) the Debtors, the Post-Restructuring Debtors, or the Liquidation Trustee, as applicable, or (b) to the extent related to an Allowed Priority Tax Claim assumed by the Buyer pursuant to the Sale Transaction Documents, the Buyer; *provided, however*, that Priority Tax Claims incurred by any Debtor in the ordinary course of business may be paid in the ordinary course of business by such Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. Any installment payments to be made pursuant to clause (iv) above shall be made in equal quarterly Cash payments beginning on the first (1st) Business Day following the Effective Date and continuing on each subsequent Distribution Date thereafter until payment in full of the applicable Allowed Priority Tax Claim. For the avoidance of doubt, Allowed Priority Tax Claims shall be reconciled and paid by the Liquidation Trustee from the Liquidation Trust Assets, unless otherwise provided for herein, following consummation of the Sale Transaction or a Restructuring Transaction.

Notwithstanding the foregoing, any Priority Tax Claim that is expressly assumed or agreed to be paid by the Buyer pursuant to the Sale Transaction Documents, including the Assumed Priority Tax Claims, shall not be an obligation of the Debtors, the Post-Restructuring Debtors, the

Wind-Down Trust, or the Liquidation Trust following consummation of the Sale Transaction and shall be satisfied by the Buyer or its respective designee in accordance with the Sale Transaction Documents.

The Priority Tax Claims Savings Amount shall be paid by the Buyer to the Liquidation Trust in accordance with the Sale Transaction Documents in the event the amount of Assumed Priority Tax Claims is determined by the Bankruptcy Court in one or more Final Orders to be less than Twenty-Eight Million Dollars ($28,000,000.00). For the avoidance of doubt, the Priority Tax Claims Savings Amount is applicable only following consummation of the Sale Transaction and shall not be paid by the Buyer if the APA is terminated.

Following consummation of the Sale Transaction, pursuant to the APA, the Debtors or the Liquidation Trustee, as applicable, shall use their reasonable best efforts to have all such Assumed Priority Tax Claims treated as General Unsecured Claims, using counsel chosen by the Buyer. Notwithstanding the foregoing, the Buyer shall have independent standing and authority to participate in the prosecution, litigation, compromise, and settlement of any dispute regarding any Priority Tax Claim, IRS Secured Claim, or any other obligation assumed under the Sale Transaction Documents, and no such dispute shall be settled without the Buyer's prior written consent (which consent shall not be unreasonably withheld, conditioned, or delayed).

Notwithstanding anything to the contrary herein, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss shall be treated as a Penalty Claim and the Holder (other than as the Holder of a Penalty Claim) may not assess or attempt to collect such penalty from the Debtors or their respective property.

## G. Priority Non-Tax Claims

On, or as soon as is reasonably practicable following the latest to occur of (i) the Effective Date, (ii) the date such Priority Non-Tax Claim becomes an Allowed Claim, and (iii) the date for payment provided by any agreement or arrangement between the Debtors, the Post-Restructuring Debtors, or the Liquidation Trustee, as applicable, and the Holder of such Allowed Priority Non-Tax Claim, except to the extent such Holder and the Debtors, the Post-Restructuring Debtors, or the Liquidation Trustee, as applicable, agree to less favorable or alternative treatment in writing, and only to the extent that such Allowed Priority Non-Tax Claim has not been paid in full prior to the Effective Date, each Holder of an Allowed Priority Non-Tax Claim shall be entitled to receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Non-Tax Claim, at the option of (a) the Debtors, the Post-Restructuring Debtors, or the Liquidation Trustee, as applicable, or (b) to the extent related to an Allowed Priority Non-Tax Claim assumed by the Buyer pursuant to the Sale Transaction Documents, the Buyer: (i) payment in full in Cash; or (ii) such other treatment rendering its Allowed Priority Non-Tax Claim Unimpaired in accordance with Bankruptcy Code section 1129(a)(9)(C). For the avoidance of doubt, to the extent funded by the Debtors on the Effective Date, Allowed Priority Non-Tax Claims shall be reconciled and paid by the Liquidation Trustee from the Liquidation Trust Assets, unless otherwise provided for herein, following consummation of the Sale Transaction or a Restructuring Transaction.

Notwithstanding the foregoing, in accordance with the Sale Transaction Documents, liabilities for self-insured medical Claims and payroll obligations incurred in the ordinary course of business that are unpaid as of the Closing Date, but not payable until after the Closing Date, excluding personal injury or general liability Claims, shall be assumed by the Buyer or its respective designee in an amount not to exceed Ninety-One Million Dollars ($91,000,000.00) and such amount shall not be an obligation of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust if the Sale Transaction is consummated.

# ARTICLE III.
# CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

## A. Summary of Classification of Claims and Interests

Pursuant to Bankruptcy Code sections 1122 and 1123(a)(1), all Claims against and Interests in the Debtors (except for Claims addressed in Article II hereof) are classified for the purposes of voting and Distribution pursuant to the Plan, as set forth herein. A Claim or an Interest shall be deemed classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class.

A Claim or an Interest is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date. Except as otherwise specifically provided for herein, the Confirmation Order, or any other Order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed one hundred percent (100%) of the underlying Allowed Claim.

Bankruptcy Code section 1129(a)(10) shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims; *provided*, *however*, that, in the event no Holder of a Claim with respect to a specific Class timely submits a Ballot in compliance with the deadline established by the Bankruptcy Court indicating acceptance or rejection of the Plan, such Class will be deemed to have rejected the Plan. The Debtors may seek Confirmation of the Plan pursuant to Bankruptcy Code section 1129(b) with respect to any rejecting Class of Claims or Interests.

All Claims and Interests (other than Administrative Expense Claims, Administrative PL/GL Claims, DIP Claims, Priority Tax Claims, Priority Non-Tax Claims, and Professional Fee Claims) are placed in the following Classes for all purposes, including, without limitation, for voting, Confirmation, and Distribution pursuant to the Plan and Bankruptcy Code sections 1122 and 1123(a)(1):

| Class | Claim / Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Prepetition ABL Claims | Impaired | ***Entitled to Vote*** |
| 2 | Rochester Manor HUD Note Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | IRS Secured Claims | Impaired | ***Entitled to Vote*** |
| 4 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 5-A | Prepetition Welltower & Omega Term Loan Claims | Impaired | ***Entitled to Vote*** |
| 5-B | Prepetition WAX & MAO Term Loan Claims | Impaired | ***Entitled to Vote*** |
| 6-A | General Unsecured Claims (GUC Distribution Group 1) | Impaired | ***Entitled to Vote*** |
| 6-B | General Unsecured Claims (GUC Distribution Group 2) | Impaired | ***Entitled to Vote*** |
| 6-C | General Unsecured Claims (GUC Distribution Group 3) | Impaired | ***Entitled to Vote*** |
| 6-D | General Unsecured Claims (GUC Distribution Group 4) | Impaired | ***Entitled to Vote*** |
| 7 | WAX & MAO Unsecured Note Claims | Impaired | ***Entitled to Vote*** |
| 8 | Convenience Claims | Impaired | ***Entitled to Vote*** |
| 9 | Subordinated Claims | Impaired | Not Entitled to Vote (Deemed Not to Accept) |
| 10-A | Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed Not to Accept) |
| 10-B | Non-Debtor Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed Not to Accept) |
| 11 | Existing Common Equity Interests | Impaired | Not Entitled to Vote (Deemed Not to Accept) |
| 12 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept or Deemed Not to Accept) |

## B. Treatment of Claims and Interests

### 1. Class 1: Prepetition ABL Claims

(a) Classification: Class 1 consists of all Prepetition ABL Claims.

(b) Allowance: On the earlier to occur of (i) the Closing Date or (ii) the Effective Date, as applicable, the Prepetition ABL Claims shall be deemed Allowed in the aggregate amount of $268.8 million.[5]

(c) Treatment:

i. ***If the Sale Transaction is Consummated***: On the Closing Date, pursuant to the terms of the Sale Transaction Documents, the Allowed Prepetition ABL Claim (exclusive of any interest accrued at the default rate) shall, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Prepetition ABL Claim, be assumed or otherwise satisfied in full by the Buyer upon such assumption and/or satisfaction. Following such assumption and/or satisfaction, all Allowed Prepetition ABL Claims shall be deemed satisfied in full under the Plan, shall not be an obligation of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, and the Holder(s) thereof shall not be entitled to any Distributions on account of such Claims pursuant to the Plan.

ii. ***If the Restructuring Transaction is Consummated***: On, or as soon as reasonably practicable after, the Effective Date, the Prepetition ABL Agent, on behalf of each Holder of an Allowed Prepetition ABL Claim, shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, one of the following from the Post-Restructuring Debtors: (a) Reinstatement of such Claim (exclusive of any interest accrued at the default rate) or (b) payment in full in Cash (exclusive of any interest accrued at the default rate) of such Claim.

(d) Voting: Class 1 is Impaired, and therefore, the Holder of the Prepetition ABL Claim in Class 1 is entitled to vote to accept or reject the Plan.

**2. Class 2: Rochester Manor HUD Note Claim**

(a) Classification: Class 2 consists of the Rochester Manor HUD Note Claim.

(b) Treatment:

i. ***If the Sale Transaction is Consummated***: On the Closing Date, pursuant to the terms of the Sale Transaction Documents, the

---

[5] The foregoing amount reflects the estimated dollar amount of Prepetition ABL Claims as of the Closing Date of the Sale Transaction and remains subject to further adjustment, including, without limitation, adjustment for indemnification obligations for any successful New Operator Claims (as defined in the Disclosure Statement). The Debtors, the Creditors' Committee, and the Prepetition ABL Secured Parties reserve all rights with respect to New Operator Claims and indemnification obligations arising therefrom.

Allowed Rochester Manor HUD Note Claim shall, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Rochester Manor HUD Note Claim, be assumed or otherwise satisfied in full by the Buyer. Accordingly, following such assumption, the Allowed Rochester Manor HUD Note Claim shall be deemed satisfied in full under the Plan, shall not be an obligation of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, and the Holder thereof shall not be entitled to any Distributions on account of such Claims pursuant to the Plan.

ii. ***If the Restructuring Transaction is Consummated***: On, or as soon as reasonably practicable after, the Effective Date, the Holder of the Allowed Rochester Manor HUD Note Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Claim, one of the following from the Post-Restructuring Debtors: (a) Reinstatement of such Claim, (b) payment in full in Cash of such Claim, or (c) such other treatment rendering such Claim Unimpaired.

(c) Voting: Class 2 is Unimpaired, and the Holder of the Rochester Manor HUD Note Claim is conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Therefore, the Holder of the Rochester Manor HUD Note Claim in Class 2 is not entitled to vote to accept or reject the Plan.

**3. Class 3: IRS Secured Claims**

(a) Classification: Class 3 consists of all IRS Secured Claims.

(b) Allowance: On the earlier to occur of (i) the Closing Date or (ii) the Effective Date, as applicable, the IRS Secured Claims shall be deemed Allowed in an amount to be determined by the Bankruptcy Court.

(c) Treatment:

i. ***If the Sale Transaction is Consummated***: Unless otherwise agreed between the Holder of the IRS Secured Claims and the Buyer, the Holder of the Allowed IRS Secured Claims shall receive in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed IRS Secured Claim, payment in full in Cash by the Buyer in equal annual installments over a period ending not more than seven (7) years after such IRS Secured Claims become Allowed; *provided* that, pursuant to the Sale Transaction Documents, Buyer shall only be obligated to pay Allowed IRS Secured Claims in an aggregate amount not to exceed $90,000,000.00, and any amount over that cap shall be satisfied by

the Debtors or the Liquidation Trust, as applicable. For the avoidance of doubt, any IRS Secured Claims assumed or otherwise satisfied by the Buyer pursuant to the Sale Transaction Documents shall not be an obligation of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, and the Holder thereof shall not be entitled to any Distributions on account of such Claims pursuant to the Plan.

ii. ***If the Restructuring Transaction is Consummated***: Unless otherwise agreed between the Holder of the IRS Secured Claims and the Debtors, the Holder of the Allowed IRS Secured Claims shall receive in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed IRS Secured Claim, payment in full in Cash by the Post-Restructuring Debtors in equal quarterly installments over a period ending not more than five (5) years after the Petition Date.

(d) Voting: Class 3 is Impaired, and therefore, the Holder of the IRS Secured Claims in Class 3 is entitled to vote to accept or reject the Plan.

**4. Class 4: Other Secured Claims**

(a) Classification: Class 4 consists of all Other Secured Claims.

(b) Treatment: Following consummation of either the Sale Transaction or the Restructuring Transaction, on or as soon as reasonably practicable after, the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, one of the following Distributions, in the discretion of the Liquidation Trust or the Post-Restructuring Debtors, as applicable: (a) the payment of such Holder's Allowed Other Secured Claim in full in Cash; (b) the sale or disposition proceeds of the property securing any Allowed Other Secured Claim to the extent of the value of their respective interests in such property; (c) the surrender to the Holder or Holders of any Allowed Other Secured Claim of the property securing such Claim; or (d) such other Distributions as shall be necessary to satisfy the requirements of chapter 11 of the Bankruptcy Code. For the avoidance of doubt, any Other Secured Claims assumed or otherwise satisfied by the Buyer following consummation of the Sale Transaction pursuant to the Sale Order or the Sale Transaction Documents shall be deemed satisfied in full, shall not be an obligation of the Debtors, the Post-Restructuring Debtors, or the Wind-Down Trust, or the Liquidation Trust, and the Holder of such Other Secured Claim shall not be entitled to, and shall not receive, any Distributions pursuant to the Plan on account thereof.

(c) Voting: Class 4 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f). Therefore, Holders of Other Secured Claims in Class 4 are not entitled to vote to accept or reject the Plan.

**5. Class 5-A: Prepetition Welltower & Omega Term Loan Claims**

(a) Classification: Class 5-A consists of all Prepetition Welltower & Omega Term Loan Claims.

(b) Allowance: Pursuant to the Plan Settlement Agreement, the Prepetition Welltower & Omega Term Loan Claims shall be Allowed as valid, binding, perfected, and non-avoidable Secured Claims, not subject to any offset, defense, counterclaim, avoidance, reduction, recoupment, subordination, recharacterization, or disallowance, in the principal amount of $233.19 million, plus applicable amounts accruing thereafter calculated in accordance with the Prepetition Term Loan Documents or under the Final DIP Order, as applicable, whether arising before or after the Petition Date, in each case without any application to, or further order of, the Bankruptcy Court, through the date of payment and including principal, accrued interest (at the base rate plus one percent (1%)), fees (including professional fees), and expenses (both the fees and expenses subject to the limitations in Article II.D hereof).

(c) Treatment:

i. ***If the Sale Transaction is Consummated***: On or after the Plan Settlement Effective Date, but in no event later than the Effective Date, the Prepetition Term Loan Agent, on behalf of each Holder of an Allowed Prepetition Welltower & Omega Term Loan Claim, shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Prepetition Welltower & Omega Term Loan Claim, payment in Cash by the Debtors from either the Sale Proceeds or remaining Cash on hand. From the Closing Date until payment of the Allowed Prepetition Welltower & Omega Term Loan Claims in full in Cash, the Sale Proceeds shall be held in a segregated account subject to the existing Liens of the Holders of the Prepetition Welltower & Omega Term Loan Claims and the Debtors shall not use, transfer, or encumber such Sale Proceeds other than (a) to pay the DIP Claims, Allowed Professional Fee Claims, or Allowed Prepetition Welltower & Omega Term Loan Claims, or (b) pursuant to the Plan Settlement Approval Order. For the avoidance of doubt, no payment made to the Prepetition Term Loan Agent on behalf of the Holders of the Prepetition Welltower & Omega Term Loan Claims shall be subject to avoidance or disgorgement on any ground.

ii. ***If the Restructuring Transaction is Consummated***: On the Effective Date, except to the extent such Holder and the Debtors (subject to the Creditors' Committee Consent Rights) or the Liquidation Trustee, as applicable, agree to alternative treatment in writing, the Prepetition Term Loan Agent, on behalf of each Holder of an Allowed Prepetition Welltower & Omega Term Loan Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Prepetition Welltower & Omega Term Loan Claim (exclusive of interest accrued at the default rate), shall (i) retain its Liens on all Assets of the Post-Restructuring Debtors (other than (a) Avoidance Actions, (b) all Causes of Action except for Causes of Action to collect accounts receivable or accounts, and (c) the proceeds of each of the foregoing), and (ii) receive payments in Cash pursuant to the terms of the Post-Restructuring Term Loan Promissory Note, which note shall be issued and delivered to the Prepetition Term Loan Agent by the Post-Restructuring Debtors on the Effective Date, until such Claims are paid in full; *provided, however*, that no Liens shall attach to the Liquidation Trust Assets other than Causes of Action to collect accounts receivable or accounts and the proceeds thereof. In the event that any portion of such Prepetition Welltower & Omega Term Loan Claim is ultimately found and determined by a Final Order of the Bankruptcy Court to be disallowed, subordinated, or unsecured pursuant to the Creditors' Committee Secured Claim Objection, then the amount owed by the Post-Restructuring Debtors to the Holders of Prepetition Welltower & Omega Term Loan Claims pursuant to the Post-Restructuring Term Loan Promissory Note shall be reduced accordingly and any amount of Cash or other form of Distributions to be made hereunder or pursuant to the Post-Restructuring Term Loan Promissory Note shall be repaid in Cash to the Liquidation Trust by the Prepetition Term Loan Agent on behalf of the applicable Holder of such Prepetition Welltower & Omega Term Loan Claim within five (5) Business Days of entry of such Final Order.

(d) Voting: Class 5-A is Impaired, and therefore, the Prepetition Term Loan Agent, on behalf of the Holders of Prepetition Welltower & Omega Term Loan Claims in Class 5-A, is entitled to vote to accept or reject the Plan.

**6. Class 5-B: Prepetition WAX & MAO Term Loan Claims**

(a) Classification: Class 5-B consists of all Prepetition WAX & MAO Term Loan Claims, which constitute Disputed Claims.

(b) Treatment:

i. ***If the Sale Transaction is Consummated***: On the Plan Settlement Effective Date, the Prepetition WAX & MAO Term Loan Claims shall be deemed cancelled, extinguished, and released, and each Holder of a Prepetition WAX & MAO Term Loan Claim shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Prepetition WAX & MAO Term Loan Claim. For the avoidance of doubt, none of the Debtors, their Estates, nor any successor in interest with respect thereto, the Wind-Down Trust, or the Liquidation Trust, shall make any Distributions on account of the Prepetition WAX & MAO Term Loan Claims.

ii. ***If the Restructuring Transaction is Consummated***: To the extent that the Prepetition WAX & MAO Term Loan Claims are avoided, Disallowed, or subordinated following adjudication of the WAX/MAO Complaint, the Holders of Prepetition WAX & MAO Term Loan Claims shall not be entitled to Distributions under the Plan and the amount of the Post-Restructuring Term Loan Promissory Note shall be reduced on a dollar-for-dollar basis as a result thereof. In the event that the Prepetition WAX & MAO Term Loan Claims become Allowed Secured Claim(s) pursuant to a Final Order, the Prepetition Term Loan Agent, on behalf of such Holder(s), shall, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Prepetition WAX & MAO Term Loan Claim, (i) retain its Liens on all of the Assets of the Post-Restructuring Debtors (other than (a) Avoidance Actions, (b) all Causes of Action except for Causes of Action to collect accounts receivable or accounts, and (c) the proceeds of each of the foregoing), and (ii) receive payments in Cash pursuant to the terms of the Post-Restructuring Term Loan Promissory Note (the amount of which shall be increased accordingly) until such Claims have been satisfied in full; *provided, however*, that no Liens shall attach to the Liquidation Trust Assets, other than Causes of Action to collect accounts receivable or accounts and the proceeds thereof. In the event that the Prepetition WAX & MAO Term Loan Claims become, in whole or in part, an Allowed General Unsecured Claim pursuant to a Final Order, the Prepetition Term Loan Agent, on behalf of such Holder(s), shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Prepetition WAX & MAO Term Loan Claims, Distributions from the Liquidation Trust in Class 6-A, Class 6-B, Class 6-C, and/or Class 6-D, as applicable, in an aggregate amount equal to such Holder's Pro Rata Share of (i) the GUC Distribution Assets and the GUC Distribution Interests attributable to the applicable GUC Distribution Group in Class 6-A, Class 6-B, Class 6-C, and/or Class 6-D, as applicable, and (ii) such amounts of Cash as may be allocated to a Holder of an Allowed General Unsecured

Claim in such GUC Distribution Group pursuant to the GUC Distribution Model.

(c) Voting: Class 5-B is Impaired, and therefore, the Prepetition Term Loan Agent, on behalf of the Holders of Prepetition WAX & MAO Term Loan Claims in Class 5-B, is entitled to vote to accept or reject the Plan; *provided, however*, that, because the Prepetition WAX & MAO Term Loan Claims in Class 5-B constitute Disputed Claims pursuant to the WAX/MAO Complaint unless otherwise determined by the Bankruptcy Court pursuant to a Final Order, the Prepetition Term Loan Agent shall be entitled to cast a provisional ballot with respect to the Plan in the amount of $1.00 with respect to Holders of Prepetition WAX & MAO Term Loan Claims.

**7. Class 6-A: General Unsecured Claims (GUC Distribution Group 1)**

(a) Classification: Class 6-A consists of all General Unsecured Claims against the OpCo Facility Debtors in GUC Distribution Group 1.

(b) Treatment: Following consummation of either the Sale Transaction or the Restructuring Transaction, commencing on the Effective Date, each Holder of an Allowed General Unsecured Claim in GUC Distribution Group 1 shall be entitled to receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim in GUC Distribution Group 1, Distributions from the Liquidation Trust in an aggregate amount equal to such Holder's Pro Rata Share of (i) the GUC Distribution Assets and the GUC Distribution Interests attributable to such GUC Distribution Group and (ii) such amounts of Cash as may be allocated to a Holder of an Allowed General Unsecured Claim in such GUC Distribution Group; *provided, however*, that such Distributions shall be made subject to the GUC Distribution Model. For the avoidance of doubt, any General Unsecured Claim in GUC Distribution Group 1 assumed or otherwise satisfied by the Buyer following consummation of the Sale Transaction pursuant to terms and provisions of the Sale Order or the Sale Transaction Documents shall be deemed satisfied in full under the Plan, shall not be an obligation of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, and shall not be entitled to any Distributions under the Plan on account thereof.

(c) Voting: Class 6-A is Impaired and therefore, Holders of General Unsecured Claims against the OpCo Facility Debtors in Class 6-A (GUC Distribution Group 1) are entitled to vote to accept or reject the Plan.

**8. Class 6-B: General Unsecured Claims (GUC Distribution Group 2)**

(a) Classification: Class 6-B consists of all General Unsecured Claims against the Ancillary Business & JV Debtors in GUC Distribution Group 2.

(b) Treatment: Following consummation of either the Sale Transaction or the Restructuring Transaction, commencing on the Effective Date, each Holder of an Allowed General Unsecured Claim in GUC Distribution Group 2 shall be entitled to receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim in GUC Distribution Group 2, Distributions from the Liquidation Trust in an aggregate amount equal to such Holder's Pro Rata Share of (i) the GUC Distribution Assets and the GUC Distribution Interests attributable to such GUC Distribution Group and (ii) such amounts of Cash as may be allocated to a Holder of an Allowed General Unsecured Claim in such GUC Distribution Group; *provided, however*, that such Distributions shall be made subject to the GUC Distribution Model. For the avoidance of doubt, any General Unsecured Claim in GUC Distribution Group 2 assumed or otherwise satisfied by the Buyer following consummation of the Sale Transaction pursuant to terms and provisions of the Sale Order or the Sale Transaction Documents shall be deemed satisfied in full under the Plan, shall not be an obligation of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, and shall not be entitled to any Distributions under the Plan on account thereof.

(c) Voting: Class 6-B is Impaired and therefore, Holders of General Unsecured Claims against the Ancillary Business & JV Debtors in Class 6-B (GUC Distribution Group 2) are entitled to vote to accept or reject the Plan.

**9. Class 6-C: General Unsecured Claims (HoldCo Non-Facility Debtors)**

(a) Classification: Class 6-C consists of all General Unsecured Claims against the HoldCo Non-Facility Debtors in GUC Distribution Group 3.

(b) Treatment: Following consummation of either the Sale Transaction or the Restructuring Transaction, commencing on the Effective Date, each Holder of an Allowed General Unsecured Claim in GUC Distribution Group 3 shall be entitled to receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim in GUC Distribution Group 3, Distributions from the Liquidation Trust in an aggregate amount equal to such Holder's Pro Rata Share of (i) the GUC Distribution Assets and the GUC Distribution Interests attributable to such GUC Distribution Group and (ii) such amounts of Cash as may be allocated to a Holder of an Allowed General Unsecured Claim in such GUC Distribution Group; *provided, however*, that such Distributions shall be made subject to the GUC Distribution Model. For the avoidance of doubt, any General Unsecured Claim in GUC Distribution Group 3 assumed or otherwise satisfied by the Buyer following consummation of the Sale Transaction pursuant to terms and provisions of the Sale Order or the Sale Transaction Documents shall be deemed satisfied in full under the Plan, shall not be an obligation of the Debtors, the Post-Restructuring Debtors,

the Wind-Down Trust, or the Liquidation Trust, and shall not be entitled to any Distributions under the Plan on account thereof.

(c) Voting: Class 6-C is Impaired and therefore, Holders of General Unsecured Claims against the HoldCo Non-Facility Debtors in Class 6-C (GUC Distribution Group 3) are entitled to vote to accept or reject the Plan.

**10. Class 6-D: General Unsecured Claims (GUC Distribution Group 4)**

(a) Classification: Class 6-D consists of all General Unsecured Claims against the DivestCo Debtors in GUC Distribution Group 4.

(b) Treatment: Following consummation of either the Sale Transaction or the Restructuring Transaction, commencing on the Effective Date, each Holder of an Allowed General Unsecured Claim in GUC Distribution Group 4 shall be entitled to receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed General Unsecured Claim in GUC Distribution Group 4, Distributions from the Liquidation Trust in an aggregate amount equal to such Holder's Pro Rata Share of (i) the GUC Distribution Assets and the GUC Distribution Interests attributable to such GUC Distribution Group and (ii) such amounts of Cash as may be allocated to a Holder of an Allowed General Unsecured Claim in such GUC Distribution Group; *provided, however*, that such Distributions shall be made subject to the GUC Distribution Model. For the avoidance of doubt, any General Unsecured Claim in GUC Distribution Group 4 assumed or otherwise satisfied by the Buyer following Consummation of the Sale Transaction pursuant to terms and provisions of the Sale Order or the Sale Transaction Documents shall be deemed satisfied in full under the Plan, shall not be an obligation of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, and shall not be entitled to any Distributions under the Plan on account thereof.

(c) Voting: Class 6-D is Impaired and therefore, Holders of General Unsecured Claims against the DivestCo Debtors in Class 6-D are entitled to vote to accept or reject the Plan.

**11. Class 7: WAX & MAO Unsecured Note Claims**

(a) Classification: Class 7 consists of all WAX & MAO Unsecured Note Claims, which constitute Disputed Claims.

(b) Treatment:

i. ***If the Sale Transaction is Consummated***: On the Plan Settlement Effective Date, the WAX & MAO Unsecured Note Claims shall be deemed cancelled, extinguished, and released, and each Holder of a WAX & MAO Unsecured Note Claim shall not be entitled to, and

shall not receive or retain, any property or interest in property on account of such WAX & MAO Unsecured Note Claim. For the avoidance of doubt, none of the Debtors, their Estates, nor any successor in interest with respect thereto, the Wind-Down Trust, or the Liquidation Trust, shall make any Distributions on account of the WAX & MAO Unsecured Note Claims.

ii. ***If the Restructuring Transaction is Consummated***: In the event that the WAX & MAO Unsecured Note Claims are avoided, Disallowed, or subordinated, the Holders of the WAX & MAO Unsecured Note Claims shall not be entitled to Distributions pursuant to the Plan. Following consummation of either the Sale Transaction or the Restructuring Transaction, commencing on the Effective Date, unless otherwise determined by a Final Order of the Bankruptcy Court in connection with the adjudication of the WAX/MAO Complaint, each Holder of an Allowed WAX & MAO Unsecured Note Claim shall be entitled to receive, on account of such Allowed WAX & MAO Unsecured Note Claim, Distributions in an aggregate amount equal to such Holder's Pro Rata Share of (i) the GUC Distribution Assets and the GUC Distribution Interests attributable to Holders of Allowed General Unsecured Claims in Class 6-C (GUC Distribution Group 3) and (ii) such amounts of Cash as may be allocated to a Holder of an Allowed WAX & MAO Unsecured Note Claim in GUC Distribution Group 3; *provided, however*, that such Distributions shall be made subject to the GUC Distribution Model.

(c) Voting: Class 7 is Impaired, and therefore, the Holders of WAX & MAO Unsecured Note Claims in Class 7, is entitled to vote to accept or reject the Plan; *provided, however*, that, because WAX & MAO Unsecured Note Claims constitute Disputed Claims pursuant to the WAX/MAO Complaint unless otherwise determined by the Bankruptcy Court pursuant to a Final Order, the Holders of WAX & MAO Unsecured Note Claims in Class 7 shall be entitled to cast a provisional ballot in the amount of $1.00.

**12. Class 8: Convenience Claims**

(a) Classification: Class 8 consists of all Convenience Claims.

(b) Treatment: Following consummation of either the Sale Transaction or the Restructuring Transaction, on or as soon as reasonably practicable after the Effective Date, any Holder of any Allowed General Unsecured Claim that is either (a) liquidated and equal to or less than Five Thousand Dollars ($5,000.00) or (b) unliquidated, with respect to which the Holder thereof voluntarily elects to receive (by making such election on the Ballot), in full satisfaction, settlement, discharge, and release of, and in exchange for, such Allowed General Unsecured Claim, payment in Cash from the Convenience

Claim Reserve in the amount of fifty percent (50%) of the amount asserted in such Allowed General Unsecured Claim; *provided, however,* that, in the event that Holders of Allowed General Unsecured Claims elect to have such Claims be treated as Convenience Claims such that Distributions with respect to the Allowed amount thereof exceeds the amount of the Convenience Claim Reserve, such Holder shall receive Holder's Pro Rata Share of the Convenience Claim Reserve; and, *provided, further*, that, if a Holder of an unliquidated General Unsecured Claim elects to be treated as a Convenience Claim by making such election on the Ballot, such unliquidated General Unsecured Claim shall be assigned an Allowed Convenience Claim in the amount of One Thousand Five Hundred Dollars ($1,500.00).

(c) Election: The election to be treated as a Convenience Claim must be made on the Ballot and be received by the Claims and Noticing Agent on or prior to the Voting Deadline. Any election made after the Voting Deadline shall not be binding upon the Debtors unless the Voting Deadline is expressly waived, in writing, by the Debtors; *provided, however*, that, under no circumstances may such waiver by the Debtors, in consultation with the Creditors' Committee, occur on or after the Effective Date.

(d) Voting: Class 8 is Impaired and, therefore, Holders of Convenience Claims in Class 8 are entitled to vote to accept or reject the Plan.

**13. Class 9: Subordinated Claims**

(a) Classification: Class 9 consists of all Subordinated Claims, including the ReGen Indebtedness Claim, the Prepetition WAX & MAO Term Loan Claims, and the WAX & MAO Unsecured Note Claims.

(b) Treatment: On the Effective Date, following consummation of either the Sale Transaction or the Restructuring Transaction, each Subordinated Claim shall be cancelled, released, and extinguished, and each Holder of a Subordinated Claim shall not be entitled to, and shall not receive or retain, any property or interest in property on account of such Subordinated Claim.

(c) Voting: Class 9 is Impaired. Holders of Subordinated Claims are conclusively deemed to have rejected the Plan under Bankruptcy Code section 1126(g). Therefore, Holders of Subordinated Claims in Class 9 are not entitled to vote to accept or reject the Plan.

**14. Class 10-A: Debtor Intercompany Claims**

(a) Classification: Class 10-A consists of all Debtor Intercompany Claims.

(b) Treatment: On, or as soon as reasonably practicable after, the Effective Date, following consummation of either the Sale Transaction or the

Restructuring Transaction (or, in the case of the ACO Entities, concurrently with the ACO Effective Date), each Debtor Intercompany Claim shall, at the option of the applicable Debtor(s) or the Liquidation Trustee, as applicable, be (i) Reinstated or (ii) extinguished, compromised, addressed, setoff, cancelled, or settled, potentially without any Distribution on account of such Debtor Intercompany Claim; *provided, however*, that, on the ACO Effective Date, each Debtor Intercompany Claim held against any ACO Entity shall be deemed released, extinguished, and cancelled without any Distribution on account thereof and without any further action by any Debtor, the Liquidation Trustee, the Wind-Down Trustee, or any other Person, and neither the Liquidation Trustee nor the Wind-Down Trustee shall have any right to Reinstate or assert any such Claim.

(c) Voting: Holders of Debtor Intercompany Claims are either (i) Unimpaired and such Holders are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f), or (ii) Impaired, and such Holders are conclusively deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g). Therefore, Holders of Allowed Debtor Intercompany Claims in Class 10-A are not entitled to vote to accept or reject the Plan.

**15. Class 10-B: Non-Debtor Intercompany Claims**

(a) Classification: Class 10-B consists of all Non-Debtor Intercompany Claims.

(b) Treatment: On, or as soon as reasonably practicable after, the Effective Date, following consummation of either the Sale Transaction or the Restructuring Transaction (or, in the case of the ACO Entities, concurrently with the ACO Effective Date), each Non-Debtor Intercompany Claim shall, at the option of the applicable Debtor(s) or the Liquidation Trustee, as applicable, be (i) Reinstated or (ii) extinguished, compromised, addressed, setoff, cancelled, or settled, potentially without any Distribution on account of such Non-Debtor Intercompany Claim; *provided, however*, that, on the ACO Effective Date, each Non-Debtor Intercompany Claim held against any ACO Entity shall be deemed released, extinguished, and cancelled without any Distribution on account thereof and without any further action by any Debtor, the Liquidation Trustee, the Wind-Down Trustee, or any other Person, and neither the Liquidation Trustee nor the Wind-Down Trustee shall have any right to Reinstate or assert any such Claim.

(c) Voting: Holders of Non-Debtor Intercompany Claims are either (i) Unimpaired and such Holders are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f), or (ii) Impaired, and such Holders are conclusively deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g). Therefore, Holders of Allowed Non-Debtor Intercompany Claims in Class 10-B are not entitled to vote to accept or reject the Plan.

16. **Class 11: Existing Common Equity Interests**

(a) Classification: Class 11 consists of all Existing Common Equity Interests.

(b) Treatment: On the Effective Date, following consummation of either the Sale Transaction or the Restructuring Transaction, Existing Common Equity Interests shall be deemed cancelled and extinguished, and Holders of Existing Common Equity Interests shall receive no recovery on account of such Interests.

(c) Voting: Class 11 is Impaired. Holders of Existing Common Equity Interests are conclusively deemed to have rejected the Plan under Bankruptcy Code section 1126(g). Therefore, Holders of Existing Common Equity Interests in Class 11 are not entitled to vote to accept or reject the Plan.

17. **Class 12: Intercompany Interests**

(a) Classification: Class 12 consists of all Intercompany Interests.

(b) Treatment: On, or as soon as reasonably practicable after, the Effective Date, following consummation of either the Sale Transaction or the Restructuring Transaction, and without the need for any further corporate or limited liability company action or approval of any board of directors, board of managers, member, manager, management, or security holders of any Debtor, at the option of the applicable Debtor(s) or the Liquidation Trustee, (x) all Intercompany Interests (other than the ACO Equity) shall be either (i) reinstated for administrative convenience only or (ii) extinguished, compromised, addressed, setoff, cancelled, or settled; and (y) the ACO Equity shall be cancelled, released, and extinguished on the ACO Effective Date, and the Reorganized ACO Equity shall be issued to the Buyer, in each case in accordance with Article IV.F hereof.

(c) Voting: Holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to Bankruptcy Code section 1126(f) or deemed to have rejected the Plan pursuant to Bankruptcy Code section 1126(g). Therefore, Holders of Allowed Intercompany Interests in Class 12 are not entitled to vote to accept or reject the Plan.

## C. Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, the Confirmation Order, any other Order of the Bankruptcy Court, or any document or agreement enforceable pursuant to the terms of the Plan, nothing shall affect the rights and defenses, both legal and equitable, of the Debtors and/or the Liquidation Trust with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to setoffs or recoupments against any such Unimpaired Claims.

## D. Special Provision Governing Claims Against and Interests in the ACO Entities

Notwithstanding anything to the contrary in this Article III or elsewhere in the Plan, following consummation of the Sale Transaction, from and after 12:01 a.m. (prevailing Central Time) on the ACO Effective Date: (a) each Allowed Claim against any ACO Entity that constitutes an ACO Excluded Liability, and is not an ACO Assumed Liability, shall be satisfied solely from the Liquidation Trust Assets or the applicable reserve(s) established under the Plan, in the amounts and in the manner set forth in this Article III for the applicable Class or category of Claim, and the Liquidation Trust shall be solely responsible for reconciling and satisfying such Claims (other than Professional Fee Claims, which shall be satisfied from the Professional Fee Escrow Account by the Wind-Down Trust); (b) no Holder of any such Claim against any ACO Entity constituting an ACO Excluded Liability or of any Interest in the ACO Equity shall have any recourse against, or any right to seek, receive, or recover any payment, Distribution, or other recovery from, any ACO Entity, the Buyer, or any of their respective Affiliates, successors, assigns, or property on account of such Claim against any ACO Entity or Interest in the ACO Equity, whether by way of judgment, Lien, setoff, recoupment, or otherwise; (c) any Lien on any assets of any ACO Entity securing a Claim that constitutes an ACO Excluded Liability, and any Lien on the ACO Equity, shall be deemed released and discharged, and the Holder of such Claim shall look solely to the treatment of such Claim under this Article III.D; (d) all Intercompany Claims held against any ACO Entity shall be released, extinguished, and cancelled as provided in Class 10-A (Debtor Intercompany Claims) and Class 10-B (Non-Debtor Intercompany Claims); and (e) the ACO Equity shall be cancelled and the Reorganized ACO Equity shall be issued to the Buyer as provided in Class 12 (Intercompany Interests) and Article IV.F hereof. The treatment of Claims against the ACO Entities and Interests in the ACO Equity under this Article III shall be deemed to constitute the full and complete satisfaction of such Claims and Interests as against the ACO Entities and the ACO Equity, and the ACO Entities shall receive the discharge set forth in Article VII.H.1 hereof.

## E. Impaired and Unimpaired Classes

Holders of Claims in Classes 2 and 4 are Unimpaired under the Plan. Holders of Claims and Interests in Classes 1, 3, 5-A, 5-B, 6-A, 6-B, 6-C, 6-D, 7, 8, 9, and 11 are Impaired under the Plan. Holders of Claims and Interests in Classes 10-A, 10-B, and 12 are either Unimpaired or Impaired under the Plan.

## F. Classes Entitled to Vote

### 1. Unimpaired Classes Not Entitled to Vote

Each Holder of a Claim or Interest in an Unimpaired Class is deemed to have accepted the Plan in accordance with Bankruptcy Code section 1126(f) and is not entitled to vote to accept or reject the Plan. Accordingly, Holders of Claims in Classes 2 and 4 are not entitled to vote on the Plan. Depending on their treatment, Holders of Claims or Interests in Classes 10-A, 10-B, and 12 may be Unimpaired and deemed to accept the Plan pursuant to Bankruptcy Code section 1126(f) and, if so, shall not be entitled to vote to accept or reject the Plan.

### 2. Impaired Classes Entitled to Vote

Each Holder of a Claim or Interest in an Impaired Class (not otherwise deemed not to accept the Plan) shall be entitled to vote to accept or reject the Plan. Accordingly, Holders of Claims in Classes 1, 3, 5-A, 5-B, 6-A, 6-B, 6-C, 6-D, 7, and 8 are the only Classes entitled to vote on the Plan; *provided, however*, that Prepetition WAX & MAO Term Loan Claims in Class 5-B and WAX & MAO Unsecured Note Claims in Class 7 are Impaired but constitute Disputed Claims pursuant to the Creditors' Committee Secured Claim Objection and the WAX/MAO Complaint unless otherwise determined by the Bankruptcy Court pursuant to a Final Order, and the Holders of such Claims shall be entitled to cast provisional ballots in the amount of $1.00.

### 3. Impaired Classes Not Entitled to Vote

Each Holder of a Claim or Interest in Classes 9 and 11 is Impaired, deemed not to have accepted the Plan pursuant to Bankruptcy Code section 1126(g), and not entitled to vote to accept or reject the Plan. Depending on their treatment, Holders of Claims or Interests in Classes 10-A, 10-B, and 12 may be Impaired and deemed not to accept the Plan pursuant to Bankruptcy Code section 1126(g) and accordingly shall not be entitled to vote to accept or reject the Plan.

### 4. Controversy Concerning Impairment

In the event of a controversy as to whether any Claim or any Class of Claims or Interests is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

## G. Acceptance by Impaired Classes

An Impaired Class of Holders of Claims shall have accepted the Plan in satisfaction of Bankruptcy Code section 1129(a)(10) if the Plan is accepted by (a) Holders of at least two-thirds (2/3) in dollar amount of the Allowed Claims actually voting in such Class and (b) Holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class. An Impaired Class of Holders of Interests shall have accepted the Plan in satisfaction of Bankruptcy Code section 1129(a)(10) if the Plan is accepted by at least two-thirds (2/3) in amount of the Allowed Interests actually voting in such Class. The Debtors hereby request Confirmation of the Plan under Bankruptcy Code section 1129(b) with respect to any Class that is deemed not to accept the Plan pursuant to Bankruptcy Code section 1126(g).

## H. Deemed Rejection if No Votes Cast

With respect to each Debtor, if a Class contains Claims eligible to vote and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be deemed rejected by the Holders of such Claims or Interests in such Class.

## I. Elimination of Vacant Classes

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018 as

of the Disclosure Statement Hearing shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies Bankruptcy Code section 1129(a)(8) with respect to such Class.

## J. Cramdown Pursuant to Bankruptcy Code Section 1129(b)

If all applicable requirements for Confirmation of the Plan are met as set forth in Bankruptcy Code sections 1129(a)(1) through (16), except subsection (8) thereof, then the Plan shall be treated as a request that the Bankruptcy Court confirm the Plan in accordance with Bankruptcy Code section 1129(b), notwithstanding the failure to satisfy the requirements of Bankruptcy Code section 1129(a)(8), on the basis that the Plan does not discriminate unfairly, and if fair and equitable, with respect to each Class of Claims that is Impaired under, and has not accepted, the Plan. Because certain classes of Claims and Interests have been deemed not to accept the Plan, the Debtors will seek confirmation of the Plan notwithstanding the failure of certain Classes of Claims and Interests to accept the Plan. The Debtors will seek to demonstrate satisfaction of the foregoing standard at the Confirmation Hearing.

## K. Allowed Claims

Notwithstanding any provision herein to the contrary, the Disbursing Agent shall only make Distributions to Holders of Allowed Claims. No Holder of a Disputed Claim shall receive any Distribution on account thereof until (and then only to the extent that) its Disputed Claim becomes an Allowed Claim in whole or in part. The Debtors and/or the Liquidation Trustee may, in their discretion, withhold Distributions otherwise due hereunder to any Holder until the Claims Objection Deadline, to enable a timely Objection thereto to be Filed. Any Holder of a Claim that becomes an Allowed Claim, in whole or in part, after the Effective Date shall receive its Distribution in accordance with the terms and provisions of the Plan, the Wind-Down Trust Agreement, and/or the Liquidation Trust Agreement, as applicable.

## L. Subordination of Claims

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, contract, Bankruptcy Code section 510(b), or otherwise. Pursuant to Bankruptcy Code section 510, the Debtors or the Liquidation Trustee, as applicable, reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto, subject in all respects to the Plan and the Final DIP Order.

## M. Insurance

Notwithstanding anything to the contrary in the Plan, if any Allowed Claim is subject to coverage under an Insurance Policy, including, but not limited to, the D&O Liability Insurance Policies, payments on account of such Allowed Claim will first be made from proceeds of such Insurance Policy in accordance with the terms thereof, with the balance of such Allowed Claim, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such

Allowed Claim. Except with respect to the cancellation of any Insurance Policy pursuant to Article V.E.1.a, nothing in the Plan or the Confirmation Order shall cause the invalidation of an Insurance Policy, including the D&O Liability Insurance Policies, or result in the loss of applicable coverage.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

In addition to the provisions set forth elsewhere in the Plan, the following shall constitute the means for implementation of the Plan:

### A. General Settlement of Claims, Interests, and Controversies

Pursuant to Bankruptcy Code section 1123(b)(2) and Bankruptcy Rule 9019, and in consideration for the classification, distribution, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that Holders of Claims or Interests may have with respect to any Allowed Claim or Interest or any Distribution to be made on account of such Allowed Claim or Interest, including pursuant to all Corporate Transactions implemented in accordance with the Plan.

The Plan also incorporates a proposed compromise and settlement of certain issues including whether the Estates of each of the Debtors should be treated separately for purposes of making payments to Creditors, whether and to what extent proceeds from the liquidation of Assets, including Assigned Causes of Action, or from the Sale Transaction should be allocated among the Debtors based upon their respective claims of ownership to such Assets. The provisions of the Plan relating to administrative consolidation of the Debtors and the treatment of each Class of Claims under the Plan reflect this compromise and settlement, which, upon the Effective Date, shall be binding upon the Debtors, all Creditors, and all Entities receiving any payments or other Distributions under the Plan.

The Plan shall be deemed a motion to approve the good faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Interests, and controversies under Bankruptcy Code section 1123 and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such compromise, settlement, and transactions are in the best interests of the Debtors, their Estates, and Holders of Allowed Claims and Interests, are fair, equitable, and within the range of reasonableness. Subject to the provisions of the Plan governing Distributions, all Distributions made to Holders of Allowed Claims and Interests in any Class are intended to be and shall be final.

The Debtors expressly reserve the right (with Bankruptcy Court approval, following appropriate notice and opportunity for a hearing) to compromise and settle any and all Claims against it and claims that it may have against other Persons and Entities at any time up to and including the Effective Date, subject to the provisions of the Creditors' Committee Standing Stipulation and Order and the Creditors' Committee Consent Rights.

## B. The Plan Settlement

Pursuant to Bankruptcy Code section 1123 and Bankruptcy Rule 9019, and in exchange for the compromises contained in the Plan, the Plan Settlement Agreement, and the Plan Settlement Approval Order, as applicable, and as further set forth in the Confirmation Order, the Debtors, the Creditors' Committee, and the Plan Settling Parties have agreed and entered into the Plan Settlement Agreement, the terms of which are incorporated herein by reference and approved by the Plan Settlement Approval Order.

The Plan incorporates the provisions of the Plan Settlement Agreement.[6] The Confirmation Order shall and shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including certain actions authorized or required by the Plan Settlement Agreement and the Plan Settlement Agreement Approval Order, and, for the avoidance of doubt, any and all actions required to be taken under applicable non-bankruptcy law.

## C. Administrative PL/GL Claim Settlement

Pursuant to Bankruptcy Code section 1123 and Bankruptcy Rule 9019, and in exchange for the compromises contained in the Plan, the Administrative PL/GL Claim Settlement Term Sheet, and the Administrative PL/GL Claim Settlement Approval Order, as applicable, and as further set forth in the Confirmation Order, the Debtors, the Creditors' Committee, and an ad hoc group of Holders of asserted Administrative PL/GL Claims represented by Anthony & Partners PLLC have agreed and entered into the Administrative PL/GL Claim Settlement Term Sheet, the terms of which are incorporated herein by reference and approved by the Administrative PL/GL Claim Settlement Approval Order.

On the Effective Date, the Administrative PL/GL Claim Fund shall be established and funded with the Administrative PL/GL Claim Fund Contribution by the Liquidation Trust from the Liquidation Trust Assets, the Administrative PL/GL Claim Fund Administrator shall be appointed, and the Administrative PL/GL Claim Settlement Fund Agreement shall be executed. The Administrative PL/GL Claim Settlement Term Sheet and the Administrative PL/GL Claim Settlement Fund Agreement shall govern the administration Administrative PL/GL Claim Fund, including, but not limited to, the powers, responsibilities, and duties of the Administrative PL/GL Claim Fund Administrator, the tax treatment of the Administrative PL/GL Claim Fund, and the reconciliation, settlement, and distribution of Administrative PL/GL Claims.

The Plan incorporates the provisions of the Administrative PL/GL Claim Settlement Term Sheet and the Administrative PL/GL Claim Settlement Fund Agreement.[7] The Confirmation Order shall and shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or

---

[6] To the extent of any discrepancy between the terms set forth herein and the terms of the Plan Settlement Agreement, the terms of the Plan Settlement Agreement shall govern.

[7] To the extent of any discrepancy between the terms set forth herein and the terms of the Administrative PL/GL Claim Settlement Term Sheet, the terms of the Administrative PL/GL Claim Settlement Term Sheet shall govern.

necessary to effectuate the Plan, including certain actions required by the Administrative PL/GL Claim Settlement Term Sheet, and for the avoidance of doubt, any and all actions required to be taken under applicable non-bankruptcy law.

## D. Corporate Transactions

On and after the Effective Date, the Debtors, the Post-Restructuring Debtors, the Liquidation Trustee, or the Wind-Down Trustee (as applicable) shall enter into any transaction and shall take any actions as may be necessary or appropriate to effect the transactions described herein, including, as applicable, the Sale Transaction, the Restructuring Transaction, the Wind-Down, the Consummation of the Plan, one or more mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dispositions, dissolutions, transfers, liquidations, spinoffs, purchases, or other corporate transactions (collectively, the "Corporate Transactions"). The actions to implement the Corporate Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, amalgamation, arrangement, continuance, restructuring, conversion, disposition, dissolution, transfer, liquidation, spinoff, sale, or purchase containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, formation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable law; and (iv) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

Notwithstanding the foregoing or anything to the contrary in the Plan, prior to the completion of the transfer of all licenses, permits, provider agreements, and national provider identifiers to the Buyer or its designee(s) in accordance with the Sale Transaction Documents, and, unless otherwise required by law, none of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, the Wind-Down Trustee, the Wind-Down Trust Board, the Liquidation Trust, or the Liquidation Trustee shall take, authorize, or permit any Corporate Transaction or other governance action (including any merger, consolidation, conversion, dissolution, or transfer of Post-Restructuring Debtor Equity Interests) that would adversely affect the rights of the Buyer under the Sale Transaction Documents (including, but not limited to, actions related to the transfer of the Debtors' licenses and the collection of accounts receivable) without the Buyer's prior written consent (which consent shall not be unreasonably withheld, conditioned, or delayed). The Wind-Down Trust Agreement and the Liquidation Trust Agreement shall each contain covenants consistent with the foregoing, which covenants shall not be subject to any "notwithstanding" or similar override provision.

## E. Sale Transaction

Following consummation of the Sale Transaction, the Liquidation Trust Assets, including the Promissory Notes, will be transferred to the Liquidation Trust, the Wind-Down Trust Assets will be administered by the Wind-Down Trust, the Wind-Down Trustee will commence a Wind-

Down of the Estates, and, subject to the restrictions thereon under the APA, the Post-Restructuring Debtors will be dissolved under applicable law as soon as practicable thereafter, but in no event earlier than the transfer of any remaining licenses pursuant to the Sale Transaction and receipt of all applicable tie-in notices in connection with the Business (as defined in the APA). As part thereof, the Liquidation Trust Assets and the Wind-Down Trust Assets will be administered and distributed as soon as practicable pursuant to the terms of the Plan, the Liquidation Trust Agreement, and the Wind-Down Trust Agreement.

For the avoidance of doubt, if any Regulatory Approval (as defined in the APA) is denied, is not obtained, or otherwise cannot be obtained, or if the Debtors do not deliver any Purchased Asset (as defined in the APA) to the Buyer or its designee(s) pursuant to the Sale Transaction Documents, then the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, the Wind-Down Trustee, the Liquidation Trust, and the Liquidation Trustee, as applicable, shall (i) hold and maintain such assets (including any Retained Operating Assets, as defined in the APA) for the exclusive benefit of the Buyer, with the Buyer receiving the economic benefits and bearing the economic burdens thereof under the applicable IMA(s), Powerback Management Agreements, and other Sale Transaction Documetns, and shall not sell, transfer, assign, encumber, amend, terminate, or otherwise dispose of such assets except as permitted by the Sale Transaction Documents, (ii) transfer such assets to the Buyer or its designee(s) (including any replacement manager or operator) as the Buyer may direct in accordance with section 2.11(e) of the APA, and (iii) promptly remit to the Buyer the amounts payable to the Buyer in respect of such assets under the Sale Transaction Documents, in each case so that the Buyer receives the full economic benefit of its bargain under the Sale Transaction Documents, and no Estate, the Wind-Down Trust, the Liquidation Trust, or any creditor or beneficiary thereof shall acquire any beneficial interest in any such asset or proceeds.

**F. ACO Entities; ACO Transaction**

Pursuant to the APA and the consideration provided by the Buyer in connection therewith, on the ACO Effective Date, pursuant to Bankruptcy Code sections 105, 363, 1123(a)(5), 1129, and 1141(b) and (c), and in accordance with the Sale Transaction Documents, (i) as of 12:01 a.m. (prevailing Central Time) on such date, first, (A) the ACO Excluded Assets shall be deemed transferred to the applicable Debtor and the ACO Excluded Liabilities shall be deemed assumed by the applicable Debtor and shall be satisfied solely in accordance with the Plan and, from and after 12:01 a.m. (prevailing Central Time) on the Effective Date, shall not be Liabilities of any ACO Entity, and (B) the ACO Purchased Assets shall vest in the applicable ACO Entity pursuant to Bankruptcy Code sections 1141(b) and (c), free and clear of all Liens, Claims, and Interests, in each case without further action by any Person and consistent with Section 2.12 of the APA; (ii) all ACO Equity shall be deemed cancelled, released, and extinguished without any Distribution on account thereof and without any further action by any Debtor or any other Person, and the Debtor holding such ACO Equity shall have no further right, title, or interest therein; and (iii) each ACO Entity, as reorganized, shall issue the Reorganized ACO Equity to the Buyer, free and clear of all Liens, Claims, charges, Interests, Causes of Action, and other encumbrances of any kind, which Reorganized ACO Equity shall constitute all of the issued and outstanding equity interests of such ACO Entity. The Confirmation Order shall constitute the Order of the Bankruptcy Court approving the ACO Transaction, and the ACO Transaction shall be deemed consummated as of 12:01 a.m. (prevailing Central Time) on the ACO Effective Date. Any Lien, Claim, Interest, or

encumbrance in or against the ACO Equity shall attach solely to the consideration received by the applicable Debtor under the APA with the same validity, force, effect, and priority as existed immediately prior to the ACO Transaction.

Notwithstanding the cancellation of the ACO Equity, each ACO Entity shall continue in existence as the same legal Entity, with the same federal tax identification number, licenses, permits, provider and participation agreements, contracts, and other Assets, and the ACO Transaction shall not constitute a dissolution, liquidation, or formation of a new Entity for any purpose.

The consummation of the ACO Transaction shall not impact, modify, or otherwise impair the treatment of Holders of Allowed Claims against the ACO Entities, which shall be governed by Article III of the Plan.

From and after the Closing Effective Time until the ACO Effective Date of the applicable ACO Entity, (i) the economic benefit and burden of each ACO Entity (other than with respect to the ACO Excluded Assets and the ACO Excluded Liabilities) shall be for the account of the Buyer in accordance with the APA, (ii) the Debtors and, if the Effective Date shall have occurred, the Post-Restructuring Debtors and the Wind-Down Trustee, as applicable, shall hold the ACO Equity, and shall cause the ACO Entities to be held and operated, solely as custodian for, and in bare legal title only for the exclusive benefit of, the Buyer, (iii) none of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, the Wind-Down Trust, the Liquidation Trustee, or the Liquidation Trust shall sell, transfer, pledge, encumber, vote, or otherwise deal with the ACO Equity, or cause or permit any ACO Entity to take any action outside the ordinary course of business, or cause or permit any Leakage (as defined in the APA) to occur with respect to any ACO Entity, in each case except at the direction of or with the prior written consent of the Buyer, and (iv) any income, proceeds, dividends, distributions, or other monies received by any Debtor (other than an ACO Entity) or any of its Affiliates (other than an ACO Entity) for or on behalf of, or otherwise belonging to, any ACO Entity, or on account of the ACO Equity or the ACO Purchased Assets, during such period shall be held in trust for and remitted to the Buyer (or its designee) in accordance with the APA, in each case so that the Buyer receives the full economic benefit of its bargain under the Sale Transaction Documents, and no Estate, the Wind-Down Trust, the Liquidation Trust, or any creditor or beneficiary thereof shall acquire any beneficial interest in the ACO Equity, the ACO Entities, or any such proceeds.

Except as provided in the Sale Transaction Documents, none of the Buyer, its Affiliates, or, from and after the ACO Effective Date, the ACO Entities shall be a successor to any Debtor or liable for any Claim against or liability of any Debtor arising prior to the ACO Effective Date, under any theory of successor liability or otherwise.

## G. Restructuring Transaction Toggle

In the event that the APA is terminated and the Sale Transaction is not consummated, the Plan provides for a toggle to a Restructuring Transaction, pursuant to which the Post-Restructuring Debtors will reorganize on the Effective Date and continue to operate the Debtors' business as a going concern. If and only if the APA is terminated and the Sale Transaction is not consummated, the Debtors shall file the Restructuring Transaction Toggle Notice as soon as reasonably

practicable following termination of the APA, informing parties-in-interest of the termination of the APA and the Debtors' election to pursue a Restructuring Transaction. The Restructuring Transaction Toggle Notice, among other things, (a) shall be deemed to extend the Voting Deadline and the Confirmation Objection Deadline by no less than twenty-one (21) days from the date set forth in the Disclosure Statement Order (as such dates may be otherwise extended pursuant to the terms thereof); (b) shall set forth a deadline for filing supplemental materials, including financial projections and related documentation, in support of the Restructuring Transaction that is no later than seven (7) days in advance of the extended Voting Deadline and the Confirmation Objection Deadline; and (c) may extend, continue, or adjourn, as applicable, other related dates and deadlines, including, without limitation, the Confirmation Hearing. If the Restructuring Transaction Toggle Notice is not filed, the Debtors shall proceed with consummation of the Sale Transaction and shall not seek approval of a Restructuring Transaction at the Confirmation Hearing.

## H. Administrative Consolidation

The Plan is premised in part upon the administrative consolidation of the Estates of (i) the OpCo Facility Debtors, (ii) the Ancillary Business & JV Debtors, (iii) the HoldCo Non-Facility Debtors, and (iv) the DivestCo Debtors, solely for the purpose of voting, tabulation, and Distributions with respect to Holders of General Unsecured Claims. Such deemed consolidation shall not constitute a transfer of assets or liabilities between Debtors for any other purpose, and each Debtor shall continue to maintain its separate corporate existence for all purposes other than the treatment of General Unsecured Claims under the Plan.

On the Effective Date, with respect to Distributions for Allowed General Unsecured Claims only: (1) all Allowed General Unsecured Claims against each of the Debtors in each of the GUC Distribution Groups shall be deemed merged and treated as Claims or Interests against the Debtors in such GUC Distribution Group on a consolidated basis to the extent Allowed; (2) each Allowed General Unsecured Claim in each respective GUC Distribution Group shall be deemed a single Claim against the Debtors in such GUC Distribution Group on a consolidated basis; (3) all guaranties by any Debtor of the obligations of any other Debtor in each GUC Distribution Group shall be deemed eliminated and extinguished so that any Allowed General Unsecured Claim against any Debtor in such GUC Distribution Group and any guarantee thereof executed by any Debtor and any joint or several Allowed General Unsecured Claim against any of the Debtors in such GUC Distribution Group shall be deemed to be one obligation of the Debtors in such GUC Distribution Group; and (4) each Holder of an Allowed General Unsecured Claim(s) against a Debtor in a GUC Distribution Group shall be entitled to recover on account of the aggregate amount of such Claims against all Debtors in a GUC Distribution Group in accordance with the treatment provided under the Plan for such Class, regardless of whether such Holder filed Proofs of Claim against multiple Debtors or has Claims against multiple Debtors based on the same or similar debt. For the avoidance of doubt, Holders of Allowed General Unsecured Claims shall be entitled to receive recoveries in each of the GUC Distribution Groups in which such Holders have Allowed General Unsecured Claims including, but not limited to, General Unsecured Claims asserted on a joint and several basis in multiple GUC Distribution Groups. If a Holder has at least one Allowed General Unsecured Claim (including claims asserted on a joint and several basis) in more than one of the GUC Distribution Groups, such Holder shall be entitled to receive its Pro Rata share of Distributions on account of such Allowed General Unsecured Claim(s) in each such

GUC Distribution Group; *provided, however*, that such Holder may not recover more than one-hundred percent (100%) of the face amount of the underlying Allowed General Unsecured Claim.

The Plan's treatment shall not affect (1) any subordination provisions set forth in any agreement relating to any Claim or Interest, (2) the ability of the Liquidation Trustee, as applicable, to seek to have any Claim subordinated in accordance with Bankruptcy Code section 510 or other applicable law, (3) any aspects, rights, benefits, privileges, liens, security interests, or claims under the New Organizational Documents, or the legal and entity structure of the Debtors or the Post-Restructuring Debtors, (4) any obligations under any contracts, licenses, or leases that were entered into during the Chapter 11 Cases or Executory Contracts or Unexpired Leases that have been or will be assumed pursuant to the Plan or assumed and assigned pursuant to the Sale Transaction Documents, (5) the vesting of assets in separate Post-Restructuring Debtors, or (6) guarantees that are required to be maintained after the Effective Date, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any of the Debtors' assets.

## I. Separate Plans

Notwithstanding the combination of separate chapter 11 plans for the Debtors set forth in this Plan for purposes of economy and efficiency, this Plan constitutes a separate chapter 11 plan for each Debtor. Accordingly, if the Bankruptcy Court does not confirm this Plan with respect to one or more Debtors, it may still confirm this Plan with respect to any other Debtor that satisfies the Confirmation requirements of Bankruptcy Code section 1129.

## J. The Wind-Down Trust

The following section shall be applicable only in the event that the Sale Transaction is consummated and shall have no force or effect in the event the Sale Transaction is not consummated and the APA is terminated. For the avoidance of doubt, the Wind-Down Trust shall not be established, and no Wind-Down Trustee shall be appointed, in the event that the APA is terminated and the Restructuring Transaction is consummated.

### 1. Establishment and Purpose

On or prior to the Effective Date, but in no event later than the date on which the Liquidation Trust is created, following consummation of the Sale Transaction, the Wind-Down Trust shall be established by the Debtors in accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. The Wind-Down Trust shall be administered by the Wind-Down Trustee in accordance with the terms and provisions of the Wind-Down Trust Agreement.

The Wind-Down Trust Agreement generally will provide for, among other things: (a) the transfer of the Wind-Down Trust Assets to the Wind-Down Trust; (b) the mechanics of the use and administration of the Wind-Down Reserve; (c) the retention of counsel, accountants, financial advisors, or other professionals; (d) the management and administration of the Wind-Down Trust Assets; and (e) as soon as reasonable practicable after the completion of the Wind-Down, the transfer of the Wind-Down Trust Assets to the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries.

### 2. Transfer of Assets

On the Effective Date, and periodically thereafter if additional Wind-Down Trust Assets become available, the Debtors or the Post-Restructuring Debtors, as applicable, shall transfer and assign to the Wind-Down Trust all of their right, title, and interest in and to all of the Wind-Down Trust Assets (other than any Wind-Down Trust Asset that is not transferable under applicable law, the transfer of which would be materially adverse to the Buyer, or that is required to be held by a Post-Restructuring Debtor in accordance with the Sale Transaction Documents), and in accordance with Bankruptcy Code section 1141, all such assets shall automatically vest in the Wind-Down Trust free and clear of all Claims, Liens, and other interests, subject only to the interests of the Liquidation Trust Beneficiaries in the Wind-Down Trust Assets and the rights and interests of the Buyer pursuant to the Sale Order and the Sale Transaction Documents. Thereupon, neither the Debtors nor the Post-Restructuring Debtors shall have any interest in or with respect to the Wind-Down Trust Assets.

### 3. Wind-Down Trust Interests

On the Effective Date, the Liquidation Trust shall, by operation of the Plan, be deemed to have received uncertificated Wind-Down Trust Interests. No other Person or Entity shall have any interest, legal, beneficial, or otherwise in the Wind-Down Trust Assets upon the assignment and transfer of such assets to the Wind-Down Trust. The Liquidation Trust, in such capacity as the Holder of the Wind-Down Trust Interests, shall have no voting rights or any authority over the activities of the Wind-Down Trust.

### 4. Wind-Down Trust Distributions

As set forth in the Wind-Down Trust Agreement, to the extent not previously made, Distributions from the Wind-Down Trust on account of the Wind-Down Trust Interests shall be made from the Wind-Down Trust to the Liquidation Trust upon the termination of the Wind-Down Trust.

### 5. The Wind-Down Trustee

#### a. Appointment

The identity of the Wind-Down Trustee shall be disclosed in the Plan Supplement and shall be designated by the Debtors, subject to the consent of the Creditors' Committee (which such consent shall not be unreasonably withheld). The appointment of the Wind-Down Trustee shall be approved in the Confirmation Order, and, in the event the Sale Transaction is consummated, such appointment shall be effective as of the Effective Date. The Wind-Down Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and the Wind-Down Trust Agreement. In the event that the Wind-Down Trustee resigns, is removed, terminated, or otherwise unable to serve as the Wind-Down Trustee, then a successor shall be appointed as set forth in the Wind-Down Trust Agreement. Any successor Wind-Down Trustee appointed shall be bound by and comply with the terms of the Plan, the Confirmation Order, and the Wind-Down Trust Agreement.

**b. Funding, Compensation, and Expenses of the Wind-Down Trust**

The Wind-Down Reserve shall be funded from the Sale Proceeds and shall be utilized by the Wind-Down Trust to finance the Wind-Down, including the cost of the services enumerated in Article IV.J.5.c. All costs, expenses, and obligations incurred by the Wind-Down Trustee in administering the Plan, overseeing the Post-Restructuring Debtors, or in any manner connected, incidental or related thereto, in effecting distributions from the Post-Restructuring Debtors thereunder (including the reimbursement of reasonable expenses) shall be incurred and paid in Cash from the Wind-Down Reserve. The post-Effective Date compensation of the Wind-Down Trustee will be set forth in the Plan Supplement and shall be paid solely from the Wind-Down Reserve.

The Wind-Down Trustee shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Wind-Down Trustee, are necessary to assist the Wind-Down Trustee in the performance of his or her duties. Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Wind-Down Trustee on or after the Effective Date (including taxes imposed on the Post-Restructuring Debtors) and any reasonable fees and expenses (including attorneys' fees and expenses) incurred by the Wind-Down Trustee or his or her retained professionals in connection with the Wind-Down Trustee's duties shall be paid in the ordinary course of business without any further notice to, or action, order, or approval of, the Bankruptcy Court in Cash solely from the Wind-Down Reserve, as applicable, if such amounts relate to any actions taken hereunder.

The Wind-Down Trustee shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. However, in the event that the Wind-Down Trustee is so ordered after the Effective Date, all costs and expenses of procuring any such bond or surety shall be paid for with Cash solely from the Wind-Down Reserve.

**c. Powers and Responsibilities**

The Wind-Down Trustee shall retain and have all the rights, powers, obligations, and duties necessary to carry out his or her responsibilities under the Plan, and as otherwise provided in the Confirmation Order. The Wind-Down Trustee shall be the exclusive trustee of the Wind-Down Trust Assets for the purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the sole representative of the Estates appointed pursuant to Bankruptcy Code section 1123(b)(3)(B).

Following the Effective Date, the powers, obligations, and responsibilities of the Wind-Down Trustee shall include, but not be limited to, any and all powers and authority to implement the Plan and the Sale Transaction and wind down the business and affairs of the Debtors and the Post-Restructuring Debtors, including, but not limited to:

1) providing revenue cycle management services, including, but not limited to, managing revenue cycle vendors, billing and collections, cash reconciliation, and refund requests;

2) maintaining oversight of the Debtors' and the Post-Restructuring Debtors' regulatory and financial reporting compliance;

3) providing post-Effective Date transition services pursuant to the Buyer TSA(s), the IMA(s), and the Buyer OTA(s), and complying with any continuing post-Closing Date obligations required under the Sale Transaction Documents, including maintaining, facilitating, and/or transitioning, as applicable, necessary licensures and governmental approvals, to the extent required thereunder, all as approved pursuant to the Sale Order;

4) providing financial services, including, but not limited to, cash management services, financial reporting services, payroll processing services, accounts payable and receivable processing services, and management of patient trust accounts;

5) procuring the necessary insurance to facilitate the Wind-Down;

6) administering employee termination and wind-down matters, including preparing and filing any employee-related tax documents, administering the Debtors' employee benefit programs, transitioning human resource matters, addressing employee bonus issues, and processing final payroll;

7) maintaining the Professional Fee Escrow Account and making distributions to Professionals for Allowed Professional Fee Claims from the Professional Fee Escrow Account;

8) maintaining necessary IT infrastructure, including network and server maintenance;

9) establishing and maintaining bank accounts in the name of the Post-Restructuring Debtors;

10) subject to the terms set forth herein, employing, retaining, terminating, or replacing professionals, without the need for retention applications, to represent it with respect to its responsibilities or otherwise effectuating the Plan to the extent necessary;

11) paying all reasonable fees, expenses, debts, charges, and liabilities of the Post-Restructuring Debtors after the Effective Date;

12) administering and paying taxes of the Post-Restructuring Debtors, including filing tax returns (to the extent not the obligation of the Buyer) and distributing information statements as required for U.S. federal income tax and other applicable tax purposes;

13) representing the interests of the Post-Restructuring Debtors before any taxing authority in all matters, including any action, suit, proceeding, or audit;

14) filing (i) any pre-confirmation monthly operating reports not Filed as of the Effective Date and (ii) any post-confirmation quarterly reports for the quarterly period during which the Chapter 11 Cases are closed as set forth herein, and pay Statutory Fees to the U.S. Trustee in accordance with 28 U.S.C. § 1930 for such periods (except for any Statutory Fees for such period with respect to Distributions made by the Liquidation Trustee during such period);

15) filing an application for entry by the Bankruptcy Court of a final decree closing the Chapter 11 Cases of the Post-Restructuring Debtors, other than the Lead Case;

16) coordinating with the Liquidation Trustee in accordance with the Liquidation Trust Agreement;

17) preparing and filing any final federal or state Medicare or Medicaid cost reports on behalf of the Post-Restructuring Debtors;

18) maintaining and distributing the Wind-Down Reserve;

19) managing, selling, administering, and monetizing the Wind-Down Trust Assets, as applicable;

20) dissolving the Post-Restructuring Debtors when appropriate; and

21) exercising such other powers as may be vested in it pursuant to Order of the Bankruptcy Court or pursuant to the Plan, or as it reasonably deems to be necessary and proper to carry out the provisions of the Plan and consistent with the Liquidation Trust Agreement.

**6. Investment Powers**

The right and power of the Wind-Down Trustee to invest assets transferred to the Wind-Down Trust, the proceeds thereof, or any income earned by the Wind-Down Trust, shall be limited to the right and power to invest such assets in Cash Equivalents; *provided, however*, that the scope of any such permissible investments shall be expanded to include any additional investments, as the case may be, that a liquidation trust, within the meaning of Treasury Regulation Section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

**7. Annual Distribution; Withholding**

The Wind-Down Trustee shall distribute at least annually to the Liquidation Trust all net Cash income plus all net Cash proceeds from the liquidation of Wind-Down Trust Assets, if any (including all Cash Equivalents); *provided, however*, that the Wind-Down Trust may retain such amounts and expend the Wind-Down Trust Assets (a) as reasonably necessary to meet contingent liabilities and to maintain the value of the Wind-Down Trust Assets during liquidation, (b) to pay

reasonable administrative expenses (including, but not limited to, any taxes imposed on the Wind-Down Trust or fees and expenses in connection with the liquidation of the Wind-Down Trust Assets), and (c) to satisfy other liabilities incurred or assumed by the Wind-Down Trust (or to which the Wind-Down Trust Assets are otherwise subject) in accordance with the Plan or the Wind-Down Trust Agreement.

**8. Securities Exempt; Transferability**

The Wind-Down Trust shall be structured so as not to be subject to the Securities Act, the Securities Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended. The interests in the Wind-Down Trust, and any right to receive a distribution from the Wind-Down Trust, shall not be evidenced by any certificate, security, receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the Wind-Down Trust by the Wind-Down Trustee. The Wind-Down Trust Interests, and any rights to receive Distributions from the Wind-Down Trust, shall not constitute "securities" and shall not be registered pursuant to the Securities Act. If it is determined that such interests in the Wind-Down Trust or rights constitute "securities," the exemption provisions of Bankruptcy Code section 1145(a)(1) would be satisfied and such securities would be exempt from registration. The Wind-Down Trust Interests may not be transferred (except as otherwise provided in the Wind-Down Trust Agreement).

**9. Tax Matters**

**a. Post-Restructuring Debtors' Tax Returns and Tax Liability**

After the Effective Date, the Wind-Down Trustee (to the extent not the responsibility of Buyer pursuant to the Sale Transaction Documents) shall complete and file all final or otherwise required federal, state, and local tax returns for each Debtor reflecting all tax consequences relating to the activities of the Post-Restructuring Debtors as attributable to and for the account of the applicable Debtor and shall pay taxes required to be paid for any of the Debtors, their Estates, or the Post-Restructuring Debtors. Pursuant to Bankruptcy Code section 505(b), the Wind-Down Trustee may request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws. For the avoidance of doubt, the Wind-Down Trustee shall not be responsible for preparing or filing any tax forms for Holders of Existing Common Equity Interests in the Debtors (which shall be cancelled pursuant to the Plan) but shall provide such Holders with any information reasonably required to prepare such forms.

**b. Federal Income Tax**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Wind-Down Trustee of a private letter ruling if the Wind-Down Trustee (or the Debtors or the Post-Restructuring Debtors) so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Wind-Down Trustee), the Wind-Down Trustee shall file returns for the Wind-Down Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). The Wind-Down Trustee shall also annually send to the Liquidation Trustee a separate statement setting forth the holder's share of items of income, gain,

loss, deduction or credit and will instruct all such holders to report such items on their federal income tax returns.

**c. Allocations of Wind-Down Trust Taxable Income**

Allocations of Wind-Down Trust taxable income shall be determined by reference to the manner in which an amount of Cash equal to such taxable income would be distributed (without regard to any restrictions on Distributions described herein) if, immediately prior to such deemed distribution, the Wind-Down Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the Liquidation Trust, taking into account all prior and concurrent Distributions from the Wind-Down Trust.

Similarly, taxable loss of the Wind-Down Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidation distribution of the Wind-Down Trust Assets. The tax book value of the Wind-Down Trust Assets for this purpose shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Wind-Down Trust, adjusted in either case in accordance with tax accounting principles prescribed by the Internal Revenue Code, the regulations and other applicable administrative and judicial authorities and pronouncements.

**d. Other Reporting Requirements**

The Wind-Down Trustee shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Wind-Down Trust that are required by any Governmental Unit.

**10. Termination**

The Wind-Down Trust shall terminate on the earlier to occur of: (a) final liquidation, administration, and effectuation of the Wind-Down and administration of the Wind-Down Trust Assets in accordance with the terms of the Plan and the Wind-Down Trust Agreement, and its full performance of all other duties and functions as set forth in the Plan or the Wind-Down Trust Agreement; and (b) the third (3rd) anniversary of the Effective Date; *provided, however*, that, on or prior to the date that is three (3) months prior to such termination, the Bankruptcy Court, upon motion by a party-in-interest, may extend the term of the Wind-Down Trust if it is necessary to the Wind-Down. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained at least three (3) months prior to the expiration of each extended term. Upon termination of the Wind-Down Trust, all Wind-Down Assets held by the Wind-Down Trust shall be transferred to the Liquidation Trust.

**K. The Liquidation Trust**

The following section shall be applicable following consummation of either the Sale Transaction or the Restructuring Transaction.

**1. Establishment and Purpose of the Liquidation Trust**

On the Effective Date, the Liquidation Trust shall be established pursuant to the Liquidation Trust Agreement for the purpose of liquidating the Liquidation Trust Assets, in

accordance with Treasury Regulation Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business. The Liquidation Trust shall be administered by the Liquidation Trustee in accordance with the terms and provisions of the Liquidation Trust Agreement. The Liquidation Trust Agreement generally will provide for, among other things: (a) the transfer of the Liquidation Trust Assets to the Liquidation Trust; (b) the mechanics of the payment of any expenses of the Liquidation Trust; (c) the retention of counsel, accountants, financial advisors, or other professionals; (d) the litigation of any Assigned Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action; and (e) making Distributions to Holders of Liquidation Trust Interests, as provided in the Plan.

**2. Funding, Compensation, and Expenses of the Liquidation Trust**

In accordance with the Liquidation Trust Agreement and any agreements entered into in connection therewith, upon the creation of the Liquidation Trust, on or prior to the Effective Date, following consummation of the Sale Transaction or the Restructuring Transaction, the Debtors shall transfer all Liquidation Trust Assets and the Liquidation Trust Funding Amount to the Liquidation Trust. The Liquidation Trust Funding Amount shall be funded from the Sale Proceeds following consummation of the Sale Transaction or Cash on hand following consummation of the Restructuring Transaction, as applicable, and shall be utilized by the Liquidation Trust to, among other things, review, reconcile, and object to Claims, administer the Trust Distribution Procedures, make Distributions to creditors, and pursue Assigned Causes of Action, as set forth in greater detail in Article IV.K.7 hereof. Upon transfer of all Liquidation Trust Assets, including the Liquidation Trust Funding Amount, the Debtors, the Post-Restructuring Debtors, and the Wind-Down Trustee (if applicable) shall have no further obligation to provide any funding with respect to the Liquidation Trust.

The post-Effective Date compensation of the Liquidation Trustee will be set forth in the Plan Supplement and shall be paid solely from the Liquidation Trust Funding Amount and proceeds of the Liquidation Trust Assets. For the avoidance of doubt, any and all expenses of the Liquidation Trust shall be paid from the Liquidation Trust Assets and none of the Post-Restructuring Debtors, the Wind-Down Trustee (if applicable), or the Wind-Down Trust (if applicable) shall be responsible for any costs, fees, or expenses of the Liquidation Trust.

**3. Liquidation Trust Assets**

On the Effective Date, and periodically thereafter, if additional Liquidation Trust Assets become available, in accordance with the Wind-Down Trust Agreement (if applicable), the Debtors or the Post-Restructuring Debtors, as applicable, shall transfer and assign to the Liquidation Trust all of their right, title, and interest in and to all of the Liquidation Trust Assets and in accordance with Bankruptcy Code section 1141, all such assets shall automatically vest in the Liquidation Trust free and clear of all Claims, Liens, and other interests, subject only to the interests of the Liquidation Trust Beneficiaries in the Liquidation Trust Assets and the expenses of the Liquidation Trust, as set forth in the Plan and the Liquidation Trust Agreement. Thereupon, neither the Debtors nor the Post-Restructuring Debtors shall have any interest in or with respect to the Liquidation Trust Assets, and the Liquidation Trust shall be solely responsible for any and all costs and expenses associated with the Liquidation Trust Assets.

The transfer of the Assigned Causes of Action shall be made for the ratable benefit of the Holders of Allowed Claims in Classes 6-A, 6-B, 6-C, and 6-D only to the extent such Holders in such Classes are entitled to Distributions under the Plan. Upon the transfer of the Assigned Causes of Action, the Debtors shall have no interest in or with respect to the Assigned Causes of Action or the Liquidation Trust. On and after the Effective Date, except as otherwise provided for in the Plan or the Confirmation Order, with respect to the Liquidation Trust Assets, the Liquidation Trust may use, acquire, or dispose of property, and compromise or settle any Assigned Causes of Action that constitute Liquidation Trust Assets. The act of transferring the Liquidation Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such Assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidation Trust as if the Asset or right was still held by the applicable Debtor.

### 4. Assumption of Claims by the Liquidation Trust

On the Effective Date, and except as provided in the Plan, including, without limitation, in connection with a Restructuring Transaction (other than with respect to Administrative PL/GL Claims which shall remain the responsibility of the Post-Restructuring Debtors following a Restructuring Transaction), without further action of any Person, the Liquidation Trust shall assume the liabilities, obligations, and responsibilities of the Debtors for reconciling Claims and making Distributions as set forth in the Plan and the Liquidation Trust Agreement. The Liquidation Trustee shall implement procedures in accordance with the Liquidation Trust Agreement to reach resolution of Claims and determine the Liquidation Trust's liability for such Claims. Distributions in accordance with the Liquidation Trust Agreement and in accordance with the procedures contemplated therein shall be the sole source of recovery, if any, against the Debtors, their Estates, or the Post-Restructuring Debtors in respect of such Claims, and the Holders of such Claims shall have no other or further recourse to the Debtors, their Estates, or the Post-Restructuring Debtors. In furtherance of the foregoing, the Liquidation Trust, subject to and only to the extent provided in the Liquidation Trust Agreement, shall have all defenses, cross-claims, offsets, and recoupments regarding Claims that the Debtors, as applicable, have or would have had under applicable law, but solely to the extent consistent with the Liquidation Trust Agreement and the Plan. For the avoidance of doubt, following consummation of the Sale Transaction, from and after the ACO Effective Date, solely to the extent not an ACO Assumed Liability, the Liquidation Trust and the Wind-Down Trust (as applicable) shall be solely responsible for reconciling and satisfying all Claims against the ACO Entities in accordance with Article III hereof, and the ACO Entities shall have no further liability or responsibility therefor.

### 5. Valuation of Assets

As soon as possible after the creation of the Liquidation Trust, but in no event later than sixty (60) days thereafter, the Liquidation Trust Board shall inform, in writing, the Liquidation Trustee of the value of the Assets transferred to the Liquidation Trust, based on the good faith determination of the Liquidation Trust Board, and the Liquidation Trustee shall apprise, in writing, the Liquidation Trust Beneficiaries of such valuation. The valuation shall be used consistently by all parties (including the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee (if applicable), the Liquidation Trustee, and the Liquidation Trust Beneficiaries) for all federal income tax purposes.

### 6. Appointment of the Liquidation Trustee

The identity and compensation of the Liquidation Trustee shall be disclosed in the Plan Supplement and shall be determined by the Creditors' Committee, subject to the consent of the Debtors (which such consent shall not be unreasonably withheld). The appointment of the Liquidation Trustee shall be approved in the Confirmation Order, and such appointment shall be effective as of the Effective Date. The Liquidation Trustee shall have and perform all of the duties, responsibilities, rights, and obligations set forth in the Plan and Liquidation Trust Agreement. In the event that the Liquidation Trustee resigns, is removed, terminated, or otherwise unable to serve as the Liquidation Trustee, then a successor shall be appointed as set forth in the Liquidation Trust Agreement. Any successor Liquidation Trustee appointed shall be bound by and comply with the terms of the Plan, the Confirmation Order, and the Liquidation Trust Agreement.

### 7. Powers, Responsibilities, and Duties of the Liquidation Trustee

(a) The Liquidation Trustee, upon direction by the Liquidation Trust Board and the exercise of their collective reasonable business judgment, shall, in an expeditious, but order, manner, liquidate, and convert to Cash the Liquidation Trust Assets, make timely Distributions, and not unduly prolong the duration of the Liquidation Trust. The liquidation of the Assigned Causes of Action may be accomplished either through the prosecution, compromise, settlement, abandonment, or dismissal of any or all of the Assigned Causes of Action, or otherwise. The Liquidation Trustee, upon direction by the Liquidation Trust Board, shall have the absolute right to pursue or not to pursue any and all Assigned Causes of Action as it determines is in the best interests of the Liquidation Trust Beneficiaries, and consistent with the purposes of the Liquidation Trust, and shall have no liability for the outcome of its decision except for any damages caused by willful misconduct, gross negligence, or fraud. The Liquidation Trustee may incur any reasonable and necessary expenses in liquidation and converting the Liquidation Trust Assets to Cash and shall be reimbursed from the Liquidation Trust Assets in accordance with the provisions of the Liquidation Trust Agreement.

(b) The Liquidation Trustee shall have the power to (i) prosecute for the benefit of Holders of Allowed Claims in Classes 6-A, 6-B, 6-C, and 6-D all Assigned Causes of Action (whether such suits are brought in the name of the Liquidation Trust or otherwise), and (ii) to otherwise perform the functions and take the actions provided for or permitted herein or in any other agreement executed by the Liquidation Trustee pursuant to the Plan, including, but not limited to, the Liquidation Trust Agreement. Any and all proceeds generated from such Assigned Causes of Action shall be the property of the Liquidation Trust and shall be distributed in accordance with the terms hereof.

(c) The Liquidation Trust shall have the authority to administer, amend, modify, or supplement the Liquidation Trust Agreement and the procedures set forth therein in accordance with the Liquidation Trust Agreement and the terms of the Plan. Subject to and to the extent set forth in the Plan, the Confirmation Order, the Liquidation Trust Agreement, or any other Order of the Bankruptcy Court entered in connection therewith, the Liquidation Trust and the Liquidation Trustee shall be empowered, without the need for Bankruptcy Court approval, to:

1. perform all actions and execute all agreements, instruments, and other documents necessary to effectuate the purpose of the Liquidation Trust;

2. establish, maintain, and administer trust accounts, which shall be segregated to the extent appropriate in accordance with the Plan;

3. accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, abandon, supervise, prosecute, settle, and protect, as applicable, the Liquidation Trust Assets in accordance with the Plan;

4. except to the extent any other Claims have already been Allowed, control and effectuate the Claims allowance and reconciliation process with respect to Claims, including to object to, seek to subordinate, recharacterize, compromise, or settle any and all such Claims against the Debtors, including Disputed Claims, pursuant to the procedures prescribed in the Plan and the Liquidation Trust Agreement;

5. reconcile applicable Claims in accordance with the Trust Distribution Procedures;

6. replace the Debtors in any appeals in the Chapter 11 Cases pending as of the Effective Date in which the Debtors are an appellee, including, but not limited to, the appeals of the Final DIP Order, the Unliquidated Claims Procedures Order, and any order denying relief from the automatic stay;

7. pursue the Assigned Causes of Action, elect not to pursue any such Assigned Causes of Action, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Assigned Causes of Action, as is in the best interests of the Holders of Allowed Claims in Classes 6-A, 6-B, 6-C, and 6-D;

8. calculate and make Distributions of the proceeds of the Liquidation Trust Assets to Holders of Liquidation Trust Interests, in accordance with the Plan and the Liquidation Trust Agreement;

9. prepare and file appropriate tax returns and other reports on behalf of the Liquidation Trust and pay taxes or other obligations owed by the Liquidation Trust;

10. retain, compensate, and employ professionals to represent the Liquidation Trust; *provided, however*, that any contingency fee or litigation financing arrangements will remain subject to Bankruptcy Court approval;

11. exercise such other powers as may be vested in the Liquidation Trust under the Liquidation Trust Agreement and the Plan, or as are deemed by the Liquidation Trustee to be necessary and proper to implement the provision of the Liquidation Trust Agreement and effectuate the purpose of the Liquidation Trust; and

12. dissolve the Liquidation Trust in accordance with the terms of the Liquidation Trust Agreement.

**8. Liquidation Trust Distributions**

Distributions from the Liquidation Trust on account of Liquidation Trust Interests shall be made from the Liquidation Trust Assets in accordance with the Plan and the Liquidation Trust Agreement. Such Distributions shall be made after paying, reserving against, or satisfying, among other things, the operating and administrative expenses of the Liquidation Trust, including but not limited to all reasonable and documented costs, expenses, and obligations incurred by the Liquidation Trustee (or professionals who may be employed by the Liquidation Trustee in administering the Liquidation Trust) in carrying out its responsibilities to the Liquidation Trust under the Liquidation Trust Agreement, or in any manner connected, incidental, or related thereto.

**9. Preservation of Assigned Causes of Action**

In accordance with Bankruptcy Code section 1123(b), the Liquidation Trust shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Assigned Causes of Action, whether arising before or after the Petition Date, and the Liquidation Trustee's rights to commence, prosecute, or settle such Assigned Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. For the avoidance of doubt, the Debtors, the Post-Restructuring Debtors, and their Estates shall not release any Estate Causes of Action, including, but not limited to, the Assigned Causes of Action, other than the Claims and Causes of Action released or otherwise settled pursuant to the Plan Settlement Agreement.

The Liquidation Trust may pursue the Assigned Causes of Action, as appropriate, in accordance with the best interests of Holders of Allowed Claims in Classes 6-A, 6-B, 6-C, and 6-D. No Person or Entity may rely on the absence of a specific reference in the Plan or the Plan Supplement to any Assigned Cause of Action against it as any indication that the Liquidation Trust will not pursue any and all available Assigned Causes of Action against it. Except as specifically released under the Plan or the Plan Settlement Agreement, or pursuant to a Final Order of the Bankruptcy Court, the Liquidation Trust expressly reserves all rights to prosecute any and all Assigned Causes of Action against any Entity, except as otherwise expressly provided, settled, or released in the Plan, the Plan Settlement Agreement, the Liquidation Trust Agreement, or a Final Order (including the Final DIP Order).

Unless any Assigned Cause of Action held against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Plan Settlement Agreement, or a Final Order (including the Final DIP Order), the Liquidation Trust expressly reserves all Assigned Causes of Action, or later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim

preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to the Assigned Causes of Action upon, after, or as a consequence of Confirmation or Consummation of the Plan; *provided, however*, that nothing in the Plan modifies, extends, or otherwise tolls any applicable statute of limitations or other period of repose with respect to the Assigned Causes of Action. The Debtors, the Special Investigation Committee, the Special Restructuring Committee, the Creditors' Committee (and each of its members), and the Professionals of each of the foregoing shall be required to preserve any and all documents and communications related to the Debtors, the Chapter 11 Cases, and the Assigned Causes of Action. Nothing in the Plan shall waive any defenses, claims (including contribution, reimbursement, or indemnification claims), counterclaims, objections, or related rights of any Person or Entity with respect to such Assigned Causes of Action, all of which are expressly preserved and shall survive Confirmation and Consummation of the Plan.

Unless any Assigned Cause of Action held against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan, the Plan Settlement Agreement, or a Final Order (including the Final DIP Order), the Liquidation Trust reserves and shall retain such Assigned Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with Bankruptcy Code section 1123(b)(3), and except as expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or the Plan Settlement Agreement, or pursuant to a Final Order, any Assigned Causes of Action held against any Entity shall vest in the Liquidation Trust, except as otherwise expressly provided in the Plan. The Liquidation Trust, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Assigned Causes of Action. Subject to approval by the Bankruptcy Court, the Liquidation Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Assigned Causes of Action and to decline to do any of the foregoing.

**10. D&O Claims**

The D&O Claims shall vest in the Liquidation Trust and the Liquidation Trustee shall seek to satisfy any obligations of such D&O Claims first from the proceeds of such D&O Liability Insurance Policies. The Liquidation Trust Agreement shall provide for the establishment of the Liquidation Trust D&O Subcommittee and such members of the Liquidation Trust D&O Subcommittee shall have full and exclusive authority regarding the Liquidation Trust's pursuit of any recovery on any D&O Claim(s) in the event that damages with respect to such D&O Claim(s) exceed(s) the proceeds of any available coverage from the D&O Liability Insurance Policies. The Liquidation Trust D&O Subcommittee shall consist of two (2) members, one of which shall be selected by the Plan Settling Parties and one of which shall be selected by the Special Restructuring Committee, with any determination by the Liquidation Trust D&O Subcommittee requiring (a) unanimous approval and (b) participation of both members, regardless of any conflict of interest of either member. No conflict of interest, actual or potential, shall require recusal of either member from any deliberation or vote of the Liquidation Trust D&O Subcommittee. The members of the Liquidation Trust D&O Subcommittee shall have no duty of any kind to the Liquidation Trust or any creditor, and the Liquidation Trust and creditors shall be barred by the Plan Settlement Approval Order from asserting any such claim against a member of the Liquidation Trust D&O Subcommittee, and the Liquidation Trust shall indemnify the members of the Liquidation Trust D&O Subcommittee for any and all losses and expenses incurred if any party asserts such a claim.

To the extent a D&O Liability Insurance Policy is terminated and not continued, all runoff payments shall be made to, and deposited in, the Liquidation Trust.

**11. Liquidation Trust Interests**

The Liquidation Trust Interests shall be uncertificated and shall be non-transferable except upon death of the Holder or by operation of law. Holders of Liquidation Trust Interests, in such capacity, shall have no voting rights or any authority over the activities of the Liquidation Trust. The Liquidation Trustee shall maintain a registry of the Holders of Liquidation Trust Interests.

On the Effective Date, each Liquidation Trust Beneficiary shall, by operation of the Plan, be deemed to have received its uncertificated Pro Rata Share of the Liquidation Trust Interests pursuant to and consistent with the treatment and distribution terms of the Plan. Liquidation Trust Interests shall be reserved for Holders of Disputed Claims and issued by the Liquidation Trust to, and held by, the Liquidation Trustee, pending allowance or disallowance of such Claims. No other Person or Entity shall have any interest, legal, beneficial, or otherwise in the Liquidation Trust Assets upon the assignment and transfer of such assets to the Liquidation Trust.

Distributions from the Liquidation Trust shall be made from the Liquidation Trust Assets after paying, reserving against, or satisfying, among other things, the operating and administrative expenses of the Liquidation Trust, including, but not limited to, costs, expenses, and obligations incurred by the Liquidation Trust and the Liquidation Trustee in fulfilling responsibilities of the Liquidation Trust and the Liquidation Trustee, respectively, or in any manner connected, incidental, or related thereto.

**12. Investment Powers**

The right and power of the Liquidation Trustee to invest assets transferred to the Liquidation Trust, the proceeds thereof, or any income earned by the Liquidation Trust, shall be limited to the right and power to invest such assets (pending periodic distributions in accordance with Article VI of the Plan) in Cash Equivalents; *provided, however*, that (a) the scope of any such permissible investments shall be expanded to include any additional investments, as the case may be, that a Liquidation Trust, within the meaning of Treasury Regulation Section 301.7701-4(d) may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise, and (b) the Liquidation Trustee may expend the assets of the Liquidation Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidation Trust Assets during liquidation, (ii) to pay reasonable administrative expenses (including, but not limited to, any taxes imposed on the Liquidation Trust or fees and expenses in connection with the liquidation of the Liquidation Trust Assets), and (iii) to satisfy other liabilities incurred or assumed by the Liquidation Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Liquidation Trust Agreement; *provided further* that under no circumstances shall the Liquidation Trust segregate the Liquidation Trust Assets on the basis of classification of the Holders of Liquidation Trust Interests, other than with respect to Distributions to be made on account of Disputed Claims in accordance with the provisions hereof.

**13. Securities Exempt; Transferability**

The Liquidation Trust shall be structured so as not to be subject to the Securities Act, the Securities Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended. The interests in the Liquidation Trust, and any right to receive a distribution from the Liquidation Trust, shall not be evidenced by any certificate, security, receipt, or in any other form or manner whatsoever, except as maintained on the books and records of the Liquidation Trust by the Liquidation Trustee. The Liquidation Trust Interests, and any rights to receive Distributions from the Liquidation Trust, shall not constitute "securities" and shall not be registered pursuant to the Securities Act. If it is determined that such interests in the Liquidation Trust or rights constitute "securities," the exemption provisions of Bankruptcy Code section 1145(a)(1) would be satisfied and such securities would be exempt from registration. The Liquidation Trust Interests may not be transferred (except as otherwise provided in the Liquidation Trust Agreement).

**14. Annual Distribution; Withholding**

The Liquidation Trustee shall distribute at least annually to the Holders of Liquidation Trust Interests all net cash income plus all net cash proceeds from the liquidation of Liquidation Trust Assets (including as Cash for this purpose, all Cash Equivalents); *provided, however*, that the Liquidation Trust may retain such amounts (a) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidation Trust Assets during liquidation, (b) to pay reasonable administrative expenses (including any taxes imposed on the Liquidation Trust or in respect of the assets of the Liquidation Trust), and (c) to satisfy other liabilities incurred or assumed by the Liquidation Trust (or to which the assets are otherwise subject) in accordance with the Plan or the Liquidation Trust Agreement. All such distributions shall be *pro rata* based on the number of Liquidation Trust Interests held by a Holder compared with the aggregate number of Liquidation Trust Interests outstanding, subject to the terms of the Plan and the Liquidation Trust Agreement. The Liquidation Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Liquidation Trustee's reasonable sole discretion, to be required by any law, regulation, rule, ruling, directive or other governmental requirement.

**15. Tax Treatment**

**a. Federal Income Tax**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidation Trustee of a private letter ruling if the Liquidation Trustee (or the Debtors) so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee shall file returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). The Liquidation Trustee shall also annually send to each Holder of a Liquidation Trust Interest a separate statement setting forth the Holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their federal income tax returns.

**b. Allocations of Liquidation Trust Taxable Income**

Allocations of Liquidation Trust taxable income shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (without regard to any restrictions on Distributions described herein) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all of its other assets (valued for this purpose at their tax book value) to the Holders of the Liquidation Trust Interests, taking into account all prior and concurrent Distributions from the Liquidation Trust (including all distributions held in escrow pending the resolution of Disputed Claims). Similarly, taxable loss of the Liquidation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidation distribution of the Assigned Causes of Action. The tax book value of the Assigned Causes of Action for this purpose shall equal their fair market value on the Effective Date or, if later, the date such assets were acquired by the Liquidation Trust, adjusted in either case in accordance with tax accounting principles prescribed by the Internal Revenue Code, the regulations and other applicable administrative and judicial authorities and pronouncements.

**c. Other**

The Liquidation Trustee shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidation Trust that are required by any Governmental Unit.

**16. Termination**

The Liquidation Trust shall terminate on the earlier of: (a) the final liquidation, administration, and Distribution of the Liquidation Trust Assets in accordance with the terms of the Plan and the Liquidation Trust Agreement, and its full performance of all other duties and functions as set forth in the Plan or the Liquidation Trust Agreement; and (b) the fifth (5th) anniversary of the Effective Date; *provided, however*, that, on or prior to the date that is three (3) months prior to such termination, the Bankruptcy Court, upon motion by a party-in-interest, may extend the term of the Liquidation Trust if it is necessary to the liquidation of the Assigned Causes of Action. Notwithstanding the foregoing, multiple extensions can be obtained so long as Bankruptcy Court approval is obtained at least three (3) months prior to the expiration of each extended term.

**L. Cooperation of the Debtors**

Subject to the terms of this section, the Liquidation Trustee shall succeed to the Privileges formerly held by the Debtors on the Effective Date. Following the Effective Date, the Post-Restructuring Debtors and the Wind-Down Trustee (if applicable) shall reasonably cooperate with the Liquidation Trust, the Liquidation Trustee, and their agents and representatives in the administration of the Liquidation Trust, including providing reasonable access to (a) the Books and Records of the Debtors, including, without limitation, those pertaining to the investigation, prosecution, compromise, and/or settlement of the Assigned Causes of Action, solely to the extent such Books & Records are in the Debtors' possession, (b) contesting, settling, compromising, reconciling, and objecting to Claims, and (c) administering the Liquidation Trust; *provided, however*, that, no Privilege shall be waived by the foregoing access or disclosures to the Liquidation Trustee or the sharing of the Debtors' documents, information, or communications

subject to any privilege, protection, or immunity, or protections from disclosure held by the Debtors. The Post-Restructuring Debtors and the Wind-Down Trustee (if applicable) shall take all reasonable efforts to assist the Liquidation Trust in connection with the foregoing, and the Liquidation Trustee may enter into agreements with the Post-Restructuring Debtors in order to obtain information from the Post-Restructuring Debtors on a confidential basis, without being restricted by or waiving any applicable Privilege. If and to the extent privileged documents, information, or communications not in the possession of the Debtors or otherwise transferred to the Post-Restructuring Debtors are sought by the Liquidation Trust from any counsel or advisor of the Debtors, including, but not limited to, their Professionals, such privileged documents, information, or communications, if any exist, shall only be required to be provided to the Liquidation Trust if (a) the Debtors would have been entitled to receive such privileged documents, information, or communications under applicable law and (b) the Liquidation Trust provides for payment of the fees, costs, and expenses necessary for such party to provide such documents. Following receipt of a request by the Liquidation Trust for privileged documents, information, or communications not in the possession of the Debtors or otherwise transferred to the Post-Restructuring Debtors, the applicable counsel, advisor, or Professional shall provide to the Liquidation Trust an estimate of fees, costs, and expenses necessary for such party to provide such documents. Following receipt of such estimate, the Liquidation Trust and the applicable party will meet and confer regarding the estimate and any other related matters, and the rights of all parties, including, but not limited to, the right to seek adjudication of any dispute before the Bankruptcy Court, are expressly reserved. Notwithstanding anything to the contrary contained in this section, the Plan, or the Confirmation Order, no restructuring counsel to the Debtors shall have any obligation to produce any documents currently in their possession as a result of or arising in any way out of their representation of the Debtors or work product that was previously provided to the Debtors or the Creditors' Committee.

Counsel to the Independent Directors comprising the Special Investigation Committee shall produce to the Liquidation Trust, prior to or shortly after the Effective Date: (a) a list of all interviews requested and conducted in the Independent Investigation; and (b) all documents produced to the Special Investigation Committee by the Debtors and/or any third parties. The Independent Directors comprising the Special Investigation Committee's agreement to produce these materials does not constitute a waiver of any Privileges or work product protections that might exist and may not be used by any Person or Entity to argue that such a waiver has occurred. The Independent Directors comprising the Special Investigation Committee will discuss in good faith whether to produce any additional factual documentation or information related to the Independent Investigation, which shall not include any legal analysis, privileged or work product protected communications, legal memoranda, or research. Notwithstanding the Debtors, the Post-Restructuring Debtors, the Independent Directors, the Wind-Down Trustee (if applicable), or any party-in-interest providing any privileged information to the Liquidation Trust, such privileged information shall be without waiver in recognition of the joint and/or successor interest in investigating and prosecuting the Liquidation Trust Assets and shall remain privileged. For the avoidance of doubt, the actions taken by the Special Investigation Committee, Special Restructuring Committee, the Debtors, the Post-Restructuring Debtors, or the Wind-Down Trustee (if applicable) in connection with the Plan or the formation of the Liquidation Trust shall not be (or deemed to be) a waiver of any Privilege of any of the Independent Directors comprising the Special Investigation Committee, the Independent Directors comprising the Special Restructuring Committee, the Debtors, and the Post-Restructuring Debtors, as applicable, including any Privilege

attaching to any document or communications (whether written or oral) transferred to the Liquidation Trust. The Privileges of the Independent Directors are hereby recognized and shall remain in full force and effect and shall not be waived, nor shall any such privileged documents be turned over to any Person or Entity without express written consent of the Independent Directors.

**M. Vesting of Assets**

**1. Title to Assets**

**a. Following Consummation of the Sale Transaction**

Except as otherwise provided in the Confirmation Order or in the Plan, on the Effective Date, title to all Assets and properties encompassed by the Plan (other than the ACO Equity, the Reorganized ACO Equity, and the ACO Purchased Assets, which shall be governed by Article IV.F hereof) shall vest in the Wind-Down Trust and the Liquidation Trust, as applicable, free and clear of all Liens, Claims, charges, other encumbrances, and interests, and in accordance with Bankruptcy Code section 1141 and the Confirmation Order shall be a judicial determination of discharge of the liabilities of the Debtors except as provided in the Plan.

**b. Following Consummation of the Restructuring Transaction**

Except as otherwise provided in the Confirmation Order or in the Plan, on the Effective Date, pursuant to Bankruptcy Code sections 1141(b) and (c), title to all Assets and all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan, except with respect to the Liquidation Trust Assets, shall vest in each respective Post-Restructuring Debtor, free and clear of all Liens, Claims, charges, other encumbrances, and interests. On and after the Effective Date, except as otherwise provided in the Plan, each Post-Restructuring Debtor may operate its business and may use, acquire, or dispose of property, enter into transactions, agreements, understandings or arrangements, whether in or other than in the ordinary course of business and execute, deliver, implement and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules in all respects.

**N. Establishment and Maintenance of Disbursement Accounts**

**1. Establishment of Disbursement Account(s)**

On or prior to the Effective Date, the Liquidation Trustee shall establish one or more Disbursement Accounts in the name of the Liquidation Trustee as Disbursing Agent under the Plan, which accounts shall be trust accounts for the benefit of Holders of Allowed Other Secured Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed General Unsecured Claims, and Allowed Convenience Claims, unless any such Claims are otherwise assumed or satisfied by the Buyer pursuant to the Sale Transaction Documents.

#### 2. Maintenance of Disbursement Account(s)

Disbursement Account(s) shall be maintained at one or more domestic banks or financial institutions having a shareholder's equity or equivalent capital of not less than $100 million.

### O. Sources of Consideration for Plan Distributions

#### 1. Following Consummation of the Sale Transaction

Subject to the provisions of the Plan concerning the Professional Fee Escrow Account and the Wind-Down Reserve, the Liquidation Trustee shall fund Distributions to Holders of Allowed Claims under and in accordance with the express terms of the Plan from (a) the Liquidation Trust Assets, (b) the Liquidation Trust Proceeds, and (c) the Debtors' Cash on hand, if any. Each Distribution and issuance referred to in the Plan shall be governed by the terms and conditions of the instruments or other documents evidencing or relating to such Distribution or issuance, which terms and conditions shall bind each Entity receiving such Distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain securities in connection with the Plan will be exempt from SEC registration, as described more fully in Article IV.J.8 and Article IV.K.13 herein.

#### 2. Following Consummation of the Restructuring Transaction

Subject to the provisions of the Plan concerning the Professional Fee Escrow Account, the Liquidation Trustee shall fund Distributions to Holders of Allowed Claims under and in accordance with the express terms of the Plan from (a) the Liquidation Trust Assets and (b) the Liquidation Trust Proceeds. Each Distribution and issuance referred to in the Plan shall be governed by the terms and conditions of the instruments or other documents evidencing or relating to such Distribution or issuance, which terms and conditions shall bind each Entity receiving such Distribution or issuance. The issuance, distribution, or authorization, as applicable, of certain securities in connection with the Plan will be exempt from SEC registration, as described more fully in Article IV.J.8 and Article IV.K.13 herein.

### P. Corporate Action and Governance Matters

#### 1. Corporate Action

On the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects and all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate or organizational structure of the Debtors or the Post-Restructuring Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors or the Post-Restructuring Debtors, as applicable, in connection with the Plan shall be deemed to have timely occurred and shall be in effect and shall be authorized and approved in all respects, without any requirement of further action by the equity holders, members, directors, or officers of the Debtors or the Post-Restructuring Debtors, as applicable, or notice to, order of, or hearing before, the Bankruptcy Court.

On or prior to the Effective Date, as applicable, the appropriate officers of the Debtors shall be authorized and, as applicable, directed, to issue, execute, and deliver the agreements, documents, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Post-Restructuring Debtors. The authorizations and approvals contemplated by this Article IV.P.1 shall be effective notwithstanding any requirements under non-bankruptcy Law. The Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee (acting pursuant to the terms of the Wind-Down Trust Agreement), and the Liquidation Trustee (acting pursuant to the terms and conditions of the Liquidation Trust Agreement), as applicable, shall be authorized to execute, deliver, file, or record such documents, instruments, releases, and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. Without limiting the foregoing, from and after the Confirmation Date, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee (if applicable), and the Liquidation Trustee may take any and all actions deemed appropriate in order to consummate the transactions contemplated herein and, notwithstanding any provision contained in the Debtors' governing documents to the contrary, such Entities shall not require the affirmative vote of Holders of Common Equity Interests in order to take any corporate action including to (a) consummate a sale transaction, (b) compromise and settle Claims and Causes of Action of or against the Debtors and their Estates, or (c) dissolve, merge, or consolidate with any other Entity, in each case, subject to the rights of the Buyer pursuant to the APA and the consent rights set forth in Article IV.D hereof.

Without limiting the foregoing, on the Effective Date and following satisfaction of the Debtors' requirements set forth in the Plan, the Debtors shall have no further duties or responsibilities in connection with implementation of the Plan, and the directors and officers, including the Co-CROs and the Independent Directors, of the Debtors shall be deemed to have resigned in favor of the ongoing administration of the Debtors' affairs by the Wind-Down Trustee or the Post-Restructuring Board, as applicable. From and after the Effective Date, the Wind-Down Trustee, following consummation of the Sale Transaction only, or the Post-Restructuring Board, following consummation of the Restructuring Transaction only, shall be authorized to act on behalf of the Debtors' Estates; *provided, however*, that the Wind-Down Trustee shall not have duties other than as expressly set forth in the Plan, the Confirmation Order, and the Wind-Down Trust Agreement.

**2. New Organizational Documents**

On or immediately prior to the Effective Date, the New Organizational Documents shall be automatically deemed adopted, authorized, and approved by the Post-Restructuring Debtors in all respects, in each case without further notice or Order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person or Entity, including, without limitation, any action by the Holders of Existing Common Equity Interests of the Debtors. To the extent required under the Plan or applicable non-bankruptcy law, each of the Post-Restructuring Debtors shall file its New Organizational Documents with the applicable authorities in its respective jurisdiction of organization.

The cancellation of all Existing Common Equity Interests and other matters provided pursuant to the Plan involving the corporate structure of the Post-Restructuring Debtors or

corporate action by the Post-Restructuring Debtors shall be deemed to have occurred, be authorized, and shall be in effect without requiring further action under applicable law, regulation, order, or rule, including, without limitation, any action by the stockholders of the Debtors or the Post-Restructuring Debtors.

The New Organizational Documents shall be deemed amended to include, among other things, a provision prohibiting the issuance of non-voting equity securities, but only to the extent required by Bankruptcy Code section 1123(a)(6). The New Organizational Documents of Genesis Healthcare, Inc. shall also include a provision decreasing the number of authorized shares to 5,000, with no par value.

On the Effective Date, all Existing Common Equity Interests in Debtor Genesis Healthcare, Inc. shall be deemed cancelled without further action and Genesis Healthcare, Inc. shall issue 5,000 authorized shares to the Wind-Down Trust, pursuant to its New Organizational Documents. The equity interests, partnership interests, or membership interests, as applicable, in the rest of the Post-Restructuring Debtors, other than Genesis Healthcare, Inc., shall be held by the same legal entities that held such interests prior to the Petition Date.

On or after the Effective Date, the Post-Restructuring Debtors may amend and restate their respective New Organizational Documents in accordance with the terms thereof, and the Post-Restructuring Debtors may file such amended certificates or articles of incorporation, bylaws, or such other applicable formation documents, and other constituent documents as permitted by the laws of their respective jurisdictions of incorporation or formation and the New Organizational Documents.

### 3. Corporate Governance

#### a. Dissolution of Genesis Board; Independent Directors' Privilege

On the Effective Date, following consummation of either the Sale Transaction or the Restructuring Transaction, the current Genesis Board shall be dissolved without any further action required on the part of the Debtors or the Debtors' officers, directors, managers, shareholders, members, or governing bodies. Any remaining officers (including the Co-CROs), directors (including the Independent Directors), managers, shareholders, members, or governing bodies of the Debtors shall be dismissed and shall be deemed to have resigned as of the Effective Date, solely in their capacities as such.

Except as otherwise set forth in the Plan, the Independent Directors shall not have any of their work product protected or privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Post-Restructuring Debtors, the Wind-Down Trust (if applicable), the Liquidation Trust, or any other Entity without the Independent Directors' prior written consent. Each Independent Director retains the right to review, approve, and make decisions, and to file papers and be heard before the Bankruptcy Court prior to and after the Effective Date, on all matters under their continuing authority.

### b. Following Consummation of the Sale Transaction

From and after the Effective Date, in the event the Sale Transaction is consummated, the Wind-Down Trustee shall (i) be appointed as the sole manager, director, officer, and representative of the Post-Restructuring Debtors, (ii) shall succeed to the powers and Privileges of the Debtors and the Debtors' managers, directors, officers, and other governing bodies, subject to the determination of the Wind-Down Trust Board, and (iii) shall act for the Post-Restructuring Debtors in the same fiduciary capacity as applicable to a board of managers, directors, officers, or other governing body, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). The foregoing shall not limit the authority of the Post-Restructuring Debtors or the Wind-Down Trustee, as applicable, to continue the employment of any former manager or officer as required under applicable law, including for regulatory purposes, or pursuant to any Buyer TSA(s) or other agreement entered into on or after the Effective Date.

Notwithstanding anything to the contrary in the Plan, the Wind-Down Trust Agreement, or the Liquidation Trust Agreement, from and after the ACO Effective Date, (i) none of the Wind-Down Trustee, the Wind-Down Trust Board, the Liquidation Trustee, or the Liquidation Trust Board shall have any authority over, or serve as or appoint any manager, officer, or authorized signatory of, any ACO Entity; (ii) the managers, officers, and authorized signatories of each ACO Entity shall be the persons designated by the Buyer, who shall be deemed appointed as of the ACO Effective Date without further action and whose identities shall be disclosed in the Plan Supplement to the extent then known; and (iii) the organizational documents of each ACO Entity shall be in the form designated by the Buyer, shall be included in the Plan Supplement, shall be deemed adopted as of the ACO Effective Date without further action, and shall prohibit the issuance of non-voting equity securities to the extent required by Bankruptcy Code section 1123(a)(6).

### c. Following Consummation of the Restructuring Transaction

On the Effective Date, the new directors and officers of the Post-Restructuring Debtors, including the Post-Restructuring Board, shall be appointed pursuant to the New Organizational Documents. The identity of the members of the Post-Restructuring Board and the officers of the Post-Restructuring Debtors shall be disclosed in the Plan Supplement. Except to the extent that a current member of the Genesis Board is designated to serve as a director, officer, or manager of a Post-Restructuring Debtor, as applicable, the current members of the Genesis Board prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Post-Restructuring Debtors on or after the Effective Date, and each such member shall be deemed to have resigned or shall otherwise cease to be a director of the Debtors on the Effective Date. Each of the directors, managers, sole managers, and officers of each of the Post-Restructuring Debtors shall serve pursuant to the terms of the applicable New Organizational Documents of such Post-Restructuring Debtor and may be designated, replaced, or removed in accordance with such New Organizational Documents.

### 4. Continued Corporate Existence and/or Dissolution

#### a. Following Consummation of the Sale Transaction

From and after entry of the Confirmation Order, the Debtors and the Post-Restructuring Debtors, as applicable, shall continue to exist for the limited purposes of complying with and fulfilling their obligations under the Sale Transaction Documents, the Buyer OTA(s), IMA(s), the Wind-Down Trust Agreement, the Liquidation Trust Agreement, and the Plan until their dissolution as provided herein. Neither the foregoing nor any provision of the Wind-Down Trust Agreement and the Liquidation Trust Agreement relating to the continued existence or dissolution of the Post-Restructuring Debtors shall be amended or modified in any manner adverse to the Buyer without the prior written consent of the Buyer.

Following the Effective Date, the Wind-Down Trustee shall be given full power of attorney and has the authority to execute and/or endorse documentation or take any action necessary on behalf of the Debtors and the Post-Restructuring Debtors in furtherance of the Plan and the Debtors' liquidation, as set forth in the Wind-Down Trust Agreement and Article IV.J.5.c hereof. The filing by the Wind-Down Trustee of any applicable Post-Restructuring Debtor's certificate of dissolution shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the members, managers, board of directors, or other governing body of the Post-Restructuring Debtors.

Notwithstanding the foregoing, the Post-Restructuring Debtors shall not be dissolved until each of the following (to the extent applicable) has been satisfied with respect to each the Post-Restructuring Debtor that currently operates a Facility or that is a Powerback Entity (as defined in the APA), and each Post-Restructuring Debtor that is a holding company of any of the foregoing: (a) Medicare has issued a written notice to the corresponding new operator advising that the provider agreement entered into between Medicare and the applicable Post-Restructuring Debtor that previously operated the applicable Facility has been assigned to such new operator and such new operator is authorized to submit claims retroactively to the date on which such new operator assumed operations at such Facility; (b) Medicaid has issued a new provider agreement to the corresponding new operator effective as of the date on which such new operator assumed operations at such Facility or Powerback Entity; (c) all applicable tie-in notices and similar regulatory confirmations required in connection with the transfer of the applicable licenses, permits, provider agreements, and national provider identifiers have been received by the Post-Restructuring Debtors or the Buyer, as applicable; (d) each IMA and Interim Sublease Agreement to which such Post-Restructuring Debtor is a party has expired or been terminated in accordance with its terms; (e) with respect to any Post-Restructuring Debtor that is a Managed Powerback Entity, the Powerback Transition Date (as defined in the APA) has occurred and each Powerback Management Agreement to which such Post-Restructuring Debtor is a party has expired or been terminated in accordance with its terms; (f) each Retained Operating Asset (as defined in the APA) of such Post-Restructuring Debtor, including any Retained Billing Assets (which includes any bank accounts which constitute a Retained Billing Bank Account) has been transferred to the Buyer or its designee(s) in accordance with the APA; (g) the Transition Outside Date (as defined in the APA, as it may be extended thereunder) has occurred and the applicable preservation period under section 6.19 or section 6.20 of the APA has expired; and (h) all applicable tie-in notices, credentialing, and similar regulatory confirmations in connection with the transfer of any

applicable licenses, permits, provider agreements, and national provider identifiers related to any contract between such Post-Restructuring Debtor and a third-party payor (including any commercial insurer, managed care organization, or other non-governmental payor) that are required to permit the Buyer to continue billing such third-party payor thereunder in accordance with the APA have been received by the Buyer, or the Buyer has entered into a replacement contract with such third-party payor permitting the Buyer to bill such third-party payor in accordance with the APA. For the avoidance of doubt, the Post-Restructuring Debtors shall not be dissolved prior to the satisfaction of all of the foregoing unless the Buyer provides written consent to such dissolution (such consent not to be unreasonably withheld, conditioned, or delayed).

**b. Following Consummation of the Restructuring Transaction**

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, each Debtor, as Post-Restructuring Debtors, shall continue to exist on and after the Effective Date as a separate legal Entity with all the powers available to such Entity pursuant to the applicable Law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other organizational documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other organizational documents) are amended, amended and restated, or replaced under the Plan or otherwise, including pursuant to the New Organizational Documents, in each case, consistent with the Plan, and to the extent such documents are amended in accordance therewith, such documents are deemed to be amended, amended and restated, or replaced pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law). On or after the Effective Date, the respective certificate of incorporation and bylaws (or other organizational documents) of one or more of the Post-Restructuring Debtors may be amended or modified in accordance with the terms thereof without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On or after the Effective Date, one or more of the Post-Restructuring Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

## Q. Cancellation of Notes, Interests, Certificates, and Instruments

Except as otherwise provided in the Plan, and in any contract, instrument, or other agreement or document created in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article VI hereof, any and all notes, instruments, certificates, credit agreements, indentures, securities, and other documents evidencing or governing Claims or Interests (other than those Claims or Interests Reinstated under the Plan) shall be cancelled and the rights of the Holders thereof and obligations of the Debtors thereunder or in any way related thereto shall be deemed satisfied in full, cancelled, discharged, and of no force or effect, without any further act or action under any applicable agreement, law, regulation, order or rule. Holders of or parties to such cancelled instruments, securities, and other documentation will have no rights arising from or relating to such instruments, securities, and other documentation, or the cancellation thereof, except the rights, distributions, and treatment provided for pursuant to the Plan or the Confirmation Order. Nothing contained herein shall be deemed to

cancel, terminate, release, or discharge the obligations of the Debtors or any of their counterparts under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed or assumed and assigned by the Debtors pursuant to a Final Order or hereunder.

## R. Books and Records; Medical Records

### 1. Following Consummation of the Sale Transaction

#### a. Buyer Obligations

The Buyer's obligations with respect to Books and Records, including, but not limited to, the Acquired Medical Records, shall be governed by the Sale Transaction Documents. Nothing contained herein shall enlarge or modify the Buyer's obligations pursuant to the APA.

From and after the Effective Date, the Wind-Down Trustee and the Liquidation Trustee shall be entitled to exercise, enforce, and benefit from all contractual rights of the Debtors pursuant to the APA relating to Books and Records, electronically stored information, cooperation, or other information from the Buyer, but only to the extent such contractual rights are assigned by the Debtors or the Post-Restructuring Debtors pursuant to the terms of the APA.

#### b. Debtor Obligations

The Debtors' obligations with respect to Books and Records (including, but not limited to, the Retained Records) relating to Assets that are not transferred to the Buyer following consummation of the Sale Transaction shall be preserved and maintained for such period as is required by applicable law.

As soon as practicable after the Liquidation Trust exhausts the assets of the Debtors' Estates by making the final Distribution under the Plan and the Liquidation Trust Agreement and has complied with and fulfilled its obligations under the Plan and after the Wind-Down Trustee has complied with and fulfilled all of its obligations under the Plan, the Liquidation Trustee or the Wind-Down Trustee, as applicable, shall be free, in their discretion, to abandon, destroy, or otherwise dispose of the Books and Records their possession in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, without the need for any other or further Court Order.

#### c. Potential Disposal of Medical Records

Subject to any alternative language in the Confirmation Order, at the election of the Wind-Down Trustee or the Post-Restructuring Debtors, as applicable, the notice of Effective Date filed, served, and published in one or more appropriate newspapers by the Post-Restructuring Debtors following the Effective Date may act as the notice pursuant to Bankruptcy Code section 351(1)(a) apprising patients, residents, and/or insurance providers, as applicable, that, if any medical records retained by the Post-Restructuring Debtors (the "Retained Medical Records") are not claimed by the applicable resident or insurance provider within one year after the date of such notification, the Post-Restructuring Debtors or the Wind-Down Trustee, as applicable, shall be authorized to destroy, abandon, or otherwise dispose of any Retained Medical Records. During the first 180

days of such one-year period, the Wind-Down Trustee or the Post-Restructuring Debtors, as applicable, shall promptly attempt to provide notice to each patient or resident that is the subject of the patient records and appropriate Insurer concerning the Retained Medical Records by mailing to the most recent known address of that patient or resident, or a family member or contact person for that patient, and to the appropriate Insurer, an appropriate notice regarding the claiming or disposing of the Retained Medical Records. If the Retained Medical Records are not claimed by a resident or insurance provider within one year after such notice is provided, the Post-Restructuring Debtors shall be and hereby are authorized to destroy, abandon, or otherwise dispose of the Retained Medical Records.

### 2. Following Consummation of the Restructuring Transaction

The Post-Restructuring Debtors shall maintain the Debtors' Books and Records, including all medical records, in the ordinary course of business for the period of time required by applicable law.

## S. Accounts and Reserves

### 1. Disbursement Account(s)

On or prior to the Effective Date, the Disbursement Account(s) will be established and maintained in one or more federally insured domestic banks in the name of the Post-Restructuring Debtors, the Liquidation Trust, or the Wind-Down Trust, as applicable.

### 2. Professional Fee Escrow Account

Pursuant to the terms set forth in Article II.E.2 hereof, which are incorporated herein by reference, as soon as practicable after Confirmation and not later than the Effective Date, the Professional Fee Escrow Account shall be funded with Cash in the Amount of the Professional Fee Estimate, shall be maintained in trust for the Professionals by the Post-Restructuring Debtors or the Wind-Down Trustee (if applicable), and shall be used to pay the Allowed Professional Fee Claims. Such funds shall not be considered property of the Debtors' Estates or the Liquidation Trust Assets. After all Professional Fee Claims are Allowed or Disallowed and the Allowed amounts of such Claims are paid by the Post-Restructuring Debtors or the Wind-Down Trustee (if applicable), any remaining Cash in the Professional Fee Escrow Account shall be transferred to the Liquidation Trust and shall become a Liquidation Trust Asset.

### 3. Other Reserves

The Debtors, the Liquidation Trust, or the Administrative PL/GL Claim Fund Administrator, as applicable, shall establish and administer any other necessary reserves that may be required under the Plan or the Liquidation Trust Agreement, or the Administrative PL/GL Claim Settlement Fund Agreement, including, without limitation, the Disputed Claims Reserve, the Administrative and Priority Claim Reserve, the Administrative PL/GL Claim Fund, the Convenience Claim Reserve, and the Wind-Down Reserve (if applicable), as outlined in the Sources and Uses.

## T. Exemption from Certain Transfer Taxes

Pursuant to Bankruptcy Code section 1146(a), any transfers of property pursuant hereto shall not be subject to any stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, personal property tax, sales tax, use tax, privilege tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local government officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment. Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the assuming and assigning any contract, lease or sublease; (3) any transaction authorized by the Plan; (4) any sale of an Asset by the Liquidation Trust in furtherance of the Plan, including but not limited to any sale of personal or real property; (5) any transfer tax in connection with the Sale Transaction; and (6) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan.

# ARTICLE V.
# TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A. Assumption and Rejection of Executory Contracts and Unexpired Leases

### 1. Assumption and Assignment to Buyer

The Debtors' assumption and assignment of Executory Contracts and Unexpired Leases to the Buyer in connection with the Sale Transaction shall occur on the Closing Date and shall be governed by and subject to the terms of the Sale Transaction Documents. To the extent that the Debtors seek to assume any Executory Contracts or Unexpired Leases not otherwise selected for assumption and assignment by the Buyer, any such assumption shall be governed by the terms of Article V.A.2 and Article V.A.3 herein.

For the avoidance of doubt, following consummation of the Sale Transaction, the Buyer shall have independent standing and authority to participate in the prosecution, litigation, compromise, and settlement of any Cure Dispute or other dispute regarding any Cure Cost with respect to any Executory Contract or Unexpired Lease to be assumed and assigned to the Buyer or its designee(s), or for which the Buyer is or may otherwise be responsible pursuant to the Sale Transaction Documents. Absent entry of an Order to the contrary, no Cure Dispute with respect to any Executory Contract or Unexpired Lease to be assumed and assigned to the Buyer or its designee(s), or for which the Buyer is or may otherwise be responsible pursuant to the Sale Transaction Documents, shall be settled, Allowed, or paid without (a) the Buyer's prior written consent, and (b) to the extent the Cure Cost Cap (as defined in the APA) has been or will be exhausted as a result of the proposed resolution of the Cure Dispute, the prior written consent of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, as applicable (which consent shall not be unreasonably withheld, conditioned, or delayed).

### 2. Assumption or Rejection by Debtors Following Sale Transaction

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan (including, for the avoidance of doubt, the Sale Transaction Documents), each of the Executory Contracts and Unexpired Leases to which any Debtor is a party shall be deemed automatically rejected by the Debtors as of the Effective Date, unless such contract or lease (a) previously has been assumed, assumed and assigned to the Buyer, or rejected by the applicable Debtor with the approval of the Bankruptcy Court; (b) expired or terminated pursuant to its own terms; (c) is the subject of a motion to assume or reject pending before the Bankruptcy Court as of the Confirmation Date; (d) is specifically identified in the Plan, the Plan Supplement (including an Assumption Schedule), or other notice filed on the docket of the Chapter 11 Cases as an Executory Contract or Unexpired Lease to be assumed by the Debtors (including in connection with the ACO Transaction), or assumed and assigned by the Debtors to the Buyer as of the Closing Date; (e) is subject to a pending Cure Dispute as of the Effective Date and shall be assumed, assumed and assigned, or rejected, as applicable, upon the resolution of such Cure Dispute; or (f) is an intercompany Executory Contract or Unexpired Lease to which only Debtor Entities are a party (except for (i) those to which solely the ACO Entities are a party, or to which the ACO Entities, on the one hand, and another Debtor Entity on the other, are party, all of which, unless identified on an Assumption Schedule, shall be automatically rejected as of the ACO Effective Date, and (ii) that certain *Amended and Restated Sub-Sublease Agreement* dated January 1, 2025 between Debtor Genesis PM PA Operations LLC and various Debtor Entities with respect to 22 Facilities in Pennsylvania, which shall be automatically rejected as of the Effective Date). Nothing contained in the Plan, nor the inclusion of a document on an Assumption Schedule, shall constitute an admission by a Debtor that any such contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or its successors and assigns has any liability thereunder. The Debtors reserve their rights, at any time before the Confirmation Date, to assume or assume and assign any Executory Contract or Unexpired Lease that was not already rejected prior to the Confirmation Date. For the avoidance of doubt, all decisions with respect to assumption and assignment to the Buyer shall be made in advance of the Closing Date in accordance with the Sale Transaction Documents, and all decisions with respect to assumption of any Executory Contracts or Unexpired Leases not otherwise selected for assumption and assignment by the Buyer shall be made by the Debtors in advance of the Confirmation Date, subject to the terms of the APA.

Notwithstanding anything to the contrary in the Plan, each Executory Contract and Unexpired Lease to which any ACO Entity is a party (including, without limitation, any provider agreement, participation agreement, or payor agreement) that is specifically identified on an Assumption Schedule with respect to the ACO Entities to be assumed, as designated by the Buyer in accordance with the Sale Transaction Documents and included in the Plan Supplement, shall be deemed assumed by such ACO Entity (and not assumed and assigned) pursuant to Bankruptcy Code sections 365 and 1123 as of the ACO Effective Date. Except as otherwise provided in the Sale Transaction Documents, each other Executory Contract and Unexpired Lease to which any ACO Entity is a party shall be deemed rejected by such ACO Entity as of the ACO Effective Date, unless such Executory Contract or Unexpired Lease (a) previously has been assumed or rejected by the applicable ACO Entity with the approval of the Bankruptcy Court, (b) expired or terminated pursuant to its own terms, or (c) is the subject of a motion to assume or reject pending before the Bankruptcy Court as of the Confirmation Date. Any Cure Cost with respect to an Executory

Contract or Unexpired Lease assumed by an ACO Entity shall be paid in accordance with, and allocated between the Debtors and the Buyer as provided in, the Sale Transaction Documents, and the Buyer, and the Debtors (if applicable), shall have the standing and consent rights set forth in Article V.A.1 with respect to any Cure Dispute relating thereto. The assumption by an ACO Entity of any Executory Contract or Unexpired Lease, and the consummation of the ACO Transaction, shall not constitute an assignment or a change of control giving rise to any right of termination, consent, acceleration, fee, or other remedy of the non-Debtor counterparty, and any such provision shall be unenforceable in accordance with Bankruptcy Code section 365 and Article VII.G hereof.

To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to the Plan or any prior order of the Bankruptcy Court (including, without limitation, any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (1) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (2) any Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease, or (3) the Confirmation or Consummation of the Plan, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

### 3. Assumption or Rejection by Debtors Following Restructuring Transaction

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, including an Assumption Schedule, each of the Executory Contracts and Unexpired Leases to which any Debtor is a party shall be deemed automatically rejected by the Debtors as of the Effective Date, unless such contract or lease (1) previously has been assumed, assumed and assigned, or rejected by the applicable Debtor with the approval of the Bankruptcy Court; (2) expired or terminated pursuant to its own terms; (3) is the subject of a motion to assume or reject pending before the Bankruptcy Court as of the Confirmation Date; (4) is specifically identified in the Plan, the Plan Supplement (including an Assumption Schedule), or other notice filed on the docket of the Chapter 11 Cases as an Executory Contract or Unexpired Lease to be assumed by the Debtors, or assumed and assigned by the Debtors to the Buyer as of the Closing Date; or (5) is subject to a pending Cure Dispute as of the Effective Date and shall be assumed, assumed and assigned, or rejected, as applicable, upon the resolution of such Cure Dispute; *provided*, *however*, that, nothing contained in the Plan, nor the inclusion of a document on an Assumption Schedule, shall constitute an admission by a Debtor that any such contract or lease is an Executory Contract or Unexpired Lease or that a Debtor or its successors and assigns has any liability thereunder; and, *provided, further*, that the Debtors reserve their rights, at any time before the Confirmation Date, to assume or assume and assign any Executory Contract or Unexpired Lease that was not already rejected prior to the Confirmation Date. For the avoidance of doubt, all decisions with respect to assumption or assumption and assignment shall be made by the Debtors in advance of the Confirmation Date. The Confirmation Order shall constitute an order approving such assumption, assumption and assignment, or

rejection, as applicable, of Executory Contracts or Unexpired Leases as of the Effective Date pursuant to Bankruptcy Code section 365(a).

To the extent any provision in any Executory Contract or Unexpired Lease assumed by the Debtors pursuant to the Plan or any prior order of the Bankruptcy Court (including, without limitation, any "change of control" provision) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (1) the commencement of these Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (2) any Debtor's assumption of such Executory Contract or Unexpired Lease, or (3) the Confirmation or Consummation of the Plan, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

## B. Cure of Defaults

### 1. Sale Transaction

In the event of a proposed assumption by the Debtors of an Executory Contract or Unexpired Lease not otherwise selected by the Buyer for assumption and assignment in advance of the Closing Date, the Debtors shall File and serve upon counterparties to such Executory Contracts and Unexpired Leases, an Assumption Schedule of their proposed assumption which will: (1) list the applicable Cure Cost, if any; (2) identify the applicable Debtor assuming the Executory Contract or Unexpired Lease; (3) describe the procedures for filing objections thereto; and (4) explain the process by which related disputes will be resolved by the Bankruptcy Court. The Filing and service of any such Assumption Schedule shall not obligate the Debtors to assume any Executory Contract or Unexpired Lease set forth in such Assumption Schedule. The listing of a document on the Assumption Schedule shall not constitute an admission by the Debtors that such document is an Executory Contract or Unexpired Lease or that the Debtors have any liability thereunder, with the exception of the amount of any proposed Cure Cost listed thereon. Unless otherwise specified on the Assumption Schedule, each Executory Contract or Unexpired Lease listed on the Assumption Schedule shall include all exhibits, schedules, riders, modifications, amendments, supplements, attachments, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument or other document is listed on the Assumption Schedule. In the event that the Debtors determine to amend the Assumption Schedule prior to the Confirmation Date, (1) the Debtors shall file a notice of any such amendment with the Bankruptcy Court and serve such notice on any affected party and (2) any Executory Contract or Unexpired Lease deleted from the Assumption Schedule shall be deemed rejected unless otherwise assumed as of the Effective Date.

**Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or any related Cure Cost set forth in an Assumption Schedule, must be Filed, served, and actually received by counsel to the Debtors by no later than 4:00 p.m. (prevailing Central Time) on the date that is seven (7) calendar days after the date of service**

**of an Assumption Schedule; *provided, however*, that, to the extent the counterparty to an Executory Contract or Unexpired Lease was previously served with the Cure Notice, then the procedures set forth therein govern such counterparty's ability to object (as opposed to the procedures set forth in the preceding clause).** Any counterparty to an Executory Contract or Unexpired Lease that does not timely object to the notice of the proposed assumption of such Executory Contract or Unexpired Lease shall be deemed to have consented to assumption of the applicable Executory Contract or Unexpired Lease notwithstanding any provision thereof that purports to (1) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (2) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (3) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor or Post-Restructuring Debtor, under such Executory Contract or Unexpired Lease; or (4) create or impose a Lien upon any property or Asset of any Debtor or Post-Restructuring Debtor, as applicable. Each such provision shall be deemed to not apply to the assumption of such Executory Contract or Unexpired Lease pursuant to the Plan and counterparties to assumed Executory Contracts or Unexpired Leases that fail to object to the proposed assumption in accordance with the terms set forth herein, shall forever be barred and enjoined from objecting to the proposed assumption or the validity of such assumption (including with respect to any proposed Cure Cost or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

Unless another Order is entered by the Bankruptcy Court approving the proposed assumption prior to the Confirmation Date, the Confirmation Order shall constitute an Order of the Bankruptcy Court approving the proposed assumption of Executory Contracts and Unexpired Leases pursuant to Bankruptcy Code sections 365 and 1123 as of the Effective Date.

In the event of a Cure Dispute regarding (1) the amount of any Cure Cost, (2) the ability of any Debtor to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the applicable payment of the Cure Cost required by Bankruptcy Code section 365(b)(1) shall be made following the entry of a Final Order resolving the dispute and approving such assumption, or the settlement of any dispute regarding the Cure Cost or the nature thereof by the Debtors or the Post-Restructuring Debtors, as applicable. To the extent a Cure Dispute relates solely to the Cure Cost, the Debtors may assume the applicable Executory Contract or Unexpired Lease prior to the resolution of the Cure Dispute; *provided, however*, that the Debtors or the Post-Restructuring Debtors (as applicable) must reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Cost by the non-Debtor party (or such smaller amount as may be fixed or estimated by the or otherwise agreed to by such non-Debtor party and the Debtors or the Post-Restructuring Debtors (as applicable)). The Debtors or the Post-Restructuring Debtors (as applicable) may settle any dispute regarding the Cure Cost or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Any defaults or Cure Costs under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied by the Debtors, as applicable, pursuant to and to the extent required by Bankruptcy Code section 365(b)(1), by payment of the applicable Cure Cost

on the Effective Date, or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree in writing.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, and payment of any Cure Costs relating thereto, shall, upon satisfaction of the applicable requirements of Bankruptcy Code section 365, result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or non-monetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, as provided in Bankruptcy Code section 365. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed by Final Order and for which such Cure Costs have been satisfied, settled, or waived shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

**2. Restructuring Transaction**

In the event of a proposed assumption by the Debtors of an Executory Contract or Unexpired Lease under the Plan in connection with a Restructuring Transaction, the Debtors shall File and serve upon counterparties to such Executory Contracts and Unexpired Leases, an Assumption Schedule of their proposed assumption which will: (1) list the applicable Cure Cost, if any; (2) identify the applicable Debtor assuming the Executory Contract or Unexpired Lease; (3) describe the procedures for filing objections thereto; and (4) explain the process by which related disputes will be resolved by the Bankruptcy Court. The Filing and service of any such Assumption Schedule shall not obligate the Debtors to assume any Executory Contract or Unexpired Lease set forth in such Assumption Schedule. The listing of a document on the Assumption Schedule shall not constitute an admission by the Debtors that such document is an Executory Contract or Unexpired Lease or that the Debtors have any liability thereunder, with the exception of the amount of any proposed Cure Cost listed thereon. Unless otherwise specified on the Assumption Schedule, each Executory Contract or Unexpired Lease listed on the Assumption Schedule shall include all exhibits, schedules, riders, modifications, amendments, supplements, attachments, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument or other document is listed on the Assumption Schedule. In the event that the Debtors determine to amend the Assumption Schedule prior to the Confirmation Date, (1) the Debtors shall file a notice of any such amendment with the Bankruptcy Court and serve such notice on any affected party and (2) any Executory Contract or Unexpired Lease deleted from the Assumption Schedule shall be deemed rejected unless otherwise assumed as of the Effective Date.

**Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or any related Cure Cost set forth in an Assumption Schedule, must be Filed, served, and actually received by counsel to the Debtors by no later than 4:00 p.m. (prevailing Central Time) on the date that is fourteen (14) calendar days after the date of service of an Assumption Schedule.** Any counterparty to an Executory Contract or Unexpired Lease that does not timely object to the notice of the proposed assumption or assumption and assignment of such Executory Contract or Unexpired Lease shall be deemed to have consented to

assumption of the applicable Executory Contract or Unexpired Lease notwithstanding any provision thereof that purports to (1) prohibit, restrict, or condition the transfer or assignment of such contract or lease; (2) terminate or modify, or permit the termination or modification of, a contract or lease as a result of any direct or indirect transfer or assignment of the rights of any Debtor under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan; (3) increase, accelerate, or otherwise alter any obligations or liabilities of any Debtor or Post-Restructuring Debtor, under such Executory Contract or Unexpired Lease; or (4) create or impose a Lien upon any property or Asset of any Debtor or Post-Restructuring Debtor, as applicable. Each such provision shall be deemed to not apply to the assumption of such Executory Contract or Unexpired Lease pursuant to the Plan and counterparties to assumed Executory Contracts or Unexpired Leases that fail to object to the proposed assumption in accordance with the terms set forth herein, shall forever be barred and enjoined from objecting to the proposed assumption or the validity of such assumption (including with respect to any proposed Cure Cost or the provision of adequate assurance of future performance), or taking actions prohibited by the foregoing or the Bankruptcy Code on account of transactions contemplated by the Plan.

Unless another Order is entered by the Bankruptcy Court approving the proposed assumption prior to the Confirmation Date, the Confirmation Order shall constitute an Order of the Bankruptcy Court approving the proposed assumption of Executory Contracts and Unexpired Leases pursuant to Bankruptcy Code sections 365 and 1123 as of the Effective Date.

In the event of a Cure Dispute regarding (1) the amount of any Cure Cost, (2) the ability of any Debtor to provide "adequate assurance of future performance" (within the meaning of Bankruptcy Code section 365) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the applicable payment of the Cure Cost required by Bankruptcy Code section 365(b)(1) shall be made following the entry of a Final Order resolving the dispute and approving such assumption, or the settlement of any dispute regarding the Cure Cost or the nature thereof by the Debtors or the Post-Restructuring Debtors, as applicable. To the extent a Cure Dispute relates solely to the Cure Cost, the Debtors may assume the applicable Executory Contract or Unexpired Lease prior to the resolution of the Cure Dispute; *provided, however*, that the Debtors or the Post-Restructuring Debtors (as applicable) must reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Cost by the non-Debtor party (or such smaller amount as may be fixed or estimated by the or otherwise agreed to by such non-Debtor party and the Debtors or the Post-Restructuring Debtors (as applicable)). The Debtors or the Post-Restructuring Debtors (as applicable) may settle any dispute regarding the Cure Cost or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Any defaults or Cure Costs under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied by the Debtors, as applicable, pursuant to and to the extent required by Bankruptcy Code section 365(b)(1), by payment of the applicable Cure Cost on the Effective Date, or on such other terms as the Bankruptcy Court may order or the parties to such Executory Contracts or Unexpired Leases may otherwise agree in writing.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan, and payment of any Cure Costs relating thereto, shall, upon satisfaction of the applicable requirements

of Bankruptcy Code section 365, result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or non-monetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption, as provided in Bankruptcy Code section 365. Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed by Final Order and for which such Cure Costs have been satisfied, settled, or waived shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### C. Rejection Damages Bar Date

If the rejection of an Executory Contract or Unexpired Lease pursuant to Article V.A hereof gives rise to a Claim for damages stemming from such rejection by the other party or parties to such contract or lease following consummation of the Sale Transaction or a Restructuring Transaction, such Claim shall be forever barred and shall not be enforceable against the Debtors, their Estates, the Post-Restructuring Debtors, the ACO Entities, the Wind-Down Trust (if applicable), the Liquidation Trust, or their respective successors, assets, or properties unless a Proof of Claim is Filed with the Claims and Noticing Agent by the Rejection Damages Bar Date. Unless otherwise Ordered by the Bankruptcy Court, all Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be treated as General Unsecured Claims against the applicable Debtor in the applicable GUC Distribution Group class under the Plan and shall, if Allowed, be treated in accordance with the provisions thereunder, including the GUC Distribution Model. Any Proofs of Claim for rejection damage claims not Filed by the Rejection Damages Bar Date will be Disallowed automatically, forever barred from assertion, and shall not be enforceable against the Debtors, their Estates, the Post-Restructuring Debtors, the ACO Entities, the Wind-Down Trust (if applicable), the Liquidation Trust, or their respective successors, assets, or properties.

### D. Indemnification Obligations

On the Effective Date, any obligations of the Debtors pursuant to their organizational documents, including amendments, entered into any time prior to the Effective Date, to indemnify or reimburse any Person pursuant to the Debtors' operating agreements, bylaws, charters, limited liability company agreements, organizational documents, policy of providing employee indemnification, applicable state law or specific agreement in respect of any claims, demands, suits, causes of action, or proceedings against such Persons based upon any act or omission related to such Persons' service with, for or on behalf of the Debtors prior to the Effective Date with respect to all present and future actions, suits and proceedings relating to the Debtors shall be deemed rejected by the Debtors as of the Effective Date; *provided, however*, that the Holders of any Claim relating thereto shall be entitled to assert (i) a claim under any applicable Insurance Policy or (ii) a General Unsecured Claim against the Debtors for such prepetition obligations, which shall be filed no later than the Rejection Damages Bar Date; *provided, further*, that any limitation of liability or state law exculpation provisions pursuant to the Debtors' operating agreements, bylaws, charters, limited liability company agreements, organizational documents, policy of providing employee indemnification, applicable state law or specific agreement shall not be impaired by the foregoing. For the avoidance of doubt, all related monetary obligations with

respect to the foregoing shall be limited solely to (i) available coverage under the Insurance Policies (solely to the extent such limitation does not invalidate the Insurance Policies or result in the loss of applicable coverage), or (ii) to the extent such Holder asserts a General Unsecured Claim that is subsequently Allowed, such Holder shall be entitled to receive its Pro Rata Share of Distributions from the Liquidation Trust Assets pursuant to the GUC Distribution Model. Neither the Post-Restructuring Debtors nor the Wind-Down Trust (if applicable) shall be liable for any of the foregoing.

The foregoing section shall not apply to or cover any Claims, suits or actions against a Person that result in a final order determining that such covered person is liable for breach of the duty of loyalty, bad faith, intentional misconduct, knowing violations of law, improper personal benefit, or liability pursuant to section 174 of the Delaware General Corporation Code. For the avoidance of doubt, this Article V.D shall not apply to or govern the Prepetition ABL – New Operator Indemnification Claims (as defined in the Disclosure Statement), which shall remain subject to the indemnification provisions set forth in the Prepetition ABL Documents, to the extent applicable, and shall be addressed in connection with the treatment of the Prepetition ABL Claims, including all liabilities associated therewith, pursuant to the Sale Transaction Documents and/or the Plan. The Prepetition ABL Secured Parties and the Debtors reserve all rights with respect to the same.

## E. Insurance Policies

### 1. Following Consummation of the Sale Transaction

#### a. General

On the Effective Date, the Insurance Policies, other than any Insurance Policy assumed and assigned or otherwise transferred to the Buyer pursuant to the Sale Transaction Documents, shall be treated as follows:

(i) Each such Insurance Policy that has not otherwise expired or terminated on its own terms, other than the D&O Liability Insurance Policies, shall be cancelled effective as of the Effective Date (or such later date as the Liquidation Trustee may designate by written notice to the applicable Insurer), whether or not such Insurance Policy is an Executory Contract. To the extent any D&O Liability Insurance Policy is an Executory Contract, such D&O Liability Insurance Policy shall be assumed by the applicable Debtor and assigned to the Liquidation Trust as of the Effective Date, and any Cure Cost with respect thereto shall be paid by the Debtors on or before the Effective Date.

(ii) All of the Debtors' rights and interests under each Insurance Policy (including the D&O Liability Insurance Policies), whether or not such Insurance Policy is an Executory Contract and whether such Insurance Policy is in effect or has been or will be cancelled, rejected, terminated, or expired, including rights to coverage, proceeds, defense, indemnity, contribution, and reimbursement with respect to any occurrence, act, omission, claim, or circumstance arising, made, or noticed prior to such cancellation, rejection, termination, or expiration; rights to returned, unearned, or refunded premiums (including any premium refunds arising from cancellation of an Insurance Policy pursuant to clause (i) hereof), audit and

retrospective premium adjustments, and runoff payments; rights to purchase or exercise any extended reporting period or similar option; rights to collateral, deposits, loss funds, and letters of credit; rights against insurance brokers and premium financing providers relating to any Insurance Policy, including to unearned commissions and premium financing refunds; and all Causes of Action against Insurers or any other Person relating thereto (collectively, the "Insurance Rights"), shall vest in the Liquidation Trust as Liquidation Trust Assets in accordance with the terms of such Insurance Policy. Except with respect to any D&O Liability Insurance Policy that is an Executory Contract assumed and assigned pursuant to clause (i) hereof, such vesting shall not constitute an assumption under Bankruptcy Code section 365 and shall be effective notwithstanding any provision of the applicable Insurance Policy or applicable non-bankruptcy law that purports to prohibit, restrict, or condition such vesting, pursuant to Bankruptcy Code sections 541(c)(1) and 1123(a)(5). The Liquidation Trust shall take the Insurance Rights subject to the terms and conditions of the applicable Insurance Policy.

(iii) Any dispute as to whether an Insurance Policy is an Executory Contract shall be determined by the Bankruptcy Court; *provided*, that no such dispute shall affect the cancellation of any Insurance Policy pursuant to clause (i) hereof or the vesting of the Insurance Rights in the Liquidation Trust pursuant to clause (ii) hereof.

(iv) Except as expressly provided in this Article V.E.1.a, including with respect to the cancellation and rejection of Insurance Policies pursuant to clause (i) hereof and the vesting of the Insurance Rights pursuant to clause (ii) hereof, nothing in the Plan or the Confirmation Order shall alter the rights and obligations of the Insurers under the Insurance Policies (which rights and obligations shall be determined under the applicable Insurance Policies and applicable non-bankruptcy law relating thereto) or modify the coverage thereunder.

Continuing obligations of Insurers under Insurance Policies that have ceased to be executory on or prior to the Effective Date, including, without limitation, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, or to provide indemnification, contribution or reimbursement, will continue and will be binding, in accordance with the terms of such Insurance Policy, and shall inure to the benefit of the Liquidation Trust, notwithstanding any provision to the contrary in the Plan, unless otherwise specifically terminated by the Debtors (or following the transfer contemplated by this section, the Liquidation Trust) or by order of the Bankruptcy Court; *provided*, that the cancellation of any Insurance Policy pursuant to clause (i) of this Article V.E.1.a shall not constitute a termination of any such continuing obligation.

**b. D&O Liability Insurance Policies**

Confirmation of the Plan shall not discharge, impair, or otherwise modify any defense or indemnity obligations under the D&O Liability Insurance Policies. Nothing in the Plan or the Confirmation Order shall cause the invalidation of the D&O Liability Insurance Policies or result in the loss of applicable coverage. For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall amend, modify, or otherwise alter any rights of any current or former officers or directors of the Debtors with respect to the D&O Liability Insurance Policies. Prior to and following the transfer of the D&O Liability Insurance Policies to the Liquidation Trust, coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain

available to all individuals insured thereunder, including, but not limited to, all directors (including the Independent Directors), managers, officers (including the Co-CROs), and employees who served in such capacity at any time prior to the Effective Date.

The Liquidation Trust shall maintain tail coverage under any D&O Liability Insurance Policies for the six (6) year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the D&O Liability Insurance Policies; *provided, however*, that the Debtors shall pay or fund in full all premium obligations for such tail coverage prior to the Effective Date. In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases. Subject to the above premium payment or funding obligation, in no event shall the Post-Restructuring Debtors or the Wind-Down Trust have any obligation to satisfy or pay any deductible, retention, or other financial obligation under the D&O Liability Insurance Policies after the Effective Date and the Liquidation Trust shall be solely responsible for any such expenses.

After the Effective Date, the Liquidation Trust shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors (including the Independent Directors), managers, officers (including the Co-CROs), and employees, as applicable, of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the benefits of any such D&O Liability Insurance Policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors, managers, and/or officers, as applicable, remain in such positions after the Effective Date; *provided, however*, that, any of the foregoing individuals shall provide notice to the Liquidation Trustee of his or her intent to file such claim under the D&O Liability Insurance Policies.

With respect to any D&O Claim or Assigned Cause of Action against any directors, officers, managers, or employees of the Debtors who are entitled to the benefits of any D&O Liability Insurance Policies, the Liquidation Trustee shall seek to satisfy any obligations of such directors, officers, managers, or employees arising from a D&O Claim (or other Assigned Cause of Action), first, from the proceeds of such D&O Liability Insurance Policies.

### 2. Following Consummation of the Restructuring Transaction

#### a. General

All Insurance Policies to which any Debtor is a party or beneficiary as of the Effective Date, other than the D&O Liability Insurance Policies, shall be deemed an Executory Contract and shall be automatically assumed by the applicable Debtor, effective as of the Effective Date, pursuant to Bankruptcy Code sections 365 and 1123 of the Bankruptcy Code. Nothing in the Plan or the Confirmation Order shall alter the rights and obligations of the Insurers under the Insurance Policies (which rights and obligations shall be determined under the applicable Insurance Policies and applicable non-bankruptcy law relating thereto) or modify the coverage thereunder, and all of the Insurance Policies shall continue in full force and effect according to their terms and conditions. Nothing in the Plan or the Confirmation Order shall cause the invalidation of the Insurance Policies or result in the loss of applicable coverage.

Continuing obligations of Insurers under Insurance Policies that have ceased to be executory on or prior to the Effective Date, including, without limitation, continuing obligations to pay insured claims, to defend against and process claims, to refund premiums or overpayments, or to provide indemnification, contribution or reimbursement, will continue and will be binding on such third parties, notwithstanding any provision to the contrary in the Plan, unless otherwise specifically terminated by the Post-Restructuring Debtors or by order of the Bankruptcy Court.

**b. D&O Liability Insurance Policies**

The D&O Liability Insurance Policies shall be transferred as Assets of the Estates to the Liquidation Trust by the applicable Debtor effective as of the Effective Date and shall continue in full force and effect thereafter in accordance with their respective terms. Nothing in the Plan or the Confirmation Order shall cause the invalidation of the Insurance Policies, including the D&O Liability Insurance Policies, or result in the loss of applicable coverage. Confirmation of the Plan shall not discharge, impair, or otherwise modify any defense or indemnity obligations assumed by the transfer of the D&O Liability Insurance Policies to the Liquidation Trust. For the avoidance of doubt, nothing in the Plan or the Confirmation Order shall amend, modify, or otherwise alter any rights of any current or former officers or directors of the Debtors with respect to the D&O Liability Insurance Policies. Prior to and following the transfer of the D&O Liability Insurance Policies to the Liquidation Trust, coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals insured thereunder, including, but not limited to, all directors (including the Independent Directors), managers, officers (including the Co-CROs), and employees who served in such capacity at any time prior to the Effective Date.

The Liquidation Trust shall maintain tail coverage under any D&O Liability Insurance Policies for the six (6) year period following the Effective Date on terms no less favorable than under, and with an aggregate limit of liability no less than the aggregate limit of liability under, the D&O Liability Insurance Policies; *provided, however*, that any such obligation shall be subject to the Debtors' prior payment or funding of all such premium obligations. In addition to such tail coverage, the D&O Liability Insurance Policies shall remain in place in the ordinary course during the Chapter 11 Cases. Subject to the above premium payment or funding obligation, in no event shall the Post-Restructuring Debtors or the Wind-Down Trust have any obligation to satisfy or pay any deductible, retention, or other financial obligation under the D&O Liability Insurance Policies after the Effective Date and the Liquidation Trust shall be solely responsible for any such expenses.

After the Effective Date, the Liquidation Trust shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policies (including any "tail policy") in effect on or after the Petition Date, with respect to conduct or events occurring prior to the Effective Date, and all directors (including the Independent Directors), managers, officers (including the Co-CROs), and employees, as applicable, of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the benefits of any such D&O Liability Insurance Policy for the full term of such policy, to the extent set forth therein, regardless of whether such directors, managers, and/or officers, as applicable, remain in such positions after the Effective Date; *provided, however*, that, any of the foregoing individuals shall provide notice to the Liquidation Trustee of his or her intent to file such claim under the D&O Liability Insurance Policies.

With respect to any D&O Claim or Assigned Cause of Action against any directors, officers, managers, or employees of the Debtors who are entitled to the benefits of any D&O Liability Insurance Policies, the Liquidation Trustee shall seek to satisfy any obligations of such directors, officers, managers, or employees arising from a D&O Claim (or other Assigned Cause of Action), first, from the proceeds of such D&O Liability Insurance Policies.

## F. Employment Agreements

### 1. Following Consummation of the Sale Transaction

Any Employment Agreement not assumed and assigned by the Debtors to the Buyer pursuant to the Sale Transaction Documents as part of the Sale Transaction shall be deemed rejected pursuant to Bankruptcy Code sections 365 and 1123 on the Effective Date of the Plan.

### 2. Following Consummation of the Restructuring Transaction

Any Employment Agreement not assumed by the Debtors shall be deemed rejected pursuant to Bankruptcy Code sections 365 and 1123 on the Effective Date of the Plan.

## G. Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to Bankruptcy Code section 365(d)(4), unless such deadline has expired.

## H. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided herein or by separate Order of the Bankruptcy Court, each Executory Contract and Unexpired Lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed in the Assumption Schedule(s).

## I. Reservation of Rights

Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors or the Post-Restructuring Debtors that any such contract or lease is or is not an Executory Contract or Unexpired Lease or that the Debtors or their respective Affiliates have any liability thereunder. Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Post-Restructuring Debtors under any executory or non-executory contract or unexpired or expired lease. Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, the Wind-Down Trust, the Liquidation Trust, or the Liquidation Trustee, as applicable, under any executory or non-executory contract or unexpired or expired lease. If there is a dispute regarding whether a contract or lease

is or was executory or unexpired at the time of its assumption or assumption/assignment under the Plan, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee (if applicable), or the Liquidation Trustee, as applicable, shall have thirty (30) calendar days following entry of an Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

### A. Time and Manner of Distributions

Distributions under the Plan shall be made to each Holder of an Allowed Claim as follows:

1. Prepetition Welltower & Omega Term Loan Claim Distributions: Following consummation of the Sale Transaction, on or before the Effective Date, the Debtors shall pay the Allowed Prepetition Welltower & Omega Term Loan Claims in full in Cash.

2. Liquidation Trust Initial Distributions of Cash: On or as soon as practicable after the Effective Date, the Liquidation Trust shall distribute, or cause to be distributed, to (a) Holders of Allowed Other Secured Claims, Allowed Administrative Expense Claims (including Allowed Administrative PL/GL Claims to the extent such Holder(s) validly opt(s) out of the Administrative PL/GL Claim Fund), Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Convenience Claims, Cash as determined in accordance with the provisions of Article II and Article III hereof; and (b) each Holder of an Allowed General Unsecured Claim, such Creditor's share, if any, of the GUC Distribution Assets and the GUC Distribution Interests, as determined pursuant to the GUC Distribution Model.

3. Distributions of Professional Fee Claims: On or as soon as practicable after entry of an Order approving and allowing the Professional Fee Claims set forth in each Final Fee Application, the Post-Restructuring Debtors or the Wind-Down Trustee, as applicable, shall distribute to Professionals an amount equal to their Allowed Professional Fee Claim from the Professional Fee Escrow Account or Liquidation Trust Assets, as applicable.

4. Liquidation Trust Subsequent Distributions of Cash: On the first (1st) Business Day that is after the close of one (1) full calendar quarter following the date of the initial Effective Date Distributions, and, thereafter, on each first (1st) Business Day following the close of two (2) full calendar quarters, the Liquidation Trustee, as Disbursing Agent, shall distribute, or cause to be distributed, to Holders of Disputed Claims, and to each Holder of an Allowed Claim an amount equal to such Creditor's Pro Rata Share, if any, of the proceeds of the Liquidation Trust Assets in Cash until such time as such proceeds are depleted.

5. Administrative PL/GL Claim Fund Distributions: Following liquidation of all Allowed Administrative PL/GL Claims covered by the Administrative PL/GL Claim Fund (or such earlier date as the Administrative PL/GL Claim Fund

Administrator deems appropriate subject to an appropriate reserve), the Administrative PL/GL Claim Fund Administrator shall make Distributions from the Administrative PL/GL Claim Fund to Holders of Allowed Administrative PL/GL Claims based on the Allowed amount of each such Claim; *provided, however*, that prior to any Distribution to Holders of Allowed Administrative PL/GL Claims, the Administrative PL/GL Claim Administrator shall first deduct from the Administrative PL/GL Claim Contribution (i) the Administrative PL/GL Claim Fund Administrator's compensation as set forth in Section 6 of the Administrative PL/GL Claim Settlement Term Sheet, and (ii) all other reasonable costs and expenses incurred in administering the Administrative PL/GL Claim Fund, including, without limitation, arbitration costs, professional fees, and other administrative expenses; *provided further*, that no Holder of an Allowed Administrative PL/GL Claim shall receive more than full satisfaction of his or her Allowed Administrative PL/GL Claim.

Notwithstanding any other provision of the Plan to the contrary, no Distribution shall be made on account of any Claim or portion thereof that (1) has been satisfied after the Petition Date; (2) is listed in the Schedules as contingent, unliquidated, disputed or in a zero amount, and for which a Proof of Claim has not been timely Filed; (3) is subject to an Objection by the Debtors or the Liquidation Trust; or (4) is evidenced by a Proof of Claim that has been amended by a subsequently Filed Proof of Claim.

## B. Timeliness of Payments

Any payments or Distributions to be made pursuant to the Plan shall be deemed to be timely-made if made within twenty (20) days after the dates specified in the Plan. Whenever any Distribution to be made under the Plan shall be due on a day other than a Business Day, such Distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the applicable due date.

Distributions made after the Effective Date to Holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made on the Effective Date.

## C. Distributions by the Disbursing Agent

All Distributions under the Plan shall be made by the Post-Restructuring Debtors or the applicable Disbursing Agent, including the Wind-Down Trustee, the Liquidation Trustee, or the Administrative PL/GL Claim Fund Administrator, as applicable. The Disbursing Agent may (1) effect all actions and execute all agreements, instruments, and other documents necessary to carry out the provisions of the Plan, the Wind-Down Trust Agreement, the Liquidation Trust Agreement, the Administrative PL/GL Claim Settlement Trust Agreement, as applicable; (2) make all Distributions contemplated hereby; and (3) perform such other duties as may be required pursuant to the Plan, the Wind-Down Trust Agreement, the Liquidation Trust Agreement, or the Administrative PL/GL Claim Settlement Fund Agreement, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof. The applicable Disbursing Agent shall be deemed to hold all property to be distributed hereunder in Trust for the Persons entitled to

receive the same. The applicable Disbursing Agent shall not hold an economic or beneficial interest in such property. No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties. The Disbursing Agent shall be authorized and directed to rely upon the Debtors' Books and Records and the Liquidation Trust's representatives and professionals in determining Allowed Claims entitled to Distributions under the Plan in accordance with the terms and conditions of the Plan.

**D. Manner of Payment under the Plan**

Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made shall be made at the election and in the sole discretion of the applicable Disbursing Agent by check drawn on a domestic bank or by wire transfer from a domestic bank selected by the Disbursing Agent; *provided, however*, that no Cash payments shall be made to a Holder of an Allowed Claim until such time as the amount payable thereto is equal to or greater than Ten Dollars ($10.00).

**E. Foreign Currency Exchange Rate**

As of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal* on the Effective Date.

**F. Fractional Securities**

No fractional shares of Liquidation Trust Interests or Wind-Down Trust Interests (if applicable) shall be issued. Fractional shares of Liquidation Trust Interests and Wind-Down Trust Interests shall be rounded to the next greater or next lower number of shares in accordance with the following method: (a) fractions of one-half (1/2) or greater shall be rounded to the next higher whole number, and (b) fractions of less than one-half (1/2) shall be rounded to the next lower whole number. The total number of shares or interests of Liquidation Trusts Interests to be distributed to a Class hereunder shall be adjusted as necessary to account for the rounding provided for in this Article VI.F.

Notwithstanding any other provision of the Plan, the Disbursing Agent shall not be required to make Distributions or payments of fractions of dollars. Whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

**G. Delivery of Distributions and Undeliverable or Unclaimed Distributions**

**1. Delivery of Distributions in General**

Distributions and deliveries to Holders of Allowed Claims shall be made by the applicable Disbursing Agent (a) at the addresses reflected in the Schedules if no Proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address, (b) at the addresses set forth on the Proofs of Claim Filed by such Holders (or at the last known addresses of such Holders if no Proof of Claim is Filed or if the Debtors have been notified of a change of address), (c) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim, after sufficient evidence of such

addresses as may be requested by the applicable Disbursing Agent is provided, (d) at the addresses set forth in the other records of the Debtors or the applicable Disbursing Agent at the time of the Distribution, or (e) in the case of the Holder of a Claim that is governed by an agreement and is administered by an agent or servicer, at the addresses contained in the official records of such agent or servicer.

In making Distributions under the Plan, the applicable Disbursing Agent may rely upon the accuracy of the Claims Register maintained by the Claims and Noticing Agent in the Chapter 11 Cases, as modified by any Final Order of the Bankruptcy Court disallowing Claims in whole or in part.

**2. Undeliverable Distributions**

(a) Holding of Undeliverable Distributions: If any Distribution to any Holder of an Allowed Claim is returned to the applicable Disbursing Agent as undeliverable, no further Distributions shall be made to such Holder unless and until the Disbursing Agent is notified in writing of such Holder's then-current address and such Holder provides sufficient evidence of such address as may be requested by the Disbursing Agent, at which time all missed Distributions shall be made to such Holder without interest, subject to the time limitations set forth below. Undeliverable Distributions shall remain in the possession of the Liquidation Trust until the earlier of (a) such time as a Distribution becomes deliverable or (b) such undeliverable Distribution becomes an Unclaimed Distribution. Nothing contained in the Plan or the Liquidation Trust Agreement shall require the Debtors, the Liquidation Trust, the Liquidation Trustee, or any Disbursing Agent to attempt to locate any Holder of an Allowed Claim.

(b) Failure to Claim Undeliverable Distributions: On or about the second (2nd) anniversary of the Effective Date, the Liquidation Trustee shall file a list with the Bankruptcy Court setting forth the names of those Entities for which Distributions have been made hereunder and have been returned as undeliverable as of the date thereof. Any Holder of an Allowed Claim that does not assert its rights pursuant to the Plan to receive a Distribution within one-hundred and eighty (180) days from and after the Effective Date shall have its entitlement to such undeliverable Distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan. In such case, any consideration held for Distribution on account of such Claim shall revert to the Liquidation Trust for redistribution to Holders of Allowed Claims in accordance with the provisions of Article II and Article III hereof.

**3. Unclaimed Distributions**

Any Cash or other property to be distributed under the Plan shall revert to the Liquidation Trustee and/or the Liquidation Trust, as applicable, if it is not claimed by the Entity on or before the Unclaimed Distribution Deadline. If such Cash or other property is not claimed on or before the Unclaimed Distribution Deadline, the Distribution made to such Entity shall be deemed to be reduced to zero and any consideration held for Distribution on account of such Claim shall revert to the Liquidation Trust for redistribution to Holders of Allowed Claims in accordance with the provisions of Article II and Article III hereof.

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not cashed or deposited within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the Holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (a) the second (2nd) anniversary of the Effective Date or (b) ninety (90) days after the date of issuance of such check, if such check represents a final Distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Liquidation Trustee shall retain all monies related thereto for the sole purpose of redistribution to Creditors in accordance with the terms and provisions hereof.

In the case of Unclaimed Distributions on account of Allowed Other Secured Claims, Allowed Administrative Expense Claims, Allowed Priority Tax Claims, or Allowed Priority Non-Tax Claims, any Cash otherwise reserved for Unclaimed Distributions shall revert to the Liquidation Trust. In the case of Unclaimed Distributions on account of Liquidation Trust Interests, any Cash otherwise reserved for Unclaimed Distributions shall revert to the Liquidation Trust, and all title to and all beneficial interests in the Liquidation Trust Assets represented by any such Unclaimed Distributions shall revert to and/or remain in the Liquidation Trust and shall be distributed in accordance with the Liquidation Trust Agreement and the Plan. The reversion of such Cash to the Liquidation Trust shall be free of any restrictions thereon and notwithstanding any federal or state escheat laws to the contrary and shall be treated in accordance with the terms of the Plan and the Liquidation Trust Agreement.

Any Holder of an Allowed Claim that does not assert a Claim pursuant to the Plan for an Unclaimed Distribution by the Unclaimed Distribution Deadline shall be deemed to have forfeited its Claim for such Unclaimed Distribution and shall be forever barred and enjoined from asserting any such claim for an Unclaimed Distribution against the Debtors and their Estates, the Post-Restructuring Debtors, the ACO Entities, the Liquidation Trust, and their respective agents, attorneys, representatives, employees or independent contractors, and/or any of its or their property.

If there is any residual unclaimed property at the time of dissolution of the Liquidation Trust, such residual unclaimed property shall be available for a subsequent Distribution on a Pro Rata Share basis to other Liquidation Trust Beneficiaries or donated to a charitable organization at the sole discretion of the Liquidation Trustee.

## H. Interest on Claims

Unless otherwise specifically provided for in the Final DIP Order, the Plan, the Plan Settlement Agreement, or the Confirmation Order, or required by applicable law, postpetition interest shall not accrue or be paid on any Claims, and no Holder shall be entitled to interest accruing on or after the Petition Date on any Claim. Except as otherwise specifically provided for in the Plan, the Plan Settlement Agreement, or the Confirmation Order, or required by applicable law, interest shall not accrue or be paid upon any Disputed Claim in respect of the period from the Petition Date to the date a final Distribution is made thereon if and after such Disputed Claim becomes an Allowed Claim.

## I. No Creditor to Receive More than Payment in Full

Notwithstanding any other provision hereof, no Holder of an Allowed Claim shall receive more than full payment of its applicable Allowed Claim, including any interest, costs, or fees that may be payable with respect thereto under or pursuant to the Plan.

## J. Satisfaction of Claims

Notwithstanding any other provision hereof, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of, and in exchange for, such Allowed Claims, and no Holder shall receive more than full payment of its applicable Allowed Claim, including any interest, costs or fees that may be payable with respect thereto under or pursuant to the Plan.

## K. Compliance with Tax, Withholding, and Reporting Requirements

In accordance with Bankruptcy Code section 346 and in connection with the Plan and all Distributions hereunder, the applicable Disbursing Agent shall, to the extent applicable, comply with all withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority. The Disbursing Agent shall be authorized to take any and all actions necessary and appropriate to comply with such requirements.

All Distributions hereunder shall be subject to withholding and reporting requirements. As a condition of making any Distribution under the Plan, each Person and Entity holding an Allowed Claim is required to provide any information necessary in writing, including returning W-9 statements, to affect the necessary information reporting and withholding of applicable taxes with respect to Distributions to be made under the Plan as the Disbursing Agent may request. The Disbursing Agent shall be entitled in its sole discretion to withhold any Distributions to a Holder of an Allowed Claim who fails to provide tax identification or social security information within the timeframe requested in writing by the Disbursing Agent to such Holder of an Allowed Claim, which timeframe shall not be less than 30 days. **Unless the Liquidation Trust agrees, in its sole and absolute discretion, all Distributions to any Holder of an Allowed Claim that fails to timely respond to a request for tax information deemed necessary or appropriate by the Liquidation Trust shall be waived and forfeited and the applicable Claim shall be deemed Disallowed without further order of the Bankruptcy Court.**

Notwithstanding any other provision of the Plan, each Person and Entity receiving a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations on account of any such Distribution.

## L. Setoffs and Recoupments

Subject to the terms and conditions of the Liquidation Trust Agreement, the Debtors, the Post-Restructuring Debtors, and/or the Liquidation Trust, as applicable, pursuant to the Bankruptcy Code and applicable bankruptcy and/or non-bankruptcy law, without the approval of the Bankruptcy Court, may, but shall not be required to, set off or recoup against any Allowed Claim and the payments or other Distributions to be made under the Plan on account of the Allowed Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the

Debtors may have against the Holder thereof; *provided*, *however*, that any such right of setoff or recoupment that is exercised shall be allocated, first, to the principal amount of the related Claim, and thereafter to any interest portion thereof, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors and/or the Liquidation Trust of any such claims, rights, or Causes of Action that the Debtors may have against such Holder, and nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment subject to the provisions of Bankruptcy Code section 553 or other applicable law.

## M. Procedures for Treating and Resolving Disputed, Contingent, and/or Unliquidated Claims

### 1. Claims Administration Responsibilities

On or after the Effective Date, the Liquidation Trustee shall have the sole authority to: (a) File, withdraw, or litigate to judgment, Objections to Claims or Interests asserted against the Debtors; (b) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, Order, or approval by the Bankruptcy Court with respect to such Claims and Interests; *provided, however*, that any Objection(s) to and settlement of Professional Fee Claims shall not be subject to this Article VI.M, but rather, shall be governed by Article II.E hereof. In the event that any Objection Filed by the Debtors remains pending as of the Effective Date, the Liquidation Trustee shall be deemed substituted for the Debtors, as applicable, as the objecting party. The Liquidation Trustee shall also be deemed substituted for the Debtors with respect to the unliquidated claims procedures previously approved by the Bankruptcy Court pursuant to the Unliquidated Claims Procedures Order, as modified by the Trust Distribution Procedures. The Liquidation Trust shall be entitled to assert all of the Debtors' rights, claims, defenses, offsets, rights of recoupment, setoffs, rights of disallowance, subrogation, recharacterization and/or equitable subordination and counterclaims with respect to Claims.

### 2. Objection Deadline; Prosecution of Objections

Except as set forth in the Plan with respect to Professional Fee Claims, Administrative Expense Claims, Administrative PL/GL Claims, and Substantial Contribution Claims, all Objections to Claims must be Filed and served on the Holders of such Claims by the Claims Objection Deadline. If an Objection has not been Filed to a Proof of Claim or the Schedules have not been amended with respect to a Claim that (a) was Scheduled by the Debtors but (b) was not Scheduled as contingent, unliquidated and/or disputed, by the Claims Objection Deadline, as the same may be extended by order of the Bankruptcy Court, the Claim to which the Proof of Claim or Scheduled Claim relates shall be treated as an Allowed Claim if such Claim has not been previously Allowed. Notice of any motion for an Order extending the Claims Objection Deadline shall be required to be given only to those Persons or Entities that have requested notice in the Chapter 11 Cases in accordance with Bankruptcy Rule 2002 following the Effective Date pursuant to Article XI.J hereof.

### 3. No Distributions Pending Allowance

Notwithstanding any other provision of the Plan or the Liquidation Trust Agreement, no payments or Distributions shall be made with respect to all or any portion of a Disputed Claim unless and until all Objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

Except as otherwise set forth herein, to the extent that a Claim is not a Disputed Claim but is held by a Holder that is or may be liable to the Debtors or the Liquidation Trust on account of an Assigned Cause of Action, no payments or Distributions shall be made with respect to all or any portion of such Claim unless and until such Claim and liability have been settled or withdrawn or have been determined by Final Order of the Bankruptcy Court, administrative tribunal, or such other court having jurisdiction over the matter.

### 4. Estimation of Claims

Before or after the Effective Date, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to Bankruptcy Code section 502(c), regardless of whether the Debtors had previously Objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such Objection. The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any Objection to such Claim or during the appeal relating to such Objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of Distributions), and the Liquidation Trust may elect to pursue any supplemental proceedings to Object to any ultimate Distribution on such Claim. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Liquidation Trust may pursue supplementary proceedings to Object to the allowance of such Claim. Notwithstanding Bankruptcy Code section 502(j), in no event shall any Holder of a Claim that has been estimated pursuant to Bankruptcy Code section 502(c) or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) calendar days after the date on which such Claim is estimated.

Notwithstanding any provision otherwise herein, a Claim that has been expunged or disallowed from the Claims Register, but is either subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars ($0.00) unless otherwise ordered by the Bankruptcy Court or as otherwise provided pursuant to a Final Order of the Bankruptcy Court (including any stipulation). In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee as applicable, may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.

### 5. Claims Resolution Procedures Cumulative

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan or the Plan Supplement without further notice or Bankruptcy Court approval.

### 6. Adjustment to Claims Register Without Objection

Any Claim or Interest that (a) is a duplicate, (b) has been paid or satisfied, or (c) has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trust, as applicable, upon agreement between the parties in interest without an Objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

### 7. Disputed Claims Reserve

On the Distribution Date, the Liquidation Trust shall withhold on a Pro Rata Share basis from property that would otherwise be distributed to Holders of Claims entitled to Distributions under the Plan on such date, in a separate Disputed Claims Reserve, such amounts or property as may be necessary or appropriate pursuant to the Sources and Uses. The Liquidation Trust may request, if necessary, estimation for any Disputed Claim that is contingent or unliquidated, or for which the Liquidation Trust determines to reserve less than the face amount. If the Liquidation Trust elects not to request such an estimation from the Bankruptcy Court with respect to a Disputed Claim that is contingent or unliquidated, the Liquidation Trust shall withhold the applicable Disputed Claims Reserve based upon the good faith estimate of the amount of such Claim by the Liquidation Trust. If practicable, the Liquidation Trust shall invest any Cash that is withheld as the Disputed Claims Reserve in an appropriate manner to ensure the safety of the investment, in accordance with the Liquidation Trust Agreement. However, nothing in the Plan or the Liquidation Trust Agreement shall be deemed to entitle the Holder of a Disputed Claim to postpetition interest on such Claim.

### 8. Disallowance of Claims or Interests

Except as otherwise expressly set forth herein, all Claims and Interests of any Entity from which property is sought by the Liquidation Trustee under Bankruptcy Code sections 542, 543, 550, or 553 or that the Liquidation Trustee alleges is a transferee of a transfer that is avoidable under Bankruptcy Code sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) shall be disallowed if: (a) the Entity, on the one hand, and the Liquidation Trustee, on the other hand, agree, or the Bankruptcy Court has determined by Final Order, that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

Except as otherwise expressly set forth herein, all Claims held by Persons or Entities against whom or which the Debtors or the Liquidation Trustee (as applicable) has commenced a proceeding asserting a Cause of Action under Bankruptcy Code sections 542, 543, 544, 545, 547, 548, 549, or 550 or that is a transferee of a transfer avoidable under Bankruptcy Code section

522(f), 522(h), 544, 545, 548, 549, or 724(a) shall be deemed Disputed Claims pursuant to Bankruptcy Code section 502(d), and Holders of such Claims shall not be entitled to vote to accept or reject the Plan. Unless otherwise set forth herein, a Claim deemed Disputed pursuant to this Article VI.M.8 shall continue to be Disputed for all purposes until the relevant proceeding against the Holder of such Claim has been settled or resolved by a Final Order and any sums due to the Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, from such Holder have been paid.

**9. Disallowance of Late Claims**

Except as provided herein or otherwise agreed to by the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, any Holder of a Claim Filed via Proof of Claim after the applicable Bar Date shall not receive any Distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

**10. Amendments to Claims**

Except as provided herein, on or after the Effective Date, without the prior authorization of the Bankruptcy Court, the Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, a Claim may not be Filed or amended, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court.

**11. Distributions After Allowance**

Payments and Distributions to Holders of Disputed Claims that ultimately become Allowed Claims shall be deemed to have been made on the Effective Date and shall be made in accordance with provisions of the Plan and the Liquidation Trust Agreement that govern Distributions to Holders of Allowed Claims. No interest shall accrue or be paid on any Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Claim unless the Plan provides otherwise.

**N. De Minimis Interim Distributions**

The Liquidation Trust shall not be required to make any interim distributions to Holders of Allowed Claims aggregating less than One Hundred Dollars ($100.00) in Cash. Cash that otherwise would be payable to Holders of Allowed Claims but for this Article VI.N shall remain Liquidation Trust Assets to be later Distributed pursuant to the Sources and Uses, the GUC Distribution Model, and the Liquidation Trust Agreement. If the Cash available for the final distribution is less than the cost to distribute the funds, the Liquidation Trustee may donate such funds to the unaffiliated charity of its choice.

**O. Allocation of Plan Distributions Between Principal and Interest**

To the extent that any Allowed Claim entitled to a Distribution under the Plan comprises indebtedness and accrued but unpaid interest thereon, such Distribution shall, for all U.S. federal income tax purposes, be allocated first to the principal amount of the Claim (as determined for

federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest with respect to such Claim.

**P. Distribution Record Date**

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests. Consistent with the Plan, the Wind-Down Trust Agreement, the Liquidation Trust Agreement, and the Administrative PL/GL Claim Settlement Fund Agreement, the applicable Disbursing Agent shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring on or after the Distribution Record Date. The applicable Disbursing Agent shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

**Q. Distributions Free and Clear**

Except as otherwise provided in the Plan, any Distribution or transfer made under the Plan, including Distributions to any Holder of an Allowed Claim, shall be free and clear of any Liens, Claims, encumbrances, charges, and other interests, and no other entity shall have any interest, whether legal, beneficial, or otherwise, in property distributed or transferred pursuant to the Plan.

## ARTICLE VII.
## INJUNCTION AND RELATED PROVISIONS

**A. Mutual Releases Pursuant to Plan Settlement Agreement**

**1. Release of Plan Settling Party Released Parties by Estate Released Parties**

Upon the Plan Settlement Effective Date, the Debtors, their Estates, and the Creditors' Committee (and any successor in interest with respect to any of the foregoing, including the Liquidation Trust and any chapter 7 trustee) shall be deemed to have unconditionally and irrevocably released, acquitted, and forever discharged all Plan Settling Parties and their respective affiliates, including all defendants listed in the Creditors' Committee's Draft Complaint, the WAX/MAO Complaint, and the PA-22 Complaint, including, but not limited to, Welltower, Omega, WAX, MAO, CPE, Integra Healthcare LLC, Integra WIP Tenant LLC, ReGen, Markglen, Omega DIP Lender, Cindat Best Years Welltower JV LLC, Cindat Capital Management Ltd., Cindat Best Years LLC, Pinta Capital Partners, Joel Landau, David Gefner, David Harrington, and John Randazzo, together with (a) each of the foregoing entities' respective past or present subsidiaries, direct or indirect parents, affiliates, successors, and predecessors, shareholders, members, officers, directors, employees, professional advisors, attorneys, agents, auditors, and accountants, in each case solely in their capacities as such, and (b) each of the foregoing individuals' heirs, estate, executors, administrators, legal representatives, agents, successors in interest or assigns, and any person, firm, trust, corporation, or other entity in which it has a controlling interest, in each case solely in their capacities as such (each, a "Plan Settling Party Released Party" and, collectively, the "Plan Settling Party Released Parties"), from any and all Claims and Causes of Action that (x) are property of the Estates, (y) may be settled or compromised

by the Estates, or (z) are direct claims held by creditors consenting to such releases in connection with approval of the Plan (only to the extent the Plan provides for third-party releases), in each case, as broadly as applicable law permits; *provided, however*, that the Liquidation Trust's right to pursue D&O Claims against each of David Harrington, Jonathan Kirschner, and John Randazzo is expressly preserved pursuant to the Plan Settlement Agreement; *provided, further*, that the foregoing releases shall not release (a) any rights of any party to the Plan Settlement Agreement to enforce the terms of the Plan Settlement Agreement or the Plan, (b) any Claims and Causes of Action against Professionals subject to Final Fee Applications, or (c) any Claims asserted in the PA-22 Adversary Proceeding. For the avoidance of doubt, the Plan Settling Party Released Parties shall not include Altira Health Group, LLC or OPA OpCo Parent LLC.

**2. Release of Estate Released Parties by the Plan Settling Party Released Parties**

Upon the Plan Settlement Effective Date, each Plan Settling Released Party shall be deemed to have unconditionally and irrevocably released, acquitted, and forever discharged the Debtors, the Estates, the Creditors' Committee and each member thereof (solely in its capacity as such), the Liquidation Trust, and each of their respective officers, members, directors, employee, agents, professionals, advisors, attorneys, and representatives, in each case solely in their capacity as such (each, an "Estate Released Party" and, collectively, the "Estate Released Parties"), from any and all Claims, Causes of Action, obligations, suits, judgments, damages, demands, debts, rights, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission, transaction, dealing, or other occurrence existing or taking place on or prior to the Effective Date that in any way relates to the Debtors, the Chapter 11 Cases, the Plan, the Plan Settlement Agreement, or any claim or interest that is treated under the Plan Settlement Agreement or the Plan; *provided, however,* that, the foregoing release shall not release (a) any Plan Settling Parties' rights against any Estate Released Party that asserts any claim of any nature against a Plan Settling Party and (b) any rights of any party to the Plan Settlement Agreement to enforce the terms of the Plan Settlement Agreement or the Plan.

## B. Injunction

**Except as otherwise provided in the Plan or the Confirmation Order, effective as of the Effective Date, all Persons and Entities that hold, have held, or may hold a claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy, action, proceeding, suit, account, controversy, agreement, promise, right to legal remedies, right to equitable remedies, or right to payment, or liability of any nature whatsoever against the Debtors or their Estates shall be permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from and after the Effective Date from taking any of the following actions (other than actions to enforce any rights or obligations under the Plan, the Plan Settlement Agreement, the Sale Transaction Documents, or any other related documents) against, as applicable, the Debtors, the Post-Restructuring Debtors, the ACO Entities, and the Estates: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Persons or Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes**

**of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Persons or Entities or the property or the estates of such Persons or Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Persons or Entities or against the property of such Persons or Entities on account of or in connection with or with respect to any such claims or interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim, Interest, or Cause of Action or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan; and (6) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**By accepting Distributions pursuant to the Plan, each Holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunction set forth herein and all transactions, documents, and agreements contemplated hereunder that govern the property that is the subject of such Distribution. Upon the entry of the Confirmation Order, all Holders of Claims and Interests and all other parties-in-interest, along with their respective present and former Affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or consummation of the Plan or the occurrence of the Effective Date, including, but not limited to, the actions enumerated in the preceding paragraph.**

## C. Channeling Injunction of Administrative PL/GL Claims

Pursuant to the Administrative PL/GL Claim Settlement Approval Order, unless a Holder validly opts out of participating in the Administrative PL/GL Claim Settlement, such Administrative PL/GL Claim, whether timely-filed or otherwise, shall be channeled effective as of the Effective Date to the Administrative PL/GL Claim Fund for liquidation, resolution, and distribution. Holders of participating Administrative PL/GL Claims shall have no Claims, Causes of Action, or recourse against the Debtors, the Estates, the Post-Restructuring Debtors, the ACO Entities, the Wind-Down Trust, or the Liquidation Trust on account of such channeled Claim.

## D. Release of Liens

Except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, or other agreement or document amended or created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for any Secured Claims that the Debtors elect to Reinstate in accordance with this Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Post-Restructuring Debtors and their

successors and assigns, in each case without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors or the Post-Restructuring Debtors. Any Holder of such Secured Claim (and the applicable agents for such Holder) shall be authorized and directed, at the sole cost and expense of the Post-Restructuring Debtors, to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested by the Post-Restructuring Debtors to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Post-Restructuring Debtors, at the sole cost and expense of the Post-Restructuring Debtors, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Post-Restructuring Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

## E. Protections Against Discriminatory Treatment

Consistent with Bankruptcy Code section 525 and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Post-Restructuring Debtors, the ACO Entities, the Wind-Down Trustee, or the Liquidation Trustee (as applicable), or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Post-Restructuring Debtors, the ACO Entities, the Wind-Down Trustee, or the Liquidation Trustee (as applicable), or another Entity with whom the Post-Restructuring Debtors, the ACO Entities, the Wind-Down Trustee, or the Liquidation Trustee have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## F. Retention of Causes of Action and Reservation of Rights

Except as otherwise provided in the Plan, the Sale Transaction Documents, the Plan Settlement Agreement, or the Confirmation Order, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver, release, or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. Except as otherwise provided in the Plan, the Plan Settlement Agreement, or the Confirmation Order, the Liquidation Trust, on behalf of the Debtors, shall have, retain, reserve, and be entitled

to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

For the avoidance of doubt, except as otherwise provided in the Plan, the Sale Transaction Documents, the Plan Settlement Agreement, or the Confirmation Order, the Plan shall not operate as a waiver or release of (a) any Person (i) named or subsequently named as a defendant in any action commenced by or on behalf of the Debtors, the Creditors' Committee, the Liquidation Trust, or any other Person, including any Assigned Causes of Action prosecuted by the Liquidation Trust, and (ii) adjudicated or subsequently adjudicated by, a court of competent jurisdiction to have engaged in acts of dishonesty or willful misconduct detrimental to the interests of the Debtors or (b) any claim (i) with respect to any loan, advance or similar payment by the Debtors to any such Person, (ii) with respect to any contractual obligation owed by such Person to the Debtors, (iii) relating to such person's knowing fraud, or (iv) to the extent based upon or attributable to such Person gaining in fact a personal profit to which such Person was not legally entitled, including, without limitation, profits made from the purchase or sale of equity securities of the Debtors which are recoverable by the Debtors pursuant to section 16(b) of the Securities Exchange Act of 1934, as amended; *provided, however,* that the foregoing is not intended, nor shall it be construed, to release any of the D&O Claims that may exist against the D&O Liability Insurance Policies.

## G. Ipso Facto and Similar Provisions Ineffective

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor or JV shall be void and of no further force or effect with respect to any Debtor or JV to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor or JV as a result of, or gives rise to a right of any Entity based on (i) the insolvency or financial condition of a Debtor, (ii) the commencement of the Chapter 11 Cases, or (iii) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation.

## H. Discharge of the Debtors

### 1. Following Consummation of the Sale Transaction

Pursuant to Bankruptcy Code section 1141(d)(3), Confirmation shall not discharge Claims against the Debtors; *provided, however*, that no Holder of a Claim or Interest may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against, the Debtors, the Post-Restructuring Debtors, the ACO Entities, the Wind-Down Trustee, the Liquidation Trust, the Liquidation Trustee, or their respective successors, assigns, and/or property, except as expressly provided in the Plan.

### 2. Following Consummation of the Restructuring Transaction

Pursuant to, and to the maximum extent provided by, Bankruptcy Code section 1141(d) and except as otherwise specifically provided in the Plan, or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that

are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, liens on, obligations of, rights against, and Interests in the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services that employees of the Debtors have performed prior to the Effective Date, and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code, or (c) the holder of such a Claim or Interest has accepted the Plan. The Confirmation Order, if applicable, shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date.

# ARTICLE VIII.
# CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN

## A. Conditions Precedent to Confirmation

The following are conditions precedent to Confirmation of the Plan, each of which must be satisfied or waived:

1. The Plan, the Plan Supplement(s), the Confirmation Order, and any other related documents shall be in form and substance reasonably acceptable to the Debtors, the Creditors' Committee (subject to the Creditors' Committee Consent Rights), and the Plan Settling Parties.

2. The Disclosure Statement Order shall not have been stayed, modified, or vacated on appeal, and shall have become a Final Order.

## B. Conditions Precedent to Effective Date

### 1. If the Sale Transaction is Consummated

Following consummation of the Sale Transaction, the occurrence of the Effective Date and the substantial Consummation of the Plan are subject to the satisfaction of the following conditions precedent, each of which must be satisfied or waived (except for with respect to the ACO Entities, for which the Effective Date shall occur on the ACO Effective Date upon satisfaction of the conditions set forth in the definition thereof, whether or not the following conditions precedent have been satisfied or waived as to the other Debtors):

1. The Confirmation Order shall have been entered by the Bankruptcy Court (in form and substance reasonably satisfactory to the Debtors, the Creditors' Committee, and the Plan

Settling Parties), shall not have been stayed, vacated, or reversed, and shall have become a Final Order.

2. The Sale Transaction shall have been consummated substantially on the terms described in the Sale Order and the Sale Transaction Documents (as applicable) and the Debtors shall have received the Sale Proceeds.

3. The Plan and the Sale Transaction Documents shall be in full force and effect.

4. The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the Plan.

5. The New Organizational Documents shall have become effective (or shall become effective concurrently with the Effective Date).

6. All conditions precedent to Confirmation of the Plan shall have either been satisfied or waived.

7. All conditions precedent to the Plan Settlement Effective Date shall have either been satisfied or waived in accordance with the terms of the Plan Settlement Agreement.

8. The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan.

9. No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing, or prohibiting the Consummation of the Plan.

10. The Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless, subject to the Creditors' Committee Consent Rights, the Creditors' Committee has provided written consent to such material amendment, alteration, or modification.

11. The Professional Fee Escrow Account, the Wind-Down Reserve, the Administrative and Priority Claim Reserve, and the Convenience Claim Reserve shall have been funded in Cash in full.

12. The Liquidation Trustee and the members of the Liquidation Trust Board shall have been appointed in accordance with the terms hereof and shall have accepted such appointment.

13. The Liquidation Trust Agreement shall have been executed.

14. The Liquidation Trust shall have been established and the Liquidation Trust Assets shall have been transferred to and vested in the Liquidation Trust free and clear of all Claims and Liens, except as specifically provided in the Plan and the Liquidation Trust Agreement.

15. The Wind-Down Trustee and the members of the Wind-Down Trust Board shall have been appointed in accordance with the terms hereof and shall have accepted such appointment.

16. The Wind-Down Trust Agreement shall have been executed.

17. The Wind-Down Trust shall have been established, and the Wind-Down Trust Assets shall have been transferred to and vested in the Wind-Down Trust free and clear of all Claims and Liens, except as specifically provided in the Plan and the Wind-Down Trust Agreement.

18. The Administrative PL/GL Claim Fund Administrator shall have been appointed in accordance with the terms of the Administrative PL/GL Claim Settlement Approval Order and the Administrative PL/GL Claim Settlement Fund Agreement and shall have accepted such appointment.

19. The Administrative PL/GL Claim Settlement Fund Agreement shall have been executed and the Administrative PL/GL Claim Fund shall have been established.

20. All other actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Plan shall have been effectuated or executed and delivered, as applicable.

**2. If the APA is Terminated and the Restructuring Transaction is Consummated**

If the APA is terminated, the Debtors will seek to consummate the Restructuring Transaction. The occurrence of the Effective Date and the substantial Consummation of the Plan are subject to the satisfaction of the following conditions precedent, each of which must be satisfied or waived:

1. The Confirmation Order shall have been entered by the Bankruptcy Court (in form and substance reasonably satisfactory to the Debtors and the Creditors' Committee (subject to the Creditors' Committee Consent Rights)), shall not have been stayed, vacated, or reversed, and shall have become a Final Order.

2. The Plan shall be in full force and effect.

3. The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in a manner consistent in all material respects with the Plan.

4. The Post-Restructuring Term Loan Promissory Note shall have been executed by the Debtors.

5. The New Organizational Documents shall have become effective (or shall become effective concurrently with the Effective Date) and the members of the Post-Restructuring Board shall have been appointed in accordance with the terms thereof.

6. All conditions precedent to Confirmation of the Plan shall have either been satisfied or waived.

7. The Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan.

8. No court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing, or prohibiting the Consummation of the Plan.

9. The Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless, subject to the Creditors' Committee Consent Rights, the Creditors' Committee has provided written consent to such material amendment, alteration, or modification.

10. The Professional Fee Escrow Account, the Administrative and Priority Claim Reserve, and the Convenience Claim Reserve shall have been funded in Cash in full.

11. The Liquidation Trustee and the members of the Liquidation Trust Board shall have been appointed in accordance with the terms hereof and shall have accepted such appointment.

12. The Liquidation Trust Agreement shall have been executed.

13. The Liquidation Trust shall have been established and the Liquidation Trust Assets shall have been transferred to and vested in the Liquidation Trust free and clear of all Claims and Liens, except as specifically provided in the Plan and the Liquidation Trust Agreement.

14. The Administrative PL/GL Claim Fund Administrator shall have been appointed in accordance with the terms of the Administrative PL/GL Claim Settlement Approval Order and the Administrative PL/GL Claim Settlement Fund Agreement and shall have accepted such appointment.

21. The Administrative PL/GL Claim Settlement Fund Agreement shall have been executed and the Administrative PL/GL Claim Fund shall have been established.

15. All other actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of the Plan shall have been effectuated or executed and delivered, as applicable.

## C. Establishing the Effective Date

### 1. Sale Transaction

The calendar date to serve as the Effective Date shall be the first (1st) Business Day following the Closing Date, subject to the satisfaction or waiver of all conditions to the Effective Date. On or within two (2) Business Days of the Effective Date, the Debtors shall File and serve

a notice of occurrence of the Effective Date. Such notice shall contain, among other things, the Administrative Expense Claim Bar Date, the Professional Fee Claims Bar Date, and the Rejection Damages Bar Date with respect to Executory Contracts or Unexpired Leases rejected pursuant to the Plan.

### 2. Restructuring Transaction

The calendar date to serve as the Effective Date shall be the first (1st) Business Day following the satisfaction or waiver of all conditions to the Effective Date. On or within two (2) Business Days of the Effective Date, the Debtors shall File and serve a notice of occurrence of the Effective Date. Such notice shall contain, among other things, the Administrative Expense Claim Bar Date, the Professional Fee Claims Bar Date, and the Rejection Damages Bar Date with respect to Executory Contracts or Unexpired Leases rejected pursuant to the Plan.

## D. Waiver of Conditions

Each of the conditions precedent to Confirmation and the occurrence of the Effective Date set forth in Article VIII hereof may be waived, in whole or in part, by the Debtors, subject to the Creditors' Committee Consent Rights, without any other notice to or approval of any other parties-in-interest or the Bankruptcy Court. The failure to satisfy or waive any condition to Confirmation or the occurrence of the Effective Date may be asserted by the Debtors regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of any party to exercise any of its foregoing rights shall not be deemed a waiver of any of its other rights, and each such right shall be deemed an ongoing right that may be asserted thereby at any time.

## E. Effect of Failure of Conditions

If Consummation does not occur as to any Debtor, the Plan shall be null and void in all respects as to such Debtor and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims or Liens by the Debtors, any Holders of Claims or Interests, or any other Entity; (2) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity.

# ARTICLE IX.
# RETENTION OF JURISDICTION

## A. Retention of Jurisdiction

On or after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases as is legally permissible to the fullest extent permitted under 28 U.S.C. §§ 157 and 1334, including, without limitation, such jurisdiction as is necessary to ensure that the interests and purposes of the Plan are carried out.

The Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, out of, or related to the Chapter 11 Cases and the Plan pursuant to Bankruptcy Code sections 105(a) and 1142, including jurisdiction to:

1. determine (a) the allowance, disallowance, estimation, classification, or priority of Claims upon Objection by any party-in-interest entitled to File an Objection, or (b) the validity, extent, priority, and nonavoidability of consensual and nonconsensual Liens and other encumbrances against assets of the Estates, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust;

2. issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person or Entity, to construe and to take any other action to enforce and execute the Plan, the Confirmation Order, or any other Order of the Bankruptcy Court, to issue such Orders as may be necessary for the implementation, execution, performance, and Consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Chapter 11 Cases on or before the Effective Date with respect to any Person or Entity;

3. enforce the terms and conditions of the Plan, the Disclosure Statement Order, the Plan Settlement Approval Order, the Administrative PL/GL Claim Settlement Approval Order, the Confirmation Order, the Final DIP Order, the Sale Order, the Sale Transaction Documents, and all Orders previously entered by the Bankruptcy Court;

4. protect the Assets or property of the Estates, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust, including Assigned Causes of Action, from claims against, or interference with, such assets or property, including actions to quiet or otherwise clear title to such property or to resolve any dispute concerning Liens or other encumbrances on any assets of the Estates, the Post-Restructuring Debtors, the Wind-Down Trust, or the Liquidation Trust;

5. ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

6. hear and determine any other rights, claims, or Causes of Action that may be brought by or assigned to the Liquidation Trustee;

7. hear and adjudicate any and all applications for allowance of Professional Fee Claims;

8. hear and determine any Priority Tax Claims, Priority Non-Tax Claims, or Administrative Expense Claims entitled to priority under Bankruptcy Code section 507(a);

9. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

10. hear and resolve disputes concerning any Administrative PL/GL Claims, the Administrative PL/GL Claim Fund, or the Administrative PL/GL Claim Settlement Fund Agreement;

11. hear and resolve disputes concerning any reserves with respect to Disputed Claims, including under the Unliquidated Claim Procedures, or the administration thereof;

12. hear and resolve any dispute arising under or related to the implementation, execution, Consummation, or interpretation of the Plan and the making of Distributions hereunder;

13. modify the Plan under Bankruptcy Code section 1127, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out their intent and purposes;

14. adjudicate, decide, or resolve any and all matters related to Bankruptcy Code section 1141;

15. enter and implement such Orders as may be necessary to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created or entered into in connection with the Plan or the Disclosure Statement;

16. enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

17. enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, reversed, or vacated;

18. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19. hear and determine any and all motions and disputes related to the rejection, assumption, or assumption and assignment of Executory Contracts or Unexpired Leases, including, but not limited to, any Cure Dispute or any dispute regarding whether a contract or lease is or was executory or expired, or determine any issues arising from the deemed rejection of Executory Contracts and Unexpired Leases set forth in Article V.A hereof;

20. except as otherwise provided herein, to hear and determine all applications, motions, adversary proceedings (including, but not limited to, the PA-22 Adversary Proceeding), contested matters, actions, and any other litigated matters instituted in and prior to the closing of the Chapter 11 Cases;

21. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

22. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

23. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article VII hereof;

24. enter one or more final decrees or Order closing the Chapter 11 Cases;

25. hear and determine any tax disputes concerning the Debtors or the Post-Restructuring Debtors and to determine and declare any tax effects under the Plan; *provided, however*, that nothing herein shall be construed to confer jurisdiction upon the Bankruptcy Court to make determinations as to federal tax liabilities and federal tax treatment, except as provided under Bankruptcy Code section 505;

26. enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered in connection with the Chapter 11 Cases (whether or not the Chapter 11 Cases have been closed);

27. resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Cases, the Bar Date, the Governmental Bar Date, the Rejection Damages Bar Date, the Interim Administrative Expense Claim Bar Date, the Administrative Expense Claim Bar Date, the Professional Fee Claim Bar Date, and/or the Confirmation Hearing for the purpose of determining whether a Claim, or Interest is released, satisfied and/or enjoined hereunder or for any other purpose;

28. determine any other matters that may arise in connection with or related to the Plan, the Confirmation Order, or any contract, instrument, release, indenture or other agreement or document created or implemented in connection with the Plan; and

29. hear any other matter not inconsistent with the Bankruptcy Code over which the Bankruptcy Court has jurisdiction.

As of the Effective Date, notwithstanding anything in this Article IX to the contrary, the New Organizational Documents and any documents related thereto shall be governed by the jurisdictional provisions therein and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

## B. Alternative Jurisdiction

In the event that the Bankruptcy Court is without jurisdiction to resolve any matter, then such other administrative tribunal or court of competent jurisdiction shall hear and determine such matter.

## C. Failure of Court to Exercise Jurisdiction

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, including the matters set forth in Article IX.A hereof, the provisions of Article IX.A

hereof shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A. Modification and Amendment

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules and subject to the Creditors' Committee Consent Rights, to amend or modify the Plan any time prior to the Confirmation Date. Alterations, amendments, or modifications of the Plan may be proposed in writing by the Debtors (subject to the Creditors' Committee Consent Rights), at any time before the Confirmation Date; *provided, however,* that the Plan, as altered, amended or modified, satisfies the conditions of Bankruptcy Code sections 1122 and 1123, and the Debtors shall have complied with Bankruptcy Code section 1125. Additionally, after the Confirmation Date and prior to substantial consummation of the Plan, the Debtors may, under Bankruptcy Code section 1127(b), subject to the Creditors' Committee Consent Rights, institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims under the Plan; and, *provided, further*, that prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or order of the Bankruptcy Court. A Holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as modified if the proposed modification does not materially and adversely change the treatment of the Claim of such Holder.

Notwithstanding anything to the contrary herein, the Plan shall not be amended, modified, or supplemented, whether before or after the Confirmation Date, in any manner that materially adversely affects the Buyer or its rights under the Sale Transaction Documents without the prior written consent of the Buyer (which consent shall not be unreasonably withheld, conditioned, or delayed).

Notwithstanding anything to the contrary herein, the Plan shall not be amended, modified or supplemented, whether before or after the Confirmation Date, in any manner that is inconsistent with the Plan Settlement Agreement or the Plan Settlement Approval Order without the prior written consent of Welltower and ReGen (which consent shall not be unreasonably withheld, conditioned or delayed); *provided, however*, that the foregoing consent rights shall not be applicable following the Plan Settlement Effective Date. In the event of any conflict between the Plan Settlement Agreement or the Plan Settlement Approval Order and the Plan, the applicable provisions of the Plan Settlement Agreement or the Plan Settlement Approval Order shall prevail.

### B. Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to Bankruptcy Code section 1127(a) and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### C. Revocation or Withdrawal of the Plan

The Debtors, subject to the Creditors' Committee Consent Rights, reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors. If, with respect to a Debtor, the Plan is revoked or withdrawn, or if Confirmation or the occurrence of the Effective Date as to such Debtor does not occur, then as to such Debtor (i) the Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for Consummation of the Plan, shall (a) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person or Entity, (b) prejudice in any manner the rights of such Debtor or any other Person or Entity, or (c) constitute an admission of any sort by the Debtors or any other Person or Entity.

## ARTICLE XI.
## MISCELLANEOUS PROVISIONS

### A. Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Post-Restructuring Debtors, the ACO Entities, the Wind-Down Trust, the Wind-Down Trustee, the Liquidation Trust, the Liquidation Trustee, the Administrative PL/GL Claim Fund, the Administrative PL/GL Claim Fund Administrator, the Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests (1) are Impaired or Unimpaired, (2) have, or are deemed to have accepted the Plan, or (3) failed to vote to accept or reject the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described herein, each Entity acquiring property under the Plan, any and all non-Debtor parties to Executory Contracts and Unexpired Leases, and each of their respective successors and assigns. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

### B. Filing of Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan (solely in their capacity as such), shall from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may reasonably be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

## C. Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated (within the meaning set forth in Bankruptcy Code section 1101) pursuant to Bankruptcy Code section 1127(b).

## D. Severability of Provisions

If, prior to the Confirmation Date, any term or provision of the Plan shall be held by the Bankruptcy Court to be invalid, void, or unenforceable, including, without limitation, the inclusion of one or more of the Debtors in the Plan, then the Bankruptcy Court, at the request of the Debtors and subject to the Creditors' Committee Consent Rights, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Post-Restructuring Debtors (as applicable); and (iii) nonseverable and mutually dependent.

## E. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, beneficiaries or guardian, if any, of each Entity.

## F. Dissolution of the Creditors' Committee

On the Effective Date, the Creditors' Committee shall automatically dissolve, whereupon the members thereof shall be discharged from all rights and duties from or related to the Chapter 11 Cases, except with respect to (i) prosecuting Final Fee Applications of its Professionals and (ii) prosecuting, defending, or participating in any appeal of the Confirmation Order or any request for reconsideration thereof. For the avoidance of doubt, the obligations of the Creditors' Committee, its members, Professionals, and agents arising from confidentiality agreements shall remain in full force and effect following the Effective Date.

The Debtors, the Post-Restructuring Debtors, and the Wind-Down Trustee, as applicable, shall no longer be responsible for paying any fees or expenses incurred by the members of or Professionals retained by the Creditors' Committee after the Effective Date except with respect to the reasonable fees and expenses incurred by the Creditors' Committee and its retained Professionals in connection with the matters described in clauses (i) and (ii) above without further order of the Bankruptcy Court, subject to the U.S. Supreme Court's holding in *Baker Botts L.L.P. v. Asarco LLC*, 576 U.S. 121 (2015).

## G. Termination and Discharge of PCOs, the Estate Broker, and the Mediator

### 1. PCOs

To the extent not already addressed in any Order of the Bankruptcy Court, the duties, responsibilities, and obligations of the PCOs in connection with the Chapter 11 Cases, and the retention or employment of the PCOs' attorneys, financial advisors, and other agents, shall be terminated on the Closing Date of the Sale Transaction. Effective as of the Closing Date, in recognition of their services during the Chapter 11 Cases, each of the PCOs shall be released and discharged by each and all of the Debtors, the Post-Restructuring Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, from any and all Claims, Interests, obligations, suits, damages, Causes of Action, remedies, and liabilities, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that any of the Debtors, the Post-Restructuring Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to the services provided by the PCOs during the Chapter 11 Cases.

Until the Closing Date, the PCOs shall continue to serve and be authorized to perform the following functions: (i) to review, analyze, and prepare advisory reports with respect to the operation of the Facilities during the period up to and including the Closing Date; and (ii) if necessary, appear before the Bankruptcy Court with respect to any such matter. Upon termination, the PCOs shall dispose of any documents provided to them in the course of their reporting with the exception of any documents the PCOs may be required to retain in accordance with any applicable policies or law. The PCOs and their Professionals shall be entitled to file Final Fee Applications for allowance and payment of any fees and expenses incurred to and including the Closing Date.

Prior to issuing or serving upon any PCO or her Professionals any formal or informal discovery request, including, but not limited to, subpoena, request for production of documents, requests for admissions, interrogatories, subpoenas duces tecum, requests for testimony, or any other discovery of any kind whatsoever in any way related to the Debtors, the Chapter 11 Cases, the PCOs' evaluation(s), or their report(s) (collectively, the "Discovery"), any creditor or party-in-interest in the Chapter 11 Cases must first file an appropriate pleading with the Bankruptcy Court to request permission to initiate the Discovery.

### 2. Mediator

To the extent not already addressed in any Order of the Bankruptcy Court prior to the Effective Date, the duties, responsibilities, and obligations of the Mediator in connection with the Chapter 11 Cases shall be terminated on the Effective Date. Upon termination, the Mediator shall dispose of any documents provided to him in connection with mediation with the exception of any documents the Mediator may be required to retain in accordance with any applicable policies or law. The Mediator shall be entitled to payment of any fees and expenses incurred to and including the Effective Date as an Allowed Administrative Expense Claim without Filing a Final Fee Application.

### 3. Estate Broker

To the extent not already addressed in any Order of the Bankruptcy Court prior to the Effective Date, the duties, responsibilities, and obligations of the Estate Broker in connection with the Chapter 11 Cases shall be terminated on the Effective Date. Houlihan, including in its capacity as Estate Broker, shall be entitled to file a Final Fee Application for allowance and payment of any fees and expenses incurred to and including the Effective Date.

## H. Terminations of Injunctions or Stays

Except as otherwise provided in the Plan, to the maximum extent permitted by applicable law and subject to the Bankruptcy Court's post-Confirmation jurisdiction to modify the injunctions and stays under the Plan (1) all injunctions with respect to or stays against an action against property of the Debtors or the Debtors' Estates arising under or entered during the Chapter 11 Cases under Bankruptcy Code sections 105 or 362, and in existence on the date the Confirmation Order is entered, shall remain in full force and effect until the Effective Date; and (2) all other injunctions and stays arising under or entered during the Chapter 11 Cases under Bankruptcy Code sections 105 or 362 shall remain in full force and effect until the earliest of (a) the date that the Chapter 11 Cases are closed pursuant to a final order of the Bankruptcy Court, or (b) the date that the Chapter 11 Cases are dismissed pursuant to a final order of the Bankruptcy Court. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect indefinitely.

## I. Service of Documents

In order for all notices, requests, and demands (each, a "Notice") to or upon the Debtors, the Post-Restructuring Debtors, the Wind-Down Trustee, the Liquidation Trust, and/or the Liquidation Trustee, as applicable, to be effective, such Notices shall be (i) in writing (including by electronic mail) and, unless otherwise expressly provided herein, (ii) served by (a) certified mail, return receipt requested, (b) hand delivery, (c) overnight delivery service, (d) first class mail, or (e) facsimile transmission; and (iii) deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received by the following parties:

| Entity | Contact Information |
| --- | --- |
| Debtors and<br>Post-Restructuring Debtors | Genesis Healthcare, Inc.<br>c/o Ankura Consulting Group, LLC<br>2021 McKinney Ave., Suite 340<br>Dallas, TX 75201<br>Attn: Louis E. Robichaux IV<br>(louis.robichaux@ankura.com)<br><br>with a copy to:<br>McDermott Will & Schulte LLP<br>1180 Peachtree St. NE, Suite 3350<br>Atlanta, GA 30309<br>Attn: Daniel M. Simon (dsimon@mcdermottlaw.com) |

| Entity | Contact Information |
| --- | --- |
| Wind-Down Trustee | Ankura Consulting Group, LLC<br>2021 McKinney Ave., Suite 340<br>Dallas, TX 75201<br>Attn: Russell A. Perry (russell.perry@ankura.com)<br><br>with a copy to:<br>Spencer Fane<br>5700 Granite Parkway, Suite 650<br>Plano, TX 75024<br>Attn: Clay Taylor (ctaylor@spencerfane.com) |
| Liquidation Trustee | Dundon Advisers LLC<br>565 Fifth Avenue, 16th Floor<br>New York, NY 10017<br>Attn: Matthew Dundon (md@dundon.com)<br><br>with a copy to:<br><br>Proskauer Rose LLP<br>Eleven Times Square<br>New York, NY 10036<br>Attn: Brian Rosen (brosen@proskauer.com)<br>Ehud Barak (ebarak@proskauer.com)<br>Daniel Desatnik (ddesatnik@proskauer.com)<br><br>- and -<br><br>Stinson LLP<br>1201 Walnut, Suite 2900<br>Kansas City, MO 64106<br>Attn: Nicholas Zluticky (nicholas.zluticky@stinson.com)<br>Zachary Hemenway (zachary.hemenway@stinson.com)<br>Miranda Swift (miranda.swift@stinson.com) |

A Notice is deemed to be given and received (a) if sent by personal delivery or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt, provided that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section. Any party may change its address for service from time to time by providing a Notice in accordance with the foregoing. Any element of a party's address that is not specifically changed in a Notice will be assumed not to be changed. Sending a copy of a Notice to a party's legal counsel as contemplated above is for information purposes only and does not constitute delivery of the Notice

to that party. The failure to send a copy of a Notice to legal counsel does not invalidate delivery of that Notice to a party.

**J. 2002 Service List**

After the Effective Date, any Entities or Persons that want to continue to receive notice in these Chapter 11 Cases must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002 no later than thirty days after the Effective Date; *provided, however*, that the U.S. Trustee shall be excused from this requirement and shall remain on the Bankruptcy Rule 2002 service list. To the extent a renewed request is not timely Filed with the Bankruptcy Court, the Post-Restructuring Debtors, the Wind-Down Trustee, and the Liquidation Trustee (as applicable) are authorized to limit notice and not include such Entities or Persons on any post-Effective Date Bankruptcy Rule 2002 service list.

**K. Entire Agreement**

On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**L. Plan Supplement(s)**

All exhibits to the Plan not attached hereto shall be Filed in one or more Plan Supplements by the Plan Supplement Filing Date. Any Plan Supplement (and amendments thereto) Filed by the Debtors shall be deemed an integral part of the Plan and shall be incorporated by reference as if fully set forth herein. Substantially contemporaneously with their Filing, the Plan Supplement may be viewed at the Debtors' case website (https://dm.epiq11.com/genesis). Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, the Plan Supplement shall control. All documents in the Plan Supplement are considered an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

**M. Votes Solicited in Good Faith**

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to Bankruptcy Code section 1125(e), the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code and, therefore, no such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan.

**N. Closing of the Chapter 11 Cases**

As soon as reasonably practicable after the Effective Date, the Wind-Down Trustee shall File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and Local Rule 3022-1(a) and any applicable order necessary to close the Chapter 11 Cases except for the Lead

Case, which shall remain open pending the full administration of the Liquidation Trust and the Wind-Down Trust. Promptly thereafter, the Liquidation Trustee shall seek authority from the Bankruptcy Court to close the Lead Case in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

### O. Payment of Statutory Fees

All fees payable through the Effective Date pursuant to 28 U.S.C. § 1930 shall be paid by the Debtors, the Post-Restructuring Debtors, or the Wind-Down Trustee, as applicable, on or as soon as practicable after the Effective Date. The Wind-Down Trustee shall (i) File (a) any pre-confirmation monthly operating reports not Filed as of the Effective Date and (b) any post-confirmation quarterly reports through and including the quarterly period during which the Chapter 11 Cases (other than the Lead Case) are closed as set forth herein, and (ii) pay Statutory Fees to the U.S. Trustee in accordance with 28 U.S.C. § 1930 for such periods; *provided, however*, that the Liquidation Trustee shall pay such Statutory Fees to the U.S. Trustee for such periods solely with respect to Distributions made by the Liquidation Trust during such periods. Following the closing of the Chapter 11 Cases (other than the Lead Case), until the Lead Case is closed or converted and/or the entry of a final decree with respect to the Lead Case, the Liquidation Trustee shall File post-confirmation quarterly reports for the Lead Case and the Liquidation Trust and shall pay Statutory Fees to the U.S. Trustee in accordance with 28 U.S.C. § 1930 arising from distributions made by the Liquidation Trust as well as the minimum Statutory Fee ($250) for the Lead Case, and the Wind-Down Trust shall have no responsibility for payment of such Statutory Fees. The U.S. Trustee shall not be required to File a request for payment of its quarterly fees, which shall be deemed an Allowed Administrative Expense Claim against the Debtors and their Estates.

### P. No Admissions

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission by any Entity with respect to any matter set forth herein.

### Q. Waiver or Estoppel

Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

### R. Creditor Default

An act or omission by a Holder of a Claim or an Interest in contravention of the provisions of the Plan shall be deemed an event of default under the Plan. Upon an event of default, the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, may seek to hold the defaulting party in contempt of the Confirmation Order and shall be entitled to reasonable attorneys' fees and costs of the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, in remedying such default. Upon the finding of such a default by a creditor, the Bankruptcy Court may: (1) designate a party to appear, sign and/or accept

the documents required under the Plan on behalf of the defaulting party, in accordance with Bankruptcy Rule 7070; (2) enforce the Plan by order of specific performance; (3) award judgment against such defaulting creditor in favor of the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, in an amount, including interest, to compensate the Post-Restructuring Debtors, the Wind-Down Trustee, or the Liquidation Trustee, as applicable, for the damages caused by such default; and (4) make such other order as may be equitable that does not materially alter the terms of the Plan.

**S. Inconsistency**

In the event of any inconsistency among the Plan and any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

**T. Reservation of Rights**

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order. None of the Filing of the Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors or Holders of Claims or Interests before the Effective Date.

*[Remainder of Page Intentionally Left Blank]*

Dated: October 14, 2026

GENESIS HEALTHCARE, INC, *et al.*
Debtors and Debtors-in-Possession

By: */s/ Louis E. Robichaux IV*
Louis E. Robichaux IV
Co-Chief Restructuring Officer

*/s/ Charles R. Gibbs*

Charles R. Gibbs (TX Bar No. 7846300)
**MCDERMOTT WILL & SCHULTE LLP**
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
Email: crgibbs@mcdermottlaw.com

- and -

Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Catherine L. Bloomberg (admitted *pro hac vice*)
Landon W. Foody (admitted *pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
Email: dsimon@mcdermottlaw.com
ekeil@mcdermottlaw.com
wguerrieri@mcdermottlaw.com
cbloomberg@mcdermottlaw.com
lfoody@mcdermottlaw.com

- and -

Gregg M. Galardi (admitted *pro hac vice*)
**MCDERMOTT WILL & SCHULTE LLP**
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
Email: ggalardi@mcdermottlaw.com

*Counsel for Debtors and Debtors-in-Possession*

**EXHIBIT A**

**Chapter 11 Debtors**

| Debtor Name | EIN Number |
|---|---|
| Genesis Healthcare, Inc. | 20-3934755 |
| 1 Glen Hill Road Operations LLC | 83-3800183 |
| 1 Sutphin Drive Operations LLC | 26-0798393 |
| 10 Woodland Drive Operations LLC | 26-3157524 |
| 100 Abbeyville Road Operations LLC | 88-4293103 |
| 100 Chambers Street Operations LLC | 26-0796788 |
| 100 W. Queen Street Operations LLC | 92-1075272 |
| 105 Chester Road Operations LLC | 37-1787889 |
| 1000 Lincoln Drive Operations LLC | 26-0798815 |
| 1008 Thompson Street Operations LLC | 92-1055669 |
| 101 13th Street Operations LLC | 26-0798876 |
| 101 Development Group, LLC | 26-3764579 |
| 1020 South Main Street Operations LLC | 26-0831465 |
| 106 Tyree Street Operations LLC | 26-0798930 |
| 1070 Stouffer Avenue Operations LLC | 92-1055714 |
| 11 Dairy Lane Operations LLC | 26-0797280 |
| 1100 Norman Eskridge Highway Operations LLC | 26-0789197 |
| 1104 Welsh Road Operations LLC | 26-0831607 |
| 1105 Perry Highway Operations LLC | 92-1060178 |
| 113 W. McMurray Road Operations LLC | 92-1040208 |
| 115 S. Providence Road Operations LLC | 92-1149731 |
| 12-15 Saddle River Road Operations LLC | 26-0858429 |
| 1245 Church Road Operations LLC | 26-0832125 |
| 1248 Hospital Drive Operations LLC | 36-4813989 |
| 125 Holly Road Operations LLC | 26-0833210 |
| 128 East State Street Associates, LLC | 20-5229040 |
| 136 Donahoe Manor Road Operations LLC | 92-1085905 |
| 1361 Route 72 West Operations LLC | 26-0858998 |
| 1539 Country Club Road Operations LLC | 26-1446436 |
| 1543 Country Club Road Manor Operations LLC | 26-1446339 |
| 161 Bakers Ridge Road Operations LLC | 26-0798986 |
| 1631 Ritter Drive Operations LLC | 26-0799048 |
| 1650 Galisteo Street Operations LLC | 38-4089170 |
| 1680 Spring Creek Road Operations LLC | 26-0834593 |
| 1700 Market Street Operations LLC | 88-4312980 |
| 1700 Pine Street Operations LLC | 26-0837632 |
| 175 Blueberry Lane Operations LLC | 26-0902592 |
| 1770 Barley Road Operations LLC | 92-1100285 |
| 1848 Greentree Road Operations LLC | 92-1100372 |

| Debtor Name | EIN Number |
|---|---|
| 191 Hackett Hill Road Operations LLC | 61-1745358 |
| 2 Blackberry Lane Operations LLC | 37-1787899 |
| 20 Maitland Street Operations LLC | 26-0902639 |
| 200 Pauline Drive Operations LLC | 92-1085955 |
| 200 Reynolds Avenue Operations LLC | 26-0865155 |
| 200 South Ritchie Avenue Operations LLC | 26-0802292 |
| 201 Wood Street Operations LLC | 26-0802570 |
| 2021 Westgate Drive Operations LLC | 92-1071278 |
| 2029 Westgate Drive Operations LLC | 92-1071366 |
| 2101 Fairland Road Operations LLC | 27-3286015 |
| 211-213 Ana Drive Operations LLC | 32-0445595 |
| 2125 Elizabeth Avenue Operations LLC | 88-4303273 |
| 22 Tuck Road Operations LLC | 26-3157262 |
| 225 Evergreen Road Operations LLC | 26-0837946 |
| 227 Evergreen Road Operations LLC | 26-0838035 |
| 23 Fair Street Operations LLC | 38-3974821 |
| 23 Fair Street Property, LLC | 37-1790621 |
| 24 Old Etna Road Operations LLC | 26-0902883 |
| 2400 Kingston Court Operations LLC | 88-4314431 |
| 25 East Lindsley Road Operations LLC | 26-0865287 |
| 25 Ridgewood Road Operations LLC | 26-0902937 |
| 2507 Chestnut Street Operations LLC | 26-0838130 |
| 2600 Northampton Street Operations LLC | 92-1075101 |
| 262 Toll Gate Road Operations LLC | 26-0838226 |
| 2720 Charles Town Road Operations LLC | 26-0802645 |
| 279 Cabot Street Operations LLC | 32-0473527 |
| 279 Cabot Street Property LLC | 38-3975205 |
| 2800 Palo Parkway Operations LLC | 88-4420565 |
| 290 Hanover Street Operations LLC | 26-3156358 |
| 292 Applegarth Road Operations LLC | 26-0865549 |
| 3 Industrial Way East Operations LLC | 26-0865899 |
| 30 West Avenue Operations LLC | 26-2602152 |
| 300 Pearl Street Operations LLC | 38-3975338 |
| 3000 Windmill Road Operations LLC | 88-4314481 |
| 302 Cedar Ridge Road Operations LLC | 26-0802735 |
| 330 Franklin Turnpike Operations LLC | 26-0865965 |
| 333 Green End Avenue Operations LLC | 26-0796847 |
| 3430 Huntingdon Pike Operations LLC | 88-4304543 |
| 3485 Davisville Road Operations II LLC | 92-1105056 |
| 3514 Fowler Avenue Operations LLC | 30-1116161 |
| 3590 Washington Pike Operations LLC | 37-1800646 |
| 3720 Church Rock Street Operations LLC | 36-4906274 |
| 390 Red School Lane Operations LLC | 26-0866040 |
| 40 Crosby Street Operations LLC | 32-0573730 |

| Debtor Name | EIN Number |
|---|---|
| 40 Whitehall Road Operations LLC | 30-0878413 |
| 40 Whitehall Road Property LLC | 36-4814745 |
| 400 McKinley Avenue Operations LLC | 93-3663691 |
| 4140 Old Washington Highway Operations LLC | 26-0814286 |
| 419 Harding Street Operations LLC | 37-1905331 |
| 422 23rd Street Operations LLC | 26-0806381 |
| 425 Buttonwood Street Operations LLC | 92-1040323 |
| 450 East Philadelphia Avenue Operations LLC | 26-0838908 |
| 462 Main Street Operations LLC | 26-0796131 |
| 50 Mulberry Tree Street Operations LLC | 26-0804456 |
| 50 Pheasant Road Operations LLC | 61-1896882 |
| 500 East Philadelphia Avenue Operations LLC | 26-0840575 |
| 501 Thomas Jones Way Operations LLC | 92-1086015 |
| 505 Weyman Road Operations LLC | 92-1086060 |
| 530 Macoby Street Operations LLC | 26-0840740 |
| 54 Sharp Street Operations LLC | 26-0866164 |
| 5485 Perkiomen Avenue Operations LLC | 26-0840797 |
| 550 South Negley Avenue Operations LLC | 92-1089430 |
| 5609 Fifth Avenue Operations LLC | 92-1116989 |
| 590 North Poplar Fork Road Operations LLC | 26-0802814 |
| 60 Highland Road Operations LLC | 88-4292979 |
| 600 Paoli Pointe Drive Operations LLC | 26-0842139 |
| 600 W. Valley Forge Road Operations LLC | 88-4293566 |
| 613 Hammonds Lane Operations LLC | 26-0816065 |
| 624 N. Converse Street Property, LLC | 32-0467257 |
| 640 Bethlehem Pike Operations LLC | 92-1044499 |
| 642 Metacom Avenue Operations LLC | 26-3157291 |
| 660 Commonwealth Avenue Operations LLC | 26-0796908 |
| 677 Court Street Operations LLC | 26-0903080 |
| 7 Baldwin Street Operations LLC | 26-0903110 |
| 700 Marvel Road Operations LLC | 26-0789419 |
| 700 Town Bank Road Operations LLC | 26-0866369 |
| 715 East King Street Operations LLC | 37-1690544 |
| 723 Summers Street Operations LLC | 26-0804524 |
| 724 N. Charlotte Street Operations LLC | 92-1045090 |
| 735 Putnam Pike Operations LLC | 26-3156030 |
| 75 Hickle Street Operations LLC | 26-0842502 |
| 777 Lafayette Road Operations LLC | 26-3157593 |
| 8 Rose Street Operations LLC | 26-0804585 |
| 8 Snow Road Operations LLC | 36-4904863 |
| 80 Maddex Drive Operations LLC | 26-0804643 |
| 800 Court Street Circle Operations LLC | 92-1089501 |
| 803 Hacienda Lane Operations LLC | 36-4905637 |
| 8100 Washington Lane Operations LLC | 26-0842681 |

| Debtor Name | EIN Number |
|---|---|
| 825 Summit Street Operations LLC | 26-0804702 |
| 84 Cold Hill Road Operations LLC | 26-0866432 |
| 840 Lee Road Operations LLC | 26-0805378 |
| 850 12th Avenue Property, LLC | 61-1762114 |
| 867 York Road Operations LLC | 26-0842583 |
| 885 MacBeth Drive Operations LLC | 92-1055531 |
| 900 Tuck Street Operations LLC | 92-1055607 |
| 91 Country Village Road Operations LLC | 26-0903160 |
| 940 Walnut Bottom Road Operations LLC | 92-1089574 |
| 98 Hospitality Drive Operations LLC | 36-4814147 |
| Albuquerque Heights Healthcare and Rehabilitation Center, LLC | 26-0675040 |
| Albuquerque Heights Property, LLC | 36-4739932 |
| Belen Meadows Healthcare and Rehabilitation Center, LLC | 26-0675094 |
| Belfast Operations, LLC | 20-5541877 |
| Brier Oak on Sunset, LLC | 95-4212165 |
| Camden Operations, LLC | 20-5542380 |
| Canyon Albuquerque Property, LLC | 61-1715791 |
| Canyon Transitional Rehabilitation Center, LLC | 26-0675157 |
| Clovis Healthcare and Rehabilitation Center, LLC | 26-0675210 |
| Courtyard JV LLC | 27-3653462 |
| Encore GC Acquisition LLC | 36-4746246 |
| Encore Pediatrics, LLC | 92-0850640 |
| Encore Preakness, LLC | 25-1805051 |
| Encore Rehabilitation Services, LLC | 20-8215706 |
| Falmouth Operations, LLC | 20-5542263 |
| Farmington Operations, LLC | 20-5542206 |
| FC-GEN Operations Investment, LLC | 27-3237005 |
| Five Ninety Six Sheldon Road Operations LLC | 26-3157551 |
| Forty Six Nichols Street Operations LLC | 26-3157432 |
| Fountain Holdco, LLC | 61-1690655 |
| Franklin Woods JV LLC | 27-3653701 |
| GEN BQ JV Holdings, LLC | 83-4680177 |
| GEN CCG JV Holdings LLC | 84-4231317 |
| GEN Operations I, LLC | 27-3237090 |
| GEN Operations II, LLC | 27-3237225 |
| GEN SF JV Holdings, LLC | 84-2030307 |
| GEN-CCG WO Master Tenant LLC | 84-4852373 |
| GEN-Next Holdco I LLC | 83-3196600 |
| Genesis Administrative Services LLC | 30-0847166 |
| Genesis CT Holdings LLC | 26-0787896 |
| Genesis CT XCL Operations LLC | 83-4097388 |
| Genesis DE Holdings LLC | 26-0788062 |
| Genesis Dynasty Operations LLC | 35-2579085 |
| Genesis Eldercare Network Services, LLC | 23-2107987 |

| Debtor Name | EIN Number |
|---|---|
| Genesis ElderCare Physician Services, LLC | 06-1156428 |
| Genesis HealthCare LLC | 27-3237296 |
| Genesis HealthCare of Maine, LLC | 36-4725000 |
| Genesis Holdings LLC | 30-0843337 |
| Genesis MA Holdings LLC | 26-0788158 |
| Genesis MD Holdings LLC | 26-0788216 |
| Genesis Midwest II Operations LLC | 61-1866165 |
| Genesis NH Holdings LLC | 26-0902542 |
| Genesis NHG Operations LLC | 37-1904639 |
| Genesis NHG-GEN Operations LLC | 83-4098117 |
| Genesis NJ Holdings LLC | 26-0856500 |
| Genesis OMG Operations LLC | 45-2036948 |
| Genesis Operations III LLC | 27-3956918 |
| Genesis Operations IV LLC | 45-2014515 |
| Genesis Operations LLC | 26-0787826 |
| Genesis Operations V LLC | 45-2015148 |
| Genesis Operations VI LLC | 45-2015863 |
| Genesis Orion Operations LLC | 46-3646227 |
| Genesis PA Holdings LLC | 26-0788305 |
| Genesis Partnership LLC | 61-1747445 |
| Genesis Physician Services MSO, LLC | 37-1896412 |
| Genesis PM CO Operations LLC | 92-1398777 |
| Genesis PM NJ Operations LLC | 92-1881394 |
| Genesis PM PA Operations LLC | 92-1071670 |
| Genesis RI Holdings LLC | 26-0788381 |
| Genesis SNI Operations LLC | 84-2628539 |
| Genesis Tang Operations LLC | 38-4021426 |
| Genesis VA Holdings LLC | 26-0874971 |
| Genesis VT Holdings LLC | 26-0822458 |
| Genesis WV Holdings LLC | 26-0788494 |
| GHC Holdings LLC | 26-0740682 |
| GHC JV Holdings LLC | 27-3451063 |
| GHC Payroll LLC | 26-1091992 |
| GHC TX Operations LLC | 61-1750087 |
| Granite Ledges JV LLC | 27-3653829 |
| Harborside Danbury Limited Partnership | 06-1528119 |
| Harborside Health I LLC | 51-0304578 |
| Harborside Healthcare Advisors Limited Partnership | 04-2985690 |
| Harborside Healthcare Limited Partnership | 04-2985687 |
| Harborside Healthcare, LLC | 04-3307188 |
| Harborside New Hampshire Limited Partnership | 04-3284611 |
| Harborside Rhode Island Limited Partnership | 05-0495209 |
| Harborside Toledo Business LLC | 04-3274482 |
| HBR Kentucky, LLC | 20-2512086 |

| Debtor Name | EIN Number |
|---|---|
| HBR Trumbull, LLC | 20-4599841 |
| HC 63 Operations LLC | 26-0805549 |
| Kansas City Transitional Care Center, LLC | 38-3879014 |
| Kennebunk Operations, LLC | 20-5542183 |
| Kennett Center, L.P. | 34-1975968 |
| KHI LLC | 51-0304577 |
| Leasehold Resource Group, LLC | 20-0083961 |
| Lewiston Operations, LLC | 20-5541920 |
| LTC ACO, LLC | 37-1787111 |
| Maryland Harborside, LLC | 04-3168713 |
| Magnolia JV LLC | 27-3653937 |
| Metro Therapy, Inc. | 11-3068922 |
| Nine Haywood Avenue Operations LLC | 26-0797562 |
| Odd Lot LLC | 27-5191122 |
| Orono Operations, LLC | 20-5542044 |
| PAI Participant 1, LLC | 83-4164482 |
| PAI Participant 2, LLC | 83-4164572 |
| PAI Participant 3, LLC | 83-4164685 |
| PAI Participant 4, LLC | 83-4164813 |
| PBR Intermediate Holdings, LLC | 88-3920334 |
| PDDTSE, LLC | 46-2458197 |
| Peak Medical Assisted Living, LLC | 52-2088942 |
| Peak Medical Las Cruces No. 2, LLC | 20-0068615 |
| Peak Medical Las Cruces, LLC | 71-0950059 |
| Peak Medical New Mexico No. 3, LLC | 85-0484183 |
| Peak Medical Roswell, LLC | 20-0068604 |
| Peak Medical, LLC | 52-2088940 |
| Pine Tree Villa LLC | 20-2513222 |
| Post-Acute Innovations, LLC | 37-1932430 |
| Powerback Pediatrics of Arkansas, LLC | 88-4247749 |
| Powerback Pediatrics of Georgia, LLC | 99-0921365 |
| Powerback Pediatrics of Missouri, LLC | 92-0863507 |
| Powerback Pediatrics of Nebraska, LLC | 92-0886808 |
| Powerback Pediatrics of South Carolina, LLC | 99-0921075 |
| Powerback Pediatrics of Vermont, LLC | 99-0921658 |
| Powerback Rehabilitation, LLC | 23-2446104 |
| PRMC/GEC at Salisbury Center, LLC | 23-3010869 |
| Property Resource Holdings, LLC | 37-1712484 |
| Regency Health Services, LLC | 33-0210226 |
| Respiratory Health Services LLC | 52-2054967 |
| Romney Health Care Center Limited Partnership | 55-0689584 |
| Route 92 Operations LLC | 26-0805623 |
| Saddle Shop Road Operations LLC | 26-0805711 |
| Salisbury JV LLC | 27-3654054 |

| Debtor Name | EIN Number |
|---|---|
| Scarborough Operations, LLC | 20-5542088 |
| SHG Partnership, LLC | 36-4802236 |
| SHG Resources, LLC | 20-0084078 |
| Skies Healthcare and Rehabilitation Center, LLC | 26-0675263 |
| Skiles Avenue and Sterling Drive Urban Renewal Operations LLC | 61-1717930 |
| Skilled Healthcare, LLC | 20-0084014 |
| Skowhegan SNF Operations, LLC | 20-5541352 |
| St. Anthony Healthcare and Rehabilitation Center, LLC | 26-0675327 |
| St. Catherine Healthcare and Rehabilitation Center, LLC | 20-8386337 |
| St. John Healthcare and Rehabilitation Center, LLC | 20-8386810 |
| St. Theresa Healthcare and Rehabilitation Center, LLC | 26-0675370 |
| State Street Associates, L.P. | 23-2799332 |
| State Street Kennett Square, LLC | 23-2446105 |
| Stillwell Road Operations LLC | 26-0805824 |
| Summit Care Parent, LLC | 38-3901040 |
| Summit Care, LLC | 95-3656297 |
| Sun Healthcare Group, Inc. | 13-4230695 |
| SunBridge Beckley Health Care LLC | 31-1042548 |
| SunBridge Care Enterprises, LLC | 95-3311961 |
| SunBridge Clipper Home of North Conway, LLC | 02-0417606 |
| SunBridge Clipper Home of Wolfeboro, LLC | 02-0382521 |
| SunBridge Dunbar Health Care LLC | 55-0593873 |
| SunBridge Gardendale Health Care Center, LLC | 58-2238801 |
| SunBridge Goodwin Nursing Home, LLC | 02-0303002 |
| SunBridge Healthcare, LLC | 85-0370802 |
| SunBridge Nursing Home, LLC | 91-1572371 |
| SunBridge Putnam Health Care LLC | 31-0996773 |
| SunBridge Regency-North Carolina, LLC | 56-1954175 |
| SunBridge Regency-Tennessee, LLC | 33-0690226 |
| SunBridge Retirement Care Associates, LLC | 43-1441789 |
| SunBridge Salem Health Care LLC | 31-0996769 |
| SunDance Rehabilitation Agency, LLC | 30-0141695 |
| SunDance Rehabilitation Holdco, Inc. | 38-3954180 |
| SunDance Rehabilitation, LLC | 06-1310410 |
| The Rehabilitation Center of Albuquerque, LLC | 26-0675426 |
| Thirty Five Bel-Aire Drive SNF Operations LLC | 26-0797624 |
| Three Mile Curve Operations LLC | 26-0806097 |
| Waterville SNF Operations LLC | 20-5541966 |
| Westbrook Operations, LLC | 20-5542347 |
| Westwood Medical Park Operations LLC | 26-0797458 |

# EXHIBIT B

## List of OpCo Facility Debtors (Class 6-A (GUC Distribution Group 1))

| Case # | Debtor Name |
|---|---|
| 25-80334 | SunBridge Care Enterprises, LLC |
| 25-80407 | SunBridge Regency-North Carolina, LLC |
| 25-80480 | SunBridge Healthcare, LLC |
| 25-80420 | SunBridge Retirement Care Associates, LLC |
| 25-80457 | Franklin Woods JV LLC |
| 25-80224 | Granite Ledges JV LLC |
| 25-80195 | 1 Sutphin Drive Operations LLC |
| 25-80222 | 100 Abbeyville Road Operations LLC |
| 25-80228 | 100 Chambers Street Operations LLC |
| 25-80232 | 100 W. Queen Street Operations LLC |
| 25-80311 | 1000 Lincoln Drive Operations LLC |
| 25-80315 | 1008 Thompson Street Operations LLC |
| 25-80234 | 101 13th Street Operations LLC |
| 25-80317 | 1020 South Main Street Operations LLC |
| 25-80253 | 106 Tyree Street Operations LLC |
| 25-80319 | 1070 Stouffer Avenue Operations LLC |
| 25-80210 | 11 Dairy Lane Operations LLC |
| 25-80323 | 1100 Norman Eskridge Highway Operations LLC |
| 25-80327 | 1104 Welsh Road Operations LLC |
| 25-80260 | 115 S. Providence Road Operations LLC |
| 25-80214 | 12-15 Saddle River Road Operations LLC |
| 25-80335 | 1245 Church Road Operations LLC |
| 25-80265 | 125 Holly Road Operations LLC |
| 25-80343 | 1361 Route 72 West Operations LLC |
| 25-80346 | 1539 Country Club Road Operations LLC |
| 25-80350 | 1543 Country Club Road Manor Operations LLC |
| 25-80279 | 161 Bakers Ridge Road Operations LLC |
| 25-80354 | 1631 Ritter Drive Operations LLC |
| 25-80357 | 1650 Galisteo Street Operations LLC |
| 25-80361 | 1680 Spring Creek Road Operations LLC |
| 25-80365 | 1700 Market Street Operations LLC |
| 25-80367 | 1700 Pine Street Operations LLC |
| 25-80284 | 175 Blueberry Lane Operations LLC |
| 25-80389 | 1770 Barley Road Operations LLC |
| 25-80287 | 191 Hackett Hill Road Operations LLC |
| 25-80220 | 20 Maitland Street Operations LLC |

| Case # | Debtor Name |
|---|---|
| 25-80293 | 200 Pauline Drive Operations LLC |
| 25-80303 | 200 South Ritchie Avenue Operations LLC |
| 25-80306 | 201 Wood Street Operations LLC |
| 25-80397 | 2021 Westgate Drive Operations LLC |
| 25-80401 | 2029 Westgate Drive Operations LLC |
| 25-80406 | 2101 Fairland Road Operations LLC |
| 25-80186 | 211-213 Ana Drive Operations LLC |
| 25-80189 | 2125 Elizabeth Avenue Operations LLC |
| 25-80192 | 22 Tuck Road Operations LLC |
| 25-80198 | 225 Evergreen Road Operations LLC |
| 25-80199 | 227 Evergreen Road Operations LLC |
| 25-80208 | 24 Old Etna Road Operations LLC |
| 25-80211 | 2400 Kingston Court Operations LLC |
| 25-80215 | 25 East Lindsley Road Operations LLC |
| 25-80217 | 25 Ridgewood Road Operations LLC |
| 25-80223 | 2507 Chestnut Street Operations LLC |
| 25-80227 | 2600 Northampton Street Operations LLC |
| 25-80230 | 262 Toll Gate Road Operations LLC |
| 25-80233 | 2720 Charles Town Road Operations LLC |
| 25-80236 | 279 Cabot Street Operations LLC |
| 25-80245 | 290 Hanover Street Operations LLC |
| 25-80247 | 292 Applegarth Road Operations LLC |
| 25-80249 | 3 Industrial Way East Operations LLC |
| 25-80254 | 30 West Avenue Operations LLC |
| 25-80259 | 3000 Windmill Road Operations LLC |
| 25-80264 | 302 Cedar Ridge Road Operations LLC |
| 25-80190 | 330 Franklin Turnpike Operations LLC |
| 25-80193 | 333 Green End Avenue Operations LLC |
| 25-80197 | 3430 Huntingdon Pike Operations LLC |
| 25-80213 | 3514 Fowler Avenue Operations LLC |
| 25-80218 | 3590 Washington Pike Operations LLC |
| 25-80225 | 3720 Church Rock Street Operations LLC |
| 25-80231 | 390 Red School Lane Operations LLC |
| 25-80240 | 40 Crosby Street Operations LLC |
| 25-80244 | 40 Whitehall Road Operations LLC |
| 25-80263 | 400 McKinley Avenue Operations LLC |
| 25-80268 | 4140 Old Washington Highway Operations LLC |
| 25-80272 | 419 Harding Street Operations LLC |
| 25-80276 | 422 23rd Street Operations LLC |
| 25-80282 | 425 Buttonwood Street Operations LLC |

| Case # | Debtor Name |
|---|---|
| 25-80286 | 450 East Philadelphia Avenue Operations LLC |
| 25-80289 | 462 Main Street Operations LLC |
| 25-80294 | 50 Mulberry Tree Street Operations LLC |
| 25-80301 | 50 Pheasant Road Operations LLC |
| 25-80310 | 500 East Philadelphia Avenue Operations LLC |
| 25-80333 | 530 Macoby Street Operations LLC |
| 25-80337 | 54 Sharp Street Operations LLC |
| 25-80342 | 5485 Perkiomen Avenue Operations LLC |
| 25-80356 | 590 North Poplar Fork Road Operations LLC |
| 25-80364 | 600 Paoli Pointe Drive Operations LLC |
| 25-80371 | 600 W. Valley Forge Road Operations LLC |
| 25-80375 | 613 Hammonds Lane Operations LLC |
| 25-80379 | 640 Bethlehem Pike Operations LLC |
| 25-80390 | 660 Commonwealth Avenue Operations LLC |
| 25-80393 | 677 Court Street Operations LLC |
| 25-80408 | 7 Baldwin Street Operations LLC |
| 25-80428 | 700 Marvel Road Operations LLC |
| 25-80432 | 700 Town Bank Road Operations LLC |
| 25-80436 | 715 East King Street Operations LLC |
| 25-80440 | 723 Summers Street Operations LLC |
| 25-80447 | 724 N. Charlotte Street Operations LLC |
| 25-80453 | 75 Hickle Street Operations LLC |
| 25-80455 | 777 Lafayette Road Operations LLC |
| 25-80458 | 8 Rose Street Operations LLC |
| 25-80462 | 8 Snow Road Operations LLC |
| 25-80467 | 80 Maddex Drive Operations LLC |
| 25-80468 | 800 Court Street Circle Operations LLC |
| 25-80469 | 803 Hacienda Lane Operations LLC |
| 25-80471 | 8100 Washington Lane Operations LLC |
| 25-80472 | 825 SUMMIT STREET OPERATIONS LLC |
| 25-80473 | 84 Cold Hill Road Operations LLC |
| 25-80474 | 840 Lee Road Operations LLC |
| 25-80475 | 867 York Road Operations LLC |
| 25-80476 | 900 Tuck Street Operations LLC |
| 25-80477 | 91 Country Village Road Operations LLC |
| 25-80478 | 940 Walnut Bottom Road Operations LLC |
| 25-80266 | Albuquerque Heights Healthcare and Rehabilitation Center, LLC |
| 25-80273 | Belen Meadows Healthcare and Rehabilitation Center, LLC |
| 25-80296 | Canyon Transitional Rehabilitation Center, LLC |
| 25-80299 | Clovis Healthcare and Rehabilitation Center, LLC |

| **Case #** | **Debtor Name** |
|---|---|
| 25-80316 | Falmouth Operations, LLC |
| 25-80324 | Five Ninety Six Sheldon Road Operations LLC |
| 25-80369 | Nine Haywood Avenue Operations LLC |
| 25-80414 | Peak Medical Las Cruces No. 2, LLC |
| 25-80416 | Peak Medical Las Cruces, LLC |
| 25-80421 | Peak Medical New Mexico No. 3, LLC |
| 25-80216 | Romney Health Care Center Limited Partnership |
| 25-80219 | Route 92 Operations LLC |
| 25-80221 | Saddle Shop Road Operations LLC |
| 25-80251 | Skies Healthcare and Rehabilitation Center, LLC |
| 25-80267 | Skowhegan SNF Operations, LLC |
| 25-80271 | St. Anthony Healthcare and Rehabilitation Center, LLC |
| 25-80278 | St. Catherine Healthcare and Rehabilitation Center, LLC |
| 25-80283 | St. John Healthcare and Rehabilitation Center, LLC |
| 25-80288 | St. Theresa Healthcare and Rehabilitation Center, LLC |
| 25-80300 | Stillwell Road Operations LLC |
| 25-80328 | SunBridge Beckley Health Care LLC |
| 25-80374 | SunBridge Dunbar Health Care LLC |
| 25-80377 | SunBridge Gardendale Health Care Center, LLC |
| 25-80382 | SunBridge Goodwin Nursing Home, LLC |
| 25-80400 | SunBridge Nursing Home, LLC |
| 25-80403 | SunBridge Putnam Health Care LLC |
| 25-80418 | SunBridge Regency-Tennessee, LLC |
| 25-80423 | SunBridge Salem Health Care LLC |
| 25-80435 | The Rehabilitation Center of Albuquerque, LLC |
| 25-80439 | Thirty Five Bel-Aire Drive SNF Operations LLC |
| 25-80443 | Three Mile Curve Operations LLC |
| 25-80451 | Westwood Medical Park Operations LLC |
| 25-80277 | Belfast Operations, LLC |
| 25-80285 | Camden Operations, LLC |
| 25-80318 | Farmington Operations, LLC |
| 25-80321 | Kennebunk Operations, LLC |
| 25-80341 | Lewiston Operations, LLC |
| 25-80378 | Orono Operations, LLC |
| 25-80235 | Scarborough Operations, LLC |
| 25-80446 | Waterville SNF Operations LLC |
| 25-80448 | Westbrook Operations, LLC |

# EXHIBIT C

**List of Ancillary Business & JV Debtors (Class 6-B (GUC Distribution Group 2))**

| Case # | Debtor Name |
|---|---|
| 25-80352 | Magnolia JV LLC |
| 25-80207 | GHC JV Holdings LLC |
| 25-80370 | Genesis ElderCare Physician Services, LLC |
| 25-80209 | Respiratory Health Services LLC |
| 25-80302 | Encore GC Acquisition LLC |
| 25-80305 | Encore Pediatrics, LLC |
| 25-80309 | Encore Preakness, LLC |
| 25-80312 | Encore Rehabilitation Services, LLC |
| 25-80363 | Metro Therapy, Inc. |
| 25-80399 | PBR Intermediate Holdings, LLC |
| 25-80449 | Powerback Pediatrics of Arkansas, LLC |
| 25-80452 | Powerback Pediatrics of Georgia, LLC |
| 25-80456 | Powerback Pediatrics of Missouri, LLC |
| 25-80460 | Powerback Pediatrics of Nebraska, LLC |
| 25-80463 | Powerback Pediatrics of South Carolina, LLC |
| 25-80465 | Powerback Pediatrics of Vermont, LLC |
| 25-80191 | Powerback Rehabilitation, LLC |
| 25-80433 | SunDance Rehabilitation, LLC |
| 25-80425 | SunDance Rehabilitation Agency, LLC |
| 25-80248 | Harborside Healthcare Limited Partnership |
| 25-80459 | GEN BQ JV Holdings, LLC |
| 25-80464 | GEN SF JV Holdings, LLC |
| 25-80461 | GEN CCG JV Holdings LLC |
| 25-80466 | GEN-Next Holdco I LLC |
| 25-80347 | LTC ACO, LLC |

# EXHIBIT D

**List of HoldCo Non-Facility Debtors (Class 6-C (GUC Distribution Group 3))**

| Case # | Debtor Name |
|---|---|
| 25-80372 | Genesis HealthCare LLC |
| 25-80252 | Harborside Healthcare, LLC |
| 25-80349 | Genesis Administrative Services LLC |
| 25-80366 | Genesis Eldercare Network Services, LLC |
| 25-80246 | 101 Development Group, LLC |
| 25-80330 | Fountain Holdco, LLC |
| 25-80419 | Genesis Partnership LLC |
| 25-80404 | PDDTSE, LLC |
| 25-80238 | SHG Partnership, LLC |
| 25-80388 | PAI Participant 2, LLC |
| 25-80391 | PAI Participant 3, LLC |
| 25-80395 | PAI Participant 4, LLC |
| 25-80295 | State Street Kennett Square, LLC |
| 25-80239 | 279 Cabot Street Property LLC |
| 25-80256 | 40 Whitehall Road Property LLC |
| 25-80373 | Odd Lot LLC |
| 25-80340 | GEN Operations I, LLC |
| 25-80344 | GEN Operations II, LLC |
| 25-80376 | Genesis HealthCare of Maine, LLC |
| 25-80409 | Genesis Operations IV LLC |
| 25-80412 | Genesis Operations V LLC |
| 25-80413 | Genesis Operations VI LLC |
| 25-80417 | Genesis PA Holdings LLC |
| 25-80444 | Genesis VT Holdings LLC |
| 25-80445 | Post-Acute Innovations, LLC |
| 25-80345 | GEN-CCG WO Master Tenant LLC |
| 25-80362 | Genesis Dynasty Operations LLC |
| 25-80392 | Genesis NHG Operations LLC |
| 25-80396 | Genesis NHG-GEN Operations LLC |
| 25-80411 | Genesis Operations LLC |
| 25-80415 | Genesis Orion Operations LLC |
| 25-80426 | Genesis PM NJ Operations LLC |
| 25-80438 | Genesis SNI Operations LLC |
| 25-80441 | Genesis Tang Operations LLC |
| 25-80336 | Leasehold Resource Group, LLC |
| 25-80270 | 128 East State Street Associates, LLC |

| Case # | Debtor Name |
|---|---|
| 25-80307 | HC 63 Operations LLC |
| 25-80185 | Genesis Healthcare, Inc. |
| 25-80320 | FC-GEN Operations Investment, LLC |
| 25-80380 | Genesis Holdings LLC |
| 25-80196 | GHC Holdings LLC |
| 25-80243 | Harborside Healthcare Advisors Limited Partnership |
| 25-80290 | HBR Kentucky, LLC |
| 25-80332 | KHI LLC |
| 25-80359 | Maryland Harborside, LLC |
| 25-80437 | Peak Medical, LLC |
| 25-80202 | Property Resource Holdings, LLC |
| 25-80206 | Regency Health Services, LLC |
| 25-80242 | SHG Resources, LLC |
| 25-80261 | Skilled Healthcare, LLC |
| 25-80304 | Summit Care Parent, LLC |
| 25-80308 | Summit Care, LLC |
| 25-80429 | SunDance Rehabilitation Holdco, Inc. |
| 25-80237 | Harborside Health I LLC |
| 25-80281 | Harborside Toledo Business LLC |
| 25-80325 | Kennett Center, L.P. |
| 25-80292 | State Street Associates, L.P. |
| 25-80384 | PAI Participant 1, LLC |
| 25-80422 | Genesis Physician Services MSO, LLC |
| 25-80212 | GHC Payroll LLC |
| 25-80182 | 624 N. Converse Street Property, LLC |
| 25-80183 | 850 12th Avenue Property, LLC |
| 25-80386 | Genesis Midwest II Operations LLC |
| 25-80322 | Sun Healthcare Group, Inc. |

# EXHIBIT E

## List of DivestCo Debtors (Class 6-D (GUC Distribution Group 4))

| Case# | Debtor Name |
|---|---|
| 25-80454 | Courtyard JV LLC |
| 25-80226 | Salisbury JV LLC |
| 25-80280 | Brier Oak on Sunset, LLC |
| 25-80297 | 200 Reynolds Avenue Operations LLC |
| 25-80274 | Harborside Rhode Island Limited Partnership |
| 25-80298 | HBR Trumbull, LLC |
| 25-80410 | Peak Medical Assisted Living, LLC |
| 25-80430 | Peak Medical Roswell, LLC |
| 25-80255 | Skiles Avenue and Sterling Drive Urban Renewal Operations LLC |
| 25-80348 | 550 South Negley Avenue Operations LLC |
| 25-80353 | Genesis CT Holdings LLC |
| 25-80358 | Genesis DE Holdings LLC |
| 25-80381 | Genesis MA Holdings LLC |
| 25-80385 | Genesis MD Holdings LLC |
| 25-80387 | Genesis NH Holdings LLC |
| 25-80398 | Genesis NJ Holdings LLC |
| 25-80405 | Genesis Operations III LLC |
| 25-80424 | Genesis PM CO Operations LLC |
| 25-80427 | Genesis PM PA Operations LLC |
| 25-80431 | Genesis RI Holdings LLC |
| 25-80434 | Genesis VA Holdings LLC |
| 25-80187 | Genesis WV Holdings LLC |
| 25-80205 | 23 Fair Street Property, LLC |
| 25-80269 | Albuquerque Heights Property, LLC |
| 25-80291 | Canyon Albuquerque Property, LLC |
| 25-80188 | 1 Glen Hill Road Operations LLC |
| 25-80204 | 10 Woodland Drive Operations LLC |
| 25-80250 | 105 Chester Road Operations LLC |
| 25-80331 | 1105 Perry Highway Operations LLC |
| 25-80258 | 113 W. McMurray Road Operations LLC |
| 25-80338 | 1248 Hospital Drive Operations LLC |
| 25-80275 | 136 Donahoe Manor Road Operations LLC |
| 25-80394 | 1848 Greentree Road Operations LLC |
| 25-80200 | 2 Blackberry Lane Operations LLC |
| 25-80203 | 23 Fair Street Operations LLC |
| 25-80257 | 300 Pearl Street Operations LLC |

| Case# | Debtor Name |
|---|---|
| 25-80201 | 3485 Davisville Road Operations II LLC |
| 25-80313 | 501 Thomas Jones Way Operations LLC |
| 25-80329 | 505 Weyman Road Operations LLC |
| 25-80351 | 5609 Fifth Avenue Operations LLC |
| 25-80360 | 60 Highland Road Operations LLC |
| 25-80383 | 642 Metacom Avenue Operations LLC |
| 25-80450 | 735 Putnam Pike Operations LLC |
| 25-80470 | 885 MacBeth Drive Operations LLC |
| 25-80479 | 98 Hospitality Drive Operations LLC |
| 25-80326 | Forty Six Nichols Street Operations LLC |
| 25-80229 | Harborside Danbury Limited Partnership |
| 25-80262 | Harborside New Hampshire Limited Partnership |
| 25-80339 | SunBridge Clipper Home of North Conway, LLC |
| 25-80368 | SunBridge Clipper Home of Wolfeboro, LLC |
| 25-80241 | 2800 Palo Parkway Operations LLC |
| 25-80314 | Kansas City Transitional Care Center, LLC |
| 25-80194 | PRMC/GEC at Salisbury Center, LLC |
| 25-80442 | Pine Tree Villa LLC |
| 25-80184 | GHC TX Operations LLC |
| 25-80355 | Genesis CT XCL Operations LLC |
| 25-80402 | Genesis OMG Operations LLC |

# **<u>EXHIBIT B</u>**

**Notice of Confirmation Order**

**MCDERMOTT WILL & SCHULTE LLP**
Charles R. Gibbs (TX Bar No. 7846300)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
Email: crgibbs@mcdermottlaw.com

Gregg M. Galardi (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
Email: ggalardi@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Landon W. Foody (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
Email: dsimon@mcdermottlaw.com
ekeil@mcdermottlaw.com
wguerrieri@mcdermottlaw.com
lfoody@mcdermottlaw.com

*Counsel for the Debtors and Debtors-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | ) | Case No. 25-80185 (SGJ) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Related to Docket No. [__]** |

**NOTICE OF ENTRY OF ORDER CONFIRMING DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN OF GENESIS HEALTHCARE, INC. AND ITS DEBTOR AFFILIATES**

**TO ALL CREDITORS, INTEREST HOLDERS, AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that, on [__], 2026, the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Second Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates* [Docket No. [__]] (the "Confirmation Order"),[2] confirming the *Debtors' Second Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and Its Debtor Affiliates* [Docket No. [__]] (as may be altered, amended, modified, or supplemented from time to time, including all exhibits and schedules thereto, the "Plan").

---

[1] The last four digits of Genesis Healthcare, Inc.'s federal tax-identification number are 4755. There are 299 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Confirmation Order, as applicable.

**PLEASE TAKE FURTHER NOTICE** that the Plan and the Confirmation Order contain provisions that may affect your rights, including certain release, injunction, and related provisions in Article VII of the Plan as approved by the Confirmation Order. **You are encouraged to review the Plan and the Confirmation Order in their entirety.**

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan, the Confirmation Order, and related pleadings may be obtained (i) free of charge at the website established by the Debtors' notice and claims agent, Epiq Corporate Restructuring, LLC at https://dm.epiq11.com/Genesis, (ii) from the Court's website at https://www.txnb.uscourts.gov via ECF/PACER, or (iii) upon request to the undersigned.

Dated: October [__], 2026
Dallas, Texas

**MCDERMOTT WILL & SCHULTE LLP**

*/s/ DRAFT*
Charles R. Gibbs (TX Bar No. 7846300)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
Email: crgibbs@mcdermottlaw.com

- and -

Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Landon W. Foody (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
Email: dsimon@mcdermottlaw.com
ekeil@mcdermottlaw.com
wguerrieri@mcdermottlaw.com
lfoody@mcdermottlaw.com

- and -

Gregg M. Galardi (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
Email: ggalardi@mcdermottlaw.com

*Counsel for the Debtors and Debtors-in-Possession*

**CERTIFICATE OF SERVICE**

I do hereby certify that on the date hereof, a true and correct copy of the foregoing was served via the Court's CM/ECF system to all parties authorized to receive electronic notice in these cases.

*/s/ DRAFT*
Charles R. Gibbs (TX Bar No. 7846300)

# EXHIBIT C

## Notice of Effective Date

**MCDERMOTT WILL & SCHULTE LLP**
Charles R. Gibbs (TX Bar No. 7846300)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
Email: crgibbs@mcdermottlaw.com

Gregg M. Galardi (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
Email: ggalardi@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Landon W. Foody (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
Email: dsimon@mcdermottlaw.com
ekeil@mcdermottlaw.com
wguerrieri@mcdermottlaw.com
lfoody@mcdermottlaw.com

*Counsel for the Debtors and*
*Debtors-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | ) | Case No. 25-80185 (SGJ) |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Related to Docket Nos. [__]** |

**NOTICE OF OCCURRENCE OF EFFECTIVE DATE OF DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN OF GENESIS HEALTHCARE, INC. AND ITS DEBTOR AFFILIATES**

**TO ALL CREDITORS, INTEREST HOLDERS, AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that, on [__], 2026, the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Second Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates* [Docket No. [__]] (the "Confirmation Order"),[2] confirming the *Debtors' Second Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and Its Debtor Affiliates* [Docket No. [__]] (as may be altered, amended, modified, or supplemented from time to time, including all exhibits and schedules thereto, the "Plan").

[1] The last four digits of Genesis Healthcare, Inc.'s federal tax identification number are 4755. There are 299 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at

**PLEASE TAKE FURTHER NOTICE** that on [__], 2026, the Effective Date of the Plan occurred. Each of the conditions precedent to the Effective Date set forth in Article VIII.B of the Plan has been satisfied or waived in accordance with Article VIII.D of the Plan and the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that the Plan and the Confirmation Order contain injunction and related provisions that may affect your rights, including the provisions set forth in Article VII of the Plan. Such provisions apply only to the extent and on the terms provided in the Plan, the Confirmation Order, and applicable orders of the Court.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Article XI.A of the Plan, on the Effective Date, the Plan became immediately effective, enforceable, and binding upon the Debtors, the Post-Restructuring Debtors, the Wind-Down Trust, the Wind-Down Trustee, the Liquidation Trust, the Liquidation Trustee, all Holders of Claims or Interests (irrespective of whether such Holders of Claims or Interests (1) are Impaired or Unimpaired, (2) have, or are deemed to have accepted the Plan, or (3) failed to vote to accept or reject the Plan), all Entities that are party to or subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and all non-Debtor parties to Executory Contracts or Unexpired Leases with the Debtors, and their respective successors and assigns, in each case to the extent provided in the Plan and the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Article II.E.1 of the Plan, each Professional required to file a Final Fee Application must file such application with the Court on or before [__], 202[_], the date that is sixty (60) days after the Effective Date, except as otherwise ordered by the Court. This requirement does not apply to ordinary course professionals that are not required to file Final Fee Applications under the applicable orders of the Court.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Article II.A of the Plan, except as otherwise provided in the Plan or an applicable Final Order, Holders of Administrative Expense Claims and Administrative PL/GL Claims arising on or after April 1, 2026 through the Effective Date, other than Professional Fee Claims and Independent Director Fee Claims, must submit a Proof of Administrative Expense Claim to Epiq Corporate Restructuring, LLC ("Epiq"), the Claims and Noticing Agent, on or before [__], 202[_], the date that is thirty (30) days after the Effective Date (the "Administrative Expense Claim Bar Date"), in accordance with the procedures in the Plan, Confirmation Order, and this notice.

**PLEASE TAKE FURTHER NOTICE that all parties required to file and serve requests for payment of Administrative Expense Claims or Administrative PL/GL Claims that fail to do so by the foregoing deadline shall be forever barred, estopped, and enjoined from asserting such Claims against the Debtors or their Estates, and such Claims shall be deemed disallowed, compromised, settled, and released as provided in Article II.A of the Plan.**

**PLEASE TAKE FURTHER NOTICE** that this notice does not extend, reopen, or otherwise modify the Interim Administrative Expense Claim Bar Date or any other previously established bar date, except to the extent expressly provided in the Plan, the Confirmation Order, or another applicable order of the Court.

https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

2 Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Confirmation Order, as applicable.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Article II.C of the Plan, any Person or Entity seeking allowance of a Substantial Contribution Claim based on facts or circumstances arising after the Petition Date must file an application with the Clerk of the Court on or before the Administrative Expense Claim Bar Date and serve the application on the Debtors, the Post-Restructuring Debtors, the Creditors' Committee, the Liquidation Trustee, their respective counsel, and the U.S. Trustee, and as otherwise required by the Court and the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Article V.A.1 of the Plan, the assumption and assignment of Executory Contracts and Unexpired Leases to the Buyer in connection with the Sale Transaction occurred on the Closing Date and is governed by the Sale Transaction Documents. Except as otherwise provided in the Plan or an agreement or document entered into in connection with the Plan, all Executory Contracts and Unexpired Leases are deemed rejected as of the Effective Date, other than those that: (a) were previously assumed, assumed and assigned to the Buyer, or rejected with Court approval; (b) expired or terminated under their own terms; (c) are the subject of a motion to assume or reject pending as of the Confirmation Date; (d) are specifically identified in the Plan, the Plan Supplement (including an Assumption Schedule), or another notice filed on the docket as to be assumed by the Debtors or assumed and assigned to the Buyer as of the Closing Date; (e) are subject to a pending Cure Dispute as of the Effective Date, in which case assumption, assignment, or rejection will occur, as applicable, upon resolution of that Cure Dispute; or (f) is an intercompany Executory Contract or Unexpired Lease to which only Debtor Entities are a party (except for (i) those to which solely the ACO Entities are a party, or to which the ACO Entities, on the one hand, and another Debtor Entity on the other, are party, all of which, unless identified on an Assumption Schedule, shall be automatically rejected as of the ACO Effective Date) and (ii) that certain *Amended and Restated Sub-Sublease Agreement* dated January 1, 2025 between Debtor Genesis PM PA Operations LLC and various Debtor Entities with respect to 22 Facilities in Pennsylvania, which shall be automatically rejected as of the Effective Date).

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Article V.C and Article V.D of the Plan, Proofs of Claim arising from (a) the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan or (b) the Debtors' indemnification obligations pursuant to their organizational documents must be filed with Epiq on or before [__], 202[_], the date that is thirty (30) days after the Effective Date (the "Rejection Damages Bar Date"). A different deadline may apply to a rejection approved by a separate order of the Court, as provided in the Plan or the applicable order.

**PLEASE TAKE FURTHER NOTICE THAT claims arising from the rejection of an Executory Contract or Unexpired Lease or from the Debtors' rejection of their Indemnification Obligations that are not timely filed by the Rejection Damages Bar Date will be automatically disallowed, forever barred from assertion, and unenforceable against the Debtors, their Estates, the Post-Restructuring Debtors, the Wind-Down Trust, the Liquidation Trust, their respective successors and assigns, and their respective assets and properties, as provided in Article V.C of the Plan.**

**PLEASE TAKE FURTHER NOTICE** that the Plan and the Confirmation Order contain other provisions that may affect your rights. You are encouraged to review those documents in their entirety. This notice summarizes certain provisions and does not amend the Plan, the Confirmation Order, or any other order of the Court.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan, the Confirmation Order, the Plan Supplement, and other documents filed in these Chapter 11 Cases may be obtained (i) free of charge at the website established by the Debtors' notice and claims agent, Epiq Corporate Restructuring, LLC at https://dm.epiq11.com/Genesis, (ii) from the Court's website at https://www.txnb.uscourts.gov via ECF/PACER, or (iii) upon request to the undersigned.

**THIS NOTICE CONTAINS DEADLINES THAT MAY AFFECT YOUR RIGHTS. PLEASE REVIEW THE PLAN, THE CONFIRMATION ORDER, AND THE APPLICABLE CLAIM-FILING INSTRUCTIONS CAREFULLY.**

Date: [__], 2026

**MCDERMOTT WILL & SCHULTE LLP**

*/s/ DRAFT*

Charles R. Gibbs (TX Bar No. 7846300)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
Email: crgibbs@mcdermottlaw.com

- and -

Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Landon W. Foody (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
Email: dsimon@mcdermottlaw.com
ekeil@mcdermottlaw.com
wguerrieri@mcdermottlaw.com
lfoody@mcdermottlaw.com

- and -

Gregg M. Galardi (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
Email: ggalardi@mcdermottlaw.com
*Counsel for Debtors and Debtors-in-Possession*

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true and correct copy of the foregoing was served by the Court's CM/ECF system on all counsel of record registered in these chapter 11 cases through CM/ECF.

*/s/ DRAFT*
Charles R. Gibbs (TX Bar No. 7846300)

# EXHIBIT D

## Notice of ACO Effective Date

**MCDERMOTT WILL & SCHULTE LLP**
Charles R. Gibbs (TX Bar No. 7846300)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
Email: crgibbs@mcdermottlaw.com

Gregg M. Galardi (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
Email: ggalardi@mcdermottlaw.com

**MCDERMOTT WILL & SCHULTE LLP**
Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Landon W. Foody (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
Email: dsimon@mcdermottlaw.com
ekeil@mcdermottlaw.com
wguerrieri@mcdermottlaw.com
lfoody@mcdermottlaw.com

*Counsel for the Debtors and Debtors-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| GENESIS HEALTHCARE, INC., *et al.*,[1] | ) | Case No. 25-80185 (SGJ) |
| Debtors. | ) | (Jointly Administered) |
| | ) | **Related to Docket Nos. [__]** |

**NOTICE OF OCCURRENCE OF EFFECTIVE DATE OF**
**CHAPTER 11 PLAN FOR DEBTORS LTC ACO, LLC AND PAI PARTICIPANT 1, LLC**

**TO ALL CREDITORS, INTEREST HOLDERS, AND OTHER PARTIES IN INTEREST:**

**PLEASE TAKE NOTICE** that, on [__], 2026, the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Court") entered the *Findings of Fact, Conclusions of Law, and Order Confirming the Debtors' Second Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and its Debtor Affiliates* [Docket No. [__]] (the "Confirmation Order"),[2] confirming the *Debtors' Second Amended Joint Chapter 11 Plan of Genesis Healthcare, Inc. and Its Debtor Affiliates* [Docket No. [__]] (as may be altered, amended, modified, or supplemented from time to time, including all exhibits and schedules thereto, the "Plan").

---

[1] The last four digits of Genesis Healthcare, Inc.'s federal tax identification number are 4755. There are 299 Debtors in these chapter 11 cases, which are being jointly administered for procedural purposes only. A complete list of the Debtors and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/Genesis. The location of Genesis Healthcare, Inc.'s corporate headquarters and the Debtors' service address is 101 East State Street, Kennett Square, PA 19348.

**PLEASE TAKE FURTHER NOTICE** that on [__], 2026, the effective date of the Plan with respect to LTC ACO, LLC and PAI Participant 1, LLC (together, the "ACO Entities") occurred (the "ACO Effective Date"). Please note that the Plan and the Confirmation Order contain injunction and related provisions that may affect your rights, including the provisions set forth in Article VII of the Plan. Such provisions apply only to the extent and on the terms provided in the Plan, the Confirmation Order, and applicable orders of the Court.

**PLEASE TAKE FURTHER NOTICE** that, on the ACO Effective Date, the Plan became immediately effective, enforceable, and binding upon the ACO Entities, all Holders of Claims or Interests with respect to the ACO Entities (irrespective of whether such Holders of Claims or Interests (1) are Impaired or Unimpaired, (2) have, or are deemed to have accepted the Plan, or (3) failed to vote to accept or reject the Plan), all non-Debtor parties to Executory Contracts or Unexpired Leases with the ACO Entities, and their respective successors and assigns, in each case to the extent provided in the Plan and the Confirmation Order.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Article II.A of the Plan, except as otherwise provided in the Plan or an applicable Final Order, Holders of Administrative Expense Claims and Administrative PL/GL Claims against the ACO Entities arising on or after April 1, 2026 through the ACO Effective Date, other than Professional Fee Claims and Independent Director Fee Claims, must submit a Proof of Administrative Expense Claim to Epiq Corporate Restructuring, LLC ("Epiq"), the Claims and Noticing Agent, on or before [__], 202[_], the date that is thirty (30) days after the ACO Effective Date (the "Administrative Expense Claim Bar Date"), in accordance with the procedures in the Plan, Confirmation Order, and this notice.

**PLEASE TAKE FURTHER NOTICE that all parties required to file and serve requests for payment of Administrative Expense Claims or Administrative PL/GL Claims with respect to the ACO Entities that fail to do so by the foregoing deadline shall be forever barred, estopped, and enjoined from asserting such Claims against the Debtors (including, for the avoidance of doubt, the ACO Entities) or their Estates, and such Claims shall be deemed disallowed, compromised, settled, and released as provided in Article II.A of the Plan.**

**PLEASE TAKE FURTHER NOTICE** that this notice does not extend, reopen, or otherwise modify the Interim Administrative Expense Claim Bar Date or any other previously established bar date, except to the extent expressly provided in the Plan, the Confirmation Order, or another applicable order of the Court.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Article V.A.1 of the Plan, all Executory Contracts and Unexpired Leases with respect to the ACO Entities are deemed rejected as of the ACO Effective Date, other than those that: (a) were previously assumed, assumed and assigned to the Buyer, or rejected with Court approval; (b) expired or terminated under their own terms; (c) are the subject of a motion to assume or reject pending as of the Confirmation Date; (d) are specifically identified in the Plan, the Plan Supplement (including an Assumption Schedule), or another notice filed on the docket as to be assumed by the Debtors or assumed and assigned to the Buyer as of the Closing Date; (e) are subject to a pending Cure Dispute as of the Effective Date, in which case assumption, assignment, or rejection will occur, as applicable, upon resolution of that Cure Dispute; or (f) is an intercompany Executory Contract or Unexpired Lease to which only Debtor Entities are a party (except for (i) those to which solely the ACO Entities are a party, or to which the ACO Entities, on the one hand, and another Debtor Entity on the other, are party, all of which, unless identified on an Assumption Schedule, shall be automatically rejected as of the ACO Effective Date and (ii) that certain *Amended and Restated Sub-Sublease Agreement* dated January 1, 2025

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the Confirmation Order, as applicable.

between Debtor Genesis PM PA Operations LLC and various Debtor Entities with respect to 22 Facilities in Pennsylvania, which shall be automatically rejected as of the Effective Date).

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Article V.C and Article V.D of the Plan, Proofs of Claim arising from (a) the rejection of Executory Contracts or Unexpired Leases to which the ACO Entities are a party pursuant to the Plan or (b) the ACO Entities' indemnification obligations pursuant to their organizational documents must be filed with Epiq on or before [__], 202[_], the date that is thirty (30) days after the ACO Effective Date (the "Rejection Damages Bar Date").

**PLEASE TAKE FURTHER NOTICE that claims arising from the rejection of an Executory Contract or Unexpired Lease to which the ACO Entities are a party or from the rejection of the ACO Entities' Indemnification Obligations that are not timely filed by the Rejection Damages Bar Date will be automatically disallowed, forever barred from assertion, and unenforceable against the Debtors, their Estates, the Post-Restructuring Debtors, the ACO Entities, the Wind-Down Trust, the Liquidation Trust, their respective successors and assigns, and their respective assets and properties, as provided in Article V.C and Article V.D of the Plan.**

**PLEASE TAKE FURTHER NOTICE** that the Plan and the Confirmation Order contain other provisions that may affect your rights. You are encouraged to review those documents in their entirety. This notice summarizes certain provisions and does not amend the Plan, the Confirmation Order, or any other order of the Court.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan, the Confirmation Order, the Plan Supplement, and other documents filed in these Chapter 11 Cases may be obtained (i) free of charge at the website established by the Debtors' notice and claims agent, Epiq Corporate Restructuring, LLC at https://dm.epiq11.com/Genesis, (ii) from the Court's website at https://www.txnb.uscourts.gov via ECF/PACER, or (iii) upon request to the undersigned.

**THIS NOTICE CONTAINS DEADLINES THAT MAY AFFECT YOUR RIGHTS. PLEASE REVIEW THE PLAN, THE CONFIRMATION ORDER, AND THE APPLICABLE CLAIM-FILING INSTRUCTIONS CAREFULLY.**

*[Remainder of Page Intentionally Left Blank]*

Date: [__], 2026

**MCDERMOTT WILL & SCHULTE LLP**

*/s/ DRAFT*
Charles R. Gibbs (TX Bar No. 7846300)
2801 N. Harwood Street, Suite 2600
Dallas, Texas 75201-1574
Telephone: (214) 295-8000
Facsimile: (972) 232-3098
Email: crgibbs@mcdermottlaw.com

- and -

Daniel M. Simon (admitted *pro hac vice*)
Emily C. Keil (admitted *pro hac vice*)
William A. Guerrieri (admitted *pro hac vice*)
Landon W. Foody (admitted *pro hac vice*)
444 West Lake Street, Suite 4000
Chicago, Illinois 60606
Telephone: (312) 372-2000
Facsimile: (312) 984-7700
Email: dsimon@mcdermottlaw.com
ekeil@mcdermottlaw.com
wguerrieri@mcdermottlaw.com
lfoody@mcdermottlaw.com

- and -

Gregg M. Galardi (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, New York 10017
Telephone: (212) 547-5400
Facsimile: (212) 547-5444
Email: ggalardi@mcdermottlaw.com

*Counsel for Debtors and Debtors-in-Possession*

**CERTIFICATE OF SERVICE**

I hereby certify that on this date a true and correct copy of the foregoing was served by the Court's CM/ECF system on all counsel of record registered in these chapter 11 cases through CM/ECF.

*/s/ DRAFT*
Charles R. Gibbs (TX Bar No. 7846300)